UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) |
| Plaintiff, | ) )   Civil Action No. |
| v. | ) ) |
| IFTIKAR AHMED, | )   **COMPLAINT** ) |
| Defendant, and | ) ) |
| IFTIKAR ALI AHMED SOLE PROP and I-CUBED DOMAINS, LLC, | )   JURY TRIAL DEMANDED ) |
| Relief Defendants. | ) ) |

## FILED UNDER SEAL

Plaintiff United States Securities and Exchange Commission ("the Commission") alleges

as follows for its complaint against Defendant Iftikar Ahmed, also known as Ifty Ahmed

("Ahmed"), and Relief Defendants Iftikar Ali Ahmed Sole Prop and I-Cubed Domains, LLC:

## SUMMARY

1.      This case involves fraud and self-dealing perpetrated by Ahmed in connection

with multiple investments he coordinated on behalf of a venture capital firm at which he was a

partner, Oak Investment Partners ("Oak"). As more fully outlined herein, from no later than

October 2013 through around December 2014, Ahmed recommended that Oak's funds make

multi-million dollar investments in three companies. These investments were made by two

separate pooled investment funds that Oak and Ahmed advised – funds whose money came from

public pension funds and other institutional and individual investors. Ahmed engaged in

fraudulent acts and made material misrepresentations with respect to each of these investment recommendations, thereby defrauding the Oak funds out of millions of dollars and personally obtaining ill-gotten profits.

2.      In the first of the investment recommendations, Ahmed arranged for one of Oak's funds to purchase shares of a Chinese e-commerce company at a price that was significantly higher than the price the sellers actually agreed to sell their shares. Ahmed then diverted the excess funds to an account that he controlled. Specifically, in August 2014, Ahmed negotiated for one of the Oak funds to purchase shares of the Chinese e-commerce company from a British Virgin Islands company (the "BVI Company") that held those shares. Although Ahmed knew that the third party seller was willing to sell these shares for $1.5 million, Ahmed recommended that the Oak fund purchase the same shares for approximately $3.5 million. Based on Ahmed's recommendation, which also included false representations about the finances of the Chinese e-commerce company, the Oak fund made the purported $3.5 million investment.  Oak wired the purchase price to an account that Ahmed claimed was held by the BVI Company, but was in fact controlled by Ahmed through Relief Defendant Iftikar Ali Ahmed Sole Prop ("Ahmed Sole Prop").

3.      A few months later, Ahmed engaged in similar misconduct concerning a second investment recommendation. In December 2014, Ahmed arranged for another Oak fund to purchase shares in an Asia-based joint venture from one of the joint venture's two partners. Although Ahmed knew that the joint venture partner was willing to sell its shares for $2 million, Ahmed recommended that the Oak fund purchase the shares for $20 million. To support this inflated valuation, Ahmed again made false representations to Oak about the finances of the joint venture. Ahmed also claimed that the $20 million payment was to be split between the two joint

venture partners. Ahmed claimed that $2 million was to be paid to the selling partner and $18 million was to be paid to the BVI Company, which held a controlling interest in the joint venture partner that was not selling its shares (the "BVI Subsidiary"). On December 18, 2014, the day before this deal closed, Ahmed represented to Oak personnel that upon the closing of the transaction, the Oak fund's $18 million payment to the BVI Company would "immediately" flow into the joint venture. Ahmed, however, arranged for Oak to wire $18 million to the account belonging to Relief Defendant Ahmed Sole Prop – the account that he had previously used to defraud another Oak fund and its investors. Further, notwithstanding Ahmed's representations, the Oak fund's $18 million payment to Ahmed Sole Prop was never transferred into the joint venture.

4.      In the third investment recommendation, Ahmed advised an Oak fund to make two separate investments in a U.S.-based e-commerce company, while concealing from Oak and the Oak fund that he controlled another investor in that company, Relief Defendant I-Cubed Domains, LLC ("I-Cubed"). I-Cubed was formed in 2012 with Ahmed as its sole initial member, and remained owned and controlled by Ahmed and/or his wife at all times relevant to this complaint. Even so, Ahmed never disclosed – and in fact affirmatively misrepresented – his relationship with I-Cubed to Oak and/or the Oak fund.

