## SECOND DECLARATION OF GRACE A. AMES

I, GRACE A. AMES, pursuant to 28 U.S.C. § 1746, declare as follows:

**Background**

1.      I am the Chief Operating Officer of Oak Management Corporation ("OMC").  I also am a Managing Member of certain limited liability companies that serve as general partners of venture capital investment funds ("Oak Funds") for which OMC is the investment manager (OMC, the Oak Funds and their general partners, d/b/a Oak Investment Partners, are collectively referred to herein as "Oak").  The information set forth herein is based on my personal knowledge and my review of documents.

2.      I executed a Declaration on May 5, 2015 that detailed three fraudulent transactions perpetrated by Iftikar A. Ahmed, a former Oak investment professional, during 2014.  In connection with those three transactions, Mr. Ahmed fraudulently directed Oak Funds to transfer millions of dollars to accounts at Bank of America that were, unbeknownst to Oak, controlled by Mr. Ahmed.  On May 18, 2015, OMC terminated its relationship with Mr. Ahmed, following notice of such termination on May 8, 2015.

3.      In addition to the transactions discussed in my prior declaration, Oak's ongoing review has identified other fraudulent transactions by Mr. Ahmed from 2005 to 2013. As set forth more fully below, Oak's review has discovered that Mr. Ahmed, among other things, (1) misrepresented the purchase price for certain Oak investments, enabling him to siphon off the excess to accounts he secretly controlled, including an unauthorized account he established using Oak's name; (2) created fictitious invoices that he used to cause Oak to send funds to accounts that he falsely claimed were for Oak portfolio companies; and (3) directed Oak portfolio companies to pay fees and expenses owed to Oak by sending funds to the account he had

established in Oak's name.  All of these fraudulent transactions involved the use of accounts at the Bank of America controlled by Mr. Ahmed.

4.     As a result of the transactions discussed below, Mr. Ahmed fraudulently misappropriated an additional $28,615,383 from Oak Funds.

**Misrepresentations As To The Purchase Price For Oak Investments**

5.     On several occasions when the relevant contract for an Oak investment denominated the purchase price in a foreign currency, Mr. Ahmed caused Oak Funds to overpay for the investment by misrepresenting the purchase price in U.S. dollars.  Mr. Ahmed caused the excess funds to be diverted into accounts that he secretly controlled, including accounts purportedly in the name of portfolio companies and an account purportedly for "OIP" or "OIP Advisors."  ("OIP" are the initials of Oak Investment Partners, which is a trade name under which Oak does business.)  Mr. Ahmed deployed this fraudulent scheme in connection with Oak's investments in three portfolio companies in 2005, 2007 and 2010.

**A.     July 2005:  Overpayment Of $1.36 Million For Investment In Company E**

6.     In July 2005, Mr. Ahmed worked on a transaction in which an Oak Fund made an investment in Company E.  The report presented to the senior Managing Partners of OMC who are responsible for approving investments by the Oak Funds (the "Oak Managing Partners") recommended that the Oak Fund buy 20,987,654 Series B shares in Company E at a price of 0.81 Euros per share, for a total investment amount of 17 million Euros.

7.     After the investment was approved, Mr. Ahmed submitted a wire transfer request for payment of the purchase price in U.S. Dollars.  The wire transfer request reflected a price of $1.05 per share, for a total investment amount of $22.1 million.  Wiring instructions that were provided directed that Oak wire $20.74 million to a bank account at UBS Lugano in

Switzerland in the name of Company E and $1.36 million to a Bank of America account in the name of "[Company E] USA," account number XXXXXXXX7717.

8.       On July 29, 2005, Oak purchased the shares in Company E and wired a total of $22.1 million to the accounts provided by Mr. Ahmed, including $1.36 million to the account at Bank of America (formerly Fleet National Bank) in the name of "[Company E] USA."

9.       Following Mr. Ahmed's arrest on April 2, 2015, Oak discovered documents and information demonstrating the following:

a.   On July 19, 2005, Mr. Ahmed received an email stating that "[Company E] has received the UBS bank account numbers for the subscriptions" and that payment for the purchase of the Series B shares should be wired to one of two UBS Lugano account numbers, including the account number to which Oak wired $20.74 million as described above.  The email made no reference to any Bank of America account.

b.   On August 2, 2005, Mr. Ahmed received an email from a Company E executive, in which the Company E executive reported to Mr. Ahmed that $20.74 million in funds had been received by Company E from Oak (not $22.1 million).  The Company E executive further reported that after conversion of U.S. dollars to Euros at a rate of 1.2214 USD/Euro, such funds equaled €16,980,514, or €19,486 less than the purchase price of €17 million.  In a reply email on that same date, Mr. Ahmed agreed that, if the Company E executive was using the correct exchange rate, there was a "shortfall" that Oak would have to make up. Neither Mr. Ahmed nor the Company E executive made any mention of the $1.36 million payment made by Oak to the Bank of America account.  (As described in paragraph 63 below, this €19,486 "shortfall" was resolved by Mr. Ahmed's reduction of Company E's payment for reimbursement of Oak's legal fees).

