UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

_____

|  |  |  |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 3:15cv675 (JBA) |
| v. | ) ) | |
| IFTIKAR AHMED, | ) ) | **AMENDED COMPLAINT** |
| Defendant, and | ) ) | |
| IFTIKAR ALI AHMED SOLE PROP; I-CUBED DOMAINS, LLC; SHALINI AHMED; SHALINI AHMED 2014 GRANTOR RETAINED ANNUITY TRUST; DIYA HOLDINGS LLC; DIYA REAL HOLDINGS, LLC; I.I. 1, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; I.I. 2, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; and I.I. 3, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| Relief Defendants. | ) ) | |

_____

Plaintiff United States Securities and Exchange Commission ("the Commission") alleges

as follows for its Amended Complaint against Defendant Iftikar Ahmed, also known as Ifty

Ahmed ("Ahmed"), and Relief Defendants Iftikar Ali Ahmed Sole Prop; I-Cubed Domains,

LLC; Shalini Ahmed; Shalini Ahmed 2014 Grantor Retained Annuity Trust; DIYA Holdings

LLC; DIYA Real Holdings, LLC; I.I. 1, a minor child, by and through his next friends Iftikar and

Shalini Ahmed, his parents ("I.I. 1"); I.I. 2, a minor child, by and through his next friends Iftikar

Exhibit 2

and Shalini Ahmed, his parents ("I.I. 2"); and I.I. 3, a minor child, by and through his next

friends Iftikar and Shalini Ahmed, his parents ("I.I. 3").

## SUMMARY

1.      This case involves a long-running scheme that Ahmed perpetrated to defraud Oak

Investment Partners ("Oak"), Oak's investors, and companies in which Oak invested. As more

fully outlined herein, from no later than December 2004 through around December 2014,

Ahmed, who worked as a partner at Oak, recommended and coordinated Oak's investments in

numerous companies. These investments were made by various pooled investment funds that

Oak and Ahmed advised – funds whose money came from public pension funds and other

institutional and individual investors. Ahmed engaged in fraudulent acts and made material

misrepresentations with respect to each of these investments, thereby defrauding the Oak funds

out of tens of millions of dollars and personally obtaining the same in ill-gotten profits.

2.      To perpetrate his decade-long fraud, Ahmed employed similar and related

fraudulent devices and misrepresentations in connection with at least nine companies in which

Oak's funds invested. For example, Ahmed frequently misrepresented and altered the price of an

investment, claiming to Oak that the price of the companies' shares Oak was purchasing was

greater than the price at which the seller had actually agreed to sell the shares. These investments

were often in foreign companies. In some cases, Ahmed misrepresented the exchange rate at

which the foreign currency purchase price was to be converted to the U.S. currency purchase

price, inflating the cost of the deal. In other instances, Ahmed misrepresented the financial

condition of the company whose shares Oak was purchasing and affirmatively altered the

purchase price in the deal documents that he presented to Oak.

2

3.     Ahmed also frequently used invoices for purported expenses related to Oak's purchase or sale of a company's securities to further his fraud. In many instances, Ahmed generated fictitious invoices that were purportedly from the company in which Oak invested and presented the invoices to Oak for payment. In other instances, Ahmed sent the invoices to the companies in which Oak had invested and claimed that Oak was owed payment or reimbursement.

4.     To conceal his fraud, Ahmed established multiple bank accounts that he owned and controlled, but falsely claimed belonged either to the company involved in a particular Oak deal or, in some cases, to Oak itself. Indeed, Ahmed often fraudulently registered the bank accounts as "doing business as" the companies in which Oak made investments. In instances where Ahmed misrepresented the purchase price of an investment to Oak, he directed that the excess funds be sent to a bank account that he held in the name of the company in which Oak was investing. Similarly, when Ahmed used fraudulent invoices, he directed the payment of those invoices be made either to an account he held in the name of the company purportedly billing Oak, or to an account he held in Oak's own name when the bill was purportedly due to Oak. Ahmed subsequently transferred these funds to other accounts that he also controlled, including joint accounts he held with his wife, Relief Defendant Shalini Ahmed, and accounts held for the benefit of Ahmed and Shalini Ahmed's children, Relief Defendants I.I. 1, I.I. 2, and I.I. 3.

5.     Ahmed used numerous other fraudulent devices and misrepresentations to further his fraudulent schemes, including concealing his personal interest in Relief Defendant I-Cubed Domains, LLC ("I-Cubed") when he negotiated Oak's purchase of a company's shares from I-Cubed – a purchase at a significant premium over the price I-Cubed had initially paid. Ahmed

3

also made unauthorized use of corporate funds to purchase shares in another company, which Ahmed then re-sold for a sizeable profit that he pocketed.

6.      As a result of his misconduct, Defendant Ahmed violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 206(1), 206(2), 206(3), and 206(4) of the Investment Advisers Act 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(3)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8]. Further, Relief Defendants Iftikar Ali Ahmed Sole Prop; I-Cubed Domains, LLC; Shalini Ahmed; Shalini Ahmed 2014 Grantor Retained Annuity Trust; DIYA Holdings LLC; DIYA Real Holdings, LLC; I.I. 1; I.I. 2; and I.I. 3, received illicit proceeds from Ahmed's fraud to which they have no legitimate claim.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

7.      The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)].

8.      The Commission seeks a preliminary asset freeze against Defendant Ahmed and Relief Defendants Iftikar Ali Ahmed Sole Prop; I-Cubed Domains, LLC; Shalini Ahmed; Shalini Ahmed 2014 Grantor Retained Annuity Trust; DIYA Holdings LLC; DIYA Real Holdings, LLC; I.I. 1; I.I. 2; and I.I. 3, in order to preserve assets necessary to satisfy any eventual judgment against them. The Commission also seeks an order preventing the destruction of documents and an order for expedited discovery and alternative means of service.

4

9.     The Commission further seeks a permanent injunction against Defendant Ahmed enjoining him from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, disgorgement of all ill-gotten gains from the unlawful activity set forth in this Complaint, together with prejudgment interest, and civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]. The Commission further seeks a final judgment ordering Relief Defendants Iftikar Ali Ahmed Sole Prop; I-Cubed Domains, LLC; Shalini Ahmed; Shalini Ahmed 2014 Grantor Retained Annuity Trust; DIYA Holdings LLC; DIYA Real Holdings, LLC; I.I. 1; I.I. 2; and I.I. 3, to disgorge the ill-gotten gains held in their accounts or otherwise received by them, and to pay prejudgment interest thereon. The Commission also seeks any other relief that the Court may deem appropriate.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa] and Sections 209(d) and 214 of the Advisers Act [15 U.S.C. §§ 80b-9(d) and 80b-14]. Defendant Ahmed, directly or indirectly, made use of the means or instrumentalities of interstate commerce, or of the mails, or the means or instruments of transportation or communication in interstate commerce, in connection with the acts, practices, and courses of business set forth in this Complaint.

11.     Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], Section 214 of the Advisers Act [15 U.S.C. § 80b-14], and 28 U.S.C. § 1391(b). Defendant Ahmed is a resident of Greenwich, Connecticut, as are Relief Defendants Shalini Ahmed, I.I. 1, I.I. 2, and I.I 3. Relief Defendants

Iftikar Ali Ahmed Sole Prop; I-Cubed Domains, LLC; Shalini Ahmed 2014 Grantor Retained Annuity Trust; DIYA Holdings LLC; and DIYA Real Holdings, LLC, are all controlled by Ahmed and/or his wife Shalini Ahmed, and have bank accounts that were opened in Connecticut. In addition, many of the acts, practices, and transactions described in this Complaint occurred within the District of Connecticut.

## DEFENDANT

12.   **Ahmed**, 43, resided in Greenwich, Connecticut, before he fled the United States on or about May 16, 2015. Prior to the termination of his employment in or around May 2015, Ahmed was a general partner at Oak, where he worked since 2004. Before joining Oak, he worked as an investment professional at other financial industry companies. He graduated with a degree in engineering from the Indian Institute of Technology, New Delhi and earned his MBA from Harvard Business School. As more fully outlined herein, Ahmed engaged in a pattern of fraudulent conduct in connection with investment opportunities that he identified for Oak and its funds – fraud that resulted in the loss of millions of dollars of money investors had contributed to Oak's funds.

