UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

_____

|  |  |  |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) |  |
| Plaintiff, | ) ) ) |  |
| v. | ) ) | Civil Action No. 3:15cv675 (JBA) |
| IFTIKAR AHMED, | ) ) ) |  |
| Defendant, and | ) ) |  |
| IFTIKAR ALI AHMED SOLE PROP; I-CUBED DOMAINS, LLC; SHALINI AHMED; SHALINI AHMED 2014 GRANTOR RETAINED ANNUITY TRUST; DIYA HOLDINGS LLC; DIYA REAL HOLDINGS, LLC; I.I. 1, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; I.I. 2, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; and I.I. 3, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents, | ) ) ) ) ) ) ) ) ) ) ) ) ) |  |
| Relief Defendants. | ) ) |  |

_____ )

## PLAINTIFF UNITED STATES SECURITIES AND EXCHANGE COMMISSION'S BRIEF IN SUPPORT OF PRELIMINARY INJUNCTION

Pursuant to the Court's Consent Order (Doc. No. 46), Plaintiff United States Securities and Exchange Commission (the "Commission") hereby files its brief in anticipation of the preliminary injunction hearing in this matter set for Thursday, July 23, 2015.

I.      **Introduction**

Defendant Iftikar Ahmed ("Mr. Ahmed") perpetrated a massive fraud on his employer, Oak Investment Partners ("Oak") and its investors.  This fraud spanned more than a decade and netted Mr. Ahmed more than $65 million in ill-gotten gains.  Although complex and extensive, Mr. Ahmed fraudulent scheme was akin to theft: he stole large sums of money that did not belong to him.  To effectuate this theft, Mr. Ahmed typically submitted fabricated documents and/or made false representations in order to induce Oak or companies in which Oak invested into making payments that, unbeknownst to them, went directly into accounts controlled by Mr. Ahmed.  He then typically moved the stolen money through various bank accounts before ultimately placing the majority of the money into accounts (or purchasing assets) in the names of nominees, including his wife and the other named relief defendants.  Although held in the name of nominees, those assets continued to be assets of Mr. Ahmed.

The Commission has located and frozen approximately $47 million dollars in liquid assets, as well as real estate worth approximately $20 million and certain other non-liquid assets that are difficult to value.  Much of these assets are traceable directly to Mr. Ahmed's fraud.  Notably, Mr. Ahmed has not denied the allegations that he defrauded Oak and its investors of more than $65 million, nor has he denied that he placed the majority of the proceeds into the names of nominees.  In fact, there is no better confirmation as to the accuracy of the allegations in this case than Mr. Ahmed's reaction to those allegations:  he fled the United States and remains a fugitive of justice.

As outlined herein, the Court should grant the Commission's request for a preliminary injunction freezing the assets of Mr. Ahmed in order to ensure that money will be available to

2

satisfy any ultimate judgment.  As detailed below, this preliminary injunction should apply to all assets the Commission has identified and are presently frozen, whether held in Mr. Ahmed's name or the names of nominees such as his family members and their related entities, since in fact nearly all of those assets came from Mr. Ahmed, and a significant portion of the assets can be traced directly to the fraud. Alternatively, should the Court find the assets of the relief defendants are not, essentially, assets of Mr. Ahmed, it should order an asset freeze over the specific amounts of fraudulent proceeds that each relief defendant received. The Court should also reject any request by Mr. Ahmed's wife, Relief Defendant Shalini Ahmed ("Mrs. Ahmed"), to access frozen funds by way of a "carve out."  These monies do not belong to Mrs. Ahmed or her husband, but rather should properly be used to compensate the victims of Mr. Ahmed's crimes. It would be inappropriate and improper to allow Mrs. Ahmed to consume these funds during the pendency of this litigation.

## II.    Background

On May 6, 2015, the Commission filed its initial complaint and an emergency motion for a temporary restraining order and other ancillary relief, and for a preliminary injunction, in order to prevent the dissipation of assets. (Doc. Nos. 1-2.) On May 7, 2015, the Court entered a temporary restraining order freezing assets of Defendant Iftikar Ahmed and Relief Defendants Iftikar Ali Ahmed Sole Prop and I-Cubed Domains, LLC, up to the amount of approximately $55 million, and set this matter for a preliminary injunction hearing. (Doc. No. 9.)

On May 18, 2015, the Commission and Defendant Ahmed entered into a stipulation that all assets held by him or under his direct or indirect control would remain frozen until the

Court's ruling on the Commission's motion for preliminary injunction (Doc. No. 21). Mr. Ahmed is believed to have fled the United States shortly after entering into this stipulation.

On June 16, 2015, the Commission filed its Amended Complaint alleging that Mr. Ahmed engaged in a decade-long scheme involving myriad investments made by Oak that resulted in illicit profits of approximately $65 million (Doc. No. 33.) In its Amended Complaint, the Commission also named several additional relief defendants, including Defendant Ahmed's wife, Mrs. Ahmed. The Court subsequently ordered expedited discovery and set this matter for a preliminary injunction hearing on July 2, 2015 (Doc. No. 34.)

In anticipation of the preliminary injunction hearing, the Commission sought to determine what, if any, assets Mrs. Ahmed believed should not be subject to the asset freeze. On June 19, 2015, the Commission served its First Discovery Request on Mrs. Ahmed. In part, the discovery request stated:

> Provide a listing of all assets that you or your family own, hold or have control over, either directly or indirectly, including but not limited to bank accounts and real property, which a) you contend you own individually; b) you contend Defendant Iftikar Ahmed has no direct or indirect control over (if different from your response to 6a); or c) you contend should not be subject to an asset freeze in the instant action.

On June 23, 2015, Mrs. Ahmed requested that the preliminary injunction hearing be continued to July 23, 2015, and also requested reciprocal expedited discovery from the SEC and Oak (Doc. No. 38.). The Court subsequently granted Mrs. Ahmed's request (Doc. No. 39.).

On July 10, 2015, Mrs. Ahmed responded to the Commission's First Discovery Request. Pursuant to the Commission's discovery request outlined above, Mrs. Ahmed stated as follows:

> Ms. Ahmed objects to this Interrogatory on the grounds that it is vague and ambiguous. She further objects to this Request on the

4

ground that it calls for a legal analysis as to what information concerns or supports a legal conclusion. The Commission has the burden of showing that the Relief Defendants' assets should be frozen by a Preliminary Injunction, and Ms. Ahmed will present her arguments in legal papers she submits for the Court's consideration at the time designated by the Court. Ms. Ahmed also objects to the Interrogatory to the extent it calls for information protected by the adverse spousal testimony privilege. Notwithstanding these objections, Ms. Ahmed states that the asset freeze is inappropriate with respect to compensation she earned over the course of her employment, including grants of stock and retirement account contributions; her personal contributions to the marital estate; the Shalini Ahmed 2014 Grantor Retained Annuity Trust; the assets of DIYA Holdings, LLC; the assets of DIYA Real Holdings, LLC; her and her children's reasonable legal expenses; her and her children's reasonable living expenses; and any other assets that the Commission cannot legally demonstrate should be subject to the asset freeze.

