UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

_____
                                              )
UNITED STATES SECURITIES                      )
AND EXCHANGE COMMISSION,                       )
                                              )
                  Plaintiff,                  )
                                              )
            v.                                )          Civil Action No. 3:15cv675 (JBA)
                                              )
IFTIKAR AHMED,                                )
                                              )
                  Defendant, and              )
                                              )
IFTIKAR ALI AHMED SOLE PROP;                  )
I-CUBED DOMAINS, LLC;  SHALINI AHMED;          )
SHALINI AHMED 2014 GRANTOR RETAINED            )
ANNUITY TRUST; DIYA HOLDINGS LLC;              )
DIYA REAL HOLDINGS, LLC; I.I. 1, a minor       )
child, by and through his next friends IFTIKAR )
and SHALINI AHMED, his parents; I.I. 2, a minor )
child, by and through his next friends IFTIKAR )
and SHALINI AHMED, his parents; and I.I. 3, a  )
minor child, by and through his next friends   )
IFTIKAR and SHALINI AHMED, his parents,        )
                                              )
                  Relief Defendants.          )
_____ )

## PLAINTIFF UNITED STATES SECURITIES AND EXCHANGE COMMISSION'S CLOSING BRIEF IN SUPPORT OF PRELIMINARY INJUNCTION

Plaintiff United States Securities and Exchange Commission (the "Commission") hereby

files its closing brief in support of a preliminary injunction and respectfully requests the Court

enter the attached preliminary injunction order freezing assets during the pendency of this

litigation.

//

//

## Table of Contents

I.     Introduction ......................................................................................................... 3

II.    Summary of Argument ...................................................................................... 4

III.   Relevant Background .......................................................................................... 6

IV.   Frozen Assets ....................................................................................................... 7

V.    Legal Standard for Asset Freeze ...................................................................... 8

VI.   Mr. Ahmed's Assets Should be Frozen Pending the Outcome of this Litigation ................ 9

    a.    Mr. Ahmed Committed Fraud ............................................................... 9

    b.    Mr. Ahmed Committed Fraud with Respect to the I-Cubed Transaction .................. 10

        i.    The I-Cubed Transaction Was Fraudulent ............................... 10

        ii.   The I-Cubed Transaction Will Result in Significant Disgorgement ........... 15

VII.  Mrs. Ahmed and Other Relief Defendants Served as Nominees for Mr. Ahmed ........... 16

    a.    The Commission Need Only Show Likelihood of Success on the Merits to Freeze Disputed Assets Held in the Name of Mrs. Ahmed .................... 17

    b.    Mrs. Ahmed Served as a Nominee for Mr. Ahmed ...................... 19

VIII. The Assets in Dispute Should Remain Frozen ............................................. 21

    a.    Mrs. Ahmed's Earnings Were Co-Mingled with Mr. Ahmed's Assets and Presumably Spent on the Ahmeds' Living Expenses .................... 21

    b.    Mrs. Ahmed is Not Entitled to Rental Income Generated from 530 Park Avenue, Unit 12A .................................................................................... 22

    c.    Mrs. Ahmed is Not Entitled to Monies Held in the Name of Relief Defendant Shalini Ahmed 2014 Grantor Retained Annuity Trust .................... 24

IX.   A Freeze Order Sufficient to Cover Disgorgement and Penalties is Appropriate ........... 24

    a.    Mr. Ahmed's Assets Should be Frozen Because There are Likely Not Enough Liquid Assets to Cover Disgorgement and Interest ...................... 25

    b.    Mr. Ahmed's Assets Should be Frozen Because There are Insufficient Assets to Cover Disgorgement, Interest and Penalties .................... 26

    c.    Even Were There Sufficient Assets to Cover Disgorgement, Interest and Penalties, Mrs. Ahmed has No Right to Proceeds from Illegal Activities .................... 28

X.    A Carve Out is Inappropriate and Unnecessary ............................................. 29

    a.    Mrs. Ahmed is Not Entitled to the Payment of $20,000 in Monthly Living Expenses From Frozen Funds ................................................................ 29

    b.    Mrs. Ahmed is Not Entitled to the Payment of Legal Expenses From Frozen Funds . 30

XI.   Conclusion ......................................................................................................... 33

## I.       Introduction

Defendant Iftikar Ahmed ("Mr. Ahmed") perpetrated a long-running and large-scale fraud on his employer, Oak Management Corp. ("Oak"), and its investors.  The fraud netted Mr. Ahmed more than $65 million in ill-gotten gains, the majority of which he placed into the name of his wife, Relief Defendant Shalini Ahmed ("Mrs. Ahmed"), and the other Relief Defendants. Although the Relief Defendants held these assets on paper, they in fact merely served as nominees for Mr. Ahmed – an allegation that stands unrebutted.  As more fully outlined herein, the Court should grant the Commission's request for a preliminary injunction continuing the freeze on Mr. Ahmed's assets – whether held in Mr. Ahmed's name or the names of nominees – in an amount sufficient to ensure that money will be available to satisfy any ultimate judgment.

Notably, Relief Defendants challenge only limited portions of the Court's temporary asset freeze. Specifically, they seek release of the proceeds attributable to Mr. Ahmed's October 2014 sale of shares from Relief Defendant I-Cubed to Oak, and a release of funds representing the amounts Mrs. Ahmed earned during her prior employment.  Or, alternatively, they seek release of proceeds from a condominium held in the name of Relief Defendant DIYA Holdings LLC and other funds to pay millions in legal fees. *See* Doc. No. 69 at 26-27.  Thus the vast majority of the Commission's requested asset freeze is unopposed.

As detailed herein, Relief Defendants should not be allowed to access the frozen funds they seek.  The proceeds of the I-Cubed transaction, and the funds used to purchase the DIYA Holdings property, are *directly* traceable to Mr. Ahmed's fraud.  Mrs. Ahmed should not be

permitted to benefit from her husband's illegal activities, especially if she was involved.[1] Furthermore, Mrs. Ahmed has not been employed for more than three years and her earlier earnings were comingled with Mr. Ahmed's fraudulent proceeds and, presumably, spent on the Ahmeds' living expenses.  Finally, the Commission has already consented to the release of nearly $300,000 in untainted funds for Mrs. Ahmed to spend as she sees fit.  The Court should not permit Mrs. Ahmed or the other Relief Defendants to consume the proceeds of Mr. Ahmed's fraud, to which they have no legitimate claim, especially when Mrs. Ahmed has available to her significant untainted monies that can be used for both living and legal expenses.

## II.    Summary of Argument

The Court should enter a preliminary injunction freezing assets, and decline to permit a carve-out to Relief Defendants, for several reasons.  First, nearly all, if not all, of the assets at issue came directly from Mr. Ahmed, and a significant portion of the assets can be traced directly to his fraud.  Mr. Ahmed's assets should be frozen pending the outcome of this litigation.  An asset freeze is especially appropriate in this case because the Commission's allegations of fraud, and the evidence submitted to this Court supporting those allegations, stand almost entirely undisputed and unrebutted, with the exception of the I-Cubed transaction discussed below.

Second, Mr. Ahmed has not denied the allegations in the Commission's Amended Complaint.[2]  Rather, Mrs. Ahmed, a relief defendant, is seeking to access money and assets that

---

[1]  On August 3, 2015, Mrs. Ahmed was charged in the District of Massachusetts with conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956(h) and 1957. *See* ECF No. 1,Case No. 15-mj-2161-MBB.

[2] On the first day of the Preliminary Injunction hearing, the Commission argued to the Court that much of the case law cited by Relief Defendants was inapplicable because the Defendant in this case had not disputed the allegations of fraud, nor was he seeking money to do so.  The

do not belong to her, and have never belonged to her, as the evidence is overwhelming and unrebutted that she (and the other Relief Defendants) held those assets as nominees of Mr. Ahmed.  Neither the Commission's allegations of fraud against Mr. Ahmed, nor Mr. Ahmed's flight from the United States, nor the criminal charges that are now pending against Mrs. Ahmed in the District of Massachusetts, have bestowed Mrs. Ahmed with an ownership interest in any of the assets at issue.  She was and remains a nominee who is not entitled to any of the assets that remain in dispute.  Although Mrs. Ahmed is undoubtedly in a difficult situation, it would be inappropriate and improper to allow her to access and consume money that belongs to somebody else, including the victims of Mr. Ahmed's fraud.

