UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br>　　　*Plaintiff*,<br>　　　*v.*<br>IFTIKAR AHMED, *et al.*,<br>　　　*Defendants.* | Civil No. 3:15cv675 (JBA)<br><br>August  12, 2015 |

**RULING AND ORDER GRANTING PRELIMINARY INJUNCTION**

Plaintiff the United States Securities and Exchange Commission (the "Commission" or "SEC") moves [Doc. # 29] for a preliminary injunction continuing the temporary restraining order [Doc. # 24] freezing assets of Defendant and Relief Defendants ("Asset Freeze Order"). On July 23 and 30, 2015, the Court conducted a hearing on the Commission's motion for preliminary injunction, during which it heard arguments of counsel and received evidence. For the reasons that follow, the Commission's motion is granted.

**I.     Background**

**A.     Facts Alleged**

As set forth in the record considered by the Court in issuing the Asset Freeze Order, Defendant Ahmed is alleged to have engaged in a decade-long fraud that resulted in the misappropriation of tens of millions of dollars from his former employer Oak Management Corporation ("Oak") and its investors. Among other tactics, Defendant is alleged to have misrepresented the price of an investment he advised Oak to make; fraudulently used invoices purportedly related to Oak's purchase or sale of a company's shares; and engaged in self-dealing by misrepresenting or concealing his personal stake as

the counterparty in various transactions that he entered into on behalf of Oak. In each case, Mr. Ahmed allegedly funneled the illicit proceeds into accounts at Bank of America that he claimed belonged to parties to the deals, but which in fact he opened and secretly controlled. His ill-gotten gains are alleged to have totaled $65 million. (*See* Am. Compl. [Doc. # 33]; Declarations of Grace Ames ("First Ames Declaration" [Doc. # 4] and "Second Ames Declaration [Doc. # 31]"); Am. Mot. for Prelim. Inj.)

**B.     Procedural Background**

On May 6, 2015, the SEC filed [Doc. # 2] an emergency motion for an ex parte temporary restraining order freezing assets and for a preliminary injunction continuing that asset freeze for the pendency of this litigation. On May 7, 2015, after conducting an ex parte telephonic hearing on the record, the Court issued [Doc. # 9] a temporary restraining order freezing assets, providing for other ancillary relief, and setting this matter for a preliminary injunction hearing. On May 18, 2015, the Commission and Mr. Ahmed entered into a stipulation [Doc. # 21], approved [Doc. # 22] by the Court, providing that all assets held by him or under his direct or indirect control, whether held in his name or for his direct or indirect beneficial interest, would remain frozen until the Court's ruling on the Commission's Motion for a Preliminary Injunction.

Mr. Ahmed is believed to have fled the United States around the same time that he entered into this stipulation.[1] On June 12, 2015, the Commission filed its Amended Complaint and Motion for a Preliminary Injunction based on newly-alleged misconduct

---

[1] The alleged fraud in this case was discovered after Mr. Ahmed was arrested in an unrelated case for insider trading. *See* Case No. 15-mj-02062-MBB (D. Mass.). Mr. Ahmed posted bail and fled the United States for India where he was subsequently arrested and detained by Indian authorities. (Lipman Decl. [Doc. # 97-1] ¶ 3.)

by Defendant Iftikar Ahmed. In its Amended Complaint, the Commission also named several additional relief defendants, including Defendant's wife, Shalini Ahmed. The Court subsequently ordered [Doc. # 34] expedited discovery and set this matter for a preliminary injunction hearing, which took place on July 23 and 30, 2015 with the SEC, Mrs. Ahmed, and certain other relief defendants participating.[2]

On August 3, 2015, Mr. and Mrs. Ahmed were charged in a criminal case—the second for Mr. Ahmed—with conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956(h) and 1957 related to the alleged fraud in this case. *See* Case No. 15-mj-2161-MBB (D. Mass.).

### C.    Preliminary Injunction Hearing

The SEC seeks to freeze assets up to $118 million to account for approximately $65 million in illicit profits to be disgorged plus prejudgment interest ($9.3 million) and civil penalties ($44 million). The SEC has located and claimed to be subject to the Court's Asset Freeze Order approximately $47 million dollars in liquid assets, real estate worth approximately $20 million, and "certain other non-liquid assets that are difficult to value." (SEC Post Hr'g Br. [Doc. # 98] at 7 & n.4.)

---

[2] Mr. Ahmed did not answer the SEC's complaint and the SEC has since moved [Doc. # 64] for the entry of default pursuant to Fed. R. Civ. P. 55(a). On August 5, 2015, an attorney entered an appearance in this case for Mr. Ahmed, opposing the SEC's motion for entry of default and moving [Doc. # 95] for an extension of time to respond to the complaint. While Defendant Ahmed seeks an extension of time "to answer or otherwise respond to the Amended Complaint," his briefing does not oppose the entry of a preliminary injunction. (Def.'s Mem. Supp. [Doc. # 97] at 15.) Defendant also seeks the release of money from the Asset Freeze Order to fund his civil and criminal legal expenses. (*Id.* at 7–13.) The SEC has not yet had an opportunity to respond to this motion and it will therefore be addressed in a subsequent ruling.

