UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

_____

|  |  |  |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) |  |
|  | ) |  |
| Plaintiff, | ) | Civil Action No. 3:15cv675 (JBA) |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| IFTIKAR AHMED, | ) | **SECOND AMENDED COMPLAINT** |
|  | ) |  |
| Defendant, and | ) |  |
|  | ) |  |
| IFTIKAR ALI AHMED SOLE PROP; I-CUBED DOMAINS, LLC; SHALINI AHMED; SHALINI AHMED 2014 GRANTOR RETAINED ANNUITY TRUST LLC; DIYA HOLDINGS LLC; DIYA REAL HOLDINGS, LLC; I.I. 1, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; I.I. 2, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; and I.I. 3, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | JURY TRIAL DEMANDED |
|  | ) |  |
| Relief Defendants. | ) |  |

_____ )

Plaintiff United States Securities and Exchange Commission ("the Commission") alleges

as follows for its Second Amended Complaint against Defendant Iftikar Ahmed, also known as

Ifty Ahmed ("Ahmed"), and Relief Defendants Iftikar Ali Ahmed Sole Prop; I-Cubed Domains,

LLC; Shalini Ahmed; Shalini Ahmed 2014 Grantor Retained Annuity Trust; DIYA Holdings

LLC; DIYA Real Holdings, LLC; I.I. 1, a minor child, by and through his next friends Iftikar and

Shalini Ahmed, his parents ("I.I. 1"); I.I. 2, a minor child, by and through his next friends Iftikar

and Shalini Ahmed, his parents ("I.I. 2"); and I.I. 3, a minor child, by and through his next friends Iftikar and Shalini Ahmed, his parents ("I.I. 3").

## SUMMARY

1.      This case involves a long-running scheme that Ahmed perpetrated to defraud Oak Investment Partners ("Oak"), numerous pooled investment funds managed by Oak and Ahmed ("Oak Funds") (directly and indirectly by defrauding companies held in the portfolios of Oak Funds) and Oak Funds' investors. Oak raised money from public pension funds and other institutional and individual investors in the Oak Funds.  As more fully outlined herein, from no later than December 2004 through around December 2014, Ahmed, who worked as a partner at Oak, recommended and coordinated Oak Funds' investments in numerous companies. . Ahmed engaged in fraudulent acts and made material misrepresentations with respect to each of these investments, thereby defrauding Oak, the Oak Funds and the Oak Funds' underlying investors out of tens of millions of dollars and personally obtaining the same in ill-gotten profits.

2.      To perpetrate his decade-long fraud, Ahmed employed similar and related fraudulent devices and misrepresentations in connection with at least 10 companies in which the Oak Funds invested. For example, Ahmed frequently misrepresented and altered the price of an investment, claiming to Oak and an Oak Fund that the price of the companies' shares the Oak Fund was purchasing was greater than the price at which the seller had actually agreed to sell the shares. These investments were in both domestic and foreign companies. In some cases, Ahmed misrepresented the exchange rate at which the foreign currency purchase price was to be converted to the U.S. currency purchase price, inflating the cost of the deal. In other instances, Ahmed misrepresented the financial condition of the company whose shares the Oak Fund was

2

purchasing and affirmatively altered the purchase price in the deal documents that he presented to Oak and the Oak Fund.

3.      Ahmed also frequently fabricated or altered invoices for purported expenses in connection with Oak Fund's purchase or sale of a company's securities to further his fraud. In many instances, Ahmed generated fictitious invoices that were purportedly from a company in which an Oak Fund had invested and presented the invoices to Oak for payment from the Oak Fund, thereby defrauding and decreasing the value of the Fund.  In other instances, Ahmed sent the invoices to companies in which an Oak Fund had invested and claimed that the Oak Fund was owed payment or reimbursement, but then directed that the payment or reimbursement be sent to him personally thereby directly and indirectly defrauding the Oak Fund and decreasing its value.

4.      To conceal his fraud, Ahmed established multiple bank accounts within the United States that he maintained and controlled, but falsely claimed belonged either to the company involved in a particular Oak Fund investment, or, in some cases, to Oak itself. Indeed, Ahmed often fraudulently registered the bank accounts as "doing business as" the companies in which Oak Funds made investments. In instances where Ahmed misrepresented the purchase price of an investment to Oak and the Oak Fund making the investment, he directed that the excess funds be sent to a bank account that he held in the name of the company in which the Oak Fund was investing. Similarly, when Ahmed used fraudulent invoices, he directed the payment of those invoices be made either to an account he held in the name of the company purportedly billing the Oak Fund, or to an account he held in Oak's own name when the bill was purportedly due to an Oak Fund. Ahmed subsequently transferred this money to other accounts that he also controlled, including joint accounts in the United States he held with his wife, Relief Defendant

3

Shalini Ahmed, and accounts in the United States held for the benefit of Ahmed and Shalini Ahmed's children, Relief Defendants I.I. 1, I.I. 2, and I.I. 3.

5.      Ahmed used numerous other fraudulent devices and misrepresentations to further his fraudulent schemes, including concealing his personal interest in Relief Defendant I-Cubed Domains, LLC ("I-Cubed") when he negotiated Oak's purchase of a company's shares from I-Cubed – a purchase at a significant premium over the price I-Cubed had initially paid. Ahmed also made unauthorized use of corporate funds to purchase shares in another company, which Ahmed then re-sold for a sizeable profit that he pocketed.

6.      As a result of his misconduct, Defendant Ahmed violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 206(1), 206(2), 206(3), and 206(4) of the Investment Advisers Act 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(3)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8]. Further, Relief Defendants Iftikar Ali Ahmed Sole Prop; I-Cubed Domains, LLC; Shalini Ahmed; Shalini Ahmed 2014 Grantor Retained Annuity Trust; DIYA Holdings LLC; DIYA Real Holdings, LLC; I.I. 1; I.I. 2; and I.I. 3, received illicit proceeds from Ahmed's fraud to which they have no legitimate claim.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

7.      The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)].

8.      The Commission seeks a preliminary asset freeze against Defendant Ahmed and Relief Defendants Iftikar Ali Ahmed Sole Prop; I-Cubed Domains, LLC; Shalini Ahmed; Shalini Ahmed 2014 Grantor Retained Annuity Trust; DIYA Holdings LLC; DIYA Real Holdings, LLC; I.I. 1; I.I. 2; and I.I. 3, in order to preserve assets necessary to satisfy any eventual judgment against them. The Commission also seeks an order preventing the destruction of documents and an order for expedited discovery and alternative means of service.

9.      The Commission further seeks a permanent injunction against Defendant Ahmed enjoining him from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, disgorgement of all ill-gotten gains from the unlawful activity set forth in this Complaint, together with prejudgment interest, and civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]. The Commission further seeks a final judgment ordering Relief Defendants Iftikar Ali Ahmed Sole Prop; I-Cubed Domains, LLC; Shalini Ahmed; Shalini Ahmed 2014 Grantor Retained Annuity Trust; DIYA Holdings LLC; DIYA Real Holdings, LLC; I.I. 1; I.I. 2; and I.I. 3, to disgorge the ill-gotten gains held in their accounts or otherwise received by them, and to pay prejudgment interest thereon. The Commission also seeks any other relief that the Court may deem appropriate.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa] and Sections 209(d) and 214 of the Advisers Act [15 U.S.C. §§ 80b-9(d) and 80b-14]. Defendant Ahmed, directly or indirectly, made use of the means or instrumentalities of interstate commerce, or of the mails, or the means or instruments of

5

transportation or communication in interstate commerce, in connection with the acts, practices, and courses of business set forth in this Complaint.

11.     Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], Section 214 of the Advisers Act [15 U.S.C. § 80b-14], and 28 U.S.C. § 1391(b). Defendant Ahmed is a resident of Greenwich, Connecticut, as are Relief Defendants Shalini Ahmed, I.I. 1, I.I. 2, and I.I 3. Relief Defendants Iftikar Ali Ahmed Sole Prop; I-Cubed Domains, LLC; Shalini Ahmed 2014 Grantor Retained Annuity Trust; DIYA Holdings LLC; and DIYA Real Holdings, LLC, are all controlled by Ahmed and/or his wife Shalini Ahmed, and have bank accounts that were opened in Connecticut. In addition, many of the acts, practices, and transactions described in this Complaint occurred within the District of Connecticut.

## **DEFENDANT**

12.     **Ahmed**, 44, resided and worked in Greenwich, Connecticut, before he fled the United States on or about May 16, 2015. Prior to the termination of his employment in or around May 2015, Ahmed was a general partner at Oak, where he worked since 2004. Before joining Oak, he worked as an investment professional at other financial industry companies. He graduated with a degree in engineering from the Indian Institute of Technology, New Delhi and earned his MBA from Harvard Business School. As more fully outlined herein, Ahmed engaged in a pattern of fraudulent conduct in connection with investment opportunities that he identified for Oak and the Oak Funds – fraud that resulted in the loss of millions of dollars of money investors had contributed to the Oak Funds.

**RELIEF DEFENDANTS**

13.     **Iftikar Ali Ahmed Sole Prop** ("Ahmed Sole Prop") is a purported business that had bank accounts at a large national bank. The address associated with Ahmed Sole Prop's bank accounts is Ahmed's home address in Connecticut.  The purported business accounts registered to Ahmed Sole Prop were "doing business as" ("dba") companies in which Oak made investments. As discussed in more detail below, Ahmed used this misleading dba designation to fraudulently induce Oak to transfer funds into the Ahmed Sole Prop accounts.

14.     **I-Cubed** is a Delaware limited liability company that was formed in 2012, with Ahmed as its sole initial member. In or around May 2013, Ahmed assigned his interest in I-Cubed to his wife, who later transferred most of that interest to the Shalini Ahmed 2014 Grantor Retained Annuity Trust. As more fully outlined herein, in October 2014 I-Cubed sold shares of an Oak portfolio company directly to one of the Oak Funds that Ahmed advised and received $7.5 million in proceeds from this transaction. Ahmed did not disclose to Oak or the Oak Funds his interest in I-Cubed or his conflict of interest in the deal.

15.     **Shalini Ahmed**, 40, resides in Greenwich, Connecticut. She is the wife of Ahmed. Shalini Ahmed is not presently employed. She previously worked as a Vice President for Goldman Sachs, an Assistant Vice President for Merrill Lynch, and an Analyst for Morgan Stanley. She graduated with a degree in economics from Princeton University and earned her MBA from Harvard Business School. As more fully outlined herein, Shalini Ahmed received substantial amounts of fraudulent proceeds into accounts held jointly with her husband.

