**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| v. | Civil Action No. 3:15-cv-675 (JBA) |
| IFTIKAR AHMED, | |
| Defendant, and | |
| IFTIKAR ALI AHMED SOLE PROP; I-CUBED DOMAINS, LLC; SHALINI AHMED; SHALINI AHMED 2014 GRANTOR RETAINED ANNUITY TRUST; DIYA HOLDINGS LLC; DIYA REAL HOLDINGS, LLC; I.I. 1, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; I.I. 2, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; and I.I. 3, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents, | |
| Relief Defendants. | |

**DEFENDANT'S MOTION FOR SPECIFIC INSTRUCTIONS FOR DEPOSITON AS ORDERED BY THIS ESTEEMED COURT**

Defendant Iftikar Ahmed respectfully submits the following prayer for specific

instructions to the Plaintiff for his deposition in this stated matter.

1.      On September 2nd, 2016, this esteemed Court denied the Defendant's motion for protective order and to quash the notice for deposition.  The esteemed Court acknowledged the Defendant's offer to be deposed by remote means or at the offices of his legal counsel in India.  And in conclusion, the Court accepted that the Defendant's suggestion for alternative means for conducting the deposition presented the best means for the deposition to be organized.   Please refer to Document # 301 with relevant sections highlighted (**Exhibit 1**).

2.      Immediately following the abovementioned Court order, the following sequence of email communication occurred between the Plaintiff and the Defendant.  The entire email communication is hereby presented for reference as **Exhibit 2**.

-      September 2, 2016:  The Plaintiff emailed the Defendant asking which "US consulate" and when the Defendant could be available to be deposed in India.

-      September 12, 2016:  The Defendant, after due consultation with his legal advisers in the India case, responded reiterating his willingness to be deposed in any city in the offices of his legal counsel.

-      The Defendant forwarded a letter written by his Indian counsel to the Plaintiff explaining in detail why the Defendant cannot enter a foreign consulate or embassy as per the conditions imposed on him by the Indian Courts.    This email letter is attached for the reference of the Court to **Exhibit 3**.   The letter and the Defendant's email has all the contact details and website for the Plaintiff to easily verify and validate the authenticity of the same if they so wished versus leave any doubt about the legitimacy thereof and making wasteful accusations, as in the past, on documents sent from India.

-       September 23, 2016:   The Plaintiff then writes to the Defendant unilaterally specifying that the deposition will occur at the US Consulate in Kolkata or the US Consulate in Hyderabad.   Their email states "Both consulates are in the territory of India as U.S. consulates "remain the territory of the host state" (*see*

http://diplomacy.state.gov/discoverdiplomacy/diplomacy101/places/170537.htm), and therefore there should be no issue with you appearing."    A printout of this web link sent by the Plaintiff is attached hereto as **Exhibit 4**.


The Plaintiff obviously did not completely read the very reference site they submitted. The website actually states, "While diplomatic spaces remain the territory of the host state, an **embassy or consulate represents a sovereign state** (*emphasis added*).  International rules do not allow representatives of the host country to enter an embassy without permission – even to put out a fire – and designate an attack on an embassy as an attack on the country it represents". Surely, the innocent naivety of the Plaintiff can be understood and excused given they obviously stopped reading any further once they saw the self-fulfilling segment without bothering to read the whole segment of their own referenced material.    The website sent by the Plaintiff only indeed validates and reinforces exactly what the Indian counsel to the Defendant had written to the Plaintiff in the first place, if only they had cared to read the same.


3.       The Defendant has repeatedly submitted substantial evidence to this esteemed Court about his current legal situation in India and the restrictions being placed on him by the Courts in India.   In short, the Defendant does not have any identification paper and is not allowed to leave the legal jurisdiction of the Indian Court as per the documented conditions of

his bail.  A foreign consulate or embassy, as the US consulate in either city in India would be, would be outside the legal jurisdiction of the Indian Courts.

4.       Understandably, and not surprisingly, given the nature of their domestic work, the Plaintiff is seemingly unaware of the *Vienna Convention on Diplomatic Relations of 1961*. **Article 22** of the Vienna Convention clearly establishes the same exclusion of jurisdiction of local host country courts over any foreign consulate or embassy.     The Vienna Convention agreement is hereby attached as **Exhibit 5**.

5.       Indeed, it is instructive to be reminded what one of our country's greatest Presidents said about a US embassy in another country.    On February 22nd, 1984, in the aftermath of US military retaliation in Lebanon, the then President Ronald Regan said, "It was because of shelling (of) our embassy.  Now, that's United States territory".   Surely, the President of the United States of America knows what he is talking about.

6.       Each Court is independent and there is, globally, mutual respect between Courts and judicial systems.  Trying to force the Defendant to violate the orders of one sovereign (*Indian*) Court while repeatedly demanding, justifying, and achieving the denial of basic human and civil rights accorded to any accused (including the presumption of innocence) under the aegis of any judicial system in this world, for having inadvertently violated the orders of another sovereign (*American*) Court, only exposes the haughty hubris and the banal bigotry of the Plaintiff.     Surely this esteemed Court will see through the inconsistency in the demands of the Plaintiff yet again.

4

7.     The Defendant humbly submits that English is indeed not his first language.   But the Court's order (Document #301) would seem to be quite clear that the Plaintiff should "coordinate its arrangements" for the depositions for the MA and the CT matters presumably to both be more efficient as well as to save taxpayer resources.    The Plaintiff seems to brazenly disregard that direction.

One may indeed wonder if the fact that the Defendant continues to be represented by highly qualified legal counsels in the MA matter, whose withdrawal from the CT matter was orchestrated in a blatantly shameful manner cloaked in deceit and misrepresentations duly exposed by the transcripts from the MA matter earlier presented to this esteemed Court, has anything to do with the Plaintiff's unwillingness to coordinate the depositions despite their likely travels over 8,000 miles, one way, at American taxpayer's expense!

