1           UNITED STATES DISTRICT COURT

2              DISTRICT OF CONNECTICUT


3      --------------------------- x
4   UNITED STATES SECURITIES      :
    AND EXCHANGE COMMISSION        :CASE NO.
5                                  :3:15-CV-675 (JBA)
         -versus-                  :
6                                  :
    AHMED, ET AL                   :July 23, 2015
7                                  :10:00 a.m.
       --------------------------- xNew Haven, CT
8

9

10

     B E F O R E:   THE HONORABLE JANET BOND ARTERTON
11

12

13

14  A P P E A R A N C E S:

15

16  FOR THE SEC:          NICHOLAS PETER HEINKE
                          MARK LANDER WILLIAMS
17                        U.S. SECURITIES AND EXCHANGE
                          COMMISSION - CO
18                        1961 Stout Street, Sutie 1700
                          Denver, CO  80294
19                        Heinken@sec.gov
                          Williamsml@sec.gov
20                        (303) 844-1000

21                        JOHN B. HUGHES
                          U.S. ATTORNEY'S OFFICE - NH
22                        157 Church Street, 25th Floor
                          New Haven, CT  06510
23                        John.hughes@usdoj.gov
                          (203) 821-3802

24

25

```
 1  FOR THE DEFENDANTS
    SHALINI AHMED, DIYA
 2  HOLDINGS, LLC,
    DIYA REAL HOLDINGS,
 3  LLC,I-CUBED DOMAINS,
    LLC,ET AL:            DAVID B. DEITCH
 4                        JONATHAN HARRIS
                          L. REID SKIBELL
 5                        HARRIS, O'BRIEN, ST. LAURENT &
                          CHAUDHRY, LLP
 6                        111 Broadway, Suite 1502
                          New York, NY  10006
 7                        Ddeitch@harrisobrien.com
                          Jon@harrisobrien.com
 8                        Rskibell@harrisobrien.com
                          (212)397-3370
 9

10                        PAUL E. KNAG
                          MURTHA CULLINA, LLP - STMFD
11                        177 Broad Street, 4th Floor
                          Stamford, CT  06901
12                        Pknag@murthalaw.com
                          (203) 653-5400
13

14

15

16

17

18

19

20

21  Court Reporter:       Julia Cashman, RPR, LSR
                          141 Church Street
22                        New Haven, Connecticut

23

24

25
```

09:59:37

| | | |
|---|---|---|
| 09:59:37 | 1 | THE COURT:  All right, please be |
| 10:06:30 | 2 | seated, counsel.  I'm very sorry for the delay. |
| 10:06:35 | 3 | I had scheduled a very short proceeding, that, |
| 10:06:40 | 4 | as you saw, was not short.  All right.  We're |
| 10:06:49 | 5 | here in SEC versus Iftikar Ahmed and the relief |
| 10:06:56 | 6 | defendants, 15 CV 675.  We are here on the SEC |
| 10:07:07 | 7 | motion for preliminary injunction with respect |
| 10:07:12 | 8 | to the continued asset freeze order.  May I have |
| 10:07:18 | 9 | appearances, please. |
| 10:07:22 | 10 | MR. HEINKE:  Your Honor, for the |
| 10:07:23 | 11 | Commission, Nick Heinke.  With me is Mark |
| 10:07:27 | 12 | Williams.  And at counsel table with us is Jeff |
| 10:07:29 | 13 | Oraker, who's the investigative counsel in this |
| 10:07:31 | 14 | case.  Also hear is John Hughes from the US |
| 10:07:34 | 15 | Attorney's Office, your Honor. |
| 10:07:36 | 16 | THE COURT:  Good morning.  And then |
| 10:07:38 | 17 | for relief defendants, Shalini Ahmed? |
| 10:07:46 | 18 | MR. KNAG:  Your Honor, I'm Paul Knag. |
| 10:07:48 | 19 | I'm with Murtha Cullina.  And with me here is |
| 10:07:52 | 20 | lead counsel Jonathan Harris, from the Harris, |
| 10:07:58 | 21 | O'Brien, St. Laurent & Chaudhry firm.  Jonathan |
| 10:08:00 | 22 | will introduce the others on our team. |
| 10:08:02 | 23 | THE COURT:  Thank you. |
| 10:08:02 | 24 | MR. HARRIS:  Good morning your Honor, |
| 10:08:04 | 25 | this is Ms. Shalini Ahmed, and we are here -- |

| | | |
|---|---|---|
| 10:08:07 | 1 | she is here on her own behalf, on behalf of her |
| 10:08:11 | 2 | three minor children, DIYA Holdings, DIYA Real, |
| 10:08:18 | 3 | I-Cubed, and there's a Shalini Ahmed 2014 trust. |
| 10:08:24 | 4 | And those are the relief defendants appearing |
| 10:08:27 | 5 | today. |
| 10:08:27 | 6 | THE COURT:  When you say that she is |
| 10:08:29 | 7 | here on her own behalf, you represent her, |
| 10:08:31 | 8 | though? |
| 10:08:31 | 9 | MR. HARRIS:  I do, your Honor.  I was |
| 10:08:32 | 10 | just saying, it's not all the relief defendants, |
| 10:08:35 | 11 | your Honor.  I was just trying to draw a |
| 10:08:39 | 12 | distinction, there are one or two relief |
| 10:08:41 | 13 | defendants who have not appeared. |
| 10:08:42 | 14 | THE COURT:  Okay. |
| 10:08:43 | 15 | MR. HARRIS:  And with me are my |
| 10:08:44 | 16 | colleagues David Deitch and Reid Skibell, both |
| 10:08:48 | 17 | of whom will be speaking today, your Honor. |
| 10:08:59 | 18 | THE COURT:  All right, then.  The SEC |
| 10:09:08 | 19 | has filed a notice of dissipation of assets with |
| 10:09:14 | 20 | respect to that Barclays account.  The relief |
| 10:09:18 | 21 | defendants have raised an issue as to Oak's |
| 10:09:24 | 22 | treatment of a twenty-three million dollar |
| 10:09:30 | 23 | portion of Mr. Ahmed's partnership account.  Do |
| 10:09:36 | 24 | you want to take up those issues first, or last? |
| 10:09:42 | 25 | Do you want to just proceed with your evidence? |

| | |
|---|---|
| 10:09:49 | 1 | Do you want to make each a statement as to what |
| 10:09:54 | 2 | you hope to accomplish here today? |
| 10:09:56 | 3 | MR. WILLIAMS:  Yes, your Honor.  Mark |
| 10:09:58 | 4 | Williams on behalf of the SEC.  We will be |
| 10:10:01 | 5 | touching on the -- the commission requests to |
| 10:10:03 | 6 | makes an opening statement.  I think it will |
| 10:10:06 | 7 | take about 15 minutes.  It's designed to narrow |
| 10:10:08 | 8 | the issues and ultimately I think save time |
| 10:10:11 | 9 | overall so the Court can have a better |
| 10:10:13 | 10 | understanding of what the individuals will |
| 10:10:14 | 11 | testify to who we'll call at the stand.  In that |
| 10:10:17 | 12 | opening statement, I do plan to address the, for |
| 10:10:20 | 13 | lack of a better term, allegation that was made |
| 10:10:23 | 14 | against Oak.  The Commission has no reason to |
| 10:10:27 | 15 | believe that there was any dissipation on Oak's |
| 10:10:29 | 16 | part, and I'll explain that.  As to whether we |
| 10:10:32 | 17 | take up our notice first or last, the commission |
| 10:10:35 | 18 | has no preference either way.  And whatever the |
| 10:10:39 | 19 | Court would prefer, we will ^ be ^ been prepared |
| 10:10:41 | 20 | to. |
| 10:10:41 | 21 | THE COURT:  Why don't we take it up |
| 10:10:43 | 22 | later, then, given that you indicate that the |
| 10:10:49 | 23 | subject may be touched on.  All right, Mr. |
| 10:10:53 | 24 | Harris, are you also going to make an opening |
| 10:10:58 | 25 | statement with respect to what you intend to do |

```
10:11:00   1   here today?
10:11:01   2          MR. HARRIS:  Yes, your Honor.  Mr.
10:11:03   3   Skibell will be making that for us.
10:11:05   4          THE COURT:  Very good.  All right,
10:11:07   5   then, why don't we just begin.  Mr. Williams?
10:11:12   6          MR. WILLIAMS:  Thank you, your Honor.
10:11:22   7   Your Honor, I have a few documents that I do
10:11:24   8   intend to use.  I think it's about five or six
10:11:27   9   in number.  I have a copy for your Honor, if I
10:11:29  10   may hand them up.
10:11:30  11          THE COURT:  Are you interested in
10:11:31  12   using our new technology?
10:11:34  13          MR. WILLIAMS:  Yes, I believe we had
10:11:36  14   actually -- someone had stated there would be --
10:11:38  15          THE COURT:  There is a drawer to your
10:11:40  16   right, that if you pull that out, voila.
10:11:58  17          MR. WILLIAMS:  Would your Honor also
10:12:00  18   like a hard copy?
10:12:01  19          THE COURT:  Certainly.
10:12:21  20          MR. WILLIAMS:  To deal with the
10:12:24  21   technology first, at least my screen, it has the
10:12:26  22   seal.  But I don't see that it's transmitting
10:12:28  23   the image from the ELMO.
10:13:47  24          (DISCUSSION HELD OFF THE RECORD.)
10:13:47  25          THE COURT:  Let's proceed in paper
```

10:13:50  1   until the staff on whom the world now turns,

10:13:53  2   that is, the IT staff, arrive.

10:13:57  3           MR. WILLIAMS:  It wouldn't be

10:13:59  4   technology if it always worked.  For the record,

10:14:02  5   I have handed -- I previously handed defense

10:14:05  6   counsel the same docket that I handed your

10:14:08  7   Honor, so all parties should have a paper copy.

10:14:14  8           Your Honor, as stated in our brief,

10:14:16  9   the Commission is asking for a preliminary asset

10:14:20  10  freeze as to defendant Iftikar Ahmed, as well as

10:14:23  11  all the named defendants, in the amount of one

10:14:27  12  hundred eighteen million two hundred forty-six

10:14:30  13  thousand one hundred eighty-seven dollars and

10:14:34  14  thirteen cents.  Now that figure is comprised of

10:14:36  15  three things.  First, the disgorgement, the

10:14:39  16  money that's going to be used to repay the

10:14:42  17  victims of Mr. Iftikar Ahmed's crimes.  Second,

10:14:45  18  the interest on that money.  As this Court is

10:14:47  19  likely aware from the filings, the fraud

10:14:51  20  occurred sometime in around late 2004-2005.  So

10:14:54  21  here we are ten years later.  Of course, the

10:14:57  22  numbers of the amount of money he stole was very

10:14:59  23  large.  There's of course quite a bit of

10:15:02  24  interest.  The third thing, of course, are

10:15:05  25  penalties; the penalties associated with the

10:15:08  1   crimes, or the violations of the federal

10:15:10  2   security laws that Mr. Iftikar Ahmed committed.

10:15:17  3            At the end of the day, on the other

10:15:19  4   side, we submit that Mrs. Ahmed is essentially

10:15:24  5   asking this Court to release certain funds and

10:15:27  6   assets to her.  However, the Commission submits

10:15:33  7   these funds, these assets, do not belong to her

10:15:36  8   and they never did.  This Court, the Commission

10:15:43  9   urges, should not take money from victims and

10:15:46  10  give them to defendant Iftikar Ahmed's wife.

10:15:50  11  Although we may owe her sympathy, the victims do

10:15:54  12  not owe her any money.  She is not owed any

10:15:57  13  money.

10:15:59  14            Now, this is a unique case.  First,

10:16:04  15  there's no dispute, at least at this point, that

10:16:07  16  fraud occurred.  The SEC alleges that Iftikar

10:16:11  17  Ahmed defrauded his former employer, Oak, and

10:16:15  18  its investors, and we submit that there has been

10:16:19  19  overwhelming evidence submitted to prove that.

10:16:22  20  That has been largely, if not entirely,

10:16:25  21  un-rebutted.  Of course, Oak Management Corp.

10:16:33  22  does not deny that they were defrauded by

10:16:35  23  Iftikar Ahmed.  Iftikar Ahmed does not even

10:16:38  24  deny, at least to this point, that he defrauded

10:16:41  25  Oak and its investors.  And again, at least to

| | | |
|---|---|---|
| 10:16:44 | 1 | this point, the relief defendants do not deny |
| 10:16:47 | 2 | that Iftikar Ahmed defrauded Oak and its |
| 10:16:49 | 3 | investors.  Second, it's not the defendant |
| 10:16:55 | 4 | seeking money in this case.  The defendant is |
| 10:16:57 | 5 | not seeking a carve-out.  Rather, it's a third |
| 10:17:01 | 6 | party relief defendant. |
| 10:17:05 | 7 | Now, many, if not all, of the cases |
| 10:17:08 | 8 | that Ms. Ahmed cited in her prehearing brief |
| 10:17:13 | 9 | reference cases where defendant denied the |
| 10:17:15 | 10 | allegations, and sought money so he could live |
| 10:17:19 | 11 | and defend against the allegations.  The |
| 10:17:23 | 12 | Commission is not aware of any case where a |
| 10:17:25 | 13 | defendant admits that the money in dispute is |
| 10:17:31 | 14 | stolen, proceeds of fraud, and is then allowed |
| 10:17:34 | 15 | by the Court to consume those funds.  And we |
| 10:17:37 | 16 | submit that wouldn't make much sense.  As the |
| 10:17:45 | 17 | Seventh Circuit aptly stated, and I won't quote, |
| 10:17:47 | 18 | but as a bank robber cannot use the money he |
| 10:17:50 | 19 | steals for an attorney, neither can a securities |
| 10:17:54 | 20 | fraud swindler use money for an attorney.  And |
| 10:17:57 | 21 | that was said in the context of, you know, when |
| 10:17:59 | 22 | there's overwhelming evidence before conviction. |
| 10:18:04 | 23 | Here again, no one is disputing this fraud |
| 10:18:07 | 24 | occurred.  No one is disputing this money is |
| 10:18:10 | 25 | dirty.  Third, this case is unique in that this |

| | | |
|---|---|---|
| 10:18:15 | 1 | is not a victimless crime.  This is not insider |
| 10:18:20 | 2 | trading.  This was not fraud on the market. |
| 10:18:22 | 3 | This was theft.  And there are very real victims |
| 10:18:26 | 4 | who lost very real money.  And we submit a lot |
| 10:18:29 | 5 | of it.  And the money that Mr. Iftikar Ahmed |
| 10:18:34 | 6 | stole from them, belongs to them, and nobody |
| 10:18:36 | 7 | else. |
| 10:18:39 | 8 | Now, the Commission asks this Court |
| 10:18:41 | 9 | to recognize these unique facts when it |
| 10:18:44 | 10 | ultimately hands down its ruling.  And in four |
| 10:18:48 | 11 | points, first, nobody disputes that Iftikar |
| 10:18:52 | 12 | Ahmed committed a massive fraud on Oak and its |
| 10:18:54 | 13 | investors.  The Commission alleges it's |
| 10:18:58 | 14 | sixty-five million.  Relief defendants, at least |
| 10:18:59 | 15 | in their brief, I think say it's closer to |
| 10:19:01 | 16 | fifty-eight million.  Either way, there's no |
| 10:19:03 | 17 | dispute, a massive fraud occurred.  Second, the |
| 10:19:07 | 18 | defendant is not contesting the allegations. |
| 10:19:09 | 19 | He's not seeking to dissipate any of the funds |
| 10:19:11 | 20 | in order to litigate these allegations.  Rather, |
| 10:19:14 | 21 | it's the relief defendant, who never owned this |
| 10:19:18 | 22 | money, who never controlled this money, who has |
| 10:19:20 | 23 | no right to this money.  And third, as I stated, |
| 10:19:25 | 24 | the victims are very real.  They want their |
| 10:19:27 | 25 | money back, they desire to get their money back, |

10:19:31  1   because the money belongs to them.  Fourth, this

10:19:34  2   is a preliminary injunction.  And I think that's

10:19:37  3   important to keep in mind.  The Commission is

10:19:39  4   not seeking to forfeit funds today.  The

10:19:43  5   Commission is not seeking a final judgment

10:19:46  6   today.  Rather, at this preliminary juncture,

10:19:48  7   we're asking only that the funds are preserved.

10:19:53  8            Now, turning to the facts of this

10:19:55  9   case, because the Court is likely familiar, at

10:19:58  10  least with the basics of Mr. Iftikar Ahmed's

10:20:01  11  fraud, I'll just go over it very generally.

10:20:07  12  Iftikar Ahmed worked at Oak Management Corp.

10:20:12  13  Oak is a venture capital firm that, not

10:20:14  14  surprisingly, uses investor money to invest in

10:20:19  15  companies hoping to return a profit for their

10:20:22  16  investors and for their employees.  Now, very

10:20:24  17  generally, defendant Ahmed opened bank accounts

10:20:28  18  in the name of Oak, and in the name of companies

10:20:31  19  that Oak was investing in.  And through

10:20:33  20  fraudulent documentation, false representations,

10:20:38  21  the defendant induced Oak and those companies

10:20:40  22  invested in, to transfer money into those bank

10:20:43  23  accounts that Ahmed controlled, unbeknownst to

10:20:46  24  anybody except -- or at least unbeknownst to Oak

10:20:50  25  and those companies.  Defendant Ahmed then

| | | |
|---|---|---|
| 10:20:54 | 1 | transferred the money from those accounts, into |
| 10:20:57 | 2 | accounts he held jointly with his wife, as well |
| 10:21:01 | 3 | as most of it, or much of it, if not most of it, |
| 10:21:04 | 4 | into accounts in solely his wife's name, Mrs. |
| 10:21:08 | 5 | Ahmed. |
| 10:21:11 | 6 | And turning to the first page, and |
| 10:21:15 | 7 | this is just a demonstrative, your Honor, to |
| 10:21:18 | 8 | really show exactly how it worked.  And if this |
| 10:21:22 | 9 | Court recalls, at least one of the frauds that |
| 10:21:25 | 10 | defendants Ahmed committed was Oak invested two |
| 10:21:29 | 11 | million into a company.  Oak -- Mr. Ahmed stated |
| 10:21:34 | 12 | it was twenty million.  And what he did is, you |
| 10:21:38 | 13 | can see on the left side, two million in fact |
| 10:21:41 | 14 | went into the company.  The other eighteen |
| 10:21:43 | 15 | million went into a bank account that Iftikar |
| 10:21:46 | 16 | Ahmed controlled, again, unbeknownst to Oak.  He |
| 10:21:50 | 17 | then transferred that eighteen million into a |
| 10:21:52 | 18 | joint checking account that he held jointly with |
| 10:21:56 | 19 | his wife.  And this is just earlier this year, |
| 10:21:59 | 20 | your Honor.  This is in January of this year. |
| 10:22:02 | 21 | Mr. Ahmed then wrote an eighteen million dollar |
| 10:22:05 | 22 | check to his wife.  And this is, the Government |
| 10:22:09 | 23 | submits, the same eighteen million that he stole |
| 10:22:12 | 24 | from Oak.  His wife then deposited the check |
| 10:22:15 | 25 | into an account that she held in only her name. |

| | | |
|---|---|---|
| 10:22:18 | 1 | Now, if your Honor read her |
| 10:22:21 | 2 | deposition, or I believe it was quoted in the |
| 10:22:23 | 3 | prehearing brief, she denies having any memory |
| 10:22:25 | 4 | of this eighteen million dollar check.  She |
| 10:22:27 | 5 | acknowledged it was her signature, but says she |
| 10:22:32 | 6 | simply doesn't remember this.  The money, twelve |
| 10:22:34 | 7 | million of that money is frozen; a little bit |
| 10:22:37 | 8 | more than twelve million.  And even though that |
| 10:22:40 | 9 | account is in her name, this is dirty money, |
| 10:22:42 | 10 | this is Iftikar Ahmed's money, and we submit it |
| 10:22:44 | 11 | was put in that account to protect it, and to |
| 10:22:48 | 12 | obfuscate his fraud.  Some of that money was |
| 10:22:52 | 13 | then transferred and used to purchase a Park |
| 10:22:55 | 14 | Avenue apartment for a little bit more than |
| 10:22:59 | 15 | eight million dollars.  And that's held in DIYA |
| 10:23:04 | 16 | Real Holdings.  Again, DIYA Real Holdings is an |
| 10:23:07 | 17 | entity.  Mrs. Ahmed is the -- controls that |
| 10:23:11 | 18 | entity, at least on paper.  Again, this was just |
| 10:23:14 | 19 | done to protect the funds, and to attempt to |
| 10:23:17 | 20 | conceal this fraud. |
| 10:23:21 | 21 | Now, notably, your Honor, and perhaps |
| 10:23:27 | 22 | not surprisingly, the money that Iftikar Ahmed |
| 10:23:29 | 23 | stole, at least from the tax returns we've seen, |
| 10:23:31 | 24 | never show up on the tax returns.  It's not |
| 10:23:34 | 25 | claimed as income.  And so while we see these |

| | | |
|---|---|---|
| 10:23:36 | 1 | large amounts of money moving through his and |
| 10:23:39 | 2 | his wife's accounts, joint and accounts held in |
| 10:23:42 | 3 | his wife's name, we don't see the money on the |
| 10:23:44 | 4 | tax returns.  And I do note, Mrs. Ahmed at least |
| 10:23:47 | 5 | said that she generally reviewed the tax |
| 10:23:49 | 6 | returns, albeit quickly before they were filed. |
| 10:23:53 | 7 | And that is an issue I will come back to at the |
| 10:23:56 | 8 | end. |
| 10:23:59 | 9 | So in this case, the Commission, or |
| 10:24:02 | 10 | at least at this hearing, is really in a large |
| 10:24:05 | 11 | part standing on its papers.  And that's because |
| 10:24:07 | 12 | we have submitted overwhelming evidence that is |
| 10:24:11 | 13 | largely, if not entirely, un-rebutted.  We |
| 10:24:15 | 14 | submit that we have met our burden of showing |
| 10:24:17 | 15 | either a likelihood have success on the merits, |
| 10:24:19 | 16 | or an inference that securities laws were |
| 10:24:22 | 17 | violated.  And as clear from that last chart, |
| 10:24:27 | 18 | what's really relevant here is that there was |
| 10:24:29 | 19 | large amount of money stolen and it was placed |
| 10:24:33 | 20 | in the names of nominees.  Iftikar Ahmed |
| 10:24:37 | 21 | continued to control this money.  I think the |
| 10:24:39 | 22 | Court has seen evidence in the papers, Iftikar |
| 10:24:40 | 23 | Ahmed continued to move this money himself.  His |
| 10:24:42 | 24 | name is on the checks.  We've really found very |
| 10:24:46 | 25 | little, if any evidence, indicating that Iftikar |

10:24:50  1  Ahmed didn't control every single transaction
10:24:52  2  with regards to this money, at least in some
10:24:54  3  form.
10:24:57  4          Now, there's really two issues that
10:24:59  5  the relief defendant -- or at least two issues
10:25:02  6  I'm going to focus on, that the relief defendant
10:25:05  7  puts at issue in her brief.  First is the
10:25:08  8  I-Cubed transaction.  And essentially, I submit
10:25:11  9  the parties disagree on whether a fraud occurred
10:25:13  10  with respect to this one transaction.  And I'll
10:25:16  11  walk through that transaction in a moment.  And
10:25:18  12  I submit you'll see that this is fraud plain and
10:25:21  13  simple.  The second issue, and this Court
10:25:26  14  addressed earlier this morning, was whether Oak
10:25:28  15  has twenty-three million dollars belonging to
10:25:33  16  defendant Ahmed that was dissipated or that --
10:25:40  17  or perhaps that the Commission could look to, to
10:25:42  18  recoup some money for investors.  And I'll
10:25:45  19  explain that in more detail as well.
10:25:48  20          Starting with I-Cubed, as an initial
10:25:53  21  matter, you'll notice in our brief we didn't
10:25:55  22  include many, if any, statements by Mrs. Ahmed
10:25:58  23  on I-Cubed, even though she's asserting that she
10:26:01  24  owns it.  And the reason is, is because she was
10:26:04  25  directed not to answer questions in a

10:26:06  1   deposition.  So whether or not we get an

10:26:08  2   inference based on that, the Court should keep

10:26:12  3   in mind that the Commission was really prevented

10:26:15  4   from inquiring of Mrs. Ahmed about her

10:26:17  5   assertions of ownership of this company.

10:26:21  6           Now, the I-Cubed transaction issue in

10:26:23  7   a nutshell is Mr. Ahmed, on behalf of Oak,

10:26:28  8   negotiated a purchase of shares from I-Cubed,

10:26:31  9   which the Commission submits Iftikar Ahmed

10:26:35  10  controlled.  So Iftikar Ahmed was literally on

10:26:38  11  both sides of the transaction, unbeknownst to

10:26:41  12  Oak.

10:26:44  13          And before I get into that, let me

10:26:47  14  take a brief step back and explain how Oak

10:26:49  15  works.  Oak is a venture capital firm.  It

10:26:52  16  invests people's money, real people's money,

10:26:56  17  pensions, school teachers, firemen, policemen,

10:26:59  18  probably even lawyers and judges; all sorts of

10:27:01  19  people.  And Oak has various funds.  And they

10:27:04  20  invest in different companies, some early stage,

10:27:07  21  middle stage, late stage.  And of course,

10:27:10  22  there's just a goal of getting into a company,

10:27:12  23  and getting out of it for more money, and

10:27:15  24  profiting for its investors, as well as

10:27:18  25  returning profit to Oak employees.  Now, each

10:27:24  1  fund -- and Ms. Ames will testify to this.  My
10:27:27  2  understanding is each fund has a Valuation
10:27:31  3  Committee that's made up of certain investors
10:27:33  4  that, at least in part, ensure that there's not
10:27:35  5  a conflict of interest between the individuals
10:27:38  6  managing the money, Oak employees, and the
10:27:41  7  investors of whose money it is.  And they have
10:27:46  8  the ability for what's not an arm's length
10:27:49  9  transaction or when there's a conflict of
10:27:51  10  interest, to say that, you know, to kill those
10:27:55  11  deals; to say, you know, "You Oak employee own
10:28:03  12  stock in this company, we don't think it's wise
10:28:05  13  to invest investor money in this because the
10:28:07  14  conflict is too great."  For example, maybe the
10:28:09  15  basis is different.  The Oak employee got it at
10:28:12  16  fifty cents, Oak is now being -- going in at a
10:28:15  17  dollar fifty.  Well, that employee may have an
10:28:18  18  incentive to sell everything at a dollar sixty a
10:28:20  19  share, because he makes, you know, 300 percent,
10:28:23  20  where Oak doesn't even make ten percent.  So
10:28:28  21  just like when any of us go to a financial
10:28:31  22  adviser, we expect the employee to do what's in
10:28:33  23  our best interests.  And so if a financial
10:28:37  24  adviser advised us to invest in a company he
10:28:39  25  owned, it would be a red flag.  Or at the very

10:28:43   1   least warrant carefully looking at the

10:28:45   2   investment to determine if it is actually in the

10:28:47   3   best interests of the investor, or if it is

10:28:50   4   really in the best interest of the employee who

10:28:52   5   has an interest in the company.

10:28:53   6            So there are two relevant policies at

10:28:56   7   Oak regarding this I-Cubed transaction.  First,

10:28:59   8   if the employee owns an interest in the company

10:29:01   9   that Oak has an interest in, it needs to be

10:29:02  10   disclosed to the Valuation Committee.  And

10:29:05  11   again, that's just going back to because to make

10:29:07  12   sure that the employee is acting in the best

10:29:10  13   interests of the investors, and not acting in

10:29:14  14   the interests of himself.  And what's relevant

10:29:16  15   here is when Mr. Ahmed recommended investing in

10:29:21  16   Company C, he was already holding shares of

10:29:25  17   Company C, he was invested in it.  And that

10:29:28  18   wasn't disclosed to Oak.  And therefore, it was

10:29:30  19   never disclosed to the Valuation Committee, who

10:29:33  20   could have approved or not approved this.  So

10:29:36  21   that's the first thing.  But that doesn't get at

10:29:39  22   the fraud.  Second, if an employee sells shares

10:29:43  23   of a company they own to Oak, of course there's

10:29:46  24   a massive conflict.  And that's obvious.

10:29:50  25   Because the employee may be motivated to sell it

10:29:54  1    for as much as possible, because he wants to

10:29:56  2    himself personally gain, whereas the investors

10:29:59  3    of course want the lowest price they can get.

10:30:02  4    It's a common sense conflict.  And that's

10:30:05  5    relevant because that's what Mr. Ahmed did with

10:30:07  6    regards to this fraud.  He owned shares in

10:30:10  7    Company C, he recommended Oak purchase those

10:30:13  8    shares, but didn't tell Oak they'll be

10:30:15  9    purchasing the shares from him.  Mr. Ahmed

10:30:20  10   concealed, and how he held those shares, was

10:30:25  11   through I-Cubed.  And that's why it's known as

10:30:28  12   the I-Cubed transaction.  So Mr. Ahmed concealed

10:30:30  13   that he formed I-Cubed, which hold those shares,

10:30:33  14   that he controlled I-Cubed, that he had recently

10:30:35  15   transferred his interest in I-Cubed to his wife,

10:30:40  16   and that he was on both sides of the deal.  And

10:30:40  17   I'll get to the document in a moment.

10:30:43  18         Now, really the heart of Mrs. Ahmed's

10:30:47  19   claim, we submit, is after May of 2013, she

10:30:50  20   claims that when Mr. Ahmed transferred his

10:30:52  21   entire interest in I-Cubed to her, it became

10:30:54  22   hers.  And one, this claim is belied by the

10:31:00  23   evidence.  As an initial matter, the sale of

10:31:08  24   these shares to I-Cubed took place on October

10:31:11  25   30th, 2014.  That's when the money was

10:31:14  1  exchanged, or the money was transferred, from

10:31:17  2  Oak, to I-Cubed.  This is the opening bank

10:31:24  3  account for I-Cubed, when that money was

10:31:28  4  received.  It was opened two days before Oak

10:31:32  5  sent that money.  Mrs. Ahmed's name is not on

10:31:36  6  this bank account.  Mr. Ahmed's name is on this

10:31:38  7  bank account.  So a year and a half after she

10:31:42  8  claims the company was hers, Mr. Ahmed is the

10:31:44  9  one opening the bank account and ultimately

10:31:47 10  getting the money for the transaction.  Then, as

10:31:50 11  you'll notice, he specifically claims to be a

10:31:52 12  member of I-Cubed.  Mrs. Ahmed now at least

10:31:59 13  implicitly denies this.

10:32:14 14         Next, your Honor, is the sales

10:32:16 15  agreement.  And this is the stock purchase

10:32:20 16  agreement between Oak and I-Cubed.  And as I

10:32:25 17  stated, the Commission's position is Iftikar

10:32:27 18  Ahmed was on both sides of this transaction.

10:32:29 19  Now, you'll see that Iftikar Ahmed literally

10:32:31 20  signed for Oak.  There's really know disputing

10:32:35 21  that.  On the other side, is I-Cubed Domains.

10:32:40 22  And that's Richard Kimball, LLC.  Now the

10:32:42 23  Commission has confirmed with Richard Kimball,

10:32:46 24  this is not his signature.  This is a forgery.

10:32:49 25  Mr. Kimball was not the manager of I-Cubed on

|          |    |
|----------|----|
| 10:32:51 | 1  | this date.
| 10:32:54 | 2  | Now, there's really two scenarios.
| 10:32:56 | 3  | Either one, Mrs. Ahmed was controlling I-Cubed,
| 10:33:01 | 4  | and played at least some role in forging this
| 10:33:03 | 5  | signature.  Or two, Iftikar Ahmed forged this
| 10:33:06 | 6  | signature.  And the reason this is important,
| 10:33:08 | 7  | your Honor, is Mrs. Ahmed is arguing that since
| 10:33:14 | 8  | it was in her name, there was nothing wrong with
| 10:33:16 | 9  | Iftikar Ahmed not disclosing this because he
| 10:33:17 | 10 | didn't have a personal interest in it.  Well,
| 10:33:19 | 11 | that's certainly not what Mr. Ahmed thought when
| 10:33:22 | 12 | he did this.  Because he didn't put his own name
| 10:33:24 | 13 | here.  He didn't put his wife's name here.
| 10:33:27 | 14 | Instead, he put a third party, who didn't sign
| 10:33:29 | 15 | it.  It was forged, and it was forged for a
| 10:33:35 | 16 | reason.  And that is because defense, or Mrs.
| 10:33:38 | 17 | Ahmed, is wrong when she said this is a
| 10:33:40 | 18 | legitimate transaction.  It is just fraud.
| 10:33:40 | 19 | Now, once the money was transferred,
| 10:33:58 | 20 | your Honor, from Oak, into that account that
| 10:34:01 | 21 | Iftikar Ahmed held, you'll see that than Iftikar
| 10:34:04 | 22 | Ahmed is the one who transfers this money into
| 10:34:08 | 23 | the grantor retained annuity trust, or GRAT for
| 10:34:16 | 24 | short.  And this is, again, what Mrs. Ahmed is
| 10:34:16 | 25 | claiming she's entitled to.  Again, this was

10:34:22  1   done simply to conceal the fraud, and to try and

10:34:25  2   cover up his crimes.  This money continued to be

10:34:31  3   controlled by Iftikar Ahmed.  And I asked in the

10:34:37  4   deposition of Mrs. Ahmed, was there any legal

10:34:40  5   obligation that he had to write this money to

10:34:40  6   the GRAT.  And as I recall, she didn't know, or

10:34:46  7   she didn't have any reason to believe so.  The

10:34:49  8   document says what it says.  But it's telling,

10:34:55  9   your Honor.  There was one other -- now, looking

10:35:09  10  at the GRAT, so we've seen that the money went

10:35:09  11  from Oak, to I-Cubed.  Oak was told that Richard

10:35:16  12  Kimball was I-Cubed.  In fact, Ms. Ames will

10:35:19  13  testify that Iftikar Ahmed said I-Cubed was a

10:35:22  14  small family office, or something to that

10:35:26  15  effect, of course never disclosing that he or

10:35:26  16  his wife had an interest in it.

