```
 1              UNITED STATES DISTRICT COURT

 2                 DISTRICT OF CONNECTICUT


 3        --------------------------- x
 4    UNITED STATES SECURITIES      :
      AND EXCHANGE COMMISSION        :CASE NO.
 5                                   :3:15-CV-675 (JBA)
           -versus-                  :
 6                                   :
      AHMED, ET AL                   :July 30, 2015
 7                                   :8:30 a.m.
      --------------------------- x New Haven, CT
 8

 9
                      VOLUME II
10

11      B E F O R E:  THE HONORABLE JANET BOND ARTERTON

12


13

14
      A P P E A R A N C E S:
15

16

      FOR THE SEC:        NICHOLAS PETER HEINKE
17                        MARK LANDER WILLIAMS
                          U.S. SECURITIES AND EXCHANGE
18                        COMMISSION - CO
                          1961 Stout Street, Sutie 1700
19                        Denver, CO  80294
                          Heinken@sec.gov
20                        Williamsml@sec.gov
                          (303) 844-1000
21
                          JOHN B. HUGHES
22                        U.S. ATTORNEY'S OFFICE - NH
                          157 Church Street, 25th Floor
23                        New Haven, CT  06510
                          John.hughes@usdoj.gov
24                        (203) 821-3802

25
```

```
 1   FOR THE DEFENDANTS
     SHALINI AHMED, DIYA
 2   HOLDINGS, LLC,
     DIYA REAL HOLDINGS,
 3   LLC,I-CUBED DOMAINS,
     LLC,ET AL:          DAVID B. DEITCH
 4                       L. REID SKIBELL
                         HARRIS, O'BRIEN, ST. LAURENT &
 5                       CHAUDHRY, LLP
                         111 Broadway, Suite 1502
 6                       New York, NY  10006
                         Ddeitch@harrisobrien.com
 7                       Jon@harrisobrien.com
                         Rskibell@harrisobrien.com
 8                       (212)397-3370

 9
     A L S O   P R E S E N T:
10
                         ALEX LIPMAN,
11                           BROWN RUDNICK

12

13

14

15

16

17

18

19

20

21

22   Court Reporter:     Julia Cashman, RPR, LSR
                         141 Church Street
23                       New Haven, Connecticut

24

25
```

08:27:12

08:27:12   1          THE COURT:  Good morning, counsel,

08:37:23   2   please be seated.  We're here for the continued

08:37:25   3   hearing on the SEC motion for preliminary

08:37:29   4   injunction in SEC versus Ahmed, et al,

08:37:35   5   15-CV-675.  Why don't I have appearances of who

08:37:42   6   will be presenting today for the government.

08:37:45   7          MR. HEINKE:  Good morning, your

08:37:46   8   Honor, Nick Heinke for the SEC, and with me is

08:37:49   9   my co-counsel Mark Williams.  Also with us at

08:37:51  10   counsel table is Jeff Oraker of the SEC.  And

08:37:55  11   also present is John Hughes with the US

08:37:57  12   Attorney's Office.

08:37:57  13          THE COURT:  Thank you, good morning.

08:37:59  14   And for Ms. Ahmed and the other relief

08:38:03  15   defendants that you represent?

08:38:05  16          MR. SKIBELL:  Reid Skibell of Harris

08:38:08  17   O'Brien.  With me is David Deitch, also from our

08:38:11  18   firm.  John Harris was going to be here this

08:38:13  19   morning, but he, unfortunately, has an illness.

08:38:16  20          THE COURT:  Oh, that's too bad.  All

08:38:18  21   right.  Shall we proceed with the testimony of

08:38:22  22   Ms. Ames, which we interrupted to take the

08:38:26  23   testimony of Ms. Ahmed?

08:38:30  24          MR. SKIBELL:  Your Honor, my

08:38:31  25   understanding is that there is a representative

08:38:33    1    of the defendant here that may wish to say some

08:38:37    2    words before we begin.

08:38:38    3              THE COURT:  I don't know what

08:38:39    4    "representative of the defendant" means.

08:38:41    5              MR. SKIBELL:  That would be an

08:38:42    6    attorney for the defendant Iftikar Ahmed.

08:38:45    7              THE COURT:  I don't see an appearance

08:38:47    8    filed.

08:38:51    9              MR. LIPMAN:  May I address the Court,

08:38:52   10    your Honor?

08:38:52   11              THE COURT:  You may.

08:38:53   12              MR. LIPMAN:  My name is Alex Lipman.

08:38:55   13    I'm a partner at Brown Rudnick.

08:38:55   14              THE COURT:  Lipman?

08:39:00   15              MR. LIPMAN:  L-I-P-M-A-N, your Honor.

08:39:03   16    Mr. Ahmed contacted our firm over the weekend.

08:39:06   17    I spoke with him on Monday for the first time,

08:39:12   18    and he had asked us to represent him in the

08:39:20   19    various matters.  The issue that we have is that

08:39:23   20    he can't pay our fees, aside from the fact that

08:39:26   21    he is obviously out of the jurisdiction.  But my

08:39:30   22    understanding is, your Honor, I'm sure your

08:39:34   23    Honor appreciates, that we're ethically

08:39:36   24    constrained in what we can do for him.  So my

08:39:40   25    understanding is, and I'm proceeding in this

08:39:41  1   understanding, and I will resign if that

08:39:45  2   understanding changes, is that it is his

08:39:47  3   intention to come back to the United States.

08:39:49  4           Now, as I understand it, again, what

08:39:52  5   has happened since he left is that he went to

08:39:55  6   India, and then in India, he was arrested

08:39:58  7   sometime around -- I want to say May 23rd, for

08:40:04  8   entering the country illegally.  He was in an

08:40:08  9   Indian jail -- again, this is -- I'm telling the

08:40:11  10  Court what I have learned, but I have not been

08:40:14  11  able to independently verify this by looking at

08:40:17  12  documents.  But I have talked to someone who I

08:40:23  13  believe to be his Indian counsel.  He was in an

08:40:29  14  Indian prison for 60 days.  He was released on

08:40:36  15  July 23rd, on or about July 23rd.  And he was in

08:40:42  16  contact with us on July 25th for the first time.

08:40:50  17  And what we would -- with the Court's

08:40:54  18  permission, the reason that we have not entered

08:40:56  19  an appearance is because we're concerned about

08:41:02  20  getting into a case and then being stuck.  And

08:41:06  21  the case is very complex, and it's going to take

08:41:09  22  time.  And we are not -- we're not in the

08:41:12  23  position to do this case pro bono.  So the

08:41:16  24  outcome of this hearing is very important to us

08:41:19  25  because if some money is released for -- that's

08:41:28  1   available for his defense, then we'll be able to

08:41:30  2   make an appearance.

08:41:32  3            THE COURT:  So there's no application

08:41:34  4   pending before the Court for any release of

08:41:38  5   funds for his defense, as I understand it.

08:41:43  6            MR. LIPMAN:  I am prepared to make

08:41:45  7   that application, your Honor.  But I leave it to

08:41:49  8   the Court as to how the Court would like to

08:41:52  9   proceed.  We would be prepared to do -- to make

08:41:55  10  a limited appearance, just for the purpose of

08:41:58  11  seeing whether we can make an application and

08:42:01  12  whether that application is granted.  My biggest

08:42:04  13  concern, to be completely straight, is that he

08:42:10  14  wants us to represent him in the criminal case.

08:42:13  15  And as your Honor is aware, we make an

08:42:15  16  appearance there, we may never be able to get

08:42:18  17  out.  And then -- and that, I assume, is going

08:42:21  18  to be very long.

08:42:32  19            THE COURT:  All right.  Mr. Heinke or

08:42:35  20  Mr. Williams, do you have a position on Mr.

08:42:47  21  Lipman's request for leave to file a limited

08:42:51  22  appearance to seek funds for the defendant's

08:43:06  23  defense here, or in Massachusetts?

08:43:08  24            MR. LIPMAN:  Both, your Honor.

08:43:11  25            MR. HEINKE:  Your Honor, we do.  And

08:43:13  1   I'll note Mr. Lipman reached out to us

08:43:15  2   yesterday, and we appreciate him doing so.

08:43:18  3   Frankly, your Honor, at this point, the SEC's

08:43:21  4   position is, for purposes of what's before the

08:43:26  5   Court today, and for purposes of this hearing,

08:43:28  6   which we're sort of, you know, halfway through,

08:43:31  7   I think we would oppose any request at this time

08:43:35  8   for an application of release of funds for Mr.

08:43:40  9   Ahmed.

08:43:41  10          THE COURT:  So that's kind of the

08:43:44  11  second step over the question I posed, which is

08:43:48  12  should Mr. Lipman be given leave to file a

08:43:53  13  limited appearance to seek such funds, or is the

08:44:00  14  fact that we don't have such a thing as limited

08:44:03  15  appearances going to be a bar, and/or this is a

08:44:10  16  civil matter and there would be a question as to

08:44:16  17  whether the application should be made in the

08:44:19  18  criminal matter in Massachusetts, and/or does

08:44:25  19  all of this need to await his return to the US.

08:44:33  20          MR. HEINKE:  Your Honor, I appreciate

08:44:34  21  that.  With all due respect to Mr. Lipman, I do

08:44:37  22  thing we would oppose a limited appearance at

08:44:39  23  this time.  It seems to us improper to

08:44:43  24  essentially make a limited appearance for

08:44:45  25  purposes of determining whether, you know, a

08:44:48   1    greater appearance could be made and there be

08:44:52   2    funds available.  Moreover, as your Honor noted,

08:44:55   3    given the status of Mr. Ahmed currently, you

08:45:01   4    know, in some dispute at least, I appreciate Mr.

08:45:05   5    Lipman's representations that he intends to

08:45:06   6    return, but I think until he does so, the

08:45:09   7    Commission would have significant concerns with

08:45:11   8    Mr. Ahmed essentially attempting to litigate

08:45:14   9    this matter while outside of the jurisdiction of

08:45:17   10   the courts.  And so I think the Commission's

08:45:20   11   position would be that any such application

08:45:22   12   would need to await the time, if and when it

08:45:24   13   occurs, that Mr. Ahmed were to return and submit

08:45:28   14   himself to the jurisdiction of the courts.

08:45:33   15            THE COURT:  So Mr. Lipman, at this

08:45:35   16   point, Mr. Ahmed is a fugitive from the district

08:45:45   17   court in Massachusetts.

08:45:47   18            MR. LIPMAN:  That is correct, your

08:45:48   19   Honor.  It is also my understanding that he has

08:45:51   20   been released on bail in India, and that he does

08:45:55   21   not have the ability to travel back at the

08:45:58   22   moment.  Your Honor, I am in this case for two

08:46:05   23   days, so I am obviously at a disadvantage.  I

08:46:11   24   would like to address, if possible, the SEC's

08:46:14   25   concern.  I think the reason we're here, as

08:46:18   1   opposed to the district of Massachusetts, is

08:46:20   2   because the freeze order is here.  And as far as

08:46:24   3   his ability to fund his defense, he has a Sixth

08:46:27   4   Amendment right.  And his Sixth Amendment

08:46:30   5   right --

08:46:31   6            THE COURT:  A Sixth Amendment right

08:46:33   7   in this civil matter?

08:46:35   8            MR. LIPMAN:  Actually, your Honor, he

08:46:36   9   has a Sixth Amendment right to have money

08:46:39  10   released in this civil matter for his defense of

08:46:42  11   his criminal case in Massachusetts.  Separately,

08:46:45  12   the courts have found that in an SEC case where

08:46:48  13   fraud is alleged, defendants are entitled to

08:46:53  14   release of funds for the purposes of funding

08:46:58  15   their defense.  Now, there are two --

08:47:02  16            THE COURT:  To fund his criminal

08:47:04  17   defense.

08:47:05  18            MR. LIPMAN:  No, to fund their SEC

08:47:08  19   defense.  Now, there are, as I understand it,

08:47:15  20   there are two buckets, generally, of what is

08:47:18  21   frozen, right.  One is the money that is

08:47:22  22   supposed to go back to the victims of the fraud.

08:47:25  23   And the other is the money that is being set

08:47:28  24   aside for purposes of satisfying any fine that

08:47:31  25   may be imposed at the end, when there's a

08:47:33 1   finding of guilt.  According to the Stein case,

08:47:40 2   which is the Second Circuit case on this issue,

08:47:47 3   the defendants -- they have a right to their own

08:47:52 4   money until there's a judgment.  I should be

08:47:56 5   clearer, I'm referring from the language of

08:48:00 6   Stein, that these are not the precise words, but

08:48:03 7   Stein distinguishes between forfeiture cases, in

08:48:06 8   which the money that somebody is trying to get

08:48:09 9   released actually, theoretically at least,

08:48:12 10  belongs to the government.  And other cases,

08:48:14 11  where the money belongs to the defendant.  At

08:48:18 12  this point, and until there is a judgment, all

08:48:20 13  of the fine money actually belongs to Mr. Ahmed.

08:48:24 14  And what we're asking for is actually limited

08:48:28 15  relief.  We're not even asking for all that

08:48:32 16  money.  We're asking for enough money to fund

08:48:34 17  his defense.

08:48:35 18          And I should add a couple of things.

08:48:38 19  One is there is a DNO policy that may be in

08:48:42 20  effect, that Mr. Ahmed may be able to draw in

08:48:45 21  order to fund his defense here.  And I have --

08:48:51 22  because I am so new to this, I have not explored

08:48:54 23  that yet.  But that is something that we would

08:48:56 24  like to have time to -- an ability to explore.

08:49:00 25  And the other thing is, to the extent that the

08:49:03  1   Court permits some amount of money to be set

08:49:08  2   aside for his defense costs, what we would

08:49:13  3   propose is that that money go into a client

08:49:17  4   trust account at a firm, and we will draw on

08:49:21  5   that.  And then if there's any money remaining

08:49:25  6   at the end, and the SEC gets a judgment, or

08:49:29  7   there's a criminal judgment that needs to be

08:49:31  8   satisfied, whatever is left over, the Government

08:49:35  9   can have.

08:49:37  10          This is really a critical issue.  I

08:49:39  11  don't think -- my understanding is that he's not

08:49:44  12  going to be able to afford a counsel of his

08:49:50  13  choice.  And he does have a Constitutional right

08:49:54  14  to that.

08:49:54  15          THE COURT:  He does have what?

08:49:55  16          MR. LIPMAN:  A Constitutional right

08:49:57  17  to that, a Sixth Amendment right to that.

08:49:59  18          THE COURT:  So if he can't afford

08:50:00  19  counsel for his defense in the criminal matter,

08:50:03  20  and he demonstrates that adequately to the

08:50:05  21  Court, then doesn't CJA counsel get appointed

08:50:10  22  for him.

08:50:11  23          MR. LIPMAN:  I think Stein stands for

08:50:13  24  a different proposition, your Honor.  I think

08:50:16  25  Stein stands for the proposition that so long as

| | | |
|---|---|---|
| 08:50:18 | 1 | there's money that belongs to the defendant, |
| 08:50:20 | 2 | that money can be used to fund the defense.  And |
| 08:50:28 | 3 | to the extent that there's -- to the extent that |
| 08:50:31 | 4 | a portion, a large portion of what's frozen |
| 08:50:34 | 5 | here, is to satisfy a fine that, one, is |
| 08:50:38 | 6 | speculative, and I'll let -- I will let the |
| 08:50:43 | 7 | other counsel deal with this because I am, as I |
| 08:50:47 | 8 | said, I'm at a disadvantage.  But as I |
| 08:50:49 | 9 | understand it, there's a portion, a substantial |
| 08:50:52 | 10 | portion that is being frozen.  It's speculative, |
| 08:50:56 | 11 | and it's also -- it will not be the Government's |
| 08:51:00 | 12 | money until the Government gets a judgment. |
| 08:51:02 | 13 | THE COURT:  But we're talking about |
| 08:51:03 | 14 | the asset freeze order.  And the Second Circuit |
| 08:51:06 | 15 | has said that it's appropriate for an asset |
| 08:51:11 | 16 | freeze order to freeze funds in an amount |
| 08:51:14 | 17 | sufficient to cover not just the disgorgement, |
| 08:51:18 | 18 | but also the civil penalty, which the Second |
| 08:51:24 | 19 | Circuit in SEC versus Unifund SAL, 910 F.2d 2018 |
| 08:51:29 | 20 | at 1041, in 1990, said was to allow the SEC to |
| 08:51:36 | 21 | preserve its opportunity to collect funds that |
| 08:51:40 | 22 | may yet be ordered disgorged, which includes |
| 08:51:48 | 23 | both illicit profit and a SEC penalty.  Followed |
| 08:51:56 | 24 | more recently by the SEC versus Maillard, |
| 08:52:06 | 25 | 13-CV-5299, BET, 2014 Westlaw 1660024 at star |

08:52:16  1   four, that "SEC is entitled, upon an adequate

08:52:21  2   showing to an asset, to freeze sufficient to

08:52:24  3   preserve its disgorgement remedy, as well as

08:52:27  4   assets necessary to pay a civil monetary -- to

08:52:30  5   pay civil monetary penalties." So I don't know

08:52:37  6   that that is quite the central argument here.

08:52:45  7             Now, Mr. Lipman, are you referring

08:52:50  8   to, when you refer to the Stein case, what is

08:52:55  9   the cite on that? Because I'm only familiar

08:52:58  10  with the Southern District's case that held the

08:53:03  11  Government couldn't force the employer to stop

08:53:07  12  paying the legal fees for its employees. Are we

08:53:11  13  talking about two different Stein cases?

08:53:13  14            MR. LIPMAN: It's the same case.

08:53:15  15  It's the Second Circuit decision in that case

08:53:17  16  that I'm talking about. It's 541 F.3d 130, your

08:53:21  17  Honor. And may I address the point the Court

08:53:26  18  just made about --

08:53:27  19            THE COURT: Yes.

08:53:28  20            MR. LIPMAN: The Court definitely has

08:53:29  21  the power to seize money to satisfy a potential

08:53:35  22  fine pretrial. There's no question about that.

08:53:38  23  The question is whether that power, that --

08:53:42  24  whether the Court should weigh the right of the

08:53:50  25  SEC to have some money frozen, against the

08:53:53   1   defendant's Sixth Amendment right to have

08:53:55   2   counsel of his choice.  And --

08:53:57   3        THE COURT:  Is the Sixth Amendment

08:53:59   4   right counsel of his choice?  Or is it counsel?

08:54:05   5        MR. LIPMAN:  Well actually, if I may,

08:54:16   6   I think the Sixth Amendment right is definitely

08:54:20   7   a right to counsel of his choice.  If your Honor

08:54:34   8   would give me --

08:54:36   9        THE COURT:  That's fine.  Go back, I

08:54:38   10  want to go back to something else you said.

08:54:40   11  They have a right to, quote, "their own money."

08:54:42   12  Isn't that the whole dispute here, is, is it

08:54:46   13  their money.

08:54:47   14       MR. LIPMAN:  With respect - there are

08:54:49   15  two possibilities.  There's the disgorgement;

08:54:53   16  there's the proceeds of the alleged fraud.

08:54:56   17  That, for purposes of this conversation, is not

08:54:59   18  his money.  That's somebody else's money.  Then,

08:55:02   19  there's the other part, and that part is the

08:55:07   20  penalty part.  And that is his money until the

08:55:12   21  Government gets a judgment and the Court orders

08:55:16   22  a fine in a set amount.  The other thing is, and

08:55:21   23  this is -- this is in the papers for relief

08:55:24   24  defendants, is that as I understand it, Oak

08:55:28   25  still has a bunch of money that kind of -- I

| | |
|---|---|
| 08:55:34 | 1 |
| 08:55:40 | 2 |
| 08:55:44 | 3 |
| 08:55:47 | 4 |
| 08:55:51 | 5 |
| 08:55:57 | 6 |
| 08:56:00 | 7 |
| 08:56:04 | 8 |
| 08:56:12 | 9 |
| 08:56:14 | 10 |
| 08:56:18 | 11 |
| 08:56:20 | 12 |
| 08:56:25 | 13 |
| 08:56:28 | 14 |
| 08:56:34 | 15 |
| 08:56:40 | 16 |
| 08:56:44 | 17 |
| 08:56:45 | 18 |
| 08:56:48 | 19 |
| 08:56:49 | 20 |
| 08:56:55 | 21 |
| 08:56:59 | 22 |
| 08:57:00 | 23 |
| 08:57:00 | 24 |
| 08:57:00 | 25 |

1  guess it's holding onto it, that belonged to Mr.

2  Ahmed.  And it belongs to Mr. Ahmed at least

3  until there's a judgment.  And so to the extent

4  that the theory here is that the money needs to

5  be frozen in order to pay back Oak, which is the

6  victim of the fraud, well, Oak is already in a

7  position where it's pretty far down the line of

8  being made whole.  And that amount is not being

9  accounted for in any way, as I understand it.

10 The Government's position is that, from my

11 conversation with them yesterday, is that

12 it's -- that has some speculative value.  Well,

13 it has a value.  And the speculation may be

14 about how much.  But I think there's little

15 dispute about the fact that it is in the tens of

16 millions of dollars.

17             MR. HEINKE:  Your Honor, may we say

18 something briefly?

19             THE COURT:  I'm trying to remember

20 the term that was used, the capital interest --

21 what was the term used to describe that?

22             MR. HEINKE:  Carried interest, your

23 Honor.

24             THE COURT:  What?

25             MR. HEINKE:  I believe it's carried

08:57:02    1    interest.

08:57:02    2              THE COURT:  Carried interest.

08:57:03    3              MR. HEINKE:  And your Honor I just

08:57:04    4    note from the SEC's perspective, we note the

08:57:08    5    court has limited time today.  There are issues

08:57:11    6    before the Court today.  And again, we submit

08:57:13    7    until Mr. Ahmed returns to the jurisdiction,

08:57:15    8    with all due respect to Mr. Lipman, we don't

08:57:18    9    think it's proper at this time to take up any,

08:57:20   10    you know, oral application by Mr. Ahmed for a

08:57:24   11    release of funds.

08:57:25   12              THE COURT:  Let me -- so Mr. Lipman,

08:57:29   13    it seems to me that where this should be left

08:57:34   14    for now is I am cognizant of your existence.  I

08:57:43   15    am cognizant of your future role potentially

08:57:49   16    today.  And you are, of course, invited to stay.

08:57:53   17    But I think that this is not a context in which

08:58:03   18    I'm going to make any ruling about Mr. Ahmed.

08:58:12   19    It seems to be perverse that he can orchestrate

08:58:30   20    presentation of a position before the Court

08:58:34   21    without submitting to the jurisdiction of the

08:58:37   22    court.  And he is not without the wherewithal

08:58:47   23    for criminal representation because we have

08:58:52   24    exactly a whole system for indigent defendants.

08:58:57   25              MR. LIPMAN:  May I, your Honor?

08:58:58  1          THE COURT:  Sure.

08:58:59  2          MR. LIPMAN:  I think that he -- he

08:59:04  3   intends to deal with this case on the merits.  I

08:59:09  4   am concerned, they made a default application.

08:59:13  5   I'm concerned about that.  I think their --

08:59:16  6   frankly, I think their application is defective.

08:59:19  7   But separate from that, I think that -- I'm

08:59:21  8   concerned about that.  And I would like the

08:59:23  9   Court to at least give us an opportunity to

08:59:26  10  brief these issues before we get to any question

08:59:29  11  of default.  He is prepared to deal with this on

08:59:33  12  the issues.

08:59:34  13          But the second point, your Honor, and

08:59:35  14  that is also something that I would like to have

08:59:38  15  an opportunity to address with the Court, is

08:59:40  16  that he does have a Sixth Amendment right to

08:59:43  17  have his own counsel.  And I'm looking at Stein,

08:59:46  18  and it says "An element of this right is the

08:59:51  19  right of the defendant, who does not require

08:59:53  20  appointed counsel, to choose who will represent

08:59:57  21  him."  And it says "who does not require

08:59:59  22  appointed counsel."  But the analysis here is

09:00:02  23  whose money is it.  And the money is not the

09:00:04  24  Government's until and unless there's a judgment

09:00:07  25  that makes it so.  This is not a forfeiture

09:00:10  1  proceeding.  This is a request for a fine.  And

09:00:13  2  that fine has not been determined.  And it is --

09:00:20  3  it is his money until the Court says otherwise.

09:00:23  4  And he has a right --

09:00:24  5       THE COURT:  But it can be frozen, as

09:00:26  6  you recognize.

09:00:27  7       MR. LIPMAN:  Absolutely, your Honor.

09:00:28  8  But that needs to be balanced.  And the cases

09:00:31  9  that the Court has cited, I believe -- again,

09:00:34  10  I'm operating under a disadvantage, but --

09:00:37  11       THE COURT:  I understand.

09:00:38  12       MR. LIPMAN:  But I believe that the

09:00:39  13  cases that the Court has cited do not deal with

09:00:42  14  the Sixth Amendment issue.

09:00:43  15       THE COURT:  So the Stein case from

09:00:45  16  the Second Circuit dealt with the employees

09:00:52  17  right to -- or expectation of getting the

09:01:02  18  attorney's fees as a benefit or a perquisite of

09:01:09  19  employment, whether or not that expectation

09:01:12  20  arises from a legal entitlement.  And that goes

09:01:16  21  to the advance fees.  When you are talking about

09:01:19  22  a DNO policy that may exist, that may cover --

09:01:24  23  that may be bringing us into a Stein context.

09:01:27  24  But we're not there yet.

09:01:29  25       MR. LIPMAN:  That's precisely right,

09:01:32  1   your Honor, except that Stein has a lengthy

09:01:35  2   discussion of what the Sixth Amendment rights

09:01:38  3   are.  And that's where this analysis comes from.

09:01:41  4   The Stein -- the Court is exactly right.  Stein

09:01:44  5   deals with the Government's interference with

09:01:47  6   the employer' willingness to pay for legal fees

09:01:51  7   of its present and former employees.  But the

09:01:56  8   opinion at the very end, the Court has to decide

09:01:59  9   whether there is a Sixth Amendment violation.

09:02:01  10  So there is a lengthy discussion of what -- what

09:02:06  11  the rights are, and what follows from that.  And

09:02:09  12  that's where I get the inference that the Court

09:02:17  13  distinguishes between forfeited.  Money, it

09:02:20  14  specifically says that the government -- this is

09:02:26  15  on page 155, the Government relies on capital in

09:02:34  16  Drysdale, contends the defendant has no Sixth

09:02:37  17  Amendment right to defense fund by someone

09:02:40  18  else's money.  And then, the Court says in that

09:02:42  19  case, the Supreme Court ruled the defendant's

09:02:44  20  Sixth Amendment right to retain counsel of

09:02:47  21  choice was not violated when the funds he

09:02:50  22  earmarked for defense were seized under federal

09:02:53  23  forfeiture statute.  Because title to the

09:02:57  24  forfeiture in essence had vested in the United

09:02:59  25  States.  That's the critical distinction.

09:03:01  1          THE COURT:  But we're not anywhere

09:03:02  2    near that point.  We're talking about a freeze

09:03:04  3    order only.

09:03:07  4          MR. LIPMAN:  That is correct, your

09:03:08  5    Honor.  That is my point.  My point is that

09:03:11  6    we're not at a point where the title to the

09:03:13  7    money has vested with someone else.  The title

09:03:17  8    to the money is the defendant's title.  And he

09:03:20  9    is entitled to use that money to fund his

09:03:24  10   defense under the Sixth Amendment.

09:03:26  11         THE COURT:  Okay, we're going to

09:03:27  12   proceed with our hearing today because we cannot

09:03:31  13   go past one o'clock.  I will take whatever

09:03:37  14   application you want to make on behalf of Mr.

09:03:42  15   Ahmed, giving the parties a chance to respond to

09:03:47  16   it.  The issue of a limited appearance for a

09:03:51  17   limited purpose in some ways sub silentio has

09:04:02  18   been granted in the sense that you've been heard

09:04:05  19   today.  So I will invite your written

09:04:08  20   application and you figure out the legal basis

09:04:12  21   for appearing without appearing, or appearing

09:04:17  22   for limited purposes, so you don't have to stay

09:04:19  23   in.  I am fully sympathetic to that.  Not the

09:04:23  24   least of which is, I suppose, being paid with

09:04:26  25   somebody else's money that could be clawed back.

09:04:29   1   I have no idea if that's something you face.

09:04:32   2   But, I have heard you, and I will invite your

09:04:39   3   application.  And invite you to stay and hear

09:04:42   4   the proceedings today.

09:04:43   5           MR. LIPMAN:  Thank you, your Honor.

09:04:44   6   I appreciate the Court's time.  I apologize for

09:04:47   7   the late appearance --

09:04:48   8           THE COURT:  That's fine.

09:04:48   9           MR. LIPMAN:  -- and the

09:04:49   10   circumstances.

09:04:50   11           THE COURT:  I understand.

09:04:50   12           MR. LIPMAN:  I have one last thing, I

09:04:54   13   would like to get a copy of the insurance policy

09:04:58   14   from Oak, and I just want to put that on the

09:05:02   15   record, that I have asked them.  I haven't heard

09:05:04   16   back.  But I only asked yesterday, so -- but

09:05:06   17   it's important for us to get it.

09:05:08   18           THE COURT:  Of course, all right.

09:05:10   19           MR. LIPMAN:  Thank you, your Honor.

09:05:11   20           THE COURT:  All right then.

09:05:12   21           MR. WILLIAMS:  Your Honor, this is

09:05:13   22   Mark Williams on behalf the SEC.  There were

09:05:16   23   three questions you had asked in the opening

09:05:18   24   statements that I'm prepared to address.  I can

09:05:21   25   wait to answer your questions, or I can do it

09:05:24  1    quickly now.

09:05:24  2              THE COURT:  Go ahead.

09:05:25  3              MR. WILLIAMS:  The first one is you

09:05:26  4    had asked me about the residence in Greenwich

09:05:30  5    and whether it was going to be involved in this

09:05:33  6    action.  I spoke with the Assistant United

09:05:35  7    States Attorney, she did confirm it's expected

09:05:38  8    to be seized.  However, she did say it's

09:05:41  9    possible that the residence could be applied

09:05:44  10   towards the victim's losses in this case.

09:05:47  11   There's certainly no guarantee.  However, the

09:05:52  12   AUSA did say that that, you know, she believes

09:05:53  13   it would be the just result and will at least

09:05:55  14   attempt to have the asset applied towards

09:06:02  15   victims losses in this case.

09:06:05  16             The second question that the Court

09:06:07  17   had asked was whether the carried interest

09:06:11  18   distribution would violate the freeze order.  I

09:06:14  19   think the Court sort of took care of that in

09:06:17  20   questioning Ms. Ames.  There was one thing I did

09:06:19  21   want to clarify.  Before a distribution is made

09:06:22  22   to the general partner, all the distributions

09:06:25  23   must be made to the investors.  And then even

09:06:28  24   then, there are several hurdles that must happen

09:06:31  25   before the general partner gets paid out.  So I

09:06:34  1    just want to be clear, our position is of course

09:06:36  2    Oak can continue to make distributions to

09:06:38  3    investors like they normally do.  That's their

09:06:40  4    business.  However, it would be a different

09:06:42  5    story if, after they had distributed out

09:06:45  6    everything to investors, the pool that was left

09:06:47  7    over, that would go to that general partner,

09:06:49  8    which Iftikar Ahmed at least at one time had an

09:06:52  9    interest in, if they started making payments on

09:06:55  10   that and they didn't set aside any funds, at

09:06:58  11   least for the time being.  So we do seek to draw

09:07:00  12   that -- to make clear that there is a difference

09:07:02  13   there.

09:07:02  14         THE COURT:  But my request was that

09:07:05  15   none of the partners get a distribution after

09:07:08  16   the distributions made in the ordinary course to

09:07:10  17   investors have been made.

09:07:12  18         MR. WILLIAMS:  Okay.  So then we're

09:07:13  19   on the same page.  What I wanted to make clear

09:07:15  20   is that there are distributions that would still

09:07:18  21   be made to investors, that's their normal course

09:07:21  22   of business, that would have no effect on Mr.

09:07:25  23   Ahmed's portion --

09:07:25  24         THE COURT:  Which is calculated to be

09:07:27  25   24 million dollars.

| | | |
|---|---|---|
| 09:07:29 | 1 | MR. WILLIAMS:  I believe so. |
| 09:07:30 | 2 | THE COURT:  I'm assuming that that |
| 09:07:31 | 3 | figure does not include investor -- |
| 09:07:36 | 4 | distributions to investors. |
| 09:07:38 | 5 | MR. WILLIAMS:  Correct.  So for |
| 09:07:39 | 6 | example, I think there's a 20 million dollar |
| 09:07:41 | 7 | interest in one of the funds.  All of the |
| 09:07:43 | 8 | distributions would be made out to investors |
| 09:07:45 | 9 | first.  And then distributions made out to the |
| 09:07:47 | 10 | general partner entity, Mr. Ahmed has a portion |
| 09:07:50 | 11 | of that entity, and that's where that number |
| 09:07:52 | 12 | comes from. |
| 09:07:52 | 13 | THE COURT:  And that's where -- |
| 09:07:54 | 14 | that's what I have requested not to be |
| 09:07:56 | 15 | distributed because, in the short run, because |
| 09:08:02 | 16 | it may be subject to the freeze order.  And it |
| 09:08:05 | 17 | may be subject to a disgorgement remedy, however |
| 09:08:09 | 18 | quantified or whenever quantified. |
| 09:08:11 | 19 | MR. WILLIAMS:  Exactly, your Honor. |
| 09:08:13 | 20 | I just wanted to make sure there was that |
| 09:08:15 | 21 | distinction between distributions to investors, |
| 09:08:17 | 22 | and the remainder which goes to the general |
| 09:08:19 | 23 | partners.  So yes, exactly what your Honor has |
| 09:08:22 | 24 | said, is our understanding. |
| 09:08:23 | 25 | THE COURT:  So the carried interact |

09:08:25  1    never includes the investors' interest.

09:08:31  2            MR. WILLIAMS:  The carried interact

09:08:33  3    of the general partners does not include that.

09:08:35  4    In fact, in order to even get at that, in order

09:08:38  5    for the general partners to get any money, all

09:08:40  6    the investors must be paid first.  So -- and

09:08:44  7    that sort of goes to exactly what you heard --

09:08:47  8    your Honor heard last week, about how it may

09:08:49  9    never come into being because the investors may

09:08:52  10   not get paid out.

09:08:52  11           The third question your Honor had

09:08:54  12   asked is whether the federal law governs

09:08:57  13   privilege here.  And we submit it does.  We do

09:09:00  14   have some case law on that.  And I think, you

09:09:03  15   know, we filed the brief on the attorney/client

09:09:06  16   privilege, so I won't say anything to that.  I

09:09:11  17   believe your Honor stated that you had read the

09:09:13  18   deposition.  Mrs. Ahmed had claimed the adverse

09:09:17  19   spousal privilege.  And so we do expect to call

09:09:22  20   Mrs. Ahmed.  That privilege only applies in

09:09:25  21   criminal cases.  And so but we can address that

09:09:30  22   when we call her.  But to answer your question,

09:09:33  23   the federal law does govern the privilege in

09:09:35  24   this case.  Does your Honor have any questions

09:09:38  25   for me on any of those issues?

|          |    |                                                          |
|----------|----|----------------------------------------------------------|
| 09:09:41 | 1  | THE COURT:  There's another issue of                     |
| 09:09:44 | 2  | privilege that was raised by the relief                  |
| 09:09:47 | 3  | defendants, or by you, I can't remember.  And            |
| 09:09:51 | 4  | while the Court routinely reviews in camera              |
| 09:10:00 | 5  | materials that may or may not be admissible for          |
| 09:10:02 | 6  | the purpose of making that determination, even           |
| 09:10:05 | 7  | though it is a bench proceeding, if it is --             |
| 09:10:09 | 8  | makes things get expedited, I can ask Magistrate         |
| 09:10:15 | 9  | Judge Margolis to review in camera the documents         |
| 09:10:20 | 10 | that are in dispute.  Is that a quick fix here?          |
| 09:10:24 | 11 | MR. WILLIAMS:  Your Honor we submit                      |
| 09:10:25 | 12 | that is absolutely unnecessary.  This was an             |
| 09:10:28 | 13 | objection made by defense.  As we stated, it's           |
| 09:10:31 | 14 | spurious, it's exactly -- the courts have                |
| 09:10:33 | 15 | routinely said, this is proper.  Your Honor is a         |
| 09:10:36 | 16 | judge, your Honor's job is to judge whether              |
| 09:10:38 | 17 | something is privileged.  And so we submit               |
| 09:10:40 | 18 | that's not necessary.  We can give you these             |
| 09:10:42 | 19 | documents.                                               |
| 09:10:42 | 20 | The other thing we notice, it's two                      |
| 09:10:44 | 21 | documents.  It would take probably 90 seconds.           |
| 09:10:47 | 22 | And basically, these are not privileged                  |
| 09:10:49 | 23 | documents.  And that's really the frustration on         |
| 09:10:51 | 24 | the Commission's part, is it feels, you know,            |
| 09:10:53 | 25 | all due respect to defense counsel, that it's --         |

09:10:57   1   it's a bit of gamesmanship being played.  But

09:11:02   2   there is no need for a magistrate judge to come

09:11:05   3   in.  Your Honor, I am confident, is capable of

09:11:08   4   looking at a document and even if this Court

09:11:10   5   were to say it's privileged, to not take that

09:11:12   6   document into account in its ruling.

