# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| v. | Civil Action No. 3:15-cv-675 (JBA) |
| IFTIKAR AHMED, | |
| Defendant, and | |
| IFTIKAR ALI AHMED SOLE PROP; I-CUBED DOMAINS, LLC; SHALINI AHMED; SHALINI AHMED 2014 GRANTOR RETAINED ANNUITY TRUST; DIYA HOLDINGS LLC; DIYA REAL HOLDINGS, LLC; I.I. 1, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; I.I. 2, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; and I.I. 3, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents, | |
| Relief Defendants. | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The Defendant, pursuant to Fed. R. Civ. P. 56(c), appearing *pro se*, respectfully moves this Court for an Order granting summary judgment. No genuine issue of material fact exists, and the Defendant is entitled to judgment as a matter of law. A memorandum in support of this motion is incorporated by reference. In addition, this motion is supported by a statement of undisputed facts in compliance with Local Rule 56(a), and exhibits attached herewith.

1

Respectfully Submitted,


Dated:          June 27TH, 2017          /s/ Iftikar Ahmed
                                          _____
                                          Iftikar A. Ahmed
                                          C/O Advocate Anil Sharma
                                          10 Government Place East, Ground Floor
                                          Behind Kanpur Leather House
                                          Kolkata 700069, India
                                          Tel: +91.98.30.089.945
                                          Email: iftyahmed@icloud.com
                                          *Pro Se*

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

The memorandum summarizes the claims and defenses upon which the judgment is sought by the Defendant.

## SECTION I : EXTRA-TERRITORIALITY

**COUNTS ONE AND TWO:  Defendant is entitled to summary judgment on his affirmative defense of extra-territoriality and lack of jurisdiction of the SEC regarding all claims pertaining to transactions associated with Companies A, B, D, E, F, G, H, and I.**

1.      Burden of proof and elements:

The Plaintiff's claims of misconduct by the Defendant, pertaining to each of the companies listed above (Companies A, B, D, E, F, G, H and I), requires the Plaintiff to establish, by a preponderance of the evidence that (i) the securities were registered on domestic US exchanges; *or* (ii) that irrevocable liability was incurred and title transferred within the United States.[1]  The Exchange Act regulates "domestic transactions", not foreign transactions.

In 2010, the US Supreme Court ruled in *Morrison v. National Australia Bank Ltd.*[2] that Section 10(b) of the US Securities Act of 1934 does **not** apply extraterritorially; it only applies to "transactions in securities listed on domestic exchanges" or "domestic transactions in other securities."[3]  In doing so, the Supreme Court rejected the "*flexible conduct and effects*"[4] test and replaced them with a clear bright-line "*transactional*" test which provides that Section 10(b) only

---

[1] *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 672 F. 3d 143 (2nd Cir. 2012) at 145.
[2] *Morrison v. National Australia Bank Ltd*.  130 S. Ct. 2869 (2010).
[3] Idem 257-62.
[4] The conduct test focused on whether and to what extent "the wrongful conduct occurred in the United States." *SEC v. Berger*, 322 F. 3d 187, 192 (2nd Cir. 2003).  The effects test focused on "whether the wrongful conduct has a substantial effect in the US or upon US citizens." Id.  The Third, Fifth, Seventh, Eighth, Ninth, and D.C. Circuits each adopted variations of these tests, thus prompting Justice Stevens to call the Second Circuit's tests "the 'North Star' of §10(b) jurisprudence." *Morrison*, 130 S. Ct. at 2889 (Stevens, J., concurring in the judgment).

applied to "transactions in securities listed on domestic exchanges" and to "domestic transactions in other securities."   None of the companies listed in this section were listed or traded in any domestic US exchange and, hence, all these transactions fail to satisfy Morrison's first prong test.

In *Absolute Activist Value Master Fund Ltd. v. Ficeto*[5], the Second Circuit clarified the extraterritorial reach of Section 10(b) (and therefore, of Rule 10b-5) of the Securities Exchange Act of 1934.   The Second Circuit then interpreted the second prong of the *Morrison* test - under what circumstances the purchase or sale of a security not listed on a domestic exchange should be considered  "domestic" under the meaning of *Morrison*.   The Court unanimously noted that under the transactional test, the application of Section 10(b) was a merits-based inquiry and not an issue of subject matter jurisdiction, and that "[w]ith regard to securities not registered on domestic exchanges, the *exclusive* focus [is] on domestic purchases and sales…"  Relying on the statutory provisions of the Exchange Act, the Court determined that "a 'purchase' or 'sale' takes place when the parties become bound to effectuate the transaction.  The creation of that irrevocable liability indicates also where the sale or purchase of securities occurred."[6]  The Court of Appeals further held that the *locus* of the transaction could be determined to "take place at the location in which title is transferred."[7]

The Court of Appeals rejected and dismissed other alternative tests suggested by the parties in determining whether the plaintiff's claims met the standard for invoking  Section 10(b) liability under *Morrison's* "domestic" transactional test.   The Court indicated that the identity of the parties (and, hence, their residence or citizenship), the type of securities (were the securities issued by US companies and / or companies registered with the SEC), and the individual defendant conduct engaged within the US, would **not** be determinative of whether a transaction

---

[5] Idem.
[6] Idem at 151.
[7] Idem.

is "domestic" under *Morrison's* transactional test,[8] and outright rejected these alternative tests proposed by the parties that turned on the location of the broker-dealer or legal counsel, the identity of the securities, the identity of the buyer or seller, and the location of the alleged fraudulent conduct.[9] The Court of Appeals concluded that a securities transaction is deemed to be "domestic" **only when the parties incur irrevocable liability to carry out the transaction within the US or when title is passed within the US**.[10]

Writing for a unanimous panel, Justice Katzmann[11] held that a transaction is domestic when the parties incur irrevocable liability - that is when the parties become bound to effectuate the transaction - or transfer title within the United States.[12]  Noting that there are multiple ways to locate a securities transaction, the court also embraced the Eleventh Circuit's "title transfer" test for determining whether the transaction is "domestic."[13]

Since Morrison, courts have also applied this test to claims under 17(a) (Count Two) as in *SEC v. Goldman Sachs & Co*. [14]

Thus the Plaintiff must prove and demonstrate the existence of a "domestic transaction in other securities," the Plaintiff must prove with facts that irrevocable liability was incurred or that title was transferred within the US.   A domestic purchaser's placement of a buy order from the US for the purchase of foreign stock listed on a foreign exchange, for example, is not sufficient

---

[8] The Second Circuit rejected these alternative tests as either contrary to *Morrison* or irrelevant to the extent that they fail to illuminate the location of irrevocable liability or title transfer.   *Absolute Activist*, 677 F.3d at 68-69.
[9] Idem.
[10] Idem 152-53.
[11] Joined by Justice Newmann and Justice Winter.
[12] Idem 677 F. 3d at 69.
[13] Idem 677 F. 3d at 68; also see *Quail Cruises Ship Mgmt Ltd. v. Agencia de Viagens CVC Tur Limitada*, 645 F. 3d 1307, 1310-11 (11th Cir. 2011).
[14] 790 F.Supp.2d 147, 164 (S.D.N.Y. 2011)

to establish a domestic transaction; as ruled in *City of Pontiac Policemen's and Firemen's Retirement System v. UBS AG.* [15]

Under this standard, the Plaintiff bears the burden to establish with preponderance of evidence that these alleged transactions pertaining to each of Companies A, B, D, E, F, G, H and I are indeed "domestic" transactions.

    2.   <u>Elements that cannot be proven by the Plaintiff:</u>

**<u>Element 1</u>:**   The Defendant contends that the Plaintiff cannot demonstrate a triable issue of fact as to whether any of the securities pertaining to Companies A, B, D[16], E, F, G, H and I were registered on any domestic US exchange.   The Plaintiff bears the burden, which they cannot meet, to show with factual proof that these companies were registered on any domestic US exchange.

<u>Summary</u>:   Most of the SEC's allegations pertain to foreign securities.   See Amended Complaint, [Doc. 33], *para* 27 (Company D - Asian); *para* 42 (Company E - Swiss); *para* 49 (Company F - European); *para* 56 (Company G - Asian); *para* 71 (Company H - European); *para* 75 (Company I - European); *para* 80 (Company A - Asian); and *para* 96 (Company B - Asian).

<u>Details</u>:

**Company A** was/is an unlisted (not public traded, thus a private) company domiciled in the <u>Cayman Islands</u> and not registered with the SEC and was not traded on any domestic US exchange.

---

[15] 752 F. 3d 173, 181-182 (2d Cir. 2014)
[16] Prior to June 29th 2006 when Company D went public via an IPO on NASDAQ.

**Company B** was/is an unlisted (not publicly traded, thus a private) company domiciled in the People's Republic of China (or "China") and not registered with the SEC and was not traded on any domestic US exchange.

**Company D** was an unlisted (not publicly traded, thus a private) company domiciled in the Republic of Korea (commonly known as "South Korea" or "Korea").

**Company E** was an unlisted (not publicly traded, thus a private) company domiciled in Switzerland and not registered with the SEC and was not traded on any domestic US exchange.

**Company F** was an unlisted (not publicly traded, thus a private) company domiciled in the United Kingdom and not registered with the SEC and was not traded on any domestic US exchange.

**Company G** was a listed (public traded) company listed and trading on the South Korean stock exchange KOSDAQ and was domiciled in South Korea and not registered with the SEC and was not traded on any domestic US exchange.  See Amended Complaint [Doc. 33] *para* 61.

**Company H** was an unlisted (not publicly traded, and thus a private) company domiciled in the United Kingdom and not registered with the SEC and was not traded on any domestic US exchange.

**Company I** was/is an unlisted (not publicly traded, and thus a private) company domiciled in the United Kingdom and not registered with the SEC and was not traded on any domestic US exchange.

Thus, none of the companies listed above satisfy the first prong of the *Morrison* test.


**Element 2:**     The Defendant contends that the Plaintiff cannot demonstrate a triable issue of fact as to whether in case of any of the securities pertaining to Companies A, B, D, E, F, G, H and I, an "irrevocable liability" occurred in the United States or "the title or ownership

transferred" in the United States.   Mere general allegations of some US-based connections to a securities transaction as presented by the Plaintiff in their Complaint will not suffice.   The Plaintiff bears the burden, which they cannot meet, to show with factual proof that the transactions in question became irrevocably bound to the purchaser and seller in the US or the title or ownership was transferred in the US.

There is no arbitrariness in terms of where title transfer occurs in any of these companies listed in this section.   They all occurred **outside** the United States.   In *In re Vivendi Universal, S.A. Securities Litigation*,[17] the Plaintiffs argued that the title was transferred in the US in part because "registration and delivery of shares" took place in the United States.[18]   But the New York Federal District Court held that the title transfer occurred in France because title was maintained in book entries in a French depository in accordance to French securities law.

