UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

_____

UNITED STATES SECURITIES
AND EXCHANGE COMMISSION,

   Plaintiff,

  v.

IFTIKAR AHMED,

   Defendant, and

IFTIKAR ALI AHMED SOLE PROP;
I-CUBED DOMAINS, LLC;  SHALINI AHMED;
SHALINI AHMED 2014 GRANTOR RETAINED
ANNUITY TRUST; DIYA HOLDINGS LLC;
DIYA REAL HOLDINGS, LLC; I.I. 1, a minor
child, by and through his next friends IFTIKAR
and SHALINI AHMED, his parents; I.I. 2, a minor
child, by and through his next friends IFTIKAR
and SHALINI AHMED, his parents; and I.I. 3, a
minor child, by and through his next friends
IFTIKAR and SHALINI AHMED, his parents,

   Relief Defendants.

_____

Civil Action No. 3:15cv675 (JBA)

**PLAINTIFF UNITED STATES SECURITIES AND EXCHANGE
COMMISSION'S MEMORANDUM IN SUPPORT OF ITS
<u>MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

# **Table of Contents**

INTRODUCTION ....................................................................................................1

BACKGROUND AND PROCEDURAL HISTORY…...............................................2

ARGUMENT .........................................................................................................6

    I.  LEGAL STANDARDS FOR SUMMARY JUDGMENT ...............................7

    II.  LEGAL ELEMENTS AND FACTS COMMON TO ALL FRAUDS ...........................8

        A. Fraud Under the Advisers Act                                             9

        1.      Legal Elements.......................................................................9

        2.      Defendant's Misconduct is Subject to Section 206 Because Defendant
              Acted as an Investment Adviser ..................................................11

        B. Fraud Under the Exchange Act and Securities Act...........................................12

        1.      Legal Elements.......................................................................12

        2.      Territorial Reach: The Underlying Securities Transactions Satisfy
              *Morrison* ...............................................................................13
              a.      The Oak Funds Incurred Irrevocable Liability Within the United
                  States.............................................................................14
              b.      The Transfer of Title Can Locate Transactions in the United States.18

        3.      The Conduct-or-Effects Test Applies to Conduct After Dodd-Frank ..........19

    III. THE COMMISSION IS ENTITLED TO SUMMARY JUDGMENT ON ITS FRAUD
      CLAIMS AGAINST DEFENDANT ....................................................................21

        A. Defendant's Secret Bank Accounts...................................................................22

        B. Frauds Connected to Company D ....................................................................22
            1. Summary of Material Undisputed Facts – Company D......................22
            2. Defendant Violated the Antifraud Provisions of the Advisers Act, Exchange
               Act, and Securities Act ...............................................................26

        C. Frauds Connected to Company E.....................................................................28
            1. Summary of Material Undisputed Facts – Company E .....................28
            2. Defendant Violated the Antifraud Provisions of the Advisers Act
               and Exchange Act .....................................................................30

D. Frauds Connected to Company J ..................................................................32
   1. Summary of Material Undisputed Facts – Company J ...........................32
   2. Defendant Violated the Antifraud Provisions of the Advisers Act and the
      Exchange Act ........................................................................................33

E. Frauds Connected to Company F ..................................................................34
   1. Summary of Material Undisputed Facts – Company F ...........................34
   2. Defendant Violated the Antifraud Provisions of the Advisers Act, Exchange
      Act, and Securities Act .........................................................................35

F. Frauds Connected to Company G ..................................................................36
   1. Summary of Material Undisputed Facts – Company G...........................36
   2. Defendant Violated the Antifraud Provisions of the Advisers Act, Exchange
      Act, and Securities Act .........................................................................40

G. Fraud Connected to Company H ...................................................................42
   1. Summary of Material Undisputed Facts – Company H...........................42
   2. Defendant Violated the Antifraud Provisions of the Advisers Act and Exchange
      Act.........................................................................................................43

H. Fraud Connected to Company I .....................................................................44
   1. Summary of Material Undisputed Facts – Company I ...........................44
   2. Defendant Violated the Antifraud Provisions of the Advisers Act and Exchange
      Act.........................................................................................................45

I. Fraud Connected to Company A .....................................................................46
   1. Summary of Material Undisputed Facts – Company A...........................46
   2. Defendant Violated the Antifraud Provisions of the Advisers Act and Exchange
      Act.........................................................................................................47

J. Fraud Connected to Company B .....................................................................48
   1. Summary of Material Undisputed Facts – Company B ...........................48
   2. Defendant Violated the Antifraud Provisions of the Advisers Act and Exchange
      Act.........................................................................................................50

K. Frauds Connected to Company C ..................................................................51
   1. Summary of Material Undisputed Facts – Company C ...........................51
   2. Defendant Violated the Antifraud Provisions of the Advisers Act, Exchange
      Act, and Securities Act .........................................................................58

CONCLUSION....................................................................................................60

## Table of Authorities

15 U.S.C. § 10(b) .......................................................................................................... *passim*

15 U.S.C. § 17(a) .......................................................................................................... *passim*

15 U.S.C. § 202(a)(11) ...................................................................................................... 12, 13

15 U.S.C. § 206 ............................................................................................................. *passim*

15 U.S.C. § 77q ........................................................................................... 11, 14, 31, 32

15 U.S.C. § 77v ............................................................................................................ 20, 21

15 U.S.C. § 78aa ........................................................................................................... 20, 21

15 U.S.C. § 80b-14 ....................................................................................................... 20, 21

15 U.S.C. § 80b-6 ................................................................................................. 10, 12, 60

17 C.F.R. §§ 275.206(4)-8 ................................................................................................. 11

Aaron v. SEC, 446 U.S. 680 (1980) .................................................................................. 10

Abrahamson v. Fleschner, 568 F.2d 862 (2d Cir. 1977) .............................................. 12, 13

Absolute Activist Value Master Fund Ltd. v. Ficeto, 677 F.3d 60 (2d Cir. 2012) ............ 15, 19

Adderley v. Dingman, No. 15 CIV. 9935 (NRB), 2017 WL 1319819 (S.D.N.Y. Mar. 29, 2017) .......... 18

Arco Capital Corp. v. Deutsche Bank AG, 986 F. Supp. 2d 296 (S.D.N.Y. 2013) .................... 16

Arco Capital Corps. Ltd. v. Deutsche Bank AG, 949 F. Supp. 2d 532 (S.D.N.Y. 2013) ............. 18

Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC, 2 F. Supp. 3d 550 (S.D.N.Y. 2014) ................................................................................................................. 15

Bank of Am., N.A. v. Fischer, 927 F. Supp. 2d 15 (E.D.N.Y. 2013) ...................................... 9

Butler v. United States, 992 F. Supp. 2d 165 (E.D.N.Y. 2014) .................................. 15-16, 16

Fin. Planning Ass'n v. SEC, 482 F.3d 481 (D.C. Cir. 2007) ............................................. 12

In re Gintel Asset Mgmt., Inc. et al., Advisers Act Rel. No. 2079, 2002 WL 31499839 (Nov. 8, 2002) . 60

Inv. Adviser's Act of 1940, Rel. No. 1732, 1998 WL 400409 ............................................. 60

Koch v. SEC, 793 F.3d 147 (D.C. Cir. 2015) ................................................................ 12-13

Lay v. United States, 623 F. App'x 790 (6th Cir. 2015) ................................................... 11

Liberty Media Corp. v. Vivendi Universal, S.A., 861 F. Supp. 2d 262 (S.D.N.Y. 2012) ............ 16, 17

Loginovskaya v. Batratchenko, 936 F. Supp. 2d 357 (S.D.N.Y. 2013) ................................. 18

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) ............................. 8

Meng-Lin Liu v. Siemens A.G., 978 F. Supp. 2d 325 (S.D.N.Y. 2013) .................................. 22

Morrison v. Nat'l Austl. Bank Ltd., 561 U.S. 247 (2010) ............................................. 11, 15

Morrison. SEC v. Traffic Monsoon, L.L.C., No. 2:16-CV-00832-JNP, 2017 WL 1166333 (D. Utah Mar. 28, 2017) ................................................................................................................. 21, 22

SEC v. Jammin' Java Corp., 15-cv-08921-SVW-MRW .................................................... 9

Overton v. N.Y. State Div. of Mil. & Naval Affairs , 373 F.3d 83 (2d Cir. 2004) .................... 8

Quail Cruises Ship Mgmt. v. Agencia de Viagens CVC Tur Limitada, 645 F.3d 1307 (11th Cir. 2011)  19, 20

SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180 (1963) ......................................... 11

SEC v. Cavanagh, 2004 WL 1594818 (S.D.N.Y. July 16, 2004) ........................................... 7

SEC v. Cole, No. 12-cv-8167 (RJS), 2015 WL 5737275 (S.D.N.Y. Sept. 29, 2015) ................. 28, 37, 42

SEC v. DiBella, 587 F.3d 553 (2d Cir. 2009) .................................................................. 10

SEC v. Glob. Telecom Servs. L.L.C., 325 F. Supp. 2d 94 (D. Conn. 2004) ............................. 7

SEC v. Gruss, 859 F. Supp. 2d 653 (S.D.N.Y. 2012) ........................................................ 11

SEC v. Haligiannis, 470 F. Supp. 2d 373 (S.D.N.Y. 2007) ................................................. 10

SEC v. McGinn, Smith & Co. , No. 1:10-cv-457, 2015 WL 667848 (N.D.N.Y. Feb. 17, 2015) .. 11-12, 12

SEC v. McNulty, 137 F.3d 732 (2d Cir. 1998) ................................................................ 14

SEC v. Moran, 922 F. Supp. 867 (S.D.N.Y. 1996) ........................................................... 11

SEC v. Nadel, 97 F. Supp. 3d 117 (E.D.N.Y. 2015) ......................................................... 60

SEC v. Pentagon Capital Mgmt. Publ'g Ltd. Co., 725 F.3d 279 (2d Cir. 2013) ..................... 10, 14

SEC v. PIMCO Advisors Fund Mgmt. L.L.C., 341 F. Supp. 2d 454 (S.D.N.Y. 2004) ............... 10

SEC v. Rabinovich & Assocs., LP , No. 07 Civ. 10547, 2008 WL 4937360 (S.D.N.Y. Nov. 17, 2008) . 14

SEC v. Ramoil Mgmt., Ltd., No. 01 Civ. 9057 (SC), 2007 WL 3146943 (S.D.N.Y. Oct. 25, 2007) 28, 32,

SEC v. Tourre, No. 10 Civ. 3229 (KBF), 2013 WL 2407172 (S.D.N.Y. June 4, 2013) ................. 15, 22

SEC v. Yorkville Advisors, L.L.C., No. 12 Civ. 7728, 2013 WL 3989054 (S.D.N.Y. Aug. 1, 2013) ..... 11

SEC v. Young, No. 09 Civ. 1634, 2011 WL 1376045 (E.D. Pa. Apr. 12, 2011) ....................... 14

Secs. Exch. Comm'n v. Monarch Funding Corp., 192 F.3d 295 (2d Cir. 1999) ....................... 14

Spain & Uruguay. Quail Cruises Ship Mgmt. Ltd. v. Agencia de Viagens CVC Tur Limitada , 732 F. Supp. 2d 1345 (S.D. Fla. 2010) .................................................................................... 19

Tilcon N.Y., Inc. v. Indem. Ins. Co. of N. Am., No. 3:14-CV-1296(JBA), 2017 WL 1948420 (D. Conn. May 10, 2017) ............................................................................................................. 8

U.S. SEC v. Suman, 684 F. Supp. 2d 378 (S.D.N.Y. 2010) ........................................... 8, 9, 61

United States v. 4003-4005 5th Ave., 55 F.3d 78 (2d Cir. 1995) ...................................... 9

United States v. Peterson, 100 F.3d 7 (2d Cir. 1996) ...................................................... 7

United States v. Vilar, 729 F.3d 62 (2d Cir. 2013) ........................................................ 18

# INTRODUCTION

For more than one decade, Defendant systematically used fraudulent and deceptive means to divert more than $67 million from funds he advised into his personal bank accounts, before funneling much of his ill-gotten gains into assets and accounts in the name of his wife in order to conceal his fraud and protect the assets from confiscation.[1] After his fraud was uncovered, Defendant used an expired passport to flee the United States to his native India in violation of a court order, and then attempted to access frozen assets in violation of this Court's Temporary Restraining Order. Defendant remains a fugitive of justice.

From approximately 2004 to 2015, Defendant worked at the venture capital firm Oak Investment Partners ("Oak") to advise the funds it managed. To effectuate his fraudulent scheme, Defendant covertly opened several bank accounts and deceptively titled those accounts in the name of Oak and its portfolio companies. Defendant did not have authority to open these accounts, which he alone controlled.

Defendant then used these bank accounts in connection with the purchase and sale of securities by Oak funds to divert money into his (and his wife's) personal bank accounts. To do so, Defendant falsified documents, made numerous misrepresentations and omissions, and directed others to unknowingly transfer monies intended for Oak funds or its portfolio companies into bank accounts that Defendant controlled. In general, the scheme included diverting monies for legitimate fees and expenses, misrepresenting or completely fabricating certain fees and expenses, failing to disclose material information to various parties, and engaging in self-dealing.

---

[1] The instant Motion for Summary Judgment pertains only to Defendant's liability. Per the Court's Order [Doc. # 436], "[t]he issue of damages, such as disgorgement and civil penalties, will be reserved for supplemental briefing after disposition of the Summary Judgment Motions." *Id.* at 1-2.

As a result of this scheme, Defendant diverted more than $67 million to his personal accounts over the ten year period.

## BACKGROUND AND PROCEDURAL HISTORY

Oak Management Corporation ("OMC") is the investment manager for various venture capital investment funds, which raise money from investors (ranging from state and municipal pension funds to individual investors) and, in turn, invest those monies in various types of securities. SOF X-4. Defendant joined Oak in 2004 where he worked as an investment professional and a managing member of entities that serve as general partners of certain Oak funds. SOF X-5. Defendant was responsible for, among other things, identifying companies in which Oak funds might invest ("portfolio companies"), recommending investments, and negotiating the terms of investments with portfolio companies. SOF X-6 to X-9.

On April 2, 2015, in an unrelated case, the SEC filed a civil complaint alleging Defendant and others engaged in insider trading. *SEC v. Kanodia, et al.*, No. 1:15-cv-13042-ADB (D. Mass. filed July 9, 2015). That same day, Defendant was arrested and charged with insider trading. *See United States v. Kanodia, et al.*, No. 1:15-cr-10131-NMG-MBB (D. Mass. Apr. 1, 2015) (ECF 3 & 4). Defendant's bond was set at $9 million and, as a condition of release pending his criminal trial, his travel was restricted to Connecticut, New York, and Massachusetts. *See United States v. Ahmed,* No. 3:15-mj-00052-WIG (D. Conn. Apr. 2, 2015) (ECF 4 & 8 at ¶ 7(f)); *United States v. Kanodia, et al.*, No. 1:15-cr-10131-NMG-MBB (D. Mass. Apr. 21, 2015) (ECF 19).

