UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

_____

| | |
|---|---|
| UNITED STATES SECURITIES<br>AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>IFTIKAR AHMED,<br><br>Defendant, and<br><br>IFTIKAR ALI AHMED SOLE PROP;<br>I-CUBED DOMAINS, LLC; SHALINI AHMED;<br>SHALINI AHMED 2014 GRANTOR RETAINED<br>ANNUITY TRUST; DIYA HOLDINGS LLC;<br>DIYA REAL HOLDINGS, LLC; I.I. 1, a minor<br>child, by and through his next friends IFTIKAR<br>and SHALINI AHMED, his parents; I.I. 2, a minor<br>child, by and through his next friends IFTIKAR<br>and SHALINI AHMED, his parents; and I.I. 3, a<br>minor child, by and through his next friends<br>IFTIKAR and SHALINI AHMED, his parents,<br><br>Relief Defendants. | Civil Action No. 3:15cv675 (JBA) |

_____

**PLAINTIFF UNITED STATES SECURITIES AND EXCHANGE COMMISSION'S
LOCAL RULE 56(a)1 STATEMENT OF UNDISPUTED FACTS**

## *Table of Contents*

**Background** ...................................................................................................................1

**Company D** ..................................................................................................................5

**Company E** ..................................................................................................................8

**Company J** ................................................................................................................10

**Company F** ...............................................................................................................11

**Company G** ...............................................................................................................12

**Company F** ...............................................................................................................15

**Company A** ...............................................................................................................17

**Company B** ...............................................................................................................19

**Company C** ...............................................................................................................20

**Background**

X-1.     In his Answer, deposition, and in response to discovery, Defendant invoked his Fifth Amendment right against self-incrimination in response to every allegation and substantive question. Exs. 1, 2, 12.

X-2.     Defendant opened numerous bank accounts that he owned and controlled but titled in the name of an Oak entity, portfolio companies owned by Oak funds, or Relief Defendant I-Cubed. Ex. 3.

X-3.     Grace Ames, the Chief Operating Officer of Oak Management Corporation ("OMC"), has submitted two declarations in this matter and sat for depositions. Exs. 4-6.

X-4.     The Oak funds raise money from investors and, in turn, invest those monies in various types of securities. Ex. 4 at ¶ 2.

X-5.     Defendant was an investment professional employed by OMC and a managing member of entities that serve as general partners of certain Oak funds. He joined Oak in 2004. Defendant worked out of Oak's office in Greenwich, CT. Ex. 4 at ¶ 3; Ex. 6 at 285:24-287:3.

X-6.     Defendant's responsibilities at Oak included, among other things, identifying portfolio companies for Oak funds to invest in; recommending investments to the four senior Managing Partners of OMC who are responsible for approving investments by the Oak funds; negotiating the terms of investments with portfolio companies; managing the relationship with portfolio companies, which can include serving on the company's board of directors; and negotiating and recommending the terms of Oak funds' exit from investments. Ex. 4 at ¶ 3.

X-7.     Defendant's employment agreement with OMC provided, among other things, that his duties included identifying, analyzing, and recommending investment opportunities for the Oak funds. Ex. 7 at OAK-RD-17513 (§ III A.)

1

X-8.    From 2004 through 2015, from his office in Connecticut, Defendant recommended and advised that Oak Funds IX, XI, XII, and XIII purchase or sell securities, and then monitored and managed those investments that he recommended. Ex. 6 at 287:14-288:12.

X-9.    Defendant was paid a base salary as well as additional payments that were tied to the financial performance of the portfolio companies of the Oak funds, including the portfolio companies for which he has investment responsibilities. Ex. 4 ¶ 4.

X-10.   After fleeing, Defendant attempted to access assets in violation of the Court's asset freeze order [Doc. # 9] and stipulation [Doc. # 22] of the parties. Ex. 8.

X-11.   On July 16, 2015, the SEC deposed Relief Defendant Shalini Ahmed. During her deposition, ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████.

X-12.   On February 1, 2017, the SEC deposed Ms. Ahmed's father, mother, and two sisters regarding these payments. Each invoked their Fifth Amendment right against self-incrimination in response to every substantive question. Ex. 10.

X-13.   During her deposition, ████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████.

2

X-14.   During the preliminary injunction hearing, the Court stated that at least one other district court within the circuit had opined that an adverse inference could be drawn from the invocation of the confidential marital communications privilege. Ex. 11 at 76:12-25.

X-15.   During the preliminary injunction hearing, Ms. Ahmed testified that she and her husband "never spoke about what he did in his business dealings" and had a "Chinese wall" so they "never spoke business to each other." Ex. 11 at 298:5-10.

X-16.   In 2016, the SEC propounded its first set of discovery requests to Defendant and requested documents and other communications relevant to the allegations in this case. Defendant claimed to have no responsive documents. Defendant later reiterated that he "d[id] not … have access to any of the relevant documents." Exs. 12 at 11-13; 13 at 1.

X-17.   On January 23, 2017, the SEC deposed Ms. Ahmed ███████████████████ ██████████████████████████████████████████████████████████████████████ ████████████████████████████████.

X-18.   From 2004-2015, Oak's offices were located in California, Minnesota, and Connecticut. Ex. 6 at 278:9-12. All of Oak's employees were located in and based out of Oak's offices in the U.S. Ex. 6 at 279:10-24.

X-19.   Oak Fund IX, XI, XII, and XIII are all limited partnerships registered in the state of Delaware. Ex. 6 at 287:4-17.

X-20.   The majority of Oak's investors are located in the U.S. Ex.6 at 278:13-279:9.

X-21.   Oak's investors invested by transferring funds to Oak's bank accounts located in Chicago, Illinois, and then California. Ex. 6 at 279:25-281:2.

X-22.   Oak purchased investments with funds from U.S. bank accounts and, where Oak sold an investment, Oak received payments to its U.S. bank accounts. Ex. 6 at 281:3-14.

X-23.   Oak held weekly partner meetings for general strategy discussions and other business matters, including to review pending investments or investment ideas and to discuss cash management. Oak held these meetings in its U.S. offices. Ex. 6 at 283:7-285:4.

