UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br>*Plaintiff*,<br>*v.*<br>IFTIKAR AHMED,<br>*Defendant*, and<br><br>IFTIKAR ALI AHMED SOLE PROP; I-CUBED DOMAINS, LLC; SHALINI AHMED; SHALINI AHMED 2014 GRANTOR RETAINED ANNUITY TRUST; DIYA HOLDINGS LLC; DIYA REAL HOLDINGS, LLC; I.I. 1, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; I.I. 2, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; and I.I. 3, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents,<br>*Relief Defendants*. | Civil No. 3:15cv675 (JBA)<br><br><br><br>March 29, 2017 |

**RULING ON ALL PARTIES' MOTIONS FOR SUMMARY JUDGMENT ON LIABILITY**

I.   Introduction ...................................................................................................2

II.  Background ....................................................................................................3

   A.  Overarching Facts ....................................................................................3

   B.  Procedural History....................................................................................5

   C.  Defendant's Assertion of his Fifth Amendment Right............................5

   D.  Defendant's Fraudulent Conduct.............................................................6

      *1.  Company A* ........................................................................................6

      *2.  Company B*.........................................................................................7

      *3.  Company C*.........................................................................................8

      *4.  Company D* ......................................................................................14

      *5.  Company E*.......................................................................................16

6.    *Company F* ........................................................................................... 18

7.    *Company G* .......................................................................................... 19

8.    *Company H* .......................................................................................... 22

9.    *Company I* ............................................................................................ 22

10.  *Company J* ........................................................................................... 23

III.    Discussion ........................................................................................................... 24

  A.  Standard on Summary Judgment and Effect of Adverse Inference ................... 24

  B.  Defendant's Claims he was Treated Unfairly are Without Merit ...................... 26

  C.  *Kokesh* Does not Require Dismissal of Claims Against Relief Defendants in the Pending Summary Judgment Proceedings ................................................................ 27

  D.  Defendant's Conduct Violated the Advisers Act, Securities Act, and Exchange Act ........ 30

    1.  *Fraud Under the Advisers Act* ............................................................... 30

      a.    Defendant is an Investment Adviser ................................................ 31

      b.    Defendant Violated Sections 206(1), (2), (4), and Rule 206(4)-8 ............ 33

        i.    *Defendant's Fraud was Directed Towards Clients and Investors* ........... 34

        ii.    *Negligence or Scienter* ................................................................ 36

        iii.    *Breach of Fiduciary Duties* ....................................................... 36

      c.    Section 206(3) ................................................................................ 37

    2.  *The Exchange Act and Securities Act* ..................................................... 39

      a.    Material Misrepresentations/use of a Fraudulent Device ...................... 41

      b.    Scienter ....................................................................................... 41

      c.    In Connection With a Purchase or Sale of Securities ........................... 41

      d.    Territorial Requirements ................................................................. 45

        i.    *Morrison and Subsequent Case law* ............................................. 45

        ii.    *The Intention of the Parties* ....................................................... 51

        iii.    *The SEC's Evidence is Sufficient to Establish Domesticity* ................ 53

IV.    Conclusion ........................................................................................................ 68

## I. Introduction

Plaintiff, the United States Securities and Exchange Commission ("SEC") alleges that Defendant Iftikar Ahmed ("Mr. Ahmed") violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 (Count One), Section 17(a) of the Securities Act of 1933 ("Securities Act") (Count Two), and Section 206 of the Investment Advisers Act ("Advisers Act") (Counts Three, Four, and Five).[1] (Second Am. Compl. ("SAC") [Doc. # 208].) In Counts Six through Fourteen, the SEC seeks equitable disgorgement against each respective Relief Defendant.

The Court bifurcated summary judgment, with this first stage addressing only liability, and a second stage addressing the appropriate relief, if needed, or in the alternative, a trial on liability will be held. All three parties move for summary judgment.[2] (See Def.'s Mot. for Summ. J. [Doc. #616]; Relief Defs.' ("RD") Mot. for Summ. J. [Doc. # 618-2]; Pl.'s Mot. for Summary Judgment [Doc. #622].) The Court held oral argument on February 28, 2018.

The SEC alleges that Defendant "systematically used fraudulent and deceptive means to divert more than $67 million from funds he advised" while employed by venture capital firm Oak Investment Partners ("Oak") "into his personal bank accounts, before funneling much of his ill-

---

[1] The SEC initially filed this action on May 6, 2015, with allegations arising out of transactions involving Companies A, B, and C and naming as Relief Defendants only Iftikar Ali Ahmed Sole Prop and I-Cubed Domains, LLC. (Compl. [Doc. # 1].) On June 16, 2015, the SEC filed its Amended Complaint [Doc. # 33] in which it added the remaining Relief Defendants as parties and asserted additional claims against Defendant arising out of transactions associated with Companies D, E, F, G, H, and I. Finally, on April 1, 2016, the SEC filed a Second Amended Complaint [Doc. # 208] in which it added claims involving Company J.

[2] Although there are nine Relief Defendants, the Court refers to them throughout as a single party, in light of their uniform and joint defense.

gotten gains into assets and accounts in the name of his wife in order to conceal his fraud and protect the assets from confiscation." (Pl.'s Mot. for Summ. J. at 1.) In response, neither Defendant nor Relief Defendants argue that Defendant did not commit the alleged frauds, instead contending primarily that Defendant should not be held liable because (1) certain fraudulent acts are time-barred by the statute of limitations, (2) the fraud was not sufficiently connected to securities transactions, and (3) the underlying securities transactions are not sufficiently domestic to be within the reach of the United States securities laws.

For the reasons that follow, the SEC's Motion for Summary Judgment is granted. Defendant and Relief Defendants' Motions for Summary Judgment are denied.

## II. Background

### A. Overarching Facts[3]

---

[3] While Defendant purports to deny many of the facts in the SEC's Local Rule 56(a)1 Statement, he fails to support his denials with any evidence, in violation of Local Rule 56(a)(3). See D. Conn. L. Civ. R. 56(a)(3); *Garden Catering-Hamilton Ave., LLC v. Wally's Chicken Coop, LLC*, 30 F. Supp. 3d 117, 127 (D. Conn. 2014). Defendant was specifically made aware of this rule in the Notice to Self-Represented Litigant that the SEC served on him. (*See* Doc. # 626 at 2, 19-20.) Defendant also denies certain facts because certain documents were not shared with him. But the relevant evidence consisted of confidential documents filed under seal that the Court ruled Defendant would not be permitted to receive, having fled the jurisdiction of the United States, because no protective orders could be enforced against him in India, and the documents would only be shared with him in the United States. (*See e.g.*, Doc. # 286.) Since Defendant has submitted no evidence to support his denials, and since the record does not support those denials, the facts set forth in the SEC's Rule 56(a)1 Statement have been established as true for purposes of summary judgment. *See Henderson v. Wells Fargo Bank, N.A.*, 2017 WL 731780, *4 (D. Conn. Feb. 21, 2017). Moreover, Defendant's own Local Rule 56(a)1 Statement offers only unauthenticated exhibits—which he failed to disclose in discovery—as support for his statement of facts, which does not change the Court's assessment of the facts. *See Haughton v. Town of Cromwell*, No. 3:14-CV-1974 (VLB), 2017 WL 2873047, at *4 (D. Conn. July 5, 2017) (declining to consider evidence on summary judgment that was "not disclosed during discovery;" and was not "properly authenticated").

Oak Management Corporation ("OMC") is the investment manager for various venture capital investment funds, which raise money from investors (ranging from state and municipal pension funds to individual investors) and, in turn, invest those monies in various types of securities. (SEC Loc. R. 56(a)1 Statement of Facts ("SOF") at X-4.) Defendant joined Oak in 2004 where he worked as an investment professional and a managing member of entities that serve as general partners of certain Oak funds. (SOF ¶ X-5.) Defendant was responsible for, among other things, identifying companies in which Oak funds might invest ("portfolio companies"), recommending investments, and negotiating the terms of investments with portfolio companies. (*Id.* ¶¶ X-6 to X-9.)

To enter into a securities transaction, Oak entities memorialized an agreement to consummate a purchase or sale in written agreements, typically share purchase agreements ("SPAs"), merger agreements or tender offer agreements. (*Id.* ¶ X-25.) The SEC's allegations focus on a series of such transactions relating to ten companies, described in the Second Amended Complaint as Companies A through J, all of which involved Defendant. In essence, and as described *infra* in detail with respect to each transaction, Defendant opened bank accounts he alone controlled that were deceptively titled in the name of Oak and its portfolio companies, which he then used to divert monies intended for Oak funds or its portfolio companies into his and his wife's personal bank accounts.

---

In Relief Defendants' Local Rule 56(a)2 Statement they do not admit or deny several of the SEC's facts, instead claiming that the "asserted fact is not material to any issue raised in the SEC's motion." (*See, e.g.*, RD LR 56(a)2 [Doc. # 659] ¶ X-14.) The Court considers these facts admitted, and will make its own determination as to whether or not these facts are material.

### B. Procedural History

On April 2, 2015, before the SEC initiated this action and unrelated to this action, Defendant was arrested and charged with insider trading. *See United States v. Kanodia*, et al., No. 1:15-cr-10131-NMG-MBB (D. Mass. Apr. 1, 2015) (Docs. ## 3-4). Defendant's bond was set at $9 million and, as a condition of release pending his criminal trial, his travel was restricted to Connecticut, New York, and Massachusetts. *See United States v. Ahmed*, No. 3:15-mj-00052-WIG (D. Conn. Apr. 2, 2015) (ECF 4 & 8 at ¶ 7(f)); *United States v. Kanodia, et al.*, No. 1:15-cr-10131-NMG-MBB (D. Mass. Apr. 21, 2015) (ECF 19).

On May 6, 2015, the SEC filed its Complaint [Doc. # 1] and an emergency motion [Doc. # 2] for a temporary restraining order freezing assets and asking for a preliminary injunction. The following day, the Court entered [Doc. # 9] a temporary restraining order freezing assets of Defendant and certain Relief Defendants up to approximately $55 million, and scheduled a preliminary injunction hearing. At some point in May, prior to the preliminary injunction hearing, Defendant fled from the United States to his native country—India—where he remains to this day.

On August 12, 2015, after a two day evidentiary hearing, the Court granted [Doc. # 113] the SEC's motion for a preliminary injunction. This hearing transcript is posted on the docket, to which Defendant has access.

### C. Defendant's Assertion of his Fifth Amendment Right

Defendant answered [Doc. # 218] the SEC's Second Amended Complaint on April 22, while represented by counsel, "assert[ing] his right under the Fifth Amendment to the Constitution of the United States and applicable laws and statutes not to be compelled to be a witness against himself …" in response to the SEC's allegation of fraud. (*See* SEC Ex. 1; SOF ¶ X-1.) In discovery, among other things, the SEC requested "all communications … with any of the

Relief Defendants regarding any of the allegations in the Complaint," "all communications … with any individuals from Companies A-I regarding any of the allegations in the Complaint," and "all communications … with any individual from Oak, and Oak Fund, Oak Funds investors, or an Oak Fund portfolio company regarding any of the allegations in the Complaint." (SEC Ex. 12 at 11-13.) In response to the SEC's Requests for Admission and Interrogatories, Defendant invoked his Fifth Amendment right against self-incrimination. (SOF ¶¶ X-1, X-16.) In response to the SEC's Document Requests, Defendant claimed to have no responsive documents. (*Id.* ¶ X-16.)

### D.  Defendant's Fraudulent Conduct

#### 1.    *Company A*

In August 2014, Defendant proposed via email that Oak Fund XIII purchase 124,378 Series A shares of Company A from Company A's holding company, the "BVI Company," at a price of $28.50 per share, for a total purchase price of $3,544,773. (SOF ¶ A-1.) He buttressed his proposal with favorable comments on Company A's financial condition, but before Oak Fund XIII purchased the shares, Defendant received a copy of Company A's most recent board package, which included lower estimated financial results for Company A than the figures Defendant reported in his proposal to Oak. (*Id.* ¶ A-2.) On August 11, Oak approved Defendant's proposed purchase of Company A shares and executed the stock purchase agreement on behalf of Oak Fund XIII. (*Id.* ¶ A-6.)

Defendant then induced Oak Fund XIII to pay an inflated purchase price by emailing Oak what appeared to be the deal documents already executed by the seller with the purchase price of $3,544,733. (*Id.* ¶ A-7.) However, the versions sent to the seller contained a price of $1.5 million. (*Id.*) Thus, the seller agreed to a purchase price of $1.5 million for the Company A shares, but Defendant's fraud caused Oak Fund XIII to pay $3,544,733 for those same shares.

Finally, Defendant provided Oak instructions for Oak Fund XIII to wire the $3,544,773 purchase price to a Bank of America account in the name of "Iftikar Ali Ahmed Sole Prop, DBA [BVI Company]" (the "BOA BVI Company Account"),[4] which the Oak Fund followed. (*Id.* ¶¶ A-6, A-8.) Defendant then wired the $1.5 million actual purchase price from this account to the seller. (*Id.* ¶ A-8.) Rather than returning the excess purchase price to Oak Fund XIII, Defendant transferred the remaining balance of just over $2 million into a joint account he owned with his wife, Relief Defendant Shalini Ahmed. (*Id.*)

## 2. Company B

Company B was a joint venture formed by two parties, denoted here as JV Party 1 and JV Party 2. (SOF ¶ B-1.) JV Party 2 was a subsidiary of the BVI Company from which Oak Fund XIII purchased its Company A shares. (*Id.*) In December 2014, Defendant recommended that Oak Fund XII purchase JV Party 1's shares in Company B for $20 million. (*Id.* ¶ B-2.) Financial documents Defendant received prior to his recommendation, on November 22, 2014, reveal that the projected results for Company B were lower than the projections Defendant included in his presentation recommending the investment. (*Id.* ¶ B-10.) After the investment was approved, Defendant told Oak that the $20 million purchase price should be split between two accounts, with $2 million wired to JV Party 1 and $18 million wired to an account that Defendant claimed belonged to the BVI Company, but was in fact Defendant's BOA BVI Company Account. (*Id* ¶¶ B-3, B-8.)

---

[4] Defendant had opened this account October 10, 2013, in connection with the Company C transactions, discussed *infra*. (SOF ¶ C-11.)

Oak Fund XII wired the payments as Defendant directed. (*Id.* ¶ B-7.) Defendant also forwarded to Oak personnel what he claimed were the final deal documents reflecting a $20 million purchase price. (*Id.* ¶ B-4.) The actual purchase price for the Company B shares was $2 million, not $20 million. (*Id.* ¶ B-5.) Examination of Defendant's personal directory at Oak after his arrest, which is generally inaccessible to other Oak personnel, revealed a Word version of the SPA that is identical to the SPA that Defendant received as a Word document on December 16, with the exception of Section 3.1, which reflects a $20 million purchase price. (*Id.* ¶ B-6.)[5]

After the $18 million was wired by Oak Fund XII into Defendant's BOA BVI Company account, Defendant transferred approximately $18 million into a joint bank account that he held with his wife, Relief Defendant Shalini Ahmed. (*Id.* ¶ B-9.)

### 3. Company C[6]

Defendant engaged in deceptive conduct by misrepresenting Company C's financial performance and concealing and misrepresenting his ownership of Company C shares, while he recommended and advised Oak Fund XIII to make two separate investments in Company C.

$10,896,193.59 Redemption of Company C Shares.

---

[5] Relief Defendant's dispute this fact, arguing that it is not supported by admissible evidence because "[a]lthough [Ms. Ames's Declaration] references a document, the allegation is not supported by documentary evidence attached to either Plaintiff's motion or to the referenced Declaration." (RDs' Loc. R. 56(a)2 [Doc. # 659] ¶ B-6.) Relief Defendants make this same objection with respect to several other of the SEC's asserted facts, but fail to articulate what Rule of Evidence they rely on. In each instance, Ms. Ames, as Oak's witness, testifies to things within Oak's own knowledge, and even absent production of the underlying documents, the Court sees no reason her testimony should be considered inadmissible.

