UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

_____

|  |  |  |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 3:15cv675 (JBA) |
| IFTIKAR AHMED, | ) ) ) | |
| Defendant, and | ) ) | |
| IFTIKAR ALI AHMED SOLE PROP; I-CUBED DOMAINS, LLC; SHALINI AHMED; SHALINI AHMED 2014 GRANTOR RETAINED ANNUITY TRUST; DIYA HOLDINGS LLC; DIYA REAL HOLDINGS, LLC; I.I. 1, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; I.I. 2, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; and I.I. 3, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Relief Defendants. | ) ) | |

_____

**MEMORANDUM IN SUPPORT OF PLAINTIFF UNITED STATES
SECURITIES AND EXCHANGE COMMISSION'S MOTION FOR
REMEDIES AND JUDGMENT**

# **Table of Contents**

**INTRODUCTION**..............................................................................................1

**REQUEST FOR JUDGMENT**......................................................................2

**BACKGROUND AND PROCEDURAL HISTORY**................................3

**RELEVANT LAW**............................................................................................9

     **I.**    **The Court Has Broad Equitable Powers to Grant Full Relief**..........9

**ARGUMENT**....................................................................................................11

     **I.**    **Remedies.**..............................................................................................11

          a.    The Court Should Enjoin Defendant From Future
                  Securities Laws Violations.. ..............................................12
          b.    The Court Should Order Defendant to Disgorge $43,920,639. ................13
          c.    The Court Should Order Defendant to Disgorge $1,520,953 in
                  Prejudgment Interest and Turn Over Interest
                  Accrued on Frozen Assets. ...............................................13
          d.    The Court Should Order Defendant to Pay a $43,920,639
                  Civil Penalty..................................................................15

     **II.**   **The Court Should Order that Specific Frozen Assets
          Are Available to Satisfy a Judgment Against Defendant.**...............16

          a.    Total Value of Frozen Assets................................................16
          b.    Assets Not in Dispute..........................................................17

     **III.**  **Relief Defendants Only Nominally Hold Frozen Assets in Their Name,**........17

          a.    Relief Defendants Do Not Claim to Have Genuinely
                  Owned or Controlled Any Asset...............................................17
           b.    All Frozen Assets Belong to Defendant.....................................25
           c.    Relief Defendants' Ownership Claims are Incredible. ..............................31

     **IV.**  **Ms. Ahmed has No Legitimate Claim to $44 Million
          Placed into her Name.**...........................................................37

     **V.**   **Defendant's Carried Interest Was Forfeited
          and is Not a Cognizable Asset Available to Satisfy a Judgment.**....................38

**VI.**    **A Receiver Should be Appointed to Liquidate Real Estate and Illiquid Assets.** .........................................................**39**

**VII.**    **The Court Should Set Up a Fair Fund.**.............................................**40**

**VIII.**    **SEC Requests a Hearing on any Specific Asset the Court Finds Does not Belong to the Defendant.** .........................**40**

**<u>CONCLUSION</u>** ...........................................................................................**41**

## Table of Authorities

### Cases

*Adelphia Recovery Trust v. HSBC Bank USA*, 634 F.3d 678–96 (2d Cir. 2011) ........... 28, 29, 31

*Commodity Futures Trading Comm'n v. Kimberlynn Creek Ranch, Inc.*,
   276 F.3d 187, n.5 (4th Cir. 2002) .................................................................. 24

*Deckert v. Independence Shares Corp.*, 311 U.S. 282 (1940) .................................... 10

*F.T.C. v. Bronson Partners, LLC*, 674 F. Supp. 2d 373 (D. Conn. 2009) ........................... 24

Fireman's Fund Ins. Co. v. Hartford Acc. & Indem. Co., 2011 WL 1303148
   (N.D. Ohio Mar. 31, 2011) ............................................................................. 24

*Fleet Bank Connecticut, N.A. v. Carillo*, 240 Conn. 343 A.2d 1068 (1997) .............................. 34

*In re Donald Sheldon & Co., Inc.*, 191 B.R. 39 (Bankr. S.D.N.Y. 1996) .................................. 40

*Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288 (1960) ..................................... 10

*Official Comm. of Unsecured Creditors of Worldcom, Inc. v. SEC*,
   467 F.3d 73 (2d Cir. 2006) ........................................................................... 40

*Pension Benefit Guaranty Corp. v. Ouimet Corp.*, 711 F.2d 1085 (1st Cir.1983) ................. 11

*Sarasota CCM, Inc. v. Golf Mktg., LLC*, 891 A.2d 72 (Conn. App. Ct. 2006) .......................... 34

*SEC v. AMX, Int'l, Inc.*, 872 F.Supp. 1541–45 (N.D.Tex.1994) .................................. 11

*SEC v. Aragon Capital Mgmt., LLC*, 672 F.Supp.2d 421 (S.D.N.Y.2009) ............................... 38

*SEC v. Better Life Club of Am., Inc.*, 995 F.Supp. 167–83 (D.D.C.1998) ............................... 24

*SEC v. Cavanagh*, 155 F.3d 129 (2d Cir. 1998) ................................................. 12, 13, 37

*SEC v. Cavanagh*, 445 F.3d 105 (2d Cir. 2006) ..................................................... 13

*SEC v. Colello*, 139 F.3d 674 (9th Cir. 1998) ..................................................... 23

*SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90 (2d Cir. 1978) ........................... 12

*SEC v. DiBella*, 409 F. Supp.2d 122 (D. Conn. 2006) ............................................... 10

*SEC v. Durante*, 2013 WL 6800226 (S.D.N.Y. Dec. 19, 2013) ..................................... 10

*SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450 (2d Cir. 1996) ................................. 12, 14

*SEC v. Glauberman*, 90 CIV. 5205 (MBM), 1992 WL 175270 (S.D.N.Y. July 16, 1992) ........ 23

*SEC v. I-Cubed Domains, LLC*, 664 Fed. Appx. 53 (2d Cir. 2016) ................................. passim

*SEC v. Illarramendi*, F. Supp.2d, 2011 WL 2457734 (June 16, 2011, D. Conn.) ....................... 9

*SEC v. Investors Security Corp., et al.*, 560 F.2d 561 (3d Cir. 1977) ..................................... 39-40

*SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082 (2d Cir. 1972) ..................................... 9, 39

*SEC v. Materia*, 745 F.2d 197 (2d Cir. 1984) ..................................................... 9

*SEC v. McGinn Smith & Co.*, 752 F. Supp. 2d 194 (N.D.N.Y. 2010) ................................. 22, 30

*SEC v. McGinn, Smith & Co., Inc.*, 98 F. Supp. 3d 506 (N.D.N.Y. 2015) ........................... 32, 33

*SEC v. Moran*, 944 F.Supp. 286 (S.D.N.Y.1996) ..................................................... 14

*SEC v. Mulholland*, 12-CV-14663, 2017 WL 5507889 (E.D. Mich. Nov. 17, 2017) ............... 11

*SEC v. Musella*, 818 F.Supp. 600, (S.D.N.Y.1993) ................................................. 11

*SEC v. One or More Unknown Traders in Common Stock of Certain Issuers*,
   853 F. Supp. 2d 79 (D.D.C. 2012) .................................................................. 38, 39

*SEC v. Opulentica, LLC*, 479 F. Supp. 2d 319 (S.D.N.Y. 2007) ..................................... 15

*SEC v. Quan*, 2013 WL 1703499 at *5 (D. Minn. April 19, 2013) ..................................... 11

*SEC v. Razmilovic*, 738 F.3d 14 (2d Cir. 2013) ................................................. 14-15, 37

*SEC v. Rosenthal*, 426 Fed. Appx. 1 (2d Cir. 2011) ............................................. 15, 38

*SEC v. Smith*, 646 Fed. Appx. 42 (2d Cir. 2016) ................................................. 32, 34

*SEC v. Solow*, 682 F. Supp. 2d 1312 (S.D. Fla. 2010) ............................................... 17

iv

*SEC v. Tavella*, 77 F. Supp. 3d 353 (SDNY 2015) ............................................................ 13, 14, 37
*SEC v. The Infinity Group Co.*, 27 F. Supp.2d 559 (E.D. Pa. 1998) ...................................... 9, 10
*Shillitani v. United States*, 384 U.S. 364 (1966) ..................................................................... 10
*States v. Zolin*, 491 U.S. 554 (1989) ....................................................................................... 40
*Steffen v. Gray, Harris & Robinson, P.A.*, 283 F. Supp. 2d 1272 (M.D. Fla. 2003) ................... 10
*U.S. Commodity Futures Trading Comm'n v. EJS Capital Mgmt., LLC,*
    2015 WL 5679688 (S.D.N.Y. Sept. 24, 2015) ................................................................. 24
*United States v. Quintieri*, 306 F.3d 1217 (2d Cir.2002) ............................................................ 27
*Zedner v. United States*, 547 U.S. 489 (2006) ......................................................................... 28

**Statutes**

15 U.S.C. § 77q(a)) .................................................................................................................. 12
15 U.S.C. § 78j(b) ............................................................................................................... 12-13
15 U.S.C. § 7246(a) .................................................................................................................. 40
15 U.S.C. §§ 80b-6(1) 80b-6(2) ............................................................................................... 13
15 U.S.C. §§ 80b-6(2) ............................................................................................................. 13
26 U.S.C. § 6321 ...................................................................................................................... 23
17 C.F.R. § 240.10b-5), ............................................................................................................ 13
17 C.F.R. § 275.206(4)-8 .......................................................................................................... 13
Conn. Gen. Stat. § 46b-36 (2012) ........................................................................................... 28

## INTRODUCTION

For more than a decade, Defendant Iftikar Ahmed systematically used fraudulent and deceptive means to divert approximately $67 million from funds he advised into his personal bank accounts, before funneling much of his ill-gotten gains into assets and accounts in the name of his wife (and children) in order to conceal his fraud and protect the assets from confiscation. After his crimes were uncovered, Defendant fled the United States and remains a fugitive from justice. Despite the fact that nearly 99% of the Ahmed family's assets came – legally or illegally – from Defendant, throughout this litigation, Defendant has argued that his wife and children own the near entirety of frozen assets, which he contends must be released to them. *See, e.g.,* Doc. # 704-1 at 3-5. Relief Defendants now join in these incredible claims. *See* Doc. # 862-1.

Ms. Ahmed's sudden claim to own her husband's frozen assets is not only baseless, it is an integral component of Defendant's fraudulent scheme. Defrauding the funds he advised did little good if Defendant was not able to shield his assets and ill-gotten gains from confiscation and repatriation. Thus, Ms. Ahmed's claim is in reality Defendant attempting to further frustrate law enforcement efforts to hold him accountable for his misconduct and return the money he stole to his victims.

The Court should enter a judgment against Defendant for at least $89,362,231 – representing disgorgement of ill-gotten gains within the statute of limitations, an equivalent civil penalty, and prejudgment interest – and equally importantly order that each asset listed in Exhibit 1 (the "Asset Schedule") be made available to satisfy this judgment. The bulk (if not entirety) of assets will be needed to return stolen funds to Oak investors. Although the Court cannot undo Defendant's fraud, completely ameliorate the substantial harm he has inflicted (and continues to inflict) on his victims and innocent third-parties alike, or return him to the

1

United States to answer for his crimes, it can and should prevent him from profiting from his misconduct and make recompensing his victims the highest priority.

