UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br>*Plaintiff*,<br>v.<br>IFTIKAR AHMED,<br>*Defendant*, and<br><br>IFTIKAR ALI AHMED SOLE PROP; I-CUBED DOMAINS, LLC; SHALINI AHMED; SHALINI AHMED 2014 GRANTOR RETAINED ANNUITY TRUST; DIYA HOLDINGS LLC; DIYA REAL HOLDINGS, LLC; I.I. 1, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; I.I. 2, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; and I.I. 3, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents,<br><br>*Relief Defendants*. | Civil No. 3:15cv675 (JBA)<br><br>September 6, 2018 |

**RULING ON PLAINTIFF'S MOTION FOR REMEDIES AND JUDGMENT**

This Court found [Doc. # 835] on summary judgment that Defendant Iftikar Ahmed was liable for violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder, Section 17(a) of the Securities Act of 1933 ("Securities Act"), and Section 206 of the Investment Advisers Act ("Advisers Act"). *See SEC v. Ahmed*, 308 F. Supp. 3d 628, 636–37 (D. Conn. 2018) (hereinafter "*Ahmed II*"). Plaintiff, the United States Securities and Exchange Commission ("SEC") now moves [Doc. # 886] for Remedies and Judgment against Defendant, seeking: (1) a permanent injunction; (2) disgorgement of Defendant's fraudulent proceeds in the

amount of $43,920,639; (3) disgorgement of prejudgment interest on those proceeds in the amount of $1,520,953 along with interest earned on all frozen assets during the pendency of freeze; (4) civil penalties in the amount of $43,920,639; (5) an Order specifically finding that the assets listed on the Asset Schedule (Ex. 1 [Doc. # 888-1] to Pl.'s Mem. Supp. Mot. for Judgment) belong to Defendant and can be used to satisfy a judgment against him; (6) the appointment of a receiver; (7) the establishment of a Fair Fund; and (8) any other relief that the Court may deem appropriate. (Pl.'s Mem. Supp. Mot. for Judgment [Doc. # 888] at 2.)

For the following reasons, the Court grants the SEC's Motion, with modification.

## I. Background

The Court assumes the parties' familiarity with the facts and procedural history of this case. A detailed discussion of the facts underlying Defendant's violations can be found in the Court's Ruling granting summary judgment on the issue of Defendant's liability. *See Ahmed II*, 308 F. Supp. 3d 628. A brief summary of relevant facts and findings relating to Relief Defendants' claims of ownership over assets listed in the Asset Schedule follows.

In opposition to the SEC's request for a preliminary injunction freezing assets, Relief Defendant Shalini Ahmed and her children made a claim to only three assets: (1) $7.5 million in proceeds from the Company C transaction that was held by I-Cubed and placed into the 2014 Grantor Retained Annuity Trust (the "GRAT"); (2) income earned from a Park Avenue condominium held in the name of DIYA that was purchased for approximately $9.5 million ("Unit 12A"); and (3) any income earned from a second Park Avenue condominium held in the name of DIYA Real that was purchased for approximately $8.7 million ("Unit 12F"). (*See, e.g.,* [Docs. ## 69, 96].) The Court rejected Ms. Ahmed's request, finding that she was a nominal owner for each requested asset and thus her ownership claims were not credible. *See SEC v. Ahmed*, 123 F.

Supp. 3d 301, 313 (D. Conn. 2015) (hereinafter *"Ahmed I"*), *aff'd sub nom. Sec. & Exch. Comm'n v. I-Cubed Domains, LLC,* 664 F. App'x 53 (2d Cir. 2016). However, the Court agreed to "entertain any application to release assets identifiable as [Ms. Ahmed's], and not tainted." *Sec. & Exch. Comm'n v. I-Cubed Domains, LLC,* 664 F. App'x 53, 57 (2d Cir. 2016) (internal quotations omitted)

Relief Defendants chose to take an interlocutory appeal of the Asset Freeze Order, arguing, *inter alia,* that the asset freeze was overbroad as to assets in Ms. Ahmed's name that the Court had not individually analyzed. *See I-Cubed Domains, LLC,* 664 F. App'x at 55. The Second Circuit deemed the argument "meritless" and instructed that, even with assets held in their name, Relief Defendants needed to first "identify any improperly frozen assets" and apply for their release before the SEC would be "required to carry its burden of demonstrating that any such identified assets are either ill-gotten gains to which Relief Defendants do not have a legitimate claim or that Iftikar in fact owns the assets in question." *Id.* at 57 (citing *Smith v. SEC,* 653 F.3d 121, 128 (2d Cir. 2011)). "If Relief Defendants cannot prove that any frozen assets legitimately belong to them, then necessarily none of their assets are being improperly frozen to satisfy the civil penalties alleged to apply to Iftikar's conduct." *Id.* at 57 n.3. Relief Defendants subsequently hired an expert "to counter the Commission's argument that the Relief Defendants are mere nominees." ([Doc. # 340] at 7.)

Since the Second Circuit's ruling, Ms. Ahmed has identified only two allegedly improperly frozen assets: 1) $250,000.00 in rental proceeds from Unit 12A that was previously placed in Fidelity x7540; and (2) nine 1-kilogram gold bars discovered in jointly-owned safety deposit boxes. (*See* [Doc. # 442].) The Court rejected these requests, finding that neither asset belonged to her: "Ms. Ahmed is not entitled to proceeds of Unit 12A because she was only a nominal owner of the condominium" and "[e]ven Relief Defendants' Motion does not contain an explicit allegation of Ms. Ahmed's ownership of the Gold Bars, and the SEC has pointed to testimony which

demonstrates that Ms. Ahmed had no knowledge of the existence of the bars." ([Doc. # 658] at 3-5.)

Following the Court's Summary Judgment Ruling on Liability, Relief Defendants were ordered to—and agreed to— "provide a list identifying all assets they claim belong to them, and the reasons why they claim such ownership." ([Doc. # 842] at 3.) On April 27, 2018, Relief Defendants filed the required list. (*See* Relief Defendant's Asset List [Doc. # 862]). Despite having made claims to only five frozen assets during the preceding three years of litigation (all of which were rejected), Ms. Ahmed and her young children now claim to own more than $85 million in frozen assets. *Id.* Neither Relief Defendants' Asset List, nor any other submissions to the Court, explain how Relief Defendants controlled the assets or how they were acquired. Nor do they provide any argument that goods or services were provided in exchange for the assets, or any expert analysis demonstrating the SEC's nominee allegations are inaccurate.

## II. Discussion

### A. Plaintiff's Motion is Procedurally Sound

Defendants fault the SEC for filing a Motion for Judgment instead of a motion for summary judgment on damages.[1] The SEC responds that summary judgment is not appropriate given that it is not seeking damages, but rather is requesting that the Court enter judgment against Defendant awarding certain equitable remedies, which cannot be decided at a trial. *See, e.g., Broadnax v. City of New Haven*, 415 F.3d 265, 271 (2d Cir. 2005). Relief Defendants cry foul, claiming entitlement

---

[1] The Court's April 5, 2018 endorsement order [Doc. # 842], following a discussion on the record with all parties, specifically ordered that the SEC file a Motion for Judgment.

to a jury on the question of whether specific assets belong to them, or are in fact owned by Mr. Ahmed.

