**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>IFTIKAR AHMED<br><br>　　　　　Defendant, and<br><br>and<br><br>IFTIKAR ALI AHMED SOLE PROP; I-CUBED DOMAINS, LLC; SHALINI AHMED; SHALINI AHMED 2014 GRANTOR RETAINED ANNUITY TRUST; DIYA HOLDINGS LLC; DIYA REAL HOLDINGS, LLC; I.I. 1, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; I.I. 2, a minor child, by and through his next friends, IFTIKAR and SHALINI AHMED, his parents; I.I. 3, a minor child, by and through his next friends, IFTIKAR and SHALINI AHMED, his parents<br><br>　　　　　Relief Defendants. | Civil Action No.<br>3:15-cv-675-JBA |

**FIRST INTERIM APPLICATION FOR PROFESIONAL FEES AND EXPENSES**
**INCURRED BY THE RECEIVER AND HIS PROFESSIONALS**

　　　　Jed Horwitt, Esq. (the "Receiver"), as the Receiver appointed by this Court pursuant to the

Order Appointing Receiver [Doc. No. 1070] (the "Appointment Order"), by and through his

undersigned counsel Zeisler & Zeisler, P.C. ("Z&Z"), respectfully submits this first interim

application (the "First Application") for professional fees and expenses incurred by the Receiver

and Z&Z on behalf of the Receivership Estate during the period commencing upon his

appointment on December 20, 2018, through and including March 31, 2019 (the "Compensation

Period"). In advance of its filing, and pursuant to paragraph 35 of the Appointment Order, on April 15, 2019, the Receiver served upon counsel for the Securities and Exchange Commission (the "Commission"), the Defendant, and counsel for the Relief Defendants a complete copy of the First Application, together with all exhibits and relevant billing information.[1] The Commission has expressed that it does not oppose the relief requested in this First Application. The Defendant and counsel for the Relief Defendants have not expressed a position as to this First Application. In support of this First Application, the Receiver and Z&Z respectfully represent as follows:

I.      **SUMMARY OF PROFESSIONAL FEES AND EXPENSES REQUESTED**

1.      This First Application is prepared in accordance with the Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission (the "SEC Guidelines") and the Appointment Order.

2.      Pursuant to the SEC Guidelines, the undersigned attaches the following exhibits to this First Application:

a.      The completed Standardized Fund Accounting Report ("SFAR"), in the form prescribed by the SEC Guidelines, and certified by Receiver, as **Exhibit A**;[2]

b.      A Certification of Compliance with the Receivership Guidelines as **Exhibit B**;

c.      A summary of total expenses for which reimbursement is sought as **Exhibit C**; and

d.      Time records summarizing the work performed by legal professionals and paraprofessionals, for each of the five Activity Categories (as hereinafter defined), as **Exhibit D-1**, **D-2**, **D-3**, **D-4**, and **D-5**.

---

[1] The version of the First Application served on April 15, 2019, did not fully reflect the 25% fee discount. On April 22, 2019, the Receiver served a revised copy of the First Application that reflected the entire 25% fee discount. Beyond the downward revision in the fee amounts, there were no material changes between the draft circulated on April 15 and the draft circulated on April 22.

[2] The amounts stated in Exhibit A represent the total income and expenses in the Receivership Account, which include income and expenses attributable to Ku Yong Bae by way of his interest in the Essell Entities, as defined below.

3.      The Receiver and Z&Z attorneys and paraprofessionals have expended a total of 646.30 hours working on this matter during the Compensation Period.  The Receiver and Z&Z seek allowance of compensation of services rendered during the Compensation Period on behalf of the Receivership Estate in the amount of $157,547.50 in professional and paraprofessional fees, $5,425.00 in Receiver fees, and reimbursement of actual and necessary expenses in the amount of $3,307.38.

4.      The Receiver and Z&Z acknowledge that their fee compensation is subject to a twenty percent (20%) holdback, pursuant to the SEC Guidelines and the Appointment Order.

5.      The fees assessed reflect the hours worked by the Receiver and Z&Z attorneys and paraprofessionals, and the hourly rates applicable at the time that they rendered their services, as modified by the significant discounts provided by the Receiver and Z&Z (described below).

6.      These amounts also take into account all relevant circumstances and factors as set forth in the Connecticut Rules of Professional Conduct and the SEC Guidelines, including the nature of the services performed, the amount of time spent, the experience and ability of the professionals and paraprofessionals working on this engagement, the novelty and complexity of the specific issues involved, the time limitations imposed by the circumstances, and the responsibilities undertaken by the Receiver and Z&Z under the Appointment Order.

7.      A narrative description of the particular services provided is included in the attached time records (Ex. D-1 through D-5) and a summary of the Receiver's administration of the Receivership Estate since his appointment is set forth in Section IV below.

8.      The expense reimbursements requested principally consist of: (i) PACER charges for accessing electronic documents; (ii) copying and printing charges; (iii) online research; (iv) shipping charges; and, (v) other routine expenses. (*See* Ex. C.)

9. The Receiver and Z&Z have not sought reimbursement for secretarial, word processing, proofreading or document preparation expenses (other than by professionals or paraprofessionals), data processing and other staff services (exclusive of paraprofessional services), or clerical overtime.

10. The Receiver and Z&Z have complied with the SEC Guidelines' internal photocopying rates as follows: $0.15 per page for black and white and $1.00 per page for color copies.

A. **Public Service Discounts**

11. As proposed by the Receiver as part of his application for selection as receiver submitted to the Commission, and as provided in the Appointment Order, the Receiver and Z&Z have consented to and implemented substantial public service discounts with respect to their billing rates for services provided in this proceeding.

12. More specifically, and as shown in the fee schedules set forth below, Z&Z has consented to and applied a 25% public service discount to its regularly applicable hourly rates for all legal professionals and paraprofessionals.

