UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

———————————————————————————
|  |  |
UNITED STATES SECURITIES AND ) 
EXCHANGE COMMISSION, ) No. 3:15-CV-675 (JBA)
 )
Plaintiff, )
 )
v. )
 )
IFTIKAR AHMED, )
Defendant, and )
 )
IFTIKAR ALI AHMED SOLE PROP; )
I-CUBED DOMAINS, LLC; SHALINI AHMED; )
SHALINI AHMED 2014 GRANTOR RETAINED )
ANNUITY TRUST; DIYA HOLDINGS LLC; )
DIYA REAL HOLDINGS, LLC; )
I.I. 1, a minor child, by and through his next friends )
IFTIKAR and SHALINI AHMED, his parents; )
I.I. 2, a minor child, by and through his next friends )
IFTIKAR and SHALINI AHMED, his parents; and )
I.I. 3, a minor child, by and through his next friends )
IFTIKAR and SHALINI AHMED, his parents, )
 ) JUNE 3, 2019
Relief Defendants. )
———————————————————————————

## RELIEF DEFENDANTS' OPPOSITION TO RECEIVER'S REPORT

Relief Defendants submit this Opposition ("Opposition") to the Receiver's Report

(Doc. 1130, referred to hereafter as "Report").[1]  Relief Defendants reserve all rights to all

issues.[2]

---

[1]  The Relief Defendants accept the Court's rulings simply for the purposes of opposing the Receiver's Report but reserve all rights with respect to all issues and their rights to present such issues in appeal.

[2]  Relief Defendants further explicitly reserve all rights that they be compensated by the SEC for any loss due to monetization of any asset if such is ordered prior to appellate review of issues.  This includes, but is not limited to: a "make up" for any losses on the sale of such assets, as well as on any lost capital gain(s), potential asset appreciation and income that would have accrued to the owner(s) of those liquidated assets or the replacement of certain monetized assets had those assets not been liquidated, amongst additional compensation.

10039401v1

1

## BACKGROUND

This Court entered a judgment against Defendant on September 27, 2018.  (Doc. 982.)
Based on briefings and subsequent issues that arose, this Court entered an Amended Judgment
against Defendant and Relief Defendants on December 14, 2018.  (Doc. 1054.)  This Court
appointed a Receiver on December 20, 2018 (Doc. 1070, hereafter referred to as "Receiver
Order").  The Receiver filed his Report on April 3, 2019, which included, *inter alia*, his estimate
of the amount necessary to secure the judgment and a proposal of assets to use for that purpose.
(Doc. 1130.)  Relief Defendants assume that parties are otherwise familiar with the background
of this litigation.

## ARGUMENTS

## I.   THE RECEIVER'S ESTIMATED AMOUNT TO SECURE THE JUDGMENT SHOULD BE REDUCED

The Court has entered judgment in the amount of $64.4 million, plus interest and gains
on disgorged assets.[3]  While the Court has asked the Receiver to "estimate the dollar amount …
to fully secure the judgment" (Doc. 1070 at 15), the Receiver has provided an estimate based on
computations which do not properly reflect the value of Defendant and Relief Defendants' assets
or take into account other relevant factors.

In particular, and as detailed later in this Opposition, the Receiver has:

    i.   Estimated an amount for interest or gains calculation which should be adjusted:

        a.  The Receiver has not offset losses with gains in the interest or gains calculation;

        b.  The Receiver has included Court-ordered distributions (mostly with the consent of the SEC) made throughout the course of this litigation including, but not limited to legal fees and living expenses;

---

[3]  The entirety of that judgment is under appellate review.

c.  The Receiver has not removed all expenses (such as life insurance premiums, safety deposit box fees, etc.) that were and are being made to maintain the assets under the asset freeze;

d.  The Receiver has not stated that taxes for these interest or gains will come from the amount of interest or gain calculated. That should be made clear.

ii.  Failed to credit *non-forfeited* liquid and illiquid assets held at Oak:

a.  The *non-forfeited* Oak assets should be offset from the disgorgement award;[4]

b.  The *non-forfeited* assets have not been properly valued to date and the value must be determined.

c.  Failed to identify and credit Oak distributions that have occurred since the onset of this litigation and the advent of the asset freeze.

iii.  Improperly added in post-judgment interest:

a.  Post-judgment interest has not begun to accrue because the judgment has not been meaningfully ascertained;

b.  The Receiver has double-counted post-judgment interest and "interest or gains" on disgorgement;

c.  Post-judgment interest should not accrue on frozen assets.

d.  Post-judgment interest has not been awarded by the Court.

iv.  The Receiver has not justified his excessive reserve for his fees and costs of $600,000 in light of the facts of this case and the nature of the frozen assets:

a.  There are mostly liquid and semi-liquid assets that have been frozen;

b.  There are tens of millions of dollars of assets frozen above this Court's judgment amount;

c.  It should not cost anywhere near $600,000 to monetize liquid marketable securities plus two Park Avenue apartments.

---

[4]  Relief Defendants contend that any reduction in the disgorgement amount should also result in a concomitant reduction of the penalty amount.

## II.   INTEREST OR GAINS

This Court has ordered interest or gains on any disgorged assets be disgorged along with the amount of the disgorgement itself.  The Court's decisions[5] do not establish any methodology for determining the value of the accrued interest and gains.[6]

### A.   The Calculation of "Interest or Gains"

Relief Defendants have been unable to locate any case law establishing a specific methodology for calculating interest or gains.[7]  That said, while the Court has not addressed this in any of the Court's decisions,[8] the Court did articulate a position on this from the bench at the November 9, 2018 hearing, questioning:  "why isn't interest and gain on any asset subsumed in a current valuation of that asset?"  (Trans. (11/9/18) at 22:4-6).  In response, *the SEC agreed with the Court's understanding*, stating specifically that "Your Honor, **I agree with you.**"  (Trans. (11/9/18) at 22:9 (emphasis added).)   The SEC continued, providing an example of how to calculate "interest or gains" directly applicable to this case:

> …let's use an example an account with stock in it, and let's say that account has ten thousand dollars on the date of the asset freeze and today has eleven thousand dollars.  We know that today the interest and gains on that account is a thousand dollars… So, we agree with Your Honor that it would be subsumed in a valuation to know what those interest and gains are today."

---

[5]  Defendant's Rule 59(e) Motion, which addresses this issue, remains pending.  (*See* Doc. 1086.)

[6]  Relief Defendants reserve all rights with respect to their appeal of the Court's actual award of interest or gains, its classification as disgorgement by this Court, and its calculation.

