## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

                    Plaintiff,

    v.

IFTIKAR AHMED,

                    Defendant, and

IFTIKAR AHMED SOLE PROP; *et al*

                    Relief Defendants.

Civil Action No. 3:15-cv-675 (JBA)

June 05TH, 2019

## DEFENDANT'S RESPONSE IN OPPOSITION TO THE RECEIVER'S APPLICATION FOR FEES AND EXPENSES [DOC. #1160]

The *pro se* Defendant submits this Response in Opposition to the Receiver's "First Interim Application for Professional Fees and Expenses Incurred by the Receiver and his Professionals." [Doc. #1160, or the "Application"].

The esteemed Court must deny the Application because the Receiver's fees are excessive, duplicative, unreasonable and unjustified; the Receiver has not provided any meaningful benefit to the Receivership Estate to justify such expenses; the Order Appointing Receiver is under appeal; the Receiver is proven not to be a neutral party; the Court cannot impose additional penalties on the Defendant alone and thus create a perverse incentive by paying the Receiver out of funds or assets above the judgment amount; it is inequitable for the Court to be paying a Receiver who ***solely*** benefits the public (and not the Defendant) out of funds belonging to the Defendant when the Court has repeatedly denied funds for counsel to the Defendant (in violation of his due process rights) even with the Receiver's own confirmation of tens of millions of

1

dollars of assets over and above the judgment amount.  The Defendant reserves all rights to all issues and does not waive any right by way of this Opposition.

## BACKGROUND

The Defendant assumes familiarity with the facts of this case, and submits the following summary of events simply for convenience:

1.  This Court entered a judgment against the Defendant on September 27, 2018 [Doc. #982].

2.  This Court held a telephonic conference on November 9, 2018 discussing the need for or use of a Receiver.  The Court subsequently held a hearing on November 28, 2018, whereby certain receiver candidates were questioned by the SEC and the Relief Defendants.  The Defendant was not able to join as he was hospitalized and provided necessary documentation to the Court.  As such, the Court allowed the Defendant until December 14, 2018 to submit his responses to the hearing, which he did [Doc. #1057] on time.

3.  However, just hours prior to that submission, the Court entered an Amended Final Judgment on December 14, 2018 [Doc. #1054].

4.  The Court appointed a Receiver on December 20, 2018 [Doc. #1070].

## INTRODUCTION

The Defendant has long maintained, and from the outset, that a Receiver was/is not necessary in this case, except for the valuation of his Oak assets. The Receiver, in his Report [Doc. #1130], has confirmed the amount of nearly $90MM[1] in assets being frozen for a judgment of $64.4MM and an unknown amount of interest/gains.

## ARGUMENTS

## I.    THE RECEIVER'S FEES ARE NOT JUSTIFIED IN THIS CASE.

Courts have discretion as to the amount of compensation that can or will be awarded to a court-appointed receiver. *See SEC v. Byers*, 590 F. Supp. 2d 637, 644 (S.D.N.Y. 2008); *United States v. Code Prods. Corp.*, 362 F.2d 669, 673 (3d Cir. 1966).  Courts must carefully consider

---

[1] This amount does not include the totality of Defendant's *non-forfeited* Oak assets. It includes, but is not limited to: approximately $64.6MM of cash and marketable securities, $19MM of real estate and additional assets.

the appropriate award of fees: "[A]mong the factors considered by the Court in exercising its discretion to determine the appropriate award of fees is the cost-efficiency of the Receiver's work in terms of assets recovered for victims, see SEC Billing Instructions at 26, "the complexity of problems faced, the benefits to the receivership estate, the quality of the work performed, and the time records presented," *SEC v. Fifth Ave. Coach Lines, Inc.*, 364 F. Supp. 1220, 1222 (S.D.N.Y. 1973)." *See SEC v. Illarramendi*, Civil No. 3:11CV78 (JBA), at *3 (D. Conn. Dec. 5, 2013). Under these factors, the Receiver's fee request is excessive and not justified in this case.

*First*, it is indisputable that the Court had frozen assets since May 7, 2015 worth ***at least*** **$87MM**, as per the SEC themselves [*see* Doc. #888-1],[2] which includes liquid assets of at least $64MM, another $19MM of real estate and additional assets.  It is also indisputable that these assets were and are generating income for the corpus of frozen funds, by way of rent, dividends, interests and investment gains, through the pendency of the litigation, directly due *solely* to the investment acumen of the Defendant and the Relief Defendants.

As confirmed by the Receiver's Report [Doc. #1130 at 7], the liquid assets alone (cash and marketable securities) are worth $64.6MM, an amount marginally higher than this Court's judgment of $64.4MM.  As such, the Receiver did not have to recover any assets for victims and cannot be compensated on that basis.

*Second*, the Receiver has marshaled frozen assets, as all assets have been frozen under this Court's asset freeze since May 7, 2015 and continue to remain frozen to serve as a "*supersedeas* bond" pending appeal [Doc. #1052 at 7].  The Court unequivocally stated, "I don't know that marshaling the assets is quite within the purview since they're all frozen…" [Nov 9 2018 Hr. Tr. at 36].  This Court also clearly stated, "[T]he Court recognizes the parties' concern

---

[2] These amounts did not include the Defendants allegedly forfeited assets and did not even include or provide for the totality of Defendant's *non-forfeited* assets, which would have increased this amount.

regarding the potential cost of a receiver and shares their desire to avoid unnecessary or high receivership costs," [Doc. #1070 at 5] and yet the Receiver has charged substantial fees for marshaling and gathering frozen assets and submitting a proposed plan of liquidation to this Court that simply proposes to use liquid and near-liquid cash and assets to secure the Judgment.

_Third_, there was no need for the Receiver to recover any assets for the alleged victims. A Receiver's benefit to the Estate is measured amongst other factors, by the amount of assets that he has recovered for the Estate.   In this instant matter, the Receiver had no need to recover assets as there are already more than sufficient assets (all frozen) available for judgment. In this situation, the Receiver simply tabulated already frozen assets and valued only liquid and near-liquid assets, an exercise done multiple times both by SEC and the Defendant.

_Fourth,_ there was no complexity to the Receiver's work in this case.  The Receiver marshaled frozen assets that are greater in value than the judgment amount and only focused on the liquid and near-liquid assets. Indeed, marshaling _frozen_ assets, contacting brokerages for statements and producing a Report using liquid and near liquid assets hardly justify the request for the excessive fees. Even the Defendant and/or the Relief Defendants, or the SEC (who valued the assets for their submission of Doc. #888-1), could have done the same with _no expenses to the frozen assets_.  Putting these values into a spreadsheet and presenting it to the Court, even as a potential "Plan of Liquidation" was a simple exercise that did not need a Receiver and do not justify these exorbitant fees.

_Fifth,_ there was marginal benefit to the Receivership Estate with the appointment of the Receiver. This Court itself has stated, "fees requested are justified by the net economic benefit that they will provide to the estate."  _SEC v. Illarramendi_, Civil No. 3:11cv78 (JBA), at *1 (D.

Conn. Jan. 16, 2014).  The Court must also look at the Receiver's fees as a loss to the Estate.[3]
The only economic benefit that the Defendant can ascertain was the Receiver forcing the Relief
Defendants' tenant in Apt. 12F to finally pay his "past-due electric charges" [Doc. #1160 at 20].
Any repairs to the apartment that were handled by the Receiver could have been handled by the
Relief Defendants, as has been done over the last four years at no additional expense.

As for the NY farm, the Defendant was in discussions with the prior tenant and was
discussing potential next steps with respect to the farm when the Receiver was appointed.  Any
payment towards maintenance of the farm [Doc. #1160 at 21] should have been borne by the
tenant, in accordance to the rental agreement, instead of the Defendant. The tenant was in
violation of certain of the rental agreements.  Also, the Receiver's statement that he "intends to
file a motion releasing the property from the Receivership Estate in the near future" [Doc. #1160
at 21] does not help the Estate.

What would have been of value to the Estate and the parties is the Receiver ascertaining
the total value of the ***non-forfeited*** assets at Oak by analyzing financial statements, investor
letters and all documents provided to other investors and with the Receiver providing such to the
Defendant and/or the Relief Defendants so that a true and accurate valuation of such assets could
be performed. This is critical as these assets are already under the exclusive control of and in the
hands of the alleged victim and must be credited against disgorgement (which Defendant has
detailed in his Opposition to the Receiver's Report [Doc. #1178]).  In addition, a valuation of the
Defendant's interests in certain private investments or the financial statements and investor
letters for the Defendant to perform his own valuation exercise would have been useful to the

---

[3] "…receivership… where the goal is…to manage the estate in such a way as to maximize recovery *while minimizing loss, including losses caused by attorney's fees.*" (emphasis in original) *See SEC v. Aquacell Batteries* Case No. 6:07-cv-608-Orl-22DAB, at *9 (M.D. Fla. Jan. 31, 2008)

Estate.  If these assets are needed to secure the judgment, their valuation will be needed. If these assets are not needed to secure the judgment, their valuation will still be needed, as the Receiver has taken the entirety of Defendant's liquid assets to secure the judgment.

While the Court stated that the Receiver was to focus on liquid assets, a determination of value of the Oak assets (critical as these assets are already in the hands of the alleged victim and must be offset against disgorgement first) and other private investments would have yielded a far greater benefit to the Estate, as the parties have no transparency into these valuations.

