**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>IFTIKAR AHMED<br><br>　　　　　Defendant, and<br>and<br><br>IFTIKAR ALI AHMED SOLE PROP; I-CUBED DOMAINS, LLC; SHALINI AHMED; SHALINI AHMED 2014 GRANTOR RETAINED ANNUITY TRUST; DIYA HOLDINGS LLC; DIYA REAL HOLDINGS, LLC; I.I. 1, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; I.I. 2, a minor child, by and through his next friends, IFTIKAR and SHALINI AHMED, his parents; I.I. 3, a minor child, by and through his next friends, IFTIKAR and SHALINI AHMED, his parents<br><br>　　　　　Relief Defendants. | Civil Action No.<br>3:15-cv-675-JBA |

**RECEIVER'S OMNIBUS REPLY TO THE RESPONSES TO THE
RECEIVER'S REPORT FILED BY DEFENDANT, RELIEF
DEFENDANTS, AND DANIEL G. JOHNSON AS TRUSTEE AND CUSTODIAN[1]**

Jed Horwitt, Esq., in his capacity as Court-appointed receiver of the Receivership Estate[2]

(the "Receiver"), through his undersigned counsel, respectfully submits this omnibus[3] reply (the

---

[1] The Receiver notes that the Motion for Leave to Intervene [Doc. No. 1058] filed by Daniel G. Johnson as trustee of the Iftikar A. Ahmed Family Trust and custodian of the UTMA accounts held for the benefit of the Ahmed children (hereinafter "Johnson") was withdrawn. Nonetheless, Johnson submitted a response to the Report of Receiver [Doc. No. 1135] (the "Report"), to which the Receiver now replies.

[2] Unless expressly defined otherwise in this Reply, the definitions of terms set forth in the Report are incorporated herein by reference.

[3] Most arguments set forth in the Responses overlap so for efficiency reasons the Receiver here submits a single omnibus reply addressing the arguments collectively.

1

"Reply") to the responses to the Report submitted by the Defendant (at Doc. No. 1178, the "Defendant's Response"), the Relief Defendants (at Doc. No. 1182, the "Relief Defendants' Response"), and Johnson (at Doc. No. 1180, the "Johnson Response" and, collectively with the Defendant's Response and the Relief Defendants' Response, the "Responses"). In support thereof, the Receiver respectfully represents as follows.

### Introduction

Many of the argument made in the Responses have already been decided by this Court and, accordingly, the Receiver explains below how such contentions have been previously heard and adjudicated including citations to the prior rulings. To the extent the Responses raise arguments not already decided by this Court, the Receiver also sets forth below the legal and equitable principles supporting the various positions he considered in proposing the Report. As directed by the Appointment Order, the Receiver believes and submits to this Court that the Report and, with it, the Plan of Liquidation, accomplishes the primary goal of the receivership: to "avoid over-freezing, to secure the judgment for the [Commission], … and to take necessary steps toward effectuating the judgment …." (Appointment Order, at 5.)

### I.    The Required Amount is Not Fully Secured Until the Liquidation Process is Complete

Even though the Receiver has already, in several filings with this Court, corrected various parties' mischaracterization of this very point, the Receiver feels compelled, once again, to correct the any mischaracterization of the Report concerning the existence of Receivership Assets that are not needed to secure the Required Amount ("Residual Assets"). Contrary to statements contained in the Responses, and as the Report makes clear, the ultimate extent of Residual Assets, if any, presently remains unknown in large part because the exact dollar amount of the Judgment — which continues to accrue various interest, gains, and other items — is not fixed until assets securing it

are actually liquidated and deposited into the CRIS account, and because the amount finally realized from such assets is also undetermined until they are actually liquidated. Accordingly, until the liquidation process is complete and the Required Amount, including the Judgment, is fully secured by deposits into the CRIS account, there are no Receivership Assets that, in the Receiver's view, are truly excess. Any characterization of the Receiver's conclusion suggesting that there has been a definitive determination that the Receivership Estate includes $18.6 million in Residual Assets is simply inaccurate.

For the same reasons, any characterization of the Report suggesting that the Judgment is "over-secured;" (*see* Defendant's Response, at 3; Relief Defendants' Response, at n. 30;) is inaccurate. Until the liquidation process is complete and the Required Amount is deposited into the CRIS account, there are no Residual Assets rendering the Judgment "over-secured."

## II.    Any Delay to the Liquidation Process Exposes the Receivership Estate to Market Risk

### a.    *The Court Already Determined that the Judgement is Stayed Only as to the Distribution of Funds, and that the Liquidation Process Should Proceed*

The Responses proffer multiple reasons to delay the liquidation of Receivership Assets and transfer of their proceeds to the CRIS account until after the appellate review of the Judgment is complete. Before responding to the arguments for such a further delay, the Receiver notes that this issue has already been decided by this Court.

The Defendant and Relief Defendants previously sought a stay of the judgment entered in this action. (*See* Defendant's Rule 60(b) Motion for Relief from Final Judgment and Order [Doc. No. 1012].) Such a stay would have given them essentially the same relief they now seek: the postponement (pending the appeals) of the liquidation of Receivership Assets necessary to secure the Judgment.  This Court ordered that "[t]he judgment in this case has been stayed only insofar as no assets will be distributed in satisfaction of the judgment while appeals are pending."

