# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>              Plaintiff,<br><br>v.<br><br>IFTIKAR AHMED<br><br>              Defendant, and<br>and<br><br>IFTIKAR ALI AHMED SOLE PROP; I-CUBED DOMAINS, LLC; SHALINI AHMED; SHALINI AHMED 2014 GRANTOR RETAINED ANNUITY TRUST; DIYA HOLDINGS LLC; DIYA REAL HOLDINGS, LLC; I.I. 1, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; I.I. 2, a minor child, by and through his next friends, IFTIKAR and SHALINI AHMED, his parents; I.I. 3, a minor child, by and through his next friends, IFTIKAR and SHALINI AHMED, his parents<br><br>              Relief Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Civil Action No.<br>)     3:15-cv-675-JBA |

## RECEIVER'S REPLY TO THE DEFENDANT'S AND RELIEF DEFENDANTS' RESPONSES IN OPPOSITION TO RECEIVER'S APPLICATION FOR FEES

Jed Horwitt, Esq., in his capacity as Court-appointed receiver of the Receivership Estate[1]

(the "Receiver"), through his undersigned counsel, respectfully replies (the "Reply") to the

Defendant's Response in Opposition to the Receiver's Application for Fees and Expenses [Doc.

No. 1183] (the "Defendant's Response") and the Relief Defendants' Response in Opposition to

---

[1] Unless expressly defined otherwise in this report, the Receiver incorporates by reference the definitions of terms set forth in the Report of Receiver [Doc. No. 1135] (the "Report") and the First Interim Application for Professional Fees and Expenses Incurred by the Receiver and his Professionals [Doc. No. 1160] (the "First Application").

Receiver's Application for Fees and Expenses [Doc. No. 1185] (the "Relief Defendants' Response" and, with the Defendant's Response, the "Responses").[2] In support thereof, the Receiver respectfully represents as follows.

## I.      The Fees and Expenses Sought by the Receiver are Justified

During the Compensation Period, the Receiver[3] performed numerous activities that were necessary and appropriate under the Appointment Order and were to the benefit of the Receivership Estate, all of which justify the allowance of the fees and expenses sought in the First Application.

### a.   *Becoming familiar with this matter's lengthy and complex history.*

As the Court is aware, this matter has a complex factual and procedural history that began nearly forty-four (44) months before the Court appointed the Receiver. The instant action involved no fewer than 1,069 discrete docket entries as of the Receiver's appointment on December 20, 2018. While the Receiver did not bill for time in connection with seeking his appointment (*see* Doc. No 1160-4 at 2), following his appointment it was necessary for the Receiver to familiarize himself with this matter's lengthy and complex history to allow him to efficiently control the Receivership Estate and execute his duties under the Appointment Order. Indeed, in that the Appointment Order itself defines the Receivership Estate to include "all assets subject to the Court's asset freeze order [Doc. # 113] as modified throughout this litigation," it was incumbent on the Receiver to develop a strong foundation of knowledge as to this matter's history.

---

[2] The Relief Defendants' Response merely joins the Defendant's response, and thus all citations are to the Defendant's Response.

[3] Unless otherwise stated, references to the Receiver in this Reply include the Receiver's counsel and paraprofessionals at Z&Z.

The expense incurred in developing this knowledge is a necessary component of the administration of this Receivership. As noted in the First Application, the extent of fees and expenses incurred for the first Compensation Period of the Receivership will not necessarily correspond to future applications due to the extent of initial start-up work required. *See Gordon v. Dadante*, 2008 WL 1805787 at *11 (N.D. Ohio, 2008) (recognizing that as is "common in cases of this nature [receiverships], the bulk of the effort and expense is frontloaded").

    b. *Taking control of the Receivership Estate and confirming the existence and character of Receivership Assets.*

The Responses seek to minimize the effort expended by the Receiver in taking control of the Receivership Estate and assessing Receivership Assets, in part on the basis that the Relief Defendants and the Commission already summarized such assets and the Asset Freeze was already in place. (Defendant's Response, at 3, *citing* Doc. No. 888-1 (the "May 2018 Asset Schedule").) While the May 2018 Asset Schedule and other listings of Receivership Assets (such as the Amended Final Judgment [Doc. No. 1054]) provided assistance to the Receiver in his efforts to ascertain the topography of the Receivership Estate and assume control thereof, the Receiver was obligated to notify entities in possession of Receivership Assets of the Appointment Order and independently verify the existence and nature of each Receivership Asset. (*See* Appointment Order, at 11-12 ("Notice to Third Parties"), 14-15 ("Reports").) Without such action, the Receiver would not have been able to carry out his duties under the Appointment Order, including the submission of the Report "reflecting (to the best of the Receiver's knowledge as of the date of the report)… the existence, value, and location of" Receivership Assets. (Appointment Order, at 14-15.)

To fulfil his obligations under the Appointment Order, the Receiver was required to make contact with dozens of entities defined in the First Application as "Knowledgeable Parties,"

including financial institutions, individuals, a property management company, and private entities domiciled in other countries. Once the Receiver made contact with these Knowledgeable Parties, (which in itself was difficult in some instances as certain entities had merged into others as well as the general unresponsiveness of some entities), the Receiver was required to explain the nature of the Receivership Estate and the obligations of each Knowledgeable Party in connection therewith, and ensure compliance by these entities with the Appointment Order (including the production of certified statements pursuant to paragraph 14(c) of the Appointment Order). Furthermore, after the Receiver made contact with these Knowledgeable Parties, the Receiver was required to collect documentation necessary to determine the approximate value and liquidity of each of more than 80 (eighty) discrete Receivership Assets. In multiple instances, this documentation collection process required the issuance of subpoenas and lengthy discussions with counsel representing the Knowledgeable Parties, who often initially resisted sharing information with the Receiver.

Only after the Receiver made contact with and collected information and documentation from Knowledgeable Parties could the Receiver begin the process of assessing the existence, value, location, and liquidity of Receivership Assets. With respect to Receivership Cash and Securities, this process included analyzing account statements to confirm both the account's current value and compliance with the Asset Freeze since it first entered in May of 2015.[4] This analysis necessitated the review of thousands of pages of account statements and other materials produced by the bank and brokerage firms in possession of Receivership Cash and Securities. With respect to

---

[4] Among other things, violations of the Asset Freeze may have prompted the Receiver to seek permission to initiate legal proceedings against certain entities, consistent with the Appointment Order's mandate to "take such action as necessary and appropriate for the preservation of the Receivership Estate [and] to prevent the dissipation or concealment of assets of the Receivership Estate…." (Appointment Order, at 7.)

