# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　　　　　Plaintiff,<br><br>v.<br><br>IFTIKAR AHMED<br><br>　　　　　　　　Defendant, and<br>and<br><br>IFTIKAR ALI AHMED SOLE PROP; I-CUBED DOMAINS, LLC; SHALINI AHMED; SHALINI AHMED 2014 GRANTOR RETAINED ANNUITY TRUST; DIYA HOLDINGS LLC; DIYA REAL HOLDINGS, LLC; I.I. 1, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; I.I. 2, a minor child, by and through his next friends, IFTIKAR and SHALINI AHMED, his parents; I.I. 3, a minor child, by and through his next friends, IFTIKAR and SHALINI AHMED, his parents<br><br>　　　　　　　　Relief Defendants. | Civil Action No.<br>3:15-cv-675-JBA |

## SECOND INTERIM APPLICATION FOR PROFESIONAL FEES AND EXPENSES INCURRED BY THE RECEIVER AND HIS PROFESSIONALS

Jed Horwitt, Esq., in his capacity as Court-appointed receiver of the Receivership Estate[1] (the "Receiver"), by and through his undersigned counsel Zeisler & Zeisler, P.C. ("Z&Z"), respectfully submits this second interim application (the "Second Application") for professional fees and expenses incurred by the Receiver and Z&Z on behalf of the Receivership Estate during the period commencing on April 1, 2019, through and including June 30, 2019 (the "Compensation

---

[1] Unless expressly defined otherwise, the Receiver incorporates by reference the definitions of terms set forth in the Report of Receiver [Doc. No. 1135] (the "Report").

Period"). In advance of its filing, and pursuant to paragraph 35 of the Appointment Order, on July 15, 2019, the Receiver served upon counsel for the Securities and Exchange Commission (the "Commission"), the Defendant, and counsel for the Relief Defendants a complete copy of the Second Application, together with all exhibits and relevant billing information. The Commission has expressed that it does not oppose the relief requested in this Second Application. The Defendant and counsel for the Relief Defendants have not expressed a position as to this Second Application. In support of this Second Application, the Receiver and Z&Z respectfully represent as follows:

## I.      SUMMARY OF PROFESSIONAL FEES AND EXPENSES REQUESTED

1.      This Second Application is prepared in accordance with the Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission (the "SEC Guidelines") and the Appointment Order.

2.      Pursuant to the SEC Guidelines, the undersigned attaches the following exhibits to this Second Application:

   a.      The completed Standardized Fund Accounting Report ("SFAR"), in the form prescribed by the SEC Guidelines, and certified by Receiver, as **Exhibit A**;[2]

   b.      A Certification of Compliance with the Receivership Guidelines as **Exhibit B**;

   c.      A summary of total expenses for which reimbursement is sought as **Exhibit C**; and

   d.      Time records summarizing the work performed by legal professionals and paraprofessionals, for each of the four applicable Activity Categories (as hereinafter defined), as **Exhibit D-1**, **D-2**, **D-3**, and **D-4**.

3.      The Receiver and Z&Z attorneys and paraprofessionals have expended a total of 441.90 hours working on this matter during the Compensation Period.  The Receiver and Z&Z

---

[2] The amounts stated in **Exhibit A** represent the total income and expenses in the Receivership Account, which include income and expenses attributable to Ku Yong Bae by way of his interest in the Essell Entities, as defined below.

seek allowance of compensation of services rendered during the Compensation Period on behalf of the Receivership Estate in the amount of $92,879.20 in professional and paraprofessional fees, and reimbursement of actual and necessary expenses in the amount of $1,798.69. The Receiver has elected not to bill for any of his time addressing various administrative matters during the Compensation Period.

4.      The Receiver and Z&Z acknowledge that their fee compensation is subject to a twenty percent (20%) holdback, pursuant to the SEC Guidelines and the Appointment Order.

5.      The fees assessed reflect the hours worked by the Receiver and Z&Z attorneys and paraprofessionals, and the hourly rates applicable at the time that they rendered their services, as modified by the significant discounts provided by the Receiver and Z&Z (described below).

6.      These amounts also take into account all relevant circumstances and factors as set forth in the Connecticut Rules of Professional Conduct and the SEC Guidelines, including the nature of the services performed, the amount of time spent, the experience and ability of the professionals and paraprofessionals working on this engagement, the novelty and complexity of the specific issues involved, the time limitations imposed by the circumstances, and the responsibilities undertaken by the Receiver and Z&Z under the Appointment Order.

7.      A narrative description of the particular services provided is included in the attached time records (Ex. D-1 through D-4) and a summary of the Receiver's administration of the Receivership Estate since the First Interim Application for Professional Fees and Expenses Incurred by the Receiver and his Professionals [Doc. No. 1160] (the "First Application") was filed on May 15, 2019, is set forth in Section IV below.

8.      The expense reimbursements requested principally consist of: (i) PACER charges for accessing electronic documents; (ii) copying and printing charges; (iii) online research; (iv) shipping charges; and, (v) other routine expenses. (*See* Ex. C.)

9.      The Receiver and Z&Z have not sought reimbursement for secretarial, word processing, proofreading or document preparation expenses (other than by professionals or paraprofessionals), data processing and other staff services (exclusive of paraprofessional services), or clerical overtime.

10.     The Receiver and Z&Z have complied with the SEC Guidelines' internal photocopying rates as follows: $0.15 per page for black and white and $1.00 per page for color copies.

A.      **Public Service Discounts**

11.     As proposed by the Receiver as part of his application for selection as receiver submitted to the Commission, and as provided in the Appointment Order, the Receiver and Z&Z have consented to and implemented substantial public service discounts with respect to their billing rates for services provided in this proceeding.

12.     More specifically, and as shown in the fee schedules set forth below, Z&Z has consented to and applied a 25% public service discount to its regularly applicable hourly rates for all legal professionals and paraprofessionals.

13.     The Receiver originally agreed to discount his generally applicable hourly rate for services provided when serving as Receiver to $250 per hour, reflecting a nearly 50% discount, and discount his generally applicable hourly rate for legal services to $371, reflecting a 25% discount. Despite the fact that many of the services provided by the Receiver during the Compensation Period (and those for which he is seeking compensation) were legal in nature, the

Receiver and Z&Z have voluntarily billed all of the Receiver's time during the Compensation Period at the reduced $250 per hour rate.

