# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>IFTIKAR AHMED<br><br>Defendant, and<br>and<br><br>IFTIKAR ALI AHMED SOLE PROP; I-CUBED DOMAINS, LLC; SHALINI AHMED; SHALINI AHMED 2014 GRANTOR RETAINED ANNUITY TRUST; DIYA HOLDINGS LLC; DIYA REAL HOLDINGS, LLC; I.I. 1, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; I.I. 2, a minor child, by and through his next friends, IFTIKAR and SHALINI AHMED, his parents; I.I. 3, a minor child, by and through his next friends, IFTIKAR and SHALINI AHMED, his parents<br><br>Relief Defendants. | Civil Action No.<br>3:15-cv-675-JBA |

## THIRD INTERIM APPLICATION FOR PROFESSIONAL FEES AND EXPENSES INCURRED BY THE RECEIVER AND HIS PROFESSIONALS

Jed Horwitt, Esq., in his capacity as Court-appointed receiver of the Receivership Estate[1] (the "Receiver"), by and through his undersigned counsel Zeisler & Zeisler, P.C. ("Z&Z"), respectfully submits this third interim application (the "Third Application") for professional fees and expenses incurred by the Receiver and Z&Z on behalf of the Receivership Estate during the period commencing on July 1, 2019, through and including September 30, 2019 (the

---

[1] Unless expressly defined otherwise, the Receiver incorporates by reference the definitions of terms set forth in the Report of Receiver [Doc. No. 1135] (the "Report").

"Compensation Period"). In advance of its filing, and pursuant to paragraph 35 of the Appointment Order, on October 15, 2019, the Receiver served upon counsel for the Securities and Exchange Commission (the "Commission"), the Defendant, and counsel for the Relief Defendants a complete copy of the Third Application, together with all exhibits and relevant billing information. The Commission does not object to the relief sought herein. The Defendant and counsel for the Relief Defendants have not expressed a position as to this Third Application. In support of this Third Application, the Receiver and Z&Z respectfully represent as follows:

## I.     SUMMARY OF PROFESSIONAL FEES AND EXPENSES REQUESTED

1.      This Third Application is prepared in accordance with the Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission (the "SEC Guidelines") and the Appointment Order.

2.      Pursuant to the SEC Guidelines, the undersigned attaches the following exhibits to this Third Application:

a.      The completed Standardized Fund Accounting Report ("SFAR"), in the form prescribed by the SEC Guidelines, and certified by Receiver, as **Exhibit A**;[2]

b.      A Certification of Compliance with the Receivership Guidelines as **Exhibit B**;

c.      A summary of total expenses for which reimbursement is sought as **Exhibit C**; and

d.      Time records summarizing the work performed by legal professionals and paraprofessionals at Z&Z, for each of the applicable Activity Categories (as hereinafter defined), as **Exhibit D-1**, **D-2**, **D-3**, **D-4**, **D-5**; and,

e.      Time records and expenses summarizing the work performed by legal professionals and paraprofessionals at Mitofsky, Shapiro, Neville & Hazen, LLP ("MSNH"), as **Exhibit D-6**.

---

[2] The amounts stated in **Exhibit A** represent the total income and expenses in the Receivership Account, which may include income and expenses attributable to Ku Yong Bae by way of his interest in the Essell Entities.

3.    The Receiver and Z&Z attorneys and paraprofessionals have expended a total of 165.5 hours working on this matter during the Compensation Period, not including many hours spent preparing the Second Interim Application for Professional Fees and Expenses Incurred by the Receiver and his Professionals [Doc. No. 1249] (the "Second Application") and responding to the Defendant's and Relief Defendants' objections thereto.  The Receiver and Z&Z seek allowance of compensation of services rendered during the Compensation Period on behalf of the Receivership Estate in the amount of $39,925.45 in professional and paraprofessional fees, and reimbursement of actual and necessary expenses in the amount of $1,155.33.

4.    MSNH attorneys and paraprofessionals have expended a total of 7.3 hours working on this matter during the Compensation Period and seek allowance of compensation of services rendered during the Compensation Period in the amount of $2,555.00 in professional and paraprofessional fees, and no reimbursement of actual and necessary expenses.

5.    The Receiver and Z&Z acknowledge that their fee compensation is subject to a twenty percent (20%) holdback, pursuant to the SEC Guidelines and the Appointment Order.

6.    The fees assessed reflect the hours worked by the Receiver, Z&Z attorneys and paraprofessionals, and MSNH attorneys, and the hourly rates applicable at the time that they rendered their services, as modified by the significant discounts provided by the Receiver and Z&Z (described below).

7.    With respect to the Receiver and Z&Z, these amounts also take into account all relevant circumstances and factors as set forth in the Connecticut Rules of Professional Conduct and the SEC Guidelines, including the nature of the services performed, the amount of time spent, the experience and ability of the professionals and paraprofessionals working on this engagement, the novelty and complexity of the specific issues involved, the time limitations imposed by the

circumstances, and the responsibilities undertaken by the Receiver and Z&Z under the Appointment Order.

8.      A narrative description of the particular services provided is included in the attached time records (Ex. D-1 through D-5 with respect to the Receiver and Z&Z, Ex. D-6 with respect to MSNH) and a summary of the Receiver's administration of the Receivership Estate since the Second Application was filed on August 14, 2019, is set forth in Section IV below.

9.      The expense reimbursements requested principally consist of: (i) PACER charges for accessing electronic documents; (ii) copying and printing charges; (iii) online research; (iv) shipping charges; and, (v) other routine expenses. (*See* Ex. C.)

10.     The Receiver and Z&Z have not sought reimbursement for secretarial, word processing, proofreading or document preparation expenses (other than by professionals or paraprofessionals), data processing and other staff services (exclusive of paraprofessional services), or clerical overtime.

11.     The Receiver and Z&Z have complied with the SEC Guidelines' internal photocopying rates as follows: $0.15 per page for black/white and $1.00 per page for color copies.

A.      **Public Service Discounts**

12.     As proposed by the Receiver as part of his application for selection as receiver submitted to the Commission, and as provided in the Appointment Order, the Receiver and Z&Z have consented to and implemented substantial public service discounts with respect to their billing rates for services provided in this proceeding.

