## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| v. | Civil Action No. 3:15-cv-675 (JBA) |
| IFTIKAR AHMED, | |
| Defendant, and | |
| IFTIKAR AHMED SOLE PROP; *et al* | |
| Relief Defendants. | November 30TH, 2019 |

## DEFENDANT'S RESPONSE IN OPPOSITION TO THE "THIRD INTERIM APPLICATION FOR PROFESSIONAL FEES AND EXPENSES INCURRED BY THE RECEIVER AND HIS PROFESSIONALS" [DOC. #1330]

The *pro se* Defendant submits this Response in Opposition ["Third Opposition"] to the Receiver's "Third Interim Application for Professional Fees and Expenses Incurred by the Receiver and his Professionals." [Doc. #1330, or the "Third Application"].  The Defendant reserves all rights to all issues and fully incorporates his prior Oppositions [Doc. #1183 or the "First Opposition"] and Sur-Reply [Doc. #1222-1 or the "Sur-Reply"]; and [Doc. #1261 or the "Second Opposition"] to the Receiver's First Application for Fees and Expenses [Doc. #1160 or the "First Application"] and the Receiver's Second Application for Fees and Expenses [Doc. #1249] into this Opposition.

The Court must deny the Third Application for the same reasons as the Defendant outlined in his First and Second Oppositions to Receiver's First and Second Fee Application:  the Receiver's fees are excessive, duplicative, unreasonable and unjustified; the Receiver has not

1

provided any benefit at all to the Receivership Estate to justify such excessive and unjustified expenses but instead has caused substantial losses to the Estate by way of hundreds of thousands of dollars; the Order Appointing Receiver is under appeal; the Receiver is proven beyond any reasonable doubt to be a biased party and an agent of the Plaintiff; the Court has no jurisdiction to impose additional penalties on the Defendant alone and thus create a perverse incentive by paying the Receiver out of funds or assets above the judgment amount; it is inequitable for the Court to pay a Receiver who solely benefits the public (and not the Defendant) out of funds belonging to the Defendant when the Court has repeatedly denied funds for counsel to the Defendant (in violation of his due process rights) and even for his medical treatment for cancer despite the Receiver's own confirmation of tens of millions of dollars of assets over and above the judgment amount.

The Defendant reserves all rights to all issues and does not waive any right by way of this Third Opposition or his earlier Second Opposition, his earlier First Opposition or Sur-Reply.

## I.   FIRST OPPOSITION AND SUR-REPLY AND SECOND OPPOSITION.

The Defendant incorporates his complete First Opposition [Doc. #1183] and Sur-Reply [Doc. #1222-1], and his complete Second Opposition [Doc. #1261] into this Third Opposition. For the convenience of the Court, the Defendant does not repeat the arguments here (and fully incorporates those arguments from his First and Second Oppositions and his Sur-Reply, and refers the Court to his First and Second Oppositions and his Sur-Reply), but the Defendant opposes the Receiver's Third Application for the same reasons as outlined in his First Opposition and Sur-Reply and his Second Opposition and also addresses additional reasons in this Third Opposition.

## II.    THE RECEIVER'S FEES ARE NOT JUSTIFIED IN THIS CASE.

The Defendant incorporates and reiterates his position that a Receiver was not needed in this instant case and the Receiver's Fees are not justified in this case [First Opposition at 1-7; Second Opposition at 2-5]. As the Defendant further explains in this Third Opposition, the Receiver has created no economic benefit to the Estate during the time period under the Third Application, but has rather cost the Estate a substantial amount of money and the Court must look at attorney's fees as a loss to the Estate.[1]

"[A]mong the factors considered by the Court in exercising its discretion to determine the appropriate award of fees is the cost-efficiency of the Receiver's work in terms of assets recovered for victims, *see* SEC BILLING INSTRUCTIONS at 26, "the complexity of problems faced, the benefits to the receivership estate, the quality of the work performed, and the time records presented," *SEC v. Fifth Ave. Coach Lines, Inc.*, 364 F. Supp. 1220, 1222 (S.D.N.Y. 1973)." See *SEC v. Illarramendi*, Civil No. 3:11CV78 (JBA), at *3 (D. Conn. Dec. 5, 2013). Under these factors, the Receiver's fee request is outrageously excessive and unjustified.

*First*, the Receiver did not have to recover any assets for the alleged victim, as by his own admission the value of the frozen assets greater than the Judgment amount by tens of millions of dollars [Doc. #1330-5 at 6].

*Second*, as the Defendant has made clear, there is no complexity in managing assets that are mostly liquid and real estate (and additional assets that are managed by others) and that are tens of millions of dollars above the Judgment amount.  Yet, the Receiver astonishingly invoices over $40,000 to the Defendant and has done nothing to provide *any* economic benefit to the Estate during this time.  *The Receiver has not provided any benefit to the Estate during this time,*

---

[1] "…receivership… where the goal is…to manage the estate in such a way as to maximize recovery while minimizing loss, including losses caused by attorney's fees." (emphasis in original) See *SEC v. Aquacell Batteries* Case No. 6:07-cv-608-Orl-22DAB, at *9 (M.D. Fla. Jan. 31, 2008)

*but has rather lost substantial value to the Estate by way of requesting his excessive and unjustified fees, by being reactive rather than proactive and by continuing to oppose actions that would add value to the Estate.* Defendant delves into this further, but the Receiver has spent an astonishing 40 hours[2] and billed nearly $10,000 – ***over 25% of the total invoice*** – for matters concerning the eviction of the illegal tenant in Apartment 12F owned by the Relief Defendants. Had the Receiver addressed this matter *prior* to the expiration of the lease, the Estate would not have bear the additional expenses of: (1) non-payment by the illegal tenant; (2) additional attorney fees – by the Relief Defendants and the Receivership Estate to deal with this issue; and (3) additional attorney fees to employ someone to deal with the eviction process.  By way of another example, the Receiver has spent yet an additional 10 hours and billed over $2,300 for matters concerning the transfer of the Harry Winston earrings by the Relief Defendants' former counsel.  Again, this issue should have been dealt with when the Receiver was first appointed rather than nearly a year later.  By way of yet another example, the Receiver, having been alerted to unauthorized trades in Ms. Ahmed's Fidelity accounts, scrambles to determine what has happened and belatedly confirms the no-trade status with the various firms.  The Receiver has spent an additional twelve (12) hours and billed nearly $2,700 on this issue.  The Receiver should have confirmed the no-trade status for the accounts right after his appointment. This has cost the Estate by way of (1) trading fees and commissions; and (2) lost income by way of dividend payments from that investment, not including any attorney fees spent on this issue.

