UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, ) ) ) | |
| Plaintiff, ) ) ) | |
| v. ) ) ) | Civil Action No. 3:15-cv-675-JBA |
| IFTIKAR AHMED ) ) ) | |
| Defendant, and ) and ) ) | |
| IFTIKAR ALI AHMED SOLE PROP; I-CUBED DOMAINS, LLC; SHALINI AHMED; SHALINI AHMED 2014 GRANTOR RETAINED ANNUNITY TRUST; DIYA HOLDINGS LLC; DIYA REAL HOLDINGS, LLC; I.I. 1, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; I.I. 2, a minor child, by and through his next friends, IFTIKAR and SHALINI AHMED, his parents; I.I. 3, a minor child, by and through his next friends, IFTIKAR and SHALINI AHMED, his parents ) ) ) ) ) ) ) ) ) ) ) ) | |
| Relief Defendants. ) | December 12, 2019 |

**RECEIVER'S REPLY TO THE DEFENDANT'S AND RELIEF DEFENDANTS'
RESPONSES IN OPPOSITION TO RECEIVER'S THIRD APPLICATION FOR FEES**

Jed Horwitt, Esq., in his capacity as Court-appointed receiver of the Receivership Estate[1] (the "Receiver"), through his undersigned counsel, respectfully replies (the "Reply") to the Defendant's Response in Opposition to the Third Interim Application for Professional Fees and Expenses Incurred by the Receiver and His Professionals [Doc. No. 1354] (the "Defendant's

---

[1] Unless expressly defined otherwise, the Receiver incorporates by reference the definitions of terms set forth in the Report of Receiver [Doc. No. 1135] (the "Report") and the Second Interim Application for Professional Fees and Expenses Incurred by the Receiver and his Professionals [Doc. No. 1160] (the "Second Application").

Response") and the Relief Defendants' Response in Opposition to the Receiver's Third Application for Fees and Expenses [Doc. No. 1362] (the "Relief Defendants' Response" and, with Defendant's Response, the "Responses").[2] In support thereof, the Receiver respectfully represents as follows.[3]

## I.    Incorporation of Receiver's Previous Filings

The Defendant "incorporate[d] his complete First Opposition [Doc. # 1183] and Sur-Reply [Doc. # 1222-1] and his complete Second Opposition [Doc. # 1261] into" the Defendant's Response. Accordingly, the Receiver likewise incorporates by reference the Receiver's First Interim Application for Professional Fees and Expenses Incurred by the Receiver and His Professionals [Doc. No. 1249], the Receiver's Reply to the Defendant's and Relief Defendants' Responses in Opposition to Receiver's Application for Fees [Doc. No. 1218], the Receiver's Second Interim Application for Professional Fees and Expenses Incurred by the Receiver and His Professionals [Doc. No. 1249], the Receiver's Reply to the Defendant's and Relief Defendants' Responses in Opposition to Receiver's Second Application for Fees [Doc. No. 1297], and the Receiver's Third Interim Application for Professional Fees and Expenses Incurred by the Receiver and His Professionals [Doc. No. 1330] (the "Third Application"). Accordingly, the Receiver limits his arguments below to those necessary to address new or discrete issues raised in the Responses.

---

[2] The Relief Defendants' Response merely joins the Defendant's response, and thus all citations are to the Defendant's Response.

[3] The Appointment Order directs that, "[a]t least thirty (30) days prior to filing a finalized [fee application] with the Court, the Receiver will serve upon counsel for the parties and Defendant Ahmed a complete copy of the proposed [a]pplication, together will all exhibits and relevant billing information…." (Appointment Order, ¶ 35.) In compliance with this directive, the Receiver circulated a complete copy of the Third Application, including all exhibits thereto, to the Defendant, counsel for the Relief Defendants, and counsel for the Commission on October 15, 2019. At no point between October 15, 2019, and the filing of the Third Application 30 days later did either the Defendant or counsel for the Relief Defendants communicate any of their issues to counsel for the Receiver. Consequently, the Defendant and Relief Defendants did not provide the Receiver and his counsel with any opportunity to attempt to resolve any of their issues and narrow for this Court the scope of controversy.

The Receiver respectfully submits that the Receiver's prior filings adequately address those issues raised in the Responses that were previously raised by the Defendant and Relief Defendants.

