# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　Plaintiff,<br><br>v.<br><br>IFTIKAR AHMED<br><br>　　　　Defendant, and<br>and<br><br>IFTIKAR ALI AHMED SOLE PROP; I-CUBED DOMAINS, LLC; SHALINI AHMED; SHALINI AHMED 2014 GRANTOR RETAINED ANNUNITY TRUST; DIYA HOLDINGS LLC; DIYA REAL HOLDINGS, LLC; I.I. 1, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; I.I. 2, a minor child, by and through his next friends, IFTIKAR and SHALINI AHMED, his parents; I.I. 3, a minor child, by and through his next friends, IFTIKAR and SHALINI AHMED, his parents<br><br>　　　　Relief Defendants. | Civil Action No.<br>3:15-cv-675-JBA<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>January 17, 2020 |

**NOTICE REGARDING DEFENDANT'S APPARENT FAILURE TO COMPLY WITH APPOINTMENT ORDER RELATIVE TO UNAUTHORIZED ACTIVITY**
<u>**IN FIDELITY X7540 AND FIDELITY X8965**</u>

Jed Horwitt, Esq., in his capacity as Court-appointed receiver of the Receivership Estate[1] (the "Receiver"), through his undersigned counsel, respectfully provides this notice (the "Notice") to alert this Court and all other parties of an apparent failure by the Defendant to comply with the terms of the Appointment Order, specifically with respect to certain unauthorized activity in Fidelity x7540 (SEC No. 75) and Fidelity x8965 (SEC No. 74, and with Fidelity x7540, the

---

[1] Unless expressly defined otherwise, the definitions of terms set forth in the Report of Receiver [Doc. No. 1135] (the "Report") are incorporated herein by reference.

"Accounts"), which occurred on September 9, 2019.

## I.     Background

The Accounts are Receivership Assets and are subject to the Asset Freeze. As reported in the Receiver's Notice Regarding Unauthorized Activity in Fidelity x7540 and Fidelity x8965 [Doc. No. 1281] (the "Initial Notice"), the Receiver became aware of certain unauthorized trades in the Accounts. Specifically, on September 9, 2019, 6,000 units of Plains All American Pipeline, L.P. ("PAA") were sold from Fidelity x7540 (the "x7540 Trade") and 6,000 units of PAA were sold from Fidelity x8965 (the "x8965 Trade" and, together with the x7540 Trade, the "Trades") all with execution prices of approximately $21.24. (*See* Fidelity Transaction Confirmations, attached hereto as Exhibit A.)  Subsequently, the Receiver confirmed that the proceeds from the Trades remained in the Accounts and further confirmed with Fidelity that no further trades could be executed in the Accounts absent further order by this Court.

As this Court issued no order permitting the Trades to take place, the Trades constitute a violation of the Asset Freeze and the Appointment Order, which provides that only "[i]f subsequently ordered by this Court… [will] the Receiver will be authorized to[, *inter alia*,] transfer clear title to… all… ownership interests in the Receivership Estate." (Appointment Order, at 14.)

As stated in the Initial Notice, upon learning of the Trades the Receiver commenced an investigation to discover who, if anyone,[2] intentionally violated the Asset Freeze and Appointment Order by causing the Trades to take place. The Receiver now respectfully submits the following summary of the Receiver's investigation.

---

[2] At the outset of the investigation, the Receiver contemplated a potential explanation for the Trades that did not involve an individual's willful violation of the Asset Freeze and Appointment Order, such as a forgotten but then executed contingent trade order or similar mechanism.

## II.     Receiver's Investigation

### A.  Potential for an Automated Trade.

In an effort to conserve Receivership Estate resources by minimizing the length and scope of the investigation, the Receiver first sought to confirm that the Trades were not simply the result of a forgotten or otherwise dormant contingent order or some other type of automated trade mechanism. However, Fidelity representatives confirmed to the Receiver's counsel that "the [Trades] were placed online by the customer." (Morse/Blau Email of September 11, 2019, attached hereto as Exhibit B.) This statement, and further discussions with Fidelity's representatives, ruled out the possibility that an automated mechanism caused the Trades. Thus, the Receiver had no option but to move forward with a more detailed investigation to determine the identity of the individual(s) who caused the Trades to execute.

