UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

_____

|  |  |  |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) |  |
| Plaintiff, | ) ) ) |  |
| v. | ) ) ) | Civil Action No. 3:15cv675 (JBA) |
| IFTIKAR AHMED, | ) ) ) |  |
| Defendant, and | ) ) ) |  |
| IFTIKAR ALI AHMED SOLE PROP; I-CUBED DOMAINS, LLC; SHALINI AHMED; SHALINI AHMED 2014 GRANTOR RETAINED ANNUITY TRUST; DIYA HOLDINGS LLC; DIYA REAL HOLDINGS, LLC; I.I. 1, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; I.I. 2, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; and I.I. 3, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents, | ) ) ) ) ) ) ) ) ) ) ) ) ) |  |
| Relief Defendants. | ) ) ) |  |

_____

**PLAINTIFF UNITED STATES SECURITIES AND EXCHANGE COMMISSION'S RESPONSE TO THE RECEIVER'S NOTICE REGARDING DEFENDANT'S APPARENT FAILURE TO COMPLY WITH APPOINTMENT ORDER RELATIVE TO <u>UNAUTHORIZED ACTIVITY IN FIDELITY X7540 AND FIDELITY X8965</u>**

Plaintiff United States Securities and Exchange Commission ("SEC") files this response to the Receiver's Notice [Doc. # 1412] Regarding Defendant's Apparent Failure to Comply with the Appointment Order ("Notice"), as called for [Doc. # 1414] by this Court. As outlined herein, Defendant's misconduct in (yet again) attempting to access frozen assets underscores that, despite the good and prudent work of the Receiver, the Judgment in this case will not be truly secured until *all* of Defendant's access to assets is removed. Therefore, the Court should

immediately order the liquidation of assets sufficient to satisfy the Judgment and place those proceeds entirely out of the reach of Defendant and into a Court Registry Investment System (CRIS) account controlled by this Court. The Court should then lift the asset freeze and allow whatever remaining disputes that exist be played out before the appellate court.

## INTRODUCTION

Defendant's most recent attempt to illicitly access frozen assets requires action to safeguard those assets, secure the SEC's judgment, and protect Defendant's victims. While a fugitive, and after this Court found that he defrauded his victims out of approximately $67 million over the span of a decade through calculated and continuous fraudulent conduct, Defendant attempted to use a Virtual Private Network ("VPN" or "Anonymizer") to furtively obtain frozen assets while simultaneously urging this Court to stay liquidating those very assets to satisfy the SEC's judgment. Or, put another way, Defendant is continuing his efforts to obtain the proceeds of his fraud all while urging this Court to preclude the SEC and the Receiver from definitively removing those assets from Defendant's reach and safely placing them into a CRIS account to ultimately be used to compensate his victims. This was not Defendant's first attempt to acquire frozen assets in violation of Orders of this Court. It will not be his last.

Defendant has proven that he will not abide by orders from this (or any other) Court, nor will Defendant ever respect the laws of the United States. Defendant was able to escape criminal prosecution by fleeing the United States, which drastically curtails this and other courts' ability to punish Defendant for past criminalities or prevent him from further misconduct. However, the Court can – and should – take all steps within its power to protect the Judgment entered in this case by placing assets needed to satisfy that Judgment beyond Defendant's reach. The current asset freeze – which has assets remaining in accounts that at one point belonged to the Defendant

2

and to which he still has some titular relationship – depends on a multitude of third parties who at any moment can fall victim to Defendant's quest to grab monies from the safety of India. While the SEC has no doubt that these third parties are acting in good faith, as this latest episode demonstrates, mistakes can happen. Defendant will undoubtedly continue to try to exploit any such mistakes. And if Defendant is successful, there is no question that he will move those assets beyond this Courts reach — just as he has moved himself.

The Court has the ability to eliminate this very real risk. Whether or not the Court simply allows the SEC to collect on its judgment, recognizes the asset freeze cannot fully secure the frozen assets in light of Defendant's actions, finds that Defendant's unclean hands should not allow him to delay the liquidation of assets, or sanctions Defendant for his continued misconduct, the Court should immediately order the Receiver to liquidate assets and shield those assets from Defendant by placing them into a CRIS account overseen by this Court. Additionally, the Court should order Defendant to return to the United States for a criminal contempt hearing.

