UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) )   Civil Action No. 3:15cv675 (JBA) ) |
| IFTIKAR AHMED, | ) ) ) |
| Defendant, and | ) ) ) |
| IFTIKAR ALI AHMED SOLE PROP; I-CUBED DOMAINS, LLC; SHALINI AHMED; SHALINI AHMED 2014 GRANTOR RETAINED ANNUITY TRUST; DIYA HOLDINGS LLC; DIYA REAL HOLDINGS, LLC; I.I. 1, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; I.I. 2, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; and I.I. 3, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents, | ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Relief Defendants. | ) ) |

**PLAINTIFF UNITED STATES SECURITIES AND EXCHANGE COMMISSION'S INDICATION OF POSITION AND SUPPORTING MEMORANDUM REGARDING OFFSETTING RECIEVER'S FEES AGAINST JUDGMENT**

Plaintiff United States Securities and Exchange Commission ("SEC") files this indication of its position on whether the Receiver's fees should be offset against the Judgment entered in this case, as called for [Doc. # 1415] by this Court. The simple answer is no, they should not be. This Court has broad discretion to determine who should pay the costs of a receivership, but the general rule is that costs are taxed against the receivership assets. The Court should follow that rule in this case. Given that the Receiver was only necessary because of Defendant's fraudulent

scheme, that the Receiver remains necessary because of Defendant's continued misconduct (including his attempts to access frozen assets), and that receivership costs have been (and continue to be) driven up by Defendant's frivolous litigation, it would be wholly inequitable to offset the Receiver's fees against the Judgment. In fact, given Defendant's open hostility toward his victims, to allow the Receiver's costs to be subtracted from the Judgment would only incentivize Defendant to further drive up the Receiver's costs by making more frivolous filings and engaging in additional misconduct.  The Court should decline to create this perverse incentive.

## **RELEVANT BACKGROUND**

In 2004, Defendant Iftikar Ahmed joined Oak Investment Partners ("Oak") and immediately began diverting monies from funds he advised into bank accounts he controlled. *See* Rul. on Parties' Summ. J. Mots. [Doc. # 835] at 4. For the next ten years, Defendant systematically used fraudulent and deceptive means to divert more than $67 million from funds he advised into his personal bank accounts, before funneling much of his ill-gotten gains into a multitude of assets and accounts in the name of his wife and children in order to conceal his fraud and attempt to protect the assets from confiscation. *Id.* at 6-23.

Prior to uncovering the fraud at issue in this case, on April 2, 2015, the SEC filed a civil complaint alleging Defendant violated insider trading laws and profited by more than $1.1 million. *SEC v. Kanodia, et al.*, No. 1:15-cv-13042-ADB (D. Mass. filed July 9, 2015) (ECF # 1 at ¶ 4). That same day, Defendant was arrested and criminally charged with insider trading. *United States v. Kanodia, et al.*, No. 1:15-cr-10131 (D. Mass. Apr. 1, 2015). To secure his release, Defendant specifically represented to the Hon. William I. Garfinkel that Defendant would "surrender any passport" to the clerk or the United States Attorney's Office, and that he

would "abide by" the travel restrictions placed on him, which restricted his travel to Connecticut, Massachusetts, and New York. *See United States v. Ahmed*, 3:15-mj-52-WIG (D. Conn. Apr. 2, 2015), Order Setting Conditions of Release [ECF # 8] at ¶¶ 7(d), 7(f). Almost immediately after Defendant was released from custody, he and his wife began removing Defendant's name from the few assets in which he still held an interest on paper, including the two Park Avenue condominiums that were purchased for a combined $18.3 million in cash. *See* SEC's Mem. in Supp. of Mot. for Remedies and J. [Doc. # 887] at 3-4.

On May 6, 2015, the SEC initiated this case. Fearing that Defendant would dissipate his assets once he learned that his fraud had been uncovered, the SEC filed [Doc. # 2] an emergency motion for an *ex parte* temporary restraining order. The Court granted [Doc. # 9] this request on May 7 (the "Asset Freeze Order"), and the SEC began notifying banks that evening. Seemingly foreshadowing Defendant's flight from the United States, the very next morning, Ms. Ahmed entered a Fidelity Investments branch and at 9:16 a.m. Eastern and attempted to wire $250,000 to India for purported "medical expenses" of Defendant's mother. *See* SEC's Mem. in Supp. of Mot. for Remedies and J. [Doc. # 887] at 3-4.

