# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>IFTIKAR AHMED<br><br>Defendant, and<br>and<br><br>IFTIKAR ALI AHMED SOLE PROP; I-CUBED DOMAINS, LLC; SHALINI AHMED; SHALINI AHMED 2014 GRANTOR RETAINED ANNUITY TRUST; DIYA HOLDINGS LLC; DIYA REAL HOLDINGS, LLC; I.I. 1, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; I.I. 2, a minor child, by and through his next friends, IFTIKAR and SHALINI AHMED, his parents; I.I. 3, a minor child, by and through his next friends, IFTIKAR and SHALINI AHMED, his parents<br><br>Relief Defendants. | Civil Action No.<br>3:15-cv-675-JBA |

## FOURTH INTERIM APPLICATION FOR PROFESSIONAL FEES AND EXPENSES INCURRED BY THE RECEIVER AND HIS PROFESSIONALS

Jed Horwitt, Esq., in his capacity as Court-appointed receiver of the Receivership Estate[1]

(the "Receiver"), by and through his undersigned counsel Zeisler & Zeisler, P.C. ("Z&Z"),

respectfully submits this fourth interim application (the "Fourth Application") for professional fees

and expenses incurred by the Receiver and Z&Z on behalf of the Receivership Estate during the

period commencing on October 1, 2019, through and including December 31, 2019 (the

---

[1] Unless expressly defined otherwise, the Receiver incorporates by reference the definitions of terms set forth in the Report of Receiver [Doc. No. 1135] (the "Report").

"Compensation Period"). In advance of its filing, and pursuant to paragraph 35 of the Appointment Order, on January 15, 2020, the Receiver served upon counsel for the Securities and Exchange Commission (the "Commission"), the Defendant, and counsel for the Relief Defendants a complete copy of the Fourth Application, together with all exhibits and relevant billing information. The Commission has no objection to the relief sought herein. The Defendant and counsel for the Relief Defendants have not expressed a position as to the relief sought herein. In support of this Fourth Application, the Receiver and Z&Z respectfully represent as follows:

## I.     SUMMARY OF PROFESSIONAL FEES AND EXPENSES REQUESTED

1.     This Fourth Application is prepared in accordance with the Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission (the "SEC Guidelines") and the Appointment Order.

2.     Pursuant to the SEC Guidelines, the undersigned attaches the following exhibits to this Fourth Application:

    a.     The completed Standardized Fund Accounting Report ("SFAR"), in the form prescribed by the SEC Guidelines, and certified by Receiver, as **Exhibit A**;[2]

    b.     A Certification of Compliance with the Receivership Guidelines as **Exhibit B**;

    c.     A summary of total expenses for which reimbursement is sought as **Exhibit C**; and

    d.     Time records summarizing the work performed by legal professionals and paraprofessionals at Z&Z, for each of the four applicable Activity Categories (as hereinafter defined), as **Exhibit D-1**, **D-2**, **D-3**, **D-4**, **D-5**; and,

    e.     Time records and expenses summarizing the work performed by legal professionals and paraprofessionals at Mitofsky, Shapiro, Neville & Hazen, LLP ("MSNH"), as **Exhibit D-6**.

---

[2] The amounts stated in **Exhibit A** represent the total income and expenses in the Receivership Account, which may include income and expenses attributable to Ku Yong Bae by way of his interest in the Essell Entities.

3.      The Receiver and Z&Z attorneys and paraprofessionals have expended a total of 194.30 hours working on this matter during the Compensation Period, not including 46.90 hours spent preparing the Third Interim Application for Professional Fees and Expenses Incurred by the Receiver and his Professionals [Doc. No. 1330] (the "Third Application") and responding to the Defendant's and Relief Defendants' objections thereto.  The Receiver and Z&Z seek allowance of compensation of services rendered during the Compensation Period on behalf of the Receivership Estate in the amount of $46,167.60 in professional and paraprofessional fees, and reimbursement of actual and necessary expenses in the amount of $1,126.52.

4.      MSNH attorneys and paraprofessionals have expended a total of 22.20 hours representing the Receiver in this matter during the Compensation Period and seek allowance of compensation of services rendered during the Compensation Period in the amount of $8,143.00 in professional and paraprofessional fees, and no reimbursement of actual and necessary expenses.

5.      The Receiver and Z&Z acknowledge that their fee compensation is subject to a twenty percent (20%) holdback, pursuant to the SEC Guidelines and the Appointment Order.

6.      The fees assessed reflect the hours worked by the Receiver, Z&Z attorneys and paraprofessionals, and MSNH attorneys and paraprofessionals, and the hourly rates applicable at the time that they rendered their services, as modified by the significant discounts provided by the Receiver and Z&Z (described below).

7.      With respect to the Receiver and Z&Z, these amounts also take into account all relevant circumstances and factors as set forth in the Connecticut Rules of Professional Conduct and the SEC Guidelines, including the nature of the services performed, the amount of time spent, the experience and ability of the professionals and paraprofessionals working on this engagement, the novelty and complexity of the specific issues involved, the time limitations imposed by the

circumstances, and the responsibilities undertaken by the Receiver and Z&Z under the Appointment Order.

8.      A narrative description of the particular services provided is included in the attached time records (Ex. D-1 through D-5 with respect to the Receiver and Z&Z, Ex. D-6 with respect to MSNH) and a summary of the Receiver's administration of the Receivership Estate during the Compensation Period is set forth in Section IV below.

9.      The expense reimbursements requested principally consist of: (i) PACER charges for accessing electronic documents; (ii) copying and printing charges; (iii) online research; (iv) shipping charges; and, (v) other routine expenses. (*See* Ex. C.)

10.      The Receiver and Z&Z have not sought reimbursement for secretarial, word processing, proofreading or document preparation expenses (other than by professionals or paraprofessionals), data processing and other staff services (exclusive of paraprofessional services), or clerical overtime.

11.      The Receiver and Z&Z have complied with the SEC Guidelines' internal photocopying rates as follows: $0.15 per page for black/white and $1.00 per page for color copies.

### A.      <u>Public Service Discounts</u>

12.      As proposed by the Receiver as part of his application for selection as receiver submitted to the Commission, and as provided in the Appointment Order, the Receiver and Z&Z have consented to and implemented substantial public service discounts with respect to their billing rates for services provided in this proceeding.

