# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| v. | Civil Action No. 3:15-cv-675 (JBA) |
| IFTIKAR AHMED, | |
| Defendant, and | |
| IFTIKAR AHMED SOLE PROP; *et al* | |
| Relief Defendants. | March 04TH, 2020 |

## DEFENDANT'S RESPONSE IN OPPOSITION TO THE "FOURTH INTERIM APPLICATION FOR PROFESSIONAL FEES AND EXPENSES INCURRED BY THE RECEIVER AND HIS PROFESSIONALS" [DOC. #1474]

The *pro se* Defendant submits this Response in Opposition ["Fourth Opposition"] to the Receiver's "Fourth Interim Application for Professional Fees and Expenses Incurred by the Receiver and his Professionals." [Doc. #1474, or the "Fourth Application"]. The Defendant reserves all rights to all issues and fully incorporates his prior Oppositions [Doc. #1183 or the "First Opposition"] and Sur-Reply [Doc. #1222-1 or the "Sur-Reply"]; [Doc. #1261 or the "Second Opposition"] and [Doc. #1354 or the "Third Opposition"] into this Opposition.

The Court must deny the Fourth Application for the same reasons as the Defendant outlined in his First, Second and Third Oppositions to Receiver's First, Second and Third Fee Applications:  the Receiver's fees are excessive, duplicative, unreasonable and unjustified; the Receiver has not provided any benefit at all to the Receivership Estate to justify such excessive and unjustified expenses but instead has caused substantial losses to the Estate by way of

hundreds of thousands of dollars; the Order Appointing Receiver is under appeal; the Receiver is proven beyond any reasonable doubt to be a biased party and an agent of the Plaintiff; the Court has no jurisdiction to impose additional penalties on the Defendant alone and thus create a perverse incentive by paying the Receiver out of funds or assets above the judgment amount; it is inequitable for the Court to pay a Receiver who solely benefits the public (and not the Defendant) out of funds belonging to the Defendant when the Court has repeatedly denied funds for counsel to the Defendant (in violation of his due process rights) and even for his medical treatment for cancer despite the Receiver's own confirmation of tens of millions of dollars of assets over and above the judgment amount.

The Defendant reserves all rights to all issues and does not waive any right by way of this Fourth Opposition or his earlier Third and Second Oppositions, his earlier First Opposition or Sur-Reply.

## I.   FIRST OPPOSITION AND SUR-REPLY, SECOND OPPOSITION AND THIRD OPPOSITION.

The Defendant incorporates his complete First Opposition [Doc. #1183] and Sur-Reply [Doc. #1222-1], his complete Second Opposition [Doc. #1261], and his complete Third Opposition [Doc. #1354] into this Fourth Opposition.  For the convenience of the Court, the Defendant does not repeat the arguments here (and fully incorporates those arguments from his First, Second and Third Oppositions and his Sur-Reply, and refers the Court to his First, Second and Third Oppositions and his Sur-Reply), but the Defendant opposes the Receiver's Fourth Application for the same reasons as outlined in his First Opposition and Sur-Reply and his Second and Third Oppositions and also addresses additional reasons in this Fourth Opposition.

## II.     THE RECEIVER'S FEES ARE NOT JUSTIFIED IN THIS CASE.

The Defendant incorporates and reiterates his position that a Receiver was not needed in this instant case and the Receiver's Fees are not justified in this case. In addition, the Receiver has created no economic benefit to the Estate during the time period under the Fourth Application, but has rather cost the Estate a substantial amount of money and the Court must look at attorney's fees as a loss to the Estate.[1]

"[A]mong the factors considered by the Court in exercising its discretion to determine the appropriate award of fees is the cost-efficiency of the Receiver's work in terms of assets recovered for victims, *see* SEC BILLING INSTRUCTIONS at 26, "the complexity of problems faced, the benefits to the receivership estate, the quality of the work performed, and the time records presented," *SEC v. Fifth Ave. Coach Lines, Inc.*, 364 F. Supp. 1220, 1222 (S.D.N.Y. 1973)." See *SEC v. Illarramendi*, Civil No. 3:11CV78 (JBA), at *3 (D. Conn. Dec. 5, 2013). Under these factors, the Receiver's fee request is outrageously excessive and unjustified.

*First*, the Receiver did not have to recover any assets for the alleged victim, as by his own admission the value of the frozen assets greater than the Judgment amount by tens of millions of dollars [Doc. #1474-10 at 6].

*Second*, as the Defendant has made clear, there is no complexity in managing assets that are mostly liquid and real estate (and additional assets that are managed by others) and that are tens of millions of dollars above the Judgment amount.  Yet, the Receiver astonishingly invoices over $46,000 to the Defendant and has done nothing to provide *any* economic benefit to the Estate during this time.  *The Receiver has not provided any benefit to the Estate during this time,*

---

[1] "…receivership… where the goal is…to manage the estate in such a way as to maximize recovery while minimizing loss, including losses caused by attorney's fees." (emphasis in original) See *SEC v. Aquacell Batteries* Case No. 6:07-cv-608-Orl-22DAB, at *9 (M.D. Fla. Jan. 31, 2008)

*but has rather lost substantial value to the Estate by way of requesting his excessive and unjustified fees, by being reactive rather than proactive and by continuing to oppose actions that would add value to the Estate.* Defendant delves into this further, but the Receiver has spent 17 hours[2] and billed nearly $4,000 during this compensation period – for matters concerning the eviction of the illegal tenant in Apartment 12F owned by the Relief Defendants. Adding in the hours and fees of MSNH results in a total of ***nearly 40 hours and 22% of the total amount billed*** on this matter alone during the compensation period. This does not even include the fees and expenses that the Relief Defendants have had to incur related to this issue.

Had the Receiver addressed this matter *prior* to the expiration of the lease, the Estate would not have bear the additional expenses of: (1) non-payment by the illegal tenant; (2) additional attorney fees – by the Relief Defendants and the Receivership Estate to deal with this issue; and (3) additional attorney fees to employ someone to deal with the eviction process.

