# Exhibit 1

# EXHIBIT NUMBER

~    ~    ~    ~    ~

# 46

~    ~    ~    ~    ~

## TO AFFIRMATION OF
## SCOTT A. ZILUCK
## IN SUPPORT OF PLAINTIFF'S
## OPPOSITION
## TO THE OAK DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------X
NMR E-TAILING LLC
Plaintiff,
-against-
OAK INVESTMENT PARTNERS, OAK
MANAGEMENT CORPORATION, OAK
INVESTMENT PARTNERS XIII, LP, OAK
ASSOCIATES XIII, LLC
Defendants.
-----------------------------------------------------------------X
Index No.: 656450/2017

**Expert Report of Karen A. Steighner**

# Section 1 - Introduction

**1.1** I have been retained by NMR E-tailing, LLC ("NMR"), Plaintiffs in this case, as an expert to render an opinion regarding the Plaintiff's claims that Oak Investment Partners, Oak Management Corporation ("Oak Corp."), Oak Associates XIII, LLC ("Oak Fund GP"), Oak Investment Partners XIII, LP (the "Oak Fund" and collectively with Oak Investment Partners, Oak Corp. and Oak Fund GP, "Oak"), and Iftikar Ahmed ("Ahmed" and collectively with Oaks, the "Defendants"), failed to adopt and implement internal controls.

**1.2** Specifically, I have been asked to (i) review the actions on the part of Oak during the lengthy period in which Ahmed ("Ahmed") engaged in a series of fraudulent activities while employed by Oak; (ii) determine if those actions and omissions included the failure to adopt and implement adequate internal controls designed to detect and prevent Ahmed's misconduct that resulted in losses to various Oak funds, and NMR, in its capacity as a Co-investor, together with the Oak Fund, in a company known as Choxi.com ("Choxi"); (iii) determine whether Oak's controls in detecting and preventing insider fraud that were in place during the period of Ahmed's employment, if any, deviated in any way from standard industry customs and practices, and (iv) evaluate whether Oak's internal controls or lack thereof, constituted a substantial factor in causing or contributing to Ahmed's ability to perpetrated the fraud that resulted in harm to NMR.

**1.3** I have been retained by the law firm of Whiteford, Taylor & Preston, LLP in Baltimore, Maryland, for this assignment in light of my extensive background and expertise in securities compliance matters.

**1.4** A copy of my Curriculum Vitae is attached hereto as Exhibit A.  As noted in my Curriculum Vitae, I have worked in the securities industry in various capacities during my entire professional career of more than 30 years and have extensive experience working as a C-level compliance official for broker dealers, investment advisers and investment companies.  This experience has afforded me the opportunity to acquire in depth knowledge of securities and investment banking, investment advisory and investment company compliance as well as a thorough understanding of the components of effective systems of supervision and oversight of those activities.

**1.5**  I began my career in the securities industry in 1980 in the internal audit department of a regional investment firm.  In addition to serving as a chief compliance officer, financial principal and general securities principal on a contract basis for a variety of securities firms, I have served as the President and CEO of Compliance Advisers, Inc., a regulatory compliance consulting firm since 2001.  Prior to working at Compliance Advisers, I served as a Chief Compliance Officer, Director of Compliance, Taxable Fixed Income Specialist and an Operations Manager.

**1.6**  I earned a Masters of Business Administration from the University of Colorado in Denver, Colorado in 2014.  I also have multiple securities registrations—Series 7, 24, 27, 63, 65, 79 and 99.

**1.7**  I am a current member, speaker and exhibitor of the National Society of Compliance Professionals (NSCP); a Member of the National Society of Fraud Examiners (NSFE), the Association of Anti-Money Laundering Specialists (ACAMS); the Sports Financial Advisors Association (SFAA), a Former Allied Member – New York Stock Exchange; a member of Women Business Owners – Denver Chapter, Women In Compliance, the Institute of Internal Auditors.  I have facilitated the SEC's Outreach Program in Denver, Colorado and sponsored and participated in the Mile High Compliance Roundtable.

**1.8**  Through my work at Compliance Advisers, I have led the development of a variety of compliance solutions for use by industry clients to achieve compliance with securities rules and regulations including systems of supervision, internal controls testing, written supervisory procedures, annual reviews, risk assessments, mock audits, AML testing, and testing techniques.

**1.9**  I am the author of articles on various regulatory compliance matters related to current, relevant securities regulation topics.

**1.10**  Although I have provided extensive guidance to clients involved in securities compliance matters, and in particular have advised clients with regard to internal controls and compliance issues, I have not previously served as an expert witness in litigation.

**1.11**  This Report describes (a) ordinary industry standards and practices of effective compliance programs, (b) standard industry internal controls, in particular as they relate to detecting and preventing fraud, (c) what controls Oak failed to adopt and implement; (d) how these failures to adopt and implement effective internal controls deviated significantly from industry customs and practices; and, (e) how the failures to adopt and implement basic, effective and customary internal controls substantially caused and materially contributed to the fraud that was perpetrated by Ahmed.  In particular, this Report supports my opinions,

as expressed herein, that had Oak adopted and implemented a compliance program that included an effective system of supervision and internal controls, Oak would have been able to detect and prevent the series of fraudulent activities undertaken by Ahmed, such that the loss alleged by NMR in the Complaint, to a reasonable degree of certainty, would have been avoided.

**1.12** In preparing this Report, I have relied upon my general knowledge, training, experience and expertise in securities compliance and regulation of more than 30 years and in designing regulatory compliance programs and systems of supervision, as well as providing guidance to investment advisers and broker dealers and developing effective policies and procedures for compliance with securities regulations. My experience also includes monitoring the effectiveness of internal controls programs, systems of supervision and policies and procedures through sampling, transactional and forensic testing techniques.  In addition, I have relied upon materials submitted to me by the offices of Whiteford, Taylor & Preston, LLP. (Listed in Exhibit B).  I reserve the right to amend this report if additional information becomes available.

