UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br>*Plaintiff*,<br>*v.*<br>IFTIKAR AHMED,<br>*Defendant*, and<br><br>IFTIKAR ALI AHMED SOLE PROP; I-CUBED DOMAINS, LLC; SHALINI AHMED; SHALINI AHMED 2014 GRANTOR RETAINED ANNUITY TRUST; DIYA HOLDINGS LLC; DIYA REAL HOLDINGS, LLC; I.I. 1, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; I.I. 2, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; and I.I. 3, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents,<br><br>*Relief Defendants*. | Civil No. 3:15cv675 (JBA)<br><br>January 11, 2022 |

**ORDER GRANTING WITH MODIFICATION THE RECEIVER'S MOTION TO APPROVE HIS PROPOSED PLAN OF LIQUIDATION**

In its redetermination of Defendant Iftikar Ahmed's disgorgement, the Court directed the court-appointed Receiver to propose a liquidation schedule upon which all Parties may comment. (Redetermination of Def.'s Disgorgement Obligation ("Redetermined Disgorgement Order") [Doc. # 1997] at 13.) Pursuant to that Order, the Receiver has submitted his Liquidation Plan [Doc. # 2022] for the Court's review and requests that the Court approve the Liquidation Plan [Doc. # 2134]. Plaintiff Securities and Exchange Commission ("SEC") supports the Receiver's plan [Doc. # 2075], while Defendant and Relief Defendants oppose it [Docs. ## 2065, 2064]. A hearing on the proposed Liquidation Plan was held remotely on December 20, 2021. (December 20 Hr'g, Min. Entry [Doc. # 2132].)

For the following reasons, the Receiver's motion to approve the proposed Litigation Plan is GRANTED with modification.

## I.    Background

This matter concerns the fate of the ill-gotten proceeds Mr. Ahmed acquired as a result of a long-running scheme that he executed to defraud Oak Investment Partners ("Oak"), Oak investment funds, and Oak investors. For the decade between 2004 and 2014, Mr. Ahmed worked as a partner at Oak, where he recommended and coordinated Oak Funds' investments in various companies. During that time, Mr. Ahmed also conducted his fraudulent scheme in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder, Section 17(a) of the Securities Act of 1933 ("Securities Act"), and Section 206 of the Investment Advisers Act ("Advisers Act"). *See SEC v. Ahmed*, 308 F. Supp. 3d 628, 636-37 (D. Conn. 2018) ("*Ahmed I*").[1] As a result of Mr. Ahmed's actions, he was criminally indicted in the District of Massachusetts, along with his wife, Shalini Ahmed, *see United States v. Ahmed*, Case No. 1:16-cr-10154-DPW (D. Mass.),[2] and another confederate, Amit Kaodia, *see United States v. Ahmed*, Case No. 1:15-cr-10131-NMG (D. Mass.). Mr. Ahmed is believed to have fled this country to India, his country of origin.[3]

---

[1] A detailed discussion of the facts underlying Defendant's violations can be found in the Court's Ruling granting summary judgment on the issue of Defendant's liability.

[2] The charges against Ms. Ahmed were later dropped.

[3] The district court in the criminal case still pending in the District of Massachusetts has characterized Mr. Ahmed's continued presence in India as a "refusal to return." *United States v. Ahmed*, 414 F. Supp. 3d 188, 190 (D. Mass. 2019). Mr. Ahmed represents that he is unable to return to the United States because his travel has been restricted by Indian authorities in connection with an Indian criminal matter. *See* Def.'s Mot. for Reconsideration of Declaration of Bond Forfeiture at 3-4, No. 1:15-cr-10131-NMG (D. Mass.), ECF # 308.

## II.     Procedural History

### A.  Litigation to Date

On May 6, 2015, the SEC filed its complaint [Doc. # 1] against Mr. Ahmed and requested an emergency ex parte temporary restraining order freezing assets and for a preliminary injunction continuing that asset freeze for the pendency of this litigation. On May 7, 2015, after conducting an ex parte telephonic hearing on the record, the Court issued a temporary restraining order [Doc. # 9] freezing up to $55,089,546 worth of assets allegedly involved in Mr. Ahmed's fraudulent scheme, providing for other ancillary relief, and setting the matter for a preliminary injunction hearing to be conducted on May 21, 2015. On May 18, 2015, the SEC and Mr. Ahmed entered a stipulation [Doc. # 21], approved by the Court [Doc. # 22], providing that all assets held by him or under his direct or indirect control, whether held in his name or for his direct or indirect beneficial interest, would remain frozen until the Court's ruling on the SEC's Motion for a Preliminary Injunction and continuing the scheduled preliminary injunction hearing until an undetermined date. At some point in May 2015, Defendant fled from the United States to India where he remains to this day. *See Ahmed I*, 308 F. Supp. 3d at 638.

Subsequently, on June 12, 2015, the SEC filed an amended complaint and motion for a preliminary injunction to freeze assets in an amount higher than initially requested based on newly alleged misconduct by Defendant [Docs. ## 27, 29]. In its Amended Complaint, the SEC also named several additional relief defendants, including Ms. Ahmed (collectively, "Relief Defendants"). The Court then ordered [Doc. # 34] expedited discovery and scheduled the previously continued preliminary injunction hearing, which took place on July 23 and 30, 2015 with the SEC, Ms. Ahmed, and other Relief Defendants participating. On August 12, 2015, after the two-day evidentiary hearing, the Court granted the SEC's motion for a preliminary injunction and ordered certain of Defendant and Relief Defendants' assets to be

3

temporarily frozen "up to the amount of $118,246,186," accounting for the alleged "approximately $65 million in illicit profits to be disgorged plus prejudgment interest ($9.3 million) and civil penalties ($44 million)." (Ruling and Order Granting Prelim. Inj. [Doc. # 113] at 3.) In accordance with *Kokesh v. SEC*, 137 S. Ct. 1635, 1645 (2017), the Court later reduced this total to $89,000,000 to exclude the calculation of illegally obtained profits that the SEC alleged had occurred beyond the five-year statute of limitations that decision imposed on disgorgement awards. (Order on Def.'s Mot. for Mod. of the Asset Freeze [Doc. # 829] at 3, 5.) The Court's asset freeze was based on its conclusion that there was "good cause to believe . . . the Defendant and Relief Defendants [would] dissipate, conceal, or transfer from the jurisdiction of this Court" assets that could be the subject of disgorgement if the Court later entered judgment on the merits against Defendant. (Ruling and Order Granting Prelim. Inj. at 19.)