5.      In October 2013, Ahmed arranged for the Oak fund to purchase $25 million in stock directly from the e-commerce company. At the time of that purchase, I-Cubed was also an investor in the e-commerce company; it had purchased shares in late 2012 and was one of only approximately 20 shareholders. Thus, unbeknownst to the Oak fund, it was putting millions of dollars into a company in which Ahmed and/or his wife (through I-Cubed) also owned a significant stake.

3

6.      Approximately a year later, in October 2014, Ahmed advised the Oak fund to purchase additional shares of the e-commerce company, but this time recommended the fund purchase the shares directly from I-Cubed, the company that he and/or his wife controlled. Despite the fact that I-Cubed had acquired these shares for only $2 million in late 2012, Ahmed recommended that the Oak fund purchase the shares for $7.5 million – a price increase of nearly 300%. The Oak fund made Ahmed's recommended investment without knowing it was buying the shares from an entity that Ahmed and/or his wife controlled. Ahmed's self-dealing breached his fiduciary duties to the fund.

7.      As a result of his misconduct, Defendant Ahmed violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 206(1), 206(2), 206(3), and 206(4) of the Investment Advisers Act 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(3)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8]. Further, Relief Defendants Ahmed Sole Prop and I-Cubed received illicit proceeds from Ahmed's fraud to which they have no legitimate claim.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

8.      The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)].

9.      The Commission seeks an emergency asset freeze against Defendant Ahmed and Relief Defendants Ahmed Sole Prop and I-Cubed, in order to preserve assets necessary to satisfy any eventual judgment against them. The Commission also seeks an immediate accounting of

assets, an order preventing the destruction of documents, and an order for expedited discovery and alternative means of service.

10.     The Commission also seeks a permanent injunction against Defendant Ahmed enjoining him from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, disgorgement of all ill-gotten gains from the unlawful activity set forth in this Complaint, together with prejudgment interest, and civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]. The Commission further seeks a final judgment ordering Relief Defendants Ahmed Sole Prop and I-Cubed to disgorge the ill-gotten gains held in their accounts or otherwise received by them, and to pay prejudgment interest thereon. The Commission also seeks any other relief that the Court may deem appropriate.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa] and Sections 209(d) and 214 of the Advisers Act [15 U.S.C. §§ 80b-9(d) and 80b-14]. Defendant Ahmed, directly or indirectly, made use of the means or instrumentalities of interstate commerce, or of the mails, or the means or instruments of transportation or communication in interstate commerce, in connection with the acts, practices, and courses of business set forth in this Complaint.

12.     Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], Section 214 of the Advisers Act [15 U.S.C. § 80b-14], and 28 U.S.C. § 1391(b). Defendant Ahmed is a resident of Greenwich,

Connecticut and Relief Defendant Ahmed Sole Prop's bank account is registered to an address in Greenwich, Connecticut. In addition, many of the acts, practices, and transactions described in this Complaint occurred within the District of Connecticut.

## DEFENDANT

13.   **Ahmed**, 43, currently resides in Greenwich, Connecticut. He has been a general partner at Oak since 2004. Before joining Oak, he worked as an investment professional at other financial industry companies. He graduated with a degree in engineering from the Indian Institute of Technology, New Delhi and earned his MBA from Harvard Business School. As more fully outlined herein, Ahmed engaged in fraudulent conduct in connection with at least three investment opportunities that he identified for Oak and its funds – fraud that resulted in the loss of millions of dollars of money investors had contributed to Oak's funds.

## RELIEF DEFENDANTS

14.   **Ahmed Sole Prop** is a purported business with a bank account at a large national bank. The address associated with Ahmed Sole Prop's bank account is Ahmed's home address in Connecticut.  This purported business account was sometimes described as Ahmed Sole Prop doing business as ("dba") the BVI Company.  As discussed in more detail below, Ahmed took advantage of the account's reference to the BVI Company to fraudulently induce Oak and its investors to transfer funds into this account. Approximately $21.5 million was wired from Oak's funds to Ahmed Sole Prop in connection with two of Ahmed's fraudulent investment recommendations.

15.   **I-Cubed** is a Delaware limited liability company that was formed in 2012, with Ahmed as its initial sole member. In or about May 2013, Ahmed assigned his interest in I-Cubed

6

to his wife. As more fully outlined herein, in October 2014 I-Cubed sold shares directly to one of the Oak funds Ahmed advised and received $7.5 million in proceeds from this transaction.

## FACTS

### Ahmed's Role with Oak

16.     Oak is a multistage venture capital firm with offices in Norwalk and Greenwich, Connecticut. Oak advises several funds, or "pooled investment vehicles," each of which uses money raised from various investors to make investments in companies. Investors in the funds include individual investors and institutional investors, such as public pension funds.