3

c.   The former Chairman of the Board of Company E has informed an Oak representative that he has consulted with the Company E executive, that Company E did not receive the additional $1.36 million in funds that Mr. Ahmed directed be sent to the Bank of America account, and that Company E had no such account at Bank of America.

10.   True and accurate copies of documents referred to in paragraphs 7 to 9 are attached hereto as Exhibits 1 to 5.

**B.    December 2007:  Overpayment Of $4.7 Million For Company G Investment**

11.   In or about November 2007, Mr. Ahmed recommended to the Oak Managing Partners that an Oak Fund make an investment in Company G.  Mr. Ahmed's preliminary report proposed that the Oak Fund invest 40 billion Korean Won at a per share price of 17,000 Won.  Mr. Ahmed subsequently prepared a final report reflecting the investment amount in U.S. dollars, at a price of $20.22 per share, for a total investment amount of $47.5 million.

12.   After the investment was approved, Mr. Ahmed presented Oak finance department personnel with wire transfer instructions for payment of U.S. $47.5 million, which Mr. Ahmed represented was the purchase price.  Mr. Ahmed also provided a "Schedule A," showing that Oak and other investors were paying U.S. $20.22 per share, and that Oak was buying 2,348,904 shares for total price of $47.5 million.  In accordance with Mr. Ahmed's instructions, Oak wired $45 million to an account at Korea Exchange Bank located in Seoul, Korea and the remaining $2.5 million to a Bank of America account located in New York, account number XXXXXXXX9887 in the name of "Company G."

13.   Following Mr. Ahmed's arrest on April 2, 2015, Oak discovered documents and learned other information that show the following:

4

a.  The price in U.S. dollars that Mr. Ahmed directed Oak to pay for shares of Company G, $20.22 per share, was significantly higher than the actual share price of 17,000 Won per share.  Based on information available on the website www.oanda.com, which I understand to be a reliable source of historical exchange rate data, application of the exchange rate between Korean Won and U.S. Dollars on the date of Oak's investment would have resulted in a share price of $18.26 per share, not $20.22 per share.

b.  An employee of Company G has informed an Oak representative that the Bank of America account to which Mr. Ahmed directed that the $2.5 million be sent – account number XXXXXXXX9887 – did not actually belong to Company G.

c.  In addition to Mr. Ahmed's diversion of the $2.5 million, Mr. Ahmed arranged for approximately $2.2 million out of the $45 million Oak wired to Korean Exchange Bank to be diverted for his personal benefit.  On or about December 26, 2007, Mr. Ahmed sent an email to an attorney at Bae, Kim & Lee, LLC, Oak's Korea counsel, and stated that "We wired $45MM, which should be greater than the Won 40 Billion amount."  Mr. Ahmed instructed the attorney to tell the Korean bank "to only send Won 40 Billion to the company and we shall arrange for the rest to be returned to Oak later."  On December 27, 2007, the attorney reported to Mr. Ahmed that "[a]fter conversion, USD2,201,106.11 remains as the amount to be repatriated" and asked Mr. Ahmed to provide wiring instructions for the excess funds.

d.  On or about January 9, 2008, Mr. Ahmed provided "the wiring instructions for the repatriation of the excess funds" to the Bae, Kim & Lee attorney.  Those instructions directed that the funds be sent to an account at the Bank of America purportedly in the name of "OIP ADVISORS," account number XXXXXX9310.  Bae, Kim & Lee has provided a wire transfer confirmation that reflects that Korea Exchange Bank wired $2,201,070.56 to this

5

account at the Bank of America on January 9, 2008.  Oak does not have, and has never had, an

account with that name or number at Bank of America, and Mr. Ahmed was not authorized to

open any such account on Oak's behalf.  In addition, Oak has no record of receiving

approximately $2.2 million or any other amount back from the $45 million Oak wired to Korean

Exchange Bank on December 18, 2007.

14.    True and correct copies of documents described in paragraphs 11 to 13 are

attached hereto as Exhibits 6 to 11.

**C.    December 2010:  Overpayment Of $2.2 Million For Company I Investment**

15.    In December 2010, Mr. Ahmed recommended to the Oak Managing

Partners that two Oak Funds co-invest in Company I.  Mr. Ahmed recommended that the Oak

Funds buy 16,397,100 Series C Preferred shares in Company I at £2.226 per share for a total

purchase price of £36.5 million.  After the investment was approved, on December 16, 2010, Mr.

Ahmed prepared wire transfer requests for the purchase of Series C Preferred shares in Company

I.  The wire transfer requests presented by Mr. Ahmed directed that Oak pay $3.6084 per share

for a total of $59,166,676.  The amount Mr. Ahmed directed Oak to pay in U.S. dollars assumes

an exchange rate of 1.62 U.S. dollars to the British pound.