## RELIEF DEFENDANTS

13.   **Iftikar Ali Ahmed Sole Prop** ("Ahmed Sole Prop") is a purported business that had bank accounts at a large national bank. The address associated with Ahmed Sole Prop's bank accounts is Ahmed's home address in Connecticut.  The purported business accounts registered to Ahmed Sole Prop were "doing business as" ("dba") companies in which Oak made investments. As discussed in more detail below, Ahmed used this misleading dba designation to fraudulently induce Oak to transfer funds into the Ahmed Sole Prop accounts.

6

14.     **I-Cubed** is a Delaware limited liability company that was formed in 2012, with Ahmed as its sole initial member. In or around May 2013, Ahmed assigned his interest in I-Cubed to his wife, who later transferred most of that interest to the Shalini Ahmed 2014 Grantor Retained Annuity Trust. As more fully outlined herein, in October 2014 I-Cubed sold shares of an Oak portfolio company directly to one of the Oak funds that Ahmed advised and received $7.5 million in proceeds from this transaction. Ahmed did not disclose to Oak his interest in I-Cubed or his conflict of interest in the deal.

15.     **Shalini Ahmed**, 39, resides in Greenwich, Connecticut. She is the wife of Ahmed. Shalini Ahmed is not presently employed. She previously worked as a Vice President for Goldman Sachs, an Assistant Vice President for Merrill Lynch, and an Analyst for Morgan Stanley. She graduated with a degree in economics from Princeton University and earned her MBA from Harvard Business School. As more fully outlined herein, Shalini Ahmed received substantial amounts of fraudulent proceeds into accounts held jointly with her husband.

16.     **Shalini Ahmed 2014 Grantor Retained Annuity Trust**, is, on information and belief, a Delaware Limited Liability Company with Shalini Ahmed serving as a trustee. As more fully outlined herein, at least $7.425 million in fraudulent proceeds was deposited into a brokerage account held in the Trust's name.

17.     **DIYA Holdings LLC** is a New York Limited Liability Company organized on or about December 4, 2013. Shalini Ahmed serves as the manager and the entity holds at least two bank accounts, which were opened by Shalini Ahmed. As more fully outlined herein, in or around December 2013 DIYA Holdings used proceeds of Ahmed's fraud to purchase a New York City condominium located on Park Avenue for more than $8.6 million.

18.     **DIYA Real Holdings, LLC** is a New York limited liability company that was organized on or about February 11, 2015. Shalini Ahmed serves as manager and the entity holds one bank account, which was opened by Shalini Ahmed. As more fully outlined herein, in or around April 2015 DIYA Real Holdings used proceeds of Ahmed's fraud to purchase a New York City condominium located on Park Avenue for more than $7.9 million.

19.     **I.I. 1**, a juvenile, resides in Greenwich, Connecticut. He is the son of Ahmed and Shalini Ahmed. He holds a UTMA Account[1] with Ahmed serving as the custodian. As more fully outlined herein, Ahmed transferred fraudulent proceeds into I.I. 1's UTMA Account.

20.     **I.I. 2**, a juvenile, resides in Greenwich, Connecticut. He is the son of Ahmed and Shalini Ahmed. He holds a UTMA Account with Ahmed serving as the custodian. As more fully outlined herein, Ahmed transferred fraudulent proceeds into I.I. 2's UTMA Account.

21.     **I.I. 3**, a juvenile, resides in Greenwich, Connecticut. He is the son of Ahmed and Shalini Ahmed. He holds a UTMA Account with Ahmed serving as the custodian. As more fully outlined herein, Ahmed transferred fraudulent proceeds into I.I. 3's UTMA Account.

## FACTS

### Ahmed's Role with Oak

22.     Oak is a multistage venture capital firm with offices in Norwalk and Greenwich, Connecticut. Oak advises several funds, or "pooled investment vehicles," each of which uses money raised from various investors to make investments in companies. Investors in the funds include individual investors and institutional investors, such as public pension funds.

---

1 The Uniform Transfer to Minors Act (UTMA) allows a minor to receive gifts, such as money, without the aid of a guardian or trustee. Under UTMA, the gift giver or an appointed custodian manages the minor's account until the minor reaches a certain age, typically 18 years old.

23.     Ahmed's role as general partner at Oak included identifying and recommending investment opportunities for the funds that Oak advised, including specifically recommending the purchase of securities and advising on the purchase price of those securities. Ahmed also managed and monitored the investments that he recommended. At times, Ahmed was appointed to the boards of directors of the companies in which the funds invested. Ahmed was compensated for his role in advising the funds and helping to manage the funds' investments, and he received additional compensation when the investment opportunities he recommended were particularly successful.

24.     Section 202(a)(11) of the Advisers Act defines an investment adviser as "any person who, for compensation, engages in the business of advising others ... as to the value of securities or the advisability of investing in, purchasing, or selling securities ...." In light of his roles and responsibilities, Ahmed was an investment adviser under the terms of the Advisers Act.

25.     As an investment adviser, Ahmed owed fiduciary duties to the funds that he advised on Oak's behalf, including the funds involved in the transactions described below. These duties included the duty to act for the benefit of the funds, the duty to exercise the utmost good faith in dealing with the funds, and the duty to disclose all material facts related to any actual or potential investments by the funds. Further, as a fiduciary, Ahmed was required to avoid improper self-dealing.

26.     As detailed below, Ahmed breached these duties and engaged in extensive fraud. Ahmed engaged in a long-running scheme to defraud Oak and Oak's funds in connection with the Oak funds' purchases and/or sales of securities of a number of companies in which Oak invested. Ahmed's scheme, which began shortly after he started at Oak in 2004, spanned a decade, and involved numerous fraudulent acts, misrepresentations, and omissions.

**Ahmed's Fraud in Connection with Oak's Investment in Company D**[2]

27.　　In or around December 2004, one of Oak's funds purchased $7.5 million worth of shares in an Asian-based e-commerce company ("Company D"). This was one of the first transactions on which Ahmed worked for Oak after joining the firm in 2004. Ahmed was significantly involved in negotiating the terms of the Oak fund's investment in Company D and in managing and monitoring that investment. As detailed below, Ahmed employed various fraudulent acts and misrepresentations in connection with Oak's purchase and sale of Company D shares.

28.　　In connection with Oak's purchase of Company D shares, Ahmed represented to a Company D executive that Oak would forgo any dividend payment from Company D in exchange for a purported "management fee" equal to $600,000, which was a percentage of the share purchase price. Ahmed memorialized the agreement for the purported "management fee" in a side-letter with Company D.

29.　　On or about January 4, 2005, Ahmed instructed Company D to wire funds for the purported Oak "management fee" to an account that Ahmed designated. However, this account did not belong to Oak, but rather was a bank account opened and controlled by Ahmed that purported to "do business as" OIP Advisors.  On information and belief, Company D wired the funds to the account Ahmed designated on or about January 4, 2005.

30.　　On or about January 8, 2005, Ahmed negotiated an increase in the purported management fee to a total of $650,000. On information and belief, several days later Company D

---

[2] The Commission's initial complaint in this matter alleged Ahmed's fraud in connection with three companies, designated Company A, Company B, and Company C, beginning in or around August 2014.  For consistency, the Commission has retained these initial designations and thus begins its designation of the companies involved in Ahmed's newly-alleged fraud with Company D. For ease of reading, the Commission has alleged the fraudulent transactions in chronological order.

wired the additional $50,000 to the same OIP Advisors bank account that was, in fact, opened and controlled by Ahmed. The $600,000 and $50,000 transfers were never disclosed to Oak, nor were the funds ever forwarded to Oak.

31.     In or around May 2006, the Oak fund that had purchased Company D shares sold a portion of those shares.

32.     In or around early July 2006, Ahmed claimed that Oak was required to pay $3 million to Company D to reimburse it for advisory services that an investment bank provided to Company D in connection with Oak's sale of Company D's shares. On or about July 3, 2006, at Ahmed's instruction, Oak wired the $3 million, through an intermediary entity, to an account that Ahmed claimed belonged to Company D. In fact, this account did not belong to Company D, but rather was opened and controlled by Ahmed, but titled in the name of Company D.

33.     Further, as Ahmed knew, the amount owed to the investment bank for advisory services was only $1.2 million. On or about July 5, 2006, Ahmed directed the transfer of $1.2 million from another account that he controlled – the OIP Advisors accounts, described in paragraph 29, above – to the investment bank, and retained the difference of $1.8 million, which he then transferred into bank accounts that he held jointly with his wife, Relief Defendant Shalini Ahmed.