To date, Mrs. Ahmed has not supplemented her response.[1] Thus, because Mr. Ahmed is not taking part in the instant litigation, and indeed is in default, having failed to answer either the original Complaint or Amended Complaint, the Commission anticipates the upcoming preliminary injunction hearing will primarily focus on these limited assets.

## III.    Preliminary Statement Regarding Assets in Dispute.

Notwithstanding Mrs. Ahmed's assertions to the contrary, none of the assets she identified are improperly or inappropriately frozen. First, Mrs. Ahmed has not worked since 2011, and has not received income since the first six months of 2012. The Commission is not aware of any other contributions to the marital estate aside from her employment at Goldman Sachs from 2004 through 2011. Her Goldman Sachs earnings were not segregated and have

---

[1] At her deposition, the Commission asked Mrs. Ahmed which assets she "believe[d] the SEC or the District Court of Connecticut ha[d] frozen that belong to [Mrs. Ahmed] personally." After Mrs. Ahmed's attorney objected to the question, she responded "I don't know." (Shalini Ahmed Depo. Tr. at 56-57, attached hereto as Exh. 1).

likely been spent on her living expenses, which range from luxury automobiles, to a $9 million dollar residence purchased with cash, to private school tuition for her children, and various personal employees that assist with the home and raising her children.

Moreover, as outlined herein, Mrs. Ahmed received ill-gotten gains to which she has no legitimate claim, and thus she is expected to be subject to a disgorgement order at the conclusion of this litigation. The Commission is entitled to collect this judgment against any of Mrs. Ahmed's assets. See, e.g., SEC v. Rosenthal, 426 Fed. App'x 1 (2d Cir. 2011) (rejecting argument by relief defendants that they could only be required to disgorge proceeds specifically traceable to fraudulent conduct). Therefore, any assets of Mrs. Ahmed's, including any Goldman Sachs income and awards that were segregated, should be subject to a preliminary injunction freezing assets in order to ultimately satisfy any disgorgement order.

The Shalini Ahmed 2014 Grantor Retained Annuity Trust is also properly frozen. The commission is aware of only one asset – an account at Fidelity held in the name of the Shalini Ahmed 2014 GRAT. As outlined in the declaration of Jeffrey Oraker ("Oraker Decl."), filed herewith, and as further explained below, the funds within this account are the direct proceeds of Mr. Ahmed's fraud, and in any event came entirely from Mr. Ahmed's assets. Moreover, Mrs. Ahmed did not offer any goods or perform any services in exchange for these monies.

The assets of DIYA Holdings, LLC – namely a condominium at 530 Park Avenue, Unit 12A that was purchased for $9.3 million in December 2013 – is properly frozen. This condominium was purchased by Defendant Iftikar Ahmed with proceeds of his fraud, was funded entirely with Mr. Ahmed's assets, and Mrs. Ahmed did not offer any goods or perform any services in exchange for this asset.

The assets of DIYA Real Holdings, LLC – namely another condominium at 530 Park Avenue, Unit 12F that was purchased for $8.6 million in April 2015 – is also properly frozen. This condominium was purchased entirely with proceeds of Mr. Ahmed's fraud, and Mrs. Ahmed did not offer any goods or perform any services in exchange for this asset.

Although Mrs. Ahmed seeks funds for her and her children's living and legal expenses, the pursuit of funds is not an asset that can be unfrozen. To the extent Mrs. Ahmed seeks to use funds that are properly frozen to pay for these services, the Court should reject this request. Mrs. Ahmed should not be permitted to consume money that belongs to somebody else, especially victims of fraud.

**IV.   Legal Standard: A Preliminary Asset Freeze is Appropriate Where an Inference Can be Drawn that Mr. Ahmed has Violated the Securities Laws.**

"An asset freeze is a provisional remedy, the purpose of which is to ensure that, in the event the Commission obtains a judgment, money will be available to satisfy that judgment." SEC v. Byers, 2009 WL 33434, *2 (S.D.N.Y. Jan. 7, 2009) (citing SEC v. Unifund SAL, 910 F.2d 1028, 1041 (2d Cir. 1990)); see also SEC v. Gonzalez de Castilla, 145 F. Supp. 2d 402, 416 (S.D.N.Y. 2001) ("A freeze of assets is an ancillary remedy that merely 'assures that any funds that become due can be collected ….'") (quoting Unifund SAL, 910 F.2d at 1041).

To obtain a preliminary injunction freezing assets, the Commission "must show either a likelihood of success on the merits, or that an inference can be drawn that the party has violated the federal securities laws." Smith v. SEC, 653 F.3d 121, 128 (2d Cir. 2011) (internal quotations and citation omitted). This is a lesser showing than is required to obtain a preliminary injunction against future violations of the securities laws. Id.; see also Byers, 2009 WL 33434, at *2 ("[T]he SEC's burden of proof on an asset freeze is not as onerous as its burden would be for an

injunction."); <u>SEC v. Hedén</u>, 51 F. Supp. 2d 296, 298 (S.D.N.Y. 1999) (holding that a preliminary injunction freezing assets requires "a lesser showing" than a preliminary injunction against future securities law violations). "A freeze is particularly warranted where" – as here – "the defendant's alleged conduct involves fraud." <u>SEC v. Credit Bancorp Ltd.</u>, 2010 WL 768944, at *3 (S.D.N.Y. Mar. 8, 2010).

## V.    Mr. Ahmed Committed a Massive Fraud.

As set forth in detail in both the Commission's initial emergency motion for an *ex parte* temporary restraining order freezing assets (Doc. No. 2) and accompanying documents, and the Commission's amended motion for preliminary injunction (Doc. No. 29) and accompanying documents, there is overwhelming evidence that Mr. Ahmed engaged in a decade-long fraud that resulted in the misappropriation of tens of millions of dollars from Oak, Oak's investors, and the companies in which Oak invested. To perpetrate this fraud, Mr. Ahmed employed similar illicit acts and misrepresentations: he often misrepresented the price of an investment he advised Oak to make; at other times he fraudulently used invoices purportedly related to Oak's purchase or sale of a company's shares; and finally he engaged in self-dealing by misrepresenting or concealing his role in various transactions. In each case, Mr. Ahmed funneled the illicit proceeds into accounts at Bank of America that he claimed belonged to parties to the deals, but which in fact he opened and secretly controlled. (See Oraker Decl. ¶ 6 & Ex. 1.) The details of Mr. Ahmed's fraud are briefly outlined below.

<u>First</u>, Mr. Ahmed frequently misrepresented the purchase price of the investments that he advised various Oak funds to make, overstating either the price itself or the currency exchange rate to cause Oak to pay more for a company's shares than that company had agreed to sell – and

Case 3:15-cv-00675-JBA   Document 66   Filed 07/20/15   Page 9 of 33

thought it was selling – those shares. Mr. Ahmed then directed the excess funds be wired to the Bank of America accounts that he secretly controlled. Ahmed engaged in this conduct with at least five investment recommendations: a July 2005 recommendation that Oak invest in Company E (Second Declaration of Grace A. Ames (Doc. No. 31) ("Second Ames Decl.") ¶¶ 6-10); a November 2007 recommendation that Oak invest in Company G (id. ¶¶ 11-14); a December 2010 recommendation that Oak invest in Company I (id. ¶¶ 15-20); an August 2014 recommendation that Oak invest in Company A (Declaration of Grace A. Ames (Doc. No. 4-28) ("First Ames Decl.") ¶¶ 16-22); and a December 2014 recommendation that Oak invest in Company B (id. ¶¶ 8-15).