Third, the Commission has yet to locate enough assets to ensure that victims will be repaid in full.  Rather, the liquid assets that have been frozen fall well below the nearly $75 million in disgorgement and prejudgment interest that the Commission seeks in this matter. Thus, any funds released to Mrs. Ahmed will come directly from funds that can be, and should be, used to repay the victims of Mr. Ahmed's fraud.  Moreover, the Commission is entitled freeze funds in anticipation of not only disgorgement, but also civil penalties, which the Commission anticipates will be significant.  Although Relief Defendants speculate that the Commission can obtain Mr. Ahmed's "carried interest," and further speculate that this carried interest will eventually become a realized asset worth more than $23 million, the risk that this

following week, attorneys for Relief Defendants introduced to the Court Mr. Alex Lipman, an attorney who now seeks to represent Mr. Ahmed in this litigation.  Regardless of what may occur in the future, at the present time, Mr. Ahmed has not returned to the United States, he has not made himself available for deposition or discovery, no attorney has made an appearance on his behalf, and Mr. Ahmed has never denied any of the allegations found in either the Complaint or the Amended Complaint.

asset will not materialize should be borne by Mr. Ahmed, not the victims of his fraud.  In

addition, it should be Mr. Ahmed, not his victims, who await the delay of carried interest

calculations (possibly) becoming real cash distributions sometime in the unknown future.

Simply put, the Court should decline to release assets to Mrs. Ahmed based on her optimism that

the Commission will obtain enough money in the future to repay victims.  Moreover, Mrs.

Ahmed should not be permitted to consume monies obtained by fraud or otherwise benefit from

Mr. Ahmed's illegal activities.

        Fourth, Mrs. Ahmed has sufficient untainted assets to pay for living expenses and

attorneys' fees.  Based on Mrs. Ahmed's representations, the Commission has agreed to release

certain assets to her totaling nearly $300,000.[3]  Moreover, the Order Setting Conditions of

Release in Mrs. Ahmed's criminal case specifically allow her to seek employment, albeit not in

the financial services industry. *See* ECF No. 3, Case No. 15-mj-2161-MBB.

## III.    Relevant Background

        On May 6, 2015, the Commission filed its initial complaint and an emergency motion for

a temporary restraining order and other ancillary relief, and for a preliminary injunction, in order

to prevent the dissipation of assets. (Doc. Nos. 1-2.)  The following day, the Court entered a

temporary restraining order freezing assets of Mr. Ahmed and Relief Defendants Iftikar Ali

Ahmed Sole Prop and I-Cubed Domains, LLC, up to the amount of approximately $55 million.

(Doc. No. 9.)  On May 18, 2015, the Commission and Mr. Ahmed entered into a stipulation that

all assets held by him or under his direct or indirect control, whether held in his name or for his

---

[3] The Commission calculates that Mrs. Ahmed's Goldman Sachs stock is worth approximately
$40,000, her rollover IRA account is worth approximately $165,000, and her Roth IRA account
is worth approximately $95,000. The Commission has prepared and provided to Relief
Defendants' counsel a stipulation to release these funds.

direct or indirect beneficial interest, would remain frozen until the Court's ruling on the

Commission's motion for preliminary injunction (Doc. No. 21.)  Mr. Ahmed is believed to have

fled the United States around the same time that he entered into this stipulation.

On June 16, 2015, the Commission filed an Amended Complaint alleging that Mr.

Ahmed engaged in a decade-long scheme involving myriad investments made by Oak that

resulted in illicit profits of approximately $65 million (Doc. No. 33.)  In its Amended Complaint,

the Commission also named several additional relief defendants, including Mrs. Ahmed.  The

Court subsequently ordered expedited discovery and set this matter for a preliminary injunction

hearing (Doc. No. 34), which took place on July 23, 2015, and July 30, 2015.

### IV.    Frozen Assets

The Commission has located and frozen approximately $47 million dollars in liquid

assets, real estate worth approximately $20 million, and certain other non-liquid assets that are

difficult to value.[4]  It is possible, although not assured, that the Commission may also secure

approximately $9.6 million of real estate by obtaining the proceeds from the seizure of Mr.

Ahmed's residence, which he forfeited upon fleeing the United States in violation of his

conditions of release in a criminal case pending in the District of Massachusetts.  As the Court is

aware, Relief Defendants also believe that the Commission may secure Mr. Ahmed's "carried

interest" accounts at Oak, which, according to the Relief Defendants, could eventually be worth

more than $23 million.

---

[4] According to Mrs. Ahmed, she also has other assets, including jewelry, artwork and gold, that
she placed with her attorneys for "safekeeping."  The Commission does not include these assets
in its asset freeze figure because Mrs. Ahmed and her attorneys have thus far failed to provide
detailed information on the assets.

## V.    Legal Standard for Asset Freeze

"An asset freeze is a provisional remedy, the purpose of which is to ensure that, in the event the Commission obtains a judgment, money will be available to satisfy that judgment." *SEC v. Byers*, 2009 WL 33434, *2 (S.D.N.Y. Jan. 7, 2009) (citing *SEC v. Unifund SAL*, 910 F.2d 1028, 1041 (2d Cir. 1990)); *see also SEC v. Gonzalez de Castilla*, 145 F. Supp. 2d 402, 416 (S.D.N.Y. 2001) ("A freeze of assets is an ancillary remedy that merely 'assures that any funds that become due can be collected ....'") (quoting *Unifund SAL*, 910 F.2d at 1041). Upon making the required showing, the Commission is entitled to a freeze of assets "sufficient to preserve its disgorgement remedy as well as assets necessary to pay civil monetary penalties." *SEC v. Maillard*, 2014 WL 1660024, *4 (S.D.N.Y. April 23, 2014).

To obtain a preliminary injunction freezing assets, the Commission "must show either a likelihood of success on the merits, or that an inference can be drawn that the party has violated the federal securities laws." *Smith v. SEC*, 653 F.3d 121, 128 (2d Cir. 2011) (internal quotations and citation omitted). This is a lesser showing than is required to obtain a preliminary injunction against future violations of the securities laws. *Id.*; *see also Byers*, 2009 WL 33434, at *2 ("[T]he SEC's burden of proof on an asset freeze is not as onerous as its burden would be for an injunction."); *SEC v. Heden*, 51 F. Supp. 2d 296, 298 (S.D.N.Y. 1999) (holding that a preliminary injunction freezing assets requires "a lesser showing" than a preliminary injunction against future securities law violations). "A freeze is particularly warranted where" – as here – "the defendant's alleged conduct involves fraud." *SEC v. Credit Bancorp Ltd.*, 2010 WL 768944, at *3 (S.D.N.Y. Mar. 8, 2010).

**VI.      Mr. Ahmed's Assets Should be Frozen Pending the Outcome of this Litigation**

a.   <u>Mr. Ahmed Committed Fraud</u>

As set forth in detail in both the Commission's initial emergency motion for an *ex parte* temporary restraining order freezing assets (Doc. No. 2) and accompanying documents, and the Commission's amended motion for preliminary injunction (Doc. No. 29) and accompanying documents, and as outlined in the Commission's Brief in Support of Preliminary Injunction (Doc. No. 66 at 8-13) and accompanying documents, there is overwhelming evidence that Mr. Ahmed engaged in a decade-long fraud that resulted in the misappropriation of tens of millions of dollars from Oak, Oak's investors, and the companies in which Oak invested.  Mr. Ahmed employed similar illicit acts and misrepresentations in effectuating his scheme: he often misrepresented the price of an investment he advised Oak to make; at other times he fraudulently used invoices purportedly related to Oak's purchase or sale of a company's shares; and finally he engaged in self-dealing by misrepresenting or concealing his role in various transactions.  In each case, Mr. Ahmed funneled the illicit proceeds into accounts at Bank of America that he claimed belonged to parties to the deals, but which in fact he opened and secretly controlled.