Of the nineteen transactions alleged to be fraudulent in the Commission's Amended Complaint, Relief Defendants challenged only one at the preliminary injunction hearing: the October 2014 sale of "Company C" shares from I-Cubed to Oak for $7.5 million. Additionally, Relief Defendants argued that additional unfrozen funds in Mr. Ahmed's "carried interest account" at Oak are available to satisfy any judgment against Defendant and that certain assets frozen should be unfrozen.

As to the Company C transaction, the evidence presented at the hearing largely confirmed the record presented to the Court when it issued the temporary restraining order. In October 2013, based on Mr. Ahmed's recommendation, Oak invested $25 million to purchase shares in Company C. Before consummating the investment, Grace Ames, Oak's Chief Operating Officer, asked Mr. Ahmed whether he "invest[ed] in [Company C] prior to Oak's contemplated investment" and Mr. Ahmed responded "I have NO personal investment or any direct beneficial interest of investment in [Company C]." (Hearing Ex. 2 & First Ames Decl. Ex. 18.) Mr. Ahmed did not disclose that a year earlier, in October 2012, he had formed an entity called I-Cubed and shortly thereafter purchased shares in Company C through I-Cubed. (Hearing Ex. 5; First Ames Decl. ¶ 29.b & Ex. 21.) In May 2013, shortly before Oak made its initial investment in Company C, Mr. Ahmed transferred his interest in I-Cubed to his wife. (First Ames Decl. ¶ 29.d.)

In October 2014, Mr. Ahmed recommended that Oak make an additional $7.5 million investment in Company C shares held by I-Cubed, which Mr. Ahmed described as a "family office," but Mr. Ahmed did not disclose that he had transferred his interest in I-Cubed to Mrs. Ahmed. (*Id.* ¶ 26.) Mr. Ahmed signed a Stock Purchase Agreement on behalf of Oak purchasing the $7.5 million of additional shares from I-Cubed. (*Id.* Ex. 19.)

Richard N. Kimball, a Boston attorney, signed on behalf of I-Cubed. (*Id.*) However, Mr. Kimball had resigned as I-Cubed's initial manager one month prior. (*Id.* Ex. 22.) The SEC represents that Mr. Kimball has confirmed that his signature was forged in the Stock Purchase Agreement. (SEC Post Hr'g Br. at 12 & n.7.) Mr. Ahmed then directed Oak to wire the $7.5 million payment to a Bank of America account held solely in his name, which he had opened just days prior. (Hearing Ex. 4 & Ames First Decl. Ex. 20 (wiring instructions); Hearing Ex. 6 & Oraker Decl. [Doc. # 68] Ex. 1 at SEC-BOA-00001189-1192 (account opening documents).) Mr. Ahmed then transferred this $7.5 million into the names of certain Relief Defendants by writing checks from the I-Cubed Bank of America account to Mrs. Ahmed and the Shalini Ahmed GRAT.[3] (Oraker Decl. ¶¶ 23, 32 & Exs. 15, 17, 19.)

Mr. Ahmed's private email communications reveal that he had significant concerns about the viability of Company C days before executing the October 2014 purchase on Oak's behalf, emailing another investor about the "flat to down year" Company C was having, saying it was a "non-starter" for Oak to invest additional money in Company C, and stating that he would get his "a** handed to [him]" if he approached Oak about such an investment. (Hearing Ex. K.) Mr. Ahmed did not disclose these concerns to Oak at the time he advised Oak to buy Company C shares from I-Cubed (Hearing Tr. at 283), nor did he disclose that the same shares Oak purchased for $7.5 million had been valued at only $876,193.72 two months earlier. (Hearing Ex. 8 at Shalini Ahmed_00000881 & Hearing Tr. at 304–05.)

---

[3] Mrs. Ahmed's interest in I-Cubed had been transferred to the Shalini Ahmed GRAT.

II.      **Discussion**

The Securities Act of 1933 and the Securities and Exchange Act of 1934 pursuant to which the SEC has brought this action, authorize it to bring civil actions "to enjoin [unlawful] acts or practices, and upon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond." 15 U.S.C. § 77t(b); 15 U.S.C. § 78u(d)(1) (same). Injunctions sought by the SEC "do not require a showing of irreparable harm or the unavailability of remedies at law," but rather "the SEC need only make 'a substantial showing of likelihood of success as to both a current violation and the risk of repetition.'" *Smith v. S.E.C.*, 653 F.3d 121, 127–28 (2d Cir. 2011) (quoting *SEC v. Cavanagh,* 155 F.3d 129, 132 (2d Cir. 1998)). A less stringent standard applies when the SEC seeks to freeze assets, requiring it only to "show either a likelihood of success on the merits, or that an inference can be drawn that the party has violated the federal securities laws." *Id.* (internal quotation marks omitted). This is so because an "asset freeze is a provisional remedy" that serves to preserve the status quo and "to ensure that, in the event the SEC obtains a judgment, money will be available to satisfy that judgment." *S.E.C. v. Byers*, No. 08 CIV.7104 (DC), 2009 WL 33434, at *2 (S.D.N.Y. Jan. 7, 2009).