16.     **Shalini Ahmed 2014 Grantor Retained Annuity Trust**, is, on information and belief, a Delaware Limited Liability Company with Shalini Ahmed serving as a trustee. As more

fully outlined herein, at least $7.425 million in fraudulent proceeds was deposited into a brokerage account held in the Trust's name.

17.     **DIYA Holdings LLC** is a New York Limited Liability Company organized on or about December 4, 2013. Shalini Ahmed serves as the manager and the entity holds at least two bank accounts, which were opened by Shalini Ahmed. As more fully outlined herein, in or around December 2013 DIYA Holdings used proceeds of Ahmed's fraud to purchase a New York City condominium located on Park Avenue for more than $8.6 million.

18.     **DIYA Real Holdings, LLC** is a New York limited liability company that was organized on or about February 11, 2015. Shalini Ahmed serves as manager and the entity holds one bank account, which was opened by Shalini Ahmed. As more fully outlined herein, in or around April 2015 DIYA Real Holdings used proceeds of Ahmed's fraud to purchase a New York City condominium located on Park Avenue for more than $7.9 million.

19.     **I.I. 1**, a juvenile, resides in Greenwich, Connecticut. He is the son of Ahmed and Shalini Ahmed. He holds a UTMA Account[1] with Ahmed serving as the custodian. As more fully outlined herein, Ahmed transferred fraudulent proceeds into I.I. 1's UTMA Account.

20.     **I.I. 2**, a juvenile, resides in Greenwich, Connecticut. He is the son of Ahmed and Shalini Ahmed. He holds a UTMA Account with Ahmed serving as the custodian. As more fully outlined herein, Ahmed transferred fraudulent proceeds into I.I. 2's UTMA Account.

21.     **I.I. 3**, a juvenile, resides in Greenwich, Connecticut. He is the son of Ahmed and Shalini Ahmed. He holds a UTMA Account with Ahmed serving as the custodian. As more fully outlined herein, Ahmed transferred fraudulent proceeds into I.I. 3's UTMA Account.

---

1 The Uniform Transfer to Minors Act (UTMA) allows a minor to receive gifts, such as money, without the aid of a guardian or trustee. Under UTMA, the gift giver or an appointed custodian manages the minor's account until the minor reaches a certain age, typically 18 years old.

## FACTS

### Ahmed's Role with Oak

22.    Oak Management Corporation is the investment manager for certain limited liability companies that serve as general partners of venture capital investment funds, referred to herein as Oak Funds, as defined in paragraph 1. Oak Management Corporation, the Oak Funds and their general partners do business as Oak Investment Partners, referred to herein as Oak, as described in paragraph 1. Oak operates as a multistage venture capital firm with offices in Norwalk and Greenwich, Connecticut, and Palo Alto, California. Oak manages and acts as the investment adviser to each of the Oak Funds, which are "pooled investment vehicles," all of which are based in the United States, formed as Delaware Limited Partnerships, raise money within the United States, and hold bank accounts in the United States.  The Oak Funds raise money from investors, the vast majority of whom are within the United States, and, in turn, invest those monies in various types of securities, but primarily equity securities issued in private placements.  There are many different types of investors who invest in the Oak Funds, including, among others, state and municipal pension funds, corporate pension funds, college endowments, foundations and individuals.

23.    At all times relevant to this Complaint, prior to an Oak Fund making an investment, an investment opportunity was recommended to four senior Managing Partners of Oak Management Corporation ("Oak's Managing Partners"), two of whom lived and worked in California, and two of whom lived and worked in Connecticut.  Oak's Managing Partners were responsible for approving investments by the respective Oak Funds, including those investments outlined herein. The individuals at Oak who approved the investment made by the Oak Funds as described herein, and who approved the release of funds to make those investments and to pay

invoices on behalf of the Oak Funds as described herein, were all based in the United States and were invested in each of the Oak Funds referenced herein through partnership entities established to make such investments.

24.     Pursuant to each of the Oak Fund investments outlined herein, the investment was examined, negotiated, approved, and paid for or sold from the United States.  For each investment by an Oak Fund, from within the United States, Oak examined the company it was contemplating investing in or divesting from, corresponded with the buyer or seller, conducted negotiations with the buyer or seller, approved a particular Oak Fund's purchase or sale of the investment, and with the assistance of their United States based legal counsel had drafted and prepared, or reviewed and commented on, legal contracts that formalized the purchase or sale of the investment. Oak's receipt of the operative investment contracts, signed by both the Oak Fund (or an entity controlled by the Oak Fund) and the counterparty, triggered the legal obligation of the Oak Fund (or entity controlled by the Oak Fund) to release funds or pass title to securities pursuant to the investment, and the counterparty's legal obligation to remit funds or pass title to the securities to the investing Oak Fund (or an entity controlled by the Oak Fund). After Oak obtained the signed operative investment contract, Oak directed from its Connecticut headquarters that the Oak Fund's bank account, which was based in the United States, release funds to purchase the securities pursuant to the operative investment contract, or that the Oak Fund release title of securities to the counterparty.

25.     Ahmed served as a general partner at Oak and at all times relevant to the allegations herein worked out of Oak's Greenwich office.  Ahmed's role at Oak included identifying and recommending investment opportunities for the Funds that Oak advised, including specifically recommending the purchase and sale of securities and advising on the

purchase and sale price of those securities. Ahmed also managed and monitored the investments that he recommended. At times, Ahmed was appointed to the boards of directors of the companies in which the Oak Funds invested. Ahmed was compensated for his role in advising the Oak Funds and helping to manage the Funds' investments, and he received additional compensation when the investment opportunities he recommended were particularly successful.

26.     Section 202(a)(11) of the Advisers Act defines an investment adviser as "any person who, for compensation, engages in the business of advising others ... as to the value of securities or the advisability of investing in, purchasing, or selling securities ...." Ahmed received compensation for advising the Oak Funds as to their respective investments, including the purchase and sale of securities of portfolio companies.  In light of his roles and responsibilities, Ahmed was an investment adviser under the terms of the Advisers Act.

27.     As an investment adviser, Ahmed owed fiduciary duties to the Oak Funds that he advised on Oak's behalf, including the respective Oak Funds involved in the transactions described below. These duties included the duty to act for the benefit of the Funds, the duty to exercise the utmost good faith in dealing with the Funds, and the duty to disclose all material facts related to any actual or potential investments by the Oak Funds. Further, as a fiduciary, Ahmed was required to avoid improper self-dealing.

28.     As detailed below, Ahmed breached these duties and engaged in extensive fraud and deceptive conduct. Ahmed engaged in a long-running scheme to defraud Oak, the Oak Funds (directly and indirectly by defrauding companies held in the portfolios of the Oak Funds) and the investors in the Oak Funds.  Ahmed's activities were in connection with the offer, purchase, and sale of securities by investors in the Oak Funds, and the Oak Funds' subsequent purchases and/or sales of securities in a number of companies in which an Oak Fund invested. Ahmed's scheme,

which began shortly after he started at Oak in 2004, spanned a decade, and involved numerous fraudulent acts, misrepresentations, and omissions.

**Ahmed's Fraud in Connection with Oak Fund IX's Investment in Company D**

29.     In or around December 2004, one of the Oak Funds, Oak Investment Partners IX, LP ("Oak Fund IX"), purchased $7.5 million worth of shares in an Asian-based e-commerce company ("Company D") that were held by a special purpose vehicle based in the Netherlands. As described in paragraph 24, above, the investment was examined, negotiated, approved, and transacted from the United States.  This was one of the first transactions on which Ahmed worked for Oak after joining the firm in 2004. Ahmed was significantly involved in negotiating the terms of Oak Fund IX's investment in Company D and in managing and monitoring that investment, which he did from the United States. As detailed below, Ahmed employed various fraudulent acts and misrepresentations, and omissions in connection with Oak Fund IX's purchase and sale of Company D shares.

30.     In connection with Oak Fund IX's purchase of Company D shares, Ahmed represented to a Company D executive that Oak Fund IX would forgo any dividend payment from Company D in exchange for a purported "management fee" equal to $600,000, which was a percentage of the share purchase price. Ahmed memorialized the agreement for the purported "management fee" in a side-letter with Company D.

31.     On or about January 4, 2005, Ahmed instructed Company D to wire funds for the purported Oak Fund IX "management fee" to an account that Ahmed designated. However, this account did not belong to Oak Fund IX, but rather was a bank account in the United States that was opened and controlled by Ahmed and purported to "do business as" OIP Advisors.  On

information and belief, Company D wired the funds to the account Ahmed designated on or about January 4, 2005.

32.     On or about January 8, 2005, Ahmed negotiated an increase in the purported management fee owed to Oak Fund IX to a total of $650,000. On information and belief, several days later Company D wired the additional $50,000 to the same OIP Advisors bank account that was, in fact, opened and controlled by Ahmed. Although Oak Fund IX was entitled to both the $600,000 and $50,000 payments in connection with its purchase of Company D shares, neither payment was ever forwarded to Oak Fund IX nor disclosed to anybody at Oak, Oak Fund IX or its investors.  Therefore, Ahmed misappropriated from Oak Fund IX the payments made by Company D.

33.     In or around May 2006, Oak Fund IX sold a portion of its Company D shares to Yahoo Inc., a multinational technology company headquartered in Sunnyvale, California. As described in paragraph 24, above, the investment was examined, negotiated, approved, and transacted from the United States.

34.     In or around early July 2006, Ahmed claimed that Oak Fund IX was required to pay $3 million to Company D to reimburse it for advisory services that an investment bank provided to Company D in connection with Oak Fund IX's sale of Company D's shares. On or about July 3, 2006, at Ahmed's instruction, Oak wired $3 million on behalf of Oak Fund IX, through an intermediary entity, to an account that Ahmed claimed belonged to Company D. In fact, this account did not belong to Company D, but rather was a United States bank account opened and controlled by Ahmed, but titled in the name of Company D.

35.     Further, as Ahmed knew, the amount owed to the investment bank for advisory services was only $1.2 million. On or about July 5, 2006, Ahmed directed the transfer of $1.2

million from another account that he controlled – the OIP Advisors accounts, described in paragraph 31, above – to the investment bank.  Ahmed retained the difference of $1.8 million, which he then transferred into bank accounts that he held jointly with his wife, Relief Defendant Shalini Ahmed, thereby misappropriating these funds from Oak Fund IX.

36.     Later, in or around January 2007, Ahmed represented to Oak that Oak Fund IX was required to pay $6.6 million in order to reimburse Company D for capital gains taxes that were purportedly incurred in connection with Oak's May 2006 sale of Company D shares. On or about January 24, 2007, Ahmed provided Oak with a purported invoice from Company D requesting the $6.6 million payment. Ahmed further provided Oak with wiring instructions to the same purported Company D account to which Oak had previously wired $3 million on behalf of Oak IX for purported advisory services, described in paragraph 34, above.