8.     The Plaintiff also demands that the Defendant now let the Plaintiff know whether the Defendant will invoke his Fifth Amendment Rights or answer the questions.     At this time, this is a most laughable demand.     The Defendant has not seen one iota of evidence against him. The Defendant has been denied access to the investigative file.   The Defendant has been denied access to his legitimately earned savings to retain appropriate legal counsel.    The Defendant has been denied all basic rights afforded to accused even by the most brutal of contemporaneous judicial systems like North Korea and Russia.    And yet the Defendant is asked whether he would take the Fifth or answer any questions.   Is that an admission that maybe, just maybe, the Defendant actually does have a right to something called the Fifth Amendment!   *Ut Caritas*! The Defendant feels threatened by the demands of the Plaintiff and the Defendant will make the

appropriate decision as is his right at the appropriate time and it would be illegitimate to force

the Defendant to make any premature decision one way or the other, a decision this esteemed

Court will surely agree has far reaching consequences and a decision that the US Constitution

allows a Defendant to change any time and even at the last minute.   A forced stand on whether

to take the Fifth or not would once again be yet another violation of the constitutional right of the

Defendant.


      **WHEREFORE**, the Defendant again humbly submits and respectfully requests that this

esteemed Court instruct the Plaintiff to arrange for the depositions in the MA and CT matters in a

coordinated manner as per the Court's order dated September 2, 2016 and for deposition to take

place at the offices of the legal counsel of the Defendant in India.


                        Respectfully Submitted,


Dated:        September 25th, 2016      /s/ Iftikar Ahmed
                                    _____
                                    Iftikar A. Ahmed
                                    C/O Advocate Anil Sharma
                                    10 Government Place East, Ground Floor
                                    Behind Kanpur Leather House
                                    Kolkata 700069, India
                                    Tel: +91.98.30.089.945
                                    Email: iftyahmed@icloud.com
                                    *Pro Se*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and served by electronic mail to:

Nicholas P. Heinke
U.S. Securities and Exchange Commission
Byron G. Rogers Federal Building
1961 Stout Street, Ste. 1700
Denver, CO 80294
(303) 844-1071
Email: heinken@sec.gov

Mark L. Williams
U.S. Securities and Exchange Commission
Byron G. Rogers Federal Building
1961 Stout Street, Ste. 1700
Denver, CO 80294
(303) 844-1027
Email: williamsml@sec.gov

Alexander Sakin
Harris, St. Laurent & Chaudhry LLP
40 Wall Street, 53rd Floor
New York, NY 10005
(646) 461-2279
Fax: (212) 202-6206
Email: asakin@sc-harris.com

David B. Deitch
Harris, St. Laurent & Chaudhry LLP VA
1818 Library Street, Suite 500
Reston, VA 20190
(703) 956-3549
Fax: (703) 935-0349
Email: ddeitch@sc-harris.com

Jonathan Harris
Harris, St. Laurent & Chaudhry LLP
40 Wall Street, 53rd Floor
New York, NY 10005
(646) 395-3481
Fax: (212) 202-6206
Email: jon@sc-harris.com

L. Reid Skibell
Harris, St. Laurent & Chaudhry LLP
40 Wall Street, 53rd Floor
New York, NY 10005
(917) 512-9466
Fax: (212) 202-6206
Email: rskibell@sc-harris.com

Priya Chaudhry
Harris, St. Laurent & Chaudhry LLP
40 Wall Street, 53rd Floor
New York, NY 10005
(212) 785-5550
Fax: (212) 202-6206
Email: priya@sc-harris.com

Steven Gabriel Hayes Williams
Harris, St. Lauren & Chaudhry LLP
40 Wall Street, 53rd Floor
New York, NY 10005
(212) 397-3370
Fax: (212) 202-6206
Email: ghayeswilliams@sc-harris.com

Kristen Luise Zaehringer
Murtha Cullina, LLP
177 Broad Street, 4th Floor
Stamford, CT 06901
(203) 653-5406
Fax: (860) 240-5758
Email: kzaehringer@murthalaw.com

Paul E. Knag
Murtha Cullina, LLP
177 Broad Street, 4th Floor
Stamford, CT 06901
(203) 653-5400
Fax: (203) 653-5444
Email: pknag@murthalaw.com

Dated:      September 25th, 2016      /s/ Iftikar Ahmed

_____

Iftikar A. Ahmed
C/O Advocate Anil Sharma
10 Government Place East, Ground Floor
Behind Kanpur Leather House
Kolkata 700069, India
Tel: +91.98.30.089.945
Email: iftyahmed@icloud.com

*Pro Se*

EXHIBIT   1

DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br>　　　*Plaintiff*,<br>　　　　*v.*<br>IFTIKAR AHMED,<br>　　　*Defendant*, and<br><br>IFTIKAR ALI AHMED SOLE PROP; I-CUBED DOMAINS, LLC; SHALINI AHMED; SHALINI AHMED 2014 GRANTOR RETAINED ANNUITY TRUST; DIYA HOLDINGS LLC; DIYA REAL HOLDINGS, LLC; I.I. 1, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; I.I. 2, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; and I.I. 3, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents,<br><br>　　　Relief Defendants. | Civil No. 3:15cv675 (JBA)<br><br>September 2, 2016 |

## RULING DENYING DEFENDANT'S MOTION FOR A PROTECTIVE ORDER AND TO QUASH NOTICE OF DEPOSITION

Plaintiff, the United States Securities and Exchange Commission (the "SEC"), noticed the deposition of Defendant, Iftikar Ahmed, for June 16, 2016 to be held at the United States Attorney's Office in Bridgeport, Connecticut, or the U.S. Marshals Service pretrial detention facility. On May 31, 2016, Defendant moved [Doc. # 238] for a protective order that the deposition not be held and that the SEC's notice of deposition be quashed. Defendant's motion was still pending on the date the deposition was to occur, and

Defendant did not appear for the deposition. *See* Fed. R. Civ. P. 37(d)(2). For the following reasons, Defendant's motion is DENIED.

## I. Discussion

Defendant's motion urges the Court to order that his deposition previously scheduled for June 16, 2016 not be held. He articulates three grounds for his motion.

First, Defendant states that he "is currently outside the United States of America and cannot legally return," having been arrested in India for unlawful entry into India. (Def.'s Mot. [Doc. # 238] at 2.) However, Defendant's inability to return to the United States to sit for his deposition is a consequence of his own making, having fled the U.S. in violation of the terms of his release on bond in *United States v. Kanodia et al.*, 15-10131-NMG (D. Mass). While his circumstances present a logistical impediment to his physical presence at a deposition in the U.S., it is no ground for prohibiting the deposition to be taken. In fact, Defendant alternatively proposes a deposition by remote means or at offices of his legal counsel in India.