10:35:31  17            Turning to the next document, this is

10:35:34  18  the 2014 GRAT.  And so this is where the money

10:35:39  19  goes, or is put by Iftikar Ahmed.  And I asked,

10:35:46  20  you know, Mrs. Ahmed, about this.  You know,

10:35:50  21  what is going into the GRAT.  And here we see

10:35:53  22  the Schedule A.  And she couldn't tell me.  And

10:35:53  23  I asked, you know, even looking at this, explain

10:35:57  24  this to me.  And she couldn't.  And your Honor,

10:35:57  25  it's because she's a nominee.  Moreover, there's

| | |
|---|---|
| 10:36:04 | 1 |
| 10:36:08 | 2 |
| 10:36:12 | 3 |
| 10:36:16 | 4 |
| 10:36:16 | 5 |
| 10:36:20 | 6 |
| 10:36:23 | 7 |
| 10:36:27 | 8 |
| 10:36:35 | 9 |
| 10:36:39 | 10 |
| 10:36:39 | 11 |
| 10:36:43 | 12 |
| 10:36:48 | 13 |
| 10:36:48 | 14 |
| 10:36:52 | 15 |
| 10:36:56 | 16 |
| 10:36:56 | 17 |
| 10:37:00 | 18 |
| 10:37:12 | 19 |
| 10:37:12 | 20 |
| 10:37:17 | 21 |
| 10:37:21 | 22 |
| 10:37:21 | 23 |
| 10:37:25 | 24 |
| 10:37:26 | 25 |

some dispute, at least in the prehearing brief
filed by Mrs. Ahmed on the basis of these shares
and if they were purchased for two million, and
sold for seven and a half million, you know,
didn't the investors lose out on only five. And
there's a couple things to that. One, you'll
see that this is -- the transfer date is August
29, 2014. So this is before the shares were --
this is before the shares were transferred to
Oak. And here, at least, it's saying that the
fair market value of a 99 percent interest in
I-Cubed is only eight hundred seventy-six
thousand dollars. So there is a real question
about this basis. Even if the basis was two
million, at the end of the day, it doesn't
matter because we're dealing with such high
numbers, and there's simply not enough money to
get to -- to make it relevant. In addition,
even if it was only five million lost to the
investors, meaning that they get the basis that
Iftikar Ahmed actually purchased the shares for,
it doesn't make it any less fraudulent. And the
Commission submits we would still be entitled to
the full seven million, although it may not go
to disgorgement. But again, at the end of the

| | | |
|---|---|---|
| 10:37:30 | 1 | day, it's just not relevant because the fraud |
| 10:37:34 | 2 | loss here is just so high and there's not enough |
| 10:37:34 | 3 | money to cover all of it. |
| 10:37:43 | 4 | Mrs. Ahmed also argues in her |
| 10:37:48 | 5 | prehearing brief that because Mr. Ahmed placed |
| 10:37:48 | 6 | the I-Cubed entity in her name, he didn't |
| 10:37:53 | 7 | violate Oak's policy, as well as federal |
| 10:37:54 | 8 | security laws. And Ms. Ames will testify about |
| 10:37:58 | 9 | whether this is a violation of Oak policies so |
| 10:38:02 | 10 | I'll save that for her, but suffice it to say |
| 10:38:07 | 11 | she will say it was a very big violation. To |
| 10:38:07 | 12 | argue that that conduct is not a violation of |
| 10:38:12 | 13 | federal security laws, I submit is very |
| 10:38:12 | 14 | aggressive. And of course, you know I'm |
| 10:38:17 | 15 | representing the SEC, you know the SEC finds it |
| 10:38:17 | 16 | troubling. It's fraud, plain and simple. It's |
| 10:38:28 | 17 | a violation of Section 10(b) of the Exchange |
| 10:38:28 | 18 | Act, of 206 of the Adviser Act, you cannot do |
| 10:38:33 | 19 | indirectly what you cannot do directly. And I'm |
| 10:38:33 | 20 | sure this Court wouldn't be surprised that, you |
| 10:38:39 | 21 | know, transferring assets into the name of a |
| 10:38:44 | 22 | nominee doesn't shield someone from liability. |
| 10:38:44 | 23 | I mean that's a loophole that would swallow the |
| 10:38:49 | 24 | entire SEC. |
| 10:38:50 | 25 | Does the Court have any questions for |

10:38:55  1   me at this juncture on I-Cubed?  If not, I was

10:38:55  2   going to move onto the twenty some million

10:39:00  3   dollars that we referred to.

10:39:00  4           THE COURT:  In general, is there

10:39:00  5   anything that the Massachusetts action brings to

10:39:06  6   bear on this case?  In particular, I am thinking

10:39:11  7   of the Greenwich house, which was to secure Mr.

10:39:22  8   Ahmed's bond, which it would appear he is in

10:39:28  9   violation of.  Does that implicate what the SEC

10:39:34  10  seeks to or can include in the freeze order?

10:39:39  11          MR. WILLIAMS:  Yes.  That's a very

10:39:39  12  good question your Honor.  Yes.  So the

10:39:45  13  Massachusetts action is an insider trading

10:39:45  14  action that is not in this litigation, so it was

10:39:51  15  separate.  And the allegation is that Mr. Ahmed

10:39:51  16  received inside information, he was tipped, and

10:39:56  17  he profited off that exchange for giving a

10:39:56  18  benefit to somebody.  So the allegations are

10:40:02  19  completely different.  However, he was arrested

10:40:02  20  in that case and as part of his bond, and this

10:40:08  21  is my understanding, he put up his house in

10:40:08  22  Greenwich, Connecticut.  I believe the house was

10:40:13  23  purchased in '07 for more than nine million

10:40:19  24  dollars.  My understanding, there was never a

10:40:19  25  mortgage; it was cash.  I submit it was likely a

10:40:25   1    lot of his fraudulent proceeds and/or some money
10:40:25   2    that Shalini Ahmed was making at that time.  Not
10:40:30   3    only did Mr. Ahmed sign that essentially to deed
10:40:35   4    it over to -- for bond purposes, so did Mrs.
10:40:41   5    Ahmed.  And so to answer your question, the
10:40:41   6    house has been lost.  Or at least the SEC takes
10:40:46   7    the position that we don't have a right to get
10:40:46   8    it because it was provided to the court for that
10:40:46   9    bond.  And if they have not seized the house, my
10:40:52  10    guess is they're still filling out the
10:40:57  11    paperwork.  But I don't have any personal
10:40:57  12    knowledge of that.  Does that answer your
10:41:03  13    question, that is why we're not including --
10:41:08  14              THE COURT:  Yes.
10:41:08  15              MR. WILLIAMS:  -- the house in this.
10:41:13  16    Turning to the twenty million dollars that Mrs.
10:41:19  17    Ahmed alleges either that was -- something was
10:41:19  18    done in violation of this Court's order, or that
10:41:24  19    the Commission should be looking to get that
10:41:24  20    money before it looks to get assets that are
10:41:30  21    held in her name.  And let me -- let me start, I
10:41:35  22    have page 21 of defendant's brief.  I'm not
10:41:40  23    going to put this on the ELMO because actually
10:41:40  24    this was filed redacted.  But I believe it's the
10:41:46  25    very last page in the packet I gave your Honor.

|          |    |                                                          |
|----------|----|----------------------------------------------------------|
| 10:41:46 | 1  | And like I said, I have given the same page to           |
| 10:41:46 | 2  | defense counsel.  But you'll see some large              |
| 10:41:51 | 3  | numbers.  And I believe defense counsel stated           |
| 10:41:57 | 4  | something that these are -- the quote was                |
| 10:42:02 | 5  | "certainly capable of being valued or cashed             |
| 10:42:02 | 6  | out."  And the SEC does not believe that to be           |
| 10:42:07 | 7  | the case.  As an initial matter, even if this            |
| 10:42:13 | 8  | was money, it's still not enough money to cover          |
| 10:42:13 | 9  | disgorgement and penalties.  So at the end of            |
| 10:42:19 | 10 | the day, again, it's not really relevant.                |
| 10:42:19 | 11 | Second, the SEC has traced the money                     |
| 10:42:24 | 12 | that Mr. Ahmed stole.  It went from Oak, to Mr.          |
| 10:42:24 | 13 | Ahmed's account, as well as Mrs. Ahmed's                 |
| 10:42:30 | 14 | account.  We never traced any money being stolen         |
| 10:42:30 | 15 | from Oak, going back into Oak.  Third, Ms. Grace         |
| 10:42:41 | 16 | Ames will testify to this in more detail; she's          |
| 10:42:41 | 17 | the COO of Oak.  But this isn't cash.  This is           |
| 10:42:46 | 18 | -- there's not an account holding these moneys.          |
| 10:42:52 | 19 | This is not money that Oak can pick up and give          |
| 10:42:52 | 20 | to investors to make them whole.  Rather, this           |
| 10:42:56 | 21 | is carried interest.  And it's really                    |
| 10:43:02 | 22 | accounting.                                              |
| 10:43:02 | 23 | Essentially, how this works is each                      |
| 10:43:07 | 24 | of these Oak funds has a general partner, which          |
| 10:43:07 | 25 | is an entity.  And Mr. Ahmed was a member of             |

10:43:14  1    that general partner entity for each of these.

10:43:15  2    Now, as a member of the general partner entity,

10:43:25  3    one is entitled to a portion of the general

10:43:25  4    partner's carried interest.  Now, an individual

10:43:31  5    can lose or forfeit that interest in that

10:43:31  6    general partner entity for engaging in what's

10:43:36  7    called in disabling conduct.  And that's a

10:43:42  8    defined term.  And I won't go into detail, but

10:43:42  9    not surprisingly, Mr. Ahmed's fraud on Oak

10:43:47  10   constitutes disabling conduct.  And therefore,

10:43:47  11   not only was he fired from Oak, but that he

10:43:53  12   forfeited his rights to his interest in these

10:43:59  13   general partner entities.  So that's an initial

10:44:04  14   matter.

10:44:04  15            So these numbers are not money.  They

10:44:04  16   just represent what Iftikar Ahmed at one time

10:44:10  17   was entitled to receive.  However, it's at some

10:44:16  18   time unknown in the future.  And there's no

10:44:16  19   guarantee that these numbers will actually ever

10:44:22  20   turn into any assets, especially, you know,

10:44:27  21   these amounts.

10:44:27  22            THE COURT:  There was some

10:44:27  23   correspondence with respect to a query, e-mail

10:44:33  24   query, among Oak people, as to how they would

10:44:39  25   make a distribution.  Does that convert it to

10:44:45  1    cash?

10:44:45  2            MR. WILLIAMS:  If there's a

10:44:45  3    distribution, and I'll mention that, and my

10:44:50  4    understanding is in the 11 years Mr. Ahmed was

10:44:50  5    at Oak, he received one distribution.  That's

10:44:56  6    how speculative these things are.  But to answer

10:44:56  7    your question, yes, your Honor.  If there was a

10:45:02  8    distribution.  And that's what these things are

10:45:02  9    not.  These are not distributions.  Rather, they

10:45:08  10   are -- they amount to really speculation on what

10:45:14  11   the individual could be distributed -- could

10:45:14  12   receive in distribution in the future at some

10:45:14  13   unknown date.  Assuming things go as planned,

10:45:19  14   and the company's, you know -- go as planned,

10:45:25  15   and there's profit coming in --

10:45:25  16           THE COURT:  Is it the SEC's position

10:45:25  17   that Oak is enjoined by the existing freeze

10:45:31  18   order from making any such distribution?

10:45:34  19           MR. WILLIAMS:  Yes.  At least to

10:45:36  20   Iftikar Ahmed, absolutely.  Were they to make a

10:45:38  21   distribution to Iftikar Ahmed, we would of

10:45:40  22   course say they cannot do that.  And that has

10:45:42  23   not -- my understanding is that has not happened

10:45:44  24   in this case.

10:45:47  25           THE COURT:  If they are making a

```
10:45:49   1   distribution that includes Mr. Ahmed's forfeited
10:45:54   2   interest, are they enjoined from doing that
10:45:57   3   until further order of the Court?
10:46:02   4              MR. WILLIAMS:  I just want to make
10:46:03   5   sure I understand the Court's question.  So if
10:46:05   6   they were to make a distribution -- let me back
10:46:09   7   up.  Mr. Iftikar Ahmed has forfeited his
10:46:11   8   interest because he engaged in disabling
10:46:13   9   conduct.
10:46:14  10              THE COURT:  They claim.
10:46:15  11              MR. WILLIAMS:  They claim, exactly.
10:46:16  12   This is according to Oak and what Ms. Ames will
10:46:19  13   testify to.  And so is the question are they now
10:46:21  14   free to make distributions, even though Mr.
10:46:26  15   Ahmed at one time had an interest in this?
10:46:27  16              THE COURT:  Well, it was actually the
10:46:28  17   converse.  Are they prohibited from doing that,
10:46:32  18   for the time being.
10:46:33  19              MR. WILLIAMS:  Your Honor, to be
10:46:36  20   honest, I think that they would need to come to
10:46:39  21   the Commission if they were thinking of doing
10:46:41  22   that.  And I'm going to get to why I think
10:46:43  23   that's the case.
10:46:44  24              THE COURT:  I would think that would
10:46:45  25   be a good idea.
```

10:46:47  1           MR. WILLIAMS:  There's no question, I

10:46:48  2     just don't want to sit here and say absolutely,

10:46:51  3     because the SEC is still investigating what

10:46:55  4     right it has to Mr. Ahmed's interest in this

10:46:59  5     disabling conduct.  So I can't say one way or

10:47:01  6     the other.  However, I have no doubt that Oak

10:47:04  7     would come to the commission First.  I simply

10:47:06  8     have no doubt about that.  But let me, if I can

10:47:13  9     -- because I think I can sort of -- this

10:47:17  10    dovetails into what I wanted to say about this.

10:47:22  11          These figures are simply estimations

10:47:24  12    of what Iftikar Ahmed could have received in the

10:47:27  13    future.  And because the figures are so

10:47:30  14    speculative, it's difficult, if not impossible,

10:47:34  15    for the SEC to value them.  That may be

10:47:36  16    different if they turn into distributions.  It's

10:47:40  17    also unlikely that even if these could be

10:47:43  18    valued, that they could be sold.  And that is,

10:47:48  19    as Ms. Ames will testify, is that in order for

10:47:50  20    Mr. Ahmed to sell his interests, that there are

10:47:54  21    other partners who basically have to give the

10:47:57  22    okay.  So when Mrs. Ahmed says that by Oak

10:48:06  23    claiming that he forfeited his right to this

10:48:08  24    money, and that is a violation of the asset

10:48:11  25    freeze order, it really misunderstands what

10:48:14  1   these figures are.  Although Oak takes the
10:48:19  2   position that Mr. Ahmed has forfeited his right
10:48:23  3   to the accounting, the accounting still exists,
10:48:25  4   right there on the books, completely unchanged.
10:48:29  5   Nothing has been sold, nothing has been
10:48:31  6   transferred, nothing has been dissipated,
10:48:34  7   nothing has been encumbered.  And maybe to
10:48:40  8   repeat myself, although Mr. Ahmed may not be
10:48:42  9   entitled to this, the money is still there.  It
10:48:44 10   hasn't gone anywhere.  I shouldn't say the
10:48:46 11   money, because it's not money.  The carried
10:48:48 12   interest is still there on the books.
10:48:53 13           Now, Mrs. Ahmed says -- did your
10:48:57 14   Honor have any other questions on that part?
10:49:01 15   Okay.  Mrs. Ahmed says, well, then, essentially,
10:49:05 16   if Mr. Ahmed engaged in disabling conduct and
10:49:09 17   forfeited his interest, and he has to repay the
10:49:13 18   victims, that Oak gets a windfall.  As an
10:49:18 19   initial matter, of course Mr. Ahmed is expected
10:49:21 20   to pay back his victims.  His carried interest
10:49:25 21   has nothing to do with making the victims whole.
10:49:29 22   And that's, again, because this isn't money that
10:49:32 23   Oak can just pick up and take.  As stated, these
10:49:35 24   are just accountings.  More importantly,
10:49:40 25   however, is it's illogical to say that Mr. Ahmed

10:49:44  1   should get a credit against his theft in the

10:49:47  2   amount of his carried interest.

10:49:49  3           And to really bring this point home,

10:49:51  4   your Honor, I'd like to just go to two brief

10:49:54  5   hypotheticals.  In the first, an individual has

10:49:58  6   let's say ten million in carried interest.  And

10:50:00  7   he attempts to commit fraud.  And he's caught,

10:50:03  8   and he doesn't get any money from his fraud.

10:50:06  9   And he's fired.  He forfeits his ten million

10:50:09  10  dollar interest because he engaged in disabling

10:50:11  11  conduct.  There's nothing extreme about that.

10:50:15  12  That's just -- that happens.

10:50:18  13          In the second hypothetical, the

10:50:22  14  individual has that same ten million carried

10:50:24  15  interest, he likewise attempts fraud, except

10:50:27  16  this time, he's successful.  And he successfully

10:50:30  17  steals ten million dollars.  Mrs. Ahmed is

10:50:34  18  arguing that Oak then gets to pick.  You,

10:50:38  19  fraudster, either forfeit your interest, or you

10:50:42  20  pay back the money.  But we can only ask you to

10:50:44  21  do one of those.  So essentially, what she is

10:50:50  22  saying is as long as a fraudster steals less

10:50:53  23  money than his carried interest, he is free to

10:50:56  24  keep that money.  Because he gets a credit

10:50:59  25  against the money he steals for the amount he

10:51:03  1   forfeits.  They are not combined.  These are two

10:51:07  2   completely different things.  And it's illogical

10:51:09  3   to say that people are rewarded for successfully

10:51:13  4   stealing money.  I mean it, leads to a

10:51:15  5   conclusion that I submit is really preposterous.

10:51:19  6          So to be clear, your Honor, there may

10:51:25  7   be a future asset in those figures.  There may

10:51:29  8   be.  And the SEC may conceivably argue that

10:51:33  9   they're entitled to some of those, exactly what

10:51:35  10  your Honor said, distributions.  If and when

10:51:39  11  they turn into an actual asset, which, as your

10:51:41  12  Honor noted, is a distribution.  But right now,

10:51:44  13  that asset doesn't exist.  There's nothing for

10:51:48  14  the SEC to take from Oak with regard to these

10:51:50  15  numbers.  There's nothing for the SEC to give to

10:51:53  16  investors with regard to these numbers.  And the

10:51:55  17  way the SEC has frozen assets in this case, it's

10:51:58  18  not only proper, it's typical.

10:52:01  19          We, the SEC, of course are looking to

10:52:04  20  recoup investors' losses.  So we of course look

10:52:07  21  at liquid assets first, because they can be

10:52:09  22  easily converted into cash, if they're not cash

10:52:12  23  already, and we can repay victims.  We of course

10:52:15  24  look to real property, because real property can

10:52:18  25  be converted into cash and we can repay victims.

| | | |
|---|---|---|
| 10:52:21 | 1 | Whereas carried interest, even assuming the SEC |
| 10:52:25 | 2 | could argue it had a right to that, the SEC |
| 10:52:30 | 3 | can't put any faith into these numbers, because |
| 10:52:33 | 4 | there's no guarantee these numbers will ever |
| 10:52:37 | 5 | turn into anything, much less these high values. |
| 10:52:43 | 6 | So, unless the Court has more questions on the |
| 10:52:46 | 7 | carried interest -- and I submit, much of Mrs. |
| 10:52:51 | 8 | Ahmed's arguments are really based on a |
| 10:52:53 | 9 | misunderstanding of what carried interest is. |
| 10:52:57 | 10 | Turning to -- |
| 10:52:58 | 11 | THE COURT:  So you basically say the |
| 10:53:00 | 12 | twenty-three million, plus or minus, just isn't |
| 10:53:03 | 13 | part of any of the equation of the size of the |
| 10:53:08 | 14 | potential disgorgement, et cetera. |
| 10:53:10 | 15 | MR. WILLIAMS:  Correct.  Correct, |
| 10:53:12 | 16 | because this twenty-one million not money |
| 10:53:15 | 17 | sitting somewhere.  We don't know where this |
| 10:53:17 | 18 | twenty-one million -- you know, to use I guess |
| 10:53:20 | 19 | an analogy, I mean it's essentially the way it |
| 10:53:23 | 20 | was explained to me, maybe Mrs. Ames will |
| 10:53:25 | 21 | testify as to this, imagine building a house, |
| 10:53:28 | 22 | and everybody agrees they're going to do a |
| 10:53:30 | 23 | little bit to build it.  The electrician is |
| 10:53:33 | 24 | going to do the electricity, the wood people are |
| 10:53:36 | 25 | going to come in and build the kitchen floors, |

| | |
|---|---|
| 10:53:39 | 1 |
| 10:53:41 | 2 |
| 10:53:43 | 3 |
| 10:53:45 | 4 |
| 10:53:47 | 5 |
| 10:53:50 | 6 |
| 10:53:53 | 7 |
| 10:53:55 | 8 |
| 10:53:58 | 9 |
| 10:54:00 | 10 |
| 10:54:03 | 11 |
| 10:54:06 | 12 |
| 10:54:09 | 13 |
| 10:54:11 | 14 |
| 10:54:13 | 15 |
| 10:54:16 | 16 |
| 10:54:19 | 17 |
| 10:54:22 | 18 |
| 10:54:24 | 19 |
| 10:54:28 | 20 |
| 10:54:32 | 21 |
| 10:54:35 | 22 |
| 10:54:39 | 23 |
| 10:54:40 | 24 |
| 10:54:43 | 25 |

plumbers do the plumbing, everyone agrees we're going to build this house and it will be nice and we'll sell it for a lot of money.  Pause right there.  How much is that house worth? Well, the house hasn't been built, there's no asset.  If everything goes to plan, there may be an asset in the future how much it's going to be worth.  Well, is it going to go to plan?  That's really what we're left doing, is there's not an asset here for us to get.  Whereas there's very real assets directly traceable to fraud sitting in his bank accounts.  We can get that and we should get that and give it to investors. Rather than say investor, this is as good as cash, this is money that could become money someday in the future, so we'll keep you posted. That's not how this works.  We submit that's not how it should work, your Honor.

   Turning to the carve-out, as an initial matter, and I reference carve-out as Mrs. Ahmed simply asking for money, saying "Regardless of whether I'm entitled to it or any finding of this Court, this Court should give an equitable remedy of just providing me money for living expenses and/or attorneys and other

10:54:45   1   things."  And as an initial matter, Mrs. Ahmed

10:54:49   2   in her brief stated she's been abandoned by

10:54:52   3   Iftikar Ahmed.  And I asked her that question in

10:54:56   4   her deposition.  I also asked if he was

10:54:58   5   assisting in this litigation.  And she was

10:55:01   6   instructed not to answer.  And I think that's

10:55:03   7   relevant because we're alleging that Mr. Ahmed

10:55:05   8   did a lot of this to protect the assets, and so

10:55:09   9   I think that that's -- I think that that's

10:55:13   10   relevant and the SEC is not prepared to concede

10:55:17   11   that defendant Ahmed has simply left the

10:55:20   12   picture.  But it's not really relevant at the

10:55:22   13   end of the day.  Because Mrs. Ahmed should not

10:55:25   14   be permitted to consume defrauded investor's

10:55:28   15   money.  The money belongs to the victims in this

10:55:31   16   case, and there's really no dispute that there

10:55:33   17   are indeed victims, a lot of them.  And it

10:55:38   18   should clear, I'm sorry Mrs. Ahmed is in this

10:55:41   19   position.  And my heart absolutely goes out to

10:55:44   20   her children, unquestionably.  But giving them

10:55:48   21   other people's money, the Commission submits,

10:55:52   22   it's not justice.  It's just another injustice.

10:56:02   23   At the end of the day, it's just not fair to the

10:56:05   24   victims.  And that's where this money is coming

10:56:07   25   from.

| | |
|---|---|
| 10:56:08 | 1 |
| 10:56:10 | 2 |
| 10:56:13 | 3 |
| 10:56:15 | 4 |

And I submit to a certain extent, your Honor, underlying that question for money is, at least to an extent, really a class argument.  Because to use the bank robber example, or a burglar example, and someone's wife came in and said "I want some of that money that you know my husband stole, and he's not denying he stole it," they'd get laughed out of court.  But when your husband worked at a hedge fund and he wore a suit, and, you know, between them there's two Harvard MBAs and a Princeton undergrad degree, and a nine million dollar house in Greenwich, it doesn't sound so outrageous to ask for stolen money.  But I submit there really is no difference.  And we ask that Mrs. Ahmed be treated no differently than anybody else.

Mrs. Ahmed also seems to argue that because there's so much money that was stolen and she's only asking for a little bit of it, that she should get it.  I submit that also leads to a similarly troubling conclusion. Regardless of how much money Iftikar Ahmed stole, whether it's a little or a lot, Mrs. Ahmed is still asking for money that doesn't

10:57:22  1   belong to her, that belongs to victims.  And Mr.

10:57:26  2   Ahmed should not be rewarded for stealing a lot

10:57:28  3   of money by getting even a little bit of it.  It

10:57:30  4   really just leads to the conclusion that you're

10:57:34  5   better off stealing a lot of money, rather than

10:57:36  6   a little money.

10:57:40  7           One of the last few things I wanted

10:57:42  8   to say is Mrs. Ahmed has made a claim to some

10:57:47  9   Goldman Sachs' stock and 401K money.  And she

10:57:50  10  may well be entitled to this money, your Honor.

10:57:52  11  As early as May of this year, we've considered

10:57:56  12  releasing those funds.  We've talked with her

10:58:00  13  attorneys.  I don't want to get into settlement

10:58:02  14  discussions, but we've asked for evidence that

10:58:04  15  the money is not in any way tainted, that it was

10:58:07  16  earned by her, and has remained segregated.  And

10:58:10  17  we haven't got that information.  We've gotten

10:58:14  18  some documentation from earlier attorneys, but

10:58:16  19  we simply haven't gotten anything.  And so we do

10:58:19  20  ask that although she may be entitled to that

10:58:22  21  money, she needs to show us, or I submit the

10:58:24  22  Court, at the very least, that those moneys

10:58:26  23  really do belong to her, and they're not

10:58:28  24  traceable to this fraud.  So, if I can just make

10:58:33  25  a few minor points, a few points in --

10:58:36   1          THE COURT:  That's because you say

10:58:37   2   the fraudulent time period was 2004-'05, and

10:58:43   3   Mrs. Ahmed worked at Goldman until 2011.

10:58:48   4          MR. WILLIAMS:  Correct.  I believe,

10:58:50   5   and defense counsel can correct me if I'm wrong,

10:58:53   6   I think she was at Goldman from 2004-2011,

10:58:56   7   although she was paid for six months in 2012.

10:59:00   8          THE COURT:  That's the --

10:59:03   9          MR. WILLIAMS:  And so she had income

10:59:04  10   coming in from Goldman, there's no dispute about

10:59:07  11   that.  However, that is the span of this fraud,

10:59:10  12   as well.  And that it's, you know, it's a

10:59:14  13   ten-year fraud, essentially, that Iftikar Ahmed

10:59:18  14   committed.  And the pleadings go into detail on

10:59:21  15   that.  Does your Honor have any other questions

10:59:24  16   on that point?

10:59:25  17          THE COURT:  I just wasn't sure how a

10:59:27  18   Goldman ERISA account would even be able to

10:59:31  19   receive funds other than derived from her

10:59:37  20   earnings.

10:59:40  21          MR. WILLIAMS:  If that were the case,

10:59:41  22   then I think I would agree, your Honor.  And I

10:59:44  23   do know, I believe that at least some of the

10:59:45  24   stock that she earned, that she's making a claim

10:59:48  25   to, has been transferred into other accounts.

10:59:50  1   And so we're tracing dirty money.  If they were

10:59:53  2   able to trace that directly back, and that's

10:59:56  3   what we've been asking for, just show us this is

10:59:58  4   in fact what you claim it is.  And at least to

11:00:01  5   this date, we do not believe we've received

11:00:03  6   sufficient information.  So and actually on that

11:00:09  7   note, your Honor, you know Mrs. Ahmed made on

11:00:13  8   the tax returns, and her W-2s I believe have

11:00:16  9   been submitted, was making I think a hundred

11:00:18  10  thousand, two hundred thousand, in between that,

11:00:20  11  a year.  And I think that they're asking for a

11:00:23  12  little bit more than a million dollars.  Well,

11:00:25  13  in the prehearing brief they acknowledge that

11:00:28  14  their monthly expenses, Mr. and Mrs. Ahmed's

11:00:31  15  monthly expenses, were forty-five thousand

11:00:33  16  dollars a month.  So we submit it's not right to

11:00:36  17  say that -- for Mrs. Ahmed to say "I spent the

11:00:38  18  dirty money, and the money that's left is

11:00:41  19  clean."  Especially in this case, where there's

11:00:44  20  no account that held her segregated funds.

11:00:46  21  Those funds were going into the joint account,

11:00:48  22  which also held much of Iftikar Ahmed's fraud,

11:00:51  23  at least temporarily, while it was being

11:00:53  24  transferred through.  So just to be very clear,

11:00:55  25  there's no money sitting out there in one

| | |
|---|---|
| 11:00:57 | 1 |
| 11:01:00 | 2 |
| 11:01:03 | 3 |
| 11:01:06 | 4 |
| 11:01:10 | 5 |
| 11:01:14 | 6 |
| 11:01:15 | 7 |
| 11:01:19 | 8 |
| 11:01:21 | 9 |
| 11:01:23 | 10 |
| 11:01:30 | 11 |
| 11:01:34 | 12 |
| 11:01:39 | 13 |
| 11:01:41 | 14 |
| 11:01:44 | 15 |
| 11:01:48 | 16 |
| 11:01:52 | 17 |
| 11:01:55 | 18 |
| 11:01:58 | 19 |
| 11:02:01 | 20 |
| 11:02:04 | 21 |
| 11:02:06 | 22 |
| 11:02:07 | 23 |
| 11:02:16 | 24 |
| 11:02:20 | 25 |

account, where Mrs. Ahmed and only Mrs. Ahmed deposited those earnings.  They're not there. So rather, she is simply saying, "Here's how much money I made.  I'm not going to give credit for any expenses."  And, you know, she does acknowledge that she had forty-five thousand dollars a month, which I submit is a lot in expenses.  And in fact, in three years, everything would be consumed.  And she would like to go back ten years.  And I know that, again, Mrs. Ahmed is in a difficult spot.  But in addition, asking for this money, regardless of whether the approximately hundred thousand she spends on private school was a violation of the court order, regardless of that, it is very difficult to conceive that she can spend that much money on a luxury for her young children. And I believe the youngest is three or four. And to spend thirty thousand dollars for tuition, and then to come into this court and say, you know, "Release some of those victims' funds for me.

You know, third, we've not alleged violations of securities laws against Mrs. Ahmed.  However, it's difficult to believe that

| | | |
|---|---|---|
| 11:02:21 | 1 | Mrs. Ahmed was fully candid in her deposition. |
| 11:02:25 | 2 | Mrs. Ahmed is -- and she will likely testify and |
| 11:02:28 | 3 | the Court will see, she's very sharp, not |
| 11:02:30 | 4 | surprisingly.  She is highly educated.  And I |
| 11:02:34 | 5 | submit that some of her answers in that |
| 11:02:36 | 6 | deposition were simply implausible. |
| 11:02:39 | 7 | MR. HARRIS:  Your Honor, I object to |
| 11:02:40 | 8 | the statements here about Mrs. Ahmed. |
| 11:02:41 | 9 | THE COURT:  This is to be the SEC |
| 11:02:43 | 10 | case.  And I'm assuming the SEC is not calling |
| 11:02:48 | 11 | Mrs. Ahmed. |
| 11:02:50 | 12 | MR. WILLIAMS:  The SEC may well call |
| 11:02:52 | 13 | Mrs. Ahmed. |
| 11:02:52 | 14 | THE COURT:  Let's take up issues of |
| 11:02:54 | 15 | credibility, et cetera, at the appropriate time, |
| 11:02:56 | 16 | and not in this opening. |
| 11:02:58 | 17 | MR. WILLIAMS:  Yes, your Honor. |
| 11:03:00 | 18 | THE COURT:  I have read the |
| 11:03:01 | 19 | deposition.  I read everything you submitted. |
| 11:03:05 | 20 | MR. WILLIAMS:  In closing, your |
| 11:03:06 | 21 | Honor, my final statement is there are cases |
| 11:03:09 | 22 | where carve-out may be warranted.  And the |
| 11:03:12 | 23 | Commission submits that this is just not one of |
| 11:03:14 | 24 | them.  Not where there's no dispute a fraud |
| 11:03:16 | 25 | occurred, that when there's -- you know, the |

11:03:18   1   defendant is not asking for money to contest the
11:03:22   2   allegations.  In fact, you know, by failing to
11:03:24   3   answer, he's admitted them.  I submit that by
11:03:27   4   fleeing the country, there's no better
11:03:29   5   verification of the accuracy of the allegations.
11:03:32   6   And third, you know, the victims lost money in
11:03:36   7   this case.  And any money that goes to Mrs.
11:03:38   8   Ahmed is going to come from them.  And we submit
11:03:41   9   that that's not right.
11:03:42   10           THE COURT:  Does the -- from your
11:03:44   11   statement, I wasn't quite clear whether the SEC
11:03:48   12   thinks that there is authority for the Court to
11:03:55   13   carve out for a person in Mrs. Ahmed's
11:04:07   14   situation, versus the cases that talk about
11:04:12   15   carve-out for a defendant.
11:04:14   16           MR. WILLIAMS:  And that's exactly
11:04:16   17   right, and I mentioned that earlier.  And we
11:04:19   18   haven't seen any cases.  And there may be a case
11:04:22   19   out there.  But we haven't seen it, where a
11:04:24   20   relief defendant comes in and says, you know, "I
11:04:26   21   want some of that money."  And in this case, it
11:04:29   22   really wouldn't make sense because as the
11:04:31   23   government, we submit, has proven, this was
11:04:34   24   never Mrs. Ahmed's money in the first place.
11:04:36   25   She never controlled it, she never had an

11:04:38  1   ownership interest in it.  And so it really is
11:04:41  2   -- we submit she's no different from any other
11:04:43  3   third party to walk into this courtroom and say
11:04:45  4   "I, too, would like some money, I find myself in
11:04:48  5   a difficult spot because of Mr. Ahmed's crimes."
11:04:51  6   And so we are arguing that this -- the cases
11:04:54  7   that they relied on are not persuasive because
11:04:58  8   of that.  Moreover, as I stated earlier, we
11:05:01  9   don't know of any cases where a defendant comes
11:05:03  10  in and says, "I defrauded a lot of people and a
11:05:08  11  lot of that money came from victims, but your
11:05:10  12  Honor I'd like some of it."  I submit --
11:05:14  13          THE COURT:  There are some cases that
11:05:15  14  relate to attorney's fees for defense.  But
11:05:21  15  that's not what we're talking about here.
11:05:23  16          MR. WILLIAMS:  Exactly, your Honor.
11:05:25  17  And I think that's a very important distinction.
11:05:27  18  Because when someone comes in and says "These
11:05:29  19  allegations against me are not true and I need
11:05:32  20  money to prove that they're not true, or to
11:05:34  21  prevent the SEC from proving that they're true,"
11:05:38  22  that courts release funds.  Where here, that's
11:05:41  23  not happening.  In fact, to date, the relief
11:05:44  24  defendant hasn't even disputed the fraud.  She's
11:05:47  25  just simply asking for money because she is in

11:05:51  1   financial trouble.  And, you know, while we, as

11:05:55  2   I stated, we owe her sympathy, the victims

11:06:00  3   simply don't owe her any money.  And we ask this

11:06:04  4   Court not to give her victims' money at the end

11:06:06  5   of the day.  It just wouldn't be proper, it

11:06:08  6   wouldn't be fair.

11:06:09  7            THE COURT:  All right, thank you.

11:06:10  8            MR. WILLIAMS:  Thank you.

11:06:21  9            THE COURT:  Mr. Skibell?