09:11:16   7           THE COURT:  Well, I agree.  I was

09:11:18   8   just looking for a short fix so we could move

09:11:21   9   on.  But Mr. Skibell?

09:11:24   10          MR. SKIBELL:  Your Honor, so two

09:11:26   11   things, your Honor.  One, we'd like to proceed

09:11:28   12   as quickly as possible because there's important

09:11:31   13   evidence we think we need to take up.  Now the

09:11:33   14   SEC has known about these two documents at

09:11:36   15   issue, as well as many other privileged

09:11:38   16   documents that Oak produced to them, for months.

09:11:41   17   They've known about this issue regarding these

09:11:44   18   specific documents since the deposition.  And

09:11:47   19   they waited to file their brief two days ago.

09:11:49   20   We have until the 18th of August to respond to

09:11:52   21   the brief.  We have a very different view of the

09:11:54   22   facts and the law, and we're prepared to respond

09:11:57   23   at that time.  But until we respond, under the

09:12:00   24   order and the stipulation that we agreed to with

09:12:02   25   them, and the order entered by your Honor, those

09:12:05   1    documents are privileged until there's a ruling;

09:12:08   2    and the ruling is not ripe yet because we

09:12:10   3    haven't had a chance to respond.

09:12:12   4          The other thing -- and again, I don't

09:12:13   5    want to take up the Court's time because we

09:12:15   6    really need to get to certain evidence, but Mr.

09:12:21   7    William's explanation of the adverse spousal

09:12:23   8    testimonial privilege is wrong, flatly wrong.

09:12:26   9    And he's never raised this issue before to us.

09:12:28   10   In fact, when we've discussed the adverse

09:12:31   11   spousal testimonial privilege, he seemed to

09:12:34   12   recognize that it exists in this proceeding.  So

09:12:38   13   I don't know why we're going to be litigating

09:12:39   14   that now when we have until one o'clock to

09:12:42   15   present our necessary evidence for this hearing.

09:12:44   16         MR. WILLIAMS:  May I respond, your

09:12:46   17   Honor?  Very briefly.  Two things.  One, we've

09:12:50   18   been engaged in discussions regarding the

09:12:52   19   privilege.  We note that the burden is on the

09:12:55   20   individual claiming the privilege.  It is

09:12:57   21   inherently unfair to take facially not

09:13:00   22   privileged documents, to say they are

09:13:03   23   privileged, to say this Court cannot look at

09:13:04   24   them, and to make arguments that I submit really

09:13:07   25   are contradicted by at least one of these

09:13:09   1   documents.  The court serves as a truth seek

09:13:13   2   function, first and foremost.  And I think

09:13:15   3   defense should keep that in mind.  The second

09:13:17   4   thing, with the adverse spouse privilege, this

09:13:20   5   was brought up at the deposition.  I did tell,

09:13:22   6   and the record is very clear, that -- Mr.

09:13:26   7   Skibell, that the confrontation clause prevents

09:13:32   8   anything Ms. Ahmed said in this proceeding from

09:13:35   9   being used against her husband in any criminal

09:13:37   10  proceeding.  That was Judge Scalise's majority

09:13:39   11  opinion in Crawford v. Washington, were the

09:13:41   12  exact facts.  And Mr. Skibell disagrees with

09:13:43   13  that, that's on the record, that's right there

09:13:45   14  at the beginning of the deposition.  So this

09:13:46   15  issue has been -- you know, we've stated our

09:13:50   16  position, at least in that regard, from the

09:13:53   17  beginning.

09:13:54   18        My point is, is that again, the

09:13:55   19  burden is on the defendant to assert this

09:13:57   20  privilege.  We're just asking they meet their

09:14:00   21  burden.  It's not fair for them to assert it and

09:14:02   22  then say "We don't want to litigate it."  That's

09:14:04   23  certainly not how it should work.

09:14:19   24        THE COURT:  Is it your intention to

09:14:20   25  resume the testimony of Ms. Ames?

|          |    |                                                          |
|----------|----|----------------------------------------------------------|
| 09:14:24 | 1  | MR. DEITCH:  Yes, it is, your Honor,                      |
| 09:14:27 | 2  | thank you.  I believe the clerk retained the             |
| 09:14:35 | 3  | copies of the exhibits that were admitted last           |
| 09:14:37 | 4  | week.  If I may have them and put them in front          |
| 09:14:40 | 5  | of the witness.                                          |
| 09:15:02 | 6  | THE COURT:  While you are getting                        |
| 09:15:03 | 7  | organized, I am somewhat unsatisfied with the            |
| 09:15:22 | 8  | state of play vis-a-vis the conditions of                |
| 09:15:32 | 9  | release on bond from the District of                     |
| 09:15:34 | 10 | Massachusetts.                                           |
| 09:15:36 | 11 | MR. SKIBELL:  Your Honor, I can speak                    |
| 09:15:37 | 12 | to that briefly, if that would be helpful.               |
| 09:15:39 | 13 | THE COURT:  I have your e-mail that                      |
| 09:15:41 | 14 | says she does not have a condition for                   |
| 09:15:47 | 15 | employment.  The form bond has a requirement of          |
| 09:15:56 | 16 | employment.                                              |
| 09:15:58 | 17 | MR. SKIBELL:  So your Honor, my                          |
| 09:16:00 | 18 | understanding is that the original form was              |
| 09:16:02 | 19 | modified by the oral judgment of the Court               |
| 09:16:07 | 20 | following the entry of the form.  And David can          |
| 09:16:10 | 21 | speak more to that because he's been more                |
| 09:16:12 | 22 | directly involved.  That's --                            |
| 09:16:14 | 23 | THE COURT:  I have those oral                            |
| 09:16:15 | 24 | conditions summarized as "Travel restricted to           |
| 09:16:20 | 25 | Connecticut with the following exceptions:  New          |

| | |
|---|---|
| 09:16:25 | 1 |
| 09:16:27 | 2 |
| 09:16:35 | 3 |
| 09:16:40 | 4 |
| 09:16:43 | 5 |
| 09:16:45 | 6 |
| 09:16:52 | 7 |
| 09:16:53 | 8 |
| 09:16:57 | 9 |
| 09:16:59 | 10 |
| 09:17:04 | 11 |
| 09:17:10 | 12 |
| 09:17:15 | 13 |
| 09:17:21 | 14 |
| 09:17:28 | 15 |
| 09:17:33 | 16 |
| 09:17:41 | 17 |
| 09:17:46 | 18 |
| 09:17:52 | 19 |
| 09:17:55 | 20 |
| 09:17:57 | 21 |
| 09:18:00 | 22 |
| 09:18:04 | 23 |
| 09:18:06 | 24 |
| 09:18:09 | 25 |

York for counsel, Massachusetts for court,
Connecticut including meetings with AUSA;
Princeton to meet with parents.  Condition of
home detention shall be amended to reflect a
curfew whereby Ms. Ahmed is restricted to her
residence every day 7 p.m. until 7 a.m., must
continue to stay away from airports, train
stations, bus terminals without prior approval.
All other conditions that were previously
imposed remain unchanged.  I.e., location
monitoring, report contact, surrender passport."
But there is no amended order setting
conditions.  That sounded to me as if she's
restricted to her residence 7 p.m. to 7 a.m.,
without any limitation on -- other than what's
been set out, what she is lawfully capable of
doing seven a.m. to seven p.m.  Nor does it
affect working remotely from home.  But let me
invite your view on that, Mr. Deitch.

          MR. DEITCH:  Your Honor, we sought
guidance from Pretrial Services from Ms. Owens,
who's assigned to Ms. Ahmed's case.  And she was
pretty unequivocal that her understanding is
that Ms. Ahmed is not permitted to seek
employment during that window in which she's

| | | |
|---|---|---|
| 09:18:11 | 1 | allowed to leave the home. |
| 09:18:14 | 2 | THE COURT:  And what basis in the |
| 09:18:17 | 3 | order from the magistrate judge is that based |
| 09:18:19 | 4 | on? |
| 09:18:20 | 5 | MR. DEITCH:  Your Honor, I agree. |
| 09:18:21 | 6 | The form language is there that includes |
| 09:18:24 | 7 | employment.  The paper is there.  The magistrate |
| 09:18:29 | 8 | judge did not issue a new written order -- |
| 09:18:32 | 9 | THE COURT:  I understand that. |
| 09:18:33 | 10 | MR. DEITCH:  So that -- |
| 09:18:35 | 11 | THE COURT:  And I have a summary from |
| 09:18:38 | 12 | Susan Walls, the US probation officer in Boston, |
| 09:18:42 | 13 | that clarifies that home detention shall be |
| 09:18:47 | 14 | amended to reflect a curfew whereby Ms. Ahmed is |
| 09:18:52 | 15 | restricted to her residence every day 7 p.m. to |
| 09:18:55 | 16 | seven a.m. |
| 09:18:58 | 17 | MR. DEITCH:  Your Honor, as you may |
| 09:18:59 | 18 | know, from the perspective of representing a |
| 09:19:03 | 19 | person who is subject to conditions of release, |
| 09:19:05 | 20 | we are really subject to the interpretation by |
| 09:19:10 | 21 | Pretrial Services.  And what we would need, if |
| 09:19:16 | 22 | Ms. Ahmed were going to seek employment, we |
| 09:19:19 | 23 | would need to return to Magistrate Judge Bowler |
| 09:19:21 | 24 | and seek clarification whether she intended to |
| 09:19:24 | 25 | include that form language, or whether it was |

| | | |
|---|---|---|
| 09:19:27 | 1 | included as an omission, that it should have |
| 09:19:29 | 2 | been stricken from the order.  I believe that |
| 09:19:32 | 3 | the language was probably included originally, |
| 09:19:36 | 4 | even though it contradicted in the rest of the |
| 09:19:39 | 5 | order.  She had no ability to work because she |
| 09:19:41 | 6 | was on home detention with extremely limited |
| 09:19:45 | 7 | ability to leave the home. |
| 09:19:46 | 8 | THE COURT:  But that's circular. |
| 09:19:49 | 9 | MR. DEITCH:  With respect, your |
| 09:19:50 | 10 | Honor, I don't believe it is.  I think it was |
| 09:19:52 | 11 | included simply because it was part of the form, |
| 09:19:55 | 12 | even though it clearly contradicted the intent |
| 09:19:58 | 13 | of the first order, and it was simply not |
| 09:20:00 | 14 | corrected when the order was orally amended. |
| 09:20:03 | 15 | THE COURT:  So why is it that counsel |
| 09:20:05 | 16 | for Mrs. Ahmed has not sought the clarification |
| 09:20:09 | 17 | with the magistrate judge on whether the |
| 09:20:13 | 18 | amendment to the condition of home confinement |
| 09:20:17 | 19 | restricting her to her residence 7 p.m. to 7 |
| 09:20:20 | 20 | a.m., should be construed as permitting her to |
| 09:20:26 | 21 | be employed outside the home in the hours seven |
| 09:20:32 | 22 | a.m. to seven p.m.?  That is the period of time |
| 09:20:37 | 23 | not covered by the curfew. |
| 09:20:40 | 24 | MR. DEITCH:  Your Honor, we have not |
| 09:20:41 | 25 | sought that from the magistrate.  We sought it |

09:20:43  1    from the Probation Department.

09:20:45  2            THE COURT:  You're talking about one

09:20:47  3    Probation Department removed.  So I suggest you

09:20:49  4    seek it from the District of Massachusetts and

09:20:54  5    the magistrate judge there.  If you want the

09:20:57  6    Court to make that request for clarification, if

09:21:01  7    that is appropriate, I will do that.  But I'm

09:21:05  8    not yet satisfied that we are at the end of that

09:21:09  9    road.  Nor am I satisfied that working remotely,

09:21:14  10   even if the restrictions are as Ms. Owens has

09:21:20  11   told you they are, were accurate.  So, let's

09:21:28  12   move on.

09:21:29  13           MR. HEINKE:  Your Honor, just

09:21:31  14   briefly, I'm not sure the witness has a cup for

09:21:32  15   water.  I'm happy to approach with one.

09:21:35  16           THE COURT:  All right.  Could you get

09:21:36  17   that, please.

09:21:36  18           (DISCUSSION HELD OFF THE RECORD.)

09:21:58  19           MR. DEITCH:  May I proceed, your

09:22:00  20   Honor?

09:22:00  21           THE COURT:  Yes, give me just one

09:22:01  22   second, I have misplaced my notes.

09:22:31  23           You may proceed.

09:22:32  24           MR. DEITCH:  Your Honor, I don't know

09:22:33  25   whether the witness needs to be sworn again, or

09:22:35   1   simply reminded --

09:22:36   2           THE COURT:  You continue to be under

09:22:37   3   oath, Ms. Ames.

09:22:39   4           THE WITNESS:  I understand that, your

09:22:40   5   Honor.

09:22:40   6           THE COURT:  Thank you.

09:22:40   7   GRACE AMES, having been previously sworn,

09:22:40   8   testified further as follows:

09:22:40   9   CROSS-EXAMINATION

09:22:40   10  BY MR. DEITCH (Continuing):

09:22:42   11     Q.  Ms. Ames, if you will find in the stack of

09:22:45   12  exhibit in front of you, Relief's Defendant

09:22:47   13  Exhibit E, which we were discussing when we broke

09:22:51   14  your testimony last Thursday.  Do you have that in

09:22:53   15  front of you?

09:22:54   16     A.  Relief Defendant E?

09:22:56   17     Q.  Exhibit E, like Edward.

09:22:58   18     A.  Exhibit E, okay.

09:22:59   19     Q.  This is the PCR that has your notes on it.

09:23:12   20     A.  Yes, I have that.

09:23:13   21     Q.  Okay.  Now, if you will turn to the second

09:23:16   22  page -- well, first, just to reestablish our

09:23:19   23  context, am I correct this is the Pre-Commitment

09:23:23   24  Investment Report that Mr. Ahmed created in

09:23:28   25  relation to the October 2014 purchase of Company C

09:23:34  1   shares for I-Cubed, correct?

09:23:38  2       A.   I don't know if Mr. Ahmed created every

09:23:41  3   single piece of it, but it is the Pre-Commitment

09:23:45  4   Report that he presented.

09:23:47  5       Q.   Okay.

09:23:47  6       A.   Yes.

09:23:48  7       Q.   If you turn to the second page and you go to

09:23:53  8   the section at the bottom titled Key Risks, and in

09:23:58  9   number three, do you see that it says in the

09:24:02 10   second sentence, "The valuation risk will be

09:24:06 11   mitigated by structuring the investment as a

09:24:09 12   participating preferred security, both for a sale

09:24:12 13   and for an IPO."  Do you see that language?

09:24:15 14       A.   I do see that language.

09:24:16 15       Q.   And is that your recollection, that that is

09:24:19 16   how this security was in fact structured?

09:24:21 17       A.   No, that's not my recollection.

09:24:23 18       Q.   How does your recollection differ?

09:24:25 19       A.   I just don't have a specific recollection.

09:24:27 20       Q.   Okay.   IPO refers to taking a company that

09:24:31 21   is private and offering it publicly for

09:24:35 22   shareholders, correct?

09:24:36 23       A.   That's correct.

09:24:38 24       Q.   Can you explain what it means to be a

09:24:39 25   participating preferred security for either a sale

09:24:41   1   or an IPO in this context?

09:24:43   2       A.   It's a security that provides -- that gives

09:24:48   3   preference over a common stock.

09:24:51   4       Q.   And it makes the stock more valuable than if

09:24:53   5   it did not have those particular rights attached

09:24:55   6   to it, correct?

09:24:56   7       A.   It provides additional rights.

09:25:00   8       Q.   Now, on the first page, if you go to the top

09:25:03   9   of the first page, you've made some notes and

09:25:07   10  check marks that reflect how the managing partners

09:25:11   11  and the general partners voted on this proposal,

09:25:14   12  correct?

09:25:14   13      A.   Correct.

09:25:15   14      Q.   And your notes indicate that all four of the

09:25:21   15  managing partners voted -- or managing members, I

09:25:24   16  should say, of Oak 13, voted in favor of this

09:25:28   17  particular investment, correct?

09:25:29   18      A.   Yes.

09:25:30   19      Q.   And in fact, everyone, everyone at this

09:25:33   20  meeting who voted, other than one person, voted in

09:25:37   21  favor of the investment, according to your notes?

09:25:40   22      A.   Yes, according to my notes.

09:25:41   23      Q.   Okay.   And who is that person who voted --

09:25:45   24  who did not vote in favor?

09:25:47   25      A.   It's Ben Riley.   But the X does not -- it

| | | |
|---|---|---|
| 09:25:51 | 1 | could be that he was absent. |
| 09:25:53 | 2 | Q. Do you have a recollection of Mr. Riley |
| 09:25:57 | 3 | expressing disagreement with this investment? |
| 09:26:00 | 4 | A. I don't have any recollection. |
| 09:26:02 | 5 | Q. So is it possible that in fact this was a |
| 09:26:06 | 6 | unanimous vote? |
| 09:26:06 | 7 | A. I don't know. |
| 09:26:08 | 8 | Q. Is it -- am I correct, though, it is your |
| 09:26:11 | 9 | understanding that in general, Oak prefers that |
| 09:26:14 | 10 | investments be pursued on a unanimous vote, |
| 09:26:18 | 11 | correct? |
| 09:26:18 | 12 | A. I think any firm would prefer that. |
| 09:26:21 | 13 | Q. And Oak prefers it, correct? |
| 09:26:23 | 14 | A. I think that would be a preference. |
| 09:26:30 | 15 | Q. Now, at the time of this investment of 7.5 |
| 09:26:35 | 16 | million dollars, Oak actually believed that these |
| 09:26:38 | 17 | shares of stock were substantially more than that, |
| 09:26:41 | 18 | didn't they? |
| 09:26:43 | 19 | A. That is what Mr. Ahmed said. |
| 09:26:47 | 20 | Q. It wasn't just Mr. Ahmed who said that, |
| 09:26:49 | 21 | though, was it? |
| 09:26:51 | 22 | A. I don't understand your question. |
| 09:26:56 | 23 | Q. If you find Relief Defendant's Exhibit A, |
| 09:27:01 | 24 | and put it in front of you.  Now this, you recall |
| 09:27:17 | 25 | we looked at this.  I'm not sure how I get the |

09:27:20  1   screen to show what's on the camera here.  It's

09:27:27  2   not entirely necessary.

09:27:56  3       Okay, you recall you testified that this was

09:27:57  4   an e-mail from Jessica Adams to Amy Ladin in

09:28:02  5   November 2014, correct?

09:28:04  6       A.  Yes, I see that.

09:28:05  7       Q.  So this is about a month -- a little less

09:28:08  8   than a month after the transaction, correct?

09:28:09  9       A.  Yes, correct.

09:28:11  10      Q.  And do you see that in -- that Ms. Ladin

09:28:15  11  writes -- she says, "Attached is an updated fax

09:28:21  12  sheet for Company C, including the recent

09:28:24  13  secondary purchase transaction.  This resulted in

09:28:27  14  a write-up of 2.6 million dollars, which is

09:28:29  15  consistent with Oak's valuation guidelines."  Do

09:28:32  16  you see that language?

09:28:33  17      A.  I see that language.

09:28:34  18      Q.  And that's because the valuation that was

09:28:37  19  done at that time, valued the I-Cubed shares that

09:28:42  20  were purchased at 10.1 million dollars.  Isn't

09:28:45  21  that right?

09:28:52  22      A.  I'm trying to remember if it was

09:28:54  23  specifically 10.1 million.  But that valuation was

09:28:58  24  based on the performance information that Mr.

09:29:01  25  Ahmed had presented.

09:29:11  1    Q.  I'm going to show you what will be marked as

09:29:16  2  Relief Defendant Exhibit F.

09:29:30  3              THE COURT:  We have --

09:29:32  4    A.  I already have an F.

09:29:35  5              MR. SKIBELL:  We's be on H.

09:29:39  6    Q.  Then we'll mark this as Exhibit H, I

09:29:43  7  apologize.

09:29:43  8    A.  Excuse me, I believe I have an H also.  It

09:29:47  9  looks like an H to me.  See, up here.

09:29:58 10              MR. DEITCH:  I apologize.  Your Honor

09:30:00 11  there were a number of exhibits that Mr. Harris

09:30:04 12  marked with Ms. Ahmed, and I didn't account for

09:30:08 13  those.  I think all we have is through H,

09:30:14 14  hopefully?  I'm getting a nod.

09:30:19 15              MR. HEINKE:  Do you have an copy?

09:30:21 16              MR. DEITCH:  Yes, I will give you a

09:30:22 17  copy in just a moment.  So we'll be marking this

09:30:24 18  as Relief Defendant Exhibit I.

09:30:45 19    Q.  Now, Ms. Ames, we looked earlier in your

09:30:56 20  testimony at a company -- at a confidential

09:30:59 21  company fact sheet for Oak 13 from the third

09:31:02 22  quarter of 2014.  Am I correct that this document

09:31:08 23  is the same type of report prepared for Company C,

09:31:12 24  reflecting the fourth quarter of 2014?

09:31:16 25    A.  For me to say, you know, definitively, I'd

09:31:20   1   have to see both reports next to each other.  But

09:31:22   2   if it is a fact sheet that looks like this, it

09:31:26   3   sounds like it's the same.

09:31:27   4       Q.  Okay.  And you recall you testified that

09:31:29   5   these are reports that are prepared in the

09:31:31   6   customary course of Oak's business and maintained

09:31:34   7   in the customary course of Oak's business

09:31:36   8   regarding the companies in which its funds have

09:31:39   9   investments?

09:31:40   10      A.  They are customarily maintained.

09:31:43   11          MR. DEITCH:  Your Honor, I ask this

09:31:45   12   be admitted as Relief Defendant Exhibit I.

09:31:48   13          MR. HEINKE:  No objection.

09:31:49   14          THE COURT:  Full exhibit.

09:31:50   15      Q.  Ms. Ames, this is, as we said, a

09:32:01   16   confidential company fact sheet regarding Company

09:32:05   17   C.  And then it has, the way it's been produced,

09:32:08   18   with some posits, with many handwriting on it.  Do

09:32:12   19   you know whose handwriting that is?

09:32:15   20      A.  I recognize some of the handwriting, but not

09:32:19   21   all of it.

09:32:20   22      Q.  Okay.  Do you see the initials JA and the

09:32:24   23   date November 25, 2014?

09:32:26   24      A.  Oh, now I do.

09:32:27   25      Q.  Do you believe that's Jessica Adams?

09:32:29   1      A.   I believe it is.

09:32:31   2      Q.   And AH with the same date, do you believe

09:32:35   3   that's Adrien Hamilton?

09:32:38   4      A.   I would think that's who it would be.

09:32:38   5      Q.   And he's another person who does bookkeeping

09:32:41   6   or finance department functions at Oak?

09:32:43   7      A.   Yes, he -- yes.

09:32:48   8      Q.   And do you see that on the second page,

09:32:51   9   there are check marks next to most of the numbers

09:32:55   10   that are listed on the page?

09:32:59   11      A.   I see the check marks.

09:33:00   12      Q.   Do you know, in the regular course of Oak's

09:33:06   13   business, do Ms. Adams or Mr. Hamilton, or both,

09:33:09   14   or others -- let me start that question again.

09:33:12   15        In the regular course of Oak's business, are

09:33:15   16   there personnel whose job it is to check these

09:33:17   17   figures when these reports are created?

09:33:21   18      A.   They would check the figures.

09:33:24   19      Q.   Okay.

09:33:25   20      A.   It could be for recording purposes, not

09:33:27   21   necessarily for valuation purposes.

09:33:29   22      Q.   Okay.  So do you agree that this document

09:33:32   23   appears to reflect Ms. Adams and Mr. Hamilton

09:33:36   24   checking the figures that are listed in this

09:33:39   25   confidential company fact sheet for the fourth

09:33:41   1   quarter of 2014?

09:33:43   2       A.  It looks like these check marks would be

09:33:45   3   consistent with the information that Mr. Ahmed

09:33:51   4   presented, and that they had recorded it.

09:33:56   5       Q.  And do you see that it's -- that in the top

09:34:00   6   right-hand corner, not quite in the corner, under

09:34:03   7   Explanation of Proposed Valuation, do you --

09:34:11   8       A.  On the first page, sir?

09:34:12   9       Q.  Yes, if you look at the screen, I'm

09:34:14  10   pointing --

09:34:15  11       A.  I'm sorry, yes.

09:34:16  12       Q.  Do you see that it says -- it describes the

09:34:22  13   transaction for 7 million dollars, 7 and a half

09:34:25  14   million dollar, and then it says, "We recommend

09:34:28  15   valuing the investment at the previously approved

09:34:31  16   valuation price per share.  This will result in a

09:34:35  17   gain on investment of 2.6 million dollars for the

09:34:38  18   quarter."

09:34:39  19       A.  Yes, I do see that.

09:34:40  20       Q.  And there's a check mark next to that

09:34:42  21   sentence, correct?

09:34:44  22       A.  There's multiple check marks, and it looks

09:34:47  23   like they were proofing the data.

09:34:48  24       Q.  Okay.  And a gain in 2.6 million dollars

09:34:52  25   would mean that the particular investment in the

09:34:55   1   I-Cubed shares was valued at 10.1 million dollars,

09:34:58   2   correct?

09:34:59   3       A.   Yes, based on the performance information

09:35:01   4   that Mr. Ahmed had presented.

09:35:03   5       Q.   There are check marks on here reflecting

09:35:06   6   that these people checked that data, correct?

09:35:09   7       A.   Agreed.

09:35:10   8       Q.   Do you know whether they just checked the

09:35:13   9   data that Mr. Ahmed gave, or are you just making

09:35:16   10   that assumption?

09:35:18   11       A.   The foundation of the valuation is based on

09:35:22   12   the performance information.

09:35:24   13       Q.   Now, this reflects the fourth quarter of

09:35:28   14   2014, correct?

09:35:28   15       A.   Yes, sir.

09:35:28   16       Q.   So this was prepared sometime early in 2015?

09:35:33   17       A.   Not necessarily.

09:35:35   18       Q.   Would you agree, it would be -- it had to be

09:35:37   19   prepared sometime at least towards the end of the

09:35:39   20   fourth quarter of 2014?

09:35:40   21       A.   Yes, sir.

09:35:40   22       Q.   Because the purchase wasn't made until late

09:35:43   23   October?

09:35:44   24       A.   Yes, sir.

09:35:44   25       Q.   All right.   And are you saying that the

09:35:50  1    personnel at Oak simply relied on the Data that
09:35:54  2    they've been provided before, and they don't do
09:35:56  3    any independent -- any independent determination
09:35:58  4    of whether the data is accurate?
09:36:00  5        A.   Different personnel at Oak have different
09:36:03  6    roles.
09:36:21  7        Q.   Okay.  Do you recall that in your
09:36:30  8    declaration, you're May 5th declaration, that
09:36:35  9    talked about the Company C transaction, you talked
09:36:38  10   about certain information that Mr. Ahmed gave that
09:36:44  11   you believed was inaccurate about the financial
09:36:47  12   status of Company C at the time of the 2014
09:36:51  13   transaction?
09:36:53  14       A.   Yes, we learned in the investigation that
09:36:55  15   the information was not accurate.
09:36:57  16       Q.   And do you recall that in paragraph 29(e) of
09:37:01  17   your declaration, you said "On October 8, 2014,
09:37:06  18   Mr. Ahmed received an e-mail with an attachment
09:37:09  19   showing that Company C's actual revenues for the
09:37:12  20   first eight months of 2014 were only 178.1
09:37:17  21   million, and were only 11.7 percent ahead of
09:37:20  22   revenues for the first eight most of 2013."  Do
09:37:23  23   you recall that you included that statement in
09:37:26  24   your declaration?
09:37:26  25       A.   It sounds familiar, but I cannot remember

09:37:29  1   the exact paragraph and the exact language.  But,

09:37:32  2   yes, that sounds --

09:37:33  3       Q.  Do you recall that the e-mail that is

09:37:36  4   referenced there, the October 8th e-mail, was not

09:37:38  5   attached to your declaration?

09:37:40  6       A.  I would not be able to recall that

09:37:43  7   specifically.

09:37:47  8       Q.  I will represent to you that it was not.

09:37:51  9   I'm going to show you what will be marked as

09:38:01  10  Exhibit J, Relief Defendant Exhibit J.

09:38:14  11      A.  Thank you.

09:38:37  12      Q.  And I will represent to you that this is a

09:38:40  13  document that was produced to us by Oak, pursuant

09:38:42  14  to subpoena.  If you will look at this, this is an

09:38:47  15  October 8, 2014 chain of e-mails between Mr. Ahmed

09:38:53  16  and a person named Ronak, R-O-N-A-K, Khichadia,

09:38:59  17  K-H-I-C-H-A-D-I-A.  Do you believe that this is

09:39:05  18  the October 8, 2014 e-mail to which you were

09:39:09  19  referring?

09:39:11  20      A.  I believe so.

09:39:14  21      Q.  OKAY.  Now, the data that you talked about

09:39:20  22  in your declaration, that was in that e-mail, is

09:39:23  23  not in the body of the e-mail, is it?

09:39:31  24      A.  There's an attachment.

09:39:34  25      Q.  Okay.  It appears there is an attachment to

09:39:37   1   the e-mail, correct?

09:39:38   2       A.   I believe so.

09:39:40   3           MR. DEITCH:   I should -- I'm sorry,

09:39:42   4   your Honor, I should move to admit this as

09:39:44   5   Relief Defendant Exhibit I.

09:39:46   6           THE COURT:   J.   It's J.

09:39:50   7           MR. DEITCH:   Excuse me, I apologize,

09:39:52   8   your Honor.

09:39:52   9           THE COURT:   Full exhibit.

09:39:53   10      Q.   So Ms. Ames, as you pointed out a moment

09:39:56   11  ago, there is an attachment to the e-mail.   And

09:39:59   12  that is the third page of the exhibit, correct?

09:40:03   13      A.   Yes.

09:40:07   14      Q.   And in the e-mail -- you have no way to

09:40:19   15  know, by the way, whether or not Mr. Ahmed opened

09:40:21   16  this attachment when he read this e-mail, do you?

09:40:24   17      A.   No.   No, I have no idea.

09:40:26   18      Q.   And do you recall that in your declaration,

09:40:34   19  in that same paragraph, you continued and said,

09:40:37   20  "This rate of increase was substantially below the

09:40:41   21  65 percent increase that was implied with the

09:40:45   22  estimated full year 2014 revenues of 515.6

09:40:50   23  million dollars reflected in Mr. Ahmed's

09:40:52   24  presentation to the Oak partners on October 27,

09:40:56   25  2014."   Do you recall that that sentence was in

09:40:59   1   your declaration?

09:41:00   2       A.  Yes, I recall generally, yes.

09:41:02   3       Q.  But in your declaration, you also did not

09:41:05   4   address that in the same e-mail attachment, there

09:41:10   5   was information about the twelve months ending

09:41:13   6   August 2014, correct?

09:41:15   7       A.  That's correct.

09:41:16   8       Q.  And in fact, for the twelve-month period

09:41:20   9   ending August 2014, compared to the same

09:41:25  10   twelve-month span ending August 2013, Company C

09:41:28  11   was actually doing much better, 360.1 million

09:41:35  12   dollars, versus 221.9 million dollars, correct?

09:41:40  13       A.  I can see the difference in those numbers,

09:41:43  14   and I see an increase between 13 and 14.

09:41:45  15       Q.  Would it surprise you for me -- would it

09:41:48  16   surprise you if I told you that that increase is

09:41:50  17   approximately 62 percent?

09:41:53  18       A.  It wouldn't surprise me.

09:41:55  19       Q.  And 62 percent is fairly close to the 65

09:41:58  20   percent that Mr. Ahmed was predicting for Company

09:42:02  21   C?

09:42:02  22       A.  I don't know that he -- that he was

09:42:04  23   referring to this same quotation.  This is a

09:42:06  24   trailing quote.  And the 65 percent seemed to

09:42:14  25   infer that it was more of a revenue.

09:42:17  1   Q.  But do you agree, 62 is fairly close to 65?

09:42:20  2   A.  The numbers are close, sir, yes, I agree.

09:42:24  3   Q.  Do you recall that in your -- in that same

09:42:26  4   paragraph of your declaration, you also referred

09:42:30  5   to a November 6, 2014 e-mail?

09:42:34  6   A.  Can I have a copy of my declaration?

09:42:37  7   Q.  Absolutely.

09:42:37  8   A.  Because I don't remember every word.

09:42:39  9   Q.  Just trying -- I was trying to do it a

09:42:43  10  little more quickly, but I'm happy to give it to

09:42:45  11  you.

09:42:45  12  A.  Thank you.

09:42:45  13       THE COURT:  Or just put it up on

09:42:47  14  the --

09:42:48  15       MR. DEITCH:  That's fine, if your

09:42:49  16  Honor is fine with it not being admitted as an

09:42:52  17  exhibit, since it's on the docket.

09:42:54  18       THE COURT:  It's an attachment to the

09:42:56  19  SEC papers, yes?

09:42:57  20       MR. DEITCH:  Yes.  That's fine, your

09:43:00  21  Honor.  I'm perfectly satisfied to do that.

09:43:02  22  Q.  This is the paragraph 29(e) that we've been

09:43:21  23  discussing.

09:43:22  24  A.  Thank you.

09:43:22  25  Q.  So do you see that in the middle of the

09:43:27  1   paragraph, starting where I have my pen, if you

09:43:32  2   look at the screen, it says on October 6, 2014,

09:43:36  3   less than a week after Oak purchased the I-Cubed

09:43:39  4   shares, Mr. Ahmed sent an e-mail to an investor in

09:43:42  5   Company C responding to a suggestion that Oak

09:43:45  6   participate in another financing round for Company

09:43:48  7   C.  In which Mr. Ahmed stated "With a flat-to-down

09:43:51  8   year, it is a nonstarter at Oak unfortunately for

09:43:54  9   me to even try and pitch"?

09:43:56  10       A.  Yes, I do see that.

09:44:00  11       Q.  Okay.  Do you know what information was

09:44:02  12  available to Mr. Ahmed on November 6th, that may

09:44:05  13  not have been available to him on October 27, when

09:44:10  14  the vote was taken on the investment?

09:44:13  15       A.  I don't know how I could know that.

09:44:15  16       Q.  And you did not attach this e-mail to your

09:44:19  17  affidavit.  I'll represent to you that it was not

09:44:21  18  attached to your affidavit.  Do you recall that

09:44:24  19  the November 6th e-mail discussed other issues why

09:44:28  20  Oak would not be interested in investing?

09:44:31  21       A.  I would have to see the e-mail.