In determining when irrevocable liability arises, courts have looked to various factors, including "*exchange of documents*," "*retention of rights…by the **seller***," and "*existence of express substantial conditions precedent*."[19]   In each of the companies and transactions listed in this section,  the exchange of documents occurred where the underlying company was domiciled, outside the US in all the cases, and the transaction closed in that domicile; the documents were filed with regulatory and government agencies in that domicile outside of the US which caused irrevocable liability; and the sellers in each of these transaction retained their rights to back out in their own respective domiciles that was not the US in any instance; and the express substantial conditions precedent existed in each of their own domiciles that was not the US.

In short, looked at any which way, none of the transactions related to the companies listed in this section satisfy any of the conditions necessary or sufficient to establish that they

---

[17] 284 F.R.D. 144 (S.D.N.Y. 2012).

[18] Idem at 151.

[19] Timothy M. Hall, Annotation, *What Amounts to "Purchase" or "Sale" for Purpose of Short-Swing Profits Provisions of §10(b) of Securities Exchange Act of 1934* (15 U.S.C.A. § 78p(b)), 123 A.L.R. Fed. 203, § 28[a] (1995).

were domestic transactions for the purposes of the US Securities Act and the US Investment Advisors Act.   Hence, they were all extraterritorial and the Plaintiff cannot demonstrate that there is any triable issue on the extraterritoriality of their allegations.

(i)      In case of the transactions pertaining to **Company A**, irrevocable liability occurred and the transfer of title happened in the Company's offices in <u>Shanghai, China</u>.  The Plaintiff bears the burden of proof to establish beyond any reasonable doubt that the irrevocable liability or transfer of title occurred in the United States.   It is not possible to establish as such; and were such irrevocable liability to have occurred in the US , the underlying transaction would not have met the conditions precedent necessary to legally close that transaction in the Cayman Islands.  The application for shares was also made in the Cayman Islands and accepted in the Cayman Islands.  The title of  shares was maintained in book entries in depositories in the Cayman Islands in accordance to Cayman Islands laws.

(ii)      In case of the transactions pertaining to **Company B**, irrevocable liability occurred, and the transfer of title happened in the <u>Shanghai, China</u>.    The Plaintiff bears the burden of proof to establish beyond any reasonable doubt that the irrevocable liability occurred in the United States.   It is not possible to establish as such, and were such irrevocable liability to have occurred in the US, rather than in China, the underlying transaction would not have met the conditions precedent necessary to legally close that transaction.   The transaction documents specially stipulated the official filings necessary with various governmental and regulatory bodies in China to establish the irrevocable liability on the parties to close the transaction within the jurisdiction of China.   The title transfer also happened in Chinese and in China.  The application for shares was made in Shanghai, China and accepted in China.   The title was maintained in book entries in depositories in China in accordance to Chinese laws.

(iii)    In case of the transactions pertaining to **Company D**, irrevocable liability occurred, and the transfer of title happened in the <u>Seoul, Korea</u>.    The Plaintiff bears the burden of proof to establish beyond any reasonable doubt that the irrevocable liability occurred in the United States.    It is not possible to establish as such, and were such irrevocable liability to have occurred in the US, rather than in Korea, the underlying transactions would not have met the conditions precedent necessary to legally close that transaction.    The transaction documents specially stipulated the official filings necessary with the regulatory authorities in Korea to establish the irrevocable liability on the parties to close the transaction within the jurisdiction of Korea.    The occurrence of irrevocable liability only happened with the official filing of papers with three Korean entities - Bank of Korea, FIPA or Foreign Investment Promotions Act; and KFTC or Korean Fair Trade Commission; all of which had to happen in South Korea.    The title was also in Korean and was maintained in Seoul, Korea.    The title was maintained in book entries in depositories in Seoul in keeping with Korean securities laws.  The application for shares was made in Seoul and accepted in the Seoul.  The counterparty Yahoo!Korea in one secondary share transaction was a Korean company.    All purchase transactions were entered in to and transacted by a Dutch company, A.B. Bohl Pratijk B.V.  and they were represented by a Korean law firm, Bae Kim & Lee.

(iv)    In case of the transactions pertaining to **Company E**, irrevocable liability occurred, and the transfer of title happened in the canton of <u>Ticino (where Lugano is a town/city), Switzerland</u>.    The Plaintiff bears the burden of proof to establish beyond any reasonable doubt that the irrevocable liability occurred in the United States.    It is not possible to establish as such, and were such irrevocable liability to have occurred in the US, rather than in Switzerland, the underlying transactions would not have met the conditions precedent necessary to legally close that transaction.    The transaction documents specially stipulated the official

8

filings necessary with the Commercial Register of Switzerland that would then establish the irrevocable liability on the parties to close the transaction within the jurisdiction of Switzerland. The title transfer also maintained in the canton of Ticino in Switzerland.  The title was maintained in book entries in depositories in Ticino in adherence with Swiss securities laws. The application for shares was made in Switzerland and accepted in Switzerland.

(v)      In case of the transactions pertaining to **Company F**, irrevocable liability occurred, and the transfer of title happened in <u>London, United Kingdom</u>.    The Plaintiff bears the burden of proof to establish beyond any reasonable doubt that the irrevocable liability occurred in the United States.    It is not possible to establish as such, and were such irrevocable liability were to have occurred in the US, rather than in the United Kingdom, the underlying transactions would not have met the conditions precedent necessary to legally close that transaction.   The transaction documents specially stipulated the official filings necessary with the Companies House in London and only then would the irrevocable liability on the parties to close the transaction occurs, within the jurisdiction of the UK.  The title was maintained in book entries in depositories with the Companies House in London in accordance to UK securities laws.   The application for shares was made in London and accepted in London.

In another transaction pertaining to Company F, the buyer's resolutions needed to be made in <u>Parma, Italy</u>; and the seller was Company G based in <u>London, United Kingdom</u>.    The documents related to this transaction had to be filed with the regulatory bodies in Italy (in particular, the *Consob* - standing for *Commissione Nazionale per la Societa la Borsa*) that regulates Italian public markets since the buyer was a publicly listed company (*Buongiorno*, BIT: BNG) that traded on the Italian Stock Exchange (*Borsa Italiana,* or BIT) at the relevant time. Irrevocable liability occurred in Parma, Italy - the SEC cannot prove that irrevocable liability occurred in the US.

(vi)     In case of the transactions pertaining to **Company G,** irrevocable liability occurred, and the transfer of title happened in <u>Seoul, Korea</u>.     The Plaintiff bears the burden of proof to establish beyond any reasonable doubt that the irrevocable liability occurred in the United States.    It is not possible to establish as such, and were such irrevocable liability to have occurred in the US, rather than in Korea, the underlying transactions would not have met the conditions precedent necessary to legally close that transaction.   The transaction documents specially stipulated the official filings necessary with the regulatory authorities in Korea and only then would the irrevocable liability on the parties to close the transaction occurs, within the jurisdiction of Korea.  The title transfer also happened in Seoul, Korea.    The occurrence of irrevocable liability only happens with the official filing of papers with three Korean entities - Bank of Korea, FIPA or Foreign Investment Promotions Act; and  KFTC or Korean Fair Trade Commission; all of which had to happen in Korea.   The title was also in Korean and was maintained in Seoul, Korea.    The application for shares was made in Seoul, Korea and accepted in Korea.

(vii)     In case of the transactions pertaining to **Company H**, irrevocable liability occurred, and the transfer of title happened in <u>London, United Kingdom</u>.     The Plaintiff bears the burden of proof to establish beyond any reasonable doubt that the irrevocable liability occurred in the United States.    It is not possible to establish as such, and were such irrevocable liability to have occurred in the US, rather than in the United Kingdom, the underlying transactions would not have met the conditions precedent necessary to legally close that transaction.   The transaction documents specially stipulated the official filings necessary with the Companies House in London and only then would the irrevocable liability on the parties to close the transaction occurs, within the jurisdiction of the UK.  The title was maintained in book

entries in depositories with the Companies House in London in accordance to UK securities laws.   The application for shares was made in London and accepted in London.

(viii)   In case of the transactions pertaining to **Company I**, irrevocable liability occurred, and the transfer of title happened in <u>London, United Kingdom</u>.     The Plaintiff bears the burden of proof to establish beyond any reasonable doubt that the irrevocable liability occurred in the United States.   It is not possible to establish as such, and were such irrevocable liability to have occurred in the US, rather than in the United Kingdom, the underlying transactions would not have met the conditions precedent necessary to legally close that transaction.   The transaction documents specially stipulated the official filings necessary with the Companies House in London and only then would the irrevocable liability on the parties to close the transaction occurs, within the jurisdiction of the UK.   The title was maintained in book entries in depositories with the Companies House in London in accordance to UK securities laws.   The application for shares was made in London and accepted in London.


### SECTION  II :  NO LOSS CAUSATION IN ANY OF THE TWO TRANSACTIONS PERTAINING TO COMPANY C:


**Defendant is entitled to summary judgment on his affirmative defense of "no loss causation to any party" regarding all claims pertaining to transactions associated with Company C.**


In 2005, the US Supreme Court addressed and established the critical issue of what a Plaintiff must prove to satisfy the "loss causation" element in securities fraud under the Securities Act  of 1934.[20]   It is clear that simple conclusory allegations of loss will not suffice.[21] *Dura* resolved a split in the circuits about whether loss causation is a required element of a cause

---

[20] *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005).
[21] *N.Y. City Employees' Retirement Sys. v. Jobs*, 593 F. 3d 1018, 1024 (9th Cir. 2010)

of action under Section 10(b).  The Supreme Court held that to state a cause of action in a securities suit, the plaintiff must plead and prove loss causation, a link between the claimed fraud and economic injury or loss.   This stance was supported by the decision of the Tenth Circuit in *In re Williams Sec. Litig. - WCG Subclass.*[22]

The Second Circuit addressed loss causation in *In Re Omnicom, Inc. Sec. Litig.*[23] by requiring the establishment of a strong causal link between an alleged fraud and their loss.  The Second Circuit also raised the issue that "[u]se of the term 'loss causation' is occasionally confusing because it is often used to refer to three overlapping but somewhat different concepts."[24]  Those concepts are (1) whether plaintiff relied upon the alleged misrepresentation, which is properly known as transactional causation; (2) the requirement that the wrong be a but-for-cause or cause in fact of the losses suffered; and (3) whether the events that are a cause-in-fact of losses are within the group of events that Section 10(b) was intended to prevent.[25]

The Seventh Circuit's decision in *Tricontinental Industries, Ltd. v. PriceWaterhouseCoopers, LLP,*[26] affirmed the dismissal of a securities fraud complaint by concluding that *Dura* "stresses that the complaint must specify each misleading statement … and that there must be causal connection…" Likewise, a general acknowledgement of "accounting irregularities is not sufficient."[27]

Even before *Dura*, the Seventh Circuit drew a clear line between <u>loss causation</u> and <u>transaction causation</u>, an issue that directly led to the Supreme Court's decision to grant

---

[22] 558 F.3d 1130 (10th Cir. 2009).
[23] 597 F.3d 501 (2d Cir. 2010).
[24] 597 F.3d at 509.
[25] Idem.
[26] 475 F.3d 843 (7th Cir. 2007).
[27] *Metzler, Inv. GmbH v. Corinthian Co.*, 540 F.3d 1049 (9th Cir. 2008).