On May 6, 2015, the SEC filed [Doc. # 2] an emergency motion for a temporary restraining order freezing assets and for a preliminary injunction. The following day, the Court entered [Doc. # 9] a temporary restraining order freezing assets of Defendant and certain

Relief Defendants, up to the amount of approximately $55 million, and set this matter for a preliminary injunction hearing.

On May 18, 2015, the SEC and Defendant entered [Doc. # 21] into a stipulation, approved [Doc. # 22] by the Court, providing that all assets held by him or under his direct or indirect control, whether held in his name or for his direct or indirect beneficial interest, would remain frozen until the Court's ruling on the SEC's motion for preliminary injunction. Unbeknownst to the SEC, around the same time the parties entered into this stipulation, Defendant fled the United States into his native India using an expired Indian Passport.[2] After fleeing, Defendant repeatedly attempted to access assets in direct violation of the Court's asset freeze order and the parties' stipulation. SOF X-10.

On June 16, 2015, the SEC filed [Doc. # 33] its Amended Complaint and Motion for a Preliminary Injunction based on newly-discovered misconduct by Defendant.

On July 16, 2015, the SEC deposed Relief Defendant Shalini Ahmed. SOF X-11. Although Ms. Ahmed would profess [Doc. # 69 at 6] that she and her children had been "abandoned" by Defendant, ███████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

---

[2] According to records submitted by Defendant, his Indian passport was cancelled when he obtained a United States passport and renounced his Indian citizenship. *See* Doc. 273-5. To facilitate his escape into India, Defendant tore out the page of his Indian passport that contained the stamp "CANCELLED." *Id*. at 10. After Defendant was caught, Defendant caused an affidavit to be submitted on his behalf falsely representing to the Indian court that he had not entered the country illegally, was "absolutely innocent," and was being "falsely implicated." *Id*. at 10.

[3] During the preliminary injunction hearing, the Court noted that at least one other district court within the Second Circuit had opined that an adverse inference could be drawn from the invocation of the confidential marital communications privilege. SOF X-14.

███████████████████████████████████

███████████████████████████████████

██████████████████████

On July 23, 2015, the Court held the first day of the preliminary injunction hearing. Consistent with their briefing, the only allegations of fraud that Relief Defendants initially challenged involved Oak Fund XIII's purchase of Company C[5] shares from I-Cubed Domains, LLC, which Relief Defendants argued belonged to Ms. Ahmed and therefore did not constitute self-dealing. *See* Doc. # 113 at 8 ("[I]n their prehearing brief, Relief Defendants contended that the SEC is unlikely to succeed on its claim relating to the Company C transaction because Mr. Ahmed transferred his interest in I-Cubed to his wife shortly before the sale to Oak…Relief Defendants do not continue to advance this argument in their post-hearing brief….").

During the second day of the Preliminary Injunction hearing, Ms. Ahmed did not confirm or deny the SEC's allegations, instead she claimed that she and her husband "never spoke about what he did in his business dealings" because it was "very clear between [them] there was a Chinese wall" so they "never spoke business to each other." SOF X-15. Counsel for Defendant attended, but did not participate in, the July 30th hearing. Ex. 11 at 200:9-217:19. Following the hearing, the parties submitted briefs in which neither Defendant nor Relief Defendants denied the SEC's allegations of fraud. *See* Doc. ## 96 & 97. Defendant did

---

[4] On February 1, 2017, the SEC deposed Ms. Ahmed's father, mother, and two sisters regarding these payments. Each invoked their Fifth Amendment right against self-incrimination in response to every substantive question asked. SOF X-12.

[5] The SEC's initial Complaint alleged Defendant's fraud in connection with three companies, designated Company A, Company B, and Company C, beginning in or around August 2014. The SEC's Amended Complaint alleged fraud in connection with six additional companies, designated Company D through Company I, which spanned from 2004 to 2010. The SEC's Second Amended Complaint alleged fraud in connection with one additional company, designated Company J. The SEC has retained these designations and for ease of reading will address the fraudulent transactions in chronological order.

not oppose the SEC's motion for a preliminary injunction (aside from requesting attorneys' fees), or suggest the SEC's allegations were not true. *See* Doc. # 97; Doc. # 113 at 3, n.2.

On August 12, 2015, the Court granted [Doc. #113] the SEC's request for a preliminary injunction. In relevant part, the Court found that the SEC was "likely to succeed on the merits of its claim that [the Company C] transaction was fraudulent" (*Id*. at 8), and further found that the SEC had "established[ed] a likelihood that the Commission will prevail at trial on the merits and an inference that the Defendant has engaged in acts, practices, and courses of business constituting violations of" the anti-fraud provisions of the relevant federal securities laws. *Id.* at 19.

On April 1, 2016, the SEC filed [Doc. # 208] its Second Amended Complaint, which Defendant answered [Doc. # 218] on April 22, 2016. As to the SEC allegations of fraud, Defendant, who was represented by counsel at the time of his answer, "assert[ed] his right under the Fifth Amendment to the Constitution of the United States and applicable laws and statutes not to be compelled to be a witness against himself…" in response to the SEC's allegation of fraud. *Id.*; *see also* SOF X-1.

The SEC also propounded its discovery requests to Defendant. SOF X-16. Among other things, the SEC requested "all communications … with any of the Relief Defendants regarding any of the allegations in the Complaint," "all communications … with any individuals from Companies A-I regarding any of the allegations in the Complaint," and "all communications … with any individual from Oak, and Oak Fund, Oak Funds investors, or an Oak Fund portfolio company regarding any of the allegations in the Complaint." SOF X-16. In response the SEC's Requests for Admission and Interrogatories, Defendant invoked his Fifth Amendment right against self-incrimination. SOF X-1, X-16. In response to the SEC's Document Requests, Defendant claimed to have no responsive documents. SOF X-16. On

March 16, 2017 – after Defendant began attaching responsive documents to his own pleadings – the SEC contacted Defendant and again asked that he produce any relevant documents. SOF X-16. On March 26, 2017, Defendant responded and again represented that he "d[id] not ... have access to any of the relevant documents." SOF X-16. To date, Defendant has not produced any documents responsive to the SEC's discovery requests.

On December 22, 2016, Relief Defendants[6] filed [Doc. # 375] their Answer to the SEC's Second Amended Complaint. As to the SEC's allegations of fraud, Relief Defendants repeatedly asserted that they "d[id] not possess knowledge sufficient to form an opinion as to the truth of the allegations set forth" in the SEC's Second Amended Complaint. *Id.*

On January 23, 2017, the SEC again deposed Ms. Ahmed.

On February 28, 2017, the SEC deposed Defendant. In response to every substantive question regarding the allegations in this case, Defendant invoked his Fifth Amendment right against self-incrimination.[7] SOF X-1. To date, Defendant remains a fugitive [Doc. # 286 at 1] of justice.

## ARGUMENT

Defendant perpetrated a fraudulent scheme that misled Oak, Oak funds, and Oak funds' investors for more than a decade until Defendant was caught in 2015. The SEC seeks summary judgment based upon Defendant's numerous fraudulent acts committed as part of his scheme all

---

[6] Relief Defendant Iftikar Ali Ahmed Sole Prop did not answer or file a responsive pleading to the SEC's Second Amended Complaint. The SEC will seek a default judgment against this entity.

[7] Because Defendant chose to assert his Fifth Amendment privilege in this proceeding he cannot offer his own self-serving statements – inadmissible hearsay if he offers it – to oppose summary judgment. *See United States v. Peterson*, 100 F.3d 7, 13-14 (2d Cir. 1996) ("When the defendant invokes his Fifth Amendment privilege, he has made himself unavailable to any other party, but he is not unavailable to himself [for the purposes of introducing his own prior testimony under Federal Rule of Evidence 804(b)(1)]."); *SEC v. Cavanagh*, 2004 WL 1594818, at *15 (S.D.N.Y. July 16, 2004); *SEC v. Global Telecom Servs., LLC*, 325 F. Supp. 2d 94, 110-11 (D. Conn. 2004).

of which were connected to transactions for securities related to the ten companies described in the Second Amended Complaint as Companies A-J. Section I below sets forth the legal standards for summary judgment. Section II describes the legal elements and undisputed facts common to each claim. Section III explains the legal principles and undisputed facts relevant to each fraud in chronological order and grouped by their connection to each company.

## I.    LEGAL STANDARDS FOR SUMMARY JUDGMENT.

Summary judgment is appropriate if the SEC shows "that there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the SEC makes this showing, the burden shifts to Defendant who "must come forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (original emphasis). He "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586. Defendant can create a genuine issue only with "evidence … that a reasonable jury could return a verdict for" Defendant. *Overton v. N.Y. State Div. of Military & Naval Affairs*, 373 F.3d 83, 89 (2d Cir. 2004) (quotation omitted). "[O]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Tilcon N.Y., Inc. v. Indem. Ins. Co. of N. Am.*, No. 3:14-CV-1296(JBA), 2017 WL 1948420, at *7 (D. Conn. May 10, 2017) (quotation omitted).

The proper inferences to be made by the Court in this case are unlike the typical summary judgment motion because Defendant has invoked the Fifth Amendment instead of responding to the SEC's allegations or discovery requests. *SEC v. Suman*, 684 F. Supp. 2d 378, 386 (S.D.N.Y. 2010) ("An adverse inference may be given significant weight because silence when one would be expected to speak is a powerful persuader."). The inference "must be weighted with other

evidence in the matter in determining whether genuine issues of fact exist." *Id.* Accordingly, with respect to subject matter contained in allegations in the Second Amended Complaint to which Defendant refused to respond, discovery requests that he refused to answer, and deposition questions that he refused to answer all on Fifth Amendment grounds, Defendant "must bear the consequence of lack of evidence, and the claim of privilege will not prevent an adverse finding or even summary judgment if the litigant does not present sufficient evidence to satisfy the usual evidentiary burdens in the litigation." *United States v. Certain Real Prop. & Premises Known as 4003-4005 5th Ave., Brooklyn, N.Y.*, 55 F.3d 78, 83 (2d Cir. 1995); *see also Bank of Am., N.A. v. Fischer,* 927 F. Supp. 2d 15, 26 (E.D.N.Y.2013) ("Based on [defendants'] blanket Fifth Amendment privilege assertions, the Court draws a negative inference against defendants as to all aspects of plaintiff's ... claims."). "Thus, the SEC is entitled to summary judgment if it produced admissible evidence which, construed in the light most favorable *to the SEC*, established [Defendant's] liability." Order re Plaintiff's Motion for Partial Summary Judgment, *SEC v. Jammin' Java Corp.*, 15-cv-08921-SVW-MRW at p. 3 of 7(C.D. Ca. May 31, 2017) (ECF 215) (emphasis in original).

## II.    LEGAL ELEMENTS AND FACTS COMMON TO ALL FRAUDS.

This section sets forth the legal elements and undisputed facts that apply to each of Defendant's violations of the anti-fraud provisions of the federal securities laws. Section III, below, sets forth the remaining facts and law relevant to each fraud that, together with the common principles in this Section II, will establish Defendant's liability.

Defendant is charged with violating Section 206 of the Investment Advisers Act ("Advisers Act"), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder, and Section 17(a) of the Securities Act of 1933 ("Securities Act"). While

each of these provisions has slightly different requisite elements, in general, each prohibits fraudulent acts or schemes and material misrepresentations or omissions in connection with the offer, purchase, or sale of securities or by an investment advisor. *See, e.g.*, *SEC v. Pentagon Capital Management PLC*, 725 F.3d 279, 285 (2d Cir. 2013) (Section 10(b)/Rule 10b-5 requires SEC show defendant "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities"); *Aaron v. SEC*, 446 U.S. 680, 702 (1980) (Section 17(a) requires similar showing, although scienter not required for 17(a)(2) or 17(a)(3)); *SEC v. Haligiannis*, 470 F. Supp. 2d 373, 383 (S.D.N.Y. 2007) ("Facts showing a violation of Section 17(a) or 10(b) by an investment adviser will also support a showing of a Section 206 violation.").

### A.   Fraud Under the Advisers Act.

#### 1.   Legal Elements.

Section 206 of the Advisers Act prohibits fraud by investment advisers. Section 206(1) prohibits investment advisers like Defendant from employing "any device, scheme or artifice to defraud any client or prospective client." 15 U.S.C. § 80b-6(1). Section 206(2) prohibits Defendant from engaging "in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client." 15 U.S.C. § 80b-6(2). Scienter is necessary to violate Section 206(1), but is not required to prove violations of Section 206(2). *SEC v. DiBella*, 587 F.3d 553, 567 (2d Cir. 2009) ("[T]he government need not show intent to make out a section 206(2) violation."). Negligence is enough for Section 206(2). *SEC v. Pimco Advisors Fund Mgmt., LLC*, 341 F. Supp. 2d 454, 470 (S.D.N.Y. 2004) ("Section 206(2) simply requires proof of negligence.").

Both Sections 206(1) and 206(2) impose a fiduciary duty on Defendant that encompasses an affirmative obligation of good faith and a full and fair disclosure of all material facts to Defendant's clients, as a well as an affirmative obligation to employ reasonable care to avoid misleading his clients. *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 194-95 (1963). This fiduciary duty requires Defendant to act for the benefit of his clients, and precludes Defendant from using his clients' assets to benefit himself. *SEC v. Moran*, 922 F. Supp. 867, 895-96 (S.D.N.Y. 1996).

Section 206(4) prohibits Defendant from engaging in "any act, practice, or course of business which is fraudulent, deceptive, or manipulative" as defined by rules promulgated by the SEC. For conduct after September 10, 2007, Rule 206(4)-8 prohibits advisers to "pooled investment vehicles" from engaging in fraudulent acts or making material misrepresentations to investors or prospective investors. 17 C.F.R. § 275.206(4)-8. Like Section 206(2), Section 206(4) does not require scienter; negligence is enough. *SEC v. Yorkville Advisors, LLC*, Case No. 12 Civ. 7728 (GBD), 2013 WL 3989054, at *3 (S.D.N.Y. Aug. 2, 2013) ("[T]he SEC must establish at least negligence to prove violations of Sections 206(2) and 206(4).").[8]

While the sub-parts of Section 206 protect different victims – Sections 206(1) and (2) address fraud on the adviser's "client," which is generally understood to be the fund itself, while Section 206(4) and Rule 206(4)-8 address fraud on the fund's investors – they all take aim at adviser fraud.[9] *See* 15 U.S.C. §§ 80b-6(1), 80b-6(2), 80b-6(3); 17 C.F.R. § 275.206(4)-8; *see generally SEC v. McGinn Smith & Co., Inc.*, 2015 WL 667848, *8 (N.D.N.Y. Feb. 17, 2015)

---

[8] Claims under the Advisers Act are not subject to the domestic requirements of *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 265 (2010). *S.E.C. v. Gruss*, 859 F. Supp. 2d 653, 662. 664-65 (S.D.N.Y. 2012) ("[T]he Exchange Act focuses upon purchases and sales of securities in the United States[,] whereas the [Advisers Act] focuses on the adviser.") (quotation omitted); *see also Lay v. United States,* 623 F. App'x 790, 796 (6th Cir. 2015) ("[N]o court has extended *Morrison*'s 'domestic' requirements to include the Investment Advisers Act.").