X-24.   Oak's managing members approved investments on behalf of Oak funds while located in Oak's U.S. offices. Ex. 6 at 282:10-283:6; 285:5-23.

X-25.   When Oak purchased or sold investments, including securities, Oak memorialized the agreement to purchase and sell in written agreements, including share purchase agreements, merger agreements, and tender offer agreements. Ex. 6 at 289:4-24.

X-26.   Oak's attorneys for securities transactions were located in Connecticut. Oak's attorneys and Oak's representatives negotiated the written agreements for securities transactions while located in Connecticut. Ex. 6 at 290:5-291:22.

X-27.   Oak's project managers executed written agreements for securities transactions while located in Connecticut. Ex. 6 at 292:12-293:3.

X-28.   Written agreements for securities transactions entered into by Oak required the parties to consummate the transaction once the seller delivered notice to the buyer that closing conditions had been satisfied or waived. Ex. 6 at 294:16-21, 301:11-14, 306:20-307:24.

X-29.   Sellers notified Oak that closing conditions had been satisfied or waived by sending notification to Connecticut, and Oak notified buyers that closing conditions had been satisfied or waived by sending notice from Connecticut. Ex.6 at 294:23-297:17; 299:21-300:3.

X-30.   Oak transferred funds to purchase securities from bank accounts located in the U.S. The direction to transfer funds came from an Oak representative located in the U.S. Oak received funds for selling securities to U.S. bank accounts. Ex. 6 at 308:22-310:11.

X-31.   The written agreements for securities transactions entered into by Oak required the seller to deliver to the buyer evidence of share ownership. *E.g.*, Ex. 6 at 326:5-13.

X-32.   When Oak purchased and sold securities from private companies, counterparties delivered evidence of ownership was sent from or received in Connecticut. *E.g.*, Ex. 6 at 322:13-323:22, 326:19-327:5. Oak representatives did not deliver or receive title while located in the same office or room as its counterparty. Ex. 6 at 327:20-328:2.

X-33.   Oak confirmed the accuracy of allegations ¶¶ 22-24 of the Complaint [Doc. # 208] detailing the domesticity of the transactions at issue. Ex. 6 at 336:19 – 338:21.

## Company D

D-1.   In December 2004, Oak Fund IX purchased Company D shares that were held by a special purpose vehicle based in the Netherlands named A. Bohl Praktijk B.V. ("BPBV"). Defendant had substantial responsibilities in connection with this investment. Exs. 5 ¶ 38; 15 at, e.g., OAK-SEC-5722; 6 at 75:15-21.

D-2.   On December 15, 2004, Defendant emailed a letter agreement to Company D to "formalize our agreement . . . of a one-time management fee to be paid by your company . . . to compensate for the concession we offered in taking out the annual dividend provisions in our term sheet." The letter agreement stated that Company D would pay an amount equal to 8% of Oak Fund IX's total investment (that is, $600,000). Company D signed the letter agreement and faxed it back to Defendant. Exs. 5 ¶ 57; 16 at OAK-SEC-1228; 17; 18 at OAK-SEC-1231.

D-3.   On January 4, 2005, Defendant instructed Company D to wire the management fee to a Fleet Bank Account number x9310 in the name of OIP Advisors. On January 5, 2005, Company D told Defendant it would "wire $600k to your company tomorrow." Exs. 5 ¶ 58; 19.

D-4.     On January 7, 2005, Defendant received a revised agreement reflecting a $50,000 increase in the management fee to be paid by Company D. On January 11, 2005, Defendant emailed Company D stating "[s]ame instructions as last time," and, on January 14, 2005, Company D emailed Defendant stating "[w]e have wired $50K today." Exs. 5 ¶ 59; 20 at OAK-SEC-1235; 21; 22 at OAK-SEC-1681.

D-5.     Before March 31, 2005, Defendant opened a Fleet Bank account number x9310 in the name of "Iftikar Ali Ahmed dba OIP Advisors" and that account became Bank of America account number x9310 (the "BOA OIP Advisors Account"). Oak does not have, and has never had, an account with that name or number at Bank of America, and Defendant was not authorized to open any such account on Oak's behalf.  Exs. 3 at SEC-BOA-E-2090; 5 ¶ 13(d); 23 at 1; 24 at SEC-BOA-E-2189.

D-6.     Pursuant to a May 31, 2006 Share Purchase Agreement, BPBV sold a portion of the Oak Fund IX shares in Company D for $60 million, and Oak Fund IX subsequently exited the investment by distributing Company D shares in kind to its investors in January and March 2007. Defendant had substantial responsibilities in connection with Oak Fund IX's exit from the Company D investment in 2006 and 2007. In connection with these transactions, Defendant directed Oak to wire funds to a Bank of America account in the name of "Company D." Company D did not actually have an account at Bank of America and invoices provided by Defendant on Company D letterhead were not legitimate Company D invoices. Exs. 5 ¶¶ 38, 39; 25 at, e.g., OAK-SEC-1242.

D-7.     Pursuant to the May 31, 2006 Share Purchase Agreement, Oak Fund IX agreed to pay the fees and expenses of a broker ("Investment Bank") in connection with the transaction. Exs. 5 ¶ 40; 25 at OAK-SEC-1245 (§ 3.9).

6

D-8.    On June 26, 2006, the Investment Bank sent Defendant, among others, a $1.2 million invoice for the advisory services Investment Bank provided to Company D in connection with Oak Fund IX's sale of Company D shares. Exs. 5 ¶ 41; 26 at OAK-SEC-1684.

D-9.    Defendant sent several emails to Company D and Investment Bank requesting account information for payment of the invoice. Exs. 5 ¶ 42; 27 at OAK-SEC-1704.

D-10.   On June 26, 2006, Defendant opened checking account number x2349 in the name of Company D at Bank of America (the "BOA Company D Account"); Defendant was listed as the sole authorized representative on the account. Ex. 3 at SEC-BOA-E-2106-09.