[6] Relief Defendants do not challenge any aspect of this transaction in their Motion for Summary Judgment on Liability or Opposition to the SEC's Motion.

In November 2012, Company C—an e-commerce business based in the United States—sold its Series A shares to several investors including I-Cubed Domains, LLC (discussed more fully below), and the BVI Company, an Oak portfolio company.[7] (SOF ¶ C-1.) At the time, Defendant was one of three people on the BVI Company's board of directors and was responsible for identifying and negotiating the transaction involving BVI Company's purchase of Company C Series A Preferred Stock for $150,000. (*Id.* ¶¶ C-2, C-3, C-4.) On November 13, 2013, the BVI Company wired $150,000 from a BVI Company Fidelity account to Company C. (*Id.* ¶ C-5.)

Shortly after the BVI Company's $150,000 investment in Company C, Defendant represented that an additional $2 million investment by the BVI Company was necessary because Defendant was getting pressure from Oak for being on the Board of the Company without a bigger investment. (SEC Ex. 145.) He then requested via email that Company C "lawyers . . . wrap up the incremental $2MM funding," which the Company C representative confirmed would be done "right away." (SEC Ex. 146.) On November 26, 2012, $2,000,000 was wired from the same BVI Company Fidelity account for the purchase of additional Company C shares. (SOF ¶ C-6.) When he was subsequently confronted by the BVI Company about the $2 million that was missing from the BVI Company's Fidelity account, Defendant claimed the $2 million purchase was a mistake on the part of the "finance team." (*Id.* ¶ C-7.) Continuing to conceal that he negotiated the $2 million investment, Defendant told BVI he would "take full responsibility" for the "mistake" and would personally purchase the shares, which he did on or about June 21, 2013. (*Id.* ¶ C-8.)

---

[7] The Court understands this to mean a company in which any Oak Fund holds an investment.

Meanwhile, on Defendant's recommendation, in October 2013 Oak Fund XIII invested $25 million into Company C Series B shares, while Defendant simultaneously negotiated with Company C (purportedly on behalf of Oak Fund XIII), an investment by Oak Fund XIII that would be conditioned on Company C redeeming the BVI's Company's Company C shares (now secretly owned by Defendant) for $10,896,193.59. (*Id.* ¶¶ C-9, C-15.) Essentially, Defendant was pretending to act on behalf of Oak Fund XIII in negotiating its investment in Company C, while actually seeking to profit (by more than $8 million) by redeeming the Company C shares he was holding in the name of the BVI Company. Prior to Oak Fund XIII making its $25 million investment into Company C—which triggered Company C's obligation to redeem Defendant's Company C shares held in the name of the BVI Company for $10,896,193.59—Defendant was specifically asked if he had invested in Company C. Defendant falsely stated that he had "no personal investment or any other direct beneficial interest or investment" in Company C. (*Id.* ¶ C-10.)

Ms. Ames, OMC's Chief Operating Officer and designated witness in this case (*id.* ¶ X-3), asked Defendant about any ownership of Company C shares because each Oak Fund is prohibited, absent proper consent, from investing in the securities of any entity in which any of the Managing Members of its general partner (including Defendant) have, or have had within the preceding ninety days, any investment or any other material financial interest. (SOF ¶ C-16.) Oak funds also are prohibited, absent the proper consent, from purchasing or selling securities to or from any Managing Members of the general partner of the Oak Funds (including Defendant) or any of their respective affiliates. (*Id.*)

To further conceal that he was holding Company C shares and would personally profit from their redemption (triggered by Oak Fund XIII's investment in Company C), Defendant opened the BOA BVI Company Account on October 10, 2013, and directed, through an attorney,

Company C to wire the redemption proceeds into this account. (*Id.* ¶¶ C-11-13.) After he received the funds in his BOA BVI Company Account, Defendant transferred the funds into a joint bank account that he held with his wife, Relief Defendant Shalini Ahmed. (*Id.* ¶ C-14.)

In sum, Defendant purposefully lied to his fellow BVI Company directors when he told them the $2 million purchase of Company C shares was a mistake, as he had personally negotiated the purchase of those shares in the name of the BVI Company. Defendant then bought the shares, left them in the name of the BVI Company, and negotiated their redemption for a price that was substantially greater than the $2 million originally paid by leveraging the redemption on Oak Fund XIII's $25 million investment in Company C. While recommending that Oak Fund XIII purchase $25 million of Company C's Series B shares, Defendant concealed from Oak Fund XIII and Company C that he (as opposed to the BVI Company, which was an Oak portfolio company) was the seller of those Company C shares and that he would personally profit by more than $8 million upon Oak Fund XIII's $25 million investment. Defendant told Oak that he did not have any personal investment or direct beneficial interest in Company C, which was false because Defendant was: (1) holding the Company C shares in the name of BVI Company that were redeemed upon Oak Fund XIII's investment; and (2) holding Company C shares in the name of I-Cubed, as explained below.

<u>$7,500,000 I-Cubed Sale</u>

I-Cubed is a single member Delaware LLC formed on October 24, 2012 whose sole member (and owner) was Defendant. (*Id.* ¶ C-22.) In November 2012, Defendant, through I-Cubed, invested in Company C. (*Id.* ¶ C-24.)[8]

---

[8] Later on, in May 2013, Defendant transferred his I-Cubed interest to Ms. Ahmed. (SOF C-25.) Although Defendant moved I-Cubed into the name of his wife, she merely served as a

On October 30, 2014 Oak Fund XIII entered into a Stock Purchase Agreement with I-Cubed to purchase its Company C shares for $7.5 million. (SOF ¶ C-18.) That agreement was executed by Defendant on behalf of Oak Fund XIII and was purportedly executed on behalf of I-Cubed by Richard N. Kimball. (*Id.*) Defendant provided wire transfer instructions to Oak and directed that it wire $7.5 million to an account held by I-Cubed at Bank of America ending x8384 ("BOA I-Cubed Account"), which Oak followed.[9] (*Id.* ¶ C-19.) On November 3, 2014 Defendant wrote a $7,425,000 check from the BOA I-Cubed Account to the Shalini Ahmed 2014 Grantor Retained Annuity Trust (the "GRAT"). (SEC Ex. 160 at SEC-BOA-E-1355.)

When presenting this proposed investment to Oak's managing partners at their investment committee meeting held on or about October 27, 2014, Defendant described the seller of the shares, I-Cubed, as a "family office." (SOF ¶ C-17.) Defendant's written presentation included financials for Company C showing, among other things, that Company C's estimated revenues in 2014 were $515.6 million, a 65% increase over 2013 revenues of $311.81 million. (*Id.*) However, on October 8, 2014, Defendant had received Company C's financials showing $178.1 million in revenue for the first eight months of 2014, which was just 11.7% ahead of revenues for the first eight months of 2013. (*Id.* ¶ C-30.)

Defendant had recognized the declining value of Company C stock even before this. In August 2014, two months before I-Cubed sold the Company C stock to Oak Fund XIII for $7.5

nominee. Ms. Ahmed testified that despite being the "owner" of I-Cubed, she played no role in the sale negotiations. (Preliminary Injunction Order [Doc. # 113] at 8.)

[9] Unbeknownst to Ms. Ahmed (I-Cubed's nominal owner by this time), Defendant, representing that he was a member of I-Cubed, had opened this account, listing him as the sole signatory, on October 28. (SOF C-20.)

million, a 99% interest in I-Cubed—which held only the Company C shares—was transferred into the GRAT. (*Id.* ¶¶ C-32–33.) According to the GRAT formation document, which the GRAT's 30(b)(6) witness confirmed was accurate, the market value of the 99% interest in I-Cubed was worth only $876,193.72. (*Id.* ¶ C-32.) Similarly, during the preliminary injunction hearing, Relief Defendant Shalini Ahmed testified that she believed the GRAT formation document was accurate and that I-Cubed's Company C shares were worth $876,193.72 as of August 29, 2014. (*Id.* ¶ C-33.) Thus, while Defendant represented to Oak that I-Cubed's Company C shares had increased in value by 375% (to $7.5 million) since their purchase, Defendant himself had acknowledged the shares had diminished in value by more than 50% to less than $1 million. (*Compare* SOF ¶ C-18 *with* ¶¶ C-32-33.)

Defendant misrepresented that he had no personal investment or any other direct beneficial interest or investment in Company C and did not disclose to Oak or its funds that he or his family owned or had an interest in I-Cubed despite recommending that Oak Fund XIII buy Company C shares directly from I-Cubed. (*Id.* ¶¶ C-10, C-27.) Thus, Defendant concealed that he was on both sides of the transaction, going so far as to forge the signature of Mr. Richard Kimball who had retired as I-Cubed's manager more than one month earlier and had no knowledge of the transaction.[10] (*Id* ¶¶ C-27-29.)

---

[10] On November 6, 2014, less than one week after Oak Fund XIII purchased the Company C shares from I-Cubed, Defendant explained to an investor in Company C—responding to a suggestion that Oak participate in another financing round for Company C—that the company was performing so poorly Oak would not agree to invest: "With a flat to down year it is a non-starter at Oak unfortunately for me to even try and pitch." (*Id.* ¶ C-30.) Company C ceased operations less than two years later and Oak Fund XIII lost its entire investment. (*Id.* ¶ C-31.)

### 4. *Company D*

Oak Fund IX purchased and sold Company D shares through a special purpose vehicle based in the Netherlands named A. Bohl Praktiijk B.V. ("BPBV"), and Defendant had substantial responsibilities in connection with this investment. (SOF D-1, D-6.) The evidence, discussed below, shows that in connection with these transactions, Defendant misappropriated money from Oak Fund IX four different times by causing money to be transferred to his secret bank accounts and then transferring it to his personal accounts.

The first misappropriation occurred in connection with Oak Fund IX's December 2004, purchase of Company D shares. (*Id.* ¶ D-1.) Defendant negotiated a letter agreement with Company D that replaced the annual dividend provisions in the deal's term sheet with a one-time management fee of $600,000 to be paid to Oak Fund IX by Company D. (*Id.* ¶ D-2.) After receiving instructions from Defendant to wire the money to a Fleet Bank account number x9310 in the name of OIP Advisors, Company D confirmed in a January 5, 2005 email that it would wire $600,000 the following day. (*Id.* ¶ D-3.) On January 7, 2005, Defendant received a revised agreement reflecting a $50,000 increase in the management fee to be paid by Company D.[11] (*Id.* ¶ D-4.) On January 11, 2005, Defendant emailed Company D stating "[s]ame instructions as last time" and, three days later, Company D confirmed that it had wired $50K that day. (*Id.*) In fact, the account that Defendant provided Company D was not an Oak account. (*Id.* ¶ D-5.) Rather, Defendant had previously opened a Fleet Bank account ending in numbers x9310 in the name of "Ifitkar Ali Ahmed dba OIP Advisors," and after the two banks merged, that account became Bank of America account ending in numbers x9310 (the "BOA OIP Advisors Account"). (*Id.*)

---

[11] It is not clear from whom Defendant received this agreement.

14

The second misappropriation was in relation to Oak Fund IX's sale of a portion of its Company D shares in May 2006. (SOF ¶ D-6.) Defendant had substantial responsibilities in connection with Oak Fund IX's exit from the Company D investment in 2006 and 2007. (*Id.*) Pursuant to the Share Purchase Agreement, Oak Fund IX agreed to pay the broker's (the "Investment Bank") fees and expenses in connection with the transaction. (*Id.* ¶ D-7.)

On June 26, 2006, Defendant received a $1.2 million invoice from the Investment Bank for advisory services related to the sale of the shares. (*Id.* ¶¶ D-8, D-9.) That same day, Defendant opened a Bank of America account number x2349 in the name of Company D (the "BOA Company D Account"), on which he was listed as the sole authorized representative. (*Id.* ¶ D-10.) Company D did not actually have an account at Bank of America. (SOF ¶ D-6.) On July 3, 2006, BPBV wired $3 million to Defendant's BOA Company D Account, believing that to be the amount for advisory fees charged by the Investment Bank. (*Id.* ¶ D-11.) On that same day, $1.2 million was transferred to Defendant's BOA OIP Advisors Account, and $1.8 million was transferred to his joint bank account that he held with his wife, Relief Defendant Shalini Ahmed. (*Id.* ¶ D-11.) On July 5, 2006, $1.2 million was transferred from Defendant's BOA OIP Account to an account for the Investment Bank. (*Id.*)

Defendant again misappropriated funds when, in January 2007, he requested that Oak Fund IX make a $6.6 million payment for a Korean tax obligation related to the 2006 sale of Company D shares. (SOF ¶ D-13.) Defendant submitted a wire transfer request with an invoice on Company D letterhead and included that wire transfer instructions for Defendant's BOA Company D Account. (*Id.*) The Company D invoice was not from Company D. (*Id.* ¶ D-6.) On January 26, 2007, Oak Fund IX wired a total of $6.6 million to BPBV which, in turn, on January 29, 2007, wired $6.6 million to Defendant's BOA Company D Account. (*Id.* ¶ D-14.) On that same

date, nearly $6.6 million was transferred from Defendant's BOA Company D Account to a joint bank account that he held with his wife, Relief Defendant Shalini Ahmed. (*Id.*) Contrary to Defendant's instructions, Oak is not aware of any document suggesting that Korean capital gains taxes were in fact assessed on the sale of the shares or that there was any legitimate reason for the $6.6 million payment that Defendant directed Oak Fund IX to make in January 2007. (*Id.* ¶ D-15.)

Lastly, on August 21, 2007, Defendant presented Oak Fund IX with a wire transfer request relating to another invoice on Company D letterhead seeking payment of $800,528.81 in "[t]ransaction fees to be paid to the Korean Tax Authority" in connection with Oak Fund IX's January and March 2007 distributions of Company D shares to its investors. (*Id.* ¶ D-16.) The invoice provided wire transfer instructions for payment to Defendant's BOA Company D Account. (*Id.*) Again, the Company D invoice was not from Company D. (*Id.* ¶ D-6.) On August 21, 2007, Oak Fund IX wired a total of $800,528.81 to Defendant's BOA Company D Account. (SOF ¶ D-17.) None of this money was transferred to Company D; rather, the money (minus a $30.00 wire transfer fee) was transferred to a joint bank account that Defendant held with his wife, Relief Defendant Shalini Ahmed. (*Id.* ¶ D-17.) Oak is not aware of any document or other evidence to suggest that Company D paid $800,528.81 (or any other amount) in securities transaction taxes to the Korean tax authorities in connection with Oak Fund IX's March 2007 distribution of Company D shares. (*Id.* ¶ D-18.)

### 5. *Company E*

Defendant recommended to Oak's Managing Partners that Oak Fund XI purchase Company E shares for 17 million Euros. (SOF ¶ E-1.)[12] In his recommendation, Defendant used

---

[12] Relief Defendants claim the SEC's cited evidence does not show Defendant recommended this purchase because the report (used by Oak for its consideration of projects)

an exchange rate of 1.3 U.S. Dollars to Euros to convert the purchase price to a total of $22.1 million. (*Id.* ¶ E-2.) Company E's bank account appears in the final version of the written agreement for the deal and in an email from Company E to Defendant providing payment instructions, while Defendant's BOA Company E Account[13] appears in neither. (*Id.* ¶ E-3.)

Defendant instructed Oak Fund XI to fund the $22.1 million purchase with two separate transfers: (1) $20.74 million to an account of Company E; and (2) $1.36 million to Defendant's BOA Company E Account. (*Id.*) In the written wiring instructions that Defendant sent Oak Fund XI, Defendant represented the account name as "[Company E] USA" and did not state in any manner that he owned or had a personal interest in the account. (SOF ¶ E-4.) Three days later, on July 29, 2005, Oak Fund XI made the transfers requested by Defendant. (SEC Exs. 44, 45.)