## REQUEST FOR JUDGMENT

The SEC requests that the Court enter a judgment against Defendant in favor of the SEC for at least $89,362,231 and that it endeavor to return $77 million to Defendant's victims.[1] Specifically, the SEC seeks (1) a permanent injunction; (2) disgorgement of Defendant's fraudulent proceeds in the amount of $43,920,639; (3) disgorgement of prejudgment interest on those proceeds in the amount of $1,520,953 along with interest earned on all frozen assets during the pendency of freeze; (4) civil penalties in the amount of $43,920,639; (5) an Order specifically finding the assets listed on the Asset Schedule (Ex. 1) belong to Defendant and can be used to satisfy a judgment again him; (6) the appointment of a receiver; (7) the establishment of a Fair Fund; and (8) any other relief that the Court may deem appropriate.[2]

In the alternative, were the Court to release assets to Defendant or Relief Defendants (which it should not do), the SEC requests that any amounts be offset against monies already released during the pendency of this litigation, and that any remainder remain frozen for 60 days to allow criminal authorities the opportunity to institute forfeiture proceedings against the asset (or a court in a parallel private security litigation the opportunity to freeze the asset).

Regardless, because the Court has found Defendant perpetrated a $67 million dollar fraud on his victims, and because Relief Defendants have failed to articulate any legitimate interest in frozen assets,[3] the Court should end the "substantial carve-outs from the freeze for [Ms.

---

[1] Defendant defrauded Oak funds of approximately $66,821,661.27. The prejudgment interest on these ill-gotten gains is approximately $10,191,262.38.

[2] The SEC will file a proposed Order of Final Judgment upon the Court's request or ruling on the instant motion.

[3] Relief Defendants do claim that four categories of assets (allegedly worth less than $100,000 in total) were gifted to them from third parties, but they provide no particulars, including what the actual assets are, where they appear on

2

Ahmed's] legal and living expenses" (*SEC v. I-Cubed Domains, LLC*, 664 Fed. Appx. 53, 57 (2d

Cir. 2016)) and immediately lift its Orders [Doc. # 195 & 387] releasing more than $8,000 per

month from Fidelity x7540 and rental proceeds of Unit 12A and 12F. These assets do not belong

to Ms. Ahmed and were largely, if not entirely, funded by Defendant's fraud.

## BACKGROUND AND PROCEDURAL HISTORY

In 2004, Defendant Iftikar Ahmed joined Oak Investment Partners ("Oak"). He

immediately began diverting monies from funds he advised into bank accounts he controlled.

*See* Doc. # 835 at 15. For the next 10 years, Defendant defrauded Oak funds out of nearly $67

million and transferred the near entirety of these monies into joint accounts he held with his

wife (*id.* at 7-23), before moving the money into accounts and assets in her (and their

children's) name. The stolen monies were not claimed on their jointly-filed tax returns. (Ex. 2).

On April 2, 2015, the SEC filed a civil complaint alleging Defendant profited by more

than $1.1 million through trading on inside information he obtained from a family friend. *SEC

v. Kanodia, et al.*, No. 1:15-cv-13042-ADB (D. Mass. filed July 9, 2015) (ECF # 1 at ¶ 4).

That same day, Defendant was arrested and charged with insider trading. *United States v.

Kanodia, et al.*, No. 1:15-cr-10131 (D. Mass. Apr. 1, 2015). To secure Defendant's release, the

Ahmeds pledged their residence ("505 North Street") in an Escrow Agreement with the United

States Attorney's Office and the Clerk of the Court. *Kanodia, et al.*, No. 1:15-cr-10131 (ECF #

19). Almost immediately thereafter, Mr. and Ms. Ahmed began removing Defendant's name

from the few assets in which he still held an interest on paper, including DIYA Holdings LLC

---

the safety deposit box inventory, and who allegedly gifted the asset to them. Considering that the Ahmeds round-tripped funds to their children (i.e. – sent money to friends and family so they could immediately return that money to the Ahmed's children), there is strong reason to question "gifting" claims. At a minimum, the Court should hold a hearing on these assets.

("DIYA") and DIYA Real Holdings, LLC ("DIYA Real"), which held two condominiums that were purchased for a combined $18.3 million in cash. *See, infra.* at 36-37.

Following his arrest, Defendant's fraud was uncovered after Oak placed him on administrative leave and examined his transactions. Doc. # 4 at ¶ 6. Believing Defendant would immediately further dissipate his assets, the SEC asked Oak to delay notifying Defendant that it had uncovered his fraud (or terminating his employment) until the SEC could seek an asset freeze from this Court, which it did on May 6, 2015. *See* Doc. # 2.

On May 7, the Court entered [Doc. # 9] under seal a temporary restraining order freezing assets of Defendant and certain Relief Defendants, up to the amount of approximately $55 million, and set this matter for a preliminary injunction hearing. That evening, the SEC began serving the Court's asset freeze order on financial institutions at which accounts were held in the name of Mr. and Ms. Ahmed. The very next morning, Ms. Ahmed entered a Fidelity Investments branch and at 9:16 a.m. Eastern attempted to wire $250,000 to India for purported "medical expenses" of Defendant's mother.[4] (Ex. 3). Defendant would flee to India 8 days ███████████████████████████████████████████████).

On Saturday, May 16, 2015, Defendant signed a stipulation [Doc. # 21], approved [Doc. # 22] by the Court on May 20, providing that all assets held by or for him, directly or indirectly, would remain frozen until the Court ruled on the SEC's preliminary injunction motion. Shortly after Defendant entered into this stipulation, he fled to India and repeatedly attempted to access assets in direct violation of the Court's asset freeze order and the parties' stipulation (Ex. 5; SOF X-10),[6] which he continues to falsely deny. *See, e.g.,* Doc. # 666 at 7.

---

████████████████████████████████████████████████

[5] Ms. Ahmed subsequently travelled to India to vacation with her fugitive husband.

[6] Citations to SOF refer to the SEC's Local Rule 56(a)1 Statement of Undisputed Facts. *See* Doc. # 628.

On June 11, 2015, the SEC spoke with Ms. Ahmed's counsel and notified them that the SEC intended to immediately amend its complaint to name Ms. Ahmed as a relief defendant and seek to increase the size of the asset freeze. (Ex. 6). A few hours later, from an account that had been funded with proceeds from Defendant's fraud involving Company A (*see* Doc. ## 80; 835 at 7-8) but not yet secured, Ms. Ahmed wired $671,317 to her attorneys, purportedly for a "Real Estate Closing." *See* Doc. ## 80-1; 80-2. In fact, more than $500,000 was used to secure Ms. Ahmed's bond in her husband's criminal insider trading case (since redeposited) and pay tuition at her children's private school.[7] Doc. # 69 at 9-10.

The next day, on June 12, the SEC filed [Doc. # 27] an emergency motion to amend its complaint and moved [Doc. # 29] to increase the size of the asset freeze based on newly-discovered misconduct by Defendant. In its filing, the SEC explained that "most, if not all, of the relief defendants essentially serve as nominees for [Defendant] and their accounts are controlled by and/or held for the benefit of [Defendant]." Doc. # 28 at 2, n.1.

On July 16, 2015, the SEC deposed Ms. Ahmed.



---

[7] Despite their claims to be destitute, the Ahmeds have continued to send their three young children to elite private school costing $110,000 per school year in tuition alone.

[9] During the preliminary injunction hearing, the Court recognized that this was not a valid privilege and noted that at least one other district court within the Second Circuit had opined that an adverse inference could be drawn from the invocation of marital privilege. (Ex. 8 at 76:12-25; SOF X-14)

███████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████

 Similarly, at the preliminary injunction hearing, Ms. Ahmed testified that she and her husband had a unique marital relationship in that they "never spoke about what [Defendant] did in his business dealings" and had a "Chinese wall" between them. (Ex. 8 at 298:5-10). Thus, she claimed to be unaware of her husband's fraud. Despite holding a Princeton undergraduate degree in Economics and a Harvard MBA (Doc. # 69 at 8), Ms. Ahmed claimed she did not notice the $60 million discrepancy between the income reported on their jointly-filed tax returns and the enormous amount of money and assets they held, most of which had been funneled into accounts and assets in her name. (*Id*. at 341:4-342-7) (". . . .So I briefly glanced at the tax returns and I didn't think about purchases that we were making linked to the tax returns, because some – as I stated, checks is not the same thing as income."). Ms. Ahmed did admit, however, that Defendant placed assets into her name only as a contingency plan should anything happen to him. (*Id*. at 296:24-299:1).

 In opposing the SEC's request for a preliminary injunction freezing assets, Ms. Ahmed and her children made a claim to only three assets: (1) $7.5 million in proceeds from the Company C transaction that were held by I-Cubed and placed into the 2014 Grantor Retained Annuity Trust (the "GRAT"); (2) income earned from a Park Avenue condominium held in the name of DIYA that was purchased for approximately $9.5 million ("Unit 12A"); and (3)

---

[10] On February 1, 2017, the SEC deposed Ms. Ahmed's father, mother, and two sisters regarding these payments. Each invoked their Fifth Amendment right against self-incrimination in response to every substantive question asked. (Ex. 11; SOF X-12).

potential income earned from a second Park Avenue condominium held in the name of DIYA Real that was purchased for approximately $8.7 million ("Unit 12F"). *See, e.g.* Doc. ## 69; 96. The Court rejected Ms. Ahmed's request finding she was a nominal owner for each requested asset and thus her ownership claims were not credible. *See* Doc. # 113 (the "Asset Freeze Order"). However, the Court agreed to "entertain any application to release assets identifiable as [Ms. Ahmed's], and not tainted." *I-Cubed Domains, LLC*, 664 Fed. Appx. at 57 (internal quotations omitted).

Ms. Ahmed did not accept the Court's invitation and instead took an interlocutory appeal of the Asset Freeze Order, making the (now familiar) argument she did not need to make a legitimate ownership claim over assets held in her name (to hold otherwise would be improper burden shifting) and thus the asset freeze was overbroad as to assets in her name that the Court had not individually analyzed. *SEC v. I-Cubed Domains, LLC*, 15-2658 (2d. Cir) (ECF # 41).

The Second Circuit deemed the argument "meritless" and instructed that, even with assets held in their name, Relief Defendants needed to first "identify any improperly frozen assets" and apply for their release before the SEC would be "required to carry its burden of demonstrating that any such identified assets are either ill-gotten gains to which Relief Defendants do not have a legitimate claim or that Iftikar in fact owns the assets in question." *I–Cubed Domains, LLC*, *et al.*, 664 Fed. Appx. at 57 (citing *Smith v. SEC*, 653 F.3d 121, 128 (2d Cir. 2011)). "If Relief Defendants cannot prove that any frozen assets legitimately belong to them, then necessarily none of their assets are being improperly frozen to satisfy the civil penalties alleged to apply to Iftikar's conduct." *Id.* at n.3. Relief Defendants subsequently hired an expert "to counter the Commission's argument that the Relief Defendants are mere nominees." Doc. # 340 at 7.

In the 18 months since the Second Circuit's ruling, Ms. Ahmed identified only two allegedly improperly frozen assets: 1) $250,000 in rental proceeds from Unit 12A that were previously placed in Fidelity x7540; and (2) nine 1-kilogram gold bars discovered in jointly owned safety deposit boxes.[11] *See* Doc. # 442. The Court rejected [Doc. # 658] these requests, finding that neither asset belonged to her: "Ms. Ahmed is not entitled to proceeds of Unit 12A because she was only a nominal owner of the condominium" and "[e]ven Relief Defendants' Motion does not contain an explicit allegation of Ms. Ahmed's ownership of the Gold Bars, and the SEC has pointed to testimony which demonstrates that Ms. Ahmed had no knowledge of the existence of the bars." *Id*. at 3-5. During this same time period, Defendant made repeated claims that the near entirety of the frozen assets belonged to his wife and children and should be released to them. *See, e.g.,* Doc. 685 at 2-4; 685-4.