Relief Defendants provide no convincing authority supporting their position that ownership of the assets in this context is a question of fact that must be determined by a jury. They attempt to characterize the SEC's theory of recovery against Relief Defendants as one of fraudulent conveyance, a question of common law rather than equity, in order to show entitlement to a jury trial. However, their sole cited case involves a private lawsuit in which the government intervened to enforce tax liens against two defendants by proceeding against a third defendant under the theory that it was a nominee for the first two. *See Iantosca v. Benistar Admin. Svcs., Inc*, 843 F. Supp. 2d 148, 153-54 (D. Mass. 2012). The court reasoned that "suits seeking . . . to compel the defendant to pay a sum of money to the plaintiff are suits for money damages . . . [a]nd money damages are, of course, the classic form of legal relief," therefore finding that the defendants were entitled to a jury trial with respect to the government's nominee claim. *Id.* at 153.

*Iantosca*, which unlike here was a private lawsuit, is not persuasive in light of the overwhelming case law cited by the SEC in which district courts have used their equitable power in the context of securities enforcement actions to order the turnover of assets nominally held by third parties. *See SEC v. Softpoint, Inc.*, No. 95- CV-2951, 2012 WL 1681167 at* 3 (S.D.N.Y. May 9, 2012) (where the defendant could use corporation's money at will and "attributed the assets to [the corporation] in order to retain their use while fraudulently protecting them from creditors[,]" the court found that the corporation's assets belonged to the defendant); *SEC v. Zubkis*, No. 97 Civ. 8086 (JGK), 2005 WL 1560489 at *4 (S.D.N.Y. June 30, 2005) ("The Court may use [its] broad equitable power to order the turnover of assets nominally held by third parties where the third party lacks a legitimate claim to the assets."); *SEC v. Martino*, 255 F. Supp. 2d 268, 288 (S.D.N.Y.

2003) (ordering the sale of a yacht placed in the name of a relief defendant but paid for by the defendant because "the disgorgement of unjustly retained wealth is a long-standing remed[y] that [is] within a court's equity powers" and this inherent equitable power "certainly extends to a person who, although not accused of wrongdoing, received ill-gotten funds and does not have a legitimate claim to those funds" (internal quotation marks and citations omitted)).[2, 3]

## B. Remedies

### 1. Permanent Injunction

Section 21(d)(l) of the Exchange Act, Section 20(b) of the Securities Act, and Section 209(d) of the Advisers Act allow the Commission to obtain permanent injunctive relief upon a showing

---

[2] Several Circuits have similarly found that district courts have broad equitable powers which include the ability to determine ownership of assets. See SEC v. Coello, 139 F.3d 674, 676 (9th Cir. 1998) ("[A]mple authority supports the proposition that the broad equitable powers of the federal courts can be employed to recover ill gotten gains for the benefit of the victims of wrongdoing, whether held by the original wrongdoer or by one who has received the proceeds after the wrong."); SEC v. Cherif, 933 F.2d 403, 414 n. 11 (7th Cir. 1991) ("A court can obtain equitable relief from a non-party against whom no wrongdoing is alleged if it is established that the non-party possesses illegally obtained profits but has no legitimate claim to them. Courts have jurisdiction to decide the legitimacy of ownership claims made by non-parties to assets alleged to be proceeds from securities laws violations.").

[3] Accordingly, Defendant's Motion [Doc. # 884] for Summary Judgment on Damages is denied because the SEC is not seeking damages, but only equitable remedies, and therefore there are no issues which remain for a jury. In his Motion, Defendant makes many of the same arguments he makes in his Opposition [Doc. # 902] to the SEC's Motion for Remedies and Judgment, including that after Kokesh the SEC is not authorized to seek disgorgement, that Defendant obtained no ill-gotten gains with regard to the two Company C transactions, that Oak already holds assets belonging to Defendant that must be accounted for, and that no civil penalty or injunction should be imposed. His Motion for Summary Judgment also argues the right to a jury trial to decide the amount of disgorgement. (Def.'s Mot. for Summ. J. at 11-12.) The Court incorporates Defendant's Motion for Summary Judgment into his Opposition to the SEC's Motion for Judgment and thus considers those arguments made in support of summary judgment as part of Defendant's rebuttal to the SEC's Motion.

that the defendant has violated the securities laws and there is a reasonable likelihood that the defendant will violate the securities laws in the future. *See SEC v. Commonwealth Chemical Secs., Inc.*, 574 F.2d 90, 99 (2d Cir. 1978) (injunction should be granted if the defendant's past conduct indicates "a reasonable likelihood of further violation in the future"); *see also S.E.C. v. Rabinovich & Assocs., LP*, No. 07-cv-10547(GEL), 2008 WL 4937360, at *5 (S.D.N.Y. Nov. 18, 2008). In evaluating that likelihood, a court may consider such factors as the degree of scienter involved; the sincerity of the defendant's assurances against future violations; the recurrent or isolated nature of the infraction; the defendant's recognition of the wrongful nature of his conduct; and the likelihood, given defendant's occupation, that future violations may occur. *SEC v. Universal Major Indus. Corp.*, 546 F.2d 1044, 1048 (2d Cir. 1976).

Defendant claims that "[g]iven the very public nature of this case, which has already been widely reported both by the print, television and online media, it is implausible that Defendant will be employed in the securities industry ever again." He further "disavows any interest in ever returning to the securities industry[,]" and complains that an injunction would only serve to stigmatize his current educational, charitable, and non-profit activities. (Def.'s Opp'n at 40.) Despite these noble proclamations, the above factors weigh in favor of issuing an injunction here.

Defendant's violation was not an isolated incident, rather he continuously violated the securities laws for nearly a decade while employed at Oak. Moreover, Defendant committed these violations with the highest degree of scienter—"Defendant opened bank accounts he alone controlled that were deceptively titled in the name of Oak and its portfolio companies, which he then used to divert monies intended for Oak funds or its portfolio companies into his and his wife's personal bank accounts." *Ahmed II*, 308 F. Supp. 3d at 638. Defendant has never admitted his wrongful conduct or accepted any responsibility whatsoever for his fraud, and indeed fled the

country shortly after this case began, prior to the July 2015 Preliminary Injunction hearing. Although his current employment may not at all be related to the securities industry, he nonetheless retains the skills and capacity to work in that field if given the opportunity.

On these facts, the Court finds that there is a "reasonable likelihood" that Defendant will violate the securities laws in the future. *See SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1477 (2d Cir. 1996) (An "injunction is particularly within the court's discretion where a violation was founded on systematic wrongdoing, rather than an isolated occurrence, and where the court views the defendant's degree of culpability and continued protestations of innocence as indications that injunctive relief is warranted…"). Thus, Defendant is permanently enjoined from violating Section 17(a) of the Securities Act (15 U.S.C. § 77q(a)), Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 thereunder (17 C.F.R. § 240.10b-5), and Sections 206(1), 206(2), 206(3), and 206(4) of the Advisers Act (15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(3)) and Rule 206(4)-8 thereunder (17 C.F.R. § 275.206(4)-8).

### 2. *Disgorgement*

"Once the district court has found federal securities law violations, it has broad equitable power to fashion appropriate remedies, including ordering that culpable defendants disgorge their profits." *S.E.C. v. Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013), as amended (Nov. 26, 2013). The equitable remedy of disgorgement "consists of fact finding by a district court to determine the amount of money acquired through wrongdoing – a process sometimes called 'accounting' – and an order compelling the wrongdoer to pay that amount plus interest to the court." *SEC v. Cavanagh*, 445 F.3d 105, 116 (2d Cir. 2006) ("*Cavanagh II*") (footnote omitted); *see also SEC v. Commonwealth Chemical Securities, Inc.*, 574 F.2d 90, 102 (2d Cir. 1978) (Disgorgement "is a method of forcing a defendant to give up the amount by which he was unjustly enriched.").