13. The Receiver has further discounted his generally applicable hourly rate for services provided when serving primarily in his capacity as Receiver (rather than primarily providing legal services) to $250 per hour, reflecting a nearly 50% discount. Where the Receiver provided primarily legal services, the 25% discount applies. Note that, pursuant to paragraph 34 of the Appointment Order, the Receiver's time for legal work is to be billed at $396.00 per hour. However, this rate only reflects a 20% discount from the Receiver's standard hourly rate. To remedy this oversight, this First Application (and all subsequent applications) will reflect a 25%

4

discount from for the Receiver's standard hourly rate for legal work, consistent with all other Z&Z attorneys and staff.

**B.**   **Fee Schedules**

14.   The fee schedule for the Receiver, showing: his name; the hourly rate applied to his services in this proceeding and his customary hourly rate; the discount reflected in the applied hourly rate; the number of hours of services performed in the Compensation Period; the amount billed for such services in the Compensation Period; and the amount of the discount to his services during the Compensation Period; is as follows:

| Receiver | Rate (Cust. Rate) | Rate Disc. | Hours | Amt. Billed | Amt. Disc. |
|---|---|---|---|---|---|
| Horwitt, Jed | $250.00 ($495.00) | $245.00 | 21.70 | $5,425.00 | $5,316.50 |

15.   The fee schedule for all Z&Z legal professionals who provided services during the Compensation Period, showing for each: his or her name; the hourly rate applied to his or her services in this proceeding and his or her customary hourly rate; the discount reflected in the applied hourly rate; the number of hours of services performed in the Compensation Period; the amount billed for such services in the Compensation Period; and the amount of the discount to his or her services during the Compensation Period; is as follows:

| Legal Professional | Rate (Cust. Rate) | Rate Disc. | Hours[3] | Amt. Billed | Amt. Disc. |
|---|---|---|---|---|---|
| Horwitt, Jed | $371 ($495) | $124 | 96.90 | $35,949.90 | $12,015.60 |
| Kindseth, Stephen | $337 ($450) | $113 | 151.40 | $46,270.10 | $21,859.20 |
| Blau, Christopher | $225 ($300) | $75 | 290.10 | $63,675.00 | $23,355.00 |
| Romney, Aaron | $318 ($425) | $107 | 0.20 | $63.60 | $21.40 |
| Moriarty, James | $315 ($420) | $105 | 0.50 | $157.50 | $52.50 |
| Vaughan, Rion | $225 ($300) | $75 | 3.20 | $540.00 | $420.00 |

16.   The fee schedule for the legal paraprofessionals who provided services during the Compensation Period, showing: their name; the hourly rate applied to their services in this

---

[3] The hours include hours recorded for which no corresponding fee was charged, noted in the attached invoices as "N/C."

proceeding and her customary hourly rate; the discount reflected in the applied hourly rate; the number of hours of services performed in the Compensation Period; the amount billed for such services in the Compensation Period; and the amount of the discount to their services during the Compensation Period; is as follows:

| Paraprofessional | Rate (Cust. Rate) | Rate Disc. | Hours | Amt. Billed | Amt. Disc. |
|---|---|---|---|---|---|
| Accurso, Deborah | $142 ($190) | $48 | 69.0 | $9,798.00 | $3,312.00 |
| O'Brien, Barbara | $142 ($190) | $48 | 0.70 | $99.40 | $33.60 |
| Joseph, Kristin | $142 ($190) | $48 | 5.50 | $781.00 | $264.00 |
| Accurso, Ian | $142 ($190) | $48 | 1.50 | $213.00 | $72.00 |

### C.   Activity Categories

17.   Pursuant to the SEC Guidelines, the Receiver and Z&Z utilized the following activity categories (the "Activity Categories") under which the following fees were incurred during the Compensation Period:

a.   Case Administration, 298.30 hours, $81,696.40 (*see* Ex. D-1);

b.   Asset Analysis & Recovery, 281.00 hours, $64,146.00 (*see* Ex. D-2);

c.   Asset Disposition, 15.20 hours, $4,046.40 (*see* Ex. D-3);

d.   Claims Administration & Objections, 30.10 hours, $7,658.50 (*see* Ex. D-4) and

e.   Receiver Activity, 21.70 hours, $5,425.00 (*see* Ex. D-5).

## II.   NATURE OF THE PROCEEDINGS

### A.   Underlying Procedural History

18.   On May 6, 2015, the Commission commenced this civil action by filing its Complaint [Doc. No. 1] against the Defendant. Subsequently, on June 16, 2015, the Commission filed an Amended Complaint [Doc. No. 33] naming the Relief Defendants in addition to the Defendant and, on April 1, 2016, the Commission filed a Second Amended Complaint [Doc. No. 208] in which it amended its claims against the Defendant and Relief Defendants.

19.     The Commission claimed that the Defendant "violated Section 10(b) of the Securities Exchange Act of 1934… and Rule 10b-5 (Count One), Section 17(a) of the Securities Act of 1933 …, and Section 206 of the Investment Advisers Act…." *SEC* v. *Ahmed*, 308 F. Sup. 3d 628, 636 (D. Conn. 2018). The Commission alleged that these violations arose out of the Defendant's use of "fraudulent and deceptive means to divert" millions of dollars "from funds he advised while employed by venture capital firm Oak Investment Partners ("Oak") into his personal bank accounts, before funneling much of his ill-gotten gains into assets and accounts in the name of his wife [("Mrs. Ahmed")] in order to conceal his fraud and protect the assets from confiscation." *Id*.

20.     The Defendant and the Relief Defendants did not dispute that the alleged fraud took place, but contended that the Defendant should not be liable "because (1) certain fraudulent acts are time-barred by the statute of limitations, (2) the fraud was not sufficiently connected to securities transactions, and (3) the underlying securities transactions are not sufficiently domestic to be within the reach of the United States securities laws." *Id*. at 637.

21.     Ultimately, on December 14, 2018, the Court entered an Amended Final Judgment [Doc. No. 1054] (the "Amended Final Judgment") against the Defendant and Relief Defendants and in favor of the Commission. The Amended Final Judgment, *inter alia*, ordered the Defendant to disgorge $41,920,639.00 "together with prejudgment interest thereon in the amount of $1,491,064.01 and any interest or gains accrued on disgorged frozen assets from the date of the Court's freeze order [described below]" and imposed a civil penalty in the amount of $21,000,000.00 (collectively, plus all other amounts due on account thereof, the "Judgment"). *Id*. at 2, 4.