[7]  While *Razmilovic* involved issues related to the *propriety* of awarding interest or gains, it did so in a situation in which the assets frozen were less than the disgorgement amount, and did not actually provide a methodology for calculating interest and gains during the asset freeze period.  *S.E.C. v. Razmilovic*, 2014 WL 5794871, at *3-4 (E.D.N.Y. Nov. 6, 2014).  The Final Judgment after remand in *S.E.C. v. Razmilovic* did not order interest or gains on any asset, except for pre-judgement interest prior to the asset freeze.  Similarly, the Final Judgment in *S.E.C. v. Tavella*, 77 F. Supp. 3d 353 (S.D.N.Y. 2015) did not order pre-judgment interest or interest or gains.

[8]  Relief Defendants have appealed the grant of interest or gains, which also includes the calculation of such amount.  However, Relief Defendants accept the Court's ruling on such only for the purposes of providing this Opposition.

(Trans. (11/9/18) at 22:10-17.)  In effect then, both the Court and the SEC have agreed that the proper way to value any accrued interest or gains is simply to identify the difference between the value on the asset freeze date and the end value at the time the asset is monetized.  Therefore, contrary to the Receiver's treatment of certain assets for the interest/gains calculation, one *must* take into account the valuation of the asset when determining the interest or gains calculation, since any interest or gains is "subsumed in the valuation [of the asset]" and *is not over and above the value of that asset*.

The Receiver simply fails to apply the Court's methodology to this case.  The result is a wildly over-estimated "interest or gains" amount that has no basis in law or equity.[9]  In particular, the Receiver's approach is inapposite in the following ways:

1.  The gains ascribed to the two New York City apartments is not, and cannot be, "$0."  The proper approach is to include any estimated loss from the sale of the apartments which should then be offset against the net rents and other gains.  Indeed, by any reasonable standard, the calculation must take into account the *net* gains – not simply gains when a gain occurs.  The Court has stated that the valuation of interest and gains is properly calculated by looking at the difference between two dates.  If the current valuation of an asset is less than the freeze value of an asset, then by definition, that is a "negative gain" and must be ascribed value as such.  Ignoring the netting process is entirely unreasonable, unsupported by any finance or accounting methodology, and directly at odds with the SEC's position.  (*See, e.g.*, Trans. (11/9/18) at 26:13-20.)  The SEC and the Receiver want the interest and gains calculation to follow the specific assets they allege are tainted by Defendant's actions and have specifically identified those assets for disgorgement (Doc. 1130-1).  The calculation should therefore follow all such assets.  Look at the total current value of the assets being disgorged and subtract the value of the assets at the time of the freeze to arrive at an interest/gains calculation as it is "subsumed in a current valuation of that asset."

2.  The Receiver has erroneously added back expenses that were used to maintain other assets (such as payments toward life insurance premiums,

---

[9]  The Receiver also apparently understands "interest or gains" to be synonymous with "appreciation."  (Doc. 1130 at 11.)  The term appreciation has never been mentioned, let alone defined or briefed in this litigation.

safe deposit boxes,etc.) under the asset freeze to preserve the status quo. As such, these payments should be excluded from the calculation of "interest or gains".

3. The Receiver has erroneously added back in the Court-ordered distributions for living expenses and attorneys' fees to the calculation of interest and gains without citing any legal authority.  These distributions must be excluded from any calculation of interest/gains.  During the course of litigation, the Court had ordered these equitable (or legal) distributions (in most cases consented to by the SEC) and released them from the freeze.  As with point 2, Defendants and Relief Defendants should not have to pay these amounts *back* after the Court ordered these distributions for specific purposes.  This also runs afoul of the Court and the SEC's stated position on the calculation of interest or gains:  if any interests and gains is subsumed in the value of the asset, then it is illogical to include Court-ordered distributions over and above that amount in the final determination of that value.

Simply put, the Court should enter an order consistent with the methodology it identified at the November 9 hearing (and to which the SEC agreed):  "interest and gain on any asset [is] subsumed in a current valuation of that asset."  (Hr. Trans. (11/9/18) at 22:4-6).  Here we have a freeze date.  An end date will ultimately be established.  Thus, all one needs to do is calculate the difference in value between the two dates for the assets and then add those subsequent values together.  That is enough to determine the "interest or gains" calculation.  The Receiver's approach creates unnecessary complication and goes against the Court and SEC's understanding of how this process was to proceed.  This calculation must be corrected.

**B.     Payment of Taxes from "Interest or Gains"**

Any taxes payable on the "interest or gains" must come from the "interests or gains" and there must be an explicit allowance made for those payments out of the "interest or gains."  Any other result would be illogical, would act as a penalty to Defendant and Relief Defendants, and runs afoul of the purpose behind the disgorgement remedy.

## III.   THE *NON-FORFEITED* OAK ASSETS SHOULD BE CREDITED TOWARDS THE DISGORGEMENT AMOUNT

### A.   The *Non-Forfeited* Oak Assets Should Offset the Disgorgement Award

Oak holds a significant amount of Defendant's *non-forfeited* assets.[10]   These non-forfeited assets are both liquid and illiquid.   Yet despite repeated requests, the Receiver has failed to apply these *non-forfeited* Oak assets towards the disgorgement amount.   Indeed, while the Receiver (through the SEC) purports to have traced the allegedly fraudulent proceeds[11] (Report at 10), he still ignores the fact that these expressly *non-forfeited* assets are held by the proverbial victim under their exclusive control and fails to value and credit these assets towards the disgorgement amount.   Rather, the Receiver proposes to use the liquid non-forfeited assets for his fees and for penalties, but that is not the proper use of such non-forfeited assets already in the hands of and under the exclusive control of the victim.   This approach cannot be reconciled with Second Circuit case law (discussed *infra*) and runs counter to the Receiver's goal of effectuating an efficient receivership process and the SEC's plan to return disgorged funds to Oak.   As such, these assets should be valued and credited toward the disgorgement amount.[12]

To begin with, Second Circuit precedent and decisions from sister circuits support using *non-forfeited* Oak assets – plus accrued interest/gains on these assets – as an offset against disgorgement at the outset.   *See S.E.C. v. Palmisano*, 135 F.3d 860, 863 (2d Cir. 1998) (Court determines (and SEC concedes) that amounts paid to victims should be credited toward

---

[10] There are also assets based on investments by Defendant in Oak HC/FT which apparently claims that somehow such assets are forfeited presumably based on a theory that Oak HC/FT is part of Oak.   As such, these assets should be treated as Oak assets and a determination should be made as to whether they are in fact forfeited. Therefore, any reference to Oak includes Oak HC/FT.