The Defendant and the SEC even agreed on the premise that a Receiver was to be appointed to value illiquid assets. SEC: "Indeed, the Defendant's assets held at Oak demonstrate why such an appointment [of receiver] is necessary" [Doc. #995 at 2] and "…what we would request, and this goes back to the request for a receiver is, have a third party come in and look at this…" [Nov. 9 2018 Hr. Trans. at 18:21-23). The Court further said, "…I am therefore thinking of [valuing the Oak assets and private holdings] as part of a list of things a receiver-type person might be charged with doing." [Nov. 9 2018 Hr. Trans at 21:23-25]. The SEC even stated that they wanted the Receiver to value "**_all_** of Defendant's assets, including those held at Oak." [Doc. #995 at 2].

Therefore, it was unequivocally understood that a Receiver with a "limited function of [valuing frozen assets]… [would be] useful…for both sides and at this time." [Nov. 9 2018 Hr. Trans. at 49:1-3]. Indeed, this Court itself stated, "perhaps a receiver with a limited portfolio…we might use a receiver to do the valuation." [*Idem* at 4].

While the Receiver has billed for substantial time claiming to analyze private investments, the Defendant has not seen any benefit to the Estate from that work.  The Receiver must justify the amounts billed with the value he has provided in assessing the private investments. At this point, all the Defendant can ascertain is that the Receiver asked Oak for their

estimate of Defendant's non-forfeited assets[4] and taken that value at its word without any analysis or documentation to support that amount.[5]  Until the Receiver can justify the time spent on the amounts billed[6], these amounts must be removed from any billing.

The Defendant even provided the Receiver (on January 17, 2019) with a list of items that the Receiver should look into regarding Oak and Oak HC/FT and to date, nearly five months later, the Receiver has not even responded to the Defendant.

As such, the Receiver has *provided only marginal economic benefit to the Estate.*

*Sixth*, the quality and complexity of the work performed, including the results obtained and the benefit to the receivership estate continues to be marginal as there are substantial assets **already** under this Court's asset freeze order. The Receiver created a proposed Plan of Liquidation, as requested by the Court, which consisted of a proposal to monetize assets with liquid assets and real estate only.

The Defendant himself proposed a plan [Doc. #1057 at 38-39] that would have substantially over-secured the judgment.  There was no complexity and no analysis needed for the Receiver to propose a plan that is exactly what the Defendant proposed much earlier. The Receiver has not considered or recommended how these assets, once monetized, would be returned to their owners should the Second Circuit find for the Defendant/Relief Defendants.

In addition, the Receiver has presented a Report that has not considered the Record in this case. Specifically, the Receiver has proposed a method of calculation of interest and gains

---

[4] The Receiver also did not add in *non-forfeited* cash or liquid distributions from Oak HC/FT. Contrary to Oak HC/FT's position, these have not been forfeited and were not subject to any such provision.

[5] The value of the Oak assets has been a material dispute of fact throughout this entire proceeding. He Defendant has long maintained that an evidentiary hearing is needed to determine this value, especially as it is the alleged victim themselves that are solely determining this amount.

[6] The Defendant eyeballed the invoice entries and estimated approximate 63 hours and nearly $17,600 billed for work on private investment related issues.  The Defendant estimated these numbers based on the description in the various line items of the five invoices submitted and reserves the right to update them if any new information emerges.

without clarifying it first with this Court (especially as there is a pending Rule 59(e) motion on this very subject), without briefing on that subject and without going by what is already on Record. (The only dialogue on a calculation of "interest or gains" during this litigation was during a call, when this Court asked, "why isn't interest and gain on any asset subsumed in a current valuation of that asset" and the SEC agreed. [Nov. 9 2018 Hr. Trans at 22:4-6)]

*Seventh*, the time records presented by the Receiver are vague and confusing, have general entries, demonstrate over-billing (i.e. double and triple-billing, contrary to the Receiver's testimony to the Court), show travel time being billed (at legal rates mostly and even twice), show administrative functions being billed at legal rates, show inefficiencies in execution of matters, in addition to various other concerns. The Defendant describes such in more detail in Section titled "Specific Items and/or Groups of Items on Exhibits to Application."

## II.     THE RECEIVER'S FEES ARE EXCESSIVE FOR THE DUTIES PERFORMED.

Courts have discretion to award the amount of compensation and apply a rule of moderation in such fee applications by Receivers and their attorneys as "'receivers and attorneys engaged in the administration of estates in the courts of the United States . . . should be awarded only moderate compensation.'" *Byers*, 590 F. Supp. 2d at 645 (quoting *In re New York Investors, Inc.*, 79 F.2d 182, 185 (2d Cir. 1935)). Indeed, Courts must exercise discretion to avoid even the appearance of a windfall. *Idem.* Also, the receiver and his hired professionals "must exercise proper billing judgment in seeking fees from the receivership estate, and should limit their work to that which is reasonable and necessary."[9] Under these standards, the Receiver's fees under the application are excessive and unreasonable. The Receiver has requested a total of $162,972.50 in administrative and (mostly) legal fees and an additional $3,307.38 in expenses for a total of

---

[9] *Aquacell Batteries*, 2008 WL 276026, at *2. ("Part of 'determining the nature and extent of the services rendered'…includes an analysis as to the reasonableness of the services rendered," and the expenses for which reimbursement is sought must have been "actual and [] necessarily incurred.").

approximately 90 days of work. Such amount is not justified by the work that was done by the Receiver.

*First*, over 100% of the amounts identified or "secured" by the Receiver are a direct result of the Court's asset freeze order, which was already in place since May 2015, and continued to remain prior to the Receiver's appointment (thus, already over-securing the judgment). Thus, there was no complexity to further securing frozen assets. All administrative activities (like payment of expenses) performed by the Receiver were already being done *via* Court Order by the respective owners of these assets and did not warrant a Receiver charging legal rates to perform such and further drain the resources of the Estate.

*Second*, the Defendant opposes the Fee Schedule as described by the Receiver [Doc. #1160 at 5].   When the Receiver testified in front of this Court, he testified that he would use two fee classifications, a legal fee at the rate of a 25% discount off his normal fee of $495/hour, and an administrative fee of $250/hour.  However, the Receiver billed only 22 hours out of a total 646 hours (thus representing only **3% of total hours billed**) for administrative matters, with the rest being billed at his legal rate.  The fee calculations lack any merit and are unreasonable.

In addition, if the Receiver were to be providing "primarily legal services" [Doc. #1160 at 4], which is billed at a higher rate than that for administrative work, then there was no need or justification for counsel to the Receiver.  There is no simply need for the Receiver to be billing for *providing **his** own legal services to himself* if he has counsel. And if he is providing legal services himself, then there is no need for counsel. This is not a full employment opportunity for the Receiver and his firm.

The Defendant also has the understanding that *all* professionals that would perform administrative functions would substantially discount their rates for this purpose. For example, it

was primarily Mr. Christopher Blau who was dealing with the administration of expenses for assets etc., issues that require no legal knowledge or training, yet he has charged at an exorbitant legal rate for administrative work (i.e. paying maintenance for the NYC apartments and dealing with deposits of rental checks do not require legal expertise or knowledge). Legal experts cannot be performing administrative functions and charging legal expert rates; they should charge administrative rates since they elected to perform such administrative functions.

This Court must require a submission of administrative rates from other professionals as well as a reclassification of administrative work that was charged at exorbitant legal rate to that of much lower administrative rates.

*Third,* the Receivership has been inefficiently managed just by analyzing the numbers. With a total of 646.3 hours over 96 days, that means that someone was working on this case for almost 7 (seven) hours every working day[11] since the appointment of Receiver! That is excessive for the facts of this case and the Court should take particular notice on the Receiver's efficiency of managing the Estate.

*Fourth*, the Defendant is *pro se* and does not know the proper protocol or manner in which or how he should contest specific line items or groups of items. Thus, the Defendant explains his opposition to certain groups or classifications of the Receiver's Fee Application in Section VIII of this Opposition, which is titled "Specific Items and/or Groups of Items." This opposition to certain classifications or groups does not waive the Defendant's position that the Receiver's fees should be substantially reduced, but is rather an addition to help the Court in understanding the Defendant's opposition to the payment of Receiver fees as requested.

---

[11] Calculated as 646.3 hours divided by approximately 96 business days since appointment of Receiver of the time period covering the Application.

### III.     THE RECEIVER'S FEES MUST BE PAID FROM WITHIN THE JUDGMENT AMOUNT.

Courts generally pay Receivers from the Receivership Estate. However, in those cases, the amount of funds secured is lower than the amount of judgment.  The Defendant can find no case where a Receiver has been appointed where there are tens of millions of dollars of assets frozen (as a *supersedeas* bond pending appeal) *above* the judgment amount and a Receiver has been appointed to manage mostly liquid or near-liquid assets.  Therefore, if this Court believes that fees are warranted to the Receiver, this Court should pay the Receiver from assets *within* the judgment amount of $64.4MM that is being secured for the alleged victim.  To that, the Defendant would have no objection.

*First*, this Court does not have any legal authority or jurisdiction on assets over the amount of judgment. Here, the judgment amount is $64.4MM (and a contested and undetermined amount of interest/gains, which is on appeal).  As such, the Receivership Estate can *only* encompass assets that are within the judgment amount and nothing above that amount.  This Court itself was concerned with over-freezing assets and specifically mandated that a Receiver be appointed to that effect. ("…the need to value the assets and avoid over-freezing…" [Doc. #1070 at 5]).  The Receiver cannot be paid from assets over the judgment amount, even if those assets continue to remain frozen as a "*supersedeas*" bond.