3

(Appointment Order, at 1, 5 ("This case involves a substantial collection of currently frozen assets which must be managed, valued, and/or liquidated while appeals are pending…."); *see also* Ruling on Defendant's Rule 60(b) Motion for Relief from Final Judgment and to Stay the Final Judgment [Doc. No. 1052].) This Court made clear in the Appointment Order that the liquidation process is not stayed and the Receiver should place the proceeds from the liquidation of Receivership Assets in the CRIS account. (Appointment Order, at 14-15.)  Therefore, any argument in the Responses seeking a delay of the liquidation process is simply an attempt to re-argue this Court's prior orders concerning the limited stay of the Judgment. Such re-argument harms the Receivership Estate in that the re-argument itself causes delays to the liquidation process, thereby exposing the Receivership Estate to further market risk, and imposes additional costs on the Receivership Estate in the form of attorneys' fees incurred reviewing and responding to attempts to relitigate settled issues.

Setting aside the fact that this Court has already addressed arguments concerning a stay of the liquidation process, the discrete reasons articulated in the Responses in support of such a delay do not, on balance, justify subjecting the Receivership Estate to continued market risk and the Commission to the danger of only a partially-satisfied Judgment. The Commission necessarily bears the risk of the Receivership Estate's exposure to market fluctuations. Until the liquidation process is complete and funds equal to the Required Amount are deposited into the CRIS account, the aggregate value of the frozen assets may drop below the Required Amount. The only way to minimize (and hopefully eliminate) this market risk is the prompt liquidation of Receivership Assets in the amount necessary to secure the Required Amount.  At that point, the Residual Assets will be determined.

b. *"Unique" Character of Real Estate Should Not Delay Liquidation*

The Responses argue that the liquidation of real estate, and specifically Apartment 12A

and Apartment 12F (collectively, the "Apartments"), must wait until appellate review is complete because such properties "are considered unique and loss of property rights and ownership result in irreparable harm." (Relief Defendants' Response, at 24.) However, this Court already determined that nearly all of the funds used to purchase the Apartments were the proceeds of the Defendant's fraudulent conduct. (*See* Ruling and Order Granting Preliminary Injunction [Doc. No. 113], at 10-11.) The Responses do not directly challenge this conclusion. It strains credulity to argue that, as a matter of equity, the Apartments, despite being the fruits of fraudulent conduct, are presumptively unique and, therefore, should not be liquidated to secure the Required Amount, particularly when the liquidation delay exposes the Receivership Estate to market risk in the form of a softening New York City real estate market.

While courts may generally presume that real estate is unique and the forced sale of it prejudicial, as this Court determined, the Defendant caused the purchase of the Apartments as investment properties to park the proceeds of the fraudulently obtained funds. Upon information and belief, neither the Defendant nor his wife ever resided in the Apartments. The Apartments should not then carry any sentimental or other non-economic value and there simply is no equitable impediment to the sale of them. To eliminate market risk, the Apartments should be sold. This is particularly important given the widely-recognized downward trend in high-end New York City property values.[4]

### c.  *Tax Consequences of Liquidation Do Not Justify Continued Market Risk*

The Receiver acknowledges that the liquidation of some Receivership Assets may result in

---

[4] *See generally* Lindsay Fortado, Manhattan Apartment Sales Slowed in First Quarter of 2019, FINANCIAL TIMES, Apr. 2, 2019, https://www.ft.com/content/0617efc2-54cd-11e9-91f9-b6515a54c5b1, ("Brokers predict New York prices will fall this year as new developments come to market."); Michael Gold, *As Market Cools, Median Price for Manhattan Apartment Drops Below $1 Million (to $999,000)*, N.Y. TIMES, Jan. 3, 2019, https://www.nytimes.com/2019/01/03/nyregion/manhattan-real-estate-market.html, ("Purchases have slowed, especially at the top end of the market, after a boom in luxury condo construction left a glut of higher-end apartments that allowed buyers to be more discerning.").

tax liabilities for the Defendant and/or Relief Defendants. The Receiver will endeavor to minimize the adverse tax consequences following the issuance of an order directing the Receiver to liquidate Receivership Assets so long as such does not impair the Receiver's ability to fulfill and is perfectly consistent with his duties pursuant to the Appointment Order. In accordance with the directives in the Appointment Order to manage the Receivership Estate in consultation with the Defendant and the Relief Defendants, the Receiver will, of course, certainly consider any professional tax advice provided on behalf of the Defendant and the Relief Defendants as to tax consequences and specific methods to limit tax liability, in consultation with the Receiver's own tax professional(s) that he may seek to retain as necessary.

Ultimately, however, this situation presents, to some extent, a binary choice. On the one hand, it is likely that the liquidation of some Receivership Assets will result in tax consequences for the Defendant and/or Relief Defendants. On the other hand, if such liquidation does not proceed promptly, the volatile character of many Receivership Assets, including securities, cryptocurrency, and real estate, may result in the Receiver being unable to fully secure the Required Amount.