Receivership Real Estate, this process included physical inspection of the properties in question and numerous interactions with tenants, management company representatives, and other individuals with knowledge of the subject property. As to Receivership Personal Property (specifically, such property held at Morgan Manhattan & Brother and Bank of America in Greenwich), this process included a physical inspection and inventory of the assets, again to enable the Receiver to report on the existence, value, and location of the assets. Finally, as to the Receivership Private Investments, the Receiver engaged in multiple, detailed discussions and exchanged numerous written correspondence with individuals associated with these privately-held entities and reviewed hundreds of pages of documentation produced by the same.[5]

It was only by way of the above Information Collection Process that the Receiver was able to independently verify the existence, value, and location, and conduct a preliminary analysis as to the liquidity of Receivership Assets to the degree necessary to submit the Report, assume management and control of the Receivership Estate, and otherwise execute his duties under the Appointment Order. The Responses' characterizations of the Receiver's activities during the Compensation Period as non-complex and routine are inaccurate.

   c.   *Managing the Receivership Assets during the Compensation Period.*

Contemporaneously with and following the completion of the Information Collection Process, the Receiver managed the Receivership Estate as directed by the Appointment Order.

---

[5] At the time the Receiver filed the Report, it appeared that there were sufficient liquid assets and real estate in the Receivership Estate to fully secure the Required Amount without liquidating the Receivership Private Investments. Therefore, and consistent with the Appointment Order's directive to prioritize Receivership Assets that "are liquid or could be liquidated with relative ease" (Appointment Order, at 15), the Receiver did not conduct a formal valuation of the illiquid Receivership Private Investments. Therefore, any argument in the Responses that the Court should not grant the relief sought in the First Application because the Receiver did not formally value the Receivership Private Investments (including those Receivership Assets held by Oak and Oak HC/FT) should be rejected as any valuation of the Receivership Private Investments during the Compensation Period would have been *ultra vires*.

During the Compensation Period, this ongoing management activity included paying expenses incurred by or in maintenance of Receivership Assets (such as real estate common charges, storage unit fees, insurance premiums, property taxes, as well as plumbing, gas, and electric fees[6]) and continuing to make monthly living expenses distributions to Mrs. Ahmed (which included multiple interactions with representatives of Bank of America to ensure distributions for the Relief Defendants' health insurance continued uninterrupted). The payment of such expenses entailed more than simply writing checks from the Receivership Account. Indeed, before any distribution was made, the Receiver was careful to (a) confirm the necessity of the distribution, (b) confirm the Receiver's authority under the Appointment Order to make the distribution, (c) where appropriate, obtain the consent necessary from the non-party co-owner of The Essell Farms, LLC prior to making the distribution, and (d) where appropriate, make such distributions in a manner that respected the corporate formalities of certain legal entities.

Additionally, during the Compensation Period and pursuant to his mandate to control the operation of the Receivership Estate, the Receiver undertook certain actions to enforce the Appointment Order and otherwise manage the Receivership Estate. These actions included (a) correcting Fidelity Investments' mistaken distribution of funds from the account ending x8965 in violation of the Asset Freeze; (b) correcting Bank of America's erroneous distribution of funds from account ending x3831 in violation of the Asset Freeze; (c) collecting unpaid sums due from the tenant of Apartment 12F; (d) ensuring the repair of the kitchen in Apartment 12F following a flood on the 13th floor of the 530 Park Avenue building and inspecting the repairs thereafter; (e)

---

[6] Early in the Compensation Period, the 1820 County Route 7 property was at risk of damage from burst pipes due to the anticipated cold temperatures in the Ancram, New York area. To mitigate such risk, and because the former tenant of the 1820 County Route 7 was no longer residing in the property, the Receiver opened the necessary utility accounts and arranged for the clearing of snow to permit various maintenance workers to winterize the property.

resolving, without the costs associated with judicial intervention, Bank of America's threats to close certain accounts falling within the Receivership Estate and to close the safe deposit boxes located at the Greenwich branch and transfer the assets held therein (including hundreds of thousands of dollars' worth of gold and silver in addition to items of both economic and sentimental value to the Relief Defendants) to an unsecured location; and, (f) resolving, without the costs associated with judicial intervention, various entities' non-compliance with requests made and subpoenas issued by the Receiver.

As a result, and as evidenced by the time entries submitted as Exhibit D to the First Application, during the Compensation period the Receiver provided valuable services in the form of managing the Receivership Estate and safeguarding it against any avoidable decrease in the value of Receivership Assets.

> d.  *Reviewing, analyzing, and responding to filings where appropriate.*

During the Compensation Period, there were fifty-eight (58) new docket entries in this matter, many of which were filed by the Defendant and the Relief Defendants, in addition to the activity in the Second Circuit's appellate docket. The Defendant, at page 21 of the Defendant's Response, claims that "there has been no need for the Receiver to file *any* response to *any* of the motions that have been filed during his appointment." (Emphasis in original.) This is simply not true.

The Receiver is responsible for "control[ling] the operation of the Receivership Estate" and "manag[ing]… [the assets of the Receivership Estate] with the dual objects of maximizing the realizable value of [Receivership Assets] and minimizing the expense charged thereto." (Appointment Order, at 6-7.) To appropriately and completely execute these duties, it was and continues to be necessary for the Receiver to, at a minimum, read and analyze every filing made

by parties and non-parties in this matter to assess the impact of the relief sought in such filings on the Receivership Estate and, where appropriate in the exercise of the Receiver's reasonable discretion, file responses to such filings to either object to the relief sought or otherwise alert the Court and the parties to the Receiver's position on how the Receivership Estate and the fulfillment of his duties would be impacted. The Receiver's performance of his duties under the Appointment Order would be seriously threatened if he did not read, consider, and respond where appropriate to each filing in this matter.