**B.**   **Fee Schedules**

14.   The fee schedule for all Z&Z legal professionals who provided services during the Compensation Period, showing for each: his or her name; the hourly rate applied to his or her services in this proceeding and his or her customary hourly rate; the discount reflected in the applied hourly rate; the number of hours of services performed in the Compensation Period; the amount billed for such services in the Compensation Period; and the amount of the discount to his or her services during the Compensation Period; is as follows:

| Legal Professional | Rate (Cust. Rate) | Rate Disc. | Hours[3] | Amt. Billed | Amt. Disc. |
|---|---|---|---|---|---|
| Horwitt, Jed | $250 ($495) | $245 | 35.80 | $8,950.00 | $8,771.00 |
| Kindseth, Stephen | $337 ($450) | $113 | 135.90 | $45,292.80 | $15,862.20 |
| Blau, Christopher | $225 ($300) | $75 | 240.40 | $52,965.00 | $19,155.00 |

15.   The fee schedule for the legal paraprofessionals who provided services during the Compensation Period, showing: their name; the hourly rate applied to their services in this proceeding and their customary hourly rate; the discount reflected in the applied hourly rate; the number of hours of services performed in the Compensation Period; the amount billed for such services in the Compensation Period; and the amount of the discount to their services during the Compensation Period; is as follows:

| Paraprofessional | Rate (Cust. Rate) | Rate Disc. | Hours[4] | Amt. Billed | Amt. Disc. |
|---|---|---|---|---|---|
| Accurso, Deborah | $142 ($190) | $48 | 22.0 | $3,124.00 | $1,056.00 |
| O'Brien, Barbara | $142 ($190) | $48 | .20 | $28.40 | $9.60 |

---

[3] The hours include hours recorded for which no corresponding fee was charged, noted in the attached invoices as "N/C." Additionally, these hour totals include time spent on matters related to the Receiver and Z&Z's First Application. However, the Receiver and Z&Z are not seeking payment for time spent related to any fee application filed pursuant to paragraph 35 of the Appointment Order.

[4] These hour totals include time spent on matters related to the Receiver and Z&Z's First Application. However, the Receiver and Z&Z are not seeking payment for time spent related to any fee application filed pursuant to paragraph 35 of the Appointment Order

| | | | | | |
|---|---|---|---|---|---|
| Joseph, Kristin | $142 ($190) | $48 | 5.50 | $781.00 | $264.00 |
| Accurso, Ian | $142 ($190) | $48 | 2.10 | $298.20 | $100.80 |

**C.**   **Activity Categories**

16.    Pursuant to the SEC Guidelines, the Receiver and Z&Z utilized the following activity categories (the "Activity Categories") under which the following fees were incurred during the Compensation Period:

      a.    Case Administration, 257.20 hours, $68,299.30 (*see* Ex. D-1);

      b.    Asset Analysis & Recovery, 16.30 hours, $3,232.90 (*see* Ex. D-2);

      c.    Asset Disposition, 36.60 hours, $8,579.90 (*see* Ex. D-3); and,

      d.    Claims Administration & Objections, 52.80 hours, $12,767.10 (*see* Ex. D-4).

**II.**   **NATURE OF THE PROCEEDINGS**

**A.**   **Underlying Procedural History**

17.    On May 6, 2015, the Commission commenced this civil action by filing its Complaint [Doc. No. 1] against the Defendant. Subsequently, on June 16, 2015, the Commission filed an Amended Complaint [Doc. No. 33] naming the Relief Defendants in addition to the Defendant and, on April 1, 2016, the Commission filed a Second Amended Complaint [Doc. No. 208] in which it amended its claims against the Defendant and Relief Defendants.

18.    The Commission claimed that the Defendant "violated Section 10(b) of the Securities Exchange Act of 1934… and Rule 10b-5 (Count One), Section 17(a) of the Securities Act of 1933 …, and Section 206 of the Investment Advisers Act…." *SEC* v. *Ahmed*, 308 F. Sup. 3d 628, 636 (D. Conn. 2018). The Commission alleged that these violations arose out of the Defendant's use of "fraudulent and deceptive means to divert" millions of dollars "from funds he advised while employed by venture capital firm Oak Investment Partners ('Oak') into his personal bank accounts, before funneling much of his ill-gotten gains into assets and accounts in the name

of his wife [("Mrs. Ahmed")] in order to conceal his fraud and protect the assets from confiscation." *Id*.

19.     "In response" to the Commission's allegations, "neither Defendant nor Relief Defendants argue that Defendant did not commit the alleged frauds, [but] instead contend[] primarily that Defendant should not be held liable because (1) certain fraudulent acts are time-barred by the statute of limitations, (2) the fraud was not sufficiently connected to securities transactions, and (3) the underlying securities transactions are not sufficiently domestic to be within the reach of the United States securities laws." *Id*. at 637.

20.     Ultimately, on December 14, 2018, the Court entered an Amended Final Judgment [Doc. No. 1054] (the "Amended Final Judgment") against the Defendant and Relief Defendants and in favor of the Commission. The Amended Final Judgment, *inter alia*, ordered the Defendant to disgorge $41,920,639 "together with prejudgment interest thereon in the amount of $1,491,064.01 and any interest or gains accrued on disgorged frozen assets from the date of the Court's freeze order [described below]" and imposed a civil penalty in the amount of $21,000,000 (collectively, plus all other amounts due on account thereof, the "Judgment"). *Id*. at 2, 4.

21.     The Defendant filed a Motion to Alter or Amend the Amended Final Judgment Pursuant to Fed. R. Civ. P. 59(e) [Doc. No. 1086] on January 11, 2019 (the "January 2019 Motion to Alter or Amend"), which is presently pending.

22.     After multiple Notices of Appeal filed by the Defendant and Relief Defendants, the United States Court of Appeals for the Second Circuit, at Doc. No. 1111, denied the request to stay the judgment pending appeal and denied the request to vacate or stay the Court's order appointing a receiver, described below. The matter is presently stayed, in limited part, pending resolution of Defendant's January 2019 Motion to Alter or Amend. Specifically, "judgment in this case has been

stayed only insofar as no assets will be distributed in satisfaction of the judgment while appeals are pending." (Appointment Order, at 1.)

**B.**   <u>**The Asset Freeze**</u>

23.   On May 6, 2015, the same day that it filed its initial Complaint against the Defendant, the Commission filed an Emergency Motion for an *Ex Parte* Temporary Restraining Order Freezing Assets and Providing Other Ancillary Relief and for a Preliminary Injunction [Doc. No. 2] (the "TRO Motion").