13.     More specifically, and as shown in the fee schedules set forth below, Z&Z has consented to and applied a 25% public service discount to its regularly applicable hourly rates for all legal professionals and paraprofessionals.

4

14.     The Receiver originally agreed to discount his generally applicable hourly rate for services provided when serving as Receiver to $250 per hour, reflecting a nearly 50% discount, and discount his generally applicable hourly rate for legal services to $371, reflecting a 25% discount. Despite the fact that many of the services provided by the Receiver during the Compensation Period (and those for which he is seeking compensation) were legal in nature, the Receiver and Z&Z have voluntarily billed all of the Receiver's time during the Compensation Period at the reduced $250 per hour rate.

**B.     Fee Schedules**

15.     The fee schedule for all Z&Z legal professionals who provided services during the Compensation Period, showing for each: his or her name; the hourly rate applied to his or her services in this proceeding and his or her customary hourly rate; the discount reflected in the applied hourly rate; the number of hours of services performed in the Compensation Period; the amount billed for such services in the Compensation Period; and the amount of the discount to his or her services during the Compensation Period is as follows:

| Legal Professional | Rate (Cust. Rate) | Rate Disc. | Hours[3] | Amt. Billed | Amt. Disc. |
|---|---|---|---|---|---|
| Horwitt, Jed | $250 ($495) | $245 | 2.90 | $725.00 | $710.50 |
| Kindseth, Stephen | $337 ($450) | $113 | 72.10 | $13,513.70 | $4,531.30 |
| Blau, Christopher | $225 ($300) | $75 | 137.50 | $23,343.75 | $8,456.25 |
| Cesaroni, John | $251.25 ($335) | $83.75 | .40 | $0 | $0 |

16.     The fee schedule for the legal paraprofessionals who provided services during the Compensation Period, showing: their name; the hourly rate applied to their services in this proceeding and their customary hourly rate; the discount reflected in the applied hourly rate; the

---

[3] The hours may include hours recorded for which no corresponding fee was charged, noted in the attached invoices as "N/C." Additionally, these hour totals include time spent on matters related to the Receiver and Z&Z's Second Application. However, the Receiver and Z&Z are not seeking payment for time spent related to any fee application filed pursuant to paragraph 35 of the Appointment Order.

number of hours of services performed in the Compensation Period; the amount billed for such services in the Compensation Period; and the amount of the discount to their services during the Compensation Period is as follows:

| Paraprofessional | Rate (Cust. Rate) | Rate Disc. | Hours[4] | Amt. Billed | Amt. Disc. |
|---|---|---|---|---|---|
| Accurso, Deborah | $142 ($190) | $48 | 16.50 | $2,343.00 | $792.00 |
| Joseph, Kristin | $142 ($190) | $48 | 3.50 | $0 | $0 |
| Accurso, Ian | $142 ($190) | $48 | 8.60 | $0 | $0 |

17.    Additionally, the fee schedule for Attorney William Neville, the primary attorney at MSNH representing the Receiver in connection with the eviction proceedings related to Apartment 12F and the only attorney at MSNH who has billed the Receiver for such services during the Compensation Period, is as follows:

| Legal Professional | Rate (Cust. Rate)[5] | Rate Disc. | Hours | Amt. Billed | Amt. Disc. |
|---|---|---|---|---|---|
| Neville, William | $350 ($350) | $0 | 7.30 | $2,555.00 | N/A |

**C.    Activity Categories**

18.    Pursuant to the SEC Guidelines, the Receiver and Z&Z utilized the following activity categories (the "Activity Categories") under which the following fees were incurred during the Compensation Period:

a.    Case Administration, 62.2 hours, $15,902.40 (*see* Ex. D-1);

b.    Asset Analysis & Recovery, 29 hours, $5,639.85 (*see* Ex. D-2);

c.    Asset Disposition, 36.7 hours, $9,475.00 (*see* Ex. D-3);

d.    Business Operations, 1.1 hours, $206.00 (*see* Ex. D-4); and,

e.    Claims Administration & Objections, 36.5 hours, $8702.20 (*see* Ex. D-5).

---

[4] These hour totals include time spent on matters related to the Receiver and Z&Z's Second Application. However, the Receiver and Z&Z are not seeking payment for time spent related to any fee application filed pursuant to paragraph 35 of the Appointment Order.

[5] Pursuant to this Court's Ruling Granting Receiver's Motion for Authority to Employ Mitofsky, Shapiro, Neville & Hazen, LLP [Doc. No. 1275] (the "MSNH Employment Order"), Attorney Neville is billing the Receiver at his standard hourly rate of $350.

## II.    NATURE OF THE PROCEEDINGS

### A.    Underlying Procedural History

19.    On May 6, 2015, the Commission commenced this civil action by filing its Complaint [Doc. No. 1] against the Defendant. Subsequently, on June 16, 2015, the Commission filed an Amended Complaint [Doc. No. 33] naming the Relief Defendants in addition to the Defendant and, on April 1, 2016, the Commission filed a Second Amended Complaint [Doc. No. 208] in which it amended its claims against the Defendant and Relief Defendants.

20.    The Commission claimed that the Defendant "violated Section 10(b) of the Securities Exchange Act of 1934… and Rule 10b-5 (Count One), Section 17(a) of the Securities Act of 1933 …, and Section 206 of the Investment Advisers Act…." *SEC* v. *Ahmed*, 308 F. Sup. 3d 628, 636 (D. Conn. 2018). The Commission alleged that these violations arose out of the Defendant's use of "fraudulent and deceptive means to divert" millions of dollars "from funds he advised while employed by venture capital firm Oak Investment Partners ('Oak') into his personal bank accounts, before funneling much of his ill-gotten gains into assets and accounts in the name of his wife [("Mrs. Ahmed")] in order to conceal his fraud and protect the assets from confiscation." *Id*.

21.    "In response" to the Commission's allegations, "neither Defendant nor Relief Defendants argue that Defendant did not commit the alleged frauds, [but] instead contend[] primarily that Defendant should not be held liable because (1) certain fraudulent acts are time-barred by the statute of limitations, (2) the fraud was not sufficiently connected to securities transactions, and (3) the underlying securities transactions are not sufficiently domestic to be within the reach of the United States securities laws." *Id*. at 637.