It is clear – simply by these three examples alone during this Compensation Period – that the Receiver has created extreme inefficiency around the management of the assets and the

---

[2] In all instances in this Opposition where Defendant provides hours and costs, the Defendant has eyeballed the invoice entries and has estimated these hours and amounts based on the description in the various line items of the four invoices submitted and reserves the right to update them if new information emerges.

Estate and that has cost the Estate significantly by way of additional fees and waste of time and resources of all parties involved.

_Third_, the Receiver and his counsel continue to double bill on their time records, continue to be inefficient with the management of their time in this matter, and continue to invoice the Defendant for matters that are premature to deal with at this time.  The Defendant provides his objections to the time records throughout this Third Opposition and gives additional detail in SECTION IX of this Third Opposition, titled "**SPECIFIC ITEMS AND/OR GROUPS OF ITEMS.**"

It is clear that the Receiver has done nothing during the Third Application that has provided any economic benefit to the Estate – rather he has created significant loss to the Estate during this time – and his application for fees must be denied on this basis alone.

## III.    THE RECEIVER'S FEES CONTINUE TO BE EXCESSIVE RELATIVE TO THE DUTIES PERFORMED.

The Defendant incorporates, reiterates and adds to his argument that the Receiver's Fees are Excessive for the Duties Performed [First Opposition at 8-10; Second Opposition at 5-8].  It is well known that the Receiver and his hired professionals "must exercise proper billing judgment in seeking fees from the receivership estate, and should limit their work to that which is reasonable and necessary."[3]  The Receiver has not only improperly billed the estate, but he has performed work that is unnecessary and frivolous only to further invoice the Defendant.

_First_, any increase in the value of assets under the Receivership is a direct result of the investment decisions made by parties' other than the Receiver (such as the Defendant and Relief Defendant Ms. Ahmed) and that were put into place years prior to any asset freeze. The Receiver just cannot take any credit for any increase in the value of assets during this (or any other) time

---

[3] _Aquacell Batteries_, 2008 WL 276026, at *2. ("Part of 'determining the nature and extent of the services rendered'…includes an analysis as to the reasonableness of the services rendered," and the expenses for which reimbursement is sought must have been "actual and [] necessarily incurred.").

period.  If anything, the Receiver's mismanagement of assets in this Estate has cost the Estate significantly.  For example, the continued insistence of the Receiver to refuse to rent out Apartment 12A, owned by the Relief Defendants, has cost the Estate an astonishing $420,000 as of the date of this submission. Apartment 12A has been vacant since October 1, 2018 and upon information and belief, had various tenants interested in renting the apartment.  However, the SEC and the Receiver have continued to refuse to rent the apartment, leading to a significant loss in income to the Estate. Assuming $30,000/month in rental income since October 1, 2018 to December 1, 2019 yields a loss of $420,000 (and counting!) plus any interest earned on those funds, for ***just Apartment 12A alone***.

*Second,* the Receiver's invoiced amount of nearly $40,000 is excessive in a situation where there are mostly liquid and near-liquid assets frozen, where there is no real active management that needs to happen and where there are tens of millions of dollars of assets frozen above the judgment amount.

**These invoices are all clearly unrealistic and excessive and a complete and unnecessary drain on the Estate assets with no corresponding value produced.  If anything, the Receiver has cost the Estate significant monetary value that is unjustified and unbelievable.  There is no question that the Defendant would have fired the Receiver by now for his mismanagement of the Estate, given the amount of losses incurred by the Receiver's actions (and non-actions).**

*Third*, it is clear that the Receiver is inefficiently managing the Estate and is running it into losses.  Indeed, the loss of rental income from keeping Apartment 12A vacant, the additional expenses and non-rental received from Apartment 12F and the unnecessary expenses related to the (yet to happen) transfer of Harry Winston earrings translate into a significant amount of loss

6

to the Estate – to the amount of well over $500,000 – not even accounting for attorney fees to deal with all of these issues.

_Fourth,_ the Receiver does not know how to manage these assets. Indeed, he should have dealt with the Apartment 12F situation _before_ the lease expired (and had ample opportunity to do, but chose to ignore it, as Defendant explains later in this Opposition); he should have insisted in January and February of this year for the transfer of Harry Winston earrings instead of completely dropping the ball on that transfer in the beginning of his appointment; and he should have (and still should) agree to rent the Apartment 12A, at least during the duration of the stay of liquidation[4] pending Supreme Court decision in _Liu._  In addition, the Receiver should have confirmed the no-trade status of the various accounts when he was first appointed and not _after_ an unauthorized trade was made.  By not dealing with these issues in a timely and proactive manner, the Receiver has caused the Estate to incur unacceptable losses and fees – to the amount of well over $500,000.

_Fifth,_ he Receiver is content to simply sit back and collect fees for doing _nothing._ It was Defendant, when he was aware of the situation, who alerted the Court and the Receiver as to the unacceptability of the illegal tenant in Apartment 12F; it was the Defendant who alerted the Receiver into the inappropriateness of Harris St. Laurent continuing to retain control over the Relief Defendants' Harry Winston earrings; it was the Relief Defendants who alerted the Receiver as to the unauthorized trades and it is the Relief Defendants who are asking for the apartments to be rented.  Indeed, the Receiver is sleeping on the job and only when prodded to and insisted by the Defendant (and Relief Defendants) to manage these assets in a manner befitting the Estate, does he all of a sudden "wake up" and try to rectify the situation.  By being

---

[4] Doc. #1346

reactive instead of proactive, the Receiver, who has no experience managing these assets (contrary to the Defendant and the Relief Defendants), has caused the Estate a significant loss.

*Sixth*, the Receiver continues to simply outsource the administration of the Estate to his counsel, who are charging exorbitant fees. As the Defendant has already explained in his prior Oppositions, the Receiver is providing legal services to himself. As such, there is no need for additional counsel for the Receiver, who is himself a lawyer and providing legal services. Indeed, the Defendant, who is *pro se,* has been denied counsel throughout this entire litigation and has had to be and continues to be *pro se.*  It is just **_outrageously inequitable_** for the Court to provide counsel to the Receiver (a lawyer with many decades of experience) and pay them (and him) from the Defendant's assets when the Court has denied the Defendant (who has no legal background at all) the use of his own legally earned funds for the retention of counsel for himself.  It is clear that the Receiver is content to do nothing, as his hours are not even **2%**[5] of the total hours incurred and his amount invoiced is less than 2% of the total invoices. It is simply inequitable and outrageous that the Receiver, who is an attorney himself, would (1) have counsel and (2) outsource **all** of his work to his counsel.

*Seventh*, the Defendant is *pro se* and explains his opposition to certain groups or classifications of the Receiver's Fee Application throughout this Third Opposition, but also specifically in SECTION IX of this Third Opposition, which is titled "SPECIFIC ITEMS AND/OR GROUPS OF ITEMS." This opposition to certain classifications or groups does not waive the Defendant's position that the Receiver's fees should be substantially reduced, but as in the First Opposition and the Second Opposition, is an addition to help the Court in understanding the

---

[5] The Receiver is 2.9 hours of the total 165.5 hours. The Receiver has billed $725 out of nearly $40,000. [Doc. #1330 at 3].