## II.   Time Related to Apartment 12F Eviction

As a threshold matter, without citation to specific billing entries, the Defendant claims that the Receiver spent "40 hours and billed nearly $10,000 – over 25% of the total invoice – for matters concerning the eviction" proceedings related to the occupants of Apartment 12F (the "Occupants"). (Defendant's Response, at 4.) From the Receiver's review of the invoices submitted in support of the Third Application, he estimates that approximately 35 hours at a cost of $9,000 was incurred in responding to the Occupants' holdover during the Compensation Period.

The Defendant's criticism of such expenditures is completely illogical and unfounded. The Defendant claims that "[h]ad the Receiver addressed [the holdover occupancy in Apartment 12F] prior to the expiration of the lease, the Estate would not have bear the additional expenses of: (1) non-payment by the illegal tenant; (2) additional attorney fees – by the Relief Defendants and the Receivership Estate to deal with this issue; and (3) additional attorney fees to employ someone to deal with the eviction process." (Defendant's Response, at 4; *see also* Defendant's Response, at 13.) First, the Receiver had no way of knowing that the Occupants would holdover at the end of the lease term. Second, the lack of rental income from Apartment 12F (which was to be expected given the anticipated end of the Occupants' lease term) is likely only temporary – indeed, the Occupants have agreed to make December 2019 and January 2020 use and occupancy payments in the amount of the rent due under the lease and further discussions regarding the payment of all other amounts due since the end of the Occupants' lease term are ongoing. Third, *even if* the Receiver could have somehow anticipated the Occupants' continued occupancy of Apartment 12F

after the end of the lease term, it would *still* have been necessary for the Receivership Estate to incur the expense associated with dealing with the same, including Z&Z's time and MSNH's time.

In short, the expenses incurred in connection with the Occupants' holdover are a result of the Occupants refusing the leave the property and are not the result of the Receiver's action or inaction. The Defendant himself insisted on multiple occasions as early as August 2019 that the Occupants "need[] to be evicted immediately." The Defendant's objections to the Receivership Estate incurring expenses related to this eviction process should not be credited by this Court.

### III.   Time Related to Physical Possession of Earrings

The Defendant erroneously states that "the Receiver dropped the ball in dealing with" what entity was in physical possession of the Harry Winston earrings (SEC. No. 84, the "Earrings") "when he was first appointed…." (Defendant's Response at 23-24.) In reality, following his appointment, the Receiver concluded (based on, *inter alia*, the Declaration of Shalini Ahmed Regarding Identity and Location of Assets [Doc. No. 1091]) that the Earrings were safely "[h]eld under the custody of [Harris St. Laurent, LLP ("Harris")] at safe deposit box." (*Id*. at 5.) Thereafter, following the Receiver's analysis of the balance of the Receivership Estate, the Receiver submitted the Report of Receiver [Doc. No. 1130], which did not propose to liquidate the Earrings to secure the Judgment. Thus, in the Receiver's view, it was not in the interest of the Receivership Estate to expend Receivership Estate resources to assume physical possession of the Earrings, which were already "held under the custody" of Harris in a "safe deposit box" and which were not – based on the Receiver's estimate as to the aggregate value of the Receivership Estate at that time – needed to secure the Judgment. The Receiver's decision not to seek immediate physical possession of the Earrings is entirely consistent with the Appointment Order, which provides that "[n]othing herein shall be construed as a requirement that the [R]eceiver <u>must</u> take possession, custody, or control

of any particular asset in the course of executing his duties as Receiver." (Appointment Order, at 6-7 (emphasis in original).)

With respect to the expenses incurred in attempting to assume physical possession of the Earrings, the Defendant's criticisms are unfounded for two reasons. First, after explaining the reasoning behind the Receiver's decision not to seek physical control of the Earrings and highlighting the expense such effort may cause, the Defendant explicitly requested that the Receiver "**take direct and actual physical possession of the ear-rings as soon as possible.**" (8/22/19 Email Exchange Between Defendant and Counsel to the Receiver, attached hereto as Exhibit A (the "8/22/19 Email") (emphasis in original).)[4] When the Receiver requested that Harris voluntarily surrender possession of the Earring and then learned that, contrary to prior representations to this Court, Harris asserted an interest in the Earrings, the Receiver concluded that he should move to compel the turnover of the Earring to the Receiver so the Receiver may possess them subject to further order of this Court.

Second, as evidenced by the time records submitted in support of the Third Application, the Receiver's counsel and representatives of Harris had a number of telephone conversations and exchanged multiple emails in an effort to avoid motion practice over the physical possession of the Earrings. The Receiver's counsel understood that an agreement had been reached, but ultimately Harris was unwilling to surrender physical control. This delayed the process and required the Receiver to incur additional costs in fulfilling the Defendant's request.