### B.  Timing of the Trades.

Based on the relevant Fidelity Transaction Confirmations (Exhibit A) as well as the order execution alert that Mrs. Ahmed provided (Knag/Blau Email of September 11, 2019, attached hereto as Exhibit C), the Receiver concluded that the Trades occurred at 12:22 pm Eastern Time on September 9, 2019. The Relief Defendants concurred with the Receiver's analysis concerning the timing of the trades, as counsel to the Relief Defendants wrote that "[i]t appears that the [Accounts] were accessed by someone in Seattle at 12:20pm ET and the [Trades were] made at 12:22pm ET on that same day." (Knag/Blau Email of September 12, 2019, attached hereto as Exhibit D.) Therefore, the Receiver's investigation focused on who accessed the Accounts at approximately 12:20 pm Eastern Time on September 9, 2019.

C.  Information Collected from Defendant and Relief Defendants.

At the outset of his investigation, the Receiver first looked to those persons with knowledge of and access to the Accounts. The Fidelity x7540 account is in the name of Shalini A. Ahmed while the Fidelity x8965 account is in the name of the Shalini A. Ahmed 2014 Grantor Retained Annuity Trust. Mrs. Ahmed provided notice of the Trades, through counsel, to the Receiver. (Exhibit C.) From the language of Mrs. Ahmed's notice to the Receiver, specifically her desire for the Receiver to "figure out what is going on at Fidelity," it appeared that Mrs. Ahmed had asserted that she had no further information as to who executed the Trades. (*Id*; *see also* Exhibit D ("[Mrs. Ahmed] has not authorized anyone in Seattle to access the account").)

Meanwhile, following an inquiry by the Receiver's counsel seeking "any information… concerning [the Trades]," the Defendant stated that he "did not execute or authorize [the Trades], and [he] was not in any manner involved" in the same. (IAA/Blau Email of September 12, 2019, attached hereto as Exhibit E.)  The Defendant further advised that he "access[es] the [Fidelity x7540] account online… from India on a daily basis…" to track the performance of frozen Receivership Assets. (*Id*.)

Thus, given the representations of the Defendant and Mrs. Ahmed that neither had involvement in the Trades, the Receiver sought more information from other sources to determine the identity of the individual(s) who caused the Trades to occur.

D.  Subpoenas of Technology Companies.

Based on Fidelity's statement that the Trades were "placed online" (Exhibit B), the Receiver analyzed the internet protocol ("IP") address that was used to log into the Accounts through Fidelity's website shortly before the Trades occurred because IP addresses can provide an internet user's approximate location. The preliminary information provided by Fidelity, which was later confirmed in Fidelity's subpoena compliance discussed in greater detail below, revealed that

4

an individual logged in to Fidelity's website at 12:20:39 pm Eastern Time on September 9, 2019, (the "Subject Time") from the IP address 199.187.211.223 (the "'223 IP"). (Fidelity Log of IP Addresses, attached hereto as Exhibit F.)

Using a publicly available IP address lookup service, the Receiver determined that the '223 IP is located in Seattle, Washington. This same lookup service revealed that the '223 IP belongs to an entity named Total Server Solutions L.L.C. ("TSS"), a limited liability company registered in Georgia. The Receiver thus issued a subpoena to TSS (the "TSS Subpoena") seeking, *inter alia*, any information it had concerning the identity of the individual who used the '223 IP at the Subject Time. In response to the TSS Subpoena, representatives of TSS advised that the '223 IP is used by TSS' client Avast Software s.r.o. ("Avast"), a Czech technology company. (Morris/Blau Email of October 4, 2019, attached hereto as Exhibit G; TSS Subpoena Compliance, attached hereto as Exhibit H.) TSS had no further information that would be of assistance in the Receiver's investigation.

The Receiver's attention then turned to Avast, which offers a virtual private network ("VPN") service that is advertised as being able to "[h]ide your activities from your Internet provider, advertisers, employers, and more." (Avast SecureLine VPN | Get Lightning-Fast & Secure VPN, Avast.com (2020), https://www.avast.com/en-us/secureline-vpn (last visited Jan 17, 2020).) The Receiver then issued a subpoena to Avast (the "Avast Subpoena"), again seeking information concerning the identity of the individual who used the '223 IP at the Subject Time. Following preliminary discussions with representatives of Avast in the United Kingdom concerning the nature of the Receiver's inquiry, counsel to the Receiver was advised that Avast does not maintain records for a long enough time period to provide any material information to the Receiver. Avast's counsel subsequently confirmed that no records existed via letter to the Receiver's counsel. (Merryman Letter of November 12, 2019, attached hereto as Exhibit I.)