## BACKGROUND

In 2004, Defendant Iftikar Ahmed joined Oak Investment Partners ("Oak") and immediately began diverting monies from funds he advised into bank accounts he controlled. *See* Rul. on Parties' Summ. J. Mots. [Doc. # 835] at 4. For the next 10 years, Defendant systematically used fraudulent and deceptive means to divert more than $67 million from funds he advised into his personal bank accounts, before funneling much of his ill-gotten gains into assets and accounts in the name of his wife in order to conceal his fraud and attempt to protect the assets from confiscation. *Id.* at 6-23. Defendant's misconduct was as brazen as it was calculated, and included, among other things, opening bank accounts in the name of Oak and its

3

portfolio companies, manufacturing documents, and, for more than a decade, making perpetually false statements to those that had placed their trust in him. *Id.* As discussed more fully below, even after his fraud was exposed, his assets frozen, and a judgment entered against him, Defendant has continued his campaign to illicitly access the assets he stole.

Prior to uncovering the fraud at issue in this case, on April 2, 2015, the SEC filed a civil complaint alleging Defendant violated insider trading laws and profited by more than $1.1 million. *SEC v. Kanodia, et al.*, No. 1:15-cv-13042-ADB (D. Mass. filed July 9, 2015) (ECF # 1 at ¶ 4). That same day, Defendant was arrested and criminally charged with insider trading. *United States v. Kanodia, et al.*, No. 1:15-cr-10131 (D. Mass. Apr. 1, 2015). To secure his release, Defendant specifically represented to the Hon. William I. Garfinkel that Defendant would "surrender any passport" to the clerk or the United States Attorney's Office, and that he would "abide by" the travel restrictions placed on him, which restricted his travel to Connecticut, Massachusetts, and New York. *See United States v. Ahmed*, 3:15-mj-52-WIG (D. Conn. Apr. 2, 2015), Order Setting Conditions of Release [ECF # 8] at ¶¶ 7(d), 7(f). Almost immediately after Defendant was released from custody, he and his wife began removing Defendant's name from the few assets in which he still held an interest on paper, including the two Park Avenue condominiums that were purchased for a combined $18.3 million in cash. *See* SEC's Mem. in Supp. of Mot. for Remedies and J. [Doc. # 887] at 3-4.

On May 6, 2015, the SEC initiated this case. Fearing that Defendant would dissipate his assets once he learned that his fraud had been uncovered, the SEC filed [Doc. # 2] an emergency motion for an *ex parte* temporary restraining order. The Court granted [Doc. # 9] this request on May 7 (the "Asset Freeze Order"), and the SEC began notifying banks that evening. Indicative of Defendant's future actions, the very next morning, Ms. Ahmed entered a Fidelity Investments

branch and at 9:16 a.m. Eastern and attempted to wire $250,000 to India for purported "medical expenses" of Defendant's mother. *See* SEC's Mem. in Supp. of Mot. for Remedies and J. [Doc. # 887] at 3-4.

Less than two weeks later, on May 16, 2015, Defendant signed a stipulation [Doc. # 21], approved [Doc. # 22] by the Court, providing that all assets held by or for him, directly or indirectly, would remain frozen until the Court ruled on the SEC's preliminary injunction motion. However, immediately after entering into this stipulation, Defendant fled to India using his Indian passport in violation of the court orders that restricted his travel and required him to surrender all passports. Defendant then immediately began violating this Court's asset freeze order and the parties' stipulation by attempting to quickly and furtively obtain frozen assets. *See* Doc. # 628-8. When these violations were uncovered, Defendant responded with more misrepresentations to this Court claiming he did not flee to India and that he had not been informed about the asset freeze order. *See, e.g.,* Doc. # 666 at 7-8.