Less than two weeks later, on May 16, 2015, Defendant signed a stipulation [Doc. # 21], approved [Doc. # 22] by the Court, providing that all assets held by or for him, directly or indirectly, would remain frozen until the Court ruled on the SEC's preliminary injunction motion. However, immediately after entering into this stipulation, Defendant fled to India using his Indian passport in violation of the court orders that restricted his travel and required him to surrender all passports. Defendant then immediately began violating this Court's Asset Freeze Order and the parties' stipulation by attempting to quickly and furtively grab frozen assets from the safety of India. *See* Doc. # 628-8. When these violations were uncovered, Defendant

responded with more misrepresentations to this Court claiming he did not flee to India and that he had not been informed about the Asset Freeze Order. *See, e.g.,* Doc. # 666 at 7-8.

In March 2018, this Court granted summary judgment on all of the SEC's claims against Defendant, finding that there was no genuine issue as to any material fact in light of the uncontroverted evidence that Defendant used fraudulent and deceptive means to divert more than $67 million from the venture capital funds that he advised. *See* Doc. # 835. In September 2018, the Court granted the SEC's motion for judgment and remedies, ordering that Defendant was liable for disgorgement of $41,920,639, prejudgment interest on that amount, interest and gains on frozen assets, and a civil penalty of $21 million. *See* Doc. # 955. In seeking this Judgment, the SEC requested a Fair Fund, which would allow monies obtained from the civil penalty to be added to disgorgement to recompense Defendant's victims. *See* Doc. # 888 at 40.[1] The Court entered a Final Judgment against Defendant (and Relief Defendants) in the amount of $64.4 million plus interest and gains on certain frozen assets. *See* Docs. # 982, 1054.

Defendant immediately began to file all manner of pleadings in an attempt to prevent this Judgment from taking effect. For example, Defendant filed a motion to recuse this Court – a motion the Court denied. *See* Doc. # 977. Defendant then immediately filed a notice of appeal of that ruling, and then argued that, because he had filed this notice of appeal prior to the Court entering Final Judgment, the Final Judgment was invalid. *See* Doc. # 991. The Court again denied this procedurally improper tactic aimed at simply delaying this case. *See* Doc. # 1017. Defendant also filed a motion for relief from judgment or, alternatively, to stay the judgment. *See* Doc. # 1052. The Court denied the motion for relief from the judgment, and granted the motion

---

[1] The Court has deferred the issue of creation of a Fair Fund. Transcript of Nov. 28, 2018 hearing ("Tr.") at 11:10-14.

to stay only as to actual distribution of assets in satisfaction of the Judgment. *See* Doc. # 1052. Specifically, the Court ruled that:

> [T]he Court will stay enforcement of the judgment only as to distribution of assets in satisfaction of the judgment. Defendant's assets will remain frozen during the pendency of the appeal, serving as the functional equivalent of a superdedeas bond to ensure that the SEC, should it prevail on appeal, will not be injured by the stay. The process of preparing for any post-appeal distribution of assets to satisfy the judgment, including but not limited to appointment of a receiver or other process for valuing and liquidating frozen assets, the valuation of those assets, and any liquidation of illiquid frozen assets needed to secure the judgment, is not stayed.

*Id.* at 7.

The Court also ruled that "[i]t will likely be necessary to appoint a receiver to hold the currently frozen funds and who will then effectuate a mechanism for distribution of assets to victims …." Doc. # 955 at 30. The Court invited further briefing on, among other things, "the use of a receiver or other process for asset distribution." Doc. # 986 at 3. The SEC argued for the appointment of a receiver, noting, among other things, that it would be inappropriate to allow Defendant to monitor or liquidate assets to satisfy the judgment since "[h]e is a fugitive living outside the United States and has repeatedly sought to mislead this Court, violate the Asset Freeze Order, and harass his victims." Doc. # 1002 at 2. The SEC also made clear that any receivership should be swift and efficient:

> The SEC is not requesting a continuing asset freeze. Rather, as noted above, the SEC is requesting that a receiver be appointed to immediately liquidate assets sufficient to satisfy the judgment ordered and develop a process to return those assets to Defendant's victims. Any remaining assets after satisfaction of the judgment should then be released. As explained below, a continuing asset freeze would only be necessary if Defendant requests (and this Court permits) that the sale and liquidation of assets await conclusion of Defendant's appeal. That is because the amount of money that Defendant will ultimately owe pursuant to the ordered judgment, and the amount of money the frozen assets will return, cannot be known until their liquidation, and may not be sufficient to satisfy the ordered judgment.