13.      More specifically, and as shown in the fee schedules set forth below, Z&Z has consented to and applied a 25% public service discount to its regularly applicable hourly rates for all legal professionals and paraprofessionals.

14.     The Receiver originally agreed to discount his generally applicable hourly rate for services provided when serving as Receiver to $250 per hour, reflecting a nearly 50% discount, and discount his generally applicable hourly rate for legal services to $371, reflecting a 25% discount. Despite the fact that many of the services provided by the Receiver during the Compensation Period (and those for which he is seeking compensation) were legal in nature, the Receiver and Z&Z have voluntarily billed all of the Receiver's time during the Compensation Period at the reduced $250 per hour rate.

**B.      Fee Schedules**

15.     The fee schedule for all Z&Z legal professionals who provided services during the Compensation Period, showing for each: his or her name; the hourly rate applied to his or her services in this proceeding and his or her customary hourly rate; the discount reflected in the applied hourly rate; the number of hours of services performed in the Compensation Period; the amount billed for such services in the Compensation Period; and the amount of the discount to his or her services during the Compensation Period is as follows:

| Legal Professional | Rate (Cust. Rate) | Rate Disc. | Hours[3] | Amt. Billed | Amt. Disc. |
|---|---|---|---|---|---|
| Horwitt, Jed | $250 ($495) | $245 | 4.90 | $1,225.00 | $1,200.50 |
| Kindseth, Stephen | $337 ($450) | $113 | 35.90 | $12,098.30 | $4,056.70 |
| Blau, Christopher | $225 ($300) | $75 | 133.10 | $29,947.50 | $9,982.50 |

16.     The fee schedule for the legal paraprofessionals who provided services during the Compensation Period, showing: their name; the hourly rate applied to their services in this proceeding and their customary hourly rate; the discount reflected in the applied hourly rate; the

---

[3] The hours may include hours recorded for which no corresponding fee was charged, noted in the attached invoices as "N/C." Additionally, these hour totals include time spent on matters related to the Receiver and Z&Z's Third Application. However, the Receiver and Z&Z are not seeking payment for time spent related to any fee application filed pursuant to paragraph 35 of the Appointment Order. Nonetheless, in light of the significant motion practice imitated by the Defendant and Relief Defendants concerning the Receiver's fee applications, the Receiver reserves the right to seek compensation for time spent addressing such motion practice in the future.

number of hours of services performed in the Compensation Period; the amount billed for such services in the Compensation Period; and the amount of the discount to their services during the Compensation Period is as follows:

| Paraprofessional | Rate (Cust. Rate) | Rate Disc. | Hours[4] | Amt. Billed | Amt. Disc. |
|---|---|---|---|---|---|
| Accurso, Deborah | $142 ($190) | $48 | 14.50 | $2,059.00 | $768.50 |
| Joseph, Kristin | $142 ($190) | $48 | 5.70 | $809.40 | $302.10 |
| O'Brien, Barbara | $142 ($190) | $48 | .20 | $28.40 | $10.60 |

17. Additionally, the fee schedule for Attorney William Neville, the primary attorney at MSNH representing the Receiver in connection with the eviction proceedings related to Apartment 12F and the only attorney at MSNH who has billed the Receiver for such services during the Compensation Period, is as follows:

| Legal Professional | Rate (Cust. Rate)[5] | Rate Disc. | Hours | Amt. Billed | Amt. Disc. |
|---|---|---|---|---|---|
| Neville, William | $350 ($350) | $0 | 22.20 | $8,143.00 | N/A |

**C.    Activity Categories**

18. Pursuant to the SEC Guidelines, the Receiver and Z&Z utilized the following activity categories (the "Activity Categories") under which the following fees were incurred during the Compensation Period:

a.    Case Administration, 108.40 hours, $25,932.30 (*see* Ex. D-1);

b.    Asset Analysis & Recovery, 25.00 hours, $6,337.70 (*see* Ex. D-2);

c.    Asset Disposition, 7.60 hours, $1,766.00 (*see* Ex. D-3);

d.    Business Operations, 26.30 hours, $6,593.60 (*see* Ex. D-4); and,

---

[4] These hour totals include time spent on matters related to the Receiver and Z&Z's Third Application. However, at this time the Receiver and Z&Z are not seeking payment for time spent related to any fee application filed pursuant to paragraph 35 of the Appointment Order, and expressly reserve their right to do so in the future.

[5] Pursuant to this Court's Ruling Granting Receiver's Motion for Authority to Employ Mitofsky, Shapiro, Neville & Hazen, LLP [Doc. No. 1275] (the "MSNH Employment Order"), Attorney Neville is billing the Receiver at his standard hourly rate of $350.

e.      Claims Administration & Objections, 27.00 hours, $5,538.00 (*see* Ex. D-5).

## II.     NATURE OF THE PROCEEDINGS

### A.      Underlying Procedural History

19.     On May 6, 2015, the Commission commenced this civil action by filing its Complaint [Doc. No. 1] against the Defendant. Subsequently, on June 16, 2015, the Commission filed an Amended Complaint [Doc. No. 33] naming the Relief Defendants in addition to the Defendant and, on April 1, 2016, the Commission filed a Second Amended Complaint [Doc. No. 208] in which it amended its claims against the Defendant and Relief Defendants.

20.     The Commission claimed that the Defendant "violated Section 10(b) of the Securities Exchange Act of 1934… and Rule 10b-5 (Count One), Section 17(a) of the Securities Act of 1933 …, and Section 206 of the Investment Advisers Act…." *SEC* v. *Ahmed*, 308 F. Sup. 3d 628, 636 (D. Conn. 2018). The Commission alleged that these violations arose out of the Defendant's use of "fraudulent and deceptive means to divert" millions of dollars "from funds he advised while employed by venture capital firm Oak Investment Partners ('Oak') into his personal bank accounts, before funneling much of his ill-gotten gains into assets and accounts in the name of his wife [("Mrs. Ahmed")] in order to conceal his fraud and protect the assets from confiscation." *Id*.