By way of another example, during this compensation period, the Receiver has spent yet an additional 11 hours and billed over $2,800 for matters concerning the transfer of the Harry Winston earrings by the Relief Defendants' former counsel.  Again, this issue should have been dealt with when the Receiver was first appointed rather than nearly a year later.  By way of yet another example, the Receiver, having been alerted to unauthorized trades in Ms. Ahmed's Fidelity accounts, scrambles to determine what has happened and belatedly confirms the no-trade status with the various firms.  The Receiver has spent an additional 33 hours and billed over $7,500 on this issue alone.  The Receiver should have confirmed the no-trade status for the accounts right after his appointment. This has cost the Estate by way of (1) trading fees and

---

[2] In all instances in this Opposition where Defendant provides hours and costs, the Defendant has eyeballed the invoice entries and has estimated these hours and amounts based on the description in the various line items of the four invoices submitted and reserves the right to update them if new information emerges.

commissions; and (2) lost income by way of dividend payments from that investment, not including any attorney fees spent on this issue.

It is clear – simply by these three examples alone during this Compensation Period – that the Receiver has created extreme inefficiency around the management of the assets and the Estate and that has cost the Estate significantly by way of additional fees and waste of time and resources of all parties involved.

*Third*, the Receiver and his counsel continue to be inefficient with the management of their time in this matter, and continue to invoice the Defendant for, *inter alia*, matters that are premature to deal with at this time.  The Defendant provides his objections to the time records throughout this Third Opposition and gives additional detail in **SECTION IX** of this Third Opposition, titled "**SPECIFIC ITEMS AND/OR GROUPS OF ITEMS.**"

It is clear that the Receiver has done nothing during the Fourth Application that has provided any economic benefit to the Estate – rather he has created significant loss to the Estate during this time – and his application for fees must be denied on this basis alone.

## III.   THE RECEIVER'S FEES CONTINUE TO BE EXCESSIVE RELATIVE TO THE DUTIES PERFORMED.

The Defendant incorporates, reiterates and adds to his argument that the Receiver's Fees are Excessive for the Duties Performed.  It is well known that the Receiver and his hired professionals "must exercise proper billing judgment in seeking fees from the receivership estate, and should limit their work to that which is reasonable and necessary."[3]  The Receiver has not only improperly billed the estate, but he has performed work that is unnecessary and frivolous only to further invoice the Defendant.

---

[3] *Aquacell Batteries*, 2008 WL 276026, at *2. ("Part of 'determining the nature and extent of the services rendered'…includes an analysis as to the reasonableness of the services rendered," and the expenses for which reimbursement is sought must have been "actual and [] necessarily incurred.").

*First*, any increase in the value of assets under the Receivership is a direct result of the investment decisions made by parties' other than the Receiver (such as the Defendant and Relief Defendant Ms. Ahmed) and that were put into place years prior to any asset freeze. The Receiver just cannot take any credit for any increase in the value of assets during this (or any other) time period. If anything, the Receiver's mismanagement of assets in this Estate has cost the Estate significantly. For example, the continued insistence of the Receiver to refuse to rent out Apartment 12A, owned by the Relief Defendants, has cost **the Estate** an astonishing $510,000 as of the date of this submission. Apartment 12A has been vacant since October 1, 2018 and upon information and belief, had and continues to have various tenants interested in renting the apartment. However, the SEC and the Receiver have refused to rent the apartment, leading to a significant loss in income to the Estate. Assuming $30,000/month in rental income since October 1, 2018 to March 1, 2020 yields a loss of $510,000 (and counting!) plus any interest earned on those funds, for ***just Apartment 12A alone***.

*Second,* the Receiver's invoiced amount of over $46,000 is excessive in a situation where there are mostly liquid and near-liquid assets frozen, where there is no real active management that needs to happen and where there are tens of millions of dollars of assets frozen above the judgment amount.

**These invoices are all clearly unrealistic and excessive and a complete and unnecessary drain on the Estate assets with no corresponding value produced. If anything, the Receiver has cost the Estate significant monetary value that is unjustified and unbelievable.**

*Third*, it is clear that the Receiver is inefficiently managing the Estate and is running it into losses. Indeed, the loss of rental income from keeping Apartment 12A vacant, the additional expenses and non-rental received from Apartment 12F, the unnecessary expenses related to the

6

(yet to happen) transfer of Harry Winston earrings and the unnecessary expenses related to the continued investigation of the Fidelity trade (which should not have happened in the first place) translate into a significant amount of loss to the Estate – to the amount of well over $500,000 – not even accounting for attorney fees to deal with all of these issues.

*Fourth,* the Receiver does not know how to manage these assets. Indeed, he should have dealt with the Apartment 12F situation *before* the lease expired (and had ample opportunity to do so, but chose to ignore it, as Defendant explains later in this Opposition); he should have insisted in January and February of 2019 for the transfer of Harry Winston earrings instead of completely dropping the ball on that transfer in the beginning of his appointment; and he should have (and still should) agree to rent the Apartment 12A, at least during the duration of the stay of liquidation[4] pending Supreme Court decision in *Liu.* In addition, the Receiver should have confirmed the no-trade status of the various accounts when he was first appointed and not *after* an unauthorized trade was made. Also, by not opposing the lift of litigation stay by third parties against the Defendant and Relief Defendants, but by opposing the release of funds for the Defendant and Relief Defendants to retain counsel in these proceedings, the Receiver has created a situation whereby there has been significant motion practice (resulting in "concomitant cost to the Receivership Estate" [Doc. #1477 at 4]) related to these issues alone. By not dealing with these issues in a timely and proactive manner, the Receiver has caused the Estate to incur unacceptable losses and fees – to the amount of almost $1,000,000 now, inclusive of the fees and expenses that the Receiver is invoicing.