4

Case 3:15-cv-00675-JBA   Document 1567-1   Filed 06/09/20   Page 7 of 31

# Section 2 – Relevant Factual Background

**2.1**  Oak was an Exempt Reporting Adviser ("ERA").

**2.1**  As an ERA, Oak was subject to anti-fraud provisions of the Investment Advisers Act of 1940, as well as other compliance requirements.

**2.2**  Oak is a venture capital firm that solicits investor funding to invest in companies, known as "portfolio companies", hoping to return a profit for their investors and for their employees.

**2.3**  The Oak Entities market themselves as a partnership utilizing the name "Oak Investment Partners" as highlighted on its website, in press releases, email signature blocks and marketing materials. Moreover, the personnel of Oak Investment Partners refer to themselves openly as partners, including General Partners and Managing Partners, and Ahmed identified himself as a "General Partner" of Oak Investment Partners in his communications with NMR.

**2.4**  The Oak Entities operate together under the Oak Investment Partners umbrella, which utilized various investment professionals as its managing and general partners, various investment professionals, and at all times relevant, included Ahmed.  Included under the Oak Investment Partners partnership umbrella are the Oak partners, Oak Corp, the Oak Fund, the Oak Fund GP, and their affiliates, which in varying degrees provide the investment vehicles (including the Oak Fund) by way of limited partnerships, limited liability companies which act as investment managers of such limited partnerships, and among other things, provide staffing and additional managerial oversight at a corporate level through Oak Corp.

**2.5**  Ahmed was an employee, general partner, officer, and agent of Oak.  He began his employment in 2004 and became a general partner in 2006.  Ahmed remained as a general partner at Oak until his termination in May of 2015 after Oak instituted an investigation into Ahmed's activities and discovered the lengthy pattern of his fraudulent activities.

**2.6**  The extent and duration of Ahmed's fraudulent activities are not in dispute, as Oak itself, in two Declarations submitted by its Chief Financial Officer Grace A. Ames ("Ames") dated May 5, 2015 and June 11, 2015, in connection with litigation instituted by the SEC against Ahmed, delineated the repeated, extensive acts of fraudulent activity Ahmed engaged in during the course of his over ten-year tenure at Oak.  Ames reaffirmed the various acts of fraud undertaken by Ahmed during the course of his

5

Case 3:15-cv-00675-JBA   Document 1567-1   Filed 06/09/20   Page 8 of 31

employment at Oak as set forth in her Declarations during her deposition in this matter.

**2.7**   Ahmed's fraud included various schemes whereby he opened bank accounts in the name of Oak, and in the name of Oak portfolio companies.  Through fraudulent documentation, false representations, and false invoices, as set forth in the Ames Declarations, Ahmed induced Oak and those portfolio companies to transfer money into bank accounts that he controlled unbeknownst to Oak and those portfolio companies.  Ahmed then transferred the money from those bank accounts into other accounts he controlled.

**2.8**   Through Ahmed, the Oak Entities endorsed and advocated many investment opportunities-one of which involved online internet retailer, Choxi.  Ahmed, in his capacity as "General Partner" of Oak Investment Partners, officer of Oak Corp., and a member of its investment "team", was touted by Oak Investment Partners and Oak Corp. on their website and in press releases, as the Oak Entities' expert in e-commerce—the industry in which Choxi operated.  With regard to the Series B investment in Choxi that is at the core of this litigation, the depositions of Oak's Managing Partners confirmed that Ahmed sponsored the investment at Oak, undertook a primary role in Oak's due diligence related to an investment in Choxi, was the exclusive representative of Oak that interfaced with NMR as the Series B investment opportunity was being contemplated, and took the lead role in negotiating the terms of the Series B Stock Purchase Agreement.

**2.9**   Ahmed's fraudulent activity relating to Choxi began with the 2012 round of funding, known as the Series A stock purchase. Specifically, Ahmed failed to disclose to Oak that he was personally invested in Choxi as a Series A investor, in violation of Oak investment policy.  He further misrepresented to his fellow Series A investors that he had obtained Oak's consent to invest personally in Choxi through an entity called I-Cubed Domains, LLC.  Moreover, just days after the Series A investment closed, Ahmed falsely represented to his fellow Series A investors, as well as to Choxi, that in order for him to remain on the board of Choxi and thus vested in the company's success, Oak required that an additional $2,000,000 investment be made in Choxi through an Oak portfolio company known as Giosis Holdings ("Giosis").  Giosis had made an initial $150,000 investment in Choxi as part of the Series A round of financing. In fact, Oak had made no such demand on Ahmed.  Unbeknownst to either Choxi, his fellow Series A investors or Giosis, this additional $2,000,000 Series A investment, made in the name of Giosis, was fraudulently undertaken by Ahmed, and, in fact, he purchased these supplemental Series A shares without authority, using Giosis' money, and

6

then personally assumed control over those shares that were purportedly held by Giosis when Giosis questioned him about the unauthorized transfer of its funds. In 2013, as Choxi's revenue grew and the company continued to perform well financially, Ahmed and the Oak Entities led a second round of funding in Choxi. Specifically, Ahmed convinced his partners at Oak to fund $25 million into a Series B round of financing for Choxi, and Ahmed led the effort to identify co-investors to join the Oak Defendants in their commitment and desire to participate in the Series B round. To that end, Ahmed, on behalf of the Oak Entities, solicited NMR to make a co-investment in Choxi Series B shares alongside the Oak Fund. Ahmed and the Oak Entities utilized Ahmed's vast experience and prior successes in the Internet retailing space, in conjunction with the "Oak" brand, reputation, and backing, to attract NMR and its members to make an approximate $14.5 million co-investment in Choxi, along with the Oak Fund, meaning that the Series B round of funding for Choxi totaled approximately $40 million.