Thereafter, on March 29, 2018, the Court granted summary judgment in favor of the SEC finding Defendant liable for violations of sections 206(1)-(4) of the Advisers Act, section 10(b) of the Exchange Act, and section 17(a)(1) of the Securities Act. *See Ahmed I*, 308 F. Supp. 3d at 673. Then, on September 6, 2018, the Court awarded the SEC $62,920,639. *SEC v. Ahmed*, 343 F. Supp. 3d 16, 39 (D. Conn. 2018) ("*Ahmed II*"). This figure included the disgorgement of $41,920,639 and a civil penalty of $21,000,000. *Id.* But it did not include prejudgment interest for the time period prior to the asset freeze and all interests and gains returned on the frozen assets during the pendency of the freeze (collectively, an "appreciation award"), as the Court directed the SEC to submit a revised calculation of the appreciation award for later addition to the judgment.[4]  *Id.* at 29 n.6, 39. On December 20,

---

[4] Subsequently, the Court issued an amended order directing that the amount of interest and returns on the frozen assets "from the time this Court entered a Temporary Restraining Order on May 7, 2015, to the time that such assets and returns are released from the asset

2018, the Court appointed a Receiver to value, maintain, and liquidate the frozen assets (hereinafter "Receivership Assets") to satisfy the judgment against Defendant Iftikar Ahmed.[5] (Order Appointing Receiver ("Appointment Order") [Doc. # 1070].)

In the interim, Defendant has filed multiple appeals challenging this Court's orders. On February 19, 2019, the Second Circuit Court of Appeals denied Mr. Ahmed's emergency motion to stay enforcement of the judgment against him pending appeal, determining that he did not demonstrate a likelihood of success on the merits or that he would be irreparably harmed. *See* Motion Order, *SEC v. Ahmed*, No. 18-2903 (2d Cir. 2019) ("*Ahmed III*"), ECF # 154. On March 11, 2021, the Second Circuit remanded to the Court the determination of Mr. Ahmed's disgorgement obligation "consistent with § 6501 of the National Defense Authorization Act, and, if appropriate, entry of an amended judgment." Motion Order, *Ahmed III*, No. 18-2903, ECF # 533. Accordingly, this Court reconsidered Mr. Ahmed's disgorgement obligation after briefing and oral argument and increased the disgorgement obligation by $22,251,007.04 to $64,171,646.14 with a prejudgment interest award of $9,755,798.34. (Redetermination of Def.'s Disgorgement Obligation [Doc. # 1997] at 14; Redetermined Final Am. J. [Doc. # 2011].) Displeased with an increased disgorgement obligation, Mr. Ahmed and the Relief Defendants have appealed that ruling, which is currently pending before the Second Circuit. *See* Notice of Appeal, *SEC v. Ahmed*, No. 21-1686, ("*Ahmed IV*"), ECF # 1.[6] At

---

freeze" be determined by a receiver or such other process the Court orders. (Am. Final J. against Def. and Relief Defs. [Doc. # 1054] at 5.)

[5] Notably, the Court first appointed Jed Horwitt as Receiver, who served in that capacity for just over three years. Then the Court granted [Doc. # 2100] Mr. Horwitt's motion to substitute Stephen M. Kindseth, a member of Mr. Horwitt's firm who had worked closely with him on this matter, as Receiver on November 8, 2021. All references to the Receiver refer to the collective efforts of these individuals alongside other members of their firm.

[6] Relief Defendants filed their notice of appeal on July 9, 2021 under Case No. 21-1686. Mr. Ahmed filed a separate appeal on July 14, 2021, under Case No. 21-1712. The two appeals

issue in that appeal are three questions: (1) whether this Court improperly reconsidered the disgorgement obligation; (2) whether this Court failed to exclude profits not causally linked to Mr. Ahmed's violations and to account for $35 million already recouped by Oak; and (3) whether this Court improperly entered summary judgment against Mr. Ahmed as to liability. *See* Brief for Defendant-Appellant Iftikar A. Ahmed at 1-2, *Ahmed IV*, No. 21-1686, ECF # 82.

Presently, the aggregate value of judgment against Defendant stands at $94,927,444.40.[7] According to the Receiver, the Receivership Assets have a total estimated value of $119,988,579.01 as of July 15, 2021, a figure subject to fluctuations and thus uncertain as to whether it will satisfy the total judgment as these values do not account for tax assessed and any appreciation award.

### B. Proposed Liquidation Plan

On July 15, 2021, the Receiver submitted a Liquidation Plan [Doc. # 2022] for the prompt and efficient liquidation of the Receivership Assets necessary to secure the judgment. The Receiver proposes a two-phase plan, breaking each phase down further into discrete steps. (*Id.* at 3.)

In Phase 1 the Receiver proposes to liquidate non-unique assets and file a "Phase 1 Report" setting forth the results of the Initial Liquidation, his updated identification and valuation of the Receivership Assets and calculation of the Judgment, his analysis and proposal with respect to tax liabilities, and his proposed designation of excess assets, to the extent they exist. (*Id.* at 4.) Next, with the Court's approval, the Receiver proposes to transfer

---

were consolidated into Case No. 21-1686.

[7] The aggregated obligation is calculated from adding three figures: (1) the redetermined disgorgement award of $64,171,646.14, (2) the prejudgment interest award of $9,755,798.34, and (3) the civil penalty ordered against Mr. Ahmed of $21,000,000. (*See* Redetermined Final Am. J. [Doc. # 2011]); *Ahmed II*, 343 F. Supp. 3d at 39.

"a designated amount" of the initial liquidation to a separate account operated by the Court's Registry Investment System (the "CRIS Account") and pay taxes to the extent necessary. (*Id.*) Phase 1 will conclude with the Receiver's designation and release of any excess assets as appropriate, although the Receiver doubts this step will be likely. (*Id.*)

Under Phase 2, the Receiver proposes to submit a "Phase 2 Report" setting forth the results of the liquidation in Phase 1, an updated status of the Receivership Assets and calculation of the total judgment is satisfied. (*Id.*) Upon Court approval of the "Phase 2 Report," the Receiver requests that the Court order applicable modifications or redeterminations of the total judgment, that the Receiver transfer another "designated amount" of the liquidation proceeds to the CRIS Account referenced in Phase 1, that the Receiver pay any additional taxes, and release of any additional excess assets. (*Id.*) In the final step of Phase 2, the Receiver proposes to file his Final Liquidation Report confirming the total amounts transferred to the CRIS Account and paid to satisfy tax liabilities, as well as identifying which excess assets were released. (*Id.*)

## III.   Discussion

Defendant and Relief Defendants bring a litany of arguments in response to the proposed Liquidation Plan. They first challenge the Court's authority to approve the liquidation plan. (Def.'s Resp. at 2) Next, Defendant and Relief Defendants request that the Court order an administrative stay on liquidation pending appeal of any approval of the liquidation plan. (*See* Relief Defs.' Emergency Mot. for Admin. Stay ("Mot. for Stay") [Doc. # 2104].) Finally, they raise several challenges to the Liquidation Plan itself.