17.     Ahmed's role as general partner at Oak included identifying and recommending investment opportunities for the funds that Oak advised, including specifically recommending the purchase of securities and advising on the purchase price of those securities. Ahmed also managed and monitored the investments that he recommended. At times, Ahmed was appointed to the boards of directors of the companies in which the funds invested. Ahmed was compensated for his role in advising the funds and helping to manage the funds' investments, and he received additional compensation when the investment opportunities he recommended were particularly successful.

18.     Section 202(a)(11) of the Advisers Act defines an investment adviser as "any person who, for compensation, engages in the business of advising others ... as to the value of securities or the advisability of investing in, purchasing, or selling securities ...." In light of his roles and responsibilities, Ahmed was an investment adviser under the terms of the Advisers Act.

19.     As an investment adviser, Ahmed owed fiduciary duties to the funds that he advised on Oak's behalf, including the funds involved in the transactions described below. These duties included the duty to act for the benefit of the funds, the duty to exercise the utmost good

7

faith in dealing with the funds, and the duty to disclose all material facts related to any actual or

potential investments by the funds. Further, as a fiduciary, Ahmed was required to avoid

improper self-dealing. As detailed below, Ahmed breached these duties and engaged in fraud.

### Ahmed Recommended an Investment in Company A

20.     In or about August 2014, Ahmed recommended that one of Oak's funds, Oak

Investment Partners XIII, LP ("Oak XIII"), purchase shares in an e-commerce company

operating in Asia ("Company A"). Ahmed recommended that Oak XIII purchase those shares,

not directly from Company A, but from a British Virgin Islands company, the BVI Company,

that was looking to sell its investment in Company A. Ahmed was a member of the BVI

Company's board of directors.

21.     On or about the evening of Sunday, August 10, 2014, Ahmed sent an e-mail to

Oak partners seeking approval for the purchase of Company A's shares from the BVI Company.

In making this recommendation, Ahmed represented that Company A "continues to grow fast

and do quite well," and that it had "crossed a million $ in revenues in June and turned a little

profit too." Ahmed urged that the deal needed to be done quickly.

22.     Ahmed attached to his August 10 e-mail a report recommending that Oak XIII

purchase Company A's shares from the BVI Company at a price of approximately $3.544

million.

23.     By at least August 12, 2014, Oak XIII made the purported $3.544 million

purchase of Company A's shares. On or about August 12, 2014, Ahmed forwarded to Oak

personnel what he claimed were the final, executed deal documents, with the note: "All signed

docs are in. Good to wire and close the purchase." The purchase price listed in both the signed

8

resolution of the BVI Company's board of directors and the share purchase agreement was $3.544 million. Ahmed was the sole representative of Oak XIII signing on behalf of the fund.

24.     Also on or about August 12, 2014, Ahmed submitted a check request asking that the $3.544 million be paid, purportedly to the BVI Company. Ahmed also provided Oak with wiring instructions which stated that the funds were to be sent to a bank account that belonged to the BVI Company. The request was approved, and the funds were wired on behalf of Oak XIII to the designated account.

### Ahmed's Fraudulent Acts and Misrepresentations Related to the Company A Investment

25.     Ahmed made significant misrepresentations, and engaged in fraudulent and deceptive conduct, in connection with this recommendation. As detailed below, Ahmed knew that the actual price at which the BVI Company sold its shares of Company A was $1.5 million, not the $3.544 million Ahmed represented to Oak and Oak XIII. Ahmed misrepresented the financial condition of Company A, provided Oak with altered deal documents, and fraudulently arranged for Oak XIII funds to be wired to the Ahmed Sole Prop account.

26.     The Selling Company's board of directors consisted of three individuals: Ahmed and two others. On or about July 30, 2014, Ahmed corresponded with one of the other BVI Company board members about the potential sale of its Company A shares. Ahmed claimed he had negotiated a sale of the shares for $1.5 million, but that the third party buyer was now skeptical of that price in light of Company A's "declining revenues" and "significant loss" of business. Ahmed suggested he believed he could convince the buyer to purchase the shares for approximately $1.3 million. The board member indicated that he was comfortable with a sale at that price.