16.    Pursuant to Mr. Ahmed's instructions, on December 16, 2010, Oak wired

$59,166,676 for the purchase of Series C Preferred shares in Company I, consisting of

$58,955,808.20 wired to Company I and $210,867.79 in stamp duty reserve taxes due the UK tax

authorities that Oak wired to its UK counsel.

17.    On December 22, 2010, a member of Oak's finance team sent Mr. Ahmed

an email inquiring about the exchange rate used for the Company I investment, specifically

whether "the fx rate was fixed when we wired or was there an agreement that upon conversion of

USD to GBPS, Oak would send any deficit or would Oak receive any excess as this affects the cost of the investment." Later that same day, Mr. Ahmed responded that "the company fixed the exchange rate and it was 1.62 $ to the UK£." Mr. Ahmed further stated that the agreement to fix the exchange rate had been reflected in a term sheet signed in November 2010.

18.     Following Mr. Ahmed's arrest on April 2, 2015, Oak discovered documents and information demonstrating the following:

a.   A term sheet that Mr. Ahmed executed on Oak's behalf, dated November 22, 2010, did not contain any provision fixing the rate of exchange between the U.S. dollar and the British pound for Oak's investment in Company I.

b.   The price in U.S. dollars that Mr. Ahmed directed Oak to pay for its investment in Company I resulted in a price of $3.6084 per share. That was significantly higher than the actual share price of £2.226 per share. Based on information available on the website www.oanda.com, application of the exchange rate between the British pound and the U.S. dollar on the date of Oak's investment would have resulted in a share price of $3.49 per share, not $3.6084.

c.   Company I has provided Oak with a copy of an email exchange, dated December 17 to December 22, 2010, between Mr. Ahmed and Company I employees reflecting that the Oak Funds overpaid Company I for the investment by approximately £1.434 million. Specifically, in an email to Mr. Ahmed, an employee of Company I included a chart that reflected that the $58,955,808.20 wired by Oak to Company I had been converted to £37,804,301.51 at an exchange rate of approximately 1.5595 U.S. dollars to the British pound. The Company I employee indicated to Mr. Ahmed that £1,434,441.91 in "surplus funds" had been wired back to Oak. Company I also has provided a wire transfer confirmation that reflects

a payment on December 17, 2010 of £1,434,441.91 from Company I to account number

XXXXXX9310 – the same Bank of America account that received approximately $2.2 million in

"repatriated" funds from the Company G investment, as described in paragraph 13 above.

        d.   Later that same day, Mr. Ahmed wrote back to the Company I employee

stating that he "looked at the remittances slips and noticed that the beneficiary name was put in

as Oak Investment Partners XIII."  Mr. Ahmed advised the Company I employee that "you may

have to call your bank and change that to 'OIP Advisors' (which is our business account) for

which the bank details are valid."  As noted above, Oak does not have, and has never had, an

account at Bank of America with that account number or in the name of "OIP Advisors."  On

December 20, 2010, the Company I employee advised Mr. Ahmed that Company I's bank had

amended the beneficiary name.

        19.   Oak did not receive £1.4 million or any other amount for the return of

surplus funds paid by Oak in connection with its December 2010 investment in Company I.

Based on the then-prevailing GBP/USD exchange rate according to www.oanda.com,

£1,434,441.91 was equivalent in value to approximately $2,227,545 on December 20, 2010.

        20.   True and accurate copies of documents described in paragraphs 15 to 18

are attached hereto as Exhibits 12 to 17.

**Fraudulent Invoices And Requests To Pay Fees And Expenses Of Oak Portfolio Companies**

        21.   Mr. Ahmed also fraudulently misappropriated funds by causing Oak to

make payments purportedly relating to various expenses and fees in connection with Oak's

purchase and sale of shares in portfolio companies.  These payments related to two Oak portfolio

companies:  Company G and Company D.  Typically, Mr. Ahmed induced Oak to make such

payments through the use of fictitious invoices that appeared to be legitimate and printed on the letterhead of these companies.

22.    After Mr. Ahmed's arrest, Oak discovered, on Mr. Ahmed's H: drive on the Oak computer network, Microsoft Word versions of invoices on the letterhead of both Company G and Company D, including several of the fictitious invoices referred to below that Mr. Ahmed submitted to Oak.  An Oak employee's H: drive is not accessible to other Oak personnel apart from IT administrators unless the employee allows them to log on to Oak's network with his or her user name and credentials.