34.     Later, in or around January 2007, Ahmed represented to Oak that Oak was required to pay $6.6 million in order to reimburse Company D for capital gains taxes that were purportedly incurred in connection with Oak's May 2006 sale of Company D shares. On or about January 24, 2007, Ahmed provided Oak with a purported invoice from Company D requesting the $6.6 million payment. Ahmed further provided Oak with wiring instructions to the same

purported Company D account to which Oak had previously wired $3 million for purported

advisory services, described in Paragraph 32, above.

35.     On or about January 26, 2007, Oak wired $6.6 million, through an intermediary

entity, to Ahmed's designated account.

36.     In fact, no capital gains taxes were owed in connection with Oak's May 2006 sale

of Company D shares. Rather, Ahmed falsified the invoice that he presented to Oak to support

the $6.6 million payment.  Upon receiving this payment, Ahmed did not transfer the payment to

Company D, but instead transferred the money into bank accounts that he held jointly with his

wife, Relief Defendant Shalini Ahmed.

37.     In or around 2007, the Oak fund that had purchased Company D shares

distributed the remaining shares to investors in the fund.

38.     On or about August 21, 2007, Ahmed presented Oak with another invoice

purportedly from Company D, this one seeking reimbursement of approximately $800,000 for

transaction fees owed to a foreign tax authority in connection with Oak's distribution of

Company D shares to the Oak fund's investors. Ahmed again provided Oak with wiring

instructions to the same purported Company D account to which Oak had previously wired the

$3 million for purported advisory services and the $6.6 million for purported capital gains taxes,

as described in Paragraph 32 and 34 above.

39.      On or about August 21, 2007, Oak wired the approximately $800,000 to

Ahmed's designated account.

40.     In fact, Company D was not required to pay any transaction fees related to Oak's

distribution of Company D shares. Rather, Ahmed falsified the invoice that he presented to Oak

to support the approximately $800,000 payment, which Ahmed retained and did not forward to

Company D. Instead, Ahmed transferred the funds into a bank account that he held jointly with his wife, Relief Defendant Shalini Ahmed.

41.     By virtue of his misconduct described above, Ahmed misled Oak and the Oak fund's investors, defrauding them of at least $9.85 million in connection with their investment in Company D.

### Ahmed's Fraud in Connection with Oak's Investment in Company E

42.     In or around July 2005, Ahmed recommended that an Oak fund purchase shares in a Swiss technology company ("Company E"). Ahmed was significantly involved in Oak's Company E share purchase, and managed and monitored the Oak fund's investment in Company E. As detailed below, Ahmed employed various fraudulent acts and misrepresentations in connection with the Oak fund's purchase of Company E shares.

43.     On or about July 18, 2005, Ahmed recommended that Oak purchase approximately 20 million shares of Company E stock for a total price of 17 million Euros. Ahmed claimed that this converted to a total purchase price of 22.1 million in U.S. dollars, even though the application of the true exchange rate resulted in a purchase price of approximately $20.74 million. Ahmed directed Oak to split the payment between two accounts: $20.74 million to an account at a Swiss bank in the name of Company E and $1.36 million to a U.S.-based bank account that Ahmed claimed belonged to Company E. On or about July 29, 2005, Oak purchased the shares in Company E and wired the funds to Ahmed's designated accounts.

44.     Ahmed's misrepresentation concerning the total purchase price caused Oak to overpay for the Company E shares it purchased. Only the $20.74 million that Ahmed directed be paid to the Swiss bank account was received by Company E. The U.S.-based bank account to which Oak wired $1.36 million did not belong to Company E, as Ahmed represented, but instead

was opened and controlled by Ahmed "doing business as" Company E. Upon receiving this payment, Ahmed transferred virtually all of the funds into bank accounts that he held jointly with his wife, Relief Defendant Shalini Ahmed.

45.     Ahmed's fraud in connection with Oak's purchase of Company E's shares extended beyond his misappropriation of the $1.36 million. After Oak had wired the $20.74 million to Company E, as described in Paragraph 43, Ahmed was informed by Company E that this amount fell approximately 20,000 Euros short of the 17 million Euro purchase price. At Ahmed's suggestion, Company E agreed to settle this shortfall by adjusting the amount it would owe to Oak for legal fees associated with Oak's purchase of Company E shares.

46.     On or about August 24, 2005, Ahmed sent Company E invoices for approximately 100,000 Euros, purportedly for reimbursement of Oak's legal fees. In response, Company E agreed to pay approximately 80,000 Euros – the 100,000 Euros purportedly owed minus the approximately 20,000 Euros that Oak owed Company E in connection with the purchase price shortfall. On or about November 7, 2005, Ahmed instructed Company E to wire the approximately 80,000 Euros to an account that Ahmed claimed belonged to Oak.

47.     On or about November 14, 2005, Company E wired the approximately 80,000 Euros – approximately 92,000 U.S. dollars –  to Ahmed's designated account. In fact, this account was the same OIP Advisors account, described in Paragraph 29 above, that was opened and controlled by Ahmed. Ahmed did not disclose the payment or forward the funds to Oak. Instead, Ahmed transferred the funds into a bank account that he held jointly with his wife, Relief Defendant Shalini Ahmed.

48.     By virtue of his misconduct described above, Ahmed misled Oak, the Oak fund's investors, and Company E, defrauding them of at least $1.4 million.

14

### Ahmed's Fraud in Connection with Oak's Investment in Company F

49.     In or around February 2007, an Oak fund purchased shares of a European mobile entertainment company ("Company F") and sold those shares a few months later, in or around July 2007. Ahmed misappropriated large amounts of money in connection with Oak's investment in Company F.

50.     In or around June 2007, Ahmed directed Company F to wire approximately $250,000 to the OIP Advisors account described in paragraph 29, above, purportedly to reimburse Oak for legal expenses related to Oak's investment in Company F.

51.     On or about June 7, 2007, Company F wired the approximately $250,000 to the OIP Advisors account, which, as described in Paragraph 29 above, was opened and controlled by Ahmed. Ahmed did not disclose the payment or forward the funds to Oak. Instead, Ahmed transferred the funds into a bank account that he held jointly with his wife, Relief Defendant Shalini Ahmed.

52.     Similarly, in or around October 2007, Ahmed directed Company F to wire approximately 561,000 Euros – approximately $785,000 – to the OIP Advisors account, again purportedly to reimburse Oak for legal expenses related to Oak's sale of its investment in Company F.

53.     On or about October 4, 2007, Company F wired the approximately $785,000 to the OIP Advisors account, which, as described in paragraph 29 above, was in fact opened and controlled by Ahmed.

54.     Subsequently, Company F requested remittance of some of the fees it had wired to Oak because the sale agreement capped the reimbursement of Oak's legal fees. Ahmed directed that approximately $270,000 be transferred back to Company F from the OIP Advisors

account. Instead of forwarding the remaining funds to Oak, Ahmed directed the approximately $515,000 remainder to be deposited into a bank account that he held jointly with his wife, Relief Defendant Shalini Ahmed.

55.     By virtue of his misconduct described above, Ahmed misled Oak, the Oak fund's investors, and Company F, defrauding them of at least $765,000.

### Ahmed's Fraud in Connection with Oak's Investment in Company G

56.     In or around December 2007, one of Oak's funds purchased shares in another Asian-based company ("Company G"). Ahmed was significantly involved in Oak's investment in Company G, as well as in managing and monitoring that investment. As detailed below, Ahmed employed various fraudulent acts and misrepresentations in connection with Oak's purchase and sale of Company G shares.

57.     In or around November 2007, Ahmed was involved in negotiating the terms of Oak's purchase of Company G shares. The share purchase agreement between the Oak fund and Company G listed the purchase price at approximately 40 billion Korean Won, which Ahmed represented to Oak converted to a total purchase price of 47.5 million in U.S. dollars. Ahmed directed Oak to split the payment between two accounts: $45 million to an account held at an Asian bank, and the remaining $2.5 million to a U.S.-based bank account that Ahmed claimed belonged to Company G. On or about December 18, 2007, Oak wired the funds to Ahmed's designated accounts.