Second, Mr. Ahmed frequently used invoices[2] purportedly related to the costs of Oak's investments in various companies to perpetrate his fraudulent scheme and misappropriate funds. In some instances, Mr. Ahmed would present Oak with invoices that he (falsely) claimed represented deal costs owed to various companies – invoices it appears he fraudulently created. Mr. Ahmed directed Oak to pay those invoices to Bank of America accounts that he claimed belonged to the companies, but which in fact he opened and controlled. In other instances, Mr. Ahmed would present the companies themselves with invoices from Oak that he (falsely) claimed the companies were obligated to pay; in those cases, he directed the companies to pay the invoices to a Bank of America account titled to "Oak Investment Partners" or "OIP," but which again in fact he had opened and controlled. Mr. Ahmed engaged in this conduct in at least 12 instances in connection with at least five different company investment recommendations:

---

[2] In certain instances, Ahmed used letters or email, rather than formal invoices, to communicate the amounts purportedly owed. For the Court's ease, the Commission has generally grouped these transactions as involving "invoices."

9

- Company D: December 2004/January 2005 letters for the payment of a "management fee" (Second Ames Decl. ¶¶ 56-60); a July 2006 invoice for the payment of an investment bank's advisory fees (id. ¶¶ 40-44); a January 2007 invoice for the payment of foreign capital gains taxes (id. ¶¶ 45-49); and an August 2007 invoice for the payment of foreign transaction taxes (id. ¶¶ 50-52).

- Company E: November 2005 invoices for the payment of Oak's legal fees (id. ¶¶ 61-64).

- Company F: June 2007 emails for the payment of Oak's legal fees (id. ¶¶ 65-67); and October 2007 emails for the payment of Oak's legal fees (id. ¶¶ 68-71).

- Company G: an October 2009 invoice for "delisting fees" and legal fees (id. ¶¶ 27-29); an October 2011 invoice for a "management incentive payment" (id. ¶¶ 30-32); an April 2013 invoice for another "management incentive payment" (id. ¶¶ 33-34); and an April 2013 invoice for "advisory fees" (id. ¶¶ 35-37).

- Company H: April/June 2009 requests for the payment of Oak's legal fees (id. ¶¶ 72-74).

    Third, Mr. Ahmed misrepresented or concealed his role in at least two transactions involving Company C. From November 2012 to October 2013, Mr. Ahmed purchased shares in Company C by illicitly using money of a company on whose board of directors he sat, affirmatively misrepresented to this company that such purchase was a "mistake," and then re-sold the shares in Company C for a significant profit, which he kept. See Am. Compl. ¶¶ 123-127.[3] In addition, in October 2014, Oak purchased shares of Company C from I-Cubed with no

---

[3] Evidence of this fraudulent transaction was not attached to either of the Ames declaration, but rather has been gathered by the Commission in its investigation. As discussed below, Mr. Ahmed has defaulted and thus has essentially conceded the allegations in the Amended Complaint. In any event, the Commission is prepared to present evidence on this transaction at the preliminary injunction hearing if the Court wishes.

knowledge that Mr. Ahmed and/or his family owned and controlled I-Cubed (First Ames Decl. ¶¶ 23-31).

Analysis of the records of the Bank of America accounts confirms Mr. Ahmed's fraud: the misappropriated funds were indeed deposited into these secret Bank of America accounts, and then kept for the benefit of Mr. Ahmed and his family. (See Oraker Decl. ¶¶ 7-11, 17-18.)

If this significant evidence were not enough, Mr. Ahmed has now essentially admitted the Commission's allegations. As explained in the Commission's recently-filed request for the Clerk of Court to enter default, Mr. Ahmed has failed to answer either the initial or Amended Complaints, despite waiving service of the initial complaint and being served with the Amended Complaint. (See Doc. No. 64.) This default is significant; "the entry of a default judgment means that the allegations in the complaint are deemed admitted." "R" Best Produce, Inc. v. DiSapio, 540 F.3d 115, 118 (2d Cir. 2008).

Mr. Ahmed's misconduct violated multiple provisions of the federal securities laws, including: Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; Section 17(a) of the Securities Act; and Sections 206(1), (2), and (4) of the Advisers Act and Rule 206(4)-8 thereunder. While each of these provisions has slightly different requisite elements, in general, each prohibits fraudulent acts or schemes and material misrepresentations or omissions in connection with the offer, purchase, or sale of securities or by an investment advisor. See, e.g., SEC v. Pentagon Capital Management PLC, 725 F.3d 279, 285 (2d Cir. 2013) (Section 10(b)/Rule 10b-5 requires Commission show Mr. Ahmed "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities"); Aaron v. SEC, 446 U.S. 680,

702 (1980) (Section 17(a) requires similar showing, although scienter not required for 17(a)(2) or 17(a)(3)); SEC v. Haligiannis, 470 F. Supp. 2d 373, 383 (S.D.N.Y. 2007) ("Facts showing a violation of Section 17(a) or 10(b) by an investment adviser will also support a showing of a Section 206 violation."). As outlined above, and as detailed in the declarations of Grace Ames and the Amended Complaint, Mr. Ahmed made numerous misstatements and omissions, and used fraudulent devices, to further his decade-long fraud. Further, many of Mr. Ahmed's fraudulent acts were done in connection with the purchase or sale by Oak of a company's securities, and all of Mr. Ahmed's fraudulent acts were done by an investment adviser.[4]

Mr. Ahmed's conduct – and in particular his sale of shares from I-Cubed to Oak without disclosing his interest in I-Cubed – also violated Section 206(3) of the Adviser's Act. Specifically, Section 206(3) of the Advisers Act makes it unlawful for an investment adviser to engage in a "principal transaction" – *e.g.,* a transaction in which the adviser, acting for his own account, sells securities to a client's account – without disclosing to the client the capacity in which the adviser is acting and obtaining the client's consent. See Interpretation of Section 206(3) of the Investment Advisers Act of 1940, Rel. No. 1732, 1998 WL 400409, *1 (July 17, 1998). This provision exists given the potential principal transactions create for an adviser to engage in self-dealing. See id. at *2. Mr. Ahmed's orchestration of the sale of Company C's

---

[4] Section 202(a)(11) of the Advisers Act defines an investment adviser as "any person who, for compensation, engages in the business of advising others ... as to the value of securities or the advisability of investing in, purchasing, or selling securities ...." 15 U.S.C. § 80b-2(a)(11). See generally Financial Planning Ass'n v. SEC, 482 F.3d 481, 484 (D.C. Cir. 2007) (noting that Congress "broadly defined" investment adviser in the Advisers Act). Mr. Ahmed was responsible – and was compensated – for identifying, recommending, and managing investment opportunities for the funds that Oak advises, which often involved purchasing securities. (See First Ames Decl. ¶¶ 3-4.) Mr. Ahmed is an adviser under the terms of the Advisers Act.

shares from I-Cubed to Oak XIII was a principal transaction, since Mr. Ahmed and his family had a significant personal interest in I-Cubed. Cf. In re Gintel Asset Mgmt., Inc. et al., Advisers Act Rel. No. 2079, 2002 WL 31499839 (Nov. 8, 2002) (settled order finding respondent violated 206(3) by executing trades between a fund in which he owned a 1/3 interest and advisory client accounts).