Mr. Ahmed's misconduct violated multiple provisions of the federal securities laws, including: Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; Section 17(a) of the Securities Act; and Sections 206(1), (2), and (4) of the Advisers Act and Rule 206(4)-8 thereunder.  As detailed in the declarations of Grace Ames (Doc. Nos. 4 & 31), and the Amended Complaint (Doc. No. 33), Mr. Ahmed made numerous misstatements and omissions, and used fraudulent devices, to further his decade-long fraud.  Moreover, many of Mr. Ahmed's

fraudulent acts were done in connection with the purchase or sale by Oak of a company's securities, in which Mr. Ahmed acted as an investment adviser.[5]

      b.  <u>Mr. Ahmed Committed Fraud with Respect to the I-Cubed Transaction</u>

Of the 19 transactions outlined in the Commission's Amended Complaint, Relief Defendants challenge only one – the October 2014 sale of Company C shares from I-Cubed to Oak for $7.5 million.  Notwithstanding Relief Defendants arguments to the contrary, the I-Cubed transaction was fraud, plain and simple, and disgorgement is merited.  Indeed, the fact that the Relief Defendants chose this as the transaction to challenge – a transaction that involved affirmative misrepresentations, an illicit bank account, and forged documents – underscores the egregiousness of Mr. Ahmed's conduct over the past decade.

      i.  <u>The I-Cubed Transaction Was Fraudulent</u>

Mr. Ahmed orchestrated the sale of Company C shares from I-Cubed to Oak without disclosing his or his family's ownership and control over I-Cubed, without disclosing that he was negotiating on behalf of both Oak and I-Cubed, without disclosing that he paid substantially less for the Company C shares than what Oak was paying, and without disclosing that the Company C shares he sold to Oak for $7.5 million were valued at less than $900,000 only two months earlier.  This is fraud.

---

[5] Section 202(a)(11) of the Advisers Act defines an investment adviser as "any person who, for compensation, engages in the business of advising others ... as to the value of securities or the advisability of investing in, purchasing, or selling securities ...." 15 U.S.C. § 80b-2(a)(11). *See generally Financial Planning Ass'n v. SEC*, 482 F.3d 481, 484 (D.C. Cir. 2007) (noting that Congress "broadly defined" investment adviser in the Advisers Act). Mr. Ahmed was responsible – and was compensated – for identifying, recommending, and managing investment opportunities for the funds that Oak advises, which often involved purchasing securities. (See First Ames Decl. ¶¶ 3-4.)  Mr. Ahmed is an adviser under the terms of the Advisers Act.

By way of background, in October 2012, I-Cubed was initially formed with Mr. Ahmed as the sole member. (Hearing Ex. 5 & Ames Decl. Ex. 21.)  Shortly thereafter, I-Cubed purchased shares in Company C. (Ames Decl. ¶ 29.b.)  In April 2013, Mr. Ahmed approached Oak about Oak making a potential investment in Company C, and received a favorable response. (Hearing Tr. at 95-96.)  Just weeks later, in May 2013, Mr. Ahmed transferred his interest in I-Cubed – which still held Company C shares – to Mrs. Ahmed. (Ames Decl. Ex. 23.)  A few weeks after this transfer, Mr. Ahmed affirmatively misrepresented his holdings in Company C, responding to a question from Ms. Ames about whether he "invest[ed] in [Company C] prior to Oak's contemplated investment" by falsely stating that "I have NO personal investment or any direct beneficial interest of investment in [Company C]." (Hearing Ex. 2 & Ames Decl. Ex. 18.) Because Mr. Ahmed did not disclose to Oak that he was personally invested in Company C through I-Cubed, his conflict was not – indeed could not have been – submitted to Oak's valuation committee to determine whether the deal should move forward despite the conflict. (Hearing Tr. at 98-99.)

Mr. Ahmed continued his deception in connection with Oak's October 2014 purchase of Company C shares from I-Cubed.  Mr. Ahmed told Oak that the seller (I-Cubed) was a "family office," but notably omitted that it was his family. (Ames Decl. ¶ 26; Hearing Tr. at 102.) Although Oak was purchasing the shares of Company C directly from Mr. Ahmed – although now held in the name of the Shalini Ahmed 2014 Grantor Retained Annuity Trust (the "Shalini Ahmed GRAT") – this conflict was again not submitted to Oak's valuation committee because Ahmed concealed both his interest in, and representation of, I-Cubed.

On October 30, 2014, a stock purchase agreement was executed with Mr. Ahmed signing

on behalf of Oak, and the signature of Richard Kimball appearing on behalf of I-Cubed. (Hearing

Ex. 3 & Ames Decl. Ex. 19.)  Critically, however, Mr. Kimball's signature was forged; he had

resigned at the manager of I-Cubed weeks prior. (Hearing Tr. at 80.)  Mr. Ahmed then directed

Oak to wire the $7.5 million payment to a Bank of America account held solely in his name,

which he had opened just days prior. (Hearing Ex. 4 & Ames Decl. Ex. 20 (wiring instructions);

Hearing Ex. 6 & Oraker Decl. Ex. 1 at SEC-BOA-00001189-1192 (account opening

documents).)[6]  Mr. Ahmed then transferred this $7.5 million into the names of certain Relief

Defendants by writing checks from the I-Cubed Bank of America account to Mrs. Ahmed and

the Shalini Ahmed GRAT. (Oraker Decl. ¶¶ 23, 32 & Exs. 15, 17, 19.) [7]

In the face of this evidence, Relief Defendants claim this transaction was not problematic

because Mr. Ahmed did not technically control I-Cubed at the time of the October 2014 sale. As

a threshold matter, and as Ms. Ames explained at the hearing, transferring I-Cubed into Mrs.

Ahmed's name did not cure the obvious conflict of interest that Mr. Ahmed had when he

negotiated the sale of shares between his "family-owned" entity, on the one hand, and Oak and

its investors on the other hand. (Hearing Tr. at 84-86, 116.) To underscore this conflict of

---

[6] Citations to Mr. Jeff Oraker's Declaration refer to his Declaration in Support of the Commission's Brief in Support of Preliminary Injunction (Doc. No. 68).

[7] At the July 30, 2015, hearing, the Court marked Exhibits 9 (Kimball's resignation as manager of I-Cubed) and 10 (BOA account opening documents for the I-Cubed account) for identification, subject to a foundation being demonstrated (Hearing Tr. at 321.)  The foundation for Ex. 9 is set forth in the Declaration of Grace Ames (Doc. No. 4).  See ¶ 29.c and Ex. 22. Additionally, as the Commission proffered, without objection from Relief Defendants, the accuracy of the information contained within the Ex. 9 was confirmed with Mr. Kimball. (Hearing Tr. at 80.)  The foundation for Ex. 10 is set forth in the Declaration of Jeffrey Oraker (Doc. No. 68).  See ¶¶ 5-6 and Ex. 1 (last 4 pages).

interest, the evidence shows that Mr. Ahmed had significant concerns about the viability of Company C at around the time of the October 2014 sale: just days after effectuating the sale, Mr. Ahmed e-mailed another investor in Company C about the "flat to down year" Company C was having, saying it was a "non-starter" to get additional Oak funds for Company C, and going so far as to admit he would get his "a** handed to [him]" if he approached Oak. (Hearing Ex. K.) Tellingly, Mr. Ahmed disclosed none of these concerns to Oak at the time he advised Oak to buy Company C shares from I-Cubed (Hearing Tr. at 283), nor did he disclose that those same shares Oak purchased for $7.5 million had been valued at only $876,193.72 two months earlier. (Hearing Ex. 8 at Shalini Ahmed_00000881 & Hearing Tr. at 304–305.)

But perhaps more importantly, the evidence is overwhelming that Mr. Ahmed did control I-Cubed at the time of the October 2014 sale.  It was Mr. Ahmed who opened the Bank of America account just days before the sale, certifying on that document that he was a "member" of I-Cubed. (Hearing Ex. 6 & Oraker Decl. Ex. 1 at SEC-BOA-00001189-1192.)  It was Mr. Ahmed who wrote the checks from that Bank of America account into the names of Mrs. Ahmed and the GRAT. (Oraker Decl. ¶¶ 23, 32 & Exs. 15, 17, 19.)  And it was presumably Mr. Ahmed who forged Mr. Kimball's signature on the stock purchase agreement. (*See* Hearing Tr. at 324 (Shalini Ahmed denying that she was responsible for the forgery).)  Indeed, the Court need look no further than Mrs. Ahmed herself, who admitted at the hearing that she played no role in the sale negotiations, but rather Mr. Ahmed simply told her there was a "potential liquidity event" sometime in the future.  (Hearing Tr. at 301-303, 308, 315.)  Mrs. Ahmed further admitted that she did not learn of the sale until after it took place.  (Hearing Tr. at 325.)