To show a violation of Section 10(b) of the Exchange Act and Rule 10b–5 thereunder, the SEC must show that Defendant "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." *S.E.C. v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279, 285 (2d Cir. 2013) (quoting *SEC v. Monarch Funding Corp.,* 192 F.3d 295, 308 (2d Cir. 1999)). Section 17(a) of the Securities Act and Section 206 of the Advisers Act require similar showings although scienter is not required under

6

Section 17(a)(2). *S.E.C. v. Haligiannis*, 470 F. Supp. 2d 373, 382 (S.D.N.Y. 2007) ("Facts showing a violation of Section 17(a) or 10(b) by an investment adviser will also support a showing of a Section 206 violation.").

"The plenary powers of a federal court to order an asset freeze are not limited to assets held solely by an alleged wrongdoer, who is sued as a defendant in an enforcement action," *Smith*, 653 F.3d at 128, but rather extends to a person not accused of wrongdoing "where that person: (1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds," *Cavanagh*, 155 F.3d at 136. However, this two-part test is not applicable where an asset claimed to belong to a relief defendant "is, in reality, also an asset of a defendant." *S.E.C. v. Heden*, 51 F. Supp. 2d 296, 299 (S.D.N.Y. 1999). Instead, "the freeze sought is" considered to be "against the defendant's assets." *Id.; see also S.E.C. v. McGinn, Smith & Co.*, 752 F. Supp. 2d 194, 208 (N.D.N.Y. 2010) ("Where a defendant treated an asset as his own, the asset should be treated as that of the defendant and the *Cavanagh* test becomes irrelevant.").

In determining ownership courts consider "[1] a defendant's control over the asset, [2] the length of time the asset had been held, [3] whether the defendant had an interest in and benefitted from the asset, [4] whether the defendant had transferred assets from his name into the asset, [5] whether he or she contributed to acquire the asset initially, and [6] whether the defendant ever withdrew any funds from the asset." *McGinn, Smith & Co.*, 752 F. Supp. 2d 194, 207–08.

Relief Defendants makes several arguments as to why the Court should not continue the asset freeze at the amount requested by the SEC and should carve out expenses for Mrs. Ahmed's legal fees and personal living expenses.

### A.      Company C Transaction

First, in their prehearing brief, Relief Defendants contended that the SEC is unlikely to succeed on its claim relating to the Company C transaction because Mr. Ahmed transferred his interest in I-Cubed to his wife shortly before the sale to Oak and Oak's compliance regime only prohibited employees and not their spouses from investing in companies that Oak invested in. (Relief Defs.' Prehr'g Br. [Doc. # 103] at 17–19.) Relief Defendants do not continue to advance this argument in their post-hearing brief and, to the extent that this contention has not been abandoned, the record suggests that the SEC is likely to succeed on the merits of its claim that this transaction was fraudulent. Despite Mr. Ahmed's nominal transfer of his interest in I-Cubed before the October 2014 sale, the evidence shows that he continued to control the company's bank account and flow of funds and Mrs. Ahmed's testimony at the hearing demonstrated that she played little, if any, role in the sale negotiations with Oak and did not learn of the sale until after it took place. (Hearing Tr. at 325.)

Furthermore, Mr. Ahmed did not disclose to Oak that the shares that it paid $7.5 million for were valued at less than $900,000 just two months prior or that Mr. Ahmed had privately expressed concerns about the viability of the company just before recommending that Oak further invest in it. The evidence of Defendant's omissions, misstatements, and conflict of interest suggests that the SEC is likely to succeed on the merits of this claim. *See* 15 U.S.C. § 80b-6(3) ("It shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly . . . acting as principal for his own account, knowingly to sell any security to or purchase any security from a client, or acting as broker for a person other

than such client, knowingly to effect any sale or purchase of any security for the account of such client, without disclosing to such client in writing before the completion of such transaction the capacity in which he is acting and obtaining the consent of the client to such transaction.").