37.     On or about January 26, 2007, Oak wired $6.6 million on behalf of Oak Fund IX, through an intermediary entity, to Ahmed's designated account and, to cover the expense, sold approximately $6.6 million of Company D shares, which at the time were publically traded as American depositary receipts (ADRs) on the NASDAQ Stock Market, an American stock exchange.

38.     In fact, no capital gains taxes were owed in connection with Oak Fund IX's May 2006 sale of Company D shares. Rather, Ahmed falsified the invoice that he presented to Oak and Oak Fund IX to support the $6.6 million payment.  Upon receiving this payment, Ahmed did not transfer the payment to Company D, but instead misappropriated these amounts from Oak Fund IX by transferring the money into bank accounts that he held jointly with his wife, Relief Defendant Shalini Ahmed.

39.     In or around 2007, Oak Fund IX distributed the remaining Company D shares to investors in the Fund.  At the time, Company D was publically traded as ADRs on the NASDAQ Stock Market, an American stock exchange.

40.     On or about August 21, 2007, Ahmed presented Oak Fund IX with another invoice purportedly from Company D, seeking reimbursement of approximately $800,000 for transaction fees owed to a foreign tax authority in connection with Oak Fund IX's distribution of Company D shares to Oak Fund IX's investors. Ahmed again provided Oak with wiring instructions to the same purported Company D account to which Oak had previously wired the $3 million on behalf of Oak Fund IX for purported advisory services and the $6.6 million on behalf of Oak Fund IX for purported capital gains taxes, as described in paragraphs 34 and 36, above.

41.      On or about August 21, 2007, Oak wired the approximately $800,000 on behalf of Oak Fund IX to Ahmed's designated account.

42.     In fact, Company D was not required to pay any transaction fees in connection with Oak Fund IX's distribution of Company D shares. Rather, Ahmed falsified the invoice that he presented to Oak and Oak Fund IX to support the approximately $800,000 payment, which Ahmed misappropriated and did not forward to Company D. Instead, Ahmed transferred the funds into a bank account that he held jointly with his wife, Relief Defendant Shalini Ahmed.

43.     By virtue of his misconduct and deceptive conduct described above, Ahmed misled and defrauded Oak, Oak Fund IX (directly and indirectly by defrauding companies held in Oak Fund IX's portfolio), and Oak Fund IX's investors, which included Oak's Managing Partners and Oak's COO, thereby defrauding Oak Fund IX of approximately $9.85 million in connection with its purchase and sale of securities in Company D.

15

**Ahmed's Fraud in Connection with Oak Fund XI's Investment in Company E**

44.     In or around July 2005, Ahmed recommended that one of the Oak Funds, Oak Investment Partners XI, LP ("Oak Fund XI"), purchase shares in a Swiss technology company ("Company E"). As described in paragraph 24, above, the investment was examined, negotiated, approved, and transacted from the United States. Ahmed was significantly involved in Oak Fund XI's Company E share purchase, and managed and monitored the Oak Fund XI's investment in Company E. As detailed below, Ahmed employed various fraudulent acts, misrepresentations, and omissions in connection with the Oak Fund XI's purchase of Company E shares.

45.     On or about July 18, 2005, Ahmed recommended to Oak's Managing Partners that Oak Fund XI purchase approximately 20 million shares of Company E stock for a total price of 17 million Euros. Ahmed claimed that this converted to a total purchase price of 22.1 million in U.S. dollars, even though the application of the true exchange rate resulted in a purchase price of approximately $20.74 million. Ahmed directed Oak Fund XI to split the payment between two accounts: $20.74 million to an account at a Swiss bank in the name of Company E and $1.36 million to a U.S.-based bank account that Ahmed claimed belonged to Company E. On or about July 29, 2005, Oak effectuated Oak Fund XI's purchase of the shares in Company E by wiring the funds to Ahmed's designated accounts.

46.     Ahmed's misrepresentation concerning the total purchase price caused Oak Fund XI to overpay for the Company E shares it purchased. Only the $20.74 million that Ahmed directed be paid to the Swiss bank account was received by Company E. The U.S.-based bank account to which Oak wired $1.36 million on behalf of Oak XI did not belong to Company E, as Ahmed represented, but instead was opened and controlled by Ahmed "doing business as"

16

Company E. Upon receiving this payment, Ahmed transferred virtually all of the funds into bank accounts that he held jointly with his wife, Relief Defendant Shalini Ahmed.

47.     Ahmed's fraud in connection with Oak Fund XI's purchase of Company E's shares extended beyond his misappropriation of the $1.36 million. After Oak had wired the $20.74 million on behalf of Oak Fund XI to Company E, as described in paragraph 45, Ahmed was informed by Company E that this amount fell approximately 20,000 Euros short of the 17 million Euro purchase price. At Ahmed's suggestion, Company E agreed to settle this shortfall by adjusting the amount it would owe to Oak Fund XI for legal fees associated with Oak Fund XI's purchase of Company E shares.

48.     On or about August 24, 2005, Ahmed sent Company E invoices for approximately 100,000 Euros, purportedly for reimbursement of Oak Fund XI's legal fees. In response, Company E agreed to pay approximately 80,000 Euros – the 100,000 Euros purportedly owed minus the approximately 20,000 Euros that Oak Fund XI owed Company E in connection with the purchase price shortfall. On or about November 7, 2005, Ahmed instructed Company E to wire the approximately 80,000 Euros to an account that Ahmed claimed belonged to Oak Fund XI.

49.     On or about November 14, 2005, Company E wired the approximately 80,000 Euros – approximately 92,000 U.S. dollars – to Ahmed's designated account. In fact, this account was the same OIP Advisors account, described in paragraph 31 above, that was opened and controlled by Ahmed.  Although Oak Fund XI was entitled to this reimbursement in connection with its purchase of Company E shares, Ahmed never forwarded the money to Oak Fund XI nor disclosed to anybody at Oak, Oak Fund XI or its investors that he misappropriated

17

the money. Instead, Ahmed transferred the money into a bank account that he held jointly with his wife, Relief Defendant Shalini Ahmed.

50.     By virtue of his misconduct and deceptive conduct described above, Ahmed misled and defrauded Oak, Oak Fund XI (directly and indirectly by defrauding companies held in Oak Fund XI's portfolio), and Oak Fund XI's investors, which included Oak's Managing Partners and Oak's COO, thereby defrauding Oak Fund XI of at least $1.4 million in connection with its purchase of securities in Company E.

### Ahmed's Fraud in Connection with Oak Fund XI's Investment in Company J[2]

51.     In or around April 2006, Oak Fund XI purchased shares in a United States consulting company ("Company J"). As described in paragraph 24, above, the investment was examined, negotiated, approved, and transacted from the United States. Ahmed was significantly involved in Oak Fund XI's investment in Company J.  As detailed below, Ahmed employed various fraudulent acts, misrepresentations, and omissions, in connection with Oak Fund XI's purchase of Company J shares.

52.     In or around April 2006, Ahmed was involved in negotiating the terms of Oak Fund XI's purchase of Company J shares. On or about April 7, 2006, Oak Fund XI and Company J entered into a share purchase agreement that stated that Company J would use the proceeds from the sale of the shares to Oak Fund XI to, among other things, fund the payment of a one-

---

[2] The Commission's initial Complaint in this matter alleged Ahmed's fraud in connection with three companies, designated Company A, Company B, and Company C, beginning in or around August 2014.  The Commission's Amended Complaint alleged fraud in connection with six additional companies, designated Company D, Company E, Company F, Company G, Company H, and Company I, which spanned from 2004 to 2010.  For consistency, the Commission has retained these initial designations and thus begins its designation of the company involved in Ahmed's newly-alleged fraud with Company J. For ease of reading, the Commission has alleged the fraudulent transactions in chronological order.

time special dividend to Oak Fund XI. That dividend payment was based on the number of shares purchased by Oak Fund XI and totaled $1.8 million.

53.     On or about April 19, 2006, Ahmed directed Company J to make the dividend payment to his OIP Advisors account which, as described in paragraph 31, was opened and controlled by Ahmed.

54.     On or about May 1, 2006, Company J wired $1.8 million to Ahmed's designated account. Although Oak Fund XI was entitled to the dividend payment in connection with its purchase of Company J shares, Ahmed never forwarded the money to Oak Fund XI nor disclosed to anybody at Oak, Oak Fund XI or its investors that he misappropriated the dividend payment. Instead, Ahmed transferred the money into a bank account he held jointly with his wife, Relief Defendant Shalini Ahmed.

55.     By virtue of his misconduct and deceptive conduct described above, Ahmed misled and defrauded Oak, Oak Fund XI (directly and indirectly by defrauding companies held in Oak Fund XI's portfolio), and Oak Fund XI's investors, which included Oak's Managing Partners and Oak's COO, thereby defrauding Oak Fund XI of at least $1.8 million in connection with its purchase of securities in Company J.

### Ahmed's Fraud in Connection with Oak Fund XII's Investment in Company F

56.     In or around February 2007, one of the Oak Funds, Oak Investment Partners XII, LP ("Oak Fund XII"), purchased shares of a European mobile entertainment company ("Company F") and sold those shares a few months later, in or around July 2007. As described in paragraph 24, above, the investment was examined, negotiated, approved, and transacted from the United States.  As detailed below, Ahmed employed various fraudulent acts,

misrepresentations, and omissions, in connection with Oak Fund XII's purchase and sale of Company F shares.

57.     In or around June 2007, Ahmed directed Company F to wire approximately $250,000 to the OIP Advisors account described in paragraph 31 above, purportedly to reimburse Oak Fund XII for legal expenses in connection with Oak Fund XII's purchase of Company F shares.

58.     On or about June 7, 2007, Company F wired the approximately $250,000 to the OIP Advisors account, which, as described in paragraph 31 above, was opened and controlled by Ahmed. Although Oak Fund XII was entitled to the reimbursement in connection with its purchase of Company F shares, Ahmed did not forward the money to Oak Fund XII nor disclosed to anybody at Oak, Oak Fund IX or its investors that he misappropriated the reimbursement.  Instead, Ahmed transferred the money into a bank account that he held jointly with his wife, Relief Defendant Shalini Ahmed.

59.     Similarly, in or around October 2007, Ahmed directed Company F to wire approximately 561,000 Euros – approximately $785,000 – to the OIP Advisors account, again purportedly to reimburse Oak Fund XII for legal expenses in connection with Oak Fund XII's sale of Company F shares.