Second, Defendant asks the "Court to quash all depositions until the Defendant receives and has a chance to review all investigative material" in possession of the SEC relating to this case. (Def.'s Mot. at 1-2) The Court has denied [Doc. # 286] Defendant's Motion for Full Access to SEC's Investigative File unless and until he returns to the United States and enters into appropriate protective orders. Thus, because Defendant has done neither, he will be required to submit to a deposition without having had the opportunity to review this material.

Third, Defendant recognizes that he "is now faced with the dilemma . . . of either choosing to make statements that could be used against him in his criminal case, or

2

suffering an adverse inference if he refuses to answer questions at his deposition." (Def.'s Mot. ¶ 3.) However, the fact that Defendant will have to choose between making potentially incriminating statements or invoking his Fifth Amendment right does not constitute grounds for precluding his deposition. *See Louis Vuitton Malletier S.A. v. LY USA, Inc.,* 676 F.3d 83, 97–98 (2d Cir. 2012) (quoting *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976)) ("A defendant in a civil proceeding who invokes the Fifth Amendment as a result of an overlapping criminal investigation or proceeding risks the adverse inference arising from his or her assertion of the privilege.") (internal citations and quotation marks omitted).

## II. Conclusion

For the foregoing reasons, Defendant's Motion for a Protective Order and Motion to Quash Notice of Deposition is DENIED. Defendant's suggestion of alternative means for conducting the deposition, under the current circumstances, presents the best manner in which this deposition can be taken, and parallels the District Court of Massachusetts' order directing the SEC to take Defendant's deposition either in India, or by videoconference. Order [Doc. # 109] at 3-4, *SEC v. Kanodia et al.,* No. 1:15-CV-13042 (ADB). The SEC may re-notice Defendant's deposition to be taken by either means and shall coordinate its arrangements with the parallel arrangements in the District of Massachusetts case.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 2nd day of September 2016.

EXHIBIT   2

# RE: RE: Scheduling Deposition in India

September 23, 2016 at 4:02 AM

From "Williams, Mark L"

To Ifty Ahmed

Cc "Heinke, Nicholas"

Mr. Ahmed,

This deposition concerns only the Connecticut matter.  It is difficult to say how long the deposition will take, as much of it depends on your answers to our questions.  Do you intend to answer questions about the allegations in this case, or do you intend to invoke your rights under Fifth Amendment and not answer our questions?  If you intend to invoke your rights under the Fifth Amendment, the deposition will not go longer than a few hours, and we may even be able to do the deposition via skype or a similar video program.

If you intend to answer our questions, the deposition will occur at the either U.S. Consulate in Kolkata or the U.S. Consulate in Hyderabad.  Both consulates are in the territory of India as U.S. consulates "remain the territory of the host state" (*see* http://diplomacy.state.gov/discoverdiplomacy/diplomacy101/places/170537.htm), and therefore there should be no issue with you appearing.  Please let us know if you do not intend to appear at a U.S. Consulate so we may bring it to the Court's attention.

Thank you,

Mark L. Williams
Trial Attorney
U.S. Securities and Exchange Commission
Denver Regional Office
1961 Stout St., Suite 1700, Denver, CO  80294
Phone: (303) 844-1027
Fax: (303) 297-3529

---

**From:** Iftikar Ahmed [mailto:iftyahmed@icloud.com]
**Sent:** Wednesday, September 14, 2016 6:14 PM
**To:** Heinke, Nicholas
**Cc:** Williams, Mark L; Blomgren, Elinor E (Contractor)
**Subject:** Re: RE: Scheduling Deposition in India

Thanks for your note Sir, much appreciated.    No rush from my end but will standby and wait for instructions from your end.    I shall coordinate with my Indian / US counsels once I hear from your end.  Have a wonderful weekend then.    Sincerely,  Iftikar

Please excuse typos - of course inadvertent.

On Sep 15, 2016, at 05:06 AM, "Heinke, Nicholas" <HeinkeN@SEC.GOV> wrote:

> Mr. Ahmed – Mark and I are currently tied up on other pressing matters, but expect to be back to you on your requests early next week.

Regards,

Nicholas P. Heinke
Trial Counsel
U.S. Securities & Exchange Commission
Byron G. Rogers Federal Building
1961 Stout Street, Suite 1700
Denver, CO  80294-1961
(303) 844-1071
HeinkeN@sec.gov

---

**From:** Iftikar Ahmed [mailto:iftyahmed@icloud.com]
**Sent:** Monday, September 12, 2016 9:55 AM
**To:** Williams, Mark L; Heinke, Nicholas
**Cc:** Ifty Ahmed; Blomgren, Elinor E (Contractor)
**Subject:** Re: RE: Scheduling Deposition in India

Dear Sirs:

I had sent you a couple of emails last week seeking some clarifications from your end but I am still waiting for your response.

In any event, as I had mentioned in my motions and as indicated in the Order passed by the Honorable Judge, I remain available to meet with you and your colleagues / representatives at the offices of my legal counsels in India per mutual convenience.   But you very well know the conditions of my bail.  I have sought the counsel of my Indian legal advisers and I am including herewith a letter from my legal counsel based in Hyderabad addressed to you. Please feel free to call Mr. Amritraj or email him directly if you wish to discuss or validate the letter attached herewith.   His contact details (mobile number and email address, and also his website for your reference is www.amritrajassociates.com) are included at the bottom of his email addressed to you.

I am generally free to meet with you in India at the offices of my legal counsels but I need to coordinate dates and times with them.   Also, please note that there are quite a few religious festivals in the months of Sept and Oct in India  - refer to http://www.kanchanmoni.com/durga_puja_date.htm for certain major Hindu festival dates - and it would seem that between Sept 29th to October 15th, most offices / businesses / Courts will be closed and likely my Indian counsels will also not be available.

Between **October 17th and October 28th** or **after November 1st** would be the most convenient dates according to what works for you.