11:06:34  10           MR. SKIBELL:  Your Honor, Mr.

11:06:38  11  Williams and I shall be presenting the evidence

11:06:42  12  against Mr. Ahmed as the SEC did in its brief.

11:06:45  13  And the SEC may be right, that Iftikar Ahmed

11:06:48  14  engaged in fraud.  Frankly, we don't know

11:06:50  15  without discovery in this case.  It's hard to

11:06:53  16  know what happened here.  The SEC is also

11:06:57  17  correct that Iftikar Ahmed is not here today.

11:07:01  18  He has fled the jurisdiction.  He's not fled the

11:07:03  19  jurisdiction because of this case.  He's fled

11:07:05  20  the jurisdiction because he's accused of a

11:07:10  21  criminal insider trading case.

11:07:12  22           THE COURT:  How do you know that?

11:07:13  23           MR. SKIBELL:  I don't.  I assume the

11:07:15  24  criminal case was the more important one.

11:07:17  25  You're right, I'm jumping to that conclusion.

|          |    |                                              |
|----------|----|----------------------------------------------|
| 11:07:18 | 1  | THE COURT:  It would seem that the           |
| 11:07:23 | 2  | claiming at least allows for a different      |
| 11:07:25 | 3  | inference.                                    |
| 11:07:26 | 4  | MR. SKIBELL:  That may be the case.           |
| 11:07:28 | 5  | My impression was that was the more pressing  |
| 11:07:30 | 6  | issue.  But again, you're right.  We don't    |
| 11:07:33 | 7  | really know here.  But what we do know is he's |
| 11:07:36 | 8  | abandoned his wife, he's abandoned his three  |
| 11:07:41 | 9  | kids.  They're ages eight, seven and three.  And |
| 11:07:44 | 10 | he's put them in an incredibly difficult      |
| 11:07:46 | 11 | position.  He's asked his wife to -- she's been |
| 11:07:50 | 12 | put in essence in the position of defending   |
| 11:07:53 | 13 | herself against the federal government.  Now, |
| 11:07:58 | 14 | let's be clear, because Mr. Williams said a    |
| 11:08:01 | 15 | number of things about the defendant doesn't  |
| 11:08:02 | 16 | deny anything, he admits the allegations here. |
| 11:08:07 | 17 | Iftikar Ahmed is not here so we have no idea.  |
| 11:08:11 | 18 | But the relief defendants, and we brought these |
| 11:08:13 | 19 | cases to the SEC's attention, are entitled to  |
| 11:08:15 | 20 | contest the underlying allegations in the case |
| 11:08:17 | 21 | to the extent that the SEC intends to try to   |
| 11:08:20 | 22 | disgorge money from them.  And that's what this |
| 11:08:23 | 23 | case is about.  Right now, all we are asking   |
| 11:08:29 | 24 | for, and this is what we've had in numerous    |
| 11:08:31 | 25 | discussions with the SEC, is we have said in   |

| | |
|---|---|
| 11:08:33 | 1 |
| 11:08:35 | 2 |
| 11:08:38 | 3 |
| 11:08:41 | 4 |
| 11:08:44 | 5 |
| 11:08:47 | 6 |
| 11:08:50 | 7 |
| 11:08:55 | 8 |
| 11:08:57 | 9 |
| 11:09:00 | 10 |
| 11:09:03 | 11 |
| 11:09:06 | 12 |
| 11:09:11 | 13 |
| 11:09:15 | 14 |
| 11:09:18 | 15 |
| 11:09:23 | 16 |
| 11:09:26 | 17 |
| 11:09:29 | 18 |
| 11:09:31 | 19 |
| 11:09:32 | 20 |
| 11:09:36 | 21 |
| 11:09:38 | 22 |
| 11:09:41 | 23 |
| 11:09:44 | 24 |
| 11:09:46 | 25 |

essence, we would like to carve out a small portion of money in order to cover living expenses and legal fees during the pendency of the litigation, so the relief defendants can do what they need to do, which is defend themselves to the extent the SEC attempts to disgorge assets from her. Shalini Ahmed owes that to herself, and she owes that to her three kids. And so we've brought to their attention also, there are plenty of cases, and I'll name just one, because this one is very recent, this was the Nav Sarao FTC consent order. And in that case, the defendant is accused of forty-nine million dollars of wrongdoing. And they still agreed, the CFTC and the defense counsel, that they would carve out two point five million in legal fees. And to the extent there was more than thirty million dollars of assets that were set to the side, which is three-quarters the total fraud, not the total amount, he could use those moneys for living expenses. And we submit, if a primary defendant can earn those sorts of agreements, then it really makes sense here for the relief defendant, who's accused of no wrongdoing whatsoever, but yet is having

11:09:51  1  assets frozen and hopefully being disgorged in

11:09:54  2  the SEC's opinion, to have money that is carved

11:09:57  3  out for legal expenses, and reasonable living,

11:10:02  4  and legal fees as well.  We've made those

11:10:04  5  overtures to the SEC, and they've been flatly

11:10:07  6  rejected.

11:10:08  7           And so really, all we're looking for

11:10:10  8  is, in our short term relief, and despite the

11:10:15  9  fact that the SEC has the burden of proof here,

11:10:17  10  we're not going to contest the majority of the

11:10:19  11  allegations because we simply don't have enough

11:10:22  12  discovery.  It's a very complex case and we need

11:10:26  13  time to develop those facts in behalf of our

11:10:30  14  clients, who weren't even involved in the

11:10:31  15  alleged wrongdoing.

11:10:33  16           I also want to touch on one other

11:10:34  17  thing and then I'm going to go through a few

11:10:36  18  points in a little more detail here.  We made

11:10:38  19  this point to the SEC as well.  We have offered

11:10:41  20  to say that no expenses that are carved out here

11:10:46  21  today will be used for anything but payment of

11:10:49  22  past debt, legal fees related to the defense of

11:10:52  23  this case, not something else, and reasonable

11:10:55  24  living expenses.  And you'll hear testimony

11:10:58  25  about what the reasonable living expenses are

| | |
|---|---|
| 11:11:01 | 1 |
| 11:11:05 | 2 |
| 11:11:07 | 3 |
| 11:11:09 | 4 |
| 11:11:11 | 5 |
| 11:11:14 | 6 |
| 11:11:19 | 7 |
| 11:11:21 | 8 |
| 11:11:23 | 9 |
| 11:11:28 | 10 |
| 11:11:30 | 11 |
| 11:11:31 | 12 |
| 11:11:34 | 13 |
| 11:11:35 | 14 |
| 11:11:38 | 15 |
| 11:11:39 | 16 |
| 11:11:41 | 17 |
| 11:11:44 | 18 |
| 11:11:47 | 19 |
| 11:11:49 | 20 |
| 11:11:52 | 21 |
| 11:11:54 | 22 |
| 11:11:57 | 23 |
| 11:11:59 | 24 |
| 11:12:02 | 25 |

1   for Mrs. Ahmed later today.  We've also made --

2   so there's no risk of some sort of substantial

3   dissipation of assets.

4           We've also explained to the SEC that

5   one of the relief defendants in this case, that

6   is, the DIYA Holdings, throws off approximately

7   thirty-one thousand dollars in income on a

8   monthly basis that is unrelated to the

9   allegations here.  The other property, which

10  throws off approximately twenty thousand dollars

11  per month --

12          THE COURT:  Unrelated to the

13  allegation, I thought the allegations were that

14  that property was purchased with tainted funds.

15          MR. SKIBELL:  They do.  And I'll talk

16  a little more about that later.  But at least

17  the income that comes forward from that, the

18  thirty-one thousand dollars per month, is not

19  related to the fraud itself.  It doesn't harm

20  it.  There's no harm with the investor related

21  to it.  So you could carve out that money

22  without a dissipation of the total volume of

23  frozen assets that would be used to make

24  investors whole.  And the same would be true of

25  the other apartment, which would throw off

| | | |
|---|---|---|
| 11:12:04 | 1 | roughly twenty thousand dollars a month in |
| 11:12:06 | 2 | income, if the SEC would allow us to rent it. |
| 11:12:11 | 3 | And the other thing, I think Mr. |
| 11:12:13 | 4 | Williams also sort of pushed this a little bit |
| 11:12:15 | 5 | to the side, while there are allegations of |
| 11:12:17 | 6 | fraud about Mr. Ahmed, there's also no doubt |
| 11:12:19 | 7 | there's a lot of good money that came into the |
| 11:12:22 | 8 | joint accounts of him and his wife.  His wife |
| 11:12:26 | 9 | earned a good salary at Goldman Sachs, he earned |
| 11:12:29 | 10 | a salary at Oak Capital Management, there are |
| 11:12:33 | 11 | many investments, there are many transactions. |
| 11:12:39 | 12 | So there may be significant tainted assets; |
| 11:12:43 | 13 | there are also significant assets that are |
| 11:12:46 | 14 | untainted.  So we think a minor carve-out is |
| 11:12:49 | 15 | really warranted, both in terms of justice, in |
| 11:12:52 | 16 | terms of simple practical realities of the |
| 11:12:54 | 17 | relief defendant's need to defend themselves in |
| 11:12:56 | 18 | a case of this complexity and magnitude. |
| 11:12:58 | 19 | The other thing I'll note before I |
| 11:12:59 | 20 | start going among the specifics, we're also |
| 11:13:03 | 21 | willing to sort of enter into something over the |
| 11:13:05 | 22 | next three months, and then we can come back if |
| 11:13:08 | 23 | necessary in three months' time, whatever you |
| 11:13:10 | 24 | decide, and discuss what is reasonable in terms |
| 11:13:13 | 25 | of carve-out when we have more information about |

```
11:13:16   1   the size of the fraud, and assets that may be
11:13:20   2   found or otherwise.  Now, I'm going to, unless
11:13:24   3   you have questions, I'm going to talk about some
11:13:25   4   more specific elements of why they think minor
11:13:30   5   carve-outs are warranted here.
11:13:32   6              THE COURT:  You referenced the Rigas
11:13:36   7   matter, and a carve-out to the defendants.  I
11:13:40   8   can't find any written decision, only the
11:13:45   9   newspaper article you submitted.  Is there such
11:13:47  10   a thing?
11:13:49  11              MR. HARRIS:  Your Honor, if I may, I
11:13:51  12   was one of the defense counsel in that case.
11:13:53  13   The bankruptcy judge in that case eventually
11:13:56  14   awarded up to about twenty million dollars to
11:13:58  15   defense counsel to defend that case.  The money
11:14:01  16   was used by defense counsel, I think a Curtis
11:14:05  17   Malay (phonetic) at the time.  The money went to
11:14:07  18   four law firms for the defense.  One of the
11:14:09  19   defendants was acquitted, another one of the
11:14:11  20   defendants got a hung jury, and two of the
11:14:14  21   defendants were found guilty.  But I think in
11:14:17  22   that case, as an example of this, the innocent
11:14:20  23   defendant in that case had his defense funded
11:14:23  24   through the carve-out.
11:14:23  25              THE COURT:  That was a criminal
```

| | |
|---|---|
| 11:14:24 | 1 |
| 11:14:26 | 2 |
| 11:14:30 | 3 |
| 11:14:34 | 4 |

matter, the issues of representation are
different in a criminal matter versus a civil
matter.  And I take it there was no written
decision.

MR. HARRIS:  I do not believe there
was, your Honor.  I will check.  There also
money carved out for civil cases as well in the
Rigas matter.  And that -- most of that
representation was done by the Dilworth Paxson
firm in Philadelphia, who still represent the
Rigases.  But I can contact them and --

THE COURT:  I only want to know what
the Court's analysis was.

MR. HARRIS:  The Court allowed money
for civil as well, your Honor.

THE COURT:  No, the analysis is the
part I'm interested in.  I understand the bottom
what happened.  Okay, thank you.

MR. SKIBELL:  Judge, I want to make
one more point before we move on.  It's true,
there's a posture of case law about the issue of
relieve defendants and what they're entitled to.
I know we cite at least one case where there's a
carve-out for relief defendants; it's I believe
the Peters case.  But we believe the reason that

11:15:23  1   the SEC doesn't have a single case by any agency
11:15:27  2   that relates to the freezing assets of relief
11:15:30  3   defendants, and the reason we can barely find a
11:15:35  4   case, is because no one tries to do what the SEC
11:15:36  5   is trying to do here today.  No one attempts to
11:15:39  6   say a person accused of no wrongdoing, and
11:15:41  7   there's not been a decision about anybody, gets
11:15:43  8   zero money.  Essentially that's what they're
11:15:46  9   saying, they get zero money to live, and zero
11:15:48  10  money to defend themselves against the federal
11:15:51  11  government.  We believe on its face, it's just
11:15:53  12  unjust.
11:15:56  13          But let me turn to more specifics
11:15:58  14  issues.  The first one I wanted to deal with was
11:16:01  15  the issue of Mr. Williams' claims in his opening
11:16:04  16  and through the brief that the relief defendants
11:16:05  17  are nominees of the defendant Iftikar Ahmed.
11:16:11  18  And the case about nominees relates to sort of
11:16:16  19  sham accounts, where sort of the actual
11:16:20  20  wrongdoer has full control, and the other person
11:16:22  21  doesn't even know the account exists.  And
11:16:25  22  they're trying to analogize that to a situation
11:16:29  23  here, where Shalini Ahmed worked for many years
11:16:32  24  at Goldman Sachs, she contributed to the marital
11:16:35  25  property in this case up to 2012.  At that

11:16:39  1  point, she became a homemaker and looked after

11:16:41  2  three kids; and analogizing that and they're

11:16:47  3  saying she is thus entitled to no real money in

11:16:49  4  any of her accounts after that point because she

11:16:51  5  didn't go out and have a separate job.  We don't

11:16:54  6  -- we know of no legal authority for such a

11:16:56  7  proposition.  And frankly, it seems to me like

11:17:00  8  it's something out of the 1950s.  It's not a

11:17:03  9  modern concept.

11:17:04  10        The other thing is, and you will hear

11:17:05  11  testimony from Mrs. Ahmed later today about this

11:17:09  12  issue, she has full knowledge of what is in her

11:17:11  13  accounts.  She trades in those accounts, she

11:17:14  14  monitors those accounts, she consults with

11:17:16  15  investment advisers on those accounts, she

11:17:19  16  consults with her trusts and estates attorneys

11:17:21  17  on their accounts.  The evidence that the SEC

11:17:24  18  has put forward -- and I was at the deposition,

11:17:26  19  so I know what occurred.  This is what they did.

11:17:29  20  They put the specific check in front of Shalini

11:17:33  21  Ahmed and let's say it was from the year 2013.

11:17:36  22  And it was clear the check was drawn on let's

11:17:38  23  say Bank of America account.  They didn't

11:17:40  24  provide her the backup information for what was

11:17:43  25  happening in that Bank of America account.  They

11:17:45  1    simply asked her, they said "The assets this
11:17:48  2    check was drawn upon, do you know where they
11:17:51  3    first came from.  Do you know if they were --
11:17:53  4    they came from investments, they came from
11:17:55  5    something else."  It was frankly an impossible
11:17:57  6    question, I think, for anyone to answer, much
11:17:59  7    less with no account statements.  But you can't
11:18:02  8    jump from that to say that all these accounts
11:18:04  9    are a fraud.
11:18:05  10           The other thing, the SEC has zero
11:18:08  11   evidence that Mr. Ahmed was attempting to use
11:18:10  12   his wife or anyone else in an attempt to sort of
11:18:15  13   evade justice or hide money.  It's not like he
11:18:18  14   put this money in the accounts of -- in a Swiss
11:18:21  15   bank account.  These are money that were in
11:18:25  16   joint accounts or accounts of his wife.  So the
11:18:27  17   idea that this is an effort to hide money from
11:18:29  18   someone, I really don't think the evidence is
11:18:31  19   there on that.
11:18:34  20           Now, I want to turn to the issue of
11:18:36  21   carve-out for legal expenses.  And Mr. Williams
11:18:40  22   talked about the bank robber example, many
11:18:44  23   times.  That relates to for legal expenses.  And
11:18:49  24   I'll note at the beginning that the SEC doesn't
11:18:51  25   have a single case where a Court refused to

| | | |
|---|---|---|
| 11:18:54 | 1 | carve out reasonable living expenses for a |
| 11:18:56 | 2 | primary defendant.  And I think we listed about |
| 11:19:00 | 3 | seven of those.  And I think if you're going to |
| 11:19:02 | 4 | carve out reasonable living expenses for a |
| 11:19:05 | 5 | person accused of primary wrongdoing, the |
| 11:19:08 | 6 | analysis favors all the more carving out |
| 11:19:11 | 7 | expenses for someone who's accused of no |
| 11:19:13 | 8 | wrongdoing.  That's particularly appropriate |
| 11:19:15 | 9 | here because we're talking about children ages |
| 11:19:18 | 10 | eight, seven and three, who obviously can't go |
| 11:19:20 | 11 | out and get a job.  We're also talking about |
| 11:19:23 | 12 | Shalini Ahmed, who has been named as a material |
| 11:19:26 | 13 | witness, and thus has severe restrictions on her |
| 11:19:30 | 14 | liberty.  And she can't go out and get a job -- |
| 11:19:32 | 15 | THE COURT:  I don't understand that. |
| 11:19:34 | 16 | MR. SKIBELL:  Sure.  She has been |
| 11:19:36 | 17 | named by the federal government in the District |
| 11:19:39 | 18 | of Massachusetts insider trading cases as a |
| 11:19:42 | 19 | material witnesses.  She was under house arrest |
| 11:19:44 | 20 | for a period of time.  She now can leave the |
| 11:19:48 | 21 | house for certain periods of time, and she |
| 11:19:49 | 22 | checks in with the Government.  I don't remember |
| 11:19:51 | 23 | the exact restrictions, but she can provide |
| 11:19:54 | 24 | testimony on that.  And that makes it virtually |
| 11:19:58 | 25 | impossible for her to go out and find a job. |

| | | |
|---|---|---|
| 11:20:00 | 1 | THE COURT:  Has she sought |
| 11:20:03 | 2 | modification of the terms or the curfews of the |
| 11:20:09 | 3 | electronic monitoring? |
| 11:20:11 | 4 | MR. SKIBELL:  Vigorously, your Honor. |
| 11:20:13 | 5 | THE COURT:  Being employed is usually |
| 11:20:17 | 6 | required, or usually, those purposes, the |
| 11:20:21 | 7 | purpose of being allowed to go out to work, are |
| 11:20:25 | 8 | accepted. |
| 11:20:26 | 9 | MR. SKIBELL:  Your Honor, I don't |
| 11:20:27 | 10 | know all the details of the criminal case.  But |
| 11:20:29 | 11 | I do know that we have vigorously contested the |
| 11:20:35 | 12 | current terms related to her.  And the other |
| 11:20:38 | 13 | thing I would note is that our focus has been on |
| 11:20:42 | 14 | this preliminary injunction hearing, and she |
| 11:20:44 | 15 | obviously is going to continue to attempt to |
| 11:20:46 | 16 | lessen the restrictions on her liberty.  But as |
| 11:20:50 | 17 | of now, we don't think there's any ability for |
| 11:20:51 | 18 | her to find employment until those are lifted, |
| 11:20:55 | 19 | and it's highly uncertain if they'll be lifted. |
| 11:20:58 | 20 | THE COURT:  All right, I don't have |
| 11:20:59 | 21 | in your record, documentation of the efforts to |
| 11:21:04 | 22 | lift those requirements for the purpose of her |
| 11:21:08 | 23 | seeking employment, -- |
| 11:21:10 | 24 | MR. SKIBELL:  I'm certainly -- |
| 11:21:12 | 25 | THE COURT:  -- if such documentation |

11:21:13   1   exists.  I am assuming she's supervised out of

11:21:18   2   Connecticut's probation office?

11:21:19   3         MR. SKIBELL:  She is.  She is, your

11:21:23   4   Honor, and we didn't think it was necessary.

11:21:25   5   But we are happy to submit details of the

11:21:27   6   current restrictions upon her, and our efforts

11:21:29   7   to date to lift those restrictions.

11:21:35   8         THE COURT:  Okay.

11:21:40   9         MR. SKIBELL:  Another thing I wanted

11:21:42   10  to talk about in terms of the issue of whether

11:21:47   11  or not she should get legal fees.  You'll see

11:21:49   12  that we cite a number of other cases on this

11:21:52   13  issue.  And we think those cases stand for the

11:21:55   14  general proposition that it's fair to carve out

11:22:00   15  legal fees because it's necessary for the

11:22:02   16  fairness of the proceeding.  And we think that's

11:22:05   17  all the more appropriate, in a case of this

11:22:08   18  magnitude, as well as when the relief defendant

11:22:10   19  is accused of no wrongdoing.  We think the bank

11:22:14   20  robber analogy, which the SEC relies upon, falls

11:22:18   21  down really here, because we have the bank

11:22:21   22  robber is doing two things.  One, the bank

11:22:24   23  robber obviously knows and engaged in the

11:22:26   24  alleged misconduct.  That's not what happened

11:22:28   25  here.  And the second thing is the bank robber

11:22:32   1   is funding, the analogy, is funding their legal

11:22:36   2   defense out of the exact pot of money that they

11:22:38   3   stole.  Here, as I mentioned before, Shalini

11:22:42   4   Ahmed made a lot of money, and it's a lot of

11:22:45   5   good money that went into their accounts.  And

11:22:47   6   we think that weighs in favor of our cases,

11:22:51   7   which suggest that in order to ensure the

11:22:53   8   fairness of the proceeding, you need to carve

11:22:56   9   out some amount of legal fees for a relief

11:22:59  10   defendant.

11:23:02  11           The next issue I wanted to turn to is

11:23:04  12   the issue and the behavior of Oak Capital

11:23:09  13   Management.  And I think it's important when you

11:23:12  14   understand what happened here, is looking at the

11:23:14  15   time period.  Because it's pretty self-evident

11:23:17  16   that Oak moved as quickly as possible to seize

11:23:20  17   as much money of Iftikar Ahmed as they could.

11:23:24  18   So on May 7, 2015, the TRO is entered in this

11:23:29  19   case.  And you will hear testimony on this later

11:23:31  20   today from Grace Ames, and we also have some

11:23:36  21   documents and we can provide more on this issue.

11:23:37  22   So the very next day, after the TRO is entered,

11:23:40  23   and clearly Ms. Ames knew about the TRO because

11:23:43  24   her declaration is the sole -- is really the

11:23:45  25   piece of evidence underlying that.  The very

11:23:48  1   next day, they sent a letter that's a notice of
11:23:51  2   termination to Iftikar Ahmed.  Now under his
11:23:54  3   employment agreement, there were 30 days they
11:23:57  4   had to give in order to procure.  What happens
11:24:00  5   eleven days later, or ten days later, excuse me,
11:24:03  6   but eleven days after the TRO is entered, that's
11:24:06  7   May 18, I assume they found out that Iftikar
11:24:11  8   Ahmed is no longer available.  So they announce
11:24:13  9   that he was terminated, even though the
11:24:15 10   contractual period of time they had to wait had
11:24:17 11   not run.  And they announce that they had seized
11:24:19 12   all the money in his accounts.
11:24:22 13           Now, the money in his accounts are --
11:24:26 14   there's some capital contributions in there.
11:24:28 15   There's also effectively carried interest.
11:24:31 16   Carried interest essentially is, when you boil
11:24:33 17   it down, is the interest that Oak Management,
11:24:37 18   its general partners have alongside the
11:24:42 19   investors in the fund.  So they are -- their
11:24:45 20   compensation is aligned with the underlying
11:24:47 21   investors.  That's the whole idea of carried
11:24:49 22   interest.  So they're fairly close to an actual
11:24:54 23   investor in there.
11:24:55 24           Now, as I understand the SEC's
11:24:56 25   position, is they are claiming that they simply

| 11:24:59 | 1 | cannot value the money in this carried interest. |
| 11:25:03 | 2 | I find that very hard to believe.  First, Oak |
| 11:25:07 | 3 | has valued it for tax purposes at over |
| 11:25:11 | 4 | twenty-three million dollars.  And Ms. Ames |
| 11:25:13 | 5 | testified during her deposition that that's |
| 11:25:15 | 6 | likely a conservative number.  We've also asked |
| 11:25:19 | 7 | for and they've refused to date, but eventually |
| 11:25:22 | 8 | I believe we will get these documents for Oak's |
| 11:25:24 | 9 | own internal valuation of the carried interest |
| 11:25:28 | 10 | and the funds themselves.  And I think Oak's |
| 11:25:30 | 11 | shareholders will be surprised to hear that the |
| 11:25:34 | 12 | SEC is treating the carried interest, which is |
| 11:25:36 | 13 | very similar to investors' money, as essentially |
| 11:25:40 | 14 | worthless.  We believe that Oak's internal |
| 11:25:42 | 15 | documents, expert testimony, will demonstrate |
| 11:25:45 | 16 | that that is substantial value, worth much more |
| 11:25:49 | 17 | than twenty-three million dollars.  I think |
| 11:25:51 | 18 | that's likely probably why Oak moved so rapidly |
| 11:25:54 | 19 | to seize the money itself. |
| 11:25:56 | 20 | We believe, and we cite a number of |
| 11:25:59 | 21 | cases for this proposition, that that money is |
| 11:26:02 | 22 | properly part of the asset freeze, just as |
| 11:26:07 | 23 | liquid and illiquid assets of Mr. Ahmed are, |
| 11:26:10 | 24 | because the SEC had no problem seizing plenty of |
| 11:26:14 | 25 | liquid assets from Mr. Ahmed, including interest |

11:26:16  1   from private investments that are nearly

11:26:19  2   identical in being hard to value.  And at the

11:26:21  3   appropriate time, if Oak has contractual

11:26:24  4   arguments that they think they're entitled to

11:26:26  5   the money, they can raise them in this court and

11:26:28  6   the Court will decide based on principles of

11:26:30  7   equitable distribution whether the money should

11:26:34  8   go as a windfall to Oak Capital Management, or

11:26:36  9   the money should flow to investors.  But for

11:26:39  10  now, that money is identical to the other money

11:26:41  11  in this case, with one exception.  It actually

11:26:43  12  belongs to the defendant, Iftikar Ahmed.  It

11:26:45  13  doesn't belong whatsoever to the relief

11:26:48  14  defendants in this case.  And that should come

11:26:50  15  before any money of the relief defendants.

11:27:01  16        The last issue I wanted to touch on,

11:27:04  17  just very briefly, was the I-Cubed transaction.

11:27:10  18  Since this is a preliminary injunction, we don't

11:27:14  19  think it's necessary, particularly given the

11:27:17  20  limited relief we're seeking, to go into all the

11:27:20  21  facts of the case.  We frankly haven't had time

11:27:22  22  to do so and discovery is required to do that.

11:27:25  23  But the case law is very clear -- and this is

11:27:28  24  cited in our brief and Mr. Williams is

11:27:31  25  noticeably silent on this issue -- that there

11:27:32   1   has to be a causal nexus between any wrongdoing,

11:27:37   2   and any ill gotten gains, i.e., harm to

11:27:41   3   investors.  We cited about three cases on this

11:27:43   4   issue.  Now, whether or not Mr. Ahmed should

11:27:47   5   have disclosed to Oak that his wife had enter in

11:27:50   6   Company C, maybe he should have, maybe he

11:27:55   7   shouldn't have.  But what I think we can all

11:27:56   8   agree upon is there was no harm to the

11:27:59   9   investors.  Oak's internal documents thought

11:28:01  10   this was a fantastic transaction.  Shortly after

11:28:05  11   the transaction, Oak internally valued what they

11:28:07  12   purchased for 7.5 million, at over ten million

11:28:10  13   dollars.  So whether he acted rightly or

11:28:14  14   wrongly, there's nothing to disgorge here

11:28:16  15   because there's no ill gotten gains.  Oak got a

11:28:19  16   great deal.  So that's another thing that weighs

11:28:22  17   against the disgorgement figures calculated by

11:28:26  18   the SEC.  So if you look at the twenty-three

11:28:27  19   million dollars that Oak is sitting on, and you

11:28:29  20   look at the 7.5 million dollars related to the

11:28:32  21   I-Cubed transaction, what we have is

11:28:35  22   disgorgement and penalties are going to be a lot

11:28:38  23   lower than what the SEC is asking for.  And this

11:28:40  24   is also touched in our brief.  Civil penalties

11:28:44  25   are often a minor part of the total, what is

11:28:46  1   ordered here.  I believe the SEC is requesting

11:28:49  2   forty million dollars in civil penalties.

11:28:51  3   There's no indication that they're going to get

11:28:53  4   anything near that.  So the amount that needs to

11:28:56  5   be frozen is not nearly as high as the SEC

11:28:59  6   thinks it is.  And given what they've already

11:29:02  7   frozen, and what they have effectively frozen

11:29:05  8   from Oak, though they seem to be vacillating on

11:29:09  9   this issue, we think there's more than enough

11:29:11  10  here to carve out a minor amount for reasonable

11:29:16  11  living fees and legal expenses, for just to

11:29:18  12  carve out the I-Cubed transaction, which we

11:29:21  13  don't think they have an argument on.

11:29:24  14          That's all I have, unless you have

11:29:26  15  specific questions for me.

11:29:29  16          THE COURT:  I do have a question.  I

11:29:30  17  have to find it.

11:29:33  18          MR. SKIBELL:  Your Honor, I'll just

11:29:34  19  note, my partner Jon Harris was briefly going to

11:29:37  20  talk about this issue about the notice of

11:29:38  21  dissipation that was filed last night by the

11:29:41  22  SEC.

11:29:52  23          THE COURT:  Will you be addressing

11:29:56  24  Mrs. Ahmed's Goldman account, and, I gather that

11:30:02  25  is a part of the freeze order currently?

11:30:05  1        MR. SKIBELL:  It is.  I'm happy to
11:30:07  2   address that.
11:30:07  3        THE COURT:  And then the other is,
11:30:12  4   you said that the money, or the carried interest
11:30:24  5   in the Oak account, that portion that's
11:30:29  6   legitimate money, belongs to the defendant, not
11:30:34  7   the relief defendant.  I did not understand what
11:30:36  8   that meant.
11:30:37  9        MR. SKIBELL:  I'll touch on the
11:30:38 10   second one first.  So the accounts that are held
11:30:41 11   at Oak Capital Management are solely in the name
11:30:44 12   of Iftikar Ahmed.  They're not jointly in the
11:30:48 13   name of his wife, they're not in the name of
11:30:50 14   anyone else.  And typically, when you look
11:30:52 15   towards the disgorgement remedy, since the
11:30:55 16   defendant, as opposed to the relief defendant,
11:30:57 17   the person accused of wrongdoing, the first
11:30:59 18   disgorgement would come from the assets of the
11:31:01 19   actual defendant.
11:31:02 20        THE COURT:  I see what you are
11:31:03 21   saying, okay.
11:31:04 22        MR. SKIBELL:  And you don't look
11:31:05 23   beyond that, unless you need to look beyond
11:31:07 24   that.  So that's why we believe that those funds
11:31:11 25   at Oak are clearly at the center of this case.

| | | |
|---|---|---|
| 11:31:15 | 1 | Now, I'll touch on the issue you |
| 11:31:17 | 2 | mentioned about the money that Ms. Ahmed earned |
| 11:31:20 | 3 | over the course of her employment at the Goldman |
| 11:31:24 | 4 | Sachs.  So she earned money that's in an IRA, |
| 11:31:27 | 5 | she earned Goldman Sachs, which is, I don't |
| 11:31:31 | 6 | remember the value of the IRA, I know it's in |
| 11:31:33 | 7 | our papers.  The Goldman stock is worth only |
| 11:31:36 | 8 | about forty thousand dollars.  And then she |
| 11:31:39 | 9 | earned about 1.2 million dollars in salary while |
| 11:31:42 | 10 | she was at Goldman Sachs.  And the cases are |
| 11:31:45 | 11 | fairly clear that if a relief defendant did work |
| 11:31:48 | 12 | and earned -- and that in turn, they got |
| 11:31:53 | 13 | consideration, then that can't be touched by the |
| 11:31:56 | 14 | SEC. |
| 11:31:57 | 15 | Now, the SEC's argument here is |
| 11:31:59 | 16 | they're like "Oh, she must have spent it." |
| 11:32:01 | 17 | Well, we think the burden is on the SEC to show |
| 11:32:05 | 18 | tracing of good money, not the relief |
| 11:32:09 | 19 | defendants.  But they're ignoring the fact that |
| 11:32:12 | 20 | while she didn't continue to have a job, she did |
| 11:32:14 | 21 | also contribute substantially to the marriage |
| 11:32:16 | 22 | over that same period of time.  And that, we |
| 11:32:19 | 23 | think, means that you don't look to what she |
| 11:32:22 | 24 | spent or didn't spend.  You just merely look to |
| 11:32:25 | 25 | what she earned.  And we don't think they can |

| | | |
|---|---|---|
| 11:32:28 | 1 | touch what she earned.  And I'll make one more |
| 11:32:30 | 2 | point on this. |
| 11:32:31 | 3 | In connection with the two rental |
| 11:32:33 | 4 | properties, this is the DIYA and DIYA Real, Ms. |
| 11:32:37 | 5 | Ahmed took the lead on that investment for the |
| 11:32:41 | 6 | family.  She was the one who came up with the |
| 11:32:43 | 7 | idea of it.  She was the one that pushed the |
| 11:32:45 | 8 | transaction forward.  She deals with the rental |
| 11:32:48 | 9 | agent; she deals with any issues that come up |
| 11:32:51 | 10 | relating to the property.  And under the cases |
| 11:32:54 | 11 | we cited, if someone puts their effort into an |
| 11:32:58 | 12 | asset, that takes it out of the realm of |
| 11:33:03 | 13 | disgorgement on this type of freezing order. |
| 11:33:05 | 14 | That can eventually, we can try to figure out |
| 11:33:07 | 15 | how much of the money versus her efforts are at |
| 11:33:11 | 16 | issue here.  But in terms of the initial freeze, |
| 11:33:13 | 17 | the case law is quite clear that if you put |
| 11:33:17 | 18 | effort in, it's not like you got zero, that this |
| 11:33:19 | 19 | is not your assets.  So we think that she also |
| 11:33:23 | 20 | -- we're not seeking, in terms of this |
| 11:33:24 | 21 | preliminary injunction, to carve out the rental |
| 11:33:28 | 22 | property.  We think that's an issue for a later |
| 11:33:30 | 23 | time.  But in terms, the forward looking rental |
| 11:33:33 | 24 | income, we think she has a perfectly good claim |
| 11:33:37 | 25 | to that because she's the one doing all the work |

| | |
|---|---|
| 11:34:02 | 1 |
| 11:34:02 | 2 |
| 11:34:11 | 3 |
| 11:34:18 | 4 |
| 11:34:24 | 5 |
| 11:34:27 | 6 |
| 11:34:30 | 7 |
| 11:34:39 | 8 |
| 11:34:41 | 9 |
| 11:34:44 | 10 |
| 11:34:44 | 11 |
| 11:34:46 | 12 |
| 11:34:48 | 13 |
| 11:34:51 | 14 |
| 11:34:53 | 15 |
| 11:34:55 | 16 |
| 11:34:57 | 17 |
| 11:35:00 | 18 |
| 11:35:02 | 19 |
| 11:35:03 | 20 |
| 11:35:06 | 21 |
| 11:35:09 | 22 |
| 11:35:12 | 23 |
| 11:35:14 | 24 |
| 11:35:15 | 25 |

on it.