09:44:33  22       Q.  Do you recall that -- am I correct that Oak

09:44:37  23  has a -- does Oak have a strict policy about

09:44:41  24  following on investments if they are new leads?

09:44:45  25       A.  I would not say it's a strict policy.

09:44:53  1      Q.  But as a general matter, Oak will not make a

09:44:56  2  new investment in a company in which it's already

09:44:59  3  invested, unless there's a new lead that gives

09:45:01  4  rise to that?

09:45:02  5      A.  No, I can't say that.

09:45:14  6      Q.  K.  Exhibit K.

09:45:24  7      A.  Thank you.

09:45:42  8      Q.  Ms. Ames, I have put before you what's been

09:45:44  9  marked as Exhibit K.  And do you see, this is a

09:45:49  10  November 6, 2014 exchange of e-mails between Mr.

09:45:53  11  Ahmed and that same individual, Mr. Khichadia?

09:45:58  12      A.  Yes, I do see that.

09:45:59  13      Q.  Was this the November 6th e-mail to which

09:46:01  14  you were referring?

09:46:02  15      A.  Yes, sir.

09:46:02  16      Q.  And in fact, that language that you quoted

09:46:05  17  appears in the e-mail?

09:46:09  18      A.  Yes, it does.

09:46:11  19      Q.  Okay.

09:46:12  20          MR. DEITCH:  Your Honor, I offer this

09:46:13  21  as Relief Defendant Exhibit K.

09:46:15  22          THE COURT:  Full exhibit.

09:46:21  23          MR. DEITCH:  I'm sorry, your Honor?

09:46:22  24          THE COURT:  Full exhibit.

09:46:23  25          MR. DEITCH:  Yes, it's just the two

09:46:25   1    pages.

09:46:25   2                    THE COURT:  I'm admitting it.

09:46:27   3                    MR. DEITCH:  Oh, I'm sorry.

09:46:28   4        Q.  I'm sorry, one moment.  If you look at the

09:46:44   5    discussion between Mr. Khichadia and Mr. Ahmed,

09:46:49   6    they are talking about the possibility, among

09:46:50   7    other things, they're talking about the

09:46:52   8    possibility of another Oak investment in Company

09:46:54   9    C, correct?

09:46:55   10       A.  In just reading this, it looks like that's

09:47:01   11   what they're talking about, sir.

09:47:03   12       Q.  And if you look at the e-mail that straddles

09:47:06   13   the two pages, the header actually appears on the

09:47:08   14   first page, but the language appears on the second

09:47:11   15   page.  Do you see that on the second page, in Mr.

09:47:17   16   Ahmed's e-mail, he says, in the last sentence,

09:47:21   17   "Happy for Dan and you to do so.  Oak now has a

09:47:25   18   strong policy of not doing follow on financing

09:47:27   19   without new external lead."

09:47:31   20       A.  I see that he said that.

09:47:32   21       Q.  Okay.  And is that absolutely an Oak policy?

09:47:36   22       A.  It is not a steadfast and inflexible policy.

09:47:42   23   It's an aspiration.

09:47:45   24       Q.  So when you say it is an aspiration, is it

09:47:49   25   the case that usually, Oak will not make a new

09:47:53  1   investment without a new external lead?

09:47:55  2       A.  No.

09:47:56  3       Q.  What do you mean when you say it's an

09:47:57  4   aspiration?

09:47:58  5       A.  It's nice to have a new investor.

09:48:11  6       Q.  Now, when -- I'm sorry, one moment.  I'm

09:48:35  7   missing an exhibit.

09:49:12  8            MR. DEITCH:  I'm sorry your Honor, if

09:49:13  9   you just give me a moment, I'm having trouble

09:49:16 10   finding an exhibit.

09:49:20 11            THE COURT:  I'd be happy to take a

09:49:22 12   five-minute --

09:49:23 13            MR. DEITCH:  No, it was just kind of

09:49:25 14   tucked in the front.

09:49:25 15       Q.  Ms. Ames, when the payment was made for

09:49:38 16   these I-Cubed shares in Company C, a request

09:49:44 17   was -- a request form was filled out in order for

09:49:47 18   the disbursement to be made by Oak, correct?

09:49:49 19       A.  Correct.

09:49:50 20       Q.  And that is, there is a regular form that

09:49:53 21   Oak uses for all of its wires and checks that are

09:49:57 22   issued for these investments, correct?

09:50:00 23       A.  There is a form that is used.

09:50:03 24       Q.  Okay.  I show you what's been marked as

09:50:08 25   Exhibit -- I'm having trouble with my alphabet

09:50:13   1   today.

09:50:13   2                    THE COURT:   L.

09:50:15   3                    MR. DEITCH:   Yes, I mis-marked it.

09:50:17   4   Q.   Show you what's been marked as Exhibit L.

09:50:23   5   A.   Thank you.

09:50:23   6   Q.   Ms. Ames, I have put before you what's been

09:50:43   7   marked as Exhibit L.   Are these two documents,

09:50:48   8   documents that reflect the issuance of the 7.5

09:50:51   9   million dollar payment for the Company C shares in

09:50:55  10   October 2014?

09:50:58  11   A.   These -- the second document is the

09:51:05  12   documents that you were just talking about.

09:51:06  13   Q.   The second page of exhibit L?

09:51:08  14   A.   I'm sorry, the second page, correct.

09:51:10  15   Q.   And the first page is a document that's

09:51:12  16   created by the bank that's involved with the wire?

09:51:15  17   A.   No.

09:51:16  18   Q.   Can you describe what is the first page?

09:51:18  19   A.   The first page is what the finance personnel

09:51:22  20   would -- it's the printout of them setting up the

09:51:27  21   wire in Silicon Valley Bank.

09:51:29  22   Q.   And together, these two documents are the --

09:51:34  23   are the documentary record of the issuance -- of

09:51:38  24   how the request was made for the issuance of the

09:51:40  25   payment, in this case to I-Cubed, correct?

09:51:44  1      A.  These are two of the documents of that

09:51:47  2   process.

09:51:48  3      Q.  Let's start on the second page of the

09:51:50  4   document.  And this is a form that was used for I

09:52:04  5   believe all of the payments that were described in

09:52:08  6   your two declarations that you filed in this

09:52:11  7   action, correct?

09:52:12  8      A.  This is a similar format.

09:52:15  9      Q.  So at the top of the form, up in the top

09:52:20  10  left -hand corner, it indicates that it was a

09:52:22  11  wire, correct?

09:52:23  12     A.  Correct.

09:52:23  13     Q.  And on the right side of this section, near

09:52:26  14  the top, there's a check mark to indicate the fund

09:52:29  15  to which the payment refers?

09:52:31  16     A.  That's correct.

09:52:32  17     Q.  In this case, Oak 13?

09:52:34  18     A.  Yes, sir.

09:52:34  19     Q.  And then the next section, moving downward,

09:52:39  20  describes the payment, in this case, the shares,

09:52:43  21  the per share price, and then the total payment,

09:52:45  22  correct?

09:52:46  23     A.  Correct.

09:52:46  24     Q.  Now, towards the bottom, I'm sorry, right

09:52:49  25  below that, it shows that it's paid to I-Cubed

09:52:52  1   Domains LLC?

09:52:53  2       A.   I see that.

09:52:54  3       Q.   And it refers to the portfolio company as

09:52:57  4   well, correct?

09:52:58  5       A.   I see that.

09:52:59  6       Q.   And this is information that's generally

09:53:02  7   included on this form for all of the payments that

09:53:05  8   were made?

09:53:06  9       A.   This is information that's provided

09:53:09 10   generally.

09:53:10 11       Q.   And then there's a narrative, a brief

09:53:13 12   narrative description of what the payment is for,

09:53:16 13   correct?

09:53:17 14       A.   In this case, yes.

09:53:18 15       Q.   All right.   Now, down near the bottom,

09:53:21 16   there's language about the approvals themselves.

09:53:25 17   And do you see that below where it says

09:53:29 18   "Approved," there's language that says "Forward

09:53:33 19   form signed by two partners, along with wire

09:53:36 20   instructions, Pre-Commitment Investment Report,

09:53:39 21   Schedule A, capitalization table and a copy of the

09:53:43 22   note agreement, when applicable, to the Finance

09:53:44 23   Department."   Are those the requirements that Oak

09:53:50 24   follows for the issuance of a wire or check?

09:53:53 25       A.   Those are generally the requirements.

09:53:56   1       Q.  And the purpose of having multiple

09:54:00   2   signatures is to ensure that more than one person

09:54:04   3   has looked at this request before the money goes

09:54:07   4   out, correct?

09:54:08   5       A.  That's one of the reasons.

09:54:09   6       Q.  One term that could be used, it's a form of

09:54:13   7   a control, a compliance control?

09:54:14   8       A.  It is a form of a control.

09:54:15   9       Q.  And in this case, Mr. Ahmed signed that he

09:54:19  10   was requesting the check, correct?

09:54:21  11       A.  Yes, sir.

09:54:21  12       Q.  And he is one of the two partners who signed

09:54:24  13   on the partner line?

09:54:26  14       A.  That's what it looks like, yes, sir.

09:54:28  15       Q.  You recognize his signature?

09:54:30  16       A.  Yes, sir.

09:54:30  17       Q.  Whose signature appears as the other

09:54:33  18   partner?

09:54:34  19       A.  Ed Glassmeyer.

09:54:36  20       Q.  So Mr. Glassmeyer approved the issuance of

09:54:38  21   this payment?

09:54:39  22       A.  Ed Glassmeyer signed this, yes.

09:54:41  23       Q.  And below that, it says "Approved by GAA."

09:54:45  24   Those are your initials, correct?

09:54:47  25       A.  That's right.

09:54:48   1      Q.   And every single one of these forms that

09:54:51   2   goes out is approved by you before the wire is

09:54:54   3   made, correct?

09:54:56   4      A.   I sign to confirm that the three executive

09:55:00   5   managing members have approved the investment.

09:55:08   6      Q.   And if we were to look at the wire request

09:55:12   7   forms of that sort, relating to the other

09:55:15   8   transactions that are described in your two

09:55:18   9   declarations, we would see the same routine of two

09:55:22   10  partners, plus your signature, on each form,

09:55:25   11  correct?

09:55:25   12     A.   If I was at the office, yes.

09:55:27   13     Q.   And if you were not at the office, am I

09:55:29   14  correct someone would contact you, and you would

09:55:32   15  verbally authorize them to sign on your behalf?

09:55:34   16     A.   That generally is what would happen.

09:55:36   17     Q.   Because leaving aside the actual physical

09:55:39   18  act of you affixing your signature, you are

09:55:43   19  approving each of those wires before they are

09:55:45   20  issued, correct?

09:55:46   21     A.   I'm communicating that the executive

09:55:48   22  managing members have in fact approved the

09:55:51   23  investment.

09:55:54   24     Q.   All right, you can put that aside.  We're

09:55:56   25  going to switch subjects.  Do you recall last

09:56:00　1　week, Mr. Heinke showing you a copy of the limited

09:56:06　2　partnership agreement for Oak 13, and you

09:56:09　3　discussed with him provisions in that agreement

09:56:11　4　about trades that are not allowed without the

09:56:14　5　approval of the Valuation Committee?

09:56:16　6　　　A.　I do recall that.

09:56:17　7　　　Q.　And do you recall that, if you will put --

09:56:22　8　actually, if you will pull out Exhibit 1, the SEC

09:56:26　9　Exhibit 1.

09:56:28　10　　　A.　It's right here.

09:56:29　11　　　Q.　It should be in that pile.  Okay, good.

09:56:31　12　　　A.　Right on top.

09:56:32　13　　　Q.　And if you will turn to the page that ends

09:56:34　14　with the Bates number in the bottom right-hand

09:56:36　15　corner, 337.

09:56:48　16　　　A.　Yes, I have got it.  Thank you.

09:56:50　17　　　Q.　And do you see that there's a small Roman

09:56:53　18　three and a capital A?

09:56:55　19　　　A.　Yes, I do see that.

09:56:56　20　　　Q.　And do you recall, that was one of the

09:56:58　21　provisions to which Mr. Heinke directed your

09:57:02　22　attention, talking about disclosures that --

09:57:05　23　excuse me, trades that may not be made without the

09:57:08　24　approval of the Valuation Committee?

09:57:11　25　　　A.　That is what is discussed in this section,

| | | |
|---|---|---|
| 09:57:13 | 1 | yes. |
| 09:57:13 | 2 | Q.  And do you recall, and I'll read to you from |
| 09:57:18 | 3 | the transcript, this is on page 88 of the |
| 09:57:20 | 4 | transcript from last week, Mr. Heinke asked you, |
| 09:57:23 | 5 | "Can you just explain for the Court what that |
| 09:57:25 | 6 | provision means? |
| 09:57:25 | 7 | "Answer:  What that means is we would be -- |
| 09:57:29 | 8 | general partner would be required to get Valuation |
| 09:57:33 | 9 | Committee approval if in fact they owned a |
| 09:57:35 | 10 | position in a contemplated portfolio company |
| 09:57:38 | 11 | investment. |
| 09:57:39 | 12 | "Question:  And does this apply just to the |
| 09:57:40 | 13 | general partners' personal ownership? |
| 09:57:43 | 14 | "Answer:  No, it would be any interest.  It |
| 09:57:45 | 15 | would transcend the family." |
| 09:57:48 | 16 | Do you recall those questions and answers |
| 09:57:50 | 17 | from last week? |
| 09:57:51 | 18 | A.  I do. |
| 09:57:52 | 19 | Q.  In fact, this provision doesn't say anything |
| 09:57:56 | 20 | about ownership of an asset by the family members |
| 09:58:01 | 21 | of members of the general partner, does it? |
| 09:58:04 | 22 | A.  Not this provision. |
| 09:58:09 | 23 | Q.  Now, if you will turn to the page with Bates |
| 09:58:13 | 24 | number ending 343. |
| 09:58:22 | 25 | A.  Yes, I have that. |

09:58:23  1       Q.   And there, there's a provision, lower case

09:58:28  2   B, small Roman one.

09:58:31  3       A.   I see that.

09:58:33  4       Q.   Do you recall that this was the other

09:58:35  5   provision of the agreement to which Mr. Heinke

09:58:37  6   directed your attention regarding trades that

09:58:40  7   cannot be made without Valuation Committee

09:58:42  8   approval?

09:58:43  9       A.   Yes, I do recall that.

09:58:44  10      Q.   This section, likewise, does not say

09:58:48  11  anything about ownership of an asset or an

09:58:50  12  investment by family members of a member of the

09:58:53  13  general partner, does it?

09:58:55  14      A.   Not in this specific provision.

09:59:03  15      Q.   Do you recall that in your second

09:59:05  16  declaration that you made, you talked about a

09:59:10  17  number of transactions involving what you called

09:59:12  18  Company G?

09:59:14  19      A.   I remember a Company G, yes.

09:59:17  20      Q.   And do you recall that there was one

09:59:19  21  transaction in which, in your declaration, you

09:59:23  22  stated that Mr. Ahmed had misrepresented the

09:59:25  23  proper exchange rate between US dollars and the

09:59:29  24  Korean currency in which the trade was being made?

09:59:32  25      A.   Can you pull up the declaration, please?

09:59:35   1       Q.   You know, I don't have a copy of it
09:59:39   2    available, so let me try this a different way.  Do
09:59:42   3    you recall generally that there was a transaction
09:59:44   4    involving a Korean company in which the allegation
09:59:49   5    is that Oak overpaid for its investment because
09:59:54   6    the wrong exchange rate was used?
09:59:57   7       A.   I do recall that.
09:59:59   8       Q.   And do you recall that this occurred in late
10:00:03   9    2007?
10:00:07  10       A.   Generally, I recall 2007.  There are a lot
10:00:11  11    of transactions, so --
10:00:13  12       Q.   Okay.  And the mistake in the exchange rate
10:00:16  13    was not discovered until after Mr. Ahmed's arrest
10:00:19  14    for on the insider trading charges, correct?
10:00:23  15       A.   Correct.
10:00:23  16       Q.   So it's your testimony that -- do you recall
10:00:27  17    that the transaction in question, Oak disbursed 47
10:00:32  18    and a half million dollars?
10:00:33  19       A.   It would be nice to have the declaration to
10:00:35  20    confirm that.
10:00:36  21       Q.   Do you agree that it was --
10:00:38  22       A.   I remember generally a transaction for 47.5
10:00:41  23    million in Korea.
10:00:44  24       Q.   Okay.  Is it your understanding and your
10:00:49  25    testimony that when Oak disbursed the money for

10:00:52   1   that transaction, no one checked to see whether

10:00:55   2   the proper exchange rate was being used?

10:01:01   3       A.   At that time, Mr. Ahmed had managed the FX

10:01:08   4   transaction.

10:01:09   5       Q.   And no one -- there's no protocol that Oak,

10:01:12   6   for a second or even a third person to check to

10:01:15   7   make sure the right exchange rate is applied?

10:01:17   8       A.   I don't recall at this time that that was

10:01:20   9   done.

10:01:20  10       Q.   And are Oak's funds operations reviewed by

10:01:25  11   auditors, inside or outside auditors?

10:01:29  12       A.   We have auditors, yes.

10:01:30  13       Q.   And is it the case that between 2007, when

10:01:34  14   that transaction took place, and 2015, when Mr.

10:01:38  15   Ahmed was arrested, no one checked to see whether

10:01:41  16   the proper interest rate had been applied to the

10:01:43  17   transaction -- excuse me, I said interest rate; I

10:01:47  18   meant exchange rate.

10:01:49  19       A.   I believe we funded in US dollars and were

10:01:52  20   carrying it initially on our books in US dollars.

10:01:55  21   So I don't know that that would have risen to the

10:01:58  22   attention.

10:02:00  23       Q.   What led you to go check the exchange rate

10:02:03  24   when you were preparing your declaration?

10:02:07  25       A.   It was the investigation of all the fraud

10:02:09   1   Mr. Ahmed committed.

10:02:11   2       Q.  And what made you think that the exchange

10:02:14   3   rate might be incorrect?

10:02:15   4       A.  We had reason to question everything.

10:02:18   5       Q.  And it wasn't very hard to check the

10:02:20   6   historical exchange rate, correct?

10:02:22   7       A.  No, sir.

10:02:29   8       Q.  So we talked a couple times, now you have in

10:02:35   9   front of you as well, your declaration that you

10:02:37   10  executed on May 5th, 2015.  Do you recall that

10:02:42   11  that was the date on which you executed your

10:02:44   12  declaration?

10:02:45   13      A.  May 5th?  May 5th is when I executed.

10:02:51   14      Q.  Yes, you recall that you executed this on

10:02:55   15  May 5th, 20 --

10:02:57   16      A.  I do recall that, yes.

10:03:00   17      Q.  And at the time you executed your

10:03:02   18  declaration, you knew that the SEC intended to

10:03:06   19  file it in court in support of its request for a

10:03:08   20  Temporary Restraining Order, correct?

10:03:09   21      A.  Yes, I did understand that.

10:03:12   22      Q.  And in fact, it was filed the following day,

10:03:13   23  May 6th?

10:03:14   24      A.  That's my understanding, yes.

10:03:16   25      Q.  And you knew that part of the TRO was going

10:03:18    1    to be to freeze assets?

10:03:20    2         A.   Yes, I did know that.

10:03:21    3         Q.   And are you aware that the Court issued the

10:03:25    4    Temporary Restraining Order requested by the SEC

10:03:28    5    on May 7, 2015?

10:03:31    6         A.   I know that it was issued, I believe it was

10:03:34    7    the 7th.

10:03:35    8         Q.   And at the time that -- when these events

10:03:39    9    were going on in early May, you were aware that

10:03:42    10   the TRO was issued fairly quickly after the SEC

10:03:47    11   made its application, correct?

10:03:51    12        A.   If you're speaking for the period after the

10:03:54    13   7th, then I would have known that -- I'm a little

10:03:57    14   confused by the timeline that you want me to refer

10:03:59    15   to.

10:03:59    16        Q.   You executed your declaration on May 5?

10:04:02    17        A.   Yes, sir.

10:04:02    18        Q.   You knew it was getting filed in court?

10:04:06    19        A.   Yes, I did.

10:04:07    20        Q.   After you had executed the declaration, you

10:04:10    21   knew within a fairly short time that the TRO had

10:04:14    22   actually been granted, correct?

10:04:15    23        A.   Yes.

10:04:19    24        Q.   Do you recall when you saw the TRO?

10:04:20    25        A.   No.

10:04:22   1    Q.   Do you believe that it was within a week of

10:04:25   2  when you executed your declaration?

10:04:28   3    A.   That sounds, you know, like probably the

10:04:31   4  right timeframe.

10:04:33   5    Q.   Now, Mr. Ahmed had an employment contract

10:04:36   6  with Oak Management Corporation, correct?

10:04:39   7    A.   Yes.

10:04:40   8    Q.   And that agreement describes the process by

10:04:55   9  which termination for cause can take place,

10:04:59  10  correct?

10:04:59  11    A.   Yes, there's language about termination.

10:05:02  12    Q.   Okay.  By May 5th, Oak knew that at least if

10:05:13  13  these allegations were true, that Mr. Ahmed had

10:05:16  14  committed fraud against the company or against the

10:05:19  15  company's investors or assets, correct?

10:05:21  16    A.   Correct.

10:05:22  17    Q.   On May 19, Mr. Ahmed was sent a letter

10:05:31  18  informing him that he had been terminated,

10:05:33  19  correct?

10:05:34  20    A.   Yes.

10:05:36  21    Q.   Do you know why a decision was made at that

10:05:38  22  time to terminate Mr. Ahmed, as opposed to earlier

10:05:43  23  or later?

10:05:44  24    A.   Earlier or later than when?

10:05:46  25    Q.   Earlier or later than May 19.

10:05:53   1      A.   He was notified of the termination, I

10:05:57   2   believe on the 8th.  And then there was a process

10:06:00   3   that culminated in the letter he received on the

10:06:15   4   19th.

10:06:15   5      Q.   So Mr. Ahmed was sent a letter, you believe

10:06:20   6   on May 8th, informing him that the company

10:06:23   7   intended to terminate him, correct?

10:06:27   8      A.   That was the essence of the letter.

10:06:29   9      Q.   And that's because his employment agreement

10:06:31   10  included a requirement that he be given notice of

10:06:35   11  the intention, and a 30-day cure period.  Correct?

10:06:41   12     A.   Yes, that's my understanding of the process.

10:06:43   13     Q.   And in the May 8th letter, do you recall

10:06:47   14  who -- if it was from Mr. Glassmeyer?

10:06:49   15     A.   Yes, I do recall it was from Mr. Glassmeyer.

10:06:52   16     Q.   And do you recall that in the letter, Mr.

10:06:54   17  Glassmeyer said that they believed that this was

10:06:57   18  not curable?

10:06:58   19     A.   I believe that language was in that letter,

10:07:01   20  yes, sir.

10:07:01   21     Q.   So on May 18th, do you recall that the board

10:07:06   22  assembled and appointed an employment committee to

10:07:10   23  take action regarding the termination of Mr.

10:07:12   24  Ahmed?

10:07:12   25     A.   Yes.

10:07:13  1    Q.  And on that same day, the employment -- the

10:07:16  2  members of the employment committee, who were the

10:07:18  3  four -- the members of the employment committee

10:07:21  4  were the four managing partners of Oak, correct?

10:07:24  5    A.  I believe the employment committee also

10:07:27  6  included the general partners, the active general

10:07:30  7  partners.

10:07:31  8    Q.  And do you recall that on that same day, May

10:07:34  9  18th, the employment committee executed the

10:07:36  10  unanimous consent to terminate Mr. Ahmed's

10:07:39  11  employment?

10:07:40  12    A.  Yes, sir.

10:07:40  13    Q.  And then he was informed the following day,

10:07:43  14  May 19th, of that action?

10:07:45  15    A.  Yes, sir.

10:07:45  16    Q.  Mr. Ahmed's employment agreement included

10:07:55  17  information about the different forms of

10:07:58  18  compensation that he received during his

10:08:00  19  employment at Oak, correct?

10:08:01  20    A.  It would include that, yes, sir.

10:08:03  21    Q.  So for an example, Mr. Ahmed received a base

10:08:07  22  salary?

10:08:07  23    A.  Yes, sir.

10:08:08  24    Q.  Do you recall what his base salary was in

10:08:10  25  2014 and 2015?

10:08:12  1    A.  I don't know exactly.  It was around a

10:08:16  2  million dollars.

10:08:17  3    Q.  And Mr. Ahmed also was entitled to -- might

10:08:26  4  be entitled to receive disbursement of the amounts

10:08:30  5  listed in the capital accounts -- let me rephrase

10:08:37  6  that.  Let me strike that.

10:08:39  7         Oak also had a thing called IPP; is that

10:08:43  8  Incentive Profit Plan?

10:08:44  9    A.  Incentive Performance Plan.

10:08:46  10    Q.  Incentive Performance Plan.  Could you

10:08:49  11  describe how payments were -- how the amounts of

10:08:53  12  payments to be made under IPP were calculated?

10:08:58  13    A.  Yes.  IPP is a bonus plan for investing

10:09:04  14  partners that -- specific to any projects in which

10:09:08  15  they had a role or were allocated participation

10:09:12  16  points.  So that would include investment projects

10:09:15  17  where Mr. Ahmed was both a project manager, but

10:09:19  18  also as what we call a buddy.  And to be eligible

10:09:24  19  for any payment under that plan, it would -- there

10:09:29  20  is what is called -- there's a ledger that is

10:09:32  21  maintained, that transcends all funds, all

10:09:35  22  investments.  It only includes realized gain,

10:09:39  23  realized loss, and unrealized loss.  And to be

10:09:44  24  eligible for a payment under that plan, the sum of

10:09:48  25  all those variables, less any payments, would have

10:09:54  1   to be positive.

10:09:55  2       Q.  Okay.  So within -- for each fund in which

10:09:59  3   Mr. -- or is it by a fund-by-fund, or

10:10:03  4   project-by-project basis?

10:10:04  5       A.  I don't know where your question is going,

10:10:06  6   so I don't know how to answer it.

10:10:08  7       Q.  Mr. Ahmed was involved with several

10:10:10  8   different Oak funds, correct?

10:10:12  9       A.  Yes, he was.

10:10:13  10      Q.  And within each of those funds, there were

10:10:15  11  separate investments in different companies,

10:10:18  12  correct?

10:10:18  13      A.  Yes, sir.

10:10:19  14      Q.  All right.  And you described having a role

10:10:22  15  as a manager or a buddy?

10:10:23  16      A.  Yes, sir.

10:10:24  17      Q.  That's a role that Mr. Ahmed would have with

10:10:27  18  respect to a particular investment, correct?

10:10:29  19      A.  Yes.

10:10:30  20      Q.  So when we talk about the calculation of IPP

10:10:33  21  that you just described, that has to do with each

10:10:36  22  particular investment, not with the fund as a

10:10:38  23  whole, correct?

10:10:39  24      A.  Oh, I see your point.  Yes, sir.  It's

10:10:42  25  company specific, as opposed to fund specific.

10:10:45  1      Q.  All right.  So at what point are payments
10:10:50  2  actually disbursed, representing this IPP amount,
10:10:55  3  for your particular project?
10:10:57  4      A.  At what point?  Well, again, it would
10:11:01  5  require a -- generally require a positive balance.
10:11:07  6  So the one example of when the payment could be
10:11:10  7  made is when there was a realized event, and that
10:11:15  8  the realized event put that person in a positive
10:11:19  9  ledger.  That's one example of when you could get
10:11:22 10  a payment.
10:11:22 11      Q.  And during the course of his employment, Mr.
10:11:26 12  Ahmed did receive IPP payments at different times,
10:11:30 13  correct?
10:11:30 14      A.  He received IPP payments at different times,
10:11:32 15  yes.
10:11:33 16      Q.  And somewhere in Oak's records, there is a
10:11:37 17  ledger that would reflect the amount of IPP
10:11:41 18  allocated to Mr. Ahmed as of the date of his
10:11:44 19  termination, correct?
10:11:47 20      A.  It would be the sum of the project, you
10:11:51 21  know, the project participation phenomena, less
10:11:54 22  any payments to date.  That would be a balance
10:11:58 23  that would indicate in that plan, where his
10:12:02 24  eligibility stood.
10:12:04 25      Q.  Okay.  And with respect to a particular

10:12:06  1   project, Mr. Ahmed might have a positive balance,

10:12:12  2   but not yet be entitled to receive cash until

10:12:15  3   certain conditions were fulfilled, correct?

10:12:18  4       A.   It's the sum of all of his projects.   He

10:12:21  5   could have a wonderfully successful project.   But

10:12:27  6   if he also had not wonderful outcomes, then they

10:12:31  7   would be netted together and that net result is

10:12:35  8   what would drive the ledger, less any payments

10:12:38  9   that he had received.

10:12:39  10      Q.   Did Mr. Ahmed have a positive balance in his

10:12:42  11  IPP account at the time of his termination?

10:12:45  12      A.   No.

10:12:58  13      Q.   Another portion of Mr. Ahmed's compensation

10:13:02  14  is what Oak refers to as capital call bonuses,

10:13:06  15  correct?

10:13:07  16      A.   Yes, sir.

10:13:12  17      Q.   Let me ask one last question about IPP.

10:13:14  18  What is the -- what does Oak use as the name of

10:13:19  19  the report that would include this ledger that

10:13:22  20  reflects an IPP balance?

10:13:29  21      A.   We have a balance -- there's a data base

10:13:34  22  that would -- you can report in summary for all

10:13:37  23  the partners.   There's like a balance report, that

10:13:40  24  would be one example.

10:13:41  25      Q.   Have you heard the term plus/minus report?

10:13:44  1     A.  Yes.

10:13:45  2     Q.  Is that a different report?

10:13:46  3     A.  It has nothing to do with IPP.

10:13:48  4     Q.  What does the plus/minus report reflect?

10:13:51  5     A.  That's the preparation document that's used

10:13:54  6  when we do quarter end valuations.

10:14:00  7     Q.  Okay.  So we were talking about capital call

10:14:04  8  bonuses.

10:14:05  9     A.  Okay.

10:14:05  10     Q.  Am I correct that capital call bonuses were

10:14:09  11  money that was advanced by Oak Management

10:14:14  12  Corporation to fund Mr. Ahmed's portion of a

10:14:18  13  general partners capital contribution to a fund?

10:14:23  14     A.  No.

10:14:24  15     Q.  Okay, can you describe what capital call

10:14:27  16  bonuses are?

10:14:29  17     A.  Capital call bonuses are not an advance,

10:14:33  18  because that made it sound like a loan, to me.

10:14:36  19  What it is, is it's a bonus, but the bonus is --

10:14:41  20  is given, and with a very specific intention of

10:14:43  21  immediately returning the -- the net result.  So

10:14:50  22  after tax balance, to satisfy a capital call need,

10:14:56  23  or in anticipation of satisfying a capital call

10:14:59  24  need.

10:14:59  25     Q.  Okay.  I chose the word poorly.  The general

10:15:04   1    partner LLCs of each fund are required to make

10:15:08   2    capital contributions to the fund, correct?

10:15:11   3         A.   Correct.

10:15:11   4         Q.   And as a manager member or a member of the

10:15:14   5    general partners, Mr. Ahmed was required to

10:15:16   6    contribute a portion of that capital -- that

10:15:18   7    capital contribution by the general partner?

10:15:21   8         A.   Yes.

10:15:21   9         Q.   Oak Management Corporation would give a

10:15:24   10   bonus to Mr. Ahmed for the purpose of facilitating

10:15:28   11   his payment of that portion of the capital?

10:15:31   12        A.   There was a direct link.

10:15:33   13        Q.   And Oak would give him more than the amount

10:15:36   14   that he had to put in his capital, so that it

10:15:39   15   would cover the personal income tax he would need

10:15:41   16   to pay on that bonus?

10:15:43   17        A.   He and all -- everybody.

10:15:45   18        Q.   Right.  He received it in the same way that

10:15:47   19   other partners --

10:15:48   20        A.   Yes.

10:15:49   21        Q.   -- who were managing members or members

10:15:50   22   received it?

10:15:51   23        A.   Yes, sir.

10:15:52   24        Q.   And those capital call bonuses become part

10:15:59   25   of Mr. Ahmed's capital account in that particular

10:16:02   1   fund, correct?

10:16:05   2      A.   When the called money is invested into the

10:16:13   3   fund.

10:16:14   4      Q.   He has a capital account that reflects,

10:16:17   5   among other things, the capital he contributed,

10:16:20   6   some or all of that will be capital that he was

10:16:23   7   able to contribute because of the bonus that Oak

10:16:26   8   gave him?

10:16:27   9      A.   That sounds right.

10:16:28   10     Q.   All right.

10:16:33   11          THE COURT:   If you are moving to a

10:16:34   12   separate area, should we take a five-minute

10:16:36   13   recess?

10:16:37   14          MR. DEITCH:   That's fine, your Honor.

10:16:39   15          THE COURT:   You're not close to

10:16:41   16   finishing with her, are you?

10:16:42   17          MR. DEITCH:   I am fairly close.

10:16:45   18          THE COURT:   What does that mean.

10:16:48   19          MR. DEITCH:   Depending on how easily

10:16:50   20   it goes, 15 to 20 minutes.

10:16:52   21          THE COURT:   Take a five-minute

10:16:53   22   recess.

10:30:01   23          (R E C E S S)

10:30:01   24          THE COURT:   All right, please be

10:30:02   25   seated and we will have continued testimony.

10:30:07  1    You may proceed.

10:30:08  2              MR. DEITCH:  Thank you, your Honor.

10:30:10  3    BY MR. DEITCH:

10:30:10  4        Q.  Ms. Ames, you're familiar with the term

10:30:14  5    "carried interest"?

10:30:15  6        A.  Yes, I am.

10:30:16  7        Q.  And do you agree that one way to describe

10:30:19  8    carried interest is that it is a bookkeeping entry

10:30:23  9    that defines an allocation of the profit interest

10:30:26  10   the general partner has in the performance of the

10:30:29  11   underlying fund, including realized and unrealized

10:30:33  12   gains and losses?

10:30:34  13       A.  It's an allocation of the realized and

10:30:37  14   unrealized gains and losses.

10:30:39  15       Q.  Okay.  And the general partner receives a

10:30:42  16   portion of those unrealized, or has a carried

10:30:46  17   interest equal to, a portion of those unrealized

10:30:49  18   and realized gains and losses?

10:30:52  19       A.  No.

10:30:57  20       Q.  Okay, to the extent the fund has realized

10:31:01  21   and unrealized gains and losses, a portion of

10:31:05  22   that, if you were to calculate the general

10:31:07  23   partners' carried interest, is equal to a

10:31:10  24   percentage of those unrealized and realized gains

10:31:14  25   and losses of the fund?

10:31:15  1     A.  No.

10:31:17  2     Q.  Okay.  When you talked about -- you said

10:31:22  3  that it was an allocation of the profit interest

10:31:25  4  the general partner has in the performance of the

10:31:28  5  underlying fund, correct?

10:31:31  6     A.  It's an allocation, yes, of the profit.

10:31:34  7     Q.  Okay.  And that includes -- and the

10:31:37  8  calculation of that includes both realized and

10:31:40  9  unrealized gains and losses?

10:31:43  10     A.  The allegations include both realized and

10:31:47  11  unrealized.

10:31:47  12     Q.  And individuals, individual Oak partners,

10:31:51  13  who are managing members, or members of the

10:31:53  14  general partners, --

10:31:55  15     A.  Yes.

10:31:56  16     Q.  -- are allocated a portion of the general

10:31:58  17  partners' carried interest in a capital account?

10:32:01  18     A.  There is a bookkeeping allocation.

10:32:08  19     Q.  And Mr. Ahmed had capital accounts with a

10:32:11  20  number of different funds by virtue of his role as

10:32:14  21  a managing member, or member, of the general

10:32:17  22  partner of those funds?

10:32:18  23     A.  That's correct.

10:32:19  24     Q.  If you look, I have placed before you Relief

10:32:24  25  Defendant Exhibit M.