*certiorari* in *Dura*.[28]  The Eleventh Circuit also saw the same clear difference between those two concepts prior to the decision in *Dura*.[29]   *Dura*, therefore, establishes the requirement that plaintiffs must prove loss causation - not just a misrepresentation, or reliance upon the misrepresentation, but a causal nexus between the misrepresentation and the actual loss suffered. For example, in *Ray v. Citigroup Global Markets, Inc.*[30]  the Seventh Circuit affirmed summary judgment in favor of the defendants' because despite plaintiff's attempts to establish that a broker had omitted material facts and the investors had relied on the omission, the investment losses occurred at a time when the stock market as a whole was declining.

The Plaintiff alleges fraudulent conduct in two separate transactions pertaining to Company C.   For ease of understanding and for distinction, these two transactions are being referred to here as C1 and C2.

**C1:**  The share buyback and redemption of Series A Preferred Shares from Giosis / iCubed by Company C itself in or around October 2013 and all such shares bought back were retired or cancelled post the transaction .   *Seller*:  Giosis / iCubed.  *Buyer*:  Company C.

**C2:**  The secondary purchase of Series A Preferred Shares of Company C from iCubed Domains by Oak XIII in or around November 2013.  *Seller*:  iCubed.  *Buyer*:  Oak XIII (or "Oak").

In both transactions pertaining to Company C, the SEC cannot establish a triable issue of any economic loss or injury caused to anyone, including Oak, leave alone a firm causal link between any actions of the Defendant and such alleged injury, even if there was any hypothetical injury for the sake of argument.  When there is no loss to begin with, how can there can be action for any causal nexus.

---

[28] Please see *Bastian v. Petren Resources Corp.*, 892 F.2d 680, 683-84 (7th Cir. 1993) and *Caremark Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648-648 (7th Cir. 1997).
[29] Please see *Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1447 (11th Cir. 1997).
[30] *Ray v. Citigroup Capital Markets, Inc.*, 482 F.3d 991 (7th Cir. 2007).

**II-a:  C1:  First, the transaction involving the secondary share buyback of Series A Preferred Shares by the Company from Giosis Holdings and iCubed Domains[31] in or around October 2013:**

1.      <u>Burden of proof and elements.</u>

The Plaintiff's claims requires the Plaintiff to establish, by a preponderance of evidence and beyond any reasonable doubt, that (i) the counterparty (be it Oak or anyone else) suffered losses as  a result of the alleged conduct(s) and (ii) that any such loss causation was a result of the causal nexus between any misrepresentations made by the Defendant and the actual loss, if any, suffered.

a.      In or around November 2012, Giosis Holdings (or "Giosis"), a BVI company, on whose Board the Defendant served, authorized and invested $2.15 Million in Series A Preferred shares of Company C.   The Series A Share Purchase Agreement and other related transaction documents establishes that the BVI company, Giosis, authorized and invested the  $2.15 Million in purchasing Series A Preferred Shares of Company C at $0.88 per share in a primary share purchase transaction.   Giosis bought roughly 2,443,182 shares of Series A Preferred Shares. Contemporaneously,  the Defendant joined the Board of Company C representing Giosis as a Series A Preferred Director representative.

The Giosis Board was controlled by one individual, the CEO of Giosis Holdings, Mr. Y. B. Ku.   He had 3 out of 5 votes on the Board, and the two investor groups (Oak and one other US based investor group) had 1 vote each.   He also owned roughly 70% of Giosis (and Oak owned approximately 20% of Giosis) by equity.   Thus, any decision by Giosis had to be expressly authorized and approved and taken by Mr. Ku alone.   Said another way, no decision at

---

[31] A **secondary** transaction or purchase is when existing shares are bought or sold.   For example, when Giosis / iCubed sold their existing Series A Preferred Shares to the Company C in October 2013, it was a secondary transaction.    A **primary** purchase or transaction is one where fresh or new shares are issued by a company.  So, when Oak invested in Company C and bought Series B Preferred Shares in October 2013, they were newly issues shares and, hence, it was a primary transaction.

Giosis (be it at the Board level or at a shareholder level) could be made without his express positive endorsement, approval, and affirmative vote to do so.   Mr. Ku had total and unilateral control.

This $2.15 MM investment from Giosis was authorized and approved by Mr. Ku himself and he signed all the Series A transaction documents on behalf of Giosis.   Mr. Jason Boyea, of Finn Dixon & Herling, who also happened to be Oak's outside counsel, advised and represented Giosis in this Series A transaction.

b.      In or around January 2013, however, the Board of Giosis began to regret the relatively large financial risk exposure to Company C and wanted to unwind their investment in light of their own financial health and need for money as they were incurring significant monthly operating losses at that time.

c.      Given the change of heart, it was initially decided between Mr. Ku, the Defendant and the 3rd director of Giosis Holdings that the 3 directors of Giosis would all personally invest equally ($666,666 each) and take the $2MM allocation off from Giosis on their personal accounts.   But when it came to actually wiring the funds, none came forward even a full month later.

Left facing an awkward situation, when no one came forward with their share of the allocation given the highly risky investment, in or around March 2013, the Defendant volunteered to cover the funding gap by himself since both Mr. Ku and the 3rd board member did not show any interest and did not wire their share of the funds.  Thus, it was left to the Defendant alone to arrange for the transfer of $2 Million from iCubed Domains to Giosis in a secondary trade, thereby reducing the economic exposure of Giosis to Company C to only $150,000 as Mr. Ku wanted following his change of heart.

At that stage and time, Company C was a highly speculative and very risky venture; and so the entire risk of the Series A investment (bar the remnant $150,000) was transferred from the Giosis to iCubed Domains at the request of Mr. Ku and the Giosis Board.   It was not a decision recommended or promoted by the Defendant.   It was a decision that was made by the Giosis Holding's Board of Directors, unilaterally controlled by the CEO of Giosis.  Thus, after iCubed Domains wired Giosis the $2 Million for this secondary trade, roughly 2,272,727 shares of Series A Preferred Shares now belonged to iCubed Domains and only roughly 170,455 Series A shares remained with Giosis.   Thus of the original 2,443,182 Series A shares owned by Giosis, roughly 7% of those shares remained with Giosis and the rest 93% beneficially belonged to iCubed Domains; and iCubed Domains bore the significant risk associated with this early stage and yet unproven and  risky venture called Company C.

If Company C were to have imploded at that time, which was a real possibility, iCubed Domains alone would have borne the entire risk and faced a total loss; and they could not have blamed anyone or sought any recourse from Giosis or Oak or anyone else for that matter.

**iCubed Domains had paid the full consideration of $2MM for the purchase of these 2,272,727 Series A Preferred Shares from Giosis.  For avoidance of any doubt, Giosis had paid the same amount ($2mm) for the original purchase of these shares just a few months prior to this secondary sale.**

d.      By the Fall of 2013, Company C started doing phenomenally well its business and it attracted significant outside investment interest from global top tier venture capital firms like Accel Partners, Bain Capital Ventures , and Bessemer Venture Partners (please see **Exhibit 1**); and also attracted acquisition interest from companies like WalMart.   At that time, given the significant interest expressed by the Oak managing partners to own a part of Company C directly and to "win" the deal against the likes of Accel and Bessemer, the Defendant resigned from the

Board of Company C on or around July 15TH, 2013 (please see **Exhibit 2,** in particular page 8 of 11) in order to avoid any conflict of interest as Oak was looking to negotiate the best deal possible for its own fund and the Defendant was employed by Oak.

  e. In or around October 2013, Oak XIII invested $25MM directly in Company C, in a $40MM Series B funding round; a transaction that was unanimously approved by the four Oak managing partners.   Oak bought newly issued Series B Preferred Shares at $4.466 per share (which translated to around $332MM equity valuation for Company C).  One other investor competitor had proposed a $5.19 per share purchase price only a few months earlier.  Thus, the $4.446 per share price represented a roughly 14% discount for Oak over that competitor's proposal.

  This purchase of roughly 5,597,850 Series B Preferred (primary) Shares by Oak had absolutely nothing to do with either Giosis Holdings or iCubed Domains.   Neither iCubed Domains nor Giosis Holdings was a signatory to the Series B Share Purchase Agreements or any other Series B related transaction documents, except in giving their consent to that transaction.  At the time, Oak's $25MM investment bought them a ~7.5% ownership stake in Company C.  This was a 100% primary share purchase transaction as fresh Series B shares were issued to Oak by the Company C.

  f. Subsequent to the Series B funding, Company C entered in to a separate share buyback arrangement with Giosis.   Thus, Giosis Holdings (*and iCubed Domains because of the transfer of $2.0 Million of the initial $2.15 Million purchase from Giosis to iCubed - thus, Giosis Holdings owned 7% of the originally bought Series A shares in total; and iCubed owned the rest 93% of the original Series A shares bought by Giosis Holdings*) sold its entire Series A stake in Company C back to Company C for roughly $10.86 Million.    Of the total sale proceeds, roughly $761,250 went to Giosis Holdings (for its $150,000 investment) and the rest $10.1 MM

went to iCubed Domains (for its $2 MM investment).   The Giosis' share of the sale proceeds of $761,250 (representing 7% of the total sale proceeds) were duly wired to Giosis' bank account in Seoul, Korea.

Oak was **not** a counterparty to this secondary share buyback of Series A Preferred shares by the Company C.   The Defendant was not a member of the Company C Board of Directors when this decision to buyback Series A shares was made by Company C, having resigned from their Board in or around July 2013; and hence, the Defendant did not influence or even participate in the Company C Board's discussions and decision to undertake this share repurchase from Giosis / iCubed.

The Series A share buyback was funded by Company C from its own cash reserves on its Balance Sheet.  The Series A share buyback would have gotten done irrespective and independent of the Series B round of funding because of other strategic reasons that had to do with Giosis, and nothing to do with Oak or the Series B round of funding.