[9] Defendant also violated Advisers Act Section 206(3) with respect to Company C. *See infra* at Section III. K.

(describing Section 206). As detailed below, Defendant's misconduct violated Sections 206(1) and (2) by defrauding the Oak funds, and Section 206(4) and Rule 206(4)-8 by defrauding the investors in those funds.[10]

2.      **Defendant's Misconduct is Subject to Section 206 Because Defendant Acted as an Investment Adviser.**

Section 206 covers Defendant's misconduct because the undisputed facts show that Defendant acted as an investment advisor, as that term is defined by the Advisers Act, at all relevant times. 15 U.S.C. § 80b-6. Subject to certain exceptions not applicable to Defendant, Section 202(a)(11) of the Advisers Act defines "investment adviser" as follows:

> [A]ny person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities[.].

15 U.S.C.A. § 80b-2(11). This is a "broad definition," *Financial Planning Ass'n v. SEC*, 482 F.3d 481, 484 (D.C. Cir. 2007), and reaches persons who, like Defendant, receive compensation for investing funds of their clients or who advise their "customers by exercising control over what purchases and sales are made with their clients' funds." *Abrahamson v. Fleschner*, 568 F.2d 862, 870-871 (2d Cir. 1977) (includes "persons who manage[] the funds of others for compensation."). The scope of the definition is not limited to registered advisers, but includes "any" person who offers advisory services for compensation, including persons who have not registered or need not register with the SEC. *Koch v. SEC*, 793 F.3d 147, 157 (D.C. Cir. 2015) ("[T]he structure of the [Advisers] Act demonstrates that individuals need not register, or even

---

[10] Section 206(4) specifically applies to fraud on investors in pooled investment vehicles, such as the Oak funds involved in this case. *See SEC v. McGinn Smith & Co., Inc.*, 2015 WL 667848, n.26 (N.D.N.Y. Feb. 17, 2015); *see also* SOF X-4 (describing Oak's funds).

11

be required to register, in order to be an 'investment adviser' within the meaning of the Act.")
(emphasis in original, quoting *United States v. Onsa*, 523 Fed.Appx. 63, 65 (2d Cir. 2013)).

The undisputed facts show that Defendant is an investment adviser under Section 202(a)(11). From 2004 through 2015, Defendant recommended and advised that Oak Funds IX, XI, XII, and XIII purchase or sell securities, and then monitored and managed those investments. SOF X-8. Specifically, Defendant's responsibilities at Oak included, among other things, identifying, analyzing, and recommending investment opportunities for the various Oak funds at issue in this case, which were typically investments in the securities of various so-called "portfolio companies." SOF X-6 to X-7. Defendant further negotiated the terms of the investments and managed the relationships with the companies in which the Oak funds invested. SOF X-6. Defendant was compensated for this work. SOF X-9. In addition, Defendant invoked his Fifth Amendment rights and refused to respond to allegations or answer any questions with respect to his responsibilities at Oak and to the Oak funds. SOF X-1.

Because Defendant received compensation to advise the Oak funds as to the value of securities and recommended that Oak funds purchase and sell securities at all times relevant to the SEC's claims, Defendant was an "investment adviser" under Section 202(a)(11). *See Abrahamson*, 568 F.2d at 870-871. Indeed, the trust that Oak placed in Defendant to advise and manage securities transactions is precisely what gave Defendant the opportunity to defraud the Oak funds for nearly a decade.

**B.      Fraud Under the Exchange Act and Securities Act.**

**1.      Legal Elements.**

Section 10(b) of the Exchange Act and Rule 10b-5 prohibit fraud by "any person" in connection with the purchase or sale of securities. To establish a violation, the SEC must show

that Defendant (1) made a material misrepresentation or omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities. *Pentagon Capital Management PLC*, 725 F.3d at 285. A violation of Section 17(a)(1) of the Securities Act requires essentially the same elements as Section 10(b) of the Exchange Act but in connection with the offer or sale of securities. Section 17(a)(2) makes it unlawful to obtain money or property through misstatements or omissions about material facts, and Section 17(a)(3) prohibits any transaction or course of business that operates as a fraud or deceit upon a securities buyer. 15 U.S.C. §§ 77q(a)(2) and (3). Only Section 17(a)(1) requires scienter; negligence is sufficient under Sections 17(a)(2) and 17(a)(3). *Monarch Funding*, 192 F.3d at 308.

Scienter under Section 10(b) of the Exchange Act and Section 17(a)(1) of the Securities Act can be established by Defendant's reckless disregard for the truth, *SEC v. McNulty*, 137 F.3d 732, 741 (2d Cir. 1998), or by showing that Defendant "did not have a genuine belief that . . . information [he provided] was accurate and complete in all material respects." *SEC v. Young*, No. 09 Civ. 1634, 2011 WL 1376045, at *6 (E.D. Pa. Apr. 12, 2011) (granting summary judgment under Advisers Act, Exchange Act, and Securities Act); *SEC v. Rabinovich & Assocs., L.P.*, No. 07 Civ. 10547 (GEL), 2008 WL 4937360, at *3 (S.D.N.Y. Nov. 18, 2008) (same).

### 2. Territorial Reach: The Underlying Securities Transactions Satisfy *Morrison*.

Despite the fact that the conduct at issue involved a defendant who is a United States citizen living in the U.S. (at the time), working as a U.S.-based investment adviser, employed at a U.S.-based venture capital firm, advising U.S. based funds, with a significant number of U.S.-based investors, Defendant and Relief Defendants have suggested that Defendant's misconduct is

beyond the reach of U.S. securities laws under *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010). Any such claim ignores the facts and the law.

*Morrison* held that Section 10(b) of the Exchange Act does not apply extraterritorially because Congress was silent on the matter. 561 U.S. at 265. The Supreme Court thus limited Section 10(b) to fraud connected to domestic transactions. *See Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 67 (2d Cir. 2012). Courts also apply *Morrison* to claims under Section 17(a) of the Securities Act. *See, e.g.*, *SEC v. Tourre*, No. 10 Civ. 3229 KBF, 2013 WL 2407172, at *7 (S.D.N.Y. June 4, 2013).

For transactions that do not involve securities traded on a domestic exchange, the Second Circuit recognizes two ways to locate the transactions in the United States, and thereby subject fraud connected to the transactions to the Exchange Act. *Absolute Activist*, 677 F.3d at 68. A transaction is domestic if "irrevocable liability is incurred" within the United States. *Id.* A transaction also is domestic if title is transferred in the United States. *Id.*

## a. The Oak Funds Incurred Irrevocable Liability Within the United States

Irrevocable liability occurs within the United States when (1) the purchaser incurs irrevocable liability "to take and pay for a security" in the United States; or (2) the seller incurs irrevocable liability to deliver a security in the United States. *Id.* at 68. For example, purchasers incur irrevocable liability once the only circumstances allowing them to revoke their purchases required the occurrence of events "out of their control." *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 2 F. Supp. 3d 550, 561 (S.D.N.Y. 2014), *aff'd in part, appeal dismissed in part sub nom.*, 813 F.3d 98 (2d Cir. 2016).

Courts recognize that modern securities transactions are not completed at one time and at one location. *Butler v. United States*, 992 F. Supp. 2d 165, 178 (E.D.N.Y. 2014) ("The execution

14

of contracts where two parties physically sit in different cities, states, countries, or continents and exchange a document electronically is now a standard way of doing business."). Thus, when locating a transaction that was completed in different locations, it is sufficient that either the purchaser or the seller is located within the United States at the time it incurs irrevocable liability. In *Butler*, for example, the fact that the defendant executed the transaction documents from his New York office was sufficient to establish a domestic transaction. *Id.* at 178 ("[I]t would be unreasonable to consider a transaction foreign just because a foreign [party] executed a contract abroad."); *see also Arco Capital Corp. v. Deutsche Bank AG,* 986 F. Supp. 2d 296, 301 (S.D.N.Y. 2013) (transaction conduct located in Puerto Rico, New York, and London sufficient to allege domestic transaction).

Accordingly, irrevocable liability occurs within the United States when at least one party completes an act in the United States that, according to the terms of the parties' agreement, eliminates that party's discretion to terminate the transaction. *See, e.g.*, *Butler*, 992 F. Supp. 2d at 178; *see also Liberty Media Corp. v. Vivendi Universal, S.A.*, 861 F. Supp. 2d 262, 269 (S.D.N.Y. 2012) ("Although there were conditions to be satisfied before closing and the eventual performance of the Merger Agreement was effectuated by the transfer of a different security than originally intended, this is insufficient to establish that irrevocable liability occurred later."). Here, Oak's presence and practices in the United States make the securities transactions at issue domestic.

Oak and its funds are located in the United States and are operated and advised by partners and employees who work in the United States. At all times relevant to this action, all of Oak's employees worked out of Oak's offices located in the United States. SOF X-18. The Oak funds at issue – Oak Fund IX, XI, XII, and XIII – are all limited partnerships registered in

Delaware. SOF X-19. Oak's investors—a majority of which were located in the United States—invested with the Oak funds by transferring money to Oak funds' bank accounts located in the United States. SOF X-20 to X-21. The Oak funds used the same United States bank accounts as the source of funds for the purchase of securities and as the destination of funds received for the sale of securities. SOF X-22. Oak's partners evaluated and discussed investments at its weekly partner meetings held in Oak's United States offices. SOF X-23. Oak's managing members approved investments from their United States offices. SOF X-24.

Consistent with Oak's basic presence in the United States, the Oak funds entered into securities transactions while located in the United States. To enter into a securities transaction, Oak memorialized an agreement to consummate a purchase or sale in written agreements, typically share purchase agreements, merger agreements, or tender offer agreements. SOF X-25. Oak's legal counsel, also based in Connecticut, negotiated these written agreements on behalf of the respective Oak funds while located in Connecticut. SOF X-26. Oak project managers signed the written agreements while located in the United States. SOF X-27. By entering into these agreements as a purchaser, the Oak funds agreed to pay for and take securities if the seller satisfied certain conditions. As a seller, the Oak funds agreed to deliver securities upon receipt of payment. Thus, Oak funds incurred the obligation to effectuate securities transactions in the United States by executing the agreements in United States, which is sufficient to locate the transactions in the United States under *Absolute Activist* and *Morrison*. *See, e.g.*, *Liberty Media*, 861 F.Supp.2d at 269 ("Irrevocable liability was incurred when the Merger Agreement was executed….[t]he binding obligation to effectuate the merger and the exchange for … securities occurred" on that date.).

In addition, the agreements required the parties to consummate the transaction once the seller delivered notice that necessary closing conditions have been satisfied. SOF X-28. The respective Oak funds and their counsel received (as a buyer) or delivered (as a seller) the notices required to trigger closing obligations while located in Oak's Connecticut offices. SOF X-29. Thus, the Oak funds incurred their obligations to close each transaction while located in the United States because (1) the Oak funds had no obligation to close until they received (as a buyer) or sent (as a seller) the required notice; and (2) Oak received and sent these notices while located in Connecticut. Incurring the obligation to close a transaction while located in the United States also is sufficient to locate the transactions in the United States under *Absolute Activist* and *Morrison*. *See Adderley v. Dingman*, No. 15 CIV. 9935 (NRB), 2017 WL 1319819, at *7 (S.D.N.Y. Mar. 29, 2017) (Irrevocable liability to perform a purchase and sale agreement is incurred upon satisfaction of conditions precedent.); *Arco Capital Corps. Ltd. v. Deutsche Bank AG*, 949 F. Supp. 2d 532, 543 (S.D.N.Y. 2013) (Irrevocable liability incurred when the issuer "no longer had the discretion to revoke acceptance" under the terms of the parties' agreement.).

Finally, the transfer of money always included United States banks. When an Oak fund was a purchaser, Oak transferred the purchase payment from its bank in the U.S. SOF X-30. While located in Connecticut, Oak representatives directed the Oak funds' bank to transfer money. SOF X-30. When an Oak fund was a seller, Oak received the purchase payment in a bank account located in the United States. SOF X-30. Although not "the *sine qua non* of irrevocable liability," evidence that parties exchanged money in the United States supports the conclusion that irrevocable liability occurred in the United States. *Loginovskaya v. Batratchenko,* 936 F. Supp. 2d 357, 374 (S.D.N.Y. 2013); *see also United States v. Vilar*, 729 F.3d 62, 78 (2d Cir. 2013) ("[F]acts concerning the formation of the contracts and the exchange of money, … are

precisely the sort that we indicated may suffice to prove that irrevocable liability was incurred in the United States.") (quotation omitted).

In sum, the undisputed evidence is that the Oak funds formed contracts, incurred closing obligations, and transferred or received money while in the United States, particularly since Defendant has invoked his Fifth Amendment rights and refused to respond to allegations or answer any questions regarding the domestic nature of the transactions at issue in this case. SOF X-1. This evidence is sufficient to locate transactions in the United States under *Morrison*.

> **b.      The Transfer of Title Can Locate Transactions in the United States.**

The Oak fund's transactions also are domestic because title transfer occurred in the United States. *Absolute Activist*, 677 F.3d at 68 ("[A] sale of securities can be understood to take place at the location in which title is transferred.") (citing *Quail Cruises Ship Mgmt. Ltd. v. Agencia de Viagens CVC Tur Limitada*, 645 F.3d 1307, 1310–11 (11th Cir. 2011)). The transfer of title in the United States can satisfy *Morrison* even where the underlying stock purchase agreement is otherwise located abroad. In *Quail Cruises*, the parties to a share purchase agreement signed the agreement in the parties' respective offices located in Spain and Uruguay. *Quail Cruises Ship Mgmt. Ltd. v. Agencia de Viagens CVC Tur Limitada*, 732 F. Supp. 2d 1345, 1349 (S.D. Fla. 2010), *vacated and remanded*, 645 F.3d 1307 (11th Cir. 2011). The agreement required notices, consents, and waivers or other communications pursuant to the agreement to be sent and delivered to the parties' respective offices in Spain and Uruguay, *id.*, but the agreement also required the stock transfer documents to be delivered to an office in Miami, and the plaintiff alleged that the stock transfer documents were actually delivered to Miami. *Quail Cruises*, 645 F.3d at 1310. The court held that the actual delivery of stock transfer documents to the United States, with nothing more, satisfied *Morrison*. *Id.* at 1310-1311. The Second Circuit endorsed

this holding in *Absolute Activist* as an alternative ground to locate a securities transaction. *Absolute Activist*, 677 F.3d at 68.