D-11.   On July 3, 2006, BPBV wired $3 million to the BOA Company D Account for fees charged by the Investment Bank. $1.2 million was then transferred from Defendant's BOA Company D Account to his BOA OIP Advisors Account, and $1.8 million was transferred from Defendant's BOA Company D Account to his personal bank account. On July 5, 2006, $1.2 million was wired from Defendant's BOA OIP Advisors Account to the Investment Bank. Exs. 5 ¶ 40; 28 at OAK-SEC-1708; 29 at SEC-BOA-E-2323; 30 at SEC-BOA-E-2238.

D-12.   Neither Oak nor BPBV made any transfers during 2006 to Company D or the Investment Bank after the July 3, 2006 transfer of $3 million, and Oak is not aware of any further communications from Investment Bank regarding its advisory fees. Ex. 5 ¶ 43.

D-13.   In January 2007, Defendant requested that Oak Fund IX make a $6.6 million payment for a Korean tax obligation related to the 2006 sale of Company D shares. Defendant submitted a wire transfer request with an invoice on Company D letterhead and included wire transfer instructions for payment to his BOA Company D Account. Ex. 5 ¶¶ 45, 46; 31; 32.

D-14.   After approval, on January 26, 2007, Oak Fund IX wired a total of $6.6 million to BPBV's account at Fortis Bank which, in turn, on January 29, 2007, wired $6.6 million to

Defendant's BOA Company D Account. On January 29, 2007, $6,599,994 was transferred from Defendant's BOA Company D Account to Defendant's personal bank accounts. Exs. 5 ¶ 47; 33 at OAK-SEC-1293-95; 34 at OAK-SEC-1296-98; 35 at SEC-BOA-E-2353.

D-15.   Contrary to Defendant's instructions, Oak is not aware of any document suggesting that Korean capital gains taxes were in fact assessed on the sale of the Company D shares or that there was any legitimate reason for the $6.6 million payment that Defendant directed Oak Fund IX to make in January 2007. Ex. 5 ¶ 48.

D-16.   On August 21, 2007, Defendant presented Oak Fund IX with a wire transfer request for another invoice on Company D letterhead seeking payment of $800,528.81 in "Transaction fees to be paid to the Korean Tax Authority" in connection with Oak's 2007 distribution of Company D shares. The invoice provided wire transfer instructions for payment to the BOA Company D Account. Exs. 5 ¶ 50; 36 at OAK-SEC-1314.

D-17.   On August 21, 2007, Oak Fund IX wired a total of $800,528.81 to the BOA Company D Account. On August 22, 2007, $800,498.81 ($800,528.81 less $30.00 wire transfer fees) was transferred to Defendant's personal bank account. Exs. 5 ¶ 50; 37 at OAK-SEC-1315-17; 38 at SEC-BOA-E-2378; 39 at SEC-BOA-E-6552.

D-18.   Oak is not aware of any document or other evidence to suggest that Company D paid $800,528.81 (or any other amount) in securities transaction taxes to the Korean tax authorities in connection with Oak Fund IX's March 2007 distribution of Company D shares. Ex. 5 ¶ 51.

## Company E

E-1.    Defendant recommended to Oak that Oak Fund XI purchase Company E shares for 17 million Euros. Exs. 5 ¶ 6; 40 at OAK-SEC-1630-31.

E-2.     Defendant represented to Oak Fund XI that 17 million Euros was equivalent to $22.1 million (an exchange rate of 1.30 dollars to Euros). Defendant represented to Oak Fund XI that the purchase price was $1.05 per share. Ex. 40 at OAK-SEC-1630-31.

E-3.     Defendant instructed Oak Fund XI to fund the purported $22.1 million purchase with two separate transfers: (1) $20.74 million to the account of Company E at UBS Lugano; and (2) $1.36 million to a separate Bank of America account number x7717 that appeared to be an account of Company E (the "BOA Company E Account"). The UBS Lugano account appears in the final Investment Agreement and in Company E's wiring instructions to Oak, neither of which referred to a Bank of America account. Exs. 5 ¶ 7; 41; 42; 43 at OAK-SEC-1335.

E-4.     Defendant owned the BOA Company E Account, which had a full name of "Iftikar A. Ahmed d/b/a [Company E] USA." In the wiring instructions to Oak Fund XI, Defendant did not state in any manner that he owned the BOA Company E Account. Exs. 5 ¶¶ 7 & 9(c); 41; 44.  Oak Fund XI purchased the Company E shares and wired a total of $22.1 million to the accounts provided by Defendant. Exs. 5 ¶ 8; 45.

E-5.     Company E told Defendant that it received the $20.74 million but that after conversion of U.S. dollars to Euros at a rate of 1.2214 dollars/Euro, that amount fell €19,486 below the purchase price of €17 million. Defendant replied that the actual exchange rate at the time of Oak's transfer "was more like 1.21." Exs. 5 ¶ 9(b); 46 at OAK-SEC-1643-44.

E-6.     Company E did not receive the additional $1,360,000. Ex. 5 ¶ 9(c). Defendant's BOA Company E Account received $1,360,000 from Oak Fund XI. Ex. 44 at SEC-BOA-E-2136.

E-7.     Defendant transferred a total of $1,358,169.10 from the BOA Company E Account to two of Defendant's personal accounts. Ex. 47 at SEC-BOA-E-2141.

E-8.     At Defendant's suggestion, Company E agreed that Oak could pay the €19,486 shortfall as a setoff against the amount Company E owed Oak Fund XI for legal expenses under the Investment Agreement. Exs. 46 at OAK-SEC-1643-44; 43 at OAK-SEC-1340.

E-9.     Defendant submitted invoices for Oak Fund XI's legal fees to Company E for reimbursement to Oak Fund XI, but directed that Company E send the funds to the BOA OIP Advisors Account, which Company E did. Exs. 5 ¶¶ 62-63; 48 at OAK-SEC-1646; 49.

E-10.   The BOA OIP Advisors Account received a wire from Company E for $92,285.15. Two weeks later, $92,270.15 was transferred from the BOA OIP Advisors Account to Defendant's personal account. Ex. 50 at SEC-BOA-E-2207.

## Company J

J-1.     In April 2006, Oak Fund XI entered into a Stock Purchase Agreement to purchase shares of Company J, a Delaware corporation. Ex. 51 at OAK-SEC-5630 (§ 1.1(a)), 5662.