Although Defendant represented to Oak Fund XI that the purchase price of 17 million Euros was equivalent to $22.1 million – an exchange rate of 1.3 dollars to Euros – Defendant knew at the time that the exchange rate was actually closer to 1.2 dollars to Euros. Defendant stated as much in an email to Company E dated August 2, 2005, where he told Company E that the actual exchange rate at the time of Oak Fund XI's transfer "was more like 1.21," and Defendant "did the calculations at 1.22 assuming some maring [sic] for movement" to arrive at the $20.74 million amount transferred by Oak Fund XI to the seller. (SEC Ex. 46 at OAK-SEC-1643.)

---

reflects that Bandel Carano ("BLC") was the manager of the project and Edward Glassmeyer ("EFG") was a "buddy." (RDs' LR 56(a)2 Stmt. ¶ E-1.) They assert that Defendant's name does not appear anywhere on the report, however, at the top of page one it clearly lists Defendant's initials ("IAA") under "Prepared by." (SEC Ex. 40 at OAK-SEC-1630.)

[13] The complete name on the BOA Company E Account was "Iftikar A. Ahmed d/b/a [Company E] USA." SOF E-4.

Thus, Company E agreed to a purchase price of $20.74 million but Oak Fund XI paid $22.1 million and Defendant diverted the difference of $1.36 million to Defendant's BOA "Company E" Account. (SOF ¶ E-6.) Over the next month, Defendant transferred a total of $1,358,188 from the BOA Company E Account to two of his personal accounts. (*Id.* ¶ E-7; SEC Ex. 47 at SEC-BOA-E-2141.)

Soon after the transaction, Company E notified Defendant of a shortfall in the purchase price and then accepted Defendant's suggestion that Oak Fund XI pay the shortfall of €19,486 as a setoff against the amount Company E owed Oak Fund XI for legal expenses under the Investment Agreement. (*Id.* ¶¶ E-5, E-8.) Unbeknownst to Oak Fund XI, Defendant then directed the seller to send the legal expense reimbursement (less the shortfall in the purchase price) to Defendant's BOA OIP Advisors Account. (*Id.* ¶ E-9.) The seller complied with Defendant's direction and transferred $92,285.15 to Defendant's OIP Account on November 11, 2005. (*Id.* ¶ E-10.) Two weeks later, Defendant transferred the funds from the BOA OIP Advisors Account to his personal account. (*Id.*)

### 6. *Company F*

In February 2007, Oak Fund XII invested in shares of Company F. (SOF ¶ F-1.) Company F was required to reimburse Oak Fund XII for its legal fees in connection with the share purchase, up to $250,000. (*Id.* ¶ F-2.) Defendant advised Company F to send the legal fees reimbursement to his BOA OIP Advisors Account, which Company F did. (*Id.* ¶¶ F-3 to F-4.) Defendant then wired those funds to a joint bank account that he held with Relief Defendant Shalini Ahmed. (*Id.* ¶ F-4.)

Later in 2007, Oak Fund XII sold its shares in Company F. (*Id.* ¶ F-5.) Similar to the initial share purchase agreement, the sale agreement related to this transaction provided that the acquiring company would pay the seller's transaction expenses, with a cap of $500,000. (*Id.*) Oak

Fund XII paid its own legal fees, however, once again Defendant advised Company F to send Oak Fund XII's reimbursement of legal fees to his BOA OIP Advisors Account, which Company F did. (*Id.* ¶¶ F-6 to F-7.) Just as in June 2007, Defendant did not provide the legal fees to Oak Fund XII, but rather wired the $500,000 to a joint bank account that he held with Relief Defendant Shalini Ahmed. (*Id.* ¶ F-8.)

### 7.     *Company G*

Oak Fund XII purchased and sold Company G shares through its affiliated entity Oak Asia Infrastructure, LLC. (SOF ¶ G-1.) Specifically, with respect to these transactions, Defendant recommended and/or signed the agreements on behalf of Oak Fund XII or its affiliate. (*Id.* ¶¶ G-2, G-7, G10.) In connection with these transactions, Defendant misappropriated money from Oak Fund XII five different times, as discussed below.

The first misrepresentation relates to Defendant's 2007 proposal that Oak Fund XII invest 40 billion Korean Won in Company G shares. (SOF ¶ G-2.) After the investment was approved, Defendant presented wire transfer instructions showing that Oak Fund XII was buying 2,348,904 shares for a total price of $47.5 million. (*Id.*) In accordance with Defendant's instructions, on December 18, 2007, Oak Fund XII wired $45 million to a Korea Exchange Bank account and the remaining $2.5 million to a Bank of America account ending in numbers x9887 in the name of "Company G" (the "BOA Company G Account 1"), which Defendant had opened earlier that same day. (*Id.* ¶¶ G-2, G-5.) The $2.5 million was immediately transferred to a joint bank account that Defendant held with his wife, Relief Defendant Shalini Ahmed. (*Id.* ¶ G-5.)

Defendant knew that the purchase price for the Company G shares would be less than $45 million, and he instructed that the excess funds be sent to his BOA OIP Advisors Account. (*Id.* ¶ G-3.) On January 9, 2008, Korea Exchange Bank wired $2,201,070.56 to Defendant's BOA OIP

Advisors Account.[14] (*Id.* ¶ G-4.) Oak has no record of receiving that money or any other amount back from the $45 million Oak Fund XII wired on December 18, 2007. (*Id.*) The next day that money was transferred to a joint bank account that Defendant held with his wife, Relief Defendant Shalini Ahmed. (*Id.* ¶ G-6.)

On four separate occasions from 2009 to 2013, Defendant presented requests for Oak Fund XII to make payments purportedly to Company G with an invoice that appeared to be on Company G letterhead. Each invoice was submitted with a wire request and contained wire transfer instructions directing that payment be remitted to one of two Bank of America accounts in the name of Company G. In each instance, Oak Fund XII made the payments as requested by Defendant. However, Defendant's BOA Company G Accounts did not belong to Company G, and Company G never received the funds mentioned above. (*Id.* ¶¶ G-7-16.)

Defendant's second misrepresentation was in connection with Oak Fund XII's 2009 Tender Offer Agent Engagement Agreement for Company G that resulted in the company being taken private and delisted, which Defendant signed. (*Id.* ¶ G-7.) On October 29, 2009, Defendant submitted a wire request and Company G invoice for Oak Fund XII's payment of 2,490,325,000 Korean Won (or $2,101,185.45) to Company G for purported delisting fees and legal fees with wire instructions for Defendant's BOA Company G Account 1. (SOF ¶ G-8.) Oak Fund XII subsequently wired the $2,101,185.45 to the BOA Company G Account 1, of which $2,099,998 was transferred to a joint bank account Defendant held with his wife the following day. (*Id.* ¶ G-9.)

Defendant's third fraud associated with Company G centers on Oak Fund XII's sale of its Company G shares in October 2011, with a portion of the sales price remaining in escrow until

---

[14] The account received only $2,201,050.56, likely due to a transfer fee. (*See id.* ¶ G-6.)

2013. (*Id.* ¶ G-10.) This agreement was also executed by Defendant. (*Id.*) The transaction was set up so that Oak Fund XII would receive a certain portion of the consideration for its shares at the initial closing and the remainder would be held in escrow until March 31, 2013, upon which time it would be released to Oak Fund XII. (*Id.*)

On November 25, 2011, Defendant submitted a wire request, along with an invoice, for Oak Fund XII's payment of a $3,113,981 "Management Incentive Payment" to Company G. (SOF ¶ G-11.) The wire request directed that $3,113,981 be paid to Company G, and the invoice contained wire transfer instructions for a Bank of America account number x6367 in the name of Company G (the "BOA Company G Account 2"), which Defendant had previously opened on October 17, 2011. (*Id.* ¶¶ G-11-12.) On November 28, 2011, Oak Fund XII wired $3,113,981 to that account, and the next day $3,000,000 was transferred to Defendant and his wife's joint bank account. (*Id.* ¶ G-12.)

Defendant made his fourth misrepresentation on April 10, 2013 when Defendant submitted a wire transfer request, along with an invoice and an email explanation of the fees for Oak Fund XII's payment of a $1,556,990 Management Incentive Payment to Company G, related to the sale of Company G shares. (*Id.* ¶ G-13.) The invoice contained wiring instructions for the BOA Company G Account 2. (*Id.*) On April 11, 2013, Oak Fund XII wired $1,556,990 to the BOA Company G Account 2 and that same day the money was transferred to the joint bank account that Defendant held with his wife. (*Id.* ¶ G-14.)

Finally, on April 29, 2013, Defendant submitted a wire transfer request, along with an invoice, for Oak Fund XII's payment of a $622,796 Investment Banking Advisory Fees reimbursement to Company G, again containing wiring instructions for the BOA Company G Account 2. (*Id.* ¶ G-15.) On April 30, 2013, Oak Fund XII wired $622,796 to the BOA Company

G Account 2, and $622,796 was immediately transferred to Defendant and Ms. Ahmed's joint bank account. (*Id.* ¶ G-16)

### 8. Company H

Oak Fund XII made several investments in Company H and its parent company, incurring fees from two law firms in connection with the investments and other legal matters related to Company H. (SOF ¶¶ H-1, H-2.) Purporting to act pursuant to agreements between Oak and Company H, Defendant directed Company H to transfer nearly 1.5 million British pounds to the BOA OIP Advisors Account as reimbursement for Oak's legal expenses. (*Id.* ¶ H-3.)

On June 17 and 18, 2009, Company H made three separate transfers to Defendant's BOA OIP Advisors Account in the amounts of $1,575,905.94, $118,578.60, and $535,025.04. (*Id.* ¶¶ H-4, H-5.) Shortly after the transfers, Defendant transferred $1,690,932.54 from the BOA OIP Advisors Account into Defendant's personal account. (*Id.* ¶¶ H-4, H-5.) Then, after Defendant had moved the funds paid by Company H for reimbursement of Oak's legal fees into his own personal accounts, on July 7, 2009, Defendant sent Company H a letter on Oak letterhead explaining that Oak requested that Company H "reimburse Oak for legal expenses up to a maximum of UK £1,500,000." (*Id.* ¶ H-6.)

### 9. Company I

In December 2010, Defendant recommended that two Oak funds—Oak Fund XII and Oak Fund XIII—invest 36.5 million British pounds in Company I. (SOF ¶ I-1.) Defendant represented to Oak that this purchase price translated into $3.6084 per share for a total of approximately 59 million U.S. dollars, and that this was based upon a fixed exchange rate of 1.62 dollars to the British pound, which had been reflected in a term sheet signed in November 2010. (*Id.* ¶¶ I-2, I-3.) These representations were not true—the November 2010 term sheet contained no such provision for a

fixed exchange rate, and application of the correct exchange rate on the date of Oak Fund XII's investment would have resulted in a per share price of $3.49. (*Id.* ¶¶ I-4, I-5.)

As a result of these misrepresentations the Oak funds overpaid, and on December 17, 2010, shortly after Oak wired the $59 million, Company I contacted Defendant and informed him that it was wiring back to Oak the approximately £1.4 million that had been overpaid. (*Id.* ¶ I-6.) Defendant directed Company I to wire these surplus funds to his secret BOA OIP Advisors Account, which Company I did. (*Id.* ¶¶ I-7, I-8.) The next day, Defendant transferred these funds – which amounted to approximately $2.185 million – into a joint bank account that he held with his wife, Relief Defendant Shalini Ahmed. (*Id.* ¶ I-8.) Oak never received these funds. (*Id.* ¶ I-9.)

### 10.    *Company J*

Oak Fund XI entered into a Stock Purchase Agreement dated April 7, 2006, in which it agreed to purchase from Company J (a Delaware corporation) 15,000,000 shares of its Series A Preferred Stock. (SEC Ex. 51 at OAK-SEC-5630, 5662.) Defendant worked on Oak Fund XI's purchase of Company J shares. (SOF ¶ J-2.) The Share Purchase Agreement stated that Company J would use the proceeds from the sale of the stock to, among other things, fund the payment of a one-time special dividend to Oak Fund XI in the amount of $0.12 per share, which equates to $1.8 million. (*See* SEC Ex. 53 § C(3)(a) at OAK-SEC-5610.)

On April 19, 2006 Defendant directed Company J to send the dividend to Defendant's BOA OIP Advisors Account. (SOF ¶ J-5.) Company J complied with Defendant's directives and transferred $1.8 million to Defendant's OIP Account on May 1, 2006. (*Id.* ¶ J-6.) Seven weeks later, Defendant transferred the $1.8 million from the BOA OIP Advisors Account to his and his wife's joint bank account. (*Id.* ¶ J-7.)

## III. Discussion

### A. Standard on Summary Judgment and Effect of Adverse Inference

Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record. Fed. R. Civ. P. 56(c). The same standard applies to cross-motions for summary judgment. *See Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001). The Court must examine the merits of each motion independently and in each case must consider the facts in the light most favorable to the non-moving party. *Id.* at 121.

In this case, Defendant has invoked the Fifth Amendment instead of responding to the SEC's Complaint, allegations, or discovery requests. (SEC SOF X-1.) It is Defendant's right to assert this privilege in a civil proceeding. *See, e.g., Baxter v. Palmigiano*, 425 U.S. 308, 316 (1976). However, "[a] court may draw an adverse inference against a party who asserts his Fifth Amendment privilege in a civil matter, because the invocation of the privilege results in a

24

disadvantage to opposing parties by keeping them from obtaining information they could otherwise get." *S.E.C. v. Suman*, 684 F. Supp. 2d 378, 386 (S.D.N.Y.2010) (citing *Collazos v. United States*, 368 F.3d 190, 203–04 (2d Cir. 2004) (noting that where the defendant "deprives the government of the opportunity to conduct a deposition . . . [that] itself supports an adverse inference")); *see also S.E.C. v. Pittsford Capital Income Partners, L.L.C.*, 2007 WL 2455124, at *14 (W.D.N.Y. Aug. 23, 2007) ("[L]itigants denied discovery based upon an assertion of the privilege may ask the court to draw a negative inference from the invocation of that right.").

"An adverse inference may be given significant weight because silence when one would be expected to speak is a powerful persuader." *LiButti v. United States ("LiButti II")*, 178 F.3d 114, 120 (2d Cir. 1999). "While the strength and cogency of the adverse inference" must "be tested against the other evidence in the case, 'the claim of privilege will not prevent an adverse finding or even summary judgment if the litigant does not present sufficient evidence to satisfy the usual evidentiary burdens in the litigation.'" *LiButti v. United States ("LiButti I")*, 107 F.3d 110, 124 (2d Cir. 1997) (quoting *United States v. Certain Real Prop. & Premises Known as 4003-4005 5th Ave., Brooklyn, N.Y.*, 55 F.3d 78, 83 (2d Cir. 1995)); *see also Suman*, 684 F. Supp. 2d at 386 ("a motion for summary judgment cannot be granted on an adverse inference alone; rather, the inference must be weighed with other evidence in the matter in determining whether genuine issues of fact exist."); *United States v. Inc. Vill. of Island Park*, 888 F. Supp. 419, 432 (E.D.N.Y. 1995) (finding that the moving party "must produce independent corroborative evidence of the matters to be inferred before liability will be imposed" (internal quotation marks omitted)).

**B. Defendant's Claims That he was Treated Unfairly are Without Merit**

Defendant claims that he has been treated unfairly, inappropriately denied access to evidence, and coerced into asserting his Fifth Amendment right against self-incrimination. (Def.'s Opp.'n at 1-8.)

Defendant chose to flee the United States shortly after this case was filed, in violation of his conditions of release in a criminal matter. (*See* Order Denying Def.'s Mot. for Full Access to the SEC's Investigative File [Doc. # 286] at 2.) It was as a result of this choice that the Court denied Defendant's requests for access to confidential information, reasoning that it could not enforce any protective order while Defendant remained outside of its jurisdiction. (*See, e.g.*, *id* at 3; Order Denying Def.'s Mots. To Compel Oak to Produce Documents [Doc. # 477] at 3.)