On March 29, 2018, the Court granted [Doc. #835] the SEC's Motion for Partial Summary Judgment and found that Defendant defrauded the Oak funds out of approximately $67 million, and that those proceeds were placed into accounts he jointly held with Ms. Ahmed. *Id.* at 7-23. Following this ruling, in anticipation of the instant Motion, Relief Defendants were ordered to – and agreed to – "provide a list identifying all assets they claim belong to them, and the reasons why they claim such ownership." Doc. # 842 at 3.

On April 27, 2018, Relief Defendants filed the required list. Despite having made claims to only five frozen assets during the preceding three years of litigation (all of which were rejected), Ms. Ahmed and her young children claimed to own more than $85 million in frozen assets (s*ee* Doc. # 862), almost $30 million more than even Defendant had alleged belonged to them. *See, e.g.*, Doc. ## 685-4 at 2; 704-1 at 3. Their claim, mirroring (though

---

[11] Although Relief Defendants requested [Doc. # 225] permission to liquidate Defendant's BMW, certain gold bars, an investment held at Fort Warren Capital Management, and an investment with Aldrich Capital Partners, they did so in order "to comply with the Court's Endorsement Order of February 19, 2016" (*id.* at 1), not because they alleged the assets belonged to them or were improperly frozen.

exceeding) Defendant's earlier claims, is made without any assertion that they were aware of, much less controlled, the assets prior to Defendant's flight to India, nor any explanation on how and when these assets were acquired, nor any argument that goods or services were provided in exchange for the assets, nor any expert analysis demonstrating the SEC's nominee allegations are inaccurate. In fact, without explanation, Ms. Ahmed again claims to own assets that this Court has repeatedly found were Defendant's and only nominally placed in her name. *Compare* Doc. ## 113, 658 & 835, with 862-1 at 1:1-4, 28-29, 39-40, and 53.

## RELEVANT LAW

### IX.     The Court Has Broad Equitable Powers to Grant Full Relief.

Federal courts have broad equitable powers enabling them to fashion appropriate ancillary remedies necessary to grant full relief. *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1103-4 (2d Cir. 1972); *SEC v. Illarramendi*, F. Supp.2d, 2011 WL 2457734 (June 16, 2011, D. Conn.). "[O]nce the equity jurisdiction of the district court properly has been invoked, the court has the power to order all equitable relief necessary under the circumstances." *SEC v. Materia*, 745 F.2d 197, 200 (2d Cir. 1984). Courts have the "authority to grant the full panoply of equitable remedies" so that the victims can obtain complete relief. *SEC v. The Infinity Group Co.*, 27 F. Supp.2d 559, 561 (E.D. Pa. 1998).

Congress explicitly codified the traditional equitable powers exercised by federal courts under the Securities Act of 1934 ("Securities Act") in the Sarbanes–Oxley Act of 2002 § 305: "In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors." Securities Exchange Act of 1934 ("Exchange Act") § 21(d)(5) (codified at 15 U.S.C. § 78u(d)(5)); *see also SEC v. DiBella*, 409 F. Supp.2d 122, 130 (D. Conn. 2006).

These remedies include disgorgement, asset freezes, appointments of receivers, repatriation of assets, constructive trusts, and adjudging a party in contempt for failure to comply with a Judgment. *The Infinity Group Co.*, 27 F.Supp.2d at 561; *Shillitani v. United States*, 384 U.S. 364, 370 (1966); *see also Deckert v. Independence Shares Corp.*, 311 U.S. 282, 288 (1940) ("The power to enforce [the Securities Act] implies the power to make effective the right of recovery afforded by the Act. And the power to make the right of recovery effective implies the power to utilize any of the procedures or actions normally available to the litigant according to the exigencies of the particular case."); *cf. Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 291 (1960) (discussing FLSA, "The court may go beyond the matters immediately underlying its equitable jurisdiction and give whatever other relief may be necessary under the circumstances."); *see also*, Fed. R. Civ. P. 70 (in proper cases, court may adjudge a party in civil contempt for failure to perform specific acts required by a judgment); *SEC v. Durante*, 2013 WL 6800226 (S.D.N.Y. Dec. 19, 2013) ("Because [defendant] has failed to comply, despite being given every opportunity to do so, he should be ordered incarcerated until he makes meaningful payments towards the disgorgement amount and provides a current and accurate accounting of his income and assets.").

"A district court has broad discretion in fashioning a disgorgement order" and "can ignore state law exemptions as well as other state law limitations on the ability to collect a judgment in fashioning a disgorgement order." *Steffen v. Gray, Harris & Robinson, P.A.*, 283 F. Supp. 2d 1272, 1282 (M.D. Fla. 2003), *aff'd sub nom. Steffen v. Gray, Harris & Robinson*, 138 Fed. Appx. 297 (11th Cir. 2005) (citing cases). "This ability to ignore state law limitations and exemptions exists so that state law cannot defeat or limit the scope of remedial orders under federal law." *Id.* (citing *SEC v. Hickey,* 322 F.3d 1123, 1131 (9th Cir.2003)). *See also SEC v.*

10

*AMX, Int'l, Inc.,* 872 F.Supp. 1541, 1544–45 (N.D.Tex.1994) (homestead exemption not taken

into account); *SEC v. Musella,* 818 F.Supp. 600, (S.D.N.Y.1993) (holding exemptions from

attachment under New York law did not alter a person's duty to pay under a disgorgement

order); *Pension Benefit Guaranty Corp. v. Ouimet Corp.,* 711 F.2d 1085, 1093 (1st Cir.1983)

(ignoring state law limitations on alter ego theory in ERISA context).[12] As acknowledged by

Relief Defendants:

> Upon disgorgement of a defendant's ill-gotten gains, it remains within the
> court's discretion to determine how and to whom the money will be
> distributed. A district court has broad powers and wide discretion in
> approving an equitable distribution plan for receivership funds. No
> specific distribution scheme is mandated so long as the distribution is fair
> and equitable. ***In exercising its broad discretion, a court is not bound by
> formalistic arguments that would otherwise be available in a traditional
> lawsuit.*** If the SEC prevails on its fraud claims and [the relief defendant]
> is disgorged of its assets, the Receiver may propose, and ***the Court has
> broad authority to approve, a distribution plan that is governed by
> equitable principles rather than [the relief defendant's] operating
> documents and other legal rules governing priority*.") If the SEC does
> not prevail and [the relief defendant] retains its assets, distribution of the
> receivership funds will be more heavily guided by established legal rules
> and preferences.

Doc. # 69 at 29 (quoting *SEC v. Quan,* 2013 WL 1703499 at *5 (D. Minn. April 19, 2013)

(emphasis in original)).

## ARGUMENT

### II.     Remedies

The Court should enter a judgment against Defendant in favor of the SEC for at least

$89,362,231, award other requested relief, and endeavor to return $77 million to Defendant's

victims. Though, even the return of this amount will not fully compensate victims who lost the

---

[12] "Alter ego means 'other self'—where one person or entity acts like, or, for another to the extent that they may be considered identical. A 'nominee' is a person or entity who holds legal title to property that in truth belongs to another who exercises control over and realizes the benefit of it. Nominee status is determined by the degree to which a party exercises control over an entity and its assets. The two terms are typically used interchangeably and, at least in most situations, appear to carry no legal distinction." *SEC v. Mulholland*, 12-CV-14663, 2017 WL 5507889, at *15 (E.D. Mich. Nov. 17, 2017) (internal quotations and citations omitted).

opportunity to earn returns on their stolen funds, repair the extensive reputational damage Defendant inflicted on his employer and coworkers, or compensate Oak and other third parties for the significant costs stemming from his fraud.

      a.   <u>The Court Should Enjoin Defendant From Future Securities Laws Violations.</u>

Section 21(d)(l) of the Exchange Act, Section 20(b) of the Securities Act, and Section 209(d) of the Investment Advisers Act 1940 ("Advisers Act") entitle the SEC to obtain permanent injunctive relief upon a showing that: (1) violations of the securities laws occurred; and (2) there is a reasonable likelihood that violations will occur in the future. *SEC v. Commonwealth Chem. Sec., Inc.,* 574 F.2d 90, 99 (2d Cir. 1978).[13]

As the Court is well aware, Defendant's fraudulent conduct was egregious, as were his actions upon being caught, which included fleeing the United States to avoid prosecution, repeated attempts to violate the Asset Freeze Order, and attacks on individuals who cooperate with authorities along continued denials of wrongdoing thereby offering no assurances against future violations. Thus, Defendant should be permanently enjoined from violating Section 17(a) of the Securities Act (15 U.S.C. § 77q(a)), Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 thereunder (17 C.F.R. § 240.10b-5), and Sections 206(1), 206(2), 206(3), and 206(4) of the Advisers Act (15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(3)) and Rule 206(4)-8 thereunder (17 C.F.R. § 275.206(4)-8).

---

[13] In considering whether there is a reasonable likelihood that a defendant will commit future violations, courts in this Circuit weigh various factors, including: (1) the fact that the defendant has been found liable for illegal conduct; (2) the degree of scienter involved; (3) the isolated or repeated nature of the violations; (4) the sincerity of the defendant's assurances against future violations; and (5) whether the defendant might be in a position where future violations could be anticipated. *SEC v. Cavanagh,* 155 F.3d 129, 135 (2d Cir. 1998) ("*Cavanagh I*"). *See also SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1477 (2d Cir. 1996) (An "injunction is particularly within the court's discretion where a violation was founded on systematic wrongdoing, rather than an isolated occurrence, and where the court views the defendant's degree of culpability and continued protestations of innocence as indications that injunctive relief is warranted…").

   b.   The Court Should Order Defendant to Disgorge $43,920,639.

The equitable remedy of disgorgement "consists of factfinding by a district court to determine the amount of money acquired through wrongdoing – a process sometimes called 'accounting' – and an order compelling the wrongdoer to pay that amount plus interest to the court." *SEC v. Cavanagh*, 445 F.3d 105, 116 (2d Cir. 2006) ("*Cavanagh II*") (footnote omitted). Disgorgement is "well-established ... in securities enforcement actions" (*Cavanagh*, 445 F.3d at 116) and cannot be avoided by transferring ill-gotten gains to third parties. *See, e.g.*, *Cavanagh I*, 155 F.3d at 137 ("Allowing [Defendant's wife] to now claim valid ownership of those proceeds would allow almost any defendant to circumvent the SEC's power to recapture fraud proceeds, by the simple procedure of giving stock to friends and relatives, without even their knowledge.").[14]

As this Court previously found, from 2004 through 2014**,** Defendant defrauded Oak funds he advised out of approximately $67 million. *See* Doc. # 835. Defendant obtained "$43,920,639" through his fraudulent transactions that are "indisputably within the five-year statute of limitations." Doc. # 829 at 3, n.3. *See also* Doc. # 835. Thus, Defendant should be ordered to repay $43,920,639 so the victims of his fraud can recoup at least a portion of their losses.

   c.   The Court Should Order Defendant to Disgorge $1,520,953 in Prejudgment
        Interest and Turn Over Interest Accrued on Frozen Assets.

"It is also within a court's discretion to order disgorgement of prejudgment interest on the principal amount to be disgorged, so as to deprive the wrongdoer of the benefit of holding the illicit gains over time by reasonably approximating the cost of borrowing such gain from the government." *SEC v. Tavella*, 77 F. Supp. 3d 353, 362 (SDNY 2015) (internal quotations

---

[14] The SEC's Response [Doc. # 684] in Opposition to Defendant's Emergency Motion to Stay in Light of *Kokesh* provides a more thorough analysis of this Court's authority to order disgorgement, as does the supplemental authority filed subsequently. *See,* Doc. ## 701; 709; 772; 792; 824.

omitted).[15] Here, prejudgment interest is appropriate, since without it Defendant would be allowed to "obtain[ ] the benefit of what amounts to an interest free loan procured as a result of illegal activity." *SEC v. Moran,* 944 F.Supp. 286, 295 (S.D.N.Y.1996). As this Court previously found, prejudgment interest on the amount to be disgorged "comes to $1,520,953" (Doc. # 829 at 3, n.3), which represents the interest on the amount to be disgorged prior to the asset freeze.