Courts may only order disgorgement for profits which were illegally derived, but given the difficulty in determining exactly which of a defendant's gains resulted from his frauds, "'[t]he amount of disgorgement ordered need only be a reasonable approximation of profits causally connected to the violation.'" *Razmilovic*, 738 F.3d at 31 (quoting *First Jersey,* 101 F.3d at 1475). Thus, courts have found that "[s]o long as the measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." *SEC v. Warde*, 151 F.3d 42, 50 (2d Cir. 1998) (internal quotation marks omitted). Obviously, as discussed above, disgorgement cannot be avoided by transferring ill-gotten gains to third parties. *See, e.g., Cavanagh I*, 155 F.3d at 137 ("Allowing [Defendant's wife] to now claim valid ownership of those proceeds would allow almost any defendant to circumvent the SEC's power to recapture fraud proceeds, by the simple procedure of giving stock to friends and relatives, without even their knowledge.")

### a. The Court's Authority to Order Disgorgement

Defendants contend that after *Kokesh v. SEC,* 137 S. Ct. 1635, 1644 (2017) the SEC cannot seek disgorgement against any party because it is a penalty for all purposes. However, *Kokesh* made clear it was addressing a narrow issue—whether disgorgement is a "penalty within the meaning" of the statute of limitations in § 2462— and explicitly warned that "[n]othing in this opinion should be interpreted as an opinion on whether courts possess authority to order disgorgement in SEC enforcement proceedings . . ." *Kokesh*, 137 S. Ct. at 1643, 1642 n.3. Since *Kokesh* was decided, courts have declined to endorse similar arguments as here, that the SEC has no authority to seek disgorgement at all. As one district court explained in rejecting that same argument, "*Kokesh* is best seen as a decision clarifying the statutory scope of § 2462, rather than one redefining the essential attributes of disgorgement." *SEC v. Jammin Java Corp.*, 2017 WL 4286180, at *3 (C.D.

Cal. Sept. 14, 2017). That is because "at every step of the analysis, the Court reinforce[d] [that] it [was] discussing penalties in the context of a specific provision and for statute of limitations purposes." *SEC v. Brooks*, 2017 WL 3315137, at *6-8 (S.D. Fla. Aug. 3, 2017) (reasoning that "*Kokesh's* holding cannot be plucked from the statutory context that gives it force" and determining that, despite *Kokesh*, disgorgement is an equitable remedy that is remedial for purposes of determining whether a claim survives the defendant's death). Consistent with this view, the Second Circuit has upheld a disgorgement award post-*Kokesh*, holding that courts have "broad discretion" in ordering disgorgement. *SEC v. Metter*, 706 Fed. Appx. 699, 702 (2d Cir. 2017).

Thus, nothing in *Kokesh* disturbed Second Circuit precedent that disgorgement is a proper equitable remedy. *See SEC v. Cope et al.*, No. 14CV7575 (DLC), 2018 WL 3628899, at *4 (S.D.N.Y. July 30, 2018); *see also Cavanagh II*, 445 F.3d at 118 (explaining that disgorgement serves the equitable purpose of "prevent[ing] wrongdoers from unjustly enriching themselves through violations" and that "[t]he emphasis on public protection, as opposed to simple compensatory relief, illustrates the equitable nature of the remedy" (citing *SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 102 (2d Cir. 1978))).[4]

---

[4] Relief Defendants argue that the Court cannot order disgorgement of their assets because they are not accused of any wrongdoing and therefore penalties may not be imposed against them. However, the SEC is not seeking disgorgement against Relief Defendants, only against Defendant himself. It is only because the SEC claims Relief Defendants are holding assets that are, in reality, Mr. Ahmed's, that assets in Relief Defendants' possession may be subject to the order of disgorgement against Defendant.

*b. The Total Amount to be Disgorged*

Contrary to Relief Defendants' argument, the SEC has not conflated disgorgement with restitution. The Court's findings in the Summary Judgment Ruling on Liability focused on Defendant's fraudulent gains and did not address Oak's losses from Defendant's conduct. The Court's findings detail the specific sums Defendant diverted into his and his wife's bank accounts, totaling approximately $67 million, $43,920,639.00 of which was acquired within five years of the initiation of this case. *See Ahmed*, 308 F. Supp. 3d at 638-48.

That being said, with respect to the second Company C transaction ("C2"), the Ruling on Summary Judgment, which focused specifically on liability, only calculated gross sales revenues from the sale of Company C shares and did not address Defendant's initial cost of purchasing the Company C shares through I-Cubed, which was $2 million. (*See* Ex. 4 (Ames' Decl.) ¶ 29(b).) Thus, Defendants appropriately dispute the amount that should be disgorged relating to this transaction. Their argument that the first Company C transaction ("C1") similarly was not properly calculated though, is meritless.

Relief Defendants claim that the SEC's overall disgorgement request must be reduced by $8.9 million because Mr. Ahmed had no ill-gotten gains relating to the C1 transaction. (R. Def.'s Opp'n at 8.) As the SEC notes, Defendant's conflict of interest in the transaction, where he concealed from both parties "that he (as opposed to the BVI Company, which was an Oak portfolio company) was the seller of [the] Company C shares and that he would personally profit by more than $8 million upon Oak Fund XIII's $25 million investment" in Company C violates Advisers Act Section 206(3). Accordingly, it is appropriate for the Court to order disgorged "all profits reaped through [t]his securities law violation[]," which is the $8.9 million Defendant made by

selling the shares for nearly $11 million after he purchased them for only $2 million, *Ahmed II*, 308 F. Supp. at 640-41. *See SEC v. Cavanaugh*, 445 F.3d 105, 109 (2d Cir. 2006).

The C2 transaction is another instance in which Mr. Ahmed concealed the fact that he was on both sides of the deal—as the sole member of Relief Defendant I-Cubed, Defendant sold shares of Company C (which had previously been purchased by I-Cubed, i.e., Mr. Ahmed) to an Oak Fund. *Ahmed*, 308 F. Supp. 3d at 641-42. In its Ruling, the Court found that the gross revenue from the $7.5 million sale was then distributed into an account on which Mr. Ahmed is listed as the sole signatory, which he had opened by representing that he was a member of I-Cubed. *See id.* at 642 n.9.

Because the Court is authorized to disgorge only "*profits* reaped through [Defendant's] securities law violations," the Court concludes that $5.5 million is the appropriate amount of disgorgement for the C2 transaction. *See Cavanaugh*, 445 F.3d at 109 (emphasis added). Accordingly, the total amount the SEC seeks to have disgorged of $43,920,639.00 must be reduced by $2 million. Defendants have not established with respect to any other transaction that the Court's Ruling on Liability improperly calculated profits Defendant derived from his misconduct, and therefore the Court orders Defendant to disgorge $41,920,639.00, representing his ill-gotten profits.