7

22.     The Defendant filed a Motion to Alter or Amend the Amended Final Judgment Pursuant to Fed. R. Civ. P. 59(e) [Doc. No. 1086] on January 11, 2019 (the "January 2019 Motion to Alter or Amend"), which is presently pending.

23.     After multiple Notices of Appeal filed by the Defendant and Relief Defendants, the United States Court of Appeals for the Second Circuit, at Doc. No. 1111, denied the request to stay the judgment pending appeal and denied the request to vacate or stay the Court's order appointing a receiver, described below. The matter is presently stayed, in limited part, pending resolution of Defendant's January 2019 Motion to Alter or Amend. Specifically, "judgment in this case has been stayed only insofar as no assets will be distributed in satisfaction of the judgment while appeals are pending." (Appointment Order, at 1.)

### B.      The Asset Freeze

24.     On May 6, 2015, the same day that it filed its initial Complaint against the Defendant, the Commission filed an Emergency Motion for an *Ex Parte* Temporary Restraining Order Freezing Assets and Providing Other Ancillary Relief and for a Preliminary Injunction [Doc. No. 2] (the "TRO Motion").

25.     On May 7, 2015, the Court granted the TRO Motion and, *inter alia*, froze certain assets held by or under the direct or indirect control of the Defendant and Relief Defendant I-Cubed Domains, LLC ("I-Cubed"). (Doc. No. 9.)

26.     After the Court's August 12, 2015, Ruling and Order Granting Preliminary Injunction [Doc. No. 113], and after the asset freeze entered by the same was modified from time to time, the Court issued its Order on Defendant's Motions for Modification of the Asset Freeze Order to Release Funds for His Legal Defense and for a Stay in Light of *Kokesh* [Doc. No. 829] (the "Operative Freeze Order") in which the Court froze "[t]he assets, funds, or other property held

by or under the direct or indirect control of Defendant and Relief Defendants, whether held in any of their names or for their direct or indirect beneficial interest, wherever located, up to the amount of $89,000,000." *Id*. at 5. The Amended Final Judgment, at paragraph 7, provides a schedule of assets included in the freeze that "are available to satisfy" the Judgment.

27.     The Operative Freeze Order was subsequently modified from time to time to release funds from the asset freeze to pay for various routine expenses incurred by assets of the Receivership Estate and the parties to the action.

**C.     Appointment of the Receiver**

28.     On May 29, 2018, the Commission filed its Motion for Remedies and Judgment [Doc. No. 886] seeking, *inter alia*, the appointment of a receiver.

29.     Following a telephonic conference on November 9, 2018, and a hearing held on November 28, 2018, the Court issued the Appointment Order on December 20, 2018, and thereby appointed Jed Horwitt as Receiver and Z&Z as his counsel.

30.     The Appointment Order provides that the Receiver shall control the operation of the Receivership Estate, which "includes all assets subject to the Court's asset freeze order… as modified throughout this litigation." (Appointment Order, at 6.) Among other powers and duties, the Appointment Order directed the Receiver to:

> [M]anage, in consultation with qualified business advisors, and taking into consideration the wishes of Defendant and Relief Defendants, and with the dual objects of maximizing the realizable value of the assets of the Receivership Estate and minimizing the expense charged thereto, the assets of the Receivership Estate, pending further order of the Court or until such time that the Receivership Estate can be liquidated or modified, including but not limited to management of investments and rental and maintenance of real property[.]

(Appointment Order, at 7.)

31.     The Appointment Order provides that the goal of the receivership, in part, is to "value the frozen assets[,] avoid over-freezing, [] secure the judgment for the [Commission], [and] manage and maximize the value of the frozen assets…." (Appointment Order, at 5.)

32.     Consistent with these principles, the Receiver was directed to:

> [F]ile and serve a report reflecting… (i) the existence, value, and location of assets of the Receivership Funds and all other assets of the Receivership Estate which are liquid or could be liquidated with relative ease, including but not limited to publicly traded securities and brokerage accounts; (ii) the Receiver's proposal for securing the judgment using additional assets of the Receivership Estate, including the Receiver's recommendations as to which additional assets should be valued for possible liquidation and placement into a Court Registry Investment System ("CRIS") account and the order in which the Receiver proposes to liquidate such assets; and (iii) the Receiver's estimate regarding the dollar amount which should ultimately be placed into such account to fully secure the judgment, taking into consideration the amount of the judgment in this case, the costs of the receivership and administration of the Receivership Estate, and any other relevant factors.

(Appointment Order, at 14-15.)

33.     The Receiver filed the Report of Receiver on April 3, 2019 [Doc. No. 1130]. Consistent with the Appointment Order, the Receiver identified those particular assets "which are liquid or could be liquidated with relative ease" and such additional assets proposed to be liquidated as necessary to secure the Judgment. The Receiver also provided in his Report of Receiver his estimate regarding "the amount of the judgment in this case, the costs of the receivership and administration of the Receivership Estate, and any other relevant factors."

34.     The Receiver's additional activities under the Appointment Order during the Compensation Period are summarized below in Section IV.

## III.     <u>SUMMARY OF CASH ON HAND</u>

35.     The Appointment Order, at paragraph 26, directed the Receiver to create a deposit account (the "Receivership Account"), which the Receiver did shortly after his appointment.

36.     Beyond cash held in bank accounts subject to the Operative Freeze Order that fall within the Receivership Estate as more fully detailed below in Section V, all of the Receiver's cash on hand is in the Receivership Account. As of March 31, 2019, the balance of the Receivership Account was $904,402.82.

## IV.    SUMMARY OF RECEIVER'S ADMINISTRATION OF THE ESTATE

37.     Since his appointment, the Receiver has undertaken numerous steps and made progress towards fulfilling his duties required of him under the Appointment Order.