[11] There is no need to have FTI Consulting trace proceeds. Using FTI Consulting in this case is not necessary and would resut in an unnecessary and significant expense, contrary to this Court's directive.   As such, the Receiver has made his determination of disgorgement assets via findings of this Court.

[12] Relief Defendants reserve all rights with respect to the issue of Defendant's allegedly forfeited Oak assets for appeal.

disgorgement amount because defendant is "only required to give back the proceeds of his securities fraud once"); *S.E.C. v. First Jersey Sec., Inc*., 101 F.3d 1450, 1475 (2d Cir. 1996) ("[i]t was well within the court's discretion to give defendants credit for the $5 million paid out to reimburse victims of their frauds"); *Disraeli v. S.E.C.*, 334 Fed. App'x 334, 335 (D.C. Cir. June 19, 2009) (Petitioner given offset for amounts transferred back to victim); *In re. Mutual Funds Inv. Litig.*, 681 F. Supp. 2d 622, 626 (D. Md. 2010) (offset against disgorgement award proper for amounts paid in settlement of private suits); *S.E.C. v. Penn Cent. Co.*, 425 F. Supp. 593, 599 (E.D. Penn. 1976) (noting that any settlement payment in a related action properly "serve[s] to offset part or all of a judgment for disgorgement"); *In re Timbervest, LLC*, Admin. Proc. No. 3-15519, 2016 WL 4426915, at *2 (Aug. 22, 2016) (offset to disgorgement for private settlement applicable where "suit was premised on the same underlying 'misconduct [that] ... was recently the subject of [respondents'] administrative enforcement action before the United States Securities and Exchange Commission'").

In this case, Oak holds and exclusively controls the *non-forfeited* assets. Rather than create the potential for significant transaction costs (including costs related to monetization of the assets and future potential litigation costs), the Court should instead directly credit these *non-forfeited* amounts against the disgorgement amount. Indeed, Oak is best positioned to invest or monetize the *non-forfeited* assets to maximize return on the assets now or into the future given their exclusive control over them. It therefore makes no sense to go through the process of litigating ownership and control of the assets, monetization or liquidation, and distribution, when the same result can be accomplished simply by crediting the value of the *non-forfeited* assets (plus accrued interest or gains) against the disgorgement amount.

**B.     The *Non-Forfeited* Assets Have Not Been Properly Valued to Date and the Value Must be Independently Determined**

The *non-forfeited* assets at Oak – both liquid and illiquid – must also be valued.  This has not happened to date.  Indeed, in his Report, the Receiver has failed to identify the value of *non-forfeited* Oak assets titled to the Defendant, including *non-forfeited* Oak illiquid assets and the corresponding interest/gains on the *non-forfeited* liquid Oak assets.

The reason for this failure is obvious:  the process has been stymied by Oak and the Receiver has taken the path of least resistance.  More specifically, the *non-forfeited* assets – and corresponding interest/gains on these assets[13] – have been in the hands and under the exclusive control of the alleged victim throughout the entire litigation.  Indeed, Oak has been more than opaque about the status of the assets and their current value to date.  The Receiver has also refused to provide any backup on the valuation of these assets, let alone independently determined the value of (1) the *non-forfeited* assets, (2) liquid distributions from Oak, and (3) any interest that has accrued on the assets.

This is, of course, highly problematic.  As currently situated, the value of the assets is being determined by a self-interested party without *any* transparency.  There have been no distribution notices produced or any valuation documents given on these assets (as is an investor's right).  Interest has accrued somewhere, in some account, under the control and purview of the alleged victim but that has not been identified.  There also may have been cash distributions as well – but Defendant and Relief Defendants have not been informed of as much, let alone received any such distribution.  Oak has simply provided its own numbers without any

---

[13] This Court had stated that it understood Defendant's argument that he would receive the same relative return as other investors in this situation:  "I understand what you're saying.  You're saying you're an investor in those funds that are – and those investments have been frozen by Oak in accordance with the Court's freeze order, but that you ought to be getting the same return that identical – similarly situated investors, whether they be big pension funds or whatever, whatever they got. I understand that argument."  (Trans. (11/9/18) at 21:12-18.)

documentation, verification, or other process to properly identify the actual value of the assets. In sum, the value of these assets must be determined in a transparent manner and then must be credited against the disgorgement award as discussed above.[14]

The Receiver's failure and refusal to identify the value of the assets held by Oak also works at cross purposes to the SEC's stated interest in having a receiver appointed.  Indeed, the SEC has specifically stated that "the SEC agrees that a third party should determine the value of … all of Defendant's assets, including those at Oak.  Indeed, the Defendant's assets held at Oak demonstrate why such an appointment [of receiver] is necessary."  (Doc. 995 at 2.)  Yet the Receiver has not willingly pursued any update of the amounts at Oak, not shared any documentation from Oak that points to these values, or even the value he ascribes to the *non-forfeited* cash distributions of $947,815,[15] fails to account for any interest or gains on such amounts, and fails to value the illiquid *non-forfeited* Oak assets in his report.

Oak has carefully shielded relevant information for determining these amounts and the Receiver has not adequately pursued the valuation effort.  Notwithstanding, it is essential that these *non-forfeited* assets be properly valued by a disinterested third party,  and approved by the Court after hearing, so that a proper credit to the disgorgement amount may be made.[16]

---

[14]  Relief Defendants maintain that the value of these assets is in the millions of dollars. Separately, Relief Defendants do not concede that the Court's disgorgement award was properly issued insofar as the Court failed to, *inter alia*, consider all factors of a valid disgorgement award. Relief Defendants reserve all rights to all issues, including and not limited to the fact that disgorgement is a penalty and that Defendant's allegedly forfeited assets at Oak must also be credited against disgorgement.

[15]  This amount does not include the totality of Defendant's liquid *non-forfeited* assets at Oak.  This amount also does not include any interest earned on such assets.

[16]  It is also worth noting that any forfeiture of Defendant's rightfully earned interest has, and will continue, to enrich Oak at the expense of other investors.  Moreover, Oak itself is an investor in these various funds and by seizing Defendant's assets they have enriched themselves at the expense of other investors as well, including the Defendant.