*Second,* this esteemed Court has itself stated that "[Receiver fees], [which] necessarily come at the expense of compensating victims of the fraud." *SEC v. Illarramendi*, Civil No. 3:11cv78 (JBA), at *1 (D. Conn. Jan. 16, 2014).  The Receiver was appointed for the benefit of the public and thus, can only be paid from funds that are earmarked for the public, i.e. the judgment itself.  If the Court pays the Receiver with funds over and above this judgment amount, it renders perverse incentive whereby "the possibilities for abuse [are] limited only by the size of

the estate" *SEC. v. Northshore Asset Mgt.*, 05 Civ. 2192 (WHP), at *3 (SDNY Sep. 29, 2009)

and which further penalizes the Defendant and the Relief Defendants.

Given that the Receiver was appointed at the SEC's behest and for the benefit of the

public, the Court should pay the Receiver from funds within the judgment. Neither the Defendant

nor the Relief Defendants are benefiting from the appointment of the Receiver, yet the payment

of Receiver is coming from their funds and assets.

This Court had earlier stated, "in the absence of any authority in support of the

Defendant's position that the SEC should pay for the costs of a Receiver, all costs of the

receivership in this case will be paid from the assets of the Receivership Estate" [Doc 1070 at

5].[12] The fact of the matter is that the Defendant had been unable to find a case where the

government pays for the Receiver, because courts have never appointed a receiver in a similar

situation whereby the amount of assets frozen are *substantially greater* than the judgment

amount and consists of mostly liquid and near liquid assets.

Not only is the Defendant and Relief Defendants not benefiting from the appointment of

Receiver and his actions, a pending appeal could change the judgment in this case. Even the

esteemed Court has stated "the costs [for Receiver], if they were borne by the frozen funds and

the appeal was totally successful, that would not be an appropriate treatment of those frozen

funds." [Nov 9, 2018 Hr. Trans. at 36:12-14].

In addition, because this case is on appeal and no final judgment has ensued (due to

pending appeal), the cost of the Receivership should be borne by the government or by the public

---

[12]The Court defined the Receivership Estate as to "include all assets subject to the Court's asset freeze order… as modified throughout this litigation." [Doc. #1070 at 6]. This definition is under appeal as the Receivership Estate can *only* include amounts up to the judgment amount.  As per law and because this Court only has jurisdiction up to the amount of judgment, the Receivership Estate can only encompass a value up to the amount of judgment and no further.

itself within the judgment amount.  Even the Second Circuit has stated "[S]ince the benefit of the receivership is thus enjoyed by the public, it seems appropriate at this stage to impose the costs of the receivership on the government, at least pending a resolution of its charges against the defendants..." *U.S. v. Ianniello*, 824 F.2d 203, 209 (2d Cir.1987). There is no final determination in this case as it is under appeal. A final judgment ensues when all appeals have concluded.

*Third*, neither the SEC nor the Receiver have any incentive to keep fees low, as this Court has imposed the payment of Receiver fees as an additional penalty on the Defendant and Relief Defendants.  The Defendant further elaborates on this point in the next section titled "The SEC's Support of Payment of the Receiver's Fees."

*Fourth*, this Court cannot impose another penalty on the Defendant by requiring him to pay for the Receiver at no benefit to the Defendant when the Court itself has denied Defendant the use of his legally earned funds for his legal defense. It would be highly inequitable and perverse that funds above and beyond the judgment amount would be used to pay a Receiver (and *his* counsel) who benefits Defendant's adversary and the public, when the Defendant was denied use of those funds he legally earned for ***his own defense*** in violation of his due process rights.[13] To use the Defendant's (or Relief Defendants') legally earned funds over and beyond the judgment amount to pay the Receiver, which the Defendant does not consent to and is not supported by case law, is inequitable and usurps the Defendant's property and ownership rights with respect to his own funds and assets.[14]  The Defendant has every right to direct the use of those funds above the judgment amount of $64.4MM, which he had rightfully earned.

---

[13] The Defendant's motions for such are fully briefed and remain pending [Doc. ##1135, 1146, 1147 and 1157].

[14] *See Almeida v. Holder*, 588 F.3d 778, 788 (2d Cir. 2009) ("The rights and benefits of property ownership are, after all, many... [T]hey include not only the right to actual possession of a thing, but also the right to exclude others from possessing it, the right to use it and receive income from its use, the right to transmit it to another...").

Should the Court deny the Defendant and order that the funds to pay the Receiver come from above the amount for the judgment, the Court is imposing an additional, unprecedented, and unsupported penalty on the Defendant and requiring the Defendant to pay for the benefit of the SEC, his adversary. The SEC[15], who is an unsecured creditor, has been made secure by this Court's continued asset freeze order and the appointment of a Receiver who believes it "…prudent to maintain…asset freeze over the Receivership Assets to *fully secure* the Judgment…" [Doc. #1160 at 24]. Therefore, any payment of funds towards the Receiver must come from the Receivership Estate that encompasses the amount *within* the judgment.

## IV.     THE ORDER APPOINTING RECEIVER IS UNDER APPEAL.

The Defendant filed a timely Notice of Appeal on Order Appointing Receiver [Doc. #1084], which transferred jurisdiction from this Court to the Second Circuit Court of Appeals.

The "filing of a notice of appeal is an event of jurisdictional significance – it confers jurisdiction on the court of appeals and divests the district court of... control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982)(*per curiam*). Once a notice of appeal has been filed, a district court may take actions only "in aid of the appeal or to correct clerical errors," *Leonhard v. United States*, 633 F.2d 599, 609-10 (2d Cir. 1980), cert. denied, 451 U.S. 908, 101 S.Ct. 1975, 68 L.Ed.2d 295 (1981).

As the filing of that appeal "divest[ed] the district court of its control over those assets [and issues] of the case involved in the appeal," *Griggs,* 459 US at 58, any payment towards the Receiver does not preserve the *status quo* pending appeal. Issues under appeal with respect to

---

[15] "Nor is an agency that has won a disgorgement order entitled to priority over the other creditors of the defendant." *Fed. Trade Comm'n v. Bronson Partners Llc*, 654 F.3d 359, 373 (2d Cir. 2011); *See SEC v. Spongetech Delivery Sys., Inc.*, 2015 WL 1509361, at *4 (EDNY Mar. 15, 2015) (disgorgement remedy has the same priority as other unsecured claims).

14

the Order Appointing Receiver[16] include issues such as, *inter alia*, the actual appointment of Receiver, the Receiver's duties as stipulated,[17] the provisions contained within the Order, who will pay the Receiver, the definition of the Receivership Estate[18] and the jurisdiction of the Receiver over certain assets.

Thus, payment to the Receiver while the Order Appointing Receiver has been appealed does not maintain the *status quo*.  "One general rule in all cases (subject, however, to some qualifications) is that an appeal suspends the power of the court below to proceed further in the cause." District courts only have the power to grant such relief as may be necessary to preserve the *status quo* pending an appeal. *Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. E. Air Lines, Inc.*, 847 F.2d 1014, 1018 (2d Cir. 1988)

Therefore, the Court should not direct any payment to the Receiver while its Order Appointing Receiver itself is under appeal and can only maintain *status quo*.

### V.    THE SEC'S SUPPORT FOR PAYMENT MUST BE IGNORED.

The Receiver was appointed at the SEC's behest. As such, the SEC has every incentive to support the payment of Receiver's fees.  However, this Court has removed any incentive for the SEC to **police** the Receiver's fee, because the Court has imposed the payment of Receiver's fees

---

[16] The entirety of the Order is under appeal. As such, any matters intertwined with this Order are also under appellate jurisdiction. *See U.S. v. Ianniello*, 824 F.2d 203, 209 (2d Cir.1987) ("once we have taken jurisdiction over one issue in a case, we may, in our discretion, consider otherwise nonappealable issues in the case as well") citing *See San Filippo v. U.S. Trust Co. of New York, Inc.*, 737 F.2d 246, 255 (2d Cir.1984).

[17] The Court directed the Receiver to provide his "estimate regarding "the amount of the judgment in this case…" [Doc. #1160 at 10]. This provision (as well as others) is under appeal. The Court has ordered a judgment of $64.4MM, which has been appealed. Inclusive in this appeal (among other issues) is the grant of "interest or gains" and thus, the jurisdiction over such grant and its calculation is now with the Second Circuit.

[18] The Court defined the Receivership Estate as to "include all assets subject to the Court's asset freeze order… as modified throughout this litigation." [Doc. #1070 at 6]. This definition is under appeal as the Receivership Estate can *only* include amounts up to the judgment amount.  As per law and because this Court only has jurisdiction up to the amount of judgment, the Receivership Estate can only encompass a value up to the amount of judgment and no further.

as an additional burden on the Defendant and Relief Defendant to be paid with funds above the judgment amount.   Thus, the benefiting party, the SEC and/or the public, are not paying for the Receiver and have no incentive to ensure that the Receiver's fees are in compliance and even appropriate.

Typically, "[O]pposition or acquiescence by the SEC to the fee application will be given great weight." *Byers*, 590 F. Supp. 2d at 644 (quoting *First Ave. Coach Lines*, 364 F. Supp. at 122). However, courts have stated that "[N]o statute compels such a conclusion, however, nor do[es] [the Court] believe such great deference is warranted in this instance." *In re Alpha Telcom, Inc.*, No. CV 01-1283-PA, at *6 (D. Or. Oct. 27, 2006).  Similarly, this Court should decline to give *any* weight to the SEC's opinion in this case, as the SEC's opinion should be considered ***only in a situation*** where the amount of assets collected is *less than* judgment amount or if this Court reimburses the Receiver from funds encompassed within the judgment (within the $64.4MM amount). Otherwise, only the Defendant and Relief Defendant's opinion must be given "***entire*** weight," if any payment is coming from them and their assets above the judgment amount.