As stated in the Appointment Order, the Receiver's primary duties in this matter are "to value the frozen assets and avoid over-freezing, to secure the judgment for the [Commission], to manage and maximize the value of frozen assets …, and to take necessary steps toward effectuating the judgment…." (Appointment Order, at 5.) The Receiver cannot fully secure the Judgment for the Commission unless and until the liquidation process is complete and the Required Amount is in the CRIS account given the ongoing market risk to which the Receivership Estate is exposed. Indeed, the Receiver cannot definitively prevent over-freezing unless a sum equal to the Required Amount is in the CRIS account. Because a delay of the liquidation process necessarily increases costs incurred by the Receivership Estate in managing Receivership Assets and reviewing and responding to further filings by the parties, delaying liquidation activities is also inconsistent with

the Receiver's duty to "maximize the value of frozen assets."[5]

Thus, while the Receiver appreciates the Defendant's and Relief Defendants' concerns about tax liability and will reasonably and appropriately endeavor to minimize them, the liquidation process needs to move forward to accomplish the objectives of the receivership.

### III.   Treatment of Receivership Assets Held by the Iftikar A. Ahmed Family Trust and UTMA Accounts

This Court's Amended Final Judgement [Doc. No. 1054] (the "Amended Final Judgment") unequivocally held that assets in the name of the Ifitikar A. Ahmed Family Trust (the "Trust") and the UTMA accounts of the Ahmeds' minor children ("UTMA Accounts") "are available to satisfy th[e] Final Judgment against Defendant." (*Id.* at 5.) This collection of assets includes various bank and brokerage accounts as well as a MetLife Whole Life Insurance Policy (SEC No. 25, the "MetLife Policy"). The Plan of Liquidation proposed to utilize the surrender value of the MetLife Policy, approximately $1.3 million (as of the most recently-available documentation), as well as approximately $30,000.00 of the TD Ameritrade account x7686 (SEC No. 71, the "Trust Account").[6]

The Receiver appreciates that the liquidation and transfer of assets held by the Trust and/or in the UTMA Accounts to the CRIS account to secure the Required Amount *conceivably may*, in the event the Defendant or Relief Defendants are successful on appeal, adversely impact the legal status of the Trust and UTMA Accounts.[7] However, the Receiver is also cognizant of this Court's

---

[5] With respect to taxes incurred as a consequence of the liquidation of Disgorgement Assets, as explained in Section V(b)(iii) below, the Receiver agrees that such amounts should be taken into account in determining the interest and gains realized on said assets.

[6] With the exception of the UTMA Accounts, the Trust Account is one of the most liquid assets that the Receiver did not propose to liquidate in the Plan of Liquidation filed on April 3, 2019. To the extent that the proceeds from the liquidation of other Receivership Assets, such as the Apartments, are less than estimated in the Plan of Liquidation, the Receiver may need to look to the Trust Account to fully secure the Required Amount.

[7] The Receiver has not independently evaluated this representation because he did not perceive such

prior holdings concerning the Relief Defendants' status as mere nominee holders of assets such as the Trust and the UTMA Accounts. (*See United States SEC v. Ahmed*, 343 F. Sup. 3d 16, 32-33, n. 21 (D. Conn. 2018); Amended Final Judgment, at 5.)

Without taking a position as to the likelihood of the Defendant's or Relief Defendants success on appeal, the Receiver now proposes an accommodation with respect to the treatment of Receivership Assets held by the Trust and the UTMA Accounts. The Receiver proposes that the Court direct that the Receiver shall liquidate all securities held in the Trust and UTMA Accounts and that such accounts shall continue to hold the proceeds of such sales, as well as the cash already in said accounts, subject to the Asset Freeze until such time as appellate review of the Judgment is complete and the Receiver is able to conclusively ascertain the precise amount of funds required from the Trust and/or UTMA Accounts, if any, to satisfy the Required Amount.

This immediate sale of securities nullifies any market risk to the Receivership Estate with respect to the assets held by the Trust and UTMA Accounts. This procedure also reflects the uncertain percentage of the Trust and UTMA Accounts that the Receiver may ultimately need to secure the Required Amount should the proceeds from the other sales of Receivership Assets fall short of the Receiver's estimates. Likewise, assuming that the Court applies post-judgment interest in the manner stated in the Report and that only a relatively small portion of the funds in the Trust and UTMA Accounts is necessary to secure fully the Judgment and pay for the costs of the receivership, any delay in moving funds from the Trust and UTMA Accounts to the CRIS account will have a relatively slight impact, if any, on the amount of post-judgment interest due the Commission.

Finally, with respect to the MetLife Policy, the Receiver maintains that surrendering the

---

analysis as necessary since an accommodation (as proposed herein) to satisfy his concerns as well as the Defendant's and Relief Defendants' concerns may be achieved.

policy as proposed in the Plan of Liquidation is wholly consistent with the Receiver's obligations under the Appointment Order to look first to assets that are "liquid or could be liquidated with relative ease." (Appointment Order, at 15.) The Responses do not identify any other asset that is at least as liquid as the MetLife Policy that could be used instead. Thus, consistent with the Appointment Order and the Amended Final Judgement, liquidation of the MetLife Policy is appropriate to fully secure the Required Amount.[8]

### IV.    Treatment of Oak and Oak HC/FT Assets

#### a.   *Usage of Oak and Oak HC/FT Assets Generally*

The only asset held by Oak Investment Partners ("Oak") or Oak HC/FT that the Plan of Liquidation proposes to use to secure the Required Amount is the $947,815.00 in cash held by Oak, representing the aggregate value of all frozen distributions arising out of the Defendant's non-forfeited limited partnership interests during the asset freeze (the "Non-Forfeited Distributions").[9] The Receiver did not propose to liquidate the non-forfeited limited partnership interests in Oak-affiliates because the Appointment Order makes clear that the Receiver is to first look to "assets of the Receivership Estate which are liquid or could be liquidated with relative ease;" (Appointment Order, at 15;) and, based on information collected by the Receiver, the non-forfeited limited partnership interests are more illiquid than other Receivership Assets. In the Receiver's view, it would be a waste of Receivership Estate resources to value these illiquid

---

[8] Furthermore, as the Court may be aware, there are two other life insurance policies in place that list the Defendant as the named insured. Both are term policies that each carry a face amount of $15,000,000.00. As neither has a surrender value, the Plan of Liquidation does not propose the liquidation of these policies. In this context, the impact of liquidating the MetLife Policy is significantly diminished.