      *e.  Analyzing complex tax issues.*

In the period of time leading up to the filing of the Report and proposed Plan of Liquidation, the Receiver spent a significant amount of time analyzing, discussing, and researching the complex tax issues presented by the Receivership. Understanding the Receiver's tax obligations was essential to the proper administration of the Receivership Estate and integral to a complete Report and actionable Plan of Liquidation.

A receiver's obligation to file federal tax returns and pay federal taxes is governed by the Internal Revenue Code, 26 U.S.C. § 1 *et. seq.* (the "Tax Code") and the regulations promulgated thereunder (the "Treasury Regulations") by the United States Internal Revenue Service (the "IRS"). The Receivership Estate itself is not a separate taxable entity. 26 C.F.R. § 1.641(b)-2(b). Therefore, the Receiver had to analyze the Tax Code and Treasury Regulations to determine whether the Receiver had an obligation to file tax returns on behalf of the Defendant and/or any one or all of the Relief Defendants given the scope of the Receivership Estate.

Where a receiver has possession of "all or substantially all the property or business of a corporation," the Tax Code provides that the receiver "shall make the return of income for such corporation." (26 U.S.C. § 6012(b)(3); *see also* 26 C.F.R. § 1.6012-3(b)(4).) As to an individual,

a receiver need not file a return where he or she is the receiver for "only part of the property of an individual." (26 U.S.C.S. § 6012(b)(2); *see also* 26 C.F.R. § 1.6012-3(b)(5); IRS Field Service Advisory 1996-0622-3 ("a receiver who has all of the property of an individual stands in the place of that individual and must file a return for him, but a receiver who has anything less than all the property of an individual is not required to file a return").)

With these legal principles in mind, and after exhaustive analysis,[7] the Receiver concluded that the limited scope of the Receivership Estate meant that the Receiver had no obligation to submit tax returns on behalf of the Defendant. For similar reasons, the Receiver concluded that he had no obligation to submit tax returns on behalf of Mrs. Ahmed. Finally, based on representations (subject to verification) by the Relief Defendants, their counsel, and their accountant that all taxable events involving the remaining Relief Defendants flow through to either the Defendant or Mrs. Ahmed's individual returns, the Receiver concluded that he had no obligation to submit tax returns on behalf of the Relief Defendants.

Ultimately, this tax analysis was necessary before the Receiver could submit his Report and proposed Plan of Liquidation. The Receiver performed this analysis with the least impact on the Receivership Estate as possible under the circumstances and avoided the additional expenses of employing a separate professional.

 *f.   Preparing the Report and Plan of Liquidation.*

As required by the Appointment Order, the Receiver submitted his Report and proposed Plan of Liquidation on April 3, 2019. The Report is an amalgamation of the Receiver's months of

---

[7] In analyzing these tax issues, the Receiver sought the assistance of tax professionals at FTI Consulting, Inc. ("FTI") pursuant to paragraphs 5 and 33 of the Appointment Order. The Receiver intended to move to retain FTI to, *inter alia*, prepare any necessary tax returns and advise the Receiver as to ongoing tax-related issues in the administration of the Receivership Estate. However, after the Receiver concluded that he had no obligation to submit tax returns for the Defendant and Relief Defendants, he did not move forward with retaining FTI.

effort and analysis, and accurately reflected the then-current status of the Receivership Estate to the best of the Receiver's knowledge developed throughout the process described above. The proposed Plan of Liquidation likewise reflected the Receiver's best analysis as to the most efficient manner in which Receivership Assets equal in value to the Required Amount could be liquidated and moved into the CRIS account as directed by paragraph 29 of the Appointment Order. Both the Report and the proposed Plan of Liquidation required significant research and analysis of complex issues, ranging from the appropriate calculation of interest and gains (including reflecting costs incurred during the Asset Freeze in maintaining the Disgorgement Assets ), the applicability of post-judgment interest, and additional provisions to be included in the proposed Liquidation Order that, in the Receiver's view, would assist in the orderly liquidation of Receivership Assets.

The Receiver also spent extensive time working with the Defendant and Relief Defendants to understand their perspective on the many issues raised by the contemplated liquidation and Required Amount calculation process. The Receiver also consulted with the Commission throughout this time frame to gain its' insight on the various matters affecting the liquidation of Receivership Assets and the calculation of the Required Amount. In several instances, the Receiver ultimately adopted the Relief Defendants' position and incorporated them into his Report.

Thus, the time and expenses incurred by the Receiver in preparing the Report and Plan of Liquidation are entirely justified.

## II.   This Court Has Already Determined the Source of Funds to Pay for Receivership

The Responses argue that the Court should deduct any funds used to pay the fees and expenses sought in the First Application from the Judgment amount. (Defendant's Response, at 11-14.) However, this Court has already determined that, "[i]n the absence of any authority in support of the Defendants' position that the SEC should pay for the costs of a receiver, all costs of

the receivership in this case will be paid from among the assets of the Receivership Estate." (Appointment Order, at 5.) As a result, and consistent with the Appointment Order's directive to analyze the Judgment amount and "the costs of the Receivership and administration of the Receivership Estate" separately, the source of the funds to pay the First Application is a settled issue and re-litigation of the same, in the Receiver's view, only serves to increase expenses incurred by the Receivership Estate. (Appointment Order, at 15.)

###### III.    Specific Objections to Billing Entries and Exhibits to the First Application

Throughout the Responses, the Defendant and Relief Defendants raise issues related to specific billing entries contained in Exhibits D-1 through D-5 to the First Application as well as other objections to exhibits submitted with the First Application. In response to these concerns, the Receiver provides the following clarifications.

*a.   DAA entry dated 2/8/19 (Doc. No. 1160-4, at 43).*

The entry, by Ms. Accurso who charged a paraprofessional rate in this matter, reads: "Continue NT [Northern Trust] Stmt review; meet w/ Atty Blau re same. Start cross checking debits and credits against court orders per SEC instruction. Pull Orders from PACER for review." The Responses take issue with the language suggesting the Receiver and/or Ms. Accurso was taking instructions from the Commission. (Defendant's Response, at 19.)