24.   On May 7, 2015, the Court granted the TRO Motion and, *inter alia*, froze certain assets held by or under the direct or indirect control of the Defendant and Relief Defendant I-Cubed Domains, LLC ("I-Cubed"). (Doc. No. 9.)

25.   After the Court's August 12, 2015, Ruling and Order Granting Preliminary Injunction [Doc. No. 113], and after the asset freeze entered by the same was modified from time to time, the Court issued its Order on Defendant's Motions for Modification of the Asset Freeze Order to Release Funds for His Legal Defense and for a Stay in Light of *Kokesh* [Doc. No. 829] (the "Operative Freeze Order") in which the Court froze "[t]he assets, funds, or other property held by or under the direct or indirect control of Defendant and Relief Defendants, whether held in any of their names or for their direct or indirect beneficial interest, wherever located, up to the amount of $89,000,000." *Id*. at 5. The Amended Final Judgment, at paragraph 7, provides a schedule of assets included in the freeze that "are available to satisfy" the Judgment.

26.   The Operative Freeze Order was subsequently modified from time to time to release funds from the asset freeze to pay for various routine expenses incurred by assets of the Receivership Estate and the parties to the action.

**C.**   <u>**Appointment of the Receiver**</u>

27.     On May 29, 2018, the Commission filed its Motion for Remedies and Judgment [Doc. No. 886] seeking, *inter alia*, the appointment of a receiver.

28.     Following a telephonic conference on November 9, 2018, and a hearing held on November 28, 2018, the Court issued the Appointment Order on December 20, 2018, and thereby appointed Jed Horwitt as Receiver and Z&Z as his counsel.

29.     The Appointment Order provides that the Receiver shall control the operation of the Receivership Estate, which "includes all assets subject to the Court's asset freeze order… as modified throughout this litigation." (Appointment Order, at 6.) Among other powers and duties, the Appointment Order directed the Receiver to:

> [M]anage, in consultation with qualified business advisors, and taking into consideration the wishes of Defendant and Relief Defendants, and with the dual objects of maximizing the realizable value of the assets of the Receivership Estate and minimizing the expense charged thereto, the assets of the Receivership Estate, pending further order of the Court or until such time that the Receivership Estate can be liquidated or modified, including but not limited to management of investments and rental and maintenance of real property[.]

(Appointment Order, at 7.)

30.     The Appointment Order provides that the goal of the receivership, in part, is to "value the frozen assets[,] avoid over-freezing, [] secure the judgment for the [Commission], [and] manage and maximize the value of the frozen assets…." (Appointment Order, at 5.)

31.     Consistent with these principles, the Receiver was directed to:

> [F]ile and serve a report reflecting… (i) the existence, value, and location of assets of the Receivership Funds and all other assets of the Receivership Estate which are liquid or could be liquidated with relative ease, including but not limited to publicly traded securities and brokerage accounts; (ii) the Receiver's proposal for securing the judgment using additional assets of the Receivership Estate, including the Receiver's recommendations as to which additional assets should be valued for possible liquidation and placement into

9

> a Court Registry Investment System ("CRIS") account and the order
> in which the Receiver proposes to liquidate such assets; and (iii) the
> Receiver's estimate regarding the dollar amount which should
> ultimately be placed into such account to fully secure the judgment,
> taking into consideration the amount of the judgment in this case,
> the costs of the receivership and administration of the Receivership
> Estate, and any other relevant factors.

(Appointment Order, at 14-15.)

32.     The Receiver filed the Report on April 3, 2019. Consistent with the Appointment

Order, the Receiver identified those particular assets "which are liquid or could be liquidated with

relative ease" and such additional assets proposed to be liquidated as necessary to secure the

Judgment. The Receiver also provided in his Report his estimate regarding "the amount of the

judgment in this case, the costs of the receivership and administration of the Receivership Estate,

and any other relevant factors."

33.     The Receiver summarizes his and his counsel's additional activities under the

Appointment Order during the Compensation Period in Section IV.

### D.     <u>First Application</u>

34.     On May 15, 2019, the Receiver submitted the First Application. Thereafter, on June

4, 2019, the Defendant filed his Response in Opposition to the Receiver's Application for Fees

and Expenses [Doc. No 1183] (the "Defendant's Opposition to First Application"), which the

Relief Defendants joined by way of their Response in Opposition to Receiver's Application for

Fees and Expenses [Doc. No. 1185] (the "Relief Defendant's Opposition to First Application").

On July 2, 2019, the Receiver filed his Reply to the Defendant's and Relief Defendants' Responses

in Opposition to Receiver's Application for Fees [Doc. No. 1218.] (the "Receiver's Reply to

Oppositions to First Application"). The First Application is presently pending.

## III.     <u>SUMMARY OF CASH ON HAND</u>

35.     The Appointment Order, at paragraph 26, directed the Receiver to create a deposit account (the "Primary Receivership Account"), which the Receiver did shortly after his appointment.

36.     Beyond cash held in bank accounts subject to the Operative Freeze Order that fall within the Receivership Estate as more fully detailed below in Section V, as of the end of the Compensation Period all of the Receiver's cash on hand was in the Primary Receivership Account.

37.     As of June 30, 2019, the balance of the Primary Receivership Account was $3,916,748.59.

## IV.     SUMMARY OF RECEIVER'S ADMINISTRATION OF THE ESTATE

38.     During the Compensation Period, the Receiver has continued to fulfill his duties required of him under the Appointment Order.

39.     Although the detailed time entries contained in the invoices appended hereto as **Exhibits D-1** through **D-4** set forth with particularity the services provided by the Receiver and his counsel, Z&Z, a summary of such services is provided below.

### A.     Reviewed, Analyzed, and Responded to Filings Where Appropriate (Primarily, Exhibit D-1)

40.     During the Compensation Period, there were eighty-four (84) docket entries in this matter.

41.     To fulfil his obligations under the Appointment Order, including the management, administration and protection of the Receivership Estate and the Receivership Assets, the Receiver and/or his counsel reviewed and analyzed every single filing and other docket entry to determine its impact, if any, upon the Receivership Estate.  Obviously, the Receiver could not simply ignore any filing and blindly hope that the relief sought did not prejudice the Receivership Estate. In fact, many filings sought relief that would have had a significant effect upon the Receivership Estate.