22.     Ultimately, on December 14, 2018, the Court entered an Amended Final Judgment [Doc. No. 1054] (the "Amended Final Judgment") against the Defendant and Relief Defendants and in favor of the Commission. The Amended Final Judgment, *inter alia*, ordered the Defendant to disgorge $41,920,639 "together with prejudgment interest thereon in the amount of $1,491,064.01 and any interest or gains accrued on disgorged frozen assets from the date of the Court's freeze order [described below]" and imposed a civil penalty in the amount of $21,000,000 (collectively, plus all other amounts due on account thereof, the "Judgment"). *Id*. at 2, 4.

23.     Thereafter, the Defendant filed a Motion to Alter or Amend the Amended Final Judgment Pursuant to Fed. R. Civ. P. 59(e) [Doc. No. 1086] on January 11, 2019 (the "January 2019 Motion to Alter or Amend").

24.     After multiple Notices of Appeal filed by the Defendant and Relief Defendants, the United States Court of Appeals for the Second Circuit, at Doc. No. 1111, denied the request to stay the judgment pending appeal and denied the request to vacate or stay the Court's order appointing a receiver, described below. The Second Circuit stayed the appeal on February 21, 2019, pending the resolution of the January 2019 Motion to Alter or Amend.

25.     On September 4, 2019, this Court issued its Ruling Denying Defendant's Motion to Alter Final Judgment [Doc. No. 1263]. As a result, on September 18, 2019, the United States Court of Appeals for the Second Circuit lifted the stay of the appeal. There is a pending motion to stay the appeal awaiting the United States Supreme Court's decision in *Liu.*

26.     This Court's judgment is presently stayed "only insofar as no assets will be distributed in satisfaction of the judgment while appeals are pending." (Appointment Order, at 1.)

**B.      The Asset Freeze**

27.     On May 6, 2015, the same day that it filed its initial Complaint against the Defendant, the Commission filed an Emergency Motion for an *Ex Parte* Temporary Restraining Order Freezing Assets and Providing Other Ancillary Relief and for a Preliminary Injunction [Doc. No. 2] (the "TRO Motion").

28.     On May 7, 2015, the Court granted the TRO Motion and, *inter alia*, froze certain assets held by or under the direct or indirect control of the Defendant and Relief Defendant I-Cubed Domains, LLC ("I-Cubed"). (Doc. No. 9.)

29.     After the Court's August 12, 2015, Ruling and Order Granting Preliminary Injunction [Doc. No. 113], and after the asset freeze entered by the same was modified from time to time, the Court issued its Order on Defendant's Motions for Modification of the Asset Freeze Order to Release Funds for His Legal Defense and for a Stay in Light of *Kokesh* [Doc. No. 829] (the "Operative Freeze Order") in which the Court froze "[t]he assets, funds, or other property held by or under the direct or indirect control of Defendant and Relief Defendants, whether held in any of their names or for their direct or indirect beneficial interest, wherever located, up to the amount of $89,000,000." *Id.* at 5. The Amended Final Judgment, at paragraph 7, provides a schedule of assets included in the freeze that "are available to satisfy" the Judgment.

30.     The Operative Freeze Order was subsequently modified from time to time to release funds from the asset freeze to pay for various routine expenses incurred by assets of the Receivership Estate and the parties to the action.

C.     **Appointment of the Receiver**

31.     On May 29, 2018, the Commission filed its Motion for Remedies and Judgment [Doc. No. 886] seeking, *inter alia*, the appointment of a receiver.

9

32.     Following a telephonic conference on November 9, 2018, and a hearing held on

November 28, 2018, the Court issued the Appointment Order on December 20, 2018, and thereby

appointed Jed Horwitt as Receiver and Z&Z as his counsel.

33.     The Appointment Order provides that the Receiver shall control the operation of

the Receivership Estate, which "includes all assets subject to the Court's asset freeze order… as

modified throughout this litigation." (Appointment Order, at 6.) Among other powers and duties,

the Appointment Order directed the Receiver to:

> [M]anage, in consultation with qualified business advisors, and
> taking into consideration the wishes of Defendant and Relief
> Defendants, and with the dual objects of maximizing the realizable
> value of the assets of the Receivership Estate and minimizing the
> expense charged thereto, the assets of the Receivership Estate,
> pending further order of the Court or until such time that the
> Receivership Estate can be liquidated or modified, including but not
> limited to management of investments and rental and maintenance
> of real property[.]

(Appointment Order, at 7.)

34.     The Appointment Order provides that the goal of the receivership, in part, is to

"value the frozen assets[,] avoid over-freezing, [] secure the judgment for the [Commission], [and]

manage and maximize the value of the frozen assets…." (Appointment Order, at 5.)

35.     Consistent with these principles, the Receiver was directed to:

> [F]ile and serve a report reflecting… (i) the existence, value, and
> location of assets of the Receivership Funds and all other assets of
> the Receivership Estate which are liquid or could be liquidated with
> relative ease, including but not limited to publicly traded securities
> and brokerage accounts; (ii) the Receiver's proposal for securing the
> judgment using additional assets of the Receivership Estate,
> including the Receiver's recommendations as to which additional
> assets should be valued for possible liquidation and placement into
> a Court Registry Investment System ("CRIS") account and the order
> in which the Receiver proposes to liquidate such assets; and (iii) the
> Receiver's estimate regarding the dollar amount which should
> ultimately be placed into such account to fully secure the judgment,

> taking into consideration the amount of the judgment in this case, the costs of the receivership and administration of the Receivership Estate, and any other relevant factors.

(Appointment Order, at 14-15.)

36.     The Receiver filed the Report on April 3, 2019. Consistent with the Appointment Order, the Receiver identified those particular assets "which are liquid or could be liquidated with relative ease" and such additional assets proposed to be liquidated as necessary to secure the Judgment. The Receiver also provided in his Report his estimate regarding "the amount of the judgment in this case, the costs of the receivership and administration of the Receivership Estate, and any other relevant factors."