Defendant's opposition to the payment of Receiver fees as requested in the Third Application.

## IV.    THE RECEIVER'S FEES MUST BE PAID FROM THE JUDGMENT AMOUNT AND THE ORDER IS UNDER APPEAL.

The Defendant reiterates his position [First Opposition at 11-14; Second Opposition at 8-9] that if the Court believes that the Receiver should be paid his fees, then they must be paid from within the Judgment amount and not be an additional penalty on the Defendant.  It also renders a preserve incentive – as has already been depicted – whereby "the possibilities for abuse [are] limited only by the size of the estate" *SEC. v. Northshore Asset Mgt.*, 05 Civ. 2192 (WHP), at *3 (SDNY Sep. 29, 2009).

As the Defendant has also already stated, it is highly inequitable for the Court to be paying the Receiver from the Defendant's legally earned funds when the Defendant himself has been denied the use of those funds for his own purposes,[6] including for the retention of counsel.

Not only that, the Receiver Order (and additional rulings) are under appeal [First Opposition at 14-15; Second Opposition at 8-9] and appellate rulings and a ruling in the Supreme Court case *Liu v. SEC* could very well render a different outcome than the current situation. Not only would the Receiver be personally liable for the management of assets above the judgment amount (and the judgment could be reduced materially based on the appellate courts' rulings and now the Supreme Court's review of disgorgement in *Liu*), the appellate courts could rule that the Receiver must be paid from within the Judgment amount for reasons including but not limited to: ***the Receiver does not represent the Defendant's interests***.

---

[6] *See Almeida v. Holder*, 588 F.3d 778, 788 (2d Cir. 2009) ("The rights and benefits of property ownership are, after all, many... [T]hey include not only the right to actual possession of a thing, but also the right to exclude others from possessing it, the right to use it and receive income from its use, the right to transmit it to another...").

**V.**      **THE RECEIVER IS A BIASED PARTY AND DOES NOT REPRESENT THE DEFENDANT, BUT RATHER HAS IRREVERSIBLY HURT AND DAMAGED THE DEFENDANT'S INTERESTS.**

The Receiver continues to be a partial party in this matter.  The Defendant incorporates and reiterates his position [First Opposition at 18-22; Second Opposition at 9-12] that the Receiver is not a neutral party, contrary to his mandate and the reason why a Receiver is appointed.

_First_, the Receiver does not inquire to the Defendant's position on various matters as they do with the SEC prior to the Receiver submitting his responses to various motions. In addition, the Receiver continues to take positions that are directly contrary to the Defendant's (and the Estate's) interests during this time period covering the Third Application.  ___It is simply inequitable to force the Defendant to pay for someone who takes an adverse position to his own interests.___  For example, the Receiver has opposed Defendant's Emergency Motion to Stay in Light of Liu v SEC Petition for Writ of Certiorari [Doc. #1216], which directly harms the Estate as any liquidation prior to final resolution of this matter is irreversible and leads to additional loss [Doc. ##1178, 1180, 1182; Doc. #1209-1]. The Receiver has also opposed the Relief Defendants' Emergency Motion to Immediately Rent the two NYC Apartments [Doc. #1220] which has led to a loss of over $500,000 (and counting) in rental income to the Estate. The Receiver has opposed the Defendant's Motion for Leave to File/Continue Arbitration [Doc. #1225] when such would only benefit the Estate by adding additional assets to the Estate.  The Receiver's Opposition to these issues makes it clear that he does not know how to manage or maximize the value of the Estate, which has led to a significant loss to the Estate.

_Second_, the Receiver continues to have discussions with the SEC, the Defendant's adversary in this case, on various issues in this matter and on updates regarding the Estate. Yet, the Receiver does not have these discussions with the Defendant and indeed, it is the Defendant

10

(and the Relief Defendants) who are monitoring the assets and who are in touch with the Receiver. The Defendant should not be paying for the Receiver's conversations with the SEC. Until this Court orders otherwise, the Defendant has every right to review and opine on the Receiver's fees, especially as the Court has *not released any funds that Defendant legally earned that are above the judgment amount* for Defendant to retain *legal counsel for himself* in any of his matters, but is instead using the Defendant's own legally earned funds – which Defendant strongly opposes – to pay the Receiver who *does not in any way benefit the Defendant.*

It is telling that the Receiver has **_not once_** discussed *any* issue with the Defendant and it is instead the Defendant reaching out to the Receiver.

## VI.    THE SEC'S SUPPORT FOR RECEIVER'S PAYMENT MUST BE IGNORED.

The Defendant incorporates and reiterates his position [First Opposition at 15-18 and Second Opposition at 12-13] that the SEC's support for payment to the Receiver must be ignored.  Typically, "[O]pposition or acquiescence by the SEC to the fee application will be given great weight." *Byers*, 590 F. Supp. 2d at 644 (quoting *First Ave. Coach Lines*, 364 F. Supp. at 122). However, courts have stated that "[N]o statute compels such a conclusion, however, nor do[es] [the Court] believe such great deference is warranted in this instance." *In re Alpha Telcom, Inc*., No. CV 01-1283-PA, at *6 (D. Or. Oct. 27, 2006).

This Court should decline to give any weight to the SEC's opinion in this Third Fee Application, as the SEC's opinion should be considered only in a situation where the amount of assets collected is less than judgment amount or if this Court reimburses the Receiver from funds encompassed within the judgment (within the $64.4MM amount). Otherwise, only the Defendant and the Relief Defendant's opinion must be given "entire weight," if any payment is coming from them and their assets above the judgment amount.

11

As in the First Application and the Second Application, the Receiver has confirmed "[T]he Commission does not object to the relief sought herein" [Third Application at 2]. This is to be expected, given the Court's rulings that simply incentivize the SEC to "rubber-stamp" the Receiver's Fee Applications.  The Court must decline to give any weight to the SEC's opinions on this Application.

**VII.   THE RECEIVERSHIP MUST BE TERMINATED IMMEDIATELY.**

The Defendant incorporates and reiterates his position [First Opposition at 22-26 and Second Opposition at 13-14] that the Receivership must be terminated immediately.  The Defendant has expressed multiple times that the Receiver was not needed in this case and the Receiver is "costing" the Estate money, not generating the Estate *any* value.  It is clear during the time period covering this Third Application that the Receiver has no idea of how to manage these assets and his inaction has cost the Estate significantly, indeed rendered a significant loss by his inability to deal in a timely and proactive manner with the illegal tenant in Apartment 12F prior to the expiration of the lease, the Harry Winston earrings and the secureness of the various accounts.