Ultimately, the Receiver respectfully submits that the time spent and expense incurred in attempting to assume physical possession of the Earrings is fair and reasonable.

---

[4] While the Defendant expressed some concern as to the expense associated with the Receiver assuming physical possession of the Earrings in the 8/22/19 Email, the total expense associated with the such efforts by the Receiver is less than 2% of the total value of the Earrings according to the Relief Defendants. (*See* Doc. No. 888-1, at 4.)

5

### IV. Time Related to Confirming No-Trade Status in Brokerage Accounts

The Defendant claims that the Receiver and his counsel "spent nearly twelve (12) hours and nearly $2,700 on trying to resolve the unauthorized trades in Ms. Ahmed's Fidelity accounts." (Defendant's Response, at 24.) Based on the Receiver's review of the time records submitted with the Third Application, he estimates that a total of 7.3 hours at a cost of $1,676.10 was spent confirming the no-trade status of the brokerage accounts following the unauthorized trades in certain Fidelity accounts (the "Trades").

The Defendant incorrectly states that "the Receiver clearly 'dropped the ball' and had to scramble after the fact to ensure compliance with Court Order" with respect to the Trades. Promptly upon his appointment, and pursuant to paragraph 16 of the Appointment Order, the Receiver provided notice to each brokerage at which the Defendant and/or Relief Defendants maintained an account. Indeed, on January 4, 2019, counsel to the Receiver wrote to Fidelity to provide it with a copy of the Appointment Order and highlight certain relevant provisions of the Appointment Order, including that "[t]he Appointment Order directs all [brokerage firms] to 'not liquidate, transfer, sell, convey or otherwise transfer any… securities… of the Receivership Estate except as approved by the Receiver." (1/4/19 Letter to Fidelity, at 2, attached hereto as Exhibit B.) Thereafter, Fidelity confirmed receipt of the Appointment Order and worked with the Receiver to produce various account statements and address other issues that arose during the course of the Receivership.

Based on this notice to Fidelity and Fidelity's confirmation of its receipt of the Appointment Order, the Receiver reasonably believed that Fidelity would fully comply with the Appointment Order including taking such necessary steps to lock the relevant accounts. It was only after conferring with Fidelity after Trades that the Receiver discovered that the restriction

codes placed on the relevant accounts by Fidelity restricted the transfer of assets but did not prevent trading. To be clear, the Receiver has no control over the internal procedures by which Fidelity – or any other brokerage firm – enforces the Asset Freeze. Upon discovery of the oversight by Fidelity, the Receiver's counsel confirmed with the other brokerage firms holding Receivership Assets that the account restrictions at those brokerage firms did not permit trades.

On this record, the Defendant's objection to the Third Application on the basis that the Receiver and his counsel confirmed the no-trade status with Fidelity and other brokerage firms after learning of Trades is without merit. The work provided by Receiver's counsel was reasonable and necessary.

### V.     Receiver Having Counsel and "Outsourcing" Work

The Defendant claims that "[i]t is simply inequitable and outrageous that the Receiver, who is an attorney himself, would (1) have counsel and (2) outsource all of his work to his counsel." (Defendant's Response, at 8.) The Defendant's criticism is unfounded for multiple reasons.

First, in the Appointment Order this Court determined that it was appropriate for the Receiver to have counsel and specifically appointed Z&Z to serve as such counsel. (Appointment Order, at 17.) Second, the Appointment Order provided that the Receiver's hourly rate would be $250/hour for Receiver and administrative work and $396/hour for legal work. As stated in the Third Application, "the Receiver and Z&Z have voluntarily billed all of the Receiver's time during the Compensation Period at the reduced $250 per hour rate." (Third Application, at 5.) Importantly, the blended rate of the services provided by Z&Z to the Receiver during the Compensation Period (arrived at by dividing the total time spent by fees charged, excluding all time spent on fee applications) is only $241.24/hour, or approximately $9 less per hour than the Receiver's voluntarily reduced rate of $250/hour (and $154.76/hour less than the $396/hour legal rate

y

permitted in the Appointment Order). The blended rate of services provided by Z&Z *attorneys* to the Receiver during the Compensation Period is only $252.23, or a mere $2.23 more per hour than the Receiver's lowest hourly rate (for a total expense over the 165.5 hours billed during the Compensation Period of less than $400 or $4.494 \times 10^{-6}$% of the total Asset Freeze) and remains $143.77/hour less than the permissible hourly rate for the Receiver doing legal work pursuant to the Appointment Order. The Defendant cannot reasonably claim that such hourly rates are improper.