While the Avast Subpoena did not yield materially helpful information due primarily to the nature of Avast's document retention policies, the Receiver's counsel downloaded Avast's free VPN software to in an effort to confirm that Avast used any of the Seattle-based, TSS-owned IPs for its VPN services. The Receiver's counsel connected to the Internet through Avast's VPN service and Avast automatically assigned the IP address 199.187.211.203 (the "'203 IP"), which would be the IP address that would be publicly viewable by third party websites. (Screenshot from Receiver's Counsel's Computer, attached hereto as Exhibit J.) Avast's VPN software further confirmed that the Receiver's counsel's "location now appears to others as: Seattle, USA" upon activating the VPN. (*Id.*) Notably, the IP address log that Fidelity provided to the Receiver (Exhibit F) also contains the '203 IP, indicating that someone using the '203 IP logged in to the Accounts on September 10, 2019, at 10:54:01 pm Eastern Time. This test also confirmed that Avast uses some of the Seattle-based, TSS-owned IPs for its VPN service.

Ultimately, based on subpoenas served on TSS and Avast, the Receiver was unable to confirm the identity or final location of the individual who used the '223 IP to log in to Fidelity's website and execute the Trades due in large part to Avast's temporally limited document retention policy. However, pursuant to the Receiver's counsel's independent testing of Avast's VPN software combined with the access logs provided by Fidelity, the Receiver is confident that (a) the individual who logged in to Fidelity's website to execute the Trades used Avast's VPN services (or some affiliate or subsidiary of Avast that utilizes the same servers and IP addresses) and therefore (b) that individual was attempting to conceal their location and was not physically located in Seattle, Washington when the Trades were executed.

E.  Subpoenas of Financial Services Companies.

In connection with his investigation, the Receiver also issued subpoenas to financial services companies, including Fidelity and Northern Trust, that hold Receivership Assets in an

effort to collect further information concerning the identity of the person who used the '223 IP to access Fidelity's website and execute the Trades.

Pursuant to a subpoena that the Receiver issued to Fidelity (the "Fidelity Subpoena"), Fidelity provided more detailed IP logs showing (a) the date a user accessed the Accounts through Fidelity's website; (b) the time the user accessed the Accounts on Fidelity's website; (c) the IP address the user utilized to access the Accounts on Fidelity's website; (d) the Social Security Number of the primary account holder (which has been redacted); (e) the cookie placed on the user's browser (called a "TID"); and (f) the operating system and browser version information for the user's computer. (Fidelity Subpoena Compliance (the "Fidelity Compliance"), attached hereto as Exhibit K.)[3]

Of particular importance to the Receiver's investigation is row 113 of the Fidelity Compliance spreadsheet, which is the log entry corresponding to the time and date when the Trades were placed and reflects the '223 IP referenced above. Importantly, the browser cookie (or TID) value at row 113 matches every other log entry with the exception of one (row 127, discussed below). Indeed, row 113's browser cookie value matches rows 114-117 (which reflect connections from other Seattle-based, TSS-owned IP address including the '203 IP that Avast subsequently assigned to the Receiver's counsel during testing) as well as rows reflecting connections from India-based IP addresses (such as rows 99-100, 101-110, and 111-112 for example). The same is true for the operating system and browser version information – regardless of IP address, each log entry is either identical or shows an orderly series of software upgrades with the exception of row 127.[4] Based on the Receiver's research, the matching browser cookie and operating

---

[3] While the Fidelity Compliance contains a "Highly Confidential" notation, Fidelity has advised the Receiver's counsel that it has no objection to the Receiver filing the document on the public docket.
[4] Notably, these operating system and browser version numbers echo the logs the Receiver collected from Northern Trust, suggesting that the person who accessed the Accounts at Fidelity at a minimum used the exact same operating system and browser version as the individual who accessed accounts at Northern

system/browser version values indicate that the same person who logged in from the '223 IP to execute the Trades also logged in from other, India-based IP addresses.

The information contained in row 127 of the Fidelity Compliance confirms this conclusion. Based on publicly-available IP address lookup services, the IP address at row 127 is an Optimum Online IP address located in Stamford, Connecticut. The browser cookie value at row 127 is distinct from every other browser cookie value in the Fidelity Compliance. Similarly, the operating system and browser version at row 127 is different from every other entry in the Fidelity Compliance. Thus, on balance, it appears that row 127 reflects a distinct individual who accessed the Accounts at Fidelity from an IP address located in Connecticut.