Following several years of litigation – during which time Defendant remained a fugitive and engaged in continual abusive behavior – on March 29, 2018, the Court granted [Doc. #835] the SEC's Motion for Partial Summary Judgment. In so doing, the Court recognized there was no genuine issue as to any material fact in light of the uncontroverted evidence that Defendant orchestrated a largescale fraud over the span of a decade that defrauded the funds he was trusted to advise out of approximately $67 million. The Court recognized the extent and calculation of Defendant's fraud, which included, among other things, repeatedly opening bank accounts "deceptively titled in the name of Oak and its portfolio companies" (*id*. at 4), manufacturing a sales and purchase agreement to reflect a purchase price of $20 million instead of the actual $2 million so he could defraud his victims out of the additional $18 million (*id*. at 7-8), engaging in

"deceptive conduct by misrepresenting Company C's financial performance and concealing and misrepresenting his ownership of Company C shares, while he recommended and advised Oak Fund XIII to make two separate investments in Company C" (*id*. at 8), and "misrepresenting the purchase price of shares and fabricating invoices for purported expenses" (*id*. at 30).

The Court subsequently granted [Doc. # 955] the SEC's Motion for Remedies and Judgment and directed the SEC to file a proposed judgment. Just as Defendant had done throughout this litigation to his victims, the SEC, and any third-party who had the unfortunate cause to become involved in some aspect of this case, Defendant responded by attacking the Court with facially absurd allegations about its impartiality. *See* Doc. ## 961; 973.

Immediately after Judgment was entered, and recognizing that Defendant could not be trusted to play a role in the liquidation necessary to satisfy the Judgment, the SEC requested that a receiver be appointed to assist with the liquidation of frozen assets. In addition, the SEC argued that "regardless of liquidation, a receiver should be appointed to immediately value and safeguard the frozen assets." Doc. # 1059 at 3. Tellingly, Defendant resisted the appointment of a Receiver except for the limited purpose of valuing certain assets, arguing that neither the SEC nor Oak would be "prejudiced or negatively impacted by leaving the cash in the existing accounts as ALL assets/accounts will remain frozen as per the Court order and they remain available for fulfilling any final judgment following appeals." Doc. # 1057 at 38 n. 53.

On December 20, 2018, the Court appointed [Doc. # 1070] the Receiver and explicitly placed control of the frozen assets with the Receiver (Doc. # 1070 at 6), provided Defendant with no authority over any asset (*id*.), forbid Defendant from "interefer[ing] with the Receiver's efforts to…manage [ ] assets of the Receivership Estate," and specifically prohibited Defendant

from "disposing, transferring, exchanging…any property of the Receivership Estate." *Id*. at 12 ("Receivership Order").[1]

Following the Receiver's appointment, Defendant continued to resist the liquidation of assets, repeatedly claiming that those assets were entirely safe and there was no risk to the SEC eventually securing its full judgment. For example, on June 11, 2019, Defendant filed [Doc. # 1187] a motion to stay the proceedings (including the liquidation of assets) following the petition for writ of certiorari filed in *Charles Liu, et al., v. SEC*, arguing that "no prejudice w[ould] be caused to any party by a grant of stay as the asset freeze is in place as the equivalent of a supersedeas bond, securing the judgment pending Second Circuit appeal…" *Id*. at 1. The Court denied [Doc. # 1267] his request finding the basis for the requested stay was "too speculative...to justify staying these proceedings given the risks inherent in delaying the liquidation of assets." Doc. # 1267 at 3.

But despite Defendant's assurances that the frozen assets were secure, he himself was taking illicit steps to access them. As outlined in the Receiver's Notice (and below), on September 9, 2019, Defendant logged into two Fidelity accounts using a VPN or "anonymizer" to conceal his IP address, and sold 12,000 units of certain securities that are indisputably both frozen and within the ambit of the Receivership Estate. Though Defendant was successful in liquidating the assets, the SEC understands that he was unable to withdraw the money because "the account [was] restricted from all withdrawals." Doc. # 1412-2.

---

[1] Defendant's past, present, and future fraudulent conduct are what necessitated the Receiver and therefore the conduct outlined herein will also be relevant to the Court's determination of "whether the cost of the receivership should count against the amount of the judgment against Defendant." Doc. # 1415 at 8.