*Id.* at 8.

Defendant (and Relief Defendants) opposed not only the appointment of a receiver, but again opposed the valuation or liquidation of assets at all. *See, e.g.*, Doc. # 1010 at 6 (Defendant arguing "… it would be premature to liquidate or distribute *any* asset ….") (emphasis in original); 1008 at 6 (Relief Defendants arguing that "[t]here is … no need to appoint a receiver to liquidate *or value* any assets ….") (emphasis in original). Indeed, Defendant argued that he had "no issue with the asset freeze remaining on all his assets while the appeal(s) is pending," though he was requesting a nominal release for attorneys' fees. *See* Doc. # 1052 at 5. Put another way, the SEC urged a quick and efficient process by which the receiver would value and liquidate only those assets necessary to satisfy the judgment, while Defendant urged that the asset freeze remain in place (requiring the monitoring and maintenance of assets) during the pendency of his appeals.

In November 2018, the Court held a hearing to determine whether to appoint a receiver and, if so, who that receiver should be. All of the prospective receiver candidates provided similar testimony that, absent a contrary direction from the Court, they would seek to liquidate assets subject to market risk as quickly and efficiently as possible in order to secure the judgment entered in this case. *See, e.g.*, Transcript of Nov. 28, 2018 hearing ("Tr.") at 36:2-37:15; 45:22-46:3; 73:18-74:5. At that hearing and afterward, the SEC urged appointment of a receiver, noting, among other things, that a receiver was needed to monitor assets to guard against their rapid depreciation, to ensure that assets such as real estate were properly administered and preserved, to engage in a formal, independent valuation of assets, to determine whether monies should be expended to maintain certain assets, and to develop a plan for the efficient and orderly liquidation of assets to satisfy the judgment. *See, e.g.*, Doc. # 1059 at 3 ("[R]egardless of

liquidation, a receiver should be appointed to immediately value and safeguard the frozen assets."). Not surprisingly, Defendant and Relief Defendants continued to oppose a receiver. During the hearing, Relief Defendants' counsel suggested that, rather than appoint a receiver, it would be appropriate for Defendant and Relief Defendants to liquidate assets – a proposition that the Court noted "ha[d] some appearance of a fox guarding the chicken coop." Tr. at 125. Defendant also opposed the appointment of a receiver and reiterated that he "has never agreed to liquidate or distribute any assets." See Doc. # 1057 at 17-18. Critically, the SEC agreed (and still agrees) with the Court's observation that Defendant managing or liquidating assets is akin to the fox guarding the chicken coop: it is not appropriate for Defendant to oversee, manage, or liquidate assets that will be returned to his victims in light of his extraordinary fraud and vitriolic conduct in this case. See Doc. # 1059 at 4.

On December 20, 2018, the Court appointed Jed Horwitt as receiver in this case. In doing so, the Court found:

> This case involves a substantial collection of currently frozen assets which must be managed, valued, and/or liquidated while appeals are pending, and distributed should the SEC prevail on appeal. The Court recognizes the parties' concerns regarding the potential cost of a receiver and shares their desire to avoid unnecessary or high receivership costs. Nonetheless, given the need to value the frozen assets and avoid over-freezing, to secure the judgment for the SEC, to manage and maximize the value of frozen assets under the guidance of a neutral third party, and to take necessary steps toward effectuating the judgment, the Court will appoint a receiver.

Doc. # 1070 at 5. The Court further ruled that "all costs of the receivership in this case will be paid from among the assets of the Receivership Estate." Id. Defendant appealed this order. Doc. # 1072.