21.     "In response" to the Commission's allegations, "neither Defendant nor Relief Defendants argue that Defendant did not commit the alleged frauds, [but] instead contend[] primarily that Defendant should not be held liable because (1) certain fraudulent acts are time-barred by the statute of limitations, (2) the fraud was not sufficiently connected to securities transactions, and (3) the underlying securities transactions are not sufficiently domestic to be within the reach of the United States securities laws." *Id*. at 637.

22.     Ultimately, on December 14, 2018, the Court entered an Amended Final Judgment [Doc. No. 1054] (the "Amended Final Judgment") against the Defendant and Relief Defendants and in favor of the Commission. The Amended Final Judgment, *inter alia*, ordered the Defendant to disgorge $41,920,639 "together with prejudgment interest thereon in the amount of $1,491,064.01 and any interest or gains accrued on disgorged frozen assets from the date of the Court's freeze order [described below]" and imposed a civil penalty in the amount of $21,000,000 (collectively, plus all other amounts due on account thereof, the "Judgment"). *Id*. at 2, 4.

23.     Thereafter, the Defendant filed a Motion to Alter or Amend the Amended Final Judgment Pursuant to Fed. R. Civ. P. 59(e) [Doc. No. 1086] on January 11, 2019 (the "January 2019 Motion to Alter or Amend"), which this Court denied in its Ruling Denying Defendant's Motion to Alter Final Judgment [Doc. No. 1263] on September 4, 2019.

24.     Currently, the appeals filed by the Defendant and Relief Defendants are held in abeyance pending the Supreme Court's decision in *Liu v. SEC*. Similarly, the liquidation of assets in this matter have been stayed by this Court until the Supreme Court issues its decision in *Liu*. (Ruling on Defendant's Motion to Stay [Doc. No. 1346].) No other proceedings in this court are stayed. (*Id*.)

**B.      The Asset Freeze**

25.     On May 6, 2015, the same day that it filed its initial Complaint against the Defendant, the Commission filed an Emergency Motion for an *Ex Parte* Temporary Restraining Order Freezing Assets and Providing Other Ancillary Relief and for a Preliminary Injunction [Doc. No. 2] (the "TRO Motion").

8

26.     On May 7, 2015, the Court granted the TRO Motion and, *inter alia*, froze certain assets held by or under the direct or indirect control of the Defendant and Relief Defendant I-Cubed Domains, LLC ("I-Cubed"). (Doc. No. 9.)

27.     After the Court's August 12, 2015, Ruling and Order Granting Preliminary Injunction [Doc. No. 113], and after the asset freeze entered by the same was modified from time to time, the Court issued its Order on Defendant's Motions for Modification of the Asset Freeze Order to Release Funds for His Legal Defense and for a Stay in Light of *Kokesh* [Doc. No. 829] (the "Operative Freeze Order") in which the Court froze "[t]he assets, funds, or other property held by or under the direct or indirect control of Defendant and Relief Defendants, whether held in any of their names or for their direct or indirect beneficial interest, wherever located, up to the amount of $89,000,000." (*Id*. at 5.) The Amended Final Judgment, at paragraph 7, provides a schedule of assets included in the freeze that "are available to satisfy" the Judgment.

28.     The Operative Freeze Order was subsequently modified from time to time to release funds from the asset freeze to pay for various routine and other expenses incurred by assets of the Receivership Estate and the parties to the action.

C.     **Appointment of the Receiver**

29.     On May 29, 2018, the Commission filed its Motion for Remedies and Judgment [Doc. No. 886] seeking, *inter alia*, the appointment of a receiver.

30.     Following a telephonic conference on November 9, 2018, and a hearing held on November 28, 2018, the Court issued the Appointment Order on December 20, 2018, and thereby appointed Jed Horwitt as Receiver and Z&Z as his counsel.

31.     The Appointment Order provides that the Receiver shall control the operation of the Receivership Estate, which "includes all assets subject to the Court's asset freeze order… as

9

modified throughout this litigation." (Appointment Order, at 6.) Among other powers and duties, the Appointment Order directed the Receiver to:

> [M]anage, in consultation with qualified business advisors, and taking into consideration the wishes of Defendant and Relief Defendants, and with the dual objects of maximizing the realizable value of the assets of the Receivership Estate and minimizing the expense charged thereto, the assets of the Receivership Estate, pending further order of the Court or until such time that the Receivership Estate can be liquidated or modified, including but not limited to management of investments and rental and maintenance of real property[.]

(Appointment Order, at 7.)

32.     The Appointment Order provides that the goal of the receivership, in part, is to "value the frozen assets[,] avoid over-freezing, [] secure the judgment for the [Commission], [and] manage and maximize the value of the frozen assets…." (Appointment Order, at 5.)

33.     Consistent with these principles, the Receiver was directed to:

> [F]ile and serve a report reflecting… (i) the existence, value, and location of assets of the Receivership Funds and all other assets of the Receivership Estate which are liquid or could be liquidated with relative ease, including but not limited to publicly traded securities and brokerage accounts; (ii) the Receiver's proposal for securing the judgment using additional assets of the Receivership Estate, including the Receiver's recommendations as to which additional assets should be valued for possible liquidation and placement into a Court Registry Investment System ("CRIS") account and the order in which the Receiver proposes to liquidate such assets; and (iii) the Receiver's estimate regarding the dollar amount which should ultimately be placed into such account to fully secure the judgment, taking into consideration the amount of the judgment in this case, the costs of the receivership and administration of the Receivership Estate, and any other relevant factors.

(Appointment Order, at 14-15.)

34.     The Receiver filed the Report on April 3, 2019. Consistent with the Appointment Order, the Receiver identified those particular assets "which are liquid or could be liquidated with

relative ease" and such additional assets proposed to be liquidated as necessary to secure the Judgment. The Receiver also provided in his Report his estimate regarding "the amount of the judgment in this case, the costs of the receivership and administration of the Receivership Estate, and any other relevant factors."

35.     The Receiver summarizes his and his counsel's additional activities under the Appointment Order during the Compensation Period in Section IV.