*Fifth,* the Receiver is content to simply sit back and collect fees for doing *nothing.* It was Defendant, when he was aware of the situation, who alerted the Court and the Receiver as to the

---

[4] Doc. #1346.

unacceptability of the illegal tenant in Apartment 12F; it was the Defendant who alerted the Receiver into the inappropriateness of Harris St. Laurent continuing to retain control over the Relief Defendants' Harry Winston earrings; it was the Relief Defendants who alerted the Receiver as to the unauthorized trades and it is the Relief Defendants who are asking for the apartments to be rented.  Indeed, the Receiver is sleeping on the job and only when prodded to and insisted by the Defendant (and Relief Defendants) to manage these assets in a manner befitting the Estate, does he all of a sudden "wake up" and try to rectify the situation.  By being reactive instead of proactive, the Receiver, who has no experience managing these assets (contrary to the Defendant and the Relief Defendants), has caused the Estate a significant loss.

*Sixth*, the Receiver continues to simply outsource the administration of the Estate to his counsel, who are charging exorbitant fees. As the Defendant has already explained in his prior Oppositions, the Receiver is providing legal services to himself. As such, there is no need for additional counsel for the Receiver, who is himself a lawyer and providing legal services. Indeed, the Defendant, who is not a lawyer, has been forced to be *pro se* in this (and other) proceeding(s)*,* has been denied counsel throughout this entire litigation and has had to be and continues to be *pro se.*  It is just ***outrageously inequitable*** for the Court to provide counsel to the Receiver (a lawyer with many decades of experience) and pay them (and him) from the Defendant's assets when the Court has denied the Defendant (who has no legal background at all) the use of his own legally earned funds for the retention of counsel for himself.  It is clear that the Receiver is content to do nothing, as his hours are not even **3%**[5] of the total hours incurred and his amount invoiced is less than 3% of the total invoices.

---

[5] The Receiver is 4.9 hours of the total 194.3 hours. The Receiver has billed $1,225 out of $46,167.60. [Doc. #1474 at 5].

It is simply inequitable and outrageous that the Receiver, who is an attorney himself, would (1) have counsel and (2) outsource **all** of his work to his counsel.

*Seventh*, the Defendant is *pro se* and explains his opposition to certain groups or classifications of the Receiver's Fee Application throughout this Third Opposition, but also specifically in SECTION IX of this Third Opposition, which is titled "SPECIFIC ITEMS AND/OR GROUPS OF ITEMS." This opposition to certain classifications or groups does not waive the Defendant's position that the Receiver's fees should be substantially reduced, but as in the First Opposition, Second Opposition and Third Opposition, is an addition to help the Court in understanding the Defendant's opposition to the payment of Receiver fees as requested in the Fourth Application.


## IV.   THE RECEIVER'S FEES MUST BE PAID FROM THE JUDGMENT AMOUNT AND THE ORDER IS UNDER APPEAL.

The Defendant reiterates his position that if the Court believes that the Receiver should be paid his fees, then they must be paid from within the Judgment amount and not be an additional penalty on the Defendant.  It also renders a preserve incentive – as has already been depicted – whereby "the possibilities for abuse [are] limited only by the size of the estate" *SEC. v. Northshore Asset Mgt.*, 05 Civ. 2192 (WHP), at *3 (SDNY Sep. 29, 2009).

As the Defendant has also already stated, it is highly inequitable for the Court to be paying the Receiver from the Defendant's legally earned funds when the Defendant himself has been denied the use of those funds for his own purposes,[6] including for the retention of counsel.

---

[6] *See Almeida v. Holder*, 588 F.3d 778, 788 (2d Cir. 2009) ("The rights and benefits of property ownership are, after all, many... [T]hey include not only the right to actual possession of a thing, but also the right to exclude others from possessing it, the right to use it and receive income from its use, the right to transmit it to another...").

The Defendant (and Relief Defendants) have briefed this issue of payment to the

Receiver coming from within the judgment amount and such is pending before the Court [Doc.

#1471, 1472]. In addition, as Defendant has stated, such payment is under appeal. The Court's

ability to order payment pending appellate review of, *inter alia*, the Receiver's payment has been

briefed and is pending before the Court [Doc. #1454, 1457].

In addition, a ruling in the Supreme Court case *Liu v. SEC* could very well render a

different outcome than the current situation. Not only would the Receiver be personally liable for

the management of assets above the judgment amount (and the judgment could be reduced

materially based on the appellate courts' rulings and now the Supreme Court's review of

disgorgement in *Liu*), the appellate courts could rule that the Receiver must be paid from within

the Judgment amount for reasons including but not limited to: ***the Receiver does not represent***

***the Defendant's interests***, or ***the Estate's interests,*** but rather, ***only the Judgment's interests***.

[Doc. #1471, 1472]

## V.     THE RECEIVER IS A BIASED PARTY AND DOES NOT REPRESENT THE DEFENDANT, BUT RATHER HAS IRREVERSIBLY HURT AND DAMAGED THE DEFENDANT'S INTERESTS AS WELL AS THE ESTATE AS A WHOLE.

The Receiver continues to be a partial party in this matter and it is clear that not only has

he harmed the Defendant, he has also *harmed the Estate as a whole*.  The Receiver is only and

solely interested in securing the judgment amount only and does not care about the Estate as a

whole. The Defendant incorporates the entirety of his and Relief Defendants' briefings here

[Doc. #1471, 1472].

In addition, the Receiver has (finally!) admitted that excessive motion practice incurs

concomitant expense to the Estate [Doc. #1477 at 4]. Yet it is the Receiver who has created such

a situation by not opposing third party litigation against the Defendant and Relief Defendants and

then opposing a release of funds for the Defendant and Relief Defendants to retain counsel in those proceedings, which *harms the Estate.*

In addition, the Receiver continues to take positions that are directly contrary to the Defendant's and the Estate's interests during this time period covering the Fourth Application. ***It is simply inequitable to force the Defendant and the Estate to pay for someone who takes an adverse position to his/its' own interests.*** For example, the Receiver has opposed Defendant's motions for release of attorney fees, yet does not oppose third-party litigation against the Defendant, leading to additional motion practice and an increase in expense to the Estate. The Receiver has also opposed renting Apt. 12A, which would add an additional income stream to the overall Estate, preferring to keep it empty *in case* the Court orders liquidation. The Receiver's constant oppositions to these issues makes it clear that he does not know how to manage or maximize the value of *the Estate*, contrary to his mandate in the Order Appointing Receiver [Doc. #1070], and which has led to a significant loss to the Estate.