**2.10** As previously indicated, Ahmed led the Series B investment negotiations. As part of that effort, Ahmed falsely represented both to Choxi and NMR that Oak had a policy that required the redemption of the Series A shares purportedly held by Giosis - but in actuality were owned by Ahmed – in order for Oak to participate in and close on the Series B round of financing. In fact, Oak maintained no such policy. This fraudulent misrepresentation served to allow Ahmed to cash out the "Giosis" Series A shares he secretly controlled, and thus personally benefit in the amount of approximately $10.9 million, pursuant to a Repurchase Agreement that Ahmed put in place and incorporated into the Series B Stock Purchase Agreement as a condition of closing. The net effect of this fraudulent scheme was that Choxi received $10.9 million less from the Series B round of financing proceeds, which could otherwise have been utilized by the company for ongoing operations. To effectuate this scheme, Ahmed caused NMR to wire the $10.9 million due to "Giosis" as required by the Series B Repurchase Agreement into a bank account he set up under the name of Giosis, and once such funds were received, transferred that money into another account Ahmed controlled.

**2.11** Accordingly, Ahmed, in his capacity as an employee, agent and General Partner of Oak, in securing NMR's co-investment, misrepresented and concealed, among other things:

**2.11.1** the true ownership interests of Oak Investment Partners' portfolio company in Choxi Series A shares;

**2.11.2** that Ahmed was personally profiting from the Series B round of funding by causing the transfer of approximately $10.9 million

7

to a bank account he established and controlled as part of an alleged required repurchase of Series A shares;

**2.11.3** that Oak Investment Partners had not required the repurchase of Series A shares as a condition of investing in the Series B transaction, as Ahmed had falsely informed representatives of NMR and Choxi;

**2.11.4** that Oak Investment Partners previously required that its portfolio company make a larger investment in Series A after the round had closed as a condition for Ahmed and Oak Investment Partners to continue to be active with Choxi; and,

**2.11.5** that Oak Investment Partners had approved a personal investment by Ahmed in Choxi, even though he was Oak Investment Partners' general partner and an officer, employee, and agent of Oak, when an Oak Investment Partners' portfolio company was simultaneously investing in Choxi; and that Oak Investment Partners and the Oak Entities, through the Oak Individual Partners, had approved all transactions that Ahmed and Oak Investment Partners' portfolio company were engaged in with Choxi.

**2.12** Had the Oak Defendants exercised reasonable diligence over Ahmed or implemented proper and adequate internal controls, it would have discovered Ahmed's serial fraudulent misconduct as set forth in the two Ames Declarations well prior to the Series B round of financing in October of 2013, as was belatedly uncovered in 2015 as part of Oak's investigation into Ahmed's activities. Accordingly, Ahmed would not have been in position to solicit NMR to invest its $15 million in Choxi. Moreover, had Oak not wholly failed to exercise any diligence and supervision over Ahmed as a general partner, agent, officer, and employee, to the extent they were previously unaware of his misconduct, they would have discovered Ahmed's serial misrepresentations to NMR representatives and Choxi, thereby preventing NMR's loss. In fact, Ahmed's fraud was so simple and uncomplicated that the President of Oak, Edward Glassmeyer, testified that Ahmed's fraud was uncovered by Oak "almost instantly" after Ahmed was arrested for unrelated insider trading. Ahmed's fraud relating to Choxi was a substantial factor in causing NMR's loss because both NMR representatives and Oak Managing Partners indicated they would not have gone forward with the financing had Ahmed's fraud been known. In addition, his misrepresentations and concealments reasonably and foreseeably led to NMR making its investment. Likewise, NMR only made the investment because Oak was a co-investor, and if Oak had not invested because of its knowledge of Ahmed's wrongdoing, NMR also would not have invested. Further, NMR was led by Ahmed into believing it was investing in a company free of fraud, when in reality, Ahmed, acting as an agent for Oak, had

8

Case 3:15-cv-00675-JBA   Document 1567-1   Filed 06/09/20   Page 11 of 31

perpetrated misconduct that directly involved Choxi, devalued the company by removing proceeds from the Series B stock sale from it, and negatively impacted Choxi's ability to pursue its business plans given the stolen funds and impact of fraud on fundraising efforts.

**2.13** Ahmed's arrest in April of 2015, caused Oak to belatedly perform diligence on their general partner, employee, and agent, which uncovered a web of misrepresentations, self-dealing, and fraud on the part of Ahmed while he was acting as an employee and agent of Oak, including through his roles as general partner of Oak Investment Partners' General Partner, an officer of Oak Corp., and a Managing Member of Oak Fund's General Partner.  Only then did Oak Investment Partners review its internal controls, policies, and procedures, and develop a plan to "enhance" them.

# SECTION 3  - Professional Opinion and Basis for this Opinion

**3.1**  The following opinions are held to a reasonable degree of professional certainty. The focus of my opinions center on the issue of whether Oak established, maintained and monitored adequate internal controls to supervise its employee, agent and general partner, Ahmed.

**3.2**  It is my opinion that Oak failed to adopt a compliance program reasonably designed to detect and prevent violations of securities laws including an effective system of supervision and internal controls. Accordingly, Oak not only failed to properly supervise Ahmed, it virtually exercised no oversight controls whatsoever over his activities, thereby allowing Ahmed to develop and perpetuate a pervasive, serial pattern of fraudulent activities over the course of a decade. It is also my opinion that had Oak's system of supervision and internal controls not been so grossly deficient or at times, non-existent, the harm suffered by NMR, as alleged in the Complaint, would have been avoided.

**3.3**  The opinions set forth herein are derived from my consideration of information provided by the parties in discovery, together with my education, experience and expertise.  Where appropriate, I will specifically identify information relied upon within this section of my report to support my opinions.