The SEC broadly supports the Liquidation Plan and argues that the Court should order immediate liquidation of non-unique assets and that interests and gains be calculated employing the "extrapolated calculation method" outlined in the Liquidation Plan. (Pl. SEC's Resp. to the Receiver's Liquidation Plan ("SEC's Resp.") [Doc. # 2037] at 3.) The SEC further

argues that the Court should deny any requests to delay liquidation or relitigate whether liquidation should occur. (*Id.*)

At the outset, a few principles are important to keep in mind. First, the Court maintains broad authority to fashion remedies for violations of federal securities law. *See Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC*, 467 F.3d 73, 81 (2d Cir. 2006). Second, the primary purpose of disgorgement is to ensure that those guilty of securities fraud are not unjustly enriched. *See SEC v. Wang*, 944 F.2d 80, 88 (2d Cir. 1991). Third, "[w]hen funds are limited, hard choices must be made" *Official Comm. of Unsecured Creditors*, 467 F.3d at 84 (internal citation and quotations omitted), and thus, "an equity plan is not necessarily one that everyone will like." *SEC v. Credit Bancorp, Ltd.*, No. 99 CIV. 11395 RWS, 2000 WL 1752979, at *29 (S.D.N.Y. Nov. 29, 2000) Guided by these principles, the Court considers each of the parties' arguments.

## A.  The Court's Authority to Approve the Liquidation Plan

Defendant argues that the Receiver is not empowered to liquidate assets because "equity receiverships should not be used to effect the liquidation of defendants in actions brough under the securities laws." (Def.'s Resp. at 2 (quoting *SEC v. Am. Bd. of Trade, Inc.*, 830 F.2d 431 (2d Cir. 1987).) Defendant further argues that liquidation is inappropriate before the issues currently on appeal are resolved because that appeal may determine which assets must be liquidated to satisfy the judgment against Defendant. (*Id.* at 3.) Lastly, Defendant contends that if the Court determines liquidation is appropriate, then the matter should be referred to a bankruptcy court. (*Id.* at 2.) Plaintiff SEC disagrees, contending that the Court has already rejected these arguments when it appointed the Receiver in the first instance. (SEC Resp. [Doc. # 2075] at 11 (citing Order [Doc. # 1070] at 4).) SEC also argues that the Second Circuit has also considered and rejected these arguments when it denied Defendant's requests to stay enforcement of the judgment, vacate the receivership, and to stay the

receivership. (*Id.* at 11-12.) Finally, SEC argues that *American Board of Trade* is distinguishable from this case because in that case the Second Circuit admonished the district court for essentially transforming itself into a bankruptcy court aided by a receiver. (*Id.* at 12.) SEC argues that is not the case here because the Receivership Estate is not an insolvent corporation. (*Id.* at 13.)

Defendant relies almost exclusively on *American Board of Trade* for the proposition that it is improper for the Court to adopt the Receiver's plan to liquidate the Receivership Estate in lieu of a bankruptcy proceeding. 830 F.2d at 436 (noting frequent admonition that "equity receiverships should not be used to effect the liquidation of defendants in actions brought under the securities laws"); *Esbitt v. Dutch-Am. Mercantile Corp.*, 335 F.2d 141, 143 (2d Cir. 1964) ("We see no reason why violation of the Securities Act should result in the liquidation of an insolvent corporation via an equity receivership instead of the normal bankruptcy procedures . . . ."). In *American Board of Trade*, the district court had appointed a receiver to create a plan of liquidation of frozen assets related to a Ponzi scheme concocted by the defendants. 830 F.2d at 434. In doing so, the district court, with the aid of the receiver it appointed, processed proof-of-claim forms filed by thousands of noteholders and creditors, set priorities among classes of creditors, and administered sales of real property. *Id.* at 438. The Second Circuit affirmed the district court's actions. *Id.* However, the Second Circuit admonished the court's use of the receiver in this fashion because the district court "transformed itself into a court of bankruptcy aided by a receiver performing the tasks of a bankruptcy trustee." *Id.* at 438; *see also SEC v. S & P Nat'l Corp.*, 360 F.2d 741, 750-51 (2d Cir. 1966).

Despite its reservations about employing a receiver to effectuate actions reserved for a bankruptcy proceeding, the Second Circuit, in *American Board of Trade*, stated: "we have never vacated or modified a receivership order on the ground that a district court

improperly attempted to effect a liquidation." 830 F.2d at 437. Such action is particularly appropriate where "the receivership has progressed almost to completion . . . and it would apparently not be in the interests of the parties to direct that further proceedings be diverted into bankruptcy channels." *Esbitt*, 335 F.2d at 143; *SEC v. Credit Bancorp, Ltd.*, 290 F.3d 80, 82-83 (2d Cir. 2002) (affirming approval of distribution plan as "within the equitable discretion of the District Court"); *Wang*, 944 F.2d at 88 (same).

The limitation expressed in *American Board of Trade* is best characterized as addressed to district courts considering the appointment of a receiver to monitor and distribute the assets of an insolvent corporation during a time at which the parties would be better served by a bankruptcy proceeding. *See, e.g., Esbitt*, 335 F.2d at 143 ("The record plainly indicates that the First Discount Corporation is hopelessly insolvent and is in the process (almost completed) of liquidation. We see no reason why violation of the Securities Act should result in the liquidation of an insolvent corporation via an equity receivership instead of the normal bankruptcy procedures, which are much better designed to protect the rights of interested parties."); *Lankenau v. Coggeshall & Hicks*, 350 F.2d 61, 63 (2d Cir. 1965) ("[R]eceiverships ancillary to SEC actions against brokers or broker-dealers should not be continued, in a case involving insolvency, beyond the point necessary to get the estate into the proper forum for liquidation—the bankruptcy court."). Absent those circumstances, a court has the authority to approve any liquidation plan provided it is "fair and reasonable." *Wang*, 944 F.2d at 81 (distribution plan should be "reviewed under [the District Court's] general equitable powers to ensure that it is fair and reasonable"); *see also Esbitt*, 335 F.2d at 143 ("However, the receivership has progressed almost to completion without objection and it would apparently not be in the interests of the parties to direct that further proceedings be diverted into bankruptcy channels.").