27.     On or about the morning of Monday, August 11, 2014, Ahmed e-mailed the two other BVI Company board members claiming that the potential buyer "ke[pt] going back on price." Ahmed proposed that the BVI Company sell its shares of Company A to Oak rather than a third party buyer. Ahmed claimed that "the fair price would be $1.5MM."

28.     In stark contrast to his statements to the other BVI Company board members, Ahmed recommended that Oak XIII pay $3.544 million to purchase the BVI Company's stake in Company A. In making this recommendation, Ahmed misrepresented the financial condition of Company A. As noted above, in his August 10, 2014 email recommending the investment to Oak, Ahmed claimed that Company A was "do[ing] quite well" financially, had more than $1 million in revenues in June 2014, and had "turned a little profit too." In fact, on or about August 8, 2014, Ahmed had received information about Company A's financials, which noted that estimated revenues for June 2014 were approximately $725,000, and the company had a net loss of more than $200,000.

29.     Similarly, the day after he had recommended the investment to Oak, Ahmed e-mailed the other two BVI Company board members noting that Company A's "week on week revenues … have declined" and that the company "is still losing money and will need more funding down the line."

30.     By August 12, 2014, Ahmed received approval from the BVI Company board members to proceed with the sale of Company A shares at a price of $1.5 million. Later that day, Ahmed e-mailed the deal documents reflecting the $1.5 million purchase price to the other two BVI Company board members for their signatures. The two Selling Company board members separately e-mailed to Ahmed executed versions of these deal documents that were signed on or about August 11 and August 12, 2014.

10

31.     To conceal his fraud, however, Ahmed provided Oak with altered deal documents. On August 12, 2014, after Ahmed had received executed copies of the deal documents from both of the other BVI Company board members, Ahmed emailed to Oak personnel executed deal documents that falsely depicted a purchase price of $3.544 million.

32.     In addition to misrepresenting Company A's finances and using altered deal documents that overstated the actual purchase price, Ahmed caused Oak XIII's money to be wired to a bank account that he controlled. Specifically, the wiring instructions Ahmed provided to Oak were not for an account held by the BVI Company, as Ahmed claimed in the wiring instructions, but rather were for the account held by Relief Defendant Ahmed Sole Prop.

33.     As noted above, the full name of the Ahmed Sole Prop bank account misleadingly suggested that Ahmed Sole Prop was "doing business as" the BVI Company. In fact, the bank account was controlled by Ahmed and registered to Ahmed's home address.

34.     Further, on or about August 15, 2014, Ahmed transferred $2 million from the Ahmed Sole Prop bank account to a bank account held in the name of Ahmed and his wife. That same day, Ahmed wrote a $2 million check from that personal bank account to his wife. On or about August 18, 2014, Ahmed transferred an additional $44,113 and $600 from the Ahmed Sole Prop bank account to the personal bank account held in the name of Ahmed and his wife. These three transfers from the Ahmed Sole Prop bank account to Ahmed and his wife's personal bank account equal almost exactly the difference between the approximately $3.544 million price Oak XIII believed it was paying for the Company A shares, and the $1.5 million price for which the shares were actually sold.

35.     By virtue of his misconduct, Ahmed misled Oak XIII and Oak XIII's investors, defrauding them of more than $2 million.

11

## Ahmed Recommended an Investment in Company B

36.     The Company A investment was not the only instance in which Ahmed misrepresented the price of a deal, used altered deal documents, and caused a significant loss of money that investors had put into an Oak fund. In or about December 2014, Ahmed recommended to Oak that another one of its funds, Oak Investment Partners XII, LP ("Oak XII") make an investment in a joint venture that provided e-commerce services in the Asian market ("Company B"). Company B had been formed by two existing companies: (1) a Cayman Islands company headquartered in China ("Joint Venture Party 1") and (2) a Singapore business subsidiary controlled by the BVI Company referenced above (the "BVI Subsidiary"). At the time of Ahmed's recommendation, Joint Venture Party 1 was seeking to sell its stake in Company B.

37.     Ahmed recommended that Oak XII purchase Joint Venture Party 1's shares in Company B, at a price of $20 million. As part of his recommendation, on or about December 15, 2014, Ahmed prepared a report on the proposed transaction. That report reiterated that the purchase price of the shares owned by Joint Venture Party 1 was $20 million. The report also contained detailed financial information about Company B.