23.    The payments described in this section were made, pursuant to Mr. Ahmed's instructions, to three accounts at Bank of America purportedly in the name of Company G and Company D.  As noted in my prior declaration, Mr. Ahmed fraudulently directed Oak to make payments to an account at Bank of America purportedly in the name of another Oak portfolio company, referred to in my prior declaration as Parent, which in fact, according to documentation found after Mr. Ahmed's arrest, was in the name of "Iftikar Ahmed Sole Prop DBA [Parent]."  As noted below, Oak has discovered documentation that one of the Bank of America accounts described below, purportedly in the name of Company G, actually was in the name of "Iftikar Ahmed Sole Prop DBA [Company G]," and evidence that the other two Bank of America accounts described below were likewise accounts established for the personal benefit of Mr. Ahmed.

A.    **Transfers To "Company G" Accounts**

24.    As noted above, an Oak Fund purchased shares in Company G in December 2007.  In 2011, Oak exited its investment in Company G, with a portion of the sales price remaining in escrow until 2013.

25.    On four separate occasions from 2009 to 2013, Mr. Ahmed presented requests for Oak to make payments purportedly to Company G.  On each occasion, Mr. Ahmed submitted an invoice that purported to be on Company G letterhead for approval.  Each invoice was submitted with a wire request and contained wire transfer instructions directing that payment be remitted to an account at Bank of America purportedly in the name of "Company G."  Two different accounts were utilized.  After approval, Oak made the payments as requested by Mr. Ahmed in each instance.

26.    After Mr. Ahmed's arrest, an employee of Company G informed an Oak representative that:  (1) each of the four invoices was bogus and was not a bona fide invoice from Company G; (2) neither of the accounts at Bank of America listed on the invoices actually belonged to Company G; and (3) Company G never received any of the funds that Oak paid pursuant to Mr. Ahmed's instructions.  These four invoices and payments are described further below.

### (i)   October 2009:  $2.1 Million Payment For Delisting And Legal Fees

27.    In 2009, Oak participated in a tender offer for Company G that resulted in the company being taken private and delisted from the Korean Stock Exchange.

28.    On or about October 29, 2009, Mr. Ahmed submitted a wire request for payment of 2,490,325,000 Korean Won for "Expense Reimbursement" to Company G.  Mr. Ahmed also provided an invoice on Company G letterhead, which explained that this sum was to be paid for purported "Mandatory Delisting Fees" and "Legal fees paid to Debevoise & Plimpton LLP."  The invoice contained wire instructions for a bank account at Bank of America in the name of "Company G," account number XXXXXXXX9887.  (This is the same account to which Mr. Ahmed directed that $2.5 million of the purchase price for Oak's original investment in

Company G be sent).  The amount in Korean Won was converted to U.S. dollars at an exchange rate provided by Mr. Ahmed, for a total amount of $2,101,185.45.  After the wire request and invoice were approved for payment, on October 29, 2009, Oak wired $2,101,185.45 to the Bank of America account Mr. Ahmed provided.

      29.     True and accurate copies of documents described in paragraph 28 are attached hereto as Exhibits 18 to 20.

### (ii)  October 2011:  $3.1 Million Management Incentive Payment

      30.     In October 2011, Oak sold its shares in Company G to Purchaser 1.  The shares that Oak sold represented approximately 62% of the Company G shares sold to Purchaser 1 in the transaction.  The transaction was set up so that Oak would receive a certain portion of the consideration for its shares at the initial closing and the remainder would be held in escrow until March 31, 2013, upon which time it would be released to Oak.

      31.     On or about November 25, 2011, Mr. Ahmed presented a wire request containing an invoice on Company G letterhead that sought payment of a "Management Incentive Payment" totaling $3,113,981.  The invoice stated that the payment was "[a]s per agreement between [Company G] Management Team, Oak, and [another investor]" a "Total Management Incentive of $5MM" was to be shared between Oak and the other investor based on the number of Company G shares that Oak sold.  The invoice stated that "Oak's share is 62.2796% of $5MM, that is $3,113,981."  The invoice also contained wire transfer instructions for an account at Bank of America in the name of "Company G," account number XXXX-XXXX-6367.  The wire request prepared by Mr. Ahmed directed that $3,113,981 be paid to Company G.  After approval, on November 28, 2011, Oak wired $3,113,981 to the Bank of America account in the name of "Company G" listed on the invoice provided by Mr. Ahmed.

32.     True and accurate copies of documents described in paragraph 31 are attached hereto as Exhibits 21 and 22.

### (iii) April 2013: $1.56 Million Management Incentive Payment

33.     On April 10, 2013, Mr. Ahmed submitted a wire transfer request that contained an invoice on Company G letterhead for payment of a "Management Incentive Payment," this time in the amount of $1,556,990. The invoice contained wiring instructions for the same Bank of America account in the name of "Company G," account number XXXX-XXXX-6367. Mr. Ahmed's wire transfer request directed that Oak pay $1,556,990 to Company G. On April 10, 2013, Mr. Ahmed sent an email to Oak finance personnel explaining that when Oak sold its shares in Company G to Purchaser 1, Oak "had agreed to a management carve out in exchange of the Company bearing the investment banking fees." Mr. Ahmed further stated that the purported agreement was to "tranche[ ] the $7.5 total payment to management in to two pieces – the first $5MM at the initial close and the remaining $2.5MM at the time the escrow is released." Mr. Ahmed further explained that "Oaks [sic] share was around 63%, which was our ownership stake." After the wire request and invoice were approved, on April 11, 2013, Oak wired $1,556,990 to the account at Bank of America in the name of "Company G" that was listed on the invoice provided by Mr. Ahmed.