58.     Ahmed misrepresented the exchange rate between Korean Won and U.S. dollars when he claimed the total purchase price of the shares in Company G was $47.5 million. In fact, the share purchase price was only approximately $42.8 million in U.S. dollars. After Oak wired the $45 million to the Asian-based bank account, Ahmed instructed that only approximately

$42.8 million be transferred to Company G, and that the remaining approximately $2.2 million be sent to the OIP Advisors account.

59.     On or about January 9, 2008, Company G transferred approximately $2.2 million to the OIP Advisors account, which, as described above in Paragraph 29, was opened and controlled by Ahmed. Ahmed then transferred the approximately $2.2 million into a bank account that he held jointly with his wife, Shalini Ahmed.

60.     Ahmed further misappropriated the $2.5 million that Oak wired to the U.S.-based bank account that Ahmed fraudulently claimed belonged to Company G. This account did not belong to Company G, but rather was opened and controlled by Ahmed, but titled in the name of Company G. After receiving the funds into the fictitious Company G account, Ahmed transferred approximately $2.5 million into bank accounts that he held jointly with his wife, Relief Defendant Shalini Ahmed.

61.     Ahmed's fraud with respect to Company G did not stop with his misrepresentation of the purchase price. In 2009, Oak participated in a tender offer for Company G that resulted in the company being taken private and delisted from the Korean Stock Exchange. On or about October 29, 2009, Ahmed presented Oak with a purported invoice from Company G for "Delisting Fees" and legal fees. The invoice totaled approximately $2.1 million, and contained wiring instructions to an account purportedly belonging to Company G. This was the same U.S.-based bank account that Ahmed directed Oak to send $2.5 million in connection with the original Company G share purchase, as described in Paragraph 60 above. On or about October 29, 2009, Oak wired the funds to the designated account.

62.     Ahmed falsified the invoice that he presented Oak as support for the approximately $2.1 million payment. Further, Ahmed did not forward the funds to Company G.

17

Instead, Ahmed transferred almost all of the funds into a bank account that he held jointly with his wife, Relief Defendant Shalini Ahmed.

63.     In or around October 2011, the Oak fund sold the Company G shares that it had previously purchased. The transaction was set up so Oak received a portion of the sale price at the initial closing and the remainder would be held in escrow until released to Oak on March 31, 2013. The following month, Ahmed presented Oak with a purported invoice from Company G for a "management incentive payment" in connection with the sale of the Company G shares. The invoice requested an approximately $3.1 million payment and provided wiring instructions to another bank account purportedly belonging to Company G. Ahmed signed this invoice and requested that Oak approve the payment. On or about November 28, 2011, Oak wired the approximately $3.1 million to Ahmed's designated account.

64.     The account Ahmed designated did not belong to Company G, but rather was held in the name of Relief Defendant Ahmed Sole Prop and, similar to the account described in Paragraph 60, was registered as "doing business as" Company G. Ahmed opened and controlled the account, which was registered to his home address in Greenwich, Connecticut.

65.     Ahmed falsified the invoice that he presented Oak to support his request for the approximately $3.1 million payment. Further, Ahmed did not forward the funds to Company G. Instead, Ahmed transferred the funds into a bank account that he held jointly with his wife, Relief Defendant Shalini Ahmed.

66.     On or about April 10, 2013, Ahmed presented Oak with another purported invoice from Company G related to Oak's sale of Company G shares. This invoice sought an approximately $1.56 million payment of a "Management Incentive Payment." Ahmed informed Oak that it owed Company G this second management incentive payment in connection with its

sale of Company G shares. The invoice contained wiring instructions to the same account that Ahmed had instructed Oak to wire approximately $3.1 million in November 2011, which Ahmed controlled and held in the name of Relief Defendant Ahmed Sole Prop "doing business as" Company G. On or about April 11, 2013, Oak wired the approximately $1.56 million to Ahmed's designated account.

67.     Ahmed falsified the invoice that he presented to Oak to support the approximately $1.56 million payment. Further, Ahmed did not forward the funds to Company G. Instead, Ahmed transferred the funds into a bank account that he held jointly with his wife, Relief Defendant Shalini Ahmed.

68.     On or about April 23, 2013, Ahmed presented Oak with a third purported invoice from Company G related to Oak's sale of Company G shares. This invoice sought payment of approximately $623,000 in an "Advisor Fees Reimbursement." The invoice again contained wiring instructions to the same account that Ahmed had instructed Oak to wire approximately $3.1 million in November 2011 and approximately $1.56 million earlier in April 2013, the account held in the name of Relief Defendant Ahmed Sole Prop "doing business as" Company G, and controlled by Ahmed. On or about April 30, 2013, Oak wired the approximately $623,000 to Ahmed's designated account.

69.     Ahmed falsified the invoice that he presented to Oak to support the approximately $623,000 payment. Further, Ahmed did not forward the funds to Company G. Instead, he transferred the funds into a bank account that he held jointly with his wife, Relief Defendant Shalini Ahmed.

19

70.     By virtue of his misconduct described above, Ahmed misled Oak and the Oak fund's investors, defrauding them of at least $12 million in connection with their investment in Company G.

### Ahmed's Fraud in Connection with Oak's Investment in Company H

71.     In or around 2009, an Oak fund purchased shares of a European automobile technology company ("Company H"). Ahmed misappropriated funds in connection with Oak's investment in Company H.

72.     Beginning in or around April 2009, Ahmed presented Company H with several invoices, purportedly to reimburse Oak for legal fees Oak paid in connection with the investment in Company H. Ahmed further directed Company H to wire the funds to the OIP Advisors account. At Ahmed's direction, Company H wired the funds to the account Ahmed provided.

73.     As described in Paragraph 29 above, the OIP Advisors account was opened and controlled by Ahmed. Ahmed did not disclose or forward the payment to Oak. Instead, Ahmed transferred the funds into a bank account that he held jointly with his wife, Relief Defendant Shalini Ahmed.

74.     By virtue of his misconduct described above, Ahmed misled Oak, the Oak fund's investors, and Company H, defrauding them of approximately $2.2 million.

### Ahmed's Fraud in Connection with Oak's Investment in Company I

75.     In or around 2010, an Oak fund purchased shares of a European loan servicing business ("Company I"). Ahmed was significantly involved in negotiating the Oak fund's purchase of Company I shares. Ahmed defrauded Oak and the Oak fund by misrepresenting the purchase price of the Company I shares.

20

76.     Ahmed negotiated the purchase of Company I shares on behalf of an Oak fund, at a cost of 36.5 million British pounds. Ahmed represented to Oak that the parties had agreed to a fixed exchange rate of approximately 1.62 U.S. dollars to one British pound, which resulted in a purchase price of approximately 59 million U.S. dollars. At Ahmed's direction, Oak wired, on or about December 10, 2010, approximately $59 million for the purchase of Company I shares.

77.     Ahmed's representation of the exchange rate was fraudulent. After the $59 million wire was complete, Company I informed Ahmed that, based on the prevailing exchange rate of approximately $1.56 U.S. dollars to one British pound, Oak had overpaid by approximately £1.4 million (which translated to more than $2 million). Ahmed directed Company I to wire the difference to the OIP Advisors account. Company I wired approximately $2.2 million to that account on or about December 22, 2010.

78.     As described in Paragraph 29 above, the OIP Advisors account was opened and controlled by Ahmed. Ahmed did not disclose or forward the funds to Oak. Instead, he transferred the funds into a bank account that he held jointly with his wife, Relief Defendant Shalini Ahmed.

79.     By virtue of his misconduct described above, Ahmed misled Oak and the Oak fund's investors, defrauding them of approximately $2.2 million in connection with their investment in Company I.

**Ahmed's Fraud in Connection with Oak's Investment in Company A**

80.     In or around August 2014, Ahmed recommended that one of Oak's funds, Oak Investment Partners XIII, LP ("Oak XIII"), purchase shares in an e-commerce company operating in Asia ("Company A"). Ahmed recommended that Oak XIII purchase those shares, not directly from Company A, but from a British Virgin Islands company (the "BVI Company")

21

that was looking to sell its investment in Company A. Ahmed was a member of the BVI Company's board of directors.

81.     On or about the evening of Sunday, August 10, 2014, Ahmed sent an e-mail to Oak partners seeking approval for the purchase of Company A's shares from the BVI Company. In making this recommendation, Ahmed represented that Company A "continues to grow fast and do quite well," and that it had "crossed a million $ in revenues in June and turned a little profit too." Ahmed urged that the deal needed to be done quickly.