In sum, there can be no doubt that the Commission has met its burden to show "a likelihood of success on the merits, or that an inference can be drawn that the party has violated the federal securities laws." Smith, 653 F.3d at 128.

## VI.    Mr. Ahmed's Liability for his Fraud Will Exceed $118 Million.

As noted above, "[a] freeze of assets is an ancillary remedy that merely 'assures that any funds that become due can be collected ....'" Gonzalez de Castilla, 145 F. Supp. 2d at 416 (quoting Unifund SAL, 910 F.2d at 1041). An asset freeze may properly include disgorgement, civil penalties, and prejudgment interest on disgorgement. See id. (asset freeze can include " disgorgement of profits, penalties …, and possibly prejudgment interest"); SEC v. Certain Unknown Traders in Securities of H.J. Heinz Co., 2013 WL 1174139, *1 (S.D.N.Y. 2013) (freezing assets sufficient to preserve "disgorgement of illegal profits from the violations, prejudgment interest and civil penalties").

Disgorgement represents a "reasonable approximation of profits causally connected to the violation." See, e.g., SEC v. Contorinis, 743 F.3d 296, 305 (2d Cir. 2014). Based on analysis of the evidence gathered to date, the Commission estimates Mr. Ahmed's illicit profits to be

approximately **$65 million**.[5] (Oraker Decl. ¶ 11.) Prejudgment interest is also appropriate, since without it Mr. Ahmed would be allowed to "obtain[ ] the benefit of what amounts to an interest-free loan procured as a result of illegal activity." SEC v. StratoComm Corp., --- F. Supp. 3d ---, 2015 WL 1013792, *7 (N.D.N.Y. 2015). Here, the Commission has calculated prejudgment interest to be approximately **$9.3 million**. (Oraker Decl. ¶ 50.) Finally, civil penalties are appropriate. Civil penalties may be imposed in an amount up to a defendant's gross pecuniary gain from his misconduct. See, e.g., SEC v. Amerindo Inv. Advisors Inc., 2014 WL 2112032, *11 (S.D.N.Y. May 6, 2014). This gross pecuniary gain calculation is similar to a defendant's disgorgement amount, but notably may only include gains from frauds occurring within the five-year statute of limitations for civil penalties. Id. As detailed above, many of Mr. Ahmed's fraudulent transactions occurred more than five years prior to the filing of the Commission's complaint. (See also Oraker Decl. ¶ 11 (detailing which transactions occurred within past five years)). The Commission has excluded these transactions from its civil penalty calculation, and thus estimates that the gross pecuniary gain from the fraudulent transactions that occurred within the past five years to be approximately **$44 million**. (See Oraker Decl. ¶ 11.) In total, then, the Commission seeks a preliminary injunction freezing assets up to **$118,246,186**.

     The Commission anticipates that Relief Defendants will challenge at least one piece of the Commission's disgorgement calculation, which is the calculation that Mr. Ahmed's ill-gotten

---

[5] The Commission has recently obtained evidence of additional fraudulent conduct by Mr. Ahmed in connection with another investment he recommended Oak make in a company. It appears that this conduct resulted in Mr. Ahmed misappropriating another $1.8 million into the Bank of America account that he controlled, but titled in the name of "Oak Investment Partners." The Commission continues to evaluate this evidence and has not included this amount in its current disgorgement calculation.

gains on the self-dealing sale of Company C shares from I-Cubed to Oak equaled $7.5 million. More specifically, the Commission anticipates that Relief Defendants will argue that Mr. Ahmed did not profit by $7.5 million in connection with this transaction because he initially paid $2 million for the Company C shares. However, documents produced by Mrs. Ahmed show that in late August 2014 – just over a month before the Company C shares from I-Cubed to Oak – a 99% membership interest in I-Cubed was transferred to Relief Defendant Shalini Ahmed 2014 Grantor Retained Annuity Trust ("Shalini Ahmed 2014 GRAT"). At that time, the market value of I-Cubed's assets – which included the Company C shares, along with any other assets – was reported to be approximately $876,000, far less than the $2 million initially paid. This suggests the profits on this transaction were much closer to the $7.5 million Mr. Ahmed and the Relief Defendants received on the sale. While it may ultimately be appropriate to reduce the $7.5 million to reflect the true value of the Company C shares at the time of the illegal self-dealing sale of those shares from I-Cubed to Oak, at this early stage of the litigation the Commission submits that the full $7.5 million amount should be frozen until such value can be evaluated. See SEC v. Rosenfeld, 2001 WL 118612, *2 (S.D.N.Y. Jan. 9, 2001) ("[O]nce the Commission shows the existence of a fraudulent scheme in violation of federal securities laws, the burden shifts to the defendant to "demonstrat[e] that he received less than the full amount allegedly misappropriated and sought to be disgorged.'") (quoting SEC v. Benson, 657 F. Supp. 1122, 1133 (S.D.N.Y.1987)); see also SEC v. First Jersey Securities, Inc., 101 F.3d 1450, 1475 (2d Cir. 1996) ("The amount of disgorgement ordered "need only be a reasonable approximation of profits causally connected to the violation," … ; 'any risk of uncertainty [in calculating

disgorgement] should fall on the wrongdoer whose illegal conduct created that uncertainty ....'")
(quoting <u>SEC v. Patel</u>, 61 F.3d 137, 139 (2d Cir. 1995)).[6]

## VII.    The Commission Has Frozen Significant Assets, but Those Assets Are Less than Ahmed's Ultimate Liability.

Although the Commission has been successful in freezing significant assets, those assets are not sufficient to cover Mr. Ahmed's total liability. Indeed, the liquid assets and real estate – the only two categories of assets with relatively certain value – roughly approximate only the amounts needed to pay the $65 million in disgorgement, *i.e.*, to reimburse the victims of Mr. Ahmed's fraud.

To date, approximately $47 million in liquid assets held in bank and brokerage accounts has been frozen. (Oraker Decl. ¶ 13.) The Court has also ordered that certain real estate is subject to the asset freeze. That real estate includes: the two New York City condominiums located at 530 Park Avenue, which are held in the name of Relief Defendants DIYA Real Holdings, LLC and DIYA Holdings LLC, respectively; the Ahmed's home at 505 North Street in Greenwich, Connecticut; and a farm in Ancram, New York. (<u>See</u> Doc. No. 24 at 8-9.)[7] Based on the purchase price of this real estate, the Commission estimates the value that would be available to satisfy

---

[6] If the Court were to conclude that the ill-gotten gains from I-Cubed's sale of Company C shares to Oak should be reduced by the $2 million that Mr. Ahmed and I-Cubed initially paid for the Company C shares, meaning the profits were only $5.5 million, the asset freeze would be reduced by approximately $4 million (a $2 million reduction in disgorgement and a $2 million reduction in civil penalty, with a corresponding reduction in prejudgment interest).