Given the strong evidence of Mr. Ahmed's duplicity, the Commission has met its burden to show a likelihood of success on this claim, or at least an inference that the securities laws were violated.  Mr. Ahmed's orchestration of the sale of Company C shares from I-Cubed to one of Oak's funds represented a serious conflict of interest and thus violated Advisers Act Section 206(3).[8] *See In re Kidder, Peabody & Co.*, Rel. No. IA-232, 1968 WL 87653, *2, 4 (Oct. 16, 1968) ("The Advisers Act was aimed at eliminating conflicts of interest between an investment adviser and his clients. Consequently, an investment adviser must not effect transactions in which he has a personal interest in a manner that could result in preferring his own interest to that of his advisory clients."); *In re Asbell*, Rel. No. IA-3933, 2014 WL 4726475, *2 (Sept. 24, 2014) (settled order finding investment adviser caused client to purchase securities "from [the investment adviser], members of his family, and/or other advisory clients" and failed to provide required disclosures under Section 206(3)) (emphasis added).

More generally, Mr. Ahmed's conduct involved numerous misrepresentations and fraudulent devices – misrepresenting his interest in I-Cubed in June 2013, claiming I-Cubed was a "family" office without disclosing that it was his family, directing funds be wired to a bank account without disclosing it was his account, failing to disclose his true assessment of Company C's prospects, and perhaps most notably forging the signature on the deal document – and thus violated the antifraud provisions of the Securities Act of 1933, the Securities Exchange Act of

---

[8] Section 206(3) provides that "[i]t shall be unlawful for any investment adviser … directly or indirectly … acting as a principal for his own account, knowingly sell any security to … a client … without disclosing to such client in writing before the completion of such transaction the capacity in which he is acting and obtaining the consent of the client to such transaction." 15 U.S.C. § 80b-6(3).

1934, and the Investment Advisors Act. (*See* Doc. No 2-2 at 17-19 (outlining anti-fraud

provisions of these statutes).

      ii.   <u>The I-Cubed Transaction Will Result in Significant Disgorgement</u>

      Relief Defendants further argue that none of the proceeds from the I-Cubed sale should

be frozen since Oak and its investors suffered no harm from the purchase of Company C shares

at the $7.5 million price. This claim is wrong both as a matter of law and as a matter of fact.

      Legally, Relief Defendants misstate the standard for disgorgement. As the Second Circuit

has explained:

> "[D]isgorgement" is not available primarily to compensate victims. Instead,
> disgorgement has been used by the SEC and courts to prevent wrongdoers from
> unjustly enriching themselves through violations, which has the effect of deterring
> subsequent fraud. A district court order of disgorgement forces a defendant to
> account for all profits reaped through his securities law violations and to transfer
> all such money to the court, even if it exceeds actual damages to victims…

*SEC v. Cavanaugh*, 445 F.3d 105, 109 (2d Cir. 2006). Thus, whether and to what degree Oak's

investors were damaged by the purchase is not the relevant inquiry. Rather, the relevant inquiry

is to what extent was Mr. Ahmed unjustly enriched.

      Factually, there is ample evidence that Mr. Ahmed was unjustly enriched.  As briefly

noted above, in August 2014, only weeks prior to the $7.5 million sale, a 99% interest in I-Cubed

(which held the Company C shares) was transferred into the Shalini Ahmed GRAT (Hearing Ex.

8.)  According to that transfer document, which Mrs. Ahmed confirmed was accurate to the best

of her knowledge, the market value of the 99% interest in I-Cubed was worth only $876,193.72.

(*See id.* at Shalini Ahmed_00000881; Hearing Tr. at 308.)  Even assuming Company C's shares

were I-Cubed's only asset, this evidence strongly suggests that the value of those shares was less

than $1 million at that time.[9] Further, just days after the sale, Mr. Ahmed commented on the poor performance of Company C – its "flat to down year" – and lamented that getting Oak to invest more in Company C was a "non-starter." (Hearing Ex. K.)  This is compelling evidence that the Company C shares were worth nowhere near the $7.5 million that Mr. Ahmed charged Oak.[10] Given that "[t]he amount of disgorgement ordered need only be a reasonable approximation of profits causally connected to the violation," and that "any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty," *SEC v. Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013), the Commission has met its burden at this preliminary stage to justify a freeze of the $7.5 million in proceeds from the I-Cubed transaction to preserve its disgorgement remedy, and a commensurate amount in penalties.[11]

### VII.    Mrs. Ahmed and Other Relief Defendants Served as Nominees for Mr. Ahmed

The Commission has met its burden to show a likelihood of success on its claims that Mr. Ahmed perpetrated a long-running fraud.  As explained below, the Court should order that all of Mr. Ahmed's assets – regardless of the name in which they are held – remain frozen during the pendency of this litigation, including the monies Mrs. Ahmed seeks: $1,261,564.87 (it is unclear which account(s) Mrs. Ahmed proposes this money should come from),[12] the rental proceeds

---

[9] I-Cubed purchased the Company C shares for $2 million in 2012. (Ames Decl. ¶ 29.b.)

[10] In addition, Oak has currently values those Company C shares at only $2 million. (Hearing Tr. at 121.)

[11] While the ultimate disgorgement amount may be less than the full $7.5 million, the Commission requests that the full amount of the proceeds remain frozen during the pendency of the litigation until issues of true valuation can be resolved.

[12] Even if Mr. Ahmed's salary at Oak constituted untainted monies, it is of no matter that these funds were placed into accounts that are now frozen, as where "it would be difficult, if not

from 530 Park Avenue, Unit 12A, and the $7.5 million held in the GRAT attributable to I-Cubed's sale of Company C stock to Oak.

      a.   <u>The Commission Need Only Show Likelihood of Success on the Merits to Freeze Disputed Assets Held in the Name of Mrs. Ahmed</u>

Typically, the Court may freeze the assets of a relief defendant in a securities enforcement action where that person (1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds. *SEC v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998). However, when an asset belonging to a relief defendant is, in reality, an asset of a defendant – as is the case in the instant action – then the two-part *Cavanagh* is inapplicable. As explained in *SEC v. Heden*:

> If an asset belonging to a relief defendant is, in reality, also an asset of a defendant, then the freeze sought is against the defendant's assets ... Accordingly, it is inappropriate to apply the two-part *Cavanagh* test to determine whether a "relief defendant's" principal should remain frozen. Rather, [the court] need only determine whether the SEC has met its burden of showing that it is likely to succeed on the merits.

---

impossible, to trace specific ... [fraudulently obtained funds], a freeze order need not be limited ... to funds that can be directly traced to defendant's illegal activity [because] ... the defendant should not benefit from the fact that he commingled his illegal profits with other assets." *SEC v. Byers*, No. 08–CV–7104, 2009 WL 33434, at *3 (S.D.N.Y. Jan. 7, 2009), aff'd 609 F.3d 87 (2d Cir.2010) (citations omitted); *see also SEC v. Aragon Capital Mgmt.*, LLC, 672 F.Supp.2d 421, 443 (S.D.N.Y.2009) (holding that tracing proceeds of illegal funds is unnecessary and, "where tainted funds have been commingled with potentially legitimate funds, the SEC is entitled to obtain disgorgement from the entire pool of funds."). Moreover, it is Mr. Ahmed's burden to show that frozen assets are untainted *and* that sufficient funds would remain to satisfy any ultimate judgment, a burden Mr. Ahmed has not even attempted to meet. *See SEC v. Stein*, 2009 WL 1181061, *1 (S.D.N.Y. April 30, 2009) ("To persuade a court to unfreeze assets, the defendant must establish that the funds he seeks to release are untainted and that there are sufficient funds to satisfy any disgorgement remedy that might be ordered in the event a violation is established at trial.").

51 F. Supp. 2d 296, 299-300 (S.D.N.Y. 1999); *see also SEC v. McGinn, Smith & Co., Inc.*, 752 F.Supp.2d 194, 215–16 (N.D.N.Y.2010), *aff'd sub nom. Smith v. SEC*, 432 Fed.Appx. 10 (2d Cir.2011) (finding that "[w]here a defendant treated an asset as his own, the asset should be treated as that of the defendant and the *Cavanagh* test becomes irrelevant.") (quoting *Heden*, 51 F.Supp.2d at 300).