### B.   Disgorgement

Relief Defendants next contend that even if the SEC prevails on the merits of the Company C transaction, the $7.5 million in disgorgement sought by the SEC is unwarranted because the "SEC cannot show a connection between that money" paid by Oak and Mr. Ahmed's "failure to disclose who owned the shares" because Oak "got full value for what it paid" and did not pay an inflated price. (Relief Defs.' Prehr'g Br. at 18–19.) Relief Defendants are incorrect that a remedy of disgorgement is appropriate only where the victim has sustained a loss. Rather, "[d]isgorgement serves to remedy securities law violations by depriving violators of the fruits of their illegal conduct." *S.E.C. v. Contorinis*, 743 F.3d 296, 301 (2d Cir. 2014). As an equitable remedy, it "forc[es] wrongdoers to give back the fruits of their illegal conduct" and thereby "operates to make the illicit action unprofitable for the wrongdoer," but it "need not serve to compensate the victims of the wrongdoing." *Id.; see also Cavanagh*, 445 F.3d at 117 ("A district court order of disgorgement forces a defendant to account for all profits reaped through his securities law violations and to transfer all such money to the court, even if it exceeds actual damages to victims.").

Therefore, disgorgement does not have to be causally related to a loss to the victim, but rather the focus is on Defendant's unjust enrichment. The cases cited by Relief Defendants stand only for the proposition that where there is no causal connection

9

between a defendant's profits and the charged fraud, disgorgement is not warranted. *See,*
*e.g., Commodity Futures Trading Comm'n v. Sidoti*, 178 F.3d 1132, 1138 (11th Cir. 1999)
("A district court may not disgorge profits, unless there is record evidence the defendant
is liable (either directly or indirectly) for fraud."); *see also Sec. & Exch. Comm'n v. Manor*
*Nursing Centers, Inc.*, 458 F.2d 1082, 1104 (2d Cir. 1972) (holding that district court
properly ordered disgorgement of proceeds for security fraud but that "the court erred in
ordering appellants to [disgorge] all the profits and income *earned on such proceeds*"). If
the final record evidence supports the SEC's initial showing that Defendant's conduct in
the Company C transaction was fraudulent under the federal securities law, the Court
could order the disgorgement of his profits regardless of the loss to Oak. *See Contorinis*,
743 F.3d at 301 ("Because disgorgement's underlying purpose is to make lawbreaking
unprofitable for the law-breaker, it satisfies its design when the lawbreaker returns the
fruits of his misdeeds, regardless of any other ends it may or may not accomplish.").

## C.    Disputed Assets

Mrs. Ahmed contends that several assets should be excluded from the Asset
Freeze Order. First, Mrs. Ahmed claims to own $7.5 million in proceeds from the
Company C transaction in the Shalini Ahmed GRAT, but the evidence shows that Mr.
Ahmed funded the single account for this entity with the proceeds of fraudulent
transactions (Oraker Decl. ¶¶ 13, 31–33) and, as discussed above, Mrs. Ahmed's
testimony and the other record evidence suggest that Mrs. Ahmed merely served as a
nominal owner for Mr. Ahmed's funds.

Mrs. Ahmed next contends that she is the manager and beneficial owner of Relief
Defendants DIYA Holdings LLC, an entity that owns a condominium in New York City,

530 Park Avenue, Unit 12A, which generates significant rental income, and DIYA Real Holdings LLC (Unit 12F in the same building), which could generate significant rental income; and that she is entitled to the rental income from both properties. (Relief Defs.' Prehr'g Br. at 13.) The SEC, however, has shown a likelihood of success on its claim that these properties are actually owned by Mr. Ahmed and were purchased with proceeds of fraud.

As to Unit 12A, the record shows that the purchase money for this property came directly from Mr. Ahmed and the proceeds of the Company C transaction. Specifically, Mr. Ahmed transferred the proceeds of the Company C transaction to a joint account and then wrote a check for $8.7 million to Bank of America with the memo line stating it was for "530 Park Ave NYC." (Oraker Decl. ¶ 36.) The apartment was subsequently transferred to DIYA Holdings LLC, which is owned 99% by Mrs. Ahmed and 1% by Mr. Ahmed, but Mrs. Ahmed testified that she did not provide any goods or perform any services in exchange for her interest. (S. Ahmed Dep. at 128.) Similarly, the record shows that Unit 12F was purchased nearly entirely with the proceeds of two allegedly fraudulent transactions transferred by Mr. Ahmed into an account in Mrs. Ahmed's name. (Oraker Decl. ¶¶ 13, 40–44.) Therefore, the record supports the SEC's contention that Mr. Ahmed and not Mrs. Ahmed is in reality the owner of these two properties.

Relief Defendants contend that even if the two properties were purchased with Mr. Ahmed's proceeds from fraud, "any income or profit that was earned on the proceeds of the defendant's purported fraud, including the rental revenue generated by the properties owned by Relief Defendants . . . is untainted and cannot be disgorged." (Relief Defs.' Post Hr'g Br. [Doc. # 96] at 4.) The Second Circuit has held that while it is a proper

11

for a court to order a party to refund its profits from an fraudulent transaction, it cannot order a party to account for "all the profits and income *earned on such proceeds*" in part because it would "arbitrarily require[e] those . . . who invested wisely to refund substantially more than other[s]." *Manor Nursing Centers, Inc.*, 458 F.2d at 1104–05. Even if the proceeds from these rental properties are not subject to disgorgement, these funds could still be frozen to ensure sufficient assets are available to pay a judgment and penalties. Furthermore, even if Defendant does not have to disgorge past income earned on this property, it does not mean that he can continue to earn income on a property that is alleged to have been purchased with fraudulent funds and is subject to being disgorged. *Cf. Almeida v. Holder*, 588 F.3d 778, 788 (2d Cir. 2009) ("The rights and benefits of property ownership are, after all, many . . . . [T]hey include not only the right to actual possession of a thing, but also the right to . . . receive income from its use . . . .").