60.     On or about October 4, 2007, Company F wired the approximately $785,000 to the OIP Advisors account, which, as described in paragraph 31 above, was in fact opened and controlled by Ahmed.

61.     Subsequently, Company F requested remittance of some of the fees it believed it had previously wired to Oak Fund XII because the sale agreement capped the reimbursement of Oak Fund XII's legal fees. Ahmed directed that approximately $270,000 be transferred back to

Company F from the OIP Advisors account. Instead of forwarding the remaining funds to Oak Fund XII, to which it was entitled in connection with its purchase of Company F shares, Ahmed instead directed the approximately $515,000 remainder to be deposited into a bank account that he held jointly with his wife, Relief Defendant Shalini Ahmed, and did not disclose to anybody at Oak, Oak Fund XII or its investors that he misappropriated the reimbursement.

62.     By virtue of his misconduct and deceptive conduct described above, Ahmed misled and defrauded Oak, Oak Fund XII (directly and indirectly by defrauding companies held in Oak Fund XII's portfolio), Oak Fund XII's investors which included Oak's Managing Partners and Oak's COO, thereby defrauding Oak Fund XII of at least $765,000 in connection with its purchase and sale of Company F shares.

**Ahmed's Fraud in Connection with Oak Fund XII's Investment in Company G**

63.     In or around December 2007, Oak Fund XII purchased shares in another Asian-based company ("Company G"). As described in paragraph 24, above, the investment was examined, negotiated, approved, and transacted from the United States.  Ahmed was significantly involved in Oak Fund XII's investment in Company G, as well as in managing and monitoring that investment. As detailed below, Ahmed employed various fraudulent acts, misrepresentations, and omissions in connection with Oak Fund XII's purchase and sale of Company G shares.

64.     In or around November 2007, Ahmed was involved in negotiating the terms of Oak's purchase of Company G shares. The share purchase agreement between Oak Fund XII and Company G listed the purchase price at approximately 40 billion Korean Won, which Ahmed represented to Oak converted to a total purchase price of 47.5 million in U.S. dollars. Ahmed directed Oak Fund XII to split the payment between two accounts: $45 million to an account

held at an Asian bank, and the remaining $2.5 million to a U.S.-based bank account that Ahmed

claimed belonged to Company G. On or about December 18, 2007, Oak wired the funds on

behalf of Oak Fund XII to Ahmed's designated accounts.

65.     Ahmed misrepresented the exchange rate between Korean Won and U.S. dollars

when he claimed the total purchase price of the shares in Company G was $47.5 million. In fact,

the share purchase price was only approximately $42.8 million in U.S. dollars. After Oak wired

the $45 million on behalf of Oak Fund XII to the Asian-based bank account, Ahmed instructed

that only approximately $42.8 million be transferred to Company G, and that the remaining

approximately $2.2 million be sent to the OIP Advisors account described in paragraph 31

above.

66.     On or about January 9, 2008, Company G transferred approximately $2.2 million

to the OIP Advisors account, which, as described above in paragraph 31, was opened and

controlled by Ahmed. Ahmed then transferred the approximately $2.2 million into a bank

account that he held jointly with his wife, Shalini Ahmed.

67.     Ahmed further misappropriated the $2.5 million that Oak wired on behalf of Oak

Fund XII to the U.S.-based bank account that Ahmed fraudulently claimed belonged to Company

G. This account did not belong to Company G, but rather was opened and controlled by Ahmed,

but titled in the name of Company G. After receiving the funds into the fictitious Company G

account, Ahmed transferred approximately $2.5 million into bank accounts that he held jointly

with his wife, Relief Defendant Shalini Ahmed.

68.     Ahmed misappropriated additional funds from Oak Fund XII by fabricating legal

fees that Oak Fund XII owed to Company G. In 2009, Oak Fund XII participated in a tender

offer for Company G that resulted in the company being taken private and delisted from the

Korean Stock Exchange. On or about October 29, 2009, Ahmed presented Oak with a purported invoice from Company G for "Delisting Fees" and legal fees. The invoice totaled approximately $2.1 million, and contained wiring instructions to an account purportedly belonging to Company G. This was the same U.S.-based bank account that Ahmed directed Oak to send $2.5 million in connection with the original Company G share purchase, as described in paragraph 67 above. On or about October 29, 2009, Oak wired the $2.1 million on behalf of Oak Fund XII to the designated account.

69.     Ahmed falsified the invoice that he presented Oak and Oak Fund XII as support for the approximately $2.1 million payment. Further, Ahmed did not forward the funds to Company G. Instead, Ahmed misappropriated these amounts from Oak Fund XII by transferring almost all of the funds into a bank account that he held jointly with his wife, Relief Defendant Shalini Ahmed.

70.     In or around October 2011, Oak Fund XII sold Company G shares, including those shares previously purchased pursuant to the tender offer. As described in paragraph 24, above, the investment was examined, negotiated, approved, and transacted from the United States. The transaction was set up so Oak Fund XII received a portion of the sale price at the initial closing and the remainder would be held in escrow until released to Oak Fund XII on March 31, 2013. The following month, Ahmed presented Oak and Oak Fund XII with a purported invoice from Company G for a "management incentive payment" in connection with the sale of the Company G shares. The invoice requested an approximately $3.1 million payment and provided wiring instructions to another bank account purportedly belonging to Company G. Ahmed signed this invoice and requested that Oak approve the payment from Oak Fund XII's

bank account. On or about November 28, 2011, Oak wired the approximately $3.1 million on behalf of Oak Fund XII to Ahmed's designated account.

71.     The account Ahmed designated did not belong to Company G, but rather was held in the name of Relief Defendant Ahmed Sole Prop and, similar to the account described in paragraph 67, was registered as "doing business as" Company G. Ahmed opened and controlled the account, which was registered to his home address in Greenwich, Connecticut.

72.     Ahmed falsified the invoice that he presented Oak and Oak Fund XII to support his request for the approximately $3.1 million payment. Further, Ahmed did not forward the funds to Company G. Instead, Ahmed misappropriated these amounts from Oak Fund XII by transferring the funds into a bank account that he held jointly with his wife, Relief Defendant Shalini Ahmed.

73.     On or about April 10, 2013, Ahmed presented Oak and Oak Fund XII with another purported invoice from Company G in connection with Oak Fund XII's sale of Company G shares. This invoice sought an approximately $1.56 million payment of a "Management Incentive Payment." Ahmed informed Oak that Oak Fund XII owed Company G this second management incentive payment in connection with its sale of Company G shares. The invoice contained wiring instructions to the same account that Ahmed had instructed Oak to wire approximately $3.1 million on behalf of Oak Fund XII in November 2011, which Ahmed controlled and held in the name of Relief Defendant Ahmed Sole Prop "doing business as" Company G.  On or about April 11, 2013, Oak wired the approximately $1.56 million on behalf of and Oak Fund XII to Ahmed's designated account.

74.     Ahmed falsified the invoice that he presented to Oak and Oak Fund XII to support the approximately $1.56 million payment. Further, Ahmed did not forward the funds to

24

Company G. Instead, Ahmed misappropriated these amounts from Oak Fund XII by transferring the funds into a bank account that he held jointly with his wife, Relief Defendant Shalini Ahmed.

75.     On or about April 23, 2013, Ahmed presented Oak and Oak Fund XII with a third purported invoice from Company G in connection with Oak Fund XII's sale of Company G shares. This invoice sought payment of approximately $623,000 in an "Advisor Fees Reimbursement." The invoice again contained wiring instructions to the same account that Ahmed had instructed Oak to wire approximately $3.1 million on behalf of Oak Fund XII in November 2011 and approximately $1.56 million earlier in April 2013, the account held in the name of Relief Defendant Ahmed Sole Prop "doing business as" Company G, and controlled by Ahmed.  On or about April 30, 2013, Oak wired the approximately $623,000 on behalf of Oak Fund XII to Ahmed's designated account.

76.     Ahmed falsified the invoice that he presented Oak and Oak Fund XII to support the approximately $623,000 payment. Further, Ahmed did not forward the funds to Company G. Instead, he misappropriated these amounts from Oak Fund XII by transferring the funds into a bank account that he held jointly with his wife, Relief Defendant Shalini Ahmed.

77.     By virtue of his misconduct and deceptive conduct described above, Ahmed misled and defrauded Oak, Oak Fund XII (directly and indirectly by defrauding companies held in Oak Fund XII's portfolio), Oak Fund XII's investors, which included Oak's Managing Partners and Oak's COO, thereby defrauding Oak Fund XII of at least $12 million in connection with its purchase and sale of Company G shares.

**Ahmed's Fraud in Connection with Oak Fund XII's Investment in Company H**

78.     From approximately January through April 2009, Oak Fund XII purchased shares of a European automobile technology company ("Company H"). As described in paragraph 24,

25

above, the investment was examined, negotiated, approved, and transacted from the United States. As detailed below, Ahmed employed various fraudulent acts, misrepresentations, and omissions in connection with Oak Fund XII's purchase of Company H shares.

79.     Beginning in or around April 2009, Ahmed presented Company H with several invoices, purportedly to reimburse Oak Fund XII for legal fees it paid in connection with its purchase of Company H shares. Ahmed further directed Company H to wire the funds to the OIP Advisors account, which, as described in paragraph 31 above, was opened and controlled by Ahmed.  At Ahmed's direction, Company H wired the funds to the account Ahmed provided.

80.      Although Oak Fund XII was entitled to this reimbursement in connection with its purchase of Company H shares, Ahmed never forwarded the money to Oak Fund XII nor disclosed to anybody at Oak, Oak Fund XII or its investors that he misappropriated the reimbursement. Instead, Ahmed transferred the money into a bank account that he held jointly with his wife, Relief Defendant Shalini Ahmed.

81.     By virtue of his misconduct and deceptive conduct described above, Ahmed misled and defrauded Oak, Oak Fund XII (directly and indirectly by defrauding companies held in Oak Fund XII's portfolio), Oak Fund XII's investors, which included Oak's Managing Partners and Oak's COO, thereby defrauding Oak Fund XII of approximately $2.2 million in connection with its purchase Company H shares.

**Ahmed's Fraud in Connection with Oak Fund XII and XIII's Investment in Company I**

82.     In or around December 2010, Oak Fund XII and Oak Investment Partners XIII, LP ("Oak Fund XIII") entered into a joint investment through the purchase of shares of a European loan servicing business ("Company I"). As described in paragraph 24, above, the investment was examined, negotiated, approved, and transacted from the United States. Ahmed

26

was significantly involved in negotiating Oak Fund XII and XIII's purchase of Company I shares. Ahmed defrauded Oak, Oak Fund XII and its investors, and Oak Fund XIII and its investors by misrepresenting the purchase price of the Company I shares.  As detailed below, Ahmed employed various fraudulent acts, misrepresentations, and omissions in connection with Oak Fund XII and XIII's purchase of Company I shares.