Once you let me know if this deposition is for CT alone or for both CT and MA, I shall either have to coordinate dates with my NY-based counsels for the MA deposition or not.   Please confirm as soon as you can.   As soon as you let me know whether this is for CT alone or as the Honorable Judge indicated in her order, this deposition will be for both CT and MA, I shall be better positioned to confirm exact dates (given the availability and need of my NY based counsels for the MA matter or not)

Finally in terms of location, assuming I do not have stay for more than 2 days (or, 1 night), Kolkata would be preferable.  But if you need more than a couple of days and I need to stay for multiple nights,  it may be difficult for me to arrange accommodation for more than a

night in Kolkata.   Please confirm how many days you will need or I should plan for, so that I can confirm the choice of location quickly.

Thanks and I look forward to hearing from you and welcoming you to India.

Sincerely,

Iftikar

Please excuse typos - of course inadvertent.

On Sep 07, 2016, at 09:46 PM, "Williams, Mark L" <williamsml@SEC.GOV> wrote:

> Mr. Ahmed,
>
> Following up on the below email, please let us know (1) which consulate you prefer, and (2) your availability over the next five to six weeks.
>
> Thank you,
>
> Mark L. Williams
> Trial Attorney
> U.S. Securities and Exchange Commission
> Denver Regional Office
> 1961 Stout St., Suite 1700, Denver, CO  80294
> Phone: (303) 844-1027
> Fax: (303) 297-3529

**From:** Williams, Mark L
**Sent:** Friday, September 02, 2016 2:58 PM
**To:** 'Iftikar Ahmed'
**Cc:** Heinke, Nicholas; Blomgren, Elinor E (Contractor)
**Subject:**

Mr. Ahmed,

Please find the attached Court Order that was issued earlier today.  Per the Court Order, we intend to notice your in-person deposition for either the U.S. Consulate in Hyderabad, or the U.S. Consulate in Kolkata.

Please let us know (1) which consulate you prefer, and (2) your availability over the next five to six weeks.

Thank you,

Mark L. Williams
Trial Attorney
U.S. Securities and Exchange Commission
Denver Regional Office
1961 Stout St., Suite 1700, Denver, CO  80294

EXHIBIT  3

# Letter to the SEC - please feel free to forward.

September 12, 2016 at 7:26 PM

From jaideep@amritrajassociates.com

To Ifty Ahmed

---

To:
Mr. Mark L. Williams
U.S. Securities and Exchange Commission
Denver Regional Office
1961 Stout St., Suite 1700
Denver, CO  80294
USA

Dated:  12th of September 2016

Subject:  **Deposition of Iftikar A. Ahmed**

Dear Mr. Williams:

I am a legal counsel representing Mr. Iftikar A. Ahmed in his legal matters in India.

I understand that you wish to visit India to take his deposition on the civil matter(s) in front of the US courts, even likely in Hyderabad where I am based.

As you are aware, Mr. Ahmed is currently out on bail and the conditions of release clearly state that he "shall not leave the territorial jurisdiction of India without the permission of (the) Court".    Hence, your request to depose him in a US Consulate / Embassy would be in direct violation of his conditions of bail. Showing up at a foreign Consulate / Embassy will have severe legal ramifications for him as any foreign Consulate / Embassy is outside the territorial jurisdiction of India as per the Vienna Convention on Diplomatic Relations of 1961 and local police cannot enter such premises without the invitation of the guest country to implement any orders of the Indian Courts.

It is, therefore, inadvisable for Mr. Ahmed to enter any foreign Embassy / Consulate while he is out on bail in India at this time.

We would be happy to arrange for a safe and private meeting room for you to depose Mr. Ahmed as and when you wish to visit India for his deposition per mutual convenience, be it in Hyderabad or in Kolkata. Please feel free to call me if you have any questions.

Thanks and regards,

Jaideep Amritraj, Esq.
www.amritrajassociates.com
+91-900-010-0300
jaideep@amritrajassociates.com

EXHIBIT   4

# DISCOVER DIPLOMACY
## DIPLOMACY 101

### PLACES
Find out about places around the world where the U.S. engages in diplomacy.

## WHAT IS A U.S. EMBASSY?



Inside the U.S. Embassy in Pretoria, South Africa.
(© Elizabeth Gill Lui)

**Originally** , an embassy referred to an ambassador and staff who were sent to represent and advance the interests of their country with another country's government,

Today, an embassy is the nerve center for a country's diplomatic affairs within the borders of another nation, serving as the headquarters of the chief of mission, staff and other agencies. An embassy is usually located in the capital city of a foreign nation; there may also be consulates located in provincial or regional cities.

U.S. embassies and consulates abroad, as well as foreign embassies and consulates in the United States, have a special status. While diplomatic spaces remain the territory of the host state, an embassy or consulate represents a sovereign state. International rules do not allow representatives of the host country to enter an embassy without permission --even to put out a fire -- and designate an attack on an embassy as an attack on the country it represents.

Within the embassy, the ambassador is supported by a deputy chief of mission, Foreign Service Officers and Specialists who perform the full range of mission activities, and representatives of many other U.S. agencies, such as USAID and the Departments of Defense, Commerce, Justice and Agriculture among others. The staffs of all of these agencies report to the ambassador.

Consulates, headed by a Consul General who reports to the Ambassador, carry out many of the same functions in provincial or regional capitals that the embassies do in national capitals.

Besides the more obvious functions of issuing visas and assisting American citizens abroad, Embassy and consulate staff interact with host governments, local business and nongovernmental organizations, the media and educational institutions, and private citizens to create positive responses to U.S. policy and the U.S. in general. Mission staff report on political and economic issues that affect bilateral relations and possibly impact the U.S. directly, help U.S. businesses to find partners and customers, and sponsor American scientists, scholars, and artists to promote professional, educational and cultural exchanges.

Since American officers normally are only assigned to a foreign country for a few years, it is necessary to hire citizens from the host country to fill jobs at both embassies and consulates. These foreign employees are essential to the success of an embassy's mission, both for their professional skills and for the institutional memory they provide for new officers. They used to be known as Foreign Service Nationals, but are now officially called Locally Employed Staff and may include U.S. citizens who are long-time residents of the country.



Inside the U.S. Ambassador's residence Bangkok, Thailand. (© Elizabeth Gill Lui)

The main embassy building, known as the chancery, is often complemented by other buildings, that may house the consular section, an information resource center, or a conference hall, as well as the offices of other agencies. The ambassador's residence, which is used for many diplomatic and public functions, is sometimes located on the embassy compound but more often elsewhere in the city. As the public face of the United States of America in the host country, the chancery is usually architecturally impressive—either a historic building or a striking newer structure.