THE COURT:  You indicated that Ms. Ahmed had a 401K, and Goldman stock.  I think the papers showed that the 401K was valued somewhere slightly shy of two hundred sixty-three thousand.  The stock, a little bit less than forty thousand.  Is the 401K frozen?

MR. SKIBELL:  I believe it is because it's sitting at Fidelity.  What happens in a case like that --

THE COURT:  How can that be frozen?

MR. SKIBELL:  This is what happens. Fidelity does the freezing, even if the SEC doesn't do the freeze.  So she can't get at any money in those accounts.  So those accounts, months of the accounts, either they were in her husband's name or even in her individual name, were frozen, even if they weren't directly part of the TRO.

THE COURT:  But isn't the nature of a 401K that it is segregated out and designated because you have to withdraw from it and there are tax consequences, et cetera.

MR. SKIBELL:  Absolutely.  We think the SEC has zero claim to the 401K.  She just

| | | |
|---|---|---|
| 11:35:19 | 1 | can't get to it right now because it's held by |
| 11:35:21 | 2 | Fidelity, and Fidelity doesn't allow her to |
| 11:35:25 | 3 | access any of her accounts. |
| 11:35:26 | 4 | THE COURT: So part of your claim, at |
| 11:35:28 | 5 | a minimum, is that the order should be modified |
| 11:35:30 | 6 | to exclude that. |
| 11:35:32 | 7 | MR. SKIBELL: Absolutely. |
| 11:35:32 | 8 | THE COURT: And does the same thing |
| 11:35:34 | 9 | go for the stock, is that an employee stock |
| 11:35:39 | 10 | purchase opportunity that's driven by the salary |
| 11:35:43 | 11 | level? |
| 11:35:44 | 12 | MR. SKIBELL: Absolutely. |
| 11:35:45 | 13 | THE COURT: And where is that held? |
| 11:35:46 | 14 | MR. SKIBELL: I don't remember. I |
| 11:35:48 | 15 | believe it's at Fidelity as well. |
| 11:35:50 | 16 | THE COURT: Okay. Thank you. |
| 11:35:57 | 17 | MR. SKIBELL: John is going to |
| 11:35:59 | 18 | briefly touch on this other issue. Thank you. |
| 11:36:01 | 19 | THE COURT: Thank you. |
| 11:36:05 | 20 | MR. HARRIS: Your Honor, I will be |
| 11:36:07 | 21 | very brief. I just want to touch on two things. |
| 11:36:09 | 22 | THE COURT: They all say that. |
| 11:36:10 | 23 | MR. HARRIS: But I mean it, your |
| 11:36:11 | 24 | Honor. |
| 11:36:13 | 25 | THE COURT: They all say that, too. |

|  |  |  |
|---|---|---|
| 11:36:15 | 1 | MR. HARRIS:  On the Rigas thing, I'm |
| 11:36:22 | 2 | going to see if there's a transcript of the |
| 11:36:23 | 3 | decision.  There was a parallel SEC case, and |
| 11:36:25 | 4 | this was all part of it. |
| 11:36:26 | 5 | THE COURT:  I don't actually think it |
| 11:36:29 | 6 | is very applicable, so don't spend a lot of |
| 11:36:31 | 7 | effort on it.  I think that the implications of |
| 11:36:41 | 8 | the constitutional right to counsel really |
| 11:36:45 | 9 | distinguish it.  So go ahead. |
| 11:36:46 | 10 | MR. HARRIS:  The SEC filed a motion |
| 11:36:50 | 11 | about dissipation and I just wanted to address |
| 11:36:53 | 12 | that quickly.  Because in accord with what we've |
| 11:36:58 | 13 | said to your Honor, is that any money that's |
| 11:37:00 | 14 | released here, we are willing to put in place |
| 11:37:05 | 15 | whatever controls your Honor thinks is |
| 11:37:07 | 16 | appropriate, or whatever is reasonable, in order |
| 11:37:09 | 17 | to avoid anticipation the money is going to be |
| 11:37:12 | 18 | spent for a very limited set of things.  There |
| 11:37:15 | 19 | was, before Shalini Ahmed was named as a relief |
| 11:37:18 | 20 | defendant in this case, she transferred six |
| 11:37:20 | 21 | hundred seventy-one thousand dollars to my |
| 11:37:22 | 22 | firm's IOLA account.  That money was solely in |
| 11:37:25 | 23 | her name.  It was not frozen.  Five hundred |
| 11:37:30 | 24 | thousand dollars of that money was sent to the |
| 11:37:33 | 25 | federal government in order to somewhat modify |

| | |
|---|---|
| 11:37:36 | 1 |
| 11:37:39 | 2 |
| 11:37:42 | 3 |

the conditions of her bail.  Because she was
effectively being held prisoner in her house and
could not even come to our office to meet with
us.  And the only place she was allowed to go
was to go to court, or to go pick up her kids
from school.  And so the five hundred thousand
dollars was used to modify the conditions of the
release, and that money is sitting in a court or
federal bank account as condition ^ have ^ of
the bail.  And I certainly don't think that
constitutes dissipation of assets under any
reasonable view of the world.  There is a
hundred seventy thousand dollars left.
Twenty-five thousand ^ have ^ of it was paid as
an a retainer to Mr. Knag, because we needed to
get Connecticut counsel, as your Honor knows.
And the remainder is about a hundred forty odd
thousand dollars.  I don't think that there's
anybody in this room who does not think that
Shalini Ahmed has a hundred forty thousand
dollars of good money.  And the money that was
spent was spent for school expenses.  And I just
don't think that under any view, that was not
money that was frozen, it was money that was in
her name, it has not been dissipated, and I

| | |
|---|---|
| 11:38:53 | 1 |
| 11:38:56 | 2 |
| 11:38:56 | 3 |
| 11:38:59 | 4 |
| 11:38:59 | 5 |
| 11:39:02 | 6 |
| 11:39:02 | 7 |
| 11:39:09 | 8 |
| 11:39:13 | 9 |
| 11:39:14 | 10 |
| 11:39:16 | 11 |
| 11:39:16 | 12 |
| 11:39:19 | 13 |
| 11:39:19 | 14 |
| 11:39:22 | 15 |
| 11:39:23 | 16 |
| 11:39:24 | 17 |
| 11:39:27 | 18 |
| 11:39:29 | 19 |
| 11:39:34 | 20 |
| 11:39:36 | 21 |
| 11:39:38 | 22 |
| 11:39:40 | 23 |
| 11:39:42 | 24 |
| 11:39:45 | 25 |

really, I just think the motion should not have been made.

THE COURT:  It's a notice, it's not a motion.

MR. HARRIS:  Okay.  Thank you, your Honor.

THE COURT:  All right.  Thank you. All right, let's begin the evidence, please.

MR. WILLIAMS:  Before we do, your Honor, would you like to hear a response at all on the notice?  I think there were a few things --

THE COURT:  No, because we're going to take that up, if we have time, only at the end.

MR. WILLIAMS:  Yes, your Honor.  In addition, there is -- and I guess we can wait to get To it, but I think there's a privilege issue as well, I think there's some documents that defense is asserting are privileged.  The Government feels very strongly they're not privileged.  And I think that they are unfortunately, maybe, a couple of them are very relevant to contradict maybe some of the arguments that were made about Mrs. Ahmed's

| | | |
|---|---|---|
| 11:39:47 | 1 | efforts with regards to the DIYA properties.  If |
| 11:39:51 | 2 | we have time, I think the Government would ask |
| 11:39:52 | 3 | to be heard on that.  But we can also submit |
| 11:39:56 | 4 | written papers on it. |
| 11:39:57 | 5 | THE COURT:  Is there agreement that |
| 11:39:58 | 6 | federal law governs the privilege here? |
| 11:40:05 | 7 | MR. WILLIAMS:  When you say, what do |
| 11:40:06 | 8 | you mean by -- what does your Honor, I'm sorry, |
| 11:40:09 | 9 | I don't quite understand the question. |
| 11:40:14 | 10 | THE COURT:  Well, the rule of |
| 11:40:17 | 11 | evidence 501 says that the common law as |
| 11:40:20 | 12 | interpreted by US courts, in light of reason and |
| 11:40:23 | 13 | experience, governs a claim of privilege. |
| 11:40:27 | 14 | MR. WILLIAMS:  I don't know the |
| 11:40:28 | 15 | answer to that question. |
| 11:40:30 | 16 | THE COURT:  Unless the Constitution |
| 11:40:32 | 17 | state or rule provides otherwise. |
| 11:40:35 | 18 | MR. WILLIAMS:  The issue really here |
| 11:40:37 | 19 | is all of the records that are at least in |
| 11:40:39 | 20 | dispute on privilege came from Oak, using the |
| 11:40:42 | 21 | Oak e-mail.  We submit they have an electronic |
| 11:40:45 | 22 | policy, like most companies do, saying anything |
| 11:40:47 | 23 | you say over the Oak e-mail is not privileged. |
| 11:40:50 | 24 | We have Iftikar Ahmed's signature signing that |
| 11:40:53 | 25 | document.  You know, there is some room for -- |

11:40:56  1   well, so we submit that there was -- there was

11:40:59  2   no expectation of privacy.  But like I said, I

11:41:02  3   mean I don't want to take up too much of the

11:41:05  4   Court's time.  But there are definitely some

11:41:07  5   documents we think relevant that right now

11:41:09  6   anyway, we're prevented from using because of

11:41:12  7   the privilege claim.

11:41:12  8         THE COURT:  We're talking only about

11:41:13  9   communications made in confidence during a valid

11:41:17  10  marriage.  And issues, the Second Circuit has at

11:41:25  11  least identified in re: Witness before a grand

11:41:30  12  jury, 791 Fed 2d 234 at 237, that "Whether the

11:41:37  13  couple had a joint checking account, whether

11:41:39  14  they jointly owned real estate, whether they

11:41:43  15  loaned money to each other" do not delve into

11:41:49  16  "marital communications, but rather into actions

11:41:51  17  that are not communicative and may be described

11:41:55  18  without divulgence of privileged communications.

11:41:59  19  Such inquiries are not bared by the privilege."

11:42:04  20  With that rubric, I think we can proceed.

11:42:07  21        MR. WILLIAMS:  In addition, just so

11:42:08  22  your Honor is aware, that definitely was an

11:42:10  23  issue.  There's also an issue of attorney/client

11:42:12  24  privilege.  And for example, when the DIYA

11:42:15  25  entities were being created.  And we submit that

11:42:18  1    they were created by Mr. Ahmed, and we would
11:42:20  2    like to produce documents showing that, that
11:42:23  3    defense takes the position that that's
11:42:25  4    attorney/client privilege.  And that they hold
11:42:28  5    the privilege because they represent DIYA.  And
11:42:30  6    even though Iftikar Ahmed was on the e-mails and
11:42:32  7    was using Oak's e-mail, that he had an
11:42:35  8    expectation of privacy, and therefore the
11:42:38  9    Government should be prevented from using those.
11:42:40  10   And in fact they're asking us to destroy the
11:42:43  11   documents.
11:42:45  12          THE COURT:  Why don't we see how
11:42:48  13   essential it is to reach that.  I am interested
11:42:50  14   that there is at least one district court in
11:42:56  15   this circuit that has opined, "There is no
11:43:04  16   reason why an adverse inference could not be
11:43:06  17   drawn from invocation of the confidential
11:43:09  18   marital communications privilege."  That comes
11:43:13  19   from US versus premises known as 281 Syosset
11:43:19  20   Woodbury Road, 862 Fed Supp 847 at 860 from the
11:43:24  21   Eastern District in 1994.  All right.  I give
11:43:29  22   you that just in case you wish to respond to the
11:43:37  23   applicability of either of those cases, or more
11:43:39  24   importantly, how they are applicable.  All
11:43:42  25   right.  Do you wish to proceed?

11:43:44   1          MR. WILLIAMS:  Thank you, your Honor.

11:43:53   2          MR. HEINKE:  Your Honor, as Mr.

11:43:55   3   Williams indicated in his opening statement, I

11:43:57   4   really think the case for today's presentation

11:44:01   5   focuses primarily on the, in terms of the facts

11:44:06   6   of the fraud, the I-Cubed transaction, and also

11:44:09   7   on this question of the Oak carried interest.

11:44:13   8          THE COURT:  So are you going to

11:44:14   9   address how you claim the SEC has proven, other

11:44:20  10   than by demonstration of a massive fraud,

11:44:30  11   whether there is clean money, by virtue of the

11:44:34  12   fact that Mr. Ahmed was employed by Oak for a

11:44:40  13   long time, a period of time, which presumably

11:44:43  14   means he got some legitimate income?

11:44:46  15          MR. HEINKE:  Your Honor, we don't

11:44:48  16   dispute that there was, you know, salaries paid

11:44:52  17   to Mr. Ahmed over the years.  The SEC's position

11:44:55  18   on this issue, your Honor, is that in a case

11:44:59  19   where the assets that are frozen, and I focus

11:45:04  20   specifically on the liquid assets and the real

11:45:09  21   estate, which total, by our math, somewhere on

11:45:12  22   the order of sixty-eight million dollars, and

11:45:16  23   there's disgorgement on the order of sixty-eight

11:45:19  24   million dollars, that when your Honor is

11:45:24  25   considering freezing assets for purposes of

11:45:27   1   satisfying some disgorgement order, at the end

11:45:30   2   of the day, it doesn't matter whether those

11:45:34   3   assets are clean or dirty.  And here, many of

11:45:38   4   the assets are tainted.  But in other words, if

11:45:40   5   you had someone --

11:45:41   6          THE COURT:  Because that's

11:45:42   7   recoverable against the defendant.

11:45:43   8          MR. HEINKE:  That is correct, your

11:45:44   9   Honor.  So the SEC's position is certainly that

11:45:47  10   we do not anticipate showing that every dollar

11:45:50  11   that is frozen was fraudulent money.  Rather,

11:45:53  12   our position is that the assets of Mr. Ahmed,

11:45:56  13   regardless of whose name they are held in, ought

11:45:59  14   to be preserved for a future disgorgement or

11:46:02  15   penalty remedy.

11:46:04  16          THE COURT:  Does the SEC oppose an

11:46:07  17   order that modifies or clarifies the current

11:46:11  18   freeze order to release the Fidelity account

11:46:17  19   that is identified as the 401K and the Goldman

11:46:21  20   Sachs stock account?

11:46:23  21          MR. HEINKE:  Your Honor, I don't

11:46:23  22   think we would at the end of the day.  But I

11:46:26  23   will give you this caveat, and Mr. Williams

11:46:28  24   addressed this a bit.  If there is evidence

11:46:31  25   presented today or later, that in fact that

11:46:36  1   those accounts were funded from Goldman, it was

11:46:41  2   Ms. Ahmed's money that went into those

11:46:43  3   accounts, we would not oppose such an order.

11:46:45  4   Our concern, frankly, your Honor, is given the

11:46:49  5   machinations that Mr. Ahmed took to use various

11:46:53  6   accounts to fund various things, we just needed

11:46:56  7   -- the SEC just needed to be able to satisfy

11:46:59  8   itself that in fact the money in those accounts

11:47:02  9   was from Goldman, was from Ms. Ahmed.  No reason

11:47:06  10  to believe it's not.  But we've also not seen

11:47:08  11  the evidence that it is.  So with that caveat, I

11:47:11  12  think I would say with, you know, sufficient

11:47:13  13  evidence, we would not oppose unfreezing 401K

11:47:17  14  moneys, or stock, that are sort of demonstrably

11:47:22  15  from Ms. Ahmed's time at Goldman.

11:47:25  16        The answer, just to be clear, is

11:47:27  17  different as to the salary Ms. Ahmed was paid.

11:47:31  18  I'm happy to address that, if your Honor would

11:47:33  19  like.

11:47:34  20        THE COURT:  Well, let's proceed with

11:47:36  21  any witnesses that you have.  We can only -- the

11:47:43  22  latest we can go is 2:30.

11:47:45  23        MR. HEINKE:  Thank you, your Honor.

11:47:47  24  We will keep our presentation, again, brief and

11:47:49  25  focused on those issues.

| | | |
|---|---|---|
| 11:47:51 | 1 | I note first, which I think will |
| 11:47:53 | 2 | shorten the evidentiary presentation, there is a |
| 11:47:55 | 3 | piece of evidence that is narrow, but important, |
| 11:47:57 | 4 | which is that the signature on the I-Cubed sales |
| 11:48:03 | 5 | agreement to Oak, the signature of Mr. Kimball |
| 11:48:08 | 6 | that Mr. Williams mentioned, we have spoken to |
| 11:48:12 | 7 | Mr. Kimball on that narrow issue and he has |
| 11:48:16 | 8 | confirmed that signature was a forgery.  And |
| 11:48:18 | 9 | your Honor, just for reference, I'm putting that |
| 11:48:21 | 10 | signature on the ELMO.  Mr. Oraker was on that |
| 11:48:25 | 11 | telephone call; he's prepared to testify about |
| 11:48:27 | 12 | it.  However, we've spoken with defense counsel, |
| 11:48:30 | 13 | and I believe we are in agreement that a proffer |
| 11:48:32 | 14 | by us of that evidence would be sufficient for |
| 11:48:35 | 15 | them. |
| 11:48:36 | 16 | MR. DEITCH:  That's correct, your |
| 11:48:39 | 17 | Honor.  We can't confirm whether or not it is a |
| 11:48:41 | 18 | forgery, but we will stipulate that if Mr. |
| 11:48:44 | 19 | Oraker were to testify, he would testify that |
| 11:48:47 | 20 | Mr. Kimball has so stated. |
| 11:48:50 | 21 | MR. HEINKE:  And so your Honor, we |
| 11:48:51 | 22 | think that will shorten the evidence.  We'd |
| 11:48:54 | 23 | proffer that, rather than calling those |
| 11:48:55 | 24 | witnesses. |
| 11:48:57 | 25 | Your Honor, with that, we would call |

11:48:58  1  our first witness, the SEC would call Ms. Grace

11:49:02  2  Ames.

11:49:48  3        THE COURT:  Ms. Ames, would you

11:49:50  4  kindly come to the witness stand over there.

11:49:59  5  And if you will kindly remain standing, the oath

11:50:01  6  will be administered.

11:50:01  7  GRACE AMES.

11:50:01  8  Weston, Connecticut, having been first duly sworn,

11:50:01  9  testified on her oath as follows:

11:50:30  10        THE COURT:  You may be seated, and

11:50:31  11  you may proceed.

11:50:32  12        MR. HEINKE:  Thank you, your Honor.

11:50:32  13  DIRECT EXAMINATION

11:50:34  14  BY MR. HEINKE:

11:50:34  15    Q.  Good morning, Ms. Ames.

11:50:37  16    A.  Good morning.

11:50:38  17    Q.  Could you briefly explain to the Court who

11:50:41  18  you're employed by?

11:50:42  19    A.  Oak Management Corporation.

11:50:44  20    Q.  And what is your position at Oak?

11:50:45  21    A.  My functional title is chief operating

11:50:49  22  officer.

11:50:49  23    Q.  Generally, what sort of duties do you have

11:50:52  24  as chief operating officer?

11:50:53  25    A.  I help manage the operations, the

11:50:58  1   non-investing operations of the company.

11:51:03  2       Q.  Would you explain to the Court, just

11:51:08  3   briefly, what Oak is?  There's references to Oak

11:51:13  4   and Oak funds.  What is Oak?

11:51:15  5       A.  Oak is a venture capital investor.  And we

11:51:19  6   invest in companies in multiple stages, over

11:51:25  7   multiple industries.

11:51:28  8       Q.  When you say Oak invests, where does the

11:51:30  9   money come from that Oak invests in those

11:51:32 10   companies?

11:51:33 11       A.  We have investors that make commitments to

11:51:37 12   funds.

11:51:37 13       Q.  Who are those investors?  I don't mean by

11:51:40 14   name, but what sort of investors are you

11:51:43 15   referencing?

11:51:43 16       A.  We have very significant amount of state

11:51:48 17   pension fund investors.  That would include

11:51:53 18   teachers, police officers, and other municipal

11:51:59 19   employees.  We also have corporate pension

11:52:02 20   investors.  We have endowments.  We have funds to

11:52:06 21   funds.  And in some cases, we would have

11:52:09 22   individual investors also.

11:52:13 23       Q.  Ms. Ames, were you involved generally in

11:52:19 24   Oak's investigation that uncovered Mr. Ahmed's

11:52:24 25   alleged fraudulent conduct?

11:52:26  1      A.  Yes, I was.

11:52:26  2      Q.  Okay.  And in general, could you just

11:52:30  3  describe, not the specifics of any transactions,

11:52:34  4  but generally, what Oak uncovered after Mr. Ahmed

11:52:38  5  was terminated?

11:52:38  6      A.  That Mr. Ahmed had stolen significant

11:52:43  7  millions of assets from multiple investment funds.

11:52:47  8      Q.  And when Mr. Ahmed stole those assets, whose

11:52:52  9  assets were they?

11:52:53  10      A.  Those are funds, and the funds represent the

11:52:57  11  commitments of all these underlying investors that

11:52:59  12  I just described; the pension funds, the

11:53:03  13  endowments.

11:53:04  14      Q.  Okay.  Ms. Ames, let me circle back to you

11:53:07  15  for a moment.  How long have you been in this, the

11:53:10  16  financial industry?

11:53:12  17      A.  Pretty much my entire career.  So I would --

11:53:18  18      Q.  How long have you been at Oak?

11:53:20  19      A.  I have been at Oak since 1999.

11:53:25  20      Q.  Ms. Ames, I want to focus specifically

11:53:28  21  today -- as you know, there were a number of

11:53:30  22  transactions involved.  I want to focus

11:53:33  23  specifically on the transactions involving an

11:53:37  24  entity called I-Cubed, and an entity you reference

11:53:41  25  in your declaration as Company C.  So that's where

11:53:45  1   I want to focus our time, at least for today.  And
11:53:48  2   in that vein, let me ask you a general question.
11:53:51  3   Does Oak have policies requiring disclosure of an
11:53:59  4   Oak partner's interests in the other side of a
11:54:02  5   transaction?
11:54:02  6       A.  Yes.
11:54:03  7       Q.  And generally, can you describe for the
11:54:05  8   Court, you know, what those policies are, what is
11:54:08  9   expected and required of an Oak partner when they
11:54:13  10  have interests on the other side of the
11:54:15  11  transaction?
11:54:15  12      A.  What is expected of an Oak partner is that
11:54:19  13  there will be no conflict of interest with our
11:54:21  14  investor's expectation and of the underlying
11:54:28  15  funds.  But we have policies that would restrict
11:54:32  16  the investment in any -- really any company that's
11:54:37  17  in a sector in which we invest.  And then
11:54:40  18  there's -- you get into more granular of if
11:54:44  19  there's a position the individual has owned in the
11:54:47  20  prior 90 days.  And additionally, if there's a
11:54:52  21  contemplated exit that there -- actually entrance
11:54:56  22  or exit, in any entity that would be an affiliate
11:55:00  23  of the managing member.
11:55:03  24      Q.  You mentioned in your answer that the
11:55:06  25  policies were about, at least in part, conflicts

11:55:09  1   of interest?

11:55:10  2       A.  Mm-hmm.

11:55:10  3       Q.  Can you explain that a little more?  Why are

11:55:14  4   disclosure policies important in terms of

11:55:16  5   conflicts of interest?

11:55:17  6       A.  Conflict of interest gets to the core of

11:55:21  7   what our investors rely upon.  That they have

11:55:24  8   transparency and a clear understanding of the --

11:55:31  9   of how we're investing, and the clarity of

11:55:34  10  intention in how we're investing.  And there's

11:55:37  11  also a transparency in the compensation of the

11:55:41  12  general partner, or the, you know -- in fact the

11:55:45  13  employees that are managing the funds.

11:55:48  14      Q.  From Oak's perspective, why would it matter

11:55:51  15  if an Oak partner has an interest on the other

11:55:53  16  side of a transaction that Oak is investing in?

11:55:56  17      A.  One example of how it could matter is if an

11:55:59  18  Oak investing partner had a position that had a

11:56:02  19  different cost basis, that they had purchased a

11:56:06  20  position in an Oak portfolio company at a

11:56:09  21  different level than what ultimately the fund had

11:56:12  22  invested, they may have a different motivation of

11:56:15  23  when that position should be exited, what would be

11:56:18  24  deemed an acceptable profit, or potentially, you

11:56:22  25  know, bootstrapping a potential loss.

11:56:25  1    Q.  And in sort of the policies at Oak that
11:56:30  2  you've described, is it limited to only disclosing
11:56:35  3  an actual partner's interest on the other side of
11:56:38  4  the transaction, or is it -- does it encompass
11:56:41  5  something broader than that?
11:56:42  6    A.  Can you just repeat that question?
11:56:45  7    Q.  Sure, that was probably a bad question.
11:56:47  8  From your perspective, at Oak, if the person on
11:56:50  9  the other side of the transaction is not the
11:56:52  10  partner, but the partner's spouse, does that
11:56:54  11  change what Oak expects from that partner in terms
11:56:59  12  of disclosure?
11:56:59  13    A.  No, and that's specifically articulated in
11:57:01  14  our stock trading and then insider information
11:57:04  15  policy, that it would encumber and it would
11:57:08  16  obligate the family member.
11:57:09  17    Q.  And again, why is that; why does Oak care if
11:57:12  18  the family member is on the other side of the
11:57:15  19  transaction?
11:57:15  20    A.  Because it still speaks to a conflict of
11:57:20  21  interest and what is the truest intention or
11:57:22  22  motivation of the investing partner, and their
11:57:25  23  ability to be able to parse what might be an
11:57:27  24  agenda of a personal family financial agenda,
11:57:32  25  versus what is the agenda of the investment

11:57:35  1    partnership.

11:57:37  2        Q.   You talked about the policy generally.  I'd

11:57:41  3    like to look at at least one of those policies and

11:57:44  4    some specifics.  And I will hand you what we'll

11:57:49  5    mark Exhibit 1.

11:57:52  6             MR. HEINKE:  And your Honor, I'm

11:57:53  7    happy to approach with a copy for the Court as

11:57:55  8    well.

11:58:00  9             THE COURT:  Thank you.

11:58:00  10       Q.   Ms. Ames, do you recognize the document that

11:58:16  11   you've been handed and that's been marked as

11:58:19  12   Exhibit 1?

11:58:19  13       A.   Yes, I do recognize this to be --

11:58:23  14       Q.   What is it?

11:58:23  15       A.   It's the limited partnership agreement for

11:58:26  16   one of our investment funds that we referred to as

11:58:28  17   Oak 13.

11:58:30  18            MR. HEINKE:  Your Honor, at this time

11:58:31  19   we move the admission of Exhibit 1.

11:58:33  20            MR. DEITCH:  No objection, your

11:58:34  21   Honor.

11:58:34  22            THE COURT:  Full exhibit.

11:58:37  23            MR. HEINKE:  Yes, your Honor.

11:58:37  24       Q.   Ms. Ames, when speaking of this limited

11:58:51  25   partnership agreement, do you recall, does it have

11:58:54  1    terms that address this issue of disclosure of an

11:58:58  2    Oak partner's interests on the other side of a

11:59:00  3    transaction?

11:59:01  4        A.  Yes, it does.

11:59:02  5        Q.  And I'd like to direct your attention to one

11:59:05  6    provision in particular.  Excuse me, I should use

11:59:09  7    a copy that's not highlighted.

11:59:11  8            Ms. Ames, if you could turn to the page that

11:59:14  9    is labeled at the bottom, 337.  Ms. Ames, you see

11:59:30  10   there's a sub three, and then an A, which reads

11:59:36  11   "The partnership shall not, without the approval

11:59:39  12   of the Valuation Committee, invest in the

11:59:41  13   securities of any entity in which the general

11:59:44  14   partner, the then-managing members of the general

11:59:46  15   partner, the investment manager, its then-members

11:59:50  16   of the Board of Directors and executive officers,

11:59:52  17   or any of their respective affiliates, including

11:59:55  18   the Oak affiliated entities, or any former

11:59:58  19   managing members of the general partner, then have

12:00:00  20   or have had within the preceding 90 days, an

12:00:03  21   investment or other material financial interest."

12:00:05  22   Do you see where I am?

12:00:06  23       A.  Yes, I do see.

12:00:07  24       Q.  Can you just explain for the Court what that

12:00:11  25   provision means?

12:00:12  1    A.   What that means is we would be -- general

12:00:16  2   partner would be required to get Valuation

12:00:18  3   Committee approval if in fact they owned a

12:00:23  4   position in a contemplated portfolio company

12:00:25  5   investment.

12:00:26  6    Q.   And does this apply just to the general

12:00:29  7   partner's personal ownership?

12:00:31  8    A.   No, it would be any interest; it would

12:00:36  9   transcend the family.

12:00:38  10   Q.   You mentioned -- we'll come back to it in a

12:00:41  11  minute, but since you used the term, you mentioned

12:00:44  12  and I think the document mentions the Valuation

12:00:46  13  Committee?

12:00:46  14   A.   Yes.

12:00:46  15   Q.   What is the Valuation Committee?

12:00:48  16   A.   The Valuation Committee is an advisory board

12:00:52  17  that's made up of investor representatives in that

12:00:58  18  specific limited partnership.

12:01:00  19   Q.   And when you say investor representatives,

12:01:04  20  what do you mean by that?

12:01:06  21   A.   It's generally a senior person at one of the

12:01:12  22  limited partners who have put money into our fund.

12:01:20  23   Q.   And that could include some of those

12:01:22  24  investors you spoke of earlier, like pension funds

12:01:24  25  and thing like that?

12:01:25  1      A.   Yes.

12:01:29  2      Q.   Ms. Ames, I'd now like to direct your

12:01:31  3  attention to the page that ends 343 in Exhibit 1.

12:01:44  4  And specifically, 343, there's an B(1).  Do you

12:01:52  5  see where I am?

12:01:52  6      A.   Yes, I do see.

12:01:56  7      Q.   I won't read all of the language, but let me

12:01:59  8  direct your attention to the beginning of that

12:02:00  9  paragraph.  It again says "Except with the

12:02:03  10  approval of the Valuation Committee, the general

12:02:05  11  partner shall not cause the partnership to

12:02:07  12  directly or indirectly acquire securities from or

12:02:11  13  sell securities to," and then it lists a number of

12:02:15  14  entities, "the general partner, the then managing

12:02:17  15  members of the general partner, or any of their

12:02:20  16  respective affiliates, any limited partner or any

12:02:23  17  of its affiliates," with the parenthetical, "the

12:02:25  18  investment manager or any Oak affiliated

12:02:28  19  entities," with another parenthetical.

12:02:31  20      Ms. Ames, can you again just describe for

12:02:33  21  the Court what that provision means?

12:02:35  22      A.   That the general partner would require

12:02:42  23  Valuation Committee approval to acquire or to sell

12:02:47  24  any securities that were held by any member of the

12:02:52  25  general partner.

12:02:54  1    Q.  And let's unpack who the general partner and

12:02:57  2    the members of the general partner are.  So who is

12:03:02  3    the general partner?

12:03:03  4    A.  The general partner is responsible for

12:03:06  5    managing the underlying limited partnership.

12:03:07  6    Q.  Is it a person, is it an entity?

12:03:09  7    A.  It's an entity.

12:03:10  8    Q.  And you also reference and the document

12:03:12  9    references managing members of the general

12:03:15  10   partner?

12:03:15  11   A.  Yes.

12:03:16  12   Q.  Who are managing members of the general

12:03:18  13   partner?

12:03:18  14   A.  Managing members have authority in the

12:03:21  15   general partner to -- in the management of the

12:03:24  16   underlying fund.

12:03:25  17   Q.  And are the managing members people or

12:03:27  18   entities?

12:03:27  19   A.  Those are people.

12:03:29  20   Q.  And do you recall who, at the time in sort

12:03:35  21   of 2013-2014, who some of the managing members of

12:03:39  22   Oak 13 were?

12:03:40  23   A.  Yes, I do.

12:03:41  24   Q.  And did it include Mr. Ahmed?

12:03:43  25   A.  Yes, it did.

12:03:44  1      Q.   Okay.   Ms. Ames, are partners at Oak aware

12:03:59  2   of the provisions of things like this -- excuse

12:04:02  3   me, of this limited partnership agreement?

12:04:04  4      A.   Yes, they are.

12:04:05  5      Q.   And are they required to abide by the terms

12:04:09  6   of the limited partnership agreement?

12:04:09  7      A.   Yes, they are.

12:04:10  8      Q.   Under what -- why are they required to abide

12:04:13  9   by that?

12:04:14 10      A.   Well, they actually sign the Oak associates

12:04:19 11   and other relative fund number agreement, of which

12:04:23 12   explicitly they -- each managing member and Class

12:04:30 13   A member would sign directly that agreement, where

12:04:32 14   that specifically articulates that they will abide

12:04:36 15   by the terms of the limited partnership agreement.

12:04:39 16      Q.   And that, the managing members that would

12:04:41 17   have signed that, would that also include Mr.

12:04:44 18   Ahmed?

12:04:44 19      A.   Yes.

12:04:47 20      Q.   Now, when we looked at these policies, both

12:04:50 21   the first and second sections, they talked about

12:04:53 22   except with the -- or without the approval,

12:04:56 23   probably using the wrong terms here, but you know,

12:04:59 24   things you could not do without the approval of

12:05:01 25   the Valuation Committee.   I want to turn to that

12:05:04  1    for a moment.  What happens if an Oak managing

12:05:09  2    member, someone like Mr. Ahmed, were to say, "I

12:05:12  3    had an interest on the other side of a transaction

12:05:15  4    that Oak's involved in."  What mechanically, what

12:05:17  5    then happens?

12:05:18  6        A.  What could happen, but because it didn't

12:05:22  7    happen, but what could happen, was that we, prior

12:05:25  8    to any investment by Oak, we would put this issue

12:05:30  9    on the agenda for the upcoming Valuation

12:05:33  10   Committee.  There are times that we actually call

12:05:35  11   special meetings to attend to more time sensitive

12:05:39  12   issues for the Valuation Committee.  But that

12:05:41  13   would be if in fact the executive managing member

12:05:45  14   supported presenting this to the Valuation

12:05:48  15   Committee, that would be the potential process.

12:05:50  16       Q.  So let me see if I have the steps right.

12:05:53  17   The first step would be that the executive

12:05:54  18   managing members of Oak would determine whether to

12:05:58  19   even present it to the Valuation Committee, is

12:06:00  20   that --

12:06:00  21       A.  Yes.

12:06:00  22       Q.  -- what you testified to?

12:06:02  23       A.  Yes.

12:06:02  24       Q.  And just for clarity for us and the Court,

12:06:05  25   who are the executive managing members?

12:06:06  1      A.   The executing managing members are, by name,

12:06:13  2  Bandel Carano, Fred Harman, Ed Glassmeyer, and

12:06:17  3  Annie Lamont.