10:32:29  1      A.   Yes, I see that.

10:32:30  2      Q.   Are these documents, are these the

10:32:35  3  statements of the balance of Mr. Ahmed's capital

10:32:39  4  accounts for the funds in which he was either the

10:32:43  5  managing member -- a managing member or a member

10:32:46  6  of the general partner?

10:32:47  7      A.   This is the bookkeeping statement of the

10:32:50  8  allocations of the different variables.

10:32:53  9      Q.   When Mr. Ahmed was terminated, Oak exercised

10:33:02  10  a contractual right under the operating agreement

10:33:06  11  to forfeit his interest in these capital accounts,

10:33:09  12  correct?

10:33:10  13      A.   Mr. Ahmed forfeited his carried interest

10:33:17  14  account by virtue of his actions.

10:33:20  15      Q.   And when you say his carried interest that

10:33:23  16  he forfeited, calculated in the statements that

10:33:27  17  are in Exhibit M, correct?

10:33:30  18      A.   Not all of them.

10:33:32  19      Q.   He didn't -- you mean he didn't forfeit all

10:33:34  20  of them?

10:33:36  21      A.   Correct.

10:33:37  22      Q.   And we will get to that in a moment.  And

10:33:39  23  the particular statement that is in Exhibit M is

10:33:42  24  the -- shows the balances of March 31, 2015.  Is

10:33:47  25  that, am I correct that by -- under the terms of

| | | |
|---|---|---|
| 10:33:50 | 1 | the operating agreements, Mr. Ahmed's termination |
| 10:33:55 | 2 | is as of the end of the previous fiscal quarter? |
| 10:34:00 | 3 | A.  I believe -- yes, I believe that's correct. |
| 10:34:03 | 4 | Q.  And so these capital accounts reflect the |
| 10:34:07 | 5 | state of his capital accounts at the moment they |
| 10:34:11 | 6 | were forfeited, correct? |
| 10:34:12 | 7 | A.  Prior to forfeiture. |
| 10:34:14 | 8 | Q.  Just prior to forfeiture, okay. |
| 10:34:16 | 9 | MR. DEITCH:  Your Honor, I ask |
| 10:34:19 | 10 | Exhibit M be admitted. |
| 10:34:21 | 11 | MR. HEINKE:  No objection. |
| 10:34:21 | 12 | THE COURT:  Full exhibit. |
| 10:34:28 | 13 | Q.  Okay.  If you page through Exhibit M, it has |
| 10:34:34 | 14 | balances for Oak funds 10, 11, 12 and 13, as well |
| 10:34:42 | 15 | as Oak 11-A, 12-A and 13-A, correct? |
| 10:34:47 | 16 | A.  That's what it looks like, yes. |
| 10:34:49 | 17 | Q.  The three capital acts that have an A after |
| 10:34:54 | 18 | them, 11-A, 12-A, 13-A, were not part of what Mr. |
| 10:35:00 | 19 | Ahmed forfeited, correct? |
| 10:35:02 | 20 | A.  This bookkeeping allocation is the Dash As, |
| 10:35:06 | 21 | are not part of the forfeiture. |
| 10:35:07 | 22 | THE COURT:  I'm sorry, where is |
| 10:35:08 | 23 | the -- oh, okay the Dash A is up on the fund |
| 10:35:11 | 24 | line? |
| 10:35:12 | 25 | THE WITNESS:  On the fund line, your |

10:35:13   1   Honor.

10:35:15   2            MR. DEITCH:  Your Honor, on the

10:35:16   3   second -- first page --

10:35:18   4            THE COURT:  The first, third --

10:35:19   5            MR. DEITCH:  The third page, and the

10:35:21   6   fifth page.

10:35:22   7            THE COURT:  Got it, thank you.

10:35:24   8    Q.  Could you explain why those particular

10:35:29   9   interests were not forfeited?  How are they

10:35:32  10   different from the others?

10:35:34  11    A.  These Dash -- well, if we can just call it

10:35:39  12   Dash A accounts, are different because they're

10:35:41  13   actually what we referred to as an LP interest.

10:35:45  14   The accounts where carried interest potential

10:35:50  15   exists, we invest generally one percent of the

10:35:54  16   capital.  If the general partner is going to

10:35:57  17   commit in excess of one percent of the fund

10:36:00  18   capital, that excess amount is put into these Dash

10:36:05  19   A accounts.

10:36:07  20            MR. DEITCH:  And your Honor, I will

10:36:09  21   just inform the court, and I'm sure the SEC will

10:36:11  22   agree, those A accounts are in fact part of the

10:36:15  23   SEC freeze.

10:36:16  24            MR. HEINKE:  That's right, your

10:36:20  25   Honor.

10:36:20  1      Q.  Referring to the accounts for 10, 11, 12 and

10:36:24  2  13, that were forfeited by Oak --

10:36:29  3      A.  By Mr. Ahmed, yes.

10:36:31  4      Q.  By Mr. Ahmed.  The total for those accounts

10:36:36  5  as of March 31, 2015 -- well, it's set forth on

10:36:43  6  those statements, correct, the balance?

10:36:49  7      A.  The allocations.  It is not a balance in a

10:36:52  8  bank account.  It is an allocation at a point in

10:36:54  9  time.

10:36:54  10     Q.  And these are -- these capital accounts, at

10:37:00  11  the end of the life of the fund, if certain

10:37:02  12  conditions are made, these do become in fact cash

10:37:06  13  payments, or could become cash payments, that are

10:37:09  14  made to the holders of each capital account,

10:37:11  15  correct?

10:37:11  16     A.  It's subject to multiple contingencies and I

10:37:16  17  can't predict the ultimate fund activity.

10:37:19  18     Q.  Okay.  For example, all of the investments

10:37:22  19  by the limited partners have to be repaid, the

10:37:25  20  original investments, before the carried interest

10:37:28  21  capital accounts are actually disbursed to the --

10:37:32  22     A.  Before any carried is disbursed to the

10:37:34  23  general partner, our investors need to return

10:37:38  24  their full contribution.

10:37:40  25     Q.  Has Oak distributed carried interest before,

10:37:44   1   on its funds?

10:37:45   2      A.  Yes.

10:37:47   3      Q.  And the value of these particular funds, 10,

10:37:52   4   11, 12 and 13, was much greater as of December 31,

10:37:56   5   2014, than it was as of the date on these, March

10:38:00   6   31, 2015, correct?

10:38:03   7      A.  These are not fund balances.  But yes, the

10:38:09   8   fund performance from December to March, in

10:38:12   9   aggregate, declined.

10:38:14  10      Q.  And do you know, as you sit here today, how

10:38:17  11   those balances have changed between March 31 and

10:38:21  12   June 30th of this year?

10:38:23  13      A.  What balances are you specifically --

10:38:26  14      Q.  For example, if we were looking at this same

10:38:29  15   form for these capital accounts as of June 30th,

10:38:33  16   2013, for any particular of these funds, do you

10:38:38  17   know whether they've gone up or down?

10:38:41  18      A.  I believe they've all gone down.

10:38:42  19            THE COURT:  I'm sorry, as of June

10:38:44  20   30th, what year?

10:38:47  21            MR. DEITCH:  This year.

10:38:48  22      A.  Oh, I'm sorry, I was thinking December to

10:38:50  23   March.  Can you please repeat the question?

10:38:52  24      Q.  Yes, between the date on this document,

10:38:55  25   Exhibit M, March 31, 2015, and June 30th, the end

10:39:00  1  of last month, --

10:39:01  2      A.  Yes.

10:39:01  3      Q.  -- do you know whether the fund balances

10:39:03  4  have gone up or down?

10:39:05  5      A.  Down.

10:39:08  6      Q.  When Oak fills out it's tax returns, it

10:39:13  7  reflects a value, an existing value for carried

10:39:18  8  interest, doesn't it?  Did the general partner

10:39:23  9  LLCs file tax returns?

10:39:25  10     A.  Yes.

10:39:25  11     Q.  And part of those tax returns includes a

10:39:28  12 report on the balance of their carried interest,

10:39:31  13 correct?

10:39:32  14     A.  A tax return would include taxable items.

10:39:38  15     Q.  On the tax return that is filed, whether tax

10:39:41  16 is paid on it or not, there is a reflection of the

10:39:45  17 carried interest balance as of that date, isn't

10:39:49  18 there?

10:39:49  19     A.  Yes, there is a balance that is listed.

10:39:52  20     Q.  Okay.  One last subject.  The investors in

10:39:57  21 the account, in the funds, also have the same kind

10:40:04  22 of capital account in the sense that they have an

10:40:08  23 account that reflects the value of their

10:40:10  24 investment at different points in time, correct?

10:40:13  25     A.  No.

10:40:14   1       Q.   Does Oak report to its investors, on a
10:40:17   2   quarterly basis, the value of each investor's
10:40:20   3   account?
10:40:20   4       A.   Yes.
10:40:21   5       Q.   And the ability of the investors to retrieve
10:40:26   6   that as cash is uncertain at that time, correct?
10:40:30   7       A.   No, it's -- there's not a cash balance.
10:40:34   8       Q.   Right, there's not a cash balance.  It
10:40:36   9   depends on how the fund does between then and when
10:40:39  10   the fund ends, correct?
10:40:41  11       A.   Yes, yes.
10:40:41  12       Q.   So for an investor looking at the value of
10:40:44  13   his or her investment now, that does not tell you
10:40:49  14   what the value of his or her investment will be at
10:40:52  15   the time when he or she actually cashes out?
10:40:54  16       A.   Yes, similar to most investments.
10:40:57  17       Q.   Okay.  And similar to Mr. Ahmed's capital
10:40:59  18   accounts?
10:41:01  19       A.   It's not similar.  There's different
10:41:05  20   characteristics to Mr. Ahmed, the account here,
10:41:11  21   and the investors.
10:41:13  22       Q.   Okay.
10:41:14  23             MR. DEITCH:  Thank you very much.
10:41:16  24             THE WITNESS:  Thank you.
10:41:17  25             THE COURT:  Redirect?

10:41:19  1           MR. HEINKE:  Briefly, your Honor.

10:41:30  2           Your Honor, before I question, I just

10:41:32  3  note as a procedural matter, as the Court knows,

10:41:35  4  counsel for the relief defendant requested the

10:41:38  5  time be split --

10:41:38  6           THE COURT:  Yes.

10:41:38  7           MR. HEINKE:  -- between the parties.

10:41:39  8  It appears to us that counsel has used a little

10:41:42  9  over an hour of their time at this point.  I

10:41:45  10  think the total time will probably be about an

10:41:47  11  hour and 45 minutes per side.  I'm going to

10:41:49  12  proceed quickly with Ms. Ames to make sure Mr.

10:41:53  13  Williams has sufficient time with Ms. Ahmed, and

10:41:56  14  that we have sufficient time for closing out of

10:41:58  15  our sort of hour 45 minutes today.

10:41:58  16  REDIRECT EXAMINATION

10:42:03  17  BY MR. HEINKE:

10:42:03  18    Q.  Ms. Ames, I just have a few brief questions

10:42:06  19  for you.  The first is, do you still have Relief

10:42:09  20  Defendant's Exhibit I in front of you?  This was

10:42:12  21  the fourth quarter 2014 Company C fact sheet.

10:42:23  22    A.  Yes, I do.

10:42:23  23    Q.  Just a general question, Ms. Ames.  The

10:42:26  24  information contained in the top right-hand box,

10:42:32  25  explanation of proposed valuation change, do you

10:42:36  1   know where that information comes from, or came

10:42:39  2   from?

10:42:46  3      A.  The information comes from both the proposal

10:42:50  4   of the investing partner, consistent with

10:42:54  5   guidelines, and then, I don't know if specifically

10:42:58  6   the scripting of this was by the finance team.

10:43:02  7      Q.  When you say the scripting, you mean the

10:43:04  8   actual sort of recordation of this in the

10:43:07  9   document?

10:43:08  10     A.  Thank you, yes.

10:43:08  11     Q.  And you said from the investing partner,

10:43:12  12  Company C, the investing partner was Mr. Ahmed,

10:43:14  13  correct?

10:43:14  14     A.  Correct.

10:43:22  15     Q.  If you have Relief Defendant's Exhibit K in

10:43:28  16  front of you, Ms. Ames.  This was the November 6th

10:43:33  17  e-mails that you were discussing with Mr. Deitch?

10:43:41  18     A.  One moment please, sorry.

10:43:43  19     Q.  Sure.

10:43:50  20     A.  I have it.  Thank you.

10:43:52  21     Q.  And you recall Mr. Deitch asked you a few

10:43:54  22  questions about this document.  I wanted to direct

10:44:00  23  your attention at the language in the paragraph on

10:44:04  24  the first page of Exhibit K, which is Bates

10:44:07  25  labeled 5429, the message from Mr. Ahmed, to Ronak

10:44:14  1   Khichadia.  Mr. Ahmed says "Unfortunately, I won't
10:44:22  2   be able to come up with more funds from Oak, but
10:44:25  3   would be supportive of you and Dan doing more, if
10:44:28  4   you wish.  With a flat-to-down year, it is a
10:44:31  5   nonstarter at Oak, unfortunately, for me to even
10:44:35  6   try and pitch.  I will get" -- Mr. Ahmed's word --
10:44:38  7   "my ass handed to me."  Do you see that?
10:44:39  8       A.  Yes, I do see that.
10:44:41  9       Q.  And this is November 6th, which is
10:44:43  10  approximately one week after the company -- the
10:44:50  11  purchase of Company C shares by Oak from I-Cubed?
10:44:54  12      A.  Yes, it is.
10:44:55  13      Q.  A week prior, did you have any idea from Mr.
10:45:00  14  Ahmed that it was a flat-to-down year at Company
10:45:03  15  C?
10:45:03  16      A.  No.
10:45:08  17      Q.  Were you surprised when you discovered this
10:45:11  18  information during the investigation?
10:45:13  19      A.  Very much so.
10:45:14  20      Q.  Why?
10:45:15  21      A.  It was completely inconsistent with the
10:45:17  22  information that he had provided Oak at the time
10:45:22  23  of making the investment decision.
10:45:27  24          MR. HEINKE:  Your Honor, just a
10:45:28  25  moment.  Your Honor, nothing further from the

10:45:44  1   SEC, thank you.  Thank you, Ms. Ames.

10:45:48  2            THE WITNESS:  Thank you.

10:45:50  3            THE COURT:  Anything further, Mr.

10:45:52  4   Deitch?

10:45:52  5            MR. DEITCH:  No, thank you very much,

10:45:54  6   your Honor.

10:45:54  7            THE COURT:  I have just one question

10:45:56  8   to see if I understand how the carried interest

10:46:01  9   balance works.  If a partner wished to

10:46:05 10   voluntarily withdraw from being a partner at

10:46:12 11   Oak, is the buyout process one that involves

10:46:16 12   some kind of quantification of the carried

10:46:25 13   interest account?

10:46:26 14            THE WITNESS:  We've never had that

10:46:27 15   scenario, a buyout.  If a general partner, or in

10:46:33 16   this case, a managing member, would leave the

10:46:35 17   firm voluntarily, then they would retain their

10:46:41 18   vested percentage of their capital accounts.

10:46:46 19   Similar to what is -- what happens with a Dash A

10:46:51 20   account, that you would retain -- Mr. Ahmed

10:46:55 21   would retain his vested percentage of those

10:46:58 22   accounts.

10:47:03 23            THE COURT:  And so if his departure

10:47:06 24   in May OF 2015 had been voluntary, is there any

10:47:12 25   way of looking at the exhibit that has the

10:47:19  1    bookkeeping account of his -- his account, which

10:47:26  2    is M, to know what is a vested percentage?

10:47:36  3              THE WITNESS:  This would -- this

10:47:38  4    would include some of the information.  You

10:47:40  5    would need to see, there's a schedule in the

10:47:42  6    associate's agreement that would list out the

10:47:44  7    percentages at different calendar points.  And

10:47:47  8    you would apply that percentage to the

10:47:54  9    participation percentage.

10:47:56 10              THE COURT:  And would that produce

10:47:59 11    real dollars, or only a clarification that at

10:48:07 12    the end of the fund, they would get those real

10:48:10 13    dollars?  In other words, is it real dollars

10:48:16 14    when you walk out or --

10:48:17 15        A.  No, no, there's no dollars.

10:48:19 16              THE COURT:  Okay.

10:48:20 17        A.  It's truly accounting.  One lay description

10:48:25 18    might be an analyst report.  That may predict

10:48:29 19    great things, here's where the company's, you

10:48:32 20    know, performance would indicate.  But until the

10:48:36 21    conditions are satisfied with the investors

10:48:39 22    receiving back their investments -- which we have

10:48:43 23    had funds where there's never been any carry, and

10:48:47 24    won't be any carry; but until those conditions are

10:48:51 25    all satisfied, the fund performance, the investors

10:48:55  1   returning back their money.  You have to be a

10:48:58  2   member, also, to be eligible.  And there has to be

10:49:03  3   enough cash at the end of the day in fact to

10:49:06  4   disburse.

10:49:07  5            THE COURT:  And when all those

10:49:10  6   conditions are met, if a person has voluntarily

10:49:14  7   left earlier than when all those conditions are

10:49:16  8   met, do they get actual money out of this?

10:49:22  9       A.  If there's money at the end of the rainbow,

10:49:26  10  yes.

10:49:27  11           THE COURT:  Thank you.

10:49:28  12           THE WITNESS:  Thank you, your Honor.

10:49:29  13           THE COURT:  Any questions on my

10:49:30  14  questions?

10:49:31  15           MR. HEINKE:  No, your Honor, not from

10:49:32  16  the Commission.

10:49:32  17           MR. DEITCH:  No, thank you.

10:49:34  18           THE COURT:  Thank you.  Thank you,

10:49:35  19  Ms. Ames, you are excused, you may step down.

10:49:39  20           MS. AMES:  Thank you, your Honor.

10:49:41  21           THE COURT:  Next witness?  We're back

10:49:47  22  to you, okay.

10:49:48  23           MR. WILLIAMS:  Yes, your Honor,

10:49:49  24  switching things up.  We call Ms. Shalini Ahmed

10:49:52  25  to the stand.

10:49:52    1    SHALINI AGGARWAL AHMED, testified further upon her

10:50:05    2    oath as follows:

10:50:05    3              THE COURT:  All right, you remain

10:50:07    4    under oath from your previous testimony.

10:50:10    5              THE WITNESS:  Thank you, your Honor.

10:50:11    6              THE COURT:  Would you wait just one

10:50:13    7    moment.  Let me get the right things stapled

10:50:17    8    together.

10:50:31    9              MR. WILLIAMS:  Your Honor, there's --

10:50:33   10    I think I have sort of two or three different

10:50:36   11    categories of questions, if you will, depending

10:50:39   12    on how time goes.  The first one does contain

10:50:42   13    one of the documents that is in dispute.  I have

10:50:46   14    the packet of exhibits I will be slowing the

10:50:49   15    witness.  Before I hand it up, I just want to

10:50:51   16    alert the Court that within this packet is one

10:50:53   17    of the disputed documents.

10:50:58   18              MR. SKIBELL:  Your Honor, we're

10:51:00   19    obviously going to object to the use of a

10:51:02   20    privileged document, since there's been no

10:51:04   21    determination with regard to it.  And our time

10:51:06   22    to respond is until August 18th.  I think it's

10:51:10   23    wholly inappropriate.

10:51:15   24              THE COURT:  Well, this is all a bit

10:51:16   25    of a mystery, since I have no idea --

10:51:19  1          MR. SKIBELL:  Actually, Mark, we told

10:51:21  2   you this document isn't privileged.

10:51:24  3          MR. WILLIAMS:  No, no, there's

10:51:26  4   several documents in here.

10:51:27  5          MR. SKIBELL:  Okay.  Your Honor, the

10:51:30  6   other thing I would note about this document,

10:51:32  7   it's not a complete document.  What they're

10:51:34  8   giving you is an attachment that's part of a

10:51:37  9   long e-mail chain that contains privileged

10:51:38  10  information.  So the document itself may not

10:51:42  11  appear to be privileged, but you read it in the

10:51:44  12  context of the entire thing --

10:51:46  13         THE COURT:  What sort of privilege,

10:51:48  14  if you have a log that describes what it is, and

10:51:51  15  what the basis for the privilege claimed?

10:51:53  16         MR. SKIBELL:  Yes, when we logged the

10:51:55  17  documents back in the letter, we explained it

10:51:57  18  was subject to the attorney/client privilege.

10:51:59  19  And subject to the no waiver order entered by

10:52:02  20  the Court, they have to move to object to that.

10:52:06  21  And our time to respond, like I noted, has not

10:52:09  22  run yet.

10:52:10  23         MR. WILLIAMS:  Your Honor, if I may

10:52:11  24  respond to that.  A privilege log has not been

10:52:14  25  produced.  Instead, what it was, was a letter

10:52:17  1  blanketly stating these things are

10:52:19  2  attorney/client privilege, and with a bunch of

10:52:21  3  Bates number.  As I said before, some of them

10:52:24  4  are facially just not privileged, and for

10:52:26  5  several reasons.  And I think we got to at least

10:52:29  6  some of those in the brief.  And I think we only

10:52:31  7  listed three or four, but there are other

10:52:33  8  reasons.  There has not been a document by

10:52:35  9  document assertion, which I submit the case law

10:52:38  10  is very clear on what needs to be done in order

10:52:40  11  for someone to meet their burden or carry their

10:52:43  12  burden of asserting a privilege.

10:52:45  13          MR. SKIBELL:  One point of

10:52:46  14  clarification.  We didn't produce this document.

10:52:49  15  Oak attempted to waive the privilege

10:52:51  16  unilaterally, and we clawed it back.  And the

10:52:54  17  letter we clawed it back pursuant to, we

10:52:56  18  identified the documents specifically and

10:52:58  19  explained why they are privileged.  And now

10:53:01  20  we're -- we plan to respond to their motion in

10:53:03  21  due course.

10:53:06  22          THE COURT:  Well, it's the "due

10:53:07  23  course" problem that exists.

10:53:11  24          MR. SKIBELL:  Your Honor,

10:53:11  25  respectfully, then they should have filed their

10:53:13  1  motion not two days before today's hearing, if

10:53:16  2  they wanted to use it in today's hearing.  That

10:53:18  3  would have given us -- we didn't have an

10:53:20  4  opportunity to respond.

10:53:25  5            MR. WILLIAMS:  For the record, Ms.

10:53:27  6  Ahmed, I'm going to be handing you a stack of

10:53:29  7  exhibits that we'll be going through.  Your

10:53:31  8  Honor, would you like a hard copy as well?

10:53:33  9            THE COURT:  Yes.

10:53:40  10            MR. HEINKE:  Your Honor, if I can,

10:53:42  11  just a brief housekeeping matter.  I note Ms.

10:53:44  12  Ames is still in the courtroom.  I presume --

10:53:47  13  you know, the SEC does not intend to recall her.

10:53:49  14  I presume the relief defendants don't intend to

10:53:52  15  call her.  I just wanted to raise the issue and

10:53:54  16  make sure it's appropriate for her to remain.

10:53:56  17  We obviously have no objection with her

10:53:57  18  remaining.

10:53:58  19            THE COURT:  No problem with her

10:53:59  20  remaining if she isn't going to be called.

10:54:02  21            MR. WILLIAMS:  May I proceed, your

10:54:04  22  Honor?

10:54:04  23            THE COURT:  You may.

10:54:04  24  DIRECT EXAMINATION

10:54:06  25  BY MR. WILLIAMS:

10:54:06  1       Q.  Mrs. Ahmed, we'll get to the documents in a

10:54:09  2   moment.  You were deposed, it would be exactly two

10:54:13  3   weeks ago, is that right?

10:54:14  4       A.  That's correct.

10:54:14  5       Q.  And you were placed under oath at that

10:54:17  6   deposition?

10:54:17  7       A.  That's correct.

10:54:18  8       Q.  And I asked you questions there, correct?

10:54:21  9       A.  That is correct.

10:54:22  10      Q.  And you answered truthfully?

10:54:24  11      A.  That is correct.

10:54:25  12      Q.  Your husband is Iftikar Ahmed, who is the

10:54:33  13  defendant in this case, right?

10:54:35  14      A.  That is correct.

10:54:37  15      Q.  Is he assisting you with this litigation?

10:54:40  16      A.  He is not assisting me with this litigation.

10:54:42  17      Q.  Have you indirectly or directly communicated

10:54:45  18  with him about this litigation?

10:54:48  19           MR. SKIBELL:  I'm going to object on

10:54:51  20  the basis of adverse spousal testimony

10:54:53  21  privilege.

10:54:53  22           THE COURT:  If that contains any

10:54:54  23  substance.  I think the fact of a communication

10:54:57  24  is not protected.

10:54:59  25      Q.  Have you communicated directly or indirectly

10:55:02   1   with Mr. Iftikar Ahmed about this litigation?

10:55:05   2       A.  I have not communicated with Mr. Iftikar

10:55:07   3   Ahmed about this litigation.

10:55:08   4       Q.  And just to be very clear, my question was

10:55:11   5   either directly or indirectly.

10:55:12   6       A.  I have not communicated directly or

10:55:14   7   indirectly with Mr. Ahmed concerning this

10:55:17   8   litigation.

10:55:18   9       Q.  Have you communicated with third parties who

10:55:20  10   have communicated with Mr. Ahmed?

10:55:22  11       A.  Absolutely not.

10:55:25  12       Q.  When is the last time you communicated

10:55:27  13   either directly or indirectly with Mr. Iftikar

10:55:29  14   Ahmed?

10:55:31  15       A.  The last time I spoke with Mr. Iftikar Ahmed

10:55:35  16   was the morning of May 18.

10:55:38  17       Q.  And Mrs. Ahmed, I apologize, but I want to

10:55:42  18   be very clear on my question.  I'm not asking the

10:55:44  19   last time you spoke with him.  Rather, I'm asking

10:55:46  20   the last time you communicated with him either

10:55:48  21   directly or incorrectly.  And I can give you an

10:55:51  22   example of what that may include.  That can

10:55:53  23   include e-mails, sending letters, communicating

10:55:57  24   through a third parties, another medium or form of

10:55:59  25   communication.

10:56:00   1       A.   Any direct -- or any of these forms of

10:56:02   2   communication, I have not communicated with Mr.

10:56:06   3   Ahmed.

10:56:06   4       Q.   Okay.  I want to ask you some questions

10:56:09   5   about I-Cubed.  And if we could look at the first

10:56:14   6   document.  I believe it has been marked Exhibit 7.

10:56:18   7   Do you see that in front of you?

10:56:22   8       A.   Yes, --

10:56:23   9       Q.   Okay.

10:56:24  10       A.   -- I do.

10:56:26  11       Q.   And there may also be an Exhibit 22, but

10:56:28  12   that's just referencing, of course, the deposition

10:56:30  13   exhibit.

10:56:31  14       A.   Okay.

10:56:31  15       Q.   Do you recognize Exhibit 7?

10:56:38  16       A.   Give me a moment, please, to look through

10:56:40  17   it.

10:56:46  18            Is Exhibit 7 the entire packet that you

10:56:48  19   handed me?

10:56:49  20       Q.   No, and I apologize.  It's -- there are

10:56:52  21   Exhibit 7 through 11 are in that packet.  So this

10:56:56  22   will just be the first stapled document.  Feel

10:56:59  23   free to remove that tab.

10:57:01  24            THE COURT:  Did you say you were

10:57:04  25   handing up hard copies?

10:57:06    1            MR. WILLIAMS:  Yes, your Honor.  The

10:57:07    2  first document --

10:57:09    3            THE COURT:  Did you do that?

10:57:11    4            MR. WILLIAMS:  Yes.

10:57:19    5            THE COURT:  I don't see an Exhibit 7

10:57:21    6  in here.

10:57:22    7            MR. WILLIAMS:  I apologize, I have

10:57:24    8  not marked the copy that I handed up.  I have

10:57:28    9  only marked the witness' copy with the exhibit

10:57:31   10  stickers.

10:57:35   11            THE COURT:  All right, go ahead.

10:57:40   12    Q.  Is this the I-Cubed Domains LLC limited

10:57:44   13  liability company agreement?

10:57:45   14    A.  That's what it looks like.

10:57:47   15    Q.  And do you recognize this document?

10:57:49   16    A.  I have not seen this document.

10:57:52   17    Q.  Now, do you maintain that you are the

10:57:56   18  majority owner of I-Cubed Domains?

10:57:58   19    A.  Yes, I am.

10:57:59   20    Q.  But you have never seen the company

10:58:01   21  agreement that formed I-Cubed?

10:58:02   22    A.  I have not.

10:58:08   23    Q.  To your knowledge, was I-Cubed Domains LLC

10:58:12   24  formed in October of 2012 by your husband Iftikar

10:58:15   25  Ahmed?

10:58:17  1      A.  To my knowledge, it was formed around that

10:58:20  2   time.  But I would have to go back and

10:58:23  3   double-check all the dates.

10:58:24  4      Q.  And do you know why I-Cubed Domains LLC was

10:58:27  5   formed?

10:58:27  6      A.  I do not know why I-Cubed LLC Domains was

10:58:27  7   formed.

10:58:32  8      Q.  Were you at all involved in the formation of

10:58:35  9   I-Cubed LLC?

10:58:36  10     A.  I was not involved in the formation of

10:58:38  11  I-Cubed LLC.

10:58:39  12     Q.  If you turn to the -- there's a Bates number

10:58:44  13  at the bottom right of each page.  And if you

10:58:47  14  could turn to the Bates number ending 117.

10:58:56  15     A.  Okay.

10:58:56  16     Q.  Does this say that there was a capital

10:58:58  17  contribution of 2.2 million?

10:59:01  18     A.  Yes, it does.

10:59:02  19     Q.  What did this 2.2 million consist of?

10:59:05  20     A.  I hadn't seen this document before, so I

10:59:09  21  don't know what this 2.2 million would consist of.

10:59:11  22     Q.  Okay.  And then is it fair to say you don't

10:59:15  23  know where this 2.2 million came from?

10:59:16  24     A.  That's fair to say.

10:59:17  25     Q.  Back to the front page.  This is dated

10:59:27   1   October 24, 2012.  Ms. Ahmed, was I-Cubed later

10:59:32   2   transferred into your name?

10:59:33   3       A.  Yes, it was.

10:59:34   4       Q.  And when did that occur?

10:59:35   5       A.  That would have occurred the middle of 2013.

10:59:42   6   I want to say around April, May, --

10:59:45   7       Q.  And --

10:59:46   8       A.  -- 2013.

10:59:48   9       Q.  April or May of 2013?

10:59:50  10       A.  Yes.

10:59:50  11       Q.  And who transferred I-Cubed into your name?

10:59:52  12       A.  It was owned by my husband, so my husband

10:59:58  13   transferred -- I mean, we discussed it, and it was

11:00:00  14   transferred into my name.  I'm assuming he -- by

11:00:03  15   your question, when you mean who transferred, was

11:00:06  16   it an estate lawyer who helped us or --

11:00:09  17       Q.  I just want to be clear, it was in your

11:00:11  18   husband's name before it was transferred to you,

11:00:13  19   correct?

11:00:13  20       A.  Yes, that's correct.

11:00:14  21       Q.  So then only your husband had the power to

11:00:16  22   transfer that to you?

11:00:17  23       A.  Yes, that would be correct.

11:00:18  24       Q.  And why was I-Cubed transferred into your

11:00:22  25   name?

11:00:22  1     A.   I don't have a very specific recollection of
11:00:27  2  that time.  But around that time, my husband was
11:00:29  3  diagnosed with cancer.  And he and I had discussed
11:00:32  4  me having funds in the unlikely or unfortunate
11:00:38  5  event that something could happen to him.  He was
11:00:41  6  diagnosed with cancer the beginning of April.  He
11:00:44  7  had surgery the end of March.  And we didn't know
11:00:48  8  what the procedure and the process would be going
11:00:51  9  forward or what the outcome would be.  So given
11:00:53  10  that situation, where we were also looking for
11:00:57  11  radiation treatments and options, we agreed that
11:01:01  12  there should be assets in my name, if anything
11:01:05  13  should happen to him.
11:01:07  14     Q.   So just to be clear, I-Cubed belonged to
11:01:11  15  your husband, but it was transferred into your
11:01:14  16  name in case your husband was no longer around?
11:01:17  17     A.   It was transferred in my name so that there
11:01:20  18  would be assets in my name in case anything
11:01:22  19  happened to him.
11:01:24  20     Q.   Thank you.  Why this date, why April or May
11:01:32  21  of 2013?
11:01:34  22     A.   He had his surgery the end of March 2013.
11:01:38  23  He was diagnosed with cancer at the beginning of
11:01:40  24  April 2013.  He had a very difficult recovery from
11:01:45  25  that surgery.  And in May, we were looking for

11:01:48  1    radiation options.

11:01:49  2        Q.  So to your knowledge, did it have anything

11:01:53  3    to do with Oak purchasing stock in a company C

11:01:56  4    that I-Cubed Domains LLC also had an interest in?

11:02:01  5        A.  My husband and I never spoke about what he

11:02:04  6    did in his business dealings.  I was very clear

11:02:06  7    from day one of when we met, I used to work at

11:02:12  8    Morgan Stanley MA.  He used to work at Goldman

11:02:14  9    Sachs.  I was very clear between us there was a

11:02:16  10   Chinese wall.  We never spoke business to each

11:02:19  11   other.

11:02:21  12       Q.  And we will get back to that in a moment.

11:02:25  13   When I-Cubed Domains LLC was transferred to you,

11:02:28  14   do you know what assets it held?

11:02:30  15       A.  I knew it held a Company C.

11:02:32  16       Q.  Okay.  And so your testimony is you did know

11:02:37  17   that?

11:02:37  18       A.  I knew that there was this company called C,

11:02:40  19   that was based out of New York, that was held in

11:02:42  20   I-Cubed.

11:02:42  21       Q.  Now, you didn't provide any goods or

11:02:48  22   services in exchange for Company C being

11:02:50  23   transferred into your name, right?  Because it was

11:02:53  24   transferred into your name as a contingency plan,

11:02:57  25   is that accurate?

11:02:59  1     A.  That would be accurate.

11:03:04  2     Q.  I'd like to show you the next exhibit.  And

11:03:09  3 that should be marked Exhibit 8 on your copy,

11:03:12  4 Exhibit 26 from the deposition.  And I apologize,

11:03:16  5 your Honor, your copy will not have the exhibit 8

11:03:19  6 sticker.  Do you recognize this document?

11:03:25  7     A.  I do recognize this document.

11:03:27  8     Q.  And what is Exhibit 8?

11:03:31  9     A.  Exhibit 8 is a creation of a GRAT that was

11:03:37 10 basically done on the advice of my estate counsel.

11:03:42 11     Q.  And what is the date of this document?

11:03:46 12     A.  August 29, 2014.

11:03:48 13     Q.  And as of August 29, 2014, what assets, if

11:03:52 14 any, did I-Cubed hold?

11:03:55 15     A.  My understanding is I-Cubed held Company C.

11:03:59 16     Q.  And what is being transferred into this GRAT

11:04:02 17 on August 29, 2014?

11:04:05 18     A.  An interest in this I-Cubed.

11:04:07 19     Q.  And is it 99 percent interest?

11:04:10 20     A.  Yes, it is.

11:04:10 21     Q.  So I just want to be very clear, a 99

11:04:12 22 percent interest in I-Cubed is being transferred

11:04:14 23 into the GRAT, and I-Cubed holds those Company C

11:04:18 24 shares, right?

11:04:19 25     A.  That's right.

11:04:20  1      Q.  So into the GRAT goes those Company C

11:04:23  2  shares, of course, because I-Cubed is going into

11:04:25  3  the GRAT?

11:04:27  4      A.  That's -- well, I don't think that the

11:04:32  5  assignment happened on this date.  This was

11:04:36  6  when -- I believe this was when the GRAT was

11:04:42  7  created.

11:04:49  8      Q.  Now -- and we will get to the assignment.

11:04:52  9  Is it your testimony that by this date, August 29,

11:04:54  10  2014, you controlled I-Cubed?