In the case of Company C, its founder and CEO, Mr. D. Agarwal controlled the Board with 3 out of 5 board votes and he owned or controlled well over 79% of the equity of Company C just prior to the Series B funding in October 2013.   Even after the Series B funding, Mr. Agarwal retained complete control of the company's Board of Directors as he had 4 votes out of 7 (the other 3 belonging to investors - one for the Series A representative, and 2 for two Series B directors) and owned or controlled more than 70% of the shares in the company.   At all times, Mr. Agwaral alone retained total and complete Board level and shareholder level control.

Thus, any decision of Company C had to be expressly authorized, and approved, and taken by Mr. Agarwal alone.    Said another way, no decision at Company C (be it at the Board level or at a shareholder level) could be made without his express positive endorsement, approval, and affirmative vote.

18

Oak was not a signatory or a counterparty to any of the Series A share secondary share buyback transaction documents.   Oak did not have to approve or to endorse this secondary share buyback undertaken by Company C at its own discretion and volition.

g.      Giosis did not suffer any losses as it effectively invested $150,000 in Company C, and got a return of $761,250 for that investment.   It was earlier already paid the $2MM by iCubed Domains to reduce their exposure down from $2.15MM $150,000 at their own behest much earlier in the year.   And in the aftermath of the buyback, $761,250 was wired to their bank account in Seoul, Korea.

h.      As a result of the secondary share buyback of Series A shares by the Company C from Giosis and iCubed Domains, Oak did not suffer any injury or loss at all.   It was neither a party to that buyback nor a signatory to the transaction.   It had bought Series B Preferred primary shares from Company C; and the secondary Series A Preferred share buyback had nothing to do with Series B Preferred shares and its rights and privileges etc.

In fact, Oak directly benefitted from this secondary share buyback (transaction C1) - as it effectively received a "*share dividend*" as a direct result of the share buyback by Company C. While it had negotiated a roughly 7.5% ownership stake (for its $25MM investment at a $332MM post-money valuation) for their $25MM investment, it was as a direct result of the Series A secondary shares buyback by Company C, that the ownership of Oak increased from 7.5% to roughly 7.8% with no additional investment.     Thus, rather than there being any economic (or anything else) loss, the transaction C1 indeed caused a significant economic benefit and gain to Oak as the math here shows.   Please refer to **Exhibit 3** for a step by step detailed analysis of all the financial transactions pertaining to Company C, including C1 and C2.

Thus, indisputably, there can be **no** party that suffered any losses - on the contrary, they all benefitted!   Giosis made a handsome return and financial gain on its investment; Oak

increased its ownership stake from 7.5% just prior to the buyback to around 7.8% immediately after the share buyback, thus significantly increasing their ownership % in Company C without investing even one dollar more!

In summary, the sequence of events behind the transaction C1 is as follows:

i.      In or around September 2012, the Giosis Board approves a $2.15MM investment in Company C for the purchase of Series A Preferred Shares at $0.88 per share.

ii.     The Series A financing occurs in November 2012.  All transaction documents are signed by Mr. Ku on behalf of Giosis and Mr. Jason Boyea is the legal counsel to Giosis.   Giosis buys 2,443,182 shares of Series A Preferred Shares.

iii.    In or around January 2013, the Giosis Board of Directors, in particular Mr. Ku, has a change of heart and asked if the investment in Company C could be reversed and reduced to $150,000 only instead of the original investment of $2.15MM.   Initially it was decided on phone calls by Mr. Ku that the $2MM would be split 3-ways between Mr. Ku, the Defendant, and the 3rd board member of Giosis.  But even after a month, none of them had shown any interest in actually investing and wiring the funds given the risk profile of Company C.

iv.     Thus, in or around March 2013, the Defendant went out of his way in a bid to accommodate Mr. Ku's request and arranges for iCubed Domains to purchase $2MM of the total $2.15MM worth of Series A shares from Giosis.   Thus, iCubed Domains henceforth bears the majority of the financial risk and exposure whilst the Company C remains highly speculative and risky.  iCubed Domains wires $2MM in total consideration to Giosis Holding's bank account in Seoul, Korea, to pay for the Series A shares.  In the aftermath of this cash consideration being paid, beneficially 2,272,727 (93%) shares now beneficially belong to iCubed, and 170,455 (7%) shares remain with Giosis.

v.      In or around October 2013, Company C effects a Series A share buyback from Giosis for $4.466 per share for a total consideration of $10.86 MM.   The proceeds are then ratably shared between Giosis (7%) and iCubed Domains (93%) as per their beneficial ownership levels in (iv) above.

2.      <u>Elements that cannot be proven by the Plaintiff.</u>

20

(a)      Thus, the Plaintiff cannot demonstrate a triable issue that any losses incurred to any of the parties, be it Giosis Holdings or Oak XIII or Oak as a result of this first transaction in or around October 2013.

(b)      The Plaintiff also cannot demonstrate a triable issue that there was any causal nexus between any actions of the Defendant and any actual losses suffered, even as there was no loss suffered by anyone as a result of the transaction C1.


**II-b:  C2:  The transaction involving Oak XIII directly buying Series A Preferred Shares of Company C for $7.5 MM from iCubed Domains in a secondary transaction in or around October 2014:**

1.      <u>Burden of proof and elements.</u>

The Plaintiff's claims requires the Plaintiff to establish, by a preponderance of evidence and beyond any reasonable doubt, that (i) the counterparty (be it Oak or anyone else) suffered losses as  a result of the alleged conduct(s) or the transaction(s); and (ii) that any such loss causation was a result of the causal nexus between any misrepresentations made by the Defendant and the actual loss, if any, suffered.

a.      In or around the summer of 2014, Company C engaged bankers with UBS led by their bankers and executives, Mr. Raj Dayalan and Mr. Adam Coons, to both find potential acquirers for the company and also to find strategic and financial equity partners who could infuse additional equity or debt capital to fund the hyper growth that was being experienced by the Company.

b.      At the same time, seeing the spectacular growth and success of the Company C, the Oak managing partners identified Company C as a "fund maker" (a portfolio company that had the potential and showed promise of generating outsize returns for Oak) and wanted to

increase Oak's ownership from roughly 7.8% to over 10% to be able to market it as a portfolio company where Oak had sizeable ownership (10% being the threshold ownership stake to demonstrate sizeable ownership stake).

       c.      Company C was having advanced discussions with multiple equity capital partners including Clearlake and Catterton, two leading late stage growth equity investors based in the US, to lead their Series C round of funding with a significant capital infusion in to the company.  The Company was also having multiple advanced strategic acquisition discussions led by UBS including confidential discussions with WalMart etc.

       d.      In the backdrop of Oak's expressed interest in increasing its stake in Company C to over 10%, the Defendant organized the sale of the 2,272,727 Series A Preferred Shares owned by iCubed to Oak.    This secondary share transaction represented a roughly 3.2% fully diluted ownership stake in the Company C.

       e.      This secondary purchase of shares for a consideration of $7.5MM represented a per share price of $3.30 or an equity value of $237MM for the whole company; a roughly 26% discount to the Oak internal valuation of $4.466 per share at that time; and a significantly higher discount of greater than 50% to the valuation numbers being socialized with the likes of Catterton and Clearlake of greater than $500MM for the equity value of the company (representing a price of higher than $6.95 per share; $3.30 represents only 48% of $6.95 or a discount of 52.5%).   All four managing partners of Oak were aware of these developments and wanted the secondary share transaction with iCubed done in a hurry prior to the Series C funding which would have immediately established a much higher market price for the shares of Company C.

f.      Once the secondary share purchase by Oak from iCubed was completed, all the managing partners were sending congratulatory emails and messages to the Defendant for having engineered such an attractive investment for Oak as decided and expressly approved by them.

g.      The Oak Finance team, in keeping with their own internal valuation processes and methodologies (which were neither influenced nor participated in by the Defendant), immediately following the closing of this secondary purchase of Series A Preferred Shares increased the valuation of these Series A shares from the purchase price of $7.5MM to over $10 MM, which represented a fair reflection of the fair market value (FMV) at that time.   The Oak valuation markup was 100% independently done and implemented by the Oak Finance team reporting to the Oak CFO and had absolutely no input from the Defendant, as emails between members of Oak's Finance team (particularly Ms. Jessica Adams who is an Accounting and Finance executive at Oak)  would verify.

h.      The fact that the fair market value of those Series A shares bought by Oak from iCubed Domains were actually valued significantly higher than what Oak paid for them is borne from the fact that as late as in 2016, the Oak fund valued the Company C's Series B Preferred shares at $27.686 Million (versus a cost basis of $25MM) or $4.95 per share.   The Series B share valuation has a direct implication on how Series A and common shares of Company C had to be valued.

There can be no divergence between the per share value of a Series B Preferred Share and a Series A Preferred Share and a Common share.   The Preference only comes in to play for certain downside protective provisions in favor of the preferred shareholders.   For example, even as the Series B investors paid $4.466 per share, the Founder and CEO, despite his overwhelming control of the Company, could not have sold the Company for a per share price lower than $4.466 per share without the positive consent of the Series B shareholders.

Whatever is the valuation of a share is the valuation of a share.   All shareholders would be obligated to convert their preferred shares to common shares prior to an IPO (Initial Public Offering) and would also have to convert to common shares prior to a sale.  And in any event, a sale had to be approved and accepted by the CEO, Mr. Agarwal, as he controlled both the Board as well as the shareholder votes.

Series B shares had **no** contractual rights that would allow them to be paid any higher a price per share than Series A Shares or Common Shares of the Company, except in downside scenarios where the company is sold for an amount where investors (Series A and Series B) get just their money or less back from a sale of the Company in a distressed situation.

The very fact that Oak valued their Series B shares at $4.95 per share in 2016 only establishes one thing and one thing alone - that the equity value of Company C had to be approximately $356MM (since there were around 71.9 MM shares outstanding); and so the Series A Shares (and Common) shares would therefore also have to be valued at the exact same $4.95 per share.   There is **NO** scenario under which Oak would receive $4.95 per share for their Series B Preferred Shares in any exit - be it an IPO or a sale of the company - where the Series A and common shareholders would receive anything less than $4.95 per share as well.

Thus, the fact that Oak itself valued their Series B holdings at $4.95 per share in 2016, establishes beyond any reasonable doubt that they would have to value their 2,272,727 Series A Preferred shares at the same $4.95 per share for a total of $11.24MM in 2016, significantly higher than the $7.5MM they paid iCubed Domains for those shares in November 2014.

This is Oak's math, it is Oak's valuation for the shares of Company C, this is Oak's own internal analysis as presented to their investors in 2016.