Nearly all of the underlying securities transactions here can be located in the United States based on the fact that the respective Oak funds received title in Connecticut or sent title from Connecticut. As in *Quail Cruises*, the stock purchase agreements required the seller to deliver to the buyer evidence of share ownership. SOF X-31. The undisputed evidence shows that the parties to these transactions did not transfer title while located in the same office but, rather, transferred title by mail to the parties' respective offices. SOF X-32. Thus, when an Oak fund acted as a purchaser, and a seller delivered proof of ownership to Oak, the certificates evidencing ownership of stock were sent to Oak's office in Connecticut. SOF X-32. Similarly, when an Oak fund transferred title as a seller, Oak did so from its Connecticut office. SOF X-32. Thus, regardless of where irrevocable liability was incurred, transactions can be located in the United States based on where the seller delivered evidence of ownership to Oak's office in Connecticut and where Oak delivered evidence of ownership to the purchaser from its office in Connecticut. *Quail Cruises*, 645 F.3d at 1310.

Lastly, the SEC detailed the domesticity of each of the transactions below in the Second Amended Complaint. Oak confirmed the accuracy of these allegations. SOF X-33.

### 3.    The Conduct-or-Effects Test Applies to Conduct After Dodd-Frank.

Although the SEC can establish on summary judgment that all underlying transactions are domestic under *Morrison*, the SEC need only satisfy the conduct-or-effects test for transactions that occurred after Congress enacted Dodd-Frank. Under the conduct-or-effects test, the SEC must show that sufficient wrongful conduct occurred in the United States or that the wrongful conduct had a "substantial effect within the United States." 15 U.S.C. § 78aa(b); *See* 15

19

U.S.C. § 77v(c); 15 U.S.C. § 80b-14(b). Thus, for all conduct occurring after July 21, 2010, the relevant question is whether the conduct occurred in or had a substantial effect in the United States. As detailed below, it plainly did: Defendant, a U.S.-based investment adviser, engaged in fraudulent conduct while employed at a U.S.-based venture capital firm that defrauded Oak's funds and their (majority) U.S.-based investors using fictitious accounts at a U.S.-based bank and funneled the proceeds into account at other U.S.-based financial institutions.

Congress codified the jurisdictional "conduct-or-effects test" employed by federal courts prior to *Morrison* through express language confirming that extraterritoriality is a jurisdictional matter and defining the scope of that subject-matter jurisdiction by the conduct-or-effects test in actions brought by the SEC:

**(b) Extraterritorial jurisdiction**

[Federal courts] shall have jurisdiction of an action … brought … by the Commission … alleging a violation of [Section 10(b)] involving

(1) conduct within the United States that constitutes significant steps in furtherance of the violation, even if the securities transaction occurs outside the United States and involves only foreign investors; or

(2) conduct occurring outside the United States that has a foreseeable substantial effect within the United States.

15 U.S.C. § 78aa(b) (emphasis added). Congress added the same provisions to the Securities Act and the Advisers Act. *See* 15 U.S.C. § 77v(c) ("Extraterritorial jurisdiction" under Securities Act); 15 U.S.C. § 80b-14(b) ("Extraterritorial jurisdiction" under Advisers Act).

The only federal court to squarely resolve this issue agrees that the express jurisdictional language in Dodd-Frank overcomes the Congressional silence in the version of the Exchange Act interpreted by the Supreme Court in *Morrison*. *SEC v. Traffic Monsoon, LLC*, No. 2:16-CV-00832-JNP, 2017 WL 1166333, at *10-12 (D. Utah Mar. 28, 2017). In *Traffic Monsoon*, the

court interpreted Dodd-Frank in light of the pre-Dodd-Frank legal landscape, the Dodd-Frank legislative history, and the express statutory text in Dodd-Frank that Congress sought to strengthen enforcement by the SEC, as well as jurisdictional text that would be meaningless "unless Congress also intended that these statutes be applied extraterritorially." *Id.* *10-12; *see also Meng-Lin Liu v. Siemens A.G.*, 978 F. Supp. 2d 325, 328 (S.D.N.Y. 2013) ("Section 929P(b) permits the SEC to bring enforcement actions for certain conduct or transactions outside the United States."). Accordingly, *Morrison* applies only to conduct that occurred prior to July 21, 2010 (the effective date of Dodd-Frank). *Tourre*, 2013 WL 2407172 at *1 ("Because the Dodd–Frank Act effectively reversed *Morrison* in the context of SEC enforcement actions, the primary holdings of this opinion affect only pre-Dodd Frank conduct."). Where applicable, the conduct-or-effects test is easily satisfied here for each violation because Defendant engaged in the wrongful conduct from his Connecticut office and the wrongful conduct had a substantial effect on Oak and the Oak fund's United States investors. *See, e.g.,* SOF X-5, X-8, X-18 – X-20.

## III.   THE COMMISSION IS ENTITLED TO SUMMARY JUDGMENT ON ITS FRAUD CLAIMS AGAINST DEFENDANT.

Defendant's fraudulent scheme encompassed committed twenty specific transactions, each of which violated the antifraud provisions of the federal securities laws. The frauds occurred in connection with transactions for the purchase and sale of securities in ten separate companies (Companies A-J). As described below, the undisputed facts entitle the SEC to summary judgment as to Defendant's liability under the first five claims for relief of the Second Amended Complaint against Defendant.[11]

---

[11] The SEC's Motion for Partial Summary Judgment details the specific provisions that each fraudulent transaction violated.

A.      **Defendant's Secret Bank Accounts.**

To carry out his scheme, Defendant covertly opened Bank of America accounts that he

deceptively titled in Oak's name or in various company names. SOF X-3. Though titled in names

of various companies, Defendant alone controlled each account. SOF X-3. The accounts include:

**Secret BOA Accounts**

| Account Name[12] | Date Opened | Number | Defined Term |
|---|---|---|---|
| Iftikar Ali Ahmed Sole Prop dba OIP Advisors | --- | x9310 | BOA OIP Advisors Account |
| Iftikar Ali Ahmed d/b/a Company E | 1/26/05 | x7717 | BOA Company E Account |
| Company D | 6/26/06 | x2349 | BOA Company D Account |
| Company G | 12/18/07 | x9887 | BOA Company G Account 1 |
| Iftikar Ali Ahmed Sole Prop dba Company G | 10/17/11 | x6367 | BOA Company G Account 2 |
| Iftikar Ali Ahmed Sole Prop dba BVI Company | 10/10/13 | x3640 | BOA BVI Company Account |
| I-Cubed Domains LLC | 10/28/14 | x8384 | BOA I-Cubed Account |

As described in detail below, Defendant funneled money he misappropriated from the various

Oak funds and their investors through these accounts and into his own personal bank accounts.

B.      **Frauds Connected to Company D.**

1.      **Summary of Material Undisputed Facts – Company D.**

As an investment adviser to the Oak funds, Defendant used misstatements, omissions,

and/or other fraudulent means to misappropriate money in connection with Oak Fund IX's

purchase and sale of Company D shares. Oak Fund IX purchased and sold Company D shares

through a special purpose vehicle based in the Netherlands named A. Bohl Praktijk B.V.

("BPBV") and Defendant had substantial responsibilities in connection with this investment.

---

[12] The actual names of the companies have been replaced with the designations used in the Amended Complaint
(i.e., Company D, Company E, Company G and BVI Company). For example, when the Account Name is listed as
"Company D", the account was actually opened in the name of the company that is designated by Company D.

SOF D-1, D-6. In connection with these transactions, Defendant misappropriated money from Oak Fund IX four different times by causing money to be transferred to his secret bank accounts and then transferring it to his joint bank accounts that he held with his wife, Relief Defendant Shalini Ahmed. In his Answer, deposition, and in response to discovery, Defendant invoked his Fifth Amendment right against self-incrimination in response to every allegation and substantive question. SOF X-1.

$650,000 for Management Fee. In December 2004, Oak Fund IX purchased Company D shares. SOF D-1. In connection with that purchase, Defendant negotiated a letter agreement with Company D that replaced the annual dividend provisions in the deal's term sheet with a one-time management fee of $600,000 to be paid to Oak Fund IX by Company D. SOF D-2. After receiving instructions from Defendant to wire the money to a Fleet Bank account number x9310 in the name of OIP Advisors, Company D confirmed, in a January 5, 2005 email, that it would wire $600,000 the following day. SOF D-3. On January 7, 2005, Defendant received a revised agreement reflecting a $50,000 increase in the management fee to be paid by Company D. SOF D-4. On January 11, 2005, Defendant emailed Company D stating "[s]ame instructions as last time" and, three days later, Company D confirmed that it had wired $50K that day. SOF D-4.

In fact, the account that Defendant provided Company D was not an Oak account. SOF D-5. Rather, Defendant had previously opened a Fleet Bank account ending in numbers x9310 in the name of "Ifitkar Ali Ahmed dba OIP Advisors", and that account became Bank of America account ending in numbers x9310 (the "BOA OIP Advisors Account"). SOF D-5.

$1,800,000 Overpayment for Fees. In May 2006, Oak Fund IX sold a portion of its Company D shares and subsequently exited its investment in Company D by distributing Company D shares to its investors in January and March 2007. SOF D-6. Defendant had

substantial responsibilities in connection with Oak Fund IX's exit from the Company D investment in 2006 and 2007. SOF D-6.

Pursuant to the Share Purchase Agreement, Oak Fund IX agreed to pay the fees and expenses of a broker (the "Investment Bank") in connection with the transaction. SOF D-7. On June 26, 2006, Defendant received a $1.2 million invoice from the Investment Bank for advisory services related to the sale of the shares. SOF D-8, D-9.

On or about June 26, 2006, Defendant opened a Bank of America account number x2349 in the name of Company D (the "BOA Company D Account"). SOF D-10. Defendant was listed as the sole authorized representative on the account. SOF D-10. Company D did not actually have an account at Bank of America. SOF D-6.

On July 3, 2006, BPBV wired $3 million to Defendant's BOA Company D Account for advisory fees charged by the Investment Bank. SOF D-11. On that same day, $1.2 million was transferred to Defendant's BOA OIP Advisors Account, and $1.8 million was transferred to his joint bank account that he held with his wife, Relief Defendant Shalini Ahmed. SOF D-11. On July 5, 2006, $1.2 million was transferred from Defendant's BOA OIP Account to an account for the Investment Bank. SOF D-11. Neither Oak nor BPBV made any transfers during 2006 to Company D or the Investment Bank, after the July 3, 2006 transfer of the $3 million. SOF D-12.

$6,600,000 Payment for Purported Taxes. In January 2007, Defendant requested that Oak Fund IX make a $6.6 million payment for a Korean tax obligation related to the 2006 sale of Company D shares. SOF D-13. Defendant submitted a wire transfer request with an invoice on Company D letterhead and included that wire transfer instructions for Defendant's BOA Company D Account. SOF D-13. The Company D invoice was not from Company D. SOF D-6.

On January 26, 2007, Oak Fund IX wired a total of $6.6 million to BPBV which, in turn, on January 29, 2007, wired $6.6 million to Defendant's BOA Company D Account. SOF D-14. On that same date, nearly $6.6 million was transferred from Defendant's BOA Company D Account to a joint bank account that he held with his wife, Relief Defendant Shalini Ahmed. SOF D-14. Contrary to Defendant's instructions, Oak is not aware of any document suggesting that Korean capital gains taxes were in fact assessed on the sale of the shares or that there was any legitimate reason for the $6.6 million payment that Defendant directed Oak Fund IX to make in January 2007. SOF D-15.

$800,528.81 Payment for Purported Taxes. On August 21, 2007, Defendant presented Oak Fund IX with a wire transfer request for another invoice on Company D letterhead seeking payment of $800,528.81 in "[t]ransaction fees to be paid to the Korean Tax Authority" in connection with Oak Fund IX's 2007 distribution of Company D shares. SOF D-16. The invoice provided wire transfer instructions for payment to Defendant's BOA Company D Account. SOF D-16. The Company D invoice was not from Company D. SOF D-6.

On August 21, 2007, Oak Fund IX wired a total of $800,528.81 to Defendant's BOA Company D Account. SOF D-17. None of this money was transferred to Company D; rather, the money (minus a $30.00 wire transfer fee) was transferred to a joint bank account that he held with his wife, Relief Defendant Shalini Ahmed. SOF D-17.

Oak is not aware of any document or other evidence to suggest that Company D paid $800,528.81 (or any other amount) in securities transaction taxes to the Korean tax authorities in connection with Oak Fund IX's March 2007 distribution of Company D shares. SOF D-18.

**2.   Defendant Violated the Antifraud Provisions of the Advisers Act, Exchange Act, and Securities Act.**

Defendant's conduct in connection with Oak Fund IX's purchase and sale of Company D shares violated the antifraud provisions of the Advisers Act, the Exchange Act, and the Securities Act. The court should grant summary judgment finding Defendant liable for this misconduct.

As described above, the undisputed facts show that Defendant engaged in fraudulent acts and made misrepresentations in connection with Company D. For example, he misrepresented to Company D that it was making $650,000 in payments to Oak Fund IX for a one-time management fee in connection with Oak Fund IX's purchase of Company D shares, concealed his request from Oak, and personally kept the money. In addition, he misrepresented to Oak Fund IX that the fees and expenses owed to the Investment Bank for its services in connection with the sale of Company D shares was $1,800,000 more than it really was, and Defendant personally kept the extra money. Furthermore, Defendant misrepresented to Oak Fund IX that it owed $6,600,000 for taxes in connection with Oak Fund IX's sale of Company D shares, and Defendant personally kept the money. Finally, Defendant misrepresented to Oak Fund IX that it owed an additional $800,528.81 for taxes in connection with Oak Fund IX's sale of Company D shares, and Defendant personally kept the money.

Defendant also engaged in fraudulent acts and used deceptive devices to perpetrate his scheme. He provided Company D with fraudulent wiring instructions, provided Oak Fund IX with fraudulent invoices and fraudulent wiring instructions, directed funds to his secret BOA OIP Advisors Account and his secret BOA Company D Account, and transferred the funds to his personal accounts. Moreover, there can be no dispute that Defendant acted with scienter: he directed the funds to his secret bank accounts in OIP's and Company D's name and then transferred the money into his own personal accounts.