J-2.     Defendant worked on the Company J share purchase. Ex. 52 at OAK-SEC-5715.

J-3.     The Share Purchase Agreement required Company J to use proceeds from the sale to, among other things, fund the payment of a one-time special dividend to Oak Fund XI. Ex. 51 at OAK-SEC-5630-31 (§ 1.3).

J-4.     The dividend payment was $1.8 million and based on the number of shares Oak Fund XI purchased ($0.12 per share for 15,000 shares). Ex. 53 at OAK-SEC-5610 (§ C(3)(a)).

J-5.     On April 19, 2006, Defendant sent an email directing Company J to wire $1.8 million to the BOA OIP Advisors Account. Ex. 52 at OAK-SEC-5715-16.

J-6.     On May 1, 2006, $1,800,000 was wired to the BOA OIP Advisors Account. Ex. 54 at SEC-BOA-E- 2230.

J-7.     On June 22 and 23, 2006, $1,800,000 was transferred from the BOA OIP Advisors Account to Defendant's personal bank account. Exs. 55 at SEC-BOA-E-2234, 56 at SEC-BOA-E-0006122.

### Company F

F-1.     In February 2007, Oak Fund XII bought shares of Company F. Exs. 5 ¶ 65; 57.

F-2.     Company F was required to reimburse Oak Fund XII for its legal fees in connection with the transaction, up to $250,000. In fact, Oak Fund XII paid the legal fees it incurred directly to its law firms. Exs. 5 ¶ 65; 57 at OAK-SEC-5157 (§23.5).

F-3.     On June 5, 2007, Defendant received an email from an employee of Company F indicating that Company F had wired $250,000 to an account purportedly owned by Oak in the name of "OIP." Exs. 5 ¶ 66; 58.

F-4.     On June 7, 2007, Defendant's BOA OIP Advisors Account received a wire for $250,030 from Company F; the next day that amount was transferred to Defendant's personal account. Exs. 59 at SEC-BOA-E-2278; 60 at SEC-BOA-E-6536.

F-5.     Later in 2007, Company F's shares (including the shares purchased by Oak Fund XII in February 2007, described above) were sold. The agreement required the buyer to pay the seller's transaction expenses up to a cap of $500,000. Again, Oak paid the legal fees it incurred. Exs. 5 ¶¶ 68, 70; 61 at OAK-SEC-5281 to 5282, 5344 (§14.12(f)).

F-6.     Company F attempted to wire €561,451.10 to Defendant's BOA OIP Advisors Account for purported "[Company F] Legal Expenses," and later asked Defendant to remit the amount in excess of the $500,000 limit. Exs. 5 ¶ 69; 62 at OAK-SEC-1650, 1652; 63.

F-7.     On October 4, 2007, Defendant's BOA OIP Advisers Account received a $786,312.27 wire for "[Company F] Legal Expenses." Ex. 64 at SEC-BOA-E-2290.

11

F-8.    On October 5, 2007, $500,000 was transferred from Defendant's BOA OIP Advisers Account to Defendant's personal account; the balance was later returned to Company F's account. Exs. 64 at SEC-BOA-E-2290; 65 at SEC-BOA-E-5913.

## Company G

G-1.    On Defendant's recommendation and through its affiliated entity Oak Asia Infrastructure, LLC, Oak Fund XII purchased Company G shares pursuant to a Stock Purchase Agreement signed by Defendant. Exs. 5 ¶ 11; 6 at 120:7-11; 66 at OAK-SEC-1173; 66 at OAK-SEC-1173.

G-2.    Defendant proposed that Oak Fund XII invest 40 billion Korean Won in Company G shares. After the investment was approved, Defendant presented wire transfer instructions showing that Oak Fund XII was buying 2,348,904 shares for total price of $47.5 million. In accordance with Defendant's instructions, Oak wired $45 million to a Korea Exchange Bank account and the remaining $2.5 million to a Bank of America account number x9887 in the name of "Company G" (the "BOA Company G Account 1"). Exs. 5 ¶¶ 11, 12, 13(b); 67 at OAK-SEC-1136; 68 at OAK-SEC-1140-41; 69.

G-3.    Defendant knew that the purchase price for the Company G shares would be less than $45 million. Defendant instructed that the $2,201,106.11 in excess funds be sent to his BOA OIP Advisors Account. Exs. 5 ¶ 13(c), (d); 70 at OAK-SEC-1212; 71.

G-4.    On January 9, 2008, Korea Exchange Bank wired $2,201,070.56 to Defendant's BOA OIP Advisors Account. Oak has no record of receiving that money or any other amount back from the $45 million Oak Fund XII wired on December 18, 2007. Exs. 5 ¶ 13(d); 72.

G-5.    On December 18, 2007, Defendant opened the BOA Company G Account 1 and that account received a $2,500,000 wire from Oak Fund XII referencing Company G. On that

same day, the entire $2,500,000 was transferred to Defendant's personal bank accounts. Exs. 3 at SEC-BOA-E-2099-2102; 73 at SEC-BOA-E-2115; 74 at SEC-BOA-E-2427.

G-6.      On January 9, 2008, Defendant's BOA OIP Advisors Account received a $2,201,050.56 wire, and the next day that $2,201,050.56 was transferred to Defendant's personal account. Ex. 75 at SEC-BOA-E-2299.

G-7.      In 2009, Oak Fund XII participated in a tender offer for Company G that resulted in the company being taken private and delisted and Defendant signed the Tender Offer Agent Engagement Agreement. Exs. 5 ¶ 27; 76 at OAK-SEC-6145.

G-8.      On or about October 29, 2009, Defendant submitted a wire request and Company G invoice for Oak Fund XII's payment of 2,490,325,000 Korean Won (or $2,101,185.45) to Company G for purported delisting fees and legal fees. The invoice contained wire instructions for Defendant's BOA Company G Account 1. Exs. 5 ¶ 28; 77; 78; 79 at OAK-SEC-1217.

G-9.      On October 29, 2009, Oak Fund XII wired $2,101,185.45 to the BOA Company G Account 1. One day later, a total of $2,099,998 was transferred from Defendant's BOA Company G Account 1 to his personal account. Exs. 5 ¶ 28; 80 at OAK-SEC-1219-20; 81 at SEC-BOA-E-6755; 82 at SEC-BOA-E-3100.