Defendant also claims that he has been unfairly deprived of access to counsel, but as this Court has articulated in previous rulings in this case, Defendant has no Sixth Amendment right to counsel in this civil case nor the right to use tainted assets to retain counsel. (*See* Ruling on Defendant's Motion for Release of Funds [Doc. # 191] at 2-3; Ruling Denying Defendant's Motion for Reconsideration to Modify the Asset Freeze Order to Release Funds for Legal Defense [Doc. # 392].) Since he consented to the withdrawal of his counsel, Defendant has actively participated in this litigation, and Relief Defendants, who have been continuously represented by counsel, have also litigated aspects of the merits of Defendant's claimed liability. (*See, e.g.*, RD's Mot. for Summ. J.)

Defendant further argues that he was "forced and coerced" to invoke his Fifth Amendment privilege when the SEC insisted that he appear for his deposition at the U.S. Consulate in India.[15]

---

[15] Defendant ignores that the Court ordered him to appear at either the Consulate in Hyderabad or Kolkata and refused his request for what it deemed "essentially a protective order

26

(Def.'s Opp'n at 6.) The record does not support this claim. Indeed, in initially objecting to his deposition—which was noticed in the United States—Defendant stated that he was "likely to assert his Fifth Amendment privileges," belying his argument that he ever intended to substantively testify. (*See* Def.'s Mot. for a Protective Order and to Quash Notice of Deposition [Doc. # 238] at 3.) And critically, Defendant's Fifth Amendment invocation was not made only at his deposition: Defendant also invoked his Fifth Amendment privilege in his Answer on advice of counsel and later when responding to written discovery. (*Id.*)

Defendant has received the benefit of the Fifth Amendment privilege at every stage of this proceeding, and now he must also bear the consequences of that decision. *See United States v. 4003-4005 5th Ave., Brooklyn, N.Y.*, 55 F.3d 78, 82 (2d Cir. 1995) ("[A] civil litigant's invocation of the privilege against self-incrimination during the discovery process is far from costless.") Defendant's claims that he has been "muzzled, silenced and rendered deaf, dumb and blind" are simply not accurate. (Def.'s Opp'n at 1.) The Court has afforded Defendant every opportunity to participate in this litigation despite the circumstances he created for himself by leaving its jurisdiction, as evidenced by his prolific filings since the withdrawal of his attorney.

### C. *Kokesh* Does not Require Dismissal of Claims Against Relief Defendants in the Pending Summary Judgment Proceedings

Relief Defendants and Mr. Ahmed respectively move for summary judgment in their favor on all claims arising from alleged frauds involving Companies D, E, F, H, and J, and those involving Company G (other than the frauds alleged to have occurred in November 2011 and April 2013) because each of these transactions took place more than five years prior to the filing of the SEC's

---

preventing his deposition from being conducted in a U.S. Consulate or Embassy in India." (Order Denying Defendant's Motion for Specific Instructions for Deposition [Doc. # 365] at 4.)

claim and is therefore time-barred pursuant to 18 U.S.C. § 2462, as the Supreme Court recently held in *Kokesh v. SEC*, 137 S. Ct. 1635 (2017).[16] The SEC's Motion for Summary Judgment on liability does not discuss the impact of *Kokesh*, and its Opposition to Defendants' Motion contends that *Kokesh* does not affect the question of whether Defendant is liable for the alleged violations, but only the extent of damages. It therefore argues that *Kokesh* should not be addressed until the next phase of the bifurcated summary judgment proceedings, if there is one.

Nonetheless, Plaintiff makes two arguments against dismissal of the claims arising out of events which occurred over five years before the SEC filed its Complaint: first, the SEC also seeks injunctive relief relating to those transactions, which does not carry the same statute of limitations; and second, even if the SEC could not seek any relief related to Defendant's conduct that occurred more than five years prior to the filing of this case, that conduct is still relevant to Defendant's subsequent liability and any ultimate remedies.

The SEC does not dispute that the claims for disgorgement tied to the transactions which occurred over five years before this case was filed are time-barred, however, it argues that Defendants' argument—that all relief is barred because some of the SEC's claims are based on pre-2010 conduct—ignores that the non-disgorgement relief the SEC seeks for these pre-2010 violations includes injunctive relief. (*See* Am. Compl. [Doc # 208] at 53-54.) In fact, Relief Defendants appear to admit as much, noting that "[t]he only remedy potentially available to the SEC for misconduct that accrued five years before this case was filed is injunctive relief that would

---

[16] Relief Defendants initially argue—as Defendant does—that *Kokesh* requires dismissal of "each claim relating to a transaction that occurred more than 5 years before the SEC filed claims." (RDs' Mot. for Summary Judgment at 4.) In their Opposition, however, they instead ask the Court to dismiss specific claims against Relief Defendants for equitable disgorgement. (RDs' Opp'n at 3.)

prohibit the Defendant from violating the securities laws." (RDs' Opp'n to Pl.'s Mot. for Summ. J. (citing *S.E.C. v. Collyard,* 861 F.3d 760, 764 (8th Cir. 2017) (injunction barring defendant from violating Securities Exchange Act § 15(a) permitted under *Kokesh* because a properly imposed injunction is designed to protect the public, not to punish, and thus is not a penalty subject to § 2462.)).)[17] Accordingly, the SEC argues that "it would be premature to dismiss any of [its] claims at this stage, since this court's decision whether injunctive relief is appropriate should follow its disposition of the summary judgment motions on liability." (SEC Opp'n at 6.)

The SEC also claims that even if discrete acts fall outside of a statutory time period, those acts are competent background evidence for analyzing timely misconduct. *See e.g., Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 112-13 (2002) (quoting *United Airlines, Inc. v. Evans,* 431 U.S. 553, 558 (1977); *Chin v. Port Authority,* 685 F.3d 135, 150 (2d Cir. 2012) ("It is well established . . . that so long as at least 'one alleged [violation] . . . occurred within the applicable filing period[,] . . . evidence of an earlier alleged [violation] may constitute relevant background evidence in support of [that] timely claim.'" (quoting *Jute v. Hamilton Sundstrand Corp.,* 420 F.3d 166, 176 (2d Cir. 2005))). Moreover, the SEC argues evidence of Defendant's older conduct—which involved

---

[17] Defendant, however, does not concede this point, and offers an out of circuit district court ruling as support for his argument that the injunction is also punitive. *See S.E.C. v. Gentile,* No. CV 16-1619 (JLL), 2017 WL 6371301 (D.N.J. Dec. 13, 2017). There, the court found that the "obey-the-law" injunction was punitive in nature as it would "stigmatize Defendant in the eyes of the public" where it "simply require[d] Defendant to obey the already established federal laws and regulations relating to securities." *Id.* at *4. It further found there would be no retributive effect from such an order. Additionally, it held that the injunction which would prohibit Defendant from being involved in any "penny stock" offerings would only serve to punish Defendant: "it would merely restrict Defendant's business structure and methodology, in perpetuity, simply because he was alleged to have violated securities laws when he purportedly was involved in the [fraudulent] schemes." *Id.*

similar fraudulent acts as the more recent conduct, including misrepresenting the purchase price of shares and fabricating invoices for purported expenses—tends to prove his motive, opportunity, and intent, for his conduct that is indisputably timely. *See* Fed. R. Evid. 404(b); *see also U.S. v. Vilar*, No. 05 Cr. 621, 2008 WL 4178117, at *2 (S.D.N.Y. Sept. 5, 2008) (noting the Second Circuit has adopted an "inclusionary" approach to Rule 404(b) evidence).

The Court agrees the evidence may be relevant, regardless of whether it forms the basis of an independent claim. The crux of the issue, however, is whether there is any relief which this Court may grant with respect to the pre-2010 conduct alleged in the Complaint. Because this stage of the proceedings deals with liability, and the question of whether injunctive relief is appropriate as it relates to the otherwise time-barred conduct deals with the remedy, this question must be left to be addressed in the next phase of the proceedings. The Court therefore will not dismiss any claims under *Kokesh* at this liability stage, however it earlier modified the Asset Freeze Order [Doc. # 113] to reflect this change in law. (*See* Order on Defendant's Motions for Modification of the Asset Freeze Order to Release Funds for his Legal Defense and for a Stay [Doc. # 829].)

### D. Defendant's Conduct Violated the Advisers Act, Securities Act, and Exchange Act

#### 1. Fraud Under the Advisers Act

The Advisers Act "'reflects . . . a congressional intent to eliminate, or at least to expose, all conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which was not disinterested.'" *SEC v. Wall St. Transcript Corp.*, 422 F.2d 1371, 1376 (2d Cir. 1970) (quoting *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186 (1963)).

The SEC alleges violations of all four subsections of Section 206 and Rule 206(4)-8, although not with respect to each transaction.

### a.      Defendant is an Investment Adviser

Subject to certain exceptions not applicable to Defendant, Section 202(a)(11) of the Advisers Act defines "investment adviser" as follows:

> [A]ny person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities.

15 U.S.C.A. § 80b-2(11). This is a "broad definition," *Financial Planning Ass'n v. SEC*, 482 F.3d 481, 484 (D.C. Cir. 2007), and reaches persons who receive compensation for investing funds of their clients or who advise their "customers by exercising control over what purchases and sales are made with their clients' funds." *Abrahamson v. Fleschner*, 568 F.2d 862, 870-871 (2d Cir. 1977) (includes "persons who manage[] the funds of others for compensation.").

As a threshold matter, Defendant argues that he did not "advise anyone on the value of securities or . . . the advisability of investing in, purchasing, or selling any securities," instead claiming he was merely an "assistant" and "support staff." (Def.'s Opp. at 22-23 & n.36.) He further contends that he cannot be an "investment adviser" under the federal securities laws because he did not hold the requisite licenses and certifications and was not registered with any state or federal agency. (*See, e.g.,* Def.'s Mot. for Summ. J. at 44-47.) Lastly, he maintains that an investment adviser must be compensated in certain ways. None of his arguments are availing.[18]

---

[18] Aside from the fact that Defendant's arguments have no merit, his unsubstantiated assertions cannot create a genuine dispute of material fact. *See Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 526 (2d Cir. 1994) (no genuine issue of fact where, although non-moving party "pointed to certain issues of fact in his memorandum of law," he "failed to provide evidentiary support for his contentions"). "A party asserting that a fact … [is] genuinely disputed must support the assertion by citing to particular parts of material in the record, including

The record indisputably shows that Defendant was not simply some "assistant," but played a central role in the transactions at issue. From 2004 through 2015 he recommended and advised that Oak Funds IX, XI, XII, and XIII purchase or sell securities, and then monitored and managed those investments. (SOF ¶ X-8.) Specifically, Defendant's responsibilities at Oak included identifying, analyzing, and recommending investment opportunities for the various Oak Funds at issue in this case, which were typically investments in the securities of various "portfolio companies." (*Id.* ¶¶ X-6, X-7.) Defendant was also responsible for negotiating the terms of the investments and managing the relationships with the companies in which the Oak Funds invested. (*Id.* ¶ X-6.) Indeed, Defendant signed many of the agreements for the transactions at issue on behalf of Oak.[19] (*See, e.g.*, SEC Ex. 127 at Oak-SEC-747; SEC Ex. 135 at Oak-SEC-26.) Contrary to Defendant's contention, the fact that he was not licensed, certified, or registered with any state or federal agency does not preclude him from being considered an investment adviser under the Adviser's Act, as the Act's definition of an adviser turns on conduct, not certification or registration. *See, e.g., U.S. v. Onsa*, 523 Fed. Appx. 63, 65 (2d Cir. 2013) ("[T]he Act defines

---

depositions, documents, electronically stored information, affidavits or declarations, stipulations … , admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

[19] Thus, Defendant's claim that "[t]here is not one piece of paper that Defendant signed or that Oak issued that made the Defendant responsible for any [securities purchase or sale recommendation] or powers to recommend the purchase or sale of any security to any of the Oak funds …." is demonstrably false. (*See* Def.'s Mot. for Summ. J. at 44.) Defendant's most recent employment agreement with Oak makes clear that one of his duties includes "recommending investment opportunities for one or more of the [Oak] Funds." (SOF ¶ X-7; *see also* SEC Ex. 7 (2014 Employment Agreement) § III(A) at OAK-RD-17513.) Indeed, even Defendant's 2004 employment agreement provided that he was eligible for a bonus plan designed for Oak employees whose employment responsibilities included the "identification of, recommendation of, monitoring of, eventual sale or distribution of stock from a portfolio company" (Ex. B (2004 Employment Agreement) to Oak's Opp'n to Def.'s Mot. for Sanctions [Doc. # 611-2] at B-1.)

investment adviser in a functional way, applying to 'any person' who engages in the specified conduct," and "the structure of the Act demonstrates that individuals need not register, or even be *required* to register, in order to be an 'investment adviser' within the meaning of the Act." (quoting 15 U.S.C. § 80b-2(a)(11))).

In addition, Defendant was clearly compensated for his work at Oak. (SOF ¶ X-9.) There is no requirement that an investment adviser be compensated in any particular way, and Defendant's citation to an SEC Investor Bulletin is unconvincing. (Def.'s Mot. for Summ. J. at 47 & *id.* at n.57.) Even if the bulletin were binding on this Court, it says only that individuals "might" pay a broad range of financial professionals in certain ways. *See* https://www.sec.gov/investor/alerts/ib_top_tips.pdf at 2. It does not purport to exhaustively list the ways investments advisers are compensated. Defendant's misappropriation of investor funds is sufficient, by itself, to meet the "compensation" element of the definition. *See U.S. v. Ogale*, 378 Fed. Appx. 959, 960-61 (11th Cir. 2010).

Because Defendant received compensation to advise the Oak Funds as to the value of securities and recommended that Oak Funds purchase and sell securities at all times relevant to the SEC's claims in this case, Defendant was an "investment adviser" under Section 202(a)(11). *See Abrahamson*, 568 F.2d at 870-871.

### b.   Defendant Violated Sections 206(1), (2), (4), and Rule 206(4)-8

Section 206(1) prohibits investment advisers from employing "any device, scheme or artifice to defraud any client or prospective client." 15 U.S.C. § 80b-6(1). Section 206(2) prohibits an investment advisor from engaging "in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client." 15 U.S.C. § 80b-6(2). Section 206(4) prohibits advisers from engaging in "any act, practice, or course of business which is

fraudulent, deceptive, or manipulative" as defined by rules promulgated by the SEC. For conduct after September 10, 2007, Rule 206(4)-8 prohibits advisers to "pooled investment vehicles" from engaging in fraudulent acts or making material misrepresentations to investors or prospective investors.[20] 17 C.F.R. § 275.206(4)-8.

### i. Defendant's Fraud was Directed Towards Clients and Investors

Defendant argues that certain of his misconduct related to Companies D, E, F, G, and H did not violate Sections 206(1) or 206(2) of the Advisers Act because he did not direct this fraud to any "clients." (Def.'s Mot. for Summ. J. at 40-41.) However, Defendant's clients were the various Oak Funds, and the record demonstrates without question that Defendant's fraud was directed towards these Funds.

With respect to Company D, Defendant fraudulently informed Company D that it was to pay $650,000 in a "management fee" to an Oak entity in exchange for removing a provision from the Oak Fund's investment agreement that would have required Company D to pay an annual dividend. (SOF ¶¶ D-1–D-2.) In other words, Defendant fraudulently bargained away a provision that would have benefitted his client in exchange for $650,000 that he misappropriated for himself. Similarly, with respect to Companies E, F, and G, Defendant fraudulently caused these companies to pay legal fees that his clients (the Oak funds) were entitled to receive to an account that he personally controlled, and then further misappropriated these funds for his personal use. (*Id.* ¶¶ E-5, E-8–E-10, F-1–F-8, H-1–H-6.) And with respect to Company G, Defendant fraudulently

---

[20] The SEC does not allege that Defendant violated Rule 206(4)-8 with respect to any conduct which occurred prior to September 2007, when the rule became operative. This includes all of the conduct associated with Companies D and E, the Company F June 2007 conduct, or the Company J conduct that occurred in April–June 2006.

induced his client – the Oak fund – to send money that it thought was paying to Company G for "delisting fees" to another account that he personally controlled, and again misappropriated these funds for his personal use. (*Id.* ¶¶ G-8–G-9.)