Additionally, the SEC requests that the Court order Defendant to turn over all interest and returns from frozen assets from the time this Court entered [Doc. # 9] a Temporary Restraining Order on May 9, 2015. Although it can be improper to collect prejudgment interest on "funds [that] have been frozen in connection with an enforcement action," the SEC is entitled to disgorge the accumulated returns on frozen funds: "[F]rozen funds 'turned over to the government in complete or partial satisfaction of the disgorgement order' should be turned over 'along with any interest that has accrued on them during the freeze period.'" *Tavella*, 77 F. Supp. 3d at 361 (quoting *SEC v. Razmilovic*, 738 F.3d 14, 36 (2d Cir. 2013)). "Otherwise, a defendant might perversely benefit from the asset freeze by pocketing accumulated returns on the frozen principal." *Id.* In other words, though the SEC is not requesting that Ahmed pay prejudgment interest on frozen assets during the pendency of the asset freeze, he is conversely not entitled to the interest or gains on assets while they were frozen (*id*.), and those gains should be disgorged from the Defendant and returned to his victims.[16]

---

[15] In deciding whether an award of prejudgment interest is warranted, a court should consider "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." *First Jersey Sec., Inc.*, 101 F.3d at 1476 (quoting *Wickham Contracting Co. v. Local Union No. 3,* 955 F.2d 831, 833–34 (2d Cir. 1992)).

[16] This figure is expected to be several million dollars, but will ultimately depend on which frozen assets the Court determines are available to satisfy a judgment against Defendant (or Relief Defendants). The Court can "order disgorgement of any actual returns on the frozen assets, without specifying the amount of such returns" (*Tavella*, 77 F. Supp. 3d at 362) or "defer entering judgment to afford the Commission an opportunity to establish the actual amount of the returns…that have accumulated on the frozen assets." *Id.*

d.   <u>The Court Should Order Defendant to Pay a $43,920,639 Civil Penalty.</u>

The Court should impose the maximum penalty pursuant to Section 20(d) of the Securities Act, Section 21(d)(3) of the Exchange Act, and Section 209(e) of the Advisers Act. As this Court previously noted, a civil penalty in addition to disgorgement is appropriate because "'[d]isgorgement merely requires the return of wrongfully obtained profits; it does not result in any actual economic penalty or act as a financial disincentive to engage in securities fraud' and therefore civil penalties are required in order to deter and punish fraud." Doc. # 113 at 6 (quoting *SEC v. Moran,* 944 F. Supp. 286, 296 (S.D.N.Y. 1996) (alteration in original)).

The penalty provisions provides for civil penalty amounts that shall not exceed the greater of the defendant's gross pecuniary  gain, here at least $43.9 million, or alternatively, an escalating three tier penalty structure depending upon the egregiousness of the conduct. *See also SEC v. Razmilovic*, 738 F.3d 14, 38 (2d Cir. 2013) ("Both the 1933 and 1934 Acts authorize three tiers of monetary penalties for statutory violations. . . Each tier provides that, for each violation, the amount of penalty shall not exceed *the greater of* a specified monetary amount or the defendant's gross amount of pecuniary gain.") (quotations and citations omitted) (emphasis in original). "Beyond setting maximum penalties, the statutes leave the actual amount of the penalty ... up to the discretion of the district court." *Id.* (internal quotation omitted).[17]

---

[17] In imposing a civil penalty, courts "consider factors including '(1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.'" *SEC v. Rosenthal*, 426 Fed. Appx. 1, 4 (2d Cir. 2011) (quoting *SEC v. Aragon Capital Mgmt., LLC,* 672 F.Supp.2d 421, 447 (S.D.N.Y.2009)). *See also SEC v. Opulentica, LLC*, 479 F. Supp. 2d 319, 331 (S.D.N.Y. 2007) ("While these factors are helpful in characterizing a particular defendant's actions, the civil penalty framework is of a discretionary nature and each case has its own particular facts and circumstances which determine the appropriate penalty to be imposed.") (internal quotation omitted).

On the facts of this case, anything less than the maximum civil penalty of $43,920,639 – equal to Defendant's gross pecuniary gains within the statute of limitations – would be inappropriate. Defendant engaged in premeditated, extensive, and continual fraud over the span of a decade that was intended to (and did) inflict harm on those he was entrusted to help, so he could personally profit. The length of his fraud, the high degree of scienter, the multitude of victims, the magnitude of losses to victims and gains to himself, his flight from the United States to avoid prosecution, his attempts to violate the asset freeze after signing a stipulation (filed with this Court) that all assets remain frozen, and his campaign to harass victims through abusive court filings and malign individuals who have provided evidence of his criminal conduct all underscore the egregiousness of Defendant's conduct.

Moreover, because Defendant's fraud extended beyond the statute of limitations for the SEC's claims in this action, the disgorgement of approximately $44 million that the SEC is seeking will be insufficient to fully compensate victims from whom he stole approximately $67 million. Thus, the Court should order Defendant to pay the maximum civil penalty and, as noted herein, implement a Fair Fund to allow monies collected in satisfaction of this civil penalty to be used to recompense Defendant's victims.

**III.    The Court Should Order that Specific Frozen Assets Are Available to Satisfy a Judgment Against Defendant.**

a.    <u>Total Value of Frozen Assets.</u>

As outlined in the Asset Schedule (Ex. 1), the total value of frozen assets may be as high as $86.3 million.[18] Because of receiver costs, realtor fees, taxes, penalties and other expenses

---

[18] Defendant's Motion [Doc. # 871] to Compel is both baseless and moot.

associated with the sale of assets (especially speculative non-liquid investments), the SEC
expects that the frozen assets will return substantially less than this amount.

      b.    <u>Assets Not in Dispute.</u>

In their April 27, 2018 filing [Doc. # 862-1], Relief Defendants made no claim to some
assets. (*See* Ex. 1, SEC No. 1-24, 26-39) ("Undisputed Assets"). Therefore the Court should find
that each of the Undisputed Assets is available to satisfy a judgment against Defendant.

## IV.    Relief Defendants Only Nominally Hold Frozen Assets in Their Name.

Relief Defendants join in Defendant's arguments that they own the vast majority of
frozen assets. Like her prior claims (*see, e.g.,* Doc. ## 69; 442), Ms. Ahmed's instant ownership
claim over frozen assets is not credible. The Court should find that on the current record, Relief
Defendants have failed to contradict (or even challenge) the undisputed evidence that all of the
frozen assets belong to, and were controlled by Defendant, and were only nominally placed into
the names of his wife and children. The SEC's allegation on this point remains uncontroverted,
and the overwhelming evidence supporting this claim is unrebutted. The Court should
specifically find the assets listed on the Asset Schedule belong to Defendant and can be used to
satisfy a judgment again him.[19]

      a.    <u>Relief Defendants Do Not Claim to Have Genuinely Owned or Controlled Any
Asset.</u>

Following this Court's findings [Doc. # 835] that Defendant perpetrated a $67 million
fraud, and after repeatedly rejecting [*see, e.g.,* Doc. ## 113; 658] Ms. Ahmed's claims to own

---

[19] A finding that specific assets belong to Defendant is especially important in this case because a contempt order
against Defendant, who remains a fugitive, will have little if any impact on him. *See, e.g., SEC v. Solow*, 682 F.
Supp. 2d 1312, 1330 (S.D. Fla. 2010), *aff'd,* 396 Fed. Appx. 635 (11th Cir. 2010) ("Notwithstanding these voluntary
transfers [of assets] from [defendant] to his wife, [defendant] now claims to be a ward of his wife. This contention
was made even though [defendant and his wife's] accumulated wealth has been derived exclusively from income
earned by [defendant]. If [defendant] cannot convince his spouse to return his assets to him, that is a problem of his
own making and he is consequently in contempt of court.").

certain frozen assets, and in anticipation of this Motion, this Court ordered Relief Defendants to detail their legitimate ownership claims to frozen assets and why an asset is alleged to be exempt from satisfaction of a judgment (either against the Relief Defendants or Mr. Ahmed). In response, Relief Defendants filed a letter, along with a list of assets, that fails to articulate any particularized basis for a claim of ownership or control over the assets. Instead, Relief Defendants make generalized assertions that assets may have been funded in whole or in part from untainted sources without even suggesting that they were the purchaser (or were even aware of these assets prior to this litigation). Relief Defendants do not, because they cannot, establish a legitimate ownership claim over any frozen asset.

By way of background, from the near outset of this case the SEC has argued that the frozen assets belonged to Defendant and were only nominally placed into the names of Relief Defendants (s*ee, e.g.,* Doc. ## 28 at 2, n.1; 66 at 18; 80 at 2-3; 98 at 3) and repeatedly sought to have Relief Defendants properly identify assets belonging to them. *See, e.g.,* Doc. # 157 at 2 ("It is undisputed that untainted assets belonging to Mrs. Ahmed should be released to her. While Mrs. Ahmed continues to declare the existence of such assets, she refuses to identify them.").

Ms. Ahmed was first permitted an opportunity to challenge the SEC's arguments at the preliminary injunction, which she attempted to do with only certain assets – presumably those to which she had the strongest claim. Following a two-day hearing and extensive briefing, the Court found that Ms. Ahmed "merely served as a nominal owner for Mr. Ahmed's funds" (Doc. # 113 at 10) and that "the SEC has made a preliminary showing that the frozen assets belong to Defendant, not Relief Defendant, and thus it is appropriate to freeze such funds." *Id.* at 16.

Following this ruling, and in response to Relief Defendants continuing claim that unidentified property belonging to them was improperly frozen, the Court stated "it would

entertain any application to release assets identifiable as [Ms. Ahmed's], and not tainted." *I-Cubed Domains,* 664 Fed. Appx. at 57 (internal quotations omitted). Believing they had no obligation to make ownership claims over assets held in their name, Relief Defendants opted to appeal the asset freeze making the same argument that they do now: "[t]he process proposed by the Court would, among other things, improperly shift the burden of proof to Relief Defendants, requiring them to establish ownership over assets held in their names." Doc. # 862 at 1.

The Second Circuit rejected this argument as meritless and held that even if an asset is held in the name of a Relief Defendant, they are nonetheless required to establish a valid ownership claim: "Relief Defendants argue that insufficient evidence of nominee status renders the asset freeze overbroad. The argument fails because Relief Defendants have been unable to point to any improperly frozen assets. . . .Relief Defendants do not allege that the referenced assets—a Fidelity account in Shalini's name and several trust accounts—properly belong to Relief Defendants, much less that they do not include proceeds of Iftikar's fraud." *I-Cubed Domains,* 664 Fed. Appx. at 56-7. Explicitly rejecting Relief Defendants' argument, the Second Circuit explained "[i]f Relief Defendants cannot prove that any frozen assets legitimately belong to them, then necessarily none of their assets are being improperly frozen to satisfy the civil penalties alleged to apply to Iftikar's conduct." *Id.* at 57, n.3.

Following the Second Circuit's decision, Relief Defendant's moved [Doc. # 340] for the release of expert witness fees in order to "prepare reports and to testify regarding…the tracing of funds in the Relief Defendants' possession in order to counter the Commission's argument that the Relief Defendants are mere nominees." *Id.* at 7. As Relief Defendants explained, an expert was necessary because, in part, the "Second Circuit's recent November 4, 2016, ruling on the Relief Defendants' interlocutory appeal as it pertains to tracing funds at issue" had "clarified the

legal standard and indicated that the Relief Defendants, and not the Commission, will need to trace funds in order to rebut the Commission's argument that the Relief Defendants are mere nominees..." *Id.* at 7-8. The Court granted [Doc. # 353] the request and released $60,000 for payment of expert witness fees (*id.* at ¶ 5), at least a portion of which was used to hire an expert.