### 3. *Prejudgment Interest and Interest/Gains Accrued on Frozen Assets*

As with disgorgement, an award of prejudgment interest lies within the discretion of the court. *See First Jersey*, 101 F.3d at 1476. Generally, "an award of prejudgment interest may be needed in order to ensure that the defendant not enjoy a windfall as a result of its wrongdoing." *Slupinski v. First Unum Life Ins. Co.*, 554 F.3d 38, 54 (2d Cir. 2009). In deciding whether an award of prejudgment interest is warranted, a court should consider (i) the need to fully compensate the

wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court. *First Jersey*, 101 F.3d at 1476 (internal citation omitted). It is within the "discretion of a court to award prejudgment interest on the disgorgement amount for the period during which a defendant had use of [its] illegal profits." *Razmilovic*, 738 F.3d at 36.[5]

Here, prejudgment interest on the amount to be disgorged is appropriate for the period prior to the asset freeze, since without it Defendant would be allowed to "obtain[ ] the benefit of what amounts to an interest free loan procured as a result of illegal activity." *SEC v. Moran*, 944 F.Supp. 286, 295 (S.D.N.Y. 1996). The SEC represents, and Defendants do not dispute, that this amounts to $1,520,953.00.[6]

What is disputed, however, is the SEC's additional request that the Court order Defendant to turn over all interest and returns from frozen assets from the time this Court entered [Doc. # 9] a Temporary Restraining Order on May 9, 2015. The SEC is not requesting that Mr. Ahmed pay prejudgment interest on frozen assets during the pendency of the asset freeze, but it contends that conversely, he is not entitled to interest or gains on assets while they were frozen, and those moneys should be disgorged and returned to Defendant's victims. Thus, while recognizing that it can be

---

[5] Mr. Ahmed contends that the SEC is not entitled to an award of prejudgment interest after *Kokesh* because, in his view, disgorgement now constitutes a penalty for all purposes and the SEC cannot seek prejudgment interest on any penalty. (Def.'s Opp'n at 9.) Because, as discussed below in footnote 8, the Court disagrees with the basic premise that all disgorgement orders are now penalties, this argument lacks merit.

[6] The SEC is directed to provide a revised calculation for the prejudgment interest based on the revised disgorgement figure, discussed above.

improper to collect prejudgment interest on "funds [that] have been frozen in connection with an enforcement action," the SEC claims it is entitled to disgorge the accumulated returns on frozen funds: "[F]rozen funds 'turned over to the government in complete or partial satisfaction of the disgorgement order' should be turned over 'along with any interest that has accrued on them during the freeze period.'" *Tavella*, 77 F. Supp. 3d at 361 (quoting *Razmilovic*, 738 F.3d at 36). "Otherwise, a defendant might perversely benefit from the asset freeze by pocketing accumulated returns on the frozen principal." *Id.*

Defendants have not shown entitlement to interest and gains accrued during the pendency of the asset freeze and therefore the Court, as instructed by the Second Circuit in *Razmilovic*, orders the actual returns on the frozen assets, the amount of which have not yet been determined, must also be disgorged.

### 4. Civil Penalty[7]

Civil penalties are designed to punish the individual violator and deter future violations of the securities laws. *SEC v. Moran*, 944 F. Supp. 286, 296 (S.D.N.Y. 1996). The Securities Act and the Exchange Act authorize three tiers of civil penalties. *See* 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d)(3). Third tier penalties are appropriate where "the violation involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and "directly or

---

[7] Defendant offers no argument as to how imposing a civil penalty here violates the Eighth Amendment's Excessive Fines Clause, and therefore his citation to *SEC v. Metter* is puzzling. (*See* Def.'s Mot. for Summ. J. at 36 (quoting *SEC v. Metter*, 706 F. App'x 699, 703 (2d Cir. 2017) (The Second Circuit, "assume[d] without deciding that, in light of the Supreme Court's recent decision in *Kokesh* . . . the disgorgement liability imposed in this matter was essentially punitive in nature and thus was a fine within the meaning of the Excessive Fines Clause of the Eighth Amendment."))." )

indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." *Razmilovic*, 738 F.3d at 38 (citation omitted). At each tier, "for each violation, the amount of penalty 'shall not exceed *the greater of* a specified monetary amount or the defendant's 'gross amount of pecuniary gain.'" *Id.* (quoting 15 U.S.C. §§ 77t(d)(2), 78u(d)(3)(B)).

The actual amount of the penalty, within the bounds of the statute, is left to the discretion of the district court. *Id.* When making this determination, courts consider

> (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.

*SEC v. Haligiannis*, 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007).

The SEC asks the Court to impose a third-tier penalty equal to the amount of disgorgement, here roughly $41 million, based upon what it considers Defendant's egregious conduct. It argues that "Defendant engaged in premeditated, extensive, and continual fraud . . . that was intended to (and did) inflict harm on those he was entrusted to help, so he could personally profit." (Pl.'s Mot. for Judgment at 16.) Relief Defendants maintain that there is no support in this Circuit for imposition of a penalty that is 100% of the total disgorgement, and instead that the penalty should be restricted to only 10-20%.[8]

---

[8] Defendants do not attempt to persuade the Court not to impose a third-tier penalty, although Relief Defendants maintain that the SEC's request for civil penalty should be denied outright because disgorgement is already a penalty. However, as the Court noted in the context of the asset freeze, since "[d]isgorgement merely requires the return of wrongfully obtained profits; it does not result in any actual economic penalty or act as a financial disincentive to engage in securities fraud" and therefore civil penalties are required in order to deter and punish fraud. *Ahmed I*, 123 F. Supp. 3d at 313 (quoting *S.E.C. v. Moran*, 944 F. Supp. 286, 296 (S.D.N.Y. 1996)).

Despite Defendants' protestations, there is no dispute that the Court is authorized, should it so choose, to impose a civil penalty equal to the amount ordered disgorged, representing Defendant's gross pecuniary gain. *See* 15 U.S.C. §§ 77t(d)(2), 78u(d)(3)(B)). Other district courts have done so. *See, e.g., S.E.C. v. Haligiannis*, 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007) (ordering the "defendants to pay a penalty in the approximate amount of his ill-gotten gains: $15,000,000."); *SEC v. BIC Real Estate Dev. Corp.*, 2017 WL 1740136, at *6 (E.D. Cal. May 4, 2017) ("ordering the defendant to pay a penalty of $12,132,370, equal to his profit from wrongdoing"); *SEC v. Zada*, 787 F.3d 375, 383 (6th Cir. 2015) (upholding imposition of civil penalty, equal to the amount of ill-gotten gains, of over $56 million). On the other hand, some courts have declined to impose the maximum penalty. *See, e.g., Sec. & Exch. Comm'n v. Nadel*, No. CV110215WFKAKT, 2016 WL 639063, at *26 (E.D.N.Y. Feb. 11, 2016), *report and recommendation adopted*, 206 F. Supp. 3d 782 (E.D.N.Y. 2016) (imposing third-tier penalty in the amount of $1 million where the disgorgement award was nearly $11 million); *Razmilovic*, 822 F. Supp. 2d at 281-82 (declining to impose maximum civil penalty of over $41 million, and instead imposing civil penalty of over $20 million, equal to one-half of the disgorgement amount).[9]

The Court finds that the circumstances and consequences of Defendant's conduct warrant a significant penalty. Defendant's solo, flagrant, fraudulent conduct took place over many years, it

---

[9] The facts of this case bear a striking resemblance to those in *Razmilovic*, where the defendant similarly perpetuated a pervasive fraudulent scheme spanning a number of years that involved "fraud, deceit, manipulation and deliberate, or at least, reckless disregard of regulatory requirements," which resulted in substantial losses to investors. "Yet instead of responding to the charges against him, the defendant fled the country, continue[d] to refuse to admit any wrongdoing, and . . . never expressed any remorse for his conduct." 822 F. Supp. 2d at 280.

was undoubtedly willful, with the sole motivation being to personally profit at the expense of his victims, whose resulting losses were immense. Defendant not only fled the country following his indictment on criminal charges in Massachusetts, but he has consistently and indignantly denied any wrongdoing whatsoever throughout the course of this litigation. There is no doubt Defendant utilized his professional talents and position to commandeer investors' funds purely for personal gain. Additionally, Defendant has not demonstrated that his financial condition warrants any downward adjustment, and his contention that the fine should be reduced based upon his inability to pay deserves little attention given that the SEC has already secured assets which are likely sufficient to satisfy the total award.