38.     Among other things, the Receiver, utilizing Z&Z as his legal professionals, has undertaken and accomplished the following:

### A.    Consultation and Discussions with the Commission, Defendant, Relief Defendants, and Other Concerned Parties

39.     The Receiver and Z&Z attorneys analyzed the declarations provided by the Defendant [Doc. No. 1090] (the "Defendant's Declaration") and the Relief Defendants [Doc. No. 1091] (the "Relief Defendants' Declaration"), filed with the Court pursuant to paragraph 7 of the Appointment Order, concerning the identity and location of all assets of the Receivership Estate (the "Receivership Assets") and the individuals who may possess information about such assets. The information provided in the Defendant's Declaration and the Relief Defendant's Declaration is being used by the Receiver in his investigation of Receivership Assets and his ongoing general management of the Receivership Estate.

40.     On January 17, 2019, Z&Z attorneys, as counsel to the Receiver, had a lengthy and productive in-person meeting with: Mrs. Ahmed and her counsel; Daniel Johnson in his capacity as trustee of the Iftikar A. Ahmed Family Trust and custodian of the UTMA accounts that fall

11

within the Receivership Estate and his counsel; and, the Defendant (who participated telephonically). This meeting provided the Receiver with valuable information concerning Receivership Assets and other issues germane to the management and liquidation of the Receivership Estate. In addition to this meeting, counsel to the Receiver has had regular contact with the Defendant and counsel to the Relief Defendants regarding the nature of various Receivership Assets as well as ongoing, routine matters relating to the management of the Receivership Estate.

41.     Similarly, despite the lapse in appropriations for the Federal Government that impacted the Commission from December 22, 2018, to January 25, 2019, the Receiver and his counsel had multiple discussions with counsel for the Commission concerning the Receivership Estate and information regarding Receivership Assets. Since the Federal Government restored the Commission's funding, the Receiver and his counsel have been in regular contact with counsel for the Commission regarding the Receivership Estate.

42.     Additionally, following the issuance of the Notice of Receivership described in Section IV.B below, the Receiver's counsel has had multiple telephone calls and exchanged multiple correspondence with Ku Yong Bae, who holds an interest in The Essell Group, LLC ("Essell Group, LLC") and The Essell Farms, LLC ("Essell Farms, LLC" and, with Essell Group, LLC, the "Essell Entities"), and his representatives concerning the management of these entities reflective of Mr. Ku's interest therein. As part of these interactions with Mr. Ku and his representatives, the Receiver and his counsel answered questions regarding the receivership proceeding and otherwise kept Mr. Ku apprised of developments that concerned his interests in the Essell Entities.

43.     Through the above-described meetings and discussions, the Receiver and his counsel have obtained substantial and critical information concerning the existence, value, and location of Receivership Assets. Likewise, such interactions have facilitated the Receiver's management of the Receivership Estate in consultation with the Defendant and Relief Defendants pursuant to the Appointment Order. All parties, including the Commission, the Defendant, the Relief Defendants, Mr. Johnson, and Mr. Ku have been cooperative in answering questions and providing information to the Receiver.

**B.      Notices of Receivership, Section 754 Filing, and Further Information Collection from Knowledgeable Parties**

44.     To obtain additional information concerning Receivership Assets, and pursuant to paragraph 16 of the Appointment Order, the Receiver gave notice of his appointment (the "Notice of Receivership" or "Notices of Receivership") to all known persons and entities who have possession, custody, or control of Receivership Assets and to all known persons with information concerning Receivership Assets (collectively, "Knowledgeable Parties"). The Notice of Receivership included a copy of the Appointment Order, emphasized the most germane provisions of the Appointment Order, and requested that the recipient contact Z&Z to discuss compliance with the Appointment Order.

45.     The vast majority of Receivership Assets, and an even higher proportion of assets that the Receiver believes at this time to be necessary to secure the Judgment, are either in the District of Connecticut or the Southern District of New York. Therefore, the Receiver filed a Notice of Order Appointing Jed Horwitt, Esq. as Receiver Pursuant to 28 U.S.C. § 754 (a "Section 754 Notice") on December 28, 2018, in the Southern District of New York. (*See* Case Number 1:18-mc-00609.) To date, the Receiver has not needed to rely on or otherwise reference the Section 754 Notice filed in the Southern District of New York for any purpose. Should additional Section

754 Notices be ultimately necessary, the Receiver will take all required and appropriate steps to effectuate the filing of the same in the relevant district(s).

46.     The Knowledgeable Parties, after receiving Notices of Receivership, provided information and documentation to the Receiver concerning the specific Receivership Asset(s) for which each party had knowledge of or exercised possession, custody, or control over. Where appropriate, such documentation included statements of the type required by paragraph 14(c) of the Appointment Order. Likewise, where appropriate, such documentation included partnership agreements, operating agreements, and other materials concerning the liquidity of potentially-illiquid assets. Furthermore, the Receiver obtained documentation concerning the forfeiture of Receivership Assets held by Oak and Oak HC/FT.

47.     Where necessary and appropriate in the Receiver's view to carry out his obligations under the Appointment Order, the Receiver and his counsel exchanged additional correspondence and participated in telephone discussions with Knowledgeable Parties or their counsel to collect further information regarding the Receivership Assets that would permit the Receiver to execute his Court-ordered duties.

48.     Through the process described above in Sections IV.A and IV.B (the "Information Collection Process"), the Receiver collected detailed information concerning the existence, value, and location of Receivership Assets that are in the form of cash and marketable securities ("Receivership Cash and Securities") directly from the financial institutions and other entities with such information. Additionally, and in furtherance of the Appointment Order's directive to maximize the realizable value of the assets of the Receivership Estate and minimize the expense charged thereto, Z&Z conducted a preliminary, internal review of the accounts holding the Receivership Cash and Securities to confirm that all transactions occurring during asset freeze had

14

Court approval. This preliminary review yielded one suspect transaction – $10,500 was withdrawn from Chase Bank x9065 (SEC No. 43)[4] on May 8, 2015, shortly after the temporary restraining order issued – and a small number of deposits into bank accounts subject to the asset freeze. The Receiver may propose to utilize FTI Consulting, Inc. ("FTI") to complete a formal forensic analysis of such transactions should the same be necessary in connection with securing the Judgment or as otherwise ordered by the Court.