**C.      The Oak Distributions that Accrued during the Pendency of the Litigation**

This Court should also determine as to the whereabouts and the ultimate value of the Oak distributions and the distributions that were on Defendant's Schedule K-1s that accrued (along with interest/gains on these assets) during the pendency of the litigation.  These assets were frozen and subject to the jurisdiction of the Court during the pendency of the litigation prior to the Court's ruling of forfeiture and any distributions that were generated during this time must be accounted for and offset or credited against disgorgement.

**IV.     POST-JUDGMENT INTEREST SHOULD NOT BE APPLIED IN THIS CASE**

Contrary to the SEC's and Receiver's positions in this matter, no post-judgment interest should be applied to the judgment in this case.

**A.      Post-Judgment Interest Has Not Begun to Accrue Because the Judgment Cannot Be Ascertained in a Meaningful Way**

Defendant and Relief Defendants' assets were first frozen on May 7, 2015.  All assets, including those **over** the judgment amount have been and continue to remain frozen since that date.  The Receiver uses the date of September 27, 2018 to begin the calculation of post-judgment interest, but that is erroneous.

The Second Circuit identifies the date upon which "post-judgment interest commences" to be "from the date a judgment is ascertained in a meaningful way and supported by the evidence."  *Goodrich Corp. v. Town of Middlebury*, 311 F.3d 154, 178 (2d Cir. 2002).  The phrase "ascertained in a meaningful way" has been interpreted to mean a situation where "there are no further legal or factual issues for the Court to determine."  *Shukla v. Sharma*, No. 07-CV-2972, 2014 WL 7366184, at *3 (E.D.N.Y. Dec. 24, 2014).

In this case, legal issues necessary to finding that judgment is ascertained in a meaningfull way are still outstanding.  Specifically, the Court has stated that:

> … the judgment can be reduced to an actual number upon the resolution of this interest or "interest and gain" issue.  That seems to me to be a legal issue, not a fact issue.

(Trans. (11/9/18) at 35:12-14.)   As discussed *supra*, the Court has not yet defined how to measure "interest or gains."   Therefore it has not yet resolved an outstanding legal issue that is necessary to meaningfully ascertain the judgment amount.

Additionally, and as discussed at length above, Defendant and Relief Defendants should be afforded an offset against the judgment amount for the value of the *non-forfeited* assets currently held by Oak.  Since the value of the Oak assets have not yet been ascertained and this Court has not yet ruled on this issue, the judgment has again not been ascertained in a meaningful way.[17]

More specifically, the Court has entered a judgment in the amount of $64.4 million, plus interest or gains on disgorged assets, against the Defendant and Relief Defendants.  The Court has also allowed that the *non-forfeited* Oak assets can be used towards securing the judgment.  (Doc. 1054 at 6.)   These assets have, and continue to be, under the exclusive control of the alleged victim.  Since these assets should be used to offset the disgorgement amount, the value of the assets and their application against disgorgement must be ascertained first before the judgment amount can be meaningfully ascertained.  Given that the *non-forfeited* assets have not been finally valued and applied to the disgorgement amount, it is inappropriate to calculate any particular post-judgment interest amount.  *See* *S.E.C. v. Penn*, No. 14-CV-581, 2017 WL 5515855, at *5 (S.D.N.Y. Aug. 22, 2017) ("[T]he SEC's motion for disgorgement and for civil monetary penalties are DENIED, pending an evidentiary hearing on the value of Penn's

---

[17] Relief Defendants do not waive any rights to the allegedly forfeited Oak assets by way of this statement.

forfeited interest in the Fund . . . .")  The Court should proceed in a similar fashion with respect to Defendant's *non-forfeited* interests here.[18]

While the Court in *Penn* considered the Defendant's forfeited interests and this Court's ruling to the contrary is under appeal, the value of Defendant's *non-forfeited* interests – under the exclusive control and with the alleged victim – must be determined and credited first against disgorgement.  Even if this Court simply acknowledges the value of the liquid distributions that the Receiver alleges are worth $947,815 that are in the hands of and under the exclusive control of the alleged victim – that amount (plus any accrued interest), must reduce the value of disgorgement and subsequently, the corresponding value of the civil penalty.

For instance, a calculation of judgment with application of liquid *non-forfeited* assets may look like this:[19]

| | |
|---|---|
| Receiver's statement of Oak *non-forfeited* amounts: | $947,815 |
| Assume a 2.6% interest on funds during this time: | $24,643 |
| Amount to apply to disgorgement: | $972,458 |
| Corresponding reduction in civil penalty: | $486,229 |
| Judgment amount reduced by: | $1,458,687 |
| Dec 20, 2018 judgment: | $64,411,703 |
| Judgment with application of Oak *non-forfeited* liquid assets: | $62,953,016 |

A similar analysis would apply with reference to the nonliquid *non-forfeited* assets.

---

[18] The Court previously addressed the *Penn* case in the context of this dispute with respect to Defendant's *forfeited* assets.  *See S.E.C. v. Ahmed*, 343 F. Supp. 3d 16, 37-38 (D. Conn. 2018).  Relief Defendants submit that this situation, involving *non-forfeited* assets and offsets against the disgorgement amount, is materially different than the context in which the Court previously considered *Penn*.

[19] The Relief Defendants do not waive any rights by way of this statement, as they have not been given any supporting documentation on the value of such amounts.  They provide such calculation for the Court's benefit, assuming that the numbers provided by the Receiver are correct.

Only once the Court credits the value of the *non-forfeited* assets under Oak's exclusive control against disgorgement, can a judgment amount be meaningfully ascertained.

Legal and factual issues remain outstanding that are necessary to resolve prior to the judgment being ascertained in a meaningful way. As such, post-judgment interest, to the extent it may apply (which Relief Defendants contend it does not), has not yet begun to accrue.

### B.    The Receiver Errs by Adding Post-Judgment Interest *and* Interest/Gains on Disgorged Assets

The Receiver has also erred by including *both* post-judgment interest and interest/gains on disgorged assets as these amounts are necessarily overlapping in this case. All of Defendant and Relief Defendants assets are frozen. The frozen assets are in the possession of the Receiver and cannot be accessed by the Defendant or Relief Defendants. The additional accrual of post-judgment interest on top of the "interest or gains" on the disgorged assets is inequitable and has no support in the law.