Given this Court's ruling on the payment of Receiver fees, it is hardly surprising that the Receiver has confirmed "[T]he Commission has expressed that it does not oppose the relief requested in this First Application." [Application at 2]. This is to be expected, as this Court has ruled that the government will not pay for the Receiver.   That must encompass the value of those assets that are encompassed *within* the judgment of $64.4MM.  The Receivership Estate is tens of millions of dollars over the judgment amount and the Defendant (and Relief Defendants) have a right to the use of and to direct the use of their own assets over and beyond the judgment amount. Hence, any payment to the Receiver should not be over and above the judgment amount, but must come from the amount ***within*** the judgment.

Indeed, courts have already recognized this. "Characteristically, the SEC does not oppose the Receiver's fee application. This Court wonders who should guard the guardians." *SEC v. Northshore Asset Mgt.*, 05 Civ. 2192 (WHP), at *3 (SDNY Sep. 29, 2009). Also *see FTC v. Innovative Wealth Builders, Inc*. Case No. 8:13-cv-123-T-33EAJ, at *4 (M.D. Fla. Aug. 22, 2013) (***reducing the requested fees by 50%*** and stating that "…Court's understanding that the FTC would scrutinize the Receiver's and his counsel's fee petitions and would play a part in safeguarding the funds for the victims of the alleged fraudulent scheme. It appears to the Court, however, that the FTC's current plan for the management of the assets in this case is not working...") (emphasis added).

Because of this Court's rulings, the SEC has a perverse incentive to simply blindly consent to any and all of the Receiver's fee applications.  It is the Defendant's understanding that this Court cannot monitor the Receiver's fees. "Although there is an obligation to monitor fees, "courts have recognized that it is unrealistic to expect a trial judge to evaluate and rule on every entry in [a fee] application." *New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1146 (2d Cir. 1983). In a large securities fraud action such as this one, the Court necessarily relies upon the SEC to discharge its duties to protect the victims of fraud and monitor the reasonableness of the legal fees being charged to the Receivership. If the SEC abdicates this duty, the public interest is not fully protected. *See Northshore Asset Mgmt.*, 2009 WL 3122608, at *1 ("While Judge Owen relied justifiably on the SEC to discharge its review obligation, the agency was asleep at the switch. Thus, the possibilities for abuse were limited only by the size of the estate.")." *SEC v. Illarramendi*, Civil No. 3:11CV78 (JBA), at *3 (D. Conn. Dec. 5, 2013). This Court in that matter itself further ordered the SEC to perform additional actions, including but not limited to a further audit, "includ[ing] a line by line review of each time entry or expense,

and must categorize each expense as either reasonable, questionable, or unreasonable in the SEC's view." *Idem.*

In this instant case, the SEC does not care about the line items in the Receiver's bills, because these amounts are being paid from the Receivership Estate, which includes assets over and above the judgment amount. Thus, this Court *must* take any Receiver compensation out of the amount for the judgment amount *only*, or clarify that the Receivership Estate can only encompass the amount of assets that are within the judgment amount and pay any compensation from such amount, else the SEC will simply "rubber-stamp" any and all of Receiver's fees in this case. The Defendant is sure that if the Court were to order that the Receiver's fees were to be paid by the government or to come from *within* the judgment amount, that the SEC would join the Defendant in submitting a detailed opposition to many of the Receiver's requested fees.

## VI.   THE RECEIVER HAS PROVEN TO BE NOT A NEUTRAL PARTY.

The Receiver is supposed to be a neutral party: "A receiver is a neutral third-party custodian for the property who is granted certain powers by the court."[19]  However, nearly all actions that the Receiver has taken since his appointment in this case have led the Defendant to believe that this Receiver is not a neutral party by any stretch of imagination. The Receiver has refused to share any documentation that the Defendant has requested on *his* own assets; and the Receiver is clearly "taking instruction" from the SEC. The Receiver, though claiming to be "neutral" and "taking no position" has actually supported the SEC through his filings in this case and has openly contradicted himself in his statements in his support of the SEC.[20]

---

[19] SEC website: https://www.sec.gov/oiea/investor-alerts-bulletins/ib_receivers.html, accessed on May 24th, 2019

[20] As a result, the Receiver was rewarded with a potential appointment in another civil case involving the Defendant.  The Defendant has already stated his opposition to such appointment [Doc. #1139 at 11-13] and intends to file an opposition to Receiver's request for such appointment [Doc. #1169].

_First_, the Receiver has refused to respond to the bulk of Defendant's requests in a timely manner. In particular, the Defendant gave the Receiver's counsel a packet of information on January 17, 2019 concerning his Oak assets that the Receiver has yet to respond to.

_Second_, the Receiver has opposed providing any documentation that the Defendant has requested on his _own_ assets, specifically assets that are illiquid and private, such as his _non-forfeited_ Oak and Oak HC/FT assets and his interests in private companies.  The Defendant has legally binding investor rights to be able to access and obtain such information, which includes, but is not limited to financial statements and annual reports, valuations exercises and financing plans.

_Third_, the Receiver appears to be taking instruction from the SEC.  _See_ DAA Entry dated 2/8/19 "Continue NT Stmt review; meet with Atty Blau re same. Start cross checking debits and credits against court orders ___per SEC instruction___. Pull Order from PACER for review" for 3.70 hours on Doc. #1160-4 at 43.  The Receiver, who is supposed to be a neutral third-party and an extension of this Court, is now operating per "SEC instruction!" And then billing the Defendant for payment of work generated by that instruction! The Receiver, if he needed to, should have clarified with the Court if such action was within the purview of his appointment, instead of taking "SEC instruction."

_Fourth_, despite claiming to "take no position" on the various filings in this case, the Receiver has supported the SEC in every single filing by the SEC, demonstrating a symbiotic partnership between the SEC and the Receiver.   Even to the extent that the Receiver has contradicted his earlier submission in his later filings, just to support the SEC.

In particular, the Receiver simply mimics the SEC's opposition and adds nothing new to various issues; an example of which is his response to the Defendant's motion to hold the SEC in contempt of Court Order.  _See_ Doc. #1156 at 2, whereby the Receiver simply refers to the SEC's

opposition to support Receiver's statement "...explained more fully in the Commission's Objection..." Notably, in that submission, the Receiver also fails to describe why and how "[T]he Civil Insider Trading Case constitutes a "related action of the SEC"" to this instant action [Doc. #1156 at 2] when it is just impossible that the MA matter has *any* relation to this instant matter. Yet, the Receiver makes a statement that supports the SEC without offering any reasons why the MA matter alleging insider trading is a "related action of the SEC," even though the Receiver is not a party to that case, does not know the facts, or even the allegations and has no say on the merits of that case.   And in the process wasting resources on work unrelated to its Receivership assignment.

In addition, the Receiver in his Report [Doc. #1130] makes clear that the approximately $18.6 million are "not needed to pay the judgment at this time." [Doc. #1130-1, page 3 of 6]. Yet, the Receiver contradicts himself in his Response to Defendant's Motion for Mistrial by then stating "there are **_no_** Receivership Estate assets that, in the Receiver's view, are truly excess and unnecessary to secure the Judgment." (emphasis added) [Doc. #1146 at 2].  The Receiver's comments are entirely contradictory in Doc. #1130-1 or in Doc. #1146, for it just cannot both be true that (i) assets worth $18.6 million are not needed to pay the judgment at this time; and (ii) there are no assets truly excess and unnecessary to secure the judgment.  If that were to the true, 18.6 million would be equal to zero or indeed a negative number, which is not right.

These are entirely contradictory statements that are being made by the Receiver simply because he supports the SEC's position that the Defendant should not be getting legal fees, *even from his own legal earnings and even from those amounts above the judgment amount.* This is just basic arithmetic - either there are more assets than needed to secure the judgment or there are not enough assets to secure the judgment. There is no in-between. The judgment in this case is $64.4MM. Even with the Receiver's aggressive estimate of $70.5MM (being litigated and

opposed by the Defendant), there are still millions of dollars that should have been available for Defendant's defense.  Indeed, the Receiver and the SEC further recognize that the asset freeze includes more assets than are necessary to secure the SEC's judgment in this case because the SEC has submitted to the Court that they intend to freeze additional assets over $4MM for Defendant's civil case in MA.  The Receiver, as per his own statement, does not intend to object to that request "and sees no conflict [between the two actions]" because it relates to "assets not necessary to fully secure the judgment in the instant matter." [Doc. #1138].  Therefore, it is clear – by the Receiver's own words – that there are assets in excess of the SEC's judgment. The Receiver even states so in his Application in blatant support for having his own and his counsel's fees paid.  [Doc. #1160 at 13].

Yet, the Receiver openly and blatantly makes contradictory statements on record, to support himself and the SEC and to deny the Defendant his basic rights.

*Fifth*, the Receiver has presumably billed for "respond[ing] to court filings as necessary." [Doc. #1160 at 22]. However, there has been no need for the Receiver to file *any* response to *any* of the motions that have been filed during his appointment.  Just one example (of many) of this is Receiver's response [Doc. #1156] to Defendant's Motion Seeking to Hold the SEC in Contempt of Court Order [Doc. #1139]. That motion has nothing to do with the assets under this freeze, is concerned with another matter where if not stayed, violates this Court's Order, and Receiver does not know any of the facts nor is he a party to that case. For the Receiver to opine on such matter is outside his assignment and should not be included for any reimbursement.