[9] The Receiver notes that the Defendant takes issue with the Receiver's allocation of the Non-Forfeited Distributions towards the reserve for fees incurred by the Receiver and his counsel as well as partial satisfaction of the penalty award. (Defendant's Response, at 13.) As detailed below, the Receiver does not believe it is appropriate to allocate the Non-Forfeited Distributions to the disgorgement portion of the Judgment. Further, as the parties are well aware, cash is fungible so the allocation of the Non-Forfeited Distributions to these portions of the proposed Plan of Liquidation is inconsequential.

interests because sufficient Receivership Assets "which are liquid or could be liquidated with relative ease" exist at this time. Finally, with respect to the remaining Receivership Assets held by Oak, this Court previously determined that the Defendant forfeited such assets and they are not to offset any portion of the Judgment, including the disgorgement amount.[10] (Ruling on Plaintiff's Motion for Remedies and Judgment [Doc. No. 955], at 27-29.)

Separately, Oak HC/FT takes the position that *all* of the Receivership Assets held by Oak HC/FT are forfeited. As stated by the Receiver previously, *even if* the Receiver disagreed with Oak HC/FT's analysis as to the forfeiture of the Defendant's interests, the liquidation of such assets presents significant challenges (including legal disputes, lack of a readily available market for the significant majority of the assets, substantial liquidation delays, and additional expenses to the Receivership Estate). Therefore, the Receiver determined not to incur the time and expense necessary to analyze definitively the liquidity of these assets and more precisely estimate their net realizable value. Likewise, in that the Court already determined that forfeited interests at Oak are not eligible to offset any portion of the Judgment, the Receiver has reason to believe that same holds true for forfeited interests at Oak HC/FT. As such, the Receivership Assets held at Oak HC/FT are not included whatsoever in the proposed Plan of Liquidation.

b. *Inclusion of Non-Forfeited Oak Assets in Disgorgement Amount*

The Responses argue that both the liquid and illiquid non-forfeited Receivership Assets held at Oak (the "Non-Forfeited Oak Assets") should not be included in the calculation of the amount to be disgorged. But this Court already adjudicated the disgorgement amount--

---

[10] At various points, the Responses argue that the distributions arising out of Defendant's Oak interests for which K-1s have issued during the asset freeze should offset portions of the Judgment. However, as noted above, this Court already determined that the Defendant forfeited a significant majority of his interests in Oak and, to the extent these distributions arise out of forfeited interests, the distributions are also forfeited (the Receiver addresses the treatment of non-forfeited distributions below). Furthermore, upon information and belief, Oak issued the K-1s referenced in the Responses to satisfy its own internal accounting procedures rather than to evidence that some distribution amount is due Defendant.

$41,920,639—and it certainly was not within the scope of the Receiver's duties to re-evaluate it. Accordingly, this is not an appropriate objection to the Receiver's Report.

The Relief Defendants attempt to circumvent this obvious conclusion by contending that the Court only considered the effect of the *forfeited* assets upon the calculation of the disgorgement amount, not the *non-forfeited* assets. This is a distinction without a difference. The disgorgement amount has been decided.

Furthermore, if the merits were even to be considered, the identical reasoning applies. The Non-Forfeited Oak Assets have remained frozen since May 7, 2015. Therefore, none of the Non-Forfeited Oak Assets have been "*repaid*" to Oak. Oak has not had the unimpaired use and enjoyment of this property. Indeed, contrary to the Relief Defendants' assertion that the Non-Forfeited Oak Assets are "under the exclusive control and with the alleged victim," the asset freeze in this case has prevented Oak from using the Non-Forfeited Oak Assets as it would if such assets had actually been repaid. This Court previously held with respect to the *forfeited* interests that Oak has "not recovered from [the Defendant] by withholding and/or seizing his forfeited interests, and there is no resulting double recovery." (Ruling on Plaintiff's Motion for Remedies and Judgment [Doc. No. 955], at 29.) Similarly, the Non-Forfeited Oak Assets should not reduce the disgorgement amount (even if such was procedurally possible at this point in time).

## V.    Disgorgement Assets and Interests and Gains Thereon

### a.    *The Receiver Appropriately Identified the Disgorgement Assets*

The Defendant's Response, at pages 12 and 13, argues that the Defendant himself should select the Disgorgement Assets for purposes of determining interest and gains because tracing the proceeds of the fraudulent conduct to specific assets is not necessary. This proposal misrepresents the applicable legal standards and is inconsistent with this Court's prior orders. The calculation of interest and gains is not based upon randomly selected assets so that the selecting particular party

can effectuate the result most favorable to it.