As noted above, as part of the Receiver assessing the existence, value, and location of Receivership Assets pursuant to his mandate under the Appointment Order, the Receiver needed to analyze the account records from frozen Receivership Assets to determine whether any violations of the Asset Freeze occurred prior to his appointment. Violations of the Asset Freeze may have prompted the Receiver to seek permission to initiate legal proceedings against certain entities, consistent with the Appointment Order's mandate to "take such action as necessary and

appropriate for the preservation of the Receivership Estate [and] to prevent the dissipation or concealment of assets of the Receivership Estate…." (Appointment Order, at 7.) In one of many routine discussions with counsel to the Commission, similar to the routine discussions the Receiver had with the Defendant and Relief Defendants at multiple points during the Compensation Period, the Receiver inquired whether the Commission agreed that the analysis should be done, and the Commission advised that it did. Thus, Ms. Accurso performed the analysis of the account records "per SEC instruction."

      *b. DAA entry dated 2/5/19 (Doc. No. 1160-4, at 39).*

      The entry, by Ms. Accurso, reads: "Call w/D Duksa [former tenant of 1820 County Route 7] re farmhouse, outbuilding usage, April auction. Email re same." The Responses claim that this entry relates to the Receiver's alleged discussions "regarding auctions or sale of property prior to Court determination." (Defendant's Response, at 24.) In reality, the "April auction" referenced in the above entry is an annual event typically hosted on the 1820 County Route 7 property where local individuals hold and participate in an auction of farm equipment and other materials. Ms. Accurso was responding to Mr. Duksa's inquiry as to whether that auction could proceed this year. Ultimately, because it presented issues of possible liability to the Receivership Estate and because the Receivership Estate would realize no financial benefit from hosting the auction, the Receiver declined Mr. Duksa's request and the auction was not hosted at 1820 County Route 7.

      *c. CHB entry dated 3/14/19 (Doc. No. 1160-4, at 66) and SMK entry dated 3/29/19 (Doc. No. 1160-4, at 66).*

      The entry by Attorney Christopher Blau reads: "Research David Schulhof (tenant of 12F) and his background in connection with apartment negotiations." The entry by Attorney Stephen M. Kindseth reads: "Begin to coordinate sale of NYC apartment; evaluation of listing price including comparables." At page 24 of the Defendant's Response, the Defendant asserts that these

entries reflect improper negotiations by the Receiver concerning the potential sale of Apartment 12F.

As reflected in the Report and the proposed Plan of Liquidation, the Receiver believes that he must sell both Apartment 12A and Apartment 12F to fully secure the Required Amount. In connection with that anticipated sale effort, and before the Receiver can seek Court approval to sell the Apartments pursuant to paragraph 28 of the Appointment Order and even seek to retain a real estate broker pursuant to paragraph 33 of the Appointment Order, the Receiver must educate himself as to potential buyers (including the current tenant) and the general real estate market for properties of this type. These are not "extra judicial actions… outside [the Receiver's] mandate" as the Defendant claims on page 24 of the Defendant's Response. Instead, these are necessary steps in managing the Receivership Estate and are well within the Receiver's authority under the Appointment Order.

> *d. Entries concerning FTI.*

At various points during the Compensation Period, Attorney Blau billed for time spent interfacing with FTI concerning forensic and tax accounting issues and drafting an application to employ FTI to serve as the Receiver's forensic and tax accountant as well as real estate broker. (Defendant's Response, at 25; Doc. No. 1160-4, at 66.) As noted above, the Receivership Estate presents complex and highly important tax issues, which Attorney Blau analyzed with the intermittent assistance of FTI. Likewise, Attorney Blau had discussions with FTI regarding the Receiver's potential need for forensic accounting services to review account statements and confirm that no Asset Freeze violations occurred prior to the Receiver's appointment. At one point in time during the Compensation Period, the Receiver contemplated retaining FTI to perform these accounting services and, in an effort to limit expenses charged to the Receivership Estate by

retaining and working with one company, also considered retaining FTI as a real estate broker to sell the Apartments. The Receiver's and Attorney Blau's discussions with FTI were permissible pursuant to paragraph 33 of the Appointment Order, which authorizes the Receiver to "solicit persons and entities… to assist him in carrying out the duties and responsibilities described" in the Appointment Order.

The Received has not yet finally decided to seek to retain FTI to perform these services. Nonetheless, when the Receiver and Z&Z professionals spent the time in discussions with FTI pursuant to paragraph 33 of the Appointment Order and preparing an application to employ FTI, the Receiver had a good faith belief that he may need professional assistance and would file the application. He may still ultimately file the application. Thus, the time spent in communication with FTI and on said application was reasonable and necessary.

 and he may still, and thus the time spent on said application is compensable.

   e. *Entries concerning reappointment of Receiver.*

At page 25 of the Defendant's Response, the Defendant asserts that the Receiver and his counsel were "reconsidering [the Receiver's] appointment in this case," which is an "internal issue[] for the Receiver's firm, unrelated to the mandate ordered by" the Court, and time related to such efforts "cannot be billed in this matter." (*See* Doc. No. 1160-4 at 4 (providing the time entries in question).) In actuality, the Receiver contemplated seeking reappointment to permit him to file additional Section 754 Notices because 28 U.S.C. § 754 requires that such notices be filed within ten (10) days of his appointment. *See SEC v. Equity Serv. Corp.*, 632 F.2d 1092, 1095 (3d Cir. 1980) (permitting a Receiver to seek reappointment to re-start the ten-day time period under 28 U.S.C. § 754). Upon further review and completion of the Information Collection Process, and as stated in the Report, the Receiver determined that reappointment was unnecessary at this time

14

because the vast majority of the Receivership Assets were located in either the Southern District of New York (where the Receiver did file a Section 754 Notice within ten days of his appointment) or in Connecticut (where no such notice is required).

On this basis, there is no legitimate reason to preclude the Receiver from seeking fees associated with addressing this reappointment issue.

*f. Exhibit A (Doc. No. 1160-1).*

Exhibit A to the First Application is the required Standardized Fund Accounting Report ("SFAR"), which is to be submitted with any fee application pursuant to the Billing Instructions referenced in paragraph 34 of the Appointment Order. (*See* Billing Instructions, available at https://www.sec.gov/oiea/Article/billinginstructions.pdf.) The Defendant raises three issues with respect to the SFAR document submitted with the First Application. (Defendant's Response, at 30.)