Therefore, it was, in such instances, incumbent upon the Receiver, through his counsel, to articulate any objection he may have or any other position he felt the Court and other parties-in-interest should be apprised of so that any adverse impact upon the Receivership Estate could be avoided.

42.     Of the filings made during the Compensation Period that did not relate to the Report or the proposed Plan of Liquidation (addressed separately below), the most factually and/or legally complex included:

a.     Defendant's Motion for Access to All Information Acquired by the Receiver on his Private Investments and Holdings [Doc. No. 1129];

b.     Defendant's Emergency Motion for Declaration of Mistrial [Doc. No. 1135];

c.     Defendant's Emergency Motion and Memorandum of Law to Find and Sanction the SEC for Contempt of Court Order [Doc. No. 1139] and the Relief Defendant's Memorandum in Support of Defendant's Motion to Find and Sanction the SEC for Contempt of Court Order [Doc. No. 1140];

d.     Motion of Harris, St. Laurent & Chaudhry LLP to Withdraw from Representation of Relief Defendants, and for Payment of Outstanding Attorneys' Fees, and, in the Alternative, for Relief from the Stay of Litigation as to Relief Defendants [Doc. No. 1152]; and,

e.     Relief Defendants' Emergency Motion to Modify Asset Freeze Order to Release Funds to Pay Murtha Cullina's Fees and Disbursements Since Appointment of Receiver, or in the Alternative, to Withdraw the Appearance of Counsel [Doc. No. 1171].

43.     As captured by the time entries attached hereto as **Exhibits D-1** through **D-4** and as reflected in the Receiver's responses to each of the above filings, the Receiver carefully considered and, to the extent necessary, investigated, every issue raised by each filing and in all parties' responses.

44.     The Receiver also, to the extent he believed such could be worthwhile, through his counsel, endeavored to resolve the various issues raised through discussions primarily with counsel for the SEC and counsel for the Relief Defendants, in an effort to reach some consensual resolution or, at the very least, narrow the scope of controversy.

45.     Furthermore, where necessary—such as the Defendant's Motion for Access to All Information Acquired by the Receiver on his Private Investments and Holdings—the Receiver interfaced with certain representatives of non-parties to advise them of developments in this action that may impact such non-party's interests.

46.     Consequently, a significant portion of the Receiver's and Z&Z's time expended during the Compensation Period is attributable to reviewing, addressing and responding to various filings.[5]

   **B.     Continued Litigation and Negotiations Related to the Receiver's Report and Plan of Liquidation (Exhibit D-1)**

47.     Pursuant to paragraph 29 of the Appointment Order and the Court's order granting an extension of time [Doc. No. 1125], the Receiver filed his Report on April 3, 2019 [Doc. No. 1130]. Attached as Exhibit A to the Report was the Receiver's proposed Plan of Liquidation,

---

[5] As articulated in the proposed Plan of Liquidation, the Receiver's reserve of $500,000 for fees and expenses incurred by the Receiver and Z&Z assumed minimal contested litigation and motion practice in this proceeding including concerning the Report, the proposed Plan of Liquidation, and the liquidation process itself. In light of the voluminous filing activity during the Compensation Period that required the Receiver and/or Z&Z's attention, the Receiver may need to revise this proposed reserve should the level of filing activity in this matter continue.

detailing the assets that could be liquidated most expeditiously and cost-effectively to fully secure the Judgment (and pay for the reasonably anticipated costs of the administration of this Receivership Estate).

48.    The Receiver and his counsel thereafter continued discussions with counsel for the Commission and the Relief Defendants in the hopes of bridging the various gaps that existed between the parties in their positions on how the liquidation should proceed to secure the Judgment and how the Judgment amount should be calculated. The Receiver always viewed (and continues to view) a consensual resolution on as many issues as possible to be far more cost-effective than contested litigation—a savings that ultimately would inure, presumably, to the benefit of the Defendant and the Relief Defendants.

49.    After the Receiver filed the Report, the Defendant, Relief Defendants, Daniel G. Johnson ("Johnson"), and the Commission filed separate responses to the Report on June 3, 2019, spanning more than fifty-five (55) pages in total.

50.    The responses to the Report submitted by the Defendant (at Doc. No. 1178, the "Defendant's Response"), the Relief Defendants (at Doc. No. 1182, the "Relief Defendants' Response"), and Johnson (at Doc. No. 1180, the "Johnson Response" and, collectively with the Defendant's Response and the Relief Defendants' Response, the "Responses") required a reply by the Receiver.

51.    Following an exhaustive and meticulous analysis of the issues raised in the Responses and conducting research concerning the same, the Receiver filed his Omnibus Reply to the Responses [Doc. No. 1203] on June 17, 2019.

52.    Thereafter, counsel to the Receiver engaged in further discussions with the Defendant, counsel to the Relief Defendants, and counsel to the Commission in an effort to resolve

14

some or all of the issues raised in the Responses and with the goal of preserving judicial resources, avoiding the unnecessary expenditure of funds litigating these issues, and rapidly and efficiency liquidating assets to allow the Receiver to secure the Judgment through deposits into the CRIS account. Such discussions are ongoing.

C.   **Analyzed and Addressed Potential Impact of Appointment as Receiver in *SEC v. Kanodia*, et al. (Exhibit D-1)**

53.   On April 12, 2019, counsel for the Commission advised the Receiver that the Honorable Allison D. Burroughs, presiding over *SEC v. Kanodia, et al*., No. 1:15-cv-13042-ADB (D. Mass.) (the "Civil Insider Trading Case") held a status conference attended by counsel for the Commission, counsel for the Defendant, and Mrs. Ahmed on April 11, 2019. Following this conference, Judge Burroughs issued an order stating that she "anticipates ordering an asset freeze for $4.4 million of Defendant's assets in excess of the amount necessary for satisfaction of the judgment in the Connecticut case" and, though the appointment of a receiver was not discussed at the hearing, further ordered that, "[u]pon application of the SEC to appoint Jed Horwitt of Zeisler & Zeisler, P.C. as receiver in this action, the Court anticipates issuing an appointment."[6] (Civil Insider Trading Case, Doc. No. 189).

54.   The Commission provided notice of such developments by filing in this case its Notice of Asset Freeze and Expected Appointment of Receiver in *SEC v. Kanodia, et al.*, 15-CV-13052 (D. Mass.) [Doc No. 1138], filed on April 17, 2019 (the "Notice"). In preparation for the filing of the Notice, and following detailed discussions and analysis, the Receiver provided the Commission with a statement of the Receiver's position concerning his potential appointment as the receiver in the Civil Insider Trading Case. (*See* Notice, at 4.)