37.     The Receiver summarizes his and his counsel's additional activities under the Appointment Order during the Compensation Period in Section IV.

### D.     First Application

38.     On May 15, 2019, the Receiver submitted the First Application. Thereafter, on June 4, 2019, the Defendant filed his Response in Opposition to the Receiver's Application for Fees and Expenses [Doc. No 1183] (the "Defendant's Opposition to First Application"), which the Relief Defendants joined by way of their Response in Opposition to Receiver's Application for Fees and Expenses [Doc. No. 1185] (the "Relief Defendant's Opposition to First Application"). On July 2, 2019, the Receiver filed his Reply to the Defendant's and Relief Defendants' Responses in Opposition to Receiver's Application for Fees [Doc. No. 1218.] (the "Receiver's Reply to Oppositions to First Application"). The First Application is presently *sub judice*.

### E.     Second Application

39.      On August 14, 2019, the Receiver submitted the Second Application. Thereafter, the Defendant filed his Response in Opposition to the Second Interim Application for Professional

11

Fees and Expenses Incurred by the Receiver and his Professionals [Doc. No. 1261] (the "Defendant's Opposition to Second Application"), which the Relief Defendants joined by way of their Response in Opposition to the Receiver's Second Application for Fees and Expenses [Doc. No. 1264] (the "Relief Defendants' Opposition to Second Application"). On September 23, 2019, the Receiver filed his Reply to the Defendant's and Relief Defendants' Responses in Opposition to the Receiver's Second Application for Fees [Doc. No. 1297] (the "Receiver's Reply to Oppositions to Second Application"). The Second Application is presently *sub judice*.

III.   **SUMMARY OF CASH ON HAND**

40.    The Appointment Order, at paragraph 26, directed the Receiver to create a deposit account (the "Primary Receivership Account"), which the Receiver did shortly after his appointment.

41.    As it became apparent that the Receivership Account would hold a significant amount of Receivership Assets in the form of cash pending approval of a plan of liquidation and the transfer of such assets to the CRIS account, the Receiver decided to open a second custodial account under the authority of paragraph 25 of the Appointment Order (the "Secondary Receivership Account" and, collectively, the "Receivership Accounts"). While the Primary Receivership Account yields .33% APY, the Secondary Receivership Account yields 1.05% APY.

42.    The Receivership Accounts hold funds marshaled by the Receiver and constitute Receivership Assets.

43.    In addition to the cash held in bank accounts subject to the Operative Freeze Order that fall within the Receivership Estate as more fully detailed below in Section V, as of the end of the Compensation Period the remainder of the cash in the Receivership Estate was held in the

Receivership Accounts. As of September 30, 2019, the balance of the Receivership Accounts was $3,892,827.12.

## IV.    SUMMARY OF RECEIVER'S ADMINISTRATION OF THE ESTATE

44.     During the Compensation Period, the Receiver has continued to fulfill his duties required of him under the Appointment Order.

45.     Although the detailed time entries contained in the invoices appended hereto as **Exhibits D-1** through **D-5** set forth with particularity the services provided by the Receiver and his counsel, Z&Z, a summary of such services is provided below.

### A.    Reviewed, Analyzed, and Responded to Filings Where Appropriate

46.     During the Compensation Period, there were over eighty docket entries in this matter.

47.     As during other compensation periods, and to fulfil his obligations under the Appointment Order, including the management, administration and protection of the Receivership Estate and the Receivership Assets, the Receiver and/or his counsel reviewed and analyzed each filing and other docket entry to determine its impact, if any, upon the Receivership Estate. Obviously, the Receiver could not simply ignore any filing and blindly hope that the relief sought did not prejudice the Receivership Estate. In fact, many filings sought relief that would have had a significant effect upon the Receivership Estate. Therefore, it was, in such instances, incumbent upon the Receiver, through his counsel, to articulate any objection he may have or any other position he felt the Court and other parties-in-interest should be apprised of so that any adverse impact upon the Receivership Estate could be avoided.

48.     Of the filings made during the Compensation Period that required the Receiver's attention, the most important and/or complex (except for the motion practice surrounding the Receiver's fee applications, for which neither the Receiver nor Z&Z are charging) included:

    a.  Relief Defendant's Motion to Immediately Rent the Two NYC Apartments [Doc. No. 1220];

    b.  Defendant's Motion for Leave to File and/or Continue Arbitration Against Oak [Doc. No. 1225];

    c.  Defendant's Emergency Motion for the Immediate Removal of Jed Horwitt as Receiver and termination of Receivership Due to the Gross Mismanagement of and False Statements Made Regarding the Illegal Occupancy by Former Tenant in NYC Apartment #12F Owned by Relief Defendants [Doc. No. 1244];

    d.  Defendant's Emergency Motion for Medical Treatment [Doc. No. 1251];

    e.  Motion of Harris St. Laurent LLP for Payment of Attorneys' Fees and for Resolution of Pending Motions [Doc. No. 1252];

    f.  Relief Defendants' Emergency Motion for a Ruling on Relief Defendants' Appellate Fees, in Light of the Court's Recent Ruling on Defendant's Rule 59(e) Motion [Doc. No. 1273]; and,

    g.  Defendant's Emergency Motion for a Ruling on Defendant's Appellate Fees, in Light of the Court's Recent Ruling on Defendant's Rule 59(e) Motion [Doc. No. 1288].

14

49.     As reflected by the time entries attached hereto as **Exhibits D-1** through **D-5** and the Receiver's responses to each of the above filings, the Receiver carefully considered and, to the extent necessary, investigated, every issue raised by each filing and in all parties' responses.

50.     Consequently, a significant portion of the Receiver's and Z&Z's time expended during the Compensation Period is attributable to reviewing, addressing and responding to various filings.[6]

B.      **Investigation of Unauthorized Trading Activity**

51.     As reported on September 12, 2019, in the Receiver's Notice Regarding Unauthorized Activity in Fidelity x7540 and Fidelity x8965 [Doc. No. 1281], the Receiver became aware of two unauthorized sales of a total of 12,000 shares of Plains All American Pipeline, L.P. at approximately $21.24 per share in Fidelity x7540 and Fidelity x8965.