Indeed, it is this Court that has stated that "fees requested are justified by the net economic benefit that they will provide to the estate." *SEC v. Illarramendi*, Civil No. 3:11cv78 (JBA), at *1 (D. Conn. Jan. 16, 2014). The Court must also look at the Receiver's fees as a loss to the Estate.[7] ***There was absolutely <u>NO</u> economic benefit to the Estate during this period – indeed, there were only significant and unnecessary expenses that the Receiver imposed on the Estate and significant losses by the Receiver's actions/non-actions.***

---

[7] "…receivership… where the goal is…to manage the estate in such a way as to maximize recovery while minimizing loss, including losses caused by attorney's fees." (emphasis in original) See *SEC v. Aquacell Batteries* Case No. 6:07-cv-608-Orl-22DAB, at *9 (M.D. Fla. Jan. 31, 2008)

The Defendant will go into more detail in **SECTION IX** titled "SPECIFIC ITEMS AND/OR GROUPS OF ITEMS" of this Third Opposition, but significant examples are:

(i)     The billing to the Estate of dealing with the illegal tenant in Apartment 12F is excessive and outrageous and would not have been incurred if the Receiver had dealt with the tenant *prior* to the expiration of the lease in July 2019.  This amount is nearly **$10,000** in expenses to the Estate, not including the amount billed by the eviction attorney Mitofsky, Shapiro, Neville & Hazen, LLP ("MSNH") and not including any amount spent by the Relief Defendants' attorneys on this issue.  In addition, there is a loss of rental income as the illegal tenant has not paid any rent since July 2019.

(ii)    The billing of nearly **$7,000** for the Receiver to brief the Defendant's motion for the Receiver's termination from this matter.  Such is a business expense for the Receiver to justify his continued appointment as Receiver and has nothing to do with managing the Estate. This amount spent on this briefing by the Receiver is excessive and egregious, and must be removed from the invoicing. Just as the Receiver cannot bill for any work done on his Fee Applications, so too the Receiver cannot bill for any work done to justify his continued appointment as that is a business expense for the Receiver and not for the Estate.

(iii)   The continued unnecessary billing of over **$4,200** for tax issues when the Receiver has already concluded that "based upon the dollar amount and limited nature of the Receiver Estate… that he had no obligation to submit tax returns on behalf of the Defendant… [and] had no obligation to submit tax returns on behalf of the Relief Defendants or other taxable entities that are Receivership Assets." [Doc. #1330 at 21]

(iv)    The billing to the Estate of dealing with the transfer of the Harry Winston earrings is also excessive and should have been dealt with at the outset of the Receivership. It should not be that the Defendant has to alert the Receiver as to the physical transfer of those Earrings. This amount invoiced by the Receiver on this issue is nearly **$2,400** and could have been substantially lower or even non-existent had the Receiver dealt with this issue months earlier.

(v)     The billing to the Estate of dealing with the unauthorized trades in Ms. Ahmed's Fidelity accounts. *As soon as the Receiver was appointed*, he should have confirmed that no trades of any kind could be effectuated in any account. However, the Receiver clearly "dropped the ball" and had to scramble *after* the fact to ensure compliance with Court Order. This amount is nearly **$2,700** and could have been substantially lower had the Receiver confirmed compliance with Court Order as soon as he was appointed.

(vi)    The billing to the Estate to oppose renting the two Relief Defendant apartments. The Receiver has billed nearly **$1,700** for this.  This amount does not include any amount of "lost rental income" from the vacancy of Apartment 12A and the

continued non-payment from the illegal tenant in Apartment 12F – which together is an additional amount over $500,000 (and counting) in lost rental income "billed" to the Estate (and this does not even include any interest on these amounts).

Just these examples alone ***are over 70% of the total invoice amount*** requested in the Third Application. Indeed, the loss to the Estate by not renting out the apartments and keeping an illegal tenant in Apartment 12F beyond the expiration of the lease and without the consent or knowledge of the Defendant and the Relief Defendants is substantial.  That the Receiver blatantly condones such significant loss to the Estate – over $500,000 to date and counting, while shamelessly asking for his fees is glaring mismanagement of assets.  The fact that the Receiver even billed for these actions shows the mismanagement and abuse that ensues with the appointment of a Receiver whereby "the possibilities for abuse [are] limited only by the size of the estate." *SEC. v. Northshore Asset Mgt.*, 05 Civ. 2192 (WHP), at *3 (SDNY Sep. 29, 2009). This Court should not allow that to happen.

**VIII.    IN THE ALTERNATIVE, IF THIS COURT IS INCLINED TO GRANT FEES TO THE RECEIVER, IT MUST REDUCE THE FEES SUBSTANTIALLY AND IMPOSE A 100% HOLDBACK UNTIL ALL APPEALS ARE CONCLUDED.**

The Defendant believes that the Receiver should not be paid at all. Or that if he is paid, he should be paid from within the Judgment amount and by those parties who are benefiting from the Receiver – namely the Judgment and/or the SEC.

In this Third Opposition, the Defendant incorporates and reiterates his position in the First and Second Opposition [First Opposition at 26-29; Second Opposition at 14-15] that "if this Court is inclined to grant the Receiver's fees (which the Defendant vehemently opposes), the Court should apply a minimum of a [70]% discount to the requested fees and withhold 100% of the amount" as Courts have discretion to award the amount of compensation that can or will be

14

awarded to a court-appointed receiver. See *SEC v. Byers*, 590 F. Supp. 2d 637, 644 (S.D.N.Y. 2008); *United States v. Code Prods. Corp.*, 362 F.2d 669, 673 (3d Cir. 1966).  For the Third Application, the Defendant states that there should be a 70% reduction in the requested fees (as opposed to the 50% reduction in the earlier Applications) and the Defendant details this further in Section IX of this Opposition.

The Court should also hold any payment to the Receiver in abeyance until the final conclusion of this matter when all appeals have been heard (if the Court keeps the Receivership that long), as even the Receiver himself stated that "[O]verall results can be determined only at the conclusion of the Receivership Proceeding." [Doc. #1330 at 27]  This case does not justify the award of fees or expenses to the Receiver until any benefit that the Estate receives from him is determined.  So far, the Receiver has only incurred substantial losses to the Estate.