## VI. Impact of *Liu v. SEC* on Payment of Receiver's Fee Application

The Defendant suggests that the Supreme Court's decision in *Liu v. SEC*, S.Ct. No. 18-1501, and/or the outcome of the appeals in this matter have some relevance to the payment of the Receiver's fees. (Defendant's Response, at 9.) This is inaccurate. Regardless of whether the disgorgement portion of the Judgment is impacted by the Supreme Court's decision in *Liu* and regardless of whether, on appeal, it is determined that the costs of the Receivership Estate should be paid from the Judgment amount, this Court may still authorize payments to the Receiver and, at a later date, adjust the Judgment amount as necessary.

## VII. Receiver is Not Biased

The Receiver is not biased, as the Defendant claims. (Defendant's Response, pp. 10-11.) As a preliminary matter, the Receiver stands behind his position as articulated in response to the Defendant's Emergency Motion to Stay in Light of Liu v SEC Petition for Writ of Certiorari [Doc. No. 1187], Relief Defendants' Emergency Motion to Immediately Rent the two NYC Apartments [Doc. No. 1220], and Defendant's Motion for Leave to File/Continue Arbitration [Doc. No. 1225], supposed examples of alleged bias. *See* Doc. Nos. 1216, 1237, 1240. Before responding to any filing by any party in this action, the Receiver and his counsel analyze what is in the best interests

of the Receivership Estate as well as the Receiver's responsibilities under the Appointment Order. There is absolutely no bias for or against any litigant in this action.

In connection with analyzing issues raised by any party's filings, the Receiver on occasion reaches out to the non-filing parties to confirm certain relevant facts, discuss ways in which various issues may be more efficiently addressed or even resolved, and otherwise take into consideration the positions of all stakeholders in an effort to administer the Receivership Estate in an impartial manner.

Finally, the Defendant's assertion that "the Receiver has not once discussed any issue with the Defendant" is simply wrong. (Defendant's Response, at 11.) The time entries submitted as Exhibits D-1 through D-5 in support of the Third Application reflect numerous emails between the Defendant and the Receiver's counsel, as well as many calls and emails between the Receiver's counsel and Relief Defendants' counsel. The primary reason the Receiver's counsel does not speak with the Defendant telephonically is the time difference between Connecticut and India.

Simply put, the Receiver is not biased against the Defendant or the Relief Defendants. At every opportunity, he and his counsel strive to manage the Receivership Estate in a fair and equitable manner, taking into account the various interests of the parties and the Receiver's own obligations under the Appointment Order.

## VIII. Decision to Refuse to Rent Apartment 12A

The Defendant criticizes the Receiver's decision not the rent Apartment 12A. (Defendant's Response, at 23.) The Receiver proposed to liquidate Apartment 12A to secure the Judgment. While this Court recently stayed the liquidation process, it is entirely possible that, at some point in the future, this Court may direct the Receiver to liquidate Apartment 12A to secure the Judgment. Until this Court makes that determination, the Receiver submits that it is in the best

interest of the Receivership Estate to keep the Apartments vacant, and this operational decision not to rent Apartment 12A is entirely consistent with the Appointment Order. Indeed, the Appointment Order provides that the Receiver shall, inter alia, "maximiz[e] the realizable value" of Receivership Assets. (Appointment Order, at 7.) The Receiver interprets this language to direct him, in the event this Court orders the Receiver to liquidate certain assets to secure the Required Amount, to maximize the amount realized from such liquidations.

Following conversations with Stacey Froelich of Compass, the real estate brokerage firm the Receiver intends to seek permission to retain in connection with the liquidation of the Apartments in the event the Court directs the Receiver to proceed with such liquidations, it is the Receiver's understanding that both Apartments will sell for more money in a shorter period of time if they are vacant. Upon information and belief, vacant apartments are likely to realize larger sale prices in a shorter period of time because most buyers in the current market are not investors seeking a property to rent and earn income but rather individuals looking to purchase a residence for their own use. Moreover, the sale process is more difficult (and thus more likely to result in larger expenses to the Receivership Estate) if a tenant is in place because tenants generally have no interest in assisting with the sale process and making the property attractive to prospective buyers. Furthermore, as demonstrated by the Apartment 12F, there are risks associated with renting the Apartments, including the risk of tenants holding over and forcing the Receivership Estate to incur costs associated with eviction proceedings (to which, it should be noted, the Defendant vehemently objects in the Defendant's Response).