### III.     Receiver's Conclusion

Taken together, the evidence the Receiver collected during his investigation indicates that the Defendant accessed the Accounts on September 9, 2019, from the '223 IP using an Avast (or Avast-affiliated) VPN service and executed the Trades. The Defendant himself acknowledged that he "access[es] the [Fidelity x7540] account online… from India on a daily basis…" to track the performance of frozen Receivership Assets. (Exhibit E.) The Fidelity Compliance, which reflects many logins from India-based IP addresses, confirms the Defendant's statement. Crucially, the browser cookies and operating system/browser versions for the Defendant's logins from India precisely match the browser cookie and operating system/browser version values for the logins from the Seattle-based IP addresses, including row 113 that has the '223 IP and corresponds to the time when the Trades were executed.

### IV.     Defendant's Apparent Noncompliance with the Appointment Order

The Appointment Order mandates that the Receiver notify this Court of any "apparent failure of any person or entity to comply in any way with the terms" of the Appointment Order.

---

Trust.

(Appointment Order, at 13.)

The Appointment Order further directs the Receiver to "control the operation of the Receivership Estate," which includes the Accounts. (Appointment Order, at 6.) Further, "[t]he Defendant… shall have no authority with respect to the Receivership Estate's assets…" and, instead, "[t]he Receiver shall have all powers… possessed by the Defendant… with regard to the assets of the Receivership Estate…." (*Id.*) Moreover, page 12 the Appointment Order provides:

> The Defendant… and all persons receiving notice of [the Appointment] Order… are hereby restrained and enjoined from directly or indirectly taking any action or causing any action to be taken, without the express written agreement of the Receiver, which would: [a] Interfere with the Receiver's efforts to take possession, custody or control of, or to manage, any assets of the Receivership Estate; [or] [b] Hinder, obstruct or otherwise interfere with the Receiver in the performance of his duties….

Furthermore, as noted above, the Appointment Order provides that even the Receiver needs permission from this Court to "transfer clear title to" an "ownership interest[] in the Receivership Estate," which is precisely what occurred when the Trades effectuated the transfer of title to the PAA shares to the buyer(s) of those securities. (Appointment Order, at 14.)

The Receiver respectfully submits that, based on his investigation into the Trades and the conclusions he draws therefrom, the Defendant's conduct in executing the Trades is an "apparent failure" of the Defendant to comply with Appointment Order. Specifically, the Defendant exercised authority over certain Receivership Assets, interfered with the Receiver's management thereof, and transferred clear title to certain Receivership Assets to new person(s) without permission from this Court. The Receiver therefore provides this notice to the Court of the Defendant's apparent failure to comply with the terms of the Appointment Order.

The Receiver has confirmed, in reliance upon representations by Fidelity, that (a) the proceeds from the Trades remain in the Accounts and (b) no further trades in the Accounts are

9

possible. The Receiver further believes and submits to this Court that he has taken all reasonable and appropriate steps to secure all of the other Receivership Assets. Considering that this is only the most recent in a series of apparent violations of the Asset Freeze and/or Appointment Order by the Defendant,[5] and its flagrant and cavalier nature, the Receiver is extremely concerned that further attempts to affect the Receivership Assets—in violation of the Asset Freeze and Appointment Order—will be made in the future. The Receiver is contemplating seeking appropriate relief from this Court, including, but not limited to, by filing a motion for contempt. The Receiver is cognizant, however, of the limitations upon the relief this Court may implement given the Defendant's presence outside of the jurisdiction of the United States of America. The Receiver makes these points for the benefit of all parties-in-interest but, also, to this Court, in particular, to solicit any guidance this Court deems appropriate to provide.

Upon request, the Receiver or his counsel will attend any hearings scheduled by the Court on this matter and provide any relevant information and assistance that the Court may request in addressing the Trades or otherwise.

Respectfully submitted,
JED HORWITT, ESQ., RECEIVER

 /s/ Christopher H. Blau
Stephen M. Kindseth (ct14640)
Christopher H. Blau (ct30120)
Zeisler & Zeisler, P.C.
10 Middle Street, 15th Floor
Bridgeport, CT  06604
Telephone: 203-368-4234 X 236
Facsimile: 203-549-0903
Email: cblau@zeislaw.com;
skindseth@zeislaw.com
*Counsel to the Receiver*

---

[5] *See* Notice Regarding Defendant's Apparent Failure to Comply with the Appointment Order [Doc. No. 1376]; Emails [Doc. No. 628-8].

**CERTIFICATE OF SERVICE**

I hereby certify that on January 17, 2020, a copy of the foregoing Notice was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System. Furthermore, a copy of the foregoing was sent via email to the Defendant, Iftikar A. Ahmed, at iftyahmed@icloud.com.

          /s/ *Christopher H. Blau*
          Christopher H. Blau (ct30120)