On September 24, 2019, following an inquiry by the Receiver, Defendant denied having any knowledge of the trades, categorically denied that he was involved "in any manner", and claimed to have been "fast asleep" when the trades were made. Doc. # 1412-5. Notably, although Ms. Ahmed also denied having knowledge of who executed the trades (*see* Doc. # 1412-4), her credit card records reflect that she paid for services provided by "Avast," which is the same VPN provider Defendant used to execute the trades and conceal his IP address. *Compare* **Exhibit A** (charges for Avast.com) *with* Notice at 5 (Receiver obtaining evidence that the 223 IP is used by Avast Software [ ] a Czech technology company" that "offers a virtual private network ("VPN") service that is advertised as being able to '[h]ide your activities from your Internet provider, advertisers, employers, and more.'").

Just a few weeks after illegally liquidating assets in the Fidelity account, Defendant again attempted to improperly procure assets. On November 1, 2019, Defendant (purporting to be Jaideep Amritraj, Esq.) attempted to effectuate a change in title with respect to 1820 County Route 7 in Ancram, New York (the "1820 Property"), which is within the Receivership Estate, in exchange for $10,000. *See* Doc. # 1376-1. After Defendant's misconduct came to light (*see* Doc. # 1376), he denied the conduct, claiming to "no longer ha[ve] access to any of his email accounts." Doc. # 1377 at 1. However, Defendant had used the very same email account to harangue the Receiver just days afterwards (*see* Doc. # 1377-2), and perplexingly he used the same email to serve the parties and the Court with his filing where he claimed to not be able to access the email. (**Exhibit B**).

On November 2, 2019, after effectuating the trades in the Fidelity accounts and then denying his involvement, and one day after sending an email requesting $10,000 in exchange for effectuating a change in title with respect to the 1820 Property, Defendant filed [Doc. # 1308]

8

another motion to stay the proceedings representing to this Court that "no prejudice will be caused to any party by a grant of stay as the asset freeze is in place as the equivalent of a *supersedeas* bond…" Doc. # 1308 at 3. *See also id.* at 4-5 ("Granting a stay in this case pending Supreme Court decision on the highly relevant issue of 'disgorgement' ensures that the frozen assets remain maximized and expenses minimized without any prejudice to any party."). Put another way, at the same time Defendant was attempting to illegally access assets from accounts and property he once controlled and still has a titular relationship with, he was telling this Court that those assets were safe and secure and did not need to be removed from those accounts and placed entirely beyond his reach.

On November 26, 2019, the Court "[i]n weighing the[] competing risks. . . determine[d] that the balance of interests" at that point in time "weigh[ed] in favor of staying the liquidation process in this case until the Supreme Court issues its decision in *Liu v. SEC.*" Doc. # 1346 at 7.

**ARGUMENT**

A.  Defendant Again Violated an Order of the Court.

Defendant's liquidation of the trades in the Fidelity accounts violated both the Asset Freeze Order and the Receivership Order. Moreover, this misconduct was willful and calculated.

First, there can be no credible dispute that Defendant effectuated the trades at issue. As this Court previously recognized, "[a]t some point in May [2015], prior to the preliminary injunction hearing, Defendant fled from the United States to his native country – India – where he remains to this day." Doc. # 835 at 5. Moreover, Defendant admitted to accessing the Fidelity accounts from India on a daily basis, logins from India-based IP addresses corroborate this statement, and browser cookies prove that the computer repeatedly logging into the accounts

from India is the same computer that effectuated the trades using an Anonymizer to conceal the actual IP address. *See* Doc. ## 1412-5; 1412-11.