On April 3, 2019, the Receiver filed his report and recommendation "containing his proposal for the liquidation of assets of the Receivership Estate … to continue to secure pending

appeal the judgment entered by this Court ….” Doc. # 1130 at 1-2. The Receiver estimated that the majority of this liquidation could be accomplished by July 1, 2019. *See id.* at 13.[2] The SEC urged adoption of the Receiver's report and recommendation and liquidation of assets sufficient to satisfy the judgment. Doc. # 1181. The SEC specifically noted that, following such liquidation, "there will be no need for an asset freeze, a receiver, or further litigation before this Court. This is especially warranted considering Defendant and Relief Defendants' complaints about the asset freeze [and] complaints about receivership expenses …." *Id.* at 3-4. Defendant, by contrast, objected to the Receiver's report and recommendation, argued that "liquidation is premature," and urged that the Court continue the freeze over all of his assets as a supersedeas bond. *See* Doc. # 1178 at 4 ("As the esteemed Court has frozen all of the Defendant's (and Relief Defendants') assets as a *supersedeas* bond, pending appeal, the SEC is secure in its judgment and any execution of enforcement of judgment is stayed till such time that the asset freeze is in place."). As a result of Defendant's objection, the Receiver's report and recommendation is still pending and the receiver has been required to continue monitoring and managing the entirety of the frozen assets for nearly a year.

      Not only did Defendant object to the swift liquidation of assets (and consequent winding up of the receivership) proposed nearly a year ago, Defendant has taken innumerable actions since that time to increase the costs of the receivership. By the SEC's count, Defendant (and Relief Defendants) have either made motions or taken actions requiring no less than 40 filings by the Receiver. *See, e.g.*, Docs. ## 1141, 1146, 1151, 1156, 1175, 1179, 1195, 1203, 1216, 1217, 1218, 1230, 1237, 1240, 1250, 1253, 1279, 1282, 1294, 1295, 1297, 1300, 1320, 1333, 1340,

---

[2] The Receiver noted that the process of liquidating the Park Avenue condominiums would likely take longer. *See id.* at 13-14.

1358, 1359, 1360, 1369, 1372, 1373, 1376, 1378, 1394, 1398, 1412, 1413, 1455, 1457, 1459, 1464. Given that Defendant continues to bombard this Court with filings (even after explicit deadlines have long passed), this number is expected to further escalate.

Reviewing, addressing, and responding to Defendant's (and Relief Defendants') relentless filings has resulted in significant time and expense by the Receiver. *See, e.g.*, Doc. ## 1249 at 12-13; 1330 at 13-14. The Receiver has also been required, on at least two occasions, to either prevent Defendant from violating the asset freeze and Receivership Order (*see* Doc. # 1376), or take steps to further protect the assets after determining that Defendant engaged in prohibited activity in attempting to snatch frozen assets. *See* Doc. # 1412. These activities, too, required substantial expenditures of time and resources. *See, e.g.*, Doc. # 1330 at 15-16.

In addition to dealing with Defendant's vexatious litigation and illicit actions, the Receiver has taken substantial steps to benefit the Receivership Estate. For example, the Receiver collected detailed information about the existence, location, and value of the Receivership assets, confirmed that all transactions occurring during the asset freeze had court approval, inspected property to ensure it was secure, monitored volatile assets to assess whether there were any significant declines in value, saw to it that insurance premiums were paid, facilitated the transfer of a significant asset held at Aldrich Capital to an interest-bearing account, collected past due electric charges owed on one of the New York condominiums, facilitated needed repairs to this unit, and arranged for significant management of the upstate New York farm, which was falling into disrepair. *See, e.g.*, Docs. ## 1160 at 14-21; 1249 at 19, 24; 1330 at 22, 24.

As contemplated in the Receivership appointment order [Doc. # 1070], the Receiver moved for the payment of fees and expenses incurred on behalf of the receivership estate. *See*

Docs. ## 1160, 1249, 1330. On January 22, 2020, the Court granted the payment of these fees and expenses. Doc. # 1415. In so doing, the Court denied Defendant's objections that the Receiver's fees were "excessive, duplicative, unreasonable, and unjustified" because the Receiver "has not provided any meaningful benefit to the Receivership Estate." *Id.* at 4. The Court further concluded, after reviewing the Receiver's fees, that he "did not engage in excessive billing or unnecessary work." However, the Court did invite briefing on the issue of "whether the cost of the receivership should count against the amount of the judgment against Defendant." *Id.* at 8. The SEC submits this filing to address that question.