**D.**     **First Application**

36.     On May 15, 2019, the Receiver submitted the First Interim Application for Professional Fees and Expenses Incurred by the Receiver and His Professionals [Doc. No. 1160] (the "First Application") for the period from the appointment of the Receiver through March 31, 2019. Thereafter, on June 4, 2019, the Defendant filed his Response in Opposition to the Receiver's Application for Fees and Expenses [Doc. No 1183] (the "Defendant's Opposition to First Application"), which the Relief Defendants joined by way of their Response in Opposition to Receiver's Application for Fees and Expenses [Doc. No. 1185] (the "Relief Defendant's Opposition to First Application"). On July 2, 2019, the Receiver filed his Reply to the Defendant's and Relief Defendants' Responses in Opposition to Receiver's Application for Fees [Doc. No. 1218.] (the "Receiver's Reply to Oppositions to First Application"). This Court granted the First Application on January 22, 2020. (Doc. No. 1415).

**E.**     **Second Application**

37.     On August 14, 2019, the Receiver submitted the Second Interim Application for Professional Fees and Expenses Incurred by the Receiver and His Professionals [Doc. No. 1249] (the "Second Application") for the period from April 1, 2019, through June 30, 2019. Thereafter, the Defendant filed his Response in Opposition to the Second Interim Application for Professional

Fees and Expenses Incurred by the Receiver and his Professionals [Doc. No. 1261] (the "Defendant's Opposition to Second Application"), which the Relief Defendants joined by way of their Response in Opposition to the Receiver's Second Application for Fees and Expenses [Doc. No. 1264] (the "Relief Defendants' Opposition to Second Application"). On September 23, 2019, the Receiver filed his Reply to the Defendant's and Relief Defendants' Responses in Opposition to the Receiver's Second Application for Fees [Doc. No. 1297] (the "Receiver's Reply to Oppositions to Second Application"). This Court granted the Second Application on January 22, 2020. (Doc. No. 1415).

### F.   Third Application

38.    On November 14, 2019, the Receiver submitted the Third Application for the period from July 1, 2019, through September 30, 2019. On November 30, 2019, the Defendant filed his Response in Opposition to the Third Interim Application for Professional Fees and Expenses Incurred by the Receiver and His Professionals [Doc. No. 1354] (the "Defendant's Opposition to Third Application"), which the Relief Defendants joined by way of their Response in Opposition to the Receiver's Third Application for Fees and Expenses [Doc. No. 1362] (the "Relief Defendants' Opposition to Third Application"). On December 12, 2019, the Receiver filed his Reply to the Defendant's and Relief Defendants' Responses in Opposition to Receiver's Third Application for Fees [Doc. No. 1378] (the "Receiver's Reply to Oppositions to Third Application"). This Court granted the Third Application on January 22, 2020. (Doc. No. 1415).

## III.    SUMMARY OF CASH ON HAND

39.    The Appointment Order, at paragraph 26, directed the Receiver to create a deposit account (the "Primary Receivership Account"), which the Receiver did shortly after his appointment.

40.     As it became apparent that the Receivership Account would hold a significant amount of Receivership Assets in the form of cash pending approval of a plan of liquidation and the transfer of such assets to the CRIS account, the Receiver decided to open a second custodial account under the authority of paragraph 25 of the Appointment Order (the "Secondary Receivership Account" and, collectively, the "Receivership Accounts"). While the Primary Receivership Account yields .33% APY, the Secondary Receivership Account yields 1.05% APY.

41.     The Receivership Accounts hold funds marshaled by the Receiver and constitute Receivership Assets.

42.     In addition to the cash held in bank accounts subject to the Operative Freeze Order that fall within the Receivership Estate as more fully detailed below in Section V, as of the end of the Compensation Period the remainder of the cash in the Receivership Estate was held in the Receivership Accounts. As of December 31, 2019, the balance of the Receivership Accounts was $3,795,729.56.

## IV.     SUMMARY OF RECEIVER'S ADMINISTRATION OF THE ESTATE

43.     During the Compensation Period, the Receiver has continued to fulfill his duties required of him under the Appointment Order.

44.     Although the detailed time entries contained in the invoices appended hereto as **Exhibits D-1** through **D-5** set forth with particularity the services provided by the Receiver and his counsel, Z&Z, a summary of such services is provided below.

### A.     Reviewed, Analyzed, and Responded to Filings Where Appropriate

45.     During the Compensation Period, there were more than one hundred docket entries in this matter.

46.     As during other compensation periods, and to fulfil his obligations under the Appointment Order, including the management, administration and protection of the Receivership Estate and the Receivership Assets, the Receiver and/or his counsel reviewed and analyzed each filing and other docket entry to determine its impact, if any, upon the Receivership Estate. Obviously, the Receiver could not simply ignore any filing and blindly hope that the relief sought did not prejudice the Receivership Estate. In fact, many filings sought relief that would have had a significant effect upon the Receivership Estate. Therefore, it was, in such instances, incumbent upon the Receiver, through his counsel, to articulate any objection he may have or any other position he felt the Court and other parties-in-interest should be apprised of so that any adverse impact upon the Receivership Estate could be avoided.

47.     Of the filings made during the Compensation Period that required the Receiver's review and analysis, the following were the most significant from the Receiver's perspective:

a.   Responses to the Receiver's Motion for Entry of Order Compelling Transfer of Physical Possession of Certain Earrings [Doc. No. 1300];

b.   Defendant's Emergency Motion to Stay Proceedings in Light of US Supreme Court Granting Certiorari in Charles Liu v. SEC on November 1, 2019 [Doc. No. 1308];

c.   Defendant's Emergency Motion for Order Staying AAA Action Pending Appeal [Doc. No. 1323];

d.   Defendant's Emergency Motion to Enjoin the Enforcement of the Default Judgment Obtained in Violation of This Court's Injunction and to Impose Sanctions on NMR or in the Alternative, to Impose Sanctions on NMR, Release Fees to Retain Counsel in the New York State Proceeding to Defend

Against the Default Judgment and NMR E-Tailing's Alleged Claims and to Stay the NMR Case Pending Appellate Review [Doc. No. 1324];

e.  Defendant's Motion to Reduce Disgorgement in this Case for the Default Judgment Entered Against Him in the NMR E-Tailing New York State Proceeding [Doc. No. 1325];

f.  Relief Defendants' Emergency Motion for an Enforcement of the Injunction Against the DOJ's Action and Forfeiture of Frozen Assets Until this Matter has Concluded, or in the Alternative, for a Release of $9mm to Satisfy the Bond Requirements of the Forfeiture [Doc. No. 1327];

g.  Defendant's Emergency Motion for Fees to Retain Counsel [Doc. No. 1332];

h.  Relief Defendants' Emergency Motion for Attorney Fees to Retain Attorneys Re: Bail Bond Forfeiture and Related Proceedings [Doc. No. 1335]; and,

i.  Defendant's Emergency Motion for Fees to Retain Counsel in the AAA Proceeding [Doc. No. 1371].