*Second*, the Receiver continues to have discussions with the SEC, the Defendant's adversary in this case, on various issues in this matter and on updates regarding the Estate. Yet, the Receiver does not have these discussions with the Defendant and indeed, it is the Defendant (and the Relief Defendants) who are monitoring the assets and who are in touch with the Receiver. The Defendant should not be paying for the Receiver's conversations with the SEC and he has billed nearly $3,000 to the Estate for such. To be clear, the Defendant does not mind if the Receiver speaks to the SEC, as long as *he and the Estate above the judgment are not paying for it.* Until this Court orders otherwise, the Defendant has every right to review and opine on the Receiver's fees, especially as the Court has *not released any funds that Defendant legally earned that are above the judgment amount* for Defendant to retain *legal counsel for himself* in any of his matters, but is instead using the Defendant's own legally earned funds –

which Defendant strongly opposes – to pay the Receiver who *does not in any way benefit the Defendant.*

The Receiver's bias against the Defendant is well documented. And it continues into this compensation periods as well. For example, on 11/15/2019, SMK had a conversation with the SEC: "Telephone conference with Nicholas Heinke re: stay request by Ahmed" for 0.2 hours. [Doc. #1474-4 at 8]. And then two days later, SMK "Further review(s) and revise(s) re: Receiver's objection to stay request" for 1.40 hours. *Idem.* It is clear that the Receiver's counsel is having conversations with the SEC *prior to* writing their responses (mostly objections) to the Defendant's motions. This is clear bias of the Receiver against the Defendant and for the SEC.

## VI.    THE SEC'S SUPPORT FOR RECEIVER'S PAYMENT MUST BE IGNORED.

The Defendant incorporates and reiterates his position that the SEC's support for payment to the Receiver must be ignored.  Typically, "[O]pposition or acquiescence by the SEC to the fee application will be given great weight." *Byers*, 590 F. Supp. 2d at 644 (quoting *First Ave. Coach Lines*, 364 F. Supp. at 122). However, courts have stated that "[N]o statute compels such a conclusion, however, nor do[es] [the Court] believe such great deference is warranted in this instance." *In re Alpha Telcom, Inc.*, No. CV 01-1283-PA, at *6 (D. Or. Oct. 27, 2006).

This Court should decline to give any weight to the SEC's opinion in this Fourth Fee Application, as the SEC's opinion should be considered only in a situation where the amount of assets collected is less than judgment amount or if this Court reimburses the Receiver from funds encompassed within the judgment (within the $64.4MM amount). Otherwise, only the Defendant and the Relief Defendant's opinion must be given "entire weight," if any payment is coming from them and their assets above the judgment amount.

As in the First Application, Second Application, and Third Application, the Receiver has confirmed "[T]he Commission has no objection to the relief sought herein" [Fourth Application at 2]. This is to be expected, given the Court's rulings that simply incentivize the SEC to "rubber-stamp" the Receiver's Fee Applications. The Court must decline to give any weight to the SEC's opinions on this Application.

## VII.   THE RECEIVERSHIP MUST BE TERMINATED IMMEDIATELY.

The Defendant incorporates and reiterates his position that the Receivership must be terminated immediately. The Defendant has expressed multiple times that the Receiver was not needed in this case and the Receiver is "costing" the Estate money, not generating the Estate *any* value. It is clear during the time period covering this Fourth Application that the Receiver has no idea of how to manage these assets and his inaction/misaction has cost the Estate significantly, indeed rendered a significant loss by his inability to deal in a timely and proactive manner, *inter alia*, with the tenant in Apartment 12F prior to the expiration of the lease, the Harry Winston earrings and the secureness of the various accounts.

Indeed, it is this Court that has stated that "fees requested are justified by the net economic benefit that they will provide to the estate." *SEC v. Illarramendi*, Civil No. 3:11cv78 (JBA), at *1 (D. Conn. Jan. 16, 2014). The Court must also look at the Receiver's fees as a loss to the Estate.[7] ***The Receiver has provided was absolutely <u>NO</u> economic benefit to the Estate during this period – indeed, there were only significant and unnecessary expenses that the Receiver imposed on the Estate and significant losses by the Receiver's actions/non-actions.***

---

[7] "…receivership… where the goal is…to manage the estate in such a way as to maximize recovery while minimizing loss, including losses caused by attorney's fees." (emphasis in original) See *SEC v. Aquacell Batteries* Case No. 6:07-cv-608-Orl-22DAB, at *9 (M.D. Fla. Jan. 31, 2008).

The Defendant will go into more detail in **SECTION IX** titled "SPECIFIC ITEMS AND/OR GROUPS OF ITEMS" of this Fourth Opposition, but significant examples are:

(i)     The billing to the Estate of dealing with the illegal tenant in Apartment 12F is excessive and outrageous and would not have been incurred if the Receiver had dealt with the tenant *prior* to the expiration of the lease in July 2019.  This amount is nearly **$4,000** in expenses to the Estate, not including the amount billed by the eviction attorney Mitofsky, Shapiro, Neville & Hazen, LLP ("MSNH") (which is ***an additional $8,143***) and not including any amount spent by the Relief Defendants' attorneys on this issue.  In addition, there is a loss of rental income as the illegal tenant has not paid any rent since July 2019.

(ii)    The billing of over **$10,000** for the Receiver to analyze and respond to the Defendant and Relief Defendants' motions concerning third party litigation and associated attorney fees. This is directly caused by the Receiver's no-position or lack of opposition to these third-party requests to litigate, and then his subsequent position of opposing a release of funds for the Defendant (and Relief Defendants) to have counsel in these matters.