**3.4**  In addition to its duties of care as set forth herein, Oak Management Corporation ("OMC") is an Exempt Reporting Advisor ("ERA") pursuant to the Investment Advisers Act of 1940 (the "Act").  Indeed, Ames testified that OMC is an ERA.  Ames Depo., page 74, lines 18-20.  The SEC concluded in its litigation against Ahmed that Ahmed was an "investment adviser" as defined in Section 202(a)(11) of the Act (Second Amended Complaint at ¶ 26 in Case No.: 3:15–cv–00675 (Dkt. No 208)).  Further, Oak Corp. served as an "investment adviser," as provided in its Management Advisory Agreement, for the Oak Fund.  See OAK-NMR-00001970.  Accordingly, Oak had a responsibility to supervise Ahmed as a "supervised person," as the term is defined under the Act.  See 15 USCA & 80b-2 (a)(25).  Furthermore, as an ERA, Oak is subject to the anti-fraud provisions of the Act, and pursuant to Section 206, the Act makes it a fraudulent, deceptive or manipulative act or practice to make any statement of material fact or omit a material fact.

**3.5**  ERA's like Oak have a statutory duty under the Act to supervise the activities of persons who act on its behalf.  Section 203(e)(6) of the Act

provides that a person will be deemed to have reasonably supervised another person only if: (a) procedures were established that would reasonably be expected to prevent and detect insofar as practicable any violation by a person; (b) a system was in place for applying the procedures and (c) the supervising person had reasonably discharged their supervisory responsibilities in accordance with the procedures and had no reasonable cause to believe the procedures and systems were not being complied with.

**3.6** In addition to the general anti-fraud prohibitions of Section 206, an investment adviser must disclose all potential conflicts of interest between the adviser and its clients, even if the adviser believes that a conflict has not affected and will not affect the adviser's recommendations to its clients. This obligation to disclose conflicts of interest includes the obligation to disclose any benefits the adviser may receive from third parties as a result of its recommendations to clients.

**3.7** Here, based on the inadequate polices, procedures and controls at Oak, as described in my Report, and further recognizing the complete lack of supervision over Ahmed's activities, in light of Oak's culture of relying on trust, it is my opinion that Oak grossly violated its obligation to supervise Ahmed's activities. Moreover, Oak failed to establish proper industry standard internal controls.

**3.8** An effective compliance program addresses compliance from three distinct perspectives:

- *PREVENTION:* This should be the key focus of any compliance program;

- *DETECTION*: Detection methods should include on-going compliance monitoring and testing, as well as "forensic testing," meaning analyzing information over time in order to identify patterns that raise concerns; and,

- *CORRECTION*: Steps should be established to rectify violations promptly, sanction the individuals involved where appropriate and avoid the violations occurring again.

**3.9** Oak's system of supervision deviated significantly from industry custom and practice. Oak failed to adopt and implement an effective system of supervision to detect and prevent Ahmed's fraudulent activities because it:

- Failed to establish adequate procedures and a system for their application that would reasonably be expected to prevent and detect violations of securities laws including fraud by a supervised person;

- Failed to adopt adequate Written Policies and Procedures ("WSPs") as a first line of defense against fraud and other violations of securities laws to which ERAs are subject;

- Relied instead on an internal "trust" factor.

**3.10** Pursuant to industry custom and practice, an effective system of internal controls for an investment advisor, like Oak, should have included the following:

- A person specifically charged with the responsibility of establishing policies and procedures reasonably designed to detect and prevent fraud and violations of securities laws, and to ensure compliance with all internal policies and procedures, as well as applicable regulatory requirements;
- Policies and procedures that establish compliance with legal regulatory requirements, including a Written Supervisory Procedures ("WSP") manual;
- A full ongoing training program for compliance with the anti-fraud provisions of the Act as well as other applicable regulatory requirements;
- Segregation of duties and functions such that no one person would have the responsibility for transactions from beginning to end; and,
- Ongoing risk assessments that use transactional and forensic testing to analyze internal controls to ensure that existing policies and procedures are sufficient to detect violations of securities laws and fraud.

**3.11** Oak failed to adopt policies and procedures such as a WSP manual that would provide detailed steps for the firm and its employees, agents, and officers in order to comply with applicable regulatory requirements as well as procedures to supervise their activities for compliance with the Act and their fiduciary responsibilities.

**3.12** Oak failed to adopt a system of ongoing oversight for compliance with regulatory requirements and company policies or its Code of Conduct.

**3.13** Oak failed to adopt and implement an ongoing training plan to provide access persons with industry information, rules, regulations and the firm's compliance program.

**3.14** Oak failed to segregate duties and functions so that no one person would have unfettered and unsupervised responsibility for all aspects of a transaction from beginning to end.

**3.15** Oak failed to establish reasonable procedures and/or controls related to its financial activities, specifically by having:

- Inadequate controls related to pricing violations or price manipulations
- Inadequate controls related to valuations
- Inadequate controls related to funds transfers
- Inadequate controls related to separation of duties related to financial activities

**3.16** Oak failed to conduct any risk assessments, including transactional and forensic testing, to evaluate areas of vulnerability and the associated risk to the firm.  Such assessments would have identified the existence and effectiveness of:

- Pre-transaction investigative due diligence in order to identify any potential conflicts of interest;
- Pre-closing investment diligence undertaken by the investment advisors' financial department to review financial information generated by the potential investment target;
- Pre-closing meetings to review and confirm deal terms and conditions among legal counsel, key internal investment personnel and finance department personnel;
- Pre-closing meetings between the investment advisors' financial personnel and the financial personnel of the target company to review and confirm all key deal terms;
- Pre-closing reviews of all final transaction documentation, beneficiary bank accounts and wiring instructions;
- Pre-funding reviews and approval processes for all transaction check requests to include confirmation and acknowledgment by the investment target's finance department; and,
- Post-transaction confirmations conducted between the investment advisor and the target company to confirm the terms of the completed transaction, and ensure that expenses and required reimbursements have been paid.