Here, the Receivership Assets are not those of an insolvent corporation. Instead, they

10

are the fruits of Defendant's fraud. His victim is not a throng of shareholders, but his former employer, Oak. The purpose of the liquidation is to satisfy a disgorgement award and civil penalty which this Court ordered, not to oversee the distribution of assets to injured shareholders or third-party creditors. Thus, the circumstances here are not a match for the considerations compelling the Second Circuit's dicta against the use of a receiver to liquidate assets. Finally, the Court had previously considered and rejected Defendant's and Relief Defendant's arguments when it appointed the Receiver. (Appointment Order at 4.) Reconsideration of that decision is not appropriate at this juncture.

Because the Court maintains broad authority to fashion remedies for the violations of federal securities law, *see Official Comm. of Unsecured Creditors*, 467 F.3d at 81, and the liquidation of Mr. Ahmed's assets to satisfy the judgment against him is not inconsistent with the Second Circuit's precedents, the Court maintains the authority to approve the proposed Liquidation Plan.

### B. Motion for Administrative Stay of Liquidation of Assets Pending Appeal

Relief Defendants next seek an administrative stay of liquidation pending their appeal in the Second Circuit. (*See* Relief Defs.' Emergency Mot. for Admin. Stay [Doc.# 2104] at 1.) Relief Defendants argue that "if the Court issues its liquidation order and Relief Defendants file a stay motion the next day, there is a risk that the Receiver will *immediately* liquidate and then file a response a few days later stating that the stay motion is moot." (*Id.* at 2.) They contend that this result "will foreclose Relief Defendants from ever having an opportunity to seek relief from the Second Circuit." (*Id.*)

The SEC counters that Relief Defendants' motion "serves no purpose other than to assist them in filing yet another motion for reconsideration." (*Id.* 4-5.) The SEC challenges Relief Defendants' request for a stay as a pretextual maneuver to further prevent liquidation, rather than "qualm" with the "manner and procedure" of the liquidation. (*Id.* at 5.) The SEC

further disputes the contention that the Relief Defendants will not have an opportunity to seek relief from the Second Circuit absent an administrative stay, pointing to the Second Circuit's denial of Defendant's emergency motion for a stay of enforcement of this Court's judgment. (*Id.* at 6-7 (citing Motion Order, *Ahmed III*, No. 18-2903, at 1, ECF # 154).) Thus, the SEC contends, Relief Defendants' motion ignores the Second Circuit's denial of the relief it requests. (*Id.* at 7.)

The Court agrees. Relief Defendants' motion requests the Court to stay liquidation—relief requested and denied in this Court previously [Docs. ## 1052, 1997]. Although Relief Defendants were not party to Defendant's emergency motion to stay enforcement of the judgment pending appeal, his arguments were familiar—*inter alia*, that this Court has erred by ordering the potential liquidation of assets that belong to Relief Defendants and by authorizing post judgment interest and gains. *See* Motion to Stay at 10, *Ahmed III*, No. 18-2903, ECF # 59-1. But the Second Circuit denied his motion for an emergency stay because he had not demonstrated a likelihood of success or that he would suffer irreparable harm absent such relief. Motion Order, *Ahmed III*, No. 18-2903, at 1, ECF # 154. While Relief Defendants may have interests distinct from Defendant, they have not articulated new reasons to stay the commencement of the Liquidation Plan. Thus, Relief Defendants' argument that denial of its motion is a denial of an opportunity for appeal is unpersuasive.

Further, in its denial of such relief this Court made plain its reasoning:

> Although it is possible that irreversible harm could be borne by Defendant and Relief Defendants should any decision by this Court be reversed by the Second Circuit, this risk can be substantially mitigated through a carefully timed liquidation plan that, inter alia, liquidates unique assets last and only if necessary to satisfy the judgment. Liquidation is also favored as it will allow full security of the judgment and permit release of any excess frozen assets to Defendant and Relief Defendants. After excess assets are returned, there will be no further need to continually litigate over the release of frozen assets for Defendant and Relief Defendants' various purposes. Liquidation thus promotes judicial economy.

(Redetermined Disgorgement Order at 13.) As circumstances have not changed to alter these considerations and the Receiver's proposed Liquidation Plan comports with them, Relief Defendants' motion for a stay of liquidation [Doc.# 2104] is denied.

### C. Objections to the Plan

#### 1. Designation of Unique and Non-Unique Assets

First, Defendant and Relief Defendants argue that the Receiver's methodology for classifying which assets are "non-unique" and which are "unique" is flawed. (Def.'s Resp. at 20-21; Relief Defs.' Opp'n at 6-7.) Specifically, they argue that the Receiver "confuses 'unique' with 'illiquid'" and cite the MetLife Insurance policy and Uniform Transfer to Minors Act ("UTMA") Accounts as examples of assets that they believe should be classified as unique. Defendant contends that the MetLife policy is owned by the Family Trust and the only one of its kind while the UTMA Accounts are for the sole benefit of the children of Mr. and Ms. Ahmed. (Relief Defs.' Opp'n at 5.)

At the December 20 hearing, the Receiver argued that the classification of which assets are unique or non-unique was a discretionary one made with the goal of satisfying the judgment—an uncertain task in July of 2021 when the Liquidation Plan was proposed. The Receiver represented further at the December hearing that the total value of the Receivership Assets is expected to satisfy the judgment but argued that Defendant and Relief Defendants do not propose an alternative methodology for classifying the assets.

The Receiver's task in crafting the proposed Liquidation Plan was to provide a reasonable means for satisfying the judgment against Defendant. To guide the Receiver, the Court directed him to liquidate "unique assets last" but "only if necessary to satisfy the judgment." (Redetermined Disgorgement Order at 13.) The Court, however, left for the Receiver the determination of which assets are unique under the Liquidation Plan. Far from basing his determination solely on which assets are illiquid as Defendant and Relief

Defendants contend, the Receiver settled on three criteria that define a unique asset: non-fungible, highly illiquid, and personal to Defendant and Relief Defendants. (Liquidation Plan at 5.) The Receiver justifies this selection of attributes with many considerations in mind. First, the Receiver observed "the Court's desire to promptly secure the Total Judgment while reasonably mitigating the risk of . . . 'irreversible harm' from an effectuated judgment" to Defendant and Relief Defendants should its decisions be reversed on appeal. (*Id.*) Next, the non-fungibility of an asset, the Receiver notes, would make it difficult to recover once liquidated. (*Id.* at 5-6.) An asset that is highly illiquid is unique according to the Receiver because the costs attendant to its liquidation would be a great imposition on the title holders of that asset. (*Id.* at 6.) Finally, the Receiver's Liquidation Plan accounts for the personal nature of assets, determining that highly personal assets may be considered unique to their owners. (*Id.*) The Court concludes that these general criteria are reasonable. And, given that Defendants and Relief Defendants do not provide a workable alternative definition for "unique assets," the Court approves these parameters.