38.     Ahmed further told Oak and Oak XII that the $20 million purchase price would be split, with $2 million being paid directly to Joint Venture Party 1 (the selling party) and the remaining $18 million being paid to the BVI Company. In response to questions from Oak personnel about this payment structure, Ahmed sent an e-mail on or about December 18, 2014 claiming that the $18 million would "flow in to" Company B through the BVI Company "immediately at close."

12

39.     Based on Ahmed's recommendation and representations, on or about December 19, 2014, Oak XII agreed to make the $20 million investment and purchased Company B's shares.

40.     On or about December 19, 2014, Ahmed submitted a check request detailing the payment structure. Specifically, consistent with Ahmed's earlier recommendation, Ahmed requested that $2 million be paid to Joint Venture Party 1 and $18 million be paid to the BVI Company. Ahmed provided Oak with wiring instructions for these funds. According to the wiring instructions, the $18 million was to be sent to a bank account that was in the name of the BVI Company. The account, however, was actually a personal account that Ahmed controlled and opened in the name of Relief Defendant Ahmed Sole Prop.

41.     As noted above, the full name of the Relief Defendant Ahmed Sole Prop bank account misleadingly suggested that Ahmed Sole Prop was "doing business as" the BVI Company.

42.     On or about December 19, 2014, Oak personnel wired the requested funds on behalf of Oak XII to the accounts Ahmed had designated.

43.     On or about December 29, 2014, one of Oak's employees requested additional information from Ahmed about the payment structure, and specifically asked for details and documentation of the $18 million payment purportedly made to the BVI Company. In response, on or about January 3, 2015, Ahmed e-mailed the Oak employee what Ahmed claimed were the final, executed deal documents. Those documents reflected a purchase price of $20 million.

44.     Ahmed further told the Oak employee that the payment was structured the way it was at the joint venture parties' request. In another e-mail sent on or about January 3, 2015, Ahmed stated: "Just so you are clear on the funding, the purchase of [Joint Venture Party 1's]

13

shares was for the entire $20MM, but netted out for a $18MM obligation that [Joint Venture Party 1] had to [the BVI Company] ... and hence the fund flows were as we did. The gross purchase price from Oak was $20MM but the net amount to [Joint Venture Party 1] was $2MM."

### Ahmed's Fraudulent Acts and Misrepresentations Related to the Company B Investment

45.     Ahmed's representations to Oak and Oak XII were false, and his actions were fraudulent. As detailed below, Ahmed knew that the actual purchase price for Joint Venture Party 1's shares in Company B was $2 million, not the $20 million that Ahmed represented. While Ahmed claimed that the $18 million surplus was to be paid to the BVI Company, the parent company of the other joint venture partner, the BVI Subsidiary, Ahmed directed Oak XII to pay $18 million to Relief Defendant Ahmed Sole Prop's account that was in fact associated with Ahmed's home address.

46.     In order to justify the grossly exaggerated purchase price of $20 million, Ahmed misrepresented Company B's financial condition in the investment report that he prepared for and presented to Oak and Oak XII. Prior to preparing his report, Ahmed asked for and received from Company B financial projections for the current year and the next several years. Ahmed included this same type of information in the report, but the figures were often materially different. For example, the financial projections Ahmed received from Company B indicated that the estimated value of the merchandise it expected to sell in 2014 was approximately 42.6 million RMB[1]; the information Ahmed included in the report claimed a merchandise value of 142.6 million RMB. Similarly, the financial projections Ahmed received from Company B projected revenues in 2014 of 2.918 million RMB; Ahmed's report indicated projected revenues

---

[1] "RMB" is the denotation of China's currency, the renminbi.

of 12.918 million RMB. As a result, Ahmed's report made Company B's financial condition appear significantly more robust than it actually was.

47.     On or about December 19, 2014, the share purchase agreement and other related documents for Oak XII's purchase of Joint Venture Party 1's shares were executed by the parties to the deal. Ahmed was the sole representative signing these deal documents on behalf of Oak XII. Later that day, the executed deal documents were circulated by e-mail to the parties to the deal. The executed deal documents clearly state that the purchase price was $2 million. Indeed, a press release issued by Joint Venture Party 1 confirmed that it had sold its shares of Company B to Oak XII for $2 million.

48.     Notwithstanding his knowledge of the actual purchase price, Ahmed caused $18 million of the inflated $20 million purchase price to be wired to an account that he controlled. As outlined above, the account that Ahmed informed Oak was held by the BVI Company, the parent company of the remaining joint venture partner, the BVI Subsidiary, was in fact held in the name of Relief Defendant Ahmed Sole Prop. Furthermore, the address associated with that account was Ahmed's home address in Connecticut.