34.     True and accurate copies of documents described in paragraph 33 are attached hereto as Exhibits 23 to 26.

### (iv) April 2013: $622,796 Payment For Advisory Fees

35.     On April 29, 2013, Mr. Ahmed submitted a wire transfer request that included an invoice on Company G letterhead for payment of a purported "Advisor Fees Reimbursement" to Company G in the amount of $622,796. The invoice, dated April 23, 2013,

provided the same bank account information for an account at Bank of America in the name of "Company G," account number XXXX-XXXX-6367.  The invoice also included an explanation that Oak's share of the "Total Investment Banking Advisory Fees of $1.0MM" was $622,796. After approval, on April 30, 2013, Oak wired $622,796 to the "Company G" Bank of America account listed on the invoice provided by Mr. Ahmed.

36.     True and accurate copies of documents described in paragraph 35 are attached hereto as Exhibits 27 to 29.

37.     After Mr. Ahmed's arrest on April 2, 2015, Oak discovered in Mr. Ahmed's electronic files an account statement for Bank of America account number XXXX-XXXX-6367 – the account to which Oak wired the funds described in paragraphs 30 through 36 above.  A true and accurate copy of this account statement is attached hereto as Exhibit 30.  That statement shows that the account actually was in the name of "Iftikar Ali Ahmed Sole Prop DBA [Company G]," not "Company G," as stated on the invoices Mr. Ahmed presented to Oak.  In addition, the address reflected in the account statement was 505 North Street, Greenwich, CT 06830-3422, which is Mr. Ahmed's home address.  The account statement further reflects that seven transfers were made out of the account in May 2013, totaling $645,000, to two accounts. One of the transferee accounts is a checking account ending in "3754," while the other is a savings account ending in "9566."  Other Bank of America account statements located after Mr. Ahmed's arrest show that Mr. Ahmed and his wife held a checking account at Bank of America with a number ending in "3754," and a savings account with a number ending in "9566."

B.     Transfers To "Company D" Account

38.     In December 2004, an Oak Fund invested $7.5 million in Series A Preferred shares of Company D.  Oak's shares in Company D were held by a special purpose

vehicle based in the Netherlands named A. Bohl Praktijk B.V. ("BPBV").  In 2006, a portion of

BPBV's shares in Company D were sold to Purchaser 2 for $60 million, pursuant to a Share

Purchase Agreement dated May 31, 2006, and Oak subsequently exited the investment by

distributing Company D shares in kind to its investors in January and March 2007.  Mr. Ahmed

had substantial responsibilities in connection with Oak's investment in Company D and the exit

from that investment in 2006 and 2007.

    39. On three separate occasions in 2006 and 2007, Mr. Ahmed directed Oak to

wire funds to a Bank of America account purportedly in the name of "Company D," as described

further below.  An Oak representative has learned from information provided by former financial

personnel of Company D after Mr. Ahmed's arrest that Company D did not actually have an

account at Bank of America and that invoices provided by Mr. Ahmed on Company D letterhead

to support certain of these payments were not legitimate invoices issued by Company D.

    **(i)  July 2006:  $1.8 Million Overpayment For Investment Bank Advisory Fees**

    40. On July 3, 2006, BPBV's wired $3 million to a Bank of America account

provided by Mr. Ahmed that was purportedly in the name of "Company D," account number

XXXXXXXX2349 (the "Bank of America Company D Account").  This payment, according to

a reconciliation document prepared by Oak's finance department, was for advisory fees charged

by an investment bank ("Investment Bank") in the amount of 5% of the sale price to Purchaser 2.

Pursuant to the May 31, 2006 Share Purchase Agreement, Oak had agreed to pay Investment

Bank's fees and expenses in connection with the transaction with Purchaser 2.

    41. After Mr. Ahmed's arrest on April 2, 2015, Oak discovered documents in

Mr. Ahmed's emails showing that the amount owed to Investment Bank was $1.2 million, not $3

million.  On June 26, 2006, an employee of Investment Bank sent Mr. Ahmed and the then-CFO

of Company D, among others, an email attaching an invoice for the advisory services Investment

Bank provided to Company D in connection with Oak's sale of shares to Purchaser 2.  The

invoice attached to the email reflects total fees of $1.2 million.