82.     Ahmed attached to his August 10 e-mail a report recommending that Oak XIII purchase Company A's shares from the BVI Company at a price of approximately $3.544 million.

83.     By at least August 12, 2014, Oak XIII made the purported $3.544 million purchase of Company A's shares. On or about August 12, 2014, Ahmed forwarded to Oak personnel what he claimed were the final, executed deal documents, with the note: "All signed docs are in. Good to wire and close the purchase." The purchase price listed in both the signed resolution of the BVI Company's board of directors and the share purchase agreement was $3.544 million. Ahmed was the sole representative of Oak XIII signing on behalf of the fund.

84.     Also on or about August 12, 2014, Ahmed submitted a check request asking that the $3.544 million be paid, purportedly to the BVI Company. Ahmed also provided Oak with wiring instructions which stated that the funds were to be sent to a bank account that belonged to the BVI Company. The request was approved, and the funds were wired on behalf of Oak XIII to the designated account.

85.     Ahmed made significant misrepresentations, and engaged in fraudulent and deceptive conduct, in connection with this recommendation. As detailed below, Ahmed knew

that the actual price at which the BVI Company sold its shares of Company A was $1.5 million, not the $3.544 million Ahmed represented to Oak and Oak XIII. Ahmed misrepresented the financial condition of Company A, provided Oak with altered deal documents, and fraudulently arranged for Oak XIII funds to be wired to the Ahmed Sole Prop account.

86.     The BVI Company's board of directors consisted of three individuals: Ahmed and two others. On or about July 30, 2014, Ahmed corresponded with one of the other BVI Company board members about the potential sale of its Company A shares. Ahmed claimed he had negotiated a sale of the shares for $1.5 million, but that the third party buyer was now skeptical of that price in light of Company A's "declining revenues" and "significant loss" of business. Ahmed suggested he believed he could convince the buyer to purchase the shares for approximately $1.3 million. The board member indicated that he was comfortable with a sale at that price.

87.     On or about the morning of Monday, August 11, 2014, Ahmed e-mailed the two other BVI Company board members claiming that the potential buyer "ke[pt] going back on price." Ahmed proposed that the BVI Company sell its shares of Company A to Oak rather than a third party buyer. Ahmed claimed that "the fair price would be $1.5MM."

88.     In stark contrast to his statements to the other BVI Company board members, Ahmed recommended that Oak XIII pay $3.544 million to purchase the BVI Company's stake in Company A.  In making this recommendation, Ahmed misrepresented the financial condition of Company A.  As noted above, in his August 10, 2014 email recommending the investment to Oak, Ahmed claimed that Company A was "do[ing] quite well" financially, had more than $1 million in revenues in June 2014, and had "turned a little profit too." In fact, on or about August 8, 2014, Ahmed had received information about Company A's financials, which noted that

estimated revenues for June 2014 were approximately $725,000, and the company had a net loss of more than $200,000.

89.     Similarly, the day after he had recommended the investment to Oak, Ahmed e-mailed the other two BVI Company board members noting that Company A's "week on week revenues … have declined" and that the company "is still losing money and will need more funding down the line."

90.     By August 12, 2014, Ahmed received approval from the BVI Company board members to proceed with the sale of Company A shares at a price of $1.5 million. Later that day, Ahmed e-mailed the deal documents reflecting the $1.5 million purchase price to the other two BVI Company board members for their signatures. The two BVI Company board members separately e-mailed to Ahmed executed versions of these deal documents that were signed on or about August 11 and August 12, 2014.

91.     To conceal his fraud, however, Ahmed provided Oak with altered deal documents. On August 12, 2014, after Ahmed had received executed copies of the deal documents from both of the other BVI Company board members, Ahmed emailed to Oak personnel executed deal documents that falsely depicted a purchase price of $3.544 million.

92.     In addition to misrepresenting Company A's finances and using altered deal documents that overstated the actual purchase price, Ahmed caused Oak XIII's money to be wired to a bank account that he controlled. Specifically, the wiring instructions Ahmed provided to Oak were not for an account held by the BVI Company, as Ahmed claimed in the wiring instructions, but rather were for the account held by Relief Defendant Ahmed Sole Prop.

93.     As noted above, the full name of the Ahmed Sole Prop bank account misleadingly suggested that Ahmed Sole Prop was "doing business as" the BVI Company. In fact, the bank account was controlled by Ahmed and registered to Ahmed's home address.

94.     Further, on or about August 15, 2014, Ahmed transferred $2 million from the Ahmed Sole Prop bank account to a bank account held in the name of Ahmed and Relief Defendant Shalini Ahmed. That same day, Ahmed wrote a $2 million check from that personal bank account to Relief Defendant Shalini Ahmed. On or about August 18, 2014, Ahmed transferred an additional $44,113 and $600 from the Ahmed Sole Prop bank account to the personal bank account held in the name of Ahmed and Relief Defendant Shalini Ahmed. These three transfers from the Ahmed Sole Prop bank account equal almost exactly the difference between the approximately $3.544 million price Oak XIII believed it was paying for the Company A shares, and the $1.5 million price for which the shares were actually sold.

95.     By virtue of his misconduct, Ahmed misled Oak XIII and Oak XIII's investors, defrauding them of more than $2 million.

### Ahmed's Fraud in Connection with Oak's Investment in Company B

96.     In or around December 2014, Ahmed recommended to Oak that another one of its funds, Oak Investment Partners XII, LP ("Oak XII") make an investment in a joint venture that provided e-commerce services in the Asian market ("Company B"). Company B had been formed by two existing companies: (1) a Cayman Islands company headquartered in China ("Joint Venture Party 1") and (2) a Singapore business subsidiary controlled by the BVI Company referenced above (the "BVI Subsidiary"). At the time of Ahmed's recommendation, Joint Venture Party 1 was seeking to sell its stake in Company B.

25

97.     Ahmed recommended that Oak XII purchase Joint Venture Party 1's shares in Company B, at a price of $20 million. As part of his recommendation, on or about December 15, 2014, Ahmed prepared a report on the proposed transaction. That report reiterated that the purchase price of the shares owned by Joint Venture Party 1 was $20 million. The report also contained detailed financial information about Company B.

98.     Ahmed further told Oak and Oak XII that the $20 million purchase price would be split, with $2 million being paid directly to Joint Venture Party 1 (the selling party) and the remaining $18 million being paid to the BVI Company. In response to questions from Oak personnel about this payment structure, Ahmed sent an e-mail on or about December 18, 2014 claiming that the $18 million would "flow in to" Company B through the BVI Company "immediately at close."

99.     Based on Ahmed's recommendation and representations, on or about December 19, 2014, Oak XII agreed to make the $20 million investment and purchased Company B's shares.

100.    On or about December 19, 2014, Ahmed submitted a check request detailing the payment structure. Specifically, consistent with Ahmed's earlier recommendation, Ahmed requested that $2 million be paid to Joint Venture Party 1 and $18 million be paid to the BVI Company. Ahmed provided Oak with wiring instructions for these funds. According to the wiring instructions, the $18 million was to be sent to a bank account that was in the name of the BVI Company. The account, however, was actually a personal account that Ahmed controlled and opened in the name of Relief Defendant Ahmed Sole Prop.

101.    As noted above, the full name of the Relief Defendant Ahmed Sole Prop bank account misleadingly suggested that Ahmed Sole Prop was "doing business as" the BVI Company.

102.    On or about December 19, 2014, Oak personnel wired the requested funds on behalf of Oak XII to the accounts Ahmed had designated.

103.    On or about December 29, 2014, one of Oak's employees requested additional information from Ahmed about the payment structure, and specifically asked for details and documentation of the $18 million payment purportedly made to the BVI Company. In response, on or about January 3, 2015, Ahmed e-mailed the Oak employee what Ahmed claimed were the final, executed deal documents. Those documents reflected a purchase price of $20 million.

104.    Ahmed further told the Oak employee that the payment was structured the way it was at the joint venture parties' request. In another e-mail sent on or about January 3, 2015, Ahmed stated: "Just so you are clear on the funding, the purchase of [Joint Venture Party 1's] shares was for the entire $20MM, but netted out for a $18MM obligation that [Joint Venture Party 1] had to [the BVI Company] ... and hence the fund flows were as we did. The gross purchase price from Oak was $20MM but the net amount to [Joint Venture Party 1] was $2MM."