[7] The Court's order initially included two other pieces of real property that the Commission had evidence was owned, in part, by Mr. Ahmed. (<u>See</u> Doc. No. 24 at 8.) Subsequent to the Court's order, the Commission obtained information that Mr. Ahmed no longer had an ownership interest in those properties, and stipulated with third-party Amit Kanodia that those properties would be removed from the temporary restraining order. (<u>See</u> Doc. No. 58.)

any ultimate judgment to be approximately $21 million.[8] (See Oraker Decl. ¶ 16.) Finally, the Commission has confirmed that Mr. Ahmed has certain illiquid investments and other interests. While it is difficult to value many of these investments and interests, the entities holding those positions approximate their value to be roughly $9 to $10 million. (See Oraker Decl. ¶ 16.)

Many of these assets are held in accounts over which Mr. Ahmed has sole or joint control. (Oraker Decl. ¶ 14 & Ex. 11.) Other assets are held in the name of relief defendants. (Oraker Decl. ¶ 15.) However, as described below, preliminary evidence strongly suggests that all or nearly all of these assets are, in reality, Mr. Ahmed's assets, and thus they should remain frozen during the pendency of this litigation.

## VIII.   Mrs. Ahmed and Other Relief Defendants Served as Nominees for Mr. Ahmed

The Commission requests that the Court order all of the assets the Commission has identified and frozen be subject to the preliminary injunction. This is because, as detailed below, the assets – regardless of in whose name they are held – essentially all came from Mr. Ahmed, were controlled by Mr. Ahmed, and often are directly traceable to the fraud. In short, because the assets of the relief defendants in reality belong to Mr. Ahmed, the Commission seeks a preliminary injunction freezing assets of Mr. Ahmed <u>and</u> the relief defendants up to $118,246,186.

Defendant Iftikar Ahmed did not appear for his deposition, and as noted above and in the Commission's recently filed request for default, has not answered either the original Complaint

---

[8] The 505 North Street property served as Mr. Ahmed's personal bond to appear, and not violate any conditions of bail, in his criminal case. (See Case No. 15-mj-02062-MBB (D. Mass), Doc. No. 20.) Since Mr. Ahmed has fled the United States in violation of his conditions of release, meaning that the property will presumably be seized, the Commission has not included the value of this property in calculating the value of this real estate.

or the Amended Complaint.  Indeed, Mr. Ahmed is believed to have fled the United States after he learned his fraudulent conduct was uncovered.  However, Mrs. Ahmed seeks to litigate at least some of the allegations in this case and asserts that she is entitled to at least some of the assets funded with money that Mr. Ahmed stole.

A "relief defendant," also known as a "nominal defendant," is "a person who can be joined to aid the recovery of relief without an assertion of subject matter jurisdiction only because [s]he has no ownership interest in the property which is the subject of [the] litigation." SEC v. Cherif, 933 F.2d 403, 414 (7th Cir.1991).  Generally, federal courts have jurisdiction over and "may order equitable relief against" a "relief defendant in a securities enforcement action if she: "(1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds." SEC v. Cavanagh, 155 F.3d 129, 136 (2d Cir.1998) (citation omitted).

However, "[i]f an asset belonging to a relief defendant is, in reality, also an asset of a defendant," then application of the two-part Cavanagh test is inappropriate.  SEC v. Heden, 51 F.Supp.2d 296, 299 (S.D.N.Y.1999); see SEC v. McGinn, Smith & Co., Inc., 752 F.Supp.2d 194, 215–16 (N.D.N.Y.2010), aff'd sub nom. Smith v. SEC, 432 Fed.Appx. 10 (2d Cir.2011).  In determining whether a defendant and relief defendant jointly own an asset, "the central inquiry concerns 'the element of control [implicating] ... the concept of equitable ownership.' " McGinn, Smith & Co., 752 F.Supp.2d at 207 (quoting In re Vebeliunas, 332 F.3d 85, 92 (2d Cir.2003)). Equitable or joint ownership is established when "an individual ... exercise[s] considerable authority over [the asset] ... acting as though [its] assets [are] his alone to manage and distribute." Vebeliunas, 332 F.3d at 92 (internal quotation marks and citations omitted).

In addition to the element of control, courts also consider the following factors in determining joint ownership: (1) the length of time the asset had been held; (2) whether the defendant had an interest in and benefitted from the asset; (3) whether the defendant had transferred assets from his name into the asset; (4) whether the defendant contributed to acquire the asset initially; and (5) whether the defendant ever withdrew any funds from the asset. See Heden, 51 F.Supp.2d at 301; see also McGinn, Smith & Co., 752 F.Supp.2d at 207–08.

At the end of the day, the Court may well need to apply this five factor test to certain assets Mrs. Ahmed asserts belong to her. However, at this preliminary juncture, the Court need only review Mrs. Ahmed's deposition transcript and the bank records, which together prove that the assets Mrs. Ahmed asserts are hers are directly traceable to Mr. Ahmed's fraud and that Mrs. Ahmed has little to no knowledge of the funds that were placed in her name. Thus, all assets should remain frozen, since the preliminary evidence strongly suggests these assets are, in reality, the assets of Mr. Ahmed's.

As outlined in Mr. Oraker's declaration, and confirmed by Mrs. Ahmed's answers in her deposition, the evidence strongly suggests Mrs. Ahmed simply served as a nominee to hold money and assets of Mr. Ahmed – including money and assets that Mr. Ahmed stole as part of the fraud underlying this case. As an initial matter, each and every one of the factors listed above tips in the Commission's favor. Almost all of the assets in question have been transferred directly from Mr. Ahmed to his wife in the past 18 months. Further, it was Mr. Ahmed's money (that he stole) that was used to acquire the asset initially. At her deposition, Mrs. Ahmed not only acknowledged that she did not provide any goods or services in exchange for monies and assets she received from Mr. Ahmed, but she was not able to even assert what assets she believed she

owns, nor was she able to list what assets are held in her name. The following exchange at Mrs.

Ahmed's deposition is telling:

> Q:    Ms. Ahmed, are you going to tell me which assets you assert belong to you
>       personally?

MR. SKIBELL: I'm going to object on the same grounds as before.

> A:    I don't know.

> Q:    If you wanted to know what assets belong to you personally, where would you
>       look or who would you ask?

> A:    My counsel.

> Q:    How many bank accounts do you hold solely in your name?

> A:    I don't know.

> Q:    How many brokerage accounts do you hold solely in your name?

> A:    I don't know.

> Q:    How many assets do you hold solely in your name?

> A:    I don't know.

> Q:    If I wanted the answer to those questions, who would I ask or where would I
>       look?

> A:    My counsel.

(Shalini Ahmed Depo. Tr. at 78-79.)

Mrs. Ahmed's responses to the above questions evidences that she is indeed a nominee.