In *Smith v. SEC*, the defendant's wife appealed to the Second Circuit after "the district court granted a preliminary injunction freezing the assets of a stock account held in [wife's] name based in part upon a finding that [husband-defendant] was a joint owner of that account." *Smith v. SEC*, 432 Fed.Appx. 10, *1 (2d Cir.2011).  The Second Circuit, citing *Heden,* held that, although the stock account had been maintained in the defendant's wife's sole name for at least ten years, the district court did not abuse its discretion in freezing the account because the defendant had treated the account as his own. *Id.* at *1-2.

In the underlying district court action that gave rise to the *Smith v. SEC* decision, which has similar facts to the instant case, the Commission had named the defendant's wife as a relief defendant, but argued that many of the assets held solely in her name in fact belonged to the defendant, and therefore could be properly frozen without regard to the *Cavanaugh* factors.  *SEC v. McGinn, Smith & Co., Inc.,* 752 F.Supp.2d 194, 215 (N.D.N.Y.2010), *aff'd sub nom.  Smith v. SEC,* 432 Fed.Appx. 10, *2 (2d Cir.2011).  The court agreed upon finding that the SEC had demonstrated a likelihood of success in proving that, along with the stock account, a beach home and a checking account, held only in the defendant's wife's name, in fact belonged to the defendant, but had been transferred into the wife's name for the purpose of shielding the assets from seizure.  *Id.* at 217.  The Court explained:

> Where a defendant and relief defendant jointly own an asset, the
> central inquiry concerns the element of control implicating...the
> concept of equitable ownership. Such ownership is established
> when an individual ... exercises considerable authority over the
> asset... acting as though its assets are his alone to manage and
> distribute.

*Id.* at 207 (quoting *In re Vebeliunas*, 332 F.3d 85, 92 (2d Cir.2003) (internal quotations and

citation omitted).

      b.  <u>Mrs. Ahmed Served as a Nominee for Mr. Ahmed</u>

      The Commission has repeatedly alleged that Mrs. Ahmed and the other Relief

Defendants served as nominees for Mr. Ahmed, and that assets placed into their name was for

the purpose of obfuscating Mr. Ahmed's fraud and protecting the asset from confiscation.[13]  *See,*

*e.g.,* Doc. No. 28 at 2, n.1 ("Although the Commission is seeking to name these individuals and

entities as relief defendants, most, if not all, of the relief defendants essentially serve as nominees

for Ahmed and their accounts are controlled by and/or held for the benefit of Ahmed.").  The

Commission spent a good portion of its prehearing brief, as well as the majority of its time

during the Preliminary Injunction hearing, arguing this point. The evidence bears out this

allegation.

      As an initial matter, the Commission's allegation that Mrs. Ahmed and the other Relief

Defendants were nominees stands entirely undisputed, and the evidence the Commission has put

---

[13] In her Supplement Brief, Mrs. Ahmed avers that the Commission's position is "that assets of
the Relief Defendants should be frozen because it seeks civil penalties…" (Doc. No. 86 at 4).
This is a straw man argument.  The Commission has been clear that the assets at issue do not
belong to the Relief Defendants.  Rather, the Commission is seeking to freeze the assets of Mr.
Ahmed in amounts sufficient to satisfy disgorgement and civil penalties.  As this Court is aware,
the Commission has already agreed to release monies and assets of Mrs. Ahmed that are not
believed to be tainted.

forth on the issue stands unrebutted.  In fact, with regards to the one frozen asset Mrs. Ahmed claims to have owned – I-Cubed and its proceeds from the sale of Company C stock to Oak – she specifically testified that Mr. Ahmed continued to control the entity after it was placed into her name. (Hearing Tr. at 332-333.)  Thus, the only evidence in the record is the evidence the Commission has cited, which overwhelmingly demonstrates that the Relief Defendants acted as nominees, holding assets that Mr. Ahmed continued to control.[14]

At her deposition, Mrs. Ahmed testified consistent with someone who is a nominee.  She testified that she has no memory of receiving or depositing more than $20 million worth of checks that she received directly from her husband over the past 12 months. (Shalini Ahmed Depo. Tr. at 61-79.)  Mrs. Ahmed further testified that she provided no goods or services in exchange for these funds.  (*See, e.g.,* Shalini Ahmed Depo. Tr. at 78-79 (Q: Why did Ahmed Iftikar write you an $18 million check on January 12th, 2015? A: I don't know…Q: Did you give your husband anything in exchange for this $18 million? A: Not that I can remember.").)  Mrs. Ahmed was also unable to explain what assets she believed she owned or even list what assets were held in her name. (Shalini Ahmed Depo. Tr. at 78-79.)

Moreover, the facts of the I-Cubed transaction – in which fraudulently-obtained funds flowed to both Mrs. Ahmed and the Shalini Ahmed 2014 GRAT – further underscore that the Relief Defendants were merely holding assets controlled by Mr. Ahmed.  As detailed above, even though Mr. Ahmed purported to transfer ownership of I-Cubed to Mrs. Ahmed in May 2013, Mr. Ahmed continued to control the entity. (Hearing Tr. at 332-33.)  In fact, it was Mr.

---

[14] If the Court concludes that the assets held in Relief Defendants' names should not be treated as Mr. Ahmed's assets, then, as outlined in the Commission's brief in support of its motion for preliminary injunction, a significant asset freeze against the named Relief Defendants would still be appropriate under the two-step *Cavanaugh* test. [Doc. # 66 at 25-29.]

Ahmed who – unbeknownst to Mrs. Ahmed – opened the I-Cubed bank account in October 2014 (listing himself as a member of I-Cubed) into which the $7.5 million sale price was transferred, and it was Mr. Ahmed who then wrote checks to place these funds into the Relief Defendants' names.  Moreover, as Mrs. Ahmed also testified, she played no role in negotiating the transaction between I-Cubed and Oak, and was indeed not even aware of the sale until after it occurred. (Hearing Tr. at 314-15; 325-26).  Put simply, the evidence of the flow of fraudulent funds from Mr. Ahmed into and through the Relief Defendants' accounts, coupled with Mrs. Ahmed's deposition and hearing testimony about her lack of knowledge of any of these funds or transactions, makes clear that the assets in question are, in reality, controlled by Mr. Ahmed.

## VIII.   The Assets in Dispute Should Remain Frozen

In her Prehearing Hearing Brief, Mrs. Ahmed makes a claim to only three assets that remain in dispute: (1) compensation earned while employed at Goldman Sachs; (2) rental income generated from 530 Park Ave., Unit 12F; and (3) $7.5 million held by Relief Defendant Shalini Ahmed GRAT attributable to I-Cubed's 2014 sale of Company C stock to Oak.  The Court should reject Mrs. Ahmed's claims to each of these assets.

### a.   Mrs. Ahmed's Earnings Were Co-Mingled with Mr. Ahmed's Assets and Presumably Spent on the Ahmeds' Living Expenses

Mrs. Ahmed has admitted that (1) she earned only $1,261,564.87 in after-tax income from 2004 through the first six months of 2012 and has not worked since (Doc. No. 69 at 11); and (2) she previously had monthly living expenses of $45,000 (Doc. No. 69 at 9).  The Commission has found no evidence (and Mrs. Ahmed has not provided any) that her earnings were segregated from Mr. Ahmed, or that her earnings have not been spent.  In fact, they likely were spent.  That is because since July 1, 2012, when Mrs. Ahmed last received a paycheck, she

has spent more in living expenses than she earned over the entire past decade.  Rather than
asking the Commission to unfreeze an account holding monies she allegedly earned, Mrs.
Ahmed instead merely asserts that since she previously earned income, she should now be
entitled to more than $1 million from accounts holding the proceeds of her husband's fraud.  Her
argument reduces to the perverse claim that the Ahmeds lived off the money Mr. Ahmed stole,
and saved the money that Mrs. Ahmed earned.  She provides nothing either factually or legally to
support her claim.  The Court should reject Mrs. Ahemd's request for these monies.

   b.   Mrs. Ahmed is Not Entitled to Rental Income Generated from 530 Park Avenue,
        Unit 12A

   Mrs. Ahmed also argues that she should be entitled to the rental income from 530 Park
Avenue, Unit 12A, which is held in the name of DIYA Holdings (Doc. No. 69 at 12.)  Mrs.
Ahmed has no right to this condominium, or the income it generates.  Both should remain frozen.