Mrs. Ahmed also contends that the Asset Freeze Order improperly includes the $1,261,564.87 in net income earned from her job at Goldman Sachs from 2004 to 2011. (Relief Defs.' Prehr'g Br. at 11.) There is no evidence, however, that this income was segregated from Mr. Ahmed's assets. In *S.E.C. v. Rosenthal*, 426 F. App'x 1 (2d Cir. 2011), the Second Circuit held that disgorgement could be ordered against relief defendants not accused of wrongdoing who received distributions from a limited partnership that contained both the defendant's proceeds from insider trading and legitimate assets, because it was "undisputed that the ill-gotten gains of the insider trading were commingled" and the "SEC is not required to trace specific funds to their ultimate recipients in such a situation." The Second Circuit reasoned that "[i]mposing such a tracing requirement would allow an insider trading defendant to escape disgorgement by

spending down illicit gains while protecting legitimately obtained assets or, as was the case here, by commingling and transferring such profits. Because the balance in the account after the distributions was less than the amount of illicit profits, the distributions must necessarily have contained funds subject to disgorgement. Denying disgorgement in such a situation because of the SEC's inability to trace the funds would be inconsistent with disgorgement's purpose 'to prevent unjust enrichment.'" *Id.* at 3.

Relief Defendants attempt to distinguish *Rosenthal* on the basis that there the primary defendant comingled the funds whereas here the relief defendant comingled her legitimate funds with her husband's illicit gains. (Relief Defs.' Prehr'g Br. at 12 & n.4 & Post Hr'g Br. at 2 n.2.) This attempted distinction is unpersuasive given that both *Rosenthal* and this case involve a claim by a relief defendant not accused of wrongdoing that it is entitled to untainted assets that have been comingled with the defendant's tainted assets.

In the cases cited by Relief Defendant for the proposition that "courts have refused to disgorge money paid to relief defendants for services rendered even where the funds could be directly traced to misconduct by the primary defendant" (Relief Defs.' Prehr'g Br. at 12) the relief defendants' salaries were not comingled but rather had been paid by a defendant who had obtained illicit funds. *See F.T.C. v. Bronson Partners, LLC,* 674 F. Supp. 2d 373, 392 (D. Conn. 2009) *aff'd,* 654 F.3d 359 (2d Cir. 2011) ("The monies Sandra Howard received from H & H for services performed on behalf of Bronson were legitimately paid in consideration for her services."); *Janvey v. Adams,* 588 F.3d 831, 835 (5th Cir. 2009) (innocent investors in Ponzi scheme had "legitimate ownership interests in their CD proceeds, and therefore cannot be considered proper relief defendants").

Absent any showing that Mrs. Ahmed's salary, last received in 2012, has been segregated from Mr. Ahmed's tainted assets, it cannot be considered a separate asset of hers outside the scope of the Asset Freeze Order.

### D.  Size of Asset Freeze

Relief Defendants next contend that the SEC has already frozen sufficient assets to protect investors such that the Court could provide for Mrs. Ahmed's legal and personal expenses without jeopardizing their recovery. Relief Defendant's argument that sufficient assets have already been frozen depends on (1) including $23 million from Mr. Ahmed's capital account at Oak and (2) excluding funds sought for a civil penalty from the asset freeze.[4]

On the first point, at the preliminary injunction hearing, the SEC and Ms. Ames disputed that the funds in this account are an asset available for freezing and instead contended that Mr. Ahmed's carried interest represented only an expectancy of an entitlement to future income by Mr. Ahmed on Oak's profits but any such interest was (1) still uncertain and (2) forfeited due to his disabling conflict of interest and

---

[4] Mrs. Ahmed also contends that the SEC will be able to realize $9.6 million by selling her primary residence in Greenwich (Relief Defs.' Post Hr'g Br. at 7), but this property was the collateral for Mr. Ahmed's bond in the insider trading case and was forfeited when he fled the United States. The SEC represents only that it is "possible, although not assured" that the United States Attorney's Office will consent to allowing the proceeds on this forfeiture to be used to compensate victims. (SEC Post Hr'g Br. at 7.) Mrs. Ahmed also testified that approximately $2 million in assets, including jewelry and art, are being held by her attorneys for "safekeeping." The SEC represents that Relief Defendants have thus far failed to provide detailed information about such assets. (*Id.*) Thus, in the face of this uncertainty about the Greenwich home and Mrs. Ahmed's personal assets, the Court cannot be assured that they will be available to compensate victims at this point.

termination from Oak. Thus, there is great uncertainty as to whether this carried interest account will materialize into an asset available for victim recovery and in the face of this uncertainty, the Court cannot assume that it will.