83.    Ahmed negotiated the purchase of Company I shares on behalf of Oak Fund XII and Oak Fund XIII, at a cost of 36.5 million British pounds. Ahmed represented to Oak, Oak Fund XII, and Oak Fund XIII that the parties had agreed to a fixed exchange rate of approximately 1.62 U.S. dollars to one British pound, which resulted in a purchase price of approximately 59 million U.S. dollars. At Ahmed's direction, Oak wired, on or about December 10, 2010, approximately $59 million on behalf of Oak Fund XII and XIII for the purchase of Company I shares.

84.    Ahmed's representation of the exchange rate was fraudulent. After the $59 million wire was complete, Company I informed Ahmed that, based on the prevailing exchange rate of approximately $1.56 U.S. dollars to one British pound, Oak had overpaid by approximately £1.4 million (which translated to more than $2 million). Ahmed directed Company I to wire the difference to the OIP Advisors account, which, as described in paragraph 31 above, was opened and controlled by Ahmed.  Company I wired approximately $2.2 million to that account on or about December 22, 2010.

85.    Although Oak Fund XII and XIII were entitled to the $2.2 million in connection with their purchase of Company I shares, Ahmed did not forward the overpayment back to Oak Fund XII or Oak Fund XIII, nor did he disclose to anybody at Oak, Oak XII or XIII or their investors that there was an overpayment or that he misappropriated the overpayment. Instead,

Ahmed misappropriated these amounts from Oak Fund XII and Oak Fund XIII by transferring the funds into a bank account that he held jointly with his wife, Relief Defendant Shalini Ahmed.

86.     By virtue of his misconduct and deceptive conduct described above, Ahmed misled and defrauded Oak, Oak Fund XII (directly and indirectly by defrauding companies held in Oak Fund XII's portfolio), Oak Fund XIII (directly and indirectly by defrauding companies held in Oak Fund XIII's portfolio), and investors of Oak Fund XII and Oak Fund XIII, which included Oak's Managing Partners and Oak's COO, thereby defrauding Oak Fund XII and Oak Fund XIII of approximately $2.2 million in connection with their joint investment in Company I in connection with its purchase of Company I shares.

**Ahmed's Fraud in Connection with Oak Fund XIII's Investment in Company A**

87.     In or around August 2014, Ahmed recommended that Oak Fund XIII purchase shares in an e-commerce company operating in Asia ("Company A"). Ahmed recommended that Oak Fund XIII purchase those shares, not directly from Company A, but from a British Virgin Islands company (the "BVI Company") that was looking to sell its investment in Company A. Ahmed was a member of the BVI Company's board of directors. As described in paragraph 24, above, the investment was examined, negotiated, approved, and transacted from the United States. As detailed below, Ahmed employed various fraudulent acts, misrepresentations, and omissions in connection with Oak Fund XIII's purchase of Company A shares.

88.     On or about the evening of Sunday, August 10, 2014, Ahmed sent an e-mail to Oak's Managing Partners seeking approval for the purchase of Company A's shares from the BVI Company. In making this recommendation, Ahmed represented that Company A "continues to grow fast and do quite well," and that it had "crossed a million $ in revenues in June and turned a little profit too." Ahmed urged that the deal needed to be done quickly.

89.     Ahmed attached to his August 10 e-mail a report recommending that Oak Fund XIII purchase Company A's shares from the BVI Company at a price of approximately $3.544 million.

90.     By at least August 12, 2014, Oak Fund XIII made the purported $3.544 million purchase of Company A's shares. On or about August 12, 2014, Ahmed forwarded to Oak what he claimed were the final, executed deal documents, with the note: "All signed docs are in. Good to wire and close the purchase." The purchase price listed in both the signed resolution of the BVI Company's board of directors and the share purchase agreement was $3.544 million. Ahmed was the sole representative of Oak Fund XIII signing on behalf of the Fund.

91.     Also on or about August 12, 2014, Ahmed submitted a check request asking that the $3.544 million be paid, purportedly to the BVI Company. Ahmed also provided Oak with wiring instructions which stated that the funds were to be sent to a bank account that belonged to the BVI Company. The request was approved, and Oak wired the funds on behalf of Oak Fund XIII to the designated account.

92.     Ahmed made significant misrepresentations, and engaged in fraudulent and deceptive conduct, in connection with Oak Fund XIII's purchase of Company A shares. As detailed below, Ahmed knew that the actual price at which the BVI Company sold its shares of Company A was $1.5 million, not the $3.544 million Ahmed represented to Oak and Oak Fund XIII. Ahmed misrepresented the financial condition of Company A, provided Oak and Oak Fund XIII with altered deal documents, fraudulently arranged for Oak to wire funds on behalf of Oak Fund XIII to the Ahmed Sole Prop account, and failed to disclose his conduct to Oak, Oak Fund XIII or its investors.

93.     The BVI Company's board of directors consisted of three individuals: Ahmed and two others. On or about July 30, 2014, Ahmed corresponded with one of the other BVI Company board members about the potential sale of its Company A shares. Ahmed claimed he had negotiated a sale of the shares for $1.5 million, but that the third party buyer was now skeptical of that price in light of Company A's "declining revenues" and "significant loss" of business. Ahmed suggested he believed he could convince the buyer to purchase the shares for approximately $1.3 million. The board member indicated that he was comfortable with a sale at that price.

94.     On or about the morning of Monday, August 11, 2014, Ahmed e-mailed the two other BVI Company board members claiming that the potential buyer "ke[pt] going back on price." Ahmed proposed that the BVI Company sell its shares of Company A to Oak rather than a third party buyer. Ahmed claimed that "the fair price would be $1.5MM."

95.     In stark contrast to his statements to the other BVI Company board members, Ahmed recommended to Oak's Managing Partners that Oak Fund XIII pay $3.544 million to purchase the BVI Company's stake in Company A.  In making this recommendation, Ahmed misrepresented the financial condition of Company A.  As noted above, in his August 10, 2014 email recommending the investment to Oak, Ahmed claimed that Company A was "do[ing] quite well" financially, had more than $1 million in revenues in June 2014, and had "turned a little profit too." In fact, on or about August 8, 2014, Ahmed had received information about Company A's financials, which noted that estimated revenues for June 2014 were approximately $725,000, and the company had a net loss of more than $200,000.

96.     Similarly, the day after he had recommended the investment to Oak, Ahmed e-mailed the other two BVI Company board members noting that Company A's "week on week

30

revenues … have declined" and that the company "is still losing money and will need more funding down the line."

97.     By August 12, 2014, Ahmed received approval from the BVI Company board members to proceed with the sale of Company A shares at a price of $1.5 million. Later that day, Ahmed e-mailed the deal documents reflecting the $1.5 million purchase price to the other two BVI Company board members for their signatures. The two BVI Company board members separately e-mailed to Ahmed executed versions of these deal documents that were signed on or about August 11 and August 12, 2014.

98.     To conceal his fraud, however, Ahmed provided Oak with altered deal documents. On August 12, 2014, after Ahmed had received executed copies of the deal documents from both of the other BVI Company board members, Ahmed emailed to Oak personnel executed deal documents that falsely depicted a purchase price of $3.544 million.

99.     In addition to misrepresenting Company A's finances and using altered deal documents that overstated the actual purchase price, Ahmed caused Oak to wire money on behalf of Oak Fund XIII to a bank account that he controlled. Specifically, the wiring instructions Ahmed provided to Oak were not for an account held by the BVI Company, as Ahmed claimed in the wiring instructions, but rather were for the account held by Relief Defendant Ahmed Sole Prop.

100.    As noted above, the full name of the Ahmed Sole Prop bank account misleadingly suggested that Ahmed Sole Prop was "doing business as" the BVI Company. In fact, the bank account was controlled by Ahmed and registered to Ahmed's home address.

101.    Further, on or about August 15, 2014, Ahmed completed his misappropriation from Oak Fund XIII by transferring $2 million from the Ahmed Sole Prop bank account to a

31

bank account held in the name of Ahmed and Relief Defendant Shalini Ahmed.  That same day, Ahmed wrote a $2 million check from that personal bank account to Relief Defendant Shalini Ahmed. On or about August 18, 2014, Ahmed transferred an additional $44,113 and $600 from the Ahmed Sole Prop bank account to the personal bank account held in the name of Ahmed and Relief Defendant Shalini Ahmed. These three transfers from the Ahmed Sole Prop bank account equal almost exactly the difference between the approximately $3.544 million price Oak Fund XIII believed it was paying for the Company A shares, and the $1.5 million price for which the shares were actually sold.

102.    By virtue of his misconduct and deceptive conduct described above, Ahmed misled and defrauded Oak, Oak Fund XIII (directly and indirectly by defrauding companies held in Oak Fund XIII's portfolio), and Oak Fund XIII's investors, which included Oak's Managing Partners and Oak's COO, defrauding Oak Fund XIII of more than $2 million in connection with its purchase of Company A shares.

**Ahmed's Fraud in Connection with Oak Fund XII's Investment in Company B**

103.    In or around December 2014, Ahmed recommended to Oak's Managing Partners that Oak Fund XII make an investment in a joint venture that provided e-commerce services in the Asian market ("Company B"). Company B had been formed by two existing companies: (1) a Cayman Islands company headquartered in China ("Joint Venture Party 1") and (2) a Singapore business subsidiary controlled by the BVI Company referenced above (the "BVI Subsidiary"). At the time of Ahmed's recommendation, Joint Venture Party 1 was seeking to sell its stake in Company B. As described in paragraph 24, above, the investment was examined, negotiated, approved, and transacted from the United States.  As detailed below, Ahmed

employed various fraudulent acts, misrepresentations, and omissions in connection with Oak Fund XII's purchase of Company B shares.

104.    Ahmed recommended to Oak's Managing Partners that Oak Fund XII purchase Joint Venture Party 1's shares in Company B, at a price of $20 million. As part of his recommendation, on or about December 15, 2014, Ahmed prepared a report on the proposed transaction. That report reiterated that the purchase price of the shares owned by Joint Venture Party 1 was $20 million. The report also contained detailed financial information about Company B.

105.    Ahmed further told Oak and Oak Fund XII that the $20 million purchase price would be split, with $2 million being paid directly to Joint Venture Party 1 (the selling party) and the remaining $18 million being paid to the BVI Company. In response to questions from Oak personnel about this payment structure, Ahmed sent an e-mail on or about December 18, 2014 claiming that the $18 million would "flow in to" Company B through the BVI Company "immediately at close."