**READ MORE**

- What is a U.S. Mission?
- What is a U.S. Consulate?
- WHAT Other  U.S. Agencies work in a U.S. Embassy?

**RELATED RESOURCES**

- List of all U.S. Embassy Websites
- YouTube Video: A New U.S. Chancery Becomes Operational in Addis Ababa

Quote
Geography has made us neighbors. History has made us friends. Economics has made us partners, and necessity has made us allies.

- John F. Kennedy

Diplomatic Dictionary          Educator Resources          You Are a Diplomat

Disclaimer   |   Privacy Policy   |   About   |        Discover Diplomacy is a product of the U.S. Diplomacy Center at the U.S. Department of State.

http://diplomacy.state.gov/discoverdiplomacy/diplomacy101/places/170537.htm                                                                                                            2/2

EXHIBIT    5

# Vienna Convention on Diplomatic Relations
**1961**

Done at Vienna on 18 April 1961. Entered into force on 24 April 1964.
United Nations, *Treaty Series*, vol. 500, p. 95.



Copyright © United Nations
2005

**Vienna Convention on Diplomatic Relations**
**Done at Vienna on 18 April 1961**

*The States Parties to the present Convention*,

*Recalling* that peoples of all nations from ancient times have recognized the status of diplomatic agents,

*Having in mind* the purposes and principles of the Charter of the United Nations concerning the sovereign equality of States, the maintenance of international peace and security, and the promotion of friendly relations among nations,

*Believing* that an international convention on diplomatic intercourse, privileges and immunities would contribute to the development of friendly relations among nations, irrespective of their differing constitutional and social systems,

*Realizing* that the purpose of such privileges and immunities is not to benefit individuals but to ensure the efficient performance of the functions of diplomatic missions as representing States,

*Affirming* that the rules of customary international law should continue to govern questions not expressly regulated by the provisions of the present Convention,

*Have agreed* as follows:

*Article 1*

For the purpose of the present Convention, the following expressions shall have the meanings hereunder assigned to them:

(*a*)    The "head of the mission" is the person charged by the sending State with the duty of acting in that capacity;

(*b*)    The "members of the mission" are the head of the mission and the members of the staff of the mission;

(*c*)    The "members of the staff of the mission" are the members of the diplomatic staff, of the administrative and technical staff and of the service staff of the mission;

(*d*)    The "members of the diplomatic staff" are the members of the staff of the mission having diplomatic rank;

(*e*)    A "diplomatic agent" is the head of the mission or a member of the diplomatic staff of the mission;

(*f*)    The "members of the administrative and technical staff" are the members of the staff of the mission employed in the administrative and technical service of the mission;

(*g*)     The "members of the service staff" are the members of the staff of the mission in the domestic service of the mission;

(*h*)     A "private servant" is a person who is in the domestic service of a member of the mission and who is not an employee of the sending State;

(*i*)     The "premises of the mission" are the buildings or parts of buildings and the land ancillary thereto, irrespective of ownership, used for the purposes of the mission including the residence of the head of the mission.

*Article 2*

The establishment of diplomatic relations between States, and of permanent diplomatic missions, takes place by mutual consent.

*Article 3*

1. The functions of a diplomatic mission consist, inter alia, in:

(*a*)     Representing the sending State in the receiving State;

(*b*)     Protecting in the receiving State the interests of the sending State and of its nationals, within the limits permitted by international law;

(*c*)     Negotiating with the Government of the receiving State;

(*d*)     Ascertaining by all lawful means conditions and developments in the receiving State, and reporting thereon to the Government of the sending State;

(*e*)     Promoting friendly relations between the sending State and the receiving State, and developing their economic, cultural and scientific relations.

2. Nothing in the present Convention shall be construed as preventing the performance of consular functions by a diplomatic mission.

*Article 4*

1. The sending State must make certain that the *agrément* of the receiving State has been given for the person it proposes to accredit as head of the mission to that State.

2. The receiving State is not obliged to give reasons to the sending State for a refusal of *agrément*.

*Article 5*

1. The sending State may, after it has given due notification to the receiving States concerned, accredit a head of mission or assign any member of the diplomatic staff, as the case may be, to more than one State, unless there is express objection by any of the receiving States.

2. If the sending State accredits a head of mission to one or more other States it may establish a diplomatic mission headed by a chargé d'affaires ad interim in each State where the head of mission has not his permanent seat.

3. A head of mission or any member of the diplomatic staff of the mission may act as representative of the sending State to any international organization.

*Article 6*

Two or more States may accredit the same person as head of mission to another State, unless objection is offered by the receiving State.

*Article 7*

Subject to the provisions of articles 5, 8, 9 and 11, the sending State may freely appoint the members of the staff of the mission. In the case of military, naval or air attachés, the receiving State may require their names to be submitted beforehand, for its approval.

*Article 8*

1. Members of the diplomatic staff of the mission should in principle be of the nationality of the sending State.

2. Members of the diplomatic staff of the mission may not be appointed from among persons having the nationality of the receiving State, except with the consent of that State which may be withdrawn at any time.

3. The receiving State may reserve the same right with regard to nationals of a third State who are not also nationals of the sending State.

*Article 9*

1. The receiving State may at any time and without having to explain its decision, notify the sending State that the head of the mission or any member of the diplomatic staff of the mission is persona non grata or that any other member of the staff of the mission is not acceptable. In any such case, the sending State shall, as appropriate, either recall the person concerned or terminate his functions with the mission. A person may be declared non grata or not acceptable before arriving in the territory of the receiving State.

2. If the sending State refuses or fails within a reasonable period to carry out its obligations under paragraph 1 of this article, the receiving State may refuse to recognize the person concerned as a member of the mission.

*Article 10*

1. The Ministry for Foreign Affairs of the receiving State, or such other ministry as may be agreed, shall be notified of:

(*a*)    The appointment of members of the mission, their arrival and their final departure or the termination of their functions with the mission;

(*b*)    The arrival and final departure of a person belonging to the family of a member of the mission and, where appropriate, the fact that a person becomes or ceases to be a member of the family of a member of the mission;

(*c*)    The arrival and final departure of private servants in the employ of persons referred to in subparagraph (*a*) of this paragraph and, where appropriate, the fact that they are leaving the employ of such persons;

(*d*)    The engagement and discharge of persons resident in the receiving State as members of the mission or private servants entitled to privileges and immunities.