12:06:17  4      Q.   And was Mr. Ahmed at any time an executive

12:06:20  5  managing member?

12:06:20  6      A.   No, he was not.

12:06:21  7      Q.   So we talked about the first step, which is

12:06:24  8  the -- that group, the executive managing members,

12:06:27  9  would determine whether to present the opportunity

12:06:31 10  to the Valuation Committee.   In the next step, if

12:06:33 11  they said, "Yes, we will put this to the Valuation

12:06:35 12  Committee," what are the Valuation Committees's

12:06:38 13  options when presented with such an investment?

12:06:40 14      A.   They have a option to approve it.   They have

12:06:43 15  an option to not approve it.   And I guess they

12:06:46 16  would also have an option to abstain from voting.

12:06:49 17      Q.   And if the Valuation Committee did not

12:06:50 18  approve it, what happens?   Can they go forward?

12:06:53 19      A.   No, we would not go forward.

12:06:58 20           THE COURT:   Is abstention -- what

12:07:02 21  happens with abstention; can the transaction go

12:07:07 22  forward?

12:07:09 23           THE WITNESS:   My understanding is

12:07:10 24  there would still have to be a critical majority

12:07:13 25  in support of the transaction for it to go

12:07:15  1    forward, your Honor.

12:07:23  2       Q.  Ms. Ames, let's turn from these disclosure

12:07:27  3    policies more generally, to Company C and I-Cubed

12:07:32  4    more specifically.  And I'm going to refer to it

12:07:36  5    as Company C as you did in your declaration.  Let

12:07:40  6    me ask you generally -- and these questions that

12:07:44  7    I'm about to ask you, I want to ask what you knew

12:07:46  8    at the time, before your involvement in the

12:07:49  9    investigation of Mr. Ahmed's conduct.  So I want

12:07:51  10   to focus you on what you knew at the time.  Tell

12:07:55  11   us the back story of Company C.  When was an

12:07:58  12   investment opportunity in Company C first sort of

12:08:02  13   brought to Oak's attention?

12:08:03  14      A.  My recollection is that Mr. Ahmed brought

12:08:06  15   the investment to the attention of the general

12:08:11  16   partners in April of 2013.

12:08:15  17      Q.  And I think you said this, but the person

12:08:21  18   who brought that opportunity to Oak's attention

12:08:24  19   was Mr. Ahmed?

12:08:24  20      A.  That's correct.

12:08:25  21      Q.  What do you recall the reaction was to his

12:08:30  22   presentation, his bringing the company C

12:08:33  23   investment to Oak?

12:08:35  24      A.  I don't remember specifically that day, but

12:08:43  25   I remember it being received as an interesting

12:08:47  1    opportunity to further explore.

12:08:51  2       Q.  And then, again, sticking with what you knew

12:08:53  3    at the time, what happens next?  So April 2013,

12:08:56  4    Mr. Ahmed brings the Company C opportunity to you

12:09:00  5    folks' attention.  What happens next?

12:09:02  6       A.  From there, what will generally happen, when

12:09:08  7    somebody has introduced an investment opportunity

12:09:10  8    and is pursuing, is they would proceed with

12:09:15  9    various due diligence, and that due diligence

12:09:18  10   would include not only a valuation of the

12:09:21  11   company's performance, but potentially,

12:09:25  12   competitors, customers, sole investors, if they

12:09:28  13   exist.  But also, just seeking out counsel from

12:09:32  14   different industry executives who would be

12:09:35  15   familiar with the investment space.

12:09:38  16      Q.  And who primarily would be responsible for

12:09:40  17   that diligence you just described?

12:09:42  18      A.  It would be managed by the project manager,

12:09:45  19   which in the case of Company C was Mr. Ahmed.

12:09:52  20      Q.  Ms. Ames, did there come a point in time

12:09:54  21   after Mr. Ahmed had presented the opportunity to

12:09:57  22   Oak, that you had reason to discuss with him

12:10:00  23   whether he had any interest in Company C?

12:10:03  24      A.  Yes, I did.

12:10:04  25      Q.  I want to look at a document that I think

12:10:06  1  will focus us on that.  And your Honor, if I might

12:10:08  2  approach, I'll hand the witness what we're marking

12:10:11  3  as Exhibit 2.

12:10:18  4      A.  Thank you.

12:10:27  5      Q.  Ms. Ames, if I can direct you to what we

12:10:30  6  marked as Exhibit 2, and specifically the second

12:10:32  7  page.  Do you recognize this e-mail?

12:10:34  8      A.  Yes, I do.

12:10:35  9      Q.  And what is it?

12:10:36  10     A.  It's an e-mail that I sent to Mr. Ahmed,

12:10:40  11  that I had questions about his association with

12:10:45  12  the portfolio company that was being considered

12:10:48  13  because he had put -- he had made known that he

12:10:53  14  was on the board of the company in May of 2013, is

12:10:57  15  when we have record of that being -- of he being

12:11:01  16  on the board.  And that seemed very odd that he

12:11:03  17  would be on the board of a company prior to an Oak

12:11:05  18  investment.

12:11:07  19          MR. HEINKE:  Just as a mechanical

12:11:08  20  matter, your Honor, we would offer Exhibit 2.

12:11:10  21          THE COURT:  Full exhibit.

12:11:11  22          MR. DEITCH:  No objection.

12:11:13  23          MR. HEINKE:  Thank you, your Honor.

12:11:16  24     Q.  I want to unpack a little bit of what you

12:11:18  25  just said Ms. Ames.  You mentioned that in June of

12:11:21  1    2013, you -- excuse me, May of 2013, you became

12:11:26  2    aware that Mr. Ahmed was on the board?

12:11:26  3        A.   Yes.

12:11:30  4        Q.   How did that come to your attention?

12:11:32  5        A.   We have -- we report for our insurance

12:11:39  6    coverage, where all of our investing partners or

12:11:43  7    venture partners are sitting on boards, for them

12:11:45  8    to be -- to have that coverage.  And he reported

12:11:48  9    in that report that he was -- that was an

12:11:50  10   additional company that he was on the board.

12:11:52  11       Q.   Okay.  And if we look at Exhibit 2, your

12:11:57  12   question to Mr. Ahmed, first you say "Were you on

12:12:02  13   the board," and the company's name is redacted for

12:12:05  14   privacy reasons, "prior to investment."  Then you

12:12:08  15   say "Did you invest in the company prior to Oak's

12:12:10  16   contemplated investment."  Ms. Ames, why are you

12:12:14  17   asking Mr. Ahmed those questions?

12:12:15  18       A.   It speaks to the issue that we were talking

12:12:16  19   about earlier, the conflict of interest.  And this

12:12:21  20   would be an occasion that we would -- I wanted to

12:12:25  21   flag if there was a need for us, prior to any

12:12:28  22   investments, to bring it to the Valuation

12:12:30  23   Committee.

12:12:30  24       Q.   And in his response, Mr. Ahmed says, "I have

12:12:36  25   no" -- capital N, capital O -- "personal

12:12:38  1   investment or any direct beneficial interest or

12:12:41  2   investments in the company."  Do you see that?

12:12:43  3       A.  I do see that.

12:12:45  4       Q.  What did you understand Mr. Ahmed to be

12:12:49  5   telling you there?

12:12:50  6       A.  What I understood him to be telling me is I

12:12:52  7   had -- I did not need to bring this issue, or the

12:12:56  8   general partner didn't need to bring this issue to

12:12:58  9   the Valuation Committee, and there was no conflict

12:13:00  10  of interest consistent with our obligations as

12:13:03  11  managing members.

12:13:05  12      Q.  At this time, did you have any idea that --

12:13:11  13  well, strike that.  We'll come back to that.  So

12:13:15  14  what happens next in the process.  We talked about

12:13:18  15  it comes to Oak's attention in April 2013.  This

12:13:21  16  exchange happens in June of 2013.  Did there come

12:13:24  17  a point in time where Oak in fact invested in

12:13:27  18  Company C?

12:13:28  19      A.  Yes.

12:13:29  20      Q.  Do you recall about when that was?

12:13:30  21      A.  October of 2013.

12:13:31  22      Q.  And do you recall approximately the

12:13:33  23  investment?

12:13:34  24      A.  25 million dollar.

12:13:35  25      Q.  And at the time of that investment, did Mr.

12:13:42  1   Ahmed say anything differently about his interest

12:13:46  2   in Company C?

12:13:48  3       A.  He mentioned in the partner meeting, where I

12:13:52  4   made a note, that the other side of the secondary

12:13:57  5   transaction was a family office, is what my note

12:14:00  6   said.

12:14:00  7               THE COURT:  I'm sorry, what did you

12:14:02  8   just say?

12:14:02  9               THE WITNESS:  I have notes, your

12:14:03  10  Honor -- I had notes in -- for the document that

12:14:10  11  we use in the partner meeting approval, that the

12:14:14  12  counter party for -- oh, no, I'm sorry, I'm

12:14:19  13  confusing another transaction.  I apologize.

12:14:22  14      Q.  And we will get to that in a minute.

12:14:24  15      A.  Yes.

12:14:25  16      Q.  Because that may relate to a different

12:14:27  17  Company C transaction.

12:14:28  18      A.  Yes.

12:14:29  19      Q.  Let's focus on the first time, in October of

12:14:31  20  2013, --

12:14:32  21      A.  Yes.

12:14:32  22      Q.  -- when Oak invests in Company C.  You know,

12:14:37  23  at this point you've been told, "I have no

12:14:39  24  personal investments or any direct beneficial

12:14:42  25  interest in the company."  Did Mr. Ahmed ever tell

12:14:44  1  you anything differently around the time of

12:14:46  2  October 2013?

12:14:47  3      A.  Not that I recall, no.

12:14:49  4      Q.  So October of 2013, Oak invests 25 million

12:14:56  5  dollars in Company C.  What is the next time that

12:14:59  6  Company C comes to Oak's attention to the best of

12:15:02  7  your recall?

12:15:02  8      A.  About a year later.

12:15:04  9      Q.  And about a year later, what happens?

12:15:06  10     A.  Mr. Ahmed proposed that there be an

12:15:09  11 additional investment in Company C for seven and a

12:15:13  12 half million.

12:15:13  13     Q.  Now, the first time he proposed the

12:15:16  14 investment, did Oak invest directly in Company C

12:15:22  15 and purchase shares directly from Company C?

12:15:24  16     A.  Yes, we did.  We purchased Series A stock.

12:15:28  17 We purchased Series B first, in the 25 million.

12:15:31  18     Q.  In 2013?

12:15:33  19     A.  Mm-hmm.

12:15:33  20     Q.  Was that the same investment structure Mr.

12:15:35  21 Ahmed proposed in 2013?

12:15:37  22     A.  No, it's not.

12:15:37  23     Q.  How was it different?

12:15:38  24     A.  The proposed structure for the 2014, October

12:15:41  25 2014 transaction, was actually what we called

12:15:45  1   secondary transaction, which is when you purchase

12:15:47  2   stock from a preexisting investor.

12:15:50  3       Q.   And in this case, who did Mr. Ahmed tell you

12:15:54  4   the preexisting investor was?

12:15:56  5       A.   He did not indicate the name.  I have in my

12:16:00  6   notes that it was referred to as a family office.

12:16:05  7       Q.   A family office.  Did Mr. Ahmed at that time

12:16:12  8   tell you whose family he was referring to?

12:16:15  9       A.   No, he did not.

12:16:16  10      Q.   And just for clarity, that secondary

12:16:22  11  investor, you now know was I-Cubed; Oak was

12:16:25  12  purchasing shares from I-Cubed, is that correct?

12:16:27  13      A.   Yes, since his arrest, I have learned, and

12:16:29  14  the investigation, that it was I-Cubed Domains.

12:16:32  15      Q.   Okay.  And did Oak in fact make this

12:16:38  16  investment and make the secondary investment and

12:16:41  17  purchase shares from I-Cubed?

12:16:42  18      A.   Actually, I need to just clarify one thing.

12:16:45  19  We knew the counterparty to be I-Cubed Domains.

12:16:48  20  We did not know that I-Cubed Domains was in fact

12:16:53  21  Mr. Ahmed's family association.

12:16:55  22      Q.   I see.  So at the time, even prior to his

12:16:57  23  arrest, you knew the name of the counterparty was

12:16:59  24  I-Cubed, --

12:17:00  25      A.   Yes.

12:17:00  1   Q.  -- correct?

12:17:01  2   A.  Right.

12:17:02  3   Q.  But you didn't know it involved Mr. Ahmed,

12:17:05  4   is that --

12:17:06  5   A.  That's correct, I apologize.

12:17:07  6   Q.  That's okay, thank you.  And in fact, did

12:17:12  7   Oak make that secondary purchase of shares from

12:17:15  8   I-Cubed?

12:17:15  9   A.  Yes, we did.

12:17:16  10   Q.  Do you recall the purchase price?

12:17:18  11   A.  On the secondary, I believe was three

12:17:23  12   thirty, in that range.

12:17:25  13   Q.  Excuse me?

12:17:26  14   A.  Three thirty, per share.

12:17:27  15   Q.  Per share?

12:17:28  16   A.  Three dollars thirty cents per share.

12:17:30  17   Q.  I see.  Do you recall the total purchase

12:17:32  18   price?

12:17:32  19   A.  Yes, I'm sorry, seven and a half million.

12:17:34  20   Q.  Thank you.  Ms. Ames, I'd like to show you

12:17:44  21   what is going to be marked as Exhibit 3.

12:17:53  22        MR. HEINKE:  Your Honor, if I might

12:17:54  23   approach.

12:18:06  24   Q.  Ms. Ames, do you recognize what's been

12:18:08  25   handed to you as Exhibit 3?

12:18:11   1       A.  Yes, it's labeled Exhibit 3.

12:18:14   2       Q.  Do you recognize what the document is?

12:18:17   3       A.  It looks like the stock purchase agreement

12:18:21   4   for the seven and a half million dollar

12:18:23   5   transaction.

12:18:24   6                MR. HEINKE:  Your Honor, we offer

12:18:26   7   Exhibit 3.

12:18:29   8                MR. DEITCH:  No objection.

12:18:30   9                THE COURT:  Full Exhibit.

12:18:31  10       Q.  Now, just briefly, you touched on this, but

12:18:34  11   just so it's clear.  This was the stock purchase

12:18:37  12   agreement between Oak and I-Cubed that you were

12:18:39  13   just discussing?

12:18:40  14       A.  Yes.

12:18:41  15       Q.  And the date of the agreement, can you see

12:18:44  16   that on the first -- on page 100, when was this

12:18:48  17   agreed made?

12:18:49  18       A.  October 30, 2014.

12:18:52  19       Q.  And if you look down to the Purchase of

12:18:55  20   Shares line, that reflects the 7.5 million dollar

12:18:59  21   number you discussed?

12:19:00  22       A.  Yes, it does reflect that.

12:19:02  23       Q.  Do you recall who proposed the 7.5 million

12:19:06  24   dollar number as the price or the investment?

12:19:08  25       A.  Mr. Ahmed presented that to the partnership

12:19:12  1   for consideration.

12:19:13  2       Q.  Okay.  And did you, Oak, rely on Mr. Ahmed

12:19:20  3   in terms of, you know, the valuation and a fair

12:19:22  4   price?

12:19:23  5       A.  Yes.

12:19:23  6       Q.  Why?

12:19:24  7       A.  It would -- there is a basis of trust that's

12:19:33  8   required within the partnership.  And the

12:19:37  9   investing partners, as they evaluate different

12:19:41  10  opportunities, there is an assumption that the

12:19:45  11  facts that are being presented about an investment

12:19:48  12  are accurate.  Where there is pushback, if that's

12:19:52  13  the word I can use, it would be in evaluating

12:19:57  14  whether the investment judgment has in fact pulled

12:20:00  15  together different relevant facts that might be

12:20:04  16  appropriate in any investment evaluation.  But the

12:20:08  17  assumption is, is the facts that, in this case,

12:20:11  18  Mr. Ahmed, but honestly, any investing partner is

12:20:15  19  presenting, that that -- that there is a trust and

12:20:17  20  that the facts are being presented truthfully.

12:20:22  21      Q.  Ms. Ames, I'd like to turn your attention to

12:20:26  22  the page at the bottom labeled 103.

12:20:33  23      A.  Yes.

12:20:36  24      Q.  And this is the execution page for this

12:20:39  25  share purchase agreement, is that right?

12:20:41   1        A.   Yes, it is.

12:20:41   2        Q.   And who is it that's signing on behalf of

12:20:44   3   Oak?

12:20:44   4        A.   Mr. Ahmed.

12:20:45   5        Q.   Why is that, why is he the one signing on

12:20:47   6   behalf of Oak, if you know?

12:20:49   7        A.   He is a managing member, and so he can sign

12:20:52   8   this agreement.

12:20:53   9        Q.   And at the time Oak made this purchase, who

12:20:57  10   did you understand to be signing on behalf of

12:21:00  11   I-Cubed?

12:21:02  12        A.   I don't know if I knew in advance who was

12:21:06  13   signing for I-Cubed.  I'm sorry if I misunderstood

12:21:09  14   your question.  But I can see right here, the name

12:21:11  15   is Richard Kimball, is signing on behalf of

12:21:14  16   I-Cubed Domains.  And the assumption is, is that

12:21:18  17   he is authorized to do so.

12:21:23  18        Q.   Let me ask, if instead of Richard Kimball

12:21:28  19   signing this, if Ifti Ahmed had signed on behalf

12:21:31  20   of I-Cubed, would that have caused any concerns at

12:21:34  21   Oak?

12:21:34  22        A.   Yes, that would have spoken to, again, the

12:21:37  23   conflict of interest issue that we spoke of

12:21:39  24   earlier.

12:21:40  25        Q.   If Mrs. Ahmed had signed on behalf of

12:21:42  1   I-Cubed, would that have caused concerns for Oak?

12:21:44  2       A.  Yes, it would have.

12:21:46  3       Q.  What would happen if you went to execute

12:21:48  4   this agreement, or if you saw this agreement and

12:21:50  5   it was signed on one side by Mr. Ahmed, and one

12:21:53  6   aside by Mrs. Ahmed, what would happen?

12:21:56  7       A.  We would need to -- I don't know

12:22:00  8   specifically what we would do, because this has

12:22:02  9   not happened; but it would be an issue that would

12:22:06  10  need to be obviously discussed within the

12:22:08  11  partnership.  But we have an obligation, based on

12:22:10  12  the agreements that we've signed and the

12:22:12  13  commitments we made to our investors, to bring

12:22:15  14  this to the Valuation Committee, and the decision

12:22:19  15  would be to honor the trade.

12:22:24  16      Q.  I'm going to show you another exhibit, Ms.

12:22:30  17  Ames.  This will be marked as Exhibit 4.

12:22:52  18      A.  Thank you.

12:23:01  19      Q.  Ms. Ames, do you recognize what's been

12:23:03  20  marked as Exhibit 4?

12:23:06  21      A.  Yes, I do.

12:23:07  22      Q.  And again, just generally, what is it?

12:23:10  23      A.  This looks like some of the documentation

12:23:15  24  that was presented when we are -- when an approval

12:23:22  25  has, you know, the process of approving an

| | | |
|---|---|---|
| 12:23:24 | 1 | investment, but it is what's being presented in |
| 12:23:27 | 2 | anticipation of ultimately investing in a company. |
| 12:23:30 | 3 | MR. HEINKE:  And your Honor, we'd |
| 12:23:31 | 4 | move Exhibit 4. |
| 12:23:32 | 5 | THE COURT:  Full exhibit. |
| 12:23:35 | 6 | MR. DEITCH:  No objection. |
| 12:23:36 | 7 | MR. HEINKE:  Thank you, your Honor. |
| 12:23:38 | 8 | Q.  Ms. Ames, I'll try to do this quickly and in |
| 12:23:40 | 9 | a way that makes sense.  If you will look at the |
| 12:23:43 | 10 | document labeled 106, or page labeled 106 at the |
| 12:23:47 | 11 | bottom. |
| 12:23:48 | 12 | A.  Yes. |
| 12:23:49 | 13 | Q.  You'll see there's reference, and a number |
| 12:23:53 | 14 | of this has been redacted out, but to a |
| 12:23:55 | 15 | transaction amount 7.5 million, and beneficiary |
| 12:23:59 | 16 | details to I-Cubed Domains, do you see that? |
| 12:24:02 | 17 | A.  Yes, I do see that. |
| 12:24:02 | 18 | Q.  Is this the, for lack of a better word, sort |
| 12:24:06 | 19 | of the wire transfer approval or the funding |
| 12:24:08 | 20 | approval for that 7.5 million dollar investment we |
| 12:24:11 | 21 | were just discussing? |
| 12:24:12 | 22 | A.  This is a document that's used to wire the |
| 12:24:15 | 23 | funds.  And it's part of the approval process. |
| 12:24:19 | 24 | Q.  And Ms. Ames, if you will turn to the last |
| 12:24:26 | 25 | page, which is marked 108. |

12:24:32  1    A.  Yes.

12:24:32  2    Q.  See there's wiring instructions for I-Cubed

12:24:35  3    Domains, LLC, and a bank account number?

12:24:40  4    A.  Yes.

12:24:40  5    Q.  Can you read the last four digits of that

12:24:43  6    account number?

12:24:43  7    A.  8384.

12:24:44  8    Q.  And at the time this wire was made to

12:24:47  9    account 8384, did Oak have any idea that Mr. Ahmed

12:24:52  10   -- well, strike that.

12:24:54  11       At the time Oak made this transfer to the

12:24:58  12   Bank of America account, who did Oak think it was

12:25:00  13   sending the money to?

12:25:01  14   A.  The beneficiary name that's listed, which is

12:25:04  15   I-Cubed Domains.

12:25:13  16   Q.  Now, Ms. Ames, we've just been talking about

12:25:16  17   what you knew at the time.  I want to turn now to

12:25:19  18   facts that you've learned since Mr. Ahmed was

12:25:22  19   terminated from Oak.  Do you now have an

12:25:27  20   understanding of what I-Cubed was?

12:25:31  21   A.  I now have an understanding, yes.

12:25:33  22   Q.  And what is your understanding about I-Cubed

12:25:35  23   and Mr. Ahmed's involvement in I-Cubed?

12:25:38  24   A.  That this is an entity that was used to

12:25:44  25   invest in Oak portfolio company.

12:25:48   1                    THE COURT:  Would you please keep

12:25:49   2   your voice up.

12:25:51   3                    THE WITNESS:  Speak louder, your

12:25:52   4   Honor?

12:25:53   5                    THE COURT:  Yes.

12:25:53   6                    THE WITNESS:  I'm sorry.

12:25:55   7      A.  My understanding is that I-Cubed Domains was

12:25:57   8   used as a vehicle in which to invest in an Oak

12:26:02   9   portfolio company, and that Mr. Ahmed controlled

12:26:05  10   that entity.

12:26:09  11      Q.  I'm going to hand you what's been marked as

12:26:11  12   Exhibit 5, Ms. Ames.

12:26:17  13      A.  Thank you.

12:26:23  14      Q.  Ms. Ames, do you recognize what you've been

12:26:26  15   handed as Exhibit 5?

12:26:28  16      A.  Yes, it's Exhibit 5.

12:26:31  17      Q.  And what is this document?

12:26:35  18      A.  This document looks like the LLC agreement

12:26:39  19   for I-Cubed Domains.

12:26:42  20      Q.  And I don't mean a specific date, but when

12:26:46  21   did this document first come to your attention?

12:26:48  22      A.  After the -- after Mr. Ahmed's arrest, and

12:26:53  23   in the investigation of Oak's portfolios.

12:26:59  24                    MR. HEINKE:  Your Honor, I would move

12:27:01  25   Exhibit 5.

12:27:01   1                    MR. DEITCH:  Just one moment, your
12:27:02   2   Honor.
12:27:13   3                    Your Honor, I don't believe the
12:27:14   4   foundation has been laid about where she
12:27:17   5   obtained the document, or the authenticity of
12:27:20   6   the document.
12:27:22   7                    THE COURT:  Lay that foundation.
12:27:24   8                    MR. HEINKE:  Yes, your Honor.
12:27:24   9    Q.  Ms. Ames, where was this LLC agreement
12:27:27  10   obtained by Oak?
12:27:30  11    A.  As I remember, it was in Ifti's Oak e-mail.
12:27:37  12    Q.  And to the best of your recollection, was it
12:27:42  13   attached to an e-mail Mr. Ahmed was sending or
12:27:46  14   receiving?
12:27:46  15    A.  I honestly don't remember specifically.
12:27:49  16                    MR. HEINKE:  Your Honor, with that, I
12:27:51  17   think that likely is sufficient to establish the
12:27:53  18   foundation of the document.
12:27:56  19                    THE COURT:  This document was in Mr.
12:27:59  20   Ahmed's Oak e-mail?
12:28:01  21                    THE WITNESS:  That's my recollection,
12:28:02  22   your Honor.
12:28:03  23                    THE COURT:  Any objection?
12:28:05  24                    MR. DEITCH:  No objection, your
12:28:06  25   Honor.

12:28:06  1          THE COURT:  Full exhibit.

12:28:08  2          MR. HEINKE:  Thank you, your Honor.

12:28:09  3     Q.  Ms. Ames, I'd like to direct your attention

12:28:15  4  to the first page of this document.  It ends in

12:28:19  5  109.  Excuse me, it's the second page of the

12:28:22  6  document, first page of the LLC agreement.  You

12:28:26  7  see where it states, "This agreement dated as of

12:28:28  8  October 24, 2012, is by Iftikar Ahmed as the

12:28:31  9  initial member, and Richard M. Kimball as the

12:28:35  10  initial manager."  Do you see that?

12:28:37  11     A.  Yes, I do.

12:28:37  12     Q.  And this is going to maybe sound like a

12:28:39  13  silly question, but this document, the date of

12:28:42  14  October 24, 2012, that was before Mr. Ahmed first

12:28:46  15  presented any investment opportunities related to

12:28:49  16  Company C to Oak?

12:28:50  17     A.  That's correct.  We did not invest until

12:28:52  18  2013.

12:28:53  19     Q.  All right.  Now, have you also learned

12:28:57  20  during the investigation whether I-Cubed had an

12:29:03  21  interest or an investment in Company C before Oak

12:29:07  22  made its first investment?

12:29:09  23     A.  What I have learned since the investigation?

12:29:13  24  I learned that I-Cubed Domains did have an

12:29:14  25  investment.  Prior to Oak Series B investment,

12:29:19  1   they were a Series A investor.

12:29:21  2       Q.  So at the time Oak was purchasing, making

12:29:24  3   the 25 million dollar investment, we now know that

12:29:27  4   I-Cubed also had an investment in the company?

12:29:30  5       A.  Yes, that's what I learned.

12:29:32  6       Q.  And you now know that Mr. Ahmed formed

12:29:35  7   I-Cubed, is that right?

12:29:37  8       A.  Yes.  But in looking at this document,

12:29:39  9   that's what I have learned.

12:29:41  10       Q.  Is that something that Mr. Ahmed, under

12:29:44  11   Oak's policy, should have disclosed in connection

12:29:46  12   with the first investment in October of 2013?

12:29:48  13       A.  Yes.

12:29:49  14       Q.  Why?

12:29:50  15       A.  Because again, it speaks to the conflict of

12:29:54  16   interest with our limited partners.  It's not

12:29:56  17   fairly representing potentially the motivation of

12:30:00  18   the general partner, in making an investment

12:30:04  19   recommendation for the fund.

12:30:12  20           THE COURT:  And how does that differ

12:30:13  21   from what he tells you in the June 17, 2013

12:30:23  22   e-mail?  Do you have that SEC-2 in front of you?

12:30:31  23           THE WITNESS:  The conflict of

12:30:32  24   interest issue that I was asking the question,

12:30:35  25   your Honor, is the same.  His response, what I

12:30:40  1  have learned now, was intended to be very

12:30:42  2  misleading.  And in fact, the question and the

12:30:49  3  obligations that we shared in being managing

12:30:53  4  members of the fund, would have spoken and would

12:30:58  5  have required him to disclose this I-Cubed

12:31:00  6  Domains investment in the contemplated

12:31:05  7  investment -- portfolio company investment

12:31:09  8  recommendation.

12:31:13  9     Q.  Ms. Ames, we just looked at a document

12:31:16  10  showing that Mr. Ahmed had initially formed

12:31:19  11  I-Cubed in October of 2012.  Did you learn during

12:31:22  12  the investigation whether Mr. Ahmed had ever

12:31:24  13  transferred his interest?

12:31:25  14     A.  Yes, I did.

12:31:26  15     Q.  And what did you learn?

12:31:27  16     A.  I learned that prior to Oak's initial

12:31:31  17  investment, he moved the ownership of I-Cubed

12:31:36  18  Domains to his wife.

12:31:39  19     Q.  Do you recall approximately when that was?

12:31:40  20     A.  I believe it was in May of 2013.  So it was

12:31:46  21  after he made the recommendation to Oak, in

12:31:49  22  anticipation of potentially Oak's October

12:31:53  23  investment.

12:31:53  24     Q.  So just so the timeline is clear for

12:31:58  25  everybody, in April 2013, he initially presents

12:32:01  1   the recommendation and gets a favorable response.

12:32:04  2   You now learned in May of 2013, the interest is

12:32:07  3   transferred to Ms. Ahmed.  And in June of 2013,

12:32:10  4   the initial investment -- excuse me, and then in

12:32:14  5   June of 2013, you ask Mr. Ahmed the question in

12:32:17  6   Exhibit 2, is that right?

12:32:19  7            MR. DEITCH:  Your Honor, I'm going to

12:32:20  8   object, both because it is leading and because

12:32:23  9   it misstates her prior testimony.  There was no

12:32:24 10   testimony that the investment was approved in

12:32:26 11   April 2013.

12:32:28 12            MR. HEINKE:  And if I said that, your

12:32:29 13   Honor, I apologize.

12:32:31 14            THE COURT:  Rephrase your question.

12:32:33 15            MR. HEINKE:  Thank you.

12:32:34 16   Q.  Just so I have the timeline right, let's do

12:32:37 17   this.  In April of 2013, Mr. Ahmed first brings

12:32:40 18   Company C to Oak's attention, and in May of 2013,

12:32:46 19   the interest is -- in I-Cubed, is transferred from

12:32:50 20   Mr. Ahmed, to his wife.  And in June of 2013, you

12:32:54 21   send the e-mail, Exhibit 2, inquiring about Mr.

12:32:59 22   Ahmed's interest.  Do I have that timeline right?

12:33:00 23   A.  That's how I recall the timeline.

12:33:02 24   Q.  And then ultimately, in October of 2013, Oak

12:33:05 25   makes its first investment?

12:33:07   1        A.   That's correct.

12:33:07   2        Q.   All right.  Ms. Ames, does the fact that Mr.

12:33:22   3   Ahmed transferred the interest to his wife in May

12:33:24   4   have 2013, did that change the fact that -- did

12:33:32   5   that change whether he should have disclosed that

12:33:33   6   to you, in response to your e-mail in June?

12:33:35   7        A.   No.

12:33:36   8        Q.   Why not?

12:33:37   9        A.   Because it still was an investment within

12:33:42  10   his family.  And our -- we have policies that

12:33:45  11   specifically would encompass not only a direct

12:33:50  12   investment, but also a family investment.

12:33:57  13        Q.   Ms. Ames, you talked earlier in your

12:34:00  14   testimony about one of the reasons the conflict of

12:34:03  15   interest could be important is because the cost

12:34:06  16   basis could be different between an individual who

12:34:09  17   had invested, and then the Oak investment.  Do you

12:34:12  18   recall that?

12:34:12  19        A.   I recall saying that, yes.

12:34:14  20        Q.   As a result of that investigation, have you

12:34:16  21   learned whether in fact Mr. Ahmed -- well, let me

12:34:19  22   ask this way.  I-Cubed's cost basis of different?

12:34:23  23        A.   I did learn that.

12:34:24  24        Q.   What did you understand I-Cubed's cost basis

12:34:27  25   for the shares it purchased originally in Company

| | | |
|---|---|---|
| 12:34:30 | 1 | C to be? |
| 12:34:30 | 2 | A.  I understood their purchase price to be |
| 12:34:33 | 3 | approximately 88 cents per share, as compared to |
| 12:34:39 | 4 | Oak's subsequent purchase prices of four forty and |
| 12:34:43 | 5 | three thirty; four dollars forty cents, three |
| 12:34:48 | 6 | dollars thirty cents. |
| 12:34:49 | 7 | Q.  Okay.  So let me unpack that to make sure |
| 12:34:53 | 8 | it's clear.  Oak's initial investment was at four |
| 12:34:56 | 9 | dollars and forty cents a share, is that right? |
| 12:34:59 | 10 | A.  That's my recollection, yes. |
| 12:35:00 | 11 | Q.  And then Oak's secondary investment was |
| 12:35:02 | 12 | three dollars thirty cents per share, is that |
| 12:35:05 | 13 | right? |
| 12:35:05 | 14 | A.  That's correct. |
| 12:35:10 | 15 | Q.  Ms. Ames, I want to turn back to something |
| 12:35:13 | 16 | we talked about a moment ago, which was the bank |
| 12:35:15 | 17 | account.  You recall we looked at a document where |
| 12:35:19 | 18 | Oak transferred money to a bank account ending in |
| 12:35:22 | 19 | 8384, Bank of America, belonging to I-Cubed?  And |
| 12:35:27 | 20 | if you don't recall, I'm sorry, I could direct you |
| 12:35:30 | 21 | back to -- |
| 12:35:31 | 22 | A.  I just want to make sure that -- |
| 12:35:33 | 23 | Q.  Sure.  I believe it was Exhibit 5. |
| 12:35:40 | 24 | A.  Actually, I think it's Exhibit 4.  8384, |
| 12:35:49 | 25 | yes, that's the number. |

12:35:57   1      Q.  Mrs. Ahmed -- excuse me, Ms. Ames, excuse

12:36:03   2   me, I'd like to hand you what's been marked as

12:36:06   3   Government's Exhibit 7.

12:36:09   4      A.  Thank you.

12:36:18   5      Q.  Ms. Ames, Exhibit 7 contains numerous

12:36:21   6   documents.  I want to focus your attention to what

12:36:26   7   begins, the fourth page from the end, which is

12:36:35   8   Bates label at the bottom 1157.  Do you see where

12:36:38   9   I am?

12:36:38   10      A.  Now I do.

12:36:51   11           MR. HEINKE:  And your Honor, this

12:36:53   12   document was attached to Mr. Oraker's

12:36:54   13   declaration that's been submitted with the

12:36:56   14   court.  I believe that satisfies any

12:36:58   15   foundational issues with the document.  And at

12:37:01   16   this point, we'd move Exhibit 7.

12:37:05   17           THE COURT:  Any problem?

12:37:05   18           MR. DEITCH:  No objection.

12:37:06   19           THE COURT:  Full exhibit.

12:37:07   20      Q.  Ms. Ames, do you see --

12:37:12   21           THE COURT:  Are we labeling this 7

12:37:14   22   for a reason, and leaving out 6?

12:37:17   23           MR. HEINKE:  Your Honor, if I did not

12:37:18   24   have a 6, I apologize.  It should be Exhibit 6.