11:04:58  11      A.  That is correct, when that transfer

11:05:01  12  happened.

11:05:01  13      Q.  And who was the manager of I-Cubed at that

11:05:04  14  time?

11:05:04  15      A.  My understanding is it was someone by the

11:05:08  16  name of Richard Kimball.

11:05:09  17      Q.  And why do you say your understanding,

11:05:11  18  rather than it was Mr. Kimball?

11:05:13  19      A.  In September of 2014, I received an e-mail

11:05:17  20  from my estate counsel, stating that Mr. Kimball

11:05:22  21  was the manager.

11:05:25  22      Q.  So when you --

11:05:26  23      A.  I never spoke to Mr. Kimball.

11:05:27  24      Q.  So you never, even though you owned I-Cubed,

11:05:30  25  you never spoke to the manager of the entity

11:05:33    1    I-Cubed?

11:05:34    2        A.   That's right.

11:05:35    3        Q.   Did your husband deal with all

11:05:40    4    communications between the manager of I-Cubed?

11:05:45    5        A.   I would presume he must have.

11:05:51    6        Q.   And that was even after I-Cubed was

11:05:54    7    transferred into your name, right?

11:05:55    8        A.   I mean, I'm not aware of any communications

11:06:01    9    between my husband and Mr. Kimball.  If there

11:06:03   10    were, it's not anything I know about.

11:06:10   11        Q.   Was I-Cubed in negotiations with Oak to sell

11:06:14   12    certain assets to Oak as of this date, August 29,

11:06:18   13    2014?

11:06:18   14        A.   I have no idea.

11:06:21   15        Q.   When you owned I-Cubed, you weren't aware

11:06:24   16    there was any negotiations to sell its assets?

11:06:27   17        A.   I was not involved in any negotiations to

11:06:30   18    sell its assets.

11:06:34   19        Q.   So then if there was a sale, you don't know

11:06:37   20    who was bargaining on behalf of I-Cubed?

11:06:42   21        A.   I would imagine it would have been the

11:06:44   22    manager, but the manager did not let me know if

11:06:47   23    there was any bargaining going on.

11:06:49   24        Q.   And we will get to that in a second.  And

11:06:51   25    your understanding, the manager was Mr. Richard

11:06:53  1   Kimball?

11:06:53  2       A.   That's my understanding.

11:06:54  3       Q.   So if there were sale negotiations going on

11:06:57  4   in August of 2014, you were completely unaware of

11:07:01  5   them?

11:07:03  6       A.   I had a sense that there may have been a

11:07:06  7   liquidity event, but no one specifically sat me

11:07:09  8   down and said "Look, we are negotiating with

11:07:12  9   entity or company ABC, whoever, that company may

11:07:16  10  be, for these assets.

11:07:18  11      Q.   And why did you have an idea that maybe

11:07:21  12  there would be a liquidity event?

11:07:22  13      A.   We -- this was all discussed in my -- with

11:07:26  14  my estate lawyer.  So in a meeting with my estate

11:07:29  15  lawyer, when this was created, this was all

11:07:31  16  discussed there.

11:07:33  17      Q.   And so you are saying this information came

11:07:37  18  from your estate lawyer, that I-Cubed was possibly

11:07:42  19  selling assets to Oak?

11:07:44  20      A.   This information came from my husband, who

11:07:47  21  was at that meeting.

11:07:48  22      Q.   So then your husband told you that I-Cubed

11:07:53  23  was selling assets to Oak?

11:07:56  24      A.   No.  That's not what he told me.  He told me

11:07:59  25  there may be a liquidity event.  And in the event

11:08:02  1   there's a liquidity event, we should have -- we

11:08:06  2   should talk to our estate counsel about how to

11:08:09  3   handle the assets.

11:08:10  4       Q.  Okay.  So the information you received was

11:08:12  5   only there was a liquidity event, but you had no

11:08:15  6   idea --

11:08:16  7       A.  There was a potential liquidity event.

11:08:19  8       Q.  Thank you for correcting me.  You had

11:08:20  9   information there was a potential liquidity event,

11:08:22  10  but you had no idea how that liquidity event was

11:08:26  11  going to happen or what was being sold, or any of

11:08:28  12  the details of that transaction?

11:08:30  13      A.  In terms of what was being sold, I knew

11:08:33  14  Company C was in I-Cubed.

11:08:36  15      Q.  So --

11:08:37  16      A.  Right?  So I knew Company C.  But I did not

11:08:40  17  know the other side of it.

11:08:43  18      Q.  And do you mean who the buyer was?

11:08:45  19      A.  That's right.

11:08:46  20      Q.  Okay.  So you -- I'm just trying to figure

11:08:49  21  out what you knew.

11:08:49  22      A.  Mm-hmm.

11:08:50  23      Q.  So you knew I-Cubed held Company C shares.

11:08:52  24  You knew I-Cubed was selling Company C shares, but

11:08:55  25  you didn't know who was buying them?

11:08:56  1     A.   That's right.

11:08:58  2     Q.   Do you now know who bought them?

11:09:04  3     A.   As we sit here today?

11:09:05  4     Q.   Yes.

11:09:07  5     A.   Yes.

11:09:07  6     Q.   And was that Oak?

11:09:08  7     A.   I believe it is Oak.

11:09:09  8     Q.   And do you know who negotiated on Oak's

11:09:12  9  behalf?

11:09:13  10    A.   I have just seen whatever documents was

11:09:16  11 produced to the Court, so it's whatever is stated

11:09:20  12 in those documents.

11:09:22  13    Q.   I'm going to direct you to a Bates number

11:09:26  14 again.  And I think it's the last page.  It's

11:09:31  15 Bates 881, and it should be the last page of this

11:09:33  16 document.  And so here, this is what is being

11:09:39  17 transferred into the GRAT, correct, and it has

11:09:42  18 "Transfer date" at the top?

11:09:43  19    A.   That's right.

11:09:44  20    Q.   And below that, it says a 99 membership, 99

11:09:48  21 percent membership interest in I-Cubed Domains

11:09:50  22 LLC?

11:09:51  23    A.   That's right.

11:09:52  24    Q.   And a liquidity event has not occurred yet,

11:09:55  25 right, as of August 29, 2014?

11:09:57  1      A.   That's right.

11:09:58  2      Q.   So I-Cubed Domains LLC hold the Company C

11:10:01  3  shares.   And can you read the fair market value of

11:10:05  4  the asset transfer for this Court?

11:10:06  5      A.   Eight hundred seventy-six thousand one

11:10:09  6  hundred ninety-three dollars and seventy-two

11:10:14  7  cents.

11:10:14  8      Q.   Now, you signed this document, correct?

11:10:16  9      A.   Yes.

11:10:17 10      Q.   When you signed this document, did you have

11:10:19 11  any reason to believe it was inaccurate?

11:10:21 12      A.   No.

11:10:30 13      Q.   Now, the Company C shares were sold to Oak a

11:10:35 14  few months later for 7.5 million, is that right?

11:10:40 15              MR. SKIBELL:   I'm going to object.

11:10:42 16  First, he's leading the witness, and he's on

11:10:44 17  direct testimony; it's inappropriate.   And he

11:10:46 18  hasn't laid a foundation for any of this.

11:10:48 19              THE COURT:   Why is it inappropriate

11:10:50 20  for him to lead the witness?

11:10:51 21              MR. SKIBELL:   Because this is direct.

11:10:53 22  He's -- this is not -- he's not cross-examining

11:10:56 23  anyone.   And he hasn't established it's a

11:10:58 24  hostile witness.   So he should not be asking

11:11:01 25  leading questions, just like any direct.

|          |    |
|----------|----|
| 11:11:06 | 1  | THE COURT:  But this is a relief
| 11:11:08 | 2  | defendant.
| 11:11:08 | 3  | MR. SKIBELL:  I understand that.  But
| 11:11:10 | 4  | it doesn't matter.  It's a direct -- he called
| 11:11:12 | 5  | the witness.  It's direct testimony.  And we
| 11:11:15 | 6  | would think that he shouldn't be allowed to lead
| 11:11:18 | 7  | because it's direct.  That's how direct works.
| 11:11:20 | 8  | MR. WILLIAMS:  If I respond, the law
| 11:11:22 | 9  | is very clear, one, that a Court can allow
| 11:11:24 | 10 | questioning any way it sees fit.  But two, when
| 11:11:27 | 11 | you call a party that is either identified with
| 11:11:29 | 12 | the defendant or is in fact the defendant, or
| 11:11:31 | 13 | relief defendant, in this case, leading
| 11:11:34 | 14 | questions is proper.  And conversely, that a
| 11:11:38 | 15 | lawyer does not have the right to put words in
| 11:11:40 | 16 | his own client's mouth just because it's
| 11:11:42 | 17 | cross-examination.
| 11:11:43 | 18 | THE COURT:  That's my view of things.
| 11:11:44 | 19 | You may proceed.
| 11:11:48 | 20 | BY MR. WILLIAMS:
| 11:11:48 | 21 | Q.  Now, on August 29, I-Cubed held the shares
| 11:11:53 | 22 | in Company C, right?  And they were then sold a
| 11:11:57 | 23 | few months later, which we'll get to, for 7.5
| 11:12:00 | 24 | million, right?
| 11:12:00 | 25 | A.  I believe that's the case, yes.

11:12:02   1      Q.  So why was the value in the GRAT less than a

11:12:06   2   million for those Company C shares?

11:12:09   3      A.  That, I would not be able to tell you.

11:12:14   4      Q.  And is it fair to say that you were not

11:12:17   5   actively engaged in managing the assets of

11:12:21   6   I-Cubed, and so you didn't know what those assets

11:12:23   7   were worth when this GRAT was created?

11:12:28   8      A.  I knew what was in here.  I knew what was in

11:12:30   9   the I-Cubed.  But I wasn't actively managing the

11:12:35  10   asset.

11:12:35  11      Q.  Exactly.  So if it was worth seven and a

11:12:39  12   half million, or it was worth nine hundred

11:12:41  13   thousand, in August of 2014, you didn't know?

11:12:46  14      A.  I had a sense of the company.  I had a sense

11:12:48  15   of how the company was doing.  But specifically, I

11:12:51  16   did not know the valuation of the shares that were

11:12:53  17   in --

11:12:54  18      Q.  Okay.  And so --

11:12:55  19      A.  -- I-Cubed.

11:12:56  20      Q.  -- how the company was doing, how much do

11:12:59  21   you think that those shares were worth in August

11:13:00  22   of 2014?

11:13:03  23      A.  You know, I would have to go back and check.

11:13:06  24   I don't have any -- I don't have any specific

11:13:09  25   recollection of what I thought they were worth.  I

11:13:13   1   knew that the company was doing well, e-commerce

11:13:16   2   company in New York.

11:13:17   3       Q.   But Ms. Ahmed, you signed a document saying

11:13:22   4   they were worth a certain amount.  Are you now

11:13:24   5   saying that when you signed this, you believe that

11:13:26   6   that was not the case?

11:13:27   7       A.   No, absolutely not.

11:13:28   8       Q.   So then I just need to look at the document

11:13:30   9   to figure out what you thought they were worth.

11:13:32  10       A.   Okay.

11:13:32  11       Q.   Is that fair?

11:13:33  12       A.   That's fair.

11:13:33  13       Q.   And that's accurate?

11:13:34  14       A.   That's accurate at the time.

11:13:37  15       Q.   And so they were worth eight hundred

11:13:39  16   seventy-six thousand dollars, a little bit more

11:13:41  17   than?

11:13:41  18       A.   That's what they were worth then.

11:13:42  19       Q.   Okay.  And now you were not at all involved

11:13:49  20   in the sale of those assets, so you don't know how

11:13:52  21   the negotiations occurred with the purchaser who

11:13:55  22   you later found out was Oak, right?

11:13:57  23       A.   That's right.

11:13:57  24       Q.   Now, turning to the prior page, and this is

11:14:08  25   ending Bates 880.  This is the Schedule A.  And I

| | | |
|---|---|---|
| 11:14:13 | 1 | won't spend too much time on this.  I asked you to |
| 11:14:16 | 2 | explain this to me at the deposition.  Do you |
| 11:14:18 | 3 | recall that, Mrs. Ahmed? |
| 11:14:20 | 4 | A.  I do recall that. |
| 11:14:20 | 5 | Q.  And you were not is able to explain to me |
| 11:14:22 | 6 | what that was, even looking at it? |
| 11:14:24 | 7 | A.  I was not.  I have since gone back and |
| 11:14:27 | 8 | spoken to my estate lawyer. |
| 11:14:27 | 9 | Q.  So you now -- so is it fair to say that you |
| 11:14:30 | 10 | are prepared to testify here today? |
| 11:14:32 | 11 | A.  No, I have not prepared. |
| 11:14:33 | 12 | Q.  But you're now able to explain the Schedule |
| 11:14:36 | 13 | A to me? |
| 11:14:36 | 14 | A.  No.  I think I have an understanding, but I |
| 11:14:38 | 15 | don't think I'm able to explain line by line what |
| 11:14:41 | 16 | it is. |
| 11:14:42 | 17 | Q.  Okay.  And in August of 2014, did you have |
| 11:14:47 | 18 | an understanding of what the Schedule A was? |
| 11:14:53 | 19 | A.  To my recollection, no. |
| 11:14:57 | 20 | Q.  Now, I'd like to show you what's been marked |
| 11:15:05 | 21 | as Exhibit 9. |
| 11:15:06 | 22 | MR. WILLIAMS:  And your Honor, this |
| 11:15:07 | 23 | is one of the documents in dispute. |
| 11:15:11 | 24 | MR. SKIBELL:  Your Honor, if I may, |
| 11:15:12 | 25 | this is actually not the whole document in |

| | | |
|---|---|---|
| 11:15:15 | 1 | dispute.  They've taken off the e-mail chain |
| 11:15:18 | 2 | that explains what this document is. |
| 11:15:20 | 3 | THE COURT:  I don't have something |
| 11:15:22 | 4 | called 9. |
| 11:15:24 | 5 | MR. WILLIAMS:  It should say -- I |
| 11:15:25 | 6 | apologize, your Honor.  On your copy, it will |
| 11:15:28 | 7 | say 23.  This was Exhibit 23 from the |
| 11:15:30 | 8 | deposition. |
| 11:15:30 | 9 | THE COURT:  So this is the "I hereby |
| 11:15:32 | 10 | resign." |
| 11:15:32 | 11 | MR. WILLIAMS:  Correct. |
| 11:15:33 | 12 | THE COURT:  We've already used this |
| 11:15:34 | 13 | document without objection.  No? |
| 11:15:37 | 14 | MR. WILLIAMS:  I think the testimony |
| 11:15:38 | 15 | came in.  Mr. Oraker, I think we proffered, |
| 11:15:41 | 16 | would testify that he called Mr. Kimball, and |
| 11:15:43 | 17 | Mr. Kimball verified that he did in fact resign |
| 11:15:46 | 18 | on September 23rd, 2014.  And that a signature |
| 11:15:50 | 19 | that appears a month later -- |
| 11:15:52 | 20 | THE COURT:  I don't understand how |
| 11:15:53 | 21 | this can be privileged. |
| 11:15:54 | 22 | MR. SKIBELL:  I can explain that.  So |
| 11:15:56 | 23 | this is actually not the whole document.  There |
| 11:15:58 | 24 | is an e-mail chain, and the reason we assert |
| 11:16:01 | 25 | privilege over the document as a whole was |

| | | |
|---|---|---|
| 11:16:03 | 1 | because if you produce this document, you can |
| 11:16:05 | 2 | see what Kimball, who is an attorney, who's |
| 11:16:09 | 3 | communicating to I-Cubed, at that time, what his |
| 11:16:13 | 4 | legal advice was.  And if they were not |
| 11:16:15 | 5 | deceptive and showed the incomplete document, |
| 11:16:18 | 6 | you would understand why we were asserting |
| 11:16:19 | 7 | privilege over it.  But they've tried to |
| 11:16:21 | 8 | separate out by only showing you the attachment |
| 11:16:24 | 9 | and not the whole document. |
| 11:16:25 | 10 | THE COURT:  What is the purpose?  Is |
| 11:16:26 | 11 | it to show the signature. |
| 11:16:28 | 12 | MR. WILLIAMS:  As well as the date he |
| 11:16:30 | 13 | resigned, yes, your Honor. |
| 11:16:30 | 14 | MR. SKIBELL:  The e-mail, which |
| 11:16:32 | 15 | they're not including, would indicate that it |
| 11:16:34 | 16 | was proposed that he resign.  And that's why |
| 11:16:37 | 17 | they don't want to show the e-mail.  And that's |
| 11:16:39 | 18 | also why we think the document as a whole is |
| 11:16:41 | 19 | privileged. |
| 11:16:41 | 20 | MR. WILLIAMS:  Your Honor, if I can |
| 11:16:43 | 21 | respond.  We have clarified with Mr. Kimball, |
| 11:16:45 | 22 | this was in fact the date of his resignation. |
| 11:16:47 | 23 | Any privilege in the e-mail, it doesn't come |
| 11:16:49 | 24 | into issue, because that's not what I'm putting |
| 11:16:51 | 25 | it in for. |

11:16:52  1          THE COURT:  You're putting it in for

11:16:53  2  his signature, and his date of resignation.

11:16:57  3          MR. WILLIAMS:  That is correct, your

11:16:59  4  Honor.

11:16:59  5          THE COURT:  That limited purpose, I

11:17:00  6  don't see any privilege.

11:17:01  7          MR. SKIBELL:  Fine, your Honor.

11:17:03  8  That's fine, your Honor.

11:17:05  9          THE COURT:  Thank you.

11:17:05  10  BY MR. WILLIAMS:

11:17:05  11    Q.  Ms. Ahmed, do you see Exhibit 9 in front of

11:17:10  12  you?

11:17:10  13    A.  I do.

11:17:11  14    Q.  And is this the -- did you receive this

11:17:14  15  document?

11:17:16  16    A.  I cannot remember.  I would have to go back

11:17:19  17  and check, or if I had the e-mails, I would be

11:17:21  18  able to confirm that with you.

11:17:23  19    Q.  Did you know Mr. Kimball resigned in

11:17:25  20  September of 2014?

11:17:27  21    A.  I did know Mr. Kimball resigned in September

11:17:30  22  of 2014.  That was conveyed to me by my estate

11:17:33  23  lawyer.

11:17:33  24    Q.  And who became the manager of I-Cubed when

11:17:36  25  Mr. Kimball resigned as manager?

11:17:38  1      A.  My estate lawyer, Mr. Johnson, Dan Johnson.

11:17:43  2      Q.  And do you have any documents showing that?

11:17:45  3      A.  I don't.  I would have to go back and check.

11:17:50  4      Q.  And why did Mr. Kimball resign?

11:17:54  5      A.  I do not know that.  I believe an

11:17:59  6  explanation that was given to me by my estate

11:18:01  7  lawyer was that he may be changing firms, or

11:18:06  8  moving on.  But I would have to go back and

11:18:09  9  reconfirm.

11:18:09  10     Q.  And so this information came from your

11:18:12  11  estate lawyer, and not your husband?

11:18:13  12     A.  Came from my estate lawyer.

11:18:14  13     Q.  And your testimony here today is that the

11:18:18  14  information regarding Mr. Kimball's resignation

11:18:21  15  came from your estate lawyer?

11:18:24  16     A.  Yes.

11:18:24  17     Q.  And not your husband?

11:18:24  18     A.  That is what I believe.  I would have to see

11:18:25  19  the e-mail to verify that.

11:18:28  20     Q.  What role did your husband play in Mr.

11:18:32  21  Kimball's resignation?

11:18:32  22     A.  I have no idea what role my husband played,

11:18:35  23  if any, in Mr. Kimball's resignation.

11:18:37  24     Q.  Now, this is dated September 23rd, 2014.

11:18:43  25  You controlled -- it is your contention you

11:18:45   1   controlled I-Cubed as of this date?

11:18:47   2       A.   That's correct.

11:18:48   3       Q.   And by this time, did you know -- let me ask

11:18:55   4   you a different way.  On September 23rd, 2014, you

11:19:00   5   still did not know that I-Cubed was selling

11:19:03   6   Company C shares to Oak, did you?

11:19:06   7       A.   Absolutely not.

11:19:11   8       Q.   And who was your -- but you knew there was

11:19:14   9   an upcoming liquidity event, right?

11:19:16  10       A.   Upcoming potential liquidity event.

11:19:19  11       Q.   Okay.  And now, starting on September 24th,

11:19:24  12   2014, who did you think was negotiating on behalf

11:19:27  13   of I-Cubed?

11:19:29  14       A.   It could have been my estate lawyer.

11:19:31  15       Q.   So your estate lawyer told you that he was

11:19:34  16   negotiating on behalf of I-Cubed?

11:19:36  17       A.   He didn't tell me anything.  All I know is

11:19:38  18   there was a potential liquidity event.  I did not

11:19:41  19   know the details of that liquidity event.  I found

11:19:44  20   out later in September that Mr. Kimball was

11:19:48  21   resigning.  And that my estate lawyer would be

11:19:51  22   taking his place.  That was my understanding of

11:19:54  23   what was going on at that time.

11:19:55  24       Q.   So but you didn't have -- you didn't know,

11:19:57  25   even though, you owned the company who was

| | | |
|---|---|---|
| 11:19:59 | 1 | negotiating the sale of the assets? |
| 11:20:01 | 2 | A.  I did not know. |
| 11:20:12 | 3 | Q.  It's fair to say you didn't play any role in |
| 11:20:15 | 4 | those negotiations, the sale? |
| 11:20:17 | 5 | A.  I did not play a role in those negotiations. |
| 11:20:22 | 6 | Q.  I'd like to turn to the next exhibit, |
| 11:20:24 | 7 | Exhibit 10. |
| 11:20:25 | 8 | MR. WILLIAMS:  And I apologize, your |
| 11:20:26 | 9 | Honor, it's not marked but this is the next |
| 11:20:28 | 10 | stapled document.  It's a -- with Bank of |
| 11:20:30 | 11 | America at the top left corner. |
| 11:20:32 | 12 | THE COURT:  Thank you. |
| 11:20:33 | 13 | Q.  Do you recognize Exhibit 10? |
| 11:20:41 | 14 | A.  You showed it to me at the deposition.  I |
| 11:20:44 | 15 | recognize it from the deposition. |
| 11:20:49 | 16 | Q.  And had you seen it before the deposition? |
| 11:20:52 | 17 | A.  No. |
| 11:20:59 | 18 | Q.  Whose signature appears on this document, |
| 11:21:01 | 19 | Ms. Ahmed? |
| 11:21:02 | 20 | A.  That does not look like my husband's |
| 11:21:05 | 21 | signature, if that's what you're asking. |
| 11:21:07 | 22 | Q.  And let's turn to the second page.  Whose |
| 11:21:13 | 23 | signature is at the top left there? |
| 11:21:15 | 24 | A.  That looks like my husband's signature. |
| 11:21:18 | 25 | Q.  And what is does the title say? |

11:21:23    1       A.  It says "Member."

11:21:24    2       Q.  And was your husband -- if we can go back to

11:21:30    3   the first page, is there a date there?

11:21:35    4       A.  October 28, 2014.

11:21:37    5       Q.  And was your husband a member of I-Cubed

11:21:40    6   Domains LLC on October 28, 2014?

11:21:43    7       A.  Not to my knowledge.

11:21:47    8       Q.  And do you know why he signed his name and

11:21:50    9   then wrote "Member"?

11:21:51   10       A.  I do not know that.

11:21:52   11       Q.  Did you have any discussion with him about

11:21:54   12   opening this bank account?

11:21:56   13       A.  I cannot recall specifically any discussions

11:22:00   14   with him.  But, again, we were just talking about

11:22:05   15   the potential liquidity event.

11:22:09   16       Q.  And if you turn to the third page, whose

11:22:12   17   handwriting is on that third page, Bates number

11:22:15   18   ending in 1191?

11:22:20   19       A.  At the bottom, that is my husband's

11:22:22   20   handwriting.

11:22:23   21       Q.  And again, that says -- it says "Member"

11:22:26   22   twice there, correct?

11:22:28   23       A.  It says "Member" once, by his handwriting.

11:22:31   24       Q.  And then do you see up at the top, it says

11:22:34   25   I-Cubed Domains LLC Bank of America, and then

11:22:37  1    "Member"?

11:22:38  2       A.  Yes, but that is not his handwriting.

11:22:40  3       Q.  Why wasn't the I-Cubed Domains LLC bank

11:22:48  4    account opened in your name?

11:22:54  5       A.  I can't tell you why it was or wasn't opened

11:22:57  6    in my name.  I don't know that.

11:22:58  7       Q.  Why didn't you open a bank account in

11:23:00  8    I-Cubed's name if you controlled the entity?

11:23:03  9       A.  There is no reason.  I cannot answer that

11:23:12  10   question.  I don't -- I don't know.

11:23:18  11      Q.  Is it because your husband was doing

11:23:20  12   everything with regard to I-Cubed?

11:23:22  13      A.  Well, he was managing I guess whatever

11:23:26  14   potential liquidity event was upcoming.  He and/or

11:23:31  15   my estate lawyer.  But I would imagine that would

11:23:34  16   be why this was opened.

11:23:36  17      Q.  And your husband was, of course, still here,

11:23:38  18   so there was no need to trigger that sort of

11:23:41  19   contingency event for you to take on I-Cubed,

11:23:44  20   right?

11:23:45  21      A.  Cancer is a very long term illness.  So he

11:23:49  22   was still under surveillance, or still needed to

11:23:52  23   be under surveillance.  I didn't say there was no

11:23:55  24   contingency event, he -- I mean, I don't

11:23:58  25   understand what you're talking about by that.

11:24:00  1    Q.  My point is, is that your husband was still

11:24:03  2    capable of running I-Cubed, and so he was

11:24:05  3    continuing to run I-Cubed, right?

11:24:07  4    A.  I don't know if he was continuing to run

11:24:09  5    I-Cubed.  What do you mean by run I-Cubed?

11:24:11  6    Q.  Well, I mean doing everything for I-Cubed,

11:24:15  7    opening its bank accounts, negotiating its sale,

11:24:16  8    managing its assets, communicating with the

11:24:18  9    manager of I-Cubed, transferring I-Cubed when it

11:24:21  10   needed to be transferred into someone else's name?

11:24:23  11          MR. SKIBELL:  I'm going to object.

11:24:25  12   There's no foundation for any of this and he's

11:24:27  13   just testifying himself.

11:24:28  14          THE COURT:  Rephrase, please.

11:24:29  15   Q.  To your knowledge -- you know what, let me

11:24:34  16   move on, Mrs. Ahmed.  When did you first learn

11:24:38  17   about this bank account?

11:24:40  18   A.  When you put these documents in front of me.

11:24:43  19   Q.  So before I put the document in front of

11:24:47  20   you, to your knowledge, I-Cubed did not even have

11:24:49  21   a bank account?

11:24:50  22   A.  That I knew of, that's correct.

11:24:51  23   Q.  If we can turn to the next exhibit.  And

11:25:06  24   this last exhibit, and this series of questions,

11:25:09  25   is Exhibit 3.

| | | |
|---|---|---|
| 11:25:10 | 1 | MR. WILLIAMS:  And your Honor, at |
| 11:25:10 | 2 | this time, I do move to admit Exhibits 7, 8 and |
| 11:25:16 | 3 | 9 and 10. |
| 11:25:16 | 4 | MR. SKIBELL:  I'm going to object. |
| 11:25:18 | 5 | He's laid no foundation for the admission of |
| 11:25:20 | 6 | these documents. |
| 11:25:55 | 7 | THE COURT:  I'm not quite sure that's |
| 11:25:58 | 8 | true for Plaintiff's 8. |
| 11:26:00 | 9 | MR. SKIBELL:  You're right, I |
| 11:26:02 | 10 | misspoke.  For the GRAT documents, you're |
| 11:26:04 | 11 | correct, he has laid foundation for that one. |
| 11:26:06 | 12 | But for the other ones, I don't think he has. |
| 11:26:10 | 13 | THE COURT:  We'll admit 8 in whole. |
| 11:26:12 | 14 | Is there any limited purpose for 9 or 10?  Which |
| 11:26:16 | 15 | she has not testified she had any knowledge of. |
| 11:26:20 | 16 | MR. WILLIAMS:  Yes, your Honor. |
| 11:26:22 | 17 | She's recognized -- well, one, Exhibit 9, she |
| 11:26:26 | 18 | did say in fact that she received Mr. Kimball's |
| 11:26:28 | 19 | resignation, so I submit there is a foundation. |
| 11:26:30 | 20 | With Exhibit 10 -- |
| 11:26:31 | 21 | THE COURT:  She said she knew he |
| 11:26:34 | 22 | resigned. |
| 11:26:35 | 23 | MR. WILLIAMS:  I can ask that |
| 11:26:37 | 24 | question, if I may your, Honor. |
| 11:26:38 | 25 | Q.  Mrs. Ahmed, did you receive Exhibit 9, this |

11:26:41  1    resignation letter?

11:26:43  2        A.  Via e-mail?

11:26:43  3        Q.  Yes, or in any way or form?

11:26:45  4        A.  I would have to go back and check that.  I'm

11:26:48  5    not a hundred percent sure.  I would have to go

11:26:50  6    back and look at my records.

11:26:51  7        Q.  Do you know who Mr. Kimball would be

11:26:53  8    resigning to if he didn't send it to you, who

11:26:56  9    owned I-Cubed, in September of 2014?

11:27:02 10        A.  I don't know if he would have gone to my

11:27:04 11    estate lawyer, versus me directly.  So I would

11:27:07 12    have to go back and just double-check on that.

11:27:11 13            MR. WILLIAMS:  And your Honor, with

11:27:12 14    regards to Exhibit 10, she recognized his

11:27:14 15    handwriting.  I submit they're objections to the

11:27:16 16    weight, not the admissibility.  If they want to

11:27:19 17    say these documents are forged, I'm happy for

11:27:21 18    them to make that argument.  But the fact is,

11:27:23 19    they should be made as part of the record

11:27:25 20    because this witness has been at least able to

11:27:31 21    verify and corroborate the information I believe

11:27:34 22    contained in all these documents.

11:27:37 23            MR. SKIBELL:  If they want to lay a

11:27:38 24    proper foundation, explain how they got these

11:27:40 25    documents, what they are, they can be admitted.

| | | |
|---|---|---|
| 11:27:43 | 1 | But until that time, it's plainly not |
| 11:27:45 | 2 | admissible. |
| 11:27:46 | 3 | THE COURT:  I'm going to leave them |
| 11:27:48 | 4 | as I.D., unless they are offered for just a |
| 11:27:51 | 5 | limited purpose of that is Mr. Ahmed's signature |
| 11:27:59 | 6 | on that document.  But then I don't know it's |
| 11:28:01 | 7 | relevance if I don't know what -- if I don't |
| 11:28:04 | 8 | have a basis for that document. |
| 11:28:08 | 9 | MR. WILLIAMS:  Yes, your Honor.  And |
| 11:28:09 | 10 | I -- I do note, the individual that would be |
| 11:28:14 | 11 | authenticating this fled the United States after |
| 11:28:16 | 12 | we brought this case.  And so I to ask for a bit |
| 11:28:18 | 13 | of leeway, understanding that -- |
| 11:28:23 | 14 | MR. SKIBELL:  That's not true.  You |
| 11:28:24 | 15 | got them from Bank of America or some other |
| 11:28:27 | 16 | Avenue.  You could put in evidence as to how you |
| 11:28:29 | 17 | got these documents -- |
| 11:28:30 | 18 | THE COURT:  9 and 10 will remain for |
| 11:28:32 | 19 | identification, subject to a foundation being |
| 11:28:37 | 20 | demonstrated.  Okay.  Let's move on. |
| 11:28:40 | 21 | MR. WILLIAMS:  Thank you, your Honor. |
| 11:28:42 | 22 | Q.  Now, turning to Exhibit 3, do you recognize |
| 11:28:47 | 23 | this document, Mrs. Ahmed? |
| 11:28:56 | 24 | A.  I do not recognize this document. |
| 11:29:00 | 25 | Q.  And so let's go to the top.  Is this the |

11:29:04   1   stock purchase agreement between I-Cubed Domains

11:29:08   2   and Oak Investments Partners?

11:29:10   3       A.   That's what it looks like.

11:29:11   4       Q.   And so your testimony is you don't recognize

11:29:15   5   the stock purchase agreement?

11:29:17   6       A.   That's correct.

11:29:18   7       Q.   Ms. Ahmed, how I-Cubed come to a sales price

11:29:36   8   for that liquidity event?

11:29:39   9       A.   I would imagine there are valuation

11:29:41  10   documents or a valuation that was done for that

11:29:43  11   sales price.

11:29:44  12       Q.   But you're not aware of any of those

11:29:46  13   documents or you were not involved in any of those

11:29:49  14   discussions?

11:29:49  15       A.   No, I was not.

11:29:50  16       Q.   And do you know why the shares were sold for

11:29:58  17   7.5 million, just a little more than a month that

11:30:02  18   you signed that they were worth a little over

11:30:04  19   eight hundred thousand?

11:30:05  20       A.   I do not know that.

11:30:18  21       Q.   Do you recall how many shares of Company C

11:30:23  22   I-Cubed Domain sold?

11:30:25  23       A.   I would have to go back and look.  I don't

11:30:27  24   know off the top --

11:30:29  25       Q.   Do you recall the share price that I-Cubed

| | | |
|---|---|---|
| 11:30:31 | 1 | sold to Company C shares for? |
| 11:30:35 | 2 | A.  I, again, I was not involved in those |
| 11:30:38 | 3 | negotiations.  So just whatever I have learned in |
| 11:30:40 | 4 | court here.  But not at that time. |
| 11:30:51 | 5 | Q.  Were you familiar with Richard Kimball |
| 11:30:54 | 6 | enough to recognize his signature? |
| 11:30:57 | 7 | A.  I was not familiar with Richard Kimball |
| 11:31:00 | 8 | enough. |
| 11:31:01 | 9 | Q.  If you turn to the page that ends 105, let |
| 11:31:11 | 10 | me just ask you a few questions. |
| 11:31:13 | 11 | THE COURT:  We're still on Exhibit 3? |
| 11:31:16 | 12 | MR. WILLIAMS:  I'm sorry? |
| 11:31:17 | 13 | THE COURT:  Are we still on Exhibit |
| 11:31:18 | 14 | 3? |
| 11:31:19 | 15 | MR. WILLIAMS:  Yes, we are, your |
| 11:31:20 | 16 | Honor. |
| 11:31:20 | 17 | Q.  Now, to your knowledge, Mr. Kimball resigned |
| 11:31:32 | 18 | in September of 2014, is that right? |
| 11:31:35 | 19 | A.  To my knowledge, yes. |
| 11:31:36 | 20 | Q.  And then -- now is this stock power dated |
| 11:31:40 | 21 | October 29, 2014? |
| 11:31:42 | 22 | A.  Yes, it is. |
| 11:31:43 | 23 | Q.  And is that Mr. Kimball's name? |
| 11:31:49 | 24 | A.  That is his name written, typed in there, |
| 11:31:52 | 25 | yes. |

11:31:52  1      Q.  And you would agree that Mr. Kimball was not

11:31:56  2  the manager of I-Cubed at this time, as he had

11:31:59  3  resigned a month earlier?

11:32:01  4      A.  That is my understanding.

11:32:07  5      Q.  Did you sign that signature for Mr. Kimball?

11:32:10  6      A.  Absolutely not.

11:32:12  7      Q.  I needed to ask the question, Mrs. Ahmed, I

11:32:15  8  don't mean to offend you.  If you turn to the page

11:32:19  9  ending 103.  And again, I don't mean to offend

11:32:28 10  you, but I do need to ask, did you sign Mr.

11:32:32 11  Kimball's name on this document?

11:32:32 12      A.  I did not sign Mr. Kimball's name on this

11:32:34 13  document.

11:32:35 14      Q.  Do you know who signed Mr. Kimball's name on

11:32:37 15  these two documents?