**Thus, the value of each (a Series B, a Series A, or a Common) share of Company C was $4.95 per share in 2016 per Oak themselves**.

24

At the time of an exit (an IPO or a sale), a share is a share is a share - there is no Series B or Series A share - there are just shares.   The lettering for the class of preference shares is for protective provisions only and it has no implication and relevance to any exit outcome that establishes the valuation of the shares.

Please see **Exhibit 4** for a table of Oak's valuation history for the various classes of shares of Company C.

Please see **Exhibit 5** for the detailed arithmetic behind how Oak could get to $4.95 per share and the implied valuation of all other classes of shares under the same valuation scenario - shown both in tabular form and in a summary graph.  The x-axis of the graph shows any assumed exit value, and the y-axis then plots the corresponding values that common, Series A and Series B share holders would receive per share.   Thus, when Series B is valued at $4.95 per share, the equity value for Company C is $356MM - the point where ALL shareholders (B, A and Common) would receive $4.95 per share.

Given that the Company was controlled by one individual, the Founder who owned ~72% of the Company in the form of Common shares, to believe that Oak could somehow get $4.95 per Series B share while the Series A shareholders would accept a value of $0.77 per share for their Series A shares, and the Founder/CEO would accept an even lower (let's say for example, $0.50) value per share for his Common shares in Company C, would be simply impractical and unrealistic.

The math itself does not work with Oak receiving $4.95 per share for their Series B Preferred Shares and something else for the Series A Shares and the founder getting yet something else for their common shares.   That arithmetic is flawed.   The graphical analysis taken from the Company's cap table and exit agreements clearly establish that for Series B to

receive $4.95 per share (as Oak rightly valued their shares in 2016), **each and every share** of

Company C, class and type irrespective, would receive or be valued at $4.95 per share.  Period.


2.        Elements that cannot be proven by the Plaintiff.

Thus, the Plaintiff cannot demonstrate a triable issue that any losses incurred to Oak as a

result of this second transaction (C2) completed in or around October 2014.  Oak got a attractive

bargain on the secondary purchase and Oak increased its ownership from 7.8% to 10.9%, which

was one of their strategic goals!   Rather than any loss, Oak actually rightfully marked up the

investment/purchase immediately following the purchase in October 2014 to $4.46 per share

(versus a purchase price of $3.305 per share), and they implied an even higher valuation in 2016

(of $4.95 per share versus a cost basis of $3.305 per share), more than a year after the filing of

the first Complaints in this dispute.


**SECTION III:  IN THE TRANSACTIONS RELATING TO COMPANY C, THE
DEFENDANT WAS ACTING FOR HIS WIFE'S ACCOUNT,  NOT HIS OWN.**


**COUNT FOUR:  Defendant is entitled to summary judgment on his affirmative defense
that with relation to Company C, he was acting for his wife's account and not his own.**


To state a claim under the Section 206(3) of the Adviser's Act, the Plaintiff must allege

and prove that the Defendant, if and assuming he was acting as an investment advisor, was

"acting as a principal for his ***own account***", and knowingly sold a security to a client "without

disclosing to such client in writing before the completion before the completion of such

transaction the capacity in which he is acting and obtaining the consent of the client to such

transaction."  Please see 15 U.S.C.A §80b-6(3).

26

a.      The Plaintiff alleges that the Defendant traded securities belonging to a company owned by his wife.  Doc. 33 *paras* 117-120.

b.      Section 206(3) does not state or require that an investment advisor must disclose that a family member has an interest in a company that owns a security that the investment advisor is selling.

c.      The Plaintiff cites no authority supporting its allegation that the Defendant had a duty to disclose his wife's interest in iCubed Domains in its brief in support of its motion for a temporary restraining order and for a preliminary injunction.   [Doc. 66, *paras* 12-13].

d.      The only authority relied upon by the Plaintiff finding a "principal transaction" involved an adviser dealing in securities where the said adviser had a significant direct ownership interest in.   The adviser in that case maintained a 1/3rd interest in the fund.  See *In re Gintel Asset Mgmt., Inc.* 2002 WL 31499839 (Nov. 8, 2002).


1.      <u>Burden of proof and elements:</u>

The Plaintiff's claims of misconduct by the Defendant, pertaining to Company C requires the Plaintiff to establish, by a preponderance of the evidence, that he was acting for his own account.


2.      <u>Elements that cannot be proven  by the Plaintiff:</u>

The Defendant contends that the Plaintiff cannot demonstrate a triable issue of fact as to whether the Defendant was acting for his own account.  He were not.

27

## SECTION IV:  STATUTE OF LIMITATIONS APPLICABLE TO ALL COUNTS

### Defendant is entitled to summary judgment on his affirmative defense of statute of limitations regarding all claims pertaining to Companies D, E, F, G, H and J.

The esteemed Court should dismiss each claim pertaining to transactions that occurred more than 5 years  before the Plaintiff first filed claims relating to those specific transactions.

The Plaintiff had included allegedly fraudulent transactions in its Complaints (starting) on June 16TH 2015[32], more than 5 years after the alleged wrongdoing pertaining to 6 different companies (Companies D, E, F, G, H, and J)[33].  All these alleged transactions indisputably fall well outside the 5-year statute of limitations as now established beyond any reasonable doubt by the United States Supreme Court that the "*catch-all*" statute of limitations for all government actions in 28 U.S.C. § 2462 bars the US SEC from obtaining disgorgement in actions bought beyond the 5-year limitation period.

The unanimous and unambiguous 9-0 Supreme Court decision in *Kokesh v. SEC*[34] summarily rejected the Securities & Exchange Commission's longstanding position that disgorgement was not subject to the 5-year statute of limitations under 28 U.S.C. § 2462.

Interpreting the scope of § 2462 and elaborating and expanding on its earlier landmark ruling in *Gabelli vs. SEC* [35], the US Supreme Court rejected the SEC's argument that

---

[32] First Amended Complaint [Doc. 33] dated June 16th, 2015.
[33] The SEC filed its initial Complaint [Doc. 1] on May 06th 2015 and included transactions pertaining to Companies A, B and C only.  These 3 companies are **not** included in the discussions in this section pertaining to statute of limitations.   The SEC filed its First Amended Complaint [Doc. 33] on  June 16th, 2015 adding Companies D, E, F, G, H and I; and later filed its Second Amended Complaint on April 01st, 2016 [Doc. 208] adding Company J.  Hence, the relevant date for determination of the 5-year statute of limitations for companies D, E, F, G and H is June 16th, 2015; and the relevant date for determination of the 5-year statute of limitations for Company J is April 01st, 2016. However, even if the esteemed Court were to take the earliest Complaint [Doc. 1], which did not include any of the companies relevant for this Section, the same 5-year statute of limitation argument would still hold true and apply.
[34]  *Kokesh v. SEC*, No. 16-529, 2017 (U.S. June 5, 2017).
[35] 133 S. Ct. 1216 (2013), in *Gabelli* the US Supreme Court held that the SEC must bring enforcement actions for civil penalties within 5 years of the completion of the alleged wrongdoing.

disgorgement is remedial in nature, and the Supreme Court ruled that disgorgement "represents a penalty and thus fall within the 5-year statute of limitation of § 2462", thus resolving the long standing circuit split over whether § 2462 applies to claims for disgorgement in SEC enforcement actions.   This statute in question, U.S.C. § 2462, establishes that a 5-year limitations period for "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise."   The Supreme Court, in resolving a circuit split[36], unanimously held that "disgorgement is a penalty within the meaning of § 2462."  The Supreme Court specifically pointed out that the limitations period was "vital to the welfare of society."

Consistent with the Supreme Court's earlier assertions about the need for time-bound limits on government securities enforcement, the claims pertaining to these seven companies are time-barred.   These events all occurred prior to June 16TH, 2010 - that is more than 5-years before the filing of the relevant Complaint in this matter.

Under *Gabelli* and *Kokesh*, actions that seek forfeiture of tainted funds - whether called fine, penalty, forfeiture, or disgorgement - are now established beyond any doubt to be subject to the USC Section § 2462's  5-year statute of limitations period.

The Supreme Court reaffirmed in *Gabelli v. SEC* that the statute of limitation provides a fixed date when exposure to government enforcement ends.   The Supreme Court also ruled that the "discovery rule" could not save an otherwise time-barred claim for civil penalties under § 2462.   The Supreme Court established that the 5-year clock begins to tick from the time of the alleged conduct occurring and sets the fixed date when any exposure to government enforcement efforts ends.   The Supreme Court was also vocal in stating that the SEC **cannot** be exempted from the statute of limitations by "discovery rule" given its vastly superior and practically

---

[36] *SEC v. Graham*, 823 F. 3d 1357, 1364 (11th Cir. 2016); *Riordan v. SEC*, 627 F. 3d 1230 (D.C. Cir. 2010); *SEC v. Tambone*, 550 F. 3d 106, 148 (1st Cir. 2008); and *SEC v. Kokesh*, 834 F. 3d 1158, 1167 (10th Cir. 2016).

endless resources.

The Supreme Court granted *certiorari* in *Kokesh v. SEC* to resolve a circuit split.  After affirming the principle set out in *Gabelli* that statutes of limitations specifying when exposure to government enforcement actions end are "vital to the welfare of society", the Court unanimously held that SEC disgorgement constitutes "a penalty subject to the five-year limitations period under § 2462."  The Supreme Court unanimously and unambiguously reversed the appellate decision in *Kokesh v. SEC*.   Although the Court *could* have ruled narrowly, the Supreme Court ruled quite broadly instead: "we hold that SEC disgorgement constitutes a penalty" and "the 5-year statute of limitations in § 2462 therefore applies when the SEC seeks disgorgement."

The Plaintiff may try and characterize all these disparate and disconnected transactions as part of "*one continuing scheme*" in a bid to circumvent the clear legal directive of the US Supreme Court.   Nothing could be further from the truth.  (1) These transactions are all disparate and disconnected and have nothing in common except of the alleged conduct by the same Defendant.  (2)  All of the disparate transactions and alleged conduct occurred and completed well outside the 5-year statute of limitations as clearly established by the Supreme Court in *Gabelli* and *Kokesh*.   (3)   In the case of *Kokesh*, all of his allegedly fraudulent conduct between 1999 and 2009 had to do with the same construct and same *modus operandi*  and one scheme, and yet the US Supreme Court unanimously found all such conduct beyond the 5-year statute of limitations to be time-barred under § 2462.