26

Finally, each statutory element is undisputedly met. For purposes of Section 206, Defendant is an investment adviser, *see supra* Section II.A.2, and his siphoning funds that properly belonged to Oak Fund IX breached his fiduciary duties and defrauded the fund (his client) – violating both Sections 206(1) and (2).[13] For purposes of Section 10(b) and Rule 10b-5, Defendant's conduct was in connection with the purchase and sale of securities: contemporaneously with the Company D transactions and by exploiting provisions in the securities transaction agreements, Defendant illicitly obtained fees that belonged to Oak Fund IX (*e.g*, management fees, overpayment of advisory fees, and purported Korean taxes that were never due) in connection with those securities transactions. *See, e.g.*, *SEC v. Ramoil Management, Ltd.*, 2007 WL 3146943, *8 (S.D.N.Y. Oct. 25, 2007) ("in connection with" element met if conduct "'somehow touches upon' or has 'some nexus' with 'any securities transaction'") (quoting *SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1362 (9th Cir. 1993)). And Defendant's 2006 and 2007 conduct was related to the sale of securities for purposes of Section 17(a): again, Defendant created false invoices for fees purportedly related to the 2006 sale and 2007 distribution of the Company D securities to illicitly obtain monies from Oak Fund IX. *See, e.g.*, *SEC v. Cole*, 2015 WL 5737275, at *7 (S.D.N.Y. Sept. 19, 2015) ("In addressing Section 17(a)'s requirements that fraud occur 'in' the 'offer' or 'sale' of securities, the Supreme Court has explained that 'Congress expressly intended to define [these statutory terms] broadly' and that these terms 'are expansive enough to encompass the entire selling process.'")(quoting *United States v. Naftalin*, 441 U.S. 768, 773, (1979)). Finally, the securities transactions involving Company D are domestic under *Morrison*. *See supra* Section II.B.2.

---

[13] The SEC does not allege that Defendant violated Section 206(4) or Rule 206(4)-8 with respect to this conduct because it all occurred before Rule 206(4)-8 become operative on September 10, 2007.

C.      **Frauds Connected to Company E.**

1.      **Summary of Material Undisputed Facts – Company E.**

Defendant continued his illicit scheme with respect to Oak Fund XI's investment in Company E. Specifically, as an investment adviser to the Oak funds, Defendant used misstatements, omissions, and/or other fraudulent means to misappropriate money in connection with Oak Fund XI's purchase of Company E shares. In connection with this transaction, Defendant misappropriated money from Oak Fund XI two different times by causing money to be transferred to Defendant's secret bank accounts: (1) Company E's payment of $1.36 million to Defendant that should have gone to Oak Fund XI, which resulted from Defendant misrepresenting the exchange rate that should have gone to Oak Fund XI, and (2) Company E's transfer of $92,285.15 for legal fees that should have gone to Oak Fund XI. After this money was moved to his secret bank accounts, Defendant transferred it to joint bank accounts that he held with his wife, Relief Defendant Shalini Ahmed. In his Answer, deposition, and in response to discovery, Defendant invoked his Fifth Amendment right against self-incrimination in response to every allegation and substantive question. SOF X-1.

$1,360,000 Overpayment Due to Exchange Rate. Defendant recommended to Oak's managing Partners that Oak Fund XI purchase Company E shares for 17 million Euros. SOF E-1. In his recommendation, Defendant used an exchange rate of 1.30 dollars to Euros to convert the purchase price to a total of $22.1 million. SOF E-2. Defendant instructed Oak Fund XI to fund the $22.1 million purchase with two separate transfers: (1) $20.74 million to an account of Company E; and (2) $1.36 million to Defendant's BOA Company E Account. SOF E-3. The account of Company E appears in the final version of the written agreement for the deal and in

28

an email from Company E to Defendant providing payment instructions. SOF E-3. Defendant's BOA Company E Account appears in neither. SOF E-3.

The complete name on the BOA Company E Account was "Iftikar A. Ahmed d/b/a [Company E] USA," which created the false appearance that Company E owned an interest in the account. SOF E-4. In the written wiring instructions for Oak Fund XI's purchase of Company E shares, Defendant represented the account name as "[Company E] USA" and did not state in any manner that he owned or had a personal interest in the account. SOF E-4. Three days later on July 29, 2005, Oak Fund XI made the transfers requested by Defendant. SOF E-4.

Although Defendant represented to Oak Fund XI that the purchase price of 17 million Euros was equivalent to $22.1 million – an exchange rate of 1.30 dollars to Euros – Defendant knew at the time that the exchange rate was actually closer to 1.2 dollars to Euros. Defendant stated as much in an email to Company E dated August 2, 2005, where he told Company E that the actual exchange rate at the time of Oak Fund XI's transfer "was more like 1.21," and Defendant "did the calculations at 1.22 assuming some maring [sic] for movement" to arrive at the $20.74 million amount transferred by Oak Fund XI to the seller. SOF E-5.

Thus, Company E agreed to a purchase price of $20.74 million but, as a result of Defendant's fraud, Oak Fund XI paid $22.1 million and Defendant diverted the difference of $1.36 million to Defendant's BOA "Company E" Account. Company E never received the additional $1.36 million and Defendant never returned the $1.36 million to Oak Fund XI or otherwise advised Oak of the overpayment. SOF E-6. Defendant quickly transferred a total of $1,358,188 from the BOA Company E Account to two of his personal accounts. SOF E-8.

$92,285.15 for Legal Fees. Defendant also used the BOA OIP Advisors Account to defraud Oak Fund XI out of funds intended to reimburse Oak Fund XI for legal fees owed in

connection with the purchase of shares of Company E. Soon after the transaction, Company E

notified Defendant of a shortfall in the purchase price and then accepted Defendant's suggestion

that Oak Fund XI pay the shortfall of €19,486 with a setoff against the amount Company E owed

Oak Fund XI for legal expenses under the Investment Agreement. SOF E-7.

      Unbeknownst to Oak Fund XI, Defendant then directed the seller to send the

reimbursement (less the shortfall in the purchase price) to Defendant's BOA OIP Advisors

Account, which Defendant set up to divert money from the Oak funds. SOF E-9. The seller

complied with Defendant's direction and transferred the equivalent of $92,285.15 to Defendant's

OIP Account on November 11, 2005. SOF E-10. Defendant did not return this money to Oak

Fund XI or the seller or advise Oak of the payment in any way. Instead, just three days after the

transfer to the OIP Account, Defendant transferred the funds from the BOA OIP Advisors

Account to his personal account. SOF E-10.

### 2. Defendant Violated the Antifraud Provisions of the Advisers Act and Exchange Act.

      Defendant violated Sections 206(1) and 206(2) of the Advisers Act and Section 10(b) of

the Exchange Act by operating fraudulent schemes to divert Oak Fund XI's money.

      The undisputed facts show that Defendant engaged in fraudulent acts and made

misrepresentations in connection with Company E. For example, he diverted Oak Fund XI's

money by misrepresenting the actual purchase price of shares and then directing Oak Fund XI to

transfer the overpayment to his personal account that he opened in the name of Company E.

Corroborating his guilty knowledge, Defendant acknowledged to Company E that the effective

exchange rate for the purchase was 1.2214 dollars to Euros within days after he caused Oak Fund

XI to transfer an amount calculated with the 1.30 rate that Defendant provided to Oak Fund XI.

Defendant then concealed the discrepancy from Oak Fund XI. After directing that the

overpayment be sent to his BOA Company E Account, Defendant quickly transferred the bulk of the money into his personal accounts. In addition, Defendant diverted money that was intended to be, and should have been, used to reimburse Oak Fund XI's of legal fees associated with its purchase of Company E shares. Instead of directing the money be sent to Oak Fund XI's account, Defendant directed they be sent to his BOA OIP Advisors Account. Evidence that Defendant deliberately created two separate bank accounts with misleading appearances and used those accounts to induce Oak Fund XI and Company E to divert money to bank accounts he held jointly with his wife confirms that Defendant purposefully defrauded Oak Fund XI and its investors.

Finally, each statutory element is undisputedly met. For purposes of Section 206, Defendant is an investment adviser, *see supra* Section II.A.2, and his siphoning funds that properly belonged to Oak Fund XI breached his fiduciary duties and defrauded the fund (his client) – violating Sections 206(1) and 206(2).[14] For purposes of Section 10(b) and Rule 10b-5, Defendant's conduct was in connection with the purchase and sale of securities: contemporaneously with the Company E transactions, and exploiting provisions in the securities transaction agreements, Defendant illicitly obtained funds intended for the purchase of shares and fees that belonged to Oak Fund XI. *See, e.g.*, *Ramoil Management*, 2007 WL 3146943 at *8. And, the securities transaction involving Company E is domestic under *Morrison*. *See supra* Section II.B.2.

---

[14] The SEC does not allege that Defendant violated Section 206(4) or Rule 206(4)-8 with respect to this conduct because it all occurred before Rule 206(4)-8 become operative on September 10, 2007.

### D.      Frauds Connected to Company J.

#### 1.      Summary of Material Undisputed Facts – Company J.

Defendant continued his illicit scheme with respect to Oak Fund XI's investment in

Company J. Specifically, as an investment adviser to the Oak Fund XI, Defendant made

misrepresentations and omissions and engaged in deceptive conduct that caused Company J to

send to Defendant $1.8 million that should have been paid to the fund in connection with its

purchase of Company J shares. In his Answer, deposition, and in response to discovery,

Defendant invoked his Fifth Amendment right against self-incrimination in response to every

allegation and substantive question. SOF X-1

$1,800,000 Dividend Payment. Oak Fund XI entered into a Stock Purchase Agreement

dated April 7, 2006, in which it agreed to purchase from Company J (a Delaware corporation)

15,000 shares of its Series A Preferred Stock. SOF J-1. Defendant worked on Oak Fund XI's

purchase of Company J shares. SOF J-2. The Share Purchase Agreement stated that Company J

would use the proceeds from the sale of the stock to, among other things, fund the payment of a

one-time special dividend of $1.8 million to Oak Fund XI. SOF J-3-J-4.

Unbeknownst to Oak Fund XI, Defendant directed Company J to send the dividend to

Defendant's BOA OIP Advisors Account, which Defendant set up to divert monies from Oak.

SOF J-5. Company J complied with Defendant's direction and transferred $1.8 million to

Defendant's OIP Account on May 1, 2006. SOF J-6. Defendant did not return this money to Oak

Fund XI or Company J or advise Oak of the payment in any way. Instead, seven weeks later,

Defendant transferred the $1.8 million from the BOA OIP Advisors Account to a joint bank

account that he held with his wife, Relief Defendant Shalini Ahmed. SOF J-7.

### 2. Defendant Violated the Antifraud Provisions of the Advisers Act and the Exchange Act.

Defendant's conduct in connection with the Oak Fund XI's purchase of Company J shares violated the antifraud provisions of Advisers Act and the Exchange Act. The Court should grant summary judgment finding Defendant liable for this misconduct.

The undisputed facts show that Defendant engaged in fraudulent acts and made misrepresentations in connection with Company J. For example, he misrepresented to Company J that the one-time special dividend, which was required under the stock purchase agreement, was in fact being directed into Defendant's personal bank account and not an account of Oak Fund XI and that he would keep the money for himself. Defendant also engaged in fraudulent acts and used deceptive devices to perpetrate his scheme. He provided Company J with fraudulent wiring instructions, directed funds to his fraudulent BOA OIP Advisors Account, and rather than return the money, he transferred it to a joint bank account that he held with his wife, Relief Defendant Shalini Ahmed. There can be no dispute that Defendant acted with scienter: he directed money that was intended for, and belonged to, Oak Fund XI into bank account that he opened in Oak's name, failed to disclose this to either Company J or Oak Fund XI, and then diverted the money into his own pocket.

Finally, each statutory element is undisputedly met. For purposes of Section 206, Defendant is an investment adviser, *see supra* Section II.A., his siphoning funds belonging to Oak Fund XI defrauded the fund (his client) and the fund's investors.[15] For purposes of Section 10(b) and Rule 10b-5, Defendant's conduct was in connection with the purchase and sale of securities: contemporaneously with the Company J transaction, and exploiting provisions in the securities transaction agreements, Defendant illicitly obtained the one-time special dividend to

---

[15] The SEC does not allege that Defendant violated Rule 206(4)-8 with respect to the April – June 2006 conduct, since Rule 206(4)-8 did not become operative until September 10, 2007.

which Oak Fund XI was entitled in connection with its securities transaction with Company J. *See, e.g.*, *SEC v. Ramoil Management, Ltd.*, 2007 WL 3146943 at *8. And the securities transaction involving Company J is domestic under *Morrison*. *See supra* Section II.B.2.

     **E.**    **Frauds Connected to Company F.**

        **1.**    **Summary of Material Undisputed Facts – Company F.**

Defendant continued his illicit scheme with respect to Oak Fund XII's investment in Company F. Specifically, Defendant made misrepresentations and omissions and engaged in deceptive conduct that caused Company F to send to Defendant hundreds of thousands of dollars that should have been paid to Oak Fund XII in connection with the fund's purchase and later sale of Company F's shares. In his Answer, deposition, and in response to discovery, Defendant invoked his Fifth Amendment right against self-incrimination in response to every allegation and substantive question. SOF X-1

$250,030 for Legal Fees. In February 2007, Oak Fund XII invested in shares of Company F. SOF F-1. Company F was required to reimburse Oak Fund XII for its legal fees in connection with the share purchase, up to $250,000. SOF F-2. Oak Fund XII paid its legal fees directly. SOF F-2. Defendant advised Company F to send the legal fees reimbursement to his BOA OIP Advisors Account, which Company F did. SOF F-3 to F-4. Defendant then wired those funds to a joint bank account that he held with Relief Defendant Shalini Ahmed. SOF F-4.

$516,417.10 for Legal Fees. Later in 2007, Oak Fund XII sold its shares in Company F. SOF F-5. Similar to the initial share purchase agreement, the sale agreement related to this transaction provided that the acquiring company would pay the seller's transaction expenses, up to a cap of $500,000. SOF F-5. And similar to the initial share purchase, Oak Fund XII paid its own legal fees. SOF F-5. Once again, however, Defendant advised Company F to send Oak Fund

XII's reimbursement of legal fees to his BOA OIP Advisors Account, which Company F did. SOF F-6 to 7. Just as in June 2007, Defendant did not provide the legal fees to Oak Fund XII, but rather wired those funds to a joint bank account that he held with Relief Defendant Shalini Ahmed. SOF F-8.

2.    **Defendant Violated the Antifraud Provisions of the Advisers Act, Exchange Act, and Securities Act.**

Defendant's conduct in connection with Oak Fund XII's purchase and sale of Company F shares - which involved fraudulent conduct as well as misrepresentations – violated the antifraud provisions of Advisers Act, the Exchange Act, and the Securities Act. The Court should grant summary judgment finding Defendant liable for this misconduct.

The undisputed facts show that Defendant engaged in fraudulent acts and made misrepresentations in connection with Company F. For example, he misrepresented to Company F that the payments they it made were for reimbursement of Oak Fund XII's legal fees, when in fact Defendant personally kept the money. Defendant also engaged in fraudulent acts and used deceptive devices to perpetrate his scheme. He provided Company F with fraudulent wiring instructions, directed funds to his secret BOA OIP Advisors Account, and transferred the funds to his personal bank account. Moreover, there can be no dispute that Defendant acted with scienter: he directed the funds to a fraudulent bank account in Oak's name and then diverted the money into his own pocket.