G-10.    In October 2011, Oak Fund XII sold its Company G shares, with a portion of the sales price remaining in escrow until 2013. The transaction was set up so that Oak Fund XII would receive a certain portion of the consideration for its shares at the initial closing and the remainder would be held in escrow until March 31, 2013, upon which time it would be released to Oak Fund XII. Defendant executed the agreement. Exs. 5 ¶¶ 24, 30; 83 at OAK-SEC-4973.

G-11.    On or about November 25, 2011, Defendant submitted a wire request, along with an invoice, for Oak Fund XII's payment of a $3,113,981 "Management Incentive Payment" to

Company G. The wire request directed that $3,113,981 be paid to Company G, and the invoice contained wire transfer instructions for a Bank of America account number x6367 in the name of Company G (the "BOA Company G Account 2"). Exs. 5 ¶ 31; 84 at OAK-SEC-977-78.

G-12.   On October 17, 2011, Defendant opened the BOA Company G Account 2. On November 28, 2011, Oak Fund XII wired $3,113,981 to that account, and the next day $3,000,000 was transferred to Defendant's personal bank account. Exs. 3 at SEC-BOA-E-2110-12; 5 ¶ 31; 85 at OAK-SEC-975-76; 86 at SEC-BOA-E-6889; 87 at SEC-BOA-E-3818.

G-13.   On April 10, 2013, Defendant submitted a wire transfer request, along with an invoice and an email explanation of the fees, for Oak Fund XII's payment of a $1,556,990 "Management Incentive Payment" to Company G related to the sale of Company G shares. The invoice contained wiring instructions for the BOA Company G Account 2. Exs. 5 ¶ 33; 88 at OAK-SEC-984-86; 89.

G-14.   On April 11, 2013, Oak Fund XII wired $1,556,990 to the BOA Company G Account 2. That same day, the money was transferred from the BOA Company G Account 2 to Defendant's personal bank account. Exs. 5 ¶ 33; 90; 91; 92 at SEC-BOA-E-6975, 6976; 93 at SEC-BOA-E-4394.

G-15.   On April 29, 2013, Defendant submitted a wire transfer request, along with an invoice, for Oak Fund XII's payment of a $622,796 Investment Banking Advisory Fees reimbursement to Company G. The invoice contained wiring instructions for the BOA Company G Account 2. Exs. 5 ¶ 35; 94 at OAK-SEC-990-92.

G-16.   On April 30, 2013, Oak Fund XII wired $622,796 to the BOA Company G Account 2. That same day, the $622,796 was then transferred to Defendant's personal account. Exs. 5 ¶ 33; 95; 96; 92 at SEC-BOA-E-6976; 93 at SEC-BOA-E-4395.

14

G-17.    The four Company G invoices were bogus, Defendant's BOA Company G Accounts 1 and 2 did not belong to Company G, and Company G never received the funds mentioned above. Ex. 5 ¶ 26.

### Company H

H-1.    Oak Fund XII entered into an Exchange Agreement in which it exchanged common stock of the parent company of Company H for preferred stock. Ex. 97 at OAK-SEC-6289. Oak Fund XII made two additional investments in shares of the parent company of Company H in April and May 2009. Exs. 98 at OAK-SEC-7034, 7036; 99 at OAK-SEC-7037-38; 100 at OAK-SEC-6320, 6322; 101; 102.

H-2.    Two law firms represented Oak in connection with Oak's investment in Company H as well as other legal matters related to Company H, and Oak paid the attorneys' fees it incurred directly to those firms. Ex. 5 ¶ 72.

H-3.    Purporting to act pursuant to agreements with Company H, Defendant directed Company H to transfer to the BOA OIP Advisors Account nearly 1,500,000 GBP (British pounds) for reimbursement of legal fees in connection with the investments in Company H as well as other legal work related to Company H. Exs. 5 ¶ 73; 103 at OAK-SEC-7047; 104; 105.

H-4.    The BOA OIP Advisors Account received wires for $1,575,905.94 and $118,553.60 from Company H. These funds were paid by Company H using the money Oak XII had invested in April 2009. Exs. 108 at SEC-BOA-E-6711; 109 at OAK-SEC-1970. On the next day, a total of $1,690,932.54 was transferred from the BOA OIP Advisors Account to Defendant's personal account. Exs. 5 ¶ 73; 106; 107; 108 at SEC-BOA-E-6711.

H-5.    On June 17, 2009, the BOA OIP Advisors Account received a wire for $535,025.04 from Company H. Ex. 110 at SEC-BOA-E-6727.  On the next day, the same

15

amount was transferred from the BOA OIP Advisors Account to a personal account. Exs 110 at SEC-BOA-E-6727; 111 at SEC-BOA-E-2954. Oak Fund XII never received the funds. Ex. 5 ¶¶ 53-55, 72-74.

H-6.     Defendant sent a letter to Company H which formally requests that Company H reimburse Oak up to £1,500,000 in legal expenses by transferring the funds to the BOA OIP Advisors Account. Exs. 5 ¶ 74; 112 at OAK-SEC-1961.

### **Company I**

I-1.     In December 2010, Defendant recommended that two Oak Funds – Oak Fund XII and Oak Fund XIII – purchase shares in Company I for £36.5 million. Exs. 5 ¶ 15; 113.

I-2.     After the investment was approved, Defendant directed that Oak pay $3.6084 per share for a total of approximately $59 million. The amount Defendant directed Oak to pay in U.S. dollars assumes an exchange rate of 1.62 dollars to the British pound. Exs. 5 ¶ 15; 113, 114.

I-3.     On December 22, 2010, Defendant told Oak that the exchange rate used for the Company I investment was fixed at $1.62 to the British pound, and that the agreement to fix the exchange rate had been reflected in a term sheet signed in November 2010. Exs. 5 ¶ 17; 115.

I-4.     The November 2010 term sheet that Defendant executed on Oak's behalf did not contain any provision fixing the exchange rate. Exs. 5 ¶ 18(a); 116.