In each of these instances, Defendant either misappropriated a benefit his client was entitled to receive (Company D), intercepted funds his client was entitled to be paid (Companies E, F, and H), or caused his client to send him money it thought was destined for a portfolio company (Company G). Defendant's misconduct and resultant misappropriation of his clients' money plainly violated his "affirmative duty of utmost good faith, and full and fair disclosure" to his clients, therefore violating Sections 206(1) and (2) of the Advisers Act.

Defendant also argues that his conduct did not violate Advisers Act Section 206(4) and Rule 206(4)-8 because he did not direct any of his fraud to "investors." (Def.'s Mot. for Summ. J. at 42-43.) As discussed above, Rule 206(4)-8 provides that an investment adviser may not, among other things, "engage in any act, practice, or course of business that is fraudulent, deceptive, or manipulative with respect to any investor . . ." 17 C.F.R. § 275.206(4)-8(a)(2). Misappropriating investor funds plainly violates this provision. *See, e.g., SEC v. Neman*, 2016 WL 6661174, at *6 (C.D. Cal. July 15, 2016) (violation of Rule 206(4)-8 where, "rather than pooling investor funds to purchase securities, [the adviser] pooled investor funds in his personal bank account"); *SEC v. Parrish*, 2012 WL 4378114, at *4–5 (D. Colo. Sept. 25, 2012) (violation of Rule 206(4)-8 where "Defendant pooled funds invested in his Ponzi scheme and transferred the comingled funds to brokerage accounts for trading").

This is precisely what occurred here. The money that the Oak Funds had—and that Defendant misappropriated—came from investors. (*See* SOF X-4.) Thus, even though Defendant

may not have interacted directly with the Oak Funds' investors in connection with his fraud, the result of his fraud was to misappropriate their money.

### ii. Negligence or Scienter

Scienter is necessary to violate Section 206(1), but is not required to prove violations of Sections 206(2) or (4). *Compare S.E.C. v. Batterman*, No. 00 CIV. 4835 (LAP), 2002 WL 31190171, at *8 (S.D.N.Y. Sept. 30, 2002) (Noting that both the D.C and Eleventh Circuits "have held that Section 206(1) requires a finding of fraudulent intent"), *and S.E.C. v. Moran*, 922 F. Supp. 867, 895 (S.D.N.Y. 1996) (scienter is required under Section 206(1)), *with SEC v. Pimco Advisors Fund Mgmt.*, LLC, 341 F. Supp. 2d 454, 470 (S.D.N.Y. 2004) ("Section 206(2) simply requires proof of negligence"), *and SEC v. Yorkville Advisors, LLC*, Case No. 12 Civ. 7728 (GBD), 2013 WL 3989054, at *3 (S.D.N.Y. Aug. 2, 2013) ("[T]he SEC must establish at least negligence to prove violations of Sections 206(2) and 206(4).").

The record contains ample evidence of Defendant's scienter, making a negligence determination unnecessary. Defendant opened bank accounts controlled solely by him, which he deceptively named such that they appeared to be related to Oak and its portfolio companies. He then instructed Oak and the Companies to wire funds into these accounts, after which he transferred the money into his personal accounts. He made representations that he was aware were false at the time he made them. Neither party contests Defendant's intent, and the Court finds this element is met with respect to each of the transactions in which the SEC alleges violation of Sections 206(1) and (2).

### iii. Breach of Fiduciary Duties

Both Sections 206(1) and 206(2) impose a fiduciary duty on investment advisors that encompasses an affirmative obligation of good faith and a full and fair disclosure of all material

facts to their clients, as a well as an affirmative obligation to employ reasonable care to avoid misleading their clients. *Capital Gains Research Bureau, Inc.*, 375 U.S. at 194-95. This fiduciary duty requires advisors to act for the benefit of their clients, and precludes them from using their clients' assets to benefit themselves. *SEC v. Moran*, 922 F. Supp. 867, 895-96 (S.D.N.Y. 1996).

Defendants do not argue the SEC cannot meet its burden of establishing Defendant breached his fiduciary duties, and for the same reasons discussed above regarding scienter, this cannot be reasonably disputed.

### c. Section 206(3)

Section 206(3) makes it unlawful for an investment adviser,

> acting as the principal for his own account, knowingly to sell any security to or purchase any security from a client, or acting as broker for a person other than such client, knowingly to effect any sale or purchase of any security for the account of such client, without disclosing to such client in writing before the completion of such transaction the capacity in which he is acting and obtaining the consent of the client to such transaction.

15 US.C. § 80b-6(3). In other words, an investment advisor is prohibited from engaging in a "principal transaction"—e.g., a transaction in which the adviser, acting for his own account, sells securities to a client's account—without disclosing to the client the capacity in which the adviser is acting and obtaining the client's consent. *See Interpretation of Section 206(3) of the Investment Adviser's Act of 1940*, Rel. No. 1732, 1998 WL 400409, *1 (July 17, 1998); *see also In re Gintel Asset Mgmt., Inc. et al.*, Advisers Act Rel. No. 2079, 2002 WL 31499839 (Nov. 8, 2002) (finding respondent violated 206(3) by executing trades between a fund in which he owned a 1/3 interest and advisory client accounts). "Unlike Section 206(1) and (2) of the Act, Section 206(3) can be violated without a showing of fraud." *SEC v. Nadel*, 97 F. Supp. 3d 117, 127 (E.D.N.Y. 2015) (internal quotation marks omitted).

The SEC only alleges Defendant violated Section 206(3) with respect to the Company C transactions. Because it is evident that Defendant did not disclose his interest in I-Cubed to Oak or Oak Fund XIII when Oak Fund XIII bought Company C shares directly from I-Cubed, Oak Fund XIII did not have the opportunity to—and in fact did not—give its consent to the transaction knowing that, in effect, Defendant was on the other side. (*See* SOF ¶ C-27.)

Defendant argues that SEC's claim under Section 206(3) of the Adviser's Act must fail because Defendant was not "'acting as a principal for his *own account*,'" but rather "traded securities belonging to a company owned by his wife." (Def.'s Memo at 27 (emphasis in original).) Defendant's argument is meritless. As an initial matter, Defendant provides no evidentiary support, or even argument, that his wife in fact controlled I-Cubed and owned the Company C shares. Therefore, there is no basis for the Court to revisit its previous ruling rejecting this very argument. Following the preliminary injunction hearing, the Court explained

> Despite Mr. Ahmed's nominal transfer of this interest in I-Cubed before the October 2014 sale, the evidence shows that he continued to control the company's bank account and flow of funds and Mrs. Ahmed's testimony at the hearing demonstrated that she played little, if any, role in the sale negotiations with Oak and did not learn of the sale until after it took place.

([Doc. # 113] at 8.)

The record establishes that Defendant formed I-Cubed, purchased the Company C shares in the name of I-Cubed, and, despite transferring the entity into the name of his wife, subsequently negotiated the sale of the Company C shares, going so far as to forge the signature of the purported I-Cubed representative on the stock purchase agreement. (*See* SOF ¶¶ C-17–25, C-28–29.) Indeed, it was Defendant who opened the Bank of America account just days before the sale of I-Cubed's Company C shares to the Oak fund, certifying on that account opening document that he was a

"member" of I-Cubed. (*Id.* ¶ C-20.) Ms. Ahmed was not even aware of this I-Cubed bank account until her deposition. (*Id.*) Defendant also wrote checks for the proceeds of the I-Cubed Company C shares from the Bank of America account to the Shalini Ahmed 2014 GRAT. (*Id.* ¶ C-21.)

Additionally, Ms. Ahmed admitted at the preliminary injunction hearing that while owning the Company C shares on paper, she played no role in their sale and in fact did not even learn of the sale until after it took place. (*See* Ruling and Order Granting Preliminary Injunction at 8; SEC Ex. 11 (Preliminary Injunction Hearing Transcript) at 301:11–304:12, 308:19-23, 314:3-315:5, 325:9- 326:3.) Indeed, even I-Cubed's Rule 30(b)(6) representative disclaimed knowledge of this sale, and instead assumed Defendant negotiated this transaction. (SEC Ex. 162 (I-Cubed Depo. Transcript) at 41:22-42:20.) Mr. Ahmed's nominal transfer of I-Cubed into the name of his wife does not immunize him from liability under Section 206(3) of the Advisers Act. *See In re Asbell,* Rel. No. IA-3933, 2014 WL 4726475, *2-*3 (Sept. 24, 2014) (finding violation of 206(3) where investment adviser caused client to purchase securities "from [the investment adviser], members of his family, and/or other advisory clients" and failed to provide required disclosures).

## 2. The Exchange Act and Securities Act[21]

Section 10(b) of the Exchange Act and Rule 10b-5 prohibit fraud by "any person" in connection with the purchase or sale of securities. To establish a violation, the SEC must show that Defendant (1) made a material misrepresentation or omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of

---

[21] The facts discussed herein also support the Court's conclusion that Defendant is liable under Section 206. *See SEC v. Haligiannis*, 470 F. Supp. 2d 373, 383 (S.D.N.Y. 2007) ("Facts showing a violation of Section 17(a) or 10(b) by an investment adviser will also support a showing of a Section 206 violation.")..

securities. *Pentagon Capital Management PLC*, 725 F.3d at 285. In addition, the SEC also must establish that the transactions at issue were either listed on domestic exchanges, or that the purchase or sale occurred in the United States. *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 267 (2010).

A violation of Section 17(a)(1) of the Securities Act requires essentially the same elements as Section 10(b) of the Exchange Act but in connection with the *offer* or sale of securities. *Monarch Funding*, 192 F.3d at 308. Section 17(a)(2) makes it unlawful to obtain money or property through misstatements or omissions about material facts, and Section 17(a)(3) prohibits any transaction or course of business that operates as a fraud or deceit upon a securities buyer. 15 U.S.C. §§ 77q(a)(2) and (3). Only Section 17(a)(1) requires scienter; negligence is sufficient under Sections 17(a)(2) and 17(a)(3). *Monarch Funding*, 192 F.3d at 308.[22]

The SEC does not allege that Defendant violated Section 17(a) with respect to the Company F June 2007, Company G 2007 and 2009, or Company I conduct.

---

[22] Unlike private litigants, "[t]he SEC does not need to prove investor reliance, loss causation, or damages in an action under Section 10(b) of the Exchange Act, Rule 10b–5, or Section 17(a) of the Securities Act." *SEC v. Credit Bancorp, Ltd.*, 195 F. Supp. 2d 475, 490–91 (S.D.N.Y. 2002) (collecting cases); *see also SEC v. Pirate Inv'r LLC*, 580 F.3d 233, 239, n.10 (4th Cir. 2009); *SEC v. Blavin*, 760 F.2d 706, 711 (6th Cir. 1985) ("Unlike private litigants seeking damages, the Commission is not required to prove that any investor actually relied on the misrepresentations or that the misrepresentations caused any investor to lose money."). Indeed, the Second Circuit has long recognized that the SEC need not prove loss causation because the "Commission's duty is to enforce the remedial and preventive terms of the statute in the public interest, and not merely to police those whose plain violations have already caused demonstrable loss or injury." *Berko v. SEC*, 316 F.2d 137, 143 (2d Cir. 1963). It is "legally irrelevant" in an SEC action whether a defendant's conduct results in loss, *id.*, and therefore Defendant's argument that he "is entitled to summary judgment on his affirmative defense of no loss causation to any party regarding all claims pertaining to transactions associated with Company C," is meritless (Def.'s Memo at 13 (internal quotation marks omitted)).

### a. Material Misrepresentations/use of a Fraudulent Device

The facts, articulated above, make clear that Defendant made numerous misrepresentations and used fraudulent devices to perpetuate his schemes. He provided the companies at issue with fraudulent wiring instructions, provided Oak Fund IX with fraudulent invoices and fraudulent wiring instructions, directed funds to his secret BOA OIP Advisors Account and his secret BOA Company D Account, and transferred the funds to his personal accounts. No party disputes the SEC has established this element of its claims.

### b. Scienter

Scienter under Section 10(b) of the Exchange Act and Section 17(a)(1) of the Securities Act can be established by Defendant's reckless disregard for the truth, *SEC v. McNulty*, 137 F.3d 732, 741 (2d Cir. 1998), or by showing that Defendant "did not have a genuine belief that . . . information [he provided] was accurate and complete in all material respects" *SEC v. Young*, No. 09 Civ. 1634, 2011 WL 1376045, at *6 (E.D. Pa. Apr. 12, 2011). *See also SEC v. Rabinovich & Assocs., L.P.*, No. 07 Civ. 10547 (GEL), 2008 WL 4937360, at *3 (S.D.N.Y. Nov. 18, 2008).

For the same reasons discussed *supra* with respect to the Advisers Act, the SEC has met its burden on summary judgment of establishing Defendant acted with the requisite scienter with respect to each act of fraud.

### c. In Connection With a Purchase or Sale of Securities

In *SEC v. Zandford*, the Supreme Court made clear that Section 10(b) "should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes." 535 U.S. 813, 819 (2002) (citations and quotations omitted). Thus, "[w]hile the statute must not be construed so broadly as to convert every common-law fraud that happens to involve securities into a violation of § 10(b)," it is enough that the misconduct and the securities transaction "coincide." *Id.* at 820-

21. Courts have given broad reach to this "coincide" requirement, holding that the standard is met "where plaintiff's claims 'necessarily allege,' 'necessarily involve,' or 'rest on' the purchase or sale of securities." *Romano v. Kazacos*, 609 F.3d 512, 522 (2d Cir. 2010) (citation omitted).

The analysis "does not pivot on temporal limitations." *See id.* at 523 (misconduct that occurred eighteen months prior to securities transaction still "in connection with" the purchase or sale of securities; "We are persuaded that the time that lapsed is not determinative here because, as defendants argue, 'this was a string of events that were all intertwined.'"). Rather, the "in connection with" requirement is met when the misconduct "'somehow touches upon' or has 'some nexus' with 'any securities transaction.'" *SEC v. Ramoil Management, Ltd.*, 2007 WL 3146943, *8 (S.D.N.Y. Oct. 25, 2007) (quoting *SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1362 (9th Cir. 1993)). Section 17(a)'s requirement that the misconduct occur in the "offer" or "sale" of securities is similarly expansive. *See, e.g., SEC v. Cole*, 2015 WL 5737275, at *7 (S.D.N.Y. Sept. 19, 2015) ("In addressing Section 17(a)'s requirements that fraud occur 'in' the 'offer' or 'sale' of securities, the Supreme Court has explained that 'Congress expressly intended to define [these statutory terms] broadly' and that these terms 'are expansive enough to encompass the entire selling process.'" (quoting *United States v. Naftalin*, 441 U.S. 768, 773, (1979))).