Subsequently, Ms. Ahmed again sought the release of certain assets – rental proceeds from Unit 12A and gold bars – again relying on the fact that they were held in her name. The rental proceeds were held in a Fidelity account ending x7540, and the gold bars were discovered in a safety deposit she jointly held with her husband. *See* Doc. # 442. This Court rejected [Doc. # 658] her request holding – as it and the Second Circuit previously ruled – that an asset titled in the name of Ms. Ahmed did not equate to her ownership of the asset, especially when Ms. Ahmed did not even know of the asset prior to this litigation: "Ms. Ahmed is not entitled to proceeds of Unit 12A because she was only a nominal owner of the condominium" and "[e]ven Relief Defendants' Motion does not contain an explicit allegation of Ms. Ahmed's ownership of the Gold Bars, and the SEC has pointed to testimony which demonstrates that Ms. Ahmed had no knowledge of the existence of the bars." Doc. # 658 at 3-5.

With this background in mind, following the granting [Doc. # 835] of the SEC's motion for summary judgment, this Court held a status conference to craft a schedule for the remainder of the case. In anticipation of the instant Motion for Judgment, the Court ordered Relief Defendants to make any valid ownership claim they have to assets prior to the SEC requesting that the assets be used to satisfy a judgment against Defendant. During the conference, Relief Defendants were explicitly instructed, and in fact agreed, to provide a "detailed analysis" of why any claimed assets belonged to them:

> MR. WILLIAMS: …What we would need from the Relief Defendants is not only a list of assets that the Relief Defendants believe are theirs, but why. And

the reason is, for example, if Ms. Ahmed were to say, "Half of Mr. Ahmed's salary is mine," well, then that's just going to be something we would legally say that's absolutely not the law, the law treats that salary as Mr. Ahmed's and, so, therefore, any and all of those funds can be used to satisfy a judgment against Mr. Ahmed.

If she were to say, This asset – let's just say, you know – take a house. I'll take something that doesn't exist. So let's assume that there's a house in Rhode Island – "That is mine because it was given to me in exchange for goods or services I provided to Mr. Ahmed," the SEC would then need to figure out if – whether that's true and whether there would need to be any sort of factual inquiry about what those goods or services were. So I just want to be clear that, not only does the SEC need a list of what Relief Defendants claim are theirs, but why. Because if there's a factual –

THE COURT: No, I had identified that in my colloquy with Mr. Harris, that it would be a list of assets claimed to fall outside the scope of the freeze order and why that is a correct outcome in the Relief Defendants' view. So, assumedly, it's not just going to be a list. ***It's going to be a fairly detailed analysis of why those identified assets are on a list claimed to be exempt from satisfaction of a judgment either against the Relief Defendants or Mr. Ahmed.*** And that's what's going to get filed by April 20th.

Mr. Harris, have I said anything different from what we agreed on before?

MR. HARRIS: Well, I think that's right, Your Honor.

THE COURT: Okay.

(Ex. 12 at 17:5-18:14 (emphasis added). This explicit instruction (and agreement) was encapsulated in an Order issued the next day: "Relief Defendants shall provide a list identifying all assets they claim belong to them, and the reasons why they claim such ownership, by 4/20/18." Doc. # 842 at 3 (emphasis added). After obtaining an extension, Relief Defendants filed [Doc. # 862] a letter along with a schedule of assets [Doc. 862-1] that does not include any analysis (detailed or otherwise) that any of the frozen assets legitimately belong to them, were controlled by them, or that they were even aware of the asset prior to Defendant's flight to India.

Relief Defendants' omission of a valid ownership claim was not an oversight. They have long acknowledged the SEC's nominee allegations are central to this litigation. *See, e.g.*, Doc. #

96 at 9 ("The SEC has repeatedly asserted that Mr. Ahmed controlled all of the assets held by the Relief Defendants…"). Moreover, Relief Defendants recognize, as they must, that assets "held by a Relief Defendant as Mr. Ahmed's nominee" can be used to satisfy a judgment against Defendant. *See* Doc. # 862 at 3. Likewise, Relief Defendants specifically requested – and received – $60,000 to hire an expert "in order to counter the Commission's argument that the Relief Defendants are mere nominees." Doc. # 340 at 7. Furthermore, this Court previously detailed the factors it would consider in determining ownership as to assets held in the name of Relief Defendants: "'[l] a defendant's control over the asset, [2] the length of time the asset had been held, [3] whether the defendant had an interest in and benefitted from the asset, [4] whether the defendant had transferred assets from his name into the asset, [5] whether he or she contributed to acquire the asset initially, and [6] whether the defendant ever withdrew any funds from the asset.'" Doc. # 113 at 7 (quoting *SEC v. McGinn Smith & Co.*, 752 F. Supp. 2d 194, 307-08 (N.D.N.Y. 2010).[20]

Because Relief Defendants have failed to articulate or identify any facts suggesting they actually own any of the frozen assets at issue, or offer any expert analysis on the subject, or offer a single argument or assertion addressing any control factors, or any explanation as to why this Court erred in previously finding Relief Defendants were mere nominees of Defendant, the Court should treat their filing as an admission that frozen assets at issue do not belong to them. Indeed, to hold otherwise would prejudice the SEC because Relief Defendant's failure to provide a detailed analysis of why frozen assets cannot be used to satisfy a judgment against Defendant

---

[20] In support of their earlier appellate arguments, Relief Defendants cited to *McGinn Smith* and acknowledged the listed control factors are "considered by courts in determining joint ownership…" *SEC v. I-Cubed Domains, LLC*, 15-2658 (2d. Cir) (ECF # 41 at 27, n.10). *See also id.* (ECF # 118 at 8) ("The SEC correctly cites the multi-factor test that is to guide a court in determining whether assets held by Relief Defendants are equitably owned by a defendant…"). Inexplicably, Relief Defendants now declare the Court bound by Connecticut state law and cite to cases dealing with the United States' ability to place tax liens pursuant to 26 U.S.C. § 6321 on property not held in the name of the delinquent taxpayer. *See* Doc. # 846 at 3.

prevents – as it was intended to do – the SEC from refuting Ms. Ahmed's particularized

ownership claims, which the SEC has done each and every time Ms. Ahmed asserted a claim of

ownership over a frozen asset.[21] Put another way, in disregard of an explicit Court Order, Ms.

Ahmed refused to articulate her ownership claim because she – and Defendant – know her

claims are incredible and would again be rejected.

Moreover, Relief Defendants have not only prevented the SEC from countering

ownership claims, but they have reverted back to arguments that this Court and the Second

Circuit have already rejected: "Under governing law, Relief Defendants presumptively own

assets held in their name until and unless the SEC meets its burden of demonstrating otherwise."

Doc. # 862 at 2. Relief Defendants do not cite any "governing law," do not describe how this

presumption arises, and provide no explanation as to why they are not foreclosed from making

this argument after agreeing to provide a detailed analysis of their ownership claims, and after

the Second Circuit and this Court already rejected argument,[22] as have other courts. *See, e.g.*,

*SEC v. Colello*, 139 F.3d 674, 677-8 (9th Cir. 1998) (rejecting relief defendant's argument "that

the district court improperly placed the burden on him to show that he had a legitimate claim to

the funds" and affirming summary judgment order because Relief Defendant "refused to give

---

[21] The SEC is a unique creditor with the ability to seek appropriate relief from this Court utilizing the full scope of the Court's equitable powers, including, among others, theories of fraudulent conveyance and constructive trust. *See, e.g.*, *SEC v. Glauberman*, 90 CIV. 5205 (MBM), 1992 WL 175270, at *1 (S.D.N.Y. July 16, 1992) ("Whether under a theory holding that ill-gotten gains are subject to a constructive trust from the moment they accrue to those who trade on inside information, *SEC v. Levine*, 689 F.Supp. 317, 321–22 (S.D.N.Y.1988), *aff'd in part and rev'd in part*, 881 F.2d 1165 (2d Cir.1989), or a theory that conveyances for no consideration obviously designed to avoid a debt may be set aside as fraudulent under the law of the state where the transfer takes place, Conn.Gen.Stat. § 52–552, there is no reason why a transfer even to a nominal third party cannot be reached to effect disgorgement.").

[22] Notably, as previously stated [Doc. # 339 at 6-7] by Relief Defendants: "…the Second Circuit's ruling on Relief Defendants' interlocutory appeal indicate a significantly expanded task for Relief Defendants' expert in the attempt to trace funds in order to rebut the SEC's argument that the Relief Defendants are mere nominees. . . . The Second Circuit's decision clearly places this burden on the Relief Defendants and meeting this burden requires the additional time requested in this motion."

23

information necessary to determine whether he still possessed any of the funds or whether he had a legitimate claim to them.").[23]

As is obvious, the SEC cannot prove a negative – that Relief Defendants have no legitimate claim to a particular asset—without first knowing the asserted basis for their ownership claim.[24] Thus, it is (and has been) incumbent on Relief Defendants to explain why assets the SEC maintains belong to Defendant in fact belong them. As articulated by the Second Circuit and is controlling in this case: "If Relief Defendants cannot prove that any frozen assets legitimately belong to them, then necessarily none of their assets are being improperly frozen to satisfy the civil penalties alleged to apply to Iftikar's conduct." *I-Cubed Domains,* 664 Fed. Appx. at 57, n.3.

In summary, for more than three years, Ms. Ahmed has had innumerable opportunities to make a valid ownership claim over a frozen asset. Indeed, she was invited (repeatedly) to insert evidence into the record demonstrating her knowledge of, ownership of, and control over a frozen asset so it could be released to her. Aside from IRA accounts that have already been unfrozen, she could not do so. When she did make ownership claims, they were rejected and

---

[23] *See also Commodity Futures Trading Comm'n v. Kimberlynn Creek Ranch, Inc.,* 276 F.3d 187, 192, n.5 (4th Cir. 2002) ("We have no doubt that the district court will provide the Relief Defendants with an opportunity to demonstrate the existence of a legally and factually valid ownership interest to some or all of the assets prior to ordering disgorgement." (citing *Cavanagh I* at 136–37) (emphasis added)); U.S. *Commodity Futures Trading Comm'n v. EJS Capital Mgmt.*, LLC, 2015 WL 5679688, at *4 (S.D.N.Y. Sept. 24, 2015) ("Should [relief defendant] assert some legitimate interest in [disputed] funds, she must offer evidence of her entitlement; more than unsupported, conclusory assertions need to be proffered."); *F.T.C. v. Bronson Partners, LLC,* 674 F. Supp. 2d 373, 394 (D. Conn. 2009), *aff'd,* 654 F.3d 359 (2d Cir. 2011) ("Relief defendant [ ] met her burden of demonstrating that she provided a legitimate service in exchange for monies paid to her by defendants. Accordingly, [she] is not liable for any portion of the restitution award."). *SEC v. Better Life Club of Am., Inc.*, 995 F.Supp. 167, 182–83 (D.D.C.1998) (alleged payment for an informal loan given without documentation was subject to disgorgement).