The Court is of the view that a civil penalty in the amount of $21 million, representing just over half of the total disgorgement amount, is reasonable and justified on the facts of this case, which is far from a mere slap on the wrist, and is sufficient to effectuate the punitive and deterrent purposes of such penalties, while not being greater than necessary. *See Razmilovic* 822 F. Supp. 2d at 281-82.[10]

## C. Assets Available to Satisfy the Judgment

The SEC asks the Court to find that the assets listed on the Asset Schedule (Ex. 1 to Pl.'s Mot. for Judgment) belong to Defendant and can be used to satisfy a judgment against him. Relief

---

[10] The SEC also reasons that this civil penalty is appropriate given that the disgorgement award "will be insufficient to fully compensate victims from whom [Defendant] stole approximately $67 million" because Defendant's fraud extended beyond the five-year statute of limitations for the SEC's claims (Pl.'s Mot. for Judgment at 16), leading Relief Defendants to complain that the SEC's civil penalty is simply an attempt to circumvent the holding in *Kokesh* (R. Def.'s Opp'n at 33). However, the SEC has not asked for a penalty in excess of the *Kokesh* limits; it seeks a civil penalty that is limited to the total amount that may be disgorged under *Kokesh*.

Defendants object to the process being used by the Court, arguing that it "would, among other things, improperly shift the burden of proof to Relief Defendants, requiring them to establish ownership over assets held in their names." ([Doc. # 862 at 1.]) According to Relief Defendants, the SEC is asking the Court to find that Relief Defendants are nominal owners of Mr. Ahmed's assets without providing an asset-by-asset analysis, which they claim is required under state law. (R. Def.'s Opp'n at 15 (citing *McMahon v. United States*, No. 3:09-CV-00046 PCD, 2010 WL 4430512, at *4 (D. Conn. Oct. 29, 2010) (requiring an asset-by-asset analysis to determine "whether property is held by a taxpayer's nominee.")).)

However, Relief Defendants made this same argument before the Second Circuit and it was soundly rejected. The Second Circuit noted "Relief Defendants['] argu[ment] that insufficient evidence of nominee status renders the asset freeze overbroad[,]" and held that this "argument fails because Relief Defendants have been unable to point to any improperly frozen assets. . . . Relief Defendants do not allege that the referenced assets—a Fidelity account in Shalini's name and several trust accounts—properly belong to Relief Defendants, much less that they do not include proceeds of Iftikar's fraud." *I-Cubed Domains*, 664 Fed. App'x. at 56-7. Explicitly rejecting Relief Defendants' argument, the Second Circuit explained "[i]f Relief Defendants cannot prove that any frozen assets legitimately belong to them, then necessarily none of their assets are being improperly frozen to satisfy the civil penalties alleged to apply to Iftikar's conduct." *Id.* at 57, n.3.[11]

---

[11] *See also SEC v. Colello*, 139 F.3d 674, 677-8 (9th Cir. 1998) (rejecting relief defendant's argument "that the district court improperly placed the burden on him to show that he had a legitimate claim to the funds" and affirming summary judgment order because Relief Defendant "refused to give information necessary to determine whether he still possessed any of the funds or whether he had a legitimate claim to them."); *Commodity Futures Trading Comm'n v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187, 192, n.5 (4th Cir. 2002) ("We have no doubt that the district court will provide the Relief Defendants with an opportunity to demonstrate the existence of a legally

Thereafter, Relief Defendants conceded that "the Second Circuit's ruling on Relief Defendants' interlocutory appeal indicate[s] a significantly expanded task for Relief Defendants' expert in the attempt to trace funds in order to rebut the SEC's argument that the Relief Defendants are mere nominees[,]" which, they recognized, is a burden "[t]he Second Circuit's decision clearly places . . . on the Relief Defendants." ([Doc. # 339 at 6-7].) That Relief Defendants now pivot and attempt to avoid the burden of establishing ownership of frozen assets can only be explained by their inability to put forth any convincing evidence rebutting the SEC's contention that the assets belong to Defendant.[12]

The Court previously detailed the factors it would consider in determining ownership as to assets held in the name of Relief Defendants: "'[1] a defendant's control over the asset, [2] the length of time the asset had been held, [3] whether the defendant had an interest in and benefitted from the asset, [4] whether the defendant had transferred assets from his name into the asset, [5] whether he or she contributed to acquire the asset initially, and [6] whether the defendant ever

---

and factually valid ownership interest to some or all of the assets prior to ordering disgorgement." (citing *Cavanagh I* at 136–37)); *U.S. Commodity Futures Trading Comm'n v. EJS Capital Mgmt., LLC*, 2015 WL 5679688, at *4 (S.D.N.Y. Sept. 24, 2015) ("Should [relief defendant] assert some legitimate interest in [disputed] funds, she must offer evidence of her entitlement; more than unsupported, conclusory assertions need to be proffered."); *F.T.C. v. Bronson Partners, LLC*, 674 F. Supp. 2d 373, 394 (D. Conn. 2009), *aff'd*, 654 F.3d 359 (2d Cir. 2011) ("Relief defendant . . . met her burden of demonstrating that she provided a legitimate service in exchange for monies paid to her by defendants. Accordingly, [she] is not liable for any portion of the restitution award.").

[12] The Court has given Relief Defendants multiple opportunities to present evidence establishing their ownership of specific assets over the course of this litigation. Not only were Relief Defendants ordered to provide a list of assets to which they claim ownership, with "a fairly detailed analysis of why those identified assets are on a list claimed to be exempt from satisfaction of a judgment either against the Relief Defendants or Mr. Ahmed" (Ex. 12 to SEC's Mot. For Judgment at 17:5-18:14), they also had the opportunity to, and did, present evidence through their Opposition to the SEC's Motion for Judgment.

withdrew any funds from the asset.'" *Ahmed I*, 123 F. Supp. 3d at 308 (quoting *SEC v. McGinn Smith & Co.*, 752 F. Supp. 2d 194, 307-08 (N.D.N.Y. 2010)).

### 1. Evidence That Relief Defendants are Nominal Owners of Defendant's Assets

Relief Defendants maintain that the SEC has failed to introduce evidence that Mr. Ahmed "dominated and controlled" any specific asset that a Relief Defendant is allegedly holding as his nominee, or shown that Mr. Ahmed enjoyed any monetary benefit from assets that were titled to the Relief Defendants, such as the UTMA trusts created for the sole benefit of their children. The Court rejects this attempt to avoid the burden of presenting evidence establishing Relief Defendants' ownership.

Relief Defendants have had every opportunity to refute the SEC's claim that Defendant actually owns all of the frozen assets throughout the course of this litigation, and yet have failed to do so. They cannot establish ownership of these assets simply by again complaining that the SEC has to prove that Mr. Ahmed controlled and benefited from assets in Relief Defendants' names, without offering any evidence that Relief Defendants in fact controlled and owned these assets. On the other hand, the SEC does put forth evidence that the seized assets belong to Mr. Ahmed and were placed in the names of Relief Defendants as nominees only, in an effort to protect and hide the fraudulently obtained assets.

Even Relief Defendant's own expert report found that from 2004 through 2014, Ms. Shalini Ahmed earned just over $1.9 million in gross income, and that all other "non-suspect" sources of income, totaling $62,758,960.96, belonged to Mr. Ahmed. (Ex. 15 (R. Def.'s Expert Report [Doc. # 888-15]) to SEC's Mot. for Judgment ¶ 20.) Thus, 98.8% of all funds that the Ahmeds received during the past fourteen years came from Defendant. In light of these facts, it is difficult to see, and neither Defendant nor Relief Defendants provide any argument, much less a credible explanation,

how Ms. Ahmed and her children could own more than $85 million in assets while Defendant owns less than $6 million in liquid assets. (*See* [Doc. 862-1] at 4.) Furthermore, the Ahmeds' lavish lifestyle greatly exceeded Ms. Ahmed's earnings over this ten year period, as Ms. Ahmed admitted her living expenses exceeded $46,000 per month. (*See* [Doc. # 69] at 14.)