49.     Also through the Information Collection Process, the Receiver confirmed the existence and location of various real estate assets within the Receivership Estate, including Apartment 12A and Apartment 12F located at 530 Park Avenue in New York, NY[5] ("Apartment 12A" and "Apartment 12F") and certain property located at 1820 County Route 7 in Ancram, NY[6] ("1820 County Route 7" and, collectively with Apartment 12A and Apartment 12F, "Receivership Real Estate"). The Receiver and a paraprofessional at Z&Z visited 1820 County Route 7 on two separate occasions in connection with gathering information about and otherwise managing and protecting the property. With respect to the value of the Receivership Real Estate, and as more fully described in the Report of Receiver, the Receiver proposes to sell Apartment 12A and Apartment 12F with the assistance of a broker and, at this time, contemplates a listing price of $8.2 million and $8.0 million, respectively. Furthermore, at this time it does not appear that the Receiver will need to liquidate 1820 Country Route 7 to secure the Judgment and, as such, the Receiver is not presently intending to obtain a broker's opinion or formal written appraisal report for the property.

---

[4] "SEC No." refers to the unique asset-identifier number provided in Doc. No. 888-1 and is provided for ease of reference to the Court and the parties.
[5] SEC Nos. 63 and 66, respectively.
[6] SEC No. 18.

50.     Additionally, through the Information Collection Process, the Receiver gained information concerning the privately-held investments that fall within the Receivership Estate (the "Receivership Private Investments"). In connection with this endeavor, the Receiver engaged in multiple, detailed discussions and written correspondence with individuals associated with these privately-held entities and reviewed hundreds of pages of documentation produced by the same. The Receiver obtained information sufficient to conduct a preliminary analysis as to the liquidity and approximate value of the Receivership Private Investments. Because, at this time, it appears that (i) the Judgment can be fully secured without liquidating any of the Receivership Private Investments, and (ii) the Receivership Private Investments presented significant liquidation challenges (including legal disputes, substantial delays, and additional expenses), the Receiver elected not to incur the time and expense necessary determine the liquidity and more precisely estimate the realizable value of the Receivership Private Investments. Should it become necessary, or should the Court so direct, the Receiver shall seek to engage the necessary professionals to perform a more comprehensive analysis as to the liquidity and value of the Receivership Private Investments.

51.     Finally, with respect to personal property within the Receivership Estate ("Receivership Personal Property") the Receiver and his counsel assessed the existence and location of such assets by physically inspecting the same. Specifically, the Receiver conducted an inventory and inspected the contents of a certain storage unit presently held at Morgan Manhattan & Brother in Greenwich, CT (including SEC Nos. 51, 82, 83, and 85). Likewise, the Receiver conducted an inventory and inspected the contents of safe deposit boxes 1325, 1332, and 2465 held at the Bank of America branch in Greenwich, CT (SEC Nos. 52-60).

52.     As part of the inventory process of the Receivership Personal Property, the Receiver confirmed to the extent possible that no individuals obtained physical access to the Receivership Personal Property during the asset freeze without the knowledge of all parties. With the exception of certain gold bars and gold coins, the Receiver does not believe at this time that liquidation of Receivership Personal Property is necessary to secure the Judgment and thus has not proposed a formal valuation or liquidation process of these assets.  Once again, if circumstances change or should this Court direct, the Receiver will, of course, undertake this process. As to the gold bars and gold coins, the Receiver used their weight and the publicly-available spot price of gold to determine the value of those items, as reflected in the Report of Receiver.

**C.     Marshaling and Management of Receivership Assets and the Receivership Estate**

53.     Shortly after his appointment, pursuant to the Appointment Order, the Receiver opened an account at a financial institution experienced in servicing court-appointed receivers (and bankruptcy trustees), the Receivership Account, which holds funds marshaled by the Receiver and constitutes a Receivership Asset.

54.     On January 15, 2019, the Receiver instructed E*Trade to transfer $943,048.36 held in E*Trade account ending x6818 (SEC No. 1) to the Receivership Account. The Receiver required immediate funds to pay expenses incurred by Receivership Assets. As of March 31, 2019, the funds held in the Receivership Account, totaling $904,402.82, represent the remainder of the $943,048.36 after various routine expenses of Receivership Assets ("Routine Receivership Expenses") were paid as authorized and directed by this Court in paragraph 32 of the Appointment Order. During the Compensation Period, such Routine Receivership Expenses consisted of:

| Date | Expense | Amount |
|---|---|---|
| 01/24/2019 | ACE American Insurance Company (policy premium) | $15,578.00 |
| 01/29/2019 | Morgan Manhattan (storage unit fee) | $103.00 |

| 01/29/2019 | Classic Realty LLC (common charges and electric charges for Apartment 12A) | $6,486.16 |
| 01/29/2019 | Classic Realty LLC (common charges and electric charges for Apartment 12F) | $8,170.49 |
| 02/15/2019 | Harris, St. Laurent & Chaudhry LLP (historical Morgan Manhattan storage expenses pursuant to Doc. No. 387) | $1,234.78 |
| 02/28/2019 | Classic Realty LLC (common charges and electric charges for Apartment 12A) | $3,099.03 |
| 02/28/2019 | Classic Realty LLC (common charges and electric charges for Apartment 12F) | $3,977.49 |
| 03/14/2019 | Morgan Manhattan (storage unit fee and viewing fee) | $300.00 |
| | **TOTAL** | $38,948.95 |

55.   In addition to the Routine Receivership Expenses listed above, the Receiver caused $14,018.00 held at Fidelity Investments account ending x7540 (SEC No. 75) to be transferred to AIG Private Client Group to pay premiums for excess liability and homeowners' insurance pursuant to the Court's Order at Doc. No. 1127.