Indeed, the cases the Receiver cites do not support this approach. In *Lewis v. Whelan*, 99 F.3d 542 (2d Cir. 1996), the Second Circuit merely considered the issue of the date from which post-judgment interest should run when more than one judgment has entered. *S.E.C. v. Forest Res. Mgmt. Corp.*, No. 09-CIV-0903, 2010 WL 2077202 (S.D.N.Y. May 18, 2010) in turn involves a question regarding the appropriate penalty amount to apply to the defendants. The issue of post-judgment interest only arises in that court's order when it states that "[i]nterest will accrue on the unpaid balance of the disgorgement and prejudgment interest owed by defendants in accordance with 28 U.S.C. § 1961(a)." *Id.* at *2  n.3. Neither case references, let alone analyzes the issue of applying post-judgment interest in a case where "interest or gains" has been awarded, where the assets continue to remain frozen post-judgment to secure the Plaintiff

pending an appeal, and where the method of determining interest and gains has not been determined.[20]

### C.      Post-Judgment Interest Should Not Accrue on Frozen Assets

All of Defendant's and Relief Defendants' assets have been frozen by the Court's asset freeze order since May 7, 2015.  These assets remain frozen.  As such, Defendant and Relief Defendants have not only been precluded from paying any amount towards the judgment, they have been essentially precluded from *any* use of the funds.

The Receiver claims that the post-judgment interest statute states that post-judgment interest is allowable and mandatory on civil judgments.   (Report at 13; *see also* 28 U.S.C. § 1961.)  However, the statute is silent when the funds are frozen.  This distinction is significant. As the Second Circuit explained in *Razmilovic*,

> where, as here, the defendant has had some or all of his assets frozen at the behest of the government in connection with the enforcement action, an award of prejudgment interest relating to those funds would be inappropriate with respect to the period covered by the freeze order, for the defendant has already, for that period, been denied the use of those assets . . . require[ing] the defendant to pay prejudgment interest on the entire disgorgement amount including the earlier frozen amount would, for the freeze period, deprive him twice of interest on the portion of the disgorgement award that is satisfied by the frozen assets.

*Razmilovic*, 738 F.3d at 36-37.

The same general principles apply here:  the assets are and have been frozen; Defendant and Relief Defendants cannot satisfy the judgment, and are receiving no use or enjoyment of the funds or of any currently accruing interest; and so, for the same reason that the Court does not order pre-judgment interest on frozen funds, there is no basis for awarding post-judgment

---

[20] Relief Defendants do not waive their rights to appeal the interest/gains issue.

interest.[21]   Indeed, the intent of Congress in enacting such a statute is to deter defendants from continuing to use ill-begotten funds after a judgment and instead to force the delivery of the judgment amounts to a plaintiff.

Case law in the Second Circuit supports the conclusion that post-judgment interest should not accrue on frozen assets while an appeal is pending.   Indeed, in *Razmilovic*, the District Court did not order post-judgment interest on frozen assets during the pendency of the appeal. *Razmilovic,* 2014 WL 5794871.   Rather, the Court simply incorporated the Second Circuit's ruling, resulting in disgorgement, civil penalty and a *reduction* of the pre-judgment interest award on frozen assets during the pendency of litigation.   *Id.*at *3.   The District Court did *not* order post-judgment interest on the frozen assets – or even on the judgment amount while the appeal was pending.   *Id.* at *4.   As such, this Court should also decline to enter in any order of post-judgment interest on the frozen funds while the appeal is pending, as the SEC is already secured by the asset freeze and Defendant does not have use of those funds while the appeal is pending.

## V.    THE RECEIVER

### A.    Receiver's Reserve for Fees

This Court appointed a Receiver on December 20, 2018 to amongst other things, "value the frozen assets and avoid over-freezing to secure the judgment for the SEC, to manage and maximize the value of frozen assets under the guidance of a neutral third party, and to take necessary steps toward effectuating the judgment."  (Doc. 1070 at 5.)

---

[21] It is also worth noting that the so-called "mandatory" nature of the statute is evidently subject to the agency's discretion as well.  As the Receiver notes, the SEC typically does not seek post-judgment interest once the assets are deposited in the Court's CRIS account.  There is no real difference between depositing funds in the CRIS account and the ongoing asset freeze.  Defendant's and Relief Defendants' assets are controlled by the Receiver, an officer of the Court, and cannot be touched by Defendant or Relief Defendants without leave of the Court.

As confirmed per the Report, the Receivership Estate is comprised of over $64.5 million in cash and marketable securities that are frozen, in addition to another $18 -$20 million of real property, plus additional assets.  The Receiver proposed to use cash, marketable securities and two New York City apartments to secure the judgment, assets that are mostly liquid or that only need a real estate broker to monetize.  It should not cost $600,000 to value and liquidate these assets.

Relief Defendants will address the specific fees that the Receiver has incurred in his Recent Fee Application (Doc. 1160) in their response to such Application and refer the Court to that opposition for discussion of Receiver fees incurred so far.[22]  However, the $600,000 that the Receiver is requesting as a reserve is excessive and not justified in this situation.  Indeed, the Receiver has not given any detail behind his estimate of the $500,000 he is requesting for his fees and has not given any detail behind his estimate of the $100,000 he is requesting for administrative expenses.  This alone should raise significant red flags.

The Receiver's request becomes even more tenuous when viewed in the context of the additional work that may or may not need to be done in this case.  The assets in this case have been preserved throughout the litigation and there are substantial assets frozen for the judgment. In this case, there is no need to "look for additional assets", "determine victims", or "unravel any transactions."   The fee reserve that the Receiver is requesting is simply not justified in this situation.   This Court itself stated that it "recognize[d] the parties' concerns regarding the potential cost of a receiver and shares their desire to avoid unnecessary or high receivership costs" (Doc. 1070 at 5) and "that probably is a problem, to have those costs, which would come

---

[22] The Relief Defendants maintain that no Receiver was needed in this case.  The Relief Defendants contest any payment of fees towards the Receiver and the use of a Receiver has caused the Relief Defendants to increase their outstanding legal fees, which amount continues to increase.

out of the frozen assets … if [costs] were borne by the frozen funds and the [Defendant's and/or Relief Defendants'] appeal was totally successful, that would not be an appropriate treatment of those frozen funds."  (Trans. (11/9/18) at 36.)

The Receiver has already submitted his Report and the Court (and the parties) now have a preliminary determination of the value of assets.  While such value does not account for the totality of Defendant's non-forfeited assets at Oak, it still confirms the existence of tens of millions of dollars of assets above this Court's judgment.  Thus, the Receiver's future utility is limited.