In addition, the Defendant corrects the Receiver's statement "The Defendant… did not dispute that the alleged fraud took place." [Doc. #1160 at 7].  The Defendant made it clear that these acts were not fraudulent, but "[E]ach transaction was approved unanimously by the Oak partners, each investment and transaction was vetted, researched, recommended, and approved

by senior managing partners of Oak." [Doc. #665 at 35]. In particular, "[W]hat has now been alleged as acts of *"fraud"*, were legitimate business transactions or payments that were (i) authorized and approved by one of more of the Oak Managing Partners ("MPs"); (ii) undertaken to either protect Oak's investment from total write-off, and/or to create a successful outcome; and (iii) undertaken to promote Oak's business objectives." [Doc. #682 at 3].[21]

For these reasons, the Receiver is not a neutral party and cannot be relied on to make any fair and impartial determinations towards the Defendant (or Relief Defendants) or on their assets.

## VII.    THE RECEIVERSHIP MUST NOW BE TERMINATED IMMEDIATELY.

The Receiver believes that "at this time, it is premature for [him] to speculate on when this receivership proceeding will be ready to close," and that it is "only after (i) all appeals have been fully adjudicated, (ii) if and to the extent the Judgment is affirmed on appeal, distributions are made to satisfy the Judgment, and (iii) all costs of the administration of the receivership are paid, can the receivership be appropriately closed." [Doc. #1160 at 24]. However, the Receiver is not needed to manage these properties (as they were being managed amply well even prior to the Receiver's appointment), nor is he needed for monetization of assets if the Court so orders.  The appeal process will take up to a year or so (to the Defendant's non-expert, best estimate) and there is only "one victim" here.  This Court itself stated, "[S]o if a receiver – and it's a very ***limited*** task... I mean, we only have – we don't marshal the assets *beyond valuing what's been frozen.* We only have one victim. It's ***not a broad scope receivership*** such as the types that have incurred criticism elsewhere." (emphasis added) [Doc. #1042 at 48]. As such, there is no need to

---

[21] The Defendant submitted Doc. ##383, 391, 393, 397, 451, and 464 on this topic.

burden the Estate with yet additional future Receiver fees, when a Receiver is not necessary in this case and thus, the Receivership should be terminated immediately.[22]

In addition, in this situation, there are tens of millions of dollars of assets above the judgment amount.  Any action taken by the Receiver now directly and negatively affects the value of any remaining assets he intercepts or claims jurisdiction over. This is whether or not the appellate courts affirm or reverse this Court's rulings. Indeed, while the Receiver *may* be immune to personal liability on assets up to the amount of judgment, the Receiver will be personally liable for any assets that are over and above the judgment amount, as the Court can only have jurisdiction for assets up to the judgment amount. *See De Beers Consol. Mines v. U.S.*, 325 U.S. 212 (1945). (Supreme Court ruling that assets beyond those needed to satisfy a judgment cannot be the subject of a freeze). *See* also *Cochrane v. W.F. Potts Son & Co.*, 47 F.2d 1026, 1029 (5th Cir.1931) (ruling that a court lacks jurisdiction to impose a receivership over property that is not the subject of an underlying claim or controversy).

In addition, the Receivership should be terminated as it appears that the Receiver has overstepped his authority without prior approval from the Court, as he has had discussions about potential auctions and/or sales of real estate under this Court's freeze order, prior to any Court determination and without consulting with either the Defendant and/or Relief Defendants.  The Defendant opposes any such discussion and communication with anyone else regarding any "auction" or "sale" of any property prior to any Court determination or an explicit agreement (and Court authorization) with the Defendant and Relief Defendants.  By doing so, the Receiver is usurping judicial functions from the Court. *See Weil v. Neary,* 278 U.S. 160 (1929). (Condemning undisclosed fee sharing arrangement as taking the judicial function from the court). Similarly, neither the Court nor the Defendant was made aware of any such discussion.

---

[22] The Defendant is prepared to provide additional briefing on such subject, should the Court request.

Indeed, the Defendant is astonished that the Receiver had discussions (with either prior or current tenants) regarding auctions or sale of property prior to Court determination. For example, see DAA entry 2/5/19 "Call with D Duksa re farmhouse, outbuilding usage, **_April auction_**. Email re same" (emphasis added) on Doc. #1160-4 at 39.

The Receiver discussed an auction with the former seller and tenant of the Farm **_without Court approval and authorization_** and without the consent of the owners of The Essell Farms. Furthermore, it appears as if the Receiver was negotiating with the current tenant of Apt. 12F about potential purchase offers that were not disclosed to the Court and the Defendant; and were disclosed months later to the Relief Defendants (see CHB entry on 3/14/19 "Research David Schulhof (tenant of 12F) and his background in connection with **_apartment negotiations_**" on Doc. #1160-4 at 66; see SMK entry dated 3/29/19 "Begin to **_coordinate sale of NYC apartment_**; **_evaluation of listing price including comparables (sic)_**" on Doc. #1160-4 at 66 etc.; emphasis added in all).  These extra judicial actions are outside his mandate and cannot be charged for.

These actions are in <u>direct contravention</u> to this Court's directive in the Receiver Order [Doc. #1070] that governs that the Receiver is "[T]o manage … and taking into consideration the wishes of Defendant and Relief Defendants…[the assets]" [Doc. #1070 at 7] as well as "manage the assets…subject to consultation with the Defendant and the Relief Defendants" [Doc. #1070 at 14]. In addition, this Court expressly stated that **_"[I]f subsequently ordered_** by the Court…and with due regard to the interests of the Defendant and the Relief Defendants, the Receiver will be authorized to lease, or to sell…" (emphasis added) [Doc. #1070 at 14].

The Receiver has not consulted any of these actions with the Defendant or the Relief Defendants.  He has not communicated any offer received in a timely manner or potential sale or auction of these properties that he has explored such without explicit Court order.

24

**Such behavior is beyond that allocated to the Receiver and the Court should inquire to the Receiver why such actions were taken**.

On another matter, the Receiver is creating excess work where it is not necessary. For example, the Receiver has billed for conversations with FTI Consulting ("FTI"), a forensic accounting firm, who has not been retained in this matter.[23] There is no need for FTI in this case, where no tracing has been ordered or needed, and there are more than sufficient assets available to satisfy the judgment.  Any "ongoing" discussions [Doc. #1160 at 22] with FTI are wasteful.

In addition, FTI is most definitely **not** a real estate broker.  Consequently, any entries that deal with FTI must be removed from the invoices (for example, see CHB entries on 3/19/19-3/26/19 "drafting application to employ FTI for broker and tax services…and forensic services.…regarding FTI retention…call with FTI…" for a total of at least 7.3 hours on Doc. #1160-4 at 66).[24]

It also appears as if the Receiver was reconsidering his appointment in this case. As such, the Receiver's counsel has billed for both "analyz[ing] potential changes to appointment order" and considering a "reappointment of Receiver" (*See* CHB entry on 12/31/18 "Discuss/analyze potential changes to appointment order with RV" for 1.4 hours on Doc. #1160-4 at 4; and CHB entry on 12/31/18 "Draft motion to reappoint receiver" for 1.9 hours on Doc. #1160-4 at 4). These are internal issues for the Receiver's firm, unrelated to the mandate ordered by this esteemed Court, and they cannot be billed in this matter and any such line items *must be* removed from the invoices.

---

[23] Throughout Exhibit D of Doc. #1160.

[24] The Defendant eyeballed the invoice entries and estimated an approximate 46 hours and nearly $13,000 billed for determination of tax issues alone.  The Defendant estimated these numbers based on the description in the various line items of the five invoices submitted and reserves the right to update them if and when new information emerges.

Finally, the Receiver believes that he has been appointed "to liquidate assets to secure the Judgment." [Doc. #1160 at 25].  This Court has simply ordered a proposed Report of such assets that ***may*** be liquidated and has issued careful instructions to the Receiver on such. The Court has not ordered liquidation yet and there are significant complex issues with liquidating assets prematurely and there may also be appellate issues with ordering as such, especially on certain assets.

All these reasons support the immediate termination of the Receivership, as a Receiver is no longer needed, has overstepped his authority multiple times, has overbilled for services not needed, and has officially confirmed (as the Defendant has maintained all along) that there are tens of millions of dollars of assets above this Court's judgment that remain frozen.

### VIII.   IN THE ALTERNATIVE, IF THIS COURT IS INCLINED TO GRANT FEES TO THE RECEIVER, IT MUST REDUCE THE FEES SUBSTANTIALLY AND IMPOSE A 100% HOLDBACK UNTIL ALL APPEALS ARE CONCLUDED.

Courts have discretion to award the amount of compensation that can or will be awarded to a court-appointed receiver. See *SEC v. Byers*, 590 F. Supp. 2d 637, 644 (S.D.N.Y. 2008); *United States v. Code Prods. Corp.*, 362 F.2d 669, 673 (3d Cir. 1966).  In addition, "Courts … may consider many factors when awarding a reduced fee, regardless of the fees being approved by other courts in similar cases." *See Alpha Telcom II*, 2006 WL 3085616, at *3-6.

"[I]n receivership situations, lawyers should be awarded moderate fees and not extravagant ones." *SEC v. Byers*, 590 F. Supp. 2d 637, 648 (SDNY 2008). The Receiver and any professionals assisting the Receiver should charge a reduced rate to reflect the public interest involved in preserving funds held in the receivership estate. See *id*. at 646-47. *SEC v. Small Bus. Capital Corp.*, Case No. 5:12-CV-03237 EJD, at *4 (N.D. Cal. Aug. 7, 2014).  The fees that the

Receiver and his counsel have requested are excessive, unreasonable and not justified, even with a reduction of 25% on their regular rates.