As the Court is well aware, the Amended Final Judgment held the Defendant "liable for disgorgement of $41,920,639… together with prejudgment interest thereon in the amount of $1,491,064.01 and any interest or gains accrued on disgorged frozen assets…." (Amended Final Judgment, at 4.) Thereafter, the Appointment Order directed the Receiver to, *inter alia*, provide "the Receiver's estimate regarding the dollar amount which should ultimately be placed into [the CRIS] account to fully secure the judgment, taking into consideration the amount of the judgment in this case… and any other relevant factors." (Appointment Order, at 15.) Pursuant to the Appointment Order, the Receiver filed his Report, which provided the Receiver's estimate for the Judgment amount, *including* his identification of the Disgorgement Assets and the interest and gains attributable to those assets.

As the Report makes clear, the Receiver identified the Disgorgement Assets based upon this Court's prior orders that addressed what assets held the proceeds of the Defendant's fraudulent conduct and further relied on the Commission's analysis of the flow of funds following the Defendants conduct. Some Disgorgement Assets appreciated in value during the asset freeze (such as Fidelity x8965 and Fidelity x7540) and some apparently have depreciated in value (such as the Apartments). Because "[d]isgorgement 'is a method of forcing a defendant to give up the amount by which he was unjustly enriched,'" the Receiver's selection of the Disgorgement Assets based on this Court's prior findings as to the disposition of the proceeds of the Defendant's fraud represents a perfectly "reasonable approximation." (Ruling on Plaintiff's Motion for Remedies and Judgment [Doc. No. 955], at 8 *quoting Commonwealth Chemical Securities, Inc.*, 574 F.2d 90, 102 (2d Cir. 1978).) "So long as the measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." (*Id.*, *quoting SEC v. Warde*, 151 F.3d 42, 50 (2d Cir. 1998).)

*b.  The Receiver's Calculation of Interest and Gains is Appropriate*

The Responses contain a number of objections concerning the Receiver's calculation of the interest and gains attributable to the Disgorgement Assets. At the outset, as the Relief Defendants concede, there is no case law "establishing a specific methodology for calculating interest or gains." (Relief Defendants' Response, at 4.) Notwithstanding, in many regards, the "interest and gains" attributable to a Disgorged Assets are self-evident.  To the extent not perfectly clear, the Receiver's calculation of the interest and gains attributable to the Disgorgement Assets was an exercise of the Receiver's reasonable discretion in an effort to arrive at an equitable proposal pursuant to the Receiver's mandate under the Appointment Order. With these general principles in mind, the Receiver responds to the discrete issues raised by the Defendant and Relief Defendants as to the interest and gains calculation as follows.

i.   Interest and gains are not merely the difference between the value of an asset on the freeze date and the value of an asset on the date of liquidation.

The Defendant and the Relief Defendants reference comments made on the record by the Court and counsel to the Commission concerning a manner in which interest and gains could be calculated. (Defendant's Response, at 15; Relief Defendants' Response, at 4-5.) In the Receiver's view, these statements are general observations about the difference between the value of an asset on the date the Asset Freeze entered and the date when the same asset is liquidated. These general observations did not reflect, nor did they need to in the context the observations were made, an absolute rule applicable to all circumstances.  For example, such rule would not reflect the impact of sums removed from the Disgorgement Asset for living expenses, attorneys' fees, or other costs. Thus, and subject to further order by the Court, the Receiver does not view those general observations as binding.

Fundamentally, to capture the "interest and gains" actually realized upon any particular

Disgorgement Asset, the Receiver must include any and all distributions made pursuant to a Court order during the Asset Freeze from a Disgorgement Asset. By way of example, if a Disgorgement Asset had $10 on the date of the Asset Freeze, after which this Court approved a $5 distribution from the account during the freeze for living expenses and attorneys' fees, and the balance of the account at the time of liquidation was $16, the interest and gain amount actually realized on that account would be $11 rather than, as the Defendant and Relief Defendant propose, $6. The $5 difference had, in fact, accrued in the account; it just was not in the account because it had been previously distributed for other purposes.

If the Receiver did not consider the distributions made from Disgorgement Assets as part of the final interest and gains figure, the Receiver's Report would simply not accurately reflect the Amended Final Judgment's clear award of "any interest or gains accrued on disgorged frozen assets." (Amended Final Judgment, at 4.)[11]

> ii.   <u>The issue of whether and how to incorporate any gain or loss realized upon the sale of the Apartments is not ripe and should be deferred until after the such sales.</u>

In its Ruling on Plaintiff's Motion for Remedies and Judgment where, quoting *SEC v. Tavella*, 77 F. Sup. 3d 353, 361 (S.D.N.Y. 2015), this Court stated that "funds 'turned over to the government in complete or partial satisfaction of the disgorgement order' should be turned over 'along with any interest that has accrued on them during the freeze period.... Otherwise, a defendant might perversely benefit from the asset freeze by pocketing accumulated returns on the frozen principal.'" (Ruling on Plaintiff's Motion for Remedies and Judgment, at 14.) Indeed,

---

[11] Incidentally, in balancing the Appointment Order's directive to minimize expenses incurred by the Receivership Estate with the Receiver's duty to submit a comprehensive report to the Court, the Receiver exercise his reasonable discretion in refraining from spending the resources necessary to calculate the interest and gains that would have been earned on the amounts distributed if the distributions had not occurred. Of course, upon instruction by the Court, the Receiver will engage in such an analysis, which will likely yield a higher interest and gains figure.

disgorgement "is a method of forcing a defendant to give up the amount by which he was unjustly enriched;" *SEC v. Commonwealth Chemical Securities, Inc.*, 574 F.2d 90, 102 (2d Cir. 1978); and the appropriate amount of disgorgement is "the amount of money acquired through wrongdoing… plus interest…." *SEC v. Cavanagh*, 445 F.3d 105, 116 (2d Cir. 2006).