First, as to Line 2 of the SFAR document, the $19,542.02 in "business income"[8] represents funds moved from the Northern Trust account ending x5226 held by Essell Farm LLC to the Receivership Account to pay for expenses incurred in maintaining the 1820 County Route 7 property. The Receiver classified it as "business income" as it is the most closely-applicable category in that the funds were derived from the prior activity and earnings of Essell Farm LLC.

Second, the "Interest/Dividend Income" at Line 4 of the SFAR document (totaling $556.44) represents the interest earned on funds held in the Receivership Account during the Compensation Period.

---

[8] "Business income" is defined by the Billing Instructions as "[a]mounts received by the Fund from operational income of the business assets, or other business sources."

Finally, the Defendant "opposes the generality and non-description of the breakup of the line items for Line 10." (Defendant's Response, at 30.) The $58,402.47 total for "Disbursements for Receivership Operations" are as reported at pages 17 and 18 of the First Application, broken down based on the definitions provided in the Billing Instructions.[9]

   g.   *Exhibit C (Doc. No. 1160-3).*

The Responses oppose all expenses incurred by the Receiver, totaling $3,307.48, reflected in Exhibit C to the First Application. (Defendant's Response, at 30-31.) With respect to PACER charges, as noted above the Receiver had an obligation to view a significant portion of the over 1,000 court filings in this matter that occurred prior to his appointment in connection with carrying out his duties under the Appointment Order. Likewise, while the Receiver avoided it wherever practical, the Receiver also incurred PACER expenses viewing filings made after his appointment. Similarly, the Receiver had no choice but to incur online research expenses from Lexis in addressing the myriad of complex legal issues that arose during the Compensation Period. Other expenses, such as filing fees, Federal Express expenses, copying charges, travel expenses, and subpoena expenses were all incurred in a manner consistent with the Billing Instructions and the Appointment Order and were necessarily incurred in the best interests of the Receivership Estate.

   h.   *Usage of Activity Categories in Exhibits D-1 through D-5 (Doc. No. 1160-4).*

---

[9] Pursuant to the Billing Instructions, "Business Asset Expenses" are "[a]mounts paid … for the business property assets' maintenance and business operating expenses, taxes, professional fees, liquidation expenses, administrative services, appraisals and valuation expenses, payment to participant, moving/ storage, office furniture and equipment, delivery services, resident agent, copying costs, asset protection costs, etc." "Personal Asset Expenses" are "[a]mounts paid … for the personal property assets' maintenance and operating expenses, taxes, professional fees, liquidation expenses, administrative services, appraisals and valuation costs, payment to participant, moving/ storage, office furniture and equipment, delivery services, resident agent, copying costs, asset protection costs, etc." And, "Investment Expenses" are "[a]mounts paid … for banking fees, Court Registry Investment System (CRIS) fees, mandated or economically necessary continuing investments, and other investment related costs."

16

The Defendant "opposes the breakup and classification of the fees into five... 'Activity Categories.'" (Defendant's Response, at 31.) However, the Appointment Order directs the Receiver to submit all fee applications in compliance with the Commission's Billing Instructions for receiver's in enforcement proceedings. (Appointment Order, at 17.) The Billing Instructions, in turn, specify "[t]ime records shall be in chronological order by Activity Category," as defined at pages 6 and 7 of the Billing Instructions. The First Application complies with the Activity Category requirement, and the Responses' objection on this basis is without merit.

i.   *Identity of billing entities.*

The Defendant and the Relief Defendants assert that they are confused as to the identity of the billing entities referenced in the time entries contained at Exhibit D to the First Application. (Defendant's Response, at 32, 37-38). To clarify, the name of each billing entry is reflected under the Timekeeper Fee Summary heading of each sub-exhibit to Exhibit D containing time entries. (*See* Exhibit D-1, Doc. No. 1160-4, at 20-21.) Furthermore, the name of each billing entity is also reflected at pages 5 and 6 of the First Application. To resolve the specific instances of confusion highlighted by the Responses, "KDJ" is Kristin D. Joseph, a paraprofessional at Z&Z. Likewise, contrary to the Defendant's claim at pages 37 and 38 of the Defendant's Response that the Receiver is seeking compensation for the Defendant's time, the billing entity "IAA" is not Iftikar A. Ahmed but rather Ian A. Accurso, another paraprofessional at Z&Z.

j.   *The Receiver appropriately allocated work to professionals and paraprofessionals during the Compensation Period.*

The Responses claim that counsel to the Receiver performed "administrative functions" and charged for such activity at a "legal rate." (*See* Defendant's Response, at 9-10, 32-33.) However, the Receiver appropriately allocated work between professionals and paraprofessionals based on the issues presented by each particular task as well as its potential impact upon the

administration of the Receivership Estate. The Receiver did so consistent with the Appointment Order's directive to minimize expenses charged to the Receivership Estate. The Responses' assertions in this regard are simply too numerous to address in toto and so the Receiver provides below examples to highlight the distinction between the legal issues presented and appropriately addressed by counsel, and the administrative tasks undertaken by non-lawyers.

Attorney Blau's time spent attending to payments made to maintain the Apartments required legal training in that any disbursement of Receivership Assets made without a Court order must be permissible under the Appointment Order. Each disbursement must be analyzed in that context. (*See* Defendant's Response, at 10.)

Likewise, Attorney Blau's time reviewing the rental check from the tenant Apartment 12F[10] was appropriately charged at a legal rate in that the rental proceeds realized from Apartment 12F are directly relevant to the timing and overall appropriateness of liquidating the asset. Attorney Blau then discussed this matter with Ms. Accurso to properly coordinate.  Attorney Blau also communicated with Attorney Zaehringer (counsel to the Relief Defendants) concerning the collection of amounts due from the tenant of Apartment 12F. This again presents questions related to the enforcement of the Appointment Order. (*Id*.)