---

[6] The Receiver did not affirmatively seek appointment and was not, at that time, even aware of the possibility.

15

55.     On May 16, 2019, Judge Burroughs issued an Order Freezing Assets [Doc. No. 195] (the "MA Asset Freeze Order"). The language of the MA Asset Freeze Order unequivocally provides that the asset freeze is "subject and subordinate in payment and priority" to the asset freeze entered in the instant case and any distribution to satisfy the Judgment and the expenses arising from the administration of the Receivership Estate, and does not "impair, constrain or limit the use of such assets, funds or other property subject to" the asset freeze entered in this case. (MA Asset Freeze Order, at 5.)

56.     Thereafter, the Receiver filed his Motion Pursuant to Paragraph 5(j) of the Order Appointing Receiver Regarding His Possible Appointment as Receiver in *SEC v. Kanodia, et al.* [Doc. No. 1169] (the "Paragraph 5(j) Motion") on May 23, 2019. In the Paragraph 5(j) Motion, the Receiver sought this Court's guidance as to the Receiver's involvement in the Civil Insider Trading Case while continuing to serve as Receiver in the instant action under the Appointment Order.[7]

57.     On June 7, 2019, the Relief Defendants filed the Consented-To Motion for Extension of Time to Respond to Receiver's Motion Regarding His Possible Appointment as Receiver in *SEC v. Kanodia, et al*. [Doc. No. 1186], stating that there were "ongoing settlement negotiations in" the Civil Insider Trading Case that would "obviate the need for a receiver to be appointed in that case." This Court granted the requested extension on June 11, 2019. (*See* Doc. No. 1188.)

58.     The Receiver and Z&Z took no further action regarding the Civil Insider Trading Case or the Receiver's involvement therein during the Compensation Period.

### D.     Began Process of Preparing to Liquidate Apartments (Exhibit D-3)

---

[7] The receiver subsequently withdrew the Paragraph 5(j) Motion on July 12, 2019 [Doc. No 1231] because a final judgment had entered in the Civil Insider Trading Case, rendering the Paragraph 5(j) Motion moot.

59.     Given (i) the primary objective of this receivership to liquidate assets to secure the Judgment pending appeals; (ii) the Receiver's preliminary calculation of the Judgment amount; (iii) the Receiver's extensive review of the Receivership Assets and, in particular, those assets that "are liquid or could be liquidated with relative ease," and those "additional assets of the Receivership Estate" that could be liquidated most expeditiously and cost-effectively and with the least amount of prejudice possible; and (iv) the Receiver's recognition that he needed to minimize the Receivership Estate's exposure to market risk by moving as expeditiously as possible, the Receiver concluded that he should begin the process of liquidating the apartments subject ultimately to this Court's approval of a plan of liquidation, and attempt to reach an agreement with the Relief Defendants concerning the manner of such liquidation.

60.     Accordingly, the Receiver researched various real estate brokers and ultimately decided upon the firm, Compass Real Estate ("Compass") (with the possible involvement of the Receiver's contemplated forensic and tax account, FTI Consulting, Inc. ("FTI")) The Receiver intends to seek permission from this Court to retain Compass and possibly FTI to assist in the marketing and sale of the apartments once a final plan of liquidation has been ordered by this Court.[8]

61.     The Receiver's counsel thereafter toured Apartment 12A and Apartment 12F with representatives of Compass, namely, Stacey Froelich and Julian Berkeley.

62.     The Apartments appear to be in good condition with no signs of damage or decay. The water leak in the kitchen ceiling of Apartment 12F, referenced in the First Application, appears

---

[8] Although the Receiver has, to a limited extent, consulted with these professionals, they have not yet been employed. From the Receiver's perspective, such employment is premature since this Court has not approved a plan of liquidation including the sale of the apartments, and the Receiver has not yet needed the services of a forensic or tax accountant.

fully resolved. The Apartments feature modern appliances that appear to be in good condition. Aesthetically, the Apartments are pleasing with plenty of light and good views.

63.     Ms. Froelich prepared a report as to the projected sale price of both Apartment 12A and Apartment 12F and otherwise shared her qualifications and background with counsel to the Receiver. Ms. Froelich and Mr. Berkeley confirmed to the Receiver's counsel that Compass would agree to a 4% commission in the sale of the Apartments, subject to further order from this Court.

64.     In an effort to expedite the liquidation process and with the hopes of realizing the maximum amount possible from the sale of the Apartments by listing them during the prime selling season (the spring) and avoiding unnecessary litigation around the selection of a real estate broker, the Receiver advised the Defendant and counsel to the Relief Defendants of the meeting with Ms. Froelich and Mr. Berkeley. The Receiver then proposed having representatives of Compass meet with Ms. Ahmed and her counsel to facilitate an agreed upon sale process. The Relief Defendants, ultimately, did not agree to meet with Compass. They also did not agree to the Receiver's employment of Compass or the sale of the Apartments.[9]

65.     Regardless, the Receiver is now in a position to move expeditiously forward with the sale of the Apartments when and if this Court includes them as part of the ordered plan of liquidation.

**E.     Continued Management of Receivership Assets (Exhibit D-1 and Exhibit D-4)**

66.     Shortly after his appointment, pursuant to the Appointment Order, the Receiver opened an account at a financial institution experienced in servicing court-appointed receivers (and

[9] The Receiver does not suggest that he is required to obtain either the Defendant's or the Relief Defendants' consent to the employment of a broker or any other professional. The Receiver only requires approval from this Court pursuant to paragraph 33 of the Appointment Order.

bankruptcy trustees), the Primary Receivership Account, which holds funds marshaled by the Receiver and constitutes a Receivership Asset.

67.    As it became apparent that the Receivership Account would hold a significant amount of Receivership Assets in the form of cash pending approval of a plan of liquidation and the transfer of such assets to the CRIS account, the Receiver decided to open a second custodial account under the authority of paragraph 25 of the Appointment Order (the "Secondary Receivership Account"). While the Primary Receivership Account yields .33% APY, the Secondary Receivership Account yields 1.05% APY.