52.     In addition to promptly alerting the Court, the Receiver began investigating these unauthorized trades during the Compensation Period. While the investigation is still underway, the Receiver collected records from Fidelity that showed logins to the subject Fidelity accounts from IP addresses located in Seattle at or around the time of the unauthorized trading. The Receiver then subpoenaed records from Total Server Solutions, L.L.C. ("TSS"), a Georgia company listed as the ISP for the Seattle-based IP addresses that had accessed Fidelity's servers at or around the time of the trades. TSS' subpoena compliance, in addition to statements given to the Receiver's counsel by TSS' security and compliance representative, revealed that Avast Software s.r.o. ("Avast"), a

---

[6] As articulated in the proposed Plan of Liquidation, the Receiver's reserve of $500,000 for fees and expenses incurred by the Receiver and Z&Z assumed minimal contested litigation and motion practice in this proceeding including concerning the Report, the proposed Plan of Liquidation, and the liquidation process itself. In light of the voluminous filing activity during the Compensation Period that required the Receiver and/or Z&Z's attention, the Receiver may need to revise this proposed reserve should the level of filing activity in this matter continue.

Czech company with offices in the United States of America, leases the servers affiliated with the Seattle-based IP addresses from TSS but TSS has no knowledge concerning how Avast uses these servers.

53.     Based on the Receiver's preliminary research, Avast offers a virtual private network ("VPN") service that allows an internet user to, among other things, mask his or her physical location by connecting to the VPN before connecting to some other server. The Receiver will report back to the Court on this issue as more information becomes available.

54.     Finally, to make sure that such unauthorized trades are not possible in any brokerage account holding Receivership Assets, the Receiver's counsel reached out to each financial institution that maintains such an account and confirmed that the restrictions in place on each account prevent trading from taking place.

C.     **Management of and Preparation to Liquidate the Apartments**

55.     Given (i) the primary objective of this receivership to liquidate assets to secure the Judgment pending appeals; (ii) the Receiver's preliminary calculation of the Judgment amount; (iii) the Receiver's extensive review of the Receivership Assets and, in particular, those assets that "are liquid or could be liquidated with relative ease," and those "additional assets of the Receivership Estate" that could be liquidated most expeditiously and cost-effectively and with the least amount of prejudice possible; and (iv) the Receiver's recognition that he needed to minimize the Receivership Estate's exposure to market risk by moving as expeditiously as possible, the Receiver concluded that he should continue the process of preparing the Apartments for liquidation subject ultimately to this Court's approval of a plan of liquidation.

56.     As more fully articulated in the Receiver's Objection to Relief Defendants' Motion to Immediately Rent the Two NYC Apartments [Doc. No. 1237], it remains the Receiver's

understanding that both Apartments will sell for more money in a shorter period of time if they are vacant. While Apartment 12A is already vacant, the occupants of Apartment 12F (the "12F Occupants") unexpectedly stayed passed the end of their lease term of July 14, 2019.

57.     As a result of the 12F Occupants' holdover, the Receiver filed an Emergency Application for Authority to Employ Mitofsky, Shapiro, Neville & Hazen LLP [Doc. No. 1260] to represent the Receiver in connection with evicting the 12F Occupants, which this Court granted on September 11, 2019. Shortly thereafter, the Receiver formally retained MSNH. Since that time MSNH have caused a 30-day Notice of Termination to be served on the 12F Occupants, which directs the 12F Occupants to vacate Apartment 12F on or before October 31, 2019. The Receiver has instructed MSNH to commence formal eviction proceedings.

58.     A detailed description of MSNH's activities with respect to the eviction process are provided in MSNH's invoices attached hereto as Exhibit D-6. Discussions with counsel representing the 12F Occupants regarding a potential settlement, including the possibility of a stipulated judgment of eviction, are ongoing.

### D.     Continued Management of Receivership Assets

59.     During the Compensation Period, the Receiver maintained an adequate amount in the Primary Receivership Account to pay for various routine expenses of Receivership Assets ("Routine Receivership Expenses"). Meanwhile, the Secondary Receivership Account held excess funds not immediately needed for Routine Receivership Expenses so that such balance could accrue a higher interest rate. For the purpose of simplicity and because funds can be easily transferred between the Receivership Accounts, the Receiver's summary of the activity in the Receivership Accounts will not distinguish between the Primary Receivership Account and the

Secondary Receivership Account. Should the Court so order, the Receiver will promptly provide a separate accounting for each Receivership Account.

60.   As of September 30, 2019, the Receivership Accounts held $3,892,827.12.

61.   During the Compensation Period, the Receiver paid the following Routine Receivership Expenses from the Receivership Accounts as authorized and directed by this Court in paragraph 32 of the Appointment Order:

| Date | Expense | Amount |
|------|---------|--------|
| 07/29/2019 | Recording of Appointment Order at Apartments (First American Title Insurance) | $410.00 |
| 07/29/2019 | Storage at Morgan Manhattan, 7/31 - 8/31/19 | $100.00 |
| 07/29/2019 | Common Charges & Electric (Apartment 12F) | $4,031.47 |
| 07/29/2019 | Common Charges & Electric (Apartment 12A) | $3,102.02 |
| 07/29/2019 | Health Premium Increase paid to S. Ahmed[7] | $845.88 |
| 08/07/2019 | Storage at Morgan Manhattan, 8/31 - 9/30/19 | $101.50 |
| 08/14/2019 | Annual Sublet Fee for Apartment 12F[8] | $2,000.00 |
| 08/26/2019 | Common Charges & Electric (Apartment 12A) | $3,097.22 |
| 08/26/2019 | Common Charges & Electric (Apartment 12F) | $4,005.48 |
| 09/16/2019 | Storage at Morgan Manhattan, 9/30/19 - 10/31/19 | $100.00 |
| 09/17/2019 | BoA Safety Deposit Box Pmt | $139.00 |
| 09/26/2019 | Common Charges & Electric  (Apartment 12A) | $3,095.20 |

---

[7] Due to Bank of America's ("BoA") occasional non-compliance with this Court's order directing BoA to send $845.88 every month to Mrs. Ahmed for health insurance premiums, the Receiver has intermittently been required to make such payments in BoA's place. At present, it appears BoA has returned to full compliance with this Court's order and as such the Receiver does not anticipate making any further payments.