Courts have allowed the "Receiver [to] apply for those fees at the conclusion of this litigation. Withholding fees until the conclusion of the lawsuit assists the Court in achieving its continuing goal of preserving funds held in the receivership estate for the compensation of the investors. This approach is common in SEC civil enforcement actions because it allows the Court to withhold fees until it is absolutely clear that a receiver's efforts will ultimately benefit the receivership estate. See *SEC v. Byers*, 590 F. Supp. 2d at 648. The Court derives the authority to award such reduced fees from its power to "fix the compensation" of receivers and their attorneys. Drilling, 69 F.2d at 418." *SEC v. Small Bus. Capital Corp*. Case No. 5:12-CV03237 EJD, at *4 (N.D. Cal. Aug. 7, 2014).  As such, the Court should wait until the conclusion of all appeals before any fees or expenses are awarded to the Receiver so that any net economic benefit (if any) from the Receiver's actions can be determined and assessed.

**IX.   SPECIFIC ITEMS AND/OR GROUPS OF ITEMS ON EXHIBITS TO THE THIRD APPLICATION.**

As in his First and Second Oppositions, the Defendant contests all of the Receiver's bills in his Third Opposition, but because he is *pro se* and uncertain of the proper procedure regarding line items, the Defendant only gives some examples below to support his opposition of the payment of any fees or expenses to the Receiver. Should the Court request a line item audit by the Defendant, the Defendant would provide such to the Court. The Defendant reserves the right to bring additional issues on these invoices and exhibits, or any other matter regarding the Receiver's applications for fees and expenses, to the Court's attention at a later date in time.

**1.   <u>Doc. #1330-3, or Exhibit C:</u>**

<u>*First*</u>, as in his First and Second Oppositions, the Defendant opposes all items in Doc. #1330-3 or Exhibit C in this Third Opposition. These items that the Receiver is looking to have reimbursed include: PACER expenses, online research expenses, Federal Express expenses, service fee, copying expenses, travel charges, postage, and conference call expenses.

With respect to PACER and online research expenses, the Receiver does not explain what documents he accessed from PACER and what online research resulted in these invoices. Further, as indicated in the emails transmitting electronic filings in this case, the PACER system permits parties to download for free a copy of all case-related documents. Further, the Court denied the same relief that the Defendant requested toward payment of a $28.50 PACER bill, stating that "[S]hould Defendant desire the additional benefit of viewing documents in other cases or viewing documents in his case multiple times, he must bear that expense himself." [Doc. #773]. The Court must treat the Receiver the same way.

_Second_, the Receiver does not specify the need for such other services, such as copying. In addition, because this Court also denied Defendant any amount for travel expenses, any aid with conference call expenses and any aid with any of his attempts to litigate this case, any and all expenses that the Receiver is requesting reimbursement for on Exhibit C (Doc. #1330-3) must also likewise be denied or removed. The denial of these same or similar expenses for the Defendant _has severely prejudiced the Defendant and has adversely impacted him as he was not able to properly litigate his case(s)._ The Court cannot allow the reimbursement of these expenses to the Receiver.

## 2.   Doc. #1330-4, or Exhibits D-1 to D-5:

_First_, as in the First and Second Fee Applications, there are multiple errors in the invoicing in this Third Application wherein the same activity is being billed twice by the same person. Defendant provides several examples below:

(i)     _See_ DAA entry on 7/25/19 "TelCon with D Duksa re Essell Farm; email re same" for 0.30 hours versus DAA entry on 7/25/2019 "Email to D Duksa re request and Receiver's response" for 0.10 hours [Doc. #1330-4 at 3]

(ii)    _See_ CHB entry on 7/25/19 "Draft follow up correspondence to Iftikar Ahmed re request for arbitration documents" for 0.10 hours versus CHB entry on 7/25/2019 "Exchange correspondence with Iftikar Ahmed re request for documents relative to motion to lift stay, discuss with SMK" for 0.30 hours [Doc. #1330-4 at 4]

(iii)   _See_ SMK entry on 8/14/19 "Email tenants offer to Knag and Ahmed" for 0.10 hours versus SMK entry on 8/14/19 "Email update on tenant to Knag and Ahmed" for 0.10 hours [Doc. #1330-4 at 19]

These items must be reconciled and only billed once. You cannot have the same person billing twice for the same action on the same invoice and the fact that this occurs multiple times is simply evidence of the mismanagement by the Receiver.

17

_Second,_ and already addressed in the First and Second Oppositions, the Receiver does not explain why two people were needed on any conversation with other parties such as the SEC or the Relief Defendants, and why two attorneys were needed for any communication, meeting, or discussion with any other party. Courts have reduced fees by the amount charged for other people who attended a conversation, hearing or dealt simultaneously with the same issue. See _In re 29 Brooklyn Avenue, LLC_, US Bankruptcy Court, EDNY, April 27, 2016 (reducing fees paid when more than one attorney was present). Assuming no more than one person was required, given at least two attorneys were always doing the same work, the fee total must be reduced by at least 50% if not more for this reason alone.

This continues to be concerning as the Receiver himself testified that his firm would not "double-bill, even if it's legitimate double-billing, in the sense of if two of us are dealing with the same issue we only bill for one person's time" [Doc. #1043 at 24:17-19, "Nov 28 Hr. Trans."]; and yet when the bills are submitted, the Invoices show the exact opposite of what he said.

As in the Receiver's First and Second Applications, there are multiple instances of bills for multiple attorneys for the same issue (each meeting, conference call, etc.), in the Third Application, but the Defendant provides just a few examples[8] for the Court's benefit below:

(i)      _See_ SMK entry on 7/2/19 "Attention to various matters" for 0.30 hours versus CHB entry on 7/2/19 "Discuss outstanding receivership issues with SMK" for 0.20 hours [Doc. #1330-4 at 2]

(ii)     _See_ SMK entry on 7/30/19 "Attention to email from Paul Knag re: apartment 12F and consequence of holdover tenant; draft and email extensive response; Telephone conference with Paul Knag re: how to proceed with tenant" for 0.60 hours versus CHB entry on 7/30/19 "Attention to 12F unit, including exchange

---

[8] Should the Court want a line-by-line audit of each time that an entry is being charged twice by the same individual, being double or triple billed as well as any further vague entries, Defendant would be happy to provide such for the benefit of the Court.

correspondence from PK regarding management of 12F unit, discuss with SMK and PK re same…" for 1.10 hours [Doc. #1330-4 at 17]

(iii)    *See* JED entry on 7/30/19 "Attn. to issues raised by emergency motion to terminate receivership" for 0.60 hours versus SMK entry on 7/30/19 "Read emergency motion to terminate receiver; analyze and strategize re: same" for 0.80 hours [Doc. #1330-4 at 4]

(iv)    *See* SMK entry on 7/31/19 "Attention to Ahmed's motion for the immediate removal of Attorney Horwitt as receiver, and develop response" for 0.50 hours versus CHB entry on 7/31/19 "Review motion to terminate receiver (.4), discuss with SMK (.4)…" for 5.50 hours [Doc. #1330-4 at 4-5]