Therefore, in the Receiver's view, it is in the best interest of the Receivership Estate and consistent with the Appointment Order's directive to maximize the realizable value of Receivership Assets to keep the Apartments vacant.

### IX.     Defendant's Other Criticisms of Third Application

#### a. Allegedly Duplicative Time Entries

The Defendant asserts that "there are multiple errors in the invoicing in [the] Third Application wherein the same activity is being billed twice by the same person." (Defendant's Response, at 17.) This is inaccurate. The Receiver's counsel has reviewed the time entries contained in Exhibits D-1 through D-5 to the Third Application and do not see any duplicative entries. The "examples" of what the Defendant claims to be duplicate entries are not, in reality, duplicative. Indeed, in each of the "examples" on page 17 of the Defendant's Response, while the descriptions of such tasks may be similar, the billing person performed distinct tasks in each entry.

#### b. Allegedly Vague Time Entries

The Defendant claims that certain entries in Exhibits D-1 through D-5 to the Third Application lack sufficient specificity. (Defendant's Response, at 19-20.) Time records must specify for each billing entity "the date, the hours expended, and the nature of the work done." *New York State Assn. for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1148 (2d Cir. 1983). The Receiver respectfully submits that all time entries for which the Third Application seeks payment satisfy this standard. Should the Court desire further narratives and documentary support as to any specific time entries, the Receiver will of course promptly comply.

#### c. Travel Time

The Defendant argues that the Receiver and his counsel should not bill for travel time. (Defendant's Response, at 20-21.) However, page 10 of the SEC Guidelines explicitly permit charging for travel at a 50% rate outside of a 20-mile radius from the Receiver's office. This is precisely what Attorney Christopher Blau did when he drove to Ancram, New York to check-in on the property held by The Essell Farm, LLC. (*See* Exhibit D-2, at 1-2.) Moreover, Attorney

Blau's time spent touring the property is *also* billed at a 50% rate, despite the fact that such a discount is not required under the SEC Guidelines or the Appointment Order.

The only other billing entry during the Compensation Period that references travel is Deborah Accurso's September 15, 2019, entry. (*See* Exhibit D-5, at 4.) Upon further review of the entry, the Receiver has concluded that .6 of the 1.0 entry was billed for travel within a 20-mile radius of the Receiver's office. Therefore, the Receiver and Z&Z hereby agrees to reduce the request for compensation in the Third Application by $85.20 (.6 * $142.00, Ms. Accurso's reduced hourly rate).

### d.  Time Related to Harris' Fee Motion, Tax Issues, and Other Filings

The Receiver stands by the positions articulated in his various filings during the Compensation Period, including in response to Harris' submissions seeking payment of the Relief Defendants' legal bills. Likewise, the Receiver maintains the necessity of confirming his analysis with respect to the Receivership Estate's tax obligations, including by reviewing the Defendant and/or Relief Defendants' tax returns to confirm the "pass-through" nature of various entities in the Receivership Estate. (*See* Third Application, at 20-22.) The Defendant and Relief Defendants' unwillingness to provide tax returns to the Receiver for review have slowed this confirmation process. This Court should not credit the Responses' criticisms of such efforts as they are wholly unfounded.

## X. Conclusion

For the forgoing reasons and as more fully set forth in the Third Application, the Receiver respectfully requests that this Court grant the Second Application and that the Receiver and Z&Z be awarded an allowance of $39,840.25[5] in professional and paraprofessional fees to Z&Z (subject

---

[5] This amount reflects the $85.20 reduction in fees discussed in Section IX(c), *supra*.

to a 20% holdback), $2,555.00 in professional fees to MSNH, reimbursement of actual and necessary expenses in the amount of $1,155.33; and such other and further relief as this Court deems just and proper.

> By: */s / Stephen M. Kindseth*
> Stephen M. Kindseth (ct14640)
> Christopher H. Blau (ct30120)
> Zeisler & Zeisler, P.C.
> 10 Middle Street, 15th Floor
> Bridgeport, CT  06604
> Telephone: 203-368-4234 X 236
> Facsimile: 203-549-0903
> Email: cblau@zeislaw.com;
> skindseth@zeislaw.com
> His attorneys

**CERTIFICATE OF SERVICE**

    I hereby certify that on December 12, 2019, a copy of the foregoing Reply was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System. Furthermore, a copy of the foregoing was sent via email to the Defendant, Iftikar A. Ahmed, at iftyahmed@icloud.com.

                                                     */ s / Stephen M. Kindseth*
                                                     Stephen M. Kindseth (ct14640)