Second, Defendant's trades violated both the Asset Freeze Order and the Receivership Order. The Asset Freeze Order specifically ordered Defendant's assets "frozen" and prohibited any "disposition" or "transfer" (Doc. # 113 at 20), and Defendant was well aware that any such trades would require the Court's permission, which he previously sought under similar circumstances. *See, e.g.*, Doc. ## 389 (seeking permission to sell certain equities); 835 (seeking permission to invest in exchange-traded funds). Similarly, Defendant's trades violated the Receivership Order, which explicitly ceded control of the frozen assets to the Receiver (Doc. # 1070 at 6), provided Defendant with no authority over any asset (*id*.), and specifically prohibited Defendant from "interefer[ing] with the Receiver's efforts to…manage [ ] assets of the Receivership Estate" and from "disposing, transferring, exchanging…any property of the Receivership Estate." *Id*. at 12. In fact, Defendant's subsequent denials of knowing anything about the trading also violated the Receivership Order's command that Defendant (and Relief Defendants) "respond promptly and truthfully to all requests for information…from the Receiver" and "cooperate with and assist the Receiver in the performance of his duties." Doc. # 1070 at 10, 13.

Third, Defendant's actions were both willful and calculated. As an initial matter, Defendant was keenly aware of both the Asset Freeze Order and Receivership Order prior to the at-issue trades, as he has specifically (and repeatedly) referenced both orders in his multitude of filings. *See, e.g.*, Docs. ## 933 (moving for contempt for violation of, among other things, Asset Freeze Order); 1139 (moving for contempt for violation of Receivership Order); 1239 at 2-6

(citing to the "clear and direct instructions" in, and quoting extensively from, Receivership Order).

Moreover, this was not some accident on the part of Defendant. Defendant used a VPN service (apparently purchased by his wife) to conceal his IP address, logged-in to Fidelity,[2] and effectuated the trades apparently believing he could liquidate assets and withdraw money without being caught. Though, he was successful in effectuating the trades (due to an oversight at Fidelity), the SEC understands that Fidelity's controls prevented Defendant from withdrawing the funds because "the account [was] restricted from all withdrawals." Doc. # 1412-2. Even so, when confronted about the trades, Defendant "categorically state[d] that [he] ***did not execute or authorize, and [he] was not in any manner involved with the trade…"*** Doc. # 1412-5 (emphasis in original). Notably, this is only the latest attempt to obtain monies in violation of Court Orders followed by false denials. *See, e.g.*, Doc. ## 628-8 (attempting to access frozen monies after fleeing the United States); 1376 (attempting to obtain monies in exchange for effectuating a change in title of a frozen asset).

    B. <u>Defendant will again engage in similar misconduct if given the opportunity, which puts the frozen assets and the SEC's Judgment as risk.</u>

Defendant will undoubtedly continue to try to exploit any vulnerability in the asset freeze, which depends on a multitude of third parties who at any moment can fall victim to Defendant's limitless endeavors to obtain frozen monies and move them beyond the Court's reach, just as he has done with himself. If he is successful, his illegal actions could remove enough assets that the SEC's judgment would no longer be secured, and Defendant's victims

---

[2] Notably, these accounts are in the name of Ms. Ahmed, only further confirming that Defendant controls the accounts and only placed the assets into his wife's name in an effort to protect the fruits of his fraud.

would see Defendant once again take money that rightly belongs to them. The Court should take all efforts to prevent this.

First, the Court should lift its stay on liquidating assets so the SEC's judgment can be secured and placed into a CRIS account overseen by this Court pending appeal. The Court previously used its discretionary powers to stay "enforcement of the judgment only as to distribution of assets in satisfaction of the judgment" (Doc. # 1052 at 7), before subsequently finding that "the balance of interests currently weighs in favor or staying the liquidation process in this case until the Supreme Court issues its decision in *Liu v. SEC.*" Doc. # 1346 at 7. Given that the Court's liquidation stay was based on Defendant's arguments that the frozen assets would remain safe and preserved, and that all the while Defendant was simultaneously endeavoring to procure those assets in violation of at least two Court orders, the Court should find the balance has changed and direct the Receiver to begin liquidating assets to satisfy the SEC's judgment.[3]

Put simply, it is now clear that Defendant will continue to disregard orders from this (and any other) Court, just as he has done since his arrest in 2015. It is equally clear that he will continue to engage in fraud and deceit just as he has done for more than a decade. It is therefore fundamentally unfair to both the SEC and Defendant's victims to prohibit the SEC from securing its judgment while Defendant continues to violate Court Orders and endeavors to remove assets from the Court's jurisdiction.  Indeed, the Court ordered stay of liquidating assets – because the Asset Freeze Order and Receivership Order provide a