## ARGUMENT

The Court should not offset the receivership costs against the judgment, but rather should follow the normal rule that receivership costs are taxed against the receivership estate, especially considering the Receiver is only necessary due to Defendant's past, and continuing, misconduct.

"[C]ase law involving district court administration of an equity receivership (once the receivership is underway) is sparse and is usually limited to the facts of the particular case." *SEC v. Hardy*, 803 F.2d 1034, 1037 (9th Cir. 1986) (citing *SEC v. Lincoln Thrift Ass'n*, 577 F.2d 600, 607, 608 n.11 (9th Cir. 1978)). As a general matter, though, courts are "vested with large discretion in determining who shall pay the cost and expenses of receiverships." 65 Am. Jur. 2d Receivers § 229; *see also Gaskill v. Gordon*, 27 F.3d 248, 251 (7th Cir. 1994) ("Receivership is an equitable remedy, and the district court may, in its discretion, determine who shall be charged with the costs of the receivership.); *SEC v. Elliott*, 953 F.2d 1560, 1576 (11th Cir. 1992) ("The district court appointing the receiver has discretion over who will pay the costs of the receiver."). Put another way, "a district court's power to supervise an equity receivership and to determine the appropriate action to be taken in the administration of the receivership is extremely broad.

This authority derives from the inherent power of a court of equity to fashion effective relief." *SEC v. Durmaz*, 2012 WL 13001583, *1 (C.D. Cal. Feb. 9, 2012) (citations and quotations omitted omitted).

"When a receivership is proper, the general rule is that receivership fees and expenses are a charge upon the property administered." *Netsphere, Inc. v. Baron*, 703 F.3d 296, 311 (5th Cir. 2012) (citing *Gaskill*, 27 F.3d at 251); *see also Elliott*, 953 F.2d at 1576 ("The court in equity may award the receiver fees from property securing a claim if the receiver's acts have benefitted that property."). Indeed, even where a receivership was improperly established – which is not the case here – the assessment of costs is an equitable decision. *Netsphere*, 703 F.3d at 313 ("[W]ithout 'convincing evidence that the appointment of a receiver was either collusive, capricious, venal, or in bad faith,' ordinarily the expenses of the receivership will not be charged 'other than against the fund administered by the receiver, even though the [c]ourts are vested with a discretion in determining who should pay the costs and expenses of a receivership in unusual instances.'") (quoting *Commercial Nat'l Bank v. Connolly*, 176 F.2d 1004, 1009 (5th Cir. 1949)).[3]

---

[3] As the Court has acknowledged, it has already determined that costs be paid from the receivership assets rather than charged to the SEC. *See* Doc. # 1415 at 8 (referencing Receivership Order, Doc. # 1070). And since Defendant has appealed the Receivership Order, this Court is without jurisdiction to modify that well-reasoned ruling. *See, e.g.*, *Leonhard v. United States,* 633 F.2d 599, 609–10 (2d Cir.1980) ("Once a proper appeal is taken, the district court may generally take action only in aid of the appeal or to correct clerical errors as allowed by the Federal Rules of Civil (or Criminal) Procedure."); *Vega v. Rell*, 3:09-CV-737 VLB, 2014 WL 1246550, at *1 (D. Conn. Mar. 24, 2014) (recognizing a notice of appeal divests the district court of its control over those aspects of the case involved in the appeal and therefore a district court may only act in aid of the appeal and not make substantive modifications to its decision on appeal). Thus, to the extent that any party suggests that costs should be paid from anywhere other than the receivership assets, that argument should be rejected for, among other things, lack of jurisdiction.

Here, there is no reason to deviate from the normal rule that receivership costs are charged against the receivership estate. Indeed, as detailed below, there are significant reasons to follow this rule.