48.  As reflected by the time entries attached hereto as **Exhibits D-1** through **D-5** and the Receiver's responses to each of the above filings, the Receiver carefully considered and, to the extent necessary, investigated, every issue raised by each filing and in all parties' responses.

49.  Consequently, a significant portion of the Receiver's and Z&Z's time expended during the Compensation Period is attributable to reviewing, addressing and responding to various filings.[6]

---

[6] As articulated in the proposed Plan of Liquidation, the Receiver's reserve of $500,000 for fees and expenses incurred by the Receiver and Z&Z assumed minimal contested litigation and motion practice in this proceeding including concerning the Report, the proposed Plan of Liquidation, and the liquidation process itself and further assumed a relatively expedited duration. In light of the voluminous filing activity

B.    **Investigation of Unauthorized Trading Activity**

50.    The Receiver submitted (*see* Doc. No. 1412) a more fulsome report of his investigation into the unauthorized trading activity in certain Fidelity accounts, initially raised in the Receiver's Notice Regarding Unauthorized Activity in Fidelity x7540 and Fidelity x8965 [Doc. No. 1281] filed on September 12, 2019. For the purposes of this Fourth Application, the Receiver reports that during the Compensation Period he continued his investigation and issued multiple subpoenas to entities he believed may have information that would be useful in identifying the individual who executed the subject trades. Such subpoenas included Avast Software s.r.o. ("Avast") (a Czech company that upon information and belief leased the server from Total Server Solutions, L.L.C. ("TSS") through which the individual who executed the subject trades connected to the Fidelity trading platform), Fidelity, and Northern Trust.

51.    At this time, the Receiver has no reason to believe that additional unauthorized trading activity could occur in any of the broker accounts holding Receivership Assets. As such, the Receiver's efforts in responding to the unauthorized trading activity is limited to identifying, as best as he can, the individual who executed the subject trades in September 2019 and providing that information to this Court as required by the Appointment Order. (Appointment Order, at 13 ("The Receiver shall promptly notify the Court and counsel for the parties of any failure or apparent failure of any person or entity to comply in any way with the terms of this Order").)

---

during the Compensation Period that required the Receiver and/or Z&Z's attention, and the expanded duration of the Receivership, the Receiver may need to revise this proposed reserve should the level of filing activity in this matter continue.

C.      **Eviction Process Concerning Apartment 12F**

52.     Following the entry of the MSNH Employment Order, the Receiver began the process of evicting the occupants of Apartment 12F (the "Occupants"). During the Compensation Period, MSNH initiated an eviction proceeding on behalf of the Receiver, which is now pending in the Civil Court of the City of New York with docket number L&T 71653/2019. The eviction proceeding remains pending.

53.      During the Compensation Period, with MSNH's advice and guidance, the Receiver continued to engage in settlement discussions with counsel representing the Occupants. Pursuant to the Appointment Order, the Receiver consulted with the Defendant and Relief Defendants with respect to the various settlement proposals and counterproposals. During the Compensation Period, the parties were unable to reach an agreeable settlement but discussions remain ongoing.

D.      **Continued Management of Receivership Assets**

54.     During the Compensation Period, the Receiver maintained an adequate amount in the Primary Receivership Account to pay for various routine expenses of Receivership Assets ("Routine Receivership Expenses"). Meanwhile, the Secondary Receivership Account held excess funds not immediately needed for Routine Receivership Expenses so that such balance could accrue a higher interest rate. For the purpose of simplicity and because funds can be easily transferred between the Receivership Accounts, the Receiver's summary of the activity in the Receivership Accounts will not distinguish between the Primary Receivership Account and the Secondary Receivership Account. Should the Court so order, the Receiver will promptly provide a separate accounting for each Receivership Account.

55.     As of December 31, 2019, the Receivership Accounts held $3,795,729.56.

56.     During the Compensation Period, the Receiver paid the following Routine Receivership Expenses from the Receivership Accounts as authorized and directed by this Court in paragraph 32 of the Appointment Order:

| Date | Expense | Amount |
|---|---|---|
| 10/25/2019 | Storage at Morgan Manhattan (10/31/19 - 12/31/19) | $200.00 |
| 10/25/2019 | Common Charges & Electric (Apartment 12A) | $3,093.08 |
| 10/25/2019 | Common Charges & Electric (Apartment 12F) | $4,034.75 |
| 11/11/2019 | Genworth Life Insurance Policy Premium (Insured: Iftikar Ahmed) | $17,847.59 |
| 12/02/2019 | Common Charges & Electric (Apartment 12F) | $3,938.94 |
| 12/02/2019 | Common Charges & Electric (Apartment 12A) | $3,043.67 |
| 12/02/2019 | NYC Real Estate Taxes (Apartment 12A) | $18,189.34 |
| 12/02/2019 | NYC Real Estate Taxes (Apartment 12F) | $22,329.90 |
| 12/02/2019 | Storage at Morgan Manhattan (12/31/19 - 1/31/20) | $100.00 |
| 12/02/2019 | AIG Life Insurance Policy Premium (Insured:  Iftikar Ahmed) | $20,464.00 |
| | **TOTAL:** | **$93,241.27** |

57.     Additionally, to honor the formalities of the Essell Entities' corporate structure, funds necessary to pay expenses incurred by the Essell Entities were transferred from the Essell Entities' bank accounts to the Receivership Accounts and then to the person or entity demanding payment. Such payments consisted of:

| Date | Expense | Amount |
|---|---|---|
| 10/03/2019 | The Essell Group, LLC - MA DOR Payment | $6,851.39 |
| 11/18/2019 | The Essell Group, LLC - IRS Payment | $18,515.86 |
| 12/03/2019 | The Essell Farms, LLC - IRS Payment | $5,609.50 |

| 12/20/2019 | The Essell Farms, LLC - IRS Payment | |
|---|---|---|
| | | $892.72 |
| | **TOTAL:** | **$31,869.47** |

58.     Further, pursuant to paragraph 5(c) of the Appointment Order, the Receiver has approved three monthly distributions of $8,676.00 representing Mrs. Ahmed's living expenses, each at the request of counsel to the Relief Defendants and under the authority of the Court's May 1, 2018, order [Doc. No. 865]. The Receiver transferred these funds directly from the Fidelity account ending x7540 (SEC No. 75).