(iii)   The continued unnecessary billing of over **$2,400** for tax issues when the Receiver has already concluded that "based upon the dollar amount and limited nature of the Receiver Estate… that he had no obligation to submit tax returns on behalf of the Defendant… [and] had no obligation to submit tax returns on behalf of the Relief Defendants or other taxable entities that are Receivership Assets." [Doc. #1474 at 22]

(iv)    The billing to the Estate of dealing with the transfer of the Harry Winston earrings is also excessive and should have been dealt with at the outset of the Receivership. It should not be that the Defendant has to alert the Receiver as to the physical transfer of those Earrings. This amount invoiced by the Receiver on this issue is nearly **$2,800** and could have been substantially lower or even non-existent had the Receiver dealt with this issue months earlier.

(v)     The billing to the Estate of dealing with the unauthorized trades in Ms. Ahmed's Fidelity accounts. *As soon as the Receiver was appointed*, he should have confirmed that no trades of any kind could be effectuated in any account. However, the Receiver clearly "dropped the ball" and had to scramble *after* the fact to ensure compliance with Court Order. This amount is just over **$7,500** and could have been substantially lower had the Receiver confirmed compliance with Court Order as soon as he was appointed.

Just these examples alone ***are nearly 60% of the total invoice amount*** requested in the Fourth Application. Indeed, the loss to the Estate by not renting out the apartments and keeping

14

the tenant in Apartment 12F beyond the expiration of the lease and without the consent or

knowledge of the Defendant and the Relief Defendants is substantial.  That the Receiver

blatantly condones such significant loss to the Estate – over $650,000 to date and counting, while

asking for his fees is glaring mismanagement of assets.  The fact that the Receiver even billed for

these actions shows the mismanagement and abuse that ensues with the appointment of a

Receiver whereby "the possibilities for abuse [are] limited only by the size of the estate." *SEC. v.

Northshore Asset Mgt*., 05 Civ. 2192 (WHP), at *3 (SDNY Sep. 29, 2009). This Court should not

allow that to happen.

## VIII.    IN THE ALTERNATIVE, IF THIS COURT IS INCLINED TO GRANT FEES TO THE RECEIVER, IT MUST REDUCE THE FEES SUBSTANTIALLY AND IMPOSE A 100% HOLDBACK UNTIL ALL APPEALS ARE CONCLUDED.

The Defendant believes that the Receiver should not be paid at all. Or that if he is paid,

he should be paid from within the Judgment amount and by those parties who are benefiting

from the Receiver – namely the Judgment and/or the SEC. [Doc. # 1471, 1472].

In this Fourth Opposition, the Defendant incorporates and reiterates his position that "if

this Court is inclined to grant the Receiver's fees (which the Defendant vehemently opposes), the

Court should apply a minimum of a 60% discount to the requested fees and withhold 100% of

the amount" as Courts have discretion to award the amount of compensation that can or will be

awarded to a court-appointed receiver. See *SEC v. Byers*, 590 F. Supp. 2d 637, 644 (S.D.N.Y.

2008); *United States v. Code Prods. Corp*., 362 F.2d 669, 673 (3d Cir. 1966).  For the Fourth

Application, the Defendant states that there should be a 60% reduction in the requested fees (as

opposed to the 50% or 70% reduction in the earlier Applications) and the Defendant details this

further in Section IX of this Opposition.

15

The Court should also hold any payment to the Receiver in abeyance until the final conclusion of this matter when all appeals have been heard (if the Court keeps the Receivership that long), as even the Receiver himself stated that "[O]verall results can be determined only at the conclusion of the Receivership Proceeding." [Doc. #1474 at 27]  This case does not justify the award of fees or expenses to the Receiver until any benefit that the Estate receives from him is determined.  So far, the Receiver has only incurred substantial losses to the Estate.

Courts have allowed the "Receiver [to] apply for those fees at the conclusion of this litigation. Withholding fees until the conclusion of the lawsuit assists the Court in achieving its continuing goal of preserving funds held in the receivership estate for the compensation of the investors. This approach is common in SEC civil enforcement actions because it allows the Court to withhold fees until it is absolutely clear that a receiver's efforts will ultimately benefit the receivership estate. See *SEC v. Byers*, 590 F. Supp. 2d at 648. The Court derives the authority to award such reduced fees from its power to "fix the compensation" of receivers and their attorneys. Drilling, 69 F.2d at 418." *SEC v. Small Bus. Capital Corp*. Case No. 5:12-CV03237 EJD, at *4 (N.D. Cal. Aug. 7, 2014).  As such, the Court should wait until the conclusion of all appeals before any fees or expenses are awarded to the Receiver so that any net economic benefit (if any) from the Receiver's actions can be determined and assessed.

## IX.    SPECIFIC ITEMS AND/OR GROUPS OF ITEMS ON EXHIBITS TO THE FOURTH APPLICATION.

As in his First, Second and Third Oppositions, the Defendant contests all of the Receiver's bills in his Fourth Opposition, but because he is *pro se* and uncertain of the proper procedure regarding line items, the Defendant only gives some examples below to support his opposition of the payment of any fees or expenses to the Receiver. Should the Court request a

line item audit by the Defendant, the Defendant would provide such to the Court. The Defendant reserves the right to bring additional issues on these invoices and exhibits, or any other matter regarding the Receiver's applications for fees and expenses, to the Court's attention at a later date in time.

1.      **Doc. #1474-3, or Exhibit C:**

*First*, as in his earlier Oppositions, the Defendant opposes all items in Doc. #1474-3 or Exhibit C in this Fourth Opposition. These items that the Receiver is looking to have reimbursed include: PACER expenses, online research expenses, Federal Express expenses, service fee, subpoena fees, copying expenses, printing charges, postage, and conference call expenses.

With respect to PACER and online research expenses, the Receiver does not explain what documents he accessed from PACER and what online research resulted in these invoices. Further, as indicated in the emails transmitting electronic filings in this case, the PACER system permits parties to download for free a copy of all case-related documents. Further, the Court denied the same relief that the Defendant requested toward payment of a $28.50 PACER bill, stating that "[S]hould Defendant desire the additional benefit of viewing documents in other cases or viewing documents in his case multiple times, he must bear that expense himself." [Doc. #773]. The Court must treat the Receiver the same way.