**3.17** Based on my background, experience and expertise, the policies and practices identified in the foregoing paragraphs represent the core fundamental aspects of an industry-appropriate system of internal controls for an investment advisor like Oak.  Based upon my review of the pertinent sworn testimony and exhibits generated in this matter, Oak failed to employ any of these measures and, as detailed herein, failed to exercise even the slightest level of care or diligence in supervising its employee, agent and general partner, Ahmed.

**3.18** Rather than put in place effective internal controls standard in the industry and reasonably designed to detect and prevent fraud, Oak instead relied upon a culture of trust among its partners.  As Managing Partner Bandel Carano testified in his deposition, "as partners, we didn't

13

supervise each other. We're partners." Carano Depo., Page 58, lines 2-5. Other Managing Partners agreed with that. Edward Glassmeyer Depo., Page 37, lines 14-21, Page 38, lines 10-16; Ann Lamont Depo., Page 70, lines 3-8. Mr. Glassmeyer explained: I'm reluctant to use the word supervise because we don't…." Glassmeyer Depo., Page 38, lines 18-22. Mr. Glassmeyer then said, "So, I'd say [Ahmed] was able to close a deal without being monitored by a managing partner. *Id. at Page 41, lines 20-22.* Ms. Lamont acknowledged and agreed that she viewed Ahmed as a trusted partner, and that he was "trusted to the point there didn't have to be a supervisor above him looking at what he did. Lamont Depo., Page 70, lines 3-8. Mr. Carano further testified that "we trust each other as partners" and, as such, he testified that the managing partners at Oak were not overseeing Ahmed's activities "in a compliance way". Carano Depo., Page 65, lines 4-17. Indeed, Mr. Carano testified that because Ahmed had established a significant track record of investment success at Oak, as far back as June, 2009, Ahmed was considered as an "heir apparent to achieve managing partner" status. Carano Depo., Page 55, lines 5-24. There was no reporting relationship of Ahmed to a supervisor. Lamont Depo., Page 27, lines 2-4.

**3.19** Had Oak implemented the industry standard internal controls outlined in paragraph 3.10, and followed them, the extensive, serial acts of fraud undertaken by Ahmed as described in the two Declarations executed by Ames (Plaintiff's Deposition Exhibits 4 and 13) would have been detected and prevented. Certainly, had the prior frauds been discovered, the subsequent frauds would have been avoided. By way of example, in paragraphs 15-20 of Plaintiff's Deposition Exhibit 13, Ames describes Ahmed's manipulation of foreign exchange rates in a transaction that occurred in 2010. No one at Oak undertook the basic step of confirming the applicable exchange rate, as reflected in the transaction documents or applicable to the transaction. In fact, there was no procedure in place to independently verify such information. Moreover, in paragraphs 11-14 of Plaintiff's Exhibit 13, Ames described a 2007 scheme whereby Ahmed fraudulently manipulated foreign exchange rates to inflate the per share price of stock Oak purchased in a foreign company. The effect of this fraud was to cause Oak and its funds to overpay for the investment, and Ahmed diverted the surplus funds to an account he controlled. Specifically, in Paragraph 13 of Plaintiff's Deposition Exhibit 13, Ames stated that Ahmed provided wiring instructions to Oak for payment of the manipulated stock purchase price. Ahmed cause Oak to wire $45 million to an account at the Korea Exchange Bank, while directing that the "remaining $2.5 million be sent to a Bank of America account located in New York that Ahmed had established in the name of the company in which Oak was investing. Ames further stated that, after Ahmed's fraud

14

was discovered, Oak learned that "the Bank of America account to which Ahmed directed the $2.5 million be sent did not actually belong" to Oak's portfolio company. Again, had Oak undertaken the basic step of confirming applicable exchange rates, this fraud would have been discovered.

**3.20** Further, if Oak had in place a basic system of internal controls standard in the industry, as detailed in Paragraph 3.10 above, Ahmed would not have been in a position to obtain the funds he fraudulently procured, much less cause the wiring of those funds into accounts he controlled. Given Mr. Carano's testimony that Ahmed would have been fired if Oak knew of his fraud prior to 2015, it is clear that had Oak exercised proper diligence and supervision, Ahmed never would have been in a position to induce NMR to invest in Choxi.

**3.21** Oak's Managing Partner, Lamont, was unable to identify any testing or active monitoring for fraud risks at Oak that took place prior to the discovery of Ahmed's fraud. Lamont Depo., Page 145, line 17 to Page 145, line 15. Also, no one at Oak supervised Ahmed's negotiations over the specific terms of an investment in a portfolio company that Ahmed was sponsoring. Carano Depo., page 88, lines 25 to page 89, line 5. Indeed, as it relates to the Choxi transaction, the managing partners never reviewed the Series B Stock Purchase Agreement prior to its closing, and Mr. Carano testified that he had never seen the Stock Purchase Agreement before his deposition in October, 2019. Carano Depo., page 115, lines 9-19. Mr. Glassmeyer remarked that it was "unusual" for Ahmed to have signed the stock purchase agreement for Choxi because it was not customary for partners to sign them. Glassmeyer Depo., Page 172, lines 7-20

**3.22** Accordingly, neither the managing partners nor Ames were aware of the fraudulent redemption agreement pertaining to the repurchase of the "Giosis" Series A shares which Ahmed fraudulently required as part of the Series B transaction. Ames Depo., page 176, lines 10-18; Glassmeyer Depo., at Page 173, lines 3-7. Indeed, following the discovery of Ahmed's fraud, Oak's counsel had to request a copy of the Redemption Agreement from Choxi, to which Oak was a party. *Id*. At page 257, line 23 to Page 258, line 2; Plaintiff's Deposition Exhibit 76.