Applying the Receiver's definition of "unique assets" the Court concludes, moreover, that the MetLife Insurance policy fits these criteria. This asset is not fungible; once liquidated, it likely cannot be salvaged or traded for its substantial equivalent. Additionally, it is highly personal to Defendant and Relief Defendants in that it is the only such asset of its kind among the Receivership Assets. Therefore, the Receiver is directed to reclassify the MetLife Insurance policy as a unique asset.

   2.   *Ownership of Assets & Property Rights*[8]

Defendant and Relief Defendants next advance several arguments objecting to

---

[8] Throughout his Response to the Liquidation Plan, Defendant raises several arguments that the Receiver does not provide a plan for how he intends to return Defendant and Relief Defendants back to the status quo in the event that the Second Circuit decreases the

liquidation premised on the notion that liquidation will disrupt their property rights. First, Defendant argues that the purpose of the Receiver is not to "oust any party of his right to the possession of the property but merely to retain it for the benefit of the party who may ultimately appear to be entitled to it," citing a nineteenth century Supreme Court decision. *See Wiswall v. Sampson*, 55 U.S. 52, 58 (1852). Defendant also cites to the Court's representations during a November 9, 2018 telephonic status conference [Doc. #1042] for support: "the clarification order that [the Court] issued [made clear that the Court did not take property rights from the Relief Defendants] . . . that was not what the final judgment order did." (*Id.* at 12:20-22.) But Defendant argues that this is just what the Receiver proposes to do by transferring clear title to all non-unique assets to a Receiver controlled account and then to the CRIS Account. (Def.'s Resp. at 18; Relief Defs.' Opp'n at 7.) Defendant argues that liquidating these assets before a ruling from the Second Circuit would be improper. (Def.'s Resp. at 18.) Defendant also argues that for the same reason, the Liquidation Plan is deficient given that it does not include an analysis tracing the owners of each asset. (*Id.* at 22.)

The Receiver counters these arguments, maintaining that "the liquidation of assets in the Receivership Estate may proceed regardless of the title holder of any given asset therein." (Receiver's Reply at 18.)

The Court agrees with the Receiver. The Court already has held that the Receivership Assets are available for liquidation. (Am. Final J. against Def. and Relief Defs. [Doc. # 1054] at 5.) Given that it is Relief Defendants who failed to provide evidence that anyone other than Defendant owned and controlled the frozen assets when offered the opportunity, the Court

---

judgment award. Given that these arguments implicitly challenge the propriety of using the Receivership Assets to satisfy the judgment, they are addressed by the same analysis the Court undertakes to addresses arguments regarding ownership and property rights.

will not now require the Receiver to expend resources to carry that burden. *See Ahmed II*, 343 F. Supp. 3d at 33-34. Additionally, Defendant's references to the Supreme Court and this Court lack context. True, receivers do not oust property owners on behalf of plaintiffs who happen to have a claim against a defendant. *See* 12 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2983 (3rd ed. 2021) ("Inasmuch as a receivership may interfere seriously with defendant's property rights by ousting him or her from control, and sometimes even possession, the party seeking it must show . . . some legally recognized right in that property that amounts to more than a mere claim against defendant."). But the Receiver was duly appointed by the Court to evaluate, liquidate, and if ordered by the Court, sell the Receivership Assets for distribution of the judgment awarded to the SEC. (*See* Appointment Order.) Anticipating multiple issues on appeal, the Court stayed distribution of the Receivership Assets, *but not* liquidation. (Am. Final J. against Def. and Relief Defs. [Doc. # 1054] at 9.) The Receiver's Liquidation Plan also accounts for fluctuations in the value of the total judgment by liquidating only the most liquid and fungible assets in Phase 1, reserving the liquidation of other, less fungible, assets for Phase 2 only if necessary. (*See* Liquidation Plan at 5-6.)

### 3. Minimizing Tax Liability[9]

Broadly, Defendant and Relief Defendants argue that the Receiver must conduct a pre-liquidation tax analysis as a cost-savings measure and fault the Liquidation Plan for not doing so. (Def.'s Resp. at 6-7; Relief Defs.' Opp'n at 8.) As one method of cost savings,

---

[9] Separately, the Receiver filed an application to employ tax and forensic accounting professionals to aid in his assessment of the tax ramifications of liquidation [Doc. # 2141]. To the extent Defendant and Relief Defendants contend that the Receiver should employ a tax professional before the approval of the proposed Liquidation Plan, that argument is rejected. Instead, the Court will evaluate the Receiver's application to employ tax and forensic accounting professionals following this ruling.

Defendant and Relief Defendants argue that the Receiver should liquidate losses before gains and avoid the sale of appreciated assets generating large tax liabilities. (Relief Defs.' Opp'n at 9.) The Defendant and Relief Defendants collectively raise other concerns. They request their own tax counsel, (Relief Defs.' Opp'n at 10-11) and that taxes generated from the Receivership Assets be paid from those assets, (*id.* at 11; Def.'s Resp. at 10-11).

The Receiver disagrees, reasoning that the Liquidation Plan proposes to address tax considerations attendant to liquidation at the appropriate time. (Receiver's Reply at 10.) The Receiver maintains that "many of the tax matters identified by Defendant and Relief Defendants would be analyzed and addressed in the Phase 1 Report given the proposed scope of the Receiver's tax professional's mandate described in the Liquidation Plan." (*Id.* at 11.) The Receiver proposes this course of action "given the speculative nature of the Defendants' tax claims, the market and legislative risks associated with delaying liquidation, and this Court's order to limit the Defendant's victims' exposure to risk." (*Id.*) According to the Receiver, it is an open question whether a receiver for a collection of assets held in the name of many entities, rather than for a single entity held in the name of a single person, is obligated to pay taxes. (*Id.* at 11 n.10.) But the Receiver observes that it is within the Court's "equitable discretion" to direct the Receiver to pay the capital gains tax liabilities created by the liquidation of the Receivership Assets. (*Id.*; Liquidation Plan at 18.) The Receiver also claims that Relief Defendants have "repeatedly refus[ed]" to comply with his requests for their tax returns so that he may accurately assess these matters. Finally, the Receiver argues that Defendant and Relief Defendants' suggestion to limit tax liability by liquidating losses first runs counter to the Court's directions to liquidate non-unique assets first, given that there is overlap in losses and unique assets. (Receiver's Reply at 9-10.)