49.     In an attempt to cover his tracks, Ahmed e-mailed altered deal documents to an Oak employee after the transaction was completed. On or about January 3, 2015, Ahmed emailed to the Oak employee a document that purported to be the final executed share purchase agreement. The document was nearly identical to the actual final share purchase agreement that Ahmed and the other parties had signed approximately two weeks earlier, with one significant difference:  Ahmed had changed the purchase price term of the agreement from $2 million to $20 million.

15

50.     By virtue of his misconduct, Ahmed misled Oak XII and Oak XII's investors, defrauding them of $18 million.

### Ahmed Recommended an Investment in Company C

51.     Ahmed also engaged in fraud and self-dealing in connection with another investment recommendation to Oak XIII. In 2013 and 2014, Ahmed recommended that Oak XIII make two separate investments in a U.S.-based e-commerce company ("Company C"). In or about November 2012, Company C engaged in an initial round of financing. One of the investors in this initial round of financing was Relief Defendant I-Cubed.

52.     In or about October 2013, as Company C was engaged in a second round of financing, Ahmed made a recommendation that Oak XIII invest in Company C. Based on Ahmed's recommendation, on or about October 11, 2013, Oak XIII invested $25 million and purchased shares directly from Company C. At the time of this investment, I-Cubed was one of approximately twenty shareholders in Company C.

53.     Approximately one year later, in or about October 2014, Ahmed recommended that Oak XIII make a second investment in Company C. Rather than purchase shares directly from Company C, this time Ahmed recommended that Oak XIII purchase shares from I-Cubed. Specifically, Ahmed recommended that Oak XIII purchase the shares that I-Cubed had acquired in or around November 2012, during Company C's initial round of financing. Although I-Cubed had paid only $2 million for these shares, Ahmed recommended that Oak XIII purchase the shares from I-Cubed at a price of $7.5 million. Ahmed assisted with the justification of the $7.5 million purchase price by providing purported revenue projections for Company C.

54.     Based on Ahmed's recommendation, Oak XIII made its second, $7.5 million investment in Company C. On or about October 30, 2014, a stock purchase agreement was

16

executed between Oak XIII and I-Cubed. The stock purchase agreement was signed by Ahmed on behalf of Oak XIII, and purportedly signed by a different individual on behalf of I-Cubed. On or about that same day, Oak personnel wired $7.5 million on behalf of Oak XIII to an I-Cubed bank account, in exchange for all of I-Cubed's shares in Company C.

### Ahmed's Fraudulent Acts and Misrepresentations Related to the Company C Investment

55.     Ahmed defrauded Oak XIII in connection with the investments in Company C. Most notably, Ahmed never disclosed to Oak, Oak XIII, or Oak XIII's investors his relationship with I-Cubed, violating his fiduciary duties to act in the best interest of his clients and to avoid self-dealing.

56.     As explained above, I-Cubed was formed in 2012 with Ahmed as its sole initial member.

57.     In or about November 2012, Ahmed was directly involved in I-Cubed's purchase of Company C shares for $2 million. At that time, Ahmed was still the sole member of I-Cubed. Moreover, the funds that I-Cubed used to purchase Company C's shares were wired from a brokerage account registered to Ahmed and his wife at Ahmed's home address.

58.     On or about May 16, 2013, Ahmed assigned his interest in I-Cubed to his wife. On information and belief, ninety-nine percent of that ownership interest in I-Cubed may later have been transferred to a trust in his wife's name. In any event, the ownership of I-Cubed remained with Ahmed and/or his family at all times relevant to this Complaint.

59.     Ahmed failed to disclose his interest in I-Cubed to Oak or Oak XIII in connection with the fund's investments in Company C. Specifically, when Oak XIII made its initial $25 million investment in Company C in or around October 2013, Ahmed failed to disclose that he and his wife (through her ownership of I-Cubed) held a sizable investment in Company C.

17

60.     In or about June 2013, Ahmed expressly represented to Oak's chief operating officer that he had "NO personal investment or any direct beneficial interest or investment in" Company C. This statement was false and misleading in light of the fact that Ahmed's wife owned I-Cubed, which (in turn) owned shares of Company C.

61.     Ahmed further failed to disclose his family's interest during the October 2014 transaction in which Oak XIII purchased Company C shares directly from I-Cubed for $7.5 million – a sale that allowed I-Cubed to generate a $5.5 million profit on the shares that it had purchased for $2 million just two years earlier.