       42.    In addition, Mr. Ahmed's emails show that he made arrangements for

payment to Company D of $1.2 million for Investment Bank's advisory fees after the date BPBV

wired $3 million to the Bank of America Company D Account.  In particular:

      a.    On July 3, 2006, the same day that BPBV wired $3 million to the Bank

of America Company D Account, Mr. Ahmed sent an email to the then-CFO of Company D and

the Investment Bank employee asking for "the [Company D] account name, number, bank

details as soon as possible so that I can have Oak pay you for this transaction."  Mr. Ahmed

stated that he anticipated Oak would transfer the money to Company D's account "some [time]

in the week of July 10th (as this coming week is a truncated week here in the US because of the

Independence Day celebrations)."

      b.  On July 5, 2006, Mr. Ahmed sent an email to an employee of Company D,

and asked her for "the wiring details for your account today (Wednesday) if possible," and

further explained that "my Finance folks are ready to wire funds for [Investment Bank] to your

account our Wednesday, if we get the details from your end."  The Company D employee

provided Mr. Ahmed with a Citibank account in Korea held in the name of Company D.  That

same day, Mr. Ahmed responded to the Company D employee by stating that "[w]e shall try and

get the wire out our day time on Wednesday" and that Company D should "please transfer the

fees to [Investment Bank] whenever you receive the funds."

      c.    Subsequent emails between the Company D employee and Mr. Ahmed

discuss the possibility of Oak wiring the funds to Investment Bank directly.

43.     Neither Oak nor BPBV made any transfers during 2006 to Company D or Investment Bank, after the transfer of $3 million on July 3, 2006 described above.  Moreover, Oak is not aware of any further communications from Investment Bank regarding Investment Bank's advisory fees and, accordingly, I believe Investment Bank received the fees it was owed ($1.2 million).  Based on the foregoing, it appears that Mr. Ahmed arranged for payment of Investment Bank's actual fee of $1.2 million, and kept the $1.8 million difference for himself.

44.     True and accurate copies of documents referred to in paragraphs 40 to 42 are attached hereto as Exhibits 31 to 33.

### (ii) January 2007: Payment Of $6.6 Million For Korean Capital Gains Taxes

45.     In January 2007, Mr. Ahmed requested that Oak make a $6.6 million payment to satisfy a Korean tax obligation relating to BPBV's sale of its Company D shares to Purchaser 2 in 2006.  The $6.6 million amount was equal to 11% of the $60 million purchase price.  I understand that under certain circumstances there is a capital gains tax due under Korean law when a non-resident sells shares in a Korean company, like Company D, and that this tax can equal 11% of the total purchase price.

46.     Mr. Ahmed presented Oak's finance department with an invoice on Company D letterhead, dated January 24, 2007, for $6.6 million described as a "[s]ales tax reimbursement" with a notation that read "[Company D] pays to the beneficiaries on behalf of A. Bohl Praktijk."  The invoice included wire transfer instructions for payment to the Bank of America Company D Account (the same Bank of America account to which the $3 million was wired for Investment Bank's fees as described in paragraphs 40 through 44 above).

47.     Mr. Ahmed submitted a wire transfer request to Oak on January 25, 2007 for payment of the $6.6 million amount.  The wire transfer request instructed that Oak wire the

16

money to an account held by BPBV in the Netherlands "to pay [Company D] $6.6 Korean

withholding taxes." After approval, on January 26, 2007, Oak wired a total of $6.6 million to

BPBV's account at Fortis Bank, which in turn, on January 29, 2007, wired the $6.6 million from

BPBV's account to the Bank of America Company D Account.

48.     A review of documents after Mr. Ahmed's arrest on April 2, 2015 has

indicated that at the time of the transaction in 2006, there was a tax treaty in place between the

Netherlands and Korea that provided for 0% capital gains tax for transactions between Dutch and

Korean companies. BPBV, as a Dutch company that was buying shares in Company D, a

Korean company, filed a tax exemption application in June 2006 to avail itself of the tax treaty

that was in place so that no capital gains taxes would need to be withheld or paid to the Korean

tax authorities. Contrary to the instructions provided by Mr. Ahmed, Oak is not aware of any

document suggesting that Korean capital gains taxes were in fact assessed on the sale of the

BPBV shares to Purchaser 2 or that there was any legitimate reason for the $6.6 million payment

that Mr. Ahmed directed Oak to make in January 2007.

49.     True and accurate copies of documents described in paragraphs 46 to 47to

paragraph are attached hereto as Exhibits 34 to 37.

**(iii) August 2007:  $800,528 Payment For Korean Transaction Taxes**

50.     On August 21, 2007, Mr. Ahmed presented Oak with a wire transfer

request that included another invoice on Company D letterhead seeking payment of $800,528.81

in "Transaction fees to be paid to the Korean Tax Authority" in connection with Oak's 2007

distribution to Oak investors of publicly traded Company D shares. The invoice, dated August

20, 2007, included a notation that "[Company D] pays to the beneficiaries on behalf of Oak

Management Corporation." The invoice also provided wire transfer instructions for the Bank of

America Company D Account.  After the wire request was approved, on August 21, 2007, the Oak Fund wired a total of $800,528.81 to the Bank of America Company D Account.