105.    Ahmed's representations to Oak and Oak XII were false, and his actions were fraudulent. As detailed below, Ahmed knew that the actual purchase price for Joint Venture Party 1's shares in Company B was $2 million, not the $20 million that Ahmed represented. While Ahmed claimed that the $18 million surplus was to be paid to the BVI Company, the parent company of the other joint venture partner, the BVI Subsidiary, Ahmed directed Oak XII to pay $18 million to Relief Defendant Ahmed Sole Prop's account that was in fact associated with Ahmed's home address.

106.    In order to justify the grossly exaggerated purchase price of $20 million, Ahmed misrepresented Company B's financial condition in the investment report that he prepared for and presented to Oak and Oak XII. Prior to preparing his report, Ahmed asked for and received from Company B financial projections for the current year and the next several years. Ahmed included this same type of information in the report, but the figures were often materially different. For example, the financial projections Ahmed received from Company B indicated that the estimated value of the merchandise it expected to sell in 2014 was approximately 42.6 million RMB[3]; the information Ahmed included in the report claimed a merchandise value of **1**42.6 million RMB. Similarly, the financial projections Ahmed received from Company B projected revenues in 2014 of 2.918 million RMB; Ahmed's report indicated projected revenues of **1**2.918 million RMB. As a result, Ahmed's report made Company B's financial condition appear significantly more robust than it actually was.

107.    On or about December 19, 2014, the share purchase agreement and other related documents for Oak XII's purchase of Joint Venture Party 1's shares were executed by the parties to the deal. Ahmed was the sole representative signing these deal documents on behalf of Oak XII. Later that day, the executed deal documents were circulated by e-mail to the parties to the deal. The executed deal documents clearly state that the purchase price was $2 million. Indeed, a press release issued by Joint Venture Party 1 confirmed that it had sold its shares of Company B to Oak XII for $2 million.

108.    Notwithstanding his knowledge of the actual purchase price, Ahmed caused $18 million of the inflated $20 million purchase price to be wired to an account that he controlled. As outlined above, the account that Ahmed informed Oak was held by the BVI Company, the parent

---

[3] "RMB" is the denotation of China's currency, the renminbi.

company of the remaining joint venture partner, the BVI Subsidiary, was in fact held in the name of Relief Defendant Ahmed Sole Prop. Furthermore, the address associated with that account was Ahmed's home address in Connecticut. The $18 million was then transferred from the Ahmed Sole Prop account into a bank account that Ahmed held jointly with his wife, Relief Defendant Shalini Ahmed. Those monies were then further transferred into other accounts held by Ahmed and Relief Defendant Shalini Ahmed, and a portion was later used to purchase a New York City condominium located on Park Avenue for more than $7.9 million, held in the name of DIYA Real Holdings.

109.    In an attempt to cover his tracks, Ahmed e-mailed altered deal documents to an Oak employee after the transaction was completed. On or about January 3, 2015, Ahmed emailed to the Oak employee a document that purported to be the final executed share purchase agreement. The document was nearly identical to the actual final share purchase agreement that Ahmed and the other parties had signed approximately two weeks earlier, with one significant difference:  Ahmed had changed the purchase price term of the agreement from $2 million to $20 million.

110.    By virtue of his misconduct, Ahmed misled Oak XII and Oak XII's investors, defrauding them of more than $18 million.

### Ahmed's Fraud in Connection with Oak's Investment in Company C

111.    In 2013 and 2014, Ahmed recommended that Oak XIII make two separate investments in a U.S.-based e-commerce company ("Company C"). In or around November 2012, Company C engaged in an initial round of financing. One of the investors in this initial round of financing was Relief Defendant I-Cubed.

112.     In or around October 2013, as Company C was engaged in a second round of financing, Ahmed made a recommendation that Oak XIII invest in Company C. Based on Ahmed's recommendation, on or about October 11, 2013, Oak XIII invested $25 million and purchased shares directly from Company C. At the time of this investment, I-Cubed was one of approximately twenty shareholders in Company C.

113.     Approximately one year later, in or around October 2014, Ahmed recommended that Oak XIII make a second investment in Company C. Rather than purchase shares directly from Company C, this time Ahmed recommended that Oak XIII purchase shares from I-Cubed. Specifically, Ahmed recommended that Oak XIII purchase the shares that I-Cubed had acquired in or around November 2012, during Company C's initial round of financing. Although I-Cubed had paid only $2 million for these shares, Ahmed recommended that Oak XIII purchase the shares from I-Cubed at a price of $7.5 million. Ahmed assisted with the justification of the $7.5 million purchase price by providing purported revenue projections for Company C.

114.     Based on Ahmed's recommendation, Oak XIII made its second, $7.5 million investment in Company C. On or about October 30, 2014, a stock purchase agreement was executed between Oak XIII and I-Cubed. The stock purchase agreement was signed by Ahmed on behalf of Oak XIII, and purportedly signed by a different individual on behalf of I-Cubed. On or about that same day, Oak personnel wired $7.5 million on behalf of Oak XIII to an I-Cubed bank account, in exchange for all of I-Cubed's shares in Company C. The significant majority of that $7.5 million was later transferred to an account held in the name of Relief Defendant Shalini Ahmed 2014 Grantor Retained Annuity Trust.

115.     Ahmed defrauded Oak XIII in connection with the investments in Company C. Most notably, Ahmed never disclosed to Oak, Oak XIII, or Oak XIII's investors his relationship

with I-Cubed, violating his fiduciary duties to act in the best interest of his clients and to avoid self-dealing.

116.     As explained above, I-Cubed was formed in 2012 with Ahmed as its sole initial member.

117.     In or around November 2012, Ahmed was directly involved in I-Cubed's purchase of Company C shares for $2 million. At that time, Ahmed was still the sole member of I-Cubed. Moreover, the funds that I-Cubed used to purchase Company C's shares were wired from a brokerage account registered to Ahmed and his wife at Ahmed's home address.

118.     On or about May 16, 2013, Ahmed assigned his interest in I-Cubed to his wife. On information and belief, ninety-nine percent of that ownership interest in I-Cubed may later have been transferred into a trust in his wife's name, the Shalini Ahmed 2014 Grantor Retained Annuity Trust. In any event, the ownership of I-Cubed remained with Ahmed and/or his family at all times relevant to this Complaint.

119.     Ahmed failed to disclose his interest in I-Cubed to Oak or Oak XIII in connection with the fund's investments in Company C. Specifically, when Oak XIII made its initial $25 million investment in Company C in or around October 2013, Ahmed failed to disclose that he and his wife (through her ownership of I-Cubed) held a sizable investment in Company C.

120.     In or around June 2013, Ahmed expressly represented to Oak's chief operating officer that he had "NO personal investment or any direct beneficial interest or investment in" Company C. This statement was false and misleading in light of the fact that Ahmed's wife owned I-Cubed, which (in turn) owned shares of Company C.

121.     Ahmed further failed to disclose his family's interest during the October 2014 transaction in which Oak XIII purchased Company C shares directly from I-Cubed for $7.5

million – a sale that allowed I-Cubed to generate a $5.5 million profit on the shares that it had purchased for $2 million just two years earlier.

122.    By virtue of Ahmed's fraud, concealment, and self-dealing, Oak XIII's investments in Company C were made without knowing that it was investing in a company in which Ahmed himself held a significant interest.

### Ahmed's Additional Fraud in Connection with Another Company C Investment

123.    Oak was not the only entity Ahmed defrauded in connection with investments in Company C. As alleged in Paragraph 80, above, Ahmed was a member of the BVI Company's board of directors. In or around November 2012, the BVI Company's board authorized the purchase of $150,000 worth of shares in Company C.

124.    Later in November 2012, and without authorization from the BVI Company, Ahmed directly and personally negotiated an additional $2 million purchase of Company C shares by the BVI Company. Ahmed used $2 million of the BVI Company's funds to execute this purchase.

125.    When Ahmed was confronted by the BVI Company about the $2 million share purchase, Ahmed falsely claimed that the purchase was a mistake.

126.    In or around June 2013, Ahmed transferred $2 million to the BVI Company. Shortly thereafter, Ahmed began to negotiate the sale of the Company C shares.