She is unaware of what assets are in her name, presumably because she did not control the assets

placed into her name, nor did she provide goods or perform services in exchange for the assets

held in her name.

Tellingly, even after making a claim in this litigation to certain assets such as the two

Park Avenue condominiums, Mrs. Ahmed is not able to explain where the funds came from to

purchase the properties. For example, and as outlined in the Amended Complaint, Mr. Ahmed

defrauded Oak out of $18 million dollars by changing an investment purchase price to $20

20

million from $2 million.   (Doc. No. 33 ¶¶ 96-110.) As outlined in Mr. Oraker's declaration, Mr.

Ahmed placed this $18 million in an account in Mrs. Ahmed's name by writing her an $18

million check. (Oraker Decl. ¶ 22.)  Mrs. Ahmed deposited the check on the same day it was

written, January 12, 2015, and a large portion of these funds were later used to purchase 530

Park Ave., Unit 12F for more than $8.6 million.   (Oraker Decl. ¶¶ 40-42.) Although the event

took place only six months ago, Mrs. Ahmed has no recollection of receiving this $18 million:

Q:     Why did Ahmed Iftikar write you an $18 million check on January 12th, 2015?

A:     I don't know.

Q:     Did you know that he wrote you an $18 million check on January 12th, 2015?

A:     My signature is on the check, yes.

Q:     But do you have a recollection of receiving this check?

A:     I don't remember.

Q:     Are there other times in your life that you have received checks totaling $18 million or anywhere close to that?

A:     No.

Q:     Did you give your husband anything in exchange for this $18 million?

A:     Not that I can remember.

Q:     Okay. And was this approximately six months ago or so?

A:     January 12th, 2015? Yeah.

Q:     So as you sit here today, you have no recollection about why you received this $18 million?

A:     I don't remember.

Q:     Do you recall what you used this $18 million for?

A:     It looks like it went into a Fidelity account that was in my name.

Q:     And do you recall putting this check into the Fidelity account or -- or is it simply just what the document indicates?

A:     It's what the document indicates. I don't remember.

Q:     So you don't remember depositing an $18 million check into your Fidelity account?

  A: No. And you also have to remember, I am the mom of three little boys and I'm all over with them. I have a very busy schedule. So, no, I don't remember.

(Shalini Ahmed Depo. Tr. at 78-79). Mrs. Ahmed's responses to the above questions again evidence that she is simply a nominee who was, essentially, holding these funds on behalf of her husband. The fact that she cannot remember receiving $18 million only six months ago, or how she used the $18 million, demonstrates that she did not believe she was entitled to the money, did not treat the funds as her own, and likely played a minimal role in placing the money in her name.

  Similarly, Mrs. Ahmed had no recollection about millions of dollars' worth of checks she received from Mr. Ahmed in 2014. See, e.g., Shalini Ahmed Depo. at 61-62 ("Q: And why did your husband write you a $2 million check on August 15, 2014? A: "I don't remember.""); Id. at 64 (Q: "Why did your husband write you a $500,000 check on September 23rd, 2014?" A: "I don't remember.""); Id. at 69 (Q: "Why did Ahmed write you a $1.2 million check on November 6th, 2014?" A: "I don't remember.""); Id. at 70 (Q: "Why did Iftikar Ahmed write you a $1.5 million check on November 17th, 2014?" A: "I don't remember.".").

  Bank records confirm that assets placed in the name of Mrs. Ahmed were, in essence, assets of Mr. Ahmed. As outlined in Mr. Oraker's declaration, Mr. Ahmed transferred more than $20 million in fraudulent proceeds to Mrs. Ahmed by writing checks out of their joint account to Mrs. Ahmed, which she then deposited into an account at Fidelity held in her name only. (Oraker Decl. ¶¶ 20-23.)[9] Indeed, this account, which appears to be by far the largest account held in Mrs. Ahmed's name alone, was funded almost entirely with assets of Mr. Ahmed. (Oraker Decl.

---

[9] Ultimately, Mrs. Ahmed further transferred certain of these funds to other relief defendants. (Oraker Decl. ¶¶ 24-26.) Approximately $10.215 million of the fraudulent proceeds remain in accounts in Mrs. Ahmed's name. (Oraker Decl. ¶ 27.)

¶ 29.) Indeed, Mrs. Ahmed admitted that the Fidelity account which held the funds was intended only to benefit Mrs. Ahmed in the event that Mr. Ahmed became ill or passed away. (Shalini Ahmed Depo. Tr. at 80, lns. 9 – 14.) (Q: "Why was the Fidelity account in your name opened?" A: "So my husband had a significant illness, and I believe it was opened so that I had some assets where I could take care of the children should anything happen to him."). At bottom, the evidence strongly suggests that assets placed in bank accounts in Mrs. Ahmed's name are really assets of Mr. Ahmed, and thus should remain frozen to satisfy any eventual judgment against Mr. Ahmed.

In sum, although more than $20 million of Mr. Ahmed's ill-gotten gains was placed into properties or accounts held in the name of Mrs. Ahmed (which Mr. Ahmed likely did to protect the funds and obfuscate his fraud), Mrs. Ahmed held these assets in name only. Mrs. Ahmed did not provide Mr. Ahmed any goods or services in exchange for the funds, she did not control the funds, and her answers in her deposition made clear that she has little if any knowledge about the source of the money placed into her name. Notably, the fraudulent proceeds do not appear on Mr. and Mrs. Ahmed's tax returns filed with the Internal Revenue Service.

The evidence similarly suggests that relief defendants Shalini Ahmed 2014 GRAT, DIYA Holdings, LLC, and DIYA Real Holdings – all of which hold assets Mrs. Ahmed contends should not be subject to the asset freeze – also simply served as nominees to hold Mr. Ahmed's stolen funds.

A.      Shalini Ahmed 2014 GRAT

The evidence uncovered by the Commission to this point indicates that there is one account at Fidelity held in the name of the Shalini Ahmed 2014 GRAT. (Oraker Decl. ¶ 13 Table

5.) Those funds all come directly from two of Mr. Ahmed's fraudulent transactions: $1 million from Mr. Ahmed's fraud involving Company A, which Mr. Ahmed initially placed into an account in Mrs. Ahmed's name and which Mrs. Ahmed later transferred to the GRAT account (Oraker Decl. ¶ 31); and $7.425 million from one of Mr. Ahmed's frauds involving Company C, which came directly from Mr. Ahmed, by check, and was deposited into the GRAT account (Oraker Decl. ¶ 32.) In short, the Shalini Ahmed 2014 GRAT account was funded exclusively with Mr. Ahmed's fraudulent proceeds (Oraker Decl. ¶ 33) and should remain frozen to satisfy any eventual judgment against Mr. Ahmed.

### B.    DIYA Holdings, LLC

DIYA Holdings holds one asset: 530 Park Avenue, Unit 12A. The condominium was purchased in December 2013 for approximately $9,300,000. All records obtained by the Commission show Mrs. Ahmed has a 99% interest in DIYA Holdings, with the remaining 1% owned by Mr. Ahmed. However, in Mrs. Ahmed's deposition she testified that Mr. Ahmed's 1% was transferred to the GRAT, but she could not recall when this occurred. (Shalini Depo. Tr. at 110 lns. 13-23.)