   DIYA Holdings holds one asset: 530 Park Avenue, Unit 12A.  The condominium was
purchased in December 2013 for approximately $9,300,000.  All records obtained by the
Commission show Mrs. Ahmed has a 99% interest in DIYA Holdings, with the remaining 1%
belonging to Mr. Ahmed.[15]  Thus, because Mr. Ahmed has an interest in the asset, it should be
subject to the preliminary injunction asset freeze without further analysis.

---

[15] In Mrs. Ahmed's deposition, she testified that Mr. Ahmed's 1% was transferred to the Shalini
Ahmed GRAT, but she could not recall when this occurred. (Shalini Depo. Tr. at 110 lns. 13-23.)
At the Preliminary Injunction hearing, Mrs. Ahmed's memory was similarly elusive, as she could
again not recall the date this transfer allegedly occurred or whether it occurred before or after
Mr. Ahmed's April 2015 arrest. (Hearing Tr. at 342-44.)  If Mr. Ahmed's interest in DIYA was
in fact transferred to the Shalini Ahmed GRAT, it was likely effectuated in the past few months –
and possibly the past few weeks – in an effort to further conceal Mr. Ahmed's control of the
property.  Notably, Mrs. Ahmed has produced no documentation evidencing this alleged transfer.

Moreover, bank account information shows that 530 Park Avenue, Unit 12A was purchased primarily with proceeds of the fraud, and in any event nearly entirely with Mr. Ahmed's assets. Specifically, Mr. Ahmed wrote a check on December 27, 2013, for approximately $8.7 million, with the memo line indicating it was for "530 Park Avenue NYC." (Oraker Decl. ¶ 36.) These funds were proceeds of one of Mr. Ahmed's frauds involving Company C. (Oraker Decl. ¶ 36.) While the condominium was subsequently placed into DIYA Holdings, which Mrs. Ahmed was a 99% owner, she did not provide any goods or perform any services in exchange for the $8.7 million. (Shalini Ahmed Depo. Tr. at 128, lns. 9 – 13).[16] In sum, 530 Park Avenue, Unit 12A was purchased almost entirely with Mr. Ahmed's illicit funds, and then placed into DIYA Holdings, in which Mr. Ahmed had an ownership interest. Thus, the asset and the income it produces should be frozen.

---

[16] Although largely irrelevant to the question before this Court, Mrs. Ahmed does claim to have provided services in managing the property *after* it was purchased. (Shalini Ahmed Depo. Tr. at 128.) Mrs. Ahmed's management claims are irrelevant because the central question is whether she provided consideration for the asset, not what she did with the asset after it was placed into her name less than two years ago. *See, e.g., Cavanagh*, 155 F.3d at 137 (2d Cir. 1998) (finding freezing of asset proper where SEC was likely to show that relief defendants "gave no consideration for the [assets] and thus received them as a gift."). The cases Mrs. Ahmed cites (Doc. No. 69 at 13) are not to the contrary. *See  SEC v. Quan*, 2014 WL 4670923 (D. Minn. Sept. 19, 2014) (recognizing relief defendant used her own money to make mortgage payments, pay gardening services, homeowner association fees, and cleaning expenses for real property at issue); *CFTC v. Sarvey*, 2008 WL 2788538 (N.D. Ill. July 17, 2008) (holding that a relief defendant holding real property cannot be joined "[i]f [the] party performed some service or rendered some consideration in exchange for the property…"(emphasis added). In any event, her claim of involvement with the property was belied by her inability to provide even the most basic information about the management of the condominium. (Shalini Ahmed Depo. Tr. at 133; 135-136 (could not provide the names of the renters, the date of the rental, or when she began providing services to manage the property).).

      c.  <u>Mrs. Ahmed is Not Entitled to Monies Held in the Name of Relief Defendant</u>
          <u>Shalini Ahmed 2014 Grantor Retained Annuity Trust</u>

Finally, Mrs. Ahmed argues that the Court should release to her $7.5 million held by Relief Defendant Shalini Ahmed GRAT attributable to I-Cubed's 2014 sale of Company C stock to Oak.  (Doc. No. 69 at 26.)  Mrs. Ahmed has no right to these funds, which are the proceeds of fraud.  Thus, the monies should remain frozen.

The evidence uncovered by the Commission to this point indicates that there is one account at Fidelity held in the name of the Shalini Ahmed GRAT. (Oraker Decl. ¶ 13 Table 5.) These funds in their entirety come directly from two of Mr. Ahmed's fraudulent transactions: $1 million from Mr. Ahmed's fraud involving Company A, which Mr. Ahmed initially placed into an account in Mrs. Ahmed's name before it was later transferred to the Shalini Ahmed GRAT account (Oraker Decl. ¶ 31); and $7.425 million from the I-Cubed fraud (described above), which came directly from Mr. Ahmed, by check, and was deposited into the Shalini Ahmed GRAT account (Oraker Decl. ¶ 32.)  Moreover, at her deposition, Mrs. Ahmed testified that she knew little if anything about these monies (Shalini Ahmed Depo. Tr. at 106, lns. 7 – 21), and the evidence outlined above demonstrates that Mrs. Ahmed had little to no involvement in the transaction that led to the $7.425 million being placed into the Shalini Ahmed GRAT account. Because the account was funded exclusively with Mr. Ahmed's fraudulent proceeds (Oraker Decl. ¶ 33), and because the monies were controlled by Mr. Ahmed, it should remain frozen to satisfy any eventual judgment against Mr. Ahmed.

**IX.    A Freeze Order Sufficient to Cover Disgorgement and Penalties is Appropriate**

As outlined in the Commission's brief in support of its preliminary injunction, Mr. Ahmed's liability for his fraud – including disgorgement, interest, and penalties – will likely

exceed $118 million. (Doc. No. 66 at 13-14.)  As explained below, Mr. Ahmed's assets should remain frozen during the pendency of this litigation so as to preserve this ultimate judgment, and Relief Defendants should not to be permitted to spend the fraudulent proceeds.

> a. Mr. Ahmed's Assets Should be Frozen Because There are Likely Not Enough Liquid Assets to Cover Disgorgement and Interest

Simply put, this Court should not permit Mrs. Ahmed to consume the proceeds of Mr. Ahmed's fraud, especially when these monies will likely come from funds that can and should be used to make victims whole.  With interest, Mr. Ahmed must repay his victims at least $74.3 million.  Yet, to date, the Commission has located and frozen approximately $47 million in liquid assets held in bank and brokerage accounts (Oraker Decl. ¶ 13), and real property worth approximately $21 million (*See* Oraker Decl. ¶ 16.)[17]  Although there may be other assets the Commission is able to obtain and/or convert into real monies, there is no guarantee that this will occur.

Relief Defendants will likely continue to speculate that the Commission can obtain Mr. Ahmed's "carried interest" and other assets.  However, as they must acknowledge, the Commission does not currently have these monies, and it is possible that it is never able to obtain them, whether it is because the carried interest fails to materialize or because the Commission does not have the right to the carried interest that Mr. Ahmed may have forfeited.  The very real

---

[17] The 505 North Street property served as Mr. Ahmed's personal bond to appear, and not violate any conditions of bail, in his criminal case. (*See* Case No. 15-mj-02062-MBB (D. Mass), Doc. No. 20.) It is expected to be seized by criminal authorities, and therefore, the Commission has not included the value of this property in calculating the value of this real estate.  It is possible that the funds will be used to compensate victims of Mr. Ahmed's fraud, but there is no guarantee this will occur.  The recent criminal charges brought against Mrs. Ahmed may further complicate the issue.

risk that the asset will not materialize should be borne by Mr. Ahmed, not by the victims of his fraud. It is improper and unfair for Mrs. Ahmed to demand money directly traceable to Mr. Ahmed's fraud on the grounds that the Commission may possibly obtain future monies to make the victims whole. At the very least, Mr. Ahmed, not his victims, should be the one that wait until the carried interest becomes a real cash distribution attainable by the Commission.

      b.  <u>Mr. Ahmed's Assets Should be Frozen Because There are Insufficient Assets to Cover Disgorgement, Interest and Penalties</u>

Penalties are unquestionably warranted in this case. The Court should reject Mrs. Ahmed's arguments that Mr. Ahmed should (and will) be merely ordered to return the money he stole, but permitted to keep millions of dollars that he "earned" from Oak all while defrauding the company and its investors. This would persuade, not dissuade, other similarly situated individuals to commit similar crimes because they sacrifice nothing by committing fraud, save the gains they obtain from the fraud itself.