Relief Defendants next contend that the Court should not freeze assets for the purpose of satisfying potential civil penalties that are sought by the SEC. However, the Second Circuit has held that it is appropriate for an asset freeze order to "freeze[] funds in an amount sufficient to cover not just the profits that might have to be disgorged but the civil penalty" as well, reasoning that the purpose of an asset freeze order is to allow the SEC to "preserve its opportunity to collect funds that may yet be ordered disgorged" after a trial on the merits, which includes both illicit profits and a civil penalty. *S.E.C. v. Unifund SAL*, 910 F.2d 1028, 1041 (2d Cir. 1990); *see also S.E.C. v. Maillard*, No. 13-CV-5299 VEC, 2014 WL 1660024, at *4 (S.D.N.Y. Apr. 23, 2014) ("[T]he SEC is entitled upon an adequate showing . . . to an asset freeze sufficient to preserve its disgorgement remedy as well as assets necessary to pay civil monetary penalties.").

Relief Defendants cite *S.E.C. v. Heden* for the proposition "that a relief defendant's assets may [not] be frozen to ensure payment of a penalty." 51 F. Supp. 2d at 302. In *Heden*, the relief defendant had $25,000 in legitimate funds in an account and her son subsequently committed insider trading on her behalf with those funds. While the son may have exercised some control over his mother's account, the Court found that "the proof presented is simply inadequate to establish that the funds in the [relief defendant's] account belong to any one other than [the relief defendant]" and because the relief defendant was not herself accused of any wrongdoing, the Court declined to freeze assets

to provide for a penalty against her.[5] Here by contrast, the Court has already concluded that the SEC has made a preliminary showing that the frozen assets belong to Defendant, not Relief Defendant, and thus it is appropriate to freeze such funds.

Relief Defendants next suggest that even if the Court were to freeze assets for a civil penalty, "the penalties in this matter are likely to be far lower than $44 million" because the "purpose of civil penalties is to foster deterrence, and in a case in which there is disgorgement of tens of millions of dollars, a significant penalty is simply unnecessary to achieve that goal." (Relief Defs.' Supplemental Br. [Doc. # 86] at 5.) In *S.E.C. v. Wyly*, 56 F. Supp. 3d 394, 433–34 (S.D.N.Y. 2014), cited by Relief Defendants, the court declined to impose civil penalties on the basis that "the disgorgement and prejudgment interest awarded in this proceeding [$300 to $400 million] will be staggering and among the largest awards ever imposed against individual defendants," which was "more than sufficient to deter future violations." As the Court noted in *Whly*, the facts of the case were extreme, and other courts have recognized that since "[d]isgorgement merely requires the return of wrongfully obtained profits; it does not result in any actual economic penalty or act as a financial disincentive to engage in securities fraud" and therefore civil penalties are required in order to deter and punish fraud. *S.E.C. v. Moran*, 944 F. Supp. 286, 296 (S.D.N.Y. 1996) (quoting H.R.Rep. No. 101–616, 101st Cong., 2d Sess., *reprinted in* 1990 U.S.Code Cong. & Admin.News 1379, 1384–86).

---

[5] The profits from the insider trading were frozen because they were "ill-gotten gains."

### E.      Legal and Personal Expenses

Relief Defendants request that the Court release (1) $2.5 million to pay for their attorneys' fees, (2) $20,000 per month from the earnings of DIYA Holdings LLC and DIYA Real Holdings LLC to pay living expenses, (3) order the payment of taxes and maintenance on the properties subject to the freeze, and (4) have an "offset applied for $140,000 of funds belonging to Shalini Ahmed that have been used for paying overdue bills, children's education, and legal fees."[6] (Relief Defs.' Post Hr'g Br. at 12.)

"It is well settled that this Court has authority to freeze personal assets temporarily and the corollary authority to release frozen personal assets, or lower the amount frozen." *S.E.C. v. Duclaud Gonzalez de Castilla*, 170 F. Supp. 2d 427, 429 (S.D.N.Y. 2001). "While the primary purpose of freezing assets is to facilitate compensation of defrauded investors in the event a violation is established at trial, 'the disadvantages and possible deleterious effect of a freeze must be weighed against the considerations indicating the need for such relief.'" *Id.* (quoting *Manor Nursing Centers, Inc.*, 458 F.2d at 1105).