106.    Based on Ahmed's recommendation and representations, on or about December 19, 2014, Oak Fund XII agreed to make the $20 million investment and purchased Joint Venture Party 1's shares in Company B.

107.    On or about December 19, 2014, Ahmed submitted a check request to Oak and Oak Fund XII detailing the payment structure. Specifically, consistent with Ahmed's earlier recommendation, Ahmed requested that $2 million be paid to Joint Venture Party 1 and $18 million be paid to the BVI Company. Ahmed provided Oak and Oak Fund XII with wiring instructions for these funds. According to the wiring instructions, the $18 million was to be sent to a bank account that was in the name of the BVI Company. The account, however, was actually

a personal account that Ahmed controlled and opened in the name of Relief Defendant Ahmed Sole Prop.

108.    As noted above, the full name of the Relief Defendant Ahmed Sole Prop bank account misleadingly suggested that Ahmed Sole Prop was "doing business as" the BVI Company.

109.    On or about December 19, 2014, Oak wired the requested funds on behalf of Oak Fund XII to the accounts Ahmed had designated.

110.    On or about December 29, 2014, an Oak employee requested additional information from Ahmed about the payment structure, and specifically asked for details and documentation of the $18 million payment purportedly made to the BVI Company. In response, on or about January 3, 2015, Ahmed e-mailed the Oak employee what Ahmed claimed were the final, executed deal documents. Those documents reflected a purchase price of $20 million.

111.    Ahmed further told the Oak employee that the payment was structured the way it was at the joint venture parties' request. In another e-mail sent on or about January 3, 2015, Ahmed stated: "Just so you are clear on the funding, the purchase of [Joint Venture Party 1's] shares was for the entire $20MM, but netted out for a $18MM obligation that [Joint Venture Party 1] had to [the BVI Company] ... and hence the fund flows were as we did. The gross purchase price from Oak was $20MM but the net amount to [Joint Venture Party 1] was $2MM."

112.    Ahmed's representations to Oak and Oak Fund XII were false, and his actions were fraudulent. As detailed below, Ahmed knew that the actual purchase price for Joint Venture Party 1's shares in Company B was $2 million, not the $20 million that Ahmed represented. While Ahmed claimed that the $18 million surplus was to be paid to the BVI Company, the parent company of the other joint venture partner, the BVI Subsidiary, Ahmed directed Oak

Fund XII to pay $18 million to Relief Defendant Ahmed Sole Prop's account that was in fact associated with Ahmed's home address.

113.    In order to justify the grossly exaggerated purchase price of $20 million, Ahmed misrepresented Company B's financial condition in the investment report that he prepared for and presented to Oak and Oak Fund XII. Prior to preparing his report, Ahmed asked for and received from Company B financial projections for the current year and the next several years. Ahmed included this same type of information in the report, but the figures were often materially different. For example, the financial projections Ahmed received from Company B indicated that the estimated value of the merchandise it expected to sell in 2014 was approximately 42.6 million RMB[3]; the information Ahmed included in the report claimed a merchandise value of **1**42.6 million RMB. Similarly, the financial projections Ahmed received from Company B projected revenues in 2014 of 2.918 million RMB; Ahmed's report indicated projected revenues of **1**2.918 million RMB. As a result, Ahmed's report made Company B's financial condition appear significantly more robust than it actually was.

114.    On or about December 19, 2014, the share purchase agreement and other related documents for Oak Fund XII's purchase of Joint Venture Party 1's shares were executed by the parties to the deal. Ahmed was the sole representative signing these deal documents on behalf of Oak Fund XII. Later that day, the executed deal documents were circulated by e-mail to the parties to the deal. The executed deal documents clearly state that the purchase price was $2 million. Indeed, a press release issued by Joint Venture Party 1 confirmed that it had sold its shares of Company B to Oak Fund XII for $2 million.

---

[3] "RMB" is the denotation of China's currency, the renminbi.

115.     Notwithstanding his knowledge of the actual purchase price, Ahmed misappropriated from Oak Fund XII by causing $18 million of the inflated $20 million purchase price to be wired to an account that he controlled. As outlined above, the account that Ahmed informed Oak and Oak Fund XII was held by the BVI Company, the parent company of the remaining joint venture partner, the BVI Subsidiary, was in fact held in the name of Relief Defendant Ahmed Sole Prop. Furthermore, the address associated with that account was Ahmed's home address in Connecticut. The $18 million was then transferred from the Ahmed Sole Prop account into a bank account that Ahmed held jointly with his wife, Relief Defendant Shalini Ahmed. Those monies were then further transferred into other accounts held by Ahmed and Relief Defendant Shalini Ahmed, and a portion was later used to purchase a New York City condominium located on Park Avenue for more than $7.9 million, held in the name of DIYA Real Holdings.

116.     In an attempt to cover his tracks, Ahmed e-mailed altered deal documents to an Oak employee after the transaction was completed. On or about January 3, 2015, Ahmed emailed to the Oak employee a document that purported to be the final executed share purchase agreement. The document was nearly identical to the actual final share purchase agreement that Ahmed and the other parties had signed approximately two weeks earlier, with one significant difference:  Ahmed had changed the purchase price term of the agreement from $2 million to $20 million.

117.     By virtue of his misconduct and deceptive conduct described above, Ahmed misled Oak, Oak Fund XII (directly and indirectly by defrauding companies held in Oak Fund XII's portfolio), and Oak Fund XII's investors, which included Oak's Managing Partners and

Oak's COO, thereby defrauding Oak Fund XII and its investors of more than $18 million in connection with its purchase Company B shares.

**Ahmed's Fraud in Connection with Oak Fund XII and XIII's Investment in Company C**

118.    In 2013 and 2014, Ahmed recommended that Oak Fund XIII make two separate investments in a U.S.-based e-commerce company ("Company C"). As described in paragraph 24, above, the investment was examined, negotiated, approved, and transacted from the United States.  As detailed below, Ahmed employed various fraudulent acts, misrepresentations, and omissions in connection with Oak Fund XIII's purchase of Company C shares.

119.    In or around November 2012, Company C engaged in an initial round of financing. One of the investors in this initial round of financing was Relief Defendant I-Cubed.

120.    In or around October 2013, as Company C was engaged in a second round of financing, Ahmed made a recommendation to Oak's Managing Partners that Oak Fund XIII invest in Company C. Based on Ahmed's recommendation, on or about October 11, 2013, Oak Fund XIII invested $25 million and purchased shares directly from Company C. At the time of this investment, I-Cubed was one of approximately twenty shareholders in Company C.

121.    Approximately one year later, in or around October 2014, Ahmed recommended to Oak's Managing Partners that Oak Fund XIII make a second investment in Company C. Rather than purchase shares directly from Company C, this time Ahmed recommended that Oak Fund XIII purchase shares from I-Cubed. Specifically, Ahmed recommended that Oak Fund XIII purchase the shares that I-Cubed had acquired in or around November 2012, during Company C's initial round of financing. Although I-Cubed had paid only $2 million for these shares, Ahmed recommended that Oak Fund XIII purchase the shares from I-Cubed at a price of $7.5

million. Ahmed assisted with the justification of the $7.5 million purchase price by providing purported revenue projections for Company C.

122.    Based on Ahmed's recommendation, Oak Fund XIII made its second, $7.5 million investment in Company C.  On or about October 30, 2014, a stock purchase agreement was executed between Oak Fund XIII and I-Cubed. The stock purchase agreement was signed by Ahmed on behalf of Oak Fund XIII, and purportedly signed by a different individual on behalf of I-Cubed. On or about that same day, Oak wired $7.5 million on behalf of Oak Fund XIII to an I-Cubed bank account, in exchange for all of I-Cubed's shares in Company C.  Ahmed subsequently transferred the significant majority of that $7.5 million to an account held in the name of Relief Defendant Shalini Ahmed 2014 Grantor Retained Annuity Trust.

123.    Ahmed defrauded Oak Fund XIII in connection with the investments in Company C. Most notably, Ahmed never disclosed to Oak, Oak Fund XIII, or Oak Fund XIII's investors his relationship with and financial interest in I-Cubed, violating his fiduciary duties to act in the best interest of his clients and to avoid self-dealing.

124.    As explained above, I-Cubed was formed in 2012 with Ahmed as its sole initial member.

125.    In or around November 2012, Ahmed was directly involved in I-Cubed's purchase of Company C shares for $2 million. At that time, Ahmed was still the sole member of I-Cubed. Moreover, the funds that I-Cubed used to purchase Company C's shares were wired from a brokerage account registered to Ahmed and his wife at Ahmed's home address.

126.    On or about May 16, 2013, Ahmed assigned his interest in I-Cubed to his wife, who merely served as a nominee for Ahmed. Approximately ninety-nine percent of that ownership interest in I-Cubed was later transferred into a trust in Ahmed's wife's name, the

38

Shalini Ahmed 2014 Grantor Retained Annuity Trust. Thus, the ownership of I-Cubed remained with Ahmed and/or his family at all times relevant to this Complaint, and Ahmed remained in control of I-Cubed at all times relevant to this Complaint.

127.    Ahmed failed to disclose his interest in I-Cubed to Oak or Oak Fund XIII in connection with the Fund's investments in Company C. Specifically, when Oak Fund XIII made its initial $25 million investment in Company C in or around October 2013, Ahmed failed to disclose that he (through his ownership and control of I-Cubed then held in the name of his wife) held a sizable investment in Company C.

128.    In or around June 2013, Ahmed expressly represented to Oak's COO that he had "NO personal investment or any direct beneficial interest or investment in" Company C. This statement was false and misleading in light of the fact that Ahmed owned and controlled shares of I-Cubed (then held in the name of his wife), which in turn owned shares of Company C.

129.    Ahmed further failed to disclose his ownership and control of I-Cubed (then held in the name of his wife) during the October 2014 transaction in which Oak Fund XIII purchased Company C shares directly from I-Cubed for $7.5 million – a sale that allowed I-Cubed to generate a $5.5 million profit on the shares that it had purchased for $2 million just two years earlier.

130.    This was not Ahmed's only fraud in connection with investments in Company C. As noted paragraph 87, above, Ahmed was one of three people on the BVI Company's board of directors.  Ahmed was made a board member by virtue of Oak Fund XII's investment in the BVI Company. The BVI Company's second investor, a United States based fund formed as a Delaware limited partnership, also selected a board member, who at all times relevant to this Complaint lived and worked in Massachusetts. The BVI Company's third and final investor lived

abroad and was also a board member. The BVI Company's board meetings were conducted by telephone, typically while one partner was in Massachusetts, and, on information and belief, while Ahmed was in Connecticut.