2. Where possible, prior notification of arrival and final departure shall also be given.

*Article 11*

1. In the absence of specific agreement as to the size of the mission, the receiving State may require that the size of a mission be kept within limits considered by it to be reasonable and normal, having regard to circumstances and conditions in the receiving State and to the needs of the particular mission.

2. The receiving State may equally, within similar bounds and on a non-discriminatory basis, refuse to accept officials of a particular category.

*Article 12*

The sending State may not, without the prior express consent of the receiving State, establish offices forming part of the mission in localities other than those in which the mission itself is established.

*Article 13*

1. The head of the mission is considered as having taken up his functions in the receiving State either when he has presented his credentials or when he has notified his arrival and a true copy of his credentials has been presented to the Ministry for Foreign Affairs of the receiving State, or such other

ministry as may be agreed, in accordance with the practice prevailing in the receiving State which shall be applied in a uniform manner.

2. The order of presentation of credentials or of a true copy thereof will be determined by the date and time of the arrival of the head of the mission.

*Article 14*

1. Heads of mission are divided into three classes, namely:

(*a*)    That of ambassadors or nuncios accredited to Heads of State, and other heads of mission of equivalent rank;

(*b*)    That of envoys, ministers and internuncios accredited to Heads of State;

(*c*)    That of chargés d'affaires accredited to Ministers for Foreign Affairs.

2. Except as concerns precedence and etiquette, there shall be no differentiation between heads of mission by reason of their class.

*Article 15*

The class to which the heads of their missions are to be assigned shall be agreed between States.

*Article 16*

1. Heads of mission shall take precedence in their respective classes in the order of the date and time of taking up their functions in accordance with article 13.

2. Alterations in the credentials of a head of mission not involving any change of class shall not affect his precedence.

3. This article is without prejudice to any practice accepted by the receiving State regarding the precedence of the representative of the Holy See.

*Article 17*

The precedence of the members of the diplomatic staff of the mission shall be notified by the head of the mission to the Ministry for Foreign Affairs or such other ministry as may be agreed.

*Article 18*

The procedure to be observed in each State for the reception of heads of mission shall be uniform in respect of each class.

*Article 19*

1. If the post of head of the mission is vacant, or if the head of the mission is unable to perform his functions a chargé d'affaires ad interim shall act provisionally as head of the mission. The name of the chargé d'affaires ad interim shall be notified, either by the head of the mission or, in case he is unable to do so, by the Ministry for Foreign Affairs of the sending State to the Ministry for Foreign Affairs of the receiving State or such other ministry as may be agreed.

2. In cases where no member of the diplomatic staff of the mission is present in the receiving State, a member of the administrative and technical staff may, with the consent of the receiving State, be designated by the sending State to be in charge of the current administrative affairs of the mission.

*Article 20*

The mission and its head shall have the right to use the flag and emblem of the sending State on the premises of the mission, including the residence of the head of the mission, and on his means of transport.

*Article 21*

1. The receiving State shall either facilitate the acquisition on its territory, in accordance with its laws, by the sending State of premises necessary for its mission or assist the latter in obtaining accommodation in some other way.

2. It shall also, where necessary, assist missions in obtaining suitable accommodation for their members.

*Article 22*

1. The premises of the mission shall be inviolable. The agents of the receiving State may not enter them, except with the consent of the head of the mission.

2. The receiving State is under a special duty to take all appropriate steps to protect the premises of the mission against any intrusion or damage and to prevent any disturbance of the peace of the mission or impairment of its dignity.

3. The premises of the mission, their furnishings and other property thereon and the means of transport of the mission shall be immune from search, requisition, attachment or execution.

*Article 23*

1. The sending State and the head of the mission shall be exempt from all national, regional or municipal dues and taxes in respect of the premises of the mission, whether owned or leased, other than such as represent payment for specific services rendered.

2. The exemption from taxation referred to in this article shall not apply to such dues and taxes payable under the law of the receiving State by persons contracting with the sending State or the head of the mission.

*Article 24*

The archives and documents of the mission shall be inviolable at any time and wherever they may be.

*Article 25*

The receiving State shall accord full facilities for the performance of the functions of the mission.

*Article 26*

Subject to its laws and regulations concerning zones entry into which is prohibited or regulated for reasons of national security, the receiving State shall ensure to all members of the mission freedom of movement and travel in its territory.

*Article 27*

1. The receiving State shall permit and protect free communication on the part of the mission for all official purposes. In communicating with the Government and the other missions and consulates of the sending State, wherever situated, the mission may employ all appropriate means, including diplomatic couriers and messages in code or cipher. However, the mission may install and use a wireless transmitter only with the consent of the receiving State.

2. The official correspondence of the mission shall be inviolable. Official correspondence means all correspondence relating to the mission and its functions.

3. The diplomatic bag shall not be opened or detained.

4. The packages constituting the diplomatic bag must bear visible external marks of their character and may contain only diplomatic documents or articles intended for official use.

5. The diplomatic courier, who shall be provided with an official document indicating his status and the number of packages constituting the diplomatic bag, shall be protected by the receiving State in the performance of his functions. He shall enjoy person inviolability and shall not be liable to any form of arrest or detention.

6. The sending State or the mission may designate diplomatic couriers ad hoc. In such cases the provisions of paragraph 5 of this article shall also apply, except that the immunities therein mentioned shall cease to apply when such a courier has delivered to the consignee the diplomatic bag in his charge.

7. A diplomatic bag may be entrusted to the captain of a commercial aircraft scheduled to land at an authorized port of entry. He shall be provided with an official document indicating the number of

packages constituting the bag but he shall not be considered to be a diplomatic courier. The mission may send one of its members to take possession of the diplomatic bag directly and freely from the captain of the aircraft.

*Article 28*

The fees and charges levied by the mission in the course of its official duties shall be exempt from all dues and taxes.

*Article 29*

The person of a diplomatic agent shall be inviolable. He shall not be liable to any form of arrest or detention. The receiving State shall treat him with due respect and shall take all appropriate steps to prevent any attack on his person, freedom or dignity.

*Article 30*

1. The private residence of a diplomatic agent shall enjoy the same inviolability and protection as the premises of the mission.