12:37:20   25           THE COURT:  Okay.

12:37:22   1          MR. HEINKE:  I'll make that

12:37:23   2    correction on the witness' copy right now.

12:37:39   3      Q.  I think I directed you to the wrong page, I

12:37:43   4    apologize.  I'd like to direct you to the page

12:37:44   5    that ends in 1189, Ms. Ames.  And the writing is a

12:37:52   6    little small and fuzzy, and I apologize.  But do

12:37:55   7    you see at the top of page 1189, that this is a

12:38:05   8    Bank of America account statement belonging to

12:38:07   9    I-Cubed Domains, LLC?

12:38:12  10      A.  I think it says "Signature Card."

12:38:14  11      Q.  Sure, excuse me.

12:38:17  12      A.  And yes, I do see that it's 8384.

12:38:20  13      Q.  Account 8384, the same account that Oak

12:38:24  14    wired that 7.5 million to?

12:38:27  15      A.  Yes, that's what it looks like, yes.

12:38:29  16      Q.  Ms. Ames, if you will turn to the next page

12:38:34  17    of this document, 1190, and look at the signature

12:38:40  18    line Authorized Signer?

12:38:42  19      A.  Yes.

12:38:43  20      Q.  Do you recognize that signature?

12:38:44  21      A.  Yes.

12:38:45  22      Q.  Whose signature is that?

12:38:46  23      A.  It looks like Mr. Ahmed's.

12:38:48  24      Q.  And if you will turn to the last page, 1192.

12:38:59  25    Mrs. Ames, do you recognize that signature?

12:39:01   1      A.   It looks like Mr. Ahmed's.

12:39:03   2      Q.   And do you see the date that Mr. Ahmed has

12:39:07   3  signed, right above his signature?

12:39:09   4      A.   Yes.

12:39:10   5      Q.   And what date is that?

12:39:11   6      A.   October 28, 2014.

12:39:14   7      Q.   And do you recall, we looked at the exhibit,

12:39:17   8  but when was it that Oak made its secondary

12:39:20   9  purchase of shares from I-Cubed?

12:39:24  10      A.   October 30th.

12:39:26  11      Q.   So two days later?

12:39:27  12      A.   Yes.

12:39:28  13      Q.   Ms. Ames, did you know at the time Oak was

12:39:32  14  wiring the money on October 30th, that it was

12:39:34  15  being wired to a bank account that Mr. Ahmed had

12:39:36  16  opened two days earlier?

12:39:38  17      A.   I absolutely did not.

12:39:40  18      Q.   Had you known that, would it have changed

12:39:43  19  your perspective on the investment?

12:39:44  20      A.   Yes, significantly.

12:39:45  21      Q.   Mrs. Ames, I want to talk now about the

12:40:02  22  current valuation of the Company C shares that Oak

12:40:09  23  owns.  So Mrs. Ames, as I understand it, there are

12:40:12  24  sort of two groups of shares.  There's the shares

12:40:16  25  that Oak purchased in October of 2013 directly

12:40:19  1   from Company C for 25 million.  And there are the

12:40:23  2   shares that Oak purchased in October of 2014 for

12:40:27  3   7.5 million dollars from I-Cubed.  Is that a

12:40:30  4   correct summary?

12:40:30  5       A.  Yes.

12:40:35  6       Q.  Prior to Mr. Ahmed's arrest, do you recall

12:40:38  7   generally what the value of those shares were

12:40:40  8   being carried on Oak's books?

12:40:42  9       A.  Just prior to Mr. Ahmed's -- I think in

12:40:48  10  aggregate, the two positions, we had marked at

12:40:51  11  about 35 million.

12:40:52  12      Q.  Has that changed since Mr. Ahmed's arrest?

12:40:55  13      A.  Yes.

12:40:55  14      Q.  And how has it changed?

12:40:56  15      A.  We now have it marked as what we call the

12:40:59  16  preference value, which is 27 million.  So it

12:41:03  17  would be 25 million for the Series B, and two

12:41:08  18  million for the Series A.

12:41:09  19      Q.  So to be sure it's clear, those Series A

12:41:13  20  shares that Oak purchased for 7.5 million, what is

12:41:16  21  the current value on Oak's books?

12:41:18  22      A.  Two, two million.

12:41:19  23      Q.  Why was it written down to two million?

12:41:22  24      A.  It was written down to two million because

12:41:24  25  as we have, you know, based on the information

12:41:28   1   that we have today, Company C is working on -- is

12:41:35   2   challenging in its cash position, and is working

12:41:38   3   on financing with getting more cash, and the

12:41:42   4   company seems to be in a crossroad position.  And

12:41:48   5   we took the most conservative position, which is

12:41:51   6   to go to our preferences.

12:42:03   7       Q.  Okay.  Mrs. Ahmed, I want to turn now to the

12:42:05   8   issue of carried interest --

12:42:07   9               THE COURT:  Not Ms. Ahmed.

12:42:09   10             MR. HEINKE:  I'm sorry, I have done

12:42:12   11   it twice.

12:42:12   12             THE COURT:  I do want to get to her.

12:42:14   13             MR. HEINKE:  I expect that's right,

12:42:15   14   your Honor.

12:42:16   15       Q.  Ms. Ames, I'd like to turn now to discuss

12:42:20   16   the issue of carried interest, a topic that is

12:42:24   17   quickly becoming near and dear to my heart.  I'd

12:42:27   18   just like to ask you, as a general matter, what is

12:42:34   19   carried interest?

12:42:37   20       A.  I think the best layman's terms, so I don't

12:42:42   21   bore everyone from an accounting standpoint, would

12:42:45   22   be it is a sharing of the realized profit of a

12:42:52   23   fund after the investors have received back all of

12:42:56   24   their capital.  There's some other contingencies,

12:42:59   25   but essentially it's a sharing of profit after the

| | | |
|---|---|---|
| 12:43:02 | 1 | investors have received back their funds. |
| 12:43:07 | 2 | Q.  Let's just quickly cover, so you talked what |
| 12:43:12 | 3 | it is.  I want to talk a little bit about what it |
| 12:43:15 | 4 | is not.  Is carried interest money currently |
| 12:43:18 | 5 | sitting in an account? |
| 12:43:18 | 6 | A.  No, it is not. |
| 12:43:19 | 7 | Q.  Is it something that you're necessarily |
| 12:43:22 | 8 | going to be paid? |
| 12:43:22 | 9 | A.  No, it is not. |
| 12:43:23 | 10 | Q.  Is there a guarantee that it's ever going to |
| 12:43:26 | 11 | be paid? |
| 12:43:26 | 12 | A.  There's no guarantee. |
| 12:43:27 | 13 | Q.  Could a person who has carried interest at |
| 12:43:30 | 14 | Oak sell it without approval? |
| 12:43:34 | 15 | A.  No. |
| 12:43:37 | 16 | Q.  Ms. Ames, do you have carried interest at |
| 12:43:40 | 17 | Oak? |
| 12:43:40 | 18 | A.  I do. |
| 12:43:41 | 19 | Q.  It's a personal question and I apologize, |
| 12:43:44 | 20 | but do you have a way that you value that carried |
| 12:43:48 | 21 | interest? |
| 12:43:48 | 22 | A.  Actually, when I work with my financial |
| 12:43:52 | 23 | planner, he does not including my carried interest |
| 12:43:54 | 24 | in my financial plan until and if the cash is in |
| 12:43:59 | 25 | the bank. |

| | | |
|---|---|---|
| 12:44:03 | 1 | MR. HEINKE:  Your Honor, could I have |
| 12:44:05 | 2 | a moment? |
| 12:44:05 | 3 | THE COURT:  Yes. |
| 12:44:23 | 4 | Q.  Ms. Ames, there's been some discussion, and |
| 12:44:25 | 5 | I think you're familiar with the question of |
| 12:44:29 | 6 | contractual issues around whether Mr. Ahmed's |
| 12:44:32 | 7 | carried interest was forfeited as a result of his |
| 12:44:35 | 8 | conduct.  Are you generally familiar with that? |
| 12:44:37 | 9 | A.  Yes, I generally am. |
| 12:44:38 | 10 | Q.  I just want to ask sort of on the narrow |
| 12:44:41 | 11 | issue, has Oak made any distribution of Mr. |
| 12:44:46 | 12 | Ahmed's carried interest one way or the other |
| 12:44:48 | 13 | since he was terminated? |
| 12:44:49 | 14 | A.  No. |
| 12:44:52 | 15 | MR. HEINKE:  Your Honor, that's all I |
| 12:44:53 | 16 | have for this witness at this time. |
| 12:44:56 | 17 | THE COURT:  Do you have any plans to |
| 12:44:58 | 18 | do so in the immediate future. |
| 12:45:02 | 19 | MR. HEINKE:  I apologize, your Honor, |
| 12:45:03 | 20 | I missed your question. |
| 12:45:05 | 21 | THE COURT:  My question for the |
| 12:45:06 | 22 | witness is whether she has any plans for such |
| 12:45:15 | 23 | distribution in the immediate future. |
| 12:45:19 | 24 | THE WITNESS:  No. |
| 12:45:19 | 25 | THE COURT:  The question had been |

12:45:20  1   whether you had made any distribution.  Your

12:45:23  2   answer was no.  And my question is, do you have

12:45:28  3   any plans for such distribution.

12:45:31  4              THE WITNESS:  Not at this time, your

12:45:32  5   Honor.

12:45:33  6              THE COURT:  And will you notify the

12:45:35  7   SEC before you intend to do such a thing?

12:45:37  8              THE WITNESS:  If that is the request

12:45:38  9   of the Court.

12:45:39  10             THE COURT:  It is.  Thank you.

12:45:42  11             MR. HEINKE:  Thank you, your Honor.

12:45:43  12  Thank you, Ms. Ames.

12:45:45  13             THE COURT:  Let's take a brief recess

12:45:46  14  before we have cross-examine.  Will you be

12:45:49  15  cross-examining?

12:45:49  16             MR. DEITCH:  Yes, your Honor.

12:45:50  17             THE COURT:  All right, let's take a

12:45:54  18  ten-minute recess.

12:56:28  19             (R E C E S S.)

13:08:47  20             THE COURT:  Please be seated.

13:08:48  21  Cross-examination?

13:08:48  22             MR. DEITCH:  Thank you, your Honor.

13:08:48  23  CROSS-EXAMINATION

13:08:50  24  BY MR. DEITCH:

13:08:50  25     Q.  Good afternoon, Ms. Ames?

13:08:52    1        A.  Good afternoon.

13:08:52    2        Q.  Ms. Ames, I want to talk to you first about

13:08:55    3    Oak Management Corporation.  Now Oak, if I can

13:08:59    4    refer to that just as Oak, Oak has four managing

13:09:02    5    partners, correct?

13:09:03    6        A.  Yes.

13:09:04    7        Q.  And they are Mr. Carano, Mr. Glassmeyer, Mr.

13:09:09    8    Harman and Ms. Lamont?

13:09:11    9        A.  Correct.

13:09:12   10        Q.  And these managing partners are all very

13:09:16   11    experienced people in the venture capital

13:09:19   12    industry, correct?

13:09:22   13        A.  I guess it would depend on how somebody

13:09:25   14    defines and characterized "very experienced."

13:09:27   15        Q.  For example, Mr. Carano has been with Oak

13:09:30   16    since 1985, correct?

13:09:31   17        A.  Yes.

13:09:32   18        Q.  And Mr. Glassmeyer was the cofounder of Oak

13:09:35   19    in 1978?

13:09:36   20        A.  I believe those dates are correct, yes.

13:09:39   21        Q.  And Mr. Harman has been with the company

13:09:40   22    since 1994?

13:09:42   23        A.  I don't know exactly, but that sounds right.

13:09:44   24        Q.  Okay.  And Mrs. Lamont, since 1986; does

13:09:49   25    that sound right?

13:09:49   1        A.   I don't know, but it sounds like the

13:09:52   2   vintage.

13:09:52   3        Q.   And in addition to the managing partners,

13:09:55   4   Oak also has general partners, correct?

13:09:57   5        A.   Correct.

13:09:57   6        Q.   For example, you yourself are a general

13:10:00   7   partner of Oak Management Corporation?

13:10:02   8        A.   It is a functional title, it's not a literal

13:10:06   9   title of the corporation; but yes, that's correct.

13:10:09  10        Q.   But for example, when you have talked

13:10:11  11   generally about the partners, you're referring to

13:10:14  12   the managing partners and the general partners,

13:10:16  13   correct?

13:10:16  14        A.   Correct.

13:10:17  15        Q.   So one general partner is you, another

13:10:20  16   general partner is Andrew Adams?

13:10:22  17        A.   Correct.

13:10:23  18        Q.   And Mr. Ahmed was a general partner,

13:10:25  19   correct?

13:10:25  20        A.   Correct.

13:10:26  21        Q.   Other than the managing partners and the

13:10:30  22   general partners of Oak, is it correct that the

13:10:33  23   other employees of the company are basically

13:10:37  24   staff, such as bookkeeping and other back office

13:10:39  25   type functions?

13:10:42  1      A.   There's more categories than those two, but
13:10:44  2  yes, generally.
13:10:49  3      Q.   Now, the current board of Oak is comprised
13:10:52  4  of six members, correct?
13:10:54  5      A.   Currently, that would be correct.
13:10:56  6      Q.   And those are the four managing -- the four
13:10:59  7  managing partners, and the two remaining general
13:11:03  8  partners, correct?
13:11:04  9      A.   That is correct.
13:11:05 10      Q.   Now Oak Management Corporation acts as an
13:11:12 11  investment manager for the various Oak investment
13:11:18 12  funds, correct?
13:11:19 13      A.   Yes.
13:11:21 14      Q.   And in addition -- and part of its function
13:11:24 15  as the investment manager is that Oak Management
13:11:27 16  Corporation provides managing members and members
13:11:31 17  who provide services for each of the funds,
13:11:34 18  correct?
13:11:35 19      A.   That sounds correct.
13:11:37 20      Q.   And each of these funds, each fund, is set
13:11:41 21  up as a limited partnership?
13:11:43 22      A.   Each of the investment funds, yes, are set
13:11:46 23  up as a limited partnership.
13:11:48 24      Q.   So for example, earlier today you looked at
13:11:51 25  a limited partnership agreement for Oak 13, or Oak

13:11:54  1   Investment Partnership 13, which is one of those

13:11:57  2   funds, correct?

13:11:58  3       A.  Yes.

13:11:58  4       Q.  And the general partner of each of those

13:12:03  5   limited partnerships, is a limited liability

13:12:05  6   company, correct?

13:12:06  7       A.  Yes.

13:12:07  8       Q.  And those LLC general partners are owned by

13:12:14  9   Oak Management Corporation partners, correct?

13:12:19  10      A.  No.

13:12:20  11      Q.  Okay, who -- is it -- we spoke about the

13:12:23  12   managing members and members of the LLC.  Correct?

13:12:28  13      A.  Yes.

13:12:29  14      Q.  And those managing members and members are

13:12:34  15   managing partners and general partners of Oak

13:12:37  16   Management Corporation.  Correct?

13:12:39  17      A.  Yes.

13:12:43  18      Q.  Now, you testified earlier that these funds

13:12:46  19   are the commitments of investors, that they

13:12:49  20   represent the capital commitments of investors.

13:12:52  21   Do you recall testifying that?

13:12:53  22      A.  Yes.

13:12:55  23      Q.  Now, the general partner of each of the

13:12:58  24   limited partnerships also makes a capital

13:13:01  25   contribution to the fund, correct?

13:13:02   1      A.   Correct.

13:13:03   2      Q.   And by virtue of that capital contribution,

13:13:05   3   the general partner of each of the limited

13:13:08   4   partnerships also has an investment interest in

13:13:10   5   the fund, correct?

13:13:13   6      A.   The entity of the general partner is a

13:13:17   7   limited partner.

13:13:19   8      Q.   And do you know what percentage of the total

13:13:23   9   capital contributed to each of the funds is

13:13:27  10   represented by capital that is contributed by its

13:13:29  11   general partner?

13:13:32  12      A.   I know generally.  I don't know exactly.

13:13:34  13      Q.   Generally, what percentage?

13:13:37  14      A.   There's generally a requirement of one

13:13:40  15   percent minimum in each of the funds.

13:13:43  16      Q.   So is it fair to say that in addition to the

13:13:48  17   investors who have an interest in the health and

13:13:52  18   success of the fund, the general partner and its

13:13:56  19   managing members and members, also have an

13:13:59  20   interest in the health and success of the fund?

13:14:02  21      A.   Yes.

13:14:08  22      Q.   Now, do you recall when Iftikar Ahmed began

13:14:15  23   his employment with Oak?

13:14:16  24      A.   I believe it was January 2004.

13:14:18  25      Q.   Now, from 2004 to 2011, was the firm located

13:14:24  1   in a single office in Westport, Connecticut?

13:14:28  2      A.  Yes, that's my recollection.

13:14:30  3      Q.  And just to give us kind of an idea, in

13:14:36  4   addition to the four managing partners and three

13:14:39  5   general partners, how many staff were also in the

13:14:43  6   office?

13:14:47  7      A.  Are you speaking just specifically of the

13:14:48  8   Westport office, or generally, the number of

13:14:52  9   staff?

13:14:52  10     Q.  Let's start with in the Westport office.

13:14:55  11     A.  I don't remember 2004-2011 statistics

13:15:00  12   specifically.  I know in aggregate, they were

13:15:03  13   approximately 30 staff throughout Oak.  And the

13:15:07  14   majority would have been in the Westport office.

13:15:11  15   So possibly 20, 22.

13:15:13  16     Q.  And you were located in the Westport office

13:15:16  17   during that period?

13:15:17  18     A.  2004-2011, correct, yes, I was.

13:15:20  19     Q.  And you would see Mr. Ahmed in the Westport

13:15:23  20   office, correct?

13:15:23  21     A.  When he was there and I was there, I would

13:15:25  22   see him.

13:15:26  23     Q.  And in 2011, am I correct that Oak split its

13:15:30  24   office, its Connecticut office, between Norwalk

13:15:32  25   and Greenwich?

13:15:34   1      A.  I don't know if exactly 2011.  I know there
13:15:38   2   was a transitional time.  But the ultimate result
13:15:42   3   was, yes, that the Westport office was relocated
13:15:45   4   to two different locations, one in Norwalk and one
13:15:48   5   in Greenwich.
13:15:49   6      Q.  And were all of the investing partners --
13:15:53   7   that's a term I think you've used -- were all the
13:15:56   8   investing partners in Greenwich?
13:15:59   9      A.  The Connecticut-based investing partners all
13:16:01  10   had an office in the Greenwich office, but not
13:16:04  11   necessarily based in that office.
13:16:06  12      Q.  And you would spend time in the Greenwich
13:16:09  13   office when you came for partners' meetings,
13:16:12  14   correct?
13:16:12  15      A.  Correct.
13:16:13  16      Q.  Would you agree that during his tenure, Mr.
13:16:18  17   Ahmed was a hard worker; he spent a lot of time
13:16:21  18   working?
13:16:23  19      A.  I would say he appeared to be a hard worker.
13:16:27  20      Q.  He did a lot of travel, correct?
13:16:29  21      A.  He did do a lot of travel.
13:16:31  22      Q.  Some of it was very lengthy trips, such as
13:16:34  23   to the Middle East or Asia?
13:16:36  24      A.  He did do a lot of trips.
13:16:39  25      Q.  And there were times when you and other

13:16:42  1    partners saw Mr. Ahmed outside of the office on

13:16:45  2    social occasions, correct?

13:16:49  3        A.  I can't speak to what the partners did with

13:16:54  4    Ifti socially, but there was a couple occasions

13:16:57  5    that I did socially spend time.

13:17:01  6        Q.  So for example, am I correct that Mr. Ahmed,

13:17:05  7    at least in some years, had an end of the year

13:17:07  8    party at his home that the partners were invited

13:17:10  9    to?

13:17:11 10        A.  I'm not aware of an end of the year party.

13:17:14 11        Q.  Or were you aware of an Eid celebration at

13:17:18 12    the end Ramadan?

13:17:20 13        A.  I was invited to a an Eid.

13:17:22 14        Q.  And other partners were invited as well?

13:17:24 15        A.  There was another partner there.  I don't

13:17:26 16    know who else was invited.

13:17:27 17        Q.  Prior to your discovery or your learning

13:17:31 18    about the information that you've testified about,

13:17:35 19    about the transactions that were in the two

13:17:37 20    affidavits that you executed, before you learned

13:17:40 21    all of that information, did any of the partners

13:17:44 22    that you know of ever express any suspicions about

13:17:47 23    any of the transactions in which Mr. Ahmed was

13:17:50 24    involved?

13:17:54 25        A.  There were discussions -- I can only speak

13:17:57  1   of what I know.  There was the I-Cubed Domains

13:18:04  2   that I brought up that interest, that concern.

13:18:07  3   And there was another transaction that I brought

13:18:10  4   up a concern.

13:18:11  5       Q.  Other than asking questions about concerns,

13:18:14  6   there wasn't any time when anyone expressed any

13:18:17  7   suspicions that Mr. Ahmed was committing illegal

13:18:19  8   acts, was there?

13:18:22  9       A.  There was a potential investment where I

13:18:26  10  learned that he was a sole signatory.  And I asked

13:18:28  11  our auditors to look into that investment

13:18:31  12  structure.

13:18:32  13      Q.  Any other examples?

13:18:34  14      A.  Not that I can think of right now.

13:18:37  15      Q.  Is it fair to say that when you learned of

13:18:39  16  this information, you were shocked to find out

13:18:42  17  that Mr. Ahmed -- or at least that it appeared

13:18:45  18  that Mr. Ahmed had committed these acts?

13:18:49  19      A.  That I was shocked?

13:18:50  20      Q.  Yes.

13:18:51  21      A.  Yes, I'd be shocked if learning anybody did

13:18:55  22  this.

13:18:56  23      Q.  But in this case, you were shocked because

13:18:57  24  you thought you knew him, correct?

13:18:59  25      A.  I can't say that that's the reason why I was

13:19:02  1    shocked.  I was shocked because it's shocking,

13:19:05  2    what was done.

13:19:07  3        Q.  Now, part of Mr. Ahmed's responsibility was

13:19:11  4    that he would identify potential investment

13:19:14  5    opportunities for the funds, correct?

13:19:17  6        A.  He would make recommendations of investment

13:19:20  7    opportunities.

13:19:21  8        Q.  And that proposal, when he proposed an

13:19:26  9    investment for a fund, would be documented in a

13:19:31  10   written document called a Pre-Commitment

13:19:33  11   Investment Report, correct?

13:19:35  12       A.  Yes.

13:19:35  13       Q.  And that's one of the documents that would

13:19:37  14   be presented to the managing partners, and the

13:19:40  15   other general partners, for their consideration?

13:19:44  16       A.  Yes.

13:19:44  17       Q.  And the purpose of presenting this

13:19:47  18   information to the managing and general partners

13:19:50  19   was for them to review the information that was

13:19:52  20   presented, and to make an informed decision about

13:19:55  21   whether or not the funds should pursue the

13:19:58  22   investment, correct?

13:20:00  23       A.  That's not the only reason that we have that

13:20:03  24   report, if that's your question.

13:20:05  25       Q.  Well, one purpose of the report is to aid

13:20:08   1   them in their determination; they have to make a

13:20:11   2   decision, and to aid them in making that decision

13:20:13   3   about whether the fund, that particular fund,

13:20:17   4   should pursue an investment, correct?

13:20:19   5       A.  The report does help aid in the discussion

13:20:21   6   and evaluation.

13:20:22   7       Q.  And the four managing -- each of the general

13:20:31   8   partner LLCs, one for each fund, --

13:20:36   9       A.  Yes.

13:20:36   10       Q.  -- has four executive managing members,

13:20:39   11   correct?

13:20:41   12       A.  As we stand today, yes.

13:20:43   13       Q.  And those four executive managing members of

13:20:48   14   the general partner LLC of each of those funds,

13:20:51   15   are the same people as the four managing partners

13:20:55   16   at Oak Management Corporation, correct?

13:20:56   17       A.  Yes, sir.

13:20:57   18       Q.  And to be approved as an investment for one

13:21:01   19   of those funds, am I correct that the potential

13:21:06   20   investment opportunity had to be approved by at

13:21:10   21   least three out of those four executive managing

13:21:13   22   members of the LLC for that fund?

13:21:16   23       A.  That is correct.

13:21:19   24       Q.  And am I correct that there is a vote taken

13:21:25   25   that includes the general partners, but really the

13:21:29  1   only requirement for going forward is three out of

13:21:33  2   four of the executive managing members?

13:21:35  3       A.  The only requirement per the partnership

13:21:39  4   documents, yes, that's correct, is the three

13:21:41  5   executive managing members, three out of the four.

13:21:44  6       Q.  So when those four managing members or

13:21:46  7   executive managing members consider an investment,

13:21:50  8   they are not merely a rubber stamp, correct?

13:21:54  9       A.  They have an obligation, as Mr. Ahmed in

13:21:58  10  signing this document, to uphold the requirements

13:22:01  11  of the partnership agreement, and that would

13:22:04  12  include evaluation of investments being presented

13:22:08  13  for -- opportunities being presented for

13:22:11  14  investment.

13:22:11  15      Q.  As executive managing members of the general

13:22:13  16  partner of the fund, they are seeking

13:22:17  17  opportunities that are in the best interests of

13:22:20  18  the fund, correct?

13:22:20  19      A.  Yes.

13:22:21  20      Q.  And they carefully review the information

13:22:25  21  that's presented to them, correct?

13:22:27  22      A.  That's -- that's my understanding, yes.

13:22:29  23      Q.  And you've been involved in the discussion

13:22:33  24  with them about many investment opportunities,

13:22:35  25  correct?

13:22:35  1      A.  I have been involved, yes.

13:22:37  2      Q.  And in those discussions, they have raised

13:22:40  3  questions about investments?

13:22:41  4      A.  Yes, that does happen.

13:22:43  5      Q.  They sometimes ask for additional

13:22:45  6  information?

13:22:46  7      A.  Yes, that does happen.

13:22:47  8      Q.  And there are occasions on which they reject

13:22:50  9  investments?

13:22:51  10     A.  Yes, that does happen.

13:22:53  11     Q.  And the ultimate purpose is to find

13:22:57  12  investments that will be profitable for the fund?

13:23:00  13     A.  That is the ultimate goal.

13:23:04  14     Q.  Does Oak Management Corporation have

13:23:09  15  something called valuation guidelines?

13:23:18  16     A.  We have valuation guidelines.  I'm just

13:23:22  17  hesitating if they're specifically authored by Oak

13:23:25  18  Management Corporation.

13:23:26  19     Q.  Okay.

13:23:54  20          MR. DEITCH:  Your Honor I'm going to

13:23:56  21  mark this as Exhibit 1.  Because these are

13:23:58  22  relief defendant's, I was going to write RD-1

13:24:02  23  just to make that indication.

13:24:03  24          THE COURT:  Let's call it a letter,

13:24:07  25  RD-A.

13:24:07  1          MR. DEITCH:  RD-A, that's fine.

13:24:28  2     Q.  Mrs. Ames, I have handed you what's been

13:24:31  3  marked as Relief Defendant's Exhibit A.  And do

13:24:35  4  you see that this is an e-mail, in the bottom,

13:24:38  5  from Jessica Adams to Amy Ladin, L-A-D-I-N.  And

13:24:45  6  then a reply from Ms. Ladin to Ms. Adams?

13:24:48  7     A.  I do see that.

13:24:49  8     Q.  Okay.  And Ms. Adams is identified down here

13:24:53  9  as fund controller/fund analytics.  Is she a staff

13:24:58  10  person at Oak Management Corporation?

13:24:59  11     A.  Yes, she is.

13:25:01  12     Q.  And was Ms. Ladin Mr. Ahmed's administrative

13:25:06  13  assistant around the time of this e-mail in

13:25:09  14  November 2014?

13:25:10  15     A.  Yes, she was his assistant.

13:25:16  16          MR. DEITCH:  Your Honor, this is a

13:25:17  17  document that was produced to us pursuant to

13:25:20  18  subpoena from Oak, so I'd ask that it be

13:25:23  19  admitted as Exhibit A.

13:25:25  20          THE COURT:  Absent objection.

13:25:26  21          MR. HEINKE:  No objection, your

13:25:27  22  Honor.

13:25:27  23          THE COURT:  Full Exhibit.

13:25:28  24     Q.  Ms. Ames, do you see in the portion that I

13:25:37  25  have put on the screen, in the middle, Ms. Adams'

13:25:40   1   e-mail to Ms. Ladin, she writes, in the middle

13:25:44   2   line of those three lines, "This resulted in a

13:25:47   3   write-up of 2.6 million dollars, which is

13:25:50   4   consistent with Oak's valuation guidelines."

13:25:54   5       A.  I do see that, yes.

13:25:55   6       Q.  Could you explain, what is Ms. Adams

13:25:59   7   referencing when she refers to Oak's valuation

13:26:03   8   guidelines?

13:26:04   9             MR. HEINKE:   Objection, your Honor;

13:26:05  10   calls for speculation.

13:26:07  11             MR. DEITCH:   Let me ask a

13:26:08  12   foundational question.

13:26:09  13       Q.  Do you have an understanding of what Ms.

13:26:11  14   Adams is referring to when she uses the phrase

13:26:14  15   "Oak's valuation guidelines"?

13:26:16  16       A.  Yes.

13:26:18  17       Q.  What is she referring to?

13:26:19  18       A.  The valuation guidelines that we use at

13:26:24  19   quarter end.

13:26:25  20       Q.  And are these guidelines that Oak Management

13:26:28  21   Corporation uses for determining the value of

13:26:31  22   investments that are held by the individual funds?

13:26:35  23       A.  They are the guidelines that are used in

13:26:38  24   that process.

13:26:42  25       Q.  Is it the case, going back to the subject of

13:26:46   1   how investments are approved, prior to the

13:26:49   2   approval of an investment, does someone at Oak

13:26:53   3   Management Corporation undertake a determination

13:26:56   4   of the value of the investment?

13:27:01   5       A.   The value of the investment would be

13:27:04   6   imbedded in the recommendation made by the

13:27:07   7   investing partner.

13:27:09   8       Q.   And in the ordinary course, in your

13:27:14   9   experience, is that valuation supported by

13:27:18   10   analysis of information about the company?

13:27:23   11       A.   That's one way that a valuation would be

13:27:27   12   determined.

13:27:28   13       Q.   Well, is it fair that the project manager

13:27:31   14   who presents this information does not simply pull

13:27:35   15   the figure out of the air and put is it in the

13:27:38   16   PCR?

13:27:38   17       A.   That would be inconsistent with how we do

13:27:41   18   our business and our obligations and our

13:27:44   19   agreements.

13:27:45   20       Q.   Okay.  And did I understand you correctly

13:27:51   21   that following the approval of an investment,

13:27:55   22   after the fund has made an investment, this

13:27:57   23   process of determining the value of the investment

13:28:00   24   is repeated each quarter by Oak Management

13:28:03   25   Corporation?

13:28:04  1      A.   It is reviewed every quarter.

13:28:08  2      Q.   Now, you testified earlier, in response to

13:28:12  3   Mr. Heinke's questions, that in April 2013, Mr.

13:28:19  4   Ahmed brought to the attention of the partners a

13:28:20  5   potential opportunity to invest in a company that

13:28:23  6   you've referred in your affidavit as Company C.

13:28:27  7   Correct?

13:28:28  8      A.   Yes.

13:28:28  9      Q.   And this was first mentioned after a regular

13:28:32  10  strategy meeting that the partners had had, Mr.

13:28:36  11  Ahmed raised this prospect of a possible

13:28:38  12  investment?

13:28:39  13     A.   I don't think it was raised after the

13:28:41  14  meeting.  I have it in my minutes that it would be

13:28:45  15  during the meeting.

13:28:47  16     Q.   Do you recall that in June, in early June,

13:28:51  17  2015 --

13:28:53  18     A.   2015?

13:28:54  19     Q.   Excuse me.  In early June 2013, thank you

13:28:58  20  for correcting me, there were a series of e-mails

13:29:02  21  in which Mr. Ahmed and a number of the partners

13:29:05  22  discussed this Company C investment?

13:29:08  23     A.   I don't know that specifically.

13:29:39  24     Q.   Ms. Ames, I'm handing you what's been marked

13:29:44  25  as Relief Defendant's Exhibit B.  Do you see that

13:29:57  1   this is a -- I'm not sure how to zoom it back and

13:30:06  2   fourth -- do you see that this is a series of

13:30:09  3   e-mails involving the company that you've referred

13:30:11  4   to as Company C?

13:30:15  5          THE COURT:  I think there's a button

13:30:16  6   that you push down on.

13:30:23  7          MR. DEITCH:  There it is.

13:30:28  8      A.  I'm sorry?

13:30:28  9      Q.  Do you see that this Exhibit B is a series

13:30:31  10  of e-mails in June 2013 about the company that

13:30:35  11  you've referred to as Company C?

13:30:40  12     A.  That's what it looks like, yes.

13:30:44  13         MR. DEITCH:  Your Honor, I'd ask this

13:30:45  14  exhibit be admitted into evidence.

13:30:47  15         MR. HEINKE:  Your Honor, no

13:30:48  16  objection.  Given it's a preliminary injunction

13:30:50  17  hearing and hearsay is appropriate, we would

13:30:52  18  have no objection.

13:30:53  19         THE COURT:  Full exhibit.

13:30:59  20     Q.  So as e-mails often do, do you see that the

13:31:02  21  earlier e-mail in this chain appears all the way

13:31:05  22  at the bottom?

13:31:14  23     A.  I do see that.

13:31:17  24     Q.  And do you see that the first e-mail in the

13:31:20  25  chain is on June 8, 2013, at 10:08 a.m., from Mr.

13:31:26  1    Ahmed.  And that he's e-mailing Jerry at

13:31:29  2    OakVC.com?

13:31:31  3        A.  That's what it looks like.

13:31:32  4        Q.  And Jerry at OakVC.com, is that Jerry

13:31:37  5    Gallagher, who was a general partner at the time?

13:31:39  6        A.  Yes.

13:31:39  7        Q.  And am I correct Mr. Gallagher is now

13:31:41  8    deceased?

13:31:41  9        A.  Yes.

13:31:42  10       Q.  And do you see that Mr. Ahmed reports to Mr.

13:31:47  11   Gallagher that the company has received a term

13:31:50  12   sheet from Accel, A-C-C-E-L, Partners, for a fifty

13:31:56  13   million dollar raise.  Do you have an

13:31:58  14   understanding of what Mr. Ahmed means when he used

13:32:01  15   the term "raise"?

13:32:05  16       A.  That that's the amount of money that the

13:32:07  17   company is raising funding for.

13:32:10  18       Q.  Raising money?

13:32:11  19       A.  It's raising money.

13:32:13  20       Q.  And Accel is a venture capital firm that you

13:32:21  21   had heard of at that time?

13:32:22  22       A.  Yes.

13:32:22  23       Q.  It is a well regarded firm?

13:32:25  24       A.  It's another venture capital firm.