11:32:38 16      A.  I do not know who signed Mr. Kimball's name

11:32:40 17  on these two documents.

11:32:42 18      Q.  Whose signature is on the left of Mr.

11:32:45 19  Kimball?

11:32:45 20      A.  That is my husband's signature.

11:32:48 21      Q.  And is he signing on behalf of Oak on this

11:32:52 22  document?

11:32:52 23      A.  That's what it appears.

11:32:57 24      Q.  Now, the stock purchase agreement was for

11:33:01 25  the sale from I-Cubed, of Company C shares, to

11:33:06   1   Oak.   Right?

11:33:08   2       A.   As I learn now, yes.

11:33:10   3       Q.   And that's the liquidity event?

11:33:12   4       A.   That is the potential liquidity event.

11:33:15   5       Q.   Well, it's no longer potential, correct,

11:33:17   6   because it happened on this date; is that fair?

11:33:19   7       A.   Well, you're asking me as of now, or you're

11:33:22   8   asking me back then?

11:33:24   9       Q.   Well, I guess I'm -- let me start with back

11:33:26  10   then, you didn't know that there was a sale

11:33:28  11   effectuated for I-Cubed on October 29, 2014?

11:33:32  12       A.   Again, I knew there was a potential

11:33:34  13   liquidity event.  And I found out about that

11:33:37  14   after.

11:33:37  15       Q.   So you weren't even informed that I-Cubed in

11:33:40  16   fact had sold the assets until after it had

11:33:44  17   already done so?

11:33:46  18       A.   I mean, again, I knew there was a liquidity

11:33:49  19   event, and I was informed when that happened.

11:33:51  20       Q.   You just told me that you learned after.  So

11:33:54  21   did you learn when it was happening, or did you

11:33:56  22   learn after, that --

11:33:57  23       A.   I learned after.

11:33:58  24       Q.   Okay.  So after I-Cubed sold the Company C

11:34:02  25   shares, that's when you, the owner of I-Cubed,

| | | |
|---|---|---|
| 11:34:05 | 1 | were informed of the sale? |
| 11:34:07 | 2 | A.  That's when I knew the liquidity event |
| 11:34:15 | 3 | happened. |
| 11:34:15 | 4 | MR. WILLIAMS:  Your Honor, I |
| 11:34:17 | 5 | apologize, Exhibit 3 has already been admitted. |
| 11:34:24 | 6 | Q.  And Mrs. Ahmed, I apologize, there is |
| 11:34:27 | 7 | actually one more exhibit in this line of |
| 11:34:30 | 8 | questioning, and that will be Exhibit 11.  And |
| 11:34:35 | 9 | this is just a check.  Do you recognize Exhibit |
| 11:34:39 | 10 | 11? |
| 11:34:39 | 11 | A.  I do recognize Exhibit 11, yes. |
| 11:34:41 | 12 | Q.  Before I ask you about Exhibit 11, let me |
| 11:34:58 | 13 | ask you just a few more questions.  Prior to the |
| 11:35:00 | 14 | sale of the Company C shares, you never disclosed |
| 11:35:08 | 15 | to Oak that you had an ownership interest in it, |
| 11:35:10 | 16 | right because you didn't know Oak was purchasing |
| 11:35:13 | 17 | it, is that fair? |
| 11:35:14 | 18 | A.  I had nothing to do with Oak.  And like I |
| 11:35:17 | 19 | said before, there was a Chinese wall between my |
| 11:35:19 | 20 | husband and I in terms of what he did |
| 11:35:22 | 21 | professionally, and what I did professionally. |
| 11:35:24 | 22 | Q.  And now during this time, just to be clear, |
| 11:35:28 | 23 | you were not working, were you? |
| 11:35:30 | 24 | A.  When you say "during this time," you mean |
| 11:35:32 | 25 | the 2014? |

11:35:33  1      Q.   Yes.

11:35:34  2      A.   I was not professionally employed at that

11:35:35  3   time.

11:35:35  4      Q.   Okay.  And so there was no -- when you say

11:35:38  5   the Chinese wall, it was one that you and your

11:35:40  6   husband put up; it wasn't something that JP

11:35:43  7   Morgan, for example, or Goldman Sachs said you can

11:35:46  8   not be discussing anything with your husband

11:35:47  9   regarding business?

11:35:48  10     A.   That's right.  I mean I was working in

11:35:51  11  mergers and acquisitions when I met my husband, at

11:35:54  12  Morgan Stanley.  He was at Goldman Sachs.  And

11:35:55  13  that was something that we agreed to, day one.

11:36:00  14  And that just kept going, even after I was not at

11:36:03  15  Goldman Sachs anymore.

11:36:04  16     Q.   Okay.  And so looking at Exhibit 11, this is

11:36:09  17  the check -- well, is this a check written and

11:36:11  18  signed by your husband?

11:36:13  19     A.   That looks like his handwriting, and that

11:36:15  20  looks like his signature.

11:36:17  21     Q.   And before I showed you this check -- well,

11:36:20  22  have you seen this document before, this check?

11:36:23  23     A.   Yes, I have.

11:36:24  24     Q.   And when did you first see it?

11:36:25  25     A.   Probably November 3rd, when it was given to

11:36:34  1    me.

11:36:34  2       Q.  And this check isn't from the purchaser of

11:36:42  3    the Company C shares, right?  This check is from

11:36:46  4    your husband?

11:36:48  5       A.  He signed the check, that's right.

11:36:53  6       Q.  So why does your husband have the money that

11:36:56  7    I-Cubed sold its assets for?

11:37:02  8       A.  I did not ask him that.

11:37:04  9       Q.  Did you think it was strange that he was

11:37:06  10   writing you the check, rather than the individuals

11:37:09  11   or the entity that was purchasing the assets?

11:37:11  12      A.  I never asked him, I never questioned him

11:37:14  13   about it.  I didn't even think about that.

11:37:19  14      Q.  And you never asked him who purchased the

11:37:22  15   shares?

11:37:22  16      A.  I did not ask him who purchased the shares.

11:37:24  17      Q.  Did you ask him why, when you filled out the

11:37:27  18   GRAT a few months earlier, they were worth a

11:37:30  19   little over -- they were worth approximately eight

11:37:32  20   or nine hundred thousand, and now the liquidity

11:37:36  21   event occurred, it was 7.425 million?

11:37:38  22      A.  I did not.

11:37:40  23      Q.  Why didn't you ask him those questions?

11:37:42  24      A.  I didn't -- I didn't think about it at the

11:37:48  25   time.  I was also busy with my children.  But I

11:37:58  1    didn't think to ask him the difference between the

11:38:03  2    two.

11:38:04  3        Q.  Whose idea was it to write this check to the

11:38:07  4    name of the -- I'm going to use the word GRAT, the

11:38:11  5    Grantor Retained Annuity Trust?

11:38:13  6        A.  That would have been done under the advice

11:38:15  7    of my estate counsel.

11:38:17  8        Q.  So to your understanding, was Mr. Ahmed,

11:38:21  9    your husband, Iftikar Ahmed, under any legal

11:38:24  10   obligation to write that check to the GRAT?

11:38:28  11       A.  When you say "legal obligation," what

11:38:30  12   specifically do you mean?

11:38:31  13       Q.  Well, your husband was not a member of

11:38:35  14   I-Cubed, right?

11:38:36  15       A.  Right.

11:38:37  16       Q.  He wasn't a manager of I-Cubed?

11:38:39  17       A.  Right.

11:38:39  18       Q.  And so this 7.425 million dollars, your

11:38:45  19   husband could have done anything he wanted with

11:38:46  20   that money, right?

11:38:47  21       A.  When -- what do you mean by "could have

11:38:52  22   done"?

11:38:52  23                MR. SKIBELL:  I'm going to object.

11:38:54  24   I'm not quite sure -- are you asking for the

11:38:56  25   advice of her legal counsel with regard to --

11:38:58    1            THE COURT:  I don't understand that

11:38:59    2   to be advice of counsel, but perhaps you need to

11:39:02    3   rephrase it.

11:39:04    4            MR. WILLIAMS:  That's fair, your

11:39:04    5   Honor.

11:39:04    6   Q.  Was your husband under any legal obligation

11:39:08    7   to give this money to the GRAT, or did he simply

11:39:12    8   choose to do so?

11:39:17    9   A.  Well, if -- I mean, when I look back on it

11:39:20   10   now, if he was effectuating the sale, then he

11:39:25   11   would have to give the money back to wherever the

11:39:26   12   sale of the shares came from.

11:39:32   13   Q.  And I'm trying to follow that.  So you are

11:39:34   14   saying that he was working on behalf of I-Cubed,

11:39:36   15   he was representing I-Cubed?

11:39:38   16   A.  No, I'm not saying that.  All I'm saying is

11:39:41   17   if -- if this was representing the sale of the

11:39:44   18   shares, then the money that was representing the

11:39:46   19   sale of the shares would have gone back to where

11:39:51   20   those shares came from.

11:39:53   21   Q.  And that leads me right into, is this money

11:39:56   22   for the sale of those shares?

11:39:58   23   A.  That is my understanding.

11:39:59   24   Q.  And why is that your understanding?

11:40:03   25   A.  This is -- my understanding is this was the

11:40:05  1   liquidity event, or that potential liquidity

11:40:08  2   event, that it happened.  And these were -- this

11:40:10  3   was the money because of that liquidity event.

11:40:17  4       Q.  So you felt that -- is it your testimony

11:40:20  5   that Mr. Ahmed was entitled or was forced to write

11:40:23  6   this check to the GRAT?

11:40:25  7       A.  I don't know if he was forced to, but I

11:40:28  8   think there was an obligation.

11:40:32  9       Q.  And at this time, just to be very clear, you

11:40:35  10  didn't even know I-Cubed had a bank account,

11:40:37  11  right?

11:40:37  12      A.  I did not know I-Cubed had a bank account.

11:40:41  13      Q.  And to be very clear, you didn't perform any

11:40:44  14  goods or services in exchange for this 7.425

11:40:48  15  million, right?

11:40:50  16      A.  Well, at that point, I owned the shares

11:40:54  17  that were transferred into the GRAT.  So when you

11:40:58  18  say "you didn't perform any goods or services,"

11:41:00  19  what specifically do you mean?

11:41:02  20      Q.  Well, that's my question to you, is did you

11:41:03  21  perform any goods or services in exchange for the

11:41:09  22  7.425 million dollars?  I mean, did you exchange

11:41:11  23  something for this?

11:41:13  24      A.  I mean, there was an ownership interest.

11:41:16  25      Q.  Let me back up.

11:41:17  1      A.  I'm sorry, I don't mean to be --

11:41:20  2      Q.  Mrs. Ahmed, it's fine.

11:41:21  3      A.  I'm a little confused.

11:41:23  4      Q.  Who's this check coming from?

11:41:25  5      A.  It looks like it's coming from a Bank of

11:41:28  6  America account.

11:41:28  7      Q.  And who signed the check?

11:41:30  8      A.  That looks like my husband's signature.

11:41:32  9      Q.  And you have a Harvard MBA?

11:41:34  10     A.  Yes, I do have a Harvard MBA, thank you.

11:41:36  11     Q.  So when someone signs a check, does that

11:41:38  12  mean typically it's their account, they have a

11:41:40  13  signature authority over the account?

11:41:42  14     A.  It may not be their account, but they

11:41:44  15  potentially could have a signature authority over

11:41:46  16  that account, yes.

11:41:47  17     Q.  So this money is coming from -- not from the

11:41:50  18  seller, but from Iftikar Ahmed, right?

11:41:53  19     A.  It's coming from an account where he has

11:41:56  20  signature authority over it.

11:41:58  21     Q.  Okay.  Now, Iftikar Ahmed controlled I-Cubed

11:42:06  22  before it was placed in your name, right?

11:42:10  23     A.  That's correct.

11:42:10  24     Q.  And Iftikar Ahmed controlled I-Cubed after

11:42:13  25  it was placed in your name, right?

11:42:20  1      A.  Okay.

11:42:21  2      Q.  And in fact, to this day, Iftikar Ahmed has

11:42:26  3  always controlled I-Cubed, isn't that right?

11:42:29  4      A.  Not to this day.

11:42:32  5      Q.  When did that change?

11:42:32  6      A.  I-Cubed is a -- is an entity where we were

11:42:36  7  making private investments, so investments in

11:42:38  8  other companies.  There were investments that have

11:42:42  9  come out of I-Cubed.

11:42:43  10     Q.  So I just -- I would like just a date, with

11:42:45  11  all due respect, what day did -- is it your

11:42:49  12  testimony that Mr. Iftikar Ahmed stopped

11:42:51  13  controlling I-Cubed?

11:42:52  14     A.  I don't think there was ever a question of

11:42:54  15  control.  He and I would -- we shared things.  He

11:42:58  16  and I would talk about things.  So if he wanted to

11:43:01  17  potentially look at a private investment, or if I

11:43:04  18  thought there was a company where a private

11:43:06  19  investment would be interesting, we talked about

11:43:08  20  it.  We were husband and wife.  So we never spoke

11:43:12  21  about anything that was going on professionally in

11:43:14  22  his professional domain.  But we would speak about

11:43:18  23  other types of investments personally and that had

11:43:21  24  to do with the family.  So I don't know, when

11:43:23  25  you're talking about control, again, we're husband

| | |
|---|---|
| 11:43:26 | 1 |
| 11:43:28 | 2 |
| 11:43:32 | 3 |

and wife.  He might be doing certain things, I
might be doing certain things.  But there was
discussion between us.

Q.  Well, you just got done telling me that
there wasn't any discussion regarding the
liquidity event --

A.  There was no discussion regarding the
specifics of the liquidity event, but there was a
discussion regarding a potential liquidity event.

Q.  Let me move on, Mrs. Ahmed.

MR. SKIBELL:  Before Mr. Williams
moves on, I just want to note that we're going
to be planning to take all of our time.  And
from what Mr. Heinke said, we have about an hour
left.  And by my watch, that means they have
less than ten minutes left.  So I would think,
unless I'm looking at --

THE COURT:  The calculation was that
you had 45 minutes left.

MR. SKIBELL:  Okay.

THE COURT:  So minus that out from
one o'clock.

MR. SKIBELL:  Okay.  Then I
misunderstood.  So we have 45 minutes left, so
they have approximately 20 some odd minutes

11:44:35  1    left.

11:44:35  2                  THE COURT:  Correct.

11:44:35  3                  MR. SKIBELL:  Okay, just wanted to

11:44:37  4    make sure we had that -- I'm correct before we

11:44:39  5    move forward.

11:44:40  6                  MR. WILLIAMS:  Your Honor, my records

11:44:42  7    indicate Mr. Heinke spent less than five

11:44:44  8    minutes.  I have not been up here for an hour

11:44:46  9    and 30 minutes.

11:44:47  10                  THE COURT:  You started at 10:50.  We

11:44:50  11   are now at 11:45.

11:44:56  12                  MR. WILLIAMS:  So meaning the

11:44:57  13   Government has spent a total of one hour, which

11:44:59  14   is less than what defendants has spent.  So we

11:45:03  15   should -- we must have more time than defense

11:45:05  16   still, so --

11:45:07  17                  MR. SKIBELL:  Some of that time was

11:45:09  18   taken up by things that were not allocated to

11:45:13  19   either of us.  But my understanding, as the

11:45:15  20   judge, we have 45 minutes left and we're

11:45:17  21   planning to take them, so I'd move along.

11:45:19  22                  MR. WILLIAMS:  Your Honor, I want to

11:45:21  23   be clear on this.  We have -- the Government has

11:45:22  24   spent a total of one hour.  I believe defense

11:45:25  25   has spent a total of a little more than one

| | | |
|---|---|---|
| 11:45:28 | 1 | hour.  So I just want to -- as long as we are |
| 11:45:30 | 2 | clear going forward, we have the same amount of |
| 11:45:32 | 3 | time, as of right now. |
| 11:45:33 | 4 | THE COURT:  All I want to be clear |
| 11:45:35 | 5 | about is at one o'clock, we're done.  Thank you. |
| 11:45:38 | 6 | MR. SKIBELL:  All right, and we're |
| 11:45:40 | 7 | going to have 45 left.  So I would leave us 45 |
| 11:45:43 | 8 | minutes, and you can do whatever you want in the |
| 11:45:45 | 9 | rest of your time. |
| 11:45:48 | 10 | MR. WILLIAMS:  Your Honor, I |
| 11:45:49 | 11 | apologize to keep harping on this, but I just |
| 11:45:53 | 12 | don't want to short my client of the time it |
| 11:45:55 | 13 | deserves.  My understanding is we split the time |
| 11:45:58 | 14 | even. |
| 11:46:00 | 15 | MR. SKIBELL:  With all due respect, |
| 11:46:02 | 16 | you didn't have to spend asking the same I-Cubed |
| 11:46:03 | 17 | question over and over again.  We need 45 |
| 11:46:06 | 18 | minutes, so I would move forward and leave us 45 |
| 11:46:08 | 19 | minutes. |
| 11:46:11 | 20 | THE COURT:  Let's move forward. |
| 11:46:24 | 21 | BY MR. WILLIAMS: |
| 11:46:24 | 22 | Q.  Mrs. Ahmed, let's do this.  You wrote checks |
| 11:46:39 | 23 | to your children in the amounts that were right at |
| 11:46:44 | 24 | the gift tax exclusion, isn't that right, each |
| 11:46:47 | 25 | year? |

11:46:47  1          MR. SKIBELL:  Before we move into

11:46:48  2   this line of questioning, I just want to object.

11:46:51  3   Because we will openly acknowledge that the

11:46:55  4   amounts in the children's accounts and the other

11:46:58  5   accounts are part of the freeze in this case.

11:47:00  6   And we're trying to keep them out of them.  So

11:47:02  7   we don't think this line of questions is

11:47:04  8   relevant in any way.  We're acknowledging,

11:47:06  9   they're part of the freeze.

11:47:10  10     Q.  Mrs. Ahmed, is it accurate to say that each

11:47:14  11   year, you and your husband would write checks to

11:47:18  12   the maximum amount under the gift exclusion to

11:47:23  13   your children?

11:47:24  14     A.  That's correct.

11:47:25  15     Q.  And that was around, you know, twelve,

11:47:28  16   thirteen, fourteen thousand dollars, depending on

11:47:29  17   the year?

11:47:30  18     A.  That's correct.

11:47:30  19     Q.  And you also wrote checks to your family

11:47:35  20   members, you personally wrote checks to your

11:47:37  21   family members, your sisters and your parents,

11:47:41  22   correct?

11:47:41  23     A.  That's correct.

11:47:43  24     Q.  And at a deposition, you told me that those

11:47:45  25   were gifts to your sisters and parents, right?

11:47:48  1    A.  That is correct.

11:47:50  2    Q.  And that wasn't true, was it?

11:47:51  3    A.  That is true.

11:47:54  4    Q.  But we can look at the documents if we need

11:47:58  5  to, but isn't it true that two weeks after you had

11:48:00  6  transferred the money to them, they would then

11:48:03  7  write those same amount of checks to your

11:48:06  8  children?

11:48:06  9    A.  So there was no transfer.  I would gift -- I

11:48:08  10  wrote a check to my parents and to my sisters.  It

11:48:10  11  was a gift.  They, in turn, gifted it to my

11:48:15  12  children.

11:48:15  13    Q.  And this occurred every year, right?

11:48:19  14    A.  Depends what year you start with.

11:48:21  15    Q.  And the checks, that your sisters and

11:48:25  16  parents would write checks the exact same day to

11:48:28  17  your children, right?

11:48:29  18    A.  I don't -- it was not the exact same day.

11:48:31  19  It was probably around similar timeframe, but not

11:48:34  20  necessarily the exact same day.

11:48:51  21    Q.  So you're testifying under oath, Mrs. Ahmed,

11:48:54  22  that you were not writing gifts to your family

11:48:57  23  members, knowing that they would turn around and

11:48:59  24  take that same money and gift it to your children?

11:49:01  25    A.  I'm not saying that.  I'm saying I gave my

11:49:05  1   parents a gift and my sisters a gift.  And they,

11:49:08  2   in turn, gifted that to my children.

11:49:10  3      Q.  And you knew, didn't you, when you wrote

11:49:12  4   those checks to your parents and to your sisters,

11:49:14  5   that they would gift that money to your children,

11:49:17  6   didn't you?

11:49:17  7           MR. SKIBELL:  I'm going to renew my

11:49:19  8   objection to this being irrelevant.  And note

11:49:22  9   Mr. Williams, if he has time issues, he should

11:49:24  10  move to something that's actually relevant.

11:49:26  11          THE COURT:  Let's let him take care

11:49:27  12  of his time.  I'm overruling your objection.

11:49:30  13     A.  There was an intention that they would give

11:49:33  14  that to my children, but there was no obligation.

11:49:36  15     Q.  And the reason that there was that intention

11:49:38  16  is because you knew that if you had written checks

11:49:41  17  to your children above that amount, you'd have to

11:49:43  18  file a Form 709.  Right?

11:49:48  19     A.  Keep going with your question.

11:49:50  20     Q.  Isn't that right so far?

11:49:51  21     A.  That's right.

11:49:52  22     Q.  And you knew if you filed a Form 709, it

11:49:56  23  would increase your odds of being audited, and you

11:49:59  24  knew your bank accounts and tax returns didn't

11:50:01  25  match, isn't that --

11:50:04  1    A.  That is absolutely false.  That is not why

11:50:05  2  it was given, okay?  There is a limit to the

11:50:07  3  amount you can give to your children without

11:50:09  4  incurring tax, all right?  It has nothing to do

11:50:12  5  with any type of audit or, you know, balances with

11:50:18  6  checks, or banks, or whatever.  Okay?

11:50:20  7    Q.  Ms. Ahmed, at your deposition, we looked at

11:50:28  8  a lots of checks that were written to you from

11:50:31  9  your husband.  Do you recall that?

11:50:32  10    A.  I do recall that.

11:50:33  11    Q.  And they ranged from -- let's do it this

11:50:40  12  way.  Your residence in Connecticut was purchased

11:50:42  13  for 9.6 million cash?

11:50:45  14    A.  Yes, it was.

11:50:45  15    Q.  And 530 Park Avenue 12-A was purchased for

11:50:51  16  9.3 million cash in December of 2013?

11:50:53  17    A.  Yes, it was.

11:50:54  18    Q.  And 530 Park Avenue 12-F was purchased for

11:50:58  19  approximately 8.6 million cash in April of 2015?

11:51:01  20    A.  That's right.

11:51:02  21    Q.  And in your Fidelity account ending in 7540,

11:51:05  22  it currently holds more than twelve million

11:51:07  23  dollars?

11:51:07  24    A.  That's correct.

11:51:08  25    Q.  And in the GRAT Fidelity account, which we

11:51:11  1   just spoke about, it has more than eight million

11:51:13  2   dollars?

11:51:13  3       A.  That's correct.

11:51:14  4       Q.  If we look at your tax returns, will we see

11:51:19  5   income supporting those assets?

11:51:22  6       A.  If you look at my tax returns, you will see

11:51:27  7   various types -- various numbers for income.  What

11:51:32  8   is in those bank accounts could have come from

11:51:35  9   earlier years.

11:51:36  10      Q.  Did they?

11:51:37  11      A.  They may have.  I don't know that.

11:51:39  12      Q.  Well, and that's my question.  Where did you

11:51:42  13  think this money was coming from?

11:51:44  14      A.  So I thought my -- my husband was a partner

11:51:47  15  at a very well-known, well-established,

11:51:50  16  well-respected venture capital firm.  A partner in

11:51:54  17  a venture capital firm of this stature does well.

11:51:58  18  Okay?  I understand it's a lot of money.  But a

11:52:01  19  partner at a venture capital firm like Oak is like

11:52:04  20  a partner at Goldman Sachs.  Okay?  My

11:52:09  21  understanding is that the money was coming from

11:52:12  22  his line of work.  Okay?  I also want to make it

11:52:16  23  clear that checks is not the same thing as income.

11:52:19  24      Q.  But Ms. Ahmed, when we -- you stated that

11:52:24  25  you at least -- you reviewed the tax returns

11:52:27  1    before they were filed.  Didn't you think it was

11:52:29  2    strange that you didn't see very large numbers

11:52:32  3    that would support purchases such as these?

11:52:36  4        A.  So I briefly glanced at the tax returns and

11:52:40  5    I didn't think about purchases that we were making

11:52:45  6    linked to the tax returns, because some -- as I

11:52:48  7    stated, checks is not the same thing as income.

11:52:50  8        Q.  So even when you had discussions with your

11:52:52  9    husband about, you know, his illness, there was no

11:52:56 10    discussion about where this money was coming from,

11:52:58 11    and whether it would stop if I had to stop

11:53:01 12    working?

11:53:01 13        A.  No, because if he had to stop, I mean he had

11:53:06 14    life insurance as well.  I mean, he had cancer.

11:53:09 15    It's not like he was going to stop work and sit

11:53:12 16    around and not do anything.  He had cancer.  If he

11:53:14 17    was going to stop working, it was because, you

11:53:17 18    know, something was going on with the cancer.

11:53:18 19        Q.  I only have a few more questions, Mrs.

11:53:22 20    Ahmed.  DIYA Holdings and DIYA Real Holdings are

11:53:28 21    two different entities, correct?

11:53:30 22        A.  That's right.

11:53:30 23        Q.  And at one time you were 99 percent owner of

11:53:33 24    both, and your husband was one percent owner?

11:53:35 25        A.  That's right.

11:53:35  1      Q.   And his one percent has since transferred to

11:53:38  2  the GRAT, is that right?

11:53:39  3      A.   That's correct.

11:53:40  4      Q.   When did that occur?

11:53:41  5      A.   I believe that was sometime this year.

11:53:43  6      Q.   And what month?

11:53:44  7      A.   I would not be able to tell you specifically

11:53:47  8  what month.  I would have to go back and check

11:53:50  9  with my records to let you know exactly when that

11:53:53  10  was done.

11:53:53  11      Q.   Mrs. Ahmed, was that done in order to

11:53:55  12  attempt to protect that asset in this case?

11:53:57  13      A.   That was done on the advise of my estate

11:53:59  14  counsel.

11:54:00  15      Q.   Was that done to protect the asset in this

11:54:02  16  case by removing your husband's interest in DIYA

11:54:05  17  and DIYA Real Holdings?

11:54:07  18      A.   That was done on the advice of my estate

11:54:09  19  counsel.

11:54:09  20      Q.   Was it done after the SEC initiated this

11:54:12  21  case?

11:54:12  22      A.   I would have to go back and double-check on

11:54:14  23  the dates.

11:54:14  24      Q.   You're really telling me you don't know if

11:54:16  25  it was done after this case ever initiated?

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
| 11:54:18 | 1  | A.  There were many cases that were initiated.               |
| 11:54:21 | 2  | There was an arrest on April 2nd.  There's another           |
| 11:54:23 | 3  | case pending in Boston.  There's this case here.             |
| 11:54:26 | 4  | There's a lot that's happened.  I don't remember             |
| 11:54:28 | 5  | the exact date.                                              |
| 11:54:29 | 6  | Q.  Was it done before or after your husband's               |
| 11:54:31 | 7  | arrest?                                                       |
| 11:54:31 | 8  | A.  I don't remember.  I would have to go back               |
| 11:54:33 | 9  | and check.                                                   |
| 11:54:41 | 10 | Q.  I think we're at Exhibit 11.  Mrs. Ahmed, I              |
| 11:54:45 | 11 | just want to briefly show you this document.                 |
| 11:54:48 | 12 | THE COURT:  I thought 11 was the                             |
| 11:54:50 | 13 | check, the November 3rd Bank of America check.               |
| 11:54:53 | 14 | No?                                                           |
| 11:54:58 | 15 | MR. WILLIAMS:  I apologize, your                             |
| 11:55:00 | 16 | Honor, that is correct.  So this is Exhibit 12.              |
| 11:55:03 | 17 | Handing a copy to the witness.                               |
| 11:55:04 | 18 | Q.  Very briefly, Mrs. Ahmed, is this the                    |
| 11:55:16 | 19 | transfer of six hundred seventy-one thousand three          |
| 11:55:19 | 20 | hundred eighteen dollars to your counsel?                    |
| 11:55:20 | 21 | A.  Yes, it is.                                               |
| 11:55:21 | 22 | Q.  On the left-hand side --                                 |
| 11:55:24 | 23 | MR. WILLIAMS:  Well, with that, your                         |
| 11:55:25 | 24 | Honor, I ask to move Exhibit 12 into evidence.              |
| 11:55:29 | 25 | THE COURT:  Full exhibit.                                    |

11:55:30   1       Q.   The purpose is "Real estate closing," do you

11:55:34   2   see that?

11:55:35   3       A.   I see that.

11:55:35   4       Q.   That's false, isn't it?

11:55:36   5       A.   When I requested for this transfer to be

11:55:40   6   made, I made it clear it was going to my lawyer.

11:55:42   7   I explained it was going to my lawyer.  I said

11:55:45   8   nothing about real estate.

11:55:46   9       Q.   Would you agree that every other handwritten

11:55:50   10  thing on this document is accurate?  Was that how

11:55:55   11  much money was transferred?

11:55:57   12      A.   That looks about right.

11:55:58   13      Q.   And on the top right, "Client spoken to,"

11:56:00   14  was that you?

11:56:01   15      A.   Yes.

11:56:01   16      Q.   And at that time and that date, is that

11:56:03   17  accurate?

11:56:03   18      A.   I would have no reason to believe it's not.

11:56:07   19      Q.   And then down below, it says "Provide detail

11:56:11   20  of the one or two products held," is that

11:56:13   21  accurate?

11:56:14   22      A.   Yes.

11:56:15   23      Q.   So your testimony is that the only thing

11:56:17   24  that's inaccurate is the purpose, right?

11:56:19   25      A.   Well, when it says FFW, I'm assuming that's

11:56:22   1   federal funds.

11:56:22   2          THE COURT:  I'm sorry, you need to

11:56:24   3   speak up.

11:56:24   4   A.  When it says FFW for transaction type, what

11:56:27   5   exactly does the FFW state?  What does that mean?

11:56:31   6   Q.  And I guess that would be my question to

11:56:34   7   you.  I don't know what FFW means.

11:56:37   8   A.  Okay, so I mean I'm assuming it means a

11:56:40   9   wire, but -- and I don't understand what the

11:56:42   10  client identification.  So you're asking me about

11:56:45   11  every little specific thing on this sheet of

11:56:47   12  paper.  I don't know what client identification

11:56:49   13  is.  I can't tell you what FFW is.  And I did not

11:56:53   14  state it was for a real estate closing.

11:56:57   15  Q.  Mrs. Ahmed, as you sit here today, what

11:56:59   16  assets do you believe belonged to you?

11:57:01   17  A.  Well, I think that really, you know, that's

11:57:05   18  really -- I don't know the law on that.  I mean

11:57:08   19  that's really for the Court to decide.  But I

11:57:11   20  believe that anything that's in my name, belongs

11:57:13   21  to me.

11:57:15   22  Q.  If Mr. Iftikar Ahmed in fact stole money,

11:57:20   23  and then put it in your name, do you think you're

11:57:22   24  entitled to it?

11:57:23   25  A.  No.

11:57:26    1      Q.   If Mr. Iftikar Ahmed obtained money through
11:57:29    2   fraud and put it in your name, do you think you're
11:57:31    3   entitled to it?
11:57:31    4      A.   No.
11:57:33    5      Q.   If Mr. Iftikar Ahmed used stolen money or
11:57:36    6   fraudulent proceeds to purchase assets and put
11:57:38    7   them in your name, do you think you're entitled to
11:57:41    8   those assets?
11:57:41    9      A.   No, but this is all very hypothetical.  If
11:57:44   10   he did that, if this can be proven.
11:57:48   11               MR. WILLIAMS:   One moment.
11:57:50   12               Nothing further.   Thank you, Mrs.
11:58:06   13   Ahmed.
11:58:06   14               THE COURT:   All right,
11:58:07   15   cross-examination.   This is your client, so I'll
11:58:11   16   ask you to not use leading questions.
11:58:11   17   CROSS-EXAMINATION
11:58:11   18   BY MR. SKIBELL:
11:58:13   19      Q.   Good afternoon, Ms. Ahmed.   Prior to this
11:58:17   20   case, and the case in Boston, had you ever
11:58:19   21   testified before?
11:58:20   22      A.   I have not.
11:58:21   23      Q.   Had you ever been deposed before?
11:58:24   24      A.   Not prior to this case.
11:58:26   25      Q.   Had you ever even been sued before?

11:58:29  1      A.  No, never.

11:58:29  2      Q.  Are you nervous today?

11:58:33  3      A.  I'm pretty nervous today.

11:58:35  4      Q.  Okay, it's going to be okay.  Now, let's

11:58:40  5  briefly talk about this wire.  You were shown

11:58:44  6  Exhibit 12 by the SEC.  This isn't your

11:58:47  7  handwriting, is it?

11:58:47  8      A.  No, it's not.

11:58:48  9      Q.  This is handwriting -- whose handwriting is

11:58:50  10  it?

11:58:50  11      A.  I don't know.

11:58:51  12      Q.  How did this wire come about?

11:58:55  13      A.  I had called the Barclay's representative

11:59:01  14  and asked for a wire to be initiated.

11:59:03  15      Q.  And what did you tell that person from

11:59:05  16  Barclay's was the purpose of the transfer?

11:59:07  17      A.  I said it was going to my lawyer's account.

11:59:10  18      Q.  All right.  You were also asked at length by

11:59:13  19  Mr. Williams about your involvement in

11:59:17  20  transactions by I-Cubed.  Do you recall that

11:59:19  21  testimony?

11:59:19  22      A.  I do.

11:59:20  23      Q.  What was going on in your life around that

11:59:23  24  time?

11:59:23  25      A.  So when I-Cubed was transferred to me, the

11:59:30  1   middle of March, or April, May, around that time,

11:59:34  2   my husband was under -- he had to undergo

11:59:37  3   extensive surgery at the end of March.  It was

11:59:41  4   about eight hours long, under general anesthesia.

11:59:43  5   He had a very difficult recovery in April.  He was

11:59:47  6   diagnosed with cancer at the beginning of April.

11:59:51  7   And in May, we were running around trying to find

11:59:56  8   out what radiation, what treatment would be

11:59:59  9   appropriate.  We eventually settled on radiation

12:00:01  10  and with the radiation, what type of radiation

12:00:04  11  treatment would be appropriate.  And he

12:00:06  12  subsequently went through radiation treatment in

12:00:09  13  June and July of that year.

12:00:11  14      Q.  And in connection with that, that traumatic

12:00:14  15  event, did that have an impact on how he viewed

12:00:18  16  finances, or what should be in your name versus

12:00:21  17  jointly in your names, as a couple?

12:00:23  18      A.  He did.  I think when you're faced with a

12:00:29  19  shortened life expectancy that's out of your --

12:00:31  20  really out of your control, and completely

12:00:34  21  unexpected, he wanted to make sure that the kids

12:00:40  22  were taken care of, that I was taken care of.  And

12:00:43  23  there was an understanding that, you know, he

12:00:47  24  would put things in my name.

12:00:50  25      Q.  And so just to be clear, you're aware of the

12:00:54   1   SEC alleges in this case that things were put in

12:00:57   2   your name to hide them from the government; is

12:01:00   3   that accurate?

12:01:01   4       A.  Absolutely not.

12:01:02   5       Q.  Now, at the time of these I-Cubed

12:01:06   6   transactions you were asked about, how many

12:01:08   7   children did you have?

12:01:08   8       A.  So in 2013, three children.  In 2014, three

12:01:15   9   children.  I was also dealing with medical issues

12:01:18  10   related to two of those three children in 2014.

12:01:22  11       Q.  Did that affect your ability to closely

12:01:25  12   monitor investments that were in your name?

12:01:28  13       A.  It did.  One of my children was diagnosed

12:01:31  14   with a severe speech delay and autism, being on

12:01:35  15   the autistic spectrum, in early 2014.  And another

12:01:40  16   child was diagnosed with ADHD towards the middle

12:01:44  17   to end of 2014.