Thus, to allow for such a re-characterization by the SEC to avoid the statute of limitations would fly directly in the face of the US Supreme Court decision on *Kokesh*.   It is imperative to note the rather forceful words of Chief Justice Marshall that were recalled by Chief Justice Roberts in the *Kokesh* oral arguments, in emphasizing the critical importance of time limits on all

penalty actions, stating that "it would be 'utterly repugnant to the genius of our laws' if actions for penalties could 'be brought at any distance of time.'"[37]

Furthermore, post-*Kokesh*, the SEC itself has rightly conceded in *SEC v. Wyly*[38] that, in light of the Supreme Court's decision, "*Kokesh* requires remand of the disgorgement and prejudgment interest awards" in that case.   The SEC wrote to the Court that "*Kokesh's* holding that "disgorgement actions must be commenced within five years of the date the claim accrues" (Op.1) requires a remand for recalculation of the disgorgement and prejudgment interest awards because those awards are based part on conduct outside the five-year period."  Thus, in a parallel situation, the SEC has already conceded to the dismissal of all claims outside the 5-year statute of limitations even though those claims arose from a continuing conduct of the sale of securities in unregistered transactions in that dispute.

Similarly, the SEC again also conceded in *SEC v. Michael Metter*[39] "…the Supreme Court in *Kokesh* determined that disgorgement is subject to Section 2462—and in doing so established "a uniform statute of limitations" that "avoid[s] intolerable uncertainty and time-consuming litigation…"

The same standard should apply here in this dispute.


**(IV-a)  Company D:  Defendant is entitled to summary judgment on his affirmative defense of statute of limitations regarding all claims pertaining to Company D.**

---

[37] U.S. Supreme Court, *Adams v. Woods*, 6 U.S. 2 Cranch 336 (1804) "In expounding this law, it deserves some consideration that if it does not limit actions of debt for penalties, those actions might in many cases be brought at any distance of time. This would be utterly repugnant to the genius of our laws. **In a country where not even treason can be prosecuted after a lapse of three years, it could scarcely be supposed that an individual would remain forever liable to a pecuniary forfeiture.**"  (emphasis added)

[38] *SEC v. Donald Miller, as Independent Executor of the Will and Estate of Charles J. Wyly*, 15-2821, Doc. 171 dated June 23rd, 2017.

[39] 16-cv-526, Doc. # 122 (2nd Cir. 2017) dated 19 June 2017, page 14 of 51.

1.      <u>Burden of proof and elements:</u>

The Defendant bears the burden of establishing the affirmative defense of statute of limitations.   The defense has one element: that the Plaintiff's actions was **not** commenced within five years of the alleged conduct.     28 U.S.C. § 2462[40].

2.      <u>The undisputed facts show the Complaint is untimely</u>[41].

a.      Defendant's alleged conduct occurred between December 2004 and August 2007.

b.      The Plaintiff commenced this action by filing its amended First Amended Complaint on  June 16th, 2015.  Please refer to Paragraphs 29 through 43 of Doc. # 208 for the time period of the alleged conduct as presented by the Plaintiff themselves.

c.      Therefore, the undisputed facts establish that the claim in untimely.


**(IV-b) Company E:  Defendant is entitled to summary judgment on his affirmative defense of statute of limitations regarding claims pertaining to Company E.**


1.      <u>Burden of proof and elements:</u>

The Defendant bears the burden of establishing the affirmative defense of statute of limitations.   The defense has one element: that the Plaintiff's actions was not commenced within five years of the alleged conduct.     28 U.S.C. § 2462[42].

2.      <u>The undisputed facts show the Complaint is untimely</u>[43].

a.      Defendant's alleged conduct occurred between July 2005 and November 2005.

---

[40] Affirmed by the US Supreme Court's decisions on *Gabelli v. SEC,* 133 S. Ct. 1216 (2013) and *Kokesh v. SEC*, No. 16-529, 2017 (U.S. June 5, 2017).
[41] Refer to Doc. # 208 dated 04/01/2016 pages 12-15 which establishes the dates of the alleged conduct to be between January 2005 and August 2007, well outside the 5-year statute of limitations.
[42] Idem.
[43] Refer to Doc. # 208 dated 04/01/2016 pages 16-18 which establishes the dates of the alleged conduct to be between July 2005 and November 2005, well outside the five-year statute of limitations.

b.      The Plaintiff commenced this action by filing its amended First Amended

Complaint on  June 16th, 2015.  Please refer to Paragraphs 44 through 50 of Doc. # 208 for the

time period of the alleged conduct as presented by the Plaintiff themselves.

c.      Therefore, the undisputed facts establish that the claim in untimely.


**(IV-c)  Company F:  Defendant is entitled to summary judgment on his affirmative
defense of statute of limitations regarding all claims pertaining to Company F.**

1.      <u>Burden of proof and elements:</u>

The Defendant bears the burden of establishing the affirmative defense of statute of

limitations.   The defense has one element: that the Plaintiff's actions was not commenced within

five years of the alleged conduct.     28 U.S.C. § 2462[44].

2.      <u>The undisputed facts show the Complaint is untimely</u>[45].

a.      Defendant's alleged conduct occurred between June 2007 and October 2007.

b.      The Plaintiff commenced this action by filing its amended First Amended

Complaint on  June 16th, 2015.  Please refer to Paragraphs 56 through 62 of Doc. # 208 for the

time period of the alleged conduct as presented by the Plaintiff themselves.

c.      Therefore, the undisputed facts establish that the claim in untimely.


**(IV-d)  Company G:  Defendant is entitled to summary judgment on his affirmative
defense of statute of limitations regarding all claims pertaining to Company G.**

1.      <u>Burden of proof and elements:</u>

---

[44] Idem.
[45] Refer to Doc. # 208 dated 04/01/2016 pages 19-21 which establishes the dates of the alleged conduct to be
between June 2007 and October 2007, well outside the 5-year statute of limitations.

The Defendant bears the burden of establishing the affirmative defense of statute of limitations.   The defense has one element: that the Plaintiff's actions was not commenced within five years of the alleged conduct.     28 U.S.C. § 2462[46].

2.     <u>The undisputed facts show the Complaint is untimely</u>[47].

a.     Defendant's alleged conduct occurred between January 2008 and October 2009.[48]

b.     The Plaintiff commenced this action by filing its amended First Amended Complaint on  June 16th, 2015.   Please refer to Paragraphs 63 through 77 of Doc. # 208 for the time period of the alleged conduct as presented by the Plaintiff themselves.

c.     Therefore, the undisputed facts establish that the claim in untimely.


**(IV-e)  Company H:  Defendant is entitled to summary judgment on his affirmative defense of statute of limitations regarding all claims pertaining to Company H.**


1.     <u>Burden of proof and elements:</u>

The Defendant bears the burden of establishing the affirmative defense of statute of limitations.   The defense has one element: that the Plaintiff's actions was not commenced within five years of the alleged conduct.     28 U.S.C. § 2462[49].

2.     <u>The undisputed facts show the Complaint is untimely</u>[50].

a.     Defendant's alleged conduct occurred in April 2009.

---

[46] Idem.

[47] Refer to Doc. # 208 dated 04/01/2016 pages 21-24 which establishes the dates of the alleged conduct to be between January 2008 and October 2009, well outside the 5-year statute of limitations.

[48] The conduct pertaining to November 2011 and April 2013 are omitted from this prayer for summary judgment.

[49] Idem.

[50] Refer to Doc. # 208 dated 04/01/2016 pages 25-26 which establishes the dates of the alleged conduct to be between January 2008 and October 2009, well outside the 5-year statute of limitations.

b.      The Plaintiff commenced this action by filing its amended First Amended

Complaint on  June 16th, 2015.   Please refer to Paragraphs 78 through 81 of Doc. # 208 for the

time period of the alleged conduct as presented by the Plaintiff themselves.

c.      Therefore, the undisputed facts establish that the claim in untimely.


**(IV-f)  Company J:   Defendant is entitled to summary judgment on his affirmative defense of statute of limitations regarding all claims pertaining to Company J.**


1.      <u>Burden of proof and elements:</u>

The Defendant bears the burden of establishing the affirmative defense of statute of

limitations.   The defense has one element: that the Plaintiff's actions was not commenced within

five years of the alleged conduct.     28 U.S.C. § 2462[51].

2.      <u>The undisputed facts show the Complaint is untimely</u>[52].

a.      Defendant's alleged conduct occurred between January 2005 and August 2007.

b.      The Plaintiff commenced this action by filing its amended Second Amended

Complaint on  April 01ST, 2016.   Please refer to Paragraphs 51 through 55 of Doc. # 208 for the

time period of the alleged conduct as presented by the Plaintiff themselves.

c.      Therefore, the undisputed facts establish that the claim in untimely.


Now that the Supreme Court has ruled and established that disgorgement is a penalty and

is not an equitable remedy, and because the maximum amount of penalties is also limited by

statute, the SEC cannot impose a penalty (including disgorgements, which is a penalty) greater

than the statutory maximum for those alleged wrongdoings that occurred even after May 06TH

---

[51] Idem.
[52] Refer to Doc. # 208 dated 04/01/2016 pages 18-19 which establishes the dates of the alleged conduct to be between April 2006 and May 2006, well outside the 5-year statute of limitations.

2010, or within the 5-year time period prior to May 06TH, 2015.    Under the Exchange Act 1934 § 21 (d)(3), the SEC is only entitled to obtain penalties in civil actions that do not exceed either the greater of a maximum dollar amount per violation, or the Defendant's gross pecuniary gain as a result of such violation.    Any greater monetary remedy would be impermissible because the combination of disgorgement (now established to be a "penalty" by the US Supreme Court) and traditional civil penalties would far exceed the maximum allowed statutory penalty.

Furthermore, for all the alleged transactions that fall within the 5-year statute of limitations, it has earlier been the practice of the SEC to seek pre-judgment interest on disgorgement amounts.  The SEC, however, never seeks pre-judgment interest on civil penalty amounts.  Now that the US Supreme Court has spoken clearly that "SEC disgorgement constitutes a penalty", it is therefore clear that the SEC cannot and does not have the authority to seek pre-judgment interest on disgorgement, as it is now a "penalty."   The SEC can call it whatever they want, they can characterize it whichever way they wish, but after the Supreme Court decision on *Kokesh*, they cannot seek any penalties in excess of statutory limits.   Thus the total of any disgorgement amount (*and* any pre-judgment interest, if sought) cannot exceed the statutory limits set by law.

The Supreme Court has ruled unanimously that disgorgement is not an equitable remedy, and since there is a statutory limit on maximum amount of penalties, it is clear that the SEC cannot seek or impose a penalty (including disgorgement) greater than that statutory limit. Under the Exchange Act § 21(d)(3), the SEC is entitled to obtain penalties in civil actions that do not exceed either the greater of a maximum dollar amount per violation or the defendant's gross pecuniary gain as a result of the violation(s).   In the event that the Court finds reason to grant any disgorgement claims, it must now be traced to specific assets, transactions, and violations.