Finally, each statutory element is undisputedly met. For purposes of Section 206, Defendant is an investment adviser. *See supra* Section II.A.2. His siphoning funds that properly belonged to Oak Fund XII breached his fiduciary duties and defrauded the fund (his client) – violating Sections 206(1) and (2) – and the fund's investors – violating Section 206(4) and Rule

206(4)-8.[16] For purposes of Section 10(b) and Rule 10b-5, Defendant's conduct was in connection with the purchase and sale of securities: contemporaneously with the Company F transactions, and exploiting provisions in the securities transaction agreements, Defendant illicitly obtained reimbursement of legal fees Oak Fund XII had incurred in connection with those securities transactions. *See, e.g.*, *Ramoil Management*, 2007 WL 3146943 at *8. The securities transactions involving Company F are domestic under *Morrison*. *See supra* Section II.B.2. And with respect to Defendant's October 2007 conduct, that conduct was related to the sale of securities for purposes of Section 17(a): again, Defendant exploited a provision of the agreement governing the sale of the securities to illicitly obtain legal fees Oak Fund XII incurred during the sale of the fund's Company F shares.[17] *See, e.g.*, *Cole*, 2015 WL 5737275, at *7.

### F.     Frauds Connected to Company G.

#### 1.      Summary of Material Undisputed Facts – Company G.

Defendant continued his illicit scheme with respect to Oak Fund XII's investment in Company G. Specifically, as an investment adviser to the Oak funds, Defendant made misrepresentations, omissions, and engaged in deceptive conduct that caused Oak Fund XII to send Defendant millions of dollars belonging to the fund in connection with its purchase and sale of Company G shares. Oak Fund XII purchased and sold these Company G shares through its affiliated entity Oak Asia Infrastructure, LLC. SOF G-1. Specifically, with respect to these transactions, Defendant recommended and/or signed the agreements on behalf of Oak Fund XII or its affiliate. SOF G-2, G-7 and G10. In connection with these transactions, Defendant misappropriated money from Oak Fund XII five different times by causing money to be

---

[16] The SEC does not allege that Defendant violated Rule 206(4)-8 with respect to the June 2007 conduct, since Rule 206(4)-8 did not become operative until September 10, 2007.

[17] The SEC does not allege that Defendant violated Section 17(a) with respect to the June 2007 conduct.

transferred to Defendant's secret bank accounts and then transferring it to his joint bank accounts that he held with his wife, Relief Defendant Shalini Ahmed. In his Answer, deposition, and in response to discovery, Defendant invoked his Fifth Amendment right against self-incrimination in response to every allegation and substantive question. SOF X-1.

$4,701,050.56 for Inflated Purchase Price. As part of Oak Fund XII's 2007 purchase of Company G shares, Defendant proposed that Oak Fund XII invest 40 billion Korean Won in Company G shares. SOF G-2. After the investment was approved, Defendant presented wire transfer instructions showing that Oak Fund XII was buying 2,348,904 shares for a total price of $47.5 million. SOF G-2. In accordance with Defendant's instructions, Oak Fund XII wired $45 million to a Korea Exchange Bank account and the remaining $2.5 million to a Bank of America account ending in numbers x9887 in the name of "Company G" (the "BOA Company G Account 1"). SOF G-2. That account did not belong to Company G. SOF G-17.

Defendant knew that the purchase price for the Company G shares would be less than $45 million, and he instructed that the $2,201,106.11 in excess funds be sent to his BOA OIP Advisors Account. SOF G-3. On January 9, 2008, Korea Exchange Bank wired $2,201,070.56 to his BOA OIP Advisors Account. SOF G-4. Oak has no record of receiving that money or any other amount back from the $45 million Oak Fund XII wired on December 18, 2007. SOF G-4.

On December 18, 2007, Defendant opened BOA Company G Account 1 and that account received a $2,500,000 wire from Oak Fund XII referencing Company G. SOF G-5. On that same day, that money was then transferred to a joint bank account that he held with his wife, Relief Defendant Shalini Ahmed. SOF G-5. On January 9, 2008, Defendant's BOA OIP Account received a $2,201,050.56 wire, and the next day that money was then transferred to a joint bank account that he held with his wife, Relief Defendant Shalini Ahmed. SOF G-6.

On four separate occasions from 2009 to 2013, Defendant presented requests for Oak Fund XII to make payments purportedly to Company G with an invoice that appeared to be on Company G letterhead. Each invoice was submitted with a wire request and contained wire transfer instructions directing that payment be remitted to one of two Bank of America accounts in the name of Company G. In each instance, Oak Fund XII made the payments as requested by Defendant. However, the four Company G invoices were bogus, Defendant's BOA Company G Accounts did not belong to Company G, and Company G never received the funds mentioned above. SOF G-17.

$2,101,185.45 Payment for Purported Fees. In 2009, Oak Fund XII participated in a tender offer for Company G that resulted in the company being taken private and delisted, and Defendant signed the Tender Offer Agent Engagement Agreement. SOF G-7. On or about October 29, 2009, Defendant submitted a wire request and Company G invoice for Oak Fund XII's payment of 2,490,325,000 Korean Won (or $2,101,185.45) to Company G for purported delisting fees and legal fees. SOF G-8. The invoice contained wire instructions for Defendant's BOA Company G Account 1. SOF G-8.

On October 29, 2009, Oak Fund XII wired $2,101,185.45 to the BOA Company G Account 1. SOF G-9. One day later, a total of $2,099,998 was then transferred to a joint bank account that he held with his wife, Relief Defendant Shalini Ahmed. SOF G-9.

$3,113,981.00 for Purported Management Incentive Payment. In October 2011, Oak Fund XII sold its Company G shares, with a portion of the sales price remaining in escrow until 2013. SOF G-10. The transaction was set up so that Oak Fund XII would receive a certain portion of the consideration for its shares at the initial closing and the remainder would be held

in escrow until March 31, 2013, upon which time it would be released to Oak Fund XII. SOF G-10. Defendant executed the agreement. SOF G-10.

On or about November 25, 2011, Defendant submitted a wire request, along with an invoice, for Oak Fund XII's payment of a $3,113,981 "Management Incentive Payment" to Company G. SOF G-11. The wire request directed that $3,113,981 be paid to Company G, and the invoice contained wire transfer instructions for a Bank of America account number x6367 in the name of Company G (the "BOA Company G Account 2"). SOF G-11.

On October 17, 2011, Defendant opened the BOA Company G Account 2. SOF G-12. On November 28, 2011, Oak Fund XII wired $3,113,981 to that account, and the next day $3,000,000 was transferred to a joint bank account that Defendant held with his wife, Relief Defendant Shalini Ahmed. SOF G-12.

$1,556,990 for Purported Management Incentive Payment. On April 10, 2013, Defendant submitted a wire transfer request, along with an invoice and an email explanation of the fees, for Oak Fund XII's payment of a $1,556,990 Management Incentive Payment to Company G related to the sale of Company G shares. SOF G-13. The invoice contained wiring instructions for the BOA Company G Account 2. SOF G-13. On April 11, 2013, Oak Fund XII wired $1,556,990 to the BOA Company G Account 2. SOF G-14. That same day, the money was then transferred to a joint bank account that Defendant held with his wife, Relief Defendant Shalini Ahmed. SOF G-14.

$622,796 Payment for Purported Fee. On April 29, 2013, Defendant submitted a wire transfer request, along with an invoice, for Oak Fund XII's payment of a $622,796 Investment Banking Advisory Fees reimbursement to Company G. SOF G-15. The invoice contained wiring instructions for the BOA Company G Account 2. SOF G-15.

On April 30, 2013, Oak Fund XII wired $622,796 to the BOA Company G Account 2.

SOF G-16. That same day, $622,796 was then transferred to a joint bank account that Defendant

held with his wife, Relief Defendant Shalini Ahmed. SOF G-16.

      **2.**     **Defendant Violated the Antifraud Provisions of the Advisers Act, Exchange Act, and Securities Act.**

Defendant's conduct in connection with Oak Fund XII's purchase and sale of Company

G shares – which involved fraudulent conduct as well as misrepresentations – violated the

antifraud provisions of the Advisers Act, the Exchange Act, and the Securities Act. The court

should grant summary judgment finding Defendant liable for this misconduct.

The undisputed facts show that Defendant engaged in fraudulent acts and made

misrepresentations in connection with Company G. For example, he misrepresented the purchase

price of the shares to Oak Fund XII in connection with Oak Fund XII's purchase of Company G

shares, and Defendant personally kept the additional money. In addition, he misrepresented to

Oak Fund XII that it owed $2,101,185.45 for delisting fees and legal expenses in connection with

Oak Fund XII's participation in the tender offer for Company G shares, and Defendant

personally kept the money. Furthermore, Defendant misrepresented to Oak Fund XII that it owed

$3,113,981 for a purported management incentive fee in connection with Oak Fund XII's sale of

Company G shares, and Defendant personally kept the money. Moreover, Defendant

misrepresented to Oak Fund XII that it owed $1,556,990 for a purported management incentive

fee in connection with Oak Fund XII's sale of Company G shares, and Defendant personally kept

the money. Finally, Defendant misrepresented to Oak Fund XII that it owed $622,796 for a

purported advisor fee reimbursement in connection with Oak Fund XII's sale of Company G

shares, and Defendant personally kept that money as well.

Defendant also engaged in fraudulent acts and used deceptive devices to perpetrate his scheme. He provided Oak Fund XII with fraudulent invoices and fraudulent wiring instructions, provided Company G with fraudulent wiring instructions, directed funds to his secret bank accounts in the name of Company G and OIP, and transferred the funds to his personal bank account. Moreover, there can be no dispute that Defendant acted with scienter: he directed the funds to secret bank accounts in OIP's and Company G's name and then diverted the money into a joint bank account that he held with his wife, Relief Defendant Shalini Ahmed.

Finally, each unique statutory element is undisputedly met. For purposes of Section 206, Defendant is an investment adviser. *See supra* Section II.A.2. His siphoning funds that properly belonged to the Oak Fund XII breached his fiduciary duties and defrauded the fund (his client) – violating both Sections 206(1) and (2) – and the fund's investors – violating Section 206(4) and Rule 206(4)-8. For purposes of Section 10(b) and Rule 10b-5, Defendant's conduct was in connection with the purchase and sale of securities: contemporaneously with the Company G transactions, and exploiting provisions in the securities transaction agreements, Defendant illicitly obtained fees that belonged to Oak Fund XII (e.g, inflated purchase price, delisting and legal fees, management incentive payments, and advisor fees reimbursement) in connection with those securities transactions. *See, e.g.*, *Ramoil Management*, 2007 WL 3146943 at *8.

With respect to Defendant's 2011 and 2013 conduct, that conduct was related to the sale of securities for purposes of Section 17(a): again, Defendant created false invoices for payments and fees purportedly related to the 2011 sale of the Company G securities to illicitly obtain monies from Oak Fund XII.[18] *See, e.g.*, *Cole*, 2015 WL 5737275, at *7. For conduct occurring after July 2010, Defendant's misconduct satisfies Dodd-Frank's conduct-or-effects test and, in

---

[18] The SEC does not allege that Defendant violated Section 17(a) with respect to the 2007 and 2009 conduct.

any event, the securities transaction involving Company G is domestic under *Morrison*. *See supra* Section II.B.2-3.

### G.      Fraud Connected to Company H.

#### 1.      Summary of Material Undisputed Facts – Company H.

Defendant continued his illicit scheme with respect to Oak Fund XII's investment in Company H. Specifically, Defendant made misrepresentations, omissions, and engaged in deceptive conduct that caused Company H to send to Defendant $2,237,205.49 that should have been paid to Oak Fund XII in connection with Oak's investment in Company H. In his Answer, deposition, and in response to discovery, Defendant invoked his Fifth Amendment right against self-incrimination in response to every allegation and substantive question. SOF X-1.

$2,237,205.49 for Legal Fees. Oak Fund XII made several investments in Company H and its parent company and incurred fees in connection with the investments and other legal matters related to Company H from two law firms. SOF H-1, H-2. Purporting to act pursuant to agreements between Oak and Company H, Defendant directed Company H to reimburse Oak for its legal expenses by transferring nearly 1.5 million British pounds to the BOA OIP Advisors Account. SOF H-3. With the intent to reimburse Oak's legal fees, Company H made separate transfers to Defendant's BOA OIP Advisors Account in the amounts of $1,575,905.94, $118,578.60, and $535,025.04. SOF H-4, H-5.

Shortly after the transfers, Defendant transferred the funds from the BOA OIP Advisors Account into a joint bank account that he held with his wife. SOF H-4, H-5. Then, after Defendant had moved the funds paid by Company H for reimbursement of Oak's legal fees into his own personal accounts and at the request of Company H for documentation that formally showed the purpose of the transfers, Defendant sent Company H a letter on Oak letterhead

explaining that Oak requested that Company H "reimburse Oak for legal expenses up to a maximum of UK£ 1,500,000." SOF H-6.

## 2.  Defendant Violated the Antifraud Provisions of the Advisers Act and Exchange Act.

Defendant violated the Advisers Act and Section 10(b) of the Exchange Act by operating a fraudulent scheme to steal funds intended to reimburse Oak Fund XII for legal fees.

There can be no dispute that Defendant directed Company H to reimburse Oak Fund XII for legal fees under the Exchange Agreement by wiring funds to Defendant's personal account, which appeared to be an account owned by Oak. There also is no dispute that Defendant kept the funds for himself without disclosing the fact to Oak Fund XII or Company H. Moreover, the evidence that Defendant quickly transferred the reimbursements for legal fees to his personal account three separate times and then sent Company H a formal letter explaining that the payments were intended to satisfy Company H's obligation to Oak Fund XII—not Defendant— confirms that Defendant's conduct was no mistake. He knowingly diverted the money.

Finally, each statutory element is undisputely met. For purposes of Section 206, Defendant is an investment adviser, *see supra* Section II.A.2, and his siphoning funds that properly belonged to Oak Fund XII defrauded the fund (his client) and the fund's investors. For purposes of Section 10(b) and Rule 10b-5, Defendant's conduct was in connection with the purchase and sale of securities: contemporaneously with the Company H transactions, and exploiting provisions in the agreements, Defendant illicitly obtained reimbursement of legal fees to which Oak Fund XII was entitled in connection with its securities transaction with Company H. *See, e.g.*, *Ramoil Management*, 2007 WL 3146943 at *8. And the securities transactions involving Company H are domestic under *Morrison*. *See supra* Section II.B.2.

43

H.      **Fraud Connected to Company I.**

1.      **Summary of Material Undisputed Facts – Company I.**

Defendant continued his illicit scheme with respect to two Oak funds' investment in Company I. Specifically, Defendant misrepresented the exchange rate applicable to the investment and then siphoned the excess funds through the fraudulent BOA OIP Advisors Account and into a joint bank account that he held with his wife, Relief Defendant Shalini Ahmed. In his Answer, deposition, and in response to discovery, Defendant invoked his Fifth Amendment right against self-incrimination in response to every allegation and substantive question. SOF X-1.