I-5.     Application of the exchange rate between the pound and the dollar on the date of Oak Fund XII's investment would have resulted in a per share price of $3.49. Ex. 5 ¶ 18(b).

I-6.     On December 17, 2010, Company I informed Defendant that the Oak Funds XII and XIII overpaid Company I for the investment and that approximately £1.434 million was being wired back to the Oak Funds. Exs. 5 ¶ 18(c); 117 at OAK-SEC-5121-23.

I-7.    On December 17, 2010, Company I attempted to wire the approximately £1,434 million to an account ending in number x9310. Defendant told Company I that the beneficiary name was wrong and that "you may have to call your bank and change that to 'OIP Advisors' (which is our business account) for which the bank details are valid," which Company I did. Exs. 5 ¶¶ 18(c), (d); 117 at OAK-SEC-5119-5121; 118.

I-8.    On December 22, 2010, approximately $2.185 million from Company I posted to Defendant's BOA OIP Advisors Account. The next day, this amount was transferred to Defendant's personal account. Exs. 119 at SEC-BOA-E-6837; 120 at SEC-BOA-3502.

I-9.    Oak did not receive £1.4 million (or any other amount) for the return of surplus funds paid in connection with its December 2010 investment in Company I. Ex. 5 ¶ 19.

## Company A

A-1.    Defendant recommended that that Oak Fund XIII pay $3,544,773 to purchase shares of Company A owned by its holding company referred to as "BVI Company" at a price of $28.50 per share. Defendant represented to Oak certain aspects of Company A's financial condition with his recommendation. Exs. 4 ¶ 18; 121 at OAK-SEC-671.

A-2.    Before Oak Fund XIII purchased the shares, Defendant received a copy of Company A's most recent board package, which included estimated financial results for Company A, which were lower than the figures Defendant reported in his proposal to Oak. Exs. 4 ¶ 22(f); 122 at OAK-SEC-647. Contrary to Defendant's report to Oak, the board package showed that Company A earned only $724,521 in revenue for the month of June 2014 and operated at a loss of $208,238 for that month. Ex. 4 ¶ 22(g).

A-3.    Defendant proposed to his co-director of BVI Company that it discontinue negotiations with a third party for the sale of Company A shares. Defendant suggested that BVI

Company sell to Oak at a "fair price" of $1.5 million. BVI Company agreed to sell its stake for $1.5 million based on Defendant's recommendation. Ex. 123; *see also* Ex. 4 ¶ 22(a).

A-4.    Defendant sent his co-directors of BVI Company a set of deal documents for the sale of Company A shares, which stated a price of $1.5 million price, or $12.06 per share. Exs. 4 ¶ 22(b); 124 at OAK-SEC-687, 690 ¶ 1, 696.

A-5.    The seller signed the deal documents with a purchase price of $1.5 million and delivered the signature pages and stock transfer certificates to Defendant's Oak email address. Exs. 125; 126. On behalf of Oak Fund XIII, Defendant signed a copy of the signature page for the Share Purchase Agreement that had been signed by the seller. *Compare* Ex. 127 at OAK-SEC-747, *with* Ex. 125 at OAK-SEC-705.

A-6.    On August 11, 2014, Defendant provided wire transfer instructions to Oak for the payment of $3,544,773 to a Bank of America account in the name of "Iftikar Ali Ahmed Sole Prop, DBA [BVI Company]" (the "BOA BVI Company Account."). Exs. 4 ¶¶ 15(c), 19. Oak approved the purchase of Company A shares for $3,544,773, or $28.50 per share in reliance on Defendant. Ex. 128 at OAK-SEC-714.

A-7.    On August 12, 2014, Defendant sent to Oak what appeared to be fully executed deal documents. Ex. 127 at OAK-SEC-739. Defendant created these documents by attaching the signature pages to different versions of the documents. The versions sent to the seller contained a price of $1.5 million and a per share price of $12.06, *see* Ex. 124 at OAK-SEC-687, 690 & 696, but the versions sent to Oak contained a price of $3,544,773 and a per share price of $28.50. Ex. 127 at OAK-SEC-739, 742 ¶ 1, 748.

A-8.    Oak Fund XIII wired $3,544,773 to Defendant's BOA BVI Company Account. Exs. 129; 130 at SEC-BOA 893. Defendant wired $1,500,000 from his BOA BVI Company

Account to the seller. Defendant made three separate transfers totaling $2,044,713 from the BOA

BVI Company Account to his personal account. Ex. 130 at SEC-BOA-893.

### Company B

B-1.    Company B was a joint venture formed by two parties – JV Party 1 and JV Party

2. JV Party 2 was a subsidiary of the BVI Company described in SOF ¶ A-1. Ex. 4 ¶¶ 8-9.

B-2.    In December 2014, Defendant recommended that Oak Fund XII purchase JV

Party 1's shares in Company B for a total purchase price of $20 million. Exs. 4 ¶ 10; 131 at

OAK-SEC-2.

B-3.     After the investment was approved, Defendant directed that $2 million be wired

to an account for JV Party 1 and that $18 million be wired to an account that Defendant

represented belonged to the BVI Company. Exs. 4 ¶¶ 11, 13; 132; 133.

B-4.    On January 3, 2015, Defendant sent Oak what Defendant represented were the

legal documents pertaining to Oak's Company B investment, which reflect a $20 million

purchase price. Exs. 4 ¶ 14; 134 at OAK-SEC-69 (¶ 3.1), OAK-SEC-77.

B-5.    The actual SPA for Oak Fund XII's purchase of Joint Venture Party l's interest in

Company B – which Defendant signed on behalf of the Oak Fund – states that the purchase price

is $2 million, not $20 million. Exs. 4 ¶ 14; 135 at OAK-SEC-19 (¶ 3.1), OAK-SEC-26.

B-6.    Examination of Defendant's personal directory at Oak, which is generally

inaccessible to other Oak personnel, revealed a Word version of the SPA that is identical to the

SPA that Defendant received as a Word document on December 16, with the exception of

Section 3.1, which reflects a $20 million purchase price. Ex. 4 ¶ 15(b).

B-7.    On December 19, 2014, Oak Fund XII purchased JV Party 1's shares in Company

B by wiring $2 million and $18 million to the accounts Defendant specified. Exs. 4 ¶ 12; 136.