Defendants contend that a portion of Defendant's fraud with respect to Company D was not "in connection with" the purchase or sale of securities.[23] (RDs' Memo at 11-12, 22-23.) Relief

---

[23] For the Companies F, G, and H transactions, Defendant also claims that at least some of his conduct was not in connection with the purchase or sale of securities. (Def.'s Mot. for Summ. J. at 39.) The record does not support his argument. Defendant exploited provisions in the securities transaction agreements to induce Company F to pay him approximately $750,000 in legal fees that, per the transaction agreements, should have been paid to the relevant Oak Fund. (SOF ¶¶ F-1–F-8.) With respect to Company G, Defendant exploited a tender offer agreement in which Oak purchased Company G shares to induce an Oak fund to wire him $2.1 million in

Defendants maintain that aside from the fraudulent management fee included in the agreement, the three other frauds Defendant committed with respect to Company D are not sufficiently "in connection with" the securities transaction to subject them to Section 10(b) and Rule 10b-5.[24] These include: (1) the false representation in July 2006 that Oak Investment Partners IX, L.P. ("Oak IX") was required to pay $3 million to Company D to reimburse it for advisory services that an investment bank provided in connection with the sale of Company D shares; (2) the false representation in January 2007 that Oak IX was required to pay $6.6 million to reimburse Company D for capital gains taxes it paid in connection with the Company D transaction; and (3) the false representation in August 2007 that Oak IX was required to pay $800,528.81 to reimburse Company D for transaction fees owed to a foreign tax authority.

Relief Defendants first assert that these representations did not "relate[] to the nature or value of the securities that were transferred, nor did the purchaser rely on any of these alleged misrepresentations in choosing to purchase the securities," without citing any authority that these are relevant considerations. (RDs' Mot. for Summ. J. at 23.) They then contend that Defendant's misrepresentations occurred months, or even years, after the transaction, and thus the Court

---

purported fees (*id.* ¶¶ G-7–G-9), and later exploited the sale of the Oak Fund's sale of Company G shares to induce the Oak Fund to wire him $3.1 million and $1.56 million, respectively, for purported management incentive payments (*id.* ¶¶ G-10–G-14). Finally, at least a portion of the approximately $2.2 million in legal fees Defendant illicitly caused Company H to send him related directly to the Oak Fund's investments in Company H shares. (*Id.* ¶ H-3.)

[24] Defendant also argues the SEC cannot meet this requirement with respect to the $650,000 management fee. (Def.'s Mot. for Summ. J. at 38.) This fee was directly connected to the December 2004 transaction—Defendant told Company D that Oak was willing to remove a dividend provision from the terms of the deal to purchase Company D securities in exchange for a (fraudulent) one-time management fee. (SOF ¶¶ D-1–D-5.)

should find that the alleged fraudulent misrepresentations did not "coincide" with the securities transaction, as required by *Zandford*, and therefore cannot form the basis for a claim under the federal securities laws. (*Id.*)

Relief Defendants mistakenly claim that Defendant's representations were made eighteen months after the transaction (the $3 million advisory services reimbursement), two years after the transaction (the $6.6 million reimbursement for capital gains taxes), and nearly three years after the transaction (the $800,528.81 reimbursement for Korean tax). Their math reveals they assumed these representations were made in connection with the December 2004 transaction, which none were. Rather, the evidence establishes that just months after the May 2006 securities purchase agreement, in July, Defendant fraudulently obtained $1.8 million by exploiting a provision in the agreement related to advisory fees that the relevant Oak fund was required to pay pursuant to the securities transaction. (SOF ¶¶ D-6–D-12.) Defendant later fraudulently obtained an additional $6.6 million (in January 2007) and $800,000 (in August 2007) by claiming these monies were owed to tax authorities as a result of the May 2006 sale and January/March 2007 distribution of Company D shares. (*Id.* ¶¶ D-6, D13–D-18.)

Thus, it is apparent that all of Defendant's misrepresentations were "in connection" with the Company D securities transactions. And, this is equally true with respect to all of the transactions.

d.      **Territorial Requirements**

i.      *Morrison and Subsequent Case law*

In *Morrison*, the Supreme Court limited Section 10(b)[25] to fraud connected to domestic

transactions, finding that it "reaches the use of a manipulative or deceptive device or contrivance

only in connection with [1] the purchase or sale of a security on an American stock exchange, and

[2] the purchase or sale of any other security in the United States." 561 U.S. at 273. There, three

Australian plaintiffs brought suit in the United States against an Australian bank for losses they

allegedly suffered on stock purchases traded on Australian exchanges. *Id.* at 251. It was what Justice

Breyer termed in his concurrence a "foreign-cubed" action, in which "(1) foreign plaintiffs [were]

suing (2) a foreign issuer in an American court for violations of American securities laws based on

securities transactions in (3) foreign countries." *Id.* at 283 n.11.

In *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60 (2d Cir. 2012), the Second

Circuit elaborated on what it means for a purchase or sale of a security to occur "in the United

States," as that phrase was used in *Morrison*. Under *Absolute Activist*, if a security is not traded on

a United States exchange (as is the case here), the SEC must prove, as to each transaction at issue,

any one of three things: (1) "that title to the shares was transferred within the United States"; (2)

"that the purchaser incurred irrevocable liability within the United States to take and pay for a

_____

[25] Courts have confirmed that the domesticity requirement of *Morrison* applies with equal
force to Section 17(a) of the Securities Act of 1933. *See, e.g., SEC v. Tourre*, 2013 WL 2407172, at
*4 (S.D.N.Y. June 4, 2013). However, *Morrison* does not apply to the SEC's claims under the
Investment Advisers Act ("Advisers Act"). *See SEC v. Gruss*, 859 F. Supp. 2d 653, 662. 664-65
(S.D.N.Y. 2012) ("[T]he Exchange Act focuses upon purchases and sales of securities in the United
States[,] whereas the [Advisers Act] focuses on the adviser." (internal quotation marks and citation
omitted)); *see also Lay v. United States*, 623 F. App'x 790, 796 (6th Cir. 2015) ("[N]o court has
extended Morrison's 'domestic' requirements to include the Investment Advisers Act.").

security," or (3) "that the seller incurred irrevocable liability within the United States to deliver a security." 677 F.3d at 68-69.

In making this determination the Court is directed to look at "facts concerning the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money." *Id.* at 70. However, the Second Circuit noted that the location of the broker-dealer (except to the extent it "carries out tasks that irrevocably bind the parties to buy or sell securities"), the identity of the securities, the identity of the buyer or seller, and the residency or citizenship of the buyer or seller were no longer relevant to the determination of domesticity. *Id.* at 68-70; *see also In re Petrobras Sec.*, 862 F.3d 250, 262 (2d Cir. 2017). The Second Circuit emphasized that "the time when the parties to the transaction are committed to one another . . . in the classic contractual sense, [where] there was a meeting of the minds of the parties . . . marks the point at which the parties obligated themselves to perform what they had agreed to perform even if the formal performance of their agreement is to be after a lapse of time." *Absolute Activist* 677 F.3d at 67–68.[26]

The Second Circuit also noted with respect to the passing of title that "a 'sale' is ordinarily defined as '[t]he transfer of property or title for a price.'" Thus, a sale of securities can be understood to take place at the location in which title is transferred. *Id.* at 68 (internal citations omitted). In so finding, it relied upon the Eleventh Circuit's decision in *Quail Cruises Ship*

---

[26] In the modern era, securities transactions are not completed at one time and at one location. *Butler v. United States*, 992 F. Supp. 2d 165, 178 (E.D.N.Y. 2014) ("The execution of contracts where two parties physically sit in different cities, states, countries, or continents and exchange a document electronically is now a standard way of doing business."). Thus, when locating a transaction that was completed in different locations, it is sufficient that either the purchaser or the seller is located within the United States at the time it incurs irrevocable liability. In *Butler*, for example, the fact that the defendant executed the transaction documents from his New York office was sufficient to establish a domestic transaction. *Id.* at 178.

*Management Limited v. Agencia de Viagens CVC Tur Limitada*, 645 F.3d 1307, 1310–11 (11th Cir. 2011), in which that court found that the alleged transfer of title to shares in the United States was sufficient to allege domesticity under *Morrison*. *Id.*

In *Quail Cruises*, the parties to a share purchase agreement signed the agreement in the parties' respective offices located in Spain and Uruguay. *Id.* at 1349. The agreement required notices, consents, and waivers or other communications pursuant to the agreement to be sent and delivered to the parties' respective offices in Spain and Uruguay, *id.*, but the agreement also required the stock transfer documents to be delivered to an office in Miami, and the plaintiff alleged that "[t]he transaction for the acquisition of the Templeton stock closed in Miami, Florida . . . by means of the parties submitting the stock transfer documents by express courier into this District." *Id.* at 1310. The Eleventh Circuit pointed to the plaintiff's allegation "that the closing *actually* occurred in the United States," and noted that the agreement at issue "confirms that it was not until this domestic closing that title to the shares was transferred," thus satisfying *Morrison*. *Id.* (emphasis in original).

Subsequent case law builds upon the foundation laid in *Absolute Activist*. In *Loginovskaya v. Batratchenko*, the Second Circuit distinguished between actions needed to carry out a transaction, and the transaction itself. 764 F.3d 266, 273-74 (2d Cir. 2014). There, the plaintiff resided in Russia, her investment was solicited in Russia, the investment materials were written in Russian and the investment contracts were negotiated and signed there. *Id.* at 274. The Second Circuit held that although the defendant company that negotiated these contracts was incorporated in New York and funds were wired to the company's New York bank account, this did not establish a basis for the application of the federal securities laws. *Id.* at 274-275. Rather, it held that the transfers were merely "actions needed to carry out the transactions, and not the

transactions themselves—which were previously entered into when the contracts were executed in Russia." *Id.* at 275. It thus confirmed that the direction to transfer money to the United States alone is insufficient to demonstrate a domestic transaction. *Id.* (citing *United States v. Vilar*, 729 F.3d 62, 77 (2d Cir. 2013)).[27]

In an unpublished decision, the Ninth Circuit classified transactions as domestic because "the actual sales [of the securities] closed in Nevada when [one defendant] received completed stock purchase agreements and payments." *SEC v. Levine*, 462 Fed. Appx. 717, 719 (9th Cir. 2011). The Third Circuit has determined that "territoriality under *Morrison* turns on 'where, physically, the purchaser or seller committed him or herself' to pay for or deliver a security.'" *United States v. Georgiou*, 777 F.3d 125, 136 (3d Cir. 2015).

A Southern District of New York court found in *Arco Capital Corps. Ltd. v. Deutsche Bank AG* that:

> the date beyond which the Issuer no longer had the discretion to revoke acceptance was the Closing Date, when the purchaser was to transmit the funds to HSBC in New York. Thus, the irrevocable sale of the Notes occurred with the parties' performance on the Closing Date, when Gramercy delivered the funds to HSBC in New York and the Issuer assigned the interest to the Trust in New York.

949 F. Supp. 2d 532, 543 (S.D.N.Y. 2013). The court noted that unlike cases where the only domestic activity were allegations that the investors wired money to a United States bank account, the Subscription Agreements at issue in *Arco* specified that "the delivery of funds to HSBC

---

[27] The Second Circuit in *Vilar* also found that irrevocable liability was incurred in the United States with respect to the transactions at issue based upon facts in the record "'concerning the formation of the contracts' and 'the exchange of money.'" *Id.* at 77 (quoting *Absolute Activist*, 677 F.3d at 70). Thus, although it made the point that under *Absolute Activist* the direction to wire funds to the United States alone does not render a transaction domestic, it also recognized the relevance of where the exchange of money took place.

automatically terminated or 'consummate[d]' the transaction because that act made the contract irrevocably binding." *Id.* at 543.

Another district court found on a summary judgment record that investors incurred irrevocable liability when they sent the completed, signed, subscription agreements from their foreign countries to the defendant, but that the seller did not incur irrevocable liability under the subscription agreements until the seller accepted the agreements and signed them, which occurred in the United States. *S.E.C. v. Yin Nan Michael Wang*, No. LACV1307553JAKSSX, 2015 WL 12656906, at *12 (C.D. Cal. Aug. 18, 2015). There, the plaintiff maintained that irrevocable liability was incurred when the subscription agreements were accepted by the defendant funds in their offices in the United States, while the defendant claimed that irrevocable liability attached when the foreign investors signed the agreements outside of the United States. *Id.* at 10. The agreements at issue specifically provided that the defendant funds could, at their sole discretion, choose to reject any subscription. *Id.* at 11. Accordingly, the court found that the sale of the securities did not close until the subscription agreements were accepted and signed by the seller in the United States and thus that the seller incurred irrevocable liability to sell the securities upon its acceptance of the executed agreements and the receipt of payment in the United States. *Id.*

Additionally, the court in *SEC v. Gernaio* found that although solicitation of the foreign Investors took place overseas, "the sales were not final until the Investors remitted payment to U.S.-based escrow agents and sent signed subscription agreements to the Issuers directly in the United States." No. CV 12-04257 DMG, 2013 WL 12146516, at *5 (C.D. Cal. Jan. 29, 2013). It therefore held that "the agreements became irrevocable when the Issuers countersigned them in the United States and escrow released the funds." *Id.* (citing *Absolute Activist*, 677 F.3d at 67-68)).

A recent district court addressed a situation in which the complaint alleged that the defendant offered and the plaintiff accepted an agreement to purchase shares in a Bahamian corporation at a series of meetings in New York. *See Adderley v. Dingman*, No. 15 CIV. 9935 (NRB), 2017 WL 1319819, at *7 (S.D.N.Y. Mar. 29, 2017). The plaintiff alleged he then wired the money for the shares from his New York bank account to the defendant. *Id.* However, the agreement also required that the Bahamian government approve the issuance of the shares and the plaintiff agreed that "[i]f approval was not forthcoming, [the defendant] was bound to return to . . . all funds paid by" the plaintiff. *Id.* at *8.

The district court found that the approval of the Bahamian government was a condition precedent to the plaintiff's "right and ability to take title to the shares allegedly promised by [the defendant] in exchange for [the plaintiff's] investment." *Id.* Thus, even assuming a contract had been formed between the parties, "the approval of the Bahamian authorities is best viewed as a condition that had to be satisfied before defendants became irrevocably bound to 'deliver' shares . . . to [the plaintiff], and before [the plaintiff] became irrevocably bound to 'take' or 'pay for' the same." *Id.* at *7 (quoting *Absolute Activist*, 677 F.3d at 68); *see also Stella v. Graham-Paige Motors Corp.*, 232 F.2d 299 (2d Cir. 1956) (where stock purchaser was, under purchase agreement, to make best efforts to borrow purchase amount from bank, and where bank's obligation to make the loan was on condition that another company would guaranty it, "irrevocable liability to take and pay for" stock was not incurred, for purposes of Section 16(b) of Exchange Act, until guarantee was executed). The court therefore concluded that the parties could not become irrevocably bound "unless and until" the condition was satisfied and therefore that the complaint did not allege a domestic claim. *Id.* at *7-*9.

The *Adderley* court distinguished its facts from *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 2 F. Supp. 3d 550 (S.D.N.Y. 2014), *aff'd in part, appeal dismissed in part sub nom. Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98 (2d Cir. 2016).[28] *Id.* at *9. In *Atlantica Holdings*, the plaintiff corporations were holders of notes issued by a bank, and they subsequently exchanged these notes for new notes issued by the bank as part of a restructuring. 2 F. Supp. 3d at 560. The form the plaintiffs "had to send" in order to purchase the new notes provided that the purchase was irrevocable except if the bank, "in its sole discretion, amends terminates or withdraws the Restructuring Plan . . . in a manner that is materially adverse to affected [holders of the former notes] . . . [then holders of the former notes] shall be permitted . . . to revoke" the agreement. *Id.* The court there concluded that the plaintiffs were bound upon submission because "as a practical matter," the plaintiffs' "liability was irrevocable *by them.*" *Id.* at 561. In *Adderley*, the court noted that unlike in *Atlantica Holdings*, where the condition "was one that the bank had almost complete power to satisfy or frustrate unilaterally. . . . neither [the plaintiff] nor defendants appear to have had this level of control over the key condition—approval of the Bahamian regulators." *Adderley*, 2017 WL 1319819, at *9.