[24] *See, e.g., Fireman's Fund Ins. Co. v. Hartford Acc. & Indem. Co.*, 2011 WL 1303148 at *6 (N.D. Ohio Mar. 31, 2011) (rejecting claim that summary judgment movant had the burden of demonstrating the absence of any evidence of a[n] [agreement [to toll the statute of limitations]" because the "notion that [movant] has the burden of proving that there was no [ ] agreement [to toll the statute of limitations] is not only untenable, it is impossible. A party cannot prove a negative, even if it is the movant on summary judgment," which is why the summary judgment standard the Supreme Court sets forth is that 'movant can prevail only if the materials offered in support of the motion show there is no genuine issue of a material fact.'") (quoting *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986)).

each claimed asset was found to belong to Defendant. After being ordered to (and agreeing to)

detail her ownership claim, she, along with other Relief Defendants, provides no detailed

analysis or any reason why the frozen assets in this case cannot be used to satisfy a judgment

against Defendant, nor do Relief Defendants even deny the SEC's nominee allegations, which

has continually been the case. *See, e.g.,* Doc. # 98 at 19-20. Instead, Relief Defendants revert back

to legal arguments that have been (repeatedly) rejected. Even were this a jury question (and it is

not), there is no genuine dispute of material fact that Defendant controlled all of the frozen assets

and that each asset listed on the Asset Schedule is available to satisfy a judgment against

Defendant. The Court so hold.

      b.  <u>All Frozen Assets Belong to Defendant.</u>

Relief Defendants have not only failed to articulate a valid ownership claim over any

frozen asset, but the undisputed evidence shows that Defendant – not Relief Defendants – owns

the assets at issue, the bulk of which were only nominally placed into accounts and assets in the

name of his wife and children to protect his ill-gotten gains and obfuscate his fraud.

<u>First</u>, from 2004 through 2015, virtually every dollar that came into the possession of the

Ahmeds came from Defendant. Specifically, Defendant brought in a total of $104,773,505,

comprising of approximately $37 million from his employment at Oak and other sources,[25] and

more than $67 million in proceeds from his fraud. *See* Doc. # 835. In contrast, Ms. Ahmed

admitted that she brought in a total of $1,261,564.87 in net pay during this time (Doc. # 69 at 11

& 31), that she has not been employed since mid-2012 (Ex. 8 at 357:19-23), and that she did not

receive any gifts or inheritance (Ex. 10 at 357:18-364:22; 392:19-395:2). Indeed, Relief

Defendants' own expert – who was hired to assist Ms. Ahmed in her claim that she was not a

---

[25] This consists of approximately $21,592,962 in net (*i.e.* after tax) pay or salary (Ex. 13); $12,085,451 in Oak distributions (Ex. 14); and $4,095,092 in other interest and dividends. (*Id.*; Ex. 2).

nominee – accurately recognized that from 2004 through 2014, Ms. Ahmed earned less than $2 million in gross (*i.e.* pre-tax) income and that all other "non-suspect" sources of income belonged to her husband:

| SOURCE OF FUNDS | IFTIKAR AHMED | SHALINI AHMED | TOTAL | REFERENCE |
|---|---|---|---|---|
| EMPLOYEE WAGES | $ 37,121,023.58 | $1,938,133.00 | $ 39,059,156.88 | EXHIBITS 2, 3 |
| WITHDRAWALS FROM INVESTMENTS | $ 12,085,451.38 | | $12,085,451.38 | EXHIBIT 4 |
| INVESTMENT INTEREST | $634,580.00 | | $634,580.00 | EXHIBIT 3 |
| DIVIDENDS | $6,529,483.00 | | $6,529,483.00 | EXHIBIT 3 |
| TAX REFUNDS | $167,349.00 | | $167,349.00 | EXHIBIT 3 |
| NET CAPITAL GAINS | $6,221,074.00 | | $6,221,074.00 | EXHIBIT 3 |
| **TOTALS** | **$ 62,758,960.96** | **$1,938133.00** | **$64,697,094.26** | EXHIBIT 3 |

(Ex. 15 at 9). Thus, 98.8% of all funds that the Ahmeds received during the past 14 years came from Defendant, as did 100% of the income during the past 6 years. Neither Defendant nor Relief Defendants provide any argument, much less a credible explanation, to support her claim that she and her children own more than $85 million in assets while Defendant – who "earned" and stole more than $104 million – owns less than $6 million in liquid assets. *See* Doc. 862-1 at 4, lns. 54-64. Furthermore, the Ahmed's lavish lifestyle greatly exceeded Ms. Ahmed's earnings over this ten year period, as she admitted her living expenses exceeded $46,000 per month (Doc. # 69 at 14). Moreover, even if Ms. Ahmed's salary was not spent prior to this action, it has been spent during the pendency of the litigation, as well over $1.2 million has been released to her.[26]

Second, Relief Defendants are precluded from making a claim to Defendant's salary and other income and assets he acquired both legally and illegally. The Second Circuit previously

---

[26] Ms. Ahmed has received at least $990,209.26 for civil attorney fees (Doc. ## 304; 387; 487; 495; 548; 596; 697; 741; 783; 838), $238,000 in cash (Doc. ## 195; 377), $264,157.99 for criminal attorney fees (Doc. ## 165; 367); $60,000 for expert witness fees (Doc. # 387) and $40,000 to pay certain debts (Doc. # 387).

ruled that Defendant's legitimately earned salary belongs to him and can be used to satisfy a judgment against him. *I-Cubed Domains,* 664 Fed. Appx. at 56 ("Relief Defendants' argument for release of Iftikar's legitimately earned salary also fails, not only because these assets are similarly commingled with fraudulently obtained funds, but also because ***those funds are Iftikar's*** and subject to an asset freeze to preserve his ability to pay any eventual judgment in any event.") (emphasis added). Relief Defendants are thus precluded from arguing that Defendant's salary belongs to anybody other than Defendant. *See, e.g., United States v. Quintieri,* 306 F.3d 1217, 1229 (2d Cir.2002) (the law of the case ordinarily "forecloses relitigation of issues expressly or impliedly decided by the appellate court").

Moreover, Relief Defendants previously acknowledged that in the state of Connecticut Ms. Ahmed is not entitled to assets merely because her husband "earned" or stole them during marriage: "Neither husband nor wife shall acquire by the marriage any right to or interest in any property held by the other before or acquired after such marriage . . . ." (Doc. # 69 at 21 (quoting Conn. Gen. Stat. § 46b-36 (2012)). Moreover, Ms. Ahmed already acknowledged that she is not entitled to any of the money or assets tainted by her husband's fraud:

Q. If Mr. Iftikar Ahmed in fact stole money, and then put it in your name, do you think you're entitled to it?

A. No.

Q. If Mr. Iftikar Ahmed obtained money through fraud and put it in your name, do you think you're entitled to it?

A. No.

Q. If Mr. Iftikar Ahmed used stolen money or fraudulent proceeds to purchase assets and put them in your name, do you think you're entitled to those assets?

A. No, but this is all very hypothetical. If he did that, if this can be proven.

27

Ex. 8 at 346:22-347:10. The SEC's allegations have been proven. In fact, "neither Defendant nor Relief Defendants argue[d] that Defendant did not commit the alleged frauds." Doc. # 835 at 4. Thus, Relief Defendant's claim to all, or any part, of Defendant's legal or illegal source income is both meritless and foreclosed. *See, e.g., Zedner v. United States,* 547 U.S. 489, 504 (2006); *Adelphia Recovery Trust v. HSBC Bank USA,* 634 F.3d 678, 695–96 (2d Cir. 2011).

<u>Third</u>, Ms. Ahmed was unaware of many of the assets she now claims belong to her and her children. At the outset of this case, the SEC sent Ms. Ahmed an interrogatory requesting her to identity which assets she asserted belonged to her (or her children) and not her husband. (Ex. 16 at 6-7). On July 10, 2015, after making various objections and erroneous claims of privilege, Ms. Ahmed asserted an ownership over only Unit 12A, Unit 12F, and the GRAT:



*Id.* at 7. Notably absent in her response – which has never been supplemented – is a claim to anywhere near $85 million of assets she now alleges belongs to her. Moreover, less than one week later, Ms. Ahmed was deposed and questioned about what assets belonged to her. Consistent with testimony from a nominee,

---

[27] *See* Ex. 7at 60:16-18 ("Q. Okay. Why did Iftikar Ahmed write you a check for $500,000 on January 7th, 2013? A. I don't remember."); *Id*. at 61:24-62:1 ("Q: And why did your husband write you a $2 million check on August 15, 2014? A: "I don't remember."); *Id*. at 64:16-18 (Q: "Why did your husband write you a $500,000 check on September 23rd, 2014?" A: "I don't remember."); *Id*. at 69:5-7 (Q: "Why did Ahmed write you a $1.2 million check on November 6th, 2014?" A: "I don't remember."); *Id*. at 70:14-16 (Q: "Why did Iftikar Ahmed write you a $1.5 million check on November 17th, 2014?" A: "I don't remember."); *Id*. at 74:17-19 ("Why did your husband write



Incredibly, Ms.

you a $750,000 check on December 15th, 2014? A. I don't remember.); *Id*. at 78:12-14 (Q: Why did Ahmed Iftikar write you an $18 million check on January 12th, 2015? A: I don't know.").

Ahmed now claims that the more than \$13 million sitting in that same Fidelity (ending x7540) account belongs to her. *See* Doc. # 862-1 at 1, ln. 3.[29]

Fourth, Ms. Ahmed repeatedly acknowledged holding assets as a nominee for Defendant. For example, with respect to this same Fidelity account ending x7540 funded with \$18 million from Defendant's Company B fraud, Ms. Ahmed admitted the account was intended only to benefit her *should* something "happen" to her husband in the future: ███████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████ At the Preliminary Injunction hearing, Ms. Ahmed again admitted that Defendant placed assets into her name not because they belonged to her, but as a "contingency plan" to allow her access to assets upon some future event:

> [A]round that time, my husband was diagnosed with cancer. And he and I had discussed me having funds in the unlikely or unfortunate event that something could happen to him. He was diagnosed with cancer the beginning of April. He had surgery the end of March. And we didn't know what the procedure and the process would be going forward or what the outcome would be. So given that situation, where we were also looking for radiation treatments and options, we agreed that there should be assets in my name, if anything should happen to him.

(Ex. 8 at 297:1-13). *See also id.* at 298:21-299:1 ("Q. Now, you didn't provide any goods or services in exchange for Company C being transferred into your name, right? Because it was transferred into your name as a contingency plan, is that accurate? A. That would be accurate."). Thus, Ms. Ahmed herself has admitted that she held these assets in name only – the definition of a nominee. *See, e.g.*, *McGinn Smith*, 752 F. Supp. 2d at 208 ("Where a defendant treated an asset as his own, the asset should be treated as that of the defendant …."); *see also id.* at 207-08

─────────────────────────────

■ ████████████████████████████████████████████████████████████
████████████████████

(noting that among the factors considered in determining nominee status is "whether the defendant had transferred assets from his name into the asset").

Lastly, after placing the bulk of his assets – and the near entirety of the money he stole – into accounts and assets in the name of his wife and children, Defendant invoked his Fifth Amendment right against self-incrimination and refused to answer any questions about these transfers or placements.[30] Similarly, Defendant invoked his Fifth Amendment right against self-incrimination and refused to answer any questions about I-Cubed, the GRAT, DIYA, DIYA Real, and the UTMA accounts, including his role with these entities and why he transferred various monies to and interests in these entities. (Ex. 17 at 111:3-116:2).

Put simply, there is no dispute – nor has there ever been – that the frozen assets belong to Defendant and should be liquidated to satisfy a judgment against him. *See, e.g.,* Doc. # 98 at 3 ("The fraud netted Mr. Ahmed more than $65 million in ill-gotten gains, the majority of which he placed into the name of his wife…and the other Relief Defendants. Although the Relief Defendants held these assets on paper, they in fact merely served as nominees for Mr. Ahmed – an allegation that stands unrebutted.").

c.   Relief Defendants' Ownership Claims are Incredible.

Additionally, Relief Defendant's sudden ownership claim to the near entirety of frozen assets – mirroring Defendant's prior claims – is facially incredible.