Moreover, in her interrogatory responses, Ms. Ahmed claimed only to own a few assets,[13] and never supplemented this response to assert ownership of anywhere near the $85 million of assets she now claims belong to her and her children.[14] Further undermining her claim, Ms. Ahmed was unable to remember receiving more than $25 million in checks from Defendant, money she now claims to have managed (as discussed below).[15] Both Defendant and Ms. Ahmed refused to

---

[13] Ms. Ahmed asserted an ownership over only Unit 12A, Unit 12F, and the GRAT:

Notwithstanding these objections, Ms. Ahmed states that the asset freeze is inappropriate with respect to compensation she earned over the course of her employment, including grants of stock and retirement account contributions; her personal contributions to the marital estate; the Shalini Ahmed 2014 Grantor Retained Annuity Trust; the assets of DIYA Holdings, LLC; the assets of DIYA Real Holdings, LLC; her and her children's reasonable legal expenses; her and her children's reasonable living expenses; and any other assets that the Commission cannot legally demonstrate should be subject to the asset freeze.

(Ex. 16 (Interrogatory Responses) to Pl.'s Mot. for Judgment at 7.)

[14] Ms. Ahmed also previously admitted it was Defendant who purchased both the 2009 Cadillac Escalade and 2009 Porsche Cayenne and that she did not know how he funded the purchases. (Ex. 7 (Ms. Ahmed Depo.) at 50:11-22.)

[15] (*See* Ex. 7 (Ms. Ahmed Depo.) at 60:16-18 ("Q. Okay. Why did Iftikar Ahmed write you a check for $500,000 on January 7th, 2013? A. I don't remember."); *Id.* at 61:24-62:1 ("Q: And why did your husband write you a $2 million check on August 15, 2014? A: "I don't remember."); *Id.* at 64:16-18 (Q: "Why did your husband write you a $500,000 check on September 23rd, 2014?" A: "I don't remember."); *Id.* at 69:5-7 (Q: "Why did Ahmed write you a $1.2 million check on November 6th, 2014?" A: "I don't remember."); *Id.* at 70:14-16 (Q: "Why did Iftikar Ahmed write you a $1.5 million check on November 17th, 2014?" A: "I don't remember."); *Id.* at 74:17-19 ("Why did your

testify about the transfer and placement of assets into her name (aside from those that were nominally placed into Ms. Ahmed's name as a contingency plan). Defendant invoked his Fifth Amendment right against self-incrimination,[16] and Ms. Ahmed invoked the marital privilege.[17]

### 2. *Relief Defendants' Claimed Assets*

Relief Defendants now claim to own the vast majority of the frozen assets, yet fail to provide evidence of this ownership or to meaningfully challenge the SEC's evidence that Defendant owned and controlled the currently frozen assets. Rather than explain why the factors above demonstrate that specific assets are indeed Relief Defendants' and should not be used to satisfy any judgment, Relief Defendants' Schedule A [Doc. # 862-1] offers as the basis for ownership only four "additional reasons for Relief Defendants' ownership," three of which the SEC correctly argues, even if taken as true, do not prevent the SEC from using the asset to satisfy a judgment against Defendant.[18]

---

husband write you a $750,000 check on December 15th, 2014? A. I don't remember.); *Id.* at 78:12-14 (Q: Why did Ahmed Iftikar write you an $18 million check on January 12th, 2015? A: I don't know.").

[16] (*See e.g.*, Ex. 17 (Def.'s Depo. [Doc. # 888-17]) to Pl.'s Mot. for Judgment at 21:3-16; 25:13-26:7; 28:18-29:10; 32:3-20; 36:11-37:3; 40:7-25; 43:24-44:19; 47:21-48:14; 52:6-23; 57:1-8; 58:12-59:8; 61:13-62:8; 65:22-66:20; 69:5-70:2; 72:9-73:6; 77:25-78:18; 82:22-83:15; 89:5-90:9; 96:18- 98:1; 102:3-23; 108:22-110:4.)

[17] (*See, e.g.*, Ex. 10 (Ms. Ahmed Depo. [Doc. # 888-10] at 476:13-16).)

[18] Defendant argues only that the contents of the safe deposit boxes belong to his wife and the UTMA accounts belong to his children (discussed below). (Def.'s Opp'n at 24-25.) With respect to the items in the safety deposit boxes, Ms. Ahmed did not even know of their contents until after the boxes were inventoried. (*See, e.g.*, [Doc. # 465-2 ("THE COURT:…Is it still accurate that nobody knows what is in these safe deposit boxes? Mr. Deitch? MR . DEITCH: That's correct, your Honor").)

First, Relief Defendants' contention that the SEC cannot collect any assets acquired more than five-years before the SEC commenced the action is incorrect. Although after *Kokesh* the SEC is no longer able to seek a disgorgement award for fraudulent conduct that occurred more than five years before the initiation of an action, it remains free to collect against all of Defendant's assets, no matter when they were acquired, in order to satisfy a judgment. *See, e.g., SEC v. Banner Fund Int'l*, 211 F.3d 602, 617 (D.C. Cir. 2000) (recognizing "disgorgement is an equitable obligation to return a sum equal to the amount wrongfully obtained, rather than a requirement to replevy a specific asset," and that "an order to disgorge establishes a personal liability, which the defendant must satisfy regardless whether he retains the selfsame proceeds of his wrongdoing" (*citing SEC v. Shapiro*, 494 F.2d 1301, 1309 (2d Cir. 1974))).

Additionally, Relief Defendants' claims that certain assets were purchased or funded, in whole or in part, with untainted funds are also irrelevant.[19] The SEC is free to collect on any of Defendant's assets, whether or not he used his ill-gotten gains to acquire them. *Id.* As the D.C. Circuit noted, "the requirement of a causal relationship between a wrongful act and the property to be disgorged does not imply that a court may order a malefactor to disgorge only the actual property obtained by means of his wrongful act." *Id.* It went on to explain that "the causal connection required is between the amount by which the defendant was unjustly enriched and the

---

[19] For instance, Ms. Ahmed claims to own Fidelity x7540 (*see* [Doc. # 862-1] at 1, entry 3), which holds more than $13 million (Asset Schedule at 3, entry 75). As noted above, Ms. Ahmed did not recall receiving the $18 million check (the proceeds of Defendant's Company B fraud) that funded this account, and specifically testified the account was opened only so she could access assets "should anything happen to [Defendant]." (Ex. 7 at 80:9-14) (Q: "Why was the Fidelity account in your name opened?" A: "So my husband had a significant illness, and I believe it was opened so that I had some assets where I could take care of the children should anything happen to him.").

amount he can be required to disgorge." *Id.* Thus, these reasons would be relevant only if Relief Defendants could show that the asset in question was purchased or funded with *their* untainted funds, as opposed to Mr. Ahmed's.[20]

Accordingly, assets to which Relief Defendants claim ownership on any of these three grounds, and on no other basis, may be collected by the SEC to satisfy the judgment against Defendant.[21]

---

[20] Even if Ms. Ahmed purchased or funded assets with her own untainted funds, where ill-gotten funds are comingled with a relief defendant's legitimately obtained funds, the SEC is not required to trace specific funds to their ultimate recipients. *I-Cubed Domains*, 664 Fed. Appx. at 56. Because, as discussed below, the Court concludes that Relief Defendants are nominal owners of Defendant's assets, there is no need to apply the two part *Cavanagh* test. *See I-Cubed Domains, LLC*, 664 F. App'x at 55 ("the *Cavanagh* standard does not apply where an asset claimed to belong to a relief defendant is actually owned by a defendant, such that the relief defendant is a "nominee" for the defendant.).