56.   After consulting with the Defendant and Mr. Ku, and to preserve the formalities of the Essell Entities' corporate structure, funds necessary to pay expenses incurred by the Essell Entities were transferred from the Essell Entities' bank accounts to the Receivership Account with the express consent of Mr. Ku and then from the Receivership Account to the person or entity demanding payment. Such payments consisted of:

| Date | Expense | Amount |
| --- | --- | --- |
| 02/25/2019 | Empire Plumbing Services (winterize plumbing system at 1820 Country Rt 7) | $1,054.22 |
| 02/25/2019 | Town Clerk – Ancram (town & county taxes, 2019) | $15,170.24 |
| 02/25/2019 | Herrington Fuels, Inc. (fuel oil for 1820 County Rt 7) | $300.38 |
| 02/25/2019 | Central Hudson Gas & Electric (for 1820 County Rt 7) | $265.28 |
| 03/14/2019 | Central Hudson Gas & Electric (for 1820 County Rt 7) | $62.11 |
| 03/14/2019 | Central Hudson Gas & Electric (for 1820 County Rt 7) | $301.29 |
| 03/18/2019 | Donald Duksa (reimbursement for expenses incurred for 1820 County Rt 7) | $2,300.00 |
| | **TOTAL** | $19,453.52 |

18

57.     Additionally, pursuant to paragraph 5(c) of the Appointment Order, the Receiver has approved three monthly distributions of $8,676.00 representing Mrs. Ahmed's living expenses, each at the request of counsel to the Relief Defendants and under the authority of the Court's May 1, 2018, order [Doc. No. 865]. These funds were transferred directly from Fidelity Investments account ending x7540 (SEC No. 75), with the exception of one monthly transfer that Fidelity Investments erroneously made from the account ending x8965 (SEC No. 74). The Receiver, through counsel, promptly alerted Fidelity Investments to its oversight and the issue has not occurred again.

58.     Likewise, Bank of America ("BoA") erroneously transferred $3,383.52 held in account ending x3831 (SEC No. 62) to Mrs. Ahmed in early March, 2019, in the bank's attempt to comply with the Court's May 1, 2018, order [Doc. No. 865] providing for the monthly distribution of $845.88 for Mrs. Ahmed's health insurance costs. Upon receipt of the funds, Mrs. Ahmed alerted the Receiver's counsel. At the Receiver's direction, Mrs. Ahmed returned the $3,383.52 to the account ending x3831 and the Receiver's counsel instructed BoA to make only those distributions ordered by the Court or directed by the Receiver pursuant to the Appointment Order. To date, BoA has not made the mistake again.

59.     Beyond the above-described disbursements, the Receiver and Z&Z have provided services and Z&Z has advanced reasonable and necessary expenses, for which this First Application seeks compensation and reimbursement. (*See* Ex. C.) Provided that the Court awards the fees and expenses requested in this First Application, these disbursements will be reflected as debits from the Receivership Account on the Receiver's next interim fee application.

D.     **The Report of Receiver and Plan of Liquidation**

60.     Pursuant to paragraph 29 of the Appointment Order and the Court's order granting an extension of time [Doc. No. 1125], the Receiver submitted the Report of Receiver on April 3, 2019 [Doc. No. 1130]. Attached as **Exhibit A** to the Report of Receiver is the Receiver's proposed Plan of Liquidation, detailing the assets that could be liquidated most expeditiously and cost-effectively to fully secure the Judgment.

### E.     Other Receivership Estate Management Activities

61.     The Receiver and his counsel engaged in various other activities during the Compensation Period that were reasonable and necessary in the administration and management of the Receivership Estate. These activities included:

#### i.   Collection of Past-Due Electric Charges and Repairs to Apartment 12F

62.     Apartment 12F is presently occupied by a tenant, who pays rent pursuant to a lease agreement (the "12F Lease") on a monthly basis to DIYA Real Holdings, LLC ("DIYA Real"). The 12F Lease provides that the tenant is also responsible for all electric charges, in addition to monthly rent, which are charged directly to DIYA Real. Despite demand by Mrs. Ahmed and the clear terms of the 12F Lease, the tenant of 12F had not reimbursed DIYA Real for such electric charges during the asset freeze period.

63.     Upon discovering this issue, the Receiver through counsel instructed to pay the past-due electric charges to the Bank of America account ending x7632 (SEC No. 65), held by DIYA Real. The tenant of Apartment 12F made a payment of $7,861.22 on March 9, 2019, reflecting the then-present total of the past-due electric charges. The Receiver will continue to make such demand as is necessary and appropriate under the 12F Lease for reimbursement of the electric charges for Apartment 12F.

64.    Additionally, there was flood on the 13th floor of 530 Park Avenue above the kitchen of Apartment 12F. The ceiling and walls of Apartment 12F suffered damage. Pursuant to the Appointment Order, the Receiver and staff at Z&Z facilitated the necessary repairs and repainting of Apartment 12F following the flood.

ii.    Securing and Protecting 1820 County Route 7

65.    The Receivership Real Estate located at 1820 County Route 7 includes 194 acres of land and multiple buildings, many of which are in poor repair. When the Court appointed the Receiver in December, he and his professionals acted quickly to winterize and otherwise protect 1820 County Route 7 from damage. This included coordinating necessary repairs, arranging for snow removal to allow for the delivery of heating oil, confirmation that the buildings on the property remained heated to avoid broken pipes, and organizing all such activities with Donald Duksa, the individual who was renting the property until recently, and Mr. Ku, who owns 50% of the property through Essell Farms, LLC.

66.    Given the apparent value of 1820 County Route 7, the burden of its management on the Receivership Estate, the anticipated cost and time necessary to market and sell the property, and the fact that liquidation of the property does not presently appear necessary to secure the Judgment, the Receiver intends to file a motion releasing the property from the Receivership Estate in the near future.

iii.    Preliminary Discussions with Professionals

67.    To fulfill his obligations under the Appointment Order, the Receiver and his counsel engaged in multiple discussions with representatives of FTI and Sotheby's International Realty, Inc. ("Sotheby's") in connection with the intended sale of Apartment 12A and Apartment 12F. The Receiver is continuing to research and analyze the best manner in which to sell

Apartment 12A and Apartment 12F consistent with the Appointment Order's directive to maximize value of the Receivership Assets while minimizing expenses charged to the Receivership Estate.