The Oak *non-forfeited* interests and distributions should be valued so that a proper sum can be applied towards disgorgement, and then the receivership should be put on hold.  Indeed, this is precisely what the SEC and the Court had stated earlier as well:  "THE SEC:  Indeed, the Defendant's assets held at Oak demonstrate why such an appointment [of receiver] is necessary." (Doc. 995 at 2; *see also* Trans. (11/9/18) at 18:21-23 ("… what we would request, and this goes back to the request for a receiver is, have a third party come in and look at this …").)  The Court has further said that "… I am therefore thinking of [valuing the Oak assets and private holdings] as part of a list of things a receiver-type person might be charged with doing."  (Trans. (11/9/18) at 21:23-25.)

The Receiver has not justified why he needs such a significant reserve for fees ($500,000 for his fees and an additional $100,000 for administrative expenses).

## B.    Receiver's Role in This Litigation and the Second Circuit's View of "Creditor" Courts

The Receiver's role in this case, where there is over $80 million of cash and marketable securities as well as real property (in addition to other assets), is limited.  The Receiver is to secure the judgment for the SEC pending appeal and nothing more.  The Receiver is not needed

for the "distribution" of assets, which is only to one alleged victim.  (Doc. 1042 at 48 ("THE COURT: … We only have one victim …").)  Not only that, the Receiver as originally envisioned was appointed to simply value assets.  As the Court previously explained, "that's really part of what I'm trying to figure out, is how we might use a receiver to do the valuation."  (Trans. (11/9/18) at 4.)  Further, "[S]o if a receiver – and it's a very limited task ... I mean, we only have – we don't marshal the assets *beyond valuing what's been frozen*.  We only have one victim.  It's *not a broad scope receivership* such as the types that have incurred criticism elsewhere."  (Doc. 1042 at 48.)

Contrary to this process, the Receiver "proposes to establish a reserve for the potential claims against … the Receivership Estate" (Doc. 1130 at 2), suggests that "other potential claims against the Receivership Estate may need to be addressed" (*id.* at 4), and also proposes that the Court hold a hearing where the Receiver will provide all parties with the "status, priority, and estimation of any claims against the Receivership Estate" (*id.*).  He also states that "the Liquidation Order should ultimately account for all amounts needed to be reserved or paid for … other claims of government agencies."[23]  (Doc. 1130 at 18.)  Despite all these concerns, the Receiver evidently takes the position that he is not suggesting a general claims procedure.  (*See* Doc. 1152.)

Notwithstanding the Receiver's protestations elsewise, the Second Circuit has made clear that a Receivership Court should not turn into a "creditor" court.  For example, in *Esbitt v. Dutch-American Mercantile Corp.*, 335 F.2d 141, 143 (2d Cir. 1964), the Second Circuit warned against using an equity receivership for liquidation, since the "primary purpose of appointing a

---

[23] The Receiver also previously suggested that he would be filing a motion relating to his duties to tax authorities. (Report at 17.)  It appears he has now concluded that no such motion is needed as there is no duty for him to file tax returns for any of the parties.

receiver is to conserve the existing estate."   Similarly, in *S.E.C. v. Am. Bd. of Trade*, 830 F.2d 431, 436 (2d Cir. 1987), the Second Circuit further cautioned that "equity receiverships should not be used to effect the liquidation of defendants [assets] in actions brought under the securities laws" (citations omitted).   In this connection, the SEC has not followed Second Circuit's directive that "in actions ... by the SEC, we expect counsel ... to bring our views, to the attention of the district court before the court embarks on a liquidation through an equity receivership." *Am. Bd. of Trade*, 830 F.2d at 438.  The SEC has not done that in this case.

Therefore, the Receiver should now simply value the Oak *non-forfeited* assets, monetize such assets as may be ordered by the Court, and then his duties should be placed on-hold or terminated.

### C.    Receiver's Proposed Use of FTI Consulting, a Forensic Accounting Firm, as a "Real Estate Broker"

In his report, the Receiver indicates that he intends to file a motion to employ FTI Consulting, a forensic accounting firm, as a "real estate broker" for the Park Avenue apartments which he proposes to sell.  No such motion has been filed as of yet.

Relief Defendants object to the use of FTI Consulting, a forensic accounting firm, as the broker for the proposed real estate monetization.  FTI Consulting is <u>not</u> a real estate broker, nor is it a member of REBNY (Real Estate Board of New York City), which governs all NYC real estate transactions.   In addition, FTI Consulting would not be able to reach international prospective buyers in the manner in which Relief Defendants' preferred broker would be able (as discussed below).

In contrast, Ms. Ahmed has identified a real estate broker who has over 15 years of experience with apartments similar to 530 Park Avenue, 12A and 12F.  This real estate broker,

Matt Perceval,[24] is also familiar with the units under this Court's asset freeze:  Mr. Perceval was Ms. Ahmed's broker when Diya Real Holdings purchased Apartment 12F; he secured a tenant for Apartment 12F during this litigation, and was helping Ms. Ahmed with the management of these units prior to the start of and during this litigation.   Mr. Perceval is with Sotheby's International Realty, an international real estate brokerage firm with substantial experience in premier homes and apartments.  He has also agreed to a fee of 4% of selling price, same as the proposed "broker" from the Receiver.

After the filing of the Report, the Receiver indicated to Relief Defendants that he was considering Stacey Froelich, who is affiliated with Compass and who was recommended by FTI Consulting, to be the broker, but offered to consider other brokers whom Relief Defendants might recommend.   The determination of the broker should therefore await the filing of the Receiver's motion in the event the Court determines that the apartments should be sold at this time.

## VI.    LIVING EXPENSES AND ATTORNEY FEES

In his Report, the Receiver does not address continued living expenses for Ms. Ahmed and her children, nor does he address the payment of attorneys' fees, including appellate fees, for the Relief Defendants.  As presently proposed, substantially all of Ms. Ahmed's liquid assets would be sold and placed in a CRIS account.  A sufficient amount of Ms. Ahmed's assets should be preserved to allow for payment of Ms. Ahmed's living expenses and attorneys' fees until the conclusion of the appeals.

---

[24] Mr. Perceval's website is https://www.mattperceval.com/.

## VII.   LIQUIDATION OF ASSETS IS NOT NECESSARY AT THIS TIME

### A.   The Court's Prior Rulings Require the Court to Make a Further Determination Before Monetization is Authorized

In the Court's ruling on the Defendant's Motion to Stay the Final Judgment, the Court held as follows:

> ... Defendant's assets will remain frozen during the pendency of the appeal, serving as the functional equivalent of a supersedeas bond to insure the SEC, should it prevail on the appeal, will not be injured by the stay.  The process of preparing for any post-appeal distribution of assets to satisfy the judgment, including but not limited to the appointment of a receiver or other process for valuing and liquidating frozen assets, the valuation of those assets, and any liquidation of illiquid frozen assets needed to secure the judgment is not stayed.