This case does not justify the award of fees to the Receiver until the benefit that the Estate receives from him is determined. To date, there has been only marginal benefit to the Estate and the Defendant is waiting for a ruling on his pending motion for mistrial, which is fully briefed.[25] As such, it is inefficient and a waste of resources for the Receivership to continue until that motion is ruled on and an appeal is heard. Regardless of the Court's ruling on that, there is no justification to awarding the requested fees to the Receiver and his counsel. "A court considering awarding interim fees should consider several factors. *Alpha Telcom II*, 2013 WL 840065, at *16. An award of interim fees is appropriate "where both the magnitude and the protracted nature of a case impose economic hardships on professionals rendering services to the estate." *In re Alpha Telcom, Inc.* [Alpha Telcom I], No. 01-CV-1283-PA, 2006 WL 3085616, at *3 (D. Or. Oct. 27, 2006). The court should also consider the "economy of administration, the burden that the estate may be able to bear, the amount of time required, although not necessarily expended, and the overall value of the services provided to the estate." *In re Imperial '"400'" Nat., Inc.*, 432 F.2d 232, 238 (3rd Cir. 1970)." *SEC v. Small Bus. Capital Corp.* Case No. 5:12-CV-03237 EJD, at *4 (N.D. Cal. Aug. 7, 2014). There is no economic hardship on the Receiver's firm, which looks to be a 13-professional firm, of which 9 (nine) are partners.[26] There is also no Final Judgment in this case as it is under appeal and the SEC has no incentive to "police" the Receiver's application for fees.

In addition,

> "[F]requently courts will withhold a portion of the requested interim fees because "until the case is concluded the court may not be able to accurately determine the

---

[25] The Defendant's fully briefed motions for such remain pending (Doc. ##1135, 1146, 1147 and 1157).
[26] https://www.zeislaw.com/attorneys, accessed on May 19, 2019.

'reasonable' value of the services for which the allowance of interim compensation is sought." *Alpha Telcom I*, 2006 WL 3085616, at *3. The factors listed above, and others, may persuade the court to award some amount less than requested. See *Byers*, 590 F. Supp. 2d at 648. Lastly, "'courts have recognized that it is unrealistic to expect a trial judge to evaluate and rule on every entry in an application'" and courts "'endorse percentage cuts as a practical means of trimming fat from a fee application.'" *Id*. (quoting *N.Y. State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1146 (2nd Cir. 1983)). *SEC v. Small Bus. Capital Corp*. Case No. 5:12-CV-03237 EJD, at *4 (N.D. Cal. Aug. 7, 2014)

See also *United States ex rel. Miller v. Bill Harbert Int'l. Constr. Inc*., 601 F. Supp. 2d 45, 50(D.D.C. 2009) ("the Court can also reduce fees by a reasonable amount without providing an item-by-item accounting.")  If this Court is inclined to grant the Receiver's fees (which the Defendant vehemently opposes), the Court should apply a minimum of a 50% discount to the requested fees and withhold 100% of the amount.

 Courts have allowed the "Receiver [to] apply for those fees at the conclusion of this litigation. Withholding fees until the conclusion of the lawsuit assists the Court in achieving its continuing goal of preserving funds held in the receivership estate for the compensation of the investors. This approach is common in SEC civil enforcement actions because it allows the Court to withhold fees until it is absolutely clear that a receiver's efforts will ultimately benefit the receivership estate. *See SEC v. Byers*, 590 F.  Supp. 2d at 648. The Court derives the authority to award such reduced fees from its power to "fix the compensation" of receivers and their attorneys. *Drilling*, 69 F.2d at 418."  *SEC v. Small Bus. Capital Corp*. Case No. 5:12-CV-03237 EJD, at *4 (N.D. Cal. Aug. 7, 2014)

The Court has provided for a 20% holdback in this instant matter. [Doc. #1070, at 16]. This must be increased to a 100% holdback, as even the Receiver admits that "[O]verall results can be determined only at the conclusion of the Receivership proceedings." [Doc. #1160 at 26]. The additional discount in fees and the 100% holdback is justified in this situation because (i) there is no justification for having a Receiver; (ii) the fees requested are excessive and

unreasonable; (iii) there has been only marginal benefit to the Estate; (iv) the SEC has no incentive to "police" the Fee Application; (iv) there are more liquid and near-liquid assets than the judgment amount; (v) there are tens of millions of dollars of assets frozen above the judgment amount; (vi) the Defendant has been denied the use of his own legally earned funds for his own defense in this (and other) matters; and (vii) there is an appeal pending, including on the instant issue of Appointment of Receiver (which includes any payment to such Receiver)[27].

In addition, there are significant issues that will be considered in the Second Circuit, including but not limited to: the nature and use of Defendant's allegedly *forfeited* Oak assets, the grant and calculation of interest/gains, the nature and use of Relief Defendants' assets to secure and/or satisfy Defendant's judgment, the appointment of Receiver (which includes any payment), violations of Defendant's due process rights.  The Second Circuit could find for the Defendant and/or Relief Defendant on any or all of these issues, which would have a material impact on the judgment amount itself as well as the assets used to satisfy that judgment. As such, this Court should impose a minimum discount of 50% and a 100% holdback on any fees for the Receiver as they are excessive and unjustified in this situation.

## IX.  SPECIFIC ITEMS AND/OR GROUPS OF ITEMS ON EXHIBITS TO THE APPLICATION.

The Defendant contests all of the Receiver's bills, but because he is *pro se* and uncertain of the proper procedure regarding line items, the Defendant only gives some examples below to support his opposition of the payment of ***any*** fees or expenses to the Receiver. Should the Court request a line item audit by the Defendant, the Defendant would provide such to the Court.  The Defendant reserves the right to bring additional issues on these invoices and exhibits, or any

---

[27] The filing of an appeal "divest[ed] the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Discount Co.*,459 U.S. 56, 58 (1982)(per curiam). This includes, but is not limited to: the appointment of Receiver and any payment to him.

other matter regarding the Receiver's applications for fees and expenses, to the Court's attention at a later date in time.

1.    <u>Doc. #1160-1, or Exhibit A:</u>

*First,* the Defendant opposes the lack of description for Line 2 on Doc. #1160-1, or Exhibit A. What are the items that have encompassed the business income of $19,542.02?

Similarly, Line 4 of this Exhibit depicts "Interest/Dividend Income" - but what assets generated the interest/dividend income? Was it just this account or some other assets?

*Second,* the Defendant opposes the generality and non-description of the breakup of the line items for Line 10 on Doc. #1160-1, or Exhibit A.  While the addition of the sub-line items for Line 10 adds up to a total of $58,402.27, which is equivalent to the total of amounts expended and explained in Doc. #1160 at 17-18, there is no description of which expenses are in the sub-line items for Line 10.  The Receiver must list what specific charges encompass those particular line items.

2.    <u>Doc. #1160-3, or Exhibit C:</u>

*First,* the Defendant opposes all items in Doc. #1160-3 or Exhibit C.  These include: PACER expenses, online research expenses, filing fees, Federal Express expenses, copying expenses, travel charges, expenses to *subpoena* documents, service fees for *subpoenaing* documents, conference call expenses.

With respect to PACER and online research expenses, the Receiver does not explain what documents he accessed from PACER and what online research resulted in these invoices. Further, as indicated in the emails transmitting electronic filings in this case, the PACER system permits parties to download for free a copy of all case-related documents.  Further, the Court denied the same relief that the Defendant requested toward payment of a $28.50 PACER bill, stating that "[S]hould Defendant desire the additional benefit of viewing documents in other

cases or viewing documents in his case multiple times, he must bear that expense himself." [Doc. #773].  The Court must treat the Receiver the same way.

*Second,* the Receiver does not specify the need for such other services, such as copying. In addition, because this Court also denied Defendant any amount for travel expenses, any aid with conference call expenses and any aid with his attempts to properly *subpoena* Oak [Doc. #494], any and all expenses that the Receiver is requesting reimbursement for on Exhibit C (Doc. 1160-3) must also likewise be denied or removed.

**3.      Doc. #1160-4, or Exhibits D-1 to D5 (in its entirety):**

*First,* Defendant opposes the breakup and classification of the fees into five "buckets" or "Activity Categories":  (1) Case Administration; (2) Asset Analysis and Recovery; (3) Asset Disposition; (4) Claims Admin & Objection; and (5) Admin Fees. The Receiver claims that this is being done "**pursuant to SEC Guidelines**;" however, as stated, the SEC has no incentive to *police* the Application for fees.  To break the classification this way is inefficient as the Defendant has to comb through each of these five fee breakups and also go back and forth between the five different fee invoices to make sure that there is no duplicate billing between each of these five categories. Not only that, the Receiver does not breakout what fees are being assessed at a legal rate and what fees are being assessed at an administrative rate, both being significantly different, which leads to further confusion.[28] The Receiver needs to reclassify these fees (at no charge) into legal and administrative and in one, or at most two, fee applications (between legal and administrative) so that these can be audited properly. This needs to be done ***first***.

---

[28] The Defendant assumed that Invoice D-5 is the sole invoice charged at administrative rates. This rate is $5,425 of the total requested $162,972.50, ***or 3% of the total requested fee payment***.