As set forth in the Amended Final Judgment, this Court determined the "amount of money acquired through" the Defendant's wrongdoing to be $41,920,639. In identifying the amount of interest and gains realized thereon (to prevent unjust enrichment), the Receiver first identified the assets which constituted the proceeds of the Defendant's wrongful conduct. This included the Apartments.

In calculating the interest and gains accrued upon the Apartments during the freeze, the Receiver recognized that the net rental income earned by the Apartments reflected the "accumulated return upon the frozen principal." Accordingly, the Receiver calculated the net rental income amounts and included them in his Report to be added to the Judgment. Any gain or loss in the market value of the Apartments realized upon their sale at this point in time is entirely speculative.  How the net sale proceeds would factor into the interest and gains calculation for the Apartments is simply not ripe and should be deferred until after their sale.

        iii.    <u>Interest and gains should take tax liabilities accrued thereon into account.</u>

The Receiver agrees with the Responses that the calculation of interest and gains should take into account any tax liability incurred upon such interest and gains arising out of the liquidation of the Disgorgement Asset. In the Receiver's view, this is consistent with the purpose of disgorgement, which is to prevent a defendant from "perversely benefit[ing] from the asset freeze" while acknowledging that any such benefit would necessarily be reduced in favor of amount due to the relevant taxing authority. (Ruling on Plaintiff's Motion for Remedies and

Judgment, at 14 *quoting Tavella*, 77 F. Sup. 3d at 361.)[12]

> ### iv. Only amounts used to maintain Disgorgement Assets are appropriately debited from the aggregate amount of interest and gains realized.

The Responses argue that the Receiver should take into consideration in calculating accrued interest and gains funds disbursed from Disgorgement Assets and used to maintain any Receivership Asset. (Defendant's Response, at 15-16; Relief Defendants' Response, at 5-6.) As articulated above, generally, disbursements from Disgorgement Assets should be included in the interest and gains amount to accurately reflect the Amended Final Judgment's clear award of "any interest or gains accrued on disgorged frozen assets." (Amended Final Judgment, at 4.)

The only instance where, in the Receiver's view, it is appropriate to reduce the interest and gains attributable to the Disgorgement Amount based on disbursement during the Asset Freeze is when the distribution in question was to maintain a Disgorgement Asset. In such a circumstance–similar to a credit for any tax owed upon the interest and gains—not including the maintenance cost of a Disgorgement Asset as part of the interest and gain calculation accomplishes the objective of precisely calculating the amount necessary to compel the Defendant to disgorge all benefits received. Thus, for example, in furtherance of this principle, in the proposed Plan of Liquidation, the Receiver reduced interest and gains on the Apartments (in the form of the rent received therefrom during the Asset Freeze) by the costs incurred in maintaining the Apartments, including sublet fees, repairs, common charges, insurance, and taxes. Since there has been no award of interest and gains upon Receivership Assets other than the Disgorgement Assets, there is no mechanism and it simply is not appropriate to take them into account as part of the determination of the amount of the Judgment.

---

[12] Of course, sufficient controls should be put in place by this Court to ensure that the tax liability is actually paid and prevent the Defendant from being unduly enriched.

## VI.     Liquidation Procedure

### a.  *Staged Monetization of Assets and Monetization in Same Calendar Year*

The Receiver maintains that, to limit the Receivership Estate's exposure to market risk, he should simultaneously liquidate all Receivership Assets needed to secure the Required Amount. In the Receiver's view, delaying the liquidation of one asset class until the liquidation of another asset class provides no benefit to the Receivership Estate. Nothing in the Responses presents a credible justification for a staged monetization of Receivership Assets.

The Defendant's Response further argues that, if the Receiver liquidates Receivership Assets, "[t]he assets should be monetized in the same calendar year." (*Id.* at 24.) The Receiver is not conceptually opposed to a prompt liquidation within one calendar year, but given the realities of how this matter has unfolded, the Receiver should not be required to delay the liquidation of Receivership Assets to guarantee that the liquidations all occur within the same year. As reflected in the Report filed on April 3, 2019, the Receiver estimated that the cash and other securities necessary to secure the Required Amount[13] could be liquidated and transferred to the CRIS account on or before July 1, 2019.[14] The Receiver also originally anticipated selling the Apartments by December 31, 2019. The Relief Defendants requested and received an extension of time of forty-five (45) days to respond to the Receiver's Report. At this point, it is not clear when the liquidation process will commence or will be completed.

If and when the Court orders the Receiver to begin liquidating Receivership Assets, there should be no requirement that such liquidation occur within the same calendar year as such a provision provides no benefit to the Receivership Estate and, on the contrary, exposes the

---

[13] Depending on the proceeds ultimately realized from the liquidation of the Apartments, the Receiver may propose to transfer additional funds to the CRIS account from other Receivership Assets.