Similarly, Attorney Blau's written and verbal discussions with counsel to the Relief Defendants concerning Receivership Assets (such as those held at the safe deposit boxes at Bank of America) required legal training in that the management and control of such assets implicated legal issues in interfacing with Bank of America to ensure compliance with the Appointment Order

---

[10] The Responses do not cite or quote the time entry in question, but the Receiver assumes the Responses are referring to the March 15, 2019, entry by Attorney Blau totaling .3 hours that reads "Review checks provided by tenant of 12F, discuss liquidation of 12F with [Deborah Accurso, managing director of Z&Z], exchange correspondence with [Kristen Zaehringer, counsel to Relief Defendants] re same." (Doc. No. 1160-4, at 59.)

and generally developing a plan of liquidation pursuant to the Appointment Order. (Defendant's Response, at 32; Doc. No. 1160-4, at 4.) Likewise, the entries by Attorney Kindseth and Attorney Blau on January 1 and January 4, 2019, concerning the living expense distributions reflect the legal analysis necessary to confirm that such distributions were appropriate as the Court had only recently appointed the Receiver. (Defendant's Response, at 33; Doc. No. 1160-4 at 69-70.)

The Receiver also charged his own time at a legal rate in appropriate circumstances. For example, the Receiver discussed "the history of Mr. Ahmed's purchase and the financial aspects of the Essell Farm" with the former tenant of 1820 County Route 7 and his counsel, and "[a]nalyze[d] information re: purchase price; listing history; operators; subletting of Essell Farms" to evaluate potential claims the Receivership Estate may hold related to that property. (Defendant's Response, at 23; Doc. No. 1160-4, at 23.)

The Responses further criticize Exhibit D-2 (Doc. No. 1160-4, at 23-63), stating that "almost all the entries in Exhibit D-2 are unnecessary and entirely administrative in nature and have been charged at legal rates" (Defendant's Response, at 32) and citing multiple entries by Ms. Accurso (listed in Exhibit D-2 as "DAA"). But Ms. Accurso's time was in fact billed at a reduced paralegal rate.

The First Application reflects an appropriate division of services between legal professionals providing services requiring legal analysis and paraprofessionals providing services more administrative in nature.

k. *References to "Asset Schedule" in time entries (Exhibit D to the First Application, Doc. No. 1160-4).*

The Responses reflect confusion as to a certain "asset schedule" referenced in the time entries. (Defendant's Response, at 33.) To be clear, the asset schedule was an internal document created by the Receiver to track the dozens of assets in the Receivership Estate, including

valuations as of various dates during the Asset Freeze and notes as to the characteristics of each asset. The asset schedule assisted the Receiver in the efficient management of the Receivership Estate during the Compensation Period.

> l.  *Concurrent billing by Receiver, attorneys, and paraprofessionals.*

The Responses are critical of various instances where the multiple persons billed for participating in the same event, such as conference calls or meetings. (Defendant's Response, at 34-35.) As the Receiver testified at the November 28, 2018, hearing before the Court, the Receiver and Z&Z "often do not double-bill, even if it's legitimate double-billing, in the sense of if two of us are dealing with the same issue we only bill for one person's time." (Nov. 28 Hr. Trans, at 24:17-19.) In numerous instances during the Compensation Period, the Receiver and his counsel and paraprofessionals did not bill for the same event. Due to the absence of a billing entry, these instances are not reflected in the time entries contained at Exhibit D to the First Application. Where multiple billing persons billed for participating in the same event during the Compensation Period, the same was reasonable, necessary, and appropriate given the complexity of the issues presented, and to the benefit of the Receivership Estate.

> m.  *Billing for travel time.*

The Billing Instructions state that "travel time outside a twenty (20) mile radius of the [Receiver's] office is reimbursable at 50% of the [Receiver's] regular billing rate." (Billing Instructions, at 10.) Some the travel time undertaken by the Receiver, his counsel, and paraprofessionals during the Compensation Period was outside a twenty-mile radius from the Receiver's office in Bridgeport, Connecticut. Therefore, all the travel time was to be reimbursed at 50% of the billing entities' "regular billing rate." Unfortunately, there was an oversight in applying this instruction in certain instances. Accordingly, the Receiver will reduce the fees sought

during the Compensation Period by \$2,094.75, reflecting a reduction of 50% of the time attributable to travel in the following entries:

| Date | Billing Entity | Narrative | Hours | Amount (pre-reduction) |
|------|--------------|-----------|-------|----------------------|
| 12/31/18 | JED | Travel to Essell Farm to inspect farm and inspect | 3.4 | \$850.00 |
| 1/1/19 | JED | Travel from Essell Farms to CT | 1.8 | \$667.80 |
| 1/7/19 | SMK | Meet with relief defendant's counsel in Stamford | 2.6[11] | \$876.20 |
| 1/17/19 | CHB[12] | Travel from home to Murtha Cullina Stamford office to Bridgeport office (shortest distance) in connection with attending meeting with Defendant and Relief Defendants and counsel | .7 | \$157.50 |
| 2/1/19 | DAA | Travel to/from Essell Farm to winterize farmhouse with plumber | 9.0 | \$1,278.00 |
| 2/12/19 | CHB | Travel to Morgan Manhattan from home and then return to office (shortest distance) | .8 | \$180.00 |
| 2/19/19 | CHB | Travel to Greenwich BoA for safe deposit box viewing from home and then return to office (shortest distance) | .8 | \$180.00 |

    *n.   Billing for analysis of Receivership Private Investments.*

The Responses are critical of the time spent by the Receiver analyzing information and documentation concerning the Receivership Private Investments. (Defendant's Response, at 35-36.) As discussed above, the Receiver had an obligation to report to the Court concerning the existence, value, and location of Receivership Assets and further had a duty to opine on which Receivership Assets were most liquid (and thus most easily liquidated to secure the Required Amount). (Appointment Order, at 14-15.) To evaluate and come to his conclusions on these important issues, the Receiver necessarily had to analyze various documentation produced by and

---

[11] This 2.6 hours amount reflects the amount attributable to Attorney Kindseth's travel for this event.

[12] Attorney Blau's entries for travel reflect only the time actually spent traveling from his home in Stamford, Connecticut, to the location of a given event. For all of Attorney Blau's travel during the Compensation Period, the distance (and thus the time spent) between his home in Stamford and the event location was less than the distance between Z&Z's office in Bridgeport, Connecticut and the event location.

information provided by Knowledgeable Parties concerning Receivership Private Investments. The fact that the Receiver, at the time the Report and proposed Plan of Liquidation were filed, did not believe that the liquidation of such Receivership Private Investments was ultimately necessary does not mean that the Receiver could have avoided conducting this analysis in the first place. The Time spent by the Receiver on the Receivership Private Investments was reasonable and necessary and is recoverable.