68.    On June 27, 2019, at the request counsel for Aldrich Capital Partners ("Aldrich"),[10] the Receiver instructed Aldrich to transfer the $3,078,631.27 held by Aldrich (SEC No. 69, the "Aldrich Asset") to the Primary Receivership Account. The Primary Receivership Account received the Aldrich Asset on June 28, 2019. The Receiver intends to transfer a significant portion of the funds from the Primary Receivership Account to the Secondary Receivership Account to realize the materially higher interest income. The Receiver intends to maintain an adequate amount in the Primary Receivership Account to pay for various routine expenses of Receivership Assets ("Routine Receivership Expenses"), which the Receiver will replenish as necessary from the Secondary Receivership Account. As of June 30, 2019, the Primary Receivership Account holds $3,916,748.59.

69.    During the Compensation Period, the Receiver paid the following Routine Receivership Expenses from the Primary Receivership Account as authorized and directed by this Court in paragraph 32 of the Appointment Order:

---

[10] Counsel for Aldrich advised that keeping the Aldrich Asset frozen and on its books was an administrative burden. In an effort to alleviate the impact of the Receivership on non-parties, the Receiver elected to transfer the Aldrich Asset to the Primary Receivership Account.

| Date | Expense | Amount |
|---|---|---|
| 04/08/2019 | Classic Realty LLC (Common charges & electric 12A) | $3,092.00 |
| 04/08/2019 | Classic Realty LLC (Common charges & electric 12F) | $3,951.53 |
| 04/08/2019 | Morgan Manhattan (storage) | $100.00 |
| 04/08/2019 | Bank of America (safe deposit boxes, 1 year) | $342.00 |
| 04/08/2019 | Dept. of Revenue Services (DIYA Capital Management) | $250.00 |
| 04/08/2019 | Delaware Secretary of State (DIYA Capital Management) | $300.00 |
| 04/09/2019 | Dept. of Revenue Services (DIYA Capital LP) | $250.00 |
| 04/09/2019 | Delaware Secretary of State (DIYA Capital LP) | $300.00 |
| 04/29/2019 | Shalini Ahmed (monthly health insurance costs) | $845.88 |
| 05/02/2019 | Shalini Ahmed (monthly health insurance costs) | $845.88 |
| 05/11/2019 | Classic Realty LLC (Common charges & electric 12F) | $3,881.97 |
| 05/11/2019 | Classic Realty LLC (Common charges & electric 12A) | $3,089.90 |
| 05/11/2019 | Morgan Manhattan (Storage) | $100.00 |
| 05/28/2019 | Classic Realty LLC (Common charges & electric 12F) | $3,925.91 |
| 05/28/2019 | Classic Realty LLC (Common charges & electric 12A) | $3,090.75 |
| 06/10/2019 | Morgan Manhattan (storage) | $100.00 |
| 06/20/2019 | TD Bank (Refund garnishment fee; TD Bank)[11] | ($125.00) |
| 06/24/2019 | NYC Department of Finance (Prop. Tax, 530 Park Ave, 12A) | $18,599.30 |
| 06/24/2019 | NYC Department of Finance (Prop. Tax, 530 Park Ave, 12F) | $22,833.22 |
| 06/25/2019 | Classic Realty LLC (Common charges & electric 12F) | $3,936.95 |
| 06/25/2019 | Classic Realty LLC (Common charges & electric 12A) | $3,093.14 |
| | **TOTAL** | $72,803.43 |

70.     Additionally, after consulting with the Defendant and Ku Young Bae, and to preserve the formalities of the Essell Entities' corporate structure, funds necessary to pay expenses incurred by the Essell Entities were transferred from the Essell Entities' bank accounts to the Primary Receivership Account with the express consent of Mr. Ku and then from the Primary Receivership Account to the person or entity demanding payment. Such payments consisted of:

| Date | Expense | Amount |
|---|---|---|
| 04/10/2019 | Department of Revenue Services (Essell Farms LLC) | $250.00 |
| 06/10/2019 | Central Hudson Gas & Electric (1820 County Route 7) | $9.67 |

---

[11] Before the Receiver's appointment and during the Asset Freeze, TD Bank levied a garnishment fee on certain frozen bank accounts that were Receivership Assets. TD Bank refunded said fee at the instruction of the Receiver.

| 06/18/2019 | United States Treasury (Return incorrect refund to the Internal Revenue Service for Essell Farms, LLC, Tax Yr. 2017)[12] | $155,435.16 |
|---|---|---|
| 06/19/2019 | Reardon and Company LLP (2018 tax return preparation for both Essell Entities) | $17,500.00 |
| 06/24/2019 | Central Hudson Gas & Electric (1820 County Route 7) | $22.31 |
| | **TOTAL** | $173,217.14 |

71.     Further, pursuant to paragraph 5(c) of the Appointment Order, the Receiver has approved three monthly distributions of $8,676.00 representing Mrs. Ahmed's living expenses, each at the request of counsel to the Relief Defendants and under the authority of the Court's May 1, 2018, order [Doc. No. 865]. The Receiver transferred these funds directly from Fidelity Investments account ending x7540 (SEC No. 75).

72.     In mid-April 2019, counsel for the Relief Defendants advised that they had not received the anticipated monthly check of $845.88 from Bank of America ("BoA") pursuant to the Court's May 1, 2018, order [Doc. No. 865] providing for the monthly distribution of such funds for Mrs. Ahmed's health insurance costs. Promptly upon receiving notice of the issue, counsel to the Receiver reminded BoA of its obligations to make monthly distributions to the Relief Defendants and instructed it to make such distribution for April 2019. By the end of April, BoA still had not complied and thus the Receiver issued a check to the Relief Defendants from the Primary Receivership Account in the amount of $845.88 on April 29, 2019, due to the importance of providing for the Relief Defendants' health insurance premiums. On May 2, 2019, the Receiver

---

[12] On June 12, 2019, the Receiver received notice that the Internal Revenue Service ("IRS") had issued an incorrect refund in the amount of $155,435.16 to Essell Farms, LLC for the 2017 tax year (the "Overpayment"). The IRS demanded repayment of the Overpayment on or before June 26, 2019, to avoid interest charges. With the consent of Mr. Ku, and after consultation with counsel for the Commission and the Relief Defendants, the Receiver promptly satisfied the IRS' demand for payment from the Primary Receivership Account, owing to the historically delayed processing times at Northern Trust (where Essell Farms, LLC's primary bank account is held) and the desire to avoid interest charges on the Overpayment. Thereafter, the Receiver instructed Northern Trust to issue a check in the amount of the Overpayment to the Primary Receivership Account as reimbursement for the earlier distribution to the IRS.

issued a second check in the amount of $845.88 from the Primary Receivership Account to cover the Relief Defendants' May 2019 health insurance costs. Thereafter, counsel for the Relief Defendants advised that BoA had resumed making monthly distributions pursuant to this Court's order.