[8] This sublet fee, paid to Classic Realty LLC, is necessary to permit the Receivership Estate to continue leasing Apartment 12F, despite the fact that the current occupants of Apartment 12F have overstayed their lease. The sublet fee was paid to preserve the Receivership Estate's rights.

| | | |
|---|---|---|
| 09/26/2019 | Common Charges & Electric (Apartment 12F) | $3,935.35 |
| | **TOTAL** | $24,963.12 |

62.     Additionally, after consulting with the Defendant and the other member, Ku Young Bae, and to preserve the formalities of the Essell Entities' corporate structure, funds necessary to pay expenses incurred by the Essell Entities were transferred from the Essell Entities' bank accounts to the Receivership Accounts and then to the person or entity demanding payment. Such payments consisted of:

| Date | Expense | Amount |
|---|---|---|
| 09/13/2019 | The Essell Group, LLC – IRS Payment | $64,214.00 |
| 09/13/2019 | The Essell Farm, LLC – CT DRS Payment | $250.00 |
| 09/13/2019 | The Essell Farm, LLC – NY Filing Fee | $25.00 |
| 09/13/2019 | The Essell Group, LLC – CT DRS Payment | $250.00 |
| 09/15/2019 | The Essell Group, LLC – MA DOR Payment | $6,252.00 |
| 09/16/2019 | The Essell Farm, LLC – Local School Tax | $19,876.65 |
| 09/18/2019 | The Essell Group, LLC – CT DRS Payment | $3,884.00 |
| | **TOTAL** | $94,751.65 |

63.     Further, pursuant to paragraph 5(c) of the Appointment Order, the Receiver has approved three monthly distributions of $8,676.00 representing Mrs. Ahmed's living expenses, each at the request of counsel to the Relief Defendants and under the authority of the Court's May 1, 2018, order [Doc. No. 865]. The Receiver transferred these funds directly from Fidelity Investments account ending x7540 (SEC No. 75).

64.     In addition to the above-described disbursements, the Receiver and Z&Z have provided services and Z&Z has advanced reasonable and necessary expenses, for which this Third

Application seeks compensation and reimbursement.  (*See* Ex. C.)  Furthermore, pursuant to the MSNH Employment Order, the Receiver is including MSNH's invoices for fees incurred during the Compensation Period to this Third Application.  (*See* Ex. D-6.)

65.     Provided that the Court awards the fees and expenses requested by Z&Z and/or MSNH in this Third Application, these disbursements will be reflected as debits from the Receivership Accounts on the Receiver's next interim fee application.

66.     During the Compensation Period, the Primary Receivership Account earned $1,018.30 in interest. In reviewing the statements for Secondary Receivership Account, counsel to the Receiver discovered that interest was not being posted at the agreed-to rate of 1.05%. The Receiver contacted the financial institution where the Secondary Receivership Account is located to correct this issue. The financial institution acknowledged the problem and advised that interest will be applied and posted from the day the account was opened. According to the financial institution, such interest should appear on the statement for October, and the Receiver will report on the same in the next quarterly fee application.

**E.      Other Services Provided for Receivership Estate**

67.     The Receiver and his counsel provided additional services during the Compensation Period that were reasonable and necessary in the administration and management of the Receivership Estate. These activities included:

i.      Efforts to Confirm Tax Analysis

68.     As previously reported by the Receiver, in light of the nature of the Receivership Estate and complex tax regulations applicable to individuals and entities whose property is in full or partial control of a receiver, during prior compensation periods the Receiver and his counsel engaged in an extensive analysis of applicable statutes and regulations, and the facts presented in

this matter. *See, e.g.*, 26 U.S.C. § 6012; 26 C.F.R. § 1.641(b)-2; 26 C.F.R. § 1.6012-3; Regulations of Connecticut State Agencies § 12-740-3. The Receiver concluded based upon the dollar amount and limited nature of the Receivership Estate pursuant to paragraph 2 of the Appointment Order that he had no obligation to submit tax returns on behalf of the Defendant.

69.     Additionally, with respect to Mrs. Ahmed's taxes, the Receiver concluded, based on (a) representations by the Relief Defendants, their counsel, and their accountant that all taxable events involving the remaining Relief Defendants and (b) the Receiver's review of a heavily redacted, partial copy of Mrs. Ahmed's 2017 tax return, and subject to verification as explained below, that the Receiver had no obligation to submit tax returns on behalf of the Relief Defendants or other taxable entities that are Receivership Assets.

70.     As the Receiver reported in the Second Application, the Receiver's conclusion that he did not need to submit tax returns for various Relief Defendants and other Receivership Assets was subject to verification that the tax returns had, in fact, been filed. During the Compensation Period, the Receiver continued to analyze how best to obtain such verification, most likely in the form of the as-filed versions of the Defendant and Mrs. Ahmed's tax returns provided by the applicable governmental agency.

71.     Typically, a taxpayer's returns can be produced to a third party pursuant to a Form 4506, which informs the IRS that the taxpayer consents to the production. While the Receiver requested that both the Defendant and Mrs. Ahmed execute Form 4506s, they have thus far declined to do so. The Defendant's and Mrs. Ahmed's unwillingness to sign IRS Form 4506s has complicated the Receiver's verification efforts and has delayed the Receiver's ability to confirm his tax analysis. Given the strong statutory protections that afford significant privacy to a person's tax returns, the Receiver spent a considerable amount of time during the Compensation Period

researching how to gain access to the same in the absence of executed Form 4506s from the taxpayers. At present, the Receiver is in the final phase of discussions with the Defendant and counsel to the Relief Defendant's counsel regarding permitting the Receiver to gain access to the subject tax returns.

     ii.    <u>Continued Collection of Information Concerning Receivership Assets</u>

72.    Because of the Receiver's responsibility at some point in the future once authorized and directed by this Court to liquidate those particular Receivership Assets necessary to secure the Judgment, the Receiver during the Compensation Period continued to collect and evaluate information concerning the Receivership Assets.