(v)    *See* SMK entry on 8/20/19 "Further attention to issues related to Ahmed motion to terminate receivership" for 0.80 hours versus CHB entry on 8/20/19 "Discuss further response to Iftikar Ahmed motion to terminate receivership with SMK" for 0.10 hours

(vi)    *See* SMK entry on 9/24/19 "Attention to issues with Ahmed's stay motion in light of claims made" for 0.20 hours versus CHB entry on 9/24/19 "Discuss outstanding receivership issues with SMK" for 0.20 hours

(vii)    *See* SMK entry on 9/30/19 "Strategize re: various issues (eviction action, earrings, Northern Trust account)" for 0.30 hours versus CHB entry on 9/30/19 "Discuss outstanding receivership issues with SMK" for 0.30 hours

    *Third*, there are vague entries in the invoices whereby the Defendant does not know what was done or discussed and Defendant provides several below by way of example:

(i)    *See* SMK entry on 7/2/19 "Attention to various matters" for 0.30 hours

(ii)    *See* CHB entry on 7/2/19 "Discuss outstanding receivership issues with SMK" for 0.20 hours

(iii)    *See* SMK entry on 8/28/19 "Further attention to miscellaneous pending matters" for 0.20 hours

(iv)    *See* CHB entry on 9/18/19 "Attention to outstanding receivership issues, discussion with SMK re: same" for 0.30 hours

(v)    *See* CHB entry on 9/24/19 "Discuss outstanding receivership issues with SMK" for 0.20 hours

(vi)    *See* CHB entry on 9/30/19 "Discuss outstanding receivership issues with SMK" for 0.30 hours

Courts have reduced fees awarded by *75%* due to such vague entries. "Such vague entries warrant a reduction because they fail to provide "an adequate basis upon which to determine the reasonableness of the services and hours expended on a particular matter." *Tucker v. Mukasey*, supra, 2008 WL 2544504 at *1." See *Spalluto v. Trump International Hotel Tower*, 04 Civ. 7497 (RJS) (HBP), at *21 (S.D.N.Y. Aug. 29, 2008), reducing attorney's time by 75%. "It is well settled that supporting documentation for attorney's fees must be of sufficient detail and probative value to enable the court to determine with a high degree of certainty that the billing is reasonable." *Yelton v. PHI, Inc.*, No. 09-3144, 2012 WL 3441826, at *8 (E.D. La. Aug. 14, 2012) (internal quotations omitted). Litigants who submit vague fee applications "take their chances" that those entries will be disallowed. *League of United Latin American Citizens No. 4552 v. Roscoe ISD*, 119 F.3d 1228, 1233 (5th Cir. 1997) (citing *Louisiana Power & Light*, 50 F.3d at 327).

*Fourth*, the Receiver's attorneys continue to charge for travel time.  As they are providing a public service, the Receiver and his counsel should not be paid for travel time.[9]  *See* CHB entry on 8/23/2019 "Travel (including traffic) to/from and tour/check-in on Essell Farm property in Ancram, NY" for 4.5 hours [Doc. #1330-4 at 11-12] and *See* DAA entry on 9/15/2019 "Travel to/from office to issue check; pmt deadline 9/15…" for 1.00 hours [Doc. #1330-4 at 28] – this is a total of nearly $650 that has unnecessarily been billed to the Defendant.  The Court should

---

[9] Just as the Receiver has not billed for travel time in another Receivership, he should voluntarily waive all travel expenses and charges in this case.  "In order to minimize expenses to the Receivership Estate, the Receiver and Z&Z have not requested reimbursement for travel charges during the Compensation Period associated with trips to Boston to meet with the Commission and to New York City to meet with defendant Mark J. Varacchi ("Varacchi") and his counsel." *SEC v. Varacchi*, Case 3:17cv-00155-VAB; Doc. 27, Filed 08/14/17, at 4. The Receiver should not bill for travel time here either "in order to minimize expenses to the Receivership Estate."

completely remove these and any other travel charges from the invoice, especially as the Receiver does not charge for travel time in other Receiverships.

*Fifth*, the Receiver has continued to bill for his consideration of an appointment in the MA Civil Matter, which has nothing to do with this matter and which is an unbelievable abuse of the Estate assets. Any consideration of an appointment in an unrelated matter is a business decision for his law firm and cannot be paid for from the Estate.  The SMK entry on 7/21/19 "Attention to withdrawal of motion re: MA Civil action" for 0.30 hours [Doc. #1330-4 at 3] and SMK entry on 7/11/19 "Telephone conference with Mark Williams re: MA civil action" for 0.20 hours [Doc. #1330-4 at 26] must be removed from the invoices in their entirety.

*Fifth,* the Receiver has spent an enormous amount of time – nearly 25 hours and billed almost $7,000, ***nearly 20% of the total amount*** to respond to Defendant's Motion to Terminate the Receiver.  Any Motions on behalf of the Receiver that are not in any way to the benefits or merits of the impact on the Receivership ***must be removed*** from the invoices. Such is a business expense for the Receiver to justify his continued appointment as Receiver and has nothing to do with managing the Estate. This amount, which is excessive and egregious, must be removed from the invoicing. Just as the Receiver cannot bill for any work done on his Fee Applications, so too the Receiver cannot bill for any work done to justify his continued appointment as that is a business expense for the Receiver and not for the Estate.

*Sixth,* the Receiver has spent even more time – nearly 40 hours and billed almost $10,000, ***over 25% of the total amount*** to deal with the eviction of the illegal tenant in Apartment 12F.  Indeed, it was the Defendant who alerted the Receiver to the absolute unacceptability of the situation.  Had the Receiver dealt with this issue ***prior*** to the expiration of the Apartment 12F lease, there would not be additional unnecessary billings and wasted resources on this issue. Indeed, the Receiver unbelievably states that the "occupants of

Apartment 12F… **unexpectedly** stayed passed *[sic]* the end of their lease term of July 14, 2019."

(emphasis added) [Doc. #1330 at 17]. Yet, the Receiver **knew and allowed** the illegal tenant to

stay past the expiration of the lease term on July 14th, 2019:

(1) The Receiver blatantly ignored the building management's request on June 17th, 2019 asking if the tenant had renewed the lease.  The Receiver *should have* at this time, communicated with the tenant and confirmed the expiration of the lease and vacancy of the Apartment 12F on July 15th. Yet, the Receiver completely mismanaged the entire matter with the illegal tenant in Apartment 12F by not communicating with the tenant.

(2) The Receiver deliberately answered the building management's next query on July 26th, 2019 by stating that "[T]he Receiver will provide a copy of the renewal lease if such a renewal lease is entered into."