---

[3] The Court of course has jurisdiction to order such liquidation:  "While, as a general rule, an effective notice of appeal divests the district court of jurisdiction over the matter forming the basis for the appeal, the mere pendency of an appeal does not, in itself, disturb the finality of a judgment. The district court has jurisdiction to act to enforce its judgment so long as the judgment has not been stayed or superseded." *In re Gushlak*, 2012 WL 2564466, at *10 (E.D.N.Y. Jan. 30, 2012) (citing cases) (internal citations and quotations omitted).

certain level of protecting the assets – is analogues to release conditions in a criminal case, which no matter how strict, necessarily depend on the Defendant's good faith compliance. *See, e.g.*, *United States v. Hir*, 517 F.3d 1081, 1093 n.13 (9th Cir. 2008) (recognizing that any set of conditions except detention necessarily would "hinge on [defendant's] good faith compliance"). So too do the protections afford by the Asset Freeze Order and Receivership Order rely on Defendant's compliance with those Orders, which undeniably cannot be counted on.

Second, this Court should recognize that Defendant's continued conduct, combined with his fugitive status, deprives this Court and the SEC (and Defendant's victims) of the assurance that money will be available to satisfy the judgment. As this Court previously recognized, "an 'asset freeze is a provisional  remedy' that serves to preserve the status quo and 'to ensure that, in the event the SEC obtains a judgment,  money will be available  to satisfy that  judgment.'" Asset Freeze Order [Doc. # 113] at 6 (quoting *SEC v. Byers,* No. 08 CIV.7104 (DC), 2009 WL 33434, at *2 (S.D.N.Y. Jan. 7, 2009)). Here, the SEC has obtained a judgment and therefore a provisional remedy is no longer necessary. Furthermore, because Defendant has removed himself from the jurisdiction and refuses to abide by orders of this Court or the laws of the United States, the asset freeze can no longer be said to "ensure…money will be available to satisfy [the SEC's] judgment." *Id.* Indeed, the longer the assets remain in their current accounts, the greater the risk that Defendant's endeavors to acquire frozen assets are successful. Given that the SEC has obtained a judgment, and given that Defendant continues his efforts to attain the fruits of his fraud regardless of the Court's orders commanding him to refrain, the only way to truly ensure

that assets will be available for that judgment is to liquidate assets and place them beyond his reach and into a CRIS account monitored by this Court.

Third, it is inequitable to allow Defendant to benefit from this Court's Order [Doc. # 1346] staying liquidation and continuing the asset freeze – which prevents the SEC from collecting on its judgment – while simultaneously violating the Asset Freeze Order and other orders issued by this Court. "The doctrine of unclean hands closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.,* 324 U.S. 806, 814 (U.S.1945). "[W]hile equity does not demand that its suitors shall have led blameless lives, as to other matters, it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue." *Dunlop-McCullen v. Local 1-S, AFL-CIO-CLC,* 149 F.3d 85, 90 (2d Cir. 1998).

Though the doctrine is typically applied toward a plaintiff, here it is Defendant that has effectively requested that the SEC and Receiver be enjoined from collecting on or liquidating assets because the asset freeze remains in place. *See e.g.*, Doc. # 1308 at 3. Though it was Defendant who sought and obtained this relief after the Court determined [Doc. # 1346] the Asset Freeze Order and Receivership Order would likely preserve the corpus of frozen assets, it is inequitable to grant Defendant this relief while he continually violates both Orders through endeavoring to grab frozen assets and frustrating the Receiver's efforts. These inequities are only compounded were the Court to look at how Defendant (and his wife) are using the Asset Freeze Order as both a sword and a shield, attacking parties who Defendant declares violated the Order while simultaneously declaring the Order shields assets from confiscation or prevents other litigation over his misconduct. *See, e.g.*, Doc. ## 1326 (asking the Court to enjoin enforcement of

14

a default judgment and sanction NMR for allegedly violating the Asset Freeze Order); 1355 (joining Relief Defendants' Motion [Doc. # 1327] requesting the Court find that the Department of Justice violated the Asset Freeze Order by initiating a bond forfeiture proceeding because and enjoining it from forfeiting the assets that served as collateral for Defendant's personal bond to appear).