First, the Receiver was only necessary in this case because Defendant, over the span of a decade, systematically used fraudulent and deceptive means to divert more than $67 million from funds he advised into his personal bank accounts, before funneling much of his ill-gotten gains into a multitude of assets and accounts in the name of Relief Defendants in order to conceal his fraud and attempt to protect the assets from confiscation. *See* Rul. on Parties' Summ. J. Mots. [Doc. # 835] at 4-23.  Thus, because of Defendant's misconduct and the steps he took to conceal and protect the proceeds of his fraud, there is substantial work required by a neutral third party to unwind Defendant's transactions in order to effectuate the Court's judgment. *See, e.g.*, Doc. # 1070 at 5 ("This case involves a substantial collection of currently frozen assets which must be managed, valued, and/or liquidated while appeals are pending, and distributed should the SEC prevail on appeal."). The Court should reject outright any claim that these costs be offset against the Judgment, which would, as a practical matter, reduce the amount that the SEC would collect and ultimately be able to return to Defendant's victims.  Put simply, and as further explained below, Defendant should pay over the entire amount of the Court's Judgment, as any costs associated with effectuating the Judgment should be borne by Defendant.

Second, Defendant's conduct since 2015 and throughout this litigation made clear that he could not (and cannot) be trusted to liquidate assets for the benefit of his victims and that a Receiver was therefore necessary to effectuate the Judgment. As noted above, immediately after his arrest for insider trading, Defendant specifically represented that he would "surrender any passport" would "abide by" the travel restrictions placed on him. *See United States v. Ahmed*,

3:15-mj-52-WIG (D. Conn. Apr. 2, 2015), Order Setting Conditions of Release [ECF # 8] at ¶¶ 7(d), 7(f). Instead, immediately after being released from custody, after he and his wife began removing Defendant's name from the few assets in which he still held an interest on paper, Defendant fled to India using his Indian passport, and then Defendant immediately began violating this Court's Asset Freeze Order and the parties' stipulation by attempting to quickly and furtively obtain frozen assets. *See* Doc. # 628-8. In other words, even after Defendant was arrested and his fraud was uncovered, Defendant did not hesitate to mislead this and other courts. Thus, given that Defendant has repeatedly made clear that he cannot be trusted and will not respect the laws of the United States, and given that to effectuate the Court's Judgment frozen assets need to be secured, valued, and then liquidated for the benefit of the SEC and Defendant's victims who he continues to re-victimize at every opportunity (*see, e.g.*, Doc. # 1467), the Court was left with no viable alternative other than to appoint a Receiver after entering Judgment. Defendant should not benefit by getting an offset to his Judgment, nor should the SEC or Defendant's victims suffer, simply because Defendant proved himself so untrustworthy that a Receiver was necessary to effectuate an order of this Court. *Cf. SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1105 (2d Cir. 1972) (noting that it was not unreasonable for the district court to conclude a trustee was needed to find and return funds to victims in light of defendant's fraudulent conduct).[4]

---

[4] The Court should also reject any claim that Ms. Ahmed was capable of liquidating assets. As a threshold matter, Ms. Ahmed initially disclaimed knowledge of many of the assets, testifying that she had no knowledge of the tens-of-millions of dollars placed into her name. *See* Doc. # 888-7. Moreover, though she would later claim to have owned and/or controlled some of the frozen assets, the Court found that she was merely a nominee, that her claims of ownership were not credible, and the frozen assets belonged to Defendant. *See, e.g.*, Doc. # 955 at 2 (noting Ms. Ahmed's ownership claims were "not credible"), 22 ("Relief Defendants now claim to own the vast majority of the frozen assets, yet fail to provide evidence of this ownership or to

Third, Defendant's conduct in this litigation is the cause of a significant portion of the Receiver's costs to-date. As outlined above, it was Defendant (and Relief Defendants) who continually objected to a swift and efficient liquidation, therefore requiring the valuation and continued monitoring of the receivership assets. Indeed, Defendant (and Relief Defendants) have resisted all efforts by the SEC to satisfy the Judgment and life the asset freeze. In addition to necessitating the Receiver, Defendant (and Relief Defendants) have been and continue to be exceedingly litigious, requiring the Receiver to prepare and file more than three dozen pleadings to date. Further, Defendant's illicit actions in attempting to violate the asset freeze caused the Receiver to incur additional substantial expense. Thus, given that the Receiver was necessitated by Defendant's request the corpus of frozen assets remain frozen, and given that the Receiver's costs have been driven by Defendant's perpetual misconduct, it would be wholly inappropriate to allow the costs of the receivership to be deducted from the amount of the Judgment, essentially reducing the amount of the Judgment Defendant would owe to the SEC and causing the SEC or Defendant's victims to subsidize Defendant's misconduct.