59.     In addition to the above-described disbursements, the Receiver and Z&Z have provided services and Z&Z has advanced reasonable and necessary expenses, for which this Fourth Application seeks compensation and reimbursement.  (*See* Ex. C.)  Furthermore, pursuant to the MSNH Employment Order, the Receiver is including MSNH's invoices for fees incurred during the Compensation Period in this Fourth Application.  (*See* Ex. D-6.)

60.     Provided that the Court awards the fees and expenses requested by Z&Z and/or MSNH in this Fourth Application, these disbursements will be reflected as debits from Receivership Assets on the appropriate future fee application.

61.     During the Compensation Period, the Primary Receivership Account earned $291.81 in interest and the Secondary Receivership Account earned $9,255.90 in interest. As discussed in the Third Application, the financial institution where the Secondary Receivership Account is located inadvertently failed to timely apply interest during the compensation period covered by the Third Application. Such historical interest, in the amount of $7,052.22, has been applied.

E.       **Essell Farm Title Issue**

62.       The Receivership Estate includes the Defendant's 50% interest in The Essell Farms, LLC ("Essell Farms"). Essell Farms owns, *inter alia*, certain real property located at 1820 County Route 7 in Ancram, New York (the "1820 Property"). Essell Farms acquired the 1820 Property from Donald and Betty Duksa (jointly, the "Duksas") by deed dated June 22, 2012, and recorded on June 25, 2012, with the Columbia County clerk (the "1820 Deed").

63.       During the Compensation Period, the Receiver discovered that the property description in the 1820 Deed transferring the 1820 Property from the Duksas to Essell Farms included, in addition to a description of the 1820 Property, the description of an adjacent property known as 1804 County Route 7 (the "1804 Property").

64.       Based on the Receiver's investigation, upon information and belief, the Receiver has concluded that while the Duksas previously owned the 1804 Property, they had transferred the 1804 Property to Scott and Sara Crosby by deed dated May 21, 1999, and recorded on May 26, 1999, with the Columbia County clerk. Consequently, the Duksas did not hold title to the 1804 Property in 2012 at the time of the 1820 Deed. The Duksas then acquired the 1804 Property again in 2014.

65.       During the Compensation Period, the Duksas attempted to sell the 1804 Property, a process that was reportedly complicated by what appears to be the erroneous inclusion of the 1804 Property in the 1820 Deed transferring the 1820 Property to Essell Farms.

66.       The Receiver analyzed this issue during the Compensation Period with the overall objective of ensuring that the Receivership Estate's rights were protected with the "dual objects of maximizing the realizable value of assets of the Receivership Estate and minimizing the expenses charged thereto." (Appointment Order, at 7.)

67.     During the Compensation Period, no party sought any affirmative relief to cure the apparent title issue concerning the 1820 Property and the 1804 Property. Following multiple discussions with counsel to the Duksas, it is the Receiver's understanding that the Duksas are analyzing the issue further and considering how to proceed to address the title issue.

F.     **Clues Network, Inc. Transaction**

68.     After this Court granted, at Doc. No. 1318, the Receiver's Emergency Motion on Consent for Authority to Effectuate Transfer in Connection with Acquisition of Clues Network, Inc. by Qoo10 Pte. Ltd. [Doc. No. 1317] (the "Clues Motion"), the Receiver began the process of executing the necessary documents to exchange The Essell Group, LLC's shares in Clues Network, Inc. ("Clues") for shares in Qoo10 Pte. Ltd. ("Qoo10").

69.     The Receiver submitted executed versions of the documents initially requested by Clues' representatives before the deadline on November 11, 2019. Subsequently, Clues has requested other documents, including an affidavit concerning original share certificates (which the Receiver supplied) as well as certified documents confirm The Essell Group, LLC's federal EIN number (which the Receiver requested from the IRS in November 2019).

70.     The Receiver has confirmed with counsel to Clues that any delay in collecting the requested documents will not result in the divestiture or other prejudicial event relative to The Essell Group, LLC's shares in Clues. Nonetheless, the Receiver will continue to work expeditiously to formally conclude this transaction.

G.     **The Essell Group, LLC's Tax Return in Massachusetts**

71.     During the Compensation Period, the Receiver became aware of a discrepancy between The Essell Group, LLC's Massachusetts tax returns as sent to the Receiver and the figures reported on the Massachusetts Department of Revenue ("MA DOR") website.

72.     The Receiver investigated this discrepancy and confirmed with the MA DOR that it had received the same tax returns as those submitted to the Receiver by the Relief Defendants, The MA DOR further confirmed that the differences between those returns and the MA DOR website resulted from a glitch on the website.

### H.     Other Services Provided for Receivership Estate

73.     The Receiver and his counsel provided additional services during the Compensation Period that were reasonable and necessary in the administration and management of the Receivership Estate. These activities included:

i.     Efforts to Confirm Tax Analysis

74.     As previously reported by the Receiver, in light of the nature of the Receivership Estate and complex tax regulations applicable to individuals and entities whose property is in full or partial control of a receiver, during prior compensation periods the Receiver and his counsel engaged in an extensive analysis of applicable statutes and regulations, and the facts presented in this matter. See, e.g., 26 U.S.C. § 6012; 26 C.F.R. § 1.641(b)-2; 26 C.F.R. § 1.6012-3; Regulations of Connecticut State Agencies § 12-740-3. The Receiver concluded based upon the dollar amount and limited nature of the Receivership Estate pursuant to paragraph 2 of the Appointment Order that he had no obligation to submit tax returns on behalf of the Defendant.