In addition, the Defendant is not always able to download PACER documents when they are filed and has asked the Court to order the parties to email him their filings, so that he is not further prejudiced in this case [Doc. #1393]. Such request remains pending and lends further support to the Defendant's position that the Receiver should not be reimbursed *from and by the Defendant* for PACER expenses, when the Defendant himself is not allowed to access the filings from this case when there are download issues and when Defendant has been precluded from

17

accessing PACER for other filings or research because the Court denied the payment of a nominal $28.50 bill.

*Second*, the Receiver does not specify the need for other services, such as copying. In addition, because this Court also denied Defendant any amount for travel expenses, any aid with conference call expenses and any aid with any of his attempts to litigate this case, any and all expenses that the Receiver is requesting reimbursement for on Exhibit C (Doc. #1474-3) must also likewise be denied or removed.  The denial of these same or similar expenses for the Defendant *has severely prejudiced the Defendant and has adversely impacted him as he was not able to properly litigate his case(s)*.  The Court cannot allow the reimbursement of these expenses to the Receiver from the Defendant's assets.

### 2.      Doc. #1474-4 to Doc. #1474-8, or Exhibits D-1 to D-5:

*First,* the Receiver does not explain why two people were needed on any conversation with other parties such as the SEC or the Relief Defendants, and why two attorneys were needed for any communication, meeting, or discussion with any other party. Courts have reduced fees by the amount charged for other people who attended a conversation, hearing or dealt simultaneously with the same issue. See *In re 29 Brooklyn Avenue, LLC*, US Bankruptcy Court, EDNY, April 27, 2016 (reducing fees paid when more than one attorney was present). Assuming no more than one person was required, given at least two attorneys were always doing the same work, the fee total must be reduced by at least 50% if not more for this reason alone.

This continues to be concerning as the Receiver himself testified that his firm would not "double-bill, even if it's legitimate double-billing, in the sense of if two of us are dealing with the same issue we only bill for one person's time" [Doc. #1043 at 24:17-19, "Nov 28 Hr.

Trans."]; and yet when the bills are submitted, the Invoices show the exact opposite of what he said.

There are multiple instances of bills for multiple attorneys for the same issue (each meeting, conference call, etc.), in the Fourth Application, but the Defendant provides just a few examples[8] for the Court's benefit below:

(i)     *See* SMK entry on 10/1/19 "Join part of conference call with commission re: miscellaneous issues " for 0.50 hours versus CHB entry on 10/1/19 "Call with MW/NH (SEC) regarding outstanding receivership issues" for 1.20 hours [Doc. #1474-4 at 2]

(ii)    *See* SMK entry on 10/31/19 "Call with SEC re: miscellaneous issues; further strategize re: same" for 0.50 hours versus CHB entry on 10/31/19 "2x calls with MW/NH (SEC) regarding outstanding receivership issues" for 1.00 hours [Doc. #1474-4 at 5]

(iii)   *See* SMK entry on 11/12/19 "Telephone conference with SEC re: latest developments and issues" for 0.60 hours versus CHB entry on 11/12/19 "Call with MW (SEC) and SMK regarding outstanding receivership issues" for 0.60 hours [Doc. #1474-4 at 7]

*Second*, there are vague entries in the invoices whereby the Defendant does not know what was done or discussed and Defendant provides several below by way of example:

(i)     *See* CHB entry on 12/10/19 "Review Iftikar Ahmed response to notice re motion" for 0.20 hours [Doc. #1474-4 at 12]

(ii)    *See* CHB entry on 12/10/19 "Attention to finalizing and filing notice re Iftikar Ahmed email" for 0.20 hours. *Id.*

(iii)   *See* CHB entry on 12/10/19 "Review Iftikar Ahmed emails in connection with analyzing whether to draft reply to Iftikar Ahmed" for 0.20 hours. *Id.*

(iv)    *See* SMK entry on 12/17/19 "Attention to various issues… responses to numerous pleadings)" for 0.30 hours

---

[8] Should the Court want a line-by-line audit of each time that an entry is being charged twice by the same individual, being double or triple billed as well as any further vague entries, Defendant would be happy to provide such for the benefit of the Court.

Courts have reduced fees awarded by **75%** due to such vague entries. "Such vague entries warrant a reduction because they fail to provide "an adequate basis upon which to determine the reasonableness of the services and hours expended on a particular matter." *Tucker v. Mukasey*, supra, 2008 WL 2544504 at *1." See *Spalluto v. Trump International Hotel Tower*, 04 Civ. 7497 (RJS) (HBP), at *21 (S.D.N.Y. Aug. 29, 2008), reducing attorney's time by 75%. "It is well settled that supporting documentation for attorney's fees must be of sufficient detail and probative value to enable the court to determine with a high degree of certainty that the billing is reasonable." *Yelton v. PHI, Inc.*, No. 09-3144, 2012 WL 3441826, at *8 (E.D. La. Aug. 14, 2012) (internal quotations omitted). Litigants who submit vague fee applications "take their chances" that those entries will be disallowed. *League of United Latin American Citizens No. 4552 v. Roscoe ISD*, 119 F.3d 1228, 1233 (5th Cir. 1997) (citing *Louisiana Power & Light*, 50 F.3d at 327).

*Third,* the Receiver has spent an enormous amount of time – over 40 hours and billed almost $10,300, **_over 22% of the total amount_** to respond to various filings related to third party litigation. Such is entirely a direct outcome of the Receiver refusal to oppose such requests by third or non-parties, while simultaneously opposing the requests for funds for counsel to represent the Defendant and/or the Relief Defendant in such proceedings.