**3.23** Oak apparently did not have a WSP manual, which is at variance with standard and accepted practice in the industry. This manual would have defined a system of supervision. Instead, Oak utilized a "Personnel Policies and Procedures Manual," which "describes, in general terms, some of [Oak's] employment guidelines." Plaintiff's Exhibit 40 at OAK-NMR-00096303. That said, Oak nevertheless failed to even adhere to its own guidelines for employee evaluations. Specifically, Oak's Personnel

15

Policies and Procedures Manual required that each employee was to be evaluated annually, but Ahmed had not been reviewed since July of 2005. Plaintiff's Exhibit 40 at OAK-NMR-00096316; Glassmeyer Depo., at Page 139, lines 18-20, Page 141, lines 8-12.  Mr. Glassmeyer was unable to explain why Ahmed stopped receiving annual reviews.  Glassmeyer Depo., Page 142, lines 9-11

**3.24** An effective compliance program emanates from the highest levels of the organization, i.e., the "tone at the top."  Here, noncompliance with policies even occurred at the top of the organization by Mr. Glassmeyer, Oak's founder and President.  Mr. Glassmeyer conceded that he also violated Oak's stock trading policy himself by investing in a company without consent, as Ahmed invested in Choxi personally without consent. Glassmeyer Depo., Page 144, lines 12-15.      Others at Oak were aware of Glassmeyer's non-compliance. OAK-NMR-00015655.

**3.25** In June of 2013, four months prior to the close of the Series B round of financing in Choxi, Ames acknowledged in writing that there were existing "lingering concerns" regarding Oak's internal controls, as well as the need to "beef up" those controls.  Plaintiff's Deposition Exhibit 6.  There is no evidence that any follow up or testing was conducted or directed by Ames to address these "lingering concerns."  Both Mr. Glassmeyer and Mr. Carano testified that they would have expected Ames to bring such issues to their attention, but that did not occur.  Indeed, Mr. Carano testified that he had no knowledge of any internal control concerns prior to the discovery of Ahmed's fraud in 2015.  Glassmeyer Depo., Page 100, line 18 through Page 101, line 2; Carano Depo., page 68, line 1 through page 69, line 1.

**3.26** Ames acknowledged in her deposition that prior to the time of the discovery of Ahmed's fraud, Oak did not require that all portfolio company financial information be sent to Oak's finance team as opposed to merely being sent to a general partner Ames Depo., page 105, lines 9-20.

**3.27** Ames acknowledged that prior to the time of the discovery of Ahmed's fraud, Oak did not require closing meetings with mandatory attendance by investing partners, Oak operation staff, Oak financial personnel and legal counsel to review key deal terms.  Ames Depo., page 105, lines 21 to page 106, line 7.

**3.28** Ames acknowledged that prior to the time of the discovery of Ahmed's fraud, Oak did not require a portfolio company closing meeting involving Oak financial personnel and portfolio company finance department personnel to verify all key deal terms.  Ames Depo., page 106, lines 8-21.

16

**3.29** Ames acknowledged that prior to discovery of Ahmed's fraud, Oak did not require that any funding request be sent to the finance department at Oak with a copy to the portfolio company.  Ames Depo., page 107, lines 20 to page 108, line 6.

**3.30** Ames acknowledged that prior to discovery of Ahmed's fraud, Oak did not require that a member of the finance team confirm with a portfolio company foreign exchange rates where applicable.  Ames Depo., page 108, lines 16-24.

**3.31** Ames acknowledged that prior to discovery of Ahmed's fraud, Oak did not require its finance department to confirm, prior to the disbursement of funds, with both the investment partner and the portfolio company, the applicable beneficiary bank account information.  Ames Depo., page 109, lines 1-11.

**3.32** Ames acknowledged that prior to discovery of Ahmed's fraud, Oak did not require the production of a final closing binder from outside legal counsel. Ames Depo., page 109, lines 12-20.

**3.33** Ames acknowledged that after the discovery of Ahmed's fraud, FTI was retained by Oak as an internal controls consultant was retained and FTI recommended a number of "enhancements" to Oak's then-existing internal controls, all of which were adopted by Oak.  Ames Depo., page 110, lines 11-14.  These recommendations from FTI, however, were not "enhancements" at all because that would imply that there were existing controls in the first place.

**3.34** Both Ms. Lamont and Mr. Carano acknowledged that they know of no reason that these recommendations could not have been put in place prior to the discovery of Ahmed's fraud.  Carano Depo., page 85, lines 10-11; Lamont Depo., Page 125, lines 5-10.  Ms. Lamont explained that the recommendations were not implemented earlier because the partners trusted one another and they worked on the basis of trust.  Lamont Depo., Page 125, lines 11-21.

**3.35** Ms. Lamont further testified that she could not recall that any outside internal control consultant reviewed fraud detection procedures prior to the discovery of Ahmed's fraud.  Lamont Depo., Page 105, lines 14-18. With respect to controls, policies, and procedures that were in place that Oak believed Ahmed circumvented, Mr. Glassmeyer's only response was that Ahmed failed to tell the truth.  Glassmeyer Depo., Page 117, lines 3-14.  Ms. Lamont was only able to identify a violation of the stock trading policy.  Lamont Depo., Page 102, line 19 to Page 103, line 10.

**3.36** I have reviewed the internal control recommendations provided by Oak's internal control consultant, FTI, that was hired *after* Ahmed's frauds were discovered, as set forth in Plaintiff's Deposition Exhibit 9, and concur that

17

Case 3:15-cv-00675-JBA   Document 1567-1   Filed 06/09/20   Page 20 of 31

those policies and procedures were lacking at Oak prior to the discovery of the fraud, and that such recommendations constituted standard internal controls that already should have already been in place at Oak by the time Ahmed was hired in 2004 and long before the fraud occurred.