The Receiver's Liquidation Plan proposes to employ the services of a tax professional in the Phase 1 Report. Because the Receiver has been appointed by the Court to aid it in

effectuating the judgment, a tax professional retained by the Receiver shall render an objective assessment, eliminating the duplicative use of Receivership Assets to retain their own tax counsel. Additionally, in keeping with the equitable nature of the Receivership, the Court directs the Receiver to pay any tax liability generated by the Receivership Assets from the value of those assets. Next, the Court rejects Defendant and Relief Defendants' proposal that the Receiver liquidate losses first. That course of action runs counter to not only the Court's express direction that the Receiver liquidate "non-unique assets" first, but also the Relief Defendants' own concerns about liquidating assets whose value they claim may be irreparably harmed by liquidation. The Receiver's proposed Liquidation Plan, on the other hand, accommodates both, and the Court finds it reasonable. Finally, at the December 20 hearing, the Court directed Defendant and Relief Defendants to furnish the Receiver with their income tax returns, which the Receiver has requested [Doc. # 2132]. Pursuant to that directive, the Court directs the Receiver to apprise the Court if and when those documents have been produced.

### 4. *Receiver's Request for an Exemption from 28 U.S.C. §§ 2001 & 2004*

In his proposed Liquidation Plan, the Receiver requests that his liquidation and sale of the assets classified as "non-unique" be excepted from the procedures provided in 28 U.S.C. §§ 2001 and 2004. (Liquidation Plan at 15-16.) The Receiver reasons that "the existence of public markets for each Non-Unique Asset," such as stocks and gold, obviates the need to comply with those statutes, which provide procedures for the sale of property. (*Id.*) Defendant and Relief Defendants oppose this request, arguing that the Receiver has "given *no* reason why the Court should allow" it. (Relief Defs.' Opp'n at 23-24; *see also* Def.'s Resp. at 34-35.)

Title 28 Sections 2001 and 2004 collectively require the sale of realty and personalty ordered by a court to follow certain procedures, such as a public sale, publication after a

hearing noticed to interested parties, and the court appointment of disinterested persons to appraise the property. *See* 28 U.S.C. §§ 2001, 2004. The statutes specifically direct their requirements to "property in the possession of a receiver" and use mandatory language. § 2001; § 2004 ("Any personalty sold under any order or decree of any court of the United States shall be sold in accordance with section 2001 of this title, unless the court orders otherwise.")

The Receiver's request for an exception from § 2004 stems from the existence of established public markets for the sale of many of the investments among the Receivership Assets. As these markets perform a similar function as the procedures set out in § 2001, to require the Receiver to adhere to those procedures for such investments would be unnecessarily duplicative. Therefore, the Court grants the Receiver's request to exempt the sale of personalty[10] from the procedures set out in § 2001, but only with regard to those non-unique assets whose value can be ascertained by an established public market. For all other assets for which the Receiver seeks exemption, he may make such request on an individualized basis.

### 5. *Liquidation of Certain Discrete Assets*

Defendant and Relief Defendants argue that the Receiver's proposal to liquidate the Family Trust and the children's UTMA Accounts in Phase 1 fails to "'mitigate' any irreparable prejudice or harm to the Defendants as directed by the Court." (Def.'s Resp. at 17.) Of special concern to Mr. Ahmed are his children who are the sole beneficiaries to the Family Trust and UTMA Accounts. (*Id.*) For example, Defendant insists that the Receiver does not address the

---

[10] While the statute does not define personalty, the Court defines it as "movable assets (things, including animals) which are not real property, money, or investments." *See Personalty*, THE FREE DICTIONARY, https://legal-dictionary.thefreedictionary.com/Personalty (citing *West's Encyclopedia of American Law* (2nd ed. 2008)).

"irreparable harm of liquidating . . . the MetLife insurance policy" belonging to the Family Trust, which will accrue to the children in the event of Mr. Ahmed's death. (*Id.*) As such, Mr. Ahmed argues that the Court should "at a minimum" order that these assets be excluded from liquidation or transferred to avoid an adverse legal impact. (*Id.*) Mr. Ahmed also argues that the Receiver does not account for various Limited Liability Companies among the frozen assets and that their loss is an irreparable harm. (*Id.* at 18 (citing *In re Northwest Airlines Corp.*, 349 B.R. 338, 384 (S.D.N.Y. 2006).)

In addition, Relief Defendants contend that Ms. Ahmed's jewelry should not be liquidated until after the appeal has been decided because those items have "great sentimental value," they are "irreplaceable," and the Relief Defendants have a "strong argument" on appeal. (Relief Defs.' Opp'n at 18.) They contend further that assets they claim were conveyed as gifts should not be liquidated "until a factual determination is made as to the source of the items." (*Id.* at 17-18.)

The Receiver argues that the liquidation of these assets is "wholly consistent with this Court's prior orders." (Receiver's Reply at 11.) Citing to the Court's Amended Final Judgment, the Receiver maintains that the Family Trust and UTMA Accounts specifically were made "available to satisfy this Final Judgment against Defendant." (*Id.* at 12 (quoting Am. Final J. against Def. & Relief Defs. [Doc. # 1054] at 5).) The Receiver also argues that, despite the Receiver's decision in the 2019 proposed liquidation to leave the Family Trusts and UTMA Accounts largely untouched, the Receiver presently estimates that all non-unique assets held by those accounts will be necessary to satisfy the judgment if unique assets are liquidated last. (*Id.* at 13.) Thus, the Receiver argues that there is no basis to exempt the Family Trusts and UTMA Accounts from the initial liquidation plan.

In response to Defendant and Relief Defendants' arguments regarding the jewelry and purported gifts, the Receiver argues that, like the Family Trust assets and UTMA Accounts,

the "Court explicitly held that the jewelry was 'available to satisfy' the judgment. (Receiver's Reply at 19 (citing Am. Final J. at 5, 7).) The Receiver further argues that the Court has rejected Relief Defendants' claim that these items were gifts. (*Id.* (citing Ruling on Pl.'s Motion for Remedies and J. [Doc. # 955] at 25).) Regarding the jewelry, the Receiver notes that these items are designated "unique" and will not be liquidated, if at all, until Phase 2. (*Id.*) Thus, the Receiver argues there is no legitimate basis to deviate from the Liquidation Plan with respect to these assets.

The Court has already held that the Family Trust, UTMA Accounts, and jewelry are available to satisfy the judgment. (Am. Final J. against Def. & Relief Defs. [Doc. # 1054] at 5).) The Court has also rejected Relief Defendants' claims regarding ownership over the purported gifts. *See Ahmed II*, 343 F. Supp. 3d at 35. Considering the potential for fluctuations in the value of the Receivership Assets and the increased judgment awarded, it appears that these assets may be necessary to satisfy the judgment. Additionally, while the Court recognizes the harm liquidation of these assets poses, the Relief Defendants are nominee holders of those assets. *Id.* at 35 n.21. Thus, mitigation of harm to Relief Defendants is not the central goal of the Court's charge to the Receiver to liquidate.