62.     By virtue of Ahmed's fraud, concealment, and self-dealing, Oak XIII's investments in Company C were made without knowing that it was investing in a company in which Ahmed himself held a significant interest.

## Relief Defendants Received Ill-Gotten Gains

63.     As detailed above, Relief Defendant Ahmed Sole Prop received proceeds from Ahmed's misconduct in connection with two Oak funds' investments in Companies A and B. Ahmed Sole Prop has no legitimate claim to these funds.

64.     As detailed above, Relief Defendant I-Cubed received proceeds from Ahmed's misconduct in connection with Oak XIII's investment in Company C. I-Cubed has no legitimate claim to these funds.

## FIRST CLAIM FOR RELIEF
### Fraud in the Purchase or Sale of Securities in Violation of
### Section 10(b) of the Exchange Act and Rule 10b-5
### (Against Defendant Ahmed)

65.     The Commission realleges and incorporates by reference paragraphs 1 through 64, as if fully set forth herein.

66.     As a result of the conduct alleged herein, Defendant Ahmed, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, and with scienter:

(a)     employed a device, scheme, or artifice to defraud;

(b)     made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit upon any person.

67.     By virtue of the foregoing, Defendant Ahmed, directly or indirectly, violated, and unless enjoined, will again violate Section 10(b) of the Exchange Act [15 U.S.C. 78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5] thereunder.

### SECOND CLAIM FOR RELIEF
### Fraud in the Offer or Sale of Securities in Violation of
### Section 17(a) of the Securities Act
### (Against Defendant Ahmed)

68.     The Commission realleges and incorporates by reference paragraphs 1 through 64, as if fully set forth herein.

69.     As a result of the conduct alleged herein, in connection with the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

(1)     with scienter, employed a device, scheme, or artifice to defraud;

(2)     obtained money or property by means of untrue statements of a material

fact or omission to state material facts necessary in order to make the statements made, in light of

the circumstances under which they were made, not misleading; or

(3)     engaged in a transaction, practice, or course of business which operated or

would operate as a fraud or deceit upon the purchaser.

70.     By virtue of the foregoing, Defendant Ahmed, directly or indirectly, violated, and

unless enjoined, will again violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## THIRD CLAIM FOR RELIEF
### Fraud by an Investment Adviser in Violation of
### Sections 206(1) and 206(2) of the Advisers Act
### (Against Defendant Ahmed)

71.     The Commission realleges and incorporates by reference paragraphs 1 through

64, as if fully set forth herein.

72.     As a result of the conduct alleged herein, Defendant Ahmed, while acting as an

investment adviser, by the use of the mails or any means or instrumentality of interstate

commerce, directly or indirectly:

(1)     with scienter, employed a device, scheme, or artifice to defraud; or

(2)     engaged in a transaction, practice, or course of business which operated as

a fraud or deceit upon a client or prospective client.

73.     By virtue of the foregoing, Defendant Ahmed, directly or indirectly, violated, and

unless enjoined, will again violate Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §

80b-6(1) and 80b-6(2)].

20

## FOURTH CLAIM FOR RELIEF
### Undisclosed Principal Transaction in Violation of
### Section 206(3) of the Advisers Act
### (Against Defendant Ahmed)

74.     The Commission realleges and incorporates by reference paragraphs 1 through 64, as if fully set forth herein.

75.     As a result of the conduct alleged herein, and specifically Defendant Ahmed's conduct in regard to Relief Defendant I-Cubed's sale of Company C shares to Oak XIII in or about October 2014, Defendant Ahmed, while acting as an investment adviser, by the use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, acting as a principal for his own account, knowingly sold a security to a client without disclosing to such client in writing before the completion of such transaction the capacity in which he was acting and obtaining the consent of the client to such transaction.

76.     By virtue of the foregoing, Defendant Ahmed, directly or indirectly, violated, and unless enjoined, will again violate Section 206(3) of the Advisers Act [15 U.S.C. § 80b-6(3)].