51.    Oak is not aware of any document or other evidence to suggest that Company D paid $800,528.81 (or any other amount) in securities transaction taxes to the Korean tax authorities in connection with Oak's March 2007 distribution in kind of publicly traded Company D shares to Oak's investors.

52.    True and accurate copies of documents referred to in paragraph 50 are attached hereto as Exhibits 38 and 39.

**Additional Payments To The "OIP" Account At Bank Of America**

53.    Oak also has discovered that Mr. Ahmed directed several Oak portfolio companies to transfer additional funds to Bank of America account number XXXXXX9310 (the "Bank of America OIP Account"), which is the same account used in the fraudulent transactions described in paragraphs 11 to 20 above.  These transfers were purportedly made to pay or reimburse Oak for various fees and expenses in connection with Oak's purchases of shares in these companies.  Mr. Ahmed represented to the portfolio companies that the Bank of America account was in the name of "OIP" or "OIP Advisors," thereby inducing the portfolio companies to believe that they were sending money to Oak.

54.    In fact, as noted above, Oak did not have and has never had an account at Bank of America with that name or account number, and Mr. Ahmed was not authorized to open any such account on Oak's behalf.  Oak has no records reflecting that it received any of the funds that Mr. Ahmed directed the portfolio companies to transfer to the Bank of America OIP Account.

55.     Oak has identified several occasions in 2005, 2007 and 2009 on which Mr. Ahmed fraudulently directed portfolio companies to transfer funds to the Bank of America OIP Account in connection with fees or expenses owed to Oak, as follows:

**A.      January 2005: Payment Of $650,000 By Company D For "Management Fees"**

56.     As noted above, in December 2004, Oak made a $7.5 million investment in Company D.  Oak's investment in Company D was one of the first transactions Mr. Ahmed worked on for Oak after joining the firm in 2004.

57.     On December 15, 2004, Mr. Ahmed emailed a proposed letter agreement to an executive of Company D ("Company D Executive").  The letter agreement, which was on Oak letterhead, purported to "formalize our agreement in terms of a one-time management fee to be paid by your company to an Oak Investment Partners' designated entity to compensate for the concession we offered in taking out the annual dividend provisions in our term sheet."  The letter agreement stated that Oak would be investing $7.5 million and that within 30 days of the closing, Company D would pay Oak an amount equal to 8% of Oak's total investment (that is, $600,000).  Company D Executive signed the letter agreement and faxed it back to Mr. Ahmed on December 15, 2004.

58.     On January 4, 2005, Mr. Ahmed emailed Company D Executive with wiring instructions "for the Oak Investment Partners (OIP) management fee as per our agreement."  Mr. Ahmed's email instructed that the funds be wired to the Bank of America OIP Account.  On January 5, 2005, Company D Executive emailed Mr. Ahmed and stated that Company D "will wire $600k to your company tomorrow."

59.     Two days later, Mr. Ahmed received what appears to be a revised version of the December 15, 2004 letter agreement reflecting a $50,000 increase in the "management

19

fee" to be paid to Oak by Company D.  On January 11, 2005, Mr. Ahmed sent an email to

Company D Executive stating "[s]ame instructions as last time," and on January 14, 2005,

Company D Executive sent an email to Mr. Ahmed stating "we have wired $50K today."

   60. True and accurate copies of documents described in paragraphs 57 through

59 above are attached hereto as Exhibits 40 through 44.

   **B.** **November 2005:  Payment Of €80,514 By Company E For Oak Legal Fees**

   61. As noted above, in July 2005, Oak made an investment in Company E.

Three law firms provided legal services to Oak in connection with its purchase of the Company

E shares:  Finn Dixon & Herling LLP; Simmons & Simmons LLP; and Kilpatrick Stockton LLC.

Oak paid the legal fees it incurred directly to the law firms involved.

   62. Pursuant to the Investment Agreement for the investment, dated July 22,

2005, Company E agreed to reimburse Oak's legal fees following the closing of the transaction,

up to a cap of 100,000 Euros.  Without Oak's knowledge, Mr. Ahmed submitted invoices for

Oak's legal fees to Company E purportedly for reimbursement to Oak, and directed that

Company E send the funds to the Bank of America OIP Account.