127.    In or around October 2013, Ahmed sold the shares for approximately $10.9 million. Ahmed directed those funds to be wired to the Ahmed Sole Prop account "doing business as" the BVI Company account, as described in paragraphs 93 and 108, above. Ahmed then transferred approximately $10.75 million into bank accounts that he held jointly with his

wife, Relief Defendant Shalini Ahmed, and approximately $35,000 into three separate accounts that were held in the name of Ahmed and Shalini Ahmed's children, I.I. 1, I.I. 2, and I.I. 3.

### Relief Defendants Received Ill-Gotten Gains

128.    As detailed above, Relief Defendant Ahmed Sole Prop received proceeds from Ahmed's misconduct in connection with two Oak funds' investments in Companies A, B and G. Ahmed Sole Prop has no legitimate claim to these funds.

129.    As detailed above, Relief Defendant I-Cubed received proceeds from Ahmed's misconduct in connection with Oak XIII's investment in Company C. I-Cubed has no legitimate claim to these funds.

130.    As detailed above, Relief Defendant Shalini Ahmed received a large portion of the proceeds from Ahmed's misconduct in connection with several of the transactions described herein. These include large transfers of fraudulent proceeds into bank accounts that were held jointly with Ahmed, her husband. Shalini Ahmed has no legitimate claim to these funds.

131.    Relief Defendant Shalini Ahmed 2014 Grantor Retained Annuity Trust received proceeds from Ahmed's misconduct, including Ahmed's misconduct in connection with Oak XIII's $7.5 million purchase of Company C shares from Relief Defendant I-Cubed. On or about October 30, 2014, Oak XIII wired $7.5 million to a bank account registered to I-Cubed. On or about November 2, 2014, a check for $7.425 million was written from that I-Cubed bank account and deposited into an account held by the Shalini Ahmed 2014 Grantor Retained Annuity Trust. The Shalini Ahmed 2014 Grantor Retained Annuity Trust has no legitimate claim to these funds.

132.    Relief Defendant DIYA Holdings LLC received proceeds from Ahmed's misconduct, including Ahmed's misconduct in fraudulently purchasing $2 million in Company C shares using BVI Company funds and then reselling those shares for approximately $10.9

33

million. A substantial portion of that $10.9 million was used to purchase a New York City Park Avenue condominium in December 2013, which is held in the name of DIYA Holdings LLC. DIYA Holdings LLC has no legitimate claim to these funds or this property.

133.    Relief Defendant DIYA Real Holdings, LLC received proceeds from Ahmed's misconduct, including Ahmed's misconduct in connection with Oak XII's investment in Company B. As detailed above, Ahmed defrauded Oak and Oak XII out of $18 million in connection with that investment. After moving these funds through several accounts, Ahmed used a substantial portion of that $18 million to purchase a New York City Park Avenue condominium in April 2015, which is held in the name of DIYA Real Holdings, LLC. DIYA Real Holdings, LLC has no legitimate claim to these funds or this property.

134.    I.I. 1 received proceeds from Ahmed's misconduct, including Ahmed's misconduct in fraudulently purchasing $2 million in Company C shares using BVI Company funds and then reselling those shares for approximately $10.9 million. As described in Paragraphs 19 and 127, a portion of these fraudulent funds were transferred into a UTMA Account held for the benefit of I.I. 1. I.I. 1 has no legitimate claim to these funds.

135.    I.I. 2 received proceeds from Ahmed's misconduct, including Ahmed's misconduct in fraudulently purchasing $2 million in Company C shares using BVI Company funds and then reselling those shares for approximately $10.9 million. As described in Paragraphs 20 and 127, a portion of these fraudulent funds were transferred into a UTMA Account held for the benefit of I.I. 2. I.I. 2 has no legitimate claim to these funds.

136.    I.I. 3 received proceeds from Ahmed's misconduct, including Ahmed's misconduct in fraudulently purchasing $2 million in Company C shares using BVI Company funds and then reselling those shares for approximately $10.9 million. As described in

34

Paragraphs 21 and 127, a portion of these fraudulent funds were transferred into a UTMA

Account held for the benefit of I.I. 3. I.I. 3 has no legitimate claim to these funds.

## FIRST CLAIM FOR RELIEF
**Fraud in the Purchase or Sale of Securities in Violation of
Section 10(b) of the Exchange Act and Rule 10b-5
(Against Defendant Ahmed)**

137.     The Commission realleges and incorporates by reference paragraphs 1 through

136, as if fully set forth herein.

138.     As a result of the conduct alleged herein, Defendant Ahmed, in connection with

the purchase or sale of securities, by the use of the means or instrumentalities of interstate

commerce, or of the mails, and with scienter:

(a)     employed a device, scheme, or artifice to defraud;

(b)     made untrue statements of material fact or omitted to state material facts

necessary in order to make the statements made, in light of the circumstances under which they

were made, not misleading; or

(c)     engaged in an act, practice, or course of business which operated or would

operate as a fraud or deceit upon any person.

139.     By virtue of the foregoing, Defendant Ahmed, directly or indirectly, violated, and

unless enjoined, will again violate Section 10(b) of the Exchange Act [15 U.S.C. 78j(b)] and

Rule 10b-5 [17 C.F.R. §240.10b-5] thereunder.

## SECOND CLAIM FOR RELIEF
**Fraud in the Offer or Sale of Securities in Violation of
Section 17(a) of the Securities Act
(Against Defendant Ahmed)**

140.     The Commission realleges and incorporates by reference paragraphs 1 through

136, as if fully set forth herein.

141.    As a result of the conduct alleged herein, in connection with the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

(1)     with scienter, employed a device, scheme, or artifice to defraud;

(2)     obtained money or property by means of untrue statements of a material fact or omission to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(3)     engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit upon the purchaser.

142.    By virtue of the foregoing, Defendant Ahmed, directly or indirectly, violated, and unless enjoined, will again violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## THIRD CLAIM FOR RELIEF
### Fraud by an Investment Adviser in Violation of
### Sections 206(1) and 206(2) of the Advisers Act
### (Against Defendant Ahmed)

143.    The Commission realleges and incorporates by reference paragraphs 1 through 136, as if fully set forth herein.

144.    As a result of the conduct alleged herein, Defendant Ahmed, while acting as an investment adviser, by the use of the mails or any means or instrumentality of interstate commerce, directly or indirectly:

(1)     with scienter, employed a device, scheme, or artifice to defraud; or

(2)     engaged in a transaction, practice, or course of business which operated as a fraud or deceit upon a client or prospective client.

36

145. By virtue of the foregoing, Defendant Ahmed, directly or indirectly, violated, and unless enjoined, will again violate Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. § 80b-6(1) and 80b-6(2)].

### FOURTH CLAIM FOR RELIEF
**Undisclosed Principal Transaction in Violation of
Section 206(3) of the Advisers Act
(Against Defendant Ahmed)**

146. The Commission realleges and incorporates by reference paragraphs 1 through 136, as if fully set forth herein.

147. As a result of the conduct alleged herein, and specifically Defendant Ahmed's conduct in regard to Relief Defendant I-Cubed's sale of Company C shares to Oak XIII in or around October 2014, Defendant Ahmed, while acting as an investment adviser, by the use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, acting as a principal for his own account, knowingly sold a security to a client without disclosing to such client in writing before the completion of such transaction the capacity in which he was acting and obtaining the consent of the client to such transaction.

148. By virtue of the foregoing, Defendant Ahmed, directly or indirectly, violated, and unless enjoined, will again violate Section 206(3) of the Advisers Act [15 U.S.C. § 80b-6(3)].

### FIFTH CLAIM FOR RELIEF
**Fraud on Pooled Investment Vehicle Investors in Violation of
Section 206(4) of the Advisers Act and Rule 206(4)-8
(Against Defendant Ahmed)**

149. The Commission realleges and incorporates by reference paragraphs 1 through 136, as if fully set forth herein.

150. As a result of the conduct alleged herein, Defendant Ahmed, while acting as an investment adviser to various pooled investment vehicles, by the use of the mails or any means

or instrumentality of interstate commerce, directly or indirectly engaged in acts, practices, or courses of business which were fraudulent, deceptive, or manipulative. Defendant Ahmed:

(1)      made untrue statements of material facts and omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading to an investor or prospective investor in the pooled investment vehicles; or

(2)      otherwise engaged in acts, practices, or courses of business that were fraudulent, deceptive, or manipulative with respect to an investor or prospective investor in the pooled investment vehicles.