Once again, bank account information shows that 530 Park Avenue, Unit 12A was purchased primarily with proceeds of the fraud, and in any event nearly entirely with Mr. Ahmed's assets. Specifically, Mr. Ahmed wrote a check on December 27, 2013 for approximately $8.7 million, with the memo line indicating it was for "530 Park Avenue NYC." (Oraker Decl. ¶ 36.) These funds were proceeds of one of Mr. Ahmed's frauds involving Company C. (Oraker Decl. ¶ 36.) Thus, like the GRAT, 530 Park Avenue, Unit 12A was

purchased almost entirely with Mr. Ahmed's illicit funds; DIYA Holdings' assets should remain frozen to satisfy any eventual judgment against Mr. Ahmed.

>    **C.      DIYA Real Holdings, LLC**

DIYA Real Holdings holds one asset: 530 Park Avenue, Unit 12F. The condominium was purchased in April of this year for approximately $8,630,000. The source of these funds was the $18 million dollars that, as noted above, Mrs. Ahmed has no recollection of receiving or depositing.

Just like the condominium held by DIYA Holdings, bank account information confirms that this condominium was purchased primarily with fraudulent proceeds. Specifically, after the $18 million of illicit proceeds from Mr. Ahmed's fraud involving Company B was deposited into a Fidelity account in Mrs. Ahmed's name, Mrs. Ahmed then used nearly $8.7 million of these illicit proceeds to fund the purchase of 530 Park Avenue, Unit 12F. (Oraker Decl. ¶¶ 41-42.) As with the assets held in the name of the other relief defendants, 530 Park Avenue Unit 12F was purchased almost entirely with Mr. Ahmed's illicit funds; DIYA Real Holdings' assets should remain frozen to satisfy any eventual judgment against Mr. Ahmed.

**IX.     Alternatively, if Mrs. Ahmed and Other Relief Defendants are Not Nominees, the Court Should Order a Preliminary Asset Freeze Against Each Relief Defendant.**

If the Court finds the relief defendants did not act as nominees, but rather received ill-gotten funds controlled by the respective relief defendant, it should hold that the relief defendants do not have a legitimate claim to tainted funds in the amounts listed below and freeze assets sufficient to preserve these amounts.

In the Second Circuit, to obtain relief against a nominal defendant, the SEC must demonstrate that the nominal defendant "(1) received ill-gotten funds; and (2) does not have a

legitimate claim to those funds." SEC v. Cavanagh, 155 F.3d 129, 136 (2d Cir.1998) (citation

omitted); see also Smith v. SEC, 653 F.3d 121, 128 (2d Cir.2011) (applying Cavanagh).

Performing services in exchange for compensation may be a sufficient claim of ownership to

preclude relief defendant treatment. See U.S. Commodity Futures Trading Commission v.

WeCorp, Inc., 848 F.Supp.2d 1195, 1202 (D.Haw.2012); SEC v. Chiase, No. 10–CV–5110, 2011

WL 6176209, at *3, *5 (D.N.J. Dec.12, 2011) (finding relief defendant wife had no legitimate

claim to ill-gotten funds because there was no evidence to suggest she had performed services

that would have entitled her to the funds or that she had any legitimate claim to the funds); SEC

v. DCI Telecomms, Inc., 122 F.Supp.2d 495, 502 (S.D.N.Y.2000) (holding complaint adequately

stated claim against relief defendant wife where complaint alleged she did not provide value for

wrongfully-obtained assets).

     A "claimed ownership interest must not only be recognized in law; it must also be valid

in fact. Otherwise individuals and institutions holding funds on behalf of wrongdoers would be

able to avoid disgorgement (and keep the funds for themselves) simply by stating a claim of

ownership, however specious." CFTC v. Kimberlynn Creek Ranch, Inc., 276 F.3d 187, 192 (4th

Cir.2002). "A claim of ownership is not legitimate where the relief defendant holds the funds in

trust for the primary violator, the ownership claim is a sham, the relief defendant acted as a mere

conduit of proceeds from the underlying statutory violation, or some similar specious claim to

ownership." U.S. Commodity Futures Trading Commission v. WeCorp, Inc., 848 F.Supp.2d

1195, 1202 (D.Haw.2012)

     In the event that the Court finds the relief defendants were not nominees, but rather

received ill-gotten funds in fact, the relief defendants have no legitimate claim to much of the

funds they hold, thus each fails the second part of the <u>Cavanagh</u> test.  For example, Mrs. Ahmed received more than $20 million in checks directly from Mr. Ahmed.  At her deposition, Mrs. Ahmed could not recall providing any goods or performing any services in exchange for this money. (Shalini Ahmed Depo. Tr. at 82, lns. 1 – 6.)  Similarly, Mrs. Ahmed asserts that the assets of the GRAT belong to her. The GRAT holds a bank account that was funded by a $7,425,000 check from Ifitkar Ahmed.  At Mrs. Ahmed's deposition, the following exchange took place:

> Q:   Why did Iftikar Ahmed write a $7,425,000 check to the Shalini Ahmed 2014 Grantor Retained Annuity Trust on November 3rd, 2014?
>
> A:   I don't know.
>
> Q:   Do you know where the money came from to fund this check?
>
> A:   I do not.
>
> Q:   Was Iftikar Ahmed, to your knowledge, under any legal obligation to write a check to the Shalini Ahmed 2014 Grantor Retained Annuity Trust?
>
> A:   I don't know.
>
> Q:   Ms. Ahmed, did you provide any goods or services in exchange for your husband writing this $7.425 million check?
>
> A:   Not that I'm aware of.

(Shalini Ahmed Depo. Tr. at 106, lns. 7 – 21.)  Mrs. Ahmed similarly did not provide any good or perform any services in exchange for the DIYA Holdings property, 520 Park Avenue, Unit 12A. (Shalini Ahmed Depo. Tr. at 128, lns. 9 – 13) (Q: "Okay. So when 530 Park Avenue, Unit 12A was purchased, did you provide any goods and services in exchange for having that apartment placed in an entity that you are the majority manager of?" A: "Not that I know of.").

Mrs. Ahmed also did not provide any goods or perform any services in exchange for the DIYA Real Holdings property, 520 Park Avenue, Unit 12F. (Shalini Ahmed Depo. Tr. at 151, lns. 14 – 18) ("Just to be crystal-clear, did you provide any goods or services in exchange for that

27

house being purchased?" A: It may have been purchased from a joint account or from an account where we had shared assets."). As noted in Mr. Oraker's declaration, 530 Park Avenue was in fact purchased with proceeds from an $18 million dollar check that Mr. Ahmed wrote to Mrs. Ahmed in January 2015. As stated above, Mrs. Ahmed could not recall supplying any goods or performing any services in exchange for this, and several other, checks (Shalini Ahmed Depo. Tr. at 82, lns. 1 – 6). Mrs. Ahmed's children similarly did not provide any goods or services for the money they received. (Shalini Ahmed Depo. Tr. at 88, lns. 6 – 19.) In short, the relief defendants received significant ill-gotten funds to which they have no legitimate claim.