In support of her argument that the Commission is unlikely to obtain the civil penalties, Mrs. Ahmed cites two cases out of the Southern District of New York. (*See* Doc. No. 86 at 5.) However, neither case supports her argument. In fact, both stand for the near opposite proposition. In *SEC v. Wyly*, the Court did not order civil penalties because the court estimated "the final disgorgement award, including prejudgment interest will be between $300 and $400 million dollars" which was "among the largest awards ever imposed against individual defendants" (56 F.Supp.3d 394, 434, n.242 (S.D.N.Y., 2014)), and was more than the defendants had the ability to pay. *Id.* at 432-33 (finding that "Defendants' inability to pay [prejudgment interest] argument [was] [ ] futile."). In *SEC v. Credit Bancorp, Ltd.*, the court held that the defendant's "current and future financial situation preclude[d] imposing a penalty" because the

defendant filed for bankruptcy, was subject to criminal restitution, and would remain incarcerated until the age of 56 making a civil penalty impracticable. *SEC v. Credit Bancorp, Ltd.*, 738 F.Supp.2d 376, 391 (S.D.N.Y.2010)

Here, Mr. Ahmed has not filed for bankruptcy, he is not incarcerated, he is not subject to criminal restitution, and the Commission is not seeking an impracticable civil penalty.  Rather, the Commission is seeking a penalty that, depending on the ultimate value recovered for the real estate and other illiquid assets that have been frozen, Mr. Ahmed may be able to pay.  In fact, the courts' analysis and reasoning in both *Wyly* and *Credit Bancorp* are entirely inconsistent with Mrs. Ahmed's request that the Court *release* monies that could be used to pay penalties, because both courts essentially found that a civil penalty served no purpose when the defendant could not even pay the ordered disgorgement and prejudgment interest, much less additional penalties.

Mr. Ahmed may have the ability to pay penalties.  If so, he should be ordered to pay those penalties, which will punish Mr. Ahmed and deter others from engaging in similar fraudulent activity.  Indeed, courts routinely impose significant civil penalties approximating disgorgement in SEC enforcement actions. *See, e.g.*, *SEC v. Yuen*, 2006 WL 1390837 (C.D. Cal. May 8, 2006) (ordering $10,577,692 in disgorgement and equal amount in civil penalty); *SEC v. Aimsi Technologies, Inc.*, 650 F. Supp. 2d 296, 308 (S.D.N.Y. 2009) (ordering civil penalties equal to gross pecuniary gain, which equaled $2.2 million for one individual defendant and $448,000 for another); *SEC v. Solow,* 554 F. Supp. 2d 1356, 1366 (S.D. Fla. 2008) (ordering civil penalties equal to gross pecuniary gain of $2.6 million); *SEC v. Milan Capital Group*, 2001 WL 921169, *2-3 (S.D.N.Y. Aug. 14, 2001) (ordering disgorgement of $9.4 million and civil penalty of $10 million); *see generally SEC v. One Wall Street, Inc.*, 2008 WL 5082294, *9

27

(E.D.N.Y. 2008) ("[T]he amount of the regulatory penalty assessed should have some relationship to the amount of ill-gotten gains.").

        c.   <u>Even Were There Sufficient Assets to Cover Disgorgement, Interest and Penalties, Mrs. Ahmed has No Right to Proceeds from Illegal Activities</u>

In requesting that the Court release rental income earned from 530 Park Ave., Unit 12A, and the $7.5 million in proceeds from the I-Cubed transaction, Mrs. Ahmed implicitly asks this Court to allow her to benefit from her husband's fraud. This she cannot do. As explained in *SEC v. Byers*:

> Intervenors also argue that the SEC could recoup the losses to investors through other sources, without having to freeze the assets of Intervenors, who are innocent third parties. (Intervenor Mem. 9–10). This argument is without merit. Even if the argument were true—and Intervenors offer no evidence to support it—Intervenors should not be permitted to benefit from [defendant's] illegal activities. Cf. *SEC v. Glauberman*, No. 90 Civ. 5205(MBM), 1992 U.S. Dist. LEXIS 10982, at ——3–4, 1992 WL 175270 (S.D.N.Y. July 16, 1992).

*SEC v. Byers*, 2009 WL 33434, *2 (S.D.N.Y. Jan. 7, 2009).

Mrs. Ahmed makes the identical and equally meritless argument in directing the Commission to attempt to collect Mr. Ahmed's carried interest, while at the same time requesting that the Court allow her to obtain the rents from 530 Park Ave., Unit 12A, and the proceeds from the I-Cubed transaction. Regardless of Mr. Ahmed's carried interest, the assets and monies Mrs. Ahmed requests are the direct proceeds of Mr. Ahmed's fraud. Even were the Commission to obtain every dollar of Mr. Ahmed's carried interest, Mrs. Ahmed should still not be permitted to benefit from Mr. Ahmed's illegal activities, regardless of her involvement.

### X.     A Carve Out is Inappropriate and Unnecessary

   a.   <u>Mrs. Ahmed is Not Entitled to the Payment of $20,000 in Monthly Living Expenses
        From Frozen Funds</u>

An initial matter, and contrary to arguments made by Mrs. Ahmed at the Preliminary

Injunction hearing, courts routinely deny carve our requests.  *See, e. g.  SEC v. Stein*, No. 07

Civ. 3125(GEL), 2009 WL 1181061, at *1 (S.D.N.Y. Apr. 30, 2009) (holding that "[t]o persuade

a court to unfreeze assets, the defendant must establish that the funds he seeks to release are

untainted <u>and</u> that there are sufficient funds to satisfy any disgorgement remedy that might be

ordered in the event a violation is established at trial.") (emphasis added); *SEC v. Private Equity

Mngt. Group, Inc.*, 2009 WL 2058247, at *3 (denying attorney fees where defendant cannot

"demonstrate that the assets he possesses are untainted by the fraud").

Moreover, courts have similarly denied releasing funds to relief defendants.  *See, e.g.,

Smith v. SEC*, 653 F.3d 121, 125-126 (2nd Cir. 2011) (upholding denial of "release of: (1)

$16,431 per month for [relief defendant's ] 'continued well-being,' which included expenses

surrounding the maintenance of the [relief defendant's] primary residence located in New York;

(2) attorneys' fees in the amount of $138,451; and (3) $13,466 per month for 'necessary

expenses' associated with the Florida home, including mortgage payments.")

In fact, Mrs. Ahmed concedes that "courts have denied requests for the release of living

expenses where 'the defendants were found to have other sources of income or were requesting

funds for luxuries, not necessities." (Doc. No. 69 at 8) (quoting *SEC v. Dowdell*, 175 F.Supp.2d

850, 854 (W.D. Va. 2001)).  Mrs. Ahmed attempts to sidestep the court's language by asserting

that yearly private school tuition totaling approximately $100,000, living expenses of $20,000

per month, and attorneys' fees of $2.5 million are necessities rather than luxuries.  Regardless,

the Commission has agreed to release almost $300,000 directly to Mrs. Ahmed, which she can use for both living expenses as well as attorneys' fees.  Although Mrs. Ahmed will undoubtedly be forced to change her lifestyle, she should not be permitted to continue to enjoy the profits of her husband's illegal activities simply because she became accustomed to using these monies in the past.  This is especially true now that Mrs. Ahmed has been criminally charged, as presumably there is evidence that she knew these monies were illegally obtained.

       b.   <u>Mrs. Ahmed is Not Entitled to the Payment of Legal Expenses From Frozen Funds</u>

First and foremost, the Court should reject any argument that the criminal charges Mrs. Ahmed now faces in the District of Massachusetts permits her to access frozen monies.  The Sixth Amendment guarantees Mrs. Ahmed the right to competent counsel in her criminal proceeding, but it does not give her the right to use monies that do not belong to her.