The touchstone of the Court's inquiry is "equity" and a party seeking to unfreeze assets "must establish that the funds he seeks to release are untainted and that there are

---

[6] Mrs. Ahmed acknowledges that prior to being named as a Relief Defendant in this action, she "transferred $671,000 to her counsel" from an account in her name that had not been frozen and the funds were used "to pay long overdue bills, school expenses and a modest retainer to her Connecticut counsel" as well as "to fund a [$500,000] bond to somewhat lessen the conditions of her home confinement" in connection with Mr. Ahmed's insider trading case in which Mrs. Ahmed was named as a material witness. (Relief Defs.' Prehr'g Br. at 4–5.) The SEC contends that these funds were held by Mrs. Ahmed as a nominee for Mr. Ahmed and are "traceable to Mr. Iftikar Ahmed and his fraud" and that Mrs. Ahmed's transfer without prior notice to the SEC or approval from the Court was "in violation of this Court's [Asset Freeze] Order," but the SEC has not moved the Court for any relief. (Notice of Dissipation of Assets [Doc. # 80] at 2, 6.)

sufficient funds to satisfy any disgorgement remedy that might be ordered in the event a violation is established at trial." *S.E.C. v. Stein*, No. 07 CIV. 3125GEL, 2009 WL 1181061, at *1 (S.D.N.Y. Apr. 30, 2009). Courts also consider evidence of the moving party's "overall assets or income" and will deny such requests where parties are "found to have other sources of income or were requesting funds for luxuries, not necessities." *S.E.C. v. Dowdell*, 175 F. Supp. 2d 850, 854 (W.D. Va. 2001).

Mrs. Ahmed's request to unfreeze funds is premature. The SEC has consented to releasing nearly $300,000 in assets that have been shown to belong solely to Mrs. Ahmed and are not connected to the alleged fraud, including stock options and retirement accounts from her former employer. (SEC Post Hr'g Br. at 6 & n.3.) Mrs. Ahmed has not shown that this substantial sum of money is insufficient to meet her immediate needs nor has she made any showing that she does not have access to other sources of assistance or that she is not able to earn sufficient money to support herself.[7] Furthermore, given the SEC's strong showing that the assets that Mrs. Ahmed seeks to unfreeze are ill-gotten gains belonging to Defendant's victims, the equities will not weigh in favor of a substantial easing of the asset freeze and Mrs. Ahmed's initial request is excessive.

### III. Conclusion

Based on this record, the Court finds:

1. The Court has jurisdiction over the subject matter of this action and over the Defendant and Relief Defendants.

---

[7] The Order Setting Condition of Release for Mrs. Ahmed in the criminal matter provides that she "may seek employment but not in the financial services industry." *United States v. Ahmed*, 1:15mj2161 (MBB) (Aug. 4, 2015 D. Mass), Doc. # 4.

2.      The Commission has made a sufficient and proper showing in support of the relief granted herein, as required by Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)], Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)] and Section 209(d) of the Investment Advisor's Act of 1940 ("Advisor's Act") [15 U.S.C. § 80b-9(d)] by establishing a likelihood that the Commission will prevail at trial on the merits and an inference that the Defendant has engaged in acts, practices, and courses of business constituting violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 206(1), 206(2), 206(3), and 206(4) of the Advisers Ac [15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(3)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

3.      There is good cause to believe that, unless restrained and enjoined by order of this Court, the Defendant and Relief Defendants will dissipate, conceal, or transfer from the jurisdiction of this Court assets that could be subject to an order directing disgorgement or the payment of civil monetary penalties in this action such that an order freezing the Defendant's and Relief Defendants' assets, as specified infra, is necessary to preserve the status quo and to protect this Court's ability to award equitable relief in the form of disgorgement of illegal profits from fraud and civil penalties.

Therefore, the SEC's Motion [Doc. # 29] for a Preliminary Injunction is GRANTED; and

IT IS HEREBY ORDERED that, pending trial on the merits or further order of the Court:

A.      The assets, funds, or other property held by or under the direct or indirect control of Defendant Iftikar Ahmed and Relief Defendants Iftikar Ali Ahmed Sole Prop; I-Cubed Domains, LLC; Shalini Ahmed; Shalini Ahmed 2014 Grantor Retained Annuity Trust; DIYA Holdings LLC; DIYA Real Holdings, LLC; I.I. 1; I.I. 2; and I.I. 3, whether held in any of their names or for their direct or indirect beneficial interests, wherever located, up to the amount of $118,246,186, are frozen.

B.      Defendant Iftikar Ahmed and Relief Defendants Iftikar Ali Ahmed Sole Prop; I-Cubed Domains, LLC; Shalini Ahmed; Shalini Ahmed 2014 Grantor Retained Annuity Trust; DIYA Holdings LLC; DIYA Real Holdings, LLC; I.I. 1; I.I. 2; and I.I. 3, and their officers, directors, successor corporations, subsidiaries, affiliates, agents, servants, employees, attorneys-in-fact, and those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise, and each of them, shall hold and retain within their control, and otherwise prevent any disposition, transfer, pledge, encumbrance, assignment, dissipation, concealment, or other disposal whatsoever of any of their funds or other assets or things of value presently held by them, under their control or over which they exercise actual or apparent investment or other authority, in whatever form such assets may presently exist and wherever located, up to the amounts identified in paragraph A.