131.    In or around November 2012, the BVI Company's board authorized the purchase of $150,000 (from its account in the United States) of Company C shares, a Delaware corporation. Ahmed, without authorization from the BVI Company or its investors, including Oak Fund XII, directly and personally negotiated an additional $2 million purchase of Company C shares on behalf of the BVI Company. Ahmed used $2 million of the BVI Company's funds to execute this purchase.

132.    When Ahmed was confronted by the BVI Company about the $2 million share purchase, Ahmed falsely claimed that the purchase was a mistake. Ahmed never disclosed that he purposefully entered into the $2 million transaction or that the purchased shares – held in the name of the BVI Company – had substantially increased in value.

133.    In or around June 2013, Ahmed transferred $2 million from an account he controlled in the United States to the BVI Company account. At that time, Ahmed knew that Company C shares were worth substantially more than $2 million. Shortly thereafter, Ahmed began to negotiate the sale of the Company C shares back to Company C.

134.    In or around October 2013, Ahmed sold the Company C shares (purchased for $2 million) for approximately $10.9 million. Ahmed directed those funds to be wired from Company C, a Delaware corporation, to the Ahmed Sole Prop account "doing business as" the BVI Company account, as described in paragraphs 100 and 115, above. Ahmed then transferred approximately $10.75 million into bank accounts that he held jointly with his wife, Relief Defendant Shalini Ahmed, and approximately $35,000 into three separate accounts that were

held in the name of Ahmed and Shalini Ahmed's children, I.I. 1, I.I. 2, and I.I. 3. Ahmed never transferred the approximate $8.9 million profit on the Company C shares to the BVI Company, or its investors, nor did Ahmed disclose to the BVI Company, Oak, Oak XII or its investors that he misappropriated this money.

135.    By virtue of his misconduct and deceptive conduct described above, Ahmed misled and defrauded the BVI Company, Oak, Oak Fund XII and XIII (directly and indirectly by defrauding companies held in Oak Fund XII and XIII's portfolio), Oak Fund XII and XIII's investors, which included Oak's Managing Partners and Oak's COO, thereby defrauding the BVI Company, Oak Fund XII and XIII and its investors, of more than $16 million in connection with its purchase of Company C shares.

## Ahmed Engaged in a Scheme and Fraudulent Practices or Courses of Business to Defraud Oak, Oak Funds, and Oak Fund Investors

136.    As outlined herein, since approximately 2004 and continuing to approximately 2015, Ahmed engaged in a scheme to defraud Oak, Oak Funds and the investors in the Oak Funds.  In furtherance of that scheme, Ahmed knowingly or recklessly engaged in numerous practices or courses of business that defrauded Oak, Oak Funds and the investors in the Oak Funds, including, but not limited to:

     a.  creating and disseminating false and fraudulent documents described herein;

     b.  altering and disseminating documents thereby rending the documents false and fraudulent as described herein;

     c.  opening and maintaining bank accounts in the name of Oak and companies in which Oak Funds invested as described herein;

d.   directing  monies belonging to Oak Funds and their portfolio companies into bank accounts Ahmed opened and controlled as described herein;

e.   misappropriating money from Oak Funds directly;

f.   misappropriating money from Oak Funds' portfolio companies, thereby diminishing the companies' value as assets held by the Oak Funds;

g.   failing to disclose his fraudulent and deceptive conduct to Oak, Oak Funds, and Oak Funds' portfolio companies while knowing that Oak continued to create new Funds and raise new monies, which Ahmed intended to, and did, misappropriate by false and fraudulent means as described herein; and

h.   making misrepresentations and omissions to Oak and the Oak Funds as described herein.

137.   All of Ahmed's fraudulent practices and courses of business as alleged in paragraph 136 above also constituted a scheme to defraud investors in the respective Oak Funds.  The Oak Funds are pooled investment vehicles.  Ahmed was an investment adviser to the Oak Funds, and while in that role, he misappropriated assets contributed by Oak Fund investors and secretly used them for his own purposes.  Ahmed's conduct was fraudulent and deceptive not only as to the Oak Funds, but also as to Oak Funds' investors.

138.   Throughout his scheme, Ahmed knew, or was reckless in not knowing, that Oak's Managing Partners, COO, and other individuals at Oak were investors in the Oak Funds.  As described above, Ahmed made numerous material misstatements and omissions to Oak's Managing Partners, COO and other individuals invested in the Oak Funds (and thus to Oak Funds' investors) regarding the transactions described above.

139.     During his scheme, Ahmed knew, or was reckless in not knowing that Oak continued to create new Funds and raise money from outside investors.  Ahmed further knew, or was reckless in not knowing that offering materials and other communications directed to investors of Oak Funds from 2004 through 2015 did not disclose his misappropriation of money or other deceptive or fraudulent conduct referenced herein.

### Relief Defendants Received Ill-Gotten Gains

140.     As detailed above, Relief Defendant Ahmed Sole Prop received proceeds from Ahmed's misconduct in connection with two Oak Funds' investments in Companies A, B and G. Ahmed Sole Prop has no legitimate claim to these funds.

141.     As detailed above, Relief Defendant I-Cubed received proceeds from Ahmed's misconduct in connection with Oak Fund XIII's investment in Company C. I-Cubed has no legitimate claim to these funds.

142.     As detailed above, Relief Defendant Shalini Ahmed received a large portion of the proceeds from Ahmed's misconduct in connection with several of the transactions described herein. These include large transfers of fraudulent proceeds into bank accounts that were held jointly with Ahmed, her husband. Shalini Ahmed has no legitimate claim to these funds.

143.     Relief Defendant Shalini Ahmed 2014 Grantor Retained Annuity Trust received proceeds from Ahmed's misconduct, including Ahmed's misconduct in connection with Oak Fund XIII's $7.5 million purchase of Company C shares from Relief Defendant I-Cubed. On or about October 30, 2014, Oak Fund XIII wired $7.5 million to a bank account registered to I-Cubed. On or about November 2, 2014, a check for $7.425 million was written from that I-Cubed bank account and deposited into an account held by the Shalini Ahmed 2014 Grantor

Retained Annuity Trust. The Shalini Ahmed 2014 Grantor Retained Annuity Trust has no legitimate claim to these funds.

144.     Relief Defendant DIYA Holdings LLC received proceeds from Ahmed's misconduct, including Ahmed's misconduct in fraudulently purchasing $2 million in Company C shares using BVI Company funds and then reselling those shares for approximately $10.9 million. A substantial portion of that $10.9 million was used to purchase a New York City Park Avenue condominium in December 2013, which is held in the name of DIYA Holdings LLC. DIYA Holdings LLC has no legitimate claim to these funds or this property.

145.     Relief Defendant DIYA Real Holdings, LLC received proceeds from Ahmed's misconduct, including Ahmed's misconduct in connection with Oak Fund XII's investment in Company B. As detailed above, Ahmed defrauded Oak and Oak Fund XII out of $18 million in connection with that investment. After moving these funds through several accounts, Ahmed used a substantial portion of that $18 million to purchase a New York City Park Avenue condominium in April 2015, which is held in the name of DIYA Real Holdings, LLC. DIYA Real Holdings, LLC has no legitimate claim to these funds or this property.

146.     I.I. 1 received proceeds from Ahmed's misconduct, including Ahmed's misconduct in fraudulently purchasing $2 million in Company C shares using BVI Company funds and then reselling those shares for approximately $10.9 million. As described in paragraphs 19 and 135, a portion of these fraudulent funds were transferred into a UTMA Account held for the benefit of I.I. 1. I.I. 1 has no legitimate claim to these funds.

147.     I.I. 2 received proceeds from Ahmed's misconduct, including Ahmed's misconduct in fraudulently purchasing $2 million in Company C shares using BVI Company funds and then reselling those shares for approximately $10.9 million. As described in

paragraphs 20 and 135, a portion of these fraudulent funds were transferred into a UTMA Account held for the benefit of I.I. 2. I.I. 2 has no legitimate claim to these funds.

148.   I.I. 3 received proceeds from Ahmed's misconduct, including Ahmed's misconduct in fraudulently purchasing $2 million in Company C shares using BVI Company funds and then reselling those shares for approximately $10.9 million. As described in paragraphs 21 and 135, a portion of these fraudulent funds were transferred into a UTMA Account held for the benefit of I.I. 3. I.I. 3 has no legitimate claim to these funds.

## FIRST CLAIM FOR RELIEF
### Fraud in the Purchase or Sale of Securities in Violation of Section 10(b) of the Exchange Act and Rule 10b-5 (Against Defendant Ahmed)

149.   The Commission realleges and incorporates by reference paragraphs 1 through 148, as if fully set forth herein.

150.   As a result of the conduct alleged herein, Defendant Ahmed, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, and with scienter:

      (a)   employed a device, scheme, or artifice to defraud;

      (b)   made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

      (c)   engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit upon any person.

45

151.    By virtue of the foregoing, Defendant Ahmed, directly or indirectly, violated, and unless enjoined, will again violate Section 10(b) of the Exchange Act [15 U.S.C. 78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5] thereunder.

## SECOND CLAIM FOR RELIEF
### Fraud in the Offer or Sale of Securities in Violation of Section 17(a) of the Securities Act
### (Against Defendant Ahmed)

152.    The Commission realleges and incorporates by reference paragraphs 1 through 148, as if fully set forth herein.

153.    As a result of the conduct alleged herein, in connection with the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

(1)     with scienter, employed a device, scheme, or artifice to defraud;

(2)     obtained money or property by means of untrue statements of a material fact or omission to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(3)     engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit upon the purchaser.

154.    By virtue of the foregoing, Defendant Ahmed, directly or indirectly, violated, and unless enjoined, will again violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## THIRD CLAIM FOR RELIEF
### Fraud by an Investment Adviser in Violation of Sections 206(1) and 206(2) of the Advisers Act
### (Against Defendant Ahmed)

155.    The Commission realleges and incorporates by reference paragraphs 1 through 148, as if fully set forth herein.

156.   As a result of the conduct alleged herein, Defendant Ahmed, while acting as an investment adviser, by the use of the mails or any means or instrumentality of interstate commerce, directly or indirectly:

(1)   with scienter, employed a device, scheme, or artifice to defraud; or

(2)   engaged in a transaction, practice, or course of business which operated as a fraud or deceit upon a client or prospective client.

157.   By virtue of the foregoing, Defendant Ahmed, directly or indirectly, violated, and unless enjoined, will again violate Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. § 80b-6(1) and 80b-6(2)].