2. His papers, correspondence and, except as provided in paragraph 3 of article 31, his property, shall likewise enjoy inviolability.

*Article 31*

1. A diplomatic agent shall enjoy immunity from the criminal jurisdiction of the receiving State. He shall also enjoy immunity from its civil and administrative jurisdiction, except in the case of:

(*a*)    A real action relating to private immovable property situated in the territory of the receiving State, unless he holds it on behalf of the sending State for the purposes of the mission;

(*b*)    An action relating to succession in which the diplomatic agent is involved as executor, administrator, heir or legatee as a private person and not on behalf of the sending State;

(*c*)    An action relating to any professional or commercial activity exercised by the diplomatic agent in the receiving State outside his official functions.

2. A diplomatic agent is not obliged to give evidence as a witness.

3. No measures of execution may be taken in respect of a diplomatic agent except in the cases coming under subparagraphs (*a*), (*b*) and (*c*) of paragraph 1 of this article, and provided that the measures concerned can be taken without infringing the inviolability of his person or of his residence.

4. The immunity of a diplomatic agent from the jurisdiction of the receiving State does not exempt him from the jurisdiction of the sending State.

*Article 32*

1. The immunity from jurisdiction of diplomatic agents and of persons enjoying immunity under article 37 may be waived by the sending State.

2. Waiver must always be express.

3. The initiation of proceedings by a diplomatic agent or by a person enjoying immunity from jurisdiction under article 37 shall preclude him from invoking immunity from jurisdiction in respect of any counterclaim directly connected with the principal claim.

4. Waiver of immunity from jurisdiction in respect of civil or administrative proceedings shall not be held to imply waiver of immunity in respect of the execution of the judgement, for which a separate waiver shall be necessary.

*Article 33*

1. Subject to the provisions of paragraph 3 of this article, a diplomatic agent shall with respect to services rendered for the sending State be exempt from social security provisions which may be in force in the receiving State.

2. The exemption provided for in paragraph 1 of this article shall also apply to private servants who are in the sole employ of a diplomatic agent, on condition:

(*a*)    That they are not nationals of or permanently resident in the receiving State; and

(*b*)    That they are covered by the social security provisions which may be in force in the sending State or a third State.

3. A diplomatic agent who employs persons to whom the exemption provided for in paragraph 2 of this article does not apply shall observe the obligations which the social security provisions of the receiving State impose upon employers.

4. The exemption provided for in paragraphs 1 and 2 of this article shall not preclude voluntary participation in the social security system of the receiving State provided that such participation is permitted by that State.

5. The provisions of this article shall not affect bilateral or multilateral agreements concerning social security concluded previously and shall not prevent the conclusion of such agreements in the future.

*Article 34*

A diplomatic agent shall be exempt from all dues and taxes, personal or real, national, regional or municipal, except:

(*a*)    Indirect taxes of a kind which are normally incorporated in the price of goods or services;

(*b*)    Dues and taxes on private immovable property situated in the territory of the receiving State, unless he holds it on behalf of the sending State for the purposes of the mission;

(*c*)    Estate, succession or inheritance duties levied by the receiving State, subject to the provisions of paragraph 4 of article 39;

(*d*)    Dues and taxes on private income having its source in the receiving State and capital taxes on investments made in commercial undertakings in the receiving State;

(*e*)    Charges levied for specific services rendered;

(*f*)    Registration, court or record fees, mortgage dues and stamp duty, with respect to immovable property, subject to the provisions of article 23.

*Article 35*

The receiving State shall exempt diplomatic agents from all personal services, from all public service of any kind whatsoever, and from military obligations such as those connected with requisitioning, military contributions and billeting.

*Article 36*

1. The receiving State shall, in accordance with such laws and regulations as it may adopt, permit entry of and grant exemption from all customs duties, taxes, and related charges other than charges for storage, cartage and similar services, on:

(*a*)    Articles for the official use of the mission;

(*b*)    Articles for the personal use of a diplomatic agent or members of his family forming part of his household, including articles intended for his establishment.

2. The personal baggage of a diplomatic agent shall be exempt from inspection, unless there are serious grounds for presuming that it contains articles not covered by the exemptions mentioned in paragraph 1 of this article, or articles the import or export of which is prohibited by the law or controlled by the quarantine regulations of the receiving State. Such inspection shall be conducted only in the presence of the diplomatic agent or of his authorized representative.

*Article 37*

1. The members of the family of a diplomatic agent forming part of his household shall, if they are not nationals of the receiving State, enjoy the privileges and immunities specified in articles 29 to 36.

2. Members of the administrative and technical staff of the mission, together with members of their families forming part of their respective households, shall, if they are not nationals of or

11

permanently resident in the receiving State, enjoy the privileges and immunities specified in articles 29 to 35, except that the immunity from civil and administrative jurisdiction of the receiving State specified in paragraph 1 of article 31 shall not extend to acts performed outside the course of their duties. They shall also enjoy the privileges specified in article 36, paragraph 1, in respect of articles imported at the time of first installation.

3. Members of the service staff of the mission who are not nationals of or permanently resident in the receiving State shall enjoy immunity in respect of acts performed in the course of their duties, exemption from dues and taxes on the emoluments they receive by reason of their employment and the exemption contained in article 33.

4. Private servants of members of the mission shall, if they are not nationals of or permanently resident in the receiving State, be exempt from dues and taxes on the emoluments they receive by reason of their employment. In other respects, they may enjoy privileges and immunities only to the extent admitted by the receiving State. However, the receiving State must exercise its jurisdiction over those persons in such a manner as not to interfere unduly with the performance of the functions of the mission.

*Article 38*

1. Except insofar as additional privileges and immunities may be granted by the receiving State, a diplomatic agent who is a national of or permanently resident in that State shall enjoy only immunity from jurisdiction, and inviolability, in respect of official acts performed in the exercise of his functions.

2. Other members of the staff of the mission and private servants who are nationals of or permanently resident in the receiving State shall enjoy privileges and immunities only to the extent admitted by the receiving State. However, the receiving State must exercise its jurisdiction over those persons in such a manner as not to interfere unduly with the performance of the functions of the mission.

*Article 39*

1. Every person entitled to privileges and immunities shall enjoy them from the moment he enters the territory of the receiving State on proceeding to take up his post or, if already in its territory, from the moment when his appointment is notified to the Ministry for Foreign Affairs or such other ministry as may be agreed.