13:32:28  25       Q.  And he discusses the terms in this term

13:32:33  1    sheet, and refers to Series B security.  And you

13:32:36  2    testified earlier that a Series A and a Series B,

13:32:40  3    in this context, am I correct, that that is simply

13:32:44  4    referring in time to the issuance of these

13:32:47  5    different -- the different financing, Series A,

13:32:50  6    then B, then C, as opposed to classes with certain

13:32:53  7    rights?

13:32:54  8        A.  Well, the different series can be different

13:32:57  9    classes of securities and very different rights.

13:32:59  10       Q.  But unlike Class A stock and Class B stock,

13:33:02  11   the Series A doesn't necessarily have more

13:33:06  12   valuable rights than the Class B?  This is --

13:33:10  13   Series B.  The Series A, Series B, Series C, just

13:33:14  14   refers to the groupings of different financing,

13:33:17  15   correct?

13:33:17  16       A.  For your first question, I can't generalize

13:33:24  17   for all fundraisings, whether an A or a B, you

13:33:29  18   know, has better or worse provisions.

13:33:31  19       Q.  I'm only talking about here.  When you use

13:33:33  20   the -- when you have used the term, referring to

13:33:36  21   company A -- to Series A financing, you're talking

13:33:40  22   about money the company raised in 2012?

13:33:43  23       A.  Yes, thank you.

13:33:45  24       Q.  And Series B refers to the money raised in

13:33:47  25   2013, when Oak 13 invested it's 25 million?

13:33:52   1       A.   That is what I'm referring to.

13:33:54   2       Q.   Okay.  And it then refers, as well, to an

13:34:02   3   eight percent accruing dividend.  Is your

13:34:05   4   understanding that by referring to an eight

13:34:08   5   percent accruing dividend, Mr. Ahmed is talking

13:34:11   6   about terms of that security that would provide

13:34:14   7   that a dividend equal to eight percent would be

13:34:19   8   included in the value of the security over time?

13:34:25   9       A.   It's not an assumption that that would be

13:34:27  10   included in the value of the company over time.

13:34:36  11   But it's -- it looks like it's, in reading this,

13:34:40  12   it's the aspect of the participating preferred

13:34:43  13   that Mr. Ahmed is describing at Accel.

13:34:48  14       Q.   Okay.  And Mr. Ahmed goes onto say, "The

13:34:52  15   terms are quite attractive, and I think the

13:34:54  16   company will line up for a 2H 2014 IPO which could

13:35:01  17   yield a four to five times return under

13:35:03  18   conservative assumption."  Do you understand him,

13:35:08  19   when he says 2H, to refer to the second half of

13:35:09  20   2014?

13:35:09  21       A.   That is what I understand it to mean.

13:35:11  22       Q.   And Mr. Ahmed, in the last paragraph of his

13:35:14  23   e-mail, says "I would advocate we strongly

13:35:17  24   consider co-investing with Accel Partners if their

13:35:20  25   proposal is accepted," correct?

13:35:22   1      A.   That's what it says.

13:35:23   2      Q.   And when Mr. Gallagher responds to that

13:35:28   3   e-mail -- and unfortunately it's partly split over

13:35:32   4   the two pages.  You can see at the very bottom of

13:35:35   5   the page, do you see it says, "From Jerry

13:35:37   6   Gallagher, Saturday, June 8, 2013," and it has an

13:35:41   7   odd time stamp, it says 12:43 a.m.; I'm not sure

13:35:44   8   if that time is correct.  Do you see where it says

13:35:47   9   that at the bottom of the first page?

13:35:49  10      A.   Oh, I'm sorry, you mean 5546?

13:35:52  11      Q.   Yes.

13:35:54  12      A.   Could you repeat what you'd like me to look

13:35:56  13   at?

13:35:56  14      Q.   Really, it's just do you see that -- it says

13:35:59  15   "From Jerry Gallagher" on May 8th, at the very

13:36:02  16   bottom?

13:36:02  17      A.   Yes, I'm sorry, yes, I do see that.

13:36:04  18      Q.   And the other part of that same e-mail

13:36:06  19   appears at the top of 5547.  And this response

13:36:11  20   shows who was receiving it.  It says it was

13:36:13  21   addressed to Mr. Ahmed.  And it is copied to Mr.

13:36:18  22   Glassmeyer, Ms. Lamont, Mr. Adams, Mr. Carano, Mr.

13:36:22  23   Harman, to yourself, and to Mr. Riley.  Was Mr.

13:36:26  24   Riley a general partner at that time?

13:36:30  25      A.   In 2013, yes, he was.

13:36:33   1       Q.   And do you see that Mr. Gallagher, in his

13:36:37   2   response, says, "I like the strategy a lot," and

13:36:43   3   he looks forward to a discussion and he looks

13:36:47   4   forward to meeting the management of Company C?

13:36:50   5       A.   There's another line in there, "doesn't have

13:36:53   6   a perspective on valuation."

13:36:54   7       Q.   Yes.

13:36:55   8       A.   Correct, I see that.

13:36:56   9       Q.   All right.   And then continuing the chain of

13:37:03  10   e-mails, do you see that the next one in the chain

13:37:06  11   is from Ms. Lamont, also sent on that same day,

13:37:10  12   June 8th, and copies to all those same people.

13:37:13  13   And she says "Agree with Jerry, nice you have an

13:37:16  14   inside track to co-invest"?

13:37:18  15       A.   I do see that.

13:37:19  16       Q.   And Ms. Lamont is one of the managing

13:37:23  17   partners at Oak?

13:37:23  18       A.   That's correct.

13:37:24  19       Q.   And she was at this time as well?

13:37:25  20       A.   Yes, she was.

13:37:26  21       Q.   And then the next e-mail up is from Mr.

13:37:31  22   Carano, who was also a managing partner at that

13:37:32  23   time, correct?

13:37:33  24       A.   Correct.

13:37:34  25       Q.   And he says, "I think we need to evaluate

13:37:39   1   Company C in the framework of whether this is the

13:37:43   2   single" -- all caps -- "best investment Oak 13 can

13:37:46   3   make" -- all caps -- "this quarter, especially if

13:37:50   4   we are going to consider 25 to 30 million dollars.

13:37:55   5   I also agree it looks very promising, but we need

13:37:58   6   to rank it relative to all the other projects in

13:38:01   7   the pipeline.  If we decide to commit 15 million

13:38:03   8   dollars or less, then there would be room for one

13:38:06   9   other 15 million dollar new investment for Oak 13

13:38:09  10   this quarter.  Thanks."

13:38:10  11        So is it fair to say Mr. Carano raises the

13:38:13  12   question of if we're going to invest that much

13:38:15  13   money, 25 million dollars, this has to be the best

13:38:18  14   opportunity we have this quarter for Oak 13?

13:38:22  15     A.   That is what he said in the first line.

13:38:25  16     Q.   Okay.  And then Mr. Ahmed responds, in

13:38:38  17   addition to acknowledging that question, in the

13:38:40  18   second paragraph of his e-mail, Mr. Ahmed points

13:38:44  19   out, "We should put a premium in co-investing

13:38:48  20   alongside the winning VCs in these times, and I

13:38:53  21   think Accel would qualify in that category for us

13:38:56  22   to establish the market pizzaz that we will need

13:39:00  23   for a successful Oak 14.  Not that that should be

13:39:03  24   the investment criteria, but something to be said

13:39:07  25   for the company we keep to establish prominence

13:39:10   1   that Oak deserves."  Do you see where he says

13:39:12   2   that?

13:39:13   3        A.  I do see where he says that.

13:39:15   4        Q.  And by Oak 14, he is talking about a

13:39:18   5   prospective fund that might be raised in the

13:39:21   6   future.  Correct?

13:39:22   7        A.  That's what he was talking about at that

13:39:25   8   time.

13:39:25   9        Q.  And do you see, as well, that in the e-mail,

13:39:33  10   Mr. Ahmed makes clear that he is prepared to walk

13:39:39  11   away from this investment opportunity if the

13:39:41  12   partners are not prepared to approve it.  Do you

13:39:44  13   recall that he was prepared to walk away from it?

13:39:47  14        A.  I'm sorry, where does it say that?

13:39:49  15        Q.  Do you see in the next -- in the second to

13:39:52  16   last paragraph, that starts with "I shall," he

13:39:56  17   says, "I shall prepare a basic PCR for discussion

13:39:59  18   on Monday.  And we can debate and discuss the

13:40:02  19   merits or lack thereof.  I am confident, whatever

13:40:04  20   the group decides, will be the right decision.

13:40:07  21   While I am super confident and bullish, if it does

13:40:11  22   not make sense for Oak at this time, no sweat at

13:40:12  23   all.  I don't have religion on this or any

13:40:15  24   investment decision."

13:40:16  25        Do you see that he said that?

13:40:18   1        A.   I do see that he said that.

13:40:20   2        Q.   And do you see that, after that, at the top

13:40:25   3   of this e-mail chain, Mr. Carano, who is one of

13:40:28   4   the managing partners, responds.  And if you will

13:40:33   5   look at Mr. Carano's response, do you agree that

13:40:38   6   Mr. Carano appears to be convinced that in fact

13:40:39   7   this is an opportunity worth considering?

13:40:43   8        A.   If I can read this, "I agree that Company C

13:40:47   9   is probably the most compelling --

13:40:53   10               (DISCUSSION HELD OFF THE RECORD.)

13:40:53   11       Q.   I could read it.  It says "I agree that I

13:40:56   12   agreed the Company C is probably the most

13:40:57   13   compelling project in Oak's deal log right now.

13:41:01   14   And I agree that co-investing with top three CVs

13:41:05   15   makes great sense for the Oak franchise.  Thanks."

13:41:08   16           Mr. Carano had previously questioned whether

13:41:12   17   this was the top best opportunity for the quarter.

13:41:16   18   Do you agree here, he seems to be moving towards

13:41:19   19   the idea that in fact, it is a -- it is probably

13:41:23   20   the most compelling project in Oak's deal log

13:41:26   21   right now?

13:41:26   22               MR. HEINKE:  Your Honor, I'm going to

13:41:27   23   object, only because at this point, she doesn't

13:41:29   24   have any recipient knowledge.

13:41:32   25               THE COURT:  Sustained.

13:41:33   1          MR. HEINKE:   Thank you.

13:41:40   2     Q.  Okay.  Mr. Ahmed did prepare a PCR for the

13:41:48   3   2013 investment that Oak 13 eventually made in

13:41:52   4   Company C, correct?

13:41:54   5     A.  Correct.

13:41:55   6     Q.  Now, on the PCR, am I correct that on the

13:42:07   7   PCR, they identified the role that different

13:42:11   8   people took in developing the project, correct?

13:42:16   9     A.  I don't know that it specifically identifies

13:42:19  10   those different projects.

13:42:20  11     Q.  Well, for example, on the -- on any PCR,

13:42:24  12   there will be a person identified as the manager,

13:42:27  13   correct?

13:42:30  14     A.  I do believe so.

13:42:33  15     Q.  And the manager, by virtue of being

13:42:36  16   identified as the manager of that project, that

13:42:38  17   person potentially has eligibility for receiving

13:42:43  18   bonuses associated with that project, correct?

13:42:46  19     A.  As a project manager, there would be

13:42:50  20   eligibility for consideration in a bonus that

13:42:54  21   involves the aggregate performance of the

13:42:57  22   companies in which they're involved.

13:42:59  23     Q.  And in addition to a manager, PCR also

13:43:03  24   involved people who Oak calls buddies, correct?

13:43:06  25     A.  Yes, I do believe that's on there.

13:43:08   1      Q.   And buddies are people who have assisted the

13:43:11   2    project manager in developing that potential

13:43:14   3    opportunity, correct?

13:43:15   4      A.   They can have a role in both developing the

13:43:18   5    opportunity, or in the ongoing maintenance and

13:43:21   6    management, or both; or later in the -- in

13:43:27   7    advising.

13:43:27   8      Q.   And do you agree that a person would not be

13:43:29   9    a manager or a buddy for a project that he or she

13:43:34   10   believed would not be profitable?

13:43:37   11     A.   Actually, there are buddies that are

13:43:39   12   specifically added to a project team to be what we

13:43:42   13   call a devil's advocate.

13:43:44   14     Q.   Okay.   Do you know if that was the case in

13:43:46   15   this investment?

13:43:47   16     A.   I don't remember specifically.

13:44:14   17     Q.   Do you recall, in the e-mails we just looked

13:44:17   18   at, they talked about Accel Partners sending a

13:44:22   19   term sheet to Company C.   Do you recall that

13:44:27   20   Company C ultimately accepted the term sheet from

13:44:31   21   Accel?

13:44:32   22     A.   No.

13:44:39   23     Q.   I'm going to hand you what's been marked as

13:44:41   24   Relief Defendant's Exhibit C.

13:44:44   25     A.   Thank you.

13:44:44   1    Q.   Do you see that this is another series of

13:44:59   2  e-mails regarding Company C?

13:45:03   3    A.   That's what it looks like, yes.

13:45:05   4    Q.   And these e-mails occurred a week later, on

13:45:08   5  June 15?

13:45:16   6    A.   Yes, a week later.

13:45:18   7    Q.   And if you look at the bottom of the first

13:45:20   8  page, you see an e-mail from Mr. Ahmed, from that

13:45:24   9  morning, in which he says, "This morning the

13:45:27  10  company signed a term sheet with Accel Partners"?

13:45:30  11    A.   I do see that.

13:45:31  12    Q.   Does that refresh your recollection that

13:45:33  13  Company C signed a term sheet with Accel Partners?

13:45:36  14    A.   I can read the e-mail.  I don't recall the

13:45:40  15  conversation.

13:45:42  16        MR. DEITCH:  Your Honor, this is

13:45:44  17  another e-mail produced to us by Oak Management

13:45:46  18  Corporation, pursuant to subpoena.  We ask it be

13:45:48  19  readmitted as Relief Exhibit C.

13:45:52  20        MR. HEINKE:  No objection.

13:45:54  21        THE COURT:  Full exhibit.

13:45:55  22    Q.   In that bottom e-mail, Mr. Ahmed records to

13:45:58  23  the managing partners and the general partners

13:46:01  24  that the company has signed this term sheet,

13:46:05  25  correct?

13:46:05   1      A.   That's what it looks like this e-mail is

13:46:07   2   doing.

13:46:07   3      Q.   And he also advocates going forward with

13:46:15   4   this potential investment opportunity by Oak 13,

13:46:17   5   correct?

13:46:18   6      A.   I need --

13:46:20   7      Q.   Go ahead and read the rest of the e-mail

13:46:23   8   that goes over onto the second page.

13:47:13   9      A.   Thank you.  Can you repeat your question?

13:47:15   10     Q.   Sure.  Do you agree that in that e-mail, in

13:47:18   11   addition to reporting about the signing of the

13:47:20   12   term sheet, Mr. Ahmed continues to advocate in

13:47:25   13   favor of acceptance of this investment

13:47:28   14   opportunity?

13:47:29   15     A.   It does look like he's advocating to invest

13:47:33   16   in Company C.

13:47:34   17     Q.   And if you look at the remainder of the

13:47:37   18   e-mail chain going up the first page, do you agree

13:47:40   19   that the managing partners appear to favor the

13:47:44   20   opportunity?

13:47:50   21     A.   I don't know that they're speaking

13:47:54   22   specifically to an investment recommendation, but

13:47:56   23   that it was good to position Oak for a

13:47:58   24   consideration of this investment, is how I'm

13:48:01   25   reading it right this minute.

13:48:02  1      Q.  For example, the first response is from Mr.
13:48:05  2   Glassmeyer, who says, "Brilliant leadership and
13:48:08  3   maneuvering with Company C to position Oak well
13:48:11  4   for this financing."  Correct?
13:48:12  5      A.  Yes.
13:48:13  6      Q.  Do you think that Mr. Glassmeyer would
13:48:17  7   congratulate Mr. Ahmed for brilliant leadership if
13:48:19  8   he did not believe it was a good investment
13:48:22  9   opportunity?
13:48:23  10      A.  I don't know that I can tell you if Mr.
13:48:26  11   Glassmeyer was speaking, what he was thinking at
13:48:30  12   the time.
13:48:30  13      Q.  And do you see that Mr. Harman says "Well
13:48:34  14   done, Ifti"?
13:48:36  15      A.  I do see that.
13:48:37  16      Q.  And Mr. Carano also congratulates Mr. Ahmed?
13:48:40  17      A.  I do see that.
13:48:42  18      Q.  In your testimony here earlier, you talked
13:49:01  19   about disclosure obligations relating to
13:49:05  20   investments by the Oak funds.  Do you recall that?
13:49:10  21      A.  Disclosure obligations.  Yes.
13:49:12  22      Q.  And do you remember that Mr. Heinke shows
13:49:18  23   you a limited partnership agreement for Oak 13,
13:49:21  24   and pointed out two separate provisions in that
13:49:23  25   agreement that create restrictions on what kind of

13:49:29  1   investments the partnership can make without

13:49:32  2   special approval?

13:49:33  3       A.   I do remember him pointing out those

13:49:35  4   provisions.

13:49:36  5       Q.   And when you have spoken in your testimony

13:49:38  6   about Oak's policy about investments, and Oak's

13:49:42  7   policy about disclosure of conflicts of interest,

13:49:46  8   are those the restrictions to which you're

13:49:49  9   referring?

13:49:49  10      A.   I think there's been times in my testimony

13:49:51  11  that there's been discussions about policies,

13:49:54  12  there's been discussions about limited partnership

13:49:57  13  agreement, there's been discussions about

13:49:59  14  operating agreements.  And there may be times that

13:50:02  15  the conversations have blended those requirements.

13:50:05  16  But in summary, I think -- well, in summary,

13:50:11  17  that's my summary.

13:50:12  18      Q.   Are you saying that in addition to the

13:50:14  19  limited partnership obligations, there are other

13:50:17  20  contractual obligations relating to these kinds of

13:50:22  21  disclosures?

13:50:22  22      A.   There would be obligations of disclosure and

13:50:28  23  prohibition in the stock trading and insider

13:50:31  24  information policy.

13:50:37  25      Q.   Am I correct this limited partnership

13:50:40   1    agreement that Mr. Heinke showed you was for Oak

13:50:44   2    13?

13:50:44   3        A.   That's correct.

13:50:45   4        Q.   And Mr. Ahmed was involved with investment

13:50:49   5    projects in Oak 10, 11 and 12, as well?

13:50:53   6        A.   That's correct.

13:50:53   7        Q.   Do the limited partnership agreements for

13:50:57   8    10, 11 and 12 have similar provisions in them?

13:51:01   9        A.   I would expect them to all have similar

13:51:03   10   provisions in them.

13:51:05   11       Q.   And these are agreements you've read before

13:51:07   12   today, correct?

13:51:08   13       A.   I have read before today.

13:51:09   14       Q.   None of those restrictions say that a trade

13:51:14   15   cannot be made, or an investment cannot be made by

13:51:17   16   a fund with a company in which a partner spouse

13:51:22   17   has an investment.  Correct?

13:51:24   18       A.   I can't specifically -- I don't recall

13:51:32   19   specifically the language in each of those

13:51:35   20   agreements.

13:51:38   21       Q.   And in fact, there are instances, are there

13:51:42   22   not, in which Oak funds have invested in companies

13:51:47   23   in which family members of Oak Partners already

13:51:50   24   had investments?

13:51:58   25       A.   I do not recall what company you would be

13:52:00    1    referring to.

13:52:02    2        Q.  Getting back to Company C, do you recall

13:52:09    3    that in fact, Company C had a great year in 2013?

13:52:19    4        A.  I have a recollection that it was reported

13:52:22    5    to us that it had a great year.

13:52:26    6        Q.  And what's the distinction you're making?

13:52:28    7        A.  I have a recollection that Mr. Ahmed

13:52:36    8    provided financials at the time of the October

13:52:40    9    investment, in the Pre-Commitment Report, that

13:52:43   10    would have inferred that it had a good year.

13:52:48   11    Whether it was a great year is a relative

13:52:51   12    evaluation.

13:52:52   13        Q.  After 2013 was over, Oak, after that fourth

13:52:57   14    quarter of 2013, would have done a valuation of

13:53:01   15    its 25 thousand dollar -- excuse me, 25 million

13:53:05   16    dollar investment, correct?

13:53:06   17        A.  Well, the investment was in that quarter.

13:53:10   18    So the guidelines would support accepting the

13:53:13   19    purchase price.

13:53:17   20        Q.  And let me show you a document, it will be a

13:53:21   21    little easier.  I'm going to show you what's been

13:53:51   22    marked as Relief Defendant's Exhibit D?

13:53:56   23        A.  Thank you.

13:54:05   24        Q.  Do you recognize the type of document here

13:54:09   25    that's been given you, that's been marked as

13:54:17  1    Exhibit D?

13:54:18  2        A.  Yes, I do recognize this document.

13:54:20  3        Q.  And it says at the top, "Oak 13,

13:54:23  4    Confidential Company Fact Sheet, Third Quarter

13:54:27  5    2014," correct?

13:54:28  6        A.  Yes, it does say that.

13:54:29  7        Q.  Are these the kind of documents that are

13:54:31  8    regularly produced by Oak?

13:54:35  9        A.  Yes.

13:54:38  10       Q.  Can you tell us what the purpose for which

13:54:42  11   this document was created?

13:54:45  12       A.  They are documents that are produced at

13:54:49  13   quarter's end.

13:54:51  14       Q.  Okay, so this is produced at the end of each

13:54:53  15   quarter for each company in which Oak has an

13:54:56  16   investment, or one of the Oak funds has an

13:54:58  17   investment.  Is that correct?

13:55:00  18       A.  It would be produced for any active private

13:55:06  19   company that Oak has an investment.

13:55:10  20       Q.  Like Company C?

13:55:12  21       A.  Like Company C.

13:55:14  22       Q.  And who produces these documents, who

13:55:16  23   creates them?

13:55:17  24       A.  Who creates what portion of the document?

13:55:22  25       Q.  Well, for example, in the middle --

13:55:26  1          MR. DEITCH:  Well, first of all, your

13:55:27  2   Honor, let me ask that D be admitted into

13:55:30  3   evidence.

13:55:31  4          MR. HEINKE:  Your Honor, we'd object

13:55:32  5   to this.  If it is being offered for the truth

13:55:34  6   of the matter asserted, there's been no --

13:55:36  7   nothing to establish that the figures in this

13:55:39  8   document are true.  Frankly, since it's being

13:55:43  9   sponsored by Mr. Ahmed, I think the Commission

13:55:46 10   would seriously question whether the figures in

13:55:49 11   the document are true.

13:55:49 12          THE COURT:  So what is the purpose?

13:55:51 13          MR. DEITCH:  The purpose, your Honor,

13:55:52 14   is that there's a great deal of information

13:55:55 15   here -- there are two reasons.  One is, first of

13:55:57 16   all, it has not been established that the

13:55:59 17   information came from Mr. Ahmed.  Second -- and

13:56:03 18   I can ask the witness more specifically about

13:56:06 19   the specific information.  The second is there's

13:56:08 20   a lot of reported information here, which is

13:56:11 21   both important for its truth, but also important

13:56:14 22   for whatever information was available to Oak at

13:56:17 23   the time it made its 2014 investment.

13:56:19 24          THE COURT:  So it's a business

13:56:21 25   record, because that's part of what they produce

13:56:24   1   and rely on.  And you are offering it for what

13:56:30   2   purpose?

13:56:32   3           MR. DEITCH:  Let me ask the witness

13:56:34   4   one or two more questions, and then I think I

13:56:36   5   will have a full predicate and can answer the

13:56:38   6   Court's question, if I may.

13:56:39   7       Q.  Mrs. Ames, do you see, towards -- in the

13:56:44   8   bottom half of the front page, it lists -- it's

13:56:49   9   titled Financials, and it gives a whole variety of

13:56:52  10   financial information?

13:56:53  11       A.  I do see that.

13:56:54  12       Q.  And for the information that's under

13:56:57  13   Financials, that is all actual financial

13:56:59  14   information, as opposed to forecasted financial

13:57:04  15   information?

13:57:04  16       A.  That's what the title says.

13:57:07  17       Q.  And who is customarily responsible at Oak

13:57:11  18   Management Corporation for compiling the

13:57:13  19   historical financial information that is included

13:57:16  20   on a confidential company fact sheet?

13:57:19  21       A.  The source of the information can be from

13:57:25  22   multiple sources.  It can be delivered from the

13:57:30  23   investing partner.  It can come from -- directly

13:57:33  24   from the portfolio company.  It can come from the

13:57:36  25   portfolio company, to the administrative

13:57:39  1   assistant, on to the finance team.  It can come

13:57:42  2   directly to the finance team.  There's multiple

13:57:45  3   ways that the information is delivered.

13:57:48  4      Q.  Okay.  And these are documents that are

13:57:52  5   customarily created and maintained in the course

13:57:54  6   of Oak Management Corporation's business, correct?

13:57:57  7      A.  These are maintained on a quarterly basis

13:58:01  8   currently.

13:58:02  9           MR. DEITCH:  Your Honor, I believe

13:58:03  10  it's admissible as a business record.  I think

13:58:08  11  Mr. Heinke is objecting to the weight of the

13:58:09  12  document, perhaps, because the witness was not

13:58:12  13  able to specifically identify who provided that

13:58:16  14  information.  But they're certainly business

13:58:18  15  records.

13:58:18  16           THE COURT:  I'm going to permit the

13:58:19  17  document.

13:58:24  18     Q.  So you do see, Ms. Ames, if you will look at

13:58:27  19  that section -- first of all, if you look at that

13:58:31  20  section of the --

13:58:33  21           THE COURT:  Could you straighten that

13:58:35  22  out on the --

13:58:38  23           MR. DEITCH:  You want me to zoom it

13:58:40  24  out?

13:58:40  25           THE COURT:  You have it lopsided and

13:58:43   1   I can't tell if I'm seeing everything.

13:58:47   2            MR. DEITCH:  Is that okay?

13:58:48   3            THE COURT:  If you move it down --

13:58:51   4   there we go.

13:58:53   5      Q.  Just let me know, Ms. Ames -- well, you have

13:58:57   6   a copy of it so you can look at the paper copy.

13:58:58   7      A.  Yes, I do.

13:58:59   8      Q.  Do you see that on the -- first all of, do

13:59:04   9   you see in the top right-hand corner, that the

13:59:08   10   document identifies Mr. Ahmed as the project

13:59:11   11   manager regarding Company C?

13:59:14   12      A.  I do see that.

13:59:15   13      Q.  And do you see that it then identifies Mr.

13:59:17   14   Glassmeyer, Mr. Harman and Mr. Gallagher, as

13:59:21   15   buddies for this project?

13:59:22   16      A.  I do see that.

13:59:23   17      Q.  You have no recollection as you sit here now

13:59:26   18   that any of them were devil's advocate buddies, do

13:59:30   19   you?

13:59:30   20      A.  I don't know if they were or were not.

13:59:32   21      Q.  If you look at the financial information

13:59:36   22   listed on here, do you see that the total revenue

13:59:41   23   for 2012, for Company C, was ninety-eight thousand

13:59:46   24   thirty-seven dollars?  I can point it out on the

13:59:57   25   screen.

13:59:57  1      A.  I'm sorry, 2012 -- that actually would

14:00:03  2  indicate, it's not ninety-eight thousand.  It's

14:00:07  3  because there's a reference --

14:00:08  4      Q.  Excuse me, I misspoke.  Ninety-eight million

14:00:11  5  thirty-seven thousand?

14:00:12  6      A.  Yes, that's what that says.

14:00:13  7      Q.  And do you see that it reports that the

14:00:17  8  revenue for 2013 was three hundred eleven million

14:00:21  9  eight hundred ten thousand?

14:00:25  10      A.  That's what the report says.

14:00:28  11      Q.  And do you agree that's over a 200 percent

14:00:31  12  increase from 2012, to 2013, in reference?

14:00:37  13      A.  It looks like a 200 percent increase.

14:00:40  14      Q.  I'm sorry, I couldn't hear you.

14:00:41  15      A.  Yes, it does look like this report is

14:00:45  16  representing a 200 percent increase in the

14:00:49  17  revenues between 2012 and 2013.

14:01:02  18      Q.  Do you see that also, in that same area of

14:01:05  19  the document, there is a report on the first six

14:01:12  20  months of 2014, and it lists that the revenue in

14:01:17  21  the first half of 2014 was one hundred thirty

14:01:20  22  million three hundred ninety-nine thousand

14:01:22  23  dollars.  This is in the far left-hand column of

14:01:29  24  that area.

14:01:29  25      A.  Oh, I'm sorry.  I do see that that's what

14:01:32  1   that says.

14:01:32  2       Q.  And that's for the first six months of the

14:01:34  3   year, correct?

14:01:35  4       A.  That's what the report says, yes.

14:01:37  5       Q.  Now, that's less than half of the prior

14:01:41  6   year's revenue, correct?

14:01:45  7       A.  According to this report.

14:01:47  8       Q.  Simple math, one thirty is less than half of

14:01:52  9   three eleven?

14:01:53  10      A.  Yes.

14:01:54  11      Q.  Okay.  Has it been your experience, in

14:01:57  12  examining investments over the years, that

14:02:00  13  businesses often do not earn revenue at the same

14:02:04  14  pace throughout the year?

14:02:05  15      A.  That -- is it my experience, that I have

14:02:13  16  seen that?

14:02:13  17      Q.  Yes.

14:02:13  18      A.  Yes.

14:02:14  19      Q.  It is not at all unusual, is it?

14:02:15  20      A.  It's not unusual that there's volatility in

14:02:19  21  revenue.

14:02:19  22      Q.  And isn't it also the case that as a matter

14:02:22  23  of patterns, in some industries, for example, the

14:02:25  24  retail industry, many companies make much more

14:02:28  25  money at the end of the year than they do the

14:02:31  1    other three-quarters of the year?

14:02:32  2        A.  I'm not a retail investor.  But as a

14:02:35  3    shopper, that makes sense to me.

14:02:36  4        Q.  Okay.  And do you see that -- do you see

14:02:46  5    that in the -- towards the top of the document,

14:02:48  6    here, if you look at the screen, there is a thing

14:02:51  7    called Project Manager's Assessment.  Is it fair

14:02:54  8    for us to assume that was authored by Mr. Ahmed as

14:02:59  9    the project manager?

14:03:00  10       A.  That's fair to assume.

14:03:02  11       Q.  Or at least authored by someone, based on

14:03:05  12   what he told them to say?

14:03:06  13       A.  That's fair to assume.

14:03:08  14       Q.  And do you see that Mr. Ahmed says, "The

14:03:12  15   company is now preparing for a big fourth quarter

14:03:15  16   and is optimistic of meeting their growth and

14:03:18  17   financial targets for the full year."

14:03:23  18       A.  I do see that that's what that says.

14:03:25  19       Q.  Okay.  Now, this 2014 investment was

14:03:34  20   ultimately approved by Oak 13s executive managing

14:03:38  21   members, correct?

14:03:42  22       A.  What investment are you referring to?

14:03:44  23       Q.  The October 2014 investment buying shares

14:03:49  24   for I-Cubed was ultimately approved by the

14:03:53  25   executive managing members of Oak 13?

14:03:56    1        A.  It was ultimately approved, yes, that's

14:03:59    2    correct.

14:04:03    3        Q.  Am I correct that when the meetings occur,

14:04:08    4    at which the partners discuss these investments,

14:04:11    5    it is often your practice to have the PCR in front

14:04:14    6    of you, and to take notes on the PCR reflecting

14:04:19    7    both the discussion and the actual votes that are

14:04:22    8    taken?

14:04:23    9        A.  That is my practice.

14:04:25   10        Q.  And in fact, earlier in your testimony

14:04:29   11    today, you referred to your notes about the

14:04:32   12    approval of this investment.  Were those the notes

14:04:35   13    to which you were referring?

14:04:36   14        A.  Yeah, the things that I might scribble on

14:04:39   15    the PCR.

14:04:40   16        Q.  I'm going to hand you a document that I have

14:04:47   17    marked as Relief Defendant's Exhibit E?

14:04:54   18        A.  Thank you.

14:05:06   19        Q.  Is this document the copy of the PCR for the

14:05:11   20    October 2014 purchase of shares from I-Cubed, on

14:05:16   21    which you took notes at that meeting?

14:05:18   22        A.  Yes, that's what this looks like.

14:05:21   23             MR. DEITCH:  Your Honor, I ask it be

14:05:23   24    admitted as Exhibit E.

14:05:26   25             MR. HEINKE:  No objection.

14:05:27    1          THE COURT:  Full exhibit.  Were you

14:05:29    2    going to give me hard copies of your exhibits?

14:05:31    3          MR. DEITCH:  I'm happy to, your

14:05:32    4    Honor.  I'm sorry if I neglected to do that now?

14:05:35    5          THE COURT:  Sometimes it's hard for

14:05:37    6    me to --

14:05:41    7          MR. DEITCH:  Would you like me to

14:05:44    8    give you the first four exhibits as well?

14:05:44    9          THE COURT:  Yes, if you don't mind.

14:06:10   10          MR. DEITCH:  Your Honor, I'm handing

14:06:12   11    your clerk five exhibits, which I believe are in

14:06:14   12    order from top to bottom, A through E.

14:06:17   13          THE COURT:  Thank you very much.

14:06:18   14      Q.  Ms. Ames, if you look at Exhibit E, now,

14:06:31   15    this Pre-Commitment Investment Report, it says

14:06:35   16    that it's prepared by IAA.  That is -- those are

14:06:38   17    Mr. Ahmed's initials, correct?

14:06:40   18      A.  Those are Mr. Ahmed's initials, yes.

14:06:42   19      Q.  It is dated October 27, 2014.  Was that the

14:06:46   20    date on which the meeting occurred as well?

14:06:49   21      A.  I don't know offhand.  It could be the

14:06:53   22    preparation date, or it could be the meeting date.

14:06:55   23    I don't know exactly.

14:07:01   24      Q.  If you go down to the bottom, do you see

14:07:05   25    your notes that are kind of at an angle down here,

14:07:08  1   starting with the words "Series A"?

14:07:11  2       A.   Yes, I do see that.

14:07:13  3       Q.   Am I reading it correctly, that it says

14:07:16  4   "Series A investors selling - family office"?

14:07:20  5       A.   Yes.

14:07:21  6       Q.   And that's the statement to which you

14:07:23  7   testified earlier today?

14:07:24  8       A.   That's what I was referring to, yes, sir.

14:07:26  9       Q.   And then it says, "26 percent discount to

14:07:31  10  Series B."  When you referred to Series B, you

14:07:34  11  were referring to the securities that Oak

14:07:37  12  purchased in 2013, correct?

14:07:39  13      A.   That's -- yes, we were one of the series of

14:07:43  14  the investors.

14:07:43  15      Q.   And what does it mean to say these are at a

14:07:46  16  26 percent discount to Series B?

14:07:48  17      A.   The price of the secondary would be at a

14:07:50  18  discounted price to what we purchased earlier.

14:07:53  19      Q.   26 percent better?

14:07:55  20      A.   It would be 26 percent lower.

14:07:58  21      Q.   Okay.  And when you say -- I'm sorry, I

14:08:03  22  can't read the next line.  I see "One-half

14:08:04  23  valuation," and I'm not sure what the next word

14:08:07  24  is?