12:01:45  18       Q.  And because of those health issues of both

12:01:48  19   of your children, and your husband, did you rely

12:01:51  20   on the advice you received from various financial

12:01:55  21   advisers or legal advisers?

12:01:56  22       A.  I did, yes.

12:01:58  23       Q.  As a general matter, do you rely on the

12:02:02  24   advice of legal advisers and financial advisers?

12:02:04  25       A.  As a general matter, I do, yes.

12:02:07  1    Q.  Now, you've reviewed the SEC Complaint in

12:02:11  2    this case?

12:02:13  3    A.  Yes, I have.

12:02:13  4    Q.  And you reviewed the Amended Complaint as

12:02:16  5    well?

12:02:16  6    A.  Yes, I have.

12:02:17  7    Q.  And prior to reading those complaints, did

12:02:22  8    you have any knowledge of the allegations

12:02:23  9    contained therein?

12:02:25  10   A.  Absolutely not.

12:02:27  11   Q.  Did you have any suspicions?

12:02:28  12   A.  Absolutely not.

12:02:29  13   Q.  What was your reaction upon reading the

12:02:32  14   allegations in those Complaints?

12:02:33  15   A.  I was shocked.  I was stunned.  That was not

12:02:47  16   my husband.  And I just -- I am having a very hard

12:02:55  17   time trying to understand what happened.

12:03:00  18   Q.  Now, prior to your husband's arrest in April

12:03:02  19   2015, what was your image of him?

12:03:06  20   A.  So he -- he's, you know, family guy, well

12:03:13  21   respected in the community, well liked, well

12:03:17  22   respected professionally.  He was the type of guy

12:03:23  23   who you didn't just like him, you loved him.  Some

12:03:31  24   friends of ours have told us they would put his

12:03:35  25   hand -- you know, put their hand in the fire for

12:03:38   1    him, because he was such a great person.  He spent

12:03:41   2    all his time, free time, with his children.  He

12:03:46   3    wouldn't go out with his buddies, he just wanted

12:03:48   4    to be with his kids.  He was the type of guy who

12:03:53   5    he worked really hard at his firm.  He would take

12:03:58   6    three a.m. work calls with his international

12:04:02   7    companies.  He was the type of guy who, he would

12:04:06   8    take a 14-hour flight to Korea, land at the

12:04:10   9    airport, shower at the airport, eight hours of

12:04:11   10   meetings, take a 14-hour flight back home to be

12:04:15   11   with the kids.  You know, just -- just, you know,

12:04:21   12   a great guy, part of the community, and loved his

12:04:23   13   children, loved his family, worked really hard.

12:04:26   14        Q.  Now, Ms. Ahmed, you have now reviewed the

12:04:30   15   Complaint, and you heard the testimony of Grace

12:04:32   16   Ames and the presentation by the SEC.  Are you

12:04:37   17   planning to contest the allegations in this case?

12:04:40   18        A.  I am planning on contest the allegations.

12:04:43   19        Q.  And why are you doing that, Ms. Ahmed?

12:04:45   20        A.  I have three little children at home who I

12:04:52   21   am responsible for.  I owe it to them.  My husband

12:05:28   22   worked really hard.  I worked really hard.  That,

12:05:35   23   as a mother of my three little children, I owe it

12:05:39   24   to them to contest the allegations.  I have a

12:05:43   25   fiduciary duty as trustee, but most importantly,

| | | |
|---|---|---|
| 12:05:48 | 1 | as a mom. |
| 12:05:49 | 2 | Q.  All right, Mrs. Ahmed, I'm going to ask a |
| 12:05:54 | 3 | few easier questions here for a moment.  Do you |
| 12:05:57 | 4 | recall when you previously testified, you were |
| 12:06:00 | 5 | asked about certain IRA accounts? |
| 12:06:03 | 6 | A.  Yes, I do. |
| 12:06:04 | 7 | Q.  And do you recall your testimony that you |
| 12:06:07 | 8 | were going to check your records with regards to |
| 12:06:09 | 9 | those IRA accounts? |
| 12:06:12 | 10 | A.  Yes, I do. |
| 12:06:13 | 11 | Q.  So previously, you recall there was a |
| 12:06:17 | 12 | rollover IRA, and there's a Roth IRA.  Do you |
| 12:06:20 | 13 | recall that? |
| 12:06:21 | 14 | A.  Yes. |
| 12:06:21 | 15 | Q.  So now with regard to the rollover IRA, have |
| 12:06:28 | 16 | you now confirmed whether or not that money came |
| 12:06:31 | 17 | from your work compensation, or later contribution |
| 12:06:34 | 18 | from a joint bank account? |
| 12:06:35 | 19 | A.  For the rollover IRA, that came from my work |
| 12:06:41 | 20 | contributions.  For -- for the rollover IRA. |
| 12:06:46 | 21 | Q.  And that's all of the money in the rollover |
| 12:06:49 | 22 | IRA? |
| 12:06:49 | 23 | A.  Yes. |
| 12:06:50 | 24 | Q.  Okay.  And for the Roth IRA? |
| 12:06:52 | 25 | A.  For the Roth IRA, the bulk of that came from |

| | | |
|---|---|---|
| 12:06:55 | 1 | contributions from my work.  There was a five |
| 12:06:58 | 2 | thousand five hundred dollars contribution made at |
| 12:07:01 | 3 | the end of last year, that I believe came from a |
| 12:07:04 | 4 | joint bank account. |
| 12:07:06 | 5 | Q.  All right.  I'm going to hand you a |
| 12:07:09 | 6 | document, Relief Defendant's Exhibit N.  So Ms. |
| 12:07:29 | 7 | Ahmed, are you familiar with what's been handed to |
| 12:07:31 | 8 | you as Relief Defendant's Exhibit N? |
| 12:07:33 | 9 | A.  Yes, I am. |
| 12:07:34 | 10 | Q.  Can you tell the Court what it is? |
| 12:07:36 | 11 | A.  It is a summary of different years for the |
| 12:07:40 | 12 | contributions that were made into that account, |
| 12:07:42 | 13 | that IRA account, from Fidelity. |
| 12:07:45 | 14 | MR. SKIBELL:  All right, I'm going to |
| 12:07:46 | 15 | move this into evidence. |
| 12:07:49 | 16 | MR. WILLIAMS:  No objection. |
| 12:07:51 | 17 | THE COURT:  Is this N or M? |
| 12:07:54 | 18 | MR. SKIBELL:  N as in Nancy, I |
| 12:07:58 | 19 | believe. |
| 12:07:59 | 20 | THE COURT:  Full exhibit. |
| 12:08:00 | 21 | Q.  Now, I'm going to direct your attention to |
| 12:08:03 | 22 | the page that ends in 0198.  Are you at that page? |
| 12:08:11 | 23 | A.  Yes, I am. |
| 12:08:12 | 24 | Q.  All right.  It will be easier if I do it |
| 12:08:16 | 25 | like this.  Now, do you see where it says "IRA |

12:08:22  1  type"?

12:08:23  2      A.  Yes, I do.

12:08:24  3      Q.  And that's the Roth IRA?

12:08:26  4      A.  That's correct.

12:08:27  5      Q.  And the rollover contribution, at the top,

12:08:30  6  where it says eighty-three thousand eight hundred

12:08:33  7  ninety-four and sixteen cents?

12:08:35  8      A.  Eight hundred forty-nine.  Yes.

12:08:38  9      Q.  That's from money you earned?

12:08:39  10     A.  Yes, it is.

12:08:41  11     Q.  All right.  Now, if you go to the last page

12:08:46  12  that ends in 98.  Do you see the amount, five

12:08:54  13  thousand five hundred?

12:08:55  14     A.  Yes, I do.

12:08:56  15     Q.  And was that the one contribution you were

12:09:00  16  referencing earlier in your testimony?

12:09:02  17     A.  Yes, it is.

12:09:03  18     Q.  And where would that money have come from?

12:09:04  19     A.  That likely came from a joint bank account

12:09:07  20  between my husband and myself.

12:09:09  21     Q.  Okay.  Now, Ms. Ahmed, let's back up for a

12:09:24  22  moment.  Where are you from?

12:09:25  23     A.  I was born in New York, and I grew up in

12:09:29  24  Princeton Junction, New Jersey.

12:09:30  25     Q.  And did you go to college, Ms. Ahmed?

12:09:33   1       A.   I did, I went to Princeton University.

12:09:35   2       Q.   And what did you do after you graduated from

12:09:38   3   Princeton?

12:09:38   4       A.   After I graduated from Princeton, I worked

12:09:40   5   for two years as a financial analyst in the

12:09:44   6   Mergers and Acquisition Division of Morgan

12:09:46   7   Stanley.  After working there for two years, I

12:09:50   8   went to Harvard Business School.  After I

12:09:52   9   graduated from there, I subsequently worked at

12:09:55  10   Merrill for two years, and then Goldman Sachs.

12:09:58  11       Q.   And when did you graduate from Harvard

12:10:01  12   Business School?

12:10:02  13       A.   2002.

12:10:03  14       Q.   And when did you meet your husband, Iftikar

12:10:07  15   Ahmed?

12:10:07  16       A.   I met him October of 1999.  I was looking

12:10:12  17   to -- I was class of 1998 to Princeton.  I was

12:10:17  18   looking to apply to business school.  I didn't

12:10:19  19   think I would get in with two years of work

12:10:21  20   experience.  And my roommate in New York was his

12:10:24  21   analyst at Goldman.  She had just graduated from

12:10:27  22   business school.  And she said why don't you meet

12:10:30  23   him and talk to him about your prospect of getting

12:10:33  24   into business school.  So he and I finally met,

12:10:38  25   and discussed whether or not I would get in.

| | | |
|---|---|---|
| 12:10:42 | 1 | Q.  And I guess that, that led to more |
| 12:10:45 | 2 | meetings -- |
| 12:10:46 | 3 | A.  That led to more meetings, yes. |
| 12:10:48 | 4 | Q.  And when did you marry your husband? |
| 12:10:50 | 5 | A.  I married him August of 2003. |
| 12:10:53 | 6 | Q.  And was it a marriage of love? |
| 12:10:58 | 7 | A.  Yes, it is. |
| 12:11:00 | 8 | Q.  In 2004, you started Goldman Sachs, is |
| 12:11:05 | 9 | that -- |
| 12:11:05 | 10 | A.  That's correct, yes. |
| 12:11:08 | 11 | Q.  And you earned a salary while you were at |
| 12:11:10 | 12 | Goldman Sachs? |
| 12:11:11 | 13 | A.  That's correct. |
| 12:11:12 | 14 | Q.  And where did the money go that you earned |
| 12:11:14 | 15 | from Goldman Sachs? |
| 12:11:15 | 16 | A.  My husband and I had joint accounts.  It |
| 12:11:19 | 17 | likely went -- I can't remember specifically which |
| 12:11:22 | 18 | account, but it likely went into a joint account. |
| 12:11:27 | 19 | Q.  And when did you -- you continued to work at |
| 12:11:32 | 20 | Goldman Sachs to 2011? |
| 12:11:33 | 21 | A.  I continued working until 2011.  There was a |
| 12:11:36 | 22 | general downsizing in October, but I was paid |
| 12:11:39 | 23 | through the middle of 2012. |
| 12:11:42 | 24 | Q.  And you said you have three kids, is that |
| 12:11:44 | 25 | right? |

12:11:44   1      A.   That's right.

12:11:45   2      Q.   So you continued to work, even though you --

12:11:50   3   even after you had your kids?

12:11:51   4      A.   Yes.   My oldest was born February of 2007.

12:11:55   5   My second was born March of 2008.   And I was

12:12:00   6   pregnant with my third one when I was downsized

12:12:03   7   from Goldman.

12:12:05   8      Q.   Now, Ms. Ahmed, now that the events have

12:12:10   9   transpired here, are you planning to look for

12:12:12   10  work?

12:12:13   11     A.   I would like to look for work, yes.

12:12:15   12     Q.   Have you made preparations or have you

12:12:17   13  started looking for work?

12:12:19   14     A.   My resume has been updated.   I have sent it

12:12:24   15  out to a few people.   Once our assets were frozen,

12:12:30   16  I inquired about job opportunities close to where

12:12:33   17  I live.   But then I was arrested on a material

12:12:41   18  witness warrant and put on very severe house

12:12:43   19  arrest, so I had to stop looking.

12:12:47   20     Q.   And we talked earlier, you heard the

12:12:51   21  discussion earlier, about whether or not there may

12:12:54   22  be restrictions related to the material witness

12:12:58   23  warrant.   Other than that, are there any other

12:13:02   24  impediments to you seeking work at this time?

12:13:04   25     A.   Well, I have my three children at home.   I

12:13:08    1    don't have child care.  I don't have the funds to

12:13:11    2    pay for child care.  So until I can get something

12:13:17    3    for someone to watch them, I really can't look for

12:13:22    4    a job.

12:13:23    5        Q.  And once you're able to find child care for

12:13:27    6    your children, do you plan to look for a job?

12:13:29    7        A.  Absolutely, yes.

12:13:30    8        Q.  Now, you mentioned certificate restrictions

12:13:36    9    that were put on you related to the material

12:13:39   10    witness warrant.  Can you describe what those are?

12:13:42   11        A.  So when I was arrested on May 20th, I was

12:13:46   12    told to appear in front of Pretrial Services on

12:13:50   13    May 21st.  I was outfitted with an electronic

12:13:53   14    monitoring device and was told that I could only

12:13:58   15    leave the house for two, two and a half hour

12:14:01   16    blocks, one in the morning, one in the afternoon,

12:14:04   17    to pick up and drop off my children from school

12:14:08   18    only for those five days.  I could not leave the

12:14:10   19    house on the weekends.  My kids were effectively

12:14:14   20    put on house arrest with me while this was going

12:14:16   21    on.  I could go to the grocery store, I could go

12:14:19   22    to the library.  But I had to scan in my receipts

12:14:22   23    and send them in to my Pretrial Services officer.

12:14:26   24    I couldn't go anywhere else without prior

12:14:28   25    approval.

12:14:28  1      Q.  And has the circumstances of your

12:14:32  2   confinement changed?

12:14:34  3      A.  They have.  I -- I had to put in an

12:14:40  4   appearance bond.  But once that was done, I am now

12:14:46  5   free to leave the home between 7 a.m. to 7 p.m.,

12:14:50  6   seven days a week.  I have to stay within

12:14:52  7   Connecticut.  I can go to New York to meet my

12:14:57  8   counsel.  On a case by case basis, I could go to

12:15:03  9   see my parents with my children in Princeton

12:15:06  10  Junction, New Jersey.  And that is what I

12:15:11  11  understand I can do.

12:15:12  12     Q.  And earlier, you testified about a transfer

12:15:17  13  that went to my firm.  Was five hundred thousand

12:15:21  14  dollars from that money used for the appearance

12:15:24  15  bond?

12:15:24  16     A.  Yes, it was.

12:15:25  17     Q.  And will that money be repaid if you make

12:15:30  18  your court appearances?

12:15:32  19     A.  Absolutely, it will be repaid.

12:15:33  20     Q.  So there's no dissipation of that money?

12:15:35  21     A.  No, there is no dissipation.  It's sitting

12:15:37  22  with, I assume, a clerk, or a government bank

12:15:41  23  account in Boston.

12:15:42  24     Q.  Now, in connection with the criminal case

12:15:45  25  that's pending in Boston, have you -- and that

12:15:47　1　material witness warrant, have you had to retain

12:15:50　2　legal counsel?

12:15:50　3　　　A.　Yes, I have had to retain legal counsel in

12:15:53　4　connection with that case.

12:15:53　5　　　Q.　And what counsel is that?

12:15:55　6　　　A.　So it's Ms. Priya Chaudhry.　She is with

12:16:01　7　Harris, O'Brien, St. Laurent & Chaudhry, LLP based

12:16:05　8　out of New York.

12:16:06　9　　　Q.　And do you also have are other counsel

12:16:09　10　related to that in Boston?

12:16:09　11　　　A.　I do.　I needed to have local counsel in

12:16:13　12　Boston, so there's a gentleman who is retained for

12:16:16　13　that as well.

12:16:17　14　　　Q.　So if funds are freed up in this case for

12:16:21　15　legal fees, that will also goes towards the

12:16:23　16　criminal case in Boston?

12:16:24　17　　　A.　Yes, it will.

12:16:25　18　　　Q.　Now, I wanted to ask you a little bit about

12:16:29　19　the DIYA properties.　Can you explain what -- what

12:16:34　20　DIYA Real is, and what DIYA -- I mean, DIYA Real

12:16:38　21　Holdings, and DIYA Holdings are?

12:16:39　22　　　A.　So DIYA Holdings and DIYA Real Holdings are

12:16:42　23　two entities that have been formed to hold real

12:16:46　24　estate.

12:16:46　25　　　Q.　And what real estate do they hold?

12:16:48 1      A.  So DIYA Holdings holds an apartment, it's

12:16:52 2 530 Park Avenue, Apartment 12A; and DIYA Real

12:16:56 3 Holdings, holds 530 Park Avenue, Apartment F.

12:17:01 4      Q.  And what involvement have you had in

12:17:04 5 connection with the purchase of those two

12:17:06 6 properties?

12:17:07 7      A.  So it was my idea, once I left working, it

12:17:12 8 was my idea to really start looking for something

12:17:14 9 to do that would give the family some income.  And

12:17:18 10 also, expose me to an area where I had not been

12:17:22 11 involved before, which was real estate.  I was

12:17:25 12 looking for projects, and I spoke with my estate

12:17:29 13 lawyer.  And I basically sourced the apartments, I

12:17:38 14 looked -- so I looked at the apartments, I chose

12:17:41 15 the apartments, I was in contact with a broker.

12:17:45 16 We had discussions about when apartments were

12:17:51 17 going to be up for sale.  I managed the apartments

12:17:54 18 with respect to the maintenance of them, with

12:17:57 19 respect to paying the maintenance of them.  I also

12:18:07 20 speak -- you know, I'm in touch with my broker in

12:18:10 21 terms of tenants, sourcing tenants, and trying to

12:18:13 22 find the right people to rent to.

12:18:15 23      Q.  What was your husband's role in connection

12:18:17 24 with those two -- purchases of those two

12:18:20 25 properties?

12:18:21  1     A.  I had never purchased an apartment before.

12:18:23  2  He was helping me with the process and was there

12:18:27  3  as a -- basically as moral support and sounding

12:18:32  4  board.

12:18:32  5     Q.  How would you compare your role, versus his

12:18:35  6  role, on those two transactions?

12:18:37  7     A.  Well, I mean, I would run things by him.  He

12:18:44  8  would run things by me.  And, you know, it was

12:18:49  9  something that we would discuss frequently.

12:18:53  10     Q.  Did one of you two have more of a role than

12:18:56  11  the other, or how did it work, the division

12:19:00  12  between the two of you?

12:19:02  13     A.  I think it really just depended on the

12:19:03  14  timing of what was going on and what I was busy

12:19:06  15  with.  Otherwise, I fully kept aware of

12:19:12  16  everything.  He was fully kept aware of

12:19:15  17  everything.  And again, it is something where we

12:19:18  18  would, you know, have dinner, and I would say

12:19:20  19  look, you know, this is kind of what came up with

12:19:23  20  the apartment.  This is what I'm thinking about.

12:19:25  21  And that's how discussions would come about.

12:19:28  22     Q.  I think I was asking a slightly different

12:19:31  23  question in terms of did one of you take a greater

12:19:33  24  role than the other in terms of the apartment, or

12:19:35  25  was it a joint -- jointly done throughout?

12:19:38   1     A.   I was the one who took the greater role.  It

12:19:40   2   was my project.

12:19:41   3     Q.   Okay.  Now, is one of the two apartments

12:19:45   4   rented currently?

12:19:46   5     A.   Yes, it is.

12:19:47   6     Q.   And how much income does it generate on a

12:19:51   7   monthly basis?

12:19:52   8     A.   So 12A was rented, and it currently

12:19:55   9   generates thirty-one thousand a month.

12:19:56  10     Q.   Are there also taxes or maintenance

12:20:00  11   associated with that apartment?

12:20:01  12     A.   There's insurance, there's taxes, there's

12:20:03  13   maintenance.  There's also a one percent that

12:20:07  14   needs to go back to the GRAT.

12:20:09  15     Q.   So when you put that to the side, how much

12:20:12  16   money is left over on a monthly basis that the

12:20:15  17   apartment is generating an income?

12:20:16  18     A.   If you take out the maintenance, and you

12:20:21  19   take out the insurance and the taxes, and the

12:20:27  20   GRAT, for that one apartment, I would have to say

12:20:33  21   probably around twenty-three thousand, twenty-four

12:20:36  22   thousand.

12:20:36  23     Q.   And that's twenty-three thousand dollars of

12:20:40  24   income on a monthly basis?

12:20:40  25     A.   That would be correct.

| | | |
|---|---|---|
| 12:20:41 | 1 | Q.  Now, have you looked into renting the other |
| 12:20:44 | 2 | DIYA property? |
| 12:20:45 | 3 | A.  The other property was up for rent.  When it |
| 12:20:50 | 4 | was frozen, I took it off the market because I |
| 12:20:52 | 5 | didn't know what would happen. |
| 12:20:54 | 6 | Q.  And if you were -- if the SEC agreed, would |
| 12:20:58 | 7 | you and be able to rent that apartment? |
| 12:20:59 | 8 | A.  Yes, I would. |
| 12:21:00 | 9 | Q.  And have you investigated what you would get |
| 12:21:03 | 10 | for rent for that apartment? |
| 12:21:04 | 11 | A.  The expectation was around twenty, |
| 12:21:07 | 12 | twenty-ish thousand for that apartment. |
| 12:21:09 | 13 | Q.  And what is that expectation based on? |
| 12:21:11 | 14 | A.  Discussions that I had with my real estate |
| 12:21:14 | 15 | broker, the location of the apartment, looking at |
| 12:21:17 | 16 | comps. |
| 12:21:18 | 17 | Q.  And how much money would that leave on a |
| 12:21:21 | 18 | monthly basis, when you take out the maintenance |
| 12:21:23 | 19 | and the one percent to the GRAT? |
| 12:21:25 | 20 | A.  It's a bigger apartment.  The maintenance is |
| 12:21:27 | 21 | higher.  So if you assume it runs for twenty, and |
| 12:21:32 | 22 | you take out -- I would say probably around |
| 12:21:38 | 23 | twelve, twelve thousand. |
| 12:21:40 | 24 | Q.  Okay.  I'm going to move to a new topic and |
| 12:21:44 | 25 | hand you an exhibit. |

| | | |
|---|---|---|
| 12:21:46 | 1 | THE COURT:  According to the astute |
| 12:21:48 | 2 | calculations of my law clerk, you only have |
| 12:21:51 | 3 | about six minutes left. |
| 12:21:53 | 4 | MR. SKIBELL:  I was told I had 45. |
| 12:21:55 | 5 | THE COURT:  That was not -- that was |
| 12:21:56 | 6 | what you declared, and it does not turn out to |
| 12:21:59 | 7 | be accurate as to the amount of time that we had |
| 12:22:01 | 8 | available.  So please expedite. |
| 12:22:04 | 9 | MR. SKIBELL:  Okay, I will try, your |
| 12:22:05 | 10 | Honor. |
| 12:22:05 | 11 | THE COURT:  You had used one hour and |
| 12:22:07 | 12 | 20 minutes when you started.  And thus your |
| 12:22:10 | 13 | calculation of 45 minutes more was not accurate. |
| 12:22:22 | 14 | Q.  You've been handed Relief Defendant's |
| 12:22:25 | 15 | Exhibit O.  Are you familiar with this documents? |
| 12:22:29 | 16 | A.  Yes, I am. |
| 12:22:30 | 17 | Q.  Can you explain what it is? |
| 12:22:31 | 18 | A.  It is the bills that I have due as of July |
| 12:22:36 | 19 | 22nd. |
| 12:22:37 | 20 | THE COURT:  You're going to need to |
| 12:22:38 | 21 | speak up. |
| 12:22:39 | 22 | A.  Bills that I have due as of July 22nd. |
| 12:22:43 | 23 | MR. SKIBELL:  I'm going to move this |
| 12:22:44 | 24 | document into evidence. |
| 12:22:48 | 25 | MR. WILLIAMS:  No objection, your |

12:22:49  1    Honor.

12:22:49  2                 THE COURT:  Full exhibit.

12:22:51  3        Q.  And can you tell me how -- in detail, sort

12:22:55  4    of what the -- or generally, what these bills are?

12:22:59  5        A.  So some of them are taxes, overdue

12:23:03  6    maintenance, and insurance that's due on the

12:23:05  7    apartments.  I have taxes that are due on the home

12:23:09  8    in Greenwich.  Some of these are legal fees with

12:23:14  9    the earlier counsel that I had retained, prior to

12:23:20  10   current counsel.  You know, work done on the home.

12:23:26  11   Electricity bills, and loans that I have taken

12:23:29  12   from my parents and my sisters, just to help tide

12:23:32  13   me over.

12:23:33  14       Q.  Have any of these numbers increased since

12:23:35  15   this exhibit was created?

12:23:37  16       A.  Yes, the maintenance for the apartments has

12:23:40  17   increased by another seven or eight thousand.

12:23:44  18       Q.  And very briefly, I'm just going to touch on

12:23:47  19   one of these loans from your family.  What does

12:23:49  20   that entail?

12:23:49  21       A.  So I was looking to retain counsel.  I

12:23:52  22   had -- this was after the May 20 -- well, it was

12:23:56  23   on May 18, when I was told -- or advised to retain

12:24:01  24   counsel for the Boston matter.  And one of the --

12:24:06  25   a piece of that is fifteen thousand dollars that I

12:24:08   1   owe to my father, to retain that counsel.  And the

12:24:11   2   remainder is what I owe to my two sisters for

12:24:15   3   helping tide me over.

12:24:16   4       Q.  By tiding you over, you mean things like

12:24:19   5   buying groceries?

12:24:20   6       A.  Yes.

12:24:21   7       Q.  And gasoline?

12:24:22   8       A.  Yes.

12:24:24   9       Q.  And if no funds are released for you today,

12:24:27  10   how are you going to be able to cover expenses

12:24:30  11   such as gasoline, groceries, et cetera?

12:24:32  12       A.  I'm not going to be able to.  I may have to

12:24:35  13   declare bankruptcy.

12:24:35  14       Q.  And are your parents wealthy; would they be

12:24:40  15   able to tide you over?

12:24:40  16       A.  No, they would not.  They are very ordinary,

12:24:44  17   middle class.  They would not be able to provide

12:24:47  18   funds to tide me over.

12:24:49  19              MR. SKIBELL:  I have no further

12:24:50  20   questions.

12:24:51  21              THE COURT:  Cross-examination -- or

12:24:52  22   redirect?

12:24:53  23   REDIRECT EXAMINATION

12:25:03  24   BY MR. WILLIAMS:

12:25:03  25       Q.  Mrs. Ahmed, I promise I will be very brief,

| | | |
|---|---|---|
| 12:25:05 | 1 | and I know attorneys say that, but I'm really just |
| 12:25:08 | 2 | going to show you one document. |
| 12:25:10 | 3 | MR. WILLIAMS:  Your Honor this is a |
| 12:25:12 | 4 | document in dispute.  I'll mark it as Exhibit -- |
| 12:25:17 | 5 | I would be guessing, is it 12 or 13? |
| 12:25:25 | 6 | THE COURT:  13. |
| 12:25:52 | 7 | MR. SKIBELL2:  ^ We are ^ We're going |
| 12:25:53 | 8 | to object to the entry of this document, since |
| 12:25:55 | 9 | it's privileged attorney/client communications. |
| 12:25:57 | 10 | And I think this one is pretty clear on its face |
| 12:26:00 | 11 | that's what it is. |
| 12:26:06 | 12 | THE COURT:  This is marked as -- tell |
| 12:26:08 | 13 | me the marking again. |
| 12:26:09 | 14 | MR. WILLIAMS:  Exhibit 13.  It was |
| 12:26:13 | 15 | previously marked as Exhibit 36 in Mrs. Ahmed's |
| 12:26:17 | 16 | deposition. |
| 12:26:23 | 17 | THE COURT:  Do you want to establish |
| 12:26:24 | 18 | the basis of the claim of privilege? |
| 12:26:27 | 19 | MR. SKIBELL:  Well, your Honor, it's |
| 12:26:29 | 20 | communications between attorneys and their |
| 12:26:31 | 21 | clients.  That's the way it is throughout the |
| 12:26:34 | 22 | document.  On its face, it's privileged. |
| 12:26:37 | 23 | THE COURT:  That's awfully broad.  It |
| 12:26:41 | 24 | assumes that it is exclusively for the -- and |
| 12:26:46 | 25 | intended to be confidential.  I just, you know, |

| | | |
|---|---|---|
| 12:26:50 | 1 | I'm looking at this for the first time.  I don't |
| 12:26:53 | 2 | know who these people are, and I don't know -- |
| 12:26:56 | 3 | MR. SKIBELL:  Absolutely, that's why |
| 12:26:58 | 4 | we want to brief this by August 18.  But on its |
| 12:27:00 | 5 | face, I think we can all agree, this is |
| 12:27:03 | 6 | communications between attorneys and clients -- |
| 12:27:05 | 7 | THE COURT:  I understand.  I assuming |
| 12:27:09 | 8 | Boyee (phonetic) is an attorney. |
| 12:27:11 | 9 | MR. SKIBELL:  That is correct.  And |
| 12:27:16 | 10 | there's him others, in fact, on this as well. |
| 12:27:22 | 11 | THE COURT:  That he is an attorney |
| 12:27:23 | 12 | for Mr. Ahmed? |
| 12:27:27 | 13 | MR. SKIBELL:  I do not know -- I |
| 12:27:30 | 14 | believe he's a real estate attorney for the |
| 12:27:32 | 15 | Ahmeds, as a couple.  As you'll see throughout, |
| 12:27:38 | 16 | there's also the firm Guadondo & Edith |
| 12:27:42 | 17 | (phonetic), who I understand is real estate |
| 12:27:43 | 18 | counsel. |
| 12:27:44 | 19 | THE COURT:  For whom? |
| 12:27:45 | 20 | MR. SKIBELL:  Mr. and Mrs. Ahmed. |
| 12:27:47 | 21 | Mrs. Ahmed, isn't that correct? |
| 12:27:49 | 22 | THE WITNESS:  That is correct. |
| 12:27:50 | 23 | MR. WILLIAMS:  IF I can just -- I can |
| 12:27:52 | 24 | tell you the purpose of the exhibit and what I |
| 12:27:54 | 25 | submit the exhibit shows, your Honor.  This is |

| | | |
|---|---|---|
| 12:27:56 | 1 | just a negotiation between the renter and the |
| 12:27:59 | 2 | rentee.  And so this is with regards to the 530 |
| 12:28:03 | 3 | Park Avenue, 12-A.  It's just a business |
| 12:28:07 | 4 | transaction.  There's no legal advice in here. |
| 12:28:09 | 5 | Rather, it's the representative saying that a |
| 12:28:11 | 6 | person wants to rent the unit, here's what he |
| 12:28:15 | 7 | proposes.  It's forwarded to Mrs. Ahmed.  And |
| 12:28:19 | 8 | really, what I'd like to show is Mrs. Ahmed |
| 12:28:21 | 9 | simply forwarded it to her husband.  Her husband |
| 12:28:23 | 10 | then engaged in the entire negotiation of the |
| 12:28:29 | 11 | rental of the property.  And so when Mrs. Ahmed |
| 12:28:31 | 12 | said, you know, that she was doing this work, we |
| 12:28:33 | 13 | submit it just -- that's just not true. |
| 12:28:35 | 14 | THE COURT:  So this reference is on |
| 12:28:37 | 15 | page two, at the bottom, "Communications from |
| 12:28:41 | 16 | tenant's attorney."  Why do you claim that's |
| 12:28:44 | 17 | privileged. |
| 12:28:45 | 18 | MR. SKIBELL:  We don't.  We're |
| 12:28:46 | 19 | talking about the communications between the |
| 12:28:48 | 20 | Ahmeds and their real estate attorneys. |
| 12:28:51 | 21 | Obviously, the communications with the other |
| 12:28:53 | 22 | side would not be privileged. |
| 12:29:03 | 23 | THE COURT:  What you seek to |
| 12:29:04 | 24 | establish here is that she did not, was not |
| 12:29:15 | 25 | involved in these communications? |

| 12:29:18 | 1 | MR. WILLIAMS:  Correct.  You will see |

12:29:18    1        MR. WILLIAMS:  Correct.  You will see

12:29:19    2   that essentially, an individual sends her two

12:29:24    3   e-mails, asking her to respond to the offer that

12:29:28    4   a person is going to rent this.

12:29:29    5        THE COURT:  Without regard to the

12:29:31    6   substance, can you query her in a way that

12:29:37    7   accomplishes your objective, so that we don't

12:29:40    8   have to --

12:29:49    9        MR. WILLIAMS:  I think --

12:29:51   10        THE COURT:  Or to analyze why

12:29:53   11   privilege is claimed with respect to the whole

12:29:54   12   document.  But let's see if we can do this

12:29:57   13   expeditiously.

12:29:58   14   Q.  Turning to the -- do you recognize this

12:30:01   15   e-mail chain, Mrs. Ahmed?

12:30:03   16   A.  Yes, I do.

12:30:04   17   Q.  And is the e-mail for your husband, is this

12:30:10   18   an Oak e-mail?  It says Oak e-mail address?

12:30:14   19   A.  It says Oak VC there.  I can't see if it is

12:30:17   20   an Oak e-mail address or not without seeing what

12:30:20   21   the e-mail --

12:30:21   22   Q.  Feel free to turn to the second page.  Was

12:30:23   23   his e-mail IAhmed@OakVC.com?

12:30:29   24   A.  Yes, it was.

12:30:29   25   Q.  I think maybe I can just ask this generally,

12:30:31  1  Mrs. Ahmed.  You were contacted about whether --

12:30:37  2  well, about a possible renter in the 530 Park

12:30:40  3  Avenue, 12A, right?

12:30:42  4     A.  That's correct.

12:30:42  5     Q.  And you didn't talk about -- I'm sorry, you

12:30:49  6  didn't respond with what you thought the proper

12:30:51  7  lease terms would be.  Instead, you forwarded it

12:30:53  8  to your husband, and then you stayed out of it?

12:30:55  9     A.  That's not right.  I forwarded to my husband

12:30:57  10  because I keep him apprised of what's going on.

12:31:01  11  As I had stated before, we would discuss things.

12:31:04  12  Not necessarily over e-mail, but also at home.

12:31:07  13     Q.  Okay, well, within an hour, he responded,

12:31:14  14  explaining how he wanted this apartment rented,

12:31:17  15  and then all negotiations are between him.  So I

12:31:21  16  guess, are you confident when you say that you

12:31:23  17  were the one that was leading the renting of this

12:31:28  18  apartment?

12:31:28  19     A.  I was the one who was in discussions with

12:31:31  20  the real estate broker.  Now, you don't know who

12:31:35  21  the real estate broker is here.  Right?  There is

12:31:39  22  another lawyer involved here as well, okay, who

12:31:43  23  was looking over some of these things.  So I was

12:31:46  24  in discussions with the real estate broker, but

12:31:49  25  there was another lawyer who we ran things by.

| | | |
|---|---|---|
| 12:31:52 | 1 | Okay?  So I was the one who ran that process.  Did |
| 12:31:56 | 2 | my husband help me?  Yes, he did.  He's my |
| 12:31:59 | 3 | husband.  It was my first apartment.  We discussed |
| 12:32:03 | 4 | the renting of this. |
| 12:32:05 | 5 | Q.  And when your husband was writing -- and |
| 12:32:08 | 6 | maybe this will get at the issue, your Honor -- |
| 12:32:10 | 7 | when your husband was writing his comments on what |
| 12:32:12 | 8 | he wanted the lease to look like, that was so that |
| 12:32:15 | 9 | information would be transferred to the person |
| 12:32:17 | 10 | looking to rent the apartment, right? |
| 12:32:19 | 11 | A.  These were his thoughts, but it was not |
| 12:32:25 | 12 | transferred.  This person who he sent it to, as |
| 12:32:28 | 13 | you notice, I'm copied on all these |
| 12:32:31 | 14 | communications.  So it's not like it was not done |
| 12:32:34 | 15 | without my knowledge. |
| 12:32:35 | 16 | Q.  And thank you for that.  I just mean -- |
| 12:32:38 | 17 | A.  Number two, he was very familiar with |
| 12:32:41 | 18 | contracts.  So he would help me look at the |
| 12:32:43 | 19 | contracts, and he had another lawyer look at the |
| 12:32:46 | 20 | contract.  But at the end of the day, I was the |
| 12:32:49 | 21 | one who negotiated and made the decision whether |
| 12:32:52 | 22 | or not I wanted that couple or tenant to take the |
| 12:32:56 | 23 | apartment. |
| 12:32:56 | 24 | Q.  And I understand that.  My point is, is that |
| 12:32:59 | 25 | when your husband is saying, "Here's what I want |

12:33:01  1  the contract to look like," that information is to

12:33:04  2  be relayed to the renter because that's part of

12:33:08  3  the negotiation, right?