In light of the US Supreme Court's unanimous and unambiguous decision establishing disgorgement as a penalty, without any *ifs* and *buts* or any qualifications whatsoever, the SEC also cannot seek pre-judgment interest on penalties.  It has been a long established legal standard that the SEC cannot seek pre-judgment interest on any civil penalties.   And now since disgorgement constitutes a "penalty", for those alleged wrongdoings that occurred after May 06TH 2010, the SEC cannot and does not have the authority to seek or obtain pre-judgment interest from a federal court.   Federal courts have only typically held that the payment of pre-judgment interest on disgorgement was appropriate since disgorgement was wrongly considered an equitable remedy (and not a penalty) in the past.

The Supreme Court has now established that disgorgement is a penalty - plain and simple - and, hence, is not an equitable remedy in any sense and, therefore, the levying of any pre-judgment interest would be in contravention and violation of the practice and the law that the SEC does not seek and cannot seek pre-judgment interest on civil penalties (since disgorgement is a penalty).

## SECTION V:  MANY OF THE ALLEGED TRANSACTIONS PERTAINING TO COMPANIES D, F, G AND H  WERE NOT "IN CONNECTION WITH" THE SALE OR PURCHASE OF SECURITIES.

**COUNTS ONE AND TWO:  Defendant is entitled to summary judgment on his affirmative defense that many of the alleged transactions had nothing to do with the sale or purchase of securities.**

The Plaintiff's claims of misconduct by the Defendant, pertaining to each of the companies D, F, G, and H, requires the Plaintiff to establish, by a preponderance of the evidence that alleged transactions had to do with the sale or purchase of securities.

a.      A significant number of alleged acts do not concern the sale or purchase of securities.

b.      A majority of the alleged conduct concerns invoices for payment of legal fees, advisory fees, management incentive payments etc.; all of which have nothing to do with the sale or purchase of securities.

c.      It is well established that "[A] case in which, after a lawful transaction has been consummated, a broker decided to steal the proceeds and did so" is not actionable under federal securities laws, as the US Supreme Court ruled in  *SEC v. Zanford.* [53]   Similarly, courts have dismissed alleged conduct that post-dated the decision to purchase securities as in *Taylor v. Westor Capital Group.*[54]

d.      In case of Company **D**, the SEC allegation centers around a purported management fee for $600,000 paid on or around January 04TH, 2005 [Doc. 208, page 12, *para* 31] and a further payment of a purported management fee of $50,000 on or around January 08TH, 2005 [Doc. 208, page 13, *para* 32].   The SEC allegation centers around a purported advisory fee paid on or around July 05TH, 2006 [Doc. 208, page 13-14, *para* 35].   The SEC also claims that the Defendant fraudulently  submitted an invoice for $6.6MM regarding capital gains taxes over seven months after the otherwise lawful sale and purchase of securities; and a payment of $6.6MM was purportedly made on or around January 26TH, 2007 [Doc. 208, page 14, *para* 37]. Similarly, the SEC alleges a payment of $800,000 on or around August 21ST, 2007 for transaction fees [Doc. 208, page 40 *para* 15].    None of these alleged transactions pertaining to Company D had anything to do with the sale or purchase of securities.

---

[53] 535 U.S. 813, 820 (2002).
[54] Taylor v. Westor Capital Group, 943 F. Supp. 2d 397, 402 (S.D.N.Y 2013).

e.      In case of Company **F**, the SEC alleges the payment of $250,000 on or around June 2007 for expense reimbursement [Doc. 208, page 20 *para* 57]; and a further payment of €561,000 (estimated to be around $785,000) on or around October 2007 for legal expenses [Doc. 208, page 2 *para* 59].     None of these alleged transactions pertaining to Company F had anything to do with the sale or purchase of securities.

f.      In case of Company **G**, the SEC alleges the payment of $2.1MM on or around October 29th, 2009 for legal fees and expenses [Doc. 208, page 23 *para* 68]; and a further payment of $3.1MM on or around November 28TH, 2011 for management incentive payments [Doc. 208, page 24 *para* 70].     The SEC further alleges a payment in or around April 11TH, 2013 for $1.56MM for management incentive payments [Doc. 208 page 24 *para* 73].  None of these alleged transactions pertaining to Company G had anything to do with the sale or purchase of securities.

g.      In case of Company **H**, the SEC alleges the payment of $2.2MM on or around April, 2009 for legal fees [Doc. 208, page 26 *para* 79].  This alleged transaction pertaining to Company H had nothing to do with the sale or purchase of securities.


1.      <u>Burden of proof and elements:</u>

The Plaintiff's claims of misconduct by the Defendant, pertaining to each of the companies listed in this section (Companies D, F, G, and H), requires the Plaintiff to establish, by a preponderance of the evidence that these transactions were in connection with the sale or purchase of securities.


2.      <u>Elements that cannot be proven  by the Plaintiff:</u>

The Defendant contends that the Plaintiff cannot demonstrate a triable issue of fact as to whether the these aforementioned transactions had anything to do with the sale or purchase of securities.  They did not.  Thus, they cannot be subject to the Exchange Act and the Securities Act.

### SECTION VI:  MANY OF THE ALLEGED TRANSACTIONS PERTAINING TO COMPANIES D, E, F, G AND H WERE NOT DIRECTED TOWARDS A "CLIENT OR A PROSPECTIVE CLIENT"

**COUNT THREE:  Defendant is entitled to summary judgment on his affirmative defense that many of the alleged transactions were not directed to a client or a prospective client.**

The Plaintiff's claims of misconduct by the Defendant, pertaining to each of the companies D, E, F, G, and H, requires the Plaintiff to establish, by a preponderance of the evidence that alleged conduct was directed to a client or a prospective client.

a.      The SEC must allege and indisputably prove that the Defendant, assuming he was acting as an "investment advisor" for the sake of argument, engaged in a "transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client." See U.S.C.A. § 80b-6(2).

b.      The "client" in the hedge fund context or a similar entity, for the purposes of the Adviser's Act, is the fund and / or entity itself.  See *Goldstein v. SEC*, 451 F.3d 873, 881-882 (D.C. Cir. 2006) and also see *SEC v. Northshore Asset Mgmt.*, 2008 WL 1968299, *6 (S.D.N.Y. 2008).

c.      Hence, in this dispute, assuming the Defendant were an "investment advisor", the client would be Oak or the Oak funds.   None of the allegations pertaining to Companies D, E, F, G and H were directed at Oak or the Oak funds.   The allegations of misconduct relate to certain

companies being purportedly defrauded and none of these companies were his clients or prospective clients.

       d.      Company D was purportedly defrauded into paying $650,000 management fee [Doc. 33 *para* 28-30].

       e.      Companies E, F, and H were purportedly defrauded into paying $3,057,000 for legal fees [Doc. 33, *para* 46-47 (Company E); *para* 49-55 (Company F) and *para* 71-74 (Company H)].

       f.      Company G was purportedly defrauded into paying $2,500,000 delisting fees [Doc. 33 *para* 61].

       g.      None of these alleged misconduct were directed towards a client or a prospective client.

       1.      <u>Burden of proof and elements:</u>

The Plaintiff's claims of misconduct by the Defendant, pertaining to each of the companies listed in this section (Companies D, E, F, G, and H), requires the Plaintiff to establish, by a preponderance of the evidence that these transactions were directed at a client or a prospective client.

       2.      <u>Elements that cannot be proven  by the Plaintiff:</u>

The Defendant contends that the Plaintiff cannot demonstrate a triable issue of fact as to whether the these aforementioned conduct were directed at clients or prospective clients.  They were not.  Thus, they cannot be subject to the Exchange Act and the Securities Act.

## SECTION VII:  THE ALLEGED ACTS  WERE NOT DIRECTED TOWARDS AN "INVESTOR" OR A "PROSPECTIVE INVESTOR".

**COUNT FIVE:  Defendant is entitled to summary judgment on his affirmative defense that alleged acts were not directed toward an "investor" or "prospective investor".**

The Plaintiff's claims of misconduct by the Defendant, pertaining to each of the companies listed in its Complaint(s), requires the Plaintiff to establish, by a preponderance of the evidence, that alleged conduct was directed towards an investor or prospective investors.

a.       To establish and state a claim under Section 206(4) of the Adviser's Act and Rule 206(4)-8, the Plaintiff must allege and prove that the Defendant, if and assuming he was acting as an investment advisor, directed his fraudulent acts "to any investor or prospective investor."

b.       All of the Defendant's alleged conduct was directed towards Oak, Oak's funds, companies that Oak invested in, or an entity that sold assets to Oak or Oak funds.

c.       Under the Adviser's Act, Oak and its funds would be treated as the Defendant's "clients" and not as "investors."   They cannot be "clients" and "investors" at the same time.  See *Goldstein v. SEC*, 451 F. 3d at 881 wherein it is clear that "[I]t simply cannot be the case that investment advisers are the servants of two masters."  Also see *Northshore Asset Mgmt.*, 2008 WL 1968299 *6.

1.       Burden of proof and elements:

The Plaintiff's claims of misconduct by the Defendant, pertaining to each of the companies listed in Complaint(s), requires the Plaintiff to establish, by a preponderance of the evidence that these transactions were directed at a investor or a prospective investor.

2.       Elements that cannot be proven  by the Plaintiff:

The Defendant contends that the Plaintiff cannot demonstrate a triable issue of fact as to whether the these aforementioned conduct were directed at investors or prospective investors. They were not.

## SECTION VIII:  CERTAIN ACTIONS ARE TIME BARRED UNDER RULE 206(4)-8

**COUNT FIVE:  Defendant is entitled to summary judgment on his affirmative defense that certain alleged acts are time barred.**

Even if the Plaintiff were to have properly alleged that the Defendant engaged in fraudulent or deceptive conduct towards an investor or prospective investor certain acts with respect to Count Five must still be dismissed in his favor.

a.     Rule 206(4)-8 did not come in to effect until September 10th, 2007.

b.     Hence, all of the alleged conduct that predates September 10th, 2007 are not subject to Rule 206(4)-8.  See *SEC v. Daifotis*, 2011 WL 2183314 (N.D. Cal. 2011).

c.     All allegations pertaining to Company D [Doc. 208, *paras* 29-43], all allegations pertaining to Company E [Doc. 208 *paras* 44-49] , and the first allegation pertaining to Company F [Doc. 208, *paras* 56-61] fall outside the purview of  Rule 206(4)-8.