$2,185,946 Overpayment Due to Exchange Rate. In December 2010, Defendant recommended that two Oak funds – Oak Fund XII and Oak Fund XIII – invest 36.5 million British pounds in Company I. SOF I-1. Defendant represented that this purchase price translated into approximately 59 million U.S. dollars at a fixed exchange rate of 1.62 dollars to the British pound. SOF I-2 to I-3. These representations were not true. SOF I-4 to I-5. What's more, Company I contacted Defendant shortly after Oak wired the $59 million and informed Defendant that the Oak funds had overpaid and that approximately £1.4 million was being wired back to Oak. SOF I-6. In fact, Defendant directed Company I to wire these surplus funds to his secret BOA OIP Advisors Account, which Company I did. SOF I-7 to I-8. The next day, Defendant transferred these funds – which amounted to approximately $2.185 million – into a joint bank account that he held with his wife, Relief Defendant Shalini Ahmed. SOF I-8. Oak never received these funds. SOF I-9.

**2.      Defendant Violated the Antifraud Provisions of the Advisers Act and Exchange Act.**

Defendant's conduct in connection with Oak Fund XII and Oak Fund XIII's purchase of Company I shares – which involved fraudulent conduct as well as misrepresentations – violated the antifraud provisions of the Advisers Act and the Exchange Act. The court should grant summary judgment finding Defendant liable for this misconduct.[19]

The undisputed facts show that Defendant engaged in fraudulent acts and made misrepresentations in connection with Company I. For example, he misrepresented to the Oak funds that the exchange rate was fixed when, in fact, the deal closed at a more favorable exchange rate that should have resulted in Oak Funds XII and XIII being reimbursed more than $2 million. Defendant also engaged in fraudulent acts and used deceptive devices to perpetrate his fraudulent scheme. For example, he provided Company I with fraudulent wiring instructions, directed the funds to his secret BOA OIP Advisors Account, and transferred the funds into joint bank accounts that he held with his wife, Relief Defendant Shalini Ahmed. Moreover, Defendant's scienter is undisputable. He affirmatively represented to Oak that the exchange rate was fixed and Oak would not receive any excess payments while at the same time communicating with Company I about where Company I should send the surplus funds that resulted from the adjusted exchange rate. In addition, as he did repeatedly, Defendant directed those surplus funds to a fraudulent bank account in Oak's name and then diverted that money into his own pocket.

Finally, the statutory elements of Section 206 of the Advisers Act and Section 10(b)/Rule 10b-5 of the Exchange Act are met. For purposes of Section 206, Defendant is an investment adviser, *see supra* Section II.A.2., and his diverting funds from an Oak investment that properly

---

[19] The SEC does not allege that Defendant violated Section 17(a) with respect to the Company I conduct.

belonged to the Oak funds breached his fiduciary duties and defrauded the funds (in violation of Section 206(1) and (2)) and the funds' investors (in violation of Section 206(4) and Rule 206(4)-8). And for purposes of Section 10(b) and Rule 10b-5, Defendant's conduct was in connection with the purchase of securities: Defendant misrepresented the exchange rate applicable to the Oak funds' purchase of Company I's securities and illicitly obtained more than $2 million that the Oak funds should have been reimbursed. Defendant's misconduct satisfies Dodd-Frank's conduct-or-effects test and, in any event, the securities transaction involving Company I are domestic under *Morrison*. *See supra* Section II.B.2-3.

## I.     Fraud Connected to Company A.

### 1.     Summary of Material Undisputed Facts – Company A.

Defendant continued his illicit scheme with respect to Oak Fund XIII's investment in Company A. Specifically, as an investment adviser to Oak Fund XIII, Defendant induced the fund to overpay for Company A shares and diverted the difference to his personal account. In his Answer, deposition, and in response to discovery, Defendant invoked his Fifth Amendment right against self-incrimination in response to every allegation and substantive question. SOF X-1.

$2,044,733 Overpayment. In August 2014, Defendant proposed via email that Oak Fund XIII purchase 124,378 Series A shares of Company A at a price of $28.50 per share, for a total purchase price of $3,544,773. SOF A-1. He buttressed his proposal with favorable comments on Company A's financial condition but knew at the time he made these favorable statements that they were untrue. SOF A-2. On August 11, Oak approved Defendant's proposed purchase of Company A shares and executed the stock purchase agreement on behalf of Oak Fund XIII. SOF A-6.

Defendant furthered his fraud by forging deal documents to induce Oak Fund XIII to pay the inflated purchase price to his own personal account. To convince Oak Fund XIII of the inflated purchase price, Defendant emailed Oak fake documents with the inflated purchase price of $3,544,733 that appeared to be executed by the seller. SOF A-7. However, unbeknownst to Oak or the seller, Defendant attached the seller's signature pages pulled from the true documents which contained a purchase price of just $1.5 million to the fake documents with the inflated price. SOF A-7. Thus, the seller agreed to a purchase price of $1.5 million but Defendant's fraud caused Oak Fund XIII to pay $3,544,733 for those same shares.

Finally, Defendant provided Oak instructions for Oak Fund XIII to wire the purchase price to the BOA BVI Company Account, which Defendant created to appear as belonging to the BVI Company. SOF A-8. Defendant then wired the $1.5 million purchase price from his personal account to the seller. SOF A-8. Rather than returning the excess purchase price to Oak Fund XIII, Defendant transferred the remaining balance into a joint account he owned with his wife, Relief Defendant Shalini Ahmed. A-8.

## 2.     Defendant Violated the Antifraud Provisions of the Advisers Act and Exchange Act.

Defendant violated the Advisers Act and Section 10(b) of the Exchange Act by operating a fraudulent scheme to divert funds intended for the purchase of Company A shares.

Defendant knowingly and fraudulently diverted over $2 million in connection with Oak Fund XIII's purchase of Company A shares. The evidence showing Defendant's fraudulent scheme to inflate the purchase price and keep the difference is undisputed. The fraud constitutes, at minimum, negligent violations under Sections 206(2) and (4) of the Advisers Act and Rule 206(4)-8. Moreover, the evidence that Defendant paid the seller $1.5 million and then, just days

47

later, transferred to himself the balance of the $3.544 million rather than return the balance to Oak Fund XIII, clearly shows that Defendant knowingly misrepresented the purchase price.

The statutory elements of Section 206 of the Advisers Act and Section 10(b)/Rule 10b-5 of the Exchange Act are met. For purposes of Section 206, Defendant is an investment adviser, *see supra* Section II.A.2.; *see also* SOF A-1, and his diverting funds from an Oak investment that properly belonged to the Oak funds breached his fiduciary duties and defrauded the funds (in violation of Section 206(1) and (2)) and the funds' investors (in violation of Section 206(4) and Rule 206(4)-8). And for purposes of Section 10(b) and Rule 10b-5, Defendant's conduct was in connection with the purchase of securities: Defendant misrepresented the price of shares and illicitly obtained the Oak funds. *See, e.g.*, *Ramoil Management*, 2007 WL 3146943 at *8. Defendant's misconduct satisfies Dodd-Frank's conduct-or-effects test and, in any event, the securities transaction involving Company A is domestic under *Morrison. See supra* Section II.B.2-3.

> **J.      Fraud Connected to Company B.**
>
> > **1.      Summary of Material Undisputed Facts – Company B.**

Defendant continued his illicit scheme with respect to Oak Fund XII's investment in Company B. Specifically, Defendant misrepresented both the purchase price of Company B shares and the financial condition of Company B, and as a result misappropriated $18 million that Oak was led to believe it was paying for Company B shares. As was his pattern, Defendant funneled the $18 million through the secret BOA Company B Account that he represented was owned by Company B and into to joint bank accounts that he held with his wife, Relief Defendant Shalini Ahmed. In his Answer, deposition, and in response to discovery, Defendant

invoked his Fifth Amendment right against self-incrimination in response to every allegation and substantive question. SOF X-1.

$18,000,000 Overpayment. Company B was a joint venture formed by two parties, denoted here as JV Party 1 and JV Party 2. SOF B-1. JV Party 2 was a subsidiary of the BVI Company from whom Oak Fund XIII purchased its Company A shares. SOF B-1. In December 2014, Defendant recommended that Oak Fund XII purchase JV Party 1's shares in Company B for $20 million. SOF B-2. As part of his recommendation, Defendant provided Oak various purported financial metrics for Company B. SOF B-10 to B-11. After the investment was approved, Defendant told Oak that the $20 million purchase price should be split between two accounts, with $2 million wired to JV Party 1 and $18 million wired to an account that Defendant claimed belonged to the BVI Company. SOF B-3. Oak Fund XII wired the payments as Defendant directed. SOF B-7. Defendant also forwarded to Oak personnel what he claimed were the final deal documents reflecting a $20 million purchase price. SOF B-4.

Once again, Defendant made misrepresentations and engaged in deceptive conduct to further his fraudulent scheme. The actual purchase price for the Company B shares was $2 million, not $20 million. SOF B-5. Indeed, Defendant manipulated the stock purchase agreement to change the $2 million figure in the actual agreement to the $20 million figure in the falsified documents he submitted to Oak. SOF B-5 to B-6. Moreover, the account to which Defendant directed Oak Fund XII to wire the $18 million did not belong to the BVI Company, but rather was the BOA BVI Company Account that Defendant opened and controlled but misleadingly titled in the name of the BVI Company. SOF B-8. Once the $18 million was wired by Oak Fund XII into that account, Defendant transferred the $18 million into a joint bank account that he held with his wife, Relief Defendant Shalini Ahmed. SOF B-9. In addition to misappropriating this

$18 million that belonged to Oak Fund XII and its investors, Defendant also misrepresented the financial condition of Company B in his investment recommendation. SOF B-10 to B-11.

> ### 2. Defendant Violated the Antifraud Provisions of the Advisers Act and Exchange Act.

Defendant's misrepresentations and deceptive conduct violated the antifraud provisions of the Advisers Act and the Exchange Act, and the Court should grant summary judgment finding defendant liable for this misconduct.[20]

The undisputed facts detailed above show that Defendant engaged in fraudulent acts and made misrepresentations in connection with his recommendation that Oak Fund XII invest in Company B shares. Most egregiously, he misrepresented the purchase price, inflating it from $2 million to $20. Defendant further misrepresented important financial metrics of Company B. Defendant also engaged in fraudulent acts and used deceptive devices. Among other things, he altered the share purchase agreement, provided Oak with this falsified agreement, directed the $18 million into a fraudulent bank account that he opened and controlled, and then transferred these funds to his personal accounts. Defendant's scienter is undisputable: he repeatedly overstated the purchase price by $18 million, directed those funds to a fraudulent bank account, and then, once again, diverted that money into his own pocket.

Finally, the statutory elements of Section 206 of the Advisers Act and Section 10(b) and Rule 10b-5 of the Exchange Act are met. For purposes of Section 206, Defendant is an investment adviser, *see supra* Section II.A.2., and his misappropriating funds that properly belonged to Oak Fund XII breached his fiduciary duties and defrauded the fund (in violation of Section 206(1) and (2)) and the fund's investors (in violation of Section 206(4) and Rule 206(4)-8). And for purposes of Section 10(b) and Rule 10b-5, Defendant's conduct was in connection

---

[20] The SEC does not allege that Defendant violated Section 17(a) with respect to the Company B conduct.

with the purchase of securities: Defendant misrepresented the purchase price of the Company B securities that Oak purchased. Defendant's misconduct satisfies Dodd-Frank's conduct-or-effects test and, in any event, the securities transaction involving Company B is domestic under *Morrison*. *See supra* Section II.B.

**K.    Frauds Connected to Company C.**

      **1.    Summary of Material Undisputed Facts – Company C.**

Defendant continued his illicit scheme with respect to Oak Fund XIII's two investments in Company C, a U.S.-based e-commerce company that is no longer in operation. Specifically, as an investment adviser to Oak Fund XIII, Defendant engaged in deceptive conduct by mispresenting Company C's financial performance and concealing and misrepresenting his ownership of Company C shares, while he recommended and advised Oak Fund XIII to make two separate investments into Company C. In the end, Defendant made more than $10 million in profits through the sale of his Company C shares while Oak Fund XIII lost more than $32 million in its Company C investment. In his Answer, deposition, and in response to discovery, Defendant invoked his Fifth Amendment right against self-incrimination in response to every allegation and substantive question. SOF X-1.

      <u>$10,896,193.59 Redemption of Company C Shares.</u> In or around November 2012, Company C – an e-commerce business based in the United States – sold its Series A shares to several investors including an entity called I-Cubed Domains, LLC (explained more fully below), and an Oak portfolio company known as the BVI Company. SOF C-1. At the time, Defendant was one of three people on the BVI Company's board of directors. SOF C-2.

      Defendant was responsible for identifying and negotiating BVI Company's $150,000 investment into Company C to purchase its Series A Preferred Stock. SOF C-3, C-4. On or about

November 13, 2013, the BVI Company finalized its investment by effectuating the purchase of Company C shares and wiring $150,000 from a BVI Company Fidelity account. SOF C-5.

Shortly after the BVI Company's $150,000 investment into Company C, and unbeknownst to the other BVI Company directors, Defendant requested and negotiated an additional $2 million investment into Company C by the BVI Company. SOF C-5. Defendant falsely claimed to Company C that the additional $2 million investment by the BVI Company was necessary because Defendant was getting pressure from Oak for a bigger investment in Company C. SOF C-5. On November 26, 2012, $2,000,000 was wired from the same BVI Company Fidelity account for the purchase of additional Company C shares. SOF C-6.

When he was subsequently confronted by the BVI Company about the $2 million that was missing from the BVI Company's Fidelity account, Defendant concealed that he had personally negotiated an additional $2 million investment and instead falsely claimed the $2 million purchase was a mistake on the part of the "finance team." SOF C-7.

Continuing to conceal that he negotiated the $2 million investment, Defendant told the other BVI directors (and only the BVI directors) that he would "take full responsibility" for the "mistake" and would personally purchase the shares, which he did on or about June 21, 2013. SOF C-8. At this same time, Defendant was recommending that Oak Fund XIII invest $25 million into Company C while simultaneously negotiating with Company C (ostensibly on behalf of Oak Fund XIII) that such an investment by Oak Fund XIII would be conditioned on Company C redeeming the BVI's Company C shares (now secretly owned by Defendant) for $10,896,193.59. SOF C-9, C-15.

Defendant was well aware that he was engaging in fraud and self-dealing by pretending to act on behalf of Oak Fund XIII in negotiating its investment in Company C, while actually

seeking to profit (by more than $8 million) by redeeming the Company C shares he was holding in the name of the BVI Company. That is because prior to Oak Fund XIII making its $25 million investment into Company C – which triggered Company C's obligation to redeem Defendant's Company C shares held in the name of the BVI Company for $10,896,193.59 – Defendant was specifically asked if he had invested in Company C. Defendant falsely stated that he had "NO personal investment or any other direct beneficial interest or investment" in Company C. SOF C-10.