B-8.    The account to which Defendant directed Oak to wire $18 million is in fact Defendant's BOA BVI Company Account. Exs. 4 ¶ 15(c); 137.

B-9.    Defendant's BOA BVI Company Account received the $18 million wired by Oak. Shortly thereafter, approximately $18 million was transferred from Defendant's BOA BVI Company Account to Defendant's personal account. Exs. 137 at SEC-BOA-E-909, 915; 138 at SEC-BOA-E-541.

B-10.   On November 22, 2014, Defendant received financial results and projections for Company B. The projected results for 2014 through 2017 were lower than the projections in Defendant's presentation recommending the Company B investment. Ex. 4 ¶¶ 15(d), 10; *compare* Exs. 131 at OAK-SEC-3 *with* 139 at page 5 of 8.

B-11.   Oak also later learned that Company B had cash, cash equivalents, and assets that were substantially lower than what Defendant represented Company B would have post-closing. Ex. 4 ¶ 15(e); *compare* Exs. 131 at OAK-SEC-3 *with* 140 at OAK-SEC-494.

## Company C

C-1.    In November 2012, Company C, an e-commerce business based in the United States, sold Series A shares to (among others) I-Cubed Domains, LLC ("I-Cubed") and an Oak portfolio company known as the BVI Company. Ex. 4 at ¶¶ 23, 24; Ex. 141 at OAK-SEC-835-36.

C-2.    Defendant was one of three BVI Company board of directors. Ex. 142 at OAK-SEC-824.

C-3.    Defendant was responsible for identifying and negotiating a $150,000 BVI Company investment in Company C. Ex. 142 at OAK-SEC-820, 821 (§ 2).

C-4.    Defendant circulated a Unanimous Written Consent authorizing a $150,000 purchase of Series A Preferred Stock in Company C, which was executed by at least one other Director. Exs. 142 at OAK-SEC-821 (§ 2); 143 at OAK-RD-7316.

C-5.    $150,000 was wired from a BVI Company Fidelity account ending in number x6852 (the "BVI Company Fidelity Account"). Exs. 144 at SEC-NFS-E-2241. Shortly thereafter, Defendant requested from and negotiated with Company C for an additional $2 million investment in Company C by the BVI Company, claiming it was necessary due to pressure from Oak. Exs. 145 at OAK-SEC-828; 146 at OAK-SEC-833.

C-6.    On November 26, 2012, $2,000,000 was wired from the BVI Company Fidelity Account. Ex. 147 at SEC-NFS-E-2242.

C-7.    After the $2 million transfer was discovered by the BVI Company, Defendant claimed the purchase was a mistake on the part of the "finance team." Ex. 148 at OAK-SEC-839.

C-8.    Claiming it was his "mistake," Defendant offered to take "full responsibility" and purchase the shares. On or about June 21, 2013, $2,000,000 was wired from Defendant and his wife's bank account; the BVI Company Fidelity Account received a $2,000,000 wire the same day. Exs. 149 at OAK-SEC-852; 150 at OAK-NFS-E-5177, SEC-NFS-E-0005299.

C-9.    Defendant was involved in negotiating the redemption/sale of the Company C shares in the name of the BVI Company for $10,896,193.59. The agreement stated the seller was the BVI Company and the redemption/sale was conditioned on Oak Fund XIII's purchase of Series B stock from Company C, which (as explained in SOF C-15 below) Defendant was negotiating on behalf of Oak XIII. Exs. 151 at OAK-RD-37; 152 at OAK-SEC-892 (§ 2.1), 897.

C-10.   On June 17, 2013, in connection with Oak Fund XIII October 2013 investment into Company C (*see* C-15), Defendant represented to Oak that the BVI Company had

invested $2 million in Company C but that Defendant had no personal investment or direct beneficial interest or investment in Company C. Exs. 4 at ¶ 25; 153 at OAK-SEC-861.

C-11.   On October 10, 2013, Defendant opened a bank account in the name of "BVI Company" (the "BOA BVI Company Account"). Ex. 3 at SEC-BOA-E-1156-58.

C-12.   Three days later, Company C was directed to send the redemption money for the BVI Company C shares to the BOA BVI Company Account. Ex. 154 at OAK-RD-10258.

C-13.   On or about October 18, 2013, $10,896,193.59 was wired into the BOA BVI Company Account. Ex. 155 at OAK-BOA-E-843.

C-14.   On or about November 14 & 15, 2013, $10,691,881.59 was transferred from the BOA BVI Company Account into Defendant's personal account. Ex. 156 at SEC-BOA-E-4740.

C-15.   Defendant was responsible for identifying and negotiating the terms of Oak Fund XIII's investment in Company C. In October 2013, upon Defendant's recommendation, Oak Fund XIII invested $25 million in Series B shares. Exs. 4 at ¶¶ 23- 24; 6 at 209:6-12.

C-16.   Each Oak fund is prohibited (absent consent) from investing in the securities of any entity in which any of the managing members of its general partner (including Defendant) have, or have had within the preceding ninety days, an investment or other material financial interest.  Oak funds also are prohibited (absent consent) from purchasing or selling securities to or from any managing members of the general partner of the Oak Funds (including Defendant), or any of their affiliates. Ex. 4 at ¶ 25.

C-17.   In October 2014, Defendant recommended that Oak Fund XIII make a second investment in Company C by purchasing I-Cubed's Company C shares for $7.5 million. Defendant described the seller of the shares as a "family office" and his written presentation to

Oak included financials for Company C showing its estimated revenues in 2014 to be $515.6 million, a 65% increase over 2013 revenues of $311.81 million. Ex. 4 at ¶ 26.

C-18.   On October 30, Oak Fund XIII entered into a Stock Purchase Agreement with I-Cubed that was executed by Defendant on behalf of Oak Fund XIII and purportedly by Richard N. Kimball on behalf of I-Cubed. Exs. 4 at ¶ 27;  157 at OAK-SEC-103, 105.