### ii.    The Intention of the Parties

Relief Defendants argue that the law is clear that where, as is the case in the contracts at issue here, the parties agree in the contract on the location of the closing, the courts will treat the closing as having occurred at that place, thereby suggesting that where the closing actually occurred is irrelevant. (RDs' Mot. for Summary Judgment at 13.) The SEC distinguishes Relief Defendants'

---

[28] The Second Circuit did not address domesticity on this interlocutory appeal, which focused on a discreet unrelated issue.

cases and argues that although the intent of the parties may have been for the closing to "be deemed to have occurred at the offices of the Company," where irrevocable liability attached and title was *actually* delivered to Oak in the United States, the transaction is domestic. The SEC is correct.

Relief Defendants selectively cite *SEC v. Benger* as standing for the proposition that the question of where the buyer and seller respectively incurred irrevocable liability is "dictated by the terms of the Share Purchase Agreements, which oddly, the SEC ha[d] chosen not to examine." 2013 WL 593952, at *9 (N.D. Ill. Feb. 15, 2013). What Relief Defendants fail to include is that the *Benger* court then went on to observe that "[t]he evidence shows that in fact the sale was consummated in Brazil—where [the seller] became irrevocably bound—or, perhaps, in the investors' home countries where they received their stock certificates." *Id.* at *12.[29] In addition, although the SEC inexplicably fails to highlight it, there exists Second Circuit authority directly on point. *See United States v. Vilar,* 729 F.3d 62, 93 n.12 (2d Cir. 2013) ("When a securities transaction takes place in the United States, it is subject to regulation under Section 10(b), and when a securities transaction takes place abroad, it is not. The parties' intention to engage in foreign transactions is entirely irrelevant.").

---

[29] Neither of the other two cases Relief Defendants cite involve the question of domesticity in the securities context. In the first case, an employment agreement defined a "performance period" by reference to a closing, and the court defined the period by reference to the date "the parties intended to treat the [c]losing as occurring[.]" *Handmaker v. Certusbank, N.A.*, 2016 WL 5660341, at *12-13 (W.D. Ky. Sept. 28, 2016). As the SEC notes, the court did not hold the parties *actually* closed on the date they *intended* to close, but only that the "performance period" had been defined by the parties by reference to the *intended* date. *Id.* The second case, *Leviton Manufacturing Co., Inc. v. Reeve,* involved an instance where the only evidence of the closing location was in the written agreement and neither party disputed the location of the actual closing. 942 F. Supp. 2d 244, 261 (E.D.N.Y. 2013). Thus, it is difficult to see how either of these cases support Defendants' contention that "the law is clear" courts will treat the closing as having occurred in the location specified by the contract, even in the face of evidence that the closing actually occurred elsewhere.

### iii. The SEC's Evidence is Sufficient to Establish Domesticity[30]

Defendants contend that the SEC cannot establish that the alleged frauds in connection with Companies A, B, D, E, F, G, H and I[31] were "domestic" as set out in *Morrison* and therefore claim that they are entitled to summary judgment on the SEC's claims relating to those transactions.[32] The SEC maintains that the evidence demonstrates each transaction was domestic because in each case Oak both incurred irrevocable liability in the United States and title was actually delivered to, or sent from, Oak in the United States. As discussed above, under *Absolute Activist* the SEC need only show that either of these events occurred in the United States in order to establish domesticity.

---

[30] The SEC bears the burden to prove that each transaction was domestic within the meaning of *Morrison*, and to prove that the alleged fraud occurred in connection with a domestic securities transaction. Accordingly, in Defendants' Motions for Summary Judgment, they "need only demonstrate that there is an absence of evidence to support the claims of the nonmoving party" that bears the burden of proof. *SEC v. Wang*, 2015 WL 12656906 at *6 (C.D. Calif. Aug. 18, 2015); *see also SEC v. Gonzalez de Castilla*, 184 F. Supp. 2d 365, 375 (S.D.N.Y. 2002) (where nonmoving party bears ultimate burden of proof, moving party's burden under Rule 56 "will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim"). The SEC must respond with "evidence on which the jury could reasonably find for" it on the issues in question. *See Gonzalez de Castilla*, 184 F. Supp. 2d at 376 (noting that the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986))).

[31] Neither Relief Defendants nor Defendant challenge the domesticity of transactions relating to Companies C, or J. Relief Defendants do not challenge the domesticity of the Company H transaction, butDefendant does.

[32] The SEC argues that it need only meet the "conducts-or-effects test," codified in the Dodd-Frank Act, which it claims supplants *Morrison's* domesticity requirement for conduct after July 21, 2010, which was five years before the filing of this action. *See, e.g.,* SEC v. Traffic Monsoon, LLC, No. 2:16-CV00832-JNP, 2017 WL 1166333, at *10-12 (D. Utah Mar. 28, 2017). The Court need not address this argument because, as discussed *infra*, it finds that the SEC has met the more stringent *Morrison* test.

The SEC claims the Oak funds formed contracts, incurred closing obligations, and transferred or received money while in the United States, thereby rendering the transactions domestic. (Pl.'s Mot. for Summ. J. at 18.) The SEC supports its claim of domesticity primarily with the testimony of Oak's designated witness, Ms. Grace Ames, bolstered by the adverse inference against Defendant arising from his invocation of his Fifth Amendment rights, and several emails and letters specific to transactions A, B, and E. For their part, Defendants rely entirely on the language of the contracts to argue that the transactions occurred abroad, without offering any extrinsic evidence indicating where in actuality irrevocable liability attached and transfer of title took place.[33]

### 1. Oak is a United States Company and Generally Acted from the United States

While the residency of the buyer or seller is not controlling, it still provides some evidence of the location of that party when it acts. *See Absolute Activist*, 677 F.3d at 69 (recognizing that it "may be more likely for domestic transactions to involve parties residing in the United States"). Here, the Oak funds at issue—Oak Fund IX, XI, XII, and XIII—are all limited partnerships registered in Delaware (SOF ¶ X-19), and the offices of Oak's managing members responsible for approving investments during the relevant time period were all in the United States (Ames Depo. at 282:10-4). All Oak email addresses ended with @OakVC.Com and the Oak servers housing these email addresses are located in the United States. (*Id.* at 296:8-297:5.) In addition, the legal counsel Oak used to help negotiate the stock purchase and other agreements for the transactions at issue,

---

[33] Recognizing that it must determine the domesticity of each transaction individually, the Court finds, as discussed below, that taking the evidence in its totality, the SEC has shown the absence of a material disputed fact as to the domesticity of each transaction.

Finn Dixon & Herling, is also based in Connecticut.[34] (Ames Depo. at 290:5-291:22.) Although not sufficient on its own, the fact that Oak is a United States company which functioned out of United States offices during the relevant time period, lends some support for the SEC's claim that the transactions themselves also occurred domestically.

Moreover, Ms. Ames attested that when an Oak Fund was a purchaser, Oak transferred the purchase payment from its bank in the U.S, and the Oak representatives who directed the Oak Funds' bank to transfer money were similarly based out of the U.S. (*Id.* at 309:3-10.) When an Oak fund was a seller, Oak received the purchase payment in a bank account located in the United States. (*Id.* at 309:25-310:11.) Furthermore, she specifically testified that Oak did not have a practice of traveling outside the United States for the formation of, or to enter into, contracts for the purchase or sale of an investment, nor did it do so to exchange signatures or funds or to obtain share certificates. (Ames. Depo. at 331:3-333:22.) Rather, these actions all generally occurred from the Oak offices. (*Id.*) She also confirmed that Oak followed its general practices with respect to the transactions associated with Companies A through J.[35] (Ames Depo. at 334:16-338:21.)

---

[34] On occasion Oak utilized foreign counsel in connection transactions. (*See e.g.*, RD Ex. 17 at SEC-5137 (defining "Oak's UK Solicitors" as "Simmons & Simmons of CityPoint, . . . London").)

[35] Ms. Ames explained that when she testified at her deposition about the way something "would" happen she was "describing a general practice and not a specific recollection of what actually happened in each of these transactions." (Ames Depo. at 356:14-23.) Relief Defendants argue general practices testimony alone is insufficient for a party to carry its burden on a motion for summary judgment. *See, e.g.*, *Dawson v. Litton Loan Svcg.*, LP, 2017 WL 695910, at *2 (10th Cir. Feb. 22, 2017) (testimony about loan servicing company's general practices, without personal knowledge of company's interaction with plaintiffs, insufficient to carry burden on summary judgment); *Moore v. Firstsource Advantage LLC*, 2011 WL 4345703, at *11 (W.D.N.Y. Sept. 15, 2011) (testimony about company's general practices with respect to obtaining client contact information insufficient to prove prior express consent to call particular telephone number). First, not all of Ms. Ames' testimony was stated in such terms. Second, as discussed below, the SEC offers

## 2. The Court Applies an Adverse Inference

Defendant asserted his Fifth Amendment privilege and declined to answer when the SEC asked him with respect to each Company where the respective investment, purchase, or sale, was "negotiated, approved, and transacted." (*See, e.g.*, SEC Ex. 2 (Def.'s Depo.) at 16:5-8, 22:4-6, 79:7-25.) As a result of Defendant's choice to remain silent on this point, the Court draws an adverse inference against Defendant, meaning that the Court infers that his response to the question would have affirmed the domesticity of the transactions. As discussed *supra*, this inference can be applied at the summary judgment phase, balanced against the other evidence in the record. *See, e.g.*, *LiButti I*, 107 F.3d at 124.

## 3. The Transfer of Title

The focus in *Absolute Activist* is on where title was transferred, i.e. where the buyer was located when it received title to the securities. 677 F.3d at 68. Black's Law Dictionary defines title as "[l]egal evidence of a person's ownership rights in property." TITLE, Black's Law Dictionary (10th ed. 2014). Subsequent cases (discussed *supra*) focus primarily on irrevocable liability and do not expand upon the *Absolute Activist* language, but the Second Circuit's reliance on the Eleventh Circuit's opinion in *Quail Cruises* is telling because there the Eleventh Circuit found that the complaint's allegations that share transfer documents[36] were delivered to the United States was

---

additional evidence of domesticity, and third, Ms. Ames specifically affirmed that Oak had followed its general practices with respect to these transactions.

[36] "Share transfer documents" might refer to forms in which the seller purports to transfer its interest to the Buyer (*see, e.g.* SEC Ex. 135 at SEC-47 (the Seller "for value received, does hereby transfer to Oak . . . the following shares . . . [,]")) stock/share certificates, or both. According to the SEC, "[s]tock certificates are title—the documents prove that Oak owns the shares it purchases. It does not matter whether Oak receives title on or after a closing date—the location of the transaction occurs at the place title is delivered regardless of when it is delivered." (Pl.'s Reply at

sufficient to allege title was transferred domestically. Accordingly, the point at which title is transferred is when it is delivered to the location of the buyer.[37]

The SEC maintains all of the transactions are domestic because either Oak wired funds from the United States to purchase securities, ownership of which it then received while located in the United States, or it received funds and sent title from within the United States when acting as the seller. Defendants urge the court to enforce the language in the parties' contracts, contending that in each transaction title was to be transferred at the closing, and these closings were intended to take place in foreign countries.[38]

---

9.) Given that title is evidence of ownership, an executed document which specifically expresses the buyer's ownership interest would constitute the transfer of title, even where the stock certificates are to be transferred at a later time. In either event, in this case this is a distinction without a difference, for as discussed below, the evidence supports finding that Oak received transfer instrument documents as well as the actual stock certificates in the US.

[37] The Court does not comment on whether and to what extent the location from which funds are transferred is relevant to the transfer of title, for in this case the funds were sent and received from the same location as title. However, it does find that where Oak was the seller and delivered title in the form of the transfer instruments and/or actual stock certificates to a foreign country, title was not transferred domestically. Title can be transferred only once, and the SEC cannot have it both ways–i.e, that when Oak was the buyer it was transferred in the United States upon delivery, but when it was the seller it was transferred when Oak sent it from the United States to a foreign country. Oak was the seller in only three of the contested transactions–the 2006 Company D transaction, the July 2007 Company F transaction, and the 2011 Company G transaction.

[38] In all but three of the agreements (the Company E transaction, the 2007 Company F transaction, and the 2007 Company G transaction) the contracts specifically provided that the parties could agree to close in another location. (*See e.g.*, RD's Ex. 9 § 2.2 at OAK-SEC-00001242 ("The closing of the sale and transfer of the Purchased Shares" was to take place at the offices of the South Korean operations of the U.S. entity named in the agreement in Seoul, Korea "or such other date and time as the parties may agree.").)

Ms. Ames stated that "in this electronic age . . . there's not a case where the Oaks all travel to . . . a location for a closing and people sit around the []table . . . that's just not how our business is done." (298:15-21.) She testified that Oak was "never in a room giving a check in one hand and receiving share certificates in the other hand" (*id.* at 327:20-328:2), nor was it ever in the same room as its counterparty when signatures were exchanged (*id.* at 319:14-25). Original stock certificates representing Oak's ownership in the respective Company would generally be physically mailed to Oak's counsel after the closing took place, and vice versa where Oak was the seller. (*Id.* at 322:13-324:3, 326:19-327:5.) Oak's project managers generally signed and received signed documents from Oak's offices. (*Id.* at 320:2-16.) Moreover, the evidence the SEC puts forth for both transactions A and B demonstrates that although the parties may have agreed in the contract that the closing would take place at a certain foreign location, they did not necessarily act in accordance with that language, undercutting Defendants' argument that title was transferred abroad at closing.

The Share Purchase Agreement involving Company A states that "[t]he closing hereunder, including payment for and delivery of the Shares, shall be deemed to have occurred at the offices of the Company, immediately following the execution of this Agreement, or at such other time and place as Seller and Purchaser may mutually agree . . . ." (Defs.' 56(a)1 Stmt. ¶ 7; RD Ex. 1, at OAK-SEC-00000742; SEC SOF A-7; SEC Ex. 127.) The offices of Company A are located in Shanghai, China. (*See* RD's Ex. 2 at OAK-SEC-00000715; Ames Depo. at 41:11–42:17.) The Agreement further required the Purchaser (an Oak fund) to "deliver [payment for the shares] on the Closing Date to Seller, by wire transfer of immediately available funds . . . ." (RD Ex. 1 §2(b) at OAK-SEC-00000742.) Relief Defendants acknowledge that Oak's designated witness testified that Oak's representatives were not present at Company A's offices at the time of the closing (Defs.' 56(a)1

Stmt. ¶ 9; Ex. 3, Ames Depo. 22:15–23:13), but argue that is not significant based upon their contention that the Court "must enforce the words of the parties establishing that the closing—and passing of title—took place in Shanghai, China." (RDs' Mot. for Summ. J. at 14.)

However, the SEC points to the email that Defendant, acting on behalf of Oak, sent the seller, requesting the seller "please send me scanned and signed signature pages as soon as you can. I leave for vacation tomorrow and hence getting these out to you before I leave." (SEC Ex. 124 at SEC-686.) The seller signed the deal documents with a purchase price of $1.5 million and delivered the signature pages and share transfer form to Defendant's Oak email address. (SOF A-5; SEC Exs. 125; 126.) The share transfer form stated that the seller "for value received, does hereby transfer to Oak Investment Partners XIII . . . the . . . Series A Preference Shares." (SEC Ex. 127 at SEC-749.) On behalf of Oak Fund XIII, Defendant signed a copy of the signature page for the Share Purchase Agreement that had already been signed by the seller. (Compare SEC Ex. 127 at OAKSEC-747, with SEC Ex. 125 at OAK-SEC-705.) Subsequently, Defendant sent an e-mail to the purchasers from his U.S.-based email address, saying that "[a]ll signed docs are in. Good to wire and close the purchase." (SEC Ex. 127.)