First, as noted above, Ms. Ahmed was unable to make a legitimate claim to any frozen asset for nearly three years. Her sudden claim to own nearly everything is unbelievable. In fact, this Court rejected [Doc. ## 113; 658] her earlier claims [Doc. ## 69; 96; 442] to own I-Cubed that was subsequently placed into the GRAT (*see* SOF at C-25; C-26), Units 12A and 12F and

---

[30] *See* Ex. 17 at 21:3-16; 25:13-26:7; 28:18-29:10; 32:3-20; 36:11-37:3; 40:7-25; 43:24-44:19; 47:21-48:14; 52:6-23; 57:1-8; 58:12-59:8; 61:13-62:8; 65:22-66:20; 69:5-70:2; 72:9-73:6; 77:25-78:18; 82:22-83:15; 89:5-90:9; 96:18-98:1; 102:3-23; 108:22-110:4

their rental proceeds, and nine 1-kilogram gold bars discovered in safety deposit boxes held in the name of Mr. and Ms. Ahmed. *See* Doc. ## 113; 658. Without providing any evidence, argument, or reasons why this Court erred, Ms. Ahmed again claims to own each asset. The Court should reject these claims outright.[31]

Regardless, Mr. Dan Johnson – the 30(b)(6) witness for I-Cubed and the GRAT (who also serves as manager of I-Cubed) – was not aware that I-Cubed was negotiating a sale of its Company C shares, assumes Defendant negotiated and completed that sale (despite having no ownership interest in I-Cubed), and only learned of the sale after it was completed when Defendant told him about it.[32] (Ex. 18 at 41:15-45:10). In addition, Mr. Johnson did not know I-Cubed (and therefore the GRAT) held investments in several private companies aside from Company C, including Aldrich Capital, Blade Network, and Reserve Media, only learning of the investments during his deposition.[33] (Ex. 18 at 52:1-71:4; Ex. 19 at 23:1-15, 27:7-13). Indeed, he was so unfamiliar with I-Cubed (the company he allegedly managed) that Ms. Ahmed's attorney resorted to interjecting "speculation" objections when the SEC asked basic questions about the company. (*See, e.g.*, Ex. 18 at 65:2-71:20).

---

[31] Relief Defendants represent that with respect to "potential remedies, the Court must make specific findings; it is not sufficient to rely on findings made at the preliminary injunction stage, or to treat the asset freeze as a substitute for a final adjudication" and cite *SEC v. McGinn, Smith & Co.* in support of this argument. Doc. # 846 at 1. Relief Defendants misleadingly insert an ellipsis into their citation thereby omitting the Court's recognition that it is "free to consider" its preliminary injunction findings at the summary judgment phase. *See SEC v. McGinn, Smith & Co., Inc.*, 98 F. Supp. 3d 506, 522 (N.D.N.Y. 2015), *aff'd sub nom. SEC v. Smith*, 646 Fed. Appx. 42 (2d Cir. 2016).

[32] Mr. Johnson could also not explain why Defendant, as a purported member of I-Cubed, opened a Bank of America bank account for I-Cubed on October 28, 2014 about the time of the $7.5 million sale of the I-Cubed Company C shares and wrote checks for $7.5 million from that I-Cubed bank account. (Ex. 18 at 45:17-50:15).

[33] Ms. Ahmed was similarly unaware of these investments, as she represented that a 99% interest in I-Cubed was worth "approximately $7.5 million" (Doc. # 69 at 10), which was only the proceeds of the Company C shares sold to Oak. *See, e.g., Id. at 11*. In actuality, Defendant had made more than $1 million in investments through I-Cubed separate and apart from the Company C shares, including investments which Relief Defendants now acknowledge. *See* Doc. 862-1 at 2, lns. 34-36. Documentary evidence further confirms that Defendant made each investment (Exs. 34; 35; 36; 37; 38. At most, Ms. Ahmed signed documents at the direction of Defendant, who even thanked her for "[her] help" after signing. (Ex. 34 at 2).

With respect to Units 12A and 12F, it was Defendant – not Ms. Ahmed – who contacted and worked with Mr. Johnson to form both DIYA and DIYA Real. (Ex. 20 at 28:13-20, 30:17-31:13; Ex. 21 at 14:1-16:4; 24:4-13). Defendant was intimately involved in the purchases of both units, attending the closing of unit 12A and likely handwriting information onto the executed purchase documents (Ex. 32 at 100:20-23; 111:16-115:4; Ex. 40 at 65:2-18). Defendant also negotiated the lease for Unit 12A (*id*. at 127:3-128:1; 131:14-132:10), ████████████████████ ████████████████████████████████████████ ██████████████████████████████████████ ███████████████████████████████████ ███████████████ Indeed, the Court need look no further than an email where Defendant negotiated the lease of Unit 12A (Ex. 39).

With respect to the nine gold bars, as this Court recognized, Ms. Ahmed "could not identify when the two gold bars were placed in the safety deposit box, who placed them there, or why they were placed there." [34] Doc. # 658 at 5. Moreover, credit card records reveal that Defendant – not Ms. Ahmed – purchased gold bars in Dubai for more than $419,000. (Ex. 22 at SEC-AMEX-E-1388, 1416, 1424, 1432, 1440, 1456, 1480, 1481 and 1485).

 Second, without explanation, Ms. Ahmed claims to own Fidelity x7540 (Doc. # 862-1 at 1, ln. 3), which holds more than $13 million. (Ex. 1 at ln. 75). As noted above, Ms. Ahmed did not recall receiving the $18 million check (the proceeds of Defendant's Company B fraud) that funded this account, and specifically testified the account was opened only so she could access assets "should anything happen to [Defendant]." *See, supra.* at 30.

---

[34] Though the Court noted she was originally asked about only two of the gold bars (Doc. # 658 at 5, n.2), she was subsequently questioned about the remaining bars and provided the same answer. (Ex. 10 at 377:10-21).

<u>Third</u>, without explanation, Ms. Ahmed claims to own the entirety of funds and assets that even she argues are jointly held with Defendant, including more than $15 million in joint bank accounts, along with a painting and nine gold bars (described above) worth more than $800,000. *See* Doc. 862-1 at 1, lns. 16-24; 43; 53. The bank accounts alone have balances that are more than $13 million above what Ms. Ahmed admits she earned over the past 15 years (*see* Doc. # 69 at 11 & 31). Moreover, she provides no argument as to why she would be entitled any amount of the asset even assuming she held an interest (which she does not), or, even if she did hold an interest, why the entire asset cannot be used to satisfy a judgment against Defendant.[35]

<u>Fourth</u>, Ms. Ahmed now claims she and her children own all items in the jointly held safety deposit boxes,[36] but she did not even know of their contents until after the boxes were inventoried. *See, e.g.,* Doc. ## 465-2. ("THE COURT:…Is it still accurate that nobody knows what is in these safe deposit boxes? Mr. Deitch? MR . DEITCH: That's correct, your Honor."); 465-1 at 3. Moreover, Defendant – after placing or directing the placing of jewelry and other valuables into the safety deposit boxes – had the authority to remove insurance on the items. (Ex. 23).

<u>Fifth</u>, Ms. Ahmed claims all artwork and jewelry belong to her, the bulk (if not entirely) of which was purchased by Defendant.[37] ██████████████████████████

---

[35] *See, e.g., In Fleet Bank Connecticut, N.A. v. Carillo,* 240 Conn. 343, 691 A.2d 1068 (1997); *Sarasota CCM, Inc. v. Golf Mktg., LLC,* 891 A.2d 72, 74 (Conn. App. Ct. 2006) (recognizing that Connecticut's "legislature's intent [is] to allow a judgment creditor to execute against all forms of a judgment debtor's assets" and therefore a creditor is "entitled to reach any property in which the judgment debtor had a cognizable interest" including joint assets.) *See also SEC v. Smith,* 646 Fed. Appx. 42, 43 (2d Cir. 2016) (rejecting relief defendant's argument that the district court erred in applying all assets in a jointly controlled account – held only in the name of relief defendant – to satisfy final judgment against defendant).

[36] The three safety deposit boxes were inventoried on May 2, 2016. (Ex. 33).

[37] Mr. Ahmed's American Express credit card records show that he made expensive purchases of jewelry or similar items totaling more than $550,000 (Ex. 22 at SEC-AMEX-E-1296, 1308, 1324, 1332, 1344, 1350, 1408, 1418, 1522, 1552, 1588, 1640, 1730, 1915), and several expensive art purchases totaling more than $93,000 (*id.* at SEC-AMEX-E-1448, 1915 and 1937). All of these purchases by Defendant were paid from jointly held bank accounts

34

███████████████████████████████████████████████

█████████ (Ex. 10 at 380:9-381:20), two months before he was arrested and two months

after he defrauded Oak Fund XII out of $18 million. *See* SOF B-2, B-3. This purchase was also

paid for from a jointly held bank account (Northern Trust x5188) in which Defendant's ill-gotten

gains had been co-mingled with his income and earnings. (Ex. 26 at NTC 158). Defendant also

made at least three substantial art purchases from Spanierman Gallery, LLC in 2010, totaling

more than $600,000, that were also paid for from a jointly held bank account (Fidelity x9855) in

which Defendant's ill-gotten gains had been co-mingled with his income and earnings. (Ex. 25 at

SEC-NFS-E-10039, 10060, 10388 and 12949). Notably, at her first deposition, Ms. Ahmed could

not explain who purchased or how much was spent on gold, artwork and jewelry (Ex. 7 at 50:23-

52:20), but now claims it all belongs to her. Incredibly, after her interlocutory appeal was denied,

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████[38]

    Sixth, the Ahmed's young children claim to own millions of dollars without any

explanation as to where or how they obtained these monies. In reality, Defendant set up the trusts

(the Iftikar A. Ahmed Family Trust and several UTMAs in the names of his children) to funnel

monies into them. Defendant controlled these accounts and represented that they were his

---

(Bank of America x3754, Fidelity x9855 and Northern Trust x5188) in which Defendant's ill-gotten gains had been co-mingled with his income and earnings. (*Id.* at SEC-AMEX-E-1300, 1312, 1332, 1336, 1348, 1354, 1392, 1410, 1418, 1422, 1430, 1434, 1442, 1452, 1466, 1492, 1526, 1560, 1600, 1662, 1738, 1928 and 1942; Ex.24 at SEC-BOA-E-6563, 2498, 2622, 3080, 3220, 3260, 3752, 3885, 4082, 4382, 5371; Ex. 25 at SEC-NFS-E-9963, 9957, 9977, 9985, 9997, 10013, 10018, 10019, 10074, 10112, 10202; Ex. 26 at NTC 3944). Money from these same accounts was also used to pay for large purchases on Ms. Ahmed's credit card, including two large purchases for glassware/crystal, totaling more than $86,000. (Ex. 27 at SEC-AMEX-E-1608, 1620, 1704 and 1712; Ex.24 at SEC-BOA-E-3948; Ex. 25 at SEC-NFS-E-2416).

[38] Putting aside that her statements on this subject are incredible, consistent with its admonition, the Court should draw an adverse inference adverse against Ms. Ahmed's testimony.

accounts, hiring and firing Creative Planning to manage the accounts, and directing Mr. Johnson to execute paperwork for the transfer of the accounts. (Ex. 28 at OAK-SEC-2215; OAK-SEC-2222) ("Please treat this to be the official termination notice for your services for **all my** accounts – Shal and my joint account, the kids UTMA accounts, and the Trust accounts. . . . If you need anything to be signed by Dan Johnson, please let him know and he is copied on this email.")(emphasis added).

Moreover, Defendant funded all (or nearly all) of the six UTMAs at Fidelity and TD Ameritrade with money from his joint accounts,[39] including round-tripping more than $1.1 million of his funds through Ms. Ahmed's family and other friends.[40] (Ex. 29). Every, or nearly every, dollar deposited into these accounts came from Defendant's assets.[41] Thus, these assets should be available to satisfy a judgement against Defendant. *See, e.g.*, *EJS Capital Mgmt., LLC*, 2015 WL 5679688 at *9 (recognizing that a parent who "controlled [ ] UTMA accounts" had an "'equitable interest' in them and, as such, they are properly considered to be [parent's] 'assets…'" for purposes of an asset freeze in anticipation of a judgment.).