[21] Relief Defendants argue that both the Iftikar A. Ahmed Family Trust and the children's Uniform Transfer to Minors Act ("UTMA") accounts cannot be used to satisfy a judgment against Defendant because the beneficiaries are Defendant's descendants and the SEC has not shown they were funded by Defendant's illicit gains. (R. Def.'s Opp'n at 5.) Relatedly, Relief Defendants maintain that the MetLife insurance policy is also exempt from collection because it is owned by the Family Trust for the benefit of the minor children. The SEC counters that the Family Trust was funded with Defendant's money, including approximately $1.577 million from the Company G fraud and approximately $2.0 million from the Company I fraud. (Ex. A) (Defendant writing checks deposited to Family Trust). Because the evidence establishes only that Defendant funded this Trust, and there is no indication that any other Relief Defendant also did so, the Court is satisfied that the Family Trust was funded and created using Defendant's money and therefore can be used to satisfy a judgment against him.

In addition, Relief Defendants contend that the Family Trust is entitled to a significant portion of the Rakitfi Holdings account at Northern Trust ending x5218 because Defendant assigned 99% of his interest in Rakitfi Holdings LLC to the Family Trust in exchange for a promissory note of $1,510,000 at 2.25% annual interest. (R. Def.'s Opp'n at 6.) However, even if the record supported this claim, because the Court finds that Defendant controls the Family Trust, these funds are available for collection in either event.

Relief Defendants' final reason for ownership, that an asset was a gift from a non-party, the SEC agrees is grounds for precluding the asset from being used to satisfy a judgment against Defendant. Still, Relief Defendants must offer some evidence that these were indeed gifts received from someone other than Mr. Ahmed, and have failed to do so here.

### 3. *Ms. Ahmed's Claim of Managing Assets*

In addition to the reasons listed in Relief Defendants' Schedule A, which as discussed above do not preclude a finding that those assets are available to satisfy a judgment against Defendant, Relief Defendants argue that most of the assets belong to them because Ms. Ahmed "contributed materially to developing and enhancing the corpus of marital property[,]" giving "her a cognizable right to that property." (R. Def.'s Opp'n at 19.) The SEC counters that Ms. Ahmed's "sudden management claim" is belied by the evidence and inconsistent with this Court's previous rejections of her claims to specific assets.

According to Relief Defendants, the fact that Mr. and Ms. Ahmed are married is critical because the quantum of proof needed to show that one spouse is the equitable owner of an asset titled to the other is meaningfully higher than where the primary defendant and relief defendant are not married. The sole case they cite in support of this contention, *In re Vebeliunas*, deals with the question of whether the veil of an irrevocable trust could be pierced under New York State law based on the argument that the debtor was the equitable owner of the trust. 332 F.3d 85 (2d Cir. 2003). There, the court found that the trust's equitable owner was the debtor's spouse, who had funded the trust with her own assets earned by investing her inheritance. *Id.* at 92. The court observed that because spouses "routinely share certain financial assets, such as streams of income," and "routinely administer each other's assets and conduct business on behalf of each other," these facts did not evidence control by the debtor over the trust. *Id.* at 92-93. Here, though, Ms. Ahmed

25

has not demonstrated that any of the assets were purchased or funded by her, and in fact the evidence is to the contrary, considering that nearly all of the funds acquired by the Ahmeds were earned or stolen by Defendant.

Specifically, as mentioned above, the Second Circuit held Defendant's salary belongs to him and was properly frozen to preserve his ability to pay an eventual judgment and, in the face of Ms. Ahmed's claims of managing certain assets, found that aside from her stock options and retirement accounts, which were unfrozen, she "failed to identify any other particular contributions to the marital estate." *ICubed Domains, LLC*, 664 Fed. Appx. at 57. To the extent Ms. Ahmed now attempts to argue that she acted as the "family CIO" and that this contribution entitles her to at least a portion of the marital estate, her argument misses the mark.[22]

Even if Ms. Ahmed legitimately managed the family assets, Relief Defendants provide no authority that where a spouse manages assets which were fraudulently acquired by the other spouse, the spouse managing those assets somehow gains an ownership interest in them such that the assets cannot be used to satisfy a judgment against the other spouse. Further, assuming Ms. Ahmed managed assets which were not fraudulently obtained, those jointly controlled assets can nevertheless be used to satisfy Defendant's judgment. *See, e.g., SEC v. Smith*, 646 Fed. Appx. 42, 43 (2d Cir. 2016) (rejecting the relief defendant's argument that the district court erred in applying all assets in a jointly controlled account – held only in the name of relief defendant – to satisfy final judgment against defendant); *Sarasota CCM, Inc. v. Golf Mktg., LLC*, 94 Conn. App. 34, 38, 891

---

[22] Relief Defendants offer emails which they claim demonstrate Ms. Ahmed's management of the family assets. (*See* Exs. 29-34 to R. Def.'s Opp'n.) The SEC vehemently disputes that Ms. Ahmed in fact managed the family's assets, but the Court need not make this determination given its conclusion, discussed below, that the Court can reach jointly owned assets to satisfy a judgment against Defendant.

A.2d 72, 74 (2006) (recognizing that Connecticut's "legislature's intent [is] to allow a judgment creditor to execute against all forms of a judgment debtor's assets" and therefore a creditor is "entitled to reach any property in which the judgment debtor had a cognizable interest" including the full amount of funds held in a joint account.)

In sum, Relief Defendants have not established ownership over any of the assets they identified on their Schedule A. Accordingly, the SEC may collect against all of the assets listed on the Asset Schdule.

### 4. *Assets Defendants Claim Oak Already Recovered from Mr. Ahmed*

Relief Defendants maintain that any disgorgement ordered to compensate Mr. Ahmed's alleged victims must be offset by the carried interest, which Oak has already taken, and by other assets belonging to Defendant that Oak holds, including capital contributions and K-1 distributions that Oak has seized or withheld. The SEC disagrees, citing contract provisions which provide that upon being terminated for cause, Defendant forfeited many of his interests relating to the Oak Funds, thus justifying the SEC's listing these assets as having a current value of $0 in the Asset Schedule.

The Ames declaration explains, and the contracts substantiate, that Defendant was forced to forfeit his interests in the General Partners, but retained the portion of his Class B membership interests in each of the Limited Partners that had vested by March 31, 2015 (while forfeiting the unvested portion of such membership interests).[23] (2018 Ames Decl. ¶¶ 7-9, 14-17.) Specifically,

---

[23] The SEC's Asset Schedule accounts for these frozen distributions which it agrees belong to Defendant. (*See* Asset Schedule at 2, entry # 36.) The vested portion of Mr. Ahmed's interests in the Limited Partners totals $683,172.00—$525,297.00 for 2015, $4,769.00 for 2016, and $153,106.00 for 2017. (2018 Ames Decl. [Doc. # 890] ¶ 20.)

Ms. Ames asserts that "in contrast to his interests in the Limited Partners, Mr. Ahmed's interests in the General Partners were not converted into Class B memberships" and "[i]nstead, because Mr. Ahmed was terminated for "Disabling Conduct", he was removed as a member of each of the General Partners and forfeited, for no consideration, the entirety of each of his interests in each of the General Partners." (*Id.* ¶ 15.)