68.    The Receiver also had multiple discussions with FTI relative to potential tax advisory and tax accounting services as well as forensic accounting services that the Receiver may require. These discussions are ongoing.

69.    Finally, the Receiver had discussions with multiple certified professionals with qualifications to conduct an inventory and preliminary valuation of the household furnishings of 505 North Street in Greenwich, CT (SEC No. 39). As the liquidation of such personal property does not appear necessary at this time to secure the Judgment, the Receiver has not yet moved forward or sought to retain such professionals to perform said inventory and valuation.

           iv.  Response to Motions Filed by Non-Parties

70.    During the Compensation Period, NMR e-Tailing, LLC ("NMR") and the Connecticut Commissioner of Revenue Services ("CT Revenue Commissioner") filed motions that required responses from the Receiver. (*See* Doc Nos. 1122, 1115.) Prior to the filing of the Receiver's response to the CT Revenue Commissioner, the Receiver had multiple telephonic conversations with counsel to the CT Revenue Commissioner and counsel to the Relief Defendants concerning the issues raised in the CT Revenue Commissioner's motion.

71.    The Receiver, through his counsel, will continue to respond to court filings as necessary, consistent with the Appointment Order's goal of minimizing expenses charged to the Receivership Estate.

           v.  Responses to Bank of America Noncompliance

72.     Unfortunately, the Receiver encountered repeated issues with BoA's compliance with the Appointment Order during the Compensation Period. Such noncompliance included repeated failures to fully respond to multiple subpoenas issued pursuant to paragraph 5(i) of the Appointment Order, threats to close the safe deposit boxes located at the Greenwich, Connecticut, branch and transfer the assets held therein to an off-site location, mistaken distribution of funds to the Relief Defendants inconsistent with the Court's orders, and a threat to close at least one of the UTMA accounts held by the Relief Defendants.

73.     The Receiver and his counsel were able to resolve these issues without Court-intervention. While such resolution required multiple telephone calls and written correspondence to BoA representatives during the Compensation Period, the Receiver believes the issues were remedied in an appropriate and efficient manner that cost the Receivership Estate the least amount of professional fees as possible.

vi.   Tax Analysis

74.     In light of the nature of the Receivership Estate and complex tax regulations applicable to individuals and entities whose property is in full or partial control of the Receiver, the Receiver and his counsel spent a significant amount of time researching and analyzing issues relating to the tax obligations of the Receiver and Receivership Estate. *See*, *e.g.*, 26 U.S.C. § 6012; 26 C.F.R. § 1.641(b)-2; 26 C.F.R. § 1.6012-3; Regulations of Connecticut State Agencies § 12-740-3. Due to the potential impact of the Receivership Estate's tax obligations on the ability of the Receiver to liquidate sufficient funds to fully secure the Judgment, including the potential that tax obligations may have priority in some circumstances over the Commission's judgment and other claims against the Receivership Estate, it was necessary and appropriate for the Receiver and his professionals to fully study and understand this issue. At this time, and following this extensive

analysis, the Receiver and his counsel have concluded that he is not required to submit separate tax returns for the Defendant or the Relief Defendants.

###### F.    **Anticipated Closure**

75.     At this time, it is premature for the Receiver to speculate as to precisely when this receivership proceeding will be ready to close.

76.     As stated in the Report of Receiver, and subject to further orders of the Court, the Receiver believes that a majority of the amount necessary to secure the Judgment can be liquidated and transferred into the CRIS account on or before July 1, 2019. Pursuant to the Receiver's Plan of Liquidation, the Receiver believes that Apartment 12A and Apartment 12F will also need to be liquidated to fully secure the Judgment. The Receiver does not know how long it will take to sell those properties, but he will undertake all reasonable and appropriate efforts necessary to maximize value in the shortest amount of time necessary.

77.     In the Receiver's view, in accordance with the Appointment Order, only after (i) all appeals have been fully adjudicated, (ii) if and to the extent the Judgment is affirmed on appeal, distributions are made to satisfy the Judgment, and (iii) all costs of the administration of the receivership are paid, can the receivership be appropriately closed.

### V.    **DESCRIPTION OF ASSETS OF THE RECEIVERSHIP ESTATE**

78.      A description of the assets of the Receivership Estate, including approximate or actual valuations and anticipated or proposed dispositions, is attached hereto as **Exhibit E**.

79.     At this time, the Receiver believes it is prudent to maintain the Court's asset freeze over the Receivership Assets to fully secure the Judgment until sufficient assets have been liquidated and the proceeds of such liquidations are deposited in the CRIS account and to pay for the costs of the receivership.

## VI.   SUMMARY OF RECEIVERSHIP ESTATE CLAIMS

80.   The Receiver is not aware of any claims against the Receivership Estate with the exception of (i) the Judgment; (ii) the Receiver and his counsel's fees and expenses; (iii) the likely future claims for fees from professionals retained pursuant to the Appointment Order; and (iv) the ordinary expenses incurred on account of the Receivership Assets (such as real estate taxes, property repairs, and other such routine expenditures).

## VII.   SUMMARY OF THE RECEIVERSHIP ESTATE'S CAUSES OF ACTION

81.   Considering the limited scope of the Receiver's primary duty (to liquidate assets to secure the Judgment) pursuant to the Appointment Order and his perceived ability to accomplish that objective from known assets, the Receiver has not undertaken to identify any causes of action held by the Receivership Estate. Should circumstances change, or should this Court so direct, the Receiver will commence an investigation into potential causes of action held by the Receivership Estate.

## VIII.   THE GOVERNING LEGAL STANDARD

82.   "A receiver appointed by a court who reasonably and diligently discharges his duties is entitled to be fairly compensated for services rendered and expenses incurred." *SEC* v. *Byers*, 2014 U.S. Dist. LEXIS 177180, at *13 (S.D.N.Y. Dec. 23, 2014); *see also Donovan v. Robbins*, 588 F. Supp. 1268, 1272 (N.D. Ill. 1984) ("[T]he receiver diligently and successfully discharged the responsibilities placed upon him by the Court and is entitled to reasonable compensation for his efforts."); *Securities & Exchange Comm'n v. Elliott*, 953 F.2d 1560 (11th Cir. 1992) (receiver is entitled to compensation for faithful performance of his duties.).