(Doc. 1052 at 7.)   However, the Court's Order Appointing Receiver specifically limited the Receiver's unilateral authority to sell, lease, or otherwise transfer the Defendant and Relief Defendants' property and ownership interests, by requiring a subsequent Court order to sell, lease, or transfer the property and ownership interests.   (Doc. 1070 at 14 ("*If subsequently* ordered by the Court …" (emphasis added)).   The Court also issued careful instructions to the Receiver regarding the *potential* monetization of assets, stating simply that the Receiver should *identify* liquid assets (or assets that "*could be* liquidated with relative ease") and provide a *proposal* for securing the judgment, including identifying additional assets for "*possible* liquidation and . . . the order in which the Receiver *proposes* to liquidate such assets." (Doc 1070 at 15) (emphasis added).   Thus, while the Order Appointing Receiver *anticipated* potential efforts to liquidate the Defendants and Relief Defendants' assets in the future, it did not *direct* such action.   Therefore, the Court should consider whether to direct liquidation of assets at this time, or whether, in light of the facts found by the Receiver, liquidation should, in whole or in part, properly await decision on appeals.

To that end, Relief Defendants contend that liquidation or monetization of assets is not necessary at this time due to the independent verification by the Receiver of the amount of assets frozen under this Court's asset freeze order, the nature of the "*supersedeas*" bond ordered by this Court, the fact that these assets are under appellate review, and the irreparable harm that would result by the monetization of certain assets within this context. Continuation of the asset freeze without monetization, pending appeal, maintains the *status quo* pending final disposition of the subject matters, and assures that Defendant and/or Relief Defendants will not suffer irreparable harm.[25]

The Receiver, in his Report, has asked for a monetization of over $70 million[26] to secure the judgment. Even with the Receiver's aggressive estimate of the amount required to secure the judgment, the Receiver still concedes that there is over $18.7 million of assets that "may not be necessary to secure the judgment." (Doc. 1130-1 at 3.) The asset freeze includes, but is not limited to:

1.  Over $64.5 million of cash and marketable securities;

2.  At least $18 million of real estate;

3.  Non-forfeited assets – both liquid and illiquid – held by Oak; and

4.  Illiquid assets, such as investments in private companies.

Therefore, the Receiver, an arm of the Court, has independently verified what the Relief Defendants and Defendant have been maintaining all along: the asset freeze order has resulted in

---

[25] With the Receiver having confirmed that there are tens of millions of dollars of assets over and above the judgment amount, the Relief Defendants do not object to this Court keeping the asset freeze on all assets, pending appeal, with no post-judgment interest, a limited budget for the Receiver, the *status quo* of certain payments continuing, and a release of appellate fees and other attorneys' fees of Relief Defendants.

[26] The nearly $90 million in frozen assets does not include the allegedly forfeited assets at Oak, which are under Second Circuit jurisdiction on appeal. It also does not include for the totality of all *non-forfeited* (both liquid and illiquid) assets at Oak, which this Court has stated can be used towards the judgment.

a substantial over-collateralization – to the tune of tens of millions of dollars – of the judgment. Given the Receiver's findings, the SEC cannot honestly dispute it is not adequately secured without monetization.

On the other hand, there will be irreparable harm if monetization is ordered.  The harm will arise in a variety of ways, from potentially adverse tax implications to loss of unique real property to trust concerns, including:

First, monetization of accounts invested in equities will yield substantial capital gains taxes.  These taxable events cannot be reversed if and when Defendant and Relief Defendants' appeals are won. At this juncture, selling the assets proposed by the Receiver will potentially result in substantial gains, which could be subject to federal and state capital gains taxes and which are irreversible.   This would harm Defendant and Relief Defendants and is plainly inefficient given the status of the case as it is pending appeal.

Second, the Receiver proposes to cash in a $17.7 million value MetLife insurance policy (with a $1.3 million surrender value) held by the Family Trust. Once this life insurance policy is surrendered, it cannot be reinstated, which is a particular problem in view of Defendant's cancer history.   Should the Second Circuit determine that the Family Trust and its assets are not available to satisfy Defendant's judgment, a surrender of the cash value of the life insurance policy will plainly result in irreparable harm to the Family Trust and by extension, to the three minor children who are the sole beneficiaries of the Family Trust.

Third, as to the Park Avenue apartments, there would be a loss of these assets if they are sold. Real property and its attributes are considered unique and loss of property rights and ownership result in irreparable harm.  "[E]quity presumes that real property ... is unique.  Loss of such property is therefore regarded as an irreparable injury."   *Spira v. Nick*,

876 F. Supp. 553, 563 (S.D.N.Y.1995); *see also Carpenter Techn. Corp. v. City of Bridgeport*, 180 F.3d 93, 97 (2d Cir. 1999); *Forgay, et al. v. Conrad*, 47 U.S. 201 (1848) (Stating that irreversible loss or transfer of unique property considered irreparable harm and also beyond the reach of the appellate courts if transferred.); *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203 (10th Cir. 2009) ("In sum, these properties are income producing, and realizing their income potential depends upon active management of the properties.  That makes potential damages most difficult to prove, if not practically unquantifiable.").[27]

<u>Fourth</u>, invading the Family Trust (and its assets) and the children's UGMAs before final resolution of all appeals raises numerous and significant state law issues.  For example, the Family Trust is an irrevocable, spendthrift trust for the sole benefit of the three minor children. As a result, there are significant limitations on the manner in which the trust funds (both income and corpus) can be dispersed and/or accessed.[28]  It is unclear what will happen to assets removed from the Family Trust, which was not a Relief Defendant, if and when it is held on appeal that the Family Trust was not subject to such invasion, particularly with respect any future creditor efforts to take the funds.[29]  And once again, any removal of assets from these entities is

---

[27] The Receiver has stated in his Report that "no party has objected to [the sale of the two NYC apartments] as of the date of this Report."  (Doc. 1130 at 7-8.)  That is erroneous.  Ms. Ahmed opposes (and has always opposed) the sale of any of the NYC apartments pending resolution of the appeals and believes that such property should remain frozen and be rented during the appellate review.

[28] Spendthrift trusts are defined by state statutory law, Conn. Gen. Stat. § 52-321(a).  Spendthrift trusts are statutorily exempt from claims of creditors and the trustee has a right to accumulate or withhold income from the beneficiary.  The three minor children are the sole beneficiaries of the Family Trust.