*Second*, the Receiver does not specify who certain professionals are in these invoices. For example, who is "KDJ" in Doc. #1160-4 at 2 of 78?  Similarly, while Defendant can attempt to deduce who the attorneys are for each line item, it would have been easier and more efficient for the Receiver at least specify, either in the actual document itself [Doc. #1160] or in the fee invoices [Doc. #1160-4], who these individuals mentioned in the invoices are.

*Third,* the Defendant opposes the invoicing for administrative work at legal rates.  For example, the Receiver has charged a legal rate (and for 30 minutes) for the administrative work of "Address how to coordinate obtaining information from the Commission during "shut down"" [Doc. #1160-4 at 4, entry on 1/2/19]. Surely coordination of communication does not require legal knowledge to justify being charged a legal rate? For 30 minutes?

Similarly, any exchange of emails or conversations regarding specific assets, such as Mr. Blau "exchang[ing] correspondence with Mr. Hayes-Williams regarding safety deposit boxes at Greenwich BOA" [Doc. #1160-4 at 4 of 78, entry on 1/4/19] does not require legal knowledge? In addition, the Receiver has charged a legal rate for the administrative work of "attend[ing] storage unit viewing in Greenwich, ensure clients of custody and arrange for titling in receiver." [Doc. #1160-4 at 8 of 78, entry on 2/12/19].  The Receiver has also charged a legal rate for the administrative work of determining the "history of Mr. Ahmed's purchase and the financial aspects of the Essell Farm" [JED entry 12/31/18 for 1.8 hours on Doc. #1160-4 at 23] and in "analyz[ing] information re: purchase price; listing history; operators; subletting of Essell Farms" *Id* for 2.1 hours. Such activity is simply administrative and does not require legal knowledge to assess.  Indeed, almost all the entries in Exhibit D-2 are unnecessary and entirely administrative in nature and have been charged at legal rates. [*See* CHB entry dated 1/9/19 "Call with Suzanne Morse at Fidelity Investments regarding monthly distribution, account statement" in Doc. #1160-4 at 26; *see* CHB entry dated 1/10/19 "Call Paul Knag at Murtha re Reserve

Media address and moving etrade (sic) money to receivership account to pay bills, email to same re same" in Doc. #1160-4 at 26; *see* 1/28/19 "Communicate with Duksa regarding status of farm" in Doc. #1160-4 at 35; *see* CHB entry dated 1/29/19 "Draft correspondence to Paul Knag regarding apt 12F electric billing issue" in Doc. #1160-4 at 36; *see* JED entry on 1/30/19 "Trade email exchanges with Relief Defendants' counsel and arrange to access both safety deposit boxes" in Doc. #1160-4 at 37; *see* DAA entry on 2/7/19 "Northern Trust account statement review (historical)" in Doc. #1160-4 at 42; *see* CHB entry on 2/12/19 "Attend Morgan Manhattan inventory" for 1.5 hours in Doc. #1160-4 at 46; *see* JED entry on 2/19/19 "Attend to and review inventory, lock changing title transfer of safety deposit boxes at BOA in Greenwich" for 3.2 hours in Doc. #1160-4 at 49; *see* CHB entry on 2/19/19 for same in Doc. #1160-4 at 50 for 2.7 hours; *see* DAA entry dated 2/21/19 "Email re keys to Farm; prep/send letter to D Duksa re return of keys" in Doc. #1160-4 at 51; *see* CHB entry on 2/28/19 "Draft correspondence to Relief Defendant counsel regarding 530 Park March expenses" in Doc. #1160-4 at 55; *see* numerous "exchange of correspondence" in Exhibit D-2 that have been charged at legal rates; and *see* SMK and CHB entries on 1/3/19 and 1/4/19 for "work on living expenses" in Doc. #1160-4 at 69-70).

The Defendant also opposes the term "Asset Schedule" as there has been no definition of such schedule and it is repeated throughout the invoices [*See* DAA entry dated 1/7/19 "Prepare asset schedules" in Doc. #1160-4 at 24; *see* DAA entry dated 1/8/19 "Attention to asset schedules" in Doc. #1160-4 at 24; *see* DAA entry dated 1/11/19 "Update Asset Schedule" in Doc. #1160-4 at 26; *see* DAA entry dated 1/15/19 "Create new asset schedule" in Doc. #1160-4 at 27 for 1.5 hours; etc.).

*Fourth*, the Receiver's counsel has billed for both "analyz[ing] potential changes to appointment order" and considering a "reappointment of Receiver" (*see* CHB entry on 12/31/18

"Discuss/analyze potential changes to appointment order with RV" for 1.4 hours in Doc. #1160-4 at 4; and CHB entry on 12/31/18 "Draft motion to reappoint receiver" for 1.9 hours on Doc. #1160-4 at 4). These are internal issues to the Receiver's firm that cannot be billed in this matter and any such line items *must be* entirely removed from the invoices.

*Fifth*, the Receiver does not explain why two people were needed on any conversation with the Defendant or the Relief Defendants, and why two attorneys were needed for any communication, meeting, or discussion with any other party. Courts have reduced any fees by the amount charged for other people who attended a conversation, hearing or dealt simultaneously with the same issue. *See In re 29 Brooklyn Avenue, LLC, US Bankruptcy Court*, EDNY, April 27, 2016 (reducing fees paid when more than one attorney was present). Assuming no more than one person was required, given at least two attorneys were always doing the same work, the fee total must be reduced by at least 50% if not more for this reason alone.

In addition, if the Receiver was required for certain issues and had to have his counsel present (such as at Bank of America or Morgan Manhattan), then there should only be a charge for one person's time. The Receiver himself testified that his firm would not "double-bill, even if it's legitimate double-billing, in the sense of if two of us are dealing with the same issue we only bill for one person's time" [Doc. #1043 at 24:17-19, "Nov 28 Hr. Trans."]; and yet when the bills are submitted, the Invoices show the exact opposite of what he said.

There are multiple instances of bills for multiple attorneys for the same issue:

1. *See* SMK entry on 1/17/19 "Meet with relief defendant's counsel in Stamford" for 5 hours *versus* CHB entry on 1/17/19 "Meeting with Defendant and Relief Defendants and counsel" for 2.6 hours on Doc. #1160-4 at 6). This particular entry also begs the question as to why SMK billed 5.0 hours when CHB billed for 2.6 hours – for the same meeting attended by both. Presumably, SMK billed for his travel time at his legal rate;

2. *See* SMK entry on 2/5/19 "Conference call with SEC" for 1.6 hours, *versus* CHB entry on 2/5/19 "Call with MW/NH (SEC)" for 1.7 hours in Doc. #1160-4 at 7);

3. *See* SMK entry on 2/8/19 "Telephone conference with SEC" *versus* CHB entry on 2/8/19 "Call with…SEC…" in Doc. #1160-4 at 8 *versus* JED entry on 2/5/19 "…conference call with SEC…" in Doc. #1160-4 at 78.

4. *See* SMK entry on 2/15/19 "Conference call with SEC" *versus* CHB entry on 2/15/19 "Call with … SEC".

5. The Receiver and his counsel have done the same with their internal meetings. *See* SMK entry on 2/25/19 in Doc. #1160-4 at 10: "Conference with receiver and Attorney Blau to discuss numerous issues" at 1.4 hours *versus* CHB entry on 2/25/19 "Attend status/strategy meeting with SMK/JH/DAA for 2.1 hours."

The Defendant has not listed every instance where this has happened (and will audit each invoice and present such to the Court should the Court request it), but on every telephonic call, meeting and/or internal meeting, the Receiver and his counsel have double if not triple-billed for their time.  This is excessive and contrary to what the Receiver himself represented to this Court.

*Sixth*, the Receiver and his attorneys have not only charged for travel time, they have also charged at a legal rate for their travel time.  Below are just a few examples:

1. *See* Mr. Blau's entry "Travel from home to Murtha Cullina Stamford Office… in connection with attending meeting with Defendant and Relief Defendants and counsel" [Doc. #1160-4 at 6].

2. Also *see* example (1) above, where SMK billed for travel time at his legal rate.

3. The Receiver himself not only billed for travel time to the Essell Farm property, but did so at his legal rate [*See* Doc. #1160-5 at 23: JED entry on 1/1/2019 "Travel from Essell Farms to CT" for 1.8 hours; *see* DAA entry on 2/1/19 "Travel to/from Essell Farm to winterize farmhouse with plumber" for 9 hours in Doc. #1160-4 at 39; also *see* CHB entry on 2/12/19 "Travel to Morgan Manhattan form home and then return to office" in Doc. #1160-4 at 46;

4. *See* CHB entry on 2/19/19 "Travel to Greenwich BoA for safe deposit box viewing from home and then return to office" for 0.8 hours in Doc. #1160-4 at 49). Any travel time should not be assessed and certainly not at legal rates.

*Seventh*, the Receiver has opted to not include **_any_** of the private investments to secure the judgment [Doc. #1130]. Yet, the Receiver has billed nearly 63 hours at an approximate

expense of $17,600 to gather and look through such information.[29] The Receiver has apparently collected ample information on the various private investments[30] at the Defendant's expense,[31] but refuses to hand over these documents to the Defendant and the Relief Defendants.

The Defendant and the Relief Defendants have legally binding rights to such information and the Receiver has opposed the Relief Defendants' request for such information, even though upon information and belief, the Receiver himself suggested to the Relief Defendants that they *subpoena* the information from the companies themselves.  As such, because the Receiver is not using the private investments, refuses to discuss the Defendant's *non-forfeited* assets and the valuation of such with Oak and Oak HC/FT, and also refuses to hand the information concerning all private investments to the Defendant and/or the Relief Defendants, the totality of these fees must be removed.