[14] Given the filing date of the Responses and the likely further proceedings necessary before a liquidation order might issue, this July 1, 2019, estimate is no longer realistic.

Receivership Estate to unnecessary market risk and the additional costs incidental to the delays involved.

### b.  Consultation with Defendant and Relief Defendants

The Responses request that the Receiver consult with the Defendant and Relief Defendants on "any sale, lease or transfer of their real property and ownership interests, including and not limited to the process, sale price and acceptance of any potential offers" to buy Receivership Assets. (Defendant's Response, at 24; *see also* Relief Defendants' Response, at 27-28.) Pursuant to the Appointment Order, the Receiver already has a duty "consult" with and "tak[e] into consideration the wishes of" the Defendant and Relief Defendants. (Appointment Order, at 7.) The Receiver has no objection to continuing to manage the Receivership Estate, including the liquidation of Receivership Assets as ordered by the Court, in a manner consistent with the Receiver's existing obligations under the Appointment Order.

### c.  Deposits into CRIS Account Following Liquidation

With the exception of the Trust and UTMA Accounts discussed above at Section III, the Receiver maintains that the proceeds from the liquidation of Receivership Assets should be promptly deposited into the CRIS account. As stated in the Report, once the proceeds are in the CRIS account, post-judgment interest stops running, which is objectively in the interest of the Defendant and Relief Defendants. (Report, at 13.) Furthermore, depositing liquidation proceeds into the CRIS account will likely significantly limit the involvement necessary by the Receiver and his counsel as there will be far fewer Receivership Assets to manage and oversee, which has the effect of limiting the fees and expenses incurred by the Receivership Estate. The Responses present no compelling justification for keeping the liquidation proceeds in their respective accounts rather than depositing the same in the CRIS account.

The Receiver has no objection to maintaining detailed records of the deposits into the CRIS

account and the funds deposited therein, as requested in the Relief Defendants' Response at page 26. The Receiver already maintains detailed records as to the flow of funds within the Receivership Estate, so the record keeping requested by the Relief Defendants presents no additional burden or expense on the Receivership Estate.

### d.  The Receiver's Proposed Liquidation Order

The Responses assert that the Proposed Order Authorizing and Establishing Procedures Concerning Sale of Real Estate and Ownership Interests in the Receivership Estate [Doc. No. 1130-2] (the "Proposed Order") is premature and was not requested by the Court. (Defendant's Response, at 23; Relief Defendants' Response, at 27-28.) The Receiver respectfully submitted the Proposed Order, as is customary in many contexts, to assist the Court in effectuating the Receiver's proposals and addressing certain procedural and statutory matters related to the sale of Receivership Assets. The Receiver also wanted to provide all parties with a full and fair opportunity to be heard with respect to the form of the Receiver's proposed order. Of course, the Receiver will follow whatever order the Court may ultimately issue concerning the liquidation process and will submit a revised Proposed Order should the Court so request.

### VII.    Application of Post-Judgment Interest

The Defendant and Relief Defendants devote a considerable portion of their respective responses to the issue of post-judgment interest and its appropriateness given the facts now before the Court. Because the Receiver, after due research and analysis, determined that the accrual of post-judgment interest upon the full amount of the Judgment was mandatory, not discretionary, the Receiver concluded that equitable arguments do not alter the proper application of post-judgment interest. *See Lewis v. Whelan*, 99 F.3d 542, 545 (2d Cir. 1996) ("The award of post-judgment interest is mandatory on awards in civil cases as of the date judgment is entered"); *see also SEC v. Forest Resources Management Corp.*, 2010 U.S. Dist. LEXIS 50203, at *6 n.2

(S.D.N.Y. May 18, 2010) (applying post-judgment interest to disgorgement and pre-judgment interest amounts).

## VIII.   Miscellaneous Objections to the Receivership Proceeding

### a.   The Receiver's Duties Under the Appointment Order are not Complete

The Defendant's Response argues that "there is no need for a Receiver anymore, especially given the amount of liquid and near-liquid assets that are under this Court's asset freeze order. (*Id.* at 21.) Similarly, the Relief Defendants' Response argues that the "receivership should be put on hold" after the Receiver values certain assets held by Oak.[15] The Receiver's duties under the Appointment Order are not yet complete. The Receiver's purpose pursuant to the Appointment Order is, *inter alia*, to "valu[e], liquidat[e], and, if necessary, distribut[e] assets in satisfaction" of the Judgment. (Appointment Order, at 2.) As such, the Receiver respectfully submits that his continued service in this matter and the execution of his remaining duties under the Appointment Order remains necessary to accomplish the purposes of his appointment.

### b.   The Receiver's Reserve for Fees and Expenses is Not Excessive

The Responses argue that the Receiver's reserve, in the amount of $500,000 for fees plus an additional $100,000 for Receivership Estate administrative expenses, is excessive and unjustified. (Defendant's Response, at 21-22; Relief Defendants' Response, at 17-18.) While the Receiver will respond separately and in greater detail to the discrete issues raised in response to the Defendant and Relief Defendants' objections to the Receiver's First Interim Application for Professional Fees and Expenses Incurred by the Receiver and His Professionals [Doc. No. 1160] (the "First Application"), the Receiver respectfully provides this brief response to the statements contained in the Responses concerning the reserve for fees and expenses.