       *o.   Entries that allegedly lack specificity.*

The Responses claim that certain entries in Exhibit D to the First Application lack sufficient specificity. (Defendant's Response, at 36.) Time records must specify for each billing entity "the date, the hours expended, and the nature of the work done." *New York State Assn. for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1148 (2d Cir. 1983). The Receiver respectfully submits that all time entries for which the First Application seeks payment satisfy this standard. Should the Court desire further narratives and documentary support as to any specific time entries, the Receiver will of course promptly comply.

       *p.   References to "31-44 7th Street" and "Queens properties."*

The Responses argue that the Receiver "duped and copied [time entries] from other matters" with respect to various entries concerning a property located at 31-44 78th Street in Queens, New York.[13] (Defendant's Response, at 36-37.) The Responses are inaccurate, and the Receiver had a good faith basis to investigate the 31-44 78th Street property as a possible asset of the Receivership Estate.

---

[13] One entry refers to the property as "31-44 7th Street" and another refers to the property as "31-44 79th Street." These are minor scrivener's errors, and all refer to the same property located at 31-44 78th Street.

As stated previously, the Appointment Order defined the Receivership Estate to include "all assets subject to the Court's asset freeze order… as modified throughout this litigation." (Appointment Order, at 6.) In the Operative Freeze Order, the Court froze "[t]he assets, funds, or other property held by or under the direct or indirect control of Defendant and Relief Defendants, whether held in any of their names or for their direct or indirect beneficial interest, wherever located, up to the amount of $89,000,000." Further, the Appointment order directs the Receiver control the Receivership Estate in part to "maximiz[e] the realizable value of the assets of the Receivership Estate…" (Appointment Order, at 7.) In sum, the Receiver maintains that one of his obligations under the Appointment Order is to investigate potential Receivership Assets that were heretofore unknown by the Commission and the Court.

Through a routine search of the New York City real estate records, the Receiver became aware of the 31-44 78th Street property. New York City Department of Finance records list a "Iftikar Ahmed" (sometimes spelled "Iftikhar Ahmed") as the seller of 31-44 78th Street. Pursuant to these records, the sale contract date for the property was May 7, 2015 (the day after the Commission field its complaint in this matter) and the date of the sale/transfer was August 3, 2015 (nine days before the Court entered the permanent Asset Freeze). Given these facts, and a sale price of $690,000.00 (indicating the property was of relatively significant value), the Receiver was compelled to investigate the 31-44 78th Street property as well as other properties that were referenced in New York City Department of Finance records for Iftikar/Iftikhar Ahmed. Ultimately, through a review of signatures on various mortgage documents associated with the 31-44 78th Street property as well as other research, the Receiver concluded that the 31-44 78th Street property was not associated with the Defendant and the contract and transfer dates were merely a

coincidence, and thus did not report the 31-44 78th Street property as a Receivership Asset in the Report or the First Application.

Despite the Receiver's eventual conclusion that the 31-44 78th Street property was not associated with the Defendant, there were sufficient facts presented to him that, in combination with his obligations under the Appointment Order, compelled him to research the property as a potential Receivership Asset. As a result, the First Application properly includes the fees associated with such research.

>   q.   *Receiver's alleged improper billing.*

The Responses claim that the Receiver "billed for [his] time ahead of actually expending that time," citing a billing entry by the Receiver at page 78 of Doc. No. 1160-4. (Defendants' Response, at 37.) The responses do not reproduce the full February 5, 2019, entry in question, which states: "Review/analyze all emails re: storage unit, conference call with SEC on 2/8; Oak Partners position; crypto currency partners demand for confidentiality, etc." It is clear, when read in full, that the Receiver's entry reflects time spent reviewing and analyzing emails on February 5, 2019, concerning a variety of topics, including a conference call scheduled with the Commission on February 8, 2019. In short, there is nothing improper about this time entry.

>   r.   *Time spent "determin[ing] value of Northern Trust investment account."*

At page 38 of the Defendant's Response, the Defendant questions "why it takes someone, who is smart enough to charge $475 per hour, needs over [*sic*] 1.5 hours to determine the value of an investment account... as of a certain date, when such a statement is prepared by a reputable financial institution like The Northern Trust." The entry in question reads: "Determine value of Northern Trust investment account as of 05/07/15." Mr. Accurso spent 1.5 hours on this task on February 25, 2019, for a total charge of $213.

24

As a threshold matter, Mr. Accurso is a paraprofessional. His hourly rate in this matter is $142.00 per hour. (*See* Exhibit D to First Application, Doc. No. 1160-4, at 62.) He is not charging $475.00 per hour as the Defendant claims.

Additionally, in connection with calculating the interest and gains accrued on disgorged frozen assets from the date of the Court's freeze order (May 7, 2015), the Receiver needed to determine the value of the Disgorgement Assets (including the Northern Trust account referenced in the above time entry) as of May 7, 2015. Unfortunately, the account statements provided by Northern Trust do not reflect each account's daily value and instead only reflect the accounts end-of-month value. Thus, the Receiver tasked Mr. Accurso with taking the account value as of April 30, 2015, and calculating the account value as of May 7, 2015, based on the market value of the account's holdings as of that date. Thus, the task was not as simple as the Defendant claims and was impossible to perform "within a minute."

s.   *Time spent on Plan of Liquidation.*

Finally, the Responses are critical of the time spent crafting the proposed Plan of Liquidation. (Defendant's Response, at 38.) The Receiver has not verified the Defendant's "eyeballed" figure of $33,200 in developing the proposed Plan of Liquidation. It appears, however, that the Defendant and Relief Defendants merely added every time entry in Exhibit D to the First Application with the words "liquidation proposal" or "plan of liquidation" to reach the $33,200 figure.