73.     Beyond the above-described disbursements, the Receiver and Z&Z have provided services and Z&Z has advanced reasonable and necessary expenses, for which this Second Application seeks compensation and reimbursement. (*See* Ex. C.)  Provided that the Court awards the fees and expenses requested in this Second Application, these disbursements will be reflected as debits from the Receivership Account on the Receiver's next interim fee application.

74.     During the Compensation Period, the Primary Receivership Account earned $802.47 in interest. Additionally, on April 4, 2019, Crypto Currency Partners, L.P. made a distribution of $5,243.23 pursuant to the Defendant's interest therein, which was deposited in the Primary Receivership Account.

**F.     Other Services Provided for Receivership Estate**

75.     The Receiver and his counsel provided additional services during the Compensation Period that were reasonable and necessary in the administration and management of the Receivership Estate. These activities included:

i.     Compel Compliance by Bank of America

76.     Unfortunately, the Receiver continued to encounter issues with Bank of America's ("BoA") compliance with the Appointment Order during the Compensation Period. Specifically, pursuant to a notice provided to the Receiver by counsel to the Relief Defendants, the Receiver learned that BoA intended to close certain UGMA accounts that are Receivership Assets. Upon

receiving such notice, counsel to the Receiver promptly advised BoA that any action against the UGMA accounts would be in violation of the Appointment Order.

77.    The Receiver and his counsel were able to resolve the above issue without this Court's intervention. While such resolution required multiple telephone calls and written correspondence to BoA representatives during the Compensation Period, the Receiver believes he resolved the issues in an appropriate and efficient manner that minimized the cost to the Receivership Estate.

ii.    Additional Tax Analysis

78.    In light of the nature of the Receivership Estate and complex tax regulations applicable to individuals and entities whose property is in full or partial control of the Receiver, the Receiver and his counsel spent a significant amount of time researching and analyzing issues relating to the tax obligations of the Receiver and Receivership Estate. *See*, *e.g.*, 26 U.S.C. § 6012; 26 C.F.R. § 1.641(b)-2; 26 C.F.R. § 1.6012-3; Regulations of Connecticut State Agencies § 12-740-3.

79.    After an extensive analysis of all applicable statutes and regulations, and the facts presented in this matter,[13] the Receiver concluded based upon the dollar amount and limited nature of the Receivership Estate pursuant to paragraph 2 of the Appointment Order that he was not obligated to submit tax returns on behalf of the Defendant.

80.    Additionally, based on representations by the Relief Defendants, their counsel, and their accountant that all taxable events involving the remaining Relief Defendants flow through to

---

[13] In analyzing these tax issues, the Receiver sought the assistance of tax professionals at FTI pursuant to paragraphs 5 and 33 of the Appointment Order. The Receiver intended to move to retain FTI to, *inter alia*, prepare any necessary tax returns and advise the Receiver as to ongoing tax-related issues in the administration of the Receivership Estate. However, after the Receiver concluded, subject to further verification, that he had no obligation to submit tax returns for the Defendant and Relief Defendants, he did not move forward with seeking to retain FTI.

either the Defendant or Mrs. Ahmed's individual returns, *and subject to independent verification which he is attempting to obtain*, the Receiver concluded that he had no obligation to submit tax returns on behalf of any of the Relief Defendants. The Receiver is presently in the process of confirming these conclusions.

       iii.    <u>Continued Collection of Information Concerning Receivership Assets</u>

       81.    Because of the Receiver's responsibility at some point in the future once authorized and directed by this Court to liquidate those particular Receivership Assets necessary to secure the Judgment, the Receiver during the Compensation Period continued to collect and evaluate information concerning the Receivership Assets.

       82.    This oversight responsibility was most pressing with respect to the Receivership Assets that had the greatest volatility (such as the securities, gold, and Bitcoin).

       83.    Since to the best of the Receiver's knowledge no significant decline in value occurred during the Compensation Period threatening the Receiver's ability to secure the Judgment fully, the Receiver did not need to take any further action.

       **G.**    **<u>Anticipated Closure</u>**

       84.    At this time, it is premature for the Receiver to speculate as to precisely when this receivership proceeding will be ready to close.

       85.    As stated in the Report, and subject to further orders of the Court, the Receiver believes that a majority of the amount necessary to secure the Judgment can be liquidated and transferred into the CRIS account relatively quickly. Pursuant to the Receiver's Plan of Liquidation, the Receiver believes that Apartment 12A and Apartment 12F will also need to be liquidated to fully secure the Judgment. The Receiver does not know how long it will take to sell

those properties, but he will undertake all reasonable and appropriate efforts necessary to maximize value in the shortest amount of time necessary.

86.     In the Receiver's view, in accordance with the Appointment Order, only after (i) all appeals have been fully adjudicated, (ii) if and to the extent the Judgment is affirmed on appeal, distributions are made to satisfy the Judgment, and (iii) all costs of the administration of the receivership are paid, can the receivership be appropriately closed.

## V.      **DESCRIPTION OF ASSETS OF THE RECEIVERSHIP ESTATE**

87.     A description of the assets of the Receivership Estate, including approximate or actual valuations and anticipated or proposed dispositions, is attached hereto as **Exhibit E**.

88.     At this time, the Receiver believes it is prudent to maintain the Court's asset freeze over the Receivership Assets to fully secure the Judgment until sufficient assets have been liquidated and the proceeds of such liquidations are deposited in the CRIS account and to pay for the costs of the receivership.

## VI.     **SUMMARY OF RECEIVERSHIP ESTATE CLAIMS**

89.     The Receiver is not aware of any claims against the Receivership Estate with the exception of (i) the Judgment; (ii) the Receiver and his counsel's fees and expenses; (iii) the likely future claims for fees and expenses from professionals retained pursuant to the Appointment Order; and (iv) the ordinary expenses incurred on account of the Receivership Assets (such as real estate taxes, property repairs, and other such routine expenditures).