73.    This oversight responsibility was most pressing with respect to the Receivership Assets that had the greatest volatility (such as the securities, gold, and Bitcoin). However, the Receiver continued to collect account statements and other records related to Receivership Assets to monitor the overall value of the Receivership Estate.

74.    Since to the best of the Receiver's knowledge no significant decline in value occurred during the Compensation Period threatening the Receiver's ability to secure the Judgment fully, the Receiver did not need to take any further action in this regard.

     iii.    <u>Final Judgment in *SEC v. Kanodia*</u>

75.    As reflected in the Commission's Notice of Final Judgment in *SEC v. Kanodia*, *et al.*, 15-CV-13052 (D. Mass.) [Doc No. 1228], a final judgment entered in the Civil Insider Trading Case in the District of Massachusetts against the Defendant on July 8, 2019, in the amount of $2,826,659.34. As a result, the Receiver withdrew as moot his Motion Pursuant to Paragraph 5(j) of the Order Appointing Receiver Regarding His Possible Appointment as Receiver in SEC v. Kanodia, et al. [Doc. No. 1169].

iv.    Monitoring of Second Circuit Docket

76.    After this Court's Ruling Denying Defendant's Motion to Alter Final Judgment [Doc. No. 1263] and the subsequent lifting of the appellate stay by the United States Court of Appeals for the Second Circuit, there has been an increased level of activity on the Second Circuit's docket.

77.    In furtherance of the Receiver's duties under the Appointment Order, the Receiver's counsel has been monitoring, and will continue to monitor, the Second Circuit's docket in this matter to evaluate whether any motions, orders, or other filings have an impact on the Receivership Estate. None of the appellate filings made during the Compensation Period had an impact on the Receiver's abilities to execute his duties under the Appointment Order.

v.    Physical Possession of Harry Winston Earrings

78.    Harris St. Laurent LLP (the "Harris Firm") is currently in physical possession of a pair of Harry Winston earrings (SEC No. 84, the "Earrings"). Presently, the Harris Firm is holding the Earrings in a safe deposit box controlled by the Harris Firm. (*See* Declaration of Shalini Ahmed Regarding Identity and Location of Assets [Doc. No. 1091], at 5, filed January 17, 2019 (the "S. Ahmed Declaration").)

79.    Given the value of the Earrings, the Receiver ultimately decided that, in an abundance of caution, he should take physical possession of the Earrings and maintain such possession until further order of this Court.

80.    The Harris Firm takes the position that it maintains some type of security interest in the Earrings that is superior to the Receivership Estate's interest in the Earrings. Because the Receiver's Plan of Liquidation, submitted on April 3, 2019, does not include the liquidation of

the Earrings, the Receiver has not analyzed the Harris Firm's interest in the Earrings and thus takes no position, at this time, as to the same.

81.     The transfer of physical possession of the Earrings to the Receiver is the subject of ongoing motion practice. (*See* Doc. Nos. 1300, 1303, 1320, 1321, 1322, 1329.)

vi.     Inspection of Essell Farm

82.     As part of fulfilling the Receiver's overall duty to "manage… the assets of the Receivership Estate" (Appointment Order, at 7), the Receiver directed one of his counsel to make an unannounced inspection of 1820 County Route 7, Ancram, New York ("Essell Farm") on August 23, 2019.

83.     The Receiver's counsel arrived at Essell Farm at approximately 4:00 pm on August 23, 2019, and proceeded to inspect the buildings on the property and take photographs to document the condition of the same. The inspection did not reveal anything of note. The Receiver's counsel did not enter any locked buildings, but found no indication that the buildings were being used or regularly occupied by any individuals. Similarly, while the Receiver's counsel did not tour Essell Farm beyond the area surrounding the buildings thereon, he saw no indication that the property itself was being regularly used or accessed by any individuals.

**F.     Anticipated Closure**

84.     At this time, it is premature for the Receiver to speculate as to precisely when this receivership proceeding will be ready to close.

85.     As stated in the Report, and subject to further orders of the Court, the Receiver believes that a majority of the amount necessary to secure the Judgment can be liquidated and transferred into the CRIS account relatively quickly. Pursuant to the Receiver's Plan of Liquidation, the Receiver believes that Apartment 12A and Apartment 12F will also need to be

liquidated to fully secure the Judgment. The Receiver does not know how long it will take to sell those properties, but he will undertake all reasonable and appropriate efforts necessary to maximize value in the shortest amount of time necessary.

86.     In the Receiver's view, in accordance with the Appointment Order, only after (i) all appeals have been fully adjudicated, (ii) if and to the extent the Judgment is affirmed on appeal, distributions are made to satisfy the Judgment, and (iii) all costs of the administration of the receivership are paid, can the receivership be appropriately closed.

## V.     DESCRIPTION OF ASSETS OF THE RECEIVERSHIP ESTATE

87.     A description of the assets of the Receivership Estate, including approximate or actual valuations and anticipated or proposed dispositions, is attached hereto as **Exhibit E**.

88.     At this time, the Receiver believes it is prudent to maintain the Court's asset freeze over the Receivership Assets to fully secure the Judgment until sufficient assets have been liquidated and the proceeds of such liquidations are deposited in the CRIS account and to pay for the costs of the receivership.

## VI.    SUMMARY OF RECEIVERSHIP ESTATE CLAIMS

89.     The Receiver is not aware of any claims against the Receivership Estate with the exception of (i) the Judgment; (ii) the Receiver and his counsel's fees and expenses, including both Z&Z as well as MSNH; (iii) the likely future claims for fees and expenses from professionals retained pursuant to the Appointment Order; and (iv) the ordinary expenses incurred on account of the Receivership Assets (such as real estate taxes, property repairs, and other such routine expenditures).

## VII.   SUMMARY OF THE RECEIVERSHIP ESTATE'S CAUSES OF ACTION

90.     Considering the limited scope of the Receiver's primary duty (to value assets and liquidate such assets as directed by the Court to secure the Judgment) pursuant to the Appointment Order and his perceived ability to accomplish that objective from known assets, the Receiver has not undertaken to identify any causes of action held by the Receivership Estate. Should circumstances change, or should this Court so direct, the Receiver will commence an investigation into potential causes of action held by the Receivership Estate.