(3) The Receiver knew that the illegal tenant had stayed beyond the July 14th expiration as he was "[C]ontemplating that the 12F Occupants would vacate Apartment 12F since the term of their lease had just days earlier ended (on July 14, 2019)…" [Doc. #1249 at 4]. Tenants do not leave *after* the lease expires, but rather *before* the lease expires.  The Receiver's statement makes no sense at all, but shows that he absolutely knew and condoned the illegal tenant staying beyond the lease, contrary to his statement that the tenant "unexpectedly" stayed beyond the lease expiration.

(4) The Receiver accepted a check from the illegal tenant dated July 9, 2019 – beyond the June 15th rental deadline for the time period of June 15th – July 15th or ahead of the July 15th expiration of lease. He accepted this check as "use and occupancy."  Thus, the Receiver very well knew that the illegal tenant had stayed beyond the expiration of the lease.

The Receiver did not communicate any of this to the Defendant at all or to the Relief

Defendants until he was confronted by them on this issue.  The Receiver has completely

mismanaged the entire situation with the illegal tenant in Apartment 12F and that has caused

significant loss to the Estate (indeed, the illegal tenant is still squatting in the apartment, there

has been no payment since July 2019 (and it is now December 2019) and there has had to be a

retention of an eviction lawyer to deal with this situation) and the Defendant has no idea where

the eviction process stands.

In addition, there are no details around the DAA entry on 8/6/19 "Deposit 12F checks at BoA" [Doc. 1330-4 at 23] – what 12F checks are these? Why aren't these apartment checks being deposited in a timely manner? The rental checks from the illegal tenant in 12F were due by the 15th of every month and his lease expired July 15th, 2019.  In a prior filing, the Receiver stated that he received a rental check in the middle of July 2019. Yet that is being deposited weeks later? And how many checks? These checks should be deposited within days of receipt, not weeks or months later.

*Seventh,* the Receiver has spent nearly seven (7) hours and charged the Defendant nearly $1,700 to oppose the Relief Defendants' motion to immediately rent the two apartments. [Doc. #1220] This is akin to the Receiver charging the Defendant so that he can cause significant losses to the Estate.  Apartment 12A has been vacant since October 1, 2018.  That is a loss of at least $420,000 in rental income to date (and counting) on this apartment alone because it is vacant and the Receiver opposes renting the apartment.  And even with respect to Apartment 12F, the Receiver has not gotten any rental income from the illegal tenant since July 2019, which means a further loss of nearly $100,000 and counting.  It is absurd and astounding that the Receiver is invoicing the Defendant to lose the Estate more money.  Clearly the Receiver has no idea how to manage these properties and the Estate – the apartments can be rented for a short-term time period and should have been when the Receiver was first appointed.  Instead, the Receiver has continuously opposed renting the apartments, costing the Estate a significant amount – to the amount of over half a million dollars and counting – of lost rental income.

*Eighth,* the Receiver has spent nearly 10 hours and billed almost $2,400 to deal with the transfer of the Harry Winston earrings from Harris St. Laurent ("HS") to his custody and control. It is absurd that again, it is the Defendant who alerted the Receiver in the summer 2019 to the situation that the earrings must be under his custody and not HS' custody.  Because the Receiver

23

dropped the ball in dealing with this issue when he was first appointed, it is costing the Estate a significant amount of money to deal with this issue now.  And it is still not resolved.

   *Ninth,* in yet another example where the Receiver has been reactive instead of proactive, he has spent nearly twelve (12) hours and nearly $2,700 on trying to resolve the unauthorized trades in Ms. Ahmed's Fidelity accounts. The Receiver was appointed to manage the assets and part of that includes checking with each firm *ahead of time when the Receiver was **first appointed*** a year ago in December 2018 with the safeguards the firms have in place and ensuring that they understood the Court's Orders regarding no trades without Court Order.  Indeed, not one unauthorized trade happened *prior* to the Receiver being appointed.  Had the Receiver been proactive instead of reactive, we would not be in this situation.

   *Tenth*, the Receiver continuously misstates that "the primary objective of this receivership is to liquidate assets to secure the Judgment pending appeals" [Doc. #1330 at 16]. That is but *one* of the objectives and is the last one listed: "given the need to value the frozen assets and avoid over-freezing, to secure the Judgment for the SEC, to manage and maximize the value of the frozen assets… and to take necessary steps toward effectuating the judgment…" [Doc. #1070 at 5]. Indeed, the Receiver has a duty to manage and maximize the value of the frozen assets and opposing the rental of the apartments has done the exact opposite.   Again, it is entirely premature at this point to speculate about selling the apartments and is against the "wishes of the Defendant and Relief Defendants." [Doc. #1070 at 7] This Court has made it clear that only "*[I]f* subsequently ordered by the Court… and with due regard for the interests of the Defendant and the Relief Defendants…" [Doc. #1070 at 14]. The Receiver unbelievably continues to usurp judicial functions from the Court. **See** *Weil v. Neary*, 278 U.S. 160 (1929). (Condemning undisclosed fee sharing arrangement as taking the judicial function from the court).

The Receiver continues to misunderstand his mandate and erroneously maintains that the "primary objective of this receivership is to liquidate assets…" [Doc. #1330 at 16] – this is simply one of the objectives of the Receivership, but certainly not the *primary* objective. Nowhere has the Court ever stated that any liquidation is the *primary* objective of the Receivership and it is simply astonishing that the Receiver unilaterally presumes so.

The Court must remove these charges from the invoice as they simply unnecessarily drain the assets of the Estate, especially before the Court has made any liquidation rulings and now with the stay of liquation in place [Doc. #1346].

*Eleventh*, the Receiver continues to spend time responding to the HS' firm's various motions for fees (which is in itself excessive at this point).  The Receiver has billed nearly $550 on this issue and the Defendant should not be paying for this *at all*. The Defendant has already stated his Opposition to the payment of certain fees to certain of the Relief Defendants' counsel and there is no reason why the Receiver should be paying any attention to this issue when it is the Defendant's assets that are being considered for this – the Defendant makes the sole decision on his assets, especially on those amounts over the Judgment amount.[10]

*Twelfth*, the Receiver continues to spend an unnecessary number of hours on tax issues and has billed over $4,200 – over 10% of the total amount invoiced – when he has already "concluded based upon the dollar amount and limited nature of the Receivership Estate… that he is not required to submit separate tax returns for the Defendant or the Relief Defendants."  [Doc. #1160 at 24].  There is no reason for the Receiver to have anything to do with the Defendant and the Relief Defendants' tax returns and the Receiver himself admits that "he had no obligations to

---

[10] Should it be determined that these assets belong to the Relief Defendants (as Defendant has long maintained), then the Relief Defendants are free to do whatever they wish with their assets.  The Defendant has already consented to a payment of $350,000 to Murtha Cullina and $350,000 to Jenner & Block for Relief Defendants' appellate representation.

submit tax returns on behalf of the Defendant… the Receiver had no obligation to submit tax returns on behalf of the Relief Defendants or other taxable entities that are Receivership Assets." [Doc. #1330 at 21].  Neither the Defendant nor the Relief Defendants have tax counsel and the Receiver has no right or entitlement to view any of their tax returns, especially as he admits the "strong statutory protections that afford significant privacy to a person's tax returns" [Doc. 1330 at 21].  Should the Receiver continue to waste and unnecessarily spend time on this issue, funds must be released for the Defendant and the Relief Defendants to consult with tax counsel *prior* to the release of any of their tax returns to anyone.