In sum, the Court should recognize that it is Defendant who is violating the very asset freeze that he argues should remain in place to stave off liquidation and satisfaction of the SEC's judgment. Putting aside Defendant's near constant deceit over the past 15 years, because Defendant removed himself from the jurisdiction the Court is limited in its ability to prevent the Defendant from continuing his illicit endeavors. Thus, the only equitable solution is to allow the liquation of assets and the placement of those assets into a Court monitored CRIS account, which would once and for all put the assets out of Defendant's reach.

Lastly, even were the Court to believe that the asset freeze adequately protects the assets, and/or that liquidation could result in some irreparable harm because some assets "are unique or whose liquidation cannot be reversed" (Ruling on Def.'s Mot. to Stay [Doc. # 1346] at 7), liquidating assets is an appropriate sanction, either as a result of Defendant's contempt or as an exercise of this Court's inherent power. Said another way, even were some harm to occur, it is a consequence of Defendant's own making. Regardless, because Defendant's conduct rises to the level of criminal contempt, the Court should order Defendant to return to the United States for such proceedings.

Because Defendant remains a fugitive,[4] the Court's ability to punish Defendant for his misconduct, and to prevent him from engaging in more of the same, is drastically curtailed. For

___

[4] Defendant's continual claim that he is not a fugitive is meritless. *See, e.g.*, *United States v. Kanodia, et al.*, 1:15-cr-10131-NMG (D. Mass.) (ECF 307 at 4) ("Mr. Ahmed has deliberately flouted his bail

15

example, though Defendant's conduct rises to the level of criminal contempt, such a punishment is a "crime in the ordinary sense" and "criminal penalties may not be imposed on someone who has not been afforded the protections that the Constitution requires of such criminal proceedings." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 826 (1994) (internal quotations omitted). Thus, just as Defendant has prevented his criminal insider trading and fraud prosecutions from moving forward, he has similarly impeded this Court's ability to hold criminal contempt proceedings unless he returns to the United States. Though the SEC has no faith that Defendant will in fact return, the SEC nonetheless specifically requests that this Court order Defendant to return to the United States for a criminal contempt proceeding either in an order to show cause or an arrest warrant. *See* Fed. R. Crim. P. 42

Civil contempt sanctions, however, do not give rise to criminal Constitution requirements because "those penalties [are] designed to compel future compliance with a court order, are considered to be coercive and avoidable through obedience, and thus may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard." *Bagwell*, 512 U.S. at 827. Thus, the purpose of holding a party in civil contempt is typically "to enforce compliance with an order of the court or to compensate for losses or damages." *Powell v. Ward,* 643 F.2d 924, 931 (2d Cir.1981) (internal quotations omitted). *See also Bridgeport Guardians v. Delmonte*, 371 F. Supp. 2d 115, 119 (D. Conn. 2005) ("A civil contempt sanction serves two purposes: compensation for the effects of prior wrongdoing, and coercion of future compliance. The

---

conditions.  He has failed to appear in court, has not reported to a probation officer and is a fugitive.  His refusal to return to Massachusetts has prevented the government from prosecuting him.  Therefore, this Court will allow the government's motion and declare the bail forfeited."); *Empire Blue Cross & Blue Shield v. Finkelstein*, 111 F.3d 278, 281 (2d Cir. 1997) ("A fugitive from justice has been defined as '[a] person who, having committed a crime, flees from [the] jurisdiction of [the] court where [a] crime was committed or departs from his usual place of abode and conceals himself within the district.'") (quoting *Black's Law Dictionary,* 5th ed. (1979)).

16

hallmark of civil contempt is that the defendant must have an opportunity to purge the contempt") (internal citations omitted).