Fourth, the Receiver has benefited the receivership property and should therefore be paid from that property. As described above, the Receiver secured the property, thwarted Defendants'

---

meaningfully challenge the SEC's evidence that Defendant owned and controlled the currently frozen assets."). Charging Relief Defendants with managing and liquidating unfamiliar assets that do not belong to them would not be appropriate, especially given Ms. Ahmed's acknowledgment that this litigation alone is difficult for her to handle. *See, e.g.*, Doc. # 1446 at 5. Further, any assistance by Relief Defendants in managing or liquidating assets would presumably not be done for free; indeed, Relief Defendants previously requested the release of $1 million in order to liquidate only a portion of the corpus of frozen assets. *See* Doc. # 225 ("The liquidation of these assets will require significant effort by Relief Defendants and their counsel and, as such, the Relief Defendants will only pursue the liquidation efforts … if the resulting funds may be utilized for the payment of …attorneys' fees …."). Thus, even if Relief Defendants had assisted in liquidating assets, that work would have come at a substantial cost, and certainly would not have been offset against the Judgment.

attempts to obtain assets in violation of the Receivership Order and Asset Freeze Order, and assured the assets' upkeep through, among other things, ensuring tax and insurance payments are made, that tenants are paying for their use of the condominiums, and that the upstate New York farm is protected. Indeed, given Defendant's continued objection to liquidation and agreement that the entire corpus of assets remain frozen as a supersedeas bond, the SEC has not yet secured a single asset to satisfy the Judgment. It hardly follows that the SEC's Judgment should be reduced because a Receiver was and is necessary to manage Defendant's assets while the SEC is precluded from accessing those assets to satisfy its judgment. Thus, because Defendant is a beneficiary of the Receiver's work, and because the SEC has thus far been prohibited (because of Defendant's objections) from taking control of any frozen asset, it is appropriate for this Court to order the Receiver's fees paid from the receivership assets and not offset those costs against the SEC's Judgment. *See Elliott*, 953 F.2d at 1576; *United States v. Paccione*, 730 F. Supp. 1237, 1239 (S.D.N.Y. 1990) (recognizing that when a defendant benefits from a monitor as opposed to the general public, "such facts might well lead to a decision placing the burden of payment on defendants, in the exercise of the court's discretion.").

Finally, offsetting the receivership costs against the Judgment would create a perverse incentive that would only further encourage Defendant's misconduct. If Defendant were told that any and all costs of the receivership would be deducted from the Judgment, so that every dollar he caused the Receiver to bill would be a dollar less that the SEC or his victims would receive, Defendant's meritless filings, attacks on the Receiver, attempts to obtain frozen assets, and similar misconduct requiring the Receiver to expend resources would only increase (likely exponentially). Given Defendant's continued vitriolic attacks on his victims, the Court should

decline to incentivize his entirely predictable misbehavior. Rather, the Court should follow the normal rule that receivership costs are taxed against the estate.

The SEC acknowledges that there are cases suggesting receivership costs could be charged against a party other than the defendant or his property. But those cases are distinguishable. For example, in *U.S. v. Ianniello*, the court appointed a receiver during the pendency of litigation. In assessing costs, the court ruled that "it seems appropriate at this stage to impose the costs of the receivership on the government, at least pending a resolution of its charges against the defendants." 824 F.2d 203, 209 (2d Cir. 1987). In other words, in *Ianniello*, the defendants had not yet been found guilty of anything. Here, by contrast, the receiver was not appointed until *after* this Court found that Defendant orchestrated a largescale fraud and a receiver would be necessary to effectuate the Judgment; there can be no dispute that Defendant incurred no receivership costs prior to his guilt being adjudicated. Indeed, in *Ianniello*, the district court noted the possibility of an application to have the costs of the receivership taxed against the defendants after final judgment.