75.     Additionally, with respect to Mrs. Ahmed's taxes, the Receiver concluded, based on (a) representations by the Relief Defendants, their counsel, and their accountant and (b) the Receiver's review of a heavily redacted, partial copy of Mrs. Ahmed's 2017 tax return, and subject to verification as explained below, that the Receiver had no obligation to submit tax returns on behalf of the Relief Defendants or other taxable entities that are Receivership Assets.

76.     As the Receiver reported in earlier fee applications, the Receiver's conclusion that he did not need to submit tax returns for various Relief Defendants and other Receivership Assets was subject to verification that the tax returns had, in fact, been filed. The Receiver concluded that the best form of verification would be the as-filed versions of the Defendant and Mrs. Ahmed's tax returns provided by the applicable governmental agency.

77.     Typically, a taxpayer's returns can be produced to a third party pursuant to a Form 4506, which informs the IRS that the taxpayer consents to the production. While the Receiver requested that both the Defendant and Mrs. Ahmed execute Form 4506s, they have thus far declined to do so. The Defendant's and Mrs. Ahmed's unwillingness to sign IRS Form 4506s has complicated the Receiver's verification efforts and has delayed the Receiver's ability to confirm his tax analysis.

78.     During the Compensation Period, the Receiver's counsel finished preparing a draft motion seeking an order of this Court directing the Internal Revenue Service (the "IRS") to produce the tax returns submitted by the Defendant and Mrs. Ahmed for recent years or, in the alternative, to order the Defendant and Mrs. Ahmed to execute sufficient documents (including Form 4506) to permit the Receiver to request the returns from the IRS directly. The Receiver's counsel provided a draft of this motion to the Defendant and Mrs. Ahmed's counsel in the hopes of reach an agreeable resolution without intervention from this Court. The Receiver and Mrs. Ahmed's counsel are continuing to discuss a potential resolution to this issue, which would include the production of tax returns with sufficient representations as to their provenance to allow the Receiver to confirm his earlier analysis.

79.     As before, and subject to the confirmation discussed above, based on the facts known to the Receiver at this time and based on the representations of the Relief Defendants, their

counsel, and their accountant, the Receiver does not believe it necessary to make revisions to the Report or Plan of Liquidation to reflect any tax liability by the Receivership Estate.

    ii.    <u>Continued Collection of Information Concerning Receivership Assets</u>

80.    Because of the Receiver's responsibility to manage and protect Receivership Assets, the Receiver during the Compensation Period continued to collect and evaluate information concerning the Receivership Assets.

81.    This oversight responsibility was most pressing with respect to the Receivership Assets that had the greatest volatility (such as the securities, gold, and Bitcoin). However, the Receiver continued to collect account statements and other records related to Receivership Assets to monitor the overall value of the Receivership Estate.

82.    Since, to the best of the Receiver's knowledge, no significant decline in value occurred during the Compensation Period threatening the Receiver's ability to secure the Judgment fully, the Receiver did not need to take any further action in this regard.

    iii.    <u>Physical Possession of Harry Winston Earrings</u>

83.    Harris St. Laurent LLP (the "Harris Firm") is currently in physical possession of a pair of Harry Winston earrings (SEC No. 84, the "Earrings"). Following the Receiver's unsuccessful efforts at negotiating the physical surrender of the Earrings, the Receiver filed the Motion for Entry of Order Compelling Transfer of Physical Possession of Certain Earrings [Doc. No. 1300] (the "Earrings Motion") on October 22, 2019, which is currently *sub judice*.

84.    Based on the Receiver's current analysis, given the present aggregate value of other Receivership Assets, the Receiver does not believe that the liquidation of the Earrings is necessary. However, in an abundance of caution, the Receiver respectfully maintains that good

cause exists to compel the Harris Firm to surrender physical possession of the Earrings pursuant to the terms of the proposed order submitted with the Earrings Motion as Exhibit A.

**I.**     **Anticipated Closure**

85.     At this time, it is premature for the Receiver to speculate as to precisely when this receivership proceeding will be ready to close.

86.     As stated in the Report, and subject to further orders of the Court, the Receiver believes that a majority of the amount necessary to secure the Judgment can be liquidated and transferred into the CRIS account relatively quickly. Pursuant to the Receiver's Plan of Liquidation, the Receiver believes that Apartment 12A and Apartment 12F will also need to be liquidated to fully secure the Judgment. The Receiver does not know how long it will take to sell those properties, but once authorized to do so he will undertake all reasonable and appropriate efforts necessary to maximize value in the shortest amount of time necessary.

87.     In the Receiver's view, in accordance with the Appointment Order, only after (i) all appeals have been fully adjudicated, (ii) if and to the extent the Judgment is affirmed on appeal, distributions are made to satisfy the Judgment, and (iii) all costs of the administration of the receivership are paid, can the receivership be appropriately closed.

**V.**     **DESCRIPTION OF ASSETS OF THE RECEIVERSHIP ESTATE**

88.     A description of the assets of the Receivership Estate, including approximate or actual valuations and anticipated or proposed dispositions as of December 31, 2019, is attached hereto as **Exhibit E**.

89.     At this time, the Receiver believes it is prudent to maintain the Court's asset freeze over the Receivership Assets to fully secure the Judgment until sufficient assets have been

liquidated and the proceeds of such liquidations are deposited in the CRIS account and to pay for the costs of the receivership.

## VI.    SUMMARY OF RECEIVERSHIP ESTATE CLAIMS

90.    The Receiver is not aware of any claims against the Receivership Estate with the exception of (i) the Judgment; (ii) the Receiver and his counsel's fees and expenses, including both Z&Z as well as MSNH; (iii) the likely future claims for fees and expenses from professionals retained pursuant to the Appointment Order; (iv) the ordinary expenses incurred on account of the Receivership Assets (such as real estate taxes, property repairs, and other such routine expenditures); and (v) the Harris Firm's claim as to the Earrings.

## VII.   SUMMARY OF THE RECEIVERSHIP ESTATE'S CAUSES OF ACTION

91.    Considering the limited scope of the Receiver's primary duty (to value assets and liquidate such assets as directed by the Court to secure the Judgment) pursuant to the Appointment Order and his perceived ability to accomplish that objective from known assets at this time, the Receiver has not undertaken to identify any causes of action held by the Receivership Estate. Should circumstances change, or should this Court so direct, the Receiver will commence an investigation into potential causes of action held by the Receivership Estate.