*Fourth,* the Receiver has spent nearly 20 hours and billed almost $4,000 to deal with the eviction of the illegal tenant in Apartment 12F.  This increases drastically when adding in MSNH's billing – to the tune of nearly 40 hours and billing over $12,000 to deal with this issue. Indeed, it was the Defendant who alerted the Receiver to the absolute unacceptability of the situation.  Had the Receiver dealt with this issue **prior** to the expiration of the Apartment 12F lease, there would not be additional unnecessary billings and wasted resources on this issue. Indeed, the Receiver unbelievably states that the "occupants of Apartment 12F… **_unexpectedly_**

20

stayed passed *[sic]* the end of their lease term of July 14, 2019." (emphasis added) [Doc. #1330 at 17]. Yet, the Receiver **knew and allowed** the illegal tenant to stay past the expiration of the lease term on July 14th, 2019:

(1) The Receiver blatantly ignored the building management's request on June 17th, 2019 asking if the tenant had renewed the lease.  The Receiver *should have* at this time, communicated with the tenant and confirmed the expiration of the lease and vacancy of the Apartment 12F on July 15th. Yet, the Receiver completely mismanaged the entire matter with the illegal tenant in Apartment 12F by not communicating with the tenant.

(2) The Receiver deliberately answered the building management's next query on July 26th, 2019 by stating that "[T]he Receiver will provide a copy of the renewal lease if such a renewal lease is entered into."

(3) The Receiver knew that the illegal tenant had stayed beyond the July 14th expiration as he was "[C]ontemplating that the 12F Occupants would vacate Apartment 12F since the term of their lease had just days earlier ended (on July 14, 2019)…" [Doc. #1249 at 4]. Tenants do not leave *after* the lease expires, but rather *before* the lease expires.  The Receiver's statement makes no sense at all, but shows that he absolutely knew and condoned the tenant staying beyond the lease, contrary to his statement that the tenant "unexpectedly" stayed beyond the lease expiration.

(4) The Receiver accepted a check from the tenant dated July 9, 2019 – beyond the June 15th rental deadline for the time period of June 15th – July 15th or ahead of the July 15th expiration of lease. He accepted this check as "use and occupancy."  Thus, the Receiver very well knew that the tenant had stayed beyond the expiration of the lease.

The Receiver did not communicate any of this to the Defendant at all or to the Relief Defendants until he was confronted by them on this issue.  The Receiver has completely mismanaged the entire situation with the tenant in Apartment 12F and that has caused significant loss to the Estate (indeed, the tenant is still squatting in the apartment, there has been not been full payment since July 2019 (and it is now March 2020) and there has had to be a retention of an eviction lawyer to deal with this situation) and there is still no settlement agreement or action that has commenced on the eviction process.

*Fifth,* the Receiver has spent over 10 hours and billed almost $2,800 to deal with the transfer of the Harry Winston earrings from Harris St. Laurent ("HS") to his custody and control.

21

It is absurd that again, it is the Defendant who alerted the Receiver in the summer 2019 to the situation that the earrings must be under his custody and not HS' custody.  Because the Receiver dropped the ball in dealing with this issue when he was first appointed, it is costing the Estate a significant amount of money to deal with this issue now.  And it is still not resolved.

_Sixth,_ in yet another example where the Receiver has been reactive instead of proactive, he has spent over 32 hours and over $7,500 on trying to resolve the unauthorized trades in Ms. Ahmed's Fidelity accounts. The Receiver was appointed to manage the assets and part of that includes checking with each firm _ahead of time when the Receiver was **first** appointed_ a year ago in December 2018 with the safeguards the firms have in place and ensuring that they understood the Court's Orders regarding no trades without Court Order.  Indeed, not one unauthorized trade happened _prior_ to the Receiver being appointed.  Had the Receiver been proactive instead of reactive, we would not be in this situation.

_Seventh_, the Receiver continuously misstates that his "primary duty [is to]… value assets and liquidate such assets… to secure the Judgment" [Doc. #1474 at 26].  That is but _one_ of the objectives and stands in _equal importance_ to the others that are listed: "given the need to value the frozen assets and **avoid over-freezing**, to secure the Judgment for the SEC, **to manage and maximize the value of the frozen assets**… and to take necessary steps toward effectuating the judgment…" (emphasis added) [Doc. #1070 at 5]. Tellingly, the Receiver ignores that his mandate to "avoid over-freezing" and "manage and maximize the value of the frozen assets" is _**just as important**_ as what he considers his "primary duty."

Indeed, the Receiver has a duty to manage and maximize the value of the frozen assets and opposing the rental of the apartments and allowing for third party litigation has done the exact opposite. The Receiver continues to misunderstand his mandate and nowhere has the Court ever stated that any liquidation is the _primary_ objective of the Receivership and it is simply

astonishing that the Receiver unilaterally presumes so. This presumption has driven all of the Receiver's actions to secure the judgment, but at the expense of the overall Estate and he has thus mismanaged and harmed the overall Estate (and continues to do so) as the value of the overall Estate is tens of millions of dollars *above* the judgment amount.

The Court must remove these charges from the invoice as they simply unnecessarily drain the assets of the Estate, especially before the Court has made any liquidation rulings and now with the stay of liquation in place [Doc. #1346].

*Eighth*, the Receiver continues to spend an unnecessary number of hours on tax issues and has billed over $2,400 when he has already "concluded based upon the dollar amount and limited nature of the Receivership Estate… that he is not required to submit separate tax returns for the Defendant or the Relief Defendants." [Doc. #1160 at 24].  There is no reason for the Receiver to have anything to do with the Defendant and the Relief Defendants' tax returns and the Receiver himself admits that "he had no obligations to submit tax returns on behalf of the Defendant… the Receiver had no obligation to submit tax returns on behalf of the Relief Defendants or other taxable entities that are Receivership Assets." [Doc. #1474 at 22].  Neither the Defendant nor the Relief Defendants have tax counsel and the Receiver has no right or entitlement to view any of their tax returns, especially as he admits the "strong statutory protections that afford significant privacy to a person's tax returns" [Doc. 1330 at 21].  Should the Receiver continue to waste and unnecessarily spend time on this issue, funds must be released for the Defendant and the Relief Defendants to consult with tax counsel *prior* to the release of any of their tax returns to anyone.

The Receiver is presumably experienced as a Receiver and there is no need, once he has concluded that he does not need to file taxes for the Defendant and Relief Defendants, that he

continues to have discussions, research, and draft motions on such topic and continue to bill the Defendant for it.  Any amount related to taxes must be removed from the invoicing.