**3.37** Mr. Carano testified that had Ahmed's fraud been discovered prior to the closing of the Series B round of financing in Choxi, Oak "would have fired him".  Carano Depo., Page 89, lines 6-21

**3.38** Mr. Glassmeyer testified that upon Oak's investigation into Ahmed's activities after his arrest, the fraud was discovered "almost instantly". Glassmeyer Depo., Page 237, lines 9-16.

# Section 4 - Conclusions

Preventative controls are those manual or automated processes reasonably designed to detect and prevent violations of securities laws including fraudulent activity from occurring.  Deterrent controls are designed to proactively identify and remove the causal and enabling factors of fraud. Oak was obligated to create and enforce an effective system of internal controls that would prevent fraud and increase the likelihood of detection.  Oak clearly failed to create and implement such a system, which allowed Ahmed to engage in repeated acts of fraud for an approximate 10-year period.  My opinions in this regard are as follows:

**4.1**  Based on the deposition testimony and exhibits provided, not only did Oak fail to adopt and implement a system of internal controls reasonably designed to detect and prevent fraud, it failed to implement any system of internal controls related to fraud deterrence.  In this regard, Ahmed as the Oak's employee, agent and general partner, had unchecked power in making investments, spending, and financial transactions decisions.

**4.2**  Oak's management improperly relied upon a culture of trust to justify having grossly inadequate and virtually no system of supervision or internal controls for fraud when, in fact, it is generally easier to implement such systems in smaller firms due to lower volumes of activities to monitor.  This reliance on "trust" instead of controls directly contributed to creating an environment to commit fraud.

**4.3**  Had Oak adopted, implemented and monitored the internal controls outlined herein, that are ordinary and standard for investment-related firms, Oak's culture of trust would have instead been based on factors designed to proactively identify and remove the causal and enabling factors of fraud and, therefore, would have prevented Ahmed from exploiting this "trust-based culture".

**4.4**  After Ahmed and Oak induced NMR into making the approximate $14.5 million investment in Choxi, Ahmed was arrested for insider trading, and Oak immediately thereafter instituted an investigation of Ahmed's activities which revealed a 10 year pattern of fraud.  See Plaintiff's Deposition Exhibits 4 and 13.  Had Oak adopted and implemented proper and effective standard detective internal controls, Ahmed's earlier fraudulent activities would have been identified, and he would not have been in position to have solicited NMR for the Series B round of financing, and fraudulently steal $10.9 million as part of the Series B Stock Purchase Agreement.

**4.5** I have reviewed the internal control recommendations by FTI (Plaintiff's Deposition Exhibit 9), a consultant Oak relied upon to review its existing internal controls after Ahmed's fraud was discovered.  These recommendations, all of which Oak has adopted, constituted standard industry practices and protocols for entities like Oak.  All of these recommendations could and should have been in place by 2004 when Ahmed was hired, and if those policies had in fact been implemented timely, would have prevented the fraudulent acts detailed in the two Ames Declarations, and the fraud against NMR.

**SIGNED:**

11-15-19

_____     _____
Karen A. Steighner                                        Date

20

Case 3:15-cv-00675-JBA   Document 1567-1   Filed 06/09/20   Page 23 of 31

# Section 5 - Attachments

Attached and made part of this report are:

      Exhibit A: My Curriculum Vitae

      Exhibit B: Documents Provided by Whiteford Taylor & Preston, LLP

      Exhibit C: Application of Advisers Act

      Exhibit D: Expert Fee Schedule

# Section 6 - Compensation

My fee schedule is a graduated rate per hour plus expenses.  A copy of my fee schedule is attached as Exhibit D.

# Section 7 – Citations

Jones Day Commentaries (Feb 2012) Exempt Reporting Advisers: Requirements for Investment Advisers that Qualify as Venture Capital Advisers or Private Fund Advisers,

SEC (July 2, 2004) Final Rule: Investment Adviser Code of Ethics, Rel. No. IA-2256 ("Final Release")

Robert T. Littell, et al. (Dec 15, 2003) Investment Advisers Act Release No. 2203

Breland, Jackie CPA and Jackie Breland Consulting, PA (March 2013) Internal Controls Key to Preventing Fraud, https://www.masc.sc/Pages/resources/Internal-controls-key-to-preventing-fraud.aspx

Schnase, Lorna A., "Another Look at an Adviser's Duty to Supervise Sub-Advisers (and Other Advisers)", March 2009

Schnase, Lorna A. et al (May-June 2013) Practical Compliance & Risk Management for the Securities Industry, Wolters Kluwer Financial Services, Vol. 6, No. 3

Sanford, Nicole, "Building world-class ethics and compliance programs: Making a good program great | Five ingredients for your program", Deloitte Development LLC, Stamford, CT 2015.

# Exhibit A – Curriculum Vitae – Karen A Steighner

## Qualifications, Training, Accreditation

- 38 years Securities Industry Experience – 26 years in Regulatory Compliance
- +20 years CCO and General Securities Principal Experience
- +20 years Financial & Operations Principal Experience
- Series 7, 24, 27, 63, 65, 79, 99 Securities Registrations

## Education

Master of Business Administration – University of Colorado, Denver 2014

## Past and Present Positions

**Present positions**:    President/CEO /Consultant - Compliance Advisers, Inc. (2001 to present).

**Contract positions**:    Registered CCO, CFO, Financial & Operations Principal, General Securities Principal  (2001-present)

**Past positions**:
Broker Dealer – CCO, Financial Principal, General Securities Principal, Supervisor, Operations Manager, Taxable Fixed Income Specialist
Investment Adviser - CCO
Investment Company - CCO

## Principal Professional Specializations

I specialize in all aspects of securities industry compliance related to SEC Regulations and FINRA Rules. As it relates to the examination, implementation and enforcement of securities regulations, I have—

- developed comprehensive systems of supervision and compliance programs that rely on a battery of internal controls to detect and prevent securities violations;

- served as a CCO for broker/dealers, investment advisers and investment companies;

Case 3:15-cv-00675-JBA   Document 1567-1   Filed 06/09/20   Page 27 of 31

- collaborated with CCO's, CEO's, CFO's, Boards of Directors, Senior Management, Unit Leaders, Attorneys and Auditors for maximum compliance;

- trained newly appointed CCO's and other compliance staff to successfully execute oversight of policies and procedures and implement comprehensive, highly effective controls and compliance programs;

- created FINRA Rule 3120 and SEC Rule 206(4)-7 testing models for evaluating effectiveness of firm's policies and procedures, system of supervision and internal controls; and,

- conducted and supervised teams performing mock audits and forensic testing of policies and procedures  to  evaluate the effectiveness of the firm's internal controls and overall compliance programs.