Even still, mindful of possible irreparable consequences of liquidating some assets, the Court has directed the Receiver to liquidate "unique" assets after exhausting "non-unique assets." (Redetermined Disgorgement Order at 13.) The Court ordered this liquidation schedule to balance the primary consideration of satisfying the judgment against secondary considerations such as harm to Relief Defendants. The Receiver's Plan is generally responsive to those concerns. Given the open question whether the Receivership Assets will satisfy the total judgment once interests and gains are added to the sum, however, "funds are limited" and "hard choices must be made." *Official Comm. of Unsecured Creditors*, 467 F.3d at 84. Liquidating these assets is one such hard choice that must be made if it will satisfy the

judgment.

### 6. Oak & Related Assets

Defendant and Relief Defendants advance several arguments regarding assets held by Oak and Oak Healthcare/Financial Technology ("Oak HC/FT"). First, they argue that the Receiver has a duty to recover assets in Oak HC/FT in which they maintain Defendant has an interest. (Def.'s Resp. at 13; Relief Defs.' Opp'n at 18-19.) Next, they argue that the Receiver must independently verify the value of the non-forfeited Oak assets titled to Defendant and that the Court should order the Receiver to effect this verification. (Def.'s Resp. at 14; Relief Defs.' Opp'n at 21.) Independently, the Relief Defendants urge the Court to credit the value of the non-forfeited assets against the judgment. (Relief Defs.' Opp'n at 20.) Finally, Defendant and Relief Defendants request that the Court order the Receiver to evaluate the amounts due to Defendant in his Schedule K-1 statements.[11] (Def.'s Resp. at 15; Relief Defs.'

---

[11] In his brief, Defendant argues that "interpreting the K-1 statements" was among the Court's considerations in appointing the Receiver. (Def.'s Resp. at 15 (citing Tr. of Nov. 9, 2018 Telephonic Status Conference [Doc. # 1042] at 21:15-18).) To be clear, the Court indicated that an appointed receiver "*might* be charged" with interpreting K-1 statements. (*See* Tr. of Nov. 9, 2018 Telephonic Status Conference [Doc. # 1042] at 21:19-25 (emphasis added).) However, Oak, the SEC, and Mr. Ahmed appear to dispute who owns the sums which the K-1 statements purportedly quantify. The SEC has maintained that these K-1 statements represent assets that Mr. Ahmed forfeited, and that Oak has issued them in response to the asset freeze to comply with the Court's litigation stay. (*Id.* 18:10-12.) Thus, the SEC argues, the K-1 statements are in Mr. Ahmed's name because Oak determined that its efforts to retain those funds potentially would violate the Court's orders and Oak will attempt to claim them once the asset freeze is lifted. (*Id.* at 18:12-14.)

Insofar as there is an ongoing dispute regarding the ownership over the sums the K-1 statements represent, there is doubt about whether they are part of the Receivership Assets. Therefore, the Receiver need not expend resources to identify their precise value. If the Receiver determines that the Receivership Assets as presently accounted for will not be enough to satisfy the judgment, it may be prudent for the Receiver to investigate whether the assets represented in the K-1 Statements can and should be liquidated as part of the Receivership Assets. That determination, however, may be made in Phase 2 of liquidation.

Opp'n at 23.)

In Response, the Receiver counters that the Oak HC/FT assets were classified as unique assets given their illiquid nature and Oak's representation that Defendant forfeited them. (Receiver's Reply at 14.) Thus, the Receiver argues that it is reasonable not to expend the resources to investigate those disputed assets until it becomes necessary to satisfy the judgment. (*Id.*) The Receiver does note, however, that given the values of the total judgment and the Receivership Assets, investigation and liquidation of the Oak HC/FT assets may be necessary. (*Id.* at 15.) But the Receiver recommends that such determination is more appropriate upon completion of Phase 1 of the Liquidation Plan. (*Id.*)

Next the Receiver explains that the non-forfeited Oak assets have already been classified as non-unique assets and are included in Phase 1 of the Liquidation Plan. (*Id.* at 16.) As to the assets the Court determined were forfeited by Defendant, the Receiver maintains that, because the Court has stayed only distribution and not liquidation, it was permissible to exclude interest in those forfeited assets and not to offset them against the judgment. (*Id.* 15-16.)

In asserting that the Receiver has a duty to recover assets in Oak HC/FT, Relief Defendants rely on *SEC v. Illarramendi*, No. 3:11cv78 (JBA), 2014 WL 5460816, at *2 (D. Conn. Oct. 27, 2014). (Relief Defs.' Opp'n at 19.) But Relief Defendants mischaracterize the Court's dictum. In *Illarramendi*, the Court observed that a Receiver is duty bound to "recover assets for *victims*." 2014 WL 5460816, at *2 (emphasis added). Neither Defendant nor Relief Defendants are victims of Defendant's fraud. In any event, the Receiver has accounted for the eventuality that these assets might be necessary to satisfy the judgment and classified them as unique assets to be liquidated in Phase 2 of the Liquidation Plan. It is reasonable for the Receiver to conserve the cost of investigating these assets unless necessary to satisfy the judgment.

Regarding the forfeited and non-forfeited Oak assets, the Receiver's actions also were reasonable. The Liquidation Plan proposes to liquidate the non-forfeited assets in Phase 1, accommodating Defendant and Relief Defendants' desire for those assets to be credited against the judgment. Additionally, any Oak assets the Court has previously held were forfeited by Defendant should not be included in the Liquidation Plan.

### 7. Jurisdiction to Decide Interests and Gains Calculation

The Receiver proposes two alternative methodologies to calculate an interest and gains award: a precise calculation tracing Defendant's assets and an extrapolated calculation which would "determine[e] the appreciation percentage realized by the entire Receivership Estate during the asset freeze and then apply[] that rate to the two distinct disgorgement awards." (Liquidation Plan at 7-12.) The SEC endorses the extrapolated method and argues that the Court does not need to trace the tainted monies to determine the appropriate amount of interest and gains. (SEC Resp. at 6-8.) Relief Defendants and Defendant argue that the Court is without jurisdiction to address the award of interest and gains because they have appealed this award. (Relief Defs.' Opp'n at 24; Def.'s Resp. at 24-25.) They also maintain that an award of interest and gains is punitive and inequitable. (Relief Defs.' Opp'n at 24; Def.'s Opp'n at 26.)