## FIFTH CLAIM FOR RELIEF
### Fraud on Pooled Investment Vehicle Investors in Violation of
### Section 206(4) of the Advisers Act and Rule 206(4)-8
### (Against Defendant Ahmed)

77.     The Commission realleges and incorporates by reference paragraphs 1 through 64, as if fully set forth herein.

78.     As a result of the conduct alleged herein, Defendant Ahmed, while acting as an investment adviser to various pooled investment vehicles, by the use of the mails or any means or instrumentality of interstate commerce, directly or indirectly engaged in acts, practices, or courses of business which were fraudulent, deceptive, or manipulative. Defendant Ahmed:

21

(1)    made untrue statements of material facts and omitted to state material

facts necessary to make the statements made, in light of the circumstances under which they

were made, not misleading to an investor or prospective investor in the pooled investment

vehicles; or

(2)    otherwise engaged in acts, practices, or courses of business that were

fraudulent, deceptive, or manipulative with respect to an investor or prospective investor in the

pooled investment vehicles.

79.    By virtue of the foregoing, Defendant Ahmed, directly or indirectly, violated, and

unless enjoined, will again violate Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and

Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

<h2 style="text-align:center">SIXTH CLAIM FOR RELIEF</h2>

**Equitable Disgorgement**
**(Against Relief Defendant Ahmed Sole Prop)**

80.    The Commission realleges and incorporates by reference paragraphs 1 through

64, as if fully set forth herein.

81.    Relief Defendant Ahmed Sole Prop's bank account received and held proceeds of

Defendant Ahmed's fraudulent transactions involving Company A and Company B.

82.    Relief Defendant Ahmed Sole Prop has no legitimate claim to these illicit

proceeds.

83.    Relief Defendant Ahmed Sole Prop obtained the funds under circumstances in

which it is not just, equitable, or conscionable for it to retain the funds, and therefore has been

unjustly enriched.

## SEVENTH CLAIM FOR RELIEF
### Equitable Disgorgement
### (Against Relief Defendant I-Cubed)

84.    The Commission realleges and incorporates by reference paragraphs 1 through 64, as if fully set forth herein.

85.    Defendant Ahmed controls Relief Defendant I-Cubed.

86.    Relief Defendant I-Cubed's bank account received and held proceeds of Defendant Ahmed's fraudulent transaction involving Relief Defendant I-Cubed's sale of Company C shares in October 2014.

87.    Relief Defendant I-Cubed has no legitimate claim to these illicit proceeds.

88.    Relief Defendant I-Cubed obtained the funds under circumstances in which it is not just, equitable, or conscionable for it to retain the funds, and therefore has been unjustly enriched.

## RELIEF SOUGHT

**WHEREFORE**, the Commission respectfully requests that this Court enter an emergency, temporary, and preliminary order freezing the assets of Defendant and Relief Defendants, requiring a sworn accounting, prohibiting the destruction of documents, and ordering expedited discovery and alternative means of service.

Further the Commission respectfully requests that this Court enter a Final Judgment:

### I.

Finding that the Defendant committed the violations alleged in this Complaint;

## II.

Permanently restraining and enjoining the Defendant and his agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with him, who receive actual notice of the Final Judgment by personal service or otherwise, and each of them, from engaging in transactions, acts, practices, and courses of business described herein, and from engaging in conduct of similar purport and object in violation of Section 17(a) of Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder, and Sections 206(1), 206(2), 206(3), and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2), 80b-6(3), and 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8];

## III.

Directing the Defendant and the Relief Defendants to disgorge all ill-gotten gains received during the period of violative conduct and pay prejudgment interest on such ill-gotten gains;

## IV.

Directing the Defendant to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]; and

## V.

Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

The Commission demands a jury in this matter.

Dated: May 6, 2015

Respectfully submitted,

John B. Hughes (CT05289)
Connecticut Federal Bar No. ct05289
Assistant United States Attorney
Chief, Civil Division
United States Attorney's Office
Connecticut Financial Center
157 Church St., 25th Floor
New Haven, CT 06510
Ph: (203) 821-3700
Fax: (203) 773-5373
E-mail: John.Hughes@usdoj.gov

Nicholas P. Heinke (Colo. Bar No. 38738)
Connecticut Bar No. phv07374
Mark L. Williams (New York Bar No. 4796611)
Connecticut Bar No. phv07375
United States Securities and Exchange Commission
1961 Stout St., Suite 1700, Denver, CO  80294
Phone:     (303) 844-1000 (main)
               (303) 844-1071 (Heinke)
               (303) 844-1027 (Williams)
E-mail:    HeinkeN@sec.gov
               WilliamsML@sec.gov

*Attorneys for Plaintiff*
UNITED STATES SECURITIES AND EXCHANGE
COMMISSION

25