   63. Specifically, as noted in paragraph 9(b) above, in August 2005, Company

E had noted that Oak's payment of $20.74 million to the UBS Lugano account resulted in a

shortfall of €19,486 against the purchase price of €17 million.  At Mr. Ahmed's suggestion,

Company E agreed, in an email to Mr. Ahmed dated August 24, 2005, to "compensate the

shortfall with [Oak's] legal fees accordingly."  This resulted in a reduction of the reimbursement

amount from €100,000 to €80,514.  On November 7, 2005, Mr. Ahmed sent an employee of

Company E wiring instructions for payment of the €80,514 that was purportedly for

reimbursement to Oak.  The wire instructions directed that payment be made to the Bank of

America OIP Account.  On November 11, 2005, the executive of Company E sent Mr. Ahmed confirmation that the payment had been made to the Bank of America OIP Account.  I understand that based on the Euro/U.S. dollar exchange prevailing at the time, €80,514 were equivalent to $94,080.61.

64.     True and accurate copies of documents described in paragraphs 62 and 63 are attached hereto as Exhibits 5, 45 and 46.

**C.     June 2007:  Payment Of $250,000 By Company F For Oak Legal Fees**

65.     In February 2007, an Oak Fund invested in shares of Company F.  The law firms of Finn Dixon & Herling LLP and Simmons & Simmons LLP represented Oak in connection with the transaction, and Oak paid the legal fees it incurred directly to those respective law firms.  A Subscription and Shareholders' Agreement for the transaction, dated February 27, 2007, provides for Company F to reimburse Oak for its legal fees in connection with the transaction, up to $250,000.

66.     Emails discovered after Mr. Ahmed's arrest on April 2, 2015 indicate that Mr. Ahmed directed Company F to reimburse Oak for the legal expenses it incurred in connection with the purchase of the Company F shares by sending funds to the Bank of America OIP Account.  Specifically, on June 5, 2007, Mr. Ahmed received an email from an employee of Company F indicating that Company F had wired $250,000 to an account purportedly in the name of "OIP."

67.     A true and accurate copy of the document referred to in paragraph 66 is attached hereto as Exhibit 47.

**D.      October 2007: Payment Of Approximately $500,000
           By Company F For Legal Fees**

68.      In December 2007, Purchaser 3 acquired Company F from Company F's shareholders, which included an Oak Fund.  The law firms of Finn Dixon & Herling LLP and Simmons & Simmons LLP represented Oak in connection with the sale, and Oak paid the legal fees it incurred directly to those respective law firms.  A Share Purchase and Contribution Agreement, dated as of July 2, 2007, provided, in substance, for the Purchaser 3 to pay the sellers' transaction expenses up to a cap of $500,000.

69.      On October 1, 2007, an employee of Company F sent an email to Mr. Ahmed indicating that Company F attempted to wire €561,451.10 to the Bank of America OIP Account for purported "[Company F] Legal Expenses" on September 21, 2007.  The same Company F employee sent another email to Mr. Ahmed on October 4, 2007, stating that Company F had attempted to wire the funds again.  The email further explained that the amount sent was in error, and asked Mr. Ahmed to remit back to Company F the amount in excess of $500,000.

70.      In connection with the closing of the transaction with Purchaser 3 in December 2007, a schedule of sellers' transaction expenses was prepared by Oak's counsel reflecting that Company F had already paid approximately $234,132 for Finn Dixon's fees and approximately £162,363 for Simmons & Simmons' fees.  However, as stated above, Oak paid those fees directly to those respective law firms and did not receive any reimbursement from Company F.

71.      True and accurate copies of documents referred to in paragraphs 69 and 70 are attached hereto as Exhibits 48 to 50.

22

E.       **April And June 2009: Payment Of £1,500,000 By Company H For Legal Fees**

72.    In 2009, an Oak Fund invested in shares of Company H.  In connection with Oak's investment in Company H, Oak was represented by the law firms of Finn Dixon & Herling LLP and Simmons & Simmons LLP.  Oak paid the legal fees it incurred directly to those respective law firms.  Transactional documents related to Oak's investment in Company H provided for reimbursement of certain of Oak's legal expenses.

73.    Company H's Finance Director has provided Oak with documents showing that Mr. Ahmed directed Company H to transfer to the Bank of America OIP Account nearly 1,500,000 GBP (British pounds) as purported reimbursement of Oak's legal fees in connection with its investment in Company H.  Wire transfer confirmations reflect that Company H transferred the following amounts on the following dates to the Bank of America OIP Account specified above: (i) £1,084,961.06 on April 23, 2009; (ii) $118,578.60 on April 23, 2009; and (iii) £331,901.39 on June 10, 2009.  Based on the GBP/U.S. dollar exchange rates prevailing on those dates, these three payments total approximately $2,237,205.49.

74.    Company H's Finance Director also has provided a letter from Mr. Ahmed dated July 7, 2009, which formally requests that Company H reimburse Oak up to £1,500,000 in legal expenses by transferring the funds to the Bank of America OIP Account, and includes as attachments invoices for legal fees incurred by Oak from the two law firms involved.

75.     True and accurate copies of documents referred to in paragraphs 73 and 74 are attached hereto as Exhibits 51 to 55.


Executed on June 11, 2015.

Norwalk, Connecticut

_____

GRACE A. AMES