151.   By virtue of the foregoing, Defendant Ahmed, directly or indirectly, violated, and unless enjoined, will again violate Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

### SIXTH CLAIM FOR RELIEF
### Equitable Disgorgement
### (Against Relief Defendant Ahmed Sole Prop)

152.   The Commission realleges and incorporates by reference paragraphs 1 through 136, as if fully set forth herein.

153.   Relief Defendant Ahmed Sole Prop's bank account received and held proceeds of Defendant Ahmed's fraudulent transactions involving Company A and Company B.

154.   Relief Defendant Ahmed Sole Prop has no legitimate claim to these illicit proceeds.

155.   Relief Defendant Ahmed Sole Prop obtained the funds under circumstances in which it is not just, equitable, or conscionable for it to retain the funds, and therefore has been unjustly enriched.

### SEVENTH CLAIM FOR RELIEF
**Equitable Disgorgement**
**(Against Relief Defendant I-Cubed)**

156.    The Commission realleges and incorporates by reference paragraphs 1 through 136, as if fully set forth herein.

157.    Defendant Ahmed controls Relief Defendant I-Cubed.

158.    Relief Defendant I-Cubed's bank account received and held proceeds of Defendant Ahmed's fraudulent transaction involving Relief Defendant I-Cubed's sale of Company C shares in October 2014.

159.    Relief Defendant I-Cubed has no legitimate claim to these illicit proceeds.

160.    Relief Defendant I-Cubed obtained the funds under circumstances in which it is not just, equitable, or conscionable for it to retain the funds, and therefore has been unjustly enriched.

### EIGHTH CLAIM FOR RELIEF
**Equitable Disgorgement**
**(Against Relief Defendant Shalini Ahmed)**

161.    The Commission realleges and incorporates by reference paragraphs 1 through 136, as if fully set forth herein.

162.    Relief Defendant Shalini Ahmed received proceeds from certain of Defendant Ahmed's fraudulent transactions described above.

163.    Relief Defendant Shalini Ahmed has no legitimate claim to these illicit proceeds.

164.    Relief Defendant Shalini Ahmed obtained the funds under circumstances in which it is not just, equitable, or conscionable for her to retain the funds, and therefore has been unjustly enriched.

### NINTH CLAIM FOR RELIEF
#### Equitable Disgorgement
#### (Against Relief Defendant Shalini Ahmed 2014 Grantor Retained Annuity Trust)

165.    The Commission realleges and incorporates by reference paragraphs 1 through 136, as if fully set forth herein.

166.    Relief Defendant Shalini Ahmed 2014 Grantor Retained Annuity Trust received proceeds from certain of Defendant Ahmed's fraudulent transactions described above.

167.    Relief Defendant Shalini Ahmed 2014 Grantor Retained Annuity Trust has no legitimate claim to these illicit proceeds.

168.    Relief Defendant Shalini Ahmed 2014 Grantor Retained Annuity Trust obtained the funds under circumstances in which it is not just, equitable, or conscionable for it to retain the funds, and therefore has been unjustly enriched.

### TENTH CLAIM FOR RELIEF
#### Equitable Disgorgement
#### (Against Relief Defendant DIYA Holdings LLC)

169.    The Commission realleges and incorporates by reference paragraphs 1 through 136, as if fully set forth herein.

170.    Relief Defendant DIYA Holdings LLC received proceeds from certain of Defendant Ahmed's fraudulent transactions described above.

171.    Relief Defendant DIYA Holdings LLC has no legitimate claim to these illicit proceeds.

172.    Relief Defendant DIYA Holdings LLC obtained the funds under circumstances in which it is not just, equitable, or conscionable for it to retain the funds, and therefore has been unjustly enriched.

40

## ELEVENTHCLAIM FOR RELIEF
### Equitable Disgorgement
### (Against Relief Defendant DIYA Real Holdings, LLC)

173.    The Commission realleges and incorporates by reference paragraphs 1 through 136, as if fully set forth herein.

174.    Relief Defendant DIYA Real Holdings, LLC received proceeds from certain of Defendant Ahmed's fraudulent transactions described above.

175.    Relief Defendant DIYA Real Holdings, LLC has no legitimate claim to these illicit proceeds.

176.    Relief Defendant DIYA Real Holdings, LLC obtained the funds under circumstances in which it is not just, equitable, or conscionable for it to retain the funds, and therefore has been unjustly enriched.

## TWELFTH CLAIM FOR RELIEF
### Equitable Disgorgement
### (Against Relief Defendant I.I. 1)

177.    The Commission realleges and incorporates by reference paragraphs 1 through 136, as if fully set forth herein.

178.    Relief Defendant I.I. 1 received proceeds from certain of Defendant Ahmed's fraudulent transactions described above.

179.    Relief Defendant I.I. 1 has no legitimate claim to these illicit proceeds.

180.    Relief Defendant I.I. 1 obtained the funds under circumstances in which it is not just, equitable, or conscionable for him to retain the funds, and therefore has been unjustly enriched.

## THIRTEENTH CLAIM FOR RELIEF
**Equitable Disgorgement**
**(Against Relief Defendant I.I. 2)**

181.    The Commission realleges and incorporates by reference paragraphs 1 through 136, as if fully set forth herein.

182.    Relief Defendant I.I. 2 received proceeds from certain of Defendant Ahmed's fraudulent transactions described above.

183.    Relief Defendant I.I. 2 has no legitimate claim to these illicit proceeds.

184.    Relief Defendant I.I. 2 obtained the funds under circumstances in which it is not just, equitable, or conscionable for him to retain the funds, and therefore has been unjustly enriched.

## FOURTEENTH CLAIM FOR RELIEF
**Equitable Disgorgement**
**(Against Relief Defendant I.I. 3)**

185.    The Commission realleges and incorporates by reference paragraphs 1 through 136, as if fully set forth herein.

186.    Relief Defendant I.I. 3 received proceeds from certain of Defendant Ahmed's fraudulent transactions described above.

187.    Relief Defendant I.I. 3 has no legitimate claim to these illicit proceeds.

188.    Relief Defendant I.I. 3 obtained the funds under circumstances in which it is not just, equitable, or conscionable for him to retain the funds, and therefore has been unjustly enriched.

## RELIEF SOUGHT

**WHEREFORE**, the Commission respectfully requests that this Court enter a preliminary order freezing the assets of Defendant and Relief Defendants, prohibiting the destruction of documents, and ordering expedited discovery and alternative means of service.

Further the Commission respectfully requests that this Court enter a Final Judgment:

### I.

Finding that the Defendant committed the violations alleged in this Complaint;

### II.

Permanently restraining and enjoining the Defendant and his agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with him, who receive actual notice of the Final Judgment by personal service or otherwise, and each of them, from engaging in transactions, acts, practices, and courses of business described herein, and from engaging in conduct of similar purport and object in violation of Section 17(a) of Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder, and Sections 206(1), 206(2), 206(3), and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2), 80b-6(3), and 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8];

### III.

Directing the Defendant and the Relief Defendants to disgorge all ill-gotten gains received during the period of violative conduct and pay prejudgment interest on such ill-gotten gains;

**IV.**

Directing the Defendant to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]; and

**V.**

Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

The Commission demands a jury in this matter.

Dated: June 12, 2015

Respectfully submitted,

s/ Nicholas P. Heinke
Nicholas P. Heinke (Colo. Bar No. 38738)
Connecticut Bar No. phv07374
Mark L. Williams (New York Bar No. 4796611)
Connecticut Bar No. phv07375
United States Securities and Exchange Commission
1961 Stout St., Suite 1700, Denver, CO  80294
Phone:     (303) 844-1000 (main)
                 (303) 844-1071 (Heinke)
                 (303) 844-1027 (Williams)
E-mail:     HeinkeN@sec.gov
                 WilliamsML@sec.gov

John B. Hughes (CT05289)
Connecticut Federal Bar No. ct05289
Assistant United States Attorney
Chief, Civil Division
United States Attorney's Office
Connecticut Financial Center
157 Church St., 25th Floor
New Haven, CT 06510
Ph: (203) 821-3700
Fax: (203) 773-5373
E-mail: John.Hughes@usdoj.gov

*Attorneys for Plaintiff*
UNITED STATES SECURITIES AND EXCHANGE
COMMISSION