Not only did Mrs. Ahmed not provide goods or services for the funds she received from Mr. Ahmed, she cannot be treated as a good-faith purchaser for value. See Tcherepnin v. Franz, 485 F.2d 1251, 1257 (7th Cir.1973) (stating that the court could assume jurisdiction over land held by nonparties where the nonparties were not good faith purchasers for value and were instruments in defendants' fraudulent scheme). As outlined above, Mrs. Ahmed signed and deposited millions of dollars' worth of checks into bank accounts held in only her name. Even more money was deposited into accounts she held jointly with her husband. Although more than $5 million moved through these accounts in the last few months of 2014 alone, the money was not claimed on Mr. and Mrs. Ahmed's jointly filed tax return, which reported total income in 2014 of just over $2 million. Mrs. Ahmed confirmed that she reviewed those tax returns, filed by April 15, 2015, before filing:

> Q:     This is Exhibit 52, the 2014 Form 1040 tax return filed jointly with you and your
>        husband. Did I describe that accurately?
>
> A:     Yes, you did.
>
> Q:     Was this tax return filed with the IRS?
>
> A:     I believe it was.

Q:      And was it prepared by [your tax preparer]?

A:      Yes, it was.

Q.      And did you review it before Mr. -- before it was filed?

A:      I took a quick look at it before it was filed.

Q:      Okay. And looking at Line 22, what is the total income?

A:      $2,218,302.

(Shalini Ahmed Depo. Tr. at 155-56.)  In short, these tax forms that Mrs. Ahmed admitted

reviewing omitted more than $5 million in income that was moving through her and her

husband's bank accounts just a few months. Such evidence indicates that she may have been

aware – or at least should have known – about the illegality of the monies.

In sum, should the Court find relief defendants are not nominees holding assets that are,

in reality, Mr. Ahmed's, the Court should enter a preliminary injunction freezing assets up to the

amount of ill-gotten gains the relief defendants received. Those amounts include: Shalini Ahmed

- $10,215,000 (Oraker Decl. ¶ 27); Shalini Ahmed 2014 Grantor Retained Annuity Trust -

$8,425,000 (Oraker Decl. ¶ 30; DIYA Holdings, LLC - $8,688,635 (Oraker Decl. ¶ 35); DIYA

Real Holdings, LLC - $8,851,899 (Oraker Decl. ¶ 41).

**X.      The Court Should Reject Any Request by Mrs. Ahmed for a "Carve Out" to Access and Consume Frozen Monies and Assets.**

Mrs. Ahmed undoubtedly finds herself in a difficult position because of her husband's

crimes. However, it would be both inappropriate and improper to allow Mrs. Ahmed to consume

funds that belong to the victims of her husband's fraud, even if those funds would be used to

fund her defense.

"To persuade a court to unfreeze assets, the defendant must establish that the funds she

seeks to release are untainted and that there are sufficient funds to satisfy any disgorgement

29

remedy that might be ordered in the event a violation is established at trial." SEC v. Stein, No. 07

Civ. 3125(GEL), 2009 WL 1181061, at *1 (S.D.N.Y. Apr. 30, 2009); see also SEC v. Private

Equity Mgmt. Grp., Inc., No. CV 09–2901, 2009 WL 2058247, at *3 (C.D.Cal. July 9, 2009)

(denying attorney fees where defendant cannot "demonstrate that the assets he possesses are

untainted by the fraud"). As the Seventh Circuit aptly stated:

> Just as a bank robber cannot use the loot to wage the best defense money
> can buy, so a swindler in securities markets cannot use the victim's assets
> to hire counsel who will help him retain the gleanings of crime.

SEC v. Quinn, 997 F.2d 287, 289 (7th Cir. 1993) (citations omitted). "A defendant is not

entitled to foot his legal bill with funds that are tainted by his fraud." SEC v. Coates, No. 94 Civ.

5361 (KMW), 1994 WL 455558, at *3 (S.D.N.Y. Aug. 23, 1994).

As an initial matter, Mrs. Ahmed cannot meet her burden of showing that the funds she

seeks are untainted and that there are sufficient funds to satisfy any disgorgement remedy that

might be ordered in the event a violation is established at trial. See SEC v. Stein, No. 07 Civ.

3125(GEL), 2009 WL 1181061, at *1. That is because the funds at issue are directly traceable to

Mr. Ahmed's fraud, and there are not sufficient liquid assets to satisfy a disgorgement remedy,

even before interest.

Importantly, the defendant in this case has not disputed the allegations found in the

Amended Complaint. Rather, he fled the United States in violation of a Court Order and

defaulted in this litigation. Even assuming Mrs. Ahmed, as a relief defendant, is permitted to

contest the underlying fraud, the Court should take note that nobody else disputes the allegations.

Additionally, there is overwhelming evidence that Mr. Ahmed was simply stealing large sums of

money from his employer by opening bank accounts in third party entity names and submitting

30

false documents to Oak to induce payment into those bank accounts.  In short, Mrs. Ahmed cannot credibly dispute that a massive fraud was perpetrated by Mr. Ahmed, and that many of the assets held in the name of Mrs. Ahmed and the other relief defendants are traceable directly to this fraud.

Moreover, there is substantial evidence that money and assets placed into Mrs. Ahmed's name was always controlled by (after it was stolen by) Mr. Ahmed.  She should not be permitted to access money that does not now, and did not ever, belong to her.  In fact, Mrs. Ahmed even claims to have no memory of her husband writing her more than $20 million worth of checks with the past 12 months.  As a nominee, Mrs. Ahmed did not and does not have a legitimate claim to these stolen monies and should not be permitted to consume them.

In addition, as Mrs. Ahmed conceded in her deposition, she did not provide any goods or perform any services in exchange for money she now seeks.  Thus, she is further foreclosed from claiming a legitimate interest as to any of the funds in dispute.  Moreover, she may be further prevented from claiming to have a legitimate interest in frozen monies, as there is circumstantial evidence that Mrs. Ahmed may have been aware that at least some of the funds were the product of illegal activity, since they were not reported on her and Mr. Ahmed's jointly-filed income tax return.

For all of these reasons, the Court should not permit Mrs. Ahmed a carve-out from these frozen funds. Mrs. Ahmed may be in an extremely difficult position that is not of her making, but this does not give her a right to money that belongs to the victims of Mr. Ahmed's fraud.

DATED: July 20, 2015.

s/ Nicholas P. Heinke
Nicholas P. Heinke
Mark L. Williams
U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294-1961
(303) 844-1071 (Heinke)
(303) 844-1027 (Williams)
HeinkeN@sec.gov
WilliamsML@sec.gov
*Attorneys for Plaintiff*

CERTIFICATE OF SERVICE

I certify that on July 20, 2015 a copy of the foregoing document was served via ECF

upon the following:

Jonathan Harris
Reid Skibell
David Deitch
Alexander Sakin
Harris, O'Brien, St. Laurent & Chaudhry LLP
111 Broadway, Suite 1502
New York, NY 10006
(Counsel for Relief Defendants)

s/ Nicholas P. Heinke
Nicholas P. Heinke