Indeed, it is well settled that neither civil nor criminal defendants have the right to use frozen investor funds to pay their counsel.  When analyzing a criminal defendant's right to use frozen funds to pay counsel, the United States Supreme Court has stated that "[A] robbery suspect, for example, has no Sixth Amendment right to use funds he has stolen from a bank to retain an attorney to defend him if he is apprehended.  <u>The money, though in his possession, is not rightfully his</u>. . . ." *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 626, 109 S.Ct. 2646 (1989) (emphasis added); *United States v. Monsanto*, 491 U.S. 600, 614 (1989).  The Court further stated that a defendant has no right to spend another person's money for attorneys' fees, <u>even if those funds are the only way that a defendant will be able to retain the attorney of his or her choice.</u>  *Caplin & Drysdale*, 491 U.S. at 626 (emphasis added).

The courts of appeals have consistently applied this same reasoning in civil actions, including Commission enforcement actions.  For example, the Seventh Circuit in *SEC v. Cherif* denied the defendants' request to modify the asset freeze, which they sought in order to obtain funds to pay their respective attorney's fees.  The Court stated that:

> Because this is a civil case, the arguments of [defendants] are weaker than those of *Caplin & Drysdale* or *Monsanto*.  A criminal defendant has "no Sixth Amendment right to spend another person's money for services rendered by an attorney."  It would be anomalous to hold that a civil litigant has any superior right to counsel than one who stands accused of a crime.

*SEC v. Cherif*, 933 F.2d 403, 416-17 (7th Cir. 1991), *cert. denied* 502 U.S. 1071(1992) (citations omitted).  Additionally, the Court in *SEC v. Quinn* applied the *Caplin & Drysdale* and *Monsanto* reasoning directly to securities violators, and stated that:

> Just as a bank robber cannot use the loot to wage the best defense money can buy, so a swindler in securities markets cannot use the victim's assets to hire counsel who will help him retain the gleanings of crime.

*SEC v. Quinn*, 997 F.2d 287, 289 (7th Cir. 1993) (citations omitted).[18]

---

[18]  *See also  SEC v. Bremont*, 954 F. Supp. 726, 733 (S.D.N.Y. 1997); *SEC v. Grossman*, 887 F. Supp. 649, 661 (S.D.N.Y. 1995), *aff'd sub. nom. SEC v. Estate of Hirshberg*, 101 F.3d 109 (2d Cir. 1996)(to succeed on motion to modify freeze to permit payment of attorneys' fees and other expenses, defendant "must establish that such a modification is in the interest of defrauded investors"); *SEC v. Coates*, 94 Civ. 5361, 1994 U.S. Dist. LEXIS 11787 (S.D.N.Y. 1994) ("[a] defendant is not entitled to foot his legal bill with funds that are tainted by his fraud"); *CFTC v. American Metals Exchange Corp.*, 775 F. Supp. 767 (D.N.J. 1991) (where value of frozen assets is "well short of the amount of losses suffered" by investors, "it would be inequitable to further deplete the receivership estate to pay [defendant's] attorneys' fees or additional living expenses."); *SEC v. Telecom Marketing, Inc.*, 888 F. Supp. 1160, 1162 (N.D. Ga. 1995) (motion to terminate freeze to permit payment of reasonable and necessary moving expenses and attorney's fees denied); *SEC v. Comcoa Ltd.*, 887 F. Supp. 1521, 1524 (S.D. Fla. 1995), *aff'd sub nom. Levine v. Comcoa Ltd.*, 70 F.3d 1191 (11th Cir. 1995), *cert. denied*, 519 U.S. 809 (1996) ("In imposing a freeze of assets there is no requirement that the court exempt sufficient assets for the payment of legal fees."); *SEC v. Current Financial Services*, 62 F. Supp. 2d 66, 69 (D.D.C. 1999) ("'A defendant is not entitled to foot his legal bill with funds that are tainted by his fraud.'"); *United States v. Monsanto*, 491 U.S. 600 (1989).

It would be inappropriate and improper to allow Mrs. Ahmed to consume funds that are properly frozen and/or do not belong to her, even if those funds will go directly to her attorneys. First, Mrs. Ahmed has had the benefit of counsel thus far.  Assuming the Commission has met its burden of proving that a preliminary injunction freezing assets is warranted, the Court should not now release monies, which the Commission has proved are properly frozen.  Moreover, and as noted above, the Commission has agreed to release to Mrs. Ahmed almost $300,000 of non-tainted monies, which she can use to pay for legal counsel.  Additionally, her request for $2.5 million is plainly inappropriate, as she can hire competent counsel for substantially less than this amount.  This is especially true in the instant case, where Mrs. Ahmed will likely not be involved in prolonged litigation because (1) she is a relief defendant (also known as a nominal defendant);[19] and (2) there is little to no dispute about the underlying facts in this action.

At her deposition, Mrs. Ahmed testified that she has no memory of receiving the more than $20 million the Commission alleges were placed into her name in order to conceal Mr. Ahmed's fraud and protect the assets from confiscation.  At the Preliminary Injunction hearing, Mrs. Ahmed testified that she had absolutely no knowledge of her husband's business activities

---

[19] *See SEC v. Cherif*, 933 F.2d 403, 414 (7th Cir. 1991) (explaining that "[t]he court needs to order the nominal defendant to turn over funds to the prevailing party when the dispute between the parties is resolved. A nominal defendant is not a real party in interest, however, because he has no interest in the subject matter litigated. His relation to the suit is merely incidental and 'it is of no moment [to him] whether the one or the other side in [the] controversy succeed [s].'" (quoting *Bacon v. Rives*, 106 U.S. 99, 104, 1 S.Ct. 3, 6, 27 L.Ed. 69.); *see also F.T.C. v. Strano,* 528 Fed. Appx. 47, 49-50, 2013-1 Trade Cas. (CCH) ¶ 78434 (2nd Cir. 2013) (recognizing the Second Circuit "adopt[ed] *Cherif* 's definition of relief defendant" which "identified a pair of mutually exclusive ways to bring a person's assets within the court's jurisdiction [ ]: (1) assert a substantive claim against the person as a defendant; or (2) 'purely as a means of facilitating collection,' name the person as a 'nominal,' i.e., 'relief,' defendant, who holds the named defendant's assets only 'in a subordinate or possessory capacity as to which there is no dispute.'") (quoting *Cherif*, 933 F.2d at 414-15).

and that she did not know he opened bank accounts in the names of Oak and companies in which

it invested.  She further confirmed that she is not entitled to monies or assets that her husband

obtained through fraud or theft (Hearing Tr. at 346-347.)  Even assuming a relief defendant has

the right to litigate the underlying fraud – which the Commission does not concede – considering

the evidence the Commission has presented thus far, combined with Mr. Ahmed's flight from the

jurisdiction, it is difficult to conceive Mrs. Ahmed can or will seek to litigate this case through

trial.

### XI.    Conclusion

For the reasons outlined herein, along with the Commission's prior filings and the

evidence presented at the Preliminary Injunction hearing, the Court should grant the

Commission's request for a preliminary injunction freezing the assets, funds, or other property

held by or under the direct or indirect control of Defendant Iftikar Ahmed and Relief Defendants

Iftikar Ali Ahmed Sole Prop; I-Cubed Domains, LLC; Shalini Ahmed; Shalini Ahmed 2014

Grantor Retained Annuity Trust; DIYA Holdings LLC; DIYA Real Holdings, LLC; I.I. 1; I.I. 2;

and I.I. 3, whether held in any of their names or for their direct or indirect beneficial interests,

wherever located, up to the amount of $118,246,186, to ensure that money will be available to

satisfy any ultimate judgment in this case.  The Court should further not allow Mrs. Ahmed to

benefit from her husband's illegal activities and deny her request to access and consume the

proceeds of Mr. Ahmed's fraud.


DATED: August 5, 2015.


                                        s/ Mark L. Williams
                                        Nicholas P. Heinke
                                        Mark L. Williams

U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294-1961
(303) 844-1071 (Heinke)
(303) 844-1027 (Williams)
HeinkeN@sec.gov
WilliamsML@sec.gov
*Attorneys for Plaintiff*

<u>CERTIFICATE OF SERVICE</u>

I certify that on August 5, 2015, a copy of the foregoing document was served via ECF

upon the following:

Jonathan Harris
Reid Skibell
David Deitch
Alexander Sakin
Harris, O'Brien, St. Laurent & Chaudhry LLP
111 Broadway, Suite 1502
New York, NY 10006
(Counsel for Relief Defendants)

s/ Mark L. Williams
Mark L. Williams