C.      Any bank, financial or brokerage institution or other person or entity holding any funds, securities or other assets of Defendant Iftikar Ahmed or Relief Defendants Iftikar Ali Ahmed Sole Prop; I-Cubed Domains, LLC; Shalini Ahmed; Shalini Ahmed 2014 Grantor Retained Annuity Trust; DIYA Holdings LLC; DIYA Real Holdings, LLC; I.I. 1; I.I. 2; and I.I. 3, up to the amounts identified in paragraph A, held in

the name of, for the benefit of, or under the control of Defendant Iftikar Ahmed or Relief Defendants Iftikar Ali Ahmed Sole Prop; I-Cubed Domains, LLC; Shalini Ahmed; Shalini Ahmed 2014 Grantor Retained Annuity Trust; DIYA Holdings LLC; DIYA Real Holdings, LLC; I.I. 1; I.I. 2; and I.I. 3, or their officers, directors, successor corporations, subsidiaries, affiliates, agents, servants, employees, attorneys-in-fact, and those persons in active concert or participation with them, and each of them, shall hold and retain within their control and prohibit the withdrawal, removal, transfer or other disposal of any such funds or other assets.

       D.     No person or entity, including the Defendant, Relief Defendants, or any creditor or claimant against the Defendant or any of the Relief Defendants, or any person acting on behalf of such creditor or claimant, shall take any action to interfere with the asset freeze, including, but not limited to, the filing of any lawsuits, liens, or encumbrances, or bankruptcy cases to impact the property and assets subject to this order; provided, however, that any party or non-party may seek leave from this order upon a proper showing.

       E.     The Commission may record this Order with relevant land records offices or other relevant institutions on all pieces of real property in which the Defendant or Relief Defendants have an interest. This order applies, without limitation, to the following properties:

           i.     Real property located at 530 Park Avenue, Unit 12F, New York, NY 10021, and held in the name of DIYA Real Holdings, LLC;

           ii.     Real property located at 530 Park Avenue, Unit 12A, New York, NY 10021, and held in the name of DIYA Holdings LLC;

iii.     Real property located at 1820 County Route 7, Ancram, NY 12502 and held in the name of The Essell Farms LLC; and

iv.     Real property located at 505 North Street, Greenwich, CT 06830 and held in the name of Defendant Iftikar Ahmed and Shalini Ahmed.

As to these or any other pieces of real property in which the Defendant or Relief Defendants have an interest, the Defendant and Relief Defendants and their officers, directors, successor corporations, subsidiaries, affiliates, agents, servants, employees, attorneys-in-fact, and those persons in active concert or participation with them are prohibited from encumbering their interests by means of selling, transferring, assigning, or otherwise disposing of the property, pledging the property as collateral for any purpose, or allowing the property to secure any obligation.

IT IS HEREBY FURTHER ORDERED that, pending trial on the merits or further order of this Court, the Defendant and Relief Defendants are prohibited from destroying or altering documents and records. Defendant Iftikar Ahmed and Relief Defendants Iftikar Ali Ahmed Sole Prop; I-Cubed Domains, LLC; Shalini Ahmed; Shalini Ahmed 2014 Grantor Retained Annuity Trust; DIYA Holdings LLC; DIYA Real Holdings, LLC; I.I. 1; I.I. 2; and I.I. 3, and their officers, directors, successor corporations, subsidiaries and affiliates, agents, servants, employees, attorneys-in-fact, and those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise, and each of them, are hereby restrained from destroying, mutilating, concealing, altering, or disposing of any document referring or relating in any manner to any transactions described in the Commission's Amended Complaint in this action, or to

22

any communications between or among any of the Defendant or Relief Defendants. As used in this order, "document" means the original and all non-identical copies (whether non-identical because of handwritten notation or otherwise) of all written or graphic matter, however produced, and any other tangible record, or electronic data compilation capable of reproduction in tangible form, including, without limitation, computer data, e-mail messages, correspondence, memoranda, minutes, telephone records, reports, studies, telexes, diaries, calendar entries, contracts, letters of agreement, and including any and all existing drafts of all documents.

IT IS HEREBY FURTHER ORDERED that service of this Order may be made by facsimile, mail, e-mail, delivery by commercial courier, or personally by any employee of the Securities and Exchange Commission who is not counsel of record in this matter, or special process server, or any other person, or in any other manner authorized by Rule 5 of the Federal Rules of Civil Procedure and may be made on any registered agent, officer, or director of Defendant or Relief Defendant, or by publication. If alternative service is made, the Commission must thereafter effect formal service in compliance with Fed. R. Civ. P. 5.

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 12th day of August, 2015.