## FOURTH CLAIM FOR RELIEF
### Undisclosed Principal Transaction in Violation of
### Section 206(3) of the Advisers Act
### (Against Defendant Ahmed)

158.   The Commission realleges and incorporates by reference paragraphs 1 through 148, as if fully set forth herein.

159.   As a result of the conduct alleged herein, and specifically Defendant Ahmed's conduct in regard to Relief Defendant I-Cubed's sale of Company C shares to Oak Fund XIII in or around October 2014, Defendant Ahmed, while acting as an investment adviser, by the use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, acting as a principal for his own account, knowingly sold a security to a client without disclosing to such client in writing before the completion of such transaction the capacity in which he was acting and obtaining the consent of the client to such transaction.

160.   By virtue of the foregoing, Defendant Ahmed, directly or indirectly, violated, and unless enjoined, will again violate Section 206(3) of the Advisers Act [15 U.S.C. § 80b-6(3)].

## FIFTH CLAIM FOR RELIEF
### Fraud on Pooled Investment Vehicle Investors in Violation of
### Section 206(4) of the Advisers Act and Rule 206(4)-8
### (Against Defendant Ahmed)

161.    The Commission realleges and incorporates by reference paragraphs 1 through 148, as if fully set forth herein.

162.    As a result of the conduct alleged herein, beginning September 10, 2007, and thereafter, Defendant Ahmed, while acting as an investment adviser to various pooled investment vehicles, by the use of the mails or any means or instrumentality of interstate commerce, directly or indirectly engaged in acts, practices, or courses of business which were fraudulent, deceptive, or manipulative. Defendant Ahmed:

(1)      made untrue statements of material facts and omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading to an investor or prospective investor in the pooled investment vehicles; or

(2)      otherwise engaged in acts, practices, or courses of business that were fraudulent, deceptive, or manipulative with respect to an investor or prospective investor in the pooled investment vehicles.

163.    By virtue of the foregoing, Defendant Ahmed, directly or indirectly, violated, and unless enjoined, will again violate Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

//

//

//

48

## SIXTH CLAIM FOR RELIEF
**Equitable Disgorgement**
**(Against Relief Defendant Ahmed Sole Prop)**

164.    The Commission realleges and incorporates by reference paragraphs 1 through 148, as if fully set forth herein.

165.    Relief Defendant Ahmed Sole Prop's bank account received and held proceeds of Defendant Ahmed's fraudulent transactions involving Company A and Company B.

166.    Relief Defendant Ahmed Sole Prop has no legitimate claim to these illicit proceeds.

167.    Relief Defendant Ahmed Sole Prop obtained the funds under circumstances in which it is not just, equitable, or conscionable for it to retain the funds, and therefore has been unjustly enriched.

## SEVENTH CLAIM FOR RELIEF
**Equitable Disgorgement**
**(Against Relief Defendant I-Cubed)**

168.    The Commission realleges and incorporates by reference paragraphs 1 through 148, as if fully set forth herein.

169.    Defendant Ahmed controls Relief Defendant I-Cubed.

170.    Relief Defendant I-Cubed's bank account received and held proceeds of Defendant Ahmed's fraudulent transaction involving Relief Defendant I-Cubed's sale of Company C shares in October 2014.

171.    Relief Defendant I-Cubed has no legitimate claim to these illicit proceeds.

172.    Relief Defendant I-Cubed obtained the funds under circumstances in which it is not just, equitable, or conscionable for it to retain the funds, and therefore has been unjustly enriched.

49

**EIGHTH CLAIM FOR RELIEF**
**Equitable Disgorgement**
**(Against Relief Defendant Shalini Ahmed)**

173.    The Commission realleges and incorporates by reference paragraphs 1 through 148, as if fully set forth herein.

174.    Relief Defendant Shalini Ahmed received proceeds from certain of Defendant Ahmed's fraudulent transactions described above.

175.    Relief Defendant Shalini Ahmed has no legitimate claim to these illicit proceeds.

176.    Relief Defendant Shalini Ahmed obtained the funds under circumstances in which it is not just, equitable, or conscionable for her to retain the funds, and therefore has been unjustly enriched.

**NINTH CLAIM FOR RELIEF**
**Equitable Disgorgement**
**(Against Relief Defendant Shalini Ahmed 2014 Grantor Retained Annuity Trust)**

177.    The Commission realleges and incorporates by reference paragraphs 1 through 148, as if fully set forth herein.

178.    Relief Defendant Shalini Ahmed 2014 Grantor Retained Annuity Trust received proceeds from certain of Defendant Ahmed's fraudulent transactions described above.

179.    Relief Defendant Shalini Ahmed 2014 Grantor Retained Annuity Trust has no legitimate claim to these illicit proceeds.

180.    Relief Defendant Shalini Ahmed 2014 Grantor Retained Annuity Trust obtained the funds under circumstances in which it is not just, equitable, or conscionable for it to retain the funds, and therefore has been unjustly enriched.

//

//

## TENTH CLAIM FOR RELIEF
**Equitable Disgorgement**
**(Against Relief Defendant DIYA Holdings LLC)**

181.    The Commission realleges and incorporates by reference paragraphs 1 through 148, as if fully set forth herein.

182.    Relief Defendant DIYA Holdings LLC received proceeds from certain of Defendant Ahmed's fraudulent transactions described above.

183.    Relief Defendant DIYA Holdings LLC has no legitimate claim to these illicit proceeds.

184.    Relief Defendant DIYA Holdings LLC obtained the funds under circumstances in which it is not just, equitable, or consciable for it to retain the funds, and therefore has been unjustly enriched.

## ELEVENTH CLAIM FOR RELIEF
**Equitable Disgorgement**
**(Against Relief Defendant DIYA Real Holdings, LLC)**

185.    The Commission realleges and incorporates by reference paragraphs 1 through 148, as if fully set forth herein.

186.    Relief Defendant DIYA Real Holdings, LLC received proceeds from certain of Defendant Ahmed's fraudulent transactions described above.

187.    Relief Defendant DIYA Real Holdings, LLC has no legitimate claim to these illicit proceeds.

188.    Relief Defendant DIYA Real Holdings, LLC obtained the funds under circumstances in which it is not just, equitable, or consciable for it to retain the funds, and therefore has been unjustly enriched.

## TWELFTH CLAIM FOR RELIEF
**Equitable Disgorgement**
**(Against Relief Defendant I.I. 1)**

189.    The Commission realleges and incorporates by reference paragraphs 1 through 148, as if fully set forth herein.

190.    Relief Defendant I.I. 1 received proceeds from certain of Defendant Ahmed's fraudulent transactions described above.

191.    Relief Defendant I.I. 1 has no legitimate claim to these illicit proceeds.

192.    Relief Defendant I.I. 1 obtained the funds under circumstances in which it is not just, equitable, or conscionable for him to retain the funds, and therefore has been unjustly enriched.

## THIRTEENTH CLAIM FOR RELIEF
**Equitable Disgorgement**
**(Against Relief Defendant I.I. 2)**

193.    The Commission realleges and incorporates by reference paragraphs 1 through 148, as if fully set forth herein.

194.    Relief Defendant I.I. 2 received proceeds from certain of Defendant Ahmed's fraudulent transactions described above.

195.    Relief Defendant I.I. 2 has no legitimate claim to these illicit proceeds.

196.    Relief Defendant I.I. 2 obtained the funds under circumstances in which it is not just, equitable, or conscionable for him to retain the funds, and therefore has been unjustly enriched.

//

//

//

52

## FOURTEENTH CLAIM FOR RELIEF
### Equitable Disgorgement
### (Against Relief Defendant I.I. 3)

197.     The Commission realleges and incorporates by reference paragraphs 1 through 148, as if fully set forth herein.

198.     Relief Defendant I.I. 3 received proceeds from certain of Defendant Ahmed's fraudulent transactions described above.

199.     Relief Defendant I.I. 3 has no legitimate claim to these illicit proceeds.

200.     Relief Defendant I.I. 3 obtained the funds under circumstances in which it is not just, equitable, or conscionable for him to retain the funds, and therefore has been unjustly enriched.

## RELIEF SOUGHT

**WHEREFORE**, the Commission respectfully requests that this Court enter a preliminary order freezing the assets of Defendant and Relief Defendants, prohibiting the destruction of documents, and ordering expedited discovery and alternative means of service.

Further the Commission respectfully requests that this Court enter a Final Judgment:

### I.

Finding that the Defendant committed the violations alleged in this Complaint;

### II.

Permanently restraining and enjoining the Defendant and his agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with him, who receive actual notice of the Final Judgment by personal service or otherwise, and each of them, from engaging in transactions, acts, practices, and courses of business described herein, and from

53

engaging in conduct of similar purport and object in violation of Section 17(a) of Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder, and Sections 206(1), 206(2), 206(3), and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2), 80b-6(3), and 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8];

## III.

Directing the Defendant and the Relief Defendants to disgorge all ill-gotten gains received during the period of violative conduct and pay prejudgment interest on such ill-gotten gains;

## IV.

Directing the Defendant to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]; and

## V.

Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

The Commission demands a jury in this matter.

Dated: April 1, 2016

Respectfully submitted,

s/ Mark L. Williams
Nicholas P. Heinke (Colo. Bar No. 38738)
Connecticut Bar No. phv07374
Mark L. Williams (New York Bar No. 4796611)
Connecticut Bar No. phv07375
United States Securities and Exchange Commission
1961 Stout St., Suite 1700, Denver, CO  80294
Phone:    (303) 844-1000 (main)
          (303) 844-1071 (Heinke)
          (303) 844-1027 (Williams)
E-mail:   HeinkeN@sec.gov
          WilliamsML@sec.gov

John B. Hughes (CT05289)
Connecticut Federal Bar No. ct05289
Assistant United States Attorney
Chief, Civil Division
United States Attorney's Office
Connecticut Financial Center
157 Church St., 25th Floor
New Haven, CT 06510
Ph: (203) 821-3700
Fax: (203) 773-5373
E-mail: John.Hughes@usdoj.gov

*Attorneys for Plaintiff*
UNITED STATES SECURITIES AND EXCHANGE
COMMISSION

<u>CERTIFICATE OF SERVICE</u>

I certify that on April 1, 2016, a copy of the foregoing Second Amended Complaint was served via ECF upon the following:

Alex Lipman
Ashley L. Baynham
Brown Rudnick LLP
Seven Times Square
New York, NY 10036
(Counsel for Defendant)

Jonathan Harris
Reid Skibell
David Deitch
Alexander Sakin
Harris, St. Laurent & Chaudhry LLP
40 Wall Street
53rd Floor
New York, NY 10005
 (Counsel for Relief Defendants)


*s/ Mark L. Williams*
Mark L. Williams