2. When the functions of a person enjoying privileges and immunities have come to an end, such privileges and immunities shall normally cease at the moment when he leaves the country, or on expiry of a reasonable period in which to do so, but shall subsist until that time, even in case of armed conflict. However, with respect to acts performed by such a person in the exercise of his functions as a member of the mission, immunity shall continue to subsist.

3. In case of the death of a member of the mission, the members of his family shall continue to enjoy the privileges and immunities to which they are entitled until the expiry of a reasonable period in which to leave the country.

4. In the event of the death of a member of the mission not a national of or permanently resident in the receiving State or a member of his family forming part of his household, the receiving State shall permit the withdrawal of the movable property of the deceased, with the exception of any property acquired in the country the export of which was prohibited at the time of his death. Estate, succession and inheritance duties shall not be levied on movable property the presence of which in the receiving State was due solely to the presence there of the deceased as a member of the mission or as a member of the family of a member of the mission.

*Article 40*

1. If a diplomatic agent passes through or is in the territory of a third State, which has granted him a passport visa if such visa was necessary, while proceeding to take up or to return to his post, or when returning to his own country, the third State shall accord him inviolability and such other immunities as may be required to ensure his transit or return. The same shall apply in the case of any members of his family enjoying privileges or immunities who are accompanying the diplomatic agent, or travelling separately to join him or to return to their country.

2. In circumstances similar to those specified in paragraph 1 of this article, third States shall not hinder the passage of members of the administrative and technical or service staff of a mission, and of members of their families, through their territories.

3. Third States shall accord to official correspondence and other official communications in transit, including messages in code or cipher, the same freedom and protection as is accorded by the receiving State. They shall accord to diplomatic couriers, who have been granted a passport visa if such visa was necessary, and diplomatic bags in transit, the same inviolability and protection as the receiving State is bound to accord.

4. The obligations of third States under paragraphs 1, 2 and 3 of this article shall also apply to the persons mentioned respectively in those paragraphs, and to official communications and diplomatic bags, whose presence in the territory of the third State is due to force majeure.

*Article 41*

1. Without prejudice to their privileges and immunities, it is the duty of all persons enjoying such privileges and immunities to respect the laws and regulations of the receiving State. They also have a duty not to interfere in the internal affairs of that State.

2. All official business with the receiving State entrusted to the mission by the sending State shall be conducted with or through the Ministry for Foreign Affairs of the receiving State or such other ministry as may be agreed.

3. The premises of the mission must not be used in any manner incompatible with the functions of the mission as laid down in the present Convention or by other rules of general international law or by any special agreements in force between the sending and the receiving State.

*Article 42*

A diplomatic agent shall not in the receiving State practise for personal profit any professional or commercial activity.

*Article 43*

The function of a diplomatic agent comes to an end, inter alia:

(*a*)    On notification by the sending State to the receiving State that the function of the diplomatic agent has come to an end;

(*b*)    On notification by the receiving State to the sending State that, in accordance with paragraph 2 of article 9, it refuses to recognize the diplomatic agent as a member of the mission.

*Article 44*

The receiving State must, even in case of armed conflict, grant facilities in order to enable persons enjoying privileges and immunities, other than nationals of the receiving State, and members of the families of such persons irrespective of their nationality, to leave at the earliest possible moment. It must, in particular, in case of need, place at their disposal the necessary means of transport for themselves and their property.

*Article 45*

If diplomatic relations are broken off between two States, or if a mission is permanently or temporarily recalled:

(*a*)    The receiving State must, even in case of armed conflict, respect and protect the premises of the mission, together with its property and archives;

(*b*)    The sending State may entrust the custody of the premises of the mission, together with its property and archives, to a third State acceptable to the receiving State;

(*c*)    The sending State may entrust the protection of its interests and those of its nationals to a third State acceptable to the receiving State.

*Article 46*

A sending State may with the prior consent of a receiving State, and at the request of a third State not represented in the receiving State, undertake the temporary protection of the interests of the third State and of its nationals.

14

*Article 47*

1.In the application of the provisions of the present Convention, the receiving State shall not discriminate as between States.

2.However, discrimination shall not be regarded as taking place:

(*a*)    Where the receiving State applies any of the provisions of the present Convention restrictively because of a restrictive application of that provision to its mission in the sending State;

(*b*)    Where by custom or agreement States extend to each other more favourable treatment than is required by the provisions of the present Convention.

*Article 48*

The present Convention shall be open for signature by all States Members of the United Nations or of any of the specialized agencies Parties to the Statute of the International Court of Justice, and by any other State invited by the General Assembly of the United Nations to become a Party to the Convention, as follows: until 31 October 1961 at the Federal Ministry for Foreign Affairs of Austria and subsequently, until 31 March 1962, at the United Nations Headquarters in New York.

*Article 49*

The present Convention is subject to ratification. The instruments of ratification shall be deposited with the Secretary-General of the United Nations.

*Article 50*

The present Convention shall remain open for accession by any State belonging to any of the four categories mentioned in article 48. The instruments of accession shall be deposited with the Secretary-General of the United Nations.

*Article 51*

1.The present Convention shall enter into force on the thirtieth day following the date of deposit of the twenty-second instrument of ratification or accession with the Secretary-General of the United Nations.

2.For each State ratifying or acceding to the Convention after the deposit of the twenty-second instrument of ratification or accession, the Convention shall enter into force on the thirtieth day after deposit by such State of its instrument of ratification or accession.

*Article 52*

The Secretary-General of the United Nations shall inform all States belonging to any of the four categories mentioned in article 48:

(*a*)    Of signatures to the present Convention and of the deposit of instruments of ratification or accession, in accordance with articles 48, 49 and 50;

(*b*)    Of the date on which the present Convention will enter into force, in accordance with article 51.

*Article 53*

The original of the present Convention, of which the Chinese, English, French, Russian and Spanish texts are equally authentic, shall be deposited with the Secretary-General of the United Nations, who shall send certified copies thereof to all States belonging to any of the four categories mentioned in article 48.

IN WITNESS WHEREOF the undersigned Plenipotentiaries, being duly authorized thereto by their respective Governments, have signed the present Convention.

DONE at Vienna this eighteenth day of April one thousand nine hundred and sixty-one.

_____

16