14:08:07  25      A.   Catterton.

14:08:10  1      Q.   Okay.   What is that a reference to?

14:08:13  2      A.   That was referring to there was another

14:08:16  3  venture capital firm that was considering the

14:08:18  4  investment.   And they were talking about an

14:08:23  5  investment at a specific price.   And that's what

14:08:26  6  Mr. Ahmed was alluding to in the conversation at

14:08:31  7  the partner meeting.

14:08:32  8      Q.   And what does did say in the next line, it

14:08:35  9  ends with the word "preference," but I'm having

14:08:39  10  trouble reading the other part?

14:08:39  11      A.   Well, it looks like "represents one-third of

14:08:44  12  preference."

14:08:44  13      Q.   Do you have a recollection what you were

14:08:47  14  referring to by that note.

14:08:50  15      A.   I don't have a specific recollection of what

14:08:52  16  I meant, but -- yeah, I don't.

14:08:57  17      Q.   And then across the bottom, you've written

14:09:00  18  "Needs to," what is the next word?

14:09:03  19      A.   Oh, "average down our cost."

14:09:05  20      Q.   And is that a reference simply to the fact

14:09:08  21  that the cost of this investment, on a per unit

14:09:11  22  basis, was less than the cost of the 2013

14:09:14  23  investment?

14:09:15  24      A.   Yes.   And if Oak invested in both, then

14:09:19  25  together, there would -- it would average down.

14:09:22  1      Q.   And the other part of that note is saying

14:09:25  2  that you would also increase your ownership

14:09:28  3  percentage of Company C?

14:09:30  4      A.   That's what happens when you buy more stock.

14:09:33  5      Q.   And the two percentages that are handwritten

14:09:35  6  there, is that a reflection of the change in

14:09:38  7  ownership that would occur if this investment were

14:09:41  8  approved?

14:09:52  9      A.   No, not -- both of the percentages, what I

14:09:56  10  am assuming this means, is that the 7.7 percent

14:09:59  11  was our ownership, based on our -- our existing

14:10:04  12  investment at the time.  And if we were to add

14:10:08  13  another seven and a half, that would bring our

14:10:10  14  investment to 32.5, then the post financing

14:10:14  15  ownership would increase to 10.7 percent.

14:10:18  16      Q.   I may not have said it clearly, but that was

14:10:20  17  my question.

14:10:21  18      A.   Got it.

14:10:21  19      Q.   Thank you.

14:10:25  20           THE COURT:   Mr. Deitch, I'm concerned

14:10:29  21  about time.  We have no more than 20 minutes

14:10:32  22  left.  Is there any interest in interrupting the

14:10:39  23  testimony of Mrs. Ames for the purpose of brief

14:10:44  24  testimony by Mrs. Ahmed, with respect

14:10:48  25  particularly to the 401K and the Goldman shares?

14:10:54   1                  MR. DEITCH:  Would you give me one

14:10:56   2    moment?

14:10:56   3                  THE COURT:  Yes.  We can next

14:10:58   4    continue this hearing on July 30th.

14:11:02   5                  MR. HARRIS:  Your Honor, I'm prepared

14:11:04   6    to put Ms. Ahmed on the stand right now, and go

14:11:08   7    through those issues.

14:11:17   8                  THE COURT:  All right.  Mr. Williams?

14:11:20   9                  MR. WILLIAMS:  I don't want to speak

14:11:21  10    for Mr. Heinke.

14:11:23  11                  THE COURT:  Mr. Heinke?

14:11:24  12                  MR. WILLIAMS:  But what I will say is

14:11:25  13    we planned on called Mrs. Ahmed.  Because of

14:11:29  14    time, we're happy to either continue it, or

14:11:31  15    possibly we may not even call her.  We have

14:11:34  16    submitted her deposition.

14:11:35  17                  THE COURT:  I have read her

14:11:37  18    deposition.  It does not seem to me to address

14:11:40  19    the 401K or the Goldman shares.

14:11:42  20                  MR. WILLIAMS:  That is correct.

14:11:43  21                  THE COURT:  I am not a hundred

14:11:45  22    percent sure where we're going with this

14:11:50  23    questioning of Ms. Ames.

14:11:56  24                  MR. DEITCH:  I can certainly explain,

14:11:58  25    your Honor.

14:11:58    1             THE COURT:  Can you give me -- you

14:12:00    2    may not want to give me the shorthand.

14:12:04    3             MR. DEITCH:  I prefer to do it out of

14:12:06    4    the hearing of the witness.  But I'm happy -- I

14:12:11    5    think we're prepared to go ahead with Ms.

14:12:17    6    Ahmed's testimony in order to present it to your

14:12:18    7    Honor today, if that's how you prefer.

14:12:20    8             THE COURT:  I think we've got to do

14:12:21    9    that.  All right, Ms. Ames can I get you to just

14:12:25   10    step out into the hall briefly?

14:12:29   11             THE WITNESS:  Yes.

14:12:29   12             THE COURT:  Whether we'll be able to

14:12:32   13    reconvene your testimony today, I'm not quite

14:12:34   14    sure.  But we really are very time pressured

14:12:38   15    here.

14:12:38   16             THE WITNESS:  I understand.  Thank

14:12:41   17    you, your Honor.

14:12:41   18             THE COURT:  Thank you very much.

14:13:08   19             So I have a hypothesis of what you

14:13:10   20    are doing.  And I'm not sure it's central to

14:13:12   21    what we need to be doing today.  But what is the

14:13:19   22    objective of this line of questioning?

14:13:21   23             MR. DEITCH:  This particular line of

14:13:23   24    questioning, your Honor, addresses the issue Mr.

14:13:25   25    Skibell raised, that the law requires that even

14:13:29  1    if there is a violation of the securities laws,

14:13:31  2    in order to be entitled to disgorgement, the SEC

14:13:34  3    has to show a nexus with some ill gotten gains.

14:13:38  4    I believe the testimony we will elicit, together

14:13:41  5    with the documents, will show that Oak believed

14:13:45  6    that this -- these shares that it purchased in

14:13:47  7    October 2014 were actually worth substantially

14:13:50  8    more then 7.5 million dollars.  So that even if

14:13:54  9    Mr. Ahmed committed a securities violation, even

14:13:58  10   if it was wrong for him not to disclose the

14:14:00  11   ownership of I-Cubed, there was no harm.  Oak

14:14:06  12   got what it paid for.  And in fact may have

14:14:09  13   gotten even more than what it paid for.  And if

14:14:11  14   that's the case, the SEC would be unable to show

14:14:14  15   that it is likely to prevail on its disgorgement

14:14:17  16   claim with respect to those assets.

14:14:21  17              MR. HEINKE:  Your Honor, may I

14:14:22  18   briefly respond, if it is useful?

14:14:24  19              THE COURT:  Yes.

14:14:24  20              MR. HEINKE:  Your Honor, I think

14:14:25  21   there's a couple things.  The first of which is,

14:14:27  22   as a legal matter, I think the analysis put

14:14:31  23   forth is really more akin to a damages or an

14:14:34  24   injury analysis.  The case law on SEC

14:14:38  25   disgorgement is very clear that ill gotten gains

14:14:41  1   is the query.  And the fact is here, there were

14:14:44  2   shares that had some value.  We submit the

14:14:47  3   evidence suggests that when they were sold from

14:14:50  4   I-Cubed, to Oak, their value was less than a

14:14:54  5   million dollars, based on documents that the

14:14:56  6   relief defendants themselves have produced.  In

14:15:00  7   any event, they were purchased for only two

14:15:03  8   million dollars.  So there is some ill gotten

14:15:05  9   gain to Mr. Ahmed as a result of the

14:15:08 10   transaction.

14:15:10 11           In addition, your Honor, we believe

14:15:12 12   there is certain evidence that Ms. Ames has

14:15:14 13   testified to already, there may be additional

14:15:18 14   evidence that Ms. Ames may speak to, that there

14:15:20 15   were, you know, false statements made about the

14:15:24 16   valuation of the company when Mr. Ahmed proposed

14:15:29 17   the investment itself.  So, in any event, I

14:15:35 18   think that, you know, that goes to the

14:15:36 19   disgorgement issue.  At the end of the day, this

14:15:39 20   may be an issue that needs more briefing.  But

14:15:41 21   the SEC would submit it certainly met its burden

14:15:45 22   at the preliminary stage to show a likelihood of

14:15:48 23   success, or at least an inference of success

14:15:51 24   such that funds sufficient to satisfy

14:15:53 25   disgorgement around this transaction ought to be

14:15:56   1   remain frozen.

14:15:58   2          MR. DEITCH:  Really, the

14:15:59   3   nondisclosure did not cause damage.  There are

14:16:02   4   no ill gotten gains to be disgorged.  And we

14:16:06   5   cited a number of cases in our brief on this.

14:16:09   6   And I'm prepared, through Mrs. Ames' testimony,

14:16:14   7   when we have an opportunity to complete it, to

14:16:16   8   show that the statements that she characterizes

14:16:19   9   as mischaracterizing the financial health of the

14:16:23  10   company, are in fact themselves not fair

14:16:25  11   characterizations of the communications she

14:16:28  12   described.

14:16:31  13          THE COURT:  All right.  Let's move,

14:16:34  14   in the very little remaining time that we have,

14:16:39  15   to Ms. Ahmed.  And may I focus on one thing that

14:16:52  16   I would like you to focus on, and that is, her

14:16:54  17   representations under oath to the Court with

14:16:57  18   respect to her 401K, and her Goldman Sachs

14:17:04  19   account.

14:17:04  20          MR. HARRIS:  Your Honor, that's all I

14:17:06  21   will ask about.  So that will give -- I believe

14:17:09  22   I can do it swiftly enough that the SEC will

14:17:12  23   have an opportunity to, or your Honor would have

14:17:14  24   an opportunity to question.

14:17:16  25          MR. WILLIAMS:  Your Honor, to be

| | | |
|---|---|---|
| 14:17:17 | 1 | honest I'm not too worried about |
| 14:17:19 | 2 | cross-examination if she testifies under oath, |
| 14:17:21 | 3 | on the subject. |
| 14:17:21 | 4 | THE COURT:  That's the purpose I'm |
| 14:17:22 | 5 | trying to accomplish at this point.  All right, |
| 14:17:25 | 6 | Ms. Ahmed, please raise your right hand. |
| 14:17:25 | 7 | SHALINI AGGARWAL AHMED, |
| 14:17:25 | 8 | Greenwich, Connecticut, having been first duly |
| 14:17:53 | 9 | sworn, testified on her oath as follows: |
| 14:17:53 | 10 | THE COURT:  You may proceed. |
| 14:17:53 | 11 | DIRECT EXAMINATION |
| 14:17:56 | 12 | BY MR. HARRIS: |
| 14:17:56 | 13 | Q.  Ms. Ahmed, was there a point in your life |
| 14:18:02 | 14 | where you worked at Goldman Sachs? |
| 14:18:04 | 15 | A.  Yes, there is. |
| 14:18:05 | 16 | Q.  And when was that? |
| 14:18:07 | 17 | A.  I worked at Goldman Sachs from October 2004 |
| 14:18:12 | 18 | through October 2011, but I was paid from them |
| 14:18:17 | 19 | through July of 2012. |
| 14:18:19 | 20 | Q.  And while you were at Goldman Sachs, did you |
| 14:18:22 | 21 | contribute to a 401K account? |
| 14:18:24 | 22 | A.  I did. |
| 14:18:25 | 23 | Q.  And did there come a time when you |
| 14:18:39 | 24 | transferred that Goldman Sachs 401K account, to an |
| 14:18:45 | 25 | account at Fidelity? |

14:18:46   1       A.  Yes, I did transfer that to Fidelity.

14:18:48   2       Q.  And when was that?

14:18:49   3       A.  I don't remember the exact dates when it was

14:18:53   4   transferred.  Probably after I left Goldman Sachs.

14:18:57   5       Q.  And in addition to the contributions to your

14:19:01   6   401K from Goldman Sachs, did you otherwise make

14:19:08   7   other contributions to any 401K accounts?

14:19:10   8       A.  I was working at Morgan Stanley before

14:19:13   9   business school.  And also, Merrill Lynch right

14:19:16   10  after business school.

14:19:17   11      Q.  And while you were at Merrill Lynch, did you

14:19:21   12  contribute to a 401K?

14:19:22   13      A.  I believe I did.

14:19:23   14      Q.  And while you were at Morgan Stanley, did

14:19:26   15  you contribute to a 401K?

14:19:27   16      A.  I believe I did.

14:19:28   17      Q.  And were those accounts --

14:19:31   18           THE COURT:  I'm sorry, what does "I

14:19:33   19  believe I did," as opposed to "I did," mean?

14:19:37   20  What question might there be?

14:19:39   21           THE WITNESS:  I don't remember

14:19:40   22  offhand, but I'm pretty sure that I did have a

14:19:43   23  401K at these firms, your Honor.

14:20:03   24           MR. HARRIS:  May I show -- what

14:20:09   25  number are we up to?

14:20:11   1              THE COURT:  You're at F.

14:20:25   2              MR. HARRIS:  Your Honor, may I

14:20:25   3   approach?

14:20:26   4              THE COURT:  Yes.

14:20:26   5      Q.  Mrs. Ahmed, I'm showing you a Fidelity

14:20:37   6   account statement for April 1, 2015, to April 30,

14:20:41   7   2015, in the name of Shalini Aggarwal Ahmed.  Is

14:20:49   8   that you?

14:20:50   9      A.  That's me.

14:20:50  10      Q.  Is there your statement from Fidelity?

14:20:52  11      A.  Yes, this is my statement at Fidelity during

14:20:55  12   that time, yes.

14:20:56  13              MR. HARRIS:  Your Honor, I would move

14:20:58  14   Defendant's F into evidence.

14:21:01  15              MR. WILLIAMS:  No objection.

14:21:02  16              THE COURT:  Full exhibit.

14:21:02  17      Q.  And Ms. Amend, on the first page, do you see

14:21:12  18   there's an Fidelity individual account listed, and

14:21:16  19   underneath that, there's a personal retirement

14:21:18  20   account, do you see that?

14:21:19  21      A.  Yes, I do.

14:21:20  22      Q.  And that one says a Fidelity rollover IRA,

14:21:25  23   and that has a balance as of April 30, 2015, of a

14:21:28  24   hundred sixty-six thousand four hundred

14:21:31  25   seventy-eight dollars and 20 cents?

14:21:33  1     A.  Yes, I do.

14:21:34  2     Q.  And can you please tell the Court in your

14:21:39  3  own words what those funds represent?

14:21:41  4     A.  Those funds represent the accounts that were

14:21:46  5  moved over or rolled over from any employment that

14:21:49  6  I may have had, Merrill Lynch, Goldman Sachs,

14:21:53  7  Morgan Stanley.  These are retirement accounts

14:21:57  8  that were moved over to Fidelity.

14:21:59  9     Q.  Did any of those funds come from your

14:22:02  10  husband Iftikar on that?

14:22:03  11    A.  Well, there are two IRAs, a rollover and a

14:22:06  12  Roth.  I would have to double-check that there

14:22:09  13  were no contributions that were made post my

14:22:15  14  leaving of those firms.

14:22:16  15    Q.  You might have made contributions into the

14:22:22  16  Roth IRA?

14:22:22  17    A.  That's right.

14:22:24  18    Q.  Because the Roth IRA, if I understand them,

14:22:30  19  would allow people to continue to make

14:22:33  20  contributions into them.

14:22:34  21    A.  Okay.

14:22:35  22    Q.  Okay.  I'm asking you, is that your

14:22:37  23  understanding?

14:22:37  24    A.  It's one of the two, I just don't know which

14:22:40  25  one.

14:22:40  1      Q.  So we're talking about the Fidelity Roth

14:22:43  2   IRA, and that has ninety-six thousand three

14:22:45  3   hundred fifty-four dollars and thirty-three cents

14:22:47  4   in it?

14:22:47  5      A.  Yes, it does.

14:22:48  6      Q.  And as we sit here today, you're not a

14:22:52  7   hundred percent sure of the source of funds for

14:22:54  8   the Roth IRA?

14:22:56  9      A.  That's correct.  I would believe the

14:22:59 10   majority of them come from my employment, but

14:23:02 11   there may have been contributions.  I would have

14:23:05 12   to go back and double-check on that.

14:23:06 13      Q.  And are those records you would have, do you

14:23:11 14   believe, at your home?

14:23:12 15      A.  Yes.

14:23:50 16          MR. HARRIS:  Your Honor, may I

14:23:51 17   approach?

14:23:51 18          THE COURT:  Yes.

14:23:53 19          MR. HARRIS:  Defendant's Exhibit G.

14:24:00 20      Q.  Ms. Ahmed, would it be accurate if I

14:24:03 21   described this as a compilation of your W-2s of

14:24:06 22   earnings from -- dating back to Merrill Lynch and

14:24:11 23   then Goldman Sachs?

14:24:12 24      A.  That's correct.

14:24:15 25          MR. HARRIS:  Your Honor, I move

14:24:18    1    Relief Defendant G into evidence.

14:24:21    2                MR. WILLIAMS:  No objection.

14:24:22    3                THE COURT:  Full exhibit.

14:24:23    4       Q.  Could you look at page two of that, please.

14:24:30    5    I'm sorry, if you turn to the third page of this,

14:24:33    6    Ms. Ahmed.  I'm just going to do this very

14:24:40    7    quickly.  If you look on the third page, do you

14:24:41    8    see the 2005 W-2 and earnings summaries?

14:24:45    9       A.  Yes, I do.

14:24:45   10       Q.  And do you see that, down about halfway

14:24:50   11    down, there's a 401K, do you see that line, it's

14:24:56   12    fourteen thousand?

14:24:56   13       A.  Yes I do.

14:24:57   14       Q.  And that reflects contributions you made to

14:25:00   15    your 401K in 2005?

14:25:02   16       A.  Yes, it does.

14:25:03   17       Q.  And it's your testimony today that that

14:25:07   18    money was rolled into the Fidelity rollover IRA?

14:25:13   19       A.  Or Roth IRA.

14:25:16   20       Q.  Or Roth IRA?

14:25:18   21       A.  Yes.

14:25:18   22       Q.  Thank you.  While you were at Goldman Sachs,

14:25:21   23    did you participate in any stock plans?

14:25:23   24       A.  I did.

14:25:24   25       Q.  And could you describe that plan, please,

14:25:27   1    for the Court?

14:25:27   2        A.   So as an employee of the firm, you were

14:25:30   3    given an option to participate in the purchase of

14:25:33   4    shares of the firm, pursuant to how you'd done in

14:25:41   5    your employment.  So a lot of the times, you could

14:25:43   6    purchase those shares.  You were also -- some of

14:25:47   7    my compensation at Goldman Sachs was in the form

14:25:50   8    of Goldman Sachs stock.

14:25:50   9        Q.   And if you had the opportunity to purchase,

14:25:52   10   did you purchase those shares at a discount?

14:25:54   11       A.   Yes.

14:25:55   12       Q.   Did they come out of salary; were they

14:25:58   13   withholding, do you remember?

14:25:58   14       A.   I don't remember that.

14:25:59   15       Q.   And then in addition to the opportunity to

14:26:01   16   purchase Goldman shares at a discount, you could

14:26:06   17   also be awarded shares of Goldman Sachs stock?

14:26:09   18       A.   That's correct.

14:26:10   19       Q.   And were you in fact, did you purchase

14:26:13   20   Goldman Sachs shares?

14:26:14   21       A.   Not while I was employed there.  Not that I

14:26:17   22   can remember.

14:26:17   23       Q.   And were you awarded shares as employee

14:26:21   24   compensation?

14:26:21   25       A.   I was awarded shares as part of my employee

14:26:24  1  compensation for the years that I worked at

14:26:26  2  Goldman Sachs.

14:26:47  3     Q.  Showing the witness what I have marked as

14:26:50  4  Relief Defendant Exhibit H. And this is a screen

14:27:03  5  shot from Fidelity, is that correct?

14:27:04  6     A.  That's correct.

14:27:05  7     Q.  And is this a screen shot that you took of

14:27:11  8  an account that you were looking at on a computer?

14:27:14  9     A.  Yes, it is.

14:27:15  10    Q.  All right.  And this is a screen shot you

14:27:25  11  had access to because it's an account in your

14:27:27  12  name?

14:27:28  13    A.  Yes, the shares are in an account in my

14:27:32  14  name.

14:27:32  15         MR. HARRIS:  Your Honor, I would

14:27:33  16  move, I would offer Exhibit G?

14:27:40  17         THE COURT:  H.

14:27:40  18         MR. HARRIS:  H, sorry, Defendant's

14:27:42  19  Exhibit H.

14:27:43  20         MR. WILLIAMS:  No objection.

14:27:44  21         THE COURT:  Full exhibit.

14:27:45  22    Q.  And Ms. Ahmed, do you see the kind of --

14:27:54  23  kind of in the middle of the page, just in bold

14:27:57  24  writing, Goldman Sachs Group, Inc.?

14:28:00  25    A.  Yes, I do.

14:28:02  1       Q.   IT has quantity, 192.

14:28:04  2       A.   Yes, it does.

14:28:05  3       Q.   And it has the most recent market value as

14:28:09  4   thirty-nine thousand six hundred thirty-four

14:28:11  5   dollars and fifty-six cents?

14:28:13  6       A.   Yes, I do.

14:28:14  7       Q.   And that is as of June 2, 2015?

14:28:19  8       A.   Yes.

14:28:20  9       Q.   And does this reflect the shares of Goldman

14:28:25  10  Sachs that you received as part of employee

14:28:29  11  compensation while you were at Goldman Sachs?

14:28:31  12      A.   Yes, it does.

14:28:33  13      Q.   Is this all the shares you received from

14:28:35  14  Goldman Sachs?

14:28:35  15      A.   I probably received more that I have sold.

14:28:37  16  And there are other shares that have not been

14:28:40  17  fully vested.

14:28:41  18      Q.   And would shares continue to vest?

14:28:46  19      A.   Yes.  My understanding with the firm when I

14:28:50  20  left was that shares would continue to vest.

14:28:57  21           MR. HARRIS:  2:28, your Honor, so I

14:28:59  22  think I'm going to stop right here.

14:29:04  23           THE COURT:  All right.  We'll

14:29:07  24  continue her testimony, then, at another date.

14:29:10  25  The other next date can be July 30, from nine to

14:29:15  1    one.  Will that work for you all?

14:29:18  2              MR. HARRIS:  That works for me, your

14:29:19  3    Honor.

14:29:20  4              MR. HEINKE:  Your Honor, can I check

14:29:22  5    my cell phone?

14:29:23  6              THE COURT:  Yes.

14:29:26  7              MR. HEINKE:  Your Honor, we believe

14:29:27  8    that will work for us.  We're checking now, but

14:29:30  9    if for whatever reason we're wrong, we can

14:29:34  10   certainly --

14:29:35  11             THE COURT:  Okay, let me know.

14:29:36  12             MR. HEINKE:  -- let counsel know

14:29:37  13   immediately and let the Court know immediately.

14:29:40  14             THE COURT:  Let me ask you two

14:29:41  15   things.  One, given the record that we now have

14:29:46  16   with respect to the Goldman shares awarded as

14:29:56  17   part of compensation, that is, sounding as if

14:30:02  18   they cannot have been from any tainted money, is

14:30:06  19   there any objection to releasing those from the

14:30:09  20   freeze order?

14:30:10  21             MR. HEINKE:  Your Honor, is it

14:30:11  22   possible that Mr. Williams could ask one

14:30:13  23   question?  The only reason we ask is there are

14:30:16  24   shares that appear to be acquired after the time

14:30:18  25   she left Goldman, or frankly Mr. Harris could

14:30:21  1    inquire as to it, I suppose, just so the SEC is

14:30:24  2    clear --

14:30:26  3              THE COURT:  She said that things

14:30:28  4    continued to vest.  But Mr. Harris, can you

14:30:30  5    clear that up?

14:30:31  6              MR. HARRIS:  Yes.

14:30:33  7    BY MR. HARRIS:

14:30:33  8       Q.  Mrs. Ahmed, there are shares, if you look at

14:30:43  9    I believe it's Defendant's Exhibit H, there are

14:30:48 10    shares that appear to vest in 2013 and some in

14:30:52 11    2014.  Do you see that, as you go down the column?

14:30:55 12       A.  I do see that.

14:30:57 13       Q.  Are those shares that you acquired with new

14:31:00 14    money in 2013 or 2014, or are those shares that

14:31:05 15    vested that had been previously granted to you?

14:31:07 16       A.  Those were shares that vested that were

14:31:09 17    previously granted to me.  And if you move over,

14:31:12 18    you can see there's a sale availability date.  So

14:31:17 19    even though they're in the account, some of them

14:31:18 20    can't be sold until that date.  So for example,

14:31:21 21    the last one acquired by this Fidelity account,

14:31:24 22    January 27th of 2014, can actually not be sold

14:31:28 23    until January 25th of 2016.  So there are some

14:31:31 24    conditions of the stock by the company, even after

14:31:33 25    it has vested and come into the account.

| | | |
|---|---|---|
| 14:31:36 | 1 | MR. HARRIS:  Thank you.  Does that |
| 14:31:38 | 2 | clear it up? |
| 14:31:39 | 3 | MR. WILLIAMS:  I think so.  Your |
| 14:31:40 | 4 | Honor, may I ask one question from counsel table |
| 14:31:42 | 5 | I think would get at this entire issue? |
| 14:31:45 | 6 | THE COURT:  You may. |
| 14:31:45 | 7 | CROSS-EXAMINATION |
| 14:31:46 | 8 | BY MR. WILLIAMS: |
| 14:31:46 | 9 | Q.  Mrs. Ahmed, do you testify here under oath |
| 14:31:49 | 10 | that all of the shares on RD-H were stock awards |
| 14:31:53 | 11 | to you, essentially in exchange for your |
| 14:31:56 | 12 | employment at Goldman Sachs? |
| 14:31:58 | 13 | A.  Yes, they were part of my compensation. |
| 14:32:01 | 14 | MR. WILLIAMS:  Thank you. |
| 14:32:01 | 15 | THE COURT:  All right.  Now, with |
| 14:32:02 | 16 | respect to the 401K, which -- not the Roth, the |
| 14:32:12 | 17 | 401, the rollover IRA, is there any means by |
| 14:32:25 | 18 | which an employee can add any money to their IRA |
| 14:32:40 | 19 | other than having it be taken out of |
| 14:32:43 | 20 | compensation? |
| 14:32:48 | 21 | MR. HARRIS:  To the best of my |
| 14:32:49 | 22 | knowledge, your Honor, the only way you can put |
| 14:32:51 | 23 | money into a 401K is through your compensation |
| 14:32:54 | 24 | or through a company match. |
| 14:32:56 | 25 | THE COURT:  Because otherwise, it |

14:32:58   1   will distort the carefully honed rules of who

14:33:05   2   has how much that's being allowed.

14:33:08   3           MR. HARRIS:  That's correct.

14:33:09   4           THE COURT:  I forget what the word

14:33:10   5   is.

14:33:11   6           MR. HARRIS:  That's correct, your

14:33:12   7   Honor.  So for example, our firm, an employee

14:33:16   8   could not add money to their 401K.

14:33:18   9           THE COURT:  So you can't add

14:33:21  10   fifty-five hundred dollars a year to your IRA

14:33:23  11   from some outside money.

14:33:25  12           MR. HARRIS:  Once it becomes an IRA,

14:33:27  13   your Honor, I believe you can add it.  When it's

14:33:30  14   a 401K, when it's still within the company, the

14:33:35  15   only thing you can do is contributions from the

14:33:37  16   company, or a match.

14:33:39  17           THE COURT:  So this is after that

14:33:40  18   fact, and we don't know the additional monies.

14:33:44  19           MR. HARRIS:  After the fact, I

14:33:46  20   believe, I can ask, on the Fidelity --

14:33:49  21           THE COURT:  Well, she has records at

14:33:51  22   home.  Maybe we could do this by means of

14:33:53  23   records.

14:33:53  24           MR. HARRIS:  Okay.

14:33:54  25           THE COURT:  All right.  So for the

14:33:55   1   time being, I take it the Government has --

14:33:58   2   excuse me, the SEC has no objection to removing

14:34:02   3   the portion of the Fidelity account that

14:34:14   4   reflects stock received as compensation?

14:34:18   5              MR. WILLIAMS:  We have no objection,

14:34:19   6   your Honor.  And we are not objecting based

14:34:22   7   entirely on Mrs. Ahmed's representation, just so

14:34:25   8   the record is clear.

14:34:25   9              THE COURT:  Right.  Would you kindly

14:34:27  10   agree on an order that would make sure it says

14:34:30  11   it correctly?

14:34:31  12              MR. WILLIAMS:  Absolutely, your

14:34:32  13   Honor.

14:34:32  14              THE COURT:  All right.  And I take

14:34:34  15   that we don't have any other agreements, because

14:34:36  16   it is not clear what amounts in the Fidelity

14:34:41  17   account that are rollovers or Roths, can be

14:34:46  18   attributed exclusively to her compensation.

14:34:49  19              MR. HARRIS:  I think that's correct,

14:34:51  20   your Honor.

14:34:51  21              THE COURT:  Let's take that up, then,

14:34:53  22   on the 30th.  To the extent there is --

14:34:56  23              MR. HARRIS:  Maybe we'll be able to

14:34:57  24   straighten that out in advance, your Honor.

14:34:59  25              THE COURT:  And that's fine.  Because

| | |
|---|---|
| 14:35:00 | 1 |
| 14:35:04 | 2 |
| 14:35:06 | 3 |

if you will get the records that she says she
has at home, that may well be able to be done.
Okay.

Now, my last issue is with respect to
whether Mrs. Ahmed is permitted to leave her
house to work.  I have a copy of the order
setting conditions of release, which under
paragraph eight at (ii), home detention, says in
the form language, "You are restricted to your
residence at all times, except for employment,
educational service, medical, substance abuse or
mental health treatments, attorney's visits,
Court-ordered obligations or other activities
pre-approved by the pretrial services office or
supervising officer."  The Magistrate Judge
Bowler wrote in, "Not before 7:30 a.m., not
after 7:30 p.m.," which I am assuming is the
bracketing for the curfew.  And made an
asterisk, "To be set by pretrial services, two
2.5 windows per day."  What that tells me is
that leaving the house for education has not
been precluded, even though it may require
clarification.  There may have been subsequent
modifications.  But let's get that organized
before the 30th.  Because obviously, having an

14:37:08    1    income stream is going to be one solution here.

14:37:13    2              MR. HARRIS:  Yes, your Honor.  I

14:37:14    3    believe -- do you know when the next scheduled

14:37:17    4    appearance is before the judge in Massachusetts?

14:37:19    5              MR. DEITCH:  We have an August 4

14:37:21    6    hearing before Magistrate Judge Bowler.  That's

14:37:25    7    the next appearance.

14:37:26    8              THE COURT:  And why is that, what is

14:37:27    9    the purpose of that?

14:37:28   10              MR. DEITCH:  We moved to quash the

14:37:31   11    material witness warrant, and there are issues

14:37:33   12    that have been raised regarding the assertion of

14:37:37   13    a spousal adversarial testimonial privilege.

14:37:41   14    And that's being briefed and discussed with the

14:37:43   15    judge on that date.

14:37:44   16              THE COURT:  That's something of a

14:37:45   17    larger question then the narrow one, which is,

14:37:49   18    is she approved to leave the house for the

14:37:53   19    purposes of employment as set out in the order,

14:37:59   20    at least in the form portion of the order

14:38:01   21    setting conditions of release.

14:38:04   22              MR. DEITCH:  Your Honor, I'll

14:38:05   23    inquire, and I'll inquire specifically about the

14:38:07   24    meaning of two 2.5 hour windows.  Because that

14:38:14   25    seems to limit the form language as well.

| | | |
|---|---|---|
| 14:38:16 | 1 | THE COURT:  All right.  Then I will |
| 14:38:19 | 2 | see you, if it works out for everybody, at nine |
| 14:38:21 | 3 | o'clock on July 30th.  Anything further? |
| 14:38:30 | 4 | MR. WILLIAMS:  Yes, your Honor, very |
| 14:38:32 | 5 | briefly.  I understand we don't have time to |
| 14:38:34 | 6 | talk about the notice of dissipation.  However, |
| 14:38:35 | 7 | I do ask that no funds further consumed before |
| 14:38:39 | 8 | we're back in the courtroom in a week.  Or at |
| 14:38:42 | 9 | the very least, defense counsel provides us with |
| 14:38:44 | 10 | advance notice, so that we can notify the Court |
| 14:38:48 | 11 | accordingly. |
| 14:38:49 | 12 | THE COURT:  Let's do advance notice, |
| 14:38:52 | 13 | to the extent it is of any assistance to any |
| 14:38:55 | 14 | one.  If Mr. Knag wishes to be excused from |
| 14:39:02 | 15 | future appearances on the preliminary |
| 14:39:04 | 16 | injunction, that would be fine.  And that may be |
| 14:39:12 | 17 | of some assistance.  But let's have no more |
| 14:39:16 | 18 | expenditures without notice to the SEC and an |
| 14:39:22 | 19 | opportunity for them to contest the |
| 14:39:26 | 20 | appropriateness.  There's some language in your |
| 14:39:30 | 21 | briefing that says that that account is not |
| 14:39:33 | 22 | under the order, the freeze order. |
| 14:39:39 | 23 | MR. HARRIS:  When the money was |
| 14:39:40 | 24 | transferred to us, your Honor, we did not -- I |
| 14:39:44 | 25 | understand it to be under the freeze order.  It |

14:39:46  1    was fully in Ms. Ahmed's name and she had not

14:39:48  2    yet been named as a relief defendant.

14:39:50  3                  THE COURT:  Is it now under the

14:39:52  4    freeze order?

14:39:52  5                  MR. HARRIS:  We certainly treat it as

14:39:54  6    under the freeze order, your Honor.

14:39:56  7                  THE COURT:  That would mean that this

14:39:57  8    is all unnecessary, doesn't it?  Because any

14:40:03  9    expenditures from that account, which is

14:40:08  10   admittedly a part of the freeze order, would not

14:40:11  11   be kindly viewed, right?

14:40:13  12                 MR. HARRIS:  Yes, your Honor.

14:40:14  13                 THE COURT:  So the idea that Mr.

14:40:17  14   Harris is going to tell you of an intention to

14:40:21  15   is he spend such an account, probably won't be

14:40:25  16   forthcoming if it is within the freeze order

14:40:27  17   because it won't be spent.  Right?

14:40:30  18                 MR. HARRIS:  That's correct, your

14:40:31  19   Honor.

14:40:31  20                 THE COURT:  Okay.  Good.  I'll see

14:40:33  21   you on the 30th, thank you very much.

          22                 (WHEREUPON, court was adjourned.)

          23                      * * * * * * * * * * *

          24

          25   COURT REPORTER'S TRANSCRIPT CERTIFICATE

1    I hereby certify that the within and foregoing is

2    a true and correct transcript taken from the

3    proceedings in the above-entitled matter.

4    /s/ Julia Cashman, RPR, LSR

5    Official Court Reporter

6    7/28/2015