12:33:08  4      A.  No, no, absolutely not.  This is going to

12:33:10  5  another lawyer, who has nothing to do with -- he

12:33:13  6  was looking over the contract for us.

12:33:15  7      Q.  So you are saying that if someone reads this

12:33:19  8  e-mail, you are saying that this is not Mr. Ahmed

12:33:22  9  explaining what he wanted the --

12:33:25  10     A.  This ws Mr. Ahmed --

12:33:26  11     Q.  -- wanted the contract to look like?

12:33:28  12     A.  -- explaining what we wanted to this other

12:33:31  13  lawyer, and having him just take a cursory glance

12:33:33  14  or look through the contract, to make sure that

12:33:36  15  everything was in place.

12:33:47  16          MR. WILLIAMS:  With that, your Honor,

12:33:49  17  I have no further questions on this document.  I

12:33:51  18  do ask it be admitted.  I think facially, it's

12:33:53  19  not privileged.  This is just not attorney

12:33:55  20  advice, and I submit that defense counsel's

12:33:57  21  argument that because an individual is an

12:34:00  22  attorney, that anything, any conversation he

12:34:02  23  engages in with a client is privileged, is just

12:34:04  24  contrary to law.  This, I think you can read

12:34:07  25  this, it's not seeking legal advice.  He's not

12:34:10  1   obtaining legal advice.  This is just a

12:34:12  2   negotiation regarding the renting of an

12:34:15  3   apartment.  This is business, it's not law.

12:34:16  4            MR. SKIBELL:  I think Mr. Williams

12:34:17  5   may have not heard the witness' testimony, that

12:34:19  6   this was expressly for the lawyer to look over

12:34:22  7   the comments and comment back on it.  This is

12:34:24  8   the heart of attorney/client communications.

12:34:26  9            THE COURT:  I don't understand why

12:34:28  10  this is so important.  I'm going to take the

12:34:32  11  time to read the document.  It will stay as 13

12:34:36  12  for I.D.  Her testimony with respect to her role

12:34:42  13  in the renting of this apartment, where she says

12:34:49  14  she made the final decision about the tenant, is

12:34:53  15  the testimony.  Whether I decide there's a

12:34:57  16  privilege demonstrated or not, is -- will come.

12:35:06  17  But 13 will remain for identification.

12:35:09  18            MR. WILLIAMS:  Thank you, your Honor.

12:35:11  19            THE COURT:  But I'm going to shorten

12:35:15  20  your time to respond and not have the full --

12:35:18  21  what did you say, until August 18th?

12:35:20  22            MR. SKIBELL:  That's what the docket

12:35:22  23  says, your Honor.

12:35:23  24            THE COURT:  That's going to get

12:35:24  25  shortened.  Is there any reason why it can't be

12:35:27  1   done in the next five days.

12:35:28  2          MR. SKIBELL:  No, your Honor, if

12:35:29  3   that's what you want, that's when we'll do it.

12:35:31  4          THE COURT:  I think if we're going to

12:35:32  5   bring this thing to closure, let's do that.

12:35:35  6          MR. SKIBELL:  That's what we'll do,

12:35:36  7   your Honor.

12:35:36  8   BY MR. WILLIAMS:

12:35:40  9      Q.  Mrs. Ahmed, just a few more questions.  When

12:35:45  10  you were speaking with your attorney, you had

12:35:46  11  listed the obligations you owe, for lack of a

12:35:51  12  better term.  Do you recall that document?  I can

12:35:53  13  put it -- I'm sure it's still in front of you,

12:35:55  14  it's the amount you owe, including money to your

12:35:57  15  family and things like that.

12:35:58  16     A.  Yes.

12:35:59  17     Q.  The Commission asked for you to list the

12:36:04  18  value of all of the assets that you hold in it's

12:36:07  19  Interrogatories.  Do you recall that?

12:36:09  20     A.  When you say the list of assets,

12:36:16  21  comprehensively?

12:36:16  22     Q.  Yes, and I think it was for over 25 thousand

12:36:20  23  dollars.  I can ask it this way.  You stated that

12:36:21  24  you had some artwork that you gave to your

12:36:24  25  attorneys?

12:36:24   1      A.   Yes.

12:36:25   2      Q.   What is the fair market value of that

12:36:28   3   artwork?

12:36:28   4      A.   I have not had anything appraised recently.

12:36:34   5   I would have to say, you know, I believe it was

12:36:37   6   purchased for about two hundred fifty to half a

12:36:42   7   million dollars, but I would have to go back and

12:36:45   8   check.

12:36:45   9      Q.   And then you also said that you had given

12:36:49  10   your attorneys, I think gold and jewelry, is that

12:36:52  11   right?

12:36:52  12      A.   Some jewelry.

12:36:52  13      Q.   Some jewelry.  Approximately how much is

12:36:55  14   that worth?

12:36:55  15      A.   That's probably worth another half million.

12:37:03  16      Q.   And then you said there was some assets and

12:37:06  17   some gold in a social security box.  Do you know

12:37:09  18   approximately the value of that?

12:37:11  19      A.   I would have to say probably, including

12:37:18  20   wedding gifts, probably one million.  Maybe one

12:37:25  21   and a half.

12:37:25  22      Q.   And just to be clear, has any of the -- you

12:37:28  23   haven't dissipated any of those assets, sold them,

12:37:30  24   transferred them, traded them or anything like

12:37:32  25   that, right?

12:37:32  1    A.  No, I have not touched those assets.

12:37:34  2    Q.  Okay.

12:37:38  3            MR. WILLIAMS:  Thank you.

12:37:42  4            MR. SKIBELL:  No questions, your

12:37:43  5    Honor.

12:37:44  6            THE COURT:  Thank you.  Shall we have

12:37:47  7    wrap-up argument?

12:37:50  8            MR. HEINKE:  Thank you, your Honor.

12:37:54  9            THE COURT:  And I hope that arguments

12:37:56  10   will include any position that the Commission is

12:38:03  11   taking, having heard Ms. Ahmed's testimony about

12:38:09  12   the rollover IRA, and the Goldman shares

12:38:18  13   account.

12:38:20  14            MR. HEINKE:  Your Honor, I can

12:38:21  15   address that first.  Based on Ms. Ahmed's

12:38:23  16   testimony, we are comfortable with the rollover

12:38:28  17   IRA also be being released.  I would note that

12:38:32  18   we were working with counsel for the relief

12:38:34  19   defendants, so on the stipulation, we sent it

12:38:37  20   over on Tuesday, with respect to the Goldman

12:38:39  21   shares we haven't heard back yet.  But

12:38:41  22   presumably now, the IRA, rollover IRA will be

12:38:44  23   able to be included in that as well.

12:38:46  24            THE COURT:  All right.  So you're

12:38:47  25   working on that.  And you'll get that to me, it

12:38:50  1    can be released from the asset freeze order.

12:38:54  2    Okay.

12:38:57  3              MR. HEINKE:  Your Honor, in the time

12:39:00  4    the Commission has left, I will attempt to be

12:39:02  5    brief and discuss what I think is really at

12:39:06  6    issue in this hearing; which is, whether the

12:39:13  7    assets at issue are the assets of Mr. Ahmed, or

12:39:20  8    rather, whether they sort of properly belong to

12:39:24  9    the relief defendants and ought to be released.

12:39:27  10             Now, your Honor, the SEC has come

12:39:30  11   forward with significant evidence, including the

12:39:32  12   declaration of Ms. Ames, first; and second,

12:39:36  13   including the declaration of Mr. Oraker, and

12:39:38  14   including the evidence proffered at this

12:39:40  15   hearing, of a significant fraud spanning ten

12:39:43  16   years, that resulted in along the order of 65

12:39:48  17   million dollars being stolen from Oak and from

12:39:51  18   its investors.  Those proceeds were then placed

12:39:54  19   into bank accounts that Mr. Ahmed opened

12:39:58  20   fraudulently in the name of Oak, and various

12:40:02  21   companies Oak invested in.  And those assets

12:40:04  22   were then funneled to and placed in the names of

12:40:08  23   numerous relief defendants in this case.  And we

12:40:12  24   submit that for purposes of the PI hearing,

12:40:14  25   that's what this case really -- that's what the

12:40:17  1   issue really comes down to, is for purposes of

12:40:20  2   preliminary relief, freezing assets in order to

12:40:23  3   preserve an ultimate remedy against Mr. Ahmed,

12:40:27  4   whether those assets ought to remain frozen, as

12:40:30  5   they are now, or whether millions of dollars of

12:40:34  6   those assets ought to be released as the relief

12:40:37  7   defendants are requesting.

12:40:41  8          Now, again, the SEC contends all of

12:40:43  9   the assets ought to remain frozen with the

12:40:46  10  exception of the Goldman stock and rollover IRA

12:40:49  11  that we have discussed.  The relief defendants,

12:40:51  12  in their papers, have made two proposals.  The

12:40:54  13  first is a release of the 7.5 million dollars

12:40:57  14  related to the I-Cubed sale.  Plus, Mrs. Ahmed's

12:41:02  15  Goldman salary, stock and IRA, as we already

12:41:06  16  addressed.  Or alternatively, for a carve-out

12:41:09  17  for two and a half million dollars in legal fees

12:41:11  18  and twenty thousand dollars a month in expenses.

12:41:16  19          Your Honor, you've heard significant

12:41:20  20  evidence supporting the fraud.  I won't belabor

12:41:21  21  that point, given our time.  I want to turn to

12:41:24  22  the question of sort of the proposal made by the

12:41:27  23  relief defendants, that the assets -- first,

12:41:30  24  that the assets of the I-Cubed transaction, that

12:41:34  25  7.5 million dollars, ought to be released.  Now,

12:41:36  1  the relief defendants posit that that money

12:41:41  2  should be released because one, the I-Cubed

12:41:43  3  transaction was a good transaction; it wasn't

12:41:46  4  fraudulent.  And two, because Oak really got the

12:41:51  5  7.5 million dollars worth of value that they

12:41:56  6  paid.  Your Honor, we submit that that is wrong

12:42:01  7  both on the law, and on the facts.

12:42:04  8         Now, in terms of whether the

12:42:07  9  transaction was fraudulent, what we know about

12:42:11  10  the transaction, you recall what the evidence

12:42:13  11  has shown, is that two days before the sale of

12:42:19  12  the stock, Mr. Ahmed opens a bank account at

12:42:22  13  Bank of America in I-Cubed's name, signing as a

12:42:28  14  member, in October of 2014, just two days before

12:42:30  15  the transaction.  That is Exhibit 6 in this

12:42:35  16  proceeding.  He tells Oak to transfer money, 7.5

12:42:40  17  million dollars, to that bank account, without

12:42:42  18  ever disclosing that he's the one that owns and

12:42:45  19  controls the account.

12:42:47  20         Your Honor, Mr. Ahmed, also in

12:42:50  21  connection with the I-Cubed transaction, the

12:42:52  22  sale for 7.5 million dollars, you heard Ms. Ames

12:42:55  23  testify, explained it as a purchase from a

12:42:58  24  family office.  Of course, what Mr. Ahmed

12:43:01  25  neglected to inform Oak was that that family was

| | | |
|---|---|---|
| 12:43:05 | 1 | his.  That disclosure was never made, regardless |
| 12:43:09 | 2 | of whether the ownership in I-Cubed rested with |
| 12:43:14 | 3 | him, or his wife, or the trust, at that point. |
| 12:43:17 | 4 | By saying it's a family office, and by not |
| 12:43:20 | 5 | saying that family is mine, that is fraud. |
| 12:43:25 | 6 | Those are misrepresentations, those are |
| 12:43:27 | 7 | violations of the securities laws.  Moreover, |
| 12:43:29 | 8 | and, your Honor, I think most telling about this |
| 12:43:32 | 9 | transaction, is that there is significant |
| 12:43:34 | 10 | evidence that Mr. Kimball, the purported manager |
| 12:43:38 | 11 | of I-Cubed, that his signature was forged on the |
| 12:43:41 | 12 | October 30th sales agreement from I-Cubed to |
| 12:43:46 | 13 | Oak. |
| 12:43:46 | 14 | Now, when we think about that, for |
| 12:43:50 | 15 | the relief defendants to posit that this |
| 12:43:52 | 16 | transaction was a clean transaction that perhaps |
| 12:43:54 | 17 | Mr. Ahmed was confused about whether he needed |
| 12:43:57 | 18 | to disclose that I-Cubed was controlled by his |
| 12:44:00 | 19 | wife, because of language of certain Oak |
| 12:44:03 | 20 | policies, for that theory to make sense, why |
| 12:44:05 | 21 | would Mr. Ahmed, or someone -- you heard Ms. |
| 12:44:09 | 22 | Ahmed testify it wasn't her.  The only person it |
| 12:44:12 | 23 | could have been was Mr. Ahmed.  Why would Mr. |
| 12:44:14 | 24 | Ahmed have forged the signature on the sale |
| 12:44:16 | 25 | documents.  Why wouldn't he have said "Well, you |

12:44:19  1    know, Ms. Ahmed you ought to sign on behalf of

12:44:23  2    I-Cubed, it's your entity."  We submit the

12:44:25  3    evidence shows the only logical inference would

12:44:27  4    be that Mr. Ahmed knew that he had to conceal

12:44:29  5    who the seller of the shares was to avoid the

12:44:33  6    scrutiny that Ms. Ames testified to that would

12:44:35  7    come with disclosing that the seller was really

12:44:39  8    him, or his family.

12:44:45  9          Now, your Honor, the transaction was

12:44:48  10   fraud, main and simple.  Mr. Ahmed fraudulently

12:44:51  11   opened a bank account and didn't tell Oak.  Mr.

12:44:55  12   Ahmed misrepresented that it was a family

12:44:57  13   office, and didn't tell Oak it was his family.

12:44:59  14   And the documents were forged.  The 7.5 million

12:45:03  15   dollar I-Cubed transaction was fraud.  At a

12:45:07  16   minimum, there is significant evidence at this

12:45:09  17   preliminary stage that there's a likelihood the

12:45:11  18   SEC would prevail, or at least an inference,

12:45:14  19   which is the appropriate standard, that the

12:45:16  20   securities laws were violated.

12:45:18  21         Now, the relief defendants also argue

12:45:21  22   that even if the transaction were fraudulent,

12:45:23  23   there were no damages, that Oak wasn't damaged,

12:45:28  24   because it really got seven and a half million

12:45:30  25   dollars worth of value, or perhaps more.  Your

12:45:33  1   Honor, we submit that the evidence belies that

12:45:35  2   claim.

12:45:36  3           Now, first, as a matter of law,

12:45:40  4   courts are clear that disgorgement is measured

12:45:42  5   not by the amount of injury to investors,

12:45:45  6   damages to an investor, which is the term that

12:45:48  7   the leave defendants continue to insist on.  But

12:45:50  8   rather, the unjust enrichment to the defendant.

12:45:53  9   And indeed, there's a number of cases, including

12:45:56 10   SEC versus Cavanagh, which is 455 F.3d 105, that

12:46:02 11   may make clear that it's not appropriate to look

12:46:05 12   to injury to investors, but rather unjust

12:46:08 13   enrichment to the defendant.

12:46:11 14           And the evidence is significant that

12:46:13 15   Mr. Ahmed was unjustly enriched.  The evidence

12:46:17 16   shows that I-Cubed paid about two million

12:46:20 17   dollars for the shares in 2012.  It then resold

12:46:23 18   in 2014 for seven and a half million dollars.

12:46:26 19   But perhaps more importantly, your Honor, and as

12:46:29 20   Mr. Williams discussed with Ms. Ahmed, in August

12:46:33 21   of 2014, just about five or six weeks before

12:46:36 22   this sale, the assets of I-Cubed, which included

12:46:40 23   these shares of Company C, were placed into

12:46:46 24   established -- placed into the GRAT.  And the

12:46:51 25   schedule of those assets gave them a value of

12:46:54  1  about eight hundred seventy-six thousand
12:46:56  2  dollars.  And you heard Ms. Ahmed herself
12:46:58  3  testify, that's where she would look to see what
12:47:01  4  the value of these shares were in August of
12:47:04  5  2014.
12:47:05  6          So your Honor, the evidence shows
12:47:07  7  that in August of 2014, a 99 percent interest in
12:47:11  8  I-Cubed, in other words, 99 percent of the value
12:47:14  9  of the Company C shares held by I-Cubed, was
12:47:17  10  worth less than a million dollars.  And yet,
12:47:20  11  five weeks later, it was sold by Mr. Ahmed for
12:47:25  12  seven and a half million dollars.
12:47:27  13          Your Honor, you've also seen
12:47:29  14  evidence, and Ms. Ames testified to it today,
12:47:32  15  that there was information about the financial
12:47:34  16  condition of I-Cubed that was not known by Oak
12:47:38  17  at the time they engaged and entered into that
12:47:41  18  seven and a half million dollar transaction.
12:47:43  19  Perhaps most telling, there was the November 6,
12:47:47  20  2014 e-mail that we looked at with Ms. Ames,
12:47:49  21  where just days after the seven and a half
12:47:55  22  million dollar sale, Mr. Ahmed was commenting
12:47:57  23  that Company C was having a flat-to-down year,
12:48:00  24  and that he would, in his words, "get his ass
12:48:03  25  handed to him if he went to Oak and asked for

12:48:06   1   money for Company C.  Of course, we know he did

12:48:09   2   go to Oak and ask for money for Company C.  But

12:48:13   3   what he did was he sold his shares in Company C,

12:48:15   4   to Oak.

12:48:17   5        Your Honor, you also heard last week,

12:48:19   6   Ms. Ames testify that currently on the books,

12:48:23   7   Oak has written down the value of those Company

12:48:25   8   C shares back down to around the two million

12:48:27   9   dollars that they paid for it.  So there was

12:48:30   10  unjust enrichment to Mr. Ahmed in the scope of

12:48:35   11  millions of dollars in connection with this

12:48:39   12  I-Cubed transaction.  Now, we submit, at this

12:48:42   13  point, for purposes of the preliminary freeze,

12:48:44   14  the Court ought to include the entire seven and

12:48:48   15  a half million dollar value in I-Cubed in the

12:48:51   16  freeze.  And the reason we say that, your Honor,

12:48:53   17  is there is significant dispute, I think, over

12:48:56   18  what the real value of those shares were.

12:48:58   19        Now, at the end of the day, it's

12:49:01   20  certainly true that the analysis is what were

12:49:03   21  the ill gotten gains.  So the true value at the

12:49:06   22  time of the sale, I think we would concede, may

12:49:09   23  not be included in any ultimate judgment.  But

12:49:12   24  for purposes of the preliminary freeze, until

12:49:15   25  those issues can be determined, the SEC has met

| | | |
|---|---|---|
| 12:49:18 | 1 | its burden to provide a reasonable approximation |
| 12:49:20 | 2 | of the ill gotten gains.  And as this Court |
| 12:49:24 | 3 | knows, and as numerous courts have held, any |
| 12:49:27 | 4 | risk of uncertainty in calculating the |
| 12:49:29 | 5 | disgorgement falls on the wrongdoer, rather than |
| 12:49:32 | 6 | on the Commission.  So your Honor, we submit |
| 12:49:34 | 7 | that for purposes of the one transaction that |
| 12:49:37 | 8 | the relief defendants have put at issue, the |
| 12:49:40 | 9 | I-Cubed 7.5 million dollar sale, that |
| 12:49:44 | 10 | transaction ought to be included in the asset |
| 12:49:47 | 11 | freeze because the SEC has met its burden to |
| 12:49:49 | 12 | show a likelihood of success, or at least an |
| 12:49:51 | 13 | inference; and that the value, the 7.5 million |
| 12:49:54 | 14 | dollar value, ought to be included as well. |
| 12:50:02 | 15 | MR. DEITCH:  Your Honor, I don't mean |
| 12:50:04 | 16 | to interrupt, but I assume will have at least a |
| 12:50:06 | 17 | couple minutes to address the Court before the |
| 12:50:10 | 18 | witching hour. |
| 12:50:10 | 19 | THE COURT:  I'm looking at the clock |
| 12:50:12 | 20 | and you really have to wrap up in about one |
| 12:50:15 | 21 | minute.  And I don't know whether you're going |
| 12:50:16 | 22 | to address the proposal that Mrs. Ahmed be |
| 12:50:19 | 23 | permitted to operate the apartments and utilize |
| 12:50:25 | 24 | some or all of the rents. |
| 12:50:27 | 25 | MR. HEINKE:  I'll address that |

12:50:29  1    briefly your Honor and then I'll sit down.  The

12:50:31  2    Commission's concern with permitting the

12:50:35  3    proceeds of that apartment, the rental income,

12:50:38  4    to be used by Ms. Ahmed or the relief

12:50:42  5    defendants, is that the evidence is clear, and

12:50:43  6    Mr. Oraker's declaration set this out, that that

12:50:47  7    apartment was purchased directly with fraud

12:50:49  8    money.  It's no different than someone saying,

12:50:52  9    "I stole a hundred thousand dollars, I put it in

12:50:54 10    a bank account, but why don't you, you know --

12:50:56 11    can I please take the interest from that hundred

12:50:58 12    thousand dollars and spend it as I please during

12:51:01 13    the pendency of the litigation."  Your Honor, we

12:51:03 14    think it would be inappropriate, as a matter of

12:51:05 15    policy and as a matter of law, to give free rein

12:51:09 16    to those assets.

12:51:10 17            Now, we concede that is income that

12:51:13 18    is being generated.  And perhaps were the Court

12:51:16 19    at all inclined to look toward a carve-out, that

12:51:18 20    that would be one of the less objectionable

12:51:22 21    sources.  But to be very clear, we do think it

12:51:25 22    would be objectionable.  We think a carve-out in

12:51:28 23    this instance, as a matter of policy, when there

12:51:31 24    are liquid assets that are less than the

12:51:34 25    disgorgement amount that will ultimately be owed

12:51:38  1    to investors, that that -- that anything that

12:51:41  2    would encumber assets is not appropriate in

12:51:45  3    terms of carve-out in this case.

12:51:47  4          Your Honor, unless you have another

12:51:48  5    question, I respect that we are nearly out of

12:51:50  6    time so I'll sit down.

12:51:51  7          THE COURT:  Thank you.

12:51:53  8          MR. DEITCH:  Thank you, your Honor.

12:51:56  9    And I will be -- I will be very brief.  Your

12:52:00  10   Honor, I'm not going to address in detail the

12:52:03  11   I-Cubed transaction, or Ms. Ahmed's involvement

12:52:07  12   with the DIYA entities and their apartments,

12:52:10  13   because I believe you have heard the testimony.

12:52:11  14   And I think it's sufficient at least to show

12:52:13  15   that there are significant questions which need

12:52:15  16   to be addressed in this proceeding.  And that

12:52:17  17   gets back to the fact that we are in a

12:52:20  18   proceeding for a preliminary injunction.  The

12:52:22  19   purpose, as your Honor knows, of a preliminary

12:52:24  20   injunction, is essentially to freeze the status

12:52:28  21   of the assets.  So that they will be available

12:52:30  22   for payment later.  The purpose is not to punish

12:52:35  23   relief defendants.  The purpose is not to coerce

12:52:38  24   them or squeeze them because they have no money

12:52:40  25   to live on.  The purpose is not to deprive them

12:52:43  1   of the ability to protect their rights with the

12:52:45  2   assistance of attorneys.  But that's what is

12:52:48  3   happening here.

12:52:49  4        In our supplemental brief that we

12:52:52  5   submitted this week, we provided some figures to

12:52:56  6   the Court, based -- and these are undisputed

12:52:59  7   figures from the SEC's own estimates from their

12:53:02  8   Interrogatory responses and from their briefs,

12:53:05  9   which show that the total amount frozen,

12:53:07  10  including the value of the Oak capital accounts,

12:53:10  11  is now over a hundred million dollars.  In fact,

12:53:13  12  we found out today that if the residence, which

12:53:15  13  was not previously included, is added into

12:53:18  14  that -- and that residence, by the way, may be

12:53:21  15  worth more than nine million dollars, based on

12:53:23  16  more recent assessment, may be worth more like

12:53:26  17  ten or eleven or twelve million.  But even using

12:53:29  18  the nine million figure, that would mean one

12:53:31  19  hundred ten million dollars that has been frozen

12:53:33  20  for the purpose of sixty-five million dollars of

12:53:37  21  disgorgement.  That's an enormous gap, an

12:53:40  22  enormous amount of surplus.

12:53:42  23       And as we argued in our supplemental

12:53:45  24  brief, and I believe in our prehearing brief as

12:53:48  25  well, relief defendant's assets should not be

12:53:51   1   the source -- should not be frozen for the

12:53:55   2   purpose of securing the payment of civil

12:53:57   3   penalties that will likely be much smaller than

12:53:59   4   the SEC estimates and are the defendant's

12:54:01   5   obligation.  They are to punish and deter the

12:54:03   6   defendant.  And we explained that in our brief,

12:54:06   7   both in the language of the statute, and I

12:54:08   8   believe we cited at least one case that

12:54:10   9   addressed that specifically.

12:54:12   10          So your Honor, what we are doing is

12:54:14   11   not attacking the entire request for a

12:54:17   12   preliminary injunction.  We are asking for

12:54:19   13   extremely limited relief in order to permit Ms.

12:54:23   14   Ahmed and her children to live, and to permit

12:54:26   15   all of the relief defendants we represent to be

12:54:29   16   properly represented, in order to properly test

12:54:33   17   the SEC allegations in this case.  It is simply

12:54:36   18   unjust to put them in a situation in which they

12:54:39   19   have no means to contest the SEC allegations.

12:54:42   20   And the SEC is fully secured by the freezing of

12:54:47   21   assets that it has already.

12:54:50   22          Your Honor, I know we have very

12:54:52   23   limited time.  I'm happy to address any specific

12:54:55   24   issues that you'd like me to address.  But

12:54:57   25   otherwise, we'll leave it for your

12:54:58  1    determination.

12:55:00  2          THE COURT:  In an earlier submission,

12:55:05  3    it was indicated that the Ahmed children's

12:55:08  4    tuition has been paid for school for this coming

12:55:12  5    up year, and that there was a nanny employed in

12:55:16  6    the home.  Is it not correct that for the

12:55:22  7    purposes of, say, starting September 1, that

12:55:30  8    apart from the conditions of the District of

12:55:42  9    Massachusetts with employment by Mrs. Ahmed, the

12:55:50  10   needs of the family are met, the house is owned

12:55:56  11   outright, the children are in school.  If they

12:56:01  12   weren't in private school with those tuitions,

12:56:05  13   they could be in public school.  And I'm

12:56:11  14   questioning the financial need beyond a cash

12:56:19  15   flow.

12:56:21  16          MR. DEITCH:  You're making, I

12:56:24  17   believe, an unfair assumption, which is that Ms.

12:56:26  18   Ahmed could find employment.  She is the subject

12:56:29  19   of a material witness warrant in a criminal case

12:56:32  20   in Massachusetts.  She is a relief defendant in

12:56:36  21   this case.  Her husband is a fugitive.  Even

12:56:39  22   under the best circumstances, I don't know

12:56:42  23   whether she could find employment between now

12:56:44  24   and September.  But under those circumstances, I

12:56:47  25   would say it is highly unlikely she could find

12:56:49  1   employment.  I don't know, from a numbers

12:56:53  2   standpoint, whether what you have suggested is

12:56:55  3   correct or not.  I would have to sit down and

12:56:57  4   think through the numbers.  But I -- but

12:57:01  5   certainly, if she were employed, that would be

12:57:04  6   one source of income that she would have that

12:57:07  7   could cover a lot of those costs.

12:57:09  8          I do note that the rental income from

12:57:13  9   the apartments is an easy source of income that

12:57:16  10  doesn't touch the existing frozen assets, that

12:57:20  11  can be used to fund her living expenses during

12:57:22  12  the pendency of this case.  And I believe that

12:57:26  13  it is noteworthy, your Honor, that we have yet

12:57:30  14  to see a case cited by the SEC in which a relief

12:57:33  15  defendant was denied the ability to have some

12:57:36  16  living expenses, or legal fees paid for, even

12:57:40  17  out of frozen assets.  And none of those cases

12:57:43  18  involved a situation like this one, in which the

12:57:45  19  amount of assets frozen are really almost

12:57:50  20  approaching double of the amount of the proposed

12:57:53  21  disgorgement.

12:57:54  22          THE COURT:  You identify the need for

12:58:01  23  money for attorney's fees.  Are you referring to

12:58:04  24  the matter in which she's been arrested as a

12:58:07  25  material witness?

| | | |
|---|---|---|
| 12:58:08 | 1 | MR. DEITCH:  She needs an attorney in |
| 12:58:11 | 2 | both matters.  She need an attorney in this |
| 12:58:15 | 3 | matter, most pressingly.  And she need an |
| 12:58:19 | 4 | attorney in that matter as well.  And I |
| 12:58:21 | 5 | understand, because I was here when you were |
| 12:58:22 | 6 | discussing with Mr. Lipman the possibility that |
| 12:58:26 | 7 | she could be represented by a CJA attorney. |
| 12:58:31 | 8 | THE COURT:  The Court was suggesting |
| 12:58:33 | 9 | that she could. |
| 12:58:34 | 10 | MR. DEITCH:  Yes.  My understanding, |
| 12:58:36 | 11 | and I have not specifically researched it in the |
| 12:58:39 | 12 | context of this case, and certainly not in the |
| 12:58:40 | 13 | context of a material witness warrant.  I don't |
| 12:58:44 | 14 | know whether they'll provide CJA counsel. |
| 12:58:47 | 15 | THE COURT:  I don't either. |
| 12:58:48 | 16 | MR. DEITCH:  And I do believe that |
| 12:58:50 | 17 | there's a -- there's certainly a predicate for |
| 12:58:56 | 18 | providing a relief defendant with -- well, if |
| 12:59:00 | 19 | she were in the position of a defendant, with |
| 12:59:03 | 20 | providing her funds from a civil asset freeze, |
| 12:59:05 | 21 | for the purpose of criminal proceedings. |
| 12:59:07 | 22 | THE COURT:  And my last question is, |
| 12:59:10 | 23 | for the purpose of contesting the issues in this |
| 12:59:13 | 24 | case, where she has testified as to relatively |
| 12:59:21 | 25 | blanket lack of knowledge of her husband's |

12:59:24  1  undertakings, what is it that she would be doing

12:59:28  2  by way of contesting the allegations that he

12:59:31  3  engaged in fraudulent activity.

12:59:34  4        MR. DEITCH:  Your Honor, I don't

12:59:36  5  believe that her right to contest the

12:59:38  6  allegations depends on her personal knowledge

12:59:41  7  about those allegations.  As a party, she would

12:59:45  8  be entitled to discovery, and she would be

12:59:48  9  entitled to a more prolonged review of the

12:59:52  10  discovery than we had in this proceeding, or

12:59:54  11  before this proceeding.  Because a predicate of

12:59:59  12  the relief that the SEC seeks from her, and from

13:00:02  13  the other relief defendants, has to do with the

13:00:05  14  underlying claims.  And they have a right, as we

13:00:08  15  cited case law, they have a right to put the SEC

13:00:11  16  to its proof as a plaintiff, and to put them to

13:00:15  17  their burden as a plaintiff.

13:00:17  18        So that the facts that she personally

13:00:20  19  does not have knowledge to contest, that

13:00:23  20  conflict with or otherwise form a basis to

13:00:26  21  contest the underlying allegations of the

13:00:29  22  claims, that's not really the point.  The point

13:00:31  23  is that with the assistance of counsel, through

13:00:34  24  the procedures provided in the rules of civil

13:00:36  25  procedure, counsel will be able to assist her in

13:00:41  1   determining whether there is merit to the SEC

13:00:43  2   claim and in defending against those claims.

13:00:46  3          THE COURT:  So your position is that

13:00:47  4   as a relief defendant, she can essentially take

13:00:50  5   on the defense that would otherwise have to be

13:00:54  6   launched by the defendants.

13:00:58  7          MR. DEITCH:  Yes, your Honor.  And I

13:00:59  8   believe we cited case law for that proposition

13:01:01  9   in our papers.  Thank you.

13:01:05  10          MR. HEINKE:  Your Honor, if I might

13:01:06  11   just briefly on that point.

13:01:07  12          THE COURT:  One minute.

13:01:09  13          MR. HEINKE:  I just note that we

13:01:11  14   disagree with the position that the leave

13:01:12  15   defendants are taking, and will brief the issue

13:01:14  16   further.  But the idea of a relief defendant

13:01:17  17   coming in where a defendant is not defending --

13:01:20  18   and I understand there maybe some changed

13:01:22  19   circumstances, but we think that that's -- that

13:01:25  20   the limited issues that relief defendants could

13:01:27  21   contest do not entitle them to a full, you know,

13:01:31  22   presentation in the case, as if they were a

13:01:34  23   named defendant.

13:01:37  24          THE COURT:  All right.  Let's do

13:01:38  25   this.  I'm going to ask if you have anything

13:01:47    1    more by way of legal authority, to bring to the

13:01:52    2    Court's attention on the issues that are -- on

13:01:57    3    which the preliminary injunction is based, that

13:02:07    4    I get that -- when did I ask for the privileged

13:02:19    5    material to be opposed.

13:02:21    6               MR. DEITCH:  I believe you were

13:02:23    7    somewhat general.  You just said --

13:02:25    8               THE COURT:  Let's have --

13:02:27    9               MR. DEITCH:  This week.

13:02:28   10               THE COURT:  I think I said five days.

13:02:30   11    Let's have anything that is going to be

13:02:41   12    submitted for preliminary injunction purposes,

13:02:48   13    by August 5.  And that will close out the record

13:03:21   14    here.  And that will also give Mr. Lipman a

13:03:26   15    chance to get whatever he is planning to submit,

13:03:32   16    in.  Anything else?

13:03:39   17               All right, thank you very much,

13:03:40   18    counsel.  We stand in recess.

           19

           20

           21               * * * * * * * * * * *

           22

           23

           24

           25

1                           I N D E X

2    WITNESSES                                    Page no.

3    JULY 23, 2015

4        GRACE AMES

5    Direct by Mr. Heinke                              81

6    Cross by Mr. Deitch                              125

7        SHALINI AHMED

8    Direct by Mr. Harris                             178

9    Cross by Mr. Williams                            189

10

11   JULY 30, 2015

12       GRACE AMES

13   Cross by Mr. Deitch (Continuing)                 230

14   Redirect by Mr. Heinke                           281

15       SHALINI AHMED

16   Direct by Mr. Williams                           290

17   Cross by Mr. Skibell                             347

18   Redirect by Mr. Williams                         369

19

20                    * * * * * * * * * * * *

21

22

23

24

25

1    COURT REPORTER'S TRANSCRIPT CERTIFICATE

2    I hereby certify that the within and foregoing is

3    a true and correct transcript taken from the

4    proceedings in the above-entitled matter.

5    /s/ Julia Cashman

6    Official Court Reporter

7    8/4/2015

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25