## SECTION IX:  ROLE AT OAK

a.     The Defendant was an Associate at the firm, Oak Management Corporation (or "Oak"), between January 2004 and Fall of 2006.   It was in the Fall of 2006 that the Defendant's designation was changed to Vice President of Oak (non-operative designation of "General Partner");  and the earlier "General Partners" became "Managing Partners" and all the powers

and responsibilities vested earlier in the General Partners were then only vested in the four new managing partners (namely Mr. Edward Glassmeyer, Mr. Bandel Carano, Mr. Fred Harman and Ms. Annie Lamont).  During that entire period of 2004-2015,  the Defendant had **no** responsibility to "*recommend or effect*" any "*purchase or sale of securities*" to or on behalf of anyone.   It was earlier the responsibility of the Oak general partners (there were no "Managing Partner" designation during that period of time) till Fall 2006; and then the four Managing Partners thereafter to invest, to purchase, to sell, or to transact in any of the Oak monies in private or portfolio companies as they deemed appropriate and fit.   At no point in time was the Defendant ever a member of this group of four managing partners.

b.      The Defendant's Employment Letter and the accompanying Job Description given by Oak to the Defendant does not contain any of the words "*security*", "*purchase*", "*sell*" or "*recommend*".   It was **never** the responsibility of the Defendant to make any such purchase or sale recommendation.   There is not one piece of paper that the Defendant signed or that Oak issued that made the Defendant responsible for any such decisions or powers to recommend the purchase or sale of any securities to any of the Oak funds or for that matter to anyone.   The Defendant was never an "investment advisor"[55] in any sense of the term.  If indeed the Defendant made any "purchase and sell recommendations," the Defendant would have been required to have the appropriate qualifications and certifications as per the requirements of the SEC and FINRA (Financial Industry Regulatory Authority).

---

[55] *"Understanding Professional Designations"* FINRA (http://apps.finra.org/DataDirectory/1/prodesignations.aspx) - defines "a financial advisor is a professional who carries a Series 65 or 66 license and renders financial services to clients.   According to the US Financial Industry Regulatory Authority (FINRA), license designations and compliance issues must be reported for public view.  FINRA further describes the term "financial adviser" to be: brokers, investment advisers, accountants, lawyers, insurance agents and financial planners."

c.      Please see **Exhibit 6** (only first 9 pages of 40 are included to highlight the relevant Sections 202 and 203) on what the requirements are under the US Investment Advisors Act of 1940.

Please see **Exhibit 7** - a definition from Wikipedia on what investment advisors need to have in terms of FINRA certification - "a financial advisor is a professional who carries a Series 65 or 66 license and renders financial services to clients."[56]

Please see **Exhibit 8** for the exhaustive list of all certifications required by anyone (individuals and firms) who has anything remotely to do with recommending the purchase or sale of any securities.

d.      The Defendant was not required to have, was never asked to have, was never advised to have, and he did not have any of these various certifications required to be considered an investment advisor.   In short, he was not an investment advisor in any meaning of that term at all.  It cannot both be true that (i) the SEC / FINRA requires certain certifications and qualifications for anyone to be  an "investment advisor" to make or recommend purchase and sale actions; and (ii) someone who does not have any of those certifications and qualifications can be an "investment advisor."

The Defendant's role at Oak was to help their portfolio companies achieve their true potential in business.  He was responsible to make sure the Board of Directors (where he would represent Oak once Oak had made an investment in a certain portfolio company) guided and mentored the management team appropriately and helped companies with successful execution of their business strategies - with their technology roadmap, marketing and go-to-market (G2M) strategies, and recruiting of executives and management.  The Defendant did not possess any CFA (Chartered Financial Analyst) or CFP (Chartered Financial Planner) certification or

---

[56] FINRA: "*Understanding Professional Designations*" (http://apps.finra.org/DataDirectory/1/prodesignations.aspx).

membership; and he did not possess any Series 6, Series 7, Series 63, Series 65, Series 66, or for

that matter any Series xx (any number designated by xx) certification.   Thus, the Defendant

never "recommend(*ed*)" that the Oak funds purchase or sell any securities and he was not an

"investment advisor" under the terms of his employ at Oak.     The Defendant was more of a

professional board director and management strategy coach.   If the Defendant is considered to

be an investment advisor, all directors serving on any company board would also have to be

investment advisors, which they are not.

     e.     Oak's Pre Commitment Reports (PCRs) were not a recommendation to buy or sell

shares or securities.   They were merely status reports to update the partnerships about Oak's

assessment of a private company and its business.   The PCRs did not contain any valuation work

nor any recommendation to invest or not to invest in any securities whatsoever; and they

expressed no opinions or recommendations.

     f.     Section 202(a)(11) of the Advisors Act defines an investment advisor as "*any*

*person who, for compensation, engages in the business of advising others…as to the value of*

*securities or the advisability of investing in, purchasing, or selling securities…*"  An investment

advisor can only typically provide advise depending on the licenses they hold and the training

that they have had.   For example, an insurance agent may be qualified to sell or advise on both

life insurance and variable annuities.   The Defendant never had any license as required by the

SEC.   If the Defendant were to be an "investment advisor", (i) his employment letter would have

said so; (ii) he would have been required to undergo training and obtain both licenses and

certification to do so; and (iii) he would have been required to be registered with state and

federal regulatory agencies.

     It is undisputed that (i) the Defendant's offer letter and employment letter at Oak did not

even mention the words "*securities*", "*investment advisor*", "*recommend*", and "*purchase* (*or*

46

*sale) of securities*"; (ii) the Defendant did not obtain and was not asked to, required to, obtain

any license or certification to qualify to be an "investment advisor"; and (iii) the Defendant never

registered nor was he ever asked by Oak to register with any state or federal regulatory agency.

      g.      As for compensation, a financial advisor is generally compensated through fees,

commissions, or a combination of both.  For example, an "investment advisor" must be

compensated in one or more of the following ways[57]:

- an hourly fee for advisory services;
- a flat fee, such as $3,500 per year, for an annual portfolio review or $5,000 for a financial plan;
- a commission on the securities bought or sold, such as $12 per trade;
- a commission (called a "load") based on the amount invested in a mutual fund or variable annuity;
- a "markup" when one buys "house" products (such as bonds that the broker holds in inventory) or "markdown" when they are sold; and
- a fee for assets under management, such as 1% annually of the assets managed

The Defendant's compensation at Oak, throughout his entire tenure had **none** of these

above compensation characteristics.

      1.      <u>Burden of proof and elements:</u>

The Plaintiff's claims of professional misconduct by the Defendant, pertaining to each of

the companies listed in the Complaint, requires the Plaintiff to establish, by a preponderance of

the evidence that (i) the Defendant was an Investment Advisor; (ii) the Defendant was either

registered or licensed to be an Investment Advisor; and (iii) the Defendant possessed the

necessary licenses and statutory qualifications necessary to be an Investment Advisor.

      2.      <u>Elements that cannot be proven  by the Plaintiff:</u>

---

[57] SEC: Office of Investor Education And Advocacy - http://www.sec.gov/investor/alerts/ib_top_tips.pdf

The Defendant contends that the Plaintiff cannot demonstrate a triable issue of fact as to whether the Defendant was an "investment advisor."    He was not.   Thus, the Investment Advisors Act of 1940 it not applicable to the conduct,  whatsoever it may be, of someone who is not an investment advisor as defined by the Act itself.


## CONCLUSION


The Defendant does not waive any of his other defenses pertaining to many of these claims listed above; however they are not necessary for the purposes of this Motion for Summary Judgment.

For the avoidance of any doubt, the Defendant also joins in all applicable arguments of the Relief Defendants.

Because the Plaintiff's evidence, viewed in the light most favorable to the Plaintiff, is insufficient to establish all of the elements of their claims, the Defendant is entitled to summary judgment on the aforementioned claims.  In addition, the undisputed evidence indicates that the Defendant has proven all his affirmative defenses; thus entitling the Defendant to summary judgment on all those defenses in this Motion.

Respectfully Submitted,

Dated:          June 27TH, 2017          /s/ Iftikar Ahmed
                                            _____

                                            Iftikar A. Ahmed
                                            C/O Advocate Anil Sharma
                                            10 Government Place East, Ground Floor
                                            Behind Kanpur Leather House
                                            Kolkata 700069, India
                                            Tel: +91.98.30.089.945
                                            Email: iftyahmed@icloud.com
                                            *Pro Se*

49

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and served by electronic mail to:

Nicholas P. Heinke
U.S. Securities and Exchange Commission
Byron G. Rogers Federal Building
1961 Stout Street, Ste. 1700
Denver, CO 80294
(303) 844-1071
Email: heinken@sec.gov

Mark L. Williams
U.S. Securities and Exchange Commission
Byron G. Rogers Federal Building
1961 Stout Street, Ste. 1700
Denver, CO 80294
(303) 844-1027
Email: williamsml@sec.gov

Paul E. Knag
Murtha Cullina, LLP
177 Broad Street, 4th Floor
Stamford, CT 06901
(203) 653-5400
Fax: (203) 653-5444
Email: pknag@murthalaw.com

David B. Deitch
Harris, St. Laurent & Chaudhry LLP VA
1818 Library Street, Suite 500
Reston, VA 20190
(703) 956-3549
Fax: (703) 935-0349
Email: ddeitch@sc-harris.com

Jonathan Harris
Harris, St. Laurent & Chaudhry LLP
40 Wall Street, 53rd Floor
New York, NY 10005
(646) 395-3481
Fax: (212) 202-6206
Email: jon@sc-harris.com

L. Reid Skibell
Harris, St. Laurent & Chaudhry LLP
40 Wall Street, 53rd Floor
New York, NY 10005
(917) 512-9466
Fax: (212) 202-6206
Email: rskibell@sc-harris.com

Priya Chaudhry
Harris, St. Laurent & Chaudhry LLP
40 Wall Street, 53rd Floor
New York, NY 10005
(212) 785-5550
Fax: (212) 202-6206
Email: priya@sc-harris.com

Steven Gabriel Hayes Williams
Harris, St. Lauren & Chaudhry LLP
40 Wall Street, 53rd Floor
New York, NY 10005
(212) 397-3370
Fax: (212) 202-6206
Email: ghayeswilliams@sc-harris.com

Kristen Luise Zaehringer
Murtha Cullina, LLP
177 Broad Street, 4th Floor
Stamford, CT 06901
(203) 653-5406
Fax: (860) 240-5758
Email: kzaehringer@murthalaw.com

Dated:       June 27TH, 2017       /s/ Iftikar Ahmed

                                                              _____

Iftikar A. Ahmed
C/O Advocate Anil Sharma
10 Government Place East, Ground Floor
Behind Kanpur Leather House
Kolkata 700069, India
Tel: +91.98.30.089.945
Email: iftyahmed@icloud.com

*Pro Se*