To further conceal that he was holding Company C shares and would personally profit from their redemption (triggered by Oak Fund XIII's investment into Company C), Defendant opened a bank account at Bank of America in the name of the "BVI Company" ending in numbers x3640 (the "BOA BVI Company Account") and directed, through an attorney, Company C to wire the redemption proceeds into this account by falsely claiming the account belonged to the BVI Company. SOF C-11-C-13. After he received the funds in his BOA BVI Company Account, Defendant transferred the funds into a joint bank account that he held with his wife, Relief Defendant Shalini Ahmed. SOF C-14.

In sum, Defendant purposefully lied to his fellow BVI Company directors when he told them the $2 million purchase of Company C shares was a mistake, as he had personally negotiated the purchase of those shares in the name of the BVI Company. Defendant then bought the shares, left them in the name of the BVI Company, and negotiated their redemption for a price that was substantially greater than the $2 million originally paid by leveraging the redemption on Oak Fund XIII's $25 million investment into Company C. While recommending that Oak Fund XIII purchase $25 million of Company C's Series B shares, Defendant concealed from Oak Fund XIII and Company C that he (as opposed to the BVI Company which was an

Oak portfolio company) was the seller of those Company C shares and that he would personally profit by more than $8 million upon Oak Fund XIII's $25 million investment. Defendant falsely told Oak that he did not have any personal investment or direct beneficial interest in Company C, which was false for two reasons, as Defendant was: (1) holding the Company C shares in the name of BVI Company that were redeemed upon Oak Fund XIII's investment; and (2) holding Company C shares in the name of I-Cubed, as explained below.

$7,500,000 I-Cubed Sale. Defendant's fraud did not stop with Oak Fund XIII's initial purchase of Company C shares. Later in 2014, Defendant orchestrated Oak Fund XIII's purchase of Company C shares from I-Cubed without disclosing (1) his ownership interest in and control over I-Cubed; (2) that he was negotiating on behalf of both Oak Fund XIII and I-Cubed; (3) that he paid substantially less for the Company C shares than what Oak Fund XIII was paying; and (4) that the Company C shares he sold to Oak Fund XIII for $7.5 million were valued at less than $900,000 only two months earlier and that he had privately expressed concerns about the viability of Company C shortly before recommending that Oak Fund XIII make a further investment.

As noted above, in October 2013 Defendant recommended and negotiated the terms of Oak Fund XIII's $25 million purchase of Company C's Series B shares. SOF C-15. In connection with this investment, Defendant had advised Oak that he had no personal investment or direct beneficial interest or investment in Company C. SOF C-10. Ms. Ames asked Defendant about any ownership of Company C shares because each Oak Fund is prohibited, absent proper consent, from investing in the securities of any entity in which any of the Managing Members of its general partner (including Defendant) have, or have had within the preceding ninety days, an investment or other material financial interest. Oak funds also are

54

prohibited, absent the proper consent, from purchasing or selling securities to or from any Managing Members of the general partner of the Oak Funds (including Defendant), or any of their respective affiliates. SOF C-16.

In October 2014, Defendant recommended that Oak Fund XIII make an additional investment into Company C by purchasing Company C shares held by I-Cubed for $7.5 million. SOF C-17. When presenting this proposed investment to Oak's managing partners at their investment committee meeting held on or about October 27, 2014, Defendant described the seller of the shares as a "family office." SOF C-17. Defendant's written presentation included financials for Company C showing, among other things, that Company C's estimated revenues in 2014 were $515.6 million, a 65% increase over 2013 revenues of $311.81 million. SOF C-17.

On October 30, 2014, Oak Fund XIII entered into a Stock Purchase Agreement with I-Cubed to purchase of its Company C Series A shares for $7.5 million. SOF C-18. That agreement was executed by Defendant on behalf of Oak Fund XIII and was purportedly executed on behalf of I-Cubed by Richard N. Kimball. SOF C-18. Defendant provided wire transfer instructions to Oak and directed that it wire $7.5 million to an account held by I-Cubed at Bank of America ending x8384 ("BOA I-Cubed Account"). SOF C-19. Oak Fund XIII transferred $7.5 million to the BOA I-Cubed Account on October 30, 2014. SOF C-19. Two days earlier, unbeknownst to Ms. Ahmed (I-Cubed's nominal owner), Defendant had opened the BOA I-Cubed Account and was listed as a member of I-Cubed and was the sole signatory on the account. SOF C-20. Four days later, Defendant wrote a $7,425,000 check from the BOA I-Cubed Account to the Shalini Ahmed 2014 Grantor Retained Annuity Trust. SOF C-21. ████

█████████████████████████████████████████████████████

████████████████████████████

Defendant misrepresented that he had no personal investment or any other direct beneficial interest or investment in Company C (*see* SOF C-10) and fraudulently concealed that he himself formed I-Cubed on October 24, 2012, invested in Company C through I-Cubed in November 2012, and remained the sole member (and sole owner) before he nominally[21] placed the company into the name of his wife in May 2013. SOF C-22-C-26. Defendant concealed that he was on both sides of the transaction, going so far as to forge the signature of Mr. Richard Kimball who had retired as I-Cubed's manager more than one month earlier and had no knowledge of the transaction. SOF C-27-C-29.

Moreover, in order to induce Oak Fund XIII to enter into the transaction (which allowed Defendant to cash out of Company C prior to it shutting down), Defendant misrepresented both the financials of Company C as well as the declining value of the shares that he himself had acknowledged but concealed from Oak Fund XIII. SOF C-30-C-33. On October 8, 2014, Defendant received Company C's financials showing $178.1 million in revenue for the first eight months of 2014, which was 11.7% ahead of revenues for the first eight months of 2013. SOF C-30. Yet, Defendant made a presentation to Oak partners two weeks later where he deceptively estimated full-year 2014 revenues of $515.6 (which would be a 65% increase in revenues from 2013). SOF C-30. In fact, on November 6, 2014, less than one week after Oak Fund XIII purchased the Company C shares from I-Cubed, Defendant explained to an investor in Company C – responding to a suggestion that Oak participate in another financing round for Company C – that the company was performing so poorly Oak would not agree to invest: "With a flat to down year it is a non-starter at Oak unfortunately for me to even try and pitch." SOF C-30. Defendant had good

---

[21] Although Defendant moved I-Cubed into the name of his wife, she merely served as a nominee. Ms. Ahmed testified that despite being the "owner" of I-Cubed, she played no role in the sale negotiations. Preliminary Injunction Order [Doc. # 113] at 8.

reason to cash out of Company C, as their actual revenues for 2014 were only $278.9 million, which is not only 46% less than the estimate of $515.6 million included in Defendant's presentation, but materially below their 2013 revenues. SOF C-30. Company C ceased operations less than two years later. SOF C-31.

Even earlier Defendant had recognized the declining value of Company C stock. In August 2014, two months before I-Cubed sold the Company C stock to Oak Fund XIII for $7.5 million, a 99% interest in I-Cubed – which held only the Company C shares – was transferred into Relief Defendant Shalini Ahmed 2014 Grantor Retained Annuity Trust (the "GRAT"). SOF C-32 – C-33. According to the GRAT formation document, which the GRAT's 30(b)(6) witness confirmed was accurate, the market value of the 99% interest in I-Cubed was worth only $876,193.72. C-32. Similarly, during the preliminary injunction hearing, Relief Defendant Shalini Ahmed testified that she believed the GRAT formation document was accurate and that I-Cubed's Company C shares were worth $876,193.72 as of August 29, 2014. SOF C-33. Thus, while Defendant represented to Oak that I-Cubed's Company C shares had increased in value by 375% (to $7.5 million) since their purchase, Defendant himself had acknowledged the shares had diminished in value by more than 50% to less than $1 million. *Compare* SOF C-18 with C-32-C-33.

As noted above, this latter Company C transaction was challenged by Relief Defendants during the Preliminary Injunction hearing. In granting [Doc. # 113] the SEC's request for a preliminary injunction, this Court found that Defendant's transfer of his interest in I-Cubed prior to the October 2014 sale was "nominal," that Defendant "did not disclose to Oak that the shares that it paid $7.5 million were valued at less than $900,000 just two months prior or that [Defendant] had privately expressed concerns about the viability of the company just before

57

recommending that Oak further invest in it," and that "[t]he evidence of Defendant's omission, misstatements, and conflict of interest suggests that the SEC is likely to succeed" on the merits of its 206(3) claim. Doc. # 113 at 8-9.

>    **2.    Defendant Violated the Antifraud Provisions of the Advisers Act, Exchange Act, and Securities Act.**

Defendant's conduct in connection with Oak Fund XIII's purchase of Company C shares - which involved fraudulent conduct as well as misrepresentations – violated the antifraud provisions of Advisers Act, the Exchange Act, and the Securities Act. The Court should grant summary judgment finding Defendant liable for this misconduct.

The undisputed facts show that Defendant engaged in fraudulent acts and made misrepresentations in connection with Company C. For example, he misrepresented to Oak that he did not have any personal investment or direct beneficial interest in Company C, when the Defendant in fact owned Company C shares in the name of I-Cubed and later the BVI Company. Defendant also engaged in fraudulent acts and used deceptive devices to perpetrate his scheme. He provided Oak misleading financials and actively concealed Company C shares were declining in value. Moreover, there can be no dispute that Defendant acted with scienter: he forged Mr. Kimball's signature to conceal that he himself was negotiating both sides of the transaction, directed funds to the BOA I-Cubed Account that he opened and controlled, and transferred the funds into the name of his wife, Relief Defendant Shalini Ahmed.

Moreover, there can be no dispute that Defendant engaged in self-dealing in violation of Section 206(3) of the Advisers Act, which prohibits an investment adviser from "acting as principal for his own account, knowingly to sell any security to or purchase any security from a client, or acting as broker for a person other than such client, knowingly to effect any sale or purchase of any security for the account of such client, without disclosing to such client in

writing before the completion of such transaction the capacity in which he is acting and

obtaining the consent of the client to such transaction." 15 US.C. § 80b-6(3). "Unlike Section

206(1) and (2) of the Act, Section 206(3) 'can be violated without a showing of fraud.'" *SEC v.*

*Nadel*, 97 F. Supp. 3d 117, 127 (E.D.N.Y. 2015) (quoting *In the Matter of Geman,* SEC Release

No.1924, Exchange Act Release No. 43,963, 74 SEC Docket 852, 2001 WL 124847, at *8 (Feb.

14, 2001), *aff'd sub nom. Geman v. SEC,* 334 F.3d 1183 (10th Cir.2003)).

Defendant's sale of his own Company C shares to Oak Fund XIII violated the Adviser's

Act's prohibition on an investment adviser selling securities to clients without disclosing the

adviser's interest in the transaction. Specifically, Section 206(3) of the Advisers Act makes it

unlawful for an investment adviser to engage in a "principal transaction" – *e.g.*, a transaction in

which the adviser, acting for his own account, sells securities to a client's account – without

disclosing to the client the capacity in which the adviser is acting and obtaining the client's

consent. *See Interpretation of Section 206(3) of the Investment Adviser's Act of 1940*, Rel. No.

1732, 1998 WL 400409, *1 (July 17, 1998).

Here, Defendant's orchestration of the sale of Company C's shares from I-Cubed to Oak

Fund XIII was a principal transaction since Defendant had a significant personal interest in I-

Cubed. *Cf. In re Gintel Asset Mgmt., Inc. et al.*, Advisers Act Rel. No. 2079, 2002 WL 31499839

(Nov. 8, 2002) (settled order finding respondent violated 206(3) by executing trades between a

fund in which he owned a 1/3 interest and advisory client accounts). Moreover, it cannot be

disputed that Defendant did not disclose his interest in I-Cubed to Oak or Oak Fund XIII when

Oak Fund XIII bought Company C shares directly from I-Cubed. SOF C-27. As a result, Oak

Fund XIII did not have the opportunity to – and in fact did not – give its consent to the

transaction knowing that, in effect, Defendant was on the other side.

Finally, for purposes of Section 10(b) and Rule 10b-5, Defendant's conduct was in connection with the purchase and sale of securities: contemporaneously with Oak Fund XIII's purchase of Company C shares, and by misrepresenting and concealing his ownership interest in Company C shares, Defendant illicitly obtained funds by selling those shares back to Company C in connection with Oak Fund XIII's investment into Company C, and selling other Company C shares directly to Oak Fund XIII. *See, e.g.*, *Ramoil Management*, 2007 WL 3146943 at *8. There can be no dispute the securities transactions involving Company C are domestic under *Morrison* because Company C, like Oak, is a United States based company.

## CONCLUSION

There is no genuine dispute of material fact as to any of the SEC's allegations of fraud. In fact, Relief Defendants' profess no knowledge of Defendant's conduct, and Defendant has repeatedly invoked his Fifth Amendment right against self-incrimination rather than dispute the allegations. *See Suman*, 684 F. Supp. 2d at 386 ("An adverse inference may be given significant weight because silence when one would be expected to speak is a powerful persuader.") (quotation omitted). The documentary evidence, including emails, bank records and deal documents, coupled with testimonial evidence from Oak and Relief Defendants, corroborate the SEC's allegations and leave no dispute that Defendant engaged in the fraud as alleged.

For the reasons described herein, the SEC's Motion for Partial Summary Judgment should be granted.

DATED: June 27, 2017.

Respectfully submitted,


s/ *Nicholas P. Heinke*
Nicholas P. Heinke (Colo. Bar No. 38738)
          Connecticut Bar No. phv07374
Jeffrey E. Oraker (Colorado Bar. No. 26893)
          Connecticut Bar No. phv08631
Terry Ryan Miller (Colorado Bar. No. 39007)
          Connecticut Bar No. phv08981
Mark L. Williams (New York Bar. No. 4796611)
          Connecticut Bar No. phv07375
United States Securities and Exchange Commission
1961 Stout St., Suite 1700, Denver, CO  80294
Phone:          (303) 844-1000
                      (303) 844-1071 (Heinke)
                      (303) 844-1041 (Miller)
                      (303) 844-1097 (Oraker)
                      (303) 844-1027 (Williams)
E-mail:          HeinkeN@sec.gov
                      MillerTE@sec.gov
                      OrakerJ@sec.gov
                      WilliamsML@sec.gov

Attorneys for Plaintiff:

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION

## **CERTIFICATION**

I certify that on June 27, 2017, a copy of the foregoing document was emailed to Defendant Iftikar Ahmed at IftyAhmed@icloud.com, and served via ECF upon the following:

Jonathan Harris
Reid Skibell
David Deitch
Alexander Sakin
S. Gabriel Hayes-Williams
Harris, St. Laurent & Chaudhry LLP
40 Wall Street, 53rd Floor
New York, NY 10005
(Counsel for Relief Defendants)


_s/ Nicholas P. Heinke_
Nicholas P. Heinke

62