C-19.   Defendant directed Oak to send the $7.5 million payment from Oak Fund XIII to an account held by I-Cubed at Bank of America (the "BOA I-Cubed Account"). The $7.5 million was transferred on October 30 and received the same day. Exs. 4 at ¶ 28; 158 at SEC-OAK-106-7;159 at SEC-BOA-E-799.

C-20.   On October 28, 2014, Defendant opened the BOA I-Cubed Account. Defendant stated he was a member of I-Cubed and was listed as the sole signatory on the account opening documents. Until her deposition, Ms. Ahmed had no knowledge of this bank account. Exs. 3 at SEC-BOA-1189-92; 11 at 318:15-22.

C-21.   Defendant wrote a $7,425,000 check from the BOA I-Cubed Account to the Shalini Ahmed 2014 Grantor Retained Annuity Trust ("GRAT"). Ex. 160 at SEC-BOA-E-1355.

████████████████████████████████████████████████████████████

████████████████████████████

C-22.   I-Cubed is a single member Delaware LLC formed on October 24, 2012. Its sole member (and owner) was Defendant. Exs. 4 at ¶ 29(a); 161 at OAK-SEC-109 (§ 1.1), 115.

C-23. I-Cubed's 30(b)(6) witness testified that he did not know why I-Cubed was formed, that Defendant signed I-Cubed's operating agreement, and that Defendant would have the most knowledge about its formation.  Ex. 162 at 14:10-15:18.

C-24.   On November 13, 2012, General Counsel of Company C reported to Defendant that it received a $2 million wire on behalf of I-Cubed. A transaction confirmation located in Defendant's office shows that on November 13, 2012, $2 million was wired from an account in the name of Defendant and his wife at Fidelity Investments for credit to Company C. Ex. 4 at ¶ 29(b).

C-25.   In May 2013, shortly before proposing Oak Fund XIII's initial $25 million Company C investment, Defendant transferred his I-Cubed interest to Ms. Ahmed. Exs. 4 at ¶ 29(d); 11 at 295:25-296:23; 163.

C-26.   On or around August 29, 2014, ownership of the I-Cubed shares were transferred into the GRAT for which Ms. Ahmed was trustee. Exs. 4 at ¶ 29(d); 164 at OAK-SEC-124 (§ B); 11 at 299:2-25.

C-27.   Defendant did not disclose to Oak or its funds that he or his family owned or had an interest in I-Cubed (or Company C shares) despite recommending that Oak Fund XIII buy Company C shares directly from I-Cubed. Ex. 4 at ¶ 30.

C-28.   Mr. Kimball resigned as manager of I-Cubed on September 23, 2014; he did not sign (or permit anybody to sign on his behalf) either the signature page or Exhibit B of the Stock Purchase Agreement; and, to the best of his recollection, he had no knowledge of the share sale until contacted by the SEC. Ex. 165 at 1.

C-29.   Ms. Ahmed testified that Mr. Kimball resigned as manager of I-Cubed in September 2014, that he was not I-Cubed's manager when the Stock Purchase Agreement was signed, and that she did not sign his name. Ex. 11 at 312:19-23, 323:17-324:17.

C-30.   On October 8, 2014, Defendant received an email showing that Company C's actual revenues for the first eight months of 2014 were $178.1 million (11.7% ahead of revenues) for the first eight months of 2013, well below the 65% increase implied by the estimated full-year 2014

revenue of $515.6 million in his presentation to the Oak partners. Less than one week after Oak purchased the shared from I-Cubed, Defendant told an investor in Company C (responding to a suggestion that Oak participate in another financing): "With a flat to down year it is a non-starter at Oak unfortunately for me to even try and pitch." According to a financial statement in Defendant's emails, Company C's actual revenues for 2014 ended up at only $278.9 million; 46% less than the estimate of $515.6 million included in Defendant's presentation and materially below their actual revenues for 2013. Ex. 4 ¶ 29(e).

C-31.   In Spring 2016 Company C ceased operations. Oak Fund XIII lost its entire investment. Exs. 6 at 338:22-339:19; 166 at OAK-RD-71184.

C-32.   The GRAT's 30(b)(6) witness testified the GRAT was formed on August 29, 2014, when it received a 99% membership interest in I-Cubed. The witness believed I-Cubed's only assets were Company C shares, which, consistent with the GRAT formation document, had a fair market value of $876,193.72. Exs. 167 at 15:21-23, 26:22-28:19; 168 at Shalini Ahmed_881.

C-33. At the preliminary injunction hearing, Ms. Ahmed testified that, consistent with the GRAT formation document, I-Cubed's Company C shares were worth $876,193.72 on August 29, 2014. Exs. 11 at 304:13 – 305:12, 308:3-18; 168 at Shalini Ahmed_881.

DATED: June 27, 2017.

Respectfully submitted,

*s/ Nicholas P. Heinke*
Nicholas P. Heinke (Colo. Bar No. 38738)
    Connecticut Bar No. phv07374
Jeffrey E. Oraker (Colorado Bar. No. 26893)
    Connecticut Bar No. phv08631
Terry Ryan Miller (Colorado Bar. No. 39007)
    Connecticut Bar No. phv08981
Mark L. Williams (New York Bar. No. 4796611)
    Connecticut Bar No. phv07375
United States Securities and Exchange Commission
1961 Stout St., Suite 1700, Denver, CO  80294
Phone:    (303) 844-1000
           (303) 844-1071 (Heinke)
           (303) 844-1041 (Miller)
           (303) 844-1097 (Oraker)
           (303) 844-1027 (Williams)
E-mail:    HeinkeN@sec.gov
           MillerTE@sec.gov
           OrakerJ@sec.gov
           WilliamsML@sec.gov

Attorneys for Plaintiff:

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION

<u>**CERTIFICATION**</u>

I certify that on June 27, 2017, a copy of the foregoing document was emailed to Defendant Iftikar Ahmed at IftyAhmed@icloud.com, and served via ECF upon the following:


Jonathan Harris
Reid Skibell
David Deitch
Alexander Sakin
S. Gabriel Hayes-Williams
Harris, St. Laurent & Chaudhry LLP
40 Wall Street, 53rd Floor
New York, NY 10005
(Counsel for Relief Defendants)

*s/ Nicholas P. Heinke*
Nicholas P. Heinke