The Company B Agreement provides that "[c]ompletion shall take place at the offices of the Seller's solicitors (or any other location as agreed by the Seller and the Buyer) on the Completion Date." (RD LR 56 ¶ 11; Ex. 4, at OAK-SEC-00000477.) The Seller's "solicitors" are not identified in the agreement and Oak's designated witness was unable to testify as to the location of the offices of the Seller's solicitors, but other evidence indicates it is in Shanghai, China. (R. Defs.' 56(a)1 Stmt. ¶¶ 13-14; Ex. 3, Ames Depo. 63:3-66:24, 344:22-345:21; Ex. 5, at OAK-SEC-000000008.) According to the agreement, the seller was to provide a written instrument of transfer

and "the original share certificates" to Oak at the closing. (RD.'s Ex. 4 § 5.2 at OAK-SEC-00000477 and Schedule 2, Part 1 at OAK-SEC00000484.)

In contrast with this language, in an email exchange regarding the Company B transaction, Counsel for Oak explicitly stated that "[t]o be clear, the closing will not yet have occurred and requires the completion of the [O]ak wire. Oak can't wire until it is confirmed that the signing of the SPA has occurred." (SEC Ex. 135 at OAK-SEC-8.) The Seller emailed Oak's counsel the signed SPA and "Instrument of Transfer," to be held in escrow until Oak wired the funds, upon which the transaction closed. (*Id.* at OAK-SEC-8.)

The Court is not persuaded by Defendants' argument that it should enforce the language of the contracts, given that both the testimony of Ms. Ames and the emails concerning transactions A and B illustrate that the parties did not act in accordance with those terms. Defendants have therefore offered no evidence of where title was actually transferred.[39]

On the other hand, the emails offered by the SEC establish title was transferred in the United States in both transactions A and B, since in each instance the signed transfer instruments were electronically sent to Oak's United States registered email addresses as part of the closing, rather than at the locations for closing identified in each respective agreement. Additionally, these emails tend to support Ms. Ames' testimony that the parties were never exchanging documents, such as the share transfer forms and stock certificates, while in the same room, but instead Oak

---

[39] Defendant makes the additional argument that the transfer of title took place outside the United States because in accordance with each respective countries' securities laws, title was maintained in book entries in a depository located inside the country. (Def.'s Mot. for Summ. J. at 6-11.) He offers no evidence supporting this argument and therefore the Court affords it no weight.

received these documents in the United States.[40] Thus, where Oak was the purchaser, there is no genuine dispute of fact on this record that it obtained title to the respective securities in the United States, and accordingly no rational jury could find these transactions were entirely foreign.[41]

### 4. Irrevocable Liability

With respect to irrevocable liability, there are several points at which parties might be bound, and the parties may become bound at two separate times and locations. *See Butler*, 992 F. Supp. 2d at 178. On this record, the Court cannot determine the exact point at which irrevocable liability attached for each respective transaction. Nonetheless, for each potential point at which the parties may have been irrevocably bound, the evidence demonstrates that at least one party (Oak) was acting from the United States, and therefore all of the transactions are domestic under *Morrison*.

### a. Contract Formation

The first opportunity at which the parties could have incurred an irrevocable obligation to perform was the point at which they formed the agreements—where there was a meeting of the minds. *See Absolute Activist*, 677 F.3d at 68.

---

[40] Extrinsic evidence associated with the Companies B and E transactions establish that original stock certificates were to be mailed to Oak's counsel in the United States following the respective closings. (*See* SEC Ex. 135 at OAK-SEC-7 (Oak's attorney requested in an email that the Seller "kindly mail the original stock certificate to [his] attention as follows," listing Finn, Dixon, & Herling's Stamford, Connecticut address.); RD's Ex. 14 at SEC-1321 (Counsel for Oak indicates in a letter addressed to Defendant's Connecticut address at Oak that "Company [E] counsel" informed him that it would deliver the original stock certificates to Defendant "shortly.").)

[41] By contrast, when Oak was *seller* title passed abroad However, as discussed below, because Oak incurred irrevocable liability to sell the respective shares while located in the United States, the remaining three transactions are also domestic under *Morrison*.

According to Oak's designated witness, Oak's partners evaluated and discussed investments at weekly partner meetings held in Oak's United States offices and it was often at these meeting that individuals would both seek and gain approval of investments.[42] (Ames. Depo. at 283:14-285:9.) Ms. Ames confirmed that Oak did not have a practice of traveling outside the US to form contracts for the purchase or sale of investments. (*Id.* at 330:20-331:2.) She further testified that the Oak project manager and Oak's counsel (Finn Dixon & Herling), both based out of the United States, generally worked together to negotiate agreements on behalf of Oak with respect to the purchase, sale or disposition of investments—i.e. to form the contracts. (*Id.* at 291:3-22.) Defendants offer no evidence of where the contracts were formed.

### b. *Conditions Precedent*

Subsequently, irrevocable liability might be incurred upon completion of the final closing condition, thereby obligating the parties to close the transaction. The SEC argues that "the Oak funds had no obligation to close until they received (as a buyer) or sent (as a seller) the required notice" indicating that necessary closing conditions had been satisfied, which were sent from and received in Connecticut. (Pl.'s Mot. for Summ. J. at 17.) It concludes that "incurring the obligation to close a transaction while located in the United States . . . is sufficient to locate the transactions in the United States under *Absolute Activist* and *Morrison.*" (*Id.*) Relief Defendants, for their part, contend that "the SEC must present evidence that the last condition precedent that was satisfied

---

[42] Although rare, approvals were sometimes made at meetings other than the weekly partners meetings, and these discussions took place by telephone from wherever the partners were located at that time. (Ames Depo. at 285:5-23.)

for each transaction occurred in the United States," which they maintain it cannot do. (RDs' Opp'n at 10.)[43]

Relief Defendants' basic contention is that in each of the agreements there were multiple conditions which had to occur before the closing could take place, some of which would have had to occur outside of the United States, and because the SEC has not presented the Court with evidence as to which of the conditions occurred last, it cannot establish each transaction is domestic. For instance, they argue that conditions requiring certain documents and certificates be delivered to investors or the buyer at the closing indicates these conditions were satisfied in the foreign location designated as the closing location in the respective agreements.[44] Relief Defendants also point to conditions in the July Company F agreement requiring that in order for the closing to proceed the buyer was required to have a certain resolution filed and registered by the Target's Register of Parma, Italy. (Defs.' 56(a)1 Stmt. ¶ 64; Ex. 18 § 11.1 at OAK-SEC-00005336-37.)

The Court affords Relief Defendants' first argument little weight, given that as discussed above, Ms. Ames's testimony that closings never occurred with the parties in the same room, and the email exchanges illustrating both the closings for Companies A and B occurred remotely with Oak acting from its United States based email accounts, undermine the language in the contracts

---

[43] Defendant makes an identical argument. (Def.'s Mot. for Summ. J. at 6-11.)

[44] Relief Defendants make this argument with respect to the Companies E, G (2006), and I transactions. (*See* RD's Ex. 14 § 1.11(v) at OAK-SEC-00001335 (requiring that "[a]n officer of the Company . . . deliver to the Series-B Investors at the Closing [in Lugano, Switzerland] a certificate" regarding certain specified matters); (RDs' Ex. 19 §§ 5.4-5.5 at OAK-SEC-1163-64 (the Company "shall deliver to the Investors at the Closing" certain certificates); RD's Ex. 22 at OAK-SEC-00006422 ("At Completion [in London, England] the Sellers shall deliver to the Purchaser" certain documents described in Schedule 2 of the agreement).)

providing that closing was to occur in these foreign locations. With respect to Relief Defendants' second argument, there are several flaws.

First, there is no support in existing case law for the proposition that irrevocable liability attaches abroad for a party located in the United States simply because the last condition precedent was completed in a foreign country. Relief Defendants rely upon *Adderley*, discussed *supra*, but there the court merely held that the formation of an agreement to purchase securities did not create irrevocable liability because a necessary condition was never satisfied. No. 15 CIV. 9935 (NRB), 2017 WL 1319819, at *7-8 (S.D.N.Y. Mar. 29, 2017) ("[I]rrevocable liability for purposes of Section 10(b) was not incurred."). The condition required the approval of the Bahamian authorities, but nothing in *Adderley* suggests that the buyer (located in New York) would have incurred irrevocable liability inside of a Bahamian clerk's office without the buyer's knowledge if the deal had received government approval.

Second, and relatedly, the agreements almost uniformly contained a final condition requiring delivery of notice to Oak, and/or that Oak send notice to its counterparty, confirming that all other conditions to closing had been satisfied or waived. (*See, e.g.*, RDs' Ex. 14 § 1.10 at SEC-1334-35 (the investors, including Oak "shall confirm to the Company that the conditions to Closing set forth in Section 1.11 below … have been met or have been waived…."); RD's Ex. 18 §§ 5.1.2 and 5.1.3 at SEC-5296 (requiring both that the Buyer send written evidence of the satisfaction of the conditions precedent referred to in Clause 11 to the Seller and that "[t]he Sellers . . . give to Buyer . . . written evidence of the satisfaction of the conditions precedent . . .").[45] Ms. Ames stated

---

[45] The SEC urges that even if the agreement did not specifically provide the condition that the parties notify their counterparties of completion of all other conditions precedent, a party cannot "incur the obligation to consummate a transaction without even knowing it did so." (Pl.'s

64

that the Oak representatives (counsel and project managers) would be notified the closing conditions had been met while located in their Connecticut offices either by email or telephonically. (Ames Depo. at 294:23-296:7; 299:21-300:3.)

Absent any evidence or language in the contracts tying the completion of the final condition precedent to the point at which the parties became bound, the Court cannot determine on this record if this was in fact the point at which the parties were irrevocably obligated to perform. Although it is true that the transactions could not close absent completion of all conditions precedent, nothing in the contracts suggest that was also sufficient to commit the parties to perform. That being said, if indeed this is the point at which irrevocable liability attached, the record demonstrates that in each case Oak sent and received notice that closing conditions had been satisfied while located in the United States, and Defendants again offer nothing outside of the language of the contracts themselves, which is unavailing at the summary judgment stage.

### c. Execution of the Agreement

Finally, the parties might not become irrevocably bound until they sign the agreement and obligate themselves to either deliver the securities or wire the funds to purchase the securities. *See, e.g., Liberty Media Corp. v. Vivendi Universal, S.A.*, 861 F. Supp. 2d 262, 269 (S.D.N.Y. 2012) ("Irrevocable liability was incurred when the Merger Agreement was executed....[t]he binding obligation to effectuate the merger and the exchange for … securities occurred" on that date);

---

Opp'n at 9.) Based on the record and facts in this case, the Court agrees. For instance, the Company A agreement provides as a condition to closing that the Seller and Purchaser, respectively, "shall have performed all obligations and conditions herein required to be performed or observed by it on or prior to the Closing Date." (RDs' Ex. 1 §§ 5(a)(iii), 5(b)(iii).) It does not specifically require the parties to notify one another once they have completed all of their obligations, however, absent such notification, a party would have no way of knowing when this occurred.

*Wang*, 2015 WL 12656906, at *12 (investors incurred irrevocable liability abroad when they sent the agreements from their foreign countries, but defendant did not incur irrevocable liability until he accepted the agreements and signed them while located in the United States); *Arco Capital*, 949 F. Supp. 2d at 542-43 (language in the contract indicated that the parties became irrevocably bound to execute the securities sale upon payment of the purchase price).

Ms. Ames stated that, depending on the agreements' terms, signatures would be held in escrow until closing and then at closing those would be released "insofar as, you know . . . Oak has the obligation now to fulfill whatever it had committed to in the document and to proceed with the security transaction." (Ames Depo. at 302:3-18.) She further testified that counterparties' signatures would be sent to Oak offices so the respective project manager could sign the document (*id.* at 320:2-16) and that Oak project managers signed written agreements while located at the Oak offices in the United States (*id* at 292:12-292:4).[46]

*Conclusion*

Defendants' objection that Ms. Ames' testimony is "general practices" evidence that cannot alone satisfy the SEC's burden is unpersuasive here, where Ms. Ames not only testified that Oak followed its general practices with respect to the transactions associated with Companies A through J (Ames Depo. at 334:16-338:21), but also buttresses this evidence with the adverse inference against Defendant, as well as the evidence relating to the Companies A and B transactions, which support Ms. Ames' testimony. In contrast, Defendants proffer only the

---

[46] Relief Defendants assert that Ms. Ames had not reviewed the calendars for any of the Oak partners aside from Mr. Ahmed to confirm whether they were in the United States for the relevant transactions. (*See* Deitch Decl. [Doc. # 660] ¶¶ 2-6.) Even so, Mr. Ahmed signed on behalf of Oak for more than half of the transactions, and Relief Defendants provide no rebuttal evidence to Ms. Ames's testimony that Oak's project managers signed agreements from the Oak offices.

language of the contracts, without identifying a single piece of extrinsic evidence indicating that any of these transactions actually occurred abroad, or even addressing the SEC's evidence establishing that the language of the contracts was ignored. As the Court has noted already, Defendants' reliance on the language of the contracts is insufficient. The mere fact that the parties may have intended for their conduct to occur outside of the United States carries no significance, for the question is not where the parties desired the transaction to take place, but where in fact it did take place. *See Vilar,* 729 F.3d at 93 n.12.[47]

In sum, in all but three of the disputed transactions, Oak was the buyer, and the SEC proffered evidence that title was delivered either electronically to its United States email accounts, or physically to its offices located in the United States. Moreover, in all of the transactions, the SEC established that Oak incurred irrevocable liability in the United States, as the unrebutted testimony of Oak's designated witness was that Oak acted from the United States at all potentially relevant stages of the transaction.[48]

---

[47] Relief Defendants argue it is significant that the SEC did not present any travel records or other documents which would establish conduct took place in the United States or did not take place in a foreign jurisdiction. (RDs' Opp'n at 12.) However, the SEC is not required to make its showing using any particular types of evidence, so long as it has demonstrated an absence of a material dispute of fact. Moreover, Relief Defendants similarly have not offered any such evidence– and given the extent of discovery in this case, they had every opportunity to uncover documents establishing that the transactions occurred outside of the United States. That they presented no such evidence only confirms the Court's conclusion that the transactions took place in the United States consistent with the testimony of Oak's designated witness.

[48] Relief Defendants argue that the Company D transactions are impermissibly foreign under *Parkcentral Global Hub Ltd. V. Porshe Auto Holdings SE,* 763 F.3d 198 (2d Cir. 2014). They contend that the transaction was a purchase and sale of shares in a Korean company from a Dutch company and that to the extent that particular Oak funds were involved, they participated through foreign-based entities in which the Oak funds had investment interests.

## IV. Conclusion

For the foregoing reasons, the SEC's Motion for Summary Judgment on Liability is GRANTED. Defendant and Relief Defendants' Motions for Summary Judgment on Liability are DENIED.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 29th day of March 2017.

---

In *Parkcentral* the transaction in question involved "securities-based swap agreements" relating to the stock of Volkswagen AG, a German corporation whose stock was traded on foreign exchanges. *Id.* at 201. There was no question that the swap agreements were concluded domestically, but the Court found that the domination of foreign elements in the transaction made it impermissibly extraterritorial. *Id.* at 216. In doing so, the Second Circuit noted that Morrison held that the existence of a domestic transaction was a necessary predicate to application of the securities laws, but that the *Morrison* court never said that the existence of a domestic transaction would necessarily be sufficient to warrant the application of those laws. *Id.* at 215. The Second Circuit further found that a predominantly foreign transaction poses the risk of conflict with foreign securities laws, and that fact places it outside the scope of domestic securities laws. *Id.* at 216-18. The court in *Parkcentral* explained at length that its holding should have limited application in future cases because of the unique nature of the transaction and claims at issue in the case, and warned that a transaction is not impermissibly foreign because it contains some foreign elements. *Id.* at 216. Here, a United States entity purchased the actual securities not traded on an exchange for the benefit of United States investors and with the intent to hold title to the actual securities in the United States, and Defendant, working from the United States, had direct involvement in the transactions. The fact that Oak engaged foreign service providers to facilitate the deal does not render the transaction impermissibly foreign.