Finally, Defendant's actions following his arrest belie Relief Defendants' ownership claims and corroborate that their nominal ownership is part of Defendant's fraudulent scheme. Following his arrest Defendant effected several ownership changes to assets and insurance

---

[39] Relief Defendants omit (Doc. # 862-1 at 1, lns. 25-27) that Defendant is the listed custodian for the three Bank of America UTMA accounts in the children's names and Defendant opened these accounts. (Ex. 24 at SEC-BOA-E-1161, 1163 and 1165).

[40] At the preliminary injunction hearing, Ms. Ahmed testified (incredibly) that these checks were legitimate gifts to her family members. (Ex. 8 at 337:10-338:12). Not surprisingly, when the SEC questioned her family about these checks, each exercised their Fifth Amendment right against self-incrimination refusing to answer every question. SOF X-12. In reality, these checks were not gifts but rather a way to move assets out of Defendant's name and into the names of his children in order to protect the asset from confiscation, obfuscate his fraud, and decrease the likelihood of an IRS audit (through not filing gift tax returns) because the Ahmed's tax returns omitted nearly $60 million in fraud proceeds moving through their bank accounts.

[41] Defendant further obfuscated these UTMA accounts by moving the money between different accounts. For example, the TD Ameritrade UTMA account for Child I.I.1 had two predecessor accounts. In 2009, a Fidelity UTMA account for Child I.I.1 was originally opened. The money in that original account was moved to a new Fidelity UTMA account in early 2010, and then moved to the TD Ameritrade UTMA account in 2013.

demonstrating his control over the assets, and his deliberate attempts to wipe his fingerprints from them. (Ex. 23; Ex. 30; Ex. 31). With respect to DIYA and DIYA Real, Defendant arranged for his 1% ownership interests in DIYA and DIYA Real to be transferred to the GRAT (Ex. 20 at 18:9-22; 26:5-11; 27:10-28:20) and forwarded an informal appraisal of the values of the Units to Mr. Johnson to support his ownership interest transfer (Ex. 19 at 27:14-28:2). Unsurprisingly, the Ahmeds refused to let Mr. Johnson testify as to why Defendant transferred these interests to his wife shortly after being arrested. (Ex. 20 at 20:16-24:13; Ex. 21 at 27:10-28:1). ███████

██████████████████████████████████████████████████

██████████████████████████████████████████

## V.  Ms. Ahmed has No Legitimate Claim to $44 Million Placed into her Name.

Even were Ms. Ahmed more than a mere nominee for Defendant (she is not), the Court would be authorized to award a judgment against her in favor of the SEC for $43,920,639 (*see, e.g.*, *Cavanagh I*) along with amounts earned on frozen assets during the pendency of the litigation. *See, Razmilovic*, 738 F.3d at 36; *Tavella*, 77 F. Supp. 3d at 361.

The Court is authorized to disgorge proceeds from a relief defendant in a securities enforcement action where that person (1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds. *Cavanagh I*, 155 F.3d at 129. This Court has found [Doc. # 835] that Defendant defrauded funds he advised out of approximately $67 million, of which approximately $44 million was obtained within the statute of limitations following *Kokesh*. The Court has also found Defendant placed the approximately $44 million he obtained through fraud into "joint account[s]" he owned with his wife, Relief Defendant Shalini Ahmed." *See, e.g.,* Doc. # 835 at 8-23. Ms. Ahmed claims complete ownership over each of these accounts (*see* Doc. #

---

[42] During the preliminary injunction, Ms. Ahmed testified that she could not recall if her husband's name was removed before or after his arrest. (Ex. 8 at 343:1-344:9). Ms. Ahmed was either not forthright with the Court, or she played no role in the transfer (despite owning the asset on paper) and therefore did not know when it occurred.

868-2) and previously testified that Defendant did not segregate the money he earned (and stole) and instead placed everything into shared accounts. (*See, e.g.*, Ex. 7 at 121:22-122:1).

As this Court and the Second Circuit already acknowledge, where ill-gotten funds are commingled with a relief defendant's legitimately obtained funds, the SEC is not required to trace specific funds to their ultimate recipients. *See* Doc. # 113 at 12-14; *I-Cubed Domains* 664 Fed. Appx. at 56 (citing *Rosenthal,* 426 F. App'x at 3 (noting that where ill-gotten gains are commingled with legitimate proceeds, "the SEC is not required to trace specific funds to their ultimate recipients ... [because] disgorgement is an equitable obligation to return a sum equal to the amount wrongfully obtained, rather than a requirement to replevy a specific asset" (citation and internal quotation marks omitted)).[43] Thus, even were the Court to find that Ms. Ahmed did not hold frozen assets as a mere nominee of Defendant, it is still authorized to award the SEC a $44 million dollar judgment against her.

## VI.   Defendant's Carried Interest Was Forfeited and is Not a Cognizable Asset.

Relief Defendants allege that Oak is holding more than $37 million of assets belonging to Defendant. *See* Doc. # 862-1 at 4-5, lns. 65-66; 71-79. At this time, the Court need not decide any availability/valuation disputes (*e.g.*, carried interest) because it is acknowledged that any remaining assets are available to satisfy a judgment against Defendant. Thus, this dispute can be dealt with during collections. Moreover, because "there is great uncertainty as to whether [ ] carried interest account will materialize into an asset available for victim recovery" (Doc. # 113), this dispute should not prevent the Court from ordering assets listed on the Asset Schedule be made available to satisfy a judgment against Defendant.

---

[43] "[W]here tainted funds have been commingled with potentially legitimate funds, the SEC is entitled to obtain disgorgement from the entire pool of funds." *SEC v. Aragon Capital Mgmt.*, LLC, 672 F.Supp.2d 421, 443 (S.D.N.Y.2009). *See also SEC v. One or More Unknown Traders in Common Stock of Certain Issuers*, 853 F. Supp. 2d 79, 84 (D.D.C. 2012) ("When ill-gotten gains are comingled with legitimately obtained assets, the entire pool of money is subject to disgorgement.").

Nevertheless, to refute Relief Defendants' claim that Defendant is entitled to more than $37.6 million from Oak, when the Court has found that he defrauded Oak funds out of nearly $67 million, the SEC presents further evidence as to what realizable assets Oak holds on behalf of Defendant. *See* Decl. of Grace Ames and support exhibits (filed herewith). *See also* Ex.8 at 122:15-124:14.

In short, Defendant's "carried interest," which is essentially what is left in a fund at the completion of its lifecycle after all assets have been disposed of and obligations paid (which may be nothing at all), was forfeited and, regardless, may never materialize into an actual asset. *Id*. Claims to the contrary are akin to an employee – after being caught stealing from a cash register and fired – arguing he cannot be required to repay stolen cash because he has satisfied his debt by pledging his future year-end bonuses, which the company may or may not award in the future, and to which he would only have the opportunity to share in were he to remain employed and performing his duties (and not commit theft). Offsetting any judgment with carried interest would allow Defendant to "repay" real money he stole with speculative investments to which he is not entitled, thereby rewarding his misconduct and encouraging others to engage in the same.

## VII.    A Receiver Should Be Appointed to Liquidate Real Estate and Illiquid Assets.

The power of the district court to appoint a receiver to marshal, collect, and maintain assets, including judgments, with a view to distribution is well-established and appropriate where necessary to effectuate the purposes of the securities laws. *See, e.g., SEC v. Manor Nursing Centers,* 458 F.2d 1082, 1105 (2d Cir. 1972); *SEC v. Investors Security Corp., et al.,* 560 F.2d 561, 567 (3d Cir. 1977) (appointment of a receiver is an appropriate exercise of power and discretion of a district court). A receiver should be appointed to take control of all Defendant's assets, held in his name and the name of nominees, with the goal of repatriating $77 million to

victims. In light of the nature of some of the assets, including real estate, jewelry, art, and speculative illiquid investments, a receiver is best equipped for this function and will be essential in providing meaningful recovery to Defendant's victims. The SEC will submit a proposed receivership order following this Court's ruling on what assets are available to satisfy judgment.

**VIII.   The Court Should Set Up a Fair Fund.**

Defendant's assets should be placed into a Fair Fund to compensate the victims of his fraud. In short, a Fair Fund will allow the SEC to use monies obtained from a civil penalty (in addition to disgorgement) to recompense Defendant's victims. Because Defendant's fraud was long-running and concealed, and netted him more than he will be ordered to disgorge, a Fair Fund is especially appropriate. *See* 15 U.S.C. § 7246(a); *Official Comm. of Unsecured Creditors of Worldcom, Inc. v. SEC*, 467 F.3d 73, 81-84 (2d Cir. 2006) (discussing Fair Funds).

**IX.      The Court Should Hold a Hearing Before Releasing any Asset.**

To the extent Court finds that, as a result of this briefing process, Relief Defendants have made a legitimate claim to any asset, the SEC requests the Court hold an evidentiary hearing to allow the SEC to cross-examine Ms. Ahmed or other Relief Defendants on their claim. Depending on the asset, the SEC may request expedited discovery on the claim or asset.[44]

---

[44] In anticipation of any hearing, the SEC requests the opportunity to litigate the validity of Relief Defendants' privilege claims that have prevented the SEC from obtaining evidence on many of the assets in dispute. *See, e.g.*, *In re Donald Sheldon & Co., Inc.*, 191 B.R. 39, 49 (Bankr. S.D.N.Y. 1996) ("The spousal communication privilege, developed at common law, also seeks to protect uninhibited communication. However, this freedom of communication was meant to promote domestic peace, not to afford opportunity to the married couple to engage in protected communications to perpetrate a fraud upon a judgment-creditor."); *States v. Zolin,* 491 U.S. 554, 563 (1989) ("It is the purpose of the crime-fraud exception to the attorney-client privilege to assure that the 'seal of secrecy' between lawyer and client does not extend to communications 'made for the purpose of getting advice for the commission of a fraud' or crime.") (citations omitted).

## **CONCLUSION**

For the forgoing reasons, the SEC requests the Court grant its Motion for Remedies and

Judgment.

DATED: May 29, 2018.

Respectfully submitted,


s/ *Mark L. Williams*
Nicholas P. Heinke (Colo. Bar No. 38738)
      Connecticut Bar No. phv07374
Jeffrey E. Oraker (Colorado Bar. No. 26893)
      Connecticut Bar No. phv08631
Terry Ryan Miller (Colorado Bar. No. 39007)
      Connecticut Bar No. phv08981
Mark L. Williams (New York Bar. No. 4796611)
      Connecticut Bar No. phv07375
United States Securities and Exchange Commission
1961 Stout St., Suite 1700, Denver, CO 80294
Phone:         (303) 844-1000
               (303) 844-1071 (Heinke)
               (303) 844-1041 (Miller)
               (303) 844-1097 (Oraker)
               (303) 844-1027 (Williams)
E-mail:        HeinkeN@sec.gov
               MillerTE@sec.gov
               OrakerJ@sec.gov
               WilliamsML@sec.gov

Attorneys for Plaintiff:

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION

## <u>CERTIFICATION</u>

I certify that on May 29, 2018, a copy of the foregoing document was emailed to Defendant Iftikar Ahmed at IftyAhmed@icloud.com, and served via ECF upon the following:

Jonathan Harris
Reid Skibell
David Deitch
Alexander Sakin
S. Gabriel Hayes-Williams
Harris, St. Laurent & Chaudhry LLP
40 Wall Street, 53rd Floor
New York, NY 10005
(Counsel for Relief Defendants)


<u>s/ Mark L. Williams</u>

42