Defendant concedes that the Oak Associates XIII-A, LLC operating agreement stipulated that on removal for cause or disabling conduct, all of a member's membership interest would be forfeited, but insists that this is the only agreement which so stipulated. (Def.'s Opp'n at 23.) However, the contracts support Ms. Ames' declaration—each General Partners contract including amendments thereto, specifies that "any Member who is removed by reason of having engaged in Disabling Conduct shall forfeit for no consideration such Member's entire membership interest, Percentage Interest and Capital Account and shall not become, or shall cease to be, as applicable, a Class B Member." (*See* Ex. J (Amendment to Oak Associates X, LLC Operating Agreement) to Ames' Decl. [Doc. # 890-10] ¶ 14; Ex. L (Amendment to Oak Associates XI, LLC Operating Agreement) to *id.* [Doc. # 890-12] ¶ 14; Ex. N (Amendment to Oak Associates XII, LLC Operating Agreement) to *id.* [Doc. #890-14] ¶ 14; Ex. O (Operating Agreement of Oak Associates XIII, LLC) to *id.* [Doc. #890-15] ¶ 7.4(a).)

Defendants do not dispute that Mr. Ahmed was terminated for "Disabling Conduct." Therefore, based on the language in the contracts, it is clear that Defendant forfeited his rights to any carried interest,[24] capital contributions, or K-1 distributions from Oak Management Corporation, and accordingly they are appropriately assigned no value by the SEC.

---

[24] Ms. Ames explains that "Mr. Ahmed's ownership interests in the General Partners . . . provided for participation in the performance of the Oak Funds in which such General Partners

Contrary to Relief Defendants' contention, this will not result in a double recovery by the Oak Funds because these forfeited interests are not ill-gotten gains that Oak is recovering from Defendant at all, but rather were sacrificed by Defendants upon his termination for "Disabling Conduct." Thus, Defendants' reliance on *SEC v. Penn,* 2017 WL 5515855, at *4 (S.D.N.Y. Aug. 22, 2017) for the proposition that the amount of disgorgement must be offset by the forfeited carried interest in the fund is misplaced. Because the *Penn* court reasoned that the defendant "is not required to disgorge amounts that he has already repaid [to the fund,]" it ordered an evidentiary hearing to determine what, if any, value was received by the fund from Penn's forfeiture. But, unlike in this case, Penn had a right to this "carried interest" prior to the criminal court forfeiting the asset. *Id.* Consequently, the Oak Funds here have not recovered from Mr. Ahmed by withholding and/or seizing his forfeited interests, and there is no resulting double recovery. *Cf. SEC v. Levin,* 849 F.3d 995, 1007 (11th Cir. 2017) ("[I]f any investor does ultimately recover from Levin, then Levin could petition the court for a reduction in the disgorgement award because the recovery would constitute a partial return of Levin's ill-gotten gains.").

## D. Appointment of a Receiver and Establishment of a Fair Fund

The authority of the district court to appoint a receiver to marshal, collect, and maintain assets, including judgments, with a view to distribution is well-established and appropriate where necessary to effectuate the purposes of the securities laws. *See, e.g., SEC v. Manor Nursing Centers,* 458 F.2d 1082, 1105 (2d Cir. 1972); *SEC v. Investors Security Corp., et al.,* 560 F.2d 561, 567 (3d Cir. 1977) (appointment of a receiver is an appropriate exercise of power and discretion of a district

---

invested on a basis comparable to other investors in the Oak Funds, which includes payment to the General Partner of a 'carried interest.'" (2018 Ames Decl. ¶ 13.)

court). The SEC requests that a receiver be appointed to take control of all Defendant's assets, held in his name and the name of nominees, with the goal of repatriating the assets to victims. Plaintiff suggests that a receiver is necessary to oversee the sale of illiquid (and difficult to value) assets. Defendants protest that a receivership is not necessary here, arguing that since there is only one victim, Oak, there is no need to appoint a receiver to sort through competing claims, and that appointing a receiver would also result in unneeded costs.[25]

It will likely be necessary to appoint a receiver to hold the currently frozen funds and who will then effectuate a mechanism for distribution of assets to victims in accordance with this Ruling. The receiver would then ensure the return of any frozen assets to Defendant in excess of the amount required to satisfy the judgment against him. The appointment and scope of the receiver's duties will be determined post judgment. The SEC may submit a proposed receivership order for consideration by the Court.

Moreover, the SEC requests that the Court place Defendant's assets into a Fair Fund to compensate the victims of his fraud. A "fair fund for investors" is provided for by law:

> If, in any judicial or administrative action brought by the Commission under the securities laws, the Commission obtains a civil penalty against any person for a violation of such laws, or such person agrees, in settlement of any such action, to such civil penalty, the amount of such civil penalty shall, on the motion or at the direction of the Commission, be added to and become part of a disgorgement fund or other fund established for the benefit of the victims of such violation.

---

[25] Defendants' argument that the appointment of a receiver is a "drastic remedy" to be imposed "only where no lesser relief will be effective" carries little weight here, since the cases they rely upon deal with appointing a receiver during the pendency of litigation, where liability is still not established, as opposed to here where the receiver's role would be to effectuate collection of a judgment after liability has been found. *See e.g.*, *Ferguson v. Tabah*, 288 F.2d 665, 674 (2d Cir. 1961); *Commodity Futures Trading Comm. v. Comvest Trading Corp.*, 481 F. Supp. 438, 441 (D. Mass. 1979).

15 U.S.C. § 7246(a). Thus, a Fair Fund affords "the SEC . . . flexibility by permitting it to distribute civil penalties among defrauded investors by adding the civil penalties to the disgorgement fund." *Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC*, 467 F.3d 73, 82 (2d Cir. 2006). The SEC claims that because Defendant's fraud was long-running and concealed, and netted him more than he will be ordered to disgorge, a Fair Fund is especially appropriate.[26]

The Court recognizes that a Fair Fund may be a useful vehicle to make any distributions of civil penalties to victims, if appropriate, but at this juncture is not sufficiently informed such that it can understand how this would function in the context of this case. The parties will be given an opportunity post-judgment to address the propriety and necessity of establishing a Fair Fund under these facts and circumstances.

### III. Conclusion

For the foregoing reasons, the SEC's Motion for Remedy and Judgment is GRANTED with modification, for a total of $62,920,639.00 plus prejudgment interest for the period of time prior to the asset freeze,[27] and all interest and gains returned on the frozen assets during the pendency of the freeze. This total includes disgorgement of $41,920,639.00 and a civil penalty of $21,000,000.00 million. All of the assets listed on the SEC's Asset Schedule, which are currently frozen, are available to satisfy this judgment against Defendant. Moreover, Defendant is permanently enjoined from violating Section 17(a) of the Securities Act (15 U.S.C. § 77q(a)),

---

[26] The only argument regarding the Fair Fund made by Relief Defendants is that one may only be created with assets that fall within Section 2462's five-year statute of limitations, but the regulations to which they cite do not so provide. *See* 17 C.F.R. §§ 201.1100, 201.1102(b).

[27] The SEC's revised calculation, discussed above at footnote 6, shall be provided no later than three days from the date of this Ruling.

Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 thereunder (17 C.F.R. § 240.10b-5), and Sections 206(1), 206(2), 206(3), and 206(4) of the Advisers Act (15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(3)) and Rule 206(4)-8 thereunder (17 C.F.R. § 275.206(4)-8).[28]

IT IS SO ORDERED.

/s/

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 6 day of September 2018.

---

[28] The SEC shall file a proposed Order of Final Judgment within seven days of the date of this Ruling.