83.   "The [D]istrict [C]ourt's award of a receiver's compensation is… firmly within its discretion." *Gaskill* v. *Gordon*, 27 F.3d 248, 253 (7th Cir. 1994) *citing Crites, Inc. v. Prudential*

*Ins. Co.*, 322 U.S. 408, 418, 88 L. Ed. 1356, 64 S. Ct. 1075 (1944). The Court "may consider all of the factors involved in a particular receivership in determining the appropriate fee." *Id.*

84.     The case law and other authority may provide "convenient guidelines," but ultimately "the unique fact situation renders direct reliance on precedent impossible." *Securities & Exchange Comm'n v. W.L. Moody & Co.*, 374 F. Supp. 465, 480 (S.D. Tex. 1974), *aff'd*, 519 F. 2d 1087 (5th Cir. 1975).

85.     In awarding counsel fees in Securities Act receiverships, courts consider "the complexity of problems faced, the benefits to the receivership estate, the quality of the work performed, and the time records presented." *SEC v. Illarramendi*, Docket No. 3:11CV78 (JBA), 2013 U.S. Dist. LEXIS 171950, at *8-9 (D. Conn. Dec. 5, 2013), *quoting Securities & Exchange Comm'n v. Fifth Ave. Coach Lines, Inc.*, 364 F. Supp. 1220, 1222 (S.D.N.Y. 1973); *see also United States v. Code Prods.*, 362 F.2d 669, 673 (3rd Cir. 1966) (court should consider the time, labor and skill required but not necessarily expended, the fair value of such time, labor and skill, the degree of activity, the dispatch with which the work is conducted and the result obtained).

86.     While "results are always relevant," a good result may take a form other than a "bare increase in monetary value." *Elliott*, 953 F.2d at 1577 ("Even though a receiver may not have increased, or prevented a decrease in, the value of the collateral, if a receiver reasonably and diligently discharges his duties, he is entitled to compensation"). Overall results can be determined only at the conclusion of the Receivership Proceeding.

87.     Another "basic consideration is the nature and complexity of the legal problems confronted and the skill necessary to resolve them." *Moody*, 374 F. Supp. at 485. Moreover, "[t]ime spent cannot be ignored." *Id.* at 483.

88.     Finally, and particularly relevant here, the Receiver submits that the extent of fees and expenses incurred for the first Compensation Period of the receivership will not necessarily correspond to future applications due to the extent of initial start-up work required to secure and investigate the assets and submit the Report of Receiver.  *See Gordon v. Dadante*, 2008 WL 1805787 at *11 (N.D. Ohio, 2008) (recognizing that as is "common in cases of this nature [receiverships], the bulk of the effort and expense is frontloaded").

## IX.    THE COURT SHOULD AWARD THE REQUESTED FEES AND EXPENSES

89.     Based on the foregoing, the Receiver and Z&Z respectfully submit that the services for which they seek compensation in this First Application were reasonable and necessary for, and beneficial to, the orderly administration of the Receivership Estate.

90.     The fees and expenses sought by this First Application were reasonable and necessarily incurred and were in the best interest of the Receivership Estate. With the exception of the SEC Guidelines, the Receiver has not entered into any agreement, written or oral, express or implied, with any person or entity concerning the amount of compensation paid or to be paid from the Receivership Estate, or any sharing thereof.

91.     As more fully set forth throughout this First Application and as detailed in the exhibits submitted herewith, the issues addressed by the Receiver and Z&Z have been and continue to be highly complex. The Receiver and Z&Z have reviewed a substantial volume of documents and have become familiar with multiple, and in some instances unique, assets in order to determine what assets can be liquidated most efficiently and cost-effectively to secure the Judgment and otherwise comply with the Appointment Order.

92.     The Receiver and Z&Z respectfully submit that compensation for the foregoing services as requested is commensurate with the complexity, importance and nature of the

problems, issues or tasks involved.  The professional services were performed expediently and efficiently.

93.     Accordingly, the Receiver and Z&Z submit that the compensation requested herein is fair, reasonable and warranted in light of the nature, extent and value of such service to the Receivership Estate and all parties in interest.

## X.     SOURCE AND MANNER OF PAYMENT

94.     The Receivership Estate contains cash held in the Receivership Account.

95.     The Receiver and Z&Z request that this Court enter an order directing the approved fees and reimbursed expenses to be paid from the Receivership Account, less the 20% holdback (applicable only to fees) which shall be held in the Receivership Account pending this Court's further order as to the disposition of such funds.

**WHEREFORE**, Jed Horwitt, Esq., Receiver, and Zeisler & Zeisler, P.C., counsel to the Receiver, respectfully request that this First Application be granted and that they be awarded an allowance of $157,547.50 in professional and paraprofessional fees and $5,425.00 in Receiver fees for services rendered during the Compensation Period, and $3,307.38 for the reimbursement of expenses, subject to a 20% holdback applicable to fees for services; and grant such other and further relief as this Court deems just and proper.

Dated: May 15, 2019
       Bridgeport, Connecticut

                                        Respectfully submitted,

                                        JED HORWITT, ESQ., RECEIVER

                                        */ s / Jed Horwitt*
                                        Jed Horwitt, Esq., Receiver (ct04778)

By:  */ s / Stephen M. Kindseth*
                                          Stephen M. Kindseth (ct14640)
                                          Christopher H. Blau (ct30120)
                                          Zeisler & Zeisler, P.C.
                                          10 Middle Street, 15th Floor
                                          Bridgeport, CT  06604
                                          Telephone: 203-368-4234 X 236
                                          Facsimile: 203-549-0903
                                          Email: cblau@zeislaw.com;
                                          skindseth@zeislaw.com
                                          His attorneys

29

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 15, 2019, a copy of the foregoing First Application was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

*/ s / Stephen M. Kindseth*

Stephen M. Kindseth (ct14640)