[29]  Courts in this District and the Second Circuit have released Trusts of this nature from asset freezes or the satisfaction of any judgment under more lenient circumstances, where the Defendant was not a beneficiary of the Trust, even though he may have provided investment guidance to the Trust, or where the Defendant shared benefits from the Trust with his spouse.  *See, e.g.*, *In re: Vytautas Vebeliunas*, 332 F.3d 85, 93 (2d Cir. 2003) (refusing to pierce a trust based on equitable ownership even though the husband paid all expenses of the trust because "spouses routinely administer each other's assets and conduct business on behalf of each other.")) Here, the Defendant has absolutely no ownership interest in the Trust and is not a beneficiary of the Trust.  This Court did not consider the Trust formation documents, the person of record on the TDAmeritrade accounts owned by the Trust and minor children, nor the Trust history in terms of payments made by the Trustee from the Trust.

irreversible and irreparably harms the Trust, the UGMAs and the three minor children as funds cannot simply be returned if the Second Circuit finds for the Relief Defendants on this issue.

Fifth, the Court has ordered the continuation of the asset freeze "as the functional equivalent of a *supersedeas* bond," pending appeal.  (Doc. 1052 at 7.)  The Second Circuit has stated that "Rule 62(d) provides that an appellant may obtain a stay pending appeal, *as of right,* by posting a supersedeas bond."  *Cohen v. Metro. Life Ins. Co.*, 334 Fed. App'x 375, 378 (2d Cir. 2009).  In practical terms, this means a court has no discretion to deny a Rule 62(b) stay, rather a court only has the discretion to fix the amount of the bond (or to waive the requirement entirely).  *See Frommert v. Conkright*, 639 F. Supp. 2d 305, 308 (W.D.N.Y. 2009).  Because this Court has ordered that the asset freeze continue and serve as a "*supersedeas* bond", and because a *supersedeas* bond grants the Defendant and Relief Defendants a stay in enforcement of execution of judgment, the monetization of assets should be stayed while the appeal is pending.[30]

Sixth, Receiver has stated his intent for placing funds into a CRIS account.  However, if any Relief Defendant assets are placed in a CRIS account, they should be designated as such so as to facilitate return in the event they are not needed or based on an appellate decision.  As the Court has stayed any distribution pending appeal, it would be far more efficient and economical for any funds to stay in their respective accounts, subject to the asset freeze and pending appeal.[31]  In addition, if some amount of the judgment is reversed and/or remanded on appeal, it

---

[30] As such, the SEC is not harmed by a stay of enforcement of judgment pending appeal(s) as they themselves stated:  "to the extent that Your Honor determines that the more prudent course is to simply continue the freeze such that the SEC is no worse off in a year or two when the appeal is decided, that would be an appropriate course as well" (Doc. 1042 at 43:25-44:4) and the District Court also stated that "... action can be promptly at the *end* of the appeal, including the potential for no action, whatsoever, because the Defendants prevail" (Doc. 1042 at 36:2-5).  With over $89 million of assets frozen (Doc. 1130-1) for a judgment of $64.4 million (plus interest and gains), the SEC is well over-secured with the asset freeze as "*supersedeas*" bond.

[31] The Relief Defendants would be fine with the Court's directing the investment of such funds into U.S. Treasuries, or whatever investment is deemed appropriate pending appeal.

is unclear what assets would have funds returned to them from the CRIS account, creating the potential for further litigation, which is premature to have prior to appellate review.

In truth, it would be most efficient and economical for the Court to let the Second Circuit deal with the issues under appeal – which may change the size of judgment or the particular assets that can be used to satisfy Defendant's judgment – and then, monetize assets at the end of the appeals, depending on appellate review.  (*See* Trans. (9/11/18) at 37:2-5 ("THE COURT: … would enable us to move to a position where action can be taken promptly at the end of the appeal, including the potential for no action, whatsoever, because the Defendants prevail.").) The case is currently postured such that action can be taken promptly at the end of the appeal, including the potential for no action, depending on appellate resolution of the issues in this case. It is also worth noting that the SEC itself had conceded that "to the extent that Your Honor determines that the more prudent course is to simply continue the freeze such that the SEC is no worse off in a year or two when the appeal is decided, that would be an appropriate course as well." (Doc. 1042 at 43:25-44:4.)

Given the Court's prior rulings, the fact that the SEC is over-collateralized, and the fact that monetization of the frozen assets will cause the Defendant and Relief Defendants irreparable harm, the Court should not order the monetization of the frozen assets until all appeals have been resolved.

## VIII.   THE RECEIVER'S PROPOSED ORDER

The Court did not ask for a Proposed Order in its Request for the Receiver's Report, but the Receiver has filed one (Doc. 1130-2) with his Report.  The Proposed Order does not follow the language of the Order Appointing Receiver (Doc. 1070).  Should the Court determine that the apartments and/or other assets be monetized at this time, the Relief Defendants request that the Receiver consult with the Relief Defendants (and Defendant) on the process for and price of sale

of their assets or interests, such to minimize expenses (including, but not limited to taxes) and maximize the value of the Estate and also for due regard for their (and Defendant's) interests, similar to the provision in the Court's Order Appointing Receiver (Doc. 1070) which states that "[I]f subsequently ordered … and with due regard for the interests of the Defendant and Relief Defendants, the Receiver will be authorized …"  (Doc. 1070 at 14.)

## CONCLUSION

WHEREFORE, for the reasons within, the Relief Defendants respectfully request that the Court grant the relief outlined in this Opposition in its entirety and provide any other relief as deemed proper.

Respectfully Submitted,

By: _/s/ *Paul E. Knag*_____
Paul E. Knag – ct04194
pknag@murthalaw.com
Kristen L. Zaehringer – ct27044
kzaehringer@murthalaw.com
Murtha Cullina LLP
177 Broad Street, 16th Floor
Stamford, Connecticut 06901
Telephone: 203.653.5400
Facsimile:  203.653.5444

*Attorneys for Relief Defendants*
*I-Cubed Domain, LLC, Shalini Ahmed,*
*Shalini Ahmed 2014 Grantor Retained*
*Annuity Trust, Diya Holdings, LLC, Diya*
*Real Holdings, LLC, I.I. 1, I.I. 2 and I.I. 3*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 3rd day of June, 2019, a copy of the foregoing RELIEF DEFENDANTS' OPPOSITION TO RECEIVER'S REPORT will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF system.

 /s/ *Paul E. Knag*
Paul E. Knag – ct04194