*Eighth*, several of the entries are vague and lack specificity. *See* Doc. #1160-4, entries dated 2/4/19, 2/5/19: ("Telephone conference with Paul Knag," "Telephone conference with SEC," "Prepare for conference with SEC.")  Also *see* Doc. #1160-4 at 9, entries dated 2/12/19 and 2/15/19 ("Conference call with SEC."). Also *see* DAA entry on 2/9/19 "Bank statement review" for 5 hours in Doc. #1160-4 at 44; *see* DAA entry on 2/12/19 "Bank statement/court order review" for 6.3 hours in Doc. #1160-4 at 45; *see* DAA entry on 2/27/19 "Continue bank account review (TD & BoA); attention to asset spreadsheet" for 1.6 hours in Doc. #1160-4 at 54.

*Ninth*, there are many errors in such invoices.   Here are some examples:

---

[29] The Defendant eyeballed the invoice entries and estimated these numbers based on the description in the various line items of the five invoices submitted and reserves the right to update them if new information emerges.

[30] "…Receiver gained information concerning the privately-held investment that fall within the Receivership Estate… engaged in multiple, detailed discussions and written correspondence with individuals associated with these privately-held entities and reviewed hundreds of pages of documentation produced…" (Doc. #1160 at 16)

[31] Unless the Court determines that the Receiver be paid from the amount *within* the judgment.

1.  *See* DAA entry on 2/5/19 "Historical data for **Queens property** to Atty Blau" for 1 hour in Doc. #1160-4 at 39. What is this "Queens property?"   There is no property in Queens or any Queens Property in this matter.  Period.

2.  *See* CHB entry on 2/5/19 "Review documents concerning **31-44 7th Street, NY property**" in Doc. #1160-4 at 40.   There is no 31-44 7th Street NY Property in this matter.  Period.

3.  *See* CHB entry on 2/5/19 "Review history of mortgage documents concerning **31-44 property**, discuss same with DAA" in Doc. #1160-4 at 40.   There are no mortgage documents in anything related to this matter.

4.  *See* CHB entry on 2/6/19 "Research **queens properties** potentially belonging to defendant" for 1.4 hours in Doc. #1160-4 at 41.

Clearly, the Receiver has "duped and copied" expenses from other matters he may be engaged in or from past invoices and charged those expenses to this matter.   What is this "31-44 property?" or the "queens properties?"  Why is the Receiver charging this matter for properties that are not even associated with this matter?

In addition, the Receiver has billed twice for the same travel time, and that too at his legal rate (*see* Doc. #1160-4 at 23: JED entry on 1/1/2019 "Travel from Essell Farms to CT" for 1.8 hours) and double that time at his administrative rate (*see* Doc. #1160-4 at 77: JED entry on 12/31/18 "Travel to Essell Farm to inspect farm and inspect [sic]" for 3.4 hours). These travel times, as discussed earlier, must be removed from any invoice.

The Receiver has also billed for their time ahead of actually expending that time. *See* JED entry dated **2/5/19** "…conference call with SEC on **2/8**…" in Doc. 1160-4 at 78. The Defendant does not know how a call that apparently occurred on 2/8 could be billed on an earlier date, 2/5. This entry is entirely impossible.

In addition, *see* IAA[32] entry dated 2/25/19 "[D]etermine value of Northern Trust investment account as of 05/07/15" for 1.5 hours in Doc. #1160-4 at 52. *First*, the Defendant is

---

[32] "IAA" is presumably the Defendant (the initials of his name being IAA).

neither working for the Receiver nor is he getting paid for any that work even if he performed it. _Second_, the Receiver needs to explain why it takes someone, who is smart enough to charge $475 per hour, needs over 1.5 hours to determine the value of an investment account (with only cash and/or marketable securities which are valued every second) as of a certain date, when such a statement is prepared by a reputable financial institution like The Northern Trust.  Such work can be performed within a minute, at most.

_Tenth_, the Receiver has even billed for conversations with FTI Consulting ("FTI"), which is a forensic accounting firm. There is no use for FTI in this case, where no tracing has been ordered and there are more than sufficient assets available to satisfy the judgment. In addition, FTI is not even a real estate broker and as such, has no business discussing a potential sale of any real estate. [Doc. #1160 at 21].  Therefore, all entries with FTI must be removed from the invoices (for example, _see_ CHB entries on 3/19/19-3/26/19 "drafting application to employ FTI for broker and tax services…and forensic services.… regarding FTI retention…call with FTI…" for a total of 7.3 hours on Doc. #1160-4 at 66)

_Lastly_, even the proposed Plan of Liquidation (which does not benefit the Estate, but rather certain parties to this case) has taken 121 legal hours for an estimated cost of $33,200.[33] Yet, the Plan simply recommends using cash, marketable securities, and two apartments to secure the judgment; simply mirroring the plan the Defendant submitted on multiple instances.

These are just some examples of why Defendant opposes any payment of fees to the Receiver.  *See Code Prods. Corp*., 362 F.2d at 673 ("In allowing fees the considerations are the time, labor and skill required, but not necessarily that actually expended, in the proper performance of the duties imposed by the court upon the receivers, the fair value of such time,

---

[33] The Defendant eyeballed the invoice entries and estimated these numbers based on the description in the various line items of the five invoices submitted and reserves the right to update them if new information emerges.

labor and skill measured by conservative business standards, the degree of activity, integrity and dispatch with which the work is conducted and the result obtained.").

4.    **Doc. #1160-5, or Exhibit E:**

The Defendant has responded to Receiver's Plan of Liquidation in his Opposition to that Report [Doc. #1178] and refers the Court to that document for any discussion of said proposal.

<u>CONCLUSION</u>

This Court should not allow the payment of excessive and unjustified fees to the Receiver for the reasons stated herein.  Courts have been very careful when granting attorney fee motions, especially those of a Receiver, who is supposed to be retained for the benefit of the public. As stated by a Circuit Court on excessive Receiver fees:

> "The $12,000 fee allowed appellee is more than the salary of a United States District Judge for an entire year. It is more than the salary of the most of the Governors or Judges of the Supreme Courts in the respective states of this country. In our judgment [sic] it is so exorbitant that its allowance must be held to be an abuse of the court's discretion. That there has grown up a judicial abuse in the allowance of excessive fees to masters, receivers, and attorneys in receivership cases cannot well be denied. The Supreme Court of the United States has called attention to this and sounded a note of caution and warning to the judges of the federal courts in the case of *In re Gilbert*, 276 U.S. 294, 296, 48 S. Ct. 309, 310, 72 L. Ed. 580, as follows: "We were desirous of making it clear by our action that the judges of the courts, in fixing allowances for services to court officers, should be most careful, and that vicarious generosity in such a matter could receive no countenance." And in *Newton v. Consolidated Gas Co*., 259 U.S. 101, 42 S. Ct. 438, 439, 66 L. Ed. 844, in passing on the compensation of a master the Supreme Court points out that, "***The rights of those who ultimately pay must be carefully protected.***" There seems to have developed an idea that lawyers are entitled to more compensation when employed in a receivership case than they would think of charging if employed by a private client for similar services. There is no reason for any difference in charges. Counsel should be allowed fair and reasonable compensation in receivership matters. There is no reason why they should be overpaid." (emphasis added) *Federal Oil Marketing Corporation v. Cravens*, 46 F.2d 938, 943 (8th Cir. 1931)

The same is absolutely true in this instant case. The Receiver has not shown that the fees and expenses he incurred from December 20, 2018 through March 30, 2019 were a productive use of the Estate's assets, or that they were cost-efficient and ultimately beneficial to the Estate.

WHEREFORE, the Defendant humbly requests the esteemed Court deny the Receiver's Application; *or in the alternative*, impose an additional 50% discount and a 100% holdback until the conclusion of all appeals in this case, and for any such fees to be paid from ***within*** the judgment by those parties that are benefiting from the appointment of Receiver.

Respectfully Submitted,

Dated:          June 05TH, 2019                    /s/ Iftikar Ahmed

                                                   _____
                                                   Iftikar A. Ahmed
                                                   C/O Advocate Anil Sharma
                                                   Government Place East
                                                   Kolkata 700069, India
                                                   Tel: +91.98.30.089.945
                                                   Email: iftyahmed@icloud.com
                                                   *Pro Se*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and served by electronic mail to:

MR. NICHOLAS P. HEINKE
U.S. Securities and Exchange Commission
Byron G. Rogers Federal Building
1961 Stout Street, Ste. 1700
Denver, CO 80294
(303) 844-1071
Email: heinken@sec.gov

MR. MARK L. WILLIAMS
U.S. Securities and Exchange Commission
Byron G. Rogers Federal Building
1961 Stout Street, Ste. 1700
Denver, CO 80294
(303) 844-1027
Email: williamsml@sec.gov

MR. PAUL E. KNAG
Murtha Cullina, LLP
177 Broad Street, 4th Floor
Stamford, CT 06901
(203) 653-5400
Fax: (203) 653-5444
Email: pknag@murthalaw.com

MS. KRISTEN LUISE ZAEHRINGER
Murtha Cullina, LLP
177 Broad Street, 4th Floor
Stamford, CT 06901
(203) 653-5406
Fax: (860) 240-5758
Email: kzaehringer@murthalaw.com

Dated:        June 05TH, 2019              /s/ Iftikar Ahmed

                                             _____

Iftikar A. Ahmed
C/O Advocate Anil Sharma
10 Government Place East
Kolkata 700069, India
Tel: +91.98.30.089.945
Email: iftyahmed@icloud.com

*Pro Se*