---

[15] As noted above, the Receiver maintains that any further valuation of assets held by Oak is unnecessary at this time and runs contrary to the Receiver's mandate under the Appointment Order to look first to liquid assets and assets that could be liquidated with relative ease. (Appointment Order, at 14-15.)

As to the reserve for fees, the Receiver maintains that $500,000 is appropriate in consideration of the time necessary for him and his counsel to familiarize themselves with this matter's lengthy and complex history following the Receiver's appointment, the modest amount of time necessary to manage Receivership Assets, and the time necessary to respond to filings made with the Court.[16] As stated in the First Application, the Receiver submits that the extent of fees and expenses incurred in the first quarter of the receivership will not necessarily correspond to future applications due to the extent of initial start-up work required to secure and investigate the assets and submit the Report. Nonetheless, the complex and hotly contested nature of this proceeding compels the Receiver to reserve sufficient funds to ensure that the Receivership Estate does not become administratively insolvent following the distribution of the Judgment to the Commission, if such a distribution is ultimately ordered.

As to the reserve for expenses, $100,000 is an appropriate reserve given the likely expenses of the Receivership Estate in the form of upkeep on real estate, commissions for the sale of Receivership Assets that are not Disgorgement Assets, and similar unforeseen administrative expenses. Indeed, in the event the Court determines that the Apartments are not properly characterized as Disgorgement Assets, the upkeep on those properties is over $6,000 per month in common charges alone. Likewise, the Receivership Asset colloquially known as Essell Farm located in Ancram, New York covers approximately 194 acres and has multiple buildings in poor condition, some of which need to be heated in the winter to ensure pipes do not burst (which in turn requires the Receiver to maintain access to the property for repair, oil, and other service providers). In this context, a $100,000 reserve for administrative expenses is more than justified,

---

[16] Since his appointment there have been one-hundred and fifteen (115) discrete docket entries, each of which required the Receiver's attention as well as the attention of his counsel, including twenty-two (22) from the Defendant and twenty-four (24) from the Relief Defendants. Based on the current cadence of the filings, the Receiver has no reason to believe that the volume of submissions will slow in the near term.

particularly given the unknown length of the receivership.

Functionally, even if the Receiver's reserve for fees and expenses is ultimately greater than the fees and expenses actually incurred, the Defendant and Relief Defendants suffer no material prejudice because the Receiver would certainly release any excess reserve as directed by this Court upon the termination of this receivership.

### c. The Receiver did not Propose a General Claims Process

The Relief Defendants' Response states that the Receiver is proposing a general claims process, improperly transforming this proceeding into a "creditor court." (*Id.* at 18-20.) To be clear, the purpose of the receivership as set forth in the Appointment Order is to secure the Judgment through the liquidation of Receivership Assets and deposit of the proceeds realized into the CRIS account pending appeals. To accomplish this objective, the Receiver proposed a two-stage process, whereby the Court would first provide authority to the Receiver to liquidate identified Receivership Assets and deposit the proceeds into the CRIS account to secure the Judgment and then hold a hearing where the Receiver would provide to the Court and all parties with an accounting of the amounts actually realized from the liquidation, his final calculation of the Required Amount (corresponding to the deposits made into the CRIS account) for the Court's approval, and the status, priority and estimation of any unpaid claims incurred by the Receiver in his management and operation of the Receivership Estate (such as utilities, professional fees, insurance, and similar items). The Appointment Order did not direct the Receiver, and the Receiver has not independently proposed, a process to pay the Defendant's or the Relief Defendant's other liabilities.

At the time the Receiver filed the Report, the Receiver's analysis as to his obligation to submit tax returns and pay taxes for the Receivership Estate, the Defendant, and/or the Relief Defendants was not yet complete. As such, the Receiver was concerned that there may be claims

by "other governmental agencies" such as the Internal Revenue Service or the Connecticut Department of Revenue Services. Since the Receiver filed the Report, he has concluded (subject to confirmation of the Defendant's and Relief Defendant's accountant's representation that all non-natural person Relief Defendants are pass-through entities that are included on the Defendant's or Mrs. Ahmed's individual returns) that he is not required to submit tax returns for the Receivership Estate, the Defendant, and/or the Relief Defendants. Therefore, the Receiver does not expect any claims by other governmental agencies against the Receivership Estate.

## <u>Conclusion</u>

For the forgoing reasons and the reasons originally set forth in the Receiver's Report, the Receiver respectfully submits that this Court should approve the Report, and grant such other and further relief as this Court deems just and proper.

Dated June 17, 2019, at Bridgeport, Connecticut.

Respectfully submitted,
JED HORWITT, ESQ., RECEIVER


 */s/ Stephen M. Kindseth*
Stephen M. Kindseth (ct14640)
Christopher H. Blau (ct30120)
Zeisler & Zeisler, P.C.
10 Middle Street, 15th Floor
Bridgeport, CT  06604
Telephone: 203-368-4234
Facsimile: 203-549-0903
Email: cblau@zeislaw.com;
skindseth@zeislaw.com
*Counsel to the Receiver*

## CERTIFICATE OF SERVICE

I hereby certify that on June 17, 2019, a copy of the foregoing Reply was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System. Furthermore, a copy of the foregoing was sent via email to the Defendant, Iftikar A. Ahmed, at iftyahmed@icloud.com.

 /s/ Stephen M. Kindseth
Stephen M. Kindseth (ct14640)