Regardless of the exact dollar amount of the time spent on the proposed Plan of Liquidation during the Compensation Period, the proposed Plan of Liquidation was a complicated and multifaceted proposal that incorporated a great number of legal and factual issues (including the freeze value of Disgorgement Assets to reflect only the amount frozen by the Court, the calculation

of interest and gains and any offsets attributable to Disgorgement Assets, the applicability and amount post-judgment interest, analysis as to the listing price of the Apartments, and discussions with counsel for the Relief Defendants and the Defendant concerning various issues presented by the Plan of Liquidation). The Receiver needed to continually update the figures reported in the proposed Plan of Liquidation to reflect the most recent information available from Knowledgeable Parties, and such updates sometimes would raise other issues as to the treatment of certain Receivership Assets. Furthermore, every time the Receiver changed a single value, the entire Plan of Liquidation needed to be re-calibrated to accurately reflect the state of the Receivership Estate and the dollar amount the Receiver proposed to source from each Receivership Asset.

The Court requested the proposed Plan of Liquidation in the Appointment Order. (Appointment Order, at 14-15.) The Receiver delivered such a proposal in the form of the Plan of Liquidation and respectfully submits that the time spent developing and refining the same benefited the Receivership Estate and is compensable.

## IV.    Alternative Relief Inconsistent with Court Orders

The Responses argue for two forms of alternative relief should the Court be inclined to grant the First Application. First, the Responses assert that the Receivership must be terminated immediately. (Defendant's Response, at 22-26.) However, the Receiver's duties under the Appointment Order are not yet complete. The Receiver's purpose pursuant to the Appointment Order is, *inter alia*, to "valu[e], liquidat[e], and, if necessary, distribut[e] assets in satisfaction" of the Judgment. (Appointment Order, at 2.) As such, the Receiver respectfully submits that his continued service in this matter and the execution of his remaining duties under the Appointment Order remains necessary to accomplish the purposes of his appointment.

Second, the Responses seek a 50% fee reduction and a 100% holdback of the Receiver's fees until the appeals in this matter conclude. (Defendant's Response, at 26-29.) In light of the reasonable and necessary services provided by the Receiver during the Compensation Period and the clear and significant benefit of such work to the Receivership Estate, a further 50% reduction in the fees to be paid to the Receiver beyond the 25% public interest deduction already in place as well as a 100% holdback of the Receiver's fees is unwarranted. Furthermore, this Court has already addressed the appropriate discount rate and holdback percentage at paragraphs 34 and 37 the Appointment Order. Nothing in the Responses justifies altering the compensation structure.

## V.    Miscellaneous Issues Raised by the Responses

The Responses raise certain issues that are not strictly responsive to the First Application but which, nonetheless, merit a brief response by the Receiver to avoid confusion. First, at page 5 of the Defendant's Response, the Defendant seemingly asserts that the Receiver improperly paid for the maintenance of 1820 County Route 7. As a threshold matter, the payment of expenses necessary to maintain 1820 County Route 7 were made *from the Receivership Account* under the authority of the Appointment Order (including paragraph 5(f) thereof), and reflect expenses incurred in connection with the winterization of the property by the former tenant of the property after his lease expired. The Receiver's counsel did not advance these expenses and, accordingly, is not seeking their reimbursement.

Additionally, at pages 7 and 8 of the Defendant's Response, the Defendant argues that the Report does not reflect "the [r]ecord in this case" and specifically references the Receiver's calculation of interest and gains on Disgorgement Assets. As more fully stated in the Receiver's Omnibus Reply to the Responses to the Receiver's Report Filed by Defendant, Relief Defendants, and Daniel G. Johnson as Trustee and Custodian [Doc. No. 1203] (the "Omnibus Reply") at pages

13-16, the Receiver maintains that his calculation of interest and gains on Disgorgement Assets appropriately takes into account disbursements from Disgorgement Assets during the Asset Freeze and expenses incurred in maintaining and liquidating Disgorgement Assets. To the extent the Defendant and the Relief Defendants take issue with the manner in which the Receiver calculated the interest and gains figure in the Report, the appropriate venue for such discussion is the Report approval process.

Furthermore, the Responses claim that the Appointment Order is on appeal and thus the First Application should not be granted until such time as the Second Circuit addresses the appeal. (Defendant's Response, at 14-15.) However, as this Court is aware, the only portion of the Judgment that is stayed pending appeal is the distribution of assets in satisfaction of the Judgment. (Appointment Order, at 1; Ruling on Defendant's Motion to Stay the Judgment [Doc. No. 1052], at 5-7.) Furthermore, on February 19, 2019, the Second Circuit itself denied the Defendant's motion to stay enforcement of the Judgment pending appeal declined to vacate or stay the Appointment Order, finding that the Defendant had "not made a showing that he is likely to succeed on the merits or that he will be irreparably injured absent a stay." (Order, attached hereto as **<u>Exhibit A</u>**.) Therefore, the fact that the appeal of the Judgment is pending has no impact upon whether the Court should grant the relief sought in the First Application.

Finally, to the extent the Responses take issue with portions of the Report or the Receiver's proposed Plan of Liquidation, the Receiver respectfully directs the Court and the parties to the Omnibus Reply.

**WHEREFORE**, Jed Horwitt, Esq., Receiver, and Zeisler & Zeisler, P.C., counsel to the Receiver, respectfully request that the First Application be granted and that they be awarded an

allowance of $155,452.75[14] in professional and paraprofessional fees and $5,425.00 in Receiver

fees for services rendered during the Compensation Period, and $3,307.38 for the reimbursement

of expenses, subject to a 20% holdback applicable to fees for services; and grant such other and

further relief as this Court deems just and proper.

Dated: July 2, 2019
      Bridgeport, Connecticut

                                By:   */ s / Christopher H. Blau*
                                    Stephen M. Kindseth (ct14640)
                                    Christopher H. Blau (ct30120)
                                    Zeisler & Zeisler, P.C.
                                    10 Middle Street, 15th Floor
                                    Bridgeport, CT  06604
                                    Telephone: 203-368-4234 X 236
                                    Facsimile: 203-549-0903
                                    Email: cblau@zeislaw.com;
                                    skindseth@zeislaw.com
                                    His attorneys

---

[14] This amount reflects the $2,094.75 downward revision in fees to reflect travel time billing, as discussed above.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 2, 2019, a copy of the foregoing Reply was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System. Furthermore, a copy of the foregoing was sent via email to the Defendant, Iftikar A. Ahmed, at iftyahmed@icloud.com.

 */ s / Christopher H. Blau*
Christopher H. Blau (ct30120)