## VII.    **SUMMARY OF THE RECEIVERSHIP ESTATE'S CAUSES OF ACTION**

90.     Considering the limited scope of the Receiver's primary duty (to value assets and liquidate such assets as directed by the Court to secure the Judgment) pursuant to the Appointment Order and his perceived ability to accomplish that objective from known assets, the Receiver has

not undertaken to identify any causes of action held by the Receivership Estate. Should circumstances change, or should this Court so direct, the Receiver will commence an investigation into potential causes of action held by the Receivership Estate.

## VIII.   THE GOVERNING LEGAL STANDARD

91.   "A receiver appointed by a court who reasonably and diligently discharges his duties is entitled to be fairly compensated for services rendered and expenses incurred." *SEC* v. *Byers*, 2014 U.S. Dist. LEXIS 177180, at *13 (S.D.N.Y. Dec. 23, 2014); *see also Donovan v. Robbins*, 588 F. Supp. 1268, 1272 (N.D. Ill. 1984) ("[T]he receiver diligently and successfully discharged the responsibilities placed upon him by the Court and is entitled to reasonable compensation for his efforts."); *Securities & Exchange Comm'n v. Elliott*, 953 F.2d 1560 (11th Cir. 1992) (receiver is entitled to compensation for faithful performance of his duties.).

92.   "The [D]istrict [C]ourt's award of a receiver's compensation is… firmly within its discretion." *Gaskill* v. *Gordon*, 27 F.3d 248, 253 (7th Cir. 1994) *citing Crites, Inc. v. Prudential Ins. Co.*, 322 U.S. 408, 418, 88 L. Ed. 1356, 64 S. Ct. 1075 (1944). The Court "may consider all of the factors involved in a particular receivership in determining the appropriate fee." *Id.*

93.   The case law and other authority may provide "convenient guidelines," but ultimately "the unique fact situation renders direct reliance on precedent impossible." *Securities & Exchange Comm'n v. W.L. Moody & Co.*, 374 F. Supp. 465, 480 (S.D. Tex. 1974), *aff'd*, 519 F. 2d 1087 (5th Cir. 1975).

94.   In awarding counsel fees in Securities Act receiverships, courts consider "the complexity of problems faced, the benefits to the receivership estate, the quality of the work performed, and the time records presented." *SEC v. Illarramendi*, Docket No. 3:11CV78 (JBA), 2013 U.S. Dist. LEXIS 171950, at *8-9 (D. Conn. Dec. 5, 2013), *quoting Securities & Exchange*

*Comm'n v. Fifth Ave. Coach Lines, Inc.*, 364 F. Supp. 1220, 1222 (S.D.N.Y. 1973); *see also United States v. Code Prods.*, 362 F.2d 669, 673 (3rd Cir. 1966) (court should consider the time, labor and skill required but not necessarily expended, the fair value of such time, labor and skill, the degree of activity, the dispatch with which the work is conducted and the result obtained).

95.     While "results are always relevant," a good result may take a form other than a "bare increase in monetary value." *Elliott*, 953 F.2d at 1577 ("Even though a receiver may not have increased, or prevented a decrease in, the value of the collateral, if a receiver reasonably and diligently discharges his duties, he is entitled to compensation"). Overall results can be determined only at the conclusion of the Receivership Proceeding.

96.     Another "basic consideration is the nature and complexity of the legal problems confronted and the skill necessary to resolve them." *Moody*, 374 F. Supp. at 485. Moreover, "[t]ime spent cannot be ignored." *Id.* at 483.

## IX.     THE COURT SHOULD AWARD THE REQUESTED FEES AND EXPENSES

97.     Based on the foregoing, the Receiver and Z&Z respectfully submit that the services for which they seek compensation in this Second Application were reasonable and necessary for, and beneficial to, the orderly administration of the Receivership Estate.

98.     The fees and expenses sought by this Second Application were reasonable and necessarily incurred and were in the best interest of the Receivership Estate. With the exception of the SEC Guidelines, the Receiver has not entered into any agreement, written or oral, express or implied, with any person or entity concerning the amount of compensation paid or to be paid from the Receivership Estate, or any sharing thereof.

99.     As more fully set forth throughout this Second Application and as detailed in the exhibits submitted herewith, the issues addressed by the Receiver and Z&Z have been and continue

to be highly complex. The Receiver and Z&Z respectfully submit that compensation for the foregoing services as requested is commensurate with the complexity, importance and nature of the problems, issues or tasks involved.  The Receiver and Z&Z performed such professional services expediently and efficiently.

100.    Accordingly, the Receiver and Z&Z submit that the compensation requested herein is fair, reasonable and warranted in light of the nature, extent and value of such service to the Receivership Estate and all parties in interest.

## X.    SOURCE AND MANNER OF PAYMENT

101.    The Receivership Estate contains cash held in the Primary Receivership Account and the Secondary Receivership Account.

102.    The Receiver and Z&Z request that this Court enter an order directing the approved fees and reimbursed expenses to be paid from the Secondary Receivership Account, less the 20% holdback (applicable only to fees) which shall be held in the Secondary Receivership Account pending this Court's further order as to the disposition of such funds.

**WHEREFORE**, Jed Horwitt, Esq., Receiver, and Zeisler & Zeisler, P.C., counsel to the Receiver, respectfully request that this Second Application be granted and that they be awarded an allowance of $92,879.20 in professional and paraprofessional fees and $0.00 in Receiver fees for services rendered during the Compensation Period, and $1,798.69 for the reimbursement of expenses, subject to a 20% holdback applicable to fees for services; and grant such other and further relief as this Court deems just and proper.

Dated: August 14, 2019, at Bridgeport, Connecticut.

Respectfully submitted,

JED HORWITT, ESQ., RECEIVER


 _/s/ Jed Horwitt_____
Jed Horwitt, Esq., Receiver (ct04778)


By: _/s/ Stephen M. Kindseth_____
Stephen M. Kindseth (ct14640)
Christopher H. Blau (ct30120)
Zeisler & Zeisler, P.C.
10 Middle Street, 15th Floor
Bridgeport, CT  06604
Telephone: 203-368-4234 X 236
Facsimile: 203-549-0903
Email: skindseth@zeislaw.com;
cblau@zeislaw.com
His attorneys

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 14, 2019, a copy of the foregoing Second Application was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System. Furthermore, a copy of the foregoing was sent via email to the Defendant, Iftikar A. Ahmed, at iftyahmed@icloud.com.

By:  _/s/ Stephen M. Kindseth_____
Stephen M. Kindseth (ct14640)