## VIII.   THE GOVERNING LEGAL STANDARD

91.     "A receiver appointed by a court who reasonably and diligently discharges his duties is entitled to be fairly compensated for services rendered and expenses incurred." *SEC* v. *Byers*, 2014 U.S. Dist. LEXIS 177180, at *13 (S.D.N.Y. Dec. 23, 2014); *see also Donovan v. Robbins*, 588 F. Supp. 1268, 1272 (N.D. Ill. 1984) ("[T]he receiver diligently and successfully discharged the responsibilities placed upon him by the Court and is entitled to reasonable compensation for his efforts."); *Securities & Exchange Comm'n v. Elliott*, 953 F.2d 1560 (11th Cir. 1992) (receiver is entitled to compensation for faithful performance of his duties.).

92.     "The [D]istrict [C]ourt's award of a receiver's compensation is… firmly within its discretion." *Gaskill* v. *Gordon*, 27 F.3d 248, 253 (7th Cir. 1994) *citing Crites, Inc. v. Prudential Ins. Co.*, 322 U.S. 408, 418, 88 L. Ed. 1356, 64 S. Ct. 1075 (1944). The Court "may consider all of the factors involved in a particular receivership in determining the appropriate fee." *Id.*

93.     The case law and other authority may provide "convenient guidelines," but ultimately "the unique fact situation renders direct reliance on precedent impossible." *Securities & Exchange Comm'n v. W.L. Moody & Co.*, 374 F. Supp. 465, 480 (S.D. Tex. 1974), *aff'd*, 519 F. 2d 1087 (5th Cir. 1975).

94.     In awarding counsel fees in Securities Act receiverships, courts consider "the complexity of problems faced, the benefits to the receivership estate, the quality of the work performed, and the time records presented." *SEC v. Illarramendi*, Docket No. 3:11CV78 (JBA), 2013 U.S. Dist. LEXIS 171950, at *8-9 (D. Conn. Dec. 5, 2013), *quoting Securities & Exchange Comm'n v. Fifth Ave. Coach Lines, Inc.*, 364 F. Supp. 1220, 1222 (S.D.N.Y. 1973); *see also United States v. Code Prods.*, 362 F.2d 669, 673 (3rd Cir. 1966) (court should consider the time, labor and skill required but not necessarily expended, the fair value of such time, labor and skill, the degree of activity, the dispatch with which the work is conducted and the result obtained).

95.     While "results are always relevant," a good result may take a form other than a "bare increase in monetary value." *Elliott*, 953 F.2d at 1577 ("Even though a receiver may not have increased, or prevented a decrease in, the value of the collateral, if a receiver reasonably and diligently discharges his duties, he is entitled to compensation"). Overall results can be determined only at the conclusion of the Receivership Proceeding.

96.     Another "basic consideration is the nature and complexity of the legal problems confronted and the skill necessary to resolve them." *Moody*, 374 F. Supp. at 485. Moreover, "[t]ime spent cannot be ignored." *Id.* at 483.

## IX.     THE COURT SHOULD AWARD THE REQUESTED FEES AND EXPENSES

97.     Based on the foregoing, the Receiver and Z&Z respectfully submit that the services for which they seek compensation in this Third Application were reasonable and necessary for, and beneficial to, the orderly administration of the Receivership Estate. Likewise, the Receiver respectfully submits that the services for which MSNH seeks compensation were reasonable, necessary, and benefited the Receivership Estate.

98.     The fees and expenses sought by this Third Application were reasonable and necessarily incurred and were in the best interest of the Receivership Estate. With the exception of the SEC Guidelines, the Receiver has not entered into any agreement, written or oral, express or implied, with any person or entity concerning the amount of compensation paid or to be paid from the Receivership Estate, or any sharing thereof.

99.     As more fully set forth throughout this Third Application and as detailed in the exhibits submitted herewith, the issues addressed by the Receiver and his counsel have been and continue to be highly complex. The Receiver and his counsel respectfully submit that compensation for the foregoing services as requested is commensurate with the complexity, importance and nature of the problems, issues or tasks involved.  The Receiver and his counsel performed such professional services expediently and efficiently.

100.    Accordingly, the Receiver submits that the compensation requested herein is fair, reasonable and warranted in light of the nature, extent and value of such service to the Receivership Estate and all parties in interest.

## X.     SOURCE AND MANNER OF PAYMENT

101.    The Receivership Estate contains cash held in the Receivership Accounts.

102.    The Receiver and Z&Z request that this Court enter an order directing the approved fees and reimbursed expenses to be paid from the Secondary Receivership Account, less the 20% holdback (applicable only to fees) which shall be held in the Receivership Accounts pending this Court's further order as to the disposition of such funds.

**WHEREFORE**, Jed Horwitt, Esq., Receiver, and Zeisler & Zeisler, P.C., counsel to the Receiver, respectfully request that this Third Application be granted and that they be awarded an allowance of $39,925.45 in fees for services rendered during the Compensation Period subject to

a 20% holdback, and $1,155.33 for the reimbursement of expenses, and that MSNH be awarded

$2,555.00 in fees; and grant such other and further relief as this Court deems just and proper.

Dated: November 14, 2019, at Bridgeport, Connecticut.

Respectfully submitted,

JED HORWITT, ESQ., RECEIVER

By: */s/ Jed Horwitt*_____
Jed Horwitt, Esq., Receiver (ct04778)

By: */s/ Stephen M. Kindseth*_____
Stephen M. Kindseth (ct14640)
Christopher H. Blau (ct30120)
Zeisler & Zeisler, P.C.
10 Middle Street, 15th Floor
Bridgeport, CT  06604
Telephone: 203-368-4234 X 236
Facsimile: 203-549-0903
Email: skindseth@zeislaw.com;
cblau@zeislaw.com
His attorneys

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 14, 2019, a copy of the foregoing Third Application was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System. Furthermore, a copy of the foregoing was sent via email to the Defendant, Iftikar A. Ahmed, at iftyahmed@icloud.com.


By: *<u>/s/ Stephen M. Kindseth</u>*
Stephen M. Kindseth (ct14640)