The Receiver is presumably experienced as a Receiver and there is no need, once he has concluded that he does not need to file taxes for the Defendant and Relief Defendants, that he continues to have discussions, research, and draft motions on such topic and continue to bill the Defendant for it.  Any amount related to taxes must be removed from the invoicing.

*Thus*, these unnecessary amounts listed here add up to ***over 70% of the amount invoiced*** and must be removed from the billing.  The amount invoiced for this time period is excessive and unjustified.  If the Court still feels that this should be paid, then it must be paid from the within the Judgment and/or paid by the SEC.

These are just many examples of why the Defendant opposes any payment of fees to the Receiver. *See Code Prods. Corp.*, 362 F.2d at 673 ("In allowing fees the considerations are the time, labor and skill required, but not necessarily that actually expended, in the proper performance of the duties imposed by the court upon the receivers, the fair value of such time, labor and skill measured by conservative business standards, the degree of activity, integrity and dispatch with which the work is conducted and the result obtained.").  A full (but expensive and unnecessary) audit of the Receiver's timekeeping and records – which the Defendant is happy to

do himself for the Court should the Court request it – will likely reveal many such excessive and unnecessary invoicing and unjustified expenses incurred by the Receiver.

3.    **Doc. #1330-4, or Exhibit D-6:**

The *pro se* Defendant consents to the payment of $2,555.00 (Two Thousand, Five Hundred, Fifty-Five Dollars only) to Mitofsky, Shapiro, Neville & Hazen, LLP ("MSNH") **from the rental proceeds of Apartment 12F only**.  However, to date, there has been no agreement for date of eviction nor has any information related to eviction proceedings been relayed to the Defendant and most of the amount invoiced is simply discussions between the Receiver and MSNH.  The Defendant reserves the right to oppose continued payment to MSNH if there is no progress towards the eviction of the illegal tenant.


**CONCLUSION**


This Court should not allow the payment of excessive and unjustified fees to the Receiver for the reasons stated herein.  This Court has also been clear that "it recognizes the parties' concerns regarding the potential cost of a receiver and shares their desire to avoid unnecessary or high receivership costs" [Doc. #1070 at 5].  As the Defendant continues to reiterate, courts have been very careful when granting attorney fee motions, especially those of a Receiver, who is supposed to be retained for the benefit of the public. As stated by a Circuit Court on excessive Receiver fees:

> "The $12,000 fee allowed appellee is more than the salary of a United States District Judge for an entire year. It is more than the salary of the most of the Governors or Judges of the Supreme Courts in the respective states of this country. In our judgment [sic] it is so exorbitant that its allowance must be held to be an abuse of the court's discretion. That there has grown up a judicial abuse in the allowance of excessive fees to masters, receivers, and attorneys in receivership cases cannot well be denied. The Supreme Court

of the United States has called attention to this and sounded a note of caution and warning to the judges of the federal courts in the case of *In re Gilbert*, 276 U.S. 294, 296, 48 S. Ct. 309, 310, 72 L. Ed. 580, as follows: "We were desirous of making it clear by our action that the ***judges of the courts, in fixing allowances for services to court officers, should be most careful***, and that vicarious generosity in such a matter could receive no countenance." And in *Newton v. Consolidated Gas Co*., 259 U.S. 101, 42 S. Ct. 438, 439, 66 L. Ed. 844, in passing on the compensation of a master the Supreme Court points out that, ***"The rights of those who ultimately pay must be carefully protected.***" There seems to have developed an idea that lawyers are entitled to more compensation when employed in a receivership case than they would think of charging if employed by a private client for similar services. There is no reason for any difference in charges. Counsel should be allowed fair and reasonable compensation in receivership matters. There is no reason why they should be overpaid." (emphasis added).

> *Federal Oil Marketing Corporation v. Cravens*, 46 F.2d 938, 943 (8th Cir. 1931).

The same is absolutely true in this instant case. The Receiver has not shown that the fees and expenses he incurred from July 1, 2019 through September 30, 2019 were a productive use of the Estate's assets, or that they were cost-efficient and ultimately beneficial to the Estate.  If anything, the Receiver has mismanaged the assets, causing a significant loss to the Estate and has been reactive instead of proactive.  Given the Court's understanding and desire to "avoid unnecessary or high receivership costs" and the Receiver's mandate to "manage and maximize the value of frozen assets" [Doc. #1070 at 5] with the "dual objects of maximizing the value of the assets of the Receivership Estate and minimizing the expenses charged hereunder…" [Doc. #1070 at 7], **which he has not done**, the Court should deny the Receiver's Third Application.

**WHEREFORE**, the Defendant humbly requests the esteemed Court deny the Receiver's Third Application; or in the alternative, impose an additional 70% discount and a 100% holdback until the conclusion of all appeals in this case, and for any such fees to be paid from within the judgment by those parties that are benefiting from the appointment of Receiver and not the

Defendant.

Respectfully Submitted,

Dated:        November 30TH, 2019         /s/ Iftikar Ahmed

_____

Iftikar A. Ahmed
C/O Advocate Anil Sharma
Government Place East
Kolkata 700 069, India

Tel:     +91-983-008-9945
e-mail: iftyahmed@icloud.com

*Pro Se*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and served by electronic mail to:

MR. NICHOLAS P. HEINKE, *ESQ.*
U.S. Securities and Exchange Commission
Byron G. Rogers Federal Building
1961 Stout Street, Ste. 1700
Denver, CO 80294
(303) 844-1071
e-mail: heinken@sec.gov

MR. MARK L. WILLIAMS, *ESQ.*
U.S. Securities and Exchange Commission
Byron G. Rogers Federal Building
1961 Stout Street, Ste. 1700
Denver, CO 80294
(303) 844-1027
e-mail: williamsml@sec.gov

MR. PAUL E. KNAG, *ESQ.*
Murtha Cullina, LLP
177 Broad Street, 4th Floor
Stamford, CT 06901
(203) 653-5400
Fax: (203) 653-5444
e-mail: pknag@murthalaw.com

MS. KRISTEN LUISE ZAEHRINGER, *ESQ.*
Murtha Cullina, LLP
177 Broad Street, 4th Floor
Stamford, CT 06901
(203) 653-5406
Fax: (860) 240-5758
e-mail: kzaehringer@murthalaw.com