There can be no credible dispute that Defendant's conduct rises to the level of civil contempt. *See, e.g.*, *Bridgeport Guardians v. Delmonte*, 371 F. Supp. 2d 115, 119 (D. Conn. 2005) (recognizing that in determining whether to hold a party in civil contempt, the Second Circuit has established a three prong test: "(1) the order the party allegedly failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the party has not diligently attempted in a reasonable manner to comply") (quoting *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1351 (2d Cir.1989)). Moreover, consistent with *Bagwell*, the Receiver's Notice has notified Defendant of his contemptuous actions and this Court has permitted him to be heard on the issue. *See* Doc. # 1414. Thus, the Court can and should hold Defendant in civil contempt.[5] And given that Defendant remains in India outside the jurisdiction of this Court and that his violations are recurrent, liquidating assets and placing them in a CRIS account is an appropriate mechanism to compel compliance with the Court's Judgment and various orders prohibiting Defendant from attempting to access frozen assets. Put another way, because of Defendant's own actions, the liquidation of assets is one of the few (or only) viable sanctions for his contempt.

Moreover, even were the Court disinclined to hold Defendant in civil contempt (it should not be), the Court has the ability to sanction a party pursuant to its inherent power. *See, e.g.*, *Sakon v. Andreo*, 119 F.3d 109, 113 (2d Cir. 1997) ("Sanctions may be authorized by any of a number of rules or statutory provisions, or may be permissible on the basis of the court's

---

[5] The SEC is able and willing to appear before this Court to introduce evidence of Defendant's contempt and expound on how the records provided by the Receiver prove that Defendant executed the trades at issue.

inherent power."). "When rules alone do not provide courts with sufficient authority to protect their integrity and prevent abuses of the judicial process, the inherent power fills the gap." *Shepherd v. American Broadcasting Companies*, 62 F.3d 1469, 1475 (D.C. Cir. 1995).

Here, Defendant's conduct is unquestionably worthy of sanction. Indeed, putting aside the underlying fraud, it is difficult to fathom how Defendant's conduct could have been worse. His flight to India was literally criminal, his behavior throughout this litigation has been abusive to put it mildly, his consistent attacks on his victims are inexcusable, his repeated violation of Court orders are indefensible, and his dishonesty to this Court has been relentless. The Court should put an end to this conduct, along with the multitude of meritless and frivolous filings that will never cease while the asset freeze remains in place. Put simply, the judgment should become final, the litigation should end, and the parties should move whatever disputes remain to the appellate court.

## CONCLUSION

In sum, whether this Court simply permits the SEC to collect on its judgment, or recognizes that Defendant's continued misconduct cannot assure the frozen assets will be available to satisfy the judgment, or that Defendant's unclear hands should not allow him to prevent the SEC from satisfying its judgment, or finds that liquidation and any resulting irreparable harm is an appropriate sanction for his misconduct, the Court should immediately direct the Receiver to begin his liquidation plan and place the proceeds into a Court monitored CRIS account, removing those assets from Defendant's reach. Additionally, Defendant should be ordered to return to the United States so that a criminal contempt proceeding may take place.

DATED: January 31, 2020.

<div style="margin-left: 50%;">

*s/ Mark L. Williams*
Nicholas P. Heinke
Mark L. Williams
U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294-1961
(303) 844-1071 (Heinke)
(303) 844-1027 (Williams)
HeinkeN@sec.gov
WilliamsML@sec.gov
Attorneys for Plaintiff

</div>

CERTIFICATE OF SERVICE

I certify that on January 31, 2020, a copy of the foregoing document was emailed to

Defendant Iftikar Ahmed at IftyAhmed@icloud.com, and served via ECF upon the following:


MR. PAUL E. KNAG, ESQ.
MS. KRISTEN LUISE ZAEHRINGER, ESQ.
Murtha Cullina, LLP
177 Broad Street, 4th Floor
Stamford, CT 06901
(Counsel for Relief Defendants)

Christopher H. Blau
Stephen M. Kindseth
Zeisler & Zeisler, P.C.
10 Middle Street, 15th Floor
Bridgeport, CT 06604
(Counsel for Receiver, Jed Horwitt, Esq.)

*s/ Mark L. Williams*