In *SEC v. Blatt*, the district court ordered defendants to disgorge their ill-gotten gains to a not-yet-named trustee who would be responsible for "distribut[ing] the profits on a pro rata basis" to the victims of defendants' fraud. *SEC v. Blatt*, 1975 WL 412, at *9 (S.D. Fla. July 24, 1975).  However, the district court went a step further and ordered that after defendants disgorged their gains to the trustee, they would also be responsible for paying "[t]he costs incidental to the distribution of the disgorged profits by the trustee." *Id*.  The Fifth Circuit overruled the district court and ordered that the trustee's costs would be paid from the disgorgement amount because the defendants could only be required "to pay an amount not

exceeding the fees they received for their role in the fraud." *SEC v. Blatt*, 583 F.2d 1325, 1336 (5th Cir. 1978).[5]

Here, unlike in *Blatt*, the SEC is not asking Defendant to pay additional funds *after* satisfying the Judgment in full. Rather, the SEC is asking Defendant to satisfy the Judgment in the full and not reduce his Judgment amount with costs associated with effectuating the Judgment ordered by this Court, especially since these costs are the result of Defendant's prior and continuing misconduct. While there are undoubtedly costs associated with Defendant satisfying the Judgment in this case, there are costs associated with satisfying any judgment (especially a large judgment as is the case here), whether they be in the form of liquidation costs, taxes, attorneys' fees, accountants' fees, or, in this case, Receiver's fees. Such costs are not – and should not be in this case – offset against the judgment amount, especially when the costs are being driven higher on a near daily basis through Defendant's continuing misconduct.[6]

Moreover, unlike in *Blatt*, the costs at issue do not stem from management or distribution of assets that have already been turned over in satisfaction of a judgment, as the SEC has (because of Defendant's objections) been prohibited thus far from collecting against any of Defendant's assets to satisfy its Judgment. Rather, unlike *Blatt*, the Receiver is administering and

---

[5] *Blatt* is not controlling in the Second Circuit and was decided prior to the SEC receiving Congressional authority to impose monetary remedies beyond disgorgement, and therefore its applicability to this case is questionable. *See, e.g.*, Securities Enforcement Remedies and Penny Stock Reform Act of 1990 (Remedies Act), Pub. L. No. 101-429, 104 Stat. 931.

[6] To be clear, the SEC is not seeking to add the receivership costs to the amount of disgorgement. Disgorgement is limited to a defendant's ill gotten gains. *See* Doc. # 955 at 8. Rather, the SEC is seeking to collect the full amount of the Judgment and have any necessary costs associated with the satisfaction of the Judgment, including the receivership costs, paid from the receivership assets, as those assets exceed the amount of the Judgment and because the costs stem entirely from Defendant and his misconduct and refusal to satisfy even a portion of the SEC's Judgment at this time.

benefitting *all* of Defendant's assets, which Defendant maintains should remain frozen and not used to satisfy any portion of the judgment while his appeal is pending. Thus, unlike *Blatt,* the Receiver has been charged with managing Defendant's assets, not the assets turned over to the SEC in satisfaction of a judgment.

In sum, the SEC has found no case that would suggest – much less compel – the Court to offset the Judgment amount because of costs associated with satisfying that Judgment, especially when the costs have been incurred entirely because of Defendant's misconduct. Thus, the Court should follow the general rule that receivership costs are charged against the receivership estate, and should not use its discretion to offset those costs against the Judgment. Such an offset would be inequitable, would further punish Defendant's victims, and would result in perverse incentives encouraging Defendant's bad behavior.

## **CONCLUSION**

For the foregoing reasons, the Court should decline to credit the receivership costs against the amount of the Judgment in this case.

DATED: February 12, 2020.

*s/ Nicholas P. Heinke*
Nicholas P. Heinke
Mark L. Williams
U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294-1961
(303) 844-1071 (Heinke)
(303) 844-1027 (Williams)
HeinkeN@sec.gov
WilliamsML@sec.gov
Attorneys for Plaintiff

CERTIFICATE OF SERVICE

I certify that on February 12, 2020, a copy of the foregoing document was emailed to Defendant Iftikar Ahmed at IftyAhmed@icloud.com, and served via ECF upon the following:

MR. PAUL E. KNAG, ESQ.
MS. KRISTEN LUISE ZAEHRINGER, ESQ.
Murtha Cullina, LLP
177 Broad Street, 4th Floor
Stamford, CT 06901
(Counsel for Relief Defendants)

Christopher H. Blau
Stephen M. Kindseth
Zeisler & Zeisler, P.C.
10 Middle Street, 15th Floor
Bridgeport, CT 06604
(Counsel for Receiver, Jed Horwitt, Esq.)

*s/ Nicholas P. Heinke*