## VIII.  THE GOVERNING LEGAL STANDARD

92.    "A receiver appointed by a court who reasonably and diligently discharges his duties is entitled to be fairly compensated for services rendered and expenses incurred." *SEC* v. *Byers*, 2014 U.S. Dist. LEXIS 177180, at *13 (S.D.N.Y. Dec. 23, 2014); *see also Donovan v. Robbins*, 588 F. Supp. 1268, 1272 (N.D. Ill. 1984) ("[T]he receiver diligently and successfully discharged the responsibilities placed upon him by the Court and is entitled to reasonable

compensation for his efforts."); *Securities & Exchange Comm'n v. Elliott*, 953 F.2d 1560 (11th Cir. 1992) (receiver is entitled to compensation for faithful performance of his duties.).

93.     "The [D]istrict [C]ourt's award of a receiver's compensation is… firmly within its discretion." *Gaskill* v. *Gordon*, 27 F.3d 248, 253 (7th Cir. 1994) *citing Crites, Inc. v. Prudential Ins. Co.*, 322 U.S. 408, 418, 88 L. Ed. 1356, 64 S. Ct. 1075 (1944). The Court "may consider all of the factors involved in a particular receivership in determining the appropriate fee." *Id.*

94.     The case law and other authority may provide "convenient guidelines," but ultimately "the unique fact situation renders direct reliance on precedent impossible." *Securities & Exchange Comm'n v. W.L. Moody & Co.*, 374 F. Supp. 465, 480 (S.D. Tex. 1974), *aff'd*, 519 F. 2d 1087 (5th Cir. 1975).

95.     In awarding counsel fees in Securities Act receiverships, courts consider "the complexity of problems faced, the benefits to the receivership estate, the quality of the work performed, and the time records presented." *SEC v. Illarramendi*, Docket No. 3:11CV78 (JBA), 2013 U.S. Dist. LEXIS 171950, at *8-9 (D. Conn. Dec. 5, 2013), *quoting Securities & Exchange Comm'n v. Fifth Ave. Coach Lines, Inc.*, 364 F. Supp. 1220, 1222 (S.D.N.Y. 1973); *see also United States v. Code Prods.*, 362 F.2d 669, 673 (3rd Cir. 1966) (court should consider the time, labor and skill required but not necessarily expended, the fair value of such time, labor and skill, the degree of activity, the dispatch with which the work is conducted and the result obtained).

96.     While "results are always relevant," a good result may take a form other than a "bare increase in monetary value." *Elliott*, 953 F.2d at 1577 ("Even though a receiver may not have increased, or prevented a decrease in, the value of the collateral, if a receiver reasonably and diligently discharges his duties, he is entitled to compensation"). Overall results can be determined only at the conclusion of the Receivership Proceeding.

97.     Another "basic consideration is the nature and complexity of the legal problems confronted and the skill necessary to resolve them." *Moody*, 374 F. Supp. at 485.  Moreover, "[t]ime spent cannot be ignored." *Id.* at 483.

## IX.     THE COURT SHOULD AWARD THE REQUESTED FEES AND EXPENSES

98.     Based on the foregoing, the Receiver and Z&Z respectfully submit that the services for which they seek compensation in this Fourth Application were reasonable and necessary for, and beneficial to, the orderly administration of the Receivership Estate. Likewise, the Receiver respectfully submits that the services for which MSNH seeks compensation were reasonable, necessary, and benefited the Receivership Estate.

99.     The fees and expenses sought by this Fourth Application were reasonable and necessarily incurred and were in the best interest of the Receivership Estate. With the exception of the SEC Guidelines, the Receiver has not entered into any agreement, written or oral, express or implied, with any person or entity concerning the amount of compensation paid or to be paid from the Receivership Estate, or any sharing thereof.

100.     As more fully set forth throughout this Fourth Application and as detailed in the exhibits submitted herewith, the issues addressed by the Receiver and his counsel have been and continue to be complex. The Receiver and his counsel respectfully submit that compensation for the foregoing services as requested is commensurate with the complexity, importance and nature of the problems, issues or tasks involved.  The Receiver and his counsel performed such professional services expediently and efficiently.

101.     Accordingly, the Receiver submits that the compensation requested herein is fair, reasonable and warranted in light of the nature, extent and value of such service to the Receivership Estate and all parties in interest.

X.      **SOURCE AND MANNER OF PAYMENT**

102.    The Receivership Estate contains cash held in the Receivership Accounts.

103.    The Receiver and Z&Z request that this Court enter an order directing the approved

fees and reimbursed expenses to be paid from the Receivership Accounts, less the 20% holdback

(applicable only to fees) which shall be held in the Receivership Accounts pending this Court's

further order as to the disposition of such funds.

**WHEREFORE**, Jed Horwitt, Esq., Receiver, and Zeisler & Zeisler, P.C., counsel to the

Receiver, respectfully request that this Fourth Application be granted and that they be awarded an

allowance of $46,167.60 in fees for services rendered during the Compensation Period subject to

a 20% holdback, and $1,126.52 for the reimbursement of expenses, and that MSNH be awarded

$8,143.00 in fees; and grant such other and further relief as this Court deems just and proper.

Dated: February 14, 2020, at Bridgeport, Connecticut.

Respectfully submitted,

JED HORWITT, ESQ., RECEIVER

By: */s/ Jed Horwitt*
Jed Horwitt, Esq., Receiver (ct04778)

By: */s/ Christopher H. Blau*
Stephen M. Kindseth (ct14640)
Christopher H. Blau (ct30120)
Zeisler & Zeisler, P.C.
10 Middle Street, 15th Floor
Bridgeport, CT  06604
Telephone: 203-368-4234 X 236
Facsimile: 203-549-0903
Email: skindseth@zeislaw.com;
cblau@zeislaw.com
His attorneys

29

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on February 14, 2020, a copy of the foregoing Fourth Application was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System. Furthermore, a copy of the foregoing was sent via email to the Defendant, Iftikar A. Ahmed, at iftyahmed@icloud.com.


By: */s/ Christopher H. Blau*
Christopher H. Blau (ct30120)