*Thus*, these unnecessary amounts listed here add up to ***nearly 60% of the amount invoiced*** and must be removed from the billing.  The amount invoiced for this time period is excessive and unjustified.  If the Court still feels that this should be paid, then it must be paid from the within the Judgment and/or paid by the SEC.

These are just many examples of why the Defendant opposes any payment of fees to the Receiver. *See Code Prods. Corp.*, 362 F.2d at 673 ("In allowing fees the considerations are the time, labor and skill required, but not necessarily that actually expended, in the proper performance of the duties imposed by the court upon the receivers, the fair value of such time, labor and skill measured by conservative business standards, the degree of activity, integrity and dispatch with which the work is conducted and the result obtained.").  A full (but expensive and unnecessary) audit of the Receiver's timekeeping and records – which the Defendant is happy to do himself for the Court should the Court request it – will likely reveal many such excessive and unnecessary invoicing and unjustified expenses incurred by the Receiver.

3. **Doc. #1474-9, or Exhibit D-6:**

The *pro se* Defendant consents to the payment of $10,698.00 to Mitofsky, Shapiro, Neville & Hazen, LLP ("MSNH") **from the rental proceeds of Apartment 12F only**. However, to date, there has been no agreement for date of eviction nor has the eviction proceedings commenced and most of the amount invoiced is simply discussions between the Receiver and MSNH.  The Defendant reserves the right to oppose continued payment to MSNH if there is no progress towards the eviction of the tenant from Apartment 12F.

## **CONCLUSION**

This Court should not allow the payment of excessive and unjustified fees to the Receiver for the reasons stated herein.  This Court has also been clear that "it recognizes the parties' concerns regarding the potential cost of a receiver and shares their desire to avoid unnecessary or high receivership costs" [Doc. #1070 at 5].  As the Defendant continues to reiterate, courts have been very careful when granting attorney fee motions, especially those of a Receiver, who is supposed to be retained for the benefit of the public. As stated by a Circuit Court on excessive Receiver fees:

> "The $12,000 fee allowed appellee is more than the salary of a United States District Judge for an entire year. It is more than the salary of the most of the Governors or Judges of the Supreme Courts in the respective states of this country. In our judgment [sic] it is so exorbitant that its allowance must be held to be an abuse of the court's discretion. That there has grown up a judicial abuse in the allowance of excessive fees to masters, receivers, and attorneys in receivership cases cannot well be denied. The Supreme Court of the United States has called attention to this and sounded a note of caution and warning to the judges of the federal courts in the case of *In re Gilbert*, 276 U.S. 294, 296, 48 S. Ct. 309, 310, 72 L. Ed. 580, as follows: "We were desirous of making it clear by our action that the *judges of the courts, in fixing allowances for services to court officers, should be most careful*, and that vicarious generosity in such a matter could receive no countenance." And in *Newton v. Consolidated Gas Co*., 259 U.S. 101, 42 S. Ct. 438, 439, 66 L. Ed. 844, in passing on the compensation of a master the Supreme Court points out that, *"The rights of those who ultimately pay must be carefully protected.*" There seems to have developed an idea that lawyers are entitled to more compensation when employed in a receivership case than they would think of charging if employed by a private client for similar services. There is no reason for any difference in charges. Counsel should be allowed fair and reasonable compensation in receivership matters. There is no reason why they should be overpaid." (emphasis added).
>
> *Federal Oil Marketing Corporation v. Cravens*, 46 F.2d 938, 943 (8th Cir. 1931).

The same is absolutely true in this instant case. The Receiver has not shown that the fees and expenses he incurred from October 1, 2019 through December 31, 2019 were a productive use of the Estate's assets, or that they were cost-efficient and ultimately beneficial to the Estate.

If anything, the Receiver has mismanaged the assets, causing a significant loss to the *overall* Estate (against his clear mandate) and has been reactive instead of proactive.  Given the Court's understanding and desire to "avoid unnecessary or high receivership costs" and the Receiver's mandate to "manage and maximize the value of frozen assets" [Doc. #1070 at 5] with the "dual objects of maximizing the value of the assets of the Receivership Estate and minimizing the expenses charged hereunder…" [Doc. #1070 at 7], **which he has not done**, the Court should deny the Receiver's Fourth Application.

WHEREFORE, the Defendant humbly requests the esteemed Court deny the Receiver's Fourth Application; or in the alternative, impose an additional 60% discount and a 100% holdback until the conclusion of all appeals in this case, and for any such fees to be paid from *within the judgment* by those parties that are benefiting from the appointment of Receiver and not the Defendant.


                                        Respectfully Submitted,



Dated:         March 04^(TH), 2020          /s/ Iftikar Ahmed
                                        _____
                                        Iftikar A. Ahmed
                                        C/O Advocate Anil Sharma
                                        Government Place East
                                        Kolkata 700 069, India

                                        Tel:    +91-983-008-9945
                                        e-mail: iftyahmed@icloud.com

                                        *Pro Se*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and served by electronic mail to:

MR. NICHOLAS P. HEINKE, *ESQ.*
U.S. Securities and Exchange Commission
Byron G. Rogers Federal Building
1961 Stout Street, Ste. 1700
Denver, CO 80294
(303) 844-1071
e-mail: heinken@sec.gov

MR. MARK L. WILLIAMS, *ESQ.*
U.S. Securities and Exchange Commission
Byron G. Rogers Federal Building
1961 Stout Street, Ste. 1700
Denver, CO 80294
(303) 844-1027
e-mail: williamsml@sec.gov

MR. PAUL E. KNAG, *ESQ.*
Murtha Cullina, LLP
177 Broad Street, 4th Floor
Stamford, CT 06901
(203) 653-5400
Fax: (203) 653-5444
e-mail: pknag@murthalaw.com

MS. KRISTEN LUISE ZAEHRINGER, *ESQ.*
Murtha Cullina, LLP
177 Broad Street, 4th Floor
Stamford, CT 06901
(203) 653-5406
Fax: (860) 240-5758
e-mail: kzaehringer@murthalaw.com