## Awards, Accolades and Other Professional Responsibilities

I am a recognized leader in the securities compliance field and a regular speaker at industry conferences.

## Memberships of Professional Organizations

- National Society of Compliance Professionals (NSCP) – Speaker, Exhibitor, Member
- National Society of Fraud Examiners (NSFE)
- Association of Anti-Money Laundering Specialists (ACAMS)
- Sports Financial Advisors Association (SFAA)
- Former Allied Member – New York Stock Exchange
- Women Business Owners – Denver Chapter
- Women In Compliance
- Institute of Internal Auditors

## Publications

I am the author of a variety of industry related online articles on various regulatory compliance matters related to current, relevant securities regulation topics.

Case 3:15-cv-00675-JBA   Document 1567-1   Filed 06/09/20   Page 28 of 31

# Exhibit B – List of Records Provided by Whiteford Taylor and Preston, LLP

- Harrington Deposition and Exhibits

- Glassmeyere Deposition and Exhibits

- Carano Deposition Transcripts and Exhibits

- Lamont Deposition Transcript and Exhibits

- Ames Deposition Transcript and Exhibits

- OAK-NMR-00098094.pdf

- 2017.05.04 - OAK-NMR-00011595_image.pdf

- Dkt. 508 Transcript of 2015-07-23 Hearing.pdf

- 2015.07.15 - OAK-NMR-00011355_image.pdf

- Dkt. 509 Transcript of 2015-07-30 Hearing.pdf

- OAK-NMR-00149214_image.pdf

- Extract From Ahmed Mtn. - Trust Email.pdf

- 20_OAK-NMR-00150473_image.pdf

- Oak Investments - The Rise, the Fall and the Rogue.pdf

- OAK Docs:
    - OAK-NMR-00098095.pdf
    - OAK-NMR-00096693.pdf
    - OAK-NMR-00098096.pdf
    - OAK-NMR-00015746.pdf
    - OAK-NMR-00098097.pdf
    - OAK-NMR-00015810.pdf
    - OAK-NMR-00096300.pdf
    - OAK-NMR-00096265.pdf

Case 3:15-cv-00675-JBA   Document 1567-1   Filed 06/09/20   Page 29 of 31

OAK-NMR-00098041.pdf
OAK-NMR-00015671.pdf
OAK-NMR-00015672.pdf
OAK-NMR-00015791.pdf
OAK-NMR-00015793.pdf
OAK-NMR-00015698.pdf
OAK-NMR-00015796.pdf
OAK-NMR-00015797.pdf
OAK-NMR-00098093.pdf
OAK-NMR-00015673.pdf
OAK-NMR-00015674.pdf
OAK-NMR-00015675.pdf
OAK-NMR-00150491.pdf
OAK-NMR-00150473.pdf
OAK-NMR-00015686.pdf
OAK-NMR-00015670.pdf
OAK-NMR-00015665.pdf
OAK-NMR-00098040.pdf
OAK-NMR-00015664.pdf
OAK-NMR-00015745.pdf
OAK-NMR-00098039.pdf
OAK-NMR-00015655.pdf
OAK-NMR-00015663.pdf
OAK-NMR-00015650.pdf
OAK-NMR-00015633.pdf
OAK-NMR-00098027.pdf
OAK-NMR-00098030.pdf
OAK-NMR-00015632.pdf
OAK-NMR-00015597.pdf
OAK-NMR-00098024.pdf
OAK-NMR-00098022.pdf
OAK-NMR-00015591.pdf
OAK-NMR-00015564.pdf
OAK-NMR-00015742.pdf
OAK-NMR-00015741.pdf
OAK-NMR-00015635.pdf

# Exhibit C – Advisers Act Application

## Application of Advisers Act to Different Types of Advisers

| | Form ADV Part 1A | Full Form ADV and Schedules | Brochure | Form PF | Subject to Entire Advisers Act | Subject to Certain Portions of Advisers Act |
|---|---|---|---|---|---|---|
| Registered Advisers | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Venture Capital Fund Advisers (Exempt Reporting Adviser) | ✓ | | | | | ✓ |
| Private Fund Advisers with less than $150 million AUM (Exempt Reporting Adviser) | ✓ | | | | | ✓ |
| Foreign Private Advisers | | | | | | ✓ |
| CFTC Registered Advisers | | | | | | ✓ |

Case 3:15-cv-00675-JBA Document 1567-1 Filed 06/09/20 Page 31 of 31

# Exhibit D – Expert Fee Schedule

**Retainer Deposit (Non Refundable):**    $3,000

**Hourly Fees billed on quarter hour unless otherwise indicated—**

Expert

| | |
|---|---|
| In Court Hourly | $375/hour* |
| In Court Half Day | $1,500.00* |
| In Court Full Day | $3,000.00* |
| Depositions: | $355/hour* |
| File Reviews/Doc Prep: | $255/hour |
| Travel/Commute Time | $ 55/hour |

Analyst

| | |
|---|---|
| Research | $150/hour |

Admin                              $75/hour

**\*Does not include travel time or expenses.**

The information provided herein is confidential and proprietary and may only be used by the intended recipient for the purpose of evaluating an engagement for services.