 "Once a proper appeal is taken, the district court may generally take action only in aid of the appeal or to correct clerical errors as allowed by the Federal Rules of Civil (or Criminal) Procedure." *Leonhard v. United States*, 633 F.2d 599, 609-10 (2d Cir. 1980).  Thus, a court may clarify a judgment even if its order is under appeal.  *United States v. Nichols,* 56 F.3d 403, 411 (2d Cir. 1995) (concluding that the district court acted properly when it "simply clarified" its findings). But a court cannot "act[] impermissibly 'to modify a judgment substantively' while an appeal [is] pending." *Id.* (quoting *United States v. Ransom*, 866 F.2d 574, 575-76 (2d Cir. 1989)

Relief Defendants have appealed the issue of whether interest and gains may be awarded, arguing "to the extent the district court required Relief Defendants to pay gains on frozen assets accruing after the judgment, the district court erred." Brief of Relief Defendants at 57, *Ahmed IV*, No. 21-1686, ECF # 79. In their opposition to the Receiver's proposed Liquidation Plan, Relief Defendants argue that post-judgment interest and gains cannot be squared with *Liu v. SEC*, which held that a disgorgement award is permissible in a SEC civil enforcement action when it "does not exceed a wrongdoer's net profits and is awarded for victims," 140 S. Ct. 1936, 1940 (2020). They argue that post-judgment interest and gains are impermissible here where the proposed methodologies to calculate these sums range from $25 to $33 million, far exceeding what is necessary to compensate the victims wronged in this case. The SEC does not address the impact of *Liu* on the award of post-judgment interest and gains.

The question now before the Court, however, is not *whether* to award interest and gains. That issue has been litigated and decided. In its Supplemental Ruling on Remedies, the Court determined that Defendant was liable for "any actual interest accrued or gains earned on the frozen assets" [Doc. # 1051]. This determination was reiterated in the Court's Amended Judgment, when the Court concluded that the amount of interest and returns would "be determined by a receiver or such other process that the Court will order." (Am. Final J. against Def. & Relief Defs. [Doc. # 1054] at 4-5.) Later, in redetermining Defendant's disgorgement liability, the Court awarded $9,755,798.34 in prejudgment interest, and rearticulated that Defendant was liable for "any interest or gains accrued on disgorged frozen assets from the date of the Court's freeze order." (Redetermined Final Am. J. [Doc. # 2011].)

The Court construes its present task as deciding *which* method of calculation is appropriate. Accordingly, the Court directs the Receiver to calculate interest and gains

25

employing the extrapolated method. The Court finds this method appropriate for three reasons. First, the alternative method of tracing can lead to perverse outcomes and, thus, is not required by Second Circuit precedent. *See FTC v. Bronson Partners*, LLC, 654 F.3d 359, 373-74 (2d Cir. 2011); *SEC v. Rosenthal*, 426 F. App'x 1, 3 (2d Cir. 2011) ("Imposing such a tracing requirement would allow an insider trading defendant to escape disgorgement by spending down illicit gains while protecting legitimately obtained assets or, as was the case here, by commingling and transferring such profits."). Second, as the Receiver suggests, the extrapolated method likely results in material cost savings because the Receiver would not need the assistance of a forensic accountant to identify each disgorged asset. (*See* Liquidation Plan at 13.) Third, this method would offset any appreciation of the Receivership Assets by applying losses accrued from the whole of the asset pool, just as Defendant and Relief Defendants appear to have requested throughout their briefs.

This determination is simply a clarification because it does not make a substantive change to the Court's previous rulings on the issue; it instead specifies what exactly was ordered. *Nichols,* 56 F.3d at 411. On the contrary, it would be a modification of the Court's previous rulings were it to reverse course now by declining to award these sums as Defendant and Relief Defendants request. Thus, the Court's decision today serves to aid the Second Circuit in its evaluation the precise issue on appeal—whether an award of interest and gains is permissible under the law.

### 8.   *Reserve Funds*

Finally, Defendant and Relief Defendants argue that there should not be a reserve of funds to pay for "specific asset expenses." (Def.'s Resp. at 33-34; Relief Defs.' Opp'n at 3-38.) Instead, they argue that there should be a reserve of funds to provide for ongoing distributions for various expenses for living and education, as previously ordered. (Def.'s Resp. at 33-34; Relief Defs.' Opp'n at 37.) The Receiver does not provide counterarguments

addressing Defendant and Relief Defendants' arguments.

In his Liquidation Plan, the Receiver proposes to "set forth the amount of any reserve he estimates will be necessary to satisfy other expenses and liabilities of the Receivership Estate that may arise before this Court closes the Receivership Estate" as a part of his Phase 2 Report. (Liquidation Plan at 24.) Given that the Receiver's proposed reservation of funds does not limit itself to one set of expenses or another, it is premature to hold the Receiver to one now. Instead, the Court finds it sensible to evaluate which expenses will be paid from reserve funds, to the extent practicable, during Phase 2 of Liquidation Plan.

## IV.   Conclusion

For the forgoing reasons, the Court orders the following:

(1) The Motion to Approve the Receiver's Liquidation Plan [Doc. # 2134], except as modified by this order, is GRANTED and the Receiver is hereby authorized to commence liquidation.

(2) The Receiver is directed to classify the MetLife Insurance Plan asset as "unique" as that term is defined in the Liquidation Plan.

(3) The Court directs the Receiver to pay any tax liability generated by the liquidation of Receivership Assets from the Receivership Assets.

(4) Pursuant to 28 U.S.C. §§ 2001 and 2004, the Receiver is required to engage in the sale process and procedure as defined in 28 U.S.C. § 2001, but may bypass those procedures for the sale of personalty whose value can be ascertained by an established public market.

(5) The law firm Murtha Cullina LLP is directed to transfer the $25,000 held in its Interest on Lawyers' Trust Account ("IOLTA") for the benefit of the Relief Defendants to the Receiver's control within seven (7) days of this Order.

(6) The law firm Harris St. Laurent & Wechsler LLP is directed transfer the

$73,447.29 held in its IOLTA for the benefit of the Relief Defendants to the Receiver's control within seven (7) days of this Order.

(7) For the purposes of calculating the Appreciation Award portion of the Total Judgment, the Receiver is directed to apply the extrapolated method, as detailed in the Liquidation Plan.

(8) The Minor Assets identified in Exhibit B appended to the Motion to Approve the Receiver's Liquidation Plan [Doc. # 2134-1] are hereby released from the Court's asset freeze and the Receivership Estate and the Receiver is directed to deliver such Minor Assets to their current respective title owners.

(9) Relief Defendants' Emergency Motion for an Administrative Stay [Doc.# 2104] is DENIED.

IT IS SO ORDERED.

_____ /s/ _____

Dated at New Haven, Connecticut this 11th day of January 2022.