**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> IFTIKAR AHMED <br><br> Defendant, <br> and <br><br> IFTIKAR ALI AHMED SOLE PROP; I-CUBED DOMAINS, LLC; SHALINI AHMED; SHALINI AHMED 2014 GRANTOR RETAINED ANNUITY TRUST; DIYA HOLDINGS LLC; DIYA REAL HOLDINGS, LLC; I.I. 1, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; I.I. 2, a minor child, by and through his next friends, IFTIKAR and SHALINI AHMED, his parents; I.I. 3, a minor child, by and through his next friends, IFTIKAR and SHALINI AHMED, his parents <br><br> Relief Defendants. | Civil Action No. <br> 3:15-cv-675-JBA <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br> October 5, 2022 |

**RECEIVER'S OMNIBUS REPLY**
**TO THE DEFENDANT'S, SHALINI AHMED'S, AND THE COMMISSION'S**
**RESPONSES TO THE RECEIVER'S PHASE 1 REPORT AND MOTION TO APPROVE**

Stephen M. Kindseth, Esq., in his capacity as Court-appointed Receiver of the Receivership

Estate,[1] through his undersigned counsel, hereby replies (the "Reply") to the Plaintiff United States

Securities and Exchange Commission's Response to the Receiver's Motion for Approval of Phase

1 Report and Ancillary Relief Necessary to Accomplish Phase 2 of the Liquidation Plan [Doc. No.

2310] (the "Commission's Response" or "Com. Resp."), the Defendant's Response to Receiver's

---

[1] Unless expressly defined otherwise, the Receiver incorporates by reference the definitions of terms set forth in the Receiver's Phase 1 Report [Doc. No. 2272] (the "Report").

Phase 1 Report and Motion for Orders Necessary to Accomplish Phase 2 of the Liquidation Plan [Doc. No. 2346] (the "Defendant's Response" or "Def. Resp."), and Ms. Ahmed's Response to the Receiver's Phase 1 Report and Motion to Approve [Doc. No. 2345] ("Ms. Ahmed's Response" or "Ms. A. Resp."). In support of his Reply, the Receiver respectfully states as follows.

## I.    Introduction

The Report and the Receiver's proposals set forth therein are perfectly consistent with the Liquidation Plan as approved by this Court in the Liquidation Order, and the other relevant orders entered by this Court. If approved and authorized by this Court, the Report would advance the liquidation process consistent with this Court's prior orders, increase the security of the Total Judgment, and allow the Receiver to take other necessary steps that must be completed prior to the conclusion of this receivership proceeding.

While presented as criticisms of the Report and Motion to Approve [Doc. No. 2279], the Defendant's and Ms. Ahmed's (jointly, the "Ahmeds") arguments are largely attempts to relitigate issues that this Court has already addressed. Ultimately, none of their arguments justify delaying the liquidation of Unique Assets, modifying the Liquidation Plan as approved by this Court in the Liquidation Order, or changing the Receiver's proposals set forth in the Report.

For the reasons set forth below, the Receiver respectfully submits that the Receiver's proposals in the Report are reasonable and appropriate under the circumstances of this case. Consequently, this Court should grant the Motion to Approve and direct the Receiver to proceed in accordance with the Report.

## II.    The Dissolution Proceeding Does Not Prevent the Receiver from Continuing to Liquidate Assets

The Ahmeds seek to use the state-court divorce proceeding, captioned *Ahmed v. Ahmed*, Case No. FST-FA22-5026169-S (the "Dissolution Proceeding"), as a vehicle to impede numerous aspects of the orderly liquidation of Receivership Assets as authorized and approved by this Court

in the Liquidation Order. (*See, e.g.,* Ms. A. Resp., at 4-6, 16, 18, 27, 30, 41; Def. Resp., at 4-6, 9). The Ahmeds' arguments confirm the Receiver's earlier suspicion that they are trying to "impede the fulfillment of the Receiver's duties and the other objectives of this proceeding." (Doc. No. 2248, at 8). Furthermore, it now appears that Ms. Ahmed is trying to "obtain possession of property of the Receivership Estate," Appointment Order, at 13, as she asserts that "liquidating [the assets implicated by the Dissolution Agreement] interferes with Ms. Ahmed's and the children's ownership interests in those assets, as recognized by the Dissolution Agreement,"[2] in violation of the litigation stay. (Ms. A. Resp., at 5).

Regardless of the Ahmeds' *attempts* to disrupt the orderly liquidation of Receivership Assets, as a legal matter they cannot. It is well-settled that that the court "*first assuming jurisdiction over property* may exercise jurisdiction to the exclusion of other courts." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 818 (1976) (collecting Supreme Court cases) (emphasis added). While the general rule that courts will "not interfere or try to restrain each other's proceedings… has continued substantially unchanged" throughout time, "[a]n exception has been made" such that "the state or federal court having custody of such property has *exclusive jurisdiction to proceed.*" *Donovan v. Dallas*, 377 U.S. 408, 412 (1964) (citing *Princess Lida v. Thompson*, 305 U.S. 456, 465-68 (1939) (emphasis added). This exception includes "cases where property has been actually seized under judicial process before a second suit is instituted" and "where suits are brought to marshal assets, administer trusts, or liquidate estates, and in suits of a similar nature where, to give effect to its jurisdiction, the court must control the property." *Princess Lida*, 305 U.S. at 466; *see also Czajka v. Czajka*, Docket No. FA074007798, 2009 Conn. Super

---

[2] The Ahmeds previously argued that by liquidating and transferring frozen assets, the Receiver was interfering with the Defendants property rights. (Liquidation Order, at 14-15). This Court rejected these arguments, stating that it "already has held that the Receivership Assets are available for liquidation." (*Id.*, at 15). The Ahmeds' arguments about property rights as regards the Dissolution Agreement should likewise be rejected.

LEXIS 1911, *7-8 (Conn. Super. Ct. July 9, 2009) ("[d]uring the pendency of a federal bankruptcy action," which the Receiver submits is analogous to the instant proceeding insofar as the Receivership Estate is akin to a debtor's bankruptcy estate, "a state court has jurisdiction to hear matters pertaining to the dissolution of a marriage but not to hear matters relating to the property that is part of the bankruptcy estate"); *Karski v. Karski*, Docket No. FA094042851S, 2011 Conn. Super. LEXIS 1990, *3 (Conn. Super. Ct. Aug. 2, 2011) (same).

This Court first froze certain of the Ahmeds' assets in 2015, thereby exercising jurisdiction over such assets. Thus, this Court exercised jurisdiction over the relevant assets more than *six years* prior to the initiation of the Dissolution Proceeding. Moreover, by the Appointment Order entered more than *three years* prior to the filing of the Dissolution Proceeding, this Court continued to exercise jurisdiction over these frozen assets by appointing the Receiver and authorizing him to, *inter alia*, "control the operation" of the frozen assets and "take any action (whether or not in the ordinary course of business) which, prior to the asset freeze in this case, could have been taken by the Defendant or Relief Defendants with regard" to the frozen assets. (Appointment Order, at 6-7). Furthermore, this Court issued the Liquidation Order nearly *two months* before the commencement of the Dissolution Proceeding and more than *three months* before the Dissolution Agreement was filed on April 28, 2022. Thus, consistent with the Supreme Court's decisions and analogous State Court authority, the pendency of the Dissolution Proceeding does not impair this Court's ability to exercise jurisdiction over and instruct the Receiver to liquidate the frozen assets.[3]

---

[3] The Defendant and Ms. Ahmed cite *In re Kalsi*, No. 20-10330 (MG), 2020 Bankr. LEXIS 912 (Bankr. S.D.N.Y. Mar. 31, 2020) for the proposition that "the liquidation of assets cannot continue until the various interests of Ms. Ahmed, the minor children, and Mr. Ahmed have been determined in the dissolution of marriage proceeding." (Ms. A. Resp., at 5; *see also* Def. Resp., at 4-5). However, in *In re Kalsi*, the Bankruptcy Court faced a situation where the relevant divorce action was commenced more than *two years* before the bankruptcy proceeding. *In re Kalsi*, No. 20-10330 (MG), 2020 Bankr. LEXIS 912, at *3 (Bankr. S.D.N.Y. Mar. 31, 2020). This differs markedly from the instant case, which commenced more than six years before the Dissolution Proceeding and underscores the appropriateness of permitting the first court to exercise jurisdiction over certain assets to continue exercising such jurisdiction.

### III.    The Receiver is Not Tasked with Returning Funds or Assets

The Liquidation Plan did not provide for, and the Liquidation Order did not require, the Receiver to devise and potentially execute any strategy by which money or assets could be returned to the Defendant and/or Relief Defendants. Therefore, the absence of such provisions is not a valid objection to the Report. (*See, e.g.,* Ms. A. Resp., at 25-26, 36; Def. Resp., at 14, 37). If the Defendant and/or Relief Defendants are successful on appeal in challenging this Court's orders, the return of money and assets to the extent appropriate can be addressed by this Court separately. Unless this Court's judgment is overturned, however, there is no stay of liquidation and thus no requirement to plan for the return of money or assets to the Defendants.

### IV.    Further Sequencing of Liquidation is Inconsistent with the Liquidation Plan

This Court has held that the assets the Receiver seeks to liquidate in Phase 2 are "available to satisfy" the judgment entered against the Defendant and Relief Defendants. (Amended Final Judgment, at 5). Furthermore, this Court has already explained that it "directed the Receiver to liquidate 'unique' assets after exhausting 'non-unique assets'… to balance the primary consideration of satisfying the judgment against secondary considerations such as harm to Relief Defendants." (Liquidation Order, at 21). As this Court stated, "[l]iquidating these assets is [a] hard choice that must be made if it will satisfy the judgment." (Liquidation Order, at 21-22).

Further sequencing of what assets should be liquidated and in what order beyond the unique versus non-unique distinction that this Court has already established is inconsistent with this Court's prior orders and the overall objective to secure, to the greatest extent possible under the circumstances, the Total Judgment. Therefore, this Court should reject the Ahmeds' various arguments that certain assets should be liquidated before others. (*See, e.g.,* Ms. A. Resp., at 15, 18-19; Def. Resp., at 7, 14-15).

For the same reasons, this Court should reject the Ahmeds' arguments that the analysis of Oak HC/FT's forfeiture arguments and Form K-1s issued by OMC should be complete before liquidating any Unique Assets. (Ms. A. Resp., at 38-39; Def. Resp., at 15).

As regards the Oak HC/FT forfeiture issue, the Receiver "is in the process of evaluating Oak HC/FT's" arguments that the Defendant forfeited his interest in Oak HC/FT (and thus forfeited the cash distributed pursuant to such interest). (Report, at 27). Since filing the Report, the Receiver has continued such analysis and expects to submit a discrete motion setting forth this analysis for this Court's consideration, and seeking related relief, soon. Moreover, the Liquidation Order did not require this analysis to be complete before the liquidation of any Unique Assets.

With respect to the Form K-1s issued by OMC, the Receiver has already begun "investigat[ing] whether the assets represented in the K-1 [s]tatements can and should be liquidated as part of the Receivership Assets." (Liquidation Order, at 22, n. 11). OMC has represented that the Form K-1s reflect *both* assets that this Court held the Defendant forfeited *and* assets that are not forfeited. (*See* Declaration of Grace Ames, attached hereto as **Exhibit A**). There is thus no reason to deviate from the process approved by the Liquidation Order because (i) the Liquidation Plan already accounts for the liquidation of non-forfeited assets and (ii) the forfeited assets are not subject to liquidation.

Therefore, the Receiver respectfully submits that further sequencing, and delaying, the liquidation of Unique Assets is inconsistent with the Liquidation Order and unnecessary to the orderly and efficient liquidation of Receivership Assets necessary to secure the Total Judgment.[4]

---

[4] There is likewise no basis to change the liquidation sequencing or otherwise delay the liquidation of Unique Assets because of the Ahmeds' assertions regarding Essell Farms. (*See* Ms. A. Resp., at 40-41; Def. Resp., at 17-18). Essell Farms is a Unique Asset and subject to liquidation in Phase 2. (*See* Report, at 43-45). The Receiver has previously addressed the quiet title action related to a small property adjacent to the nearly 200-acre Essell Farm and the Defendants' arguments about commencing litigation related to the property. (*See* Doc. No. 2139). The Liquidation Order provides that Unique Assets should be liquidated in

**V.    The Report's Proposals Concerning the Appreciation Award and Post-Judgment Interest Award are Consistent with the Liquidation Order**

The Receiver emphasizes that he is *not* determining the amount of the Total Judgment in the Report or any other filings submitted to this Court. Such a determination is the sole province of this Court. As directed by the Liquidation Order, the Receiver submitted his analysis related to the Total Judgment and his proposals for further securing the Total Judgment for this Court's consideration. All parties-in-interest have had an opportunity to object to the Receiver's analysis and proposals and will continue to have such an opportunity as the liquidation process moves forward. The Receiver developed his estimate of the Total Judgment as set forth in the Report and further explained below, in part, to determine whether to recommend the liquidation of Unique Assets. Based on the Receiver's estimation of the Total Judgment (calculated in a manner perfectly consistent with this Court's judgments, Liquidation Order, and other orders), the liquidation of Unique Assets is necessary to secure the Total Judgment.

a.    **The Defendant and Ms. Ahmed attempt to relitigate already-settled issues.**

The Liquidation Plan set forth two potential methods that could be used to calculate the Appreciation Award: the Precise Calculation Method and the Extrapolated Calculation Method.[5] (Liquidation Plan, at 7-14). After briefing by all parties-in-interest, this Court "direct[ed] the Receiver to calculate interest and gains employing the extrapolated method." (Liquidation Order, at 25-26). This Court confirmed that the selection of the Extrapolated Calculation Method "is simply a clarification because it does not make a substantive change to the Court's previous rulings

---

Phase 2 and this Court separately ordered that it "will not permit… re-litigation of previously decided issues, except for any alleged misapplication" (which is not the case here). (Doc. No. 2293, at 3). Therefore, the Receiver submits that the Report appropriately addresses Essell Farm as a Unique Asset in Phase 2.

[5] The Receiver emphasizes that, in submitting proposals for the dollar amounts for the constituent parts of the judgment this Court entered against the Defendant, he is not determining the Defendant's "underlying liability." (Ms. A. Resp., at 7-8; Def. Resp., at 21, 25). As before, the Receiver has no position with respect to the Defendant's underlying liability. (*See* Doc. No. 1899; Doc. No. 1358; Doc. No. 1577).

on the issue; it instead specifies what exactly was ordered." (Liquidation Order, at 26).

Based on the information the Receiver has obtained to date, he submitted "an updated, though not final, proposed calculation of the Appreciation Award" applying the Extrapolated Calculation Method in his Report. (Report, at 12). The Receiver also outlined the steps necessary to finalize such calculations in Phase 2. (*Id.*, at 13-17). Such additional steps include, *inter alia*, valuing certain assets[6] and (subject to this Court's approval of V&L's proposed process to calculate taxes) appropriately reflecting the taxes in the final proposed Appreciation Award, which the Receiver will submit for this Court's approval in the Phase 2 Report.[7] (*Id.*, at 16-17).

As this Court has already selected the Extrapolated Calculation Method in the Liquidation Order, the only issue that remains is the correct calculation of the Appreciation Award using that method. Consequently, the Ahmeds' arguments that the Appreciation Award is "indeterminable," "penalizes" them, "substantively modifies the judgment[,] and is in tension with earlier orders already appealed" are simply attempts to relitigate issues that this Court has already decided. (Ms. A. Resp., at 8, 13, 34; *see also* Def. Resp., at 3-4, 19). Likewise, the Defendant's request to modify

---

[6] The Receiver acknowledges the Commission's "belie[f] that it is unlikely that most of the jewelry and art materially increased (or decreased) in value in such a way that would warrant appraisals." (Com. Resp., at 6). Should the parties-in-interest wish to stipulate as to the value of certain assets at various points in time, the Receiver has no objection to using such stipulated values. However, in the absence of a stipulation or further order from this Court, the Receiver respectfully submits that appraisals should be performed. The Receiver further notes that appraisals of the jewelry and art as of the date the QSF was established will still be necessary in connection with the Receiver's tax analysis. (*See* Report, at 11). Furthermore, the Receiver acknowledges Ms. Ahmed's request that the Receiver seek this Court's permission before engaging appraisers. (Ms. A. Resp., at 25). The Receiver does not interpret the Appointment Order as requiring the Receiver to seek such relief from this Court, and the Receiver notes that the cost in moving for authority to engage the appraisers may (in some instances) exceed the cost of the appraisers themselves. The Receiver has not yet engaged any appraisers and will proceed as directed by this Court.

[7] The Receiver is not yet able to reflect any tax obligations in the Appreciation Award calculation as such tax obligations have not yet been quantified. (*See* Def. Resp., at 22). The Receiver expects to such tax obligations to be quantified in Phase 2. The final proposed Appreciation Award amount, which will also be submitted in the Phase 2 Report, will reflect any proposed tax offset (as well as any other such offsets as may be approved by this Court, such as for Mitofsky, Shapiro, Neville & Hazen, LLP's fees and expenses). The liquidation of Unique Assets does not need to await the finalization of such offsets because, by all reasonable projections, the Receiver must generate additional cash to secure the Total Judgment and make tax payments as may be approved by this Court.

the Extrapolated Calculation Method to only incorporate the May 2015 through December 2018 period and/or have differing calculation periods for the Defendant and Relief Defendants is at odds with the method already approved by this Court in the Liquidation Order. (Def. Resp., at 22-23).

Accordingly, the Receiver respectfully submits that this Court should reject the Ahmeds' attempt to re-argue already settled issues relating to the Extrapolated Calculation Method.

### b. The Receiver provided preliminary valuations for assets as of May 2015.

Calculating the Appreciation Award requires the Receiver to determine the aggregate value of all of the Receivership Assets as of May 2015, when this Court first froze the Defendant's assets. (*See* Liquidation Plan, at 12). The Receiver has collected hundreds of pages of documentation relating to the value of the frozen Receivership Assets, including documentation related to the value of such assets as of May 2015. The Receiver relied upon these documents in setting forth his preliminary proposals for the dollar amount of the Appreciation Award. (*See* Report, at 17-18, *citing* Exhibit B and Exhibit C attached thereto). As stated in the Report, the Appreciation Award analysis "will be further confirmed and refined as appropriate in Phase 2." (Report, at 18, *citing* Liquidation Plan, at 23-24; *see also* Liquidation Order, at 7 (noting that, under the Liquidation Plan, certain "modifications or redeterminations of the total judgment" may occur in Phase 2)). It will also be subject to objections by the parties-in-interest and this Court's ultimate determination.

Though the Appreciation Award figure set forth in the Report does not represent the Receiver's final calculations, the Receiver will respond to the Ahmeds' discrete challenges to the reported May 2015 values of certain Receivership Assets.

### i. Clues Network, Inc.

Shortly after his appointment, the Receiver contacted Clues Network, Inc.'s (SEC No. 21, "Clues Network") counsel at Fenwick & West LLP to obtain "a certified statement setting forth... the... description of the asset[]…." (Appointment Order, at 11). On February 13, 2019, Clues

Network's counsel responded by stating that the Essell Group purchased 1,613,177 shares of Series A Preferred Stock in Clues Network on February 24, 2012, for $950,000 and a further 18,546 shares of Series C Preferred Stock in Clues Network on May 27, 2014, for $49,998.17. Clues Network's counsel further advised that, because there was not "any other valuation done" for these preferred shares, "[t]he closest approximations we can provide is: (i) the purchase price for the Series A and Series C shares, noted above, and (ii) the 409A valuation[8] for the common stock of Clues Network as of 5/6/15, which was $1.50 per common share." (*See* 2/13/19 Correspondence, attached hereto as **Exhibit B**).

Thus, based on Cluse Network's representations, the closest valuation of the Essell Group's interest as of May 2015 was either (i) $999,998.17 (representing the sum of $950,000 and $49,998.17, the aggregate purchase price of the shares from 2012 and 2014) or (ii) $2,447,584.50 (representing 1,613,177 Series A shares plus 18,546 Series C shares multiplied by the $1.50 per common share price). Because the 409A valuation was closer in time to the relevant May 2015 date, the Receiver elected initially to rely on the $2,447,584.50 value.[9] As the Receivership Estate only includes the Defendant's 60% interest in the Essell Group, the Receiver reported the value of the interest to be $1,468,550.70 (representing 60% of $2,447,584.50). (*See* Report, at Exhibit C).

The Ahmeds' challenge to this value appears to be based on a misapprehension of facts. (Ms. A. Resp., at 46; Def. Resp., at 29). In 2015, the Essell Group held an interest Clues Network, a Delaware corporation. Meanwhile, the ShopClues entity that the Defendant and Ms. Ahmed assert was worth $1.1 billion in January 2016, *see*, *e.g.*, Def. Resp., at 29, appears to be held by Clues Network Pvt. Ltd., which appears to be an Indian company that has been assigned a reference

---

[8] A "409A valuation" refers to a valuation performed pursuant to 26 U.S.C. § 409A and is an independent appraisal of the fair market value of a private company's common stock.

[9] The Receiver notes that this valuation is a preliminary in nature. As set forth in the Report, "the Receiver will need to ascertain the value of the Essell Group's interest in Clues Network… in 2015" during Phase 2.

number of U52590HR2011PTC055841 by the Indian Ministry of Corporate Affairs. (*See* Shrutika
Verma, *ShopClues plans acquisition spree to accelerate expansion*, LiveMint.com, Dec. 8, 2015,
https://www.livemint.com/Companies/UQlNNccObbnKIY9pmG9lRK/ShopClues-looks-to-
invest-50-million-in-acquisitions.html). Accordingly, the Receiver submits that the value of Clues
Network, the Delaware corporation, is the relevant inquiry.

### ii.  The Receiver correctly excluded the forfeited interests in OMC-advised entities from the Appreciation Award calculations.

The Appointment Order defines the Receivership Estate to include "all assets subject to the
Court's asset freeze order [Doc. No. #113] as modified throughout this litigation." (Appointment
Order, at 6). This Court's asset freeze applies to "[t]he assets, funds, or other property held by or
under the direct or indirect control of Defendant and Relief Defendants…." (Order on Defendant's
Motions for Modification of the Asset Freeze Order to Release Funds for His Legal Defense and
for a Stay in Light of *Kokesh* [Doc. No. 829], at 5). On September 6, 2018, this Court issued its
Ruling on Plaintiff's Motion for Remedies and Judgment [Doc. No. 955], wherein this Court held
that the Defendant forfeited various interests held in OMC-advised investment entities for
"[d]isabling [c]onduct," namely the fraudulent activities that gave rise to the Commission's instant
action. (*Id.*, at 27-29 (noting that, because of the forfeiture, such assets were "appropriately
assigned no value" by the Commission)). As the Receiver interprets this Court's orders, at least as
of the date when this Court determined that the Defendant forfeited the interests in OMC-advised
funds, those interests were no longer "assets subject to the Court's asset freeze order" and are thus
not Receivership Assets. (Appointment Order, at 6).

The Extrapolated Calculation Method, meanwhile, looks to "the rate of appreciation of *all
Receivership Assets*"[10] between the date of the asset freeze and the date of the relevant judgment.

---

[10] The Liquidation Plan defines "Receivership Assets" to include "assets of the Receivership Estate,"

(Liquidation Plan, at 12 (emphasis added)). Because the forfeited interests in OMC-advised investment entities are not part of the asset freeze, these interests are not Receivership Assets and thus the Receiver appropriately excluded them in calculating the Appreciation Award using the Extrapolated Calculation Method.

Therefore, the Receiver submits that this Court should reject the Ahmeds' arguments that these forfeited assets should be included in the Extrapolated Calculation Method. [11] (*See* Def. Resp., at 27; Ms. A. Resp., at 48).

### iii.    Anticipated revisions to the Extrapolated Calculation Method.

The Liquidation Plan, as authorized and approved by the Liquidation Order, provides that the Report would include an "updated identification and valuation of the Receivership Assets and calculation of the Total Judgment," of which the Appreciation Award is an integral part. (Liquidation Plan, at 4). Consistent with this process, the Report included the Receiver's "current estimate[] for… the Appreciation Award" and noted that "final figures will be set forth in the Phase 2 Report." (Report, at 17; *see also* Liquidation Order, at 7 (noting that, under the Liquidation Plan, certain "modifications or redeterminations of the total judgment" may occur in Phase 2)).

As a threshold matter, the Receiver notes that Ms. Ahmed is mistaken about various frozen investments in Blade Networks, Lola Travel Co., and Reserve Media – the Receiver included these

---

Liquidation Plan, at 1, which the Appointment Order defines as "assets subject to the Court's asset freeze order." (Appointment Order, at 6).

[11] Equally inappropriate would be to value the Defendant's interest in OMC itself as of May 7, 2015, as if the Defendant had not committed disabling conduct. (*See* Def. Resp., at 16; Ms. A. Resp., at 46). When this Court froze certain of the Defendant's assets, the disabling conduct had already occurred, and the Class A shares in OMC were subject to conversion to Class B shares. Valuing the Class A shares on May 7, 2015, as if such disabling conduct had not occurred (as the Defendant and Ms. Ahmed suggest) does not reflect the true value of those shares. It also appears the Defendant's employer was *already* intending to terminate the Defendant for disabling conduct when this Court initiated the asset freeze. (*See* Doc. No. 2-1, at ¶ 5). Accordingly, in calculating the Appreciation Award, the Receiver submits that using the $1,200 valuation of the OMC Class B shares at all relevant times is appropriate and, subject to further order of this Court, the Receiver will use such valuation in his Phase 2 Report.

assets in the preliminary calculation of the Appreciation Award submitted with the Report.[12] (*See* Report, Exhibit C, at 2). Likewise, the Defendant and Ms. Ahmed mistakenly assert that the iMENA and Desert Wind Technologies LLC ("DWT") assets are missing from the Receiver's preliminary calculations. Based on the information in the Receiver's possession, DWT's only asset is an investment in iMENA. Furthermore, the Receiver included iMENA in the May 2015 asset valuation. (*See* Report, Exhibit C, at 2).

The Receiver acknowledges that the value of certain Receivership Assets needs to be further confirmed as part of the liquidation process, including items of personal property, the non-forfeited interests in OMC-advised funds, the Defendant's interest in Crypto Currency Partners, LP, and the Essell Group's interest in Ribbit Capital, LP and Ribbit Capital II, LP. (*See* Def. Resp., at 16 (discussing the valuation of non-forfeited assets related to OMC)). For certain assets, like personal property and real estate, the Receiver has set forth how such values can be ascertained in Phase 2. (*See* Report, at 33-34, 40). In other instances, particularly regarding illiquid assets, the Receiver has provided preliminary valuations of these assets in his Report based on the documentation obtained by the Receiver from relevant third parties. (*See* Report, Exhibits B, C). The Receiver is working with these third parties to confirm these values, which the Receiver will submit to this Court for consideration and approval in Phase 2. This is entirely consistent with the Liquidation Plan, as the Phase 2 Report will include the Receiver's "final calculation, for this Court's consideration and approval, as to the Total Judgment (including his calculation of the Appreciation Award…)," which necessarily includes the values of the constituent assets in the Receivership Estate. (Liquidation Plan, at 23-24).

Additionally, as part of the Receiver's Phase 2 Report, the Receiver will include the

---

[12] The Receiver understands that, in 2015, Blade Networks held the investment in Lola Travel Co., therefore the May 2015 value of Lola Travel Co. reported on Exhibit C attached to the Report is $0 as such Lola Travel Co. interest is subsumed within the Blade Networks value.

Ahmeds' August 1, 2014, investment of $500,000 in Fort Warren Opportunities Fund, LP ("Fort Warren") in the May 2015 valuation of frozen assets. (*See* Ms. A. Resp., at 46; Def. Resp., at 24; *see also* Doc. No. 711 (providing background information)). Likewise, the Phase 2 Report will fully reflect the $1,057,018 inter-asset-freeze transfer from the Northern Trust account ending x8537 to the Northern Trust account ending x3934. (Ms. A. Resp., at 46). Furthermore, the Appreciation Award calculations in the Phase 2 Report will also make any further appropriate revisions to reflect the values of the Essell Group's holdings in Harbor View Investors LLC ("Harbor View") and MadeByBelieve. (*Id.*).

The Receiver emphasizes that, even after reflecting the $500,000 Fort Warren investment, the $1,057,018 inter-asset-freeze transfer between Northern Trust accounts, and assuming that the Essell Group's interest in MadeByBelieve and Harbor View should be valued as claimed by the Defendant (at $600,000 and $265,914.60 respectively, *see* Doc. No. 2346-1),[13] the Appreciation Award still exceeds $20 million as set forth in **Exhibit C**.

Making these revisions to the Appreciation Award calculations results in an Appreciation Award of $20,412,242.80 (representing the sum of $7,369,149.89 and $13,043,092.91). (*Id.*). Meanwhile, the preliminary Appreciation Award figure reported in the Report's was $23,204,079.65. (Report, at 21). The decrease of $2,791,836.85 in the Appreciation Award (representing $23,204,079.65 minus $20,412,242.80) still results in a Total Judgment presently estimated to be $122,665,918.28 (not including additional post-judgment interest, which continues to run as set forth below). This Total Judgment of approximately $122.6 million still greatly exceeds the value of assets in the Receivership Estate that the Receiver can presently reasonably ascertain of approximately $118 million. As the Receiver is holding only approximately $97

---

[13] The Receiver will further investigate the Defendant's claims regarding the value of these assets. The Receiver's reference to these values in this Reply does not reflect an endorsement of such valuations.

million in cash, additional liquidation of Unique Assets remains necessary.

###### c. The application of post-judgment interest is mandatory and consistent with the Liquidation Plan as approved by the Liquidation Order.

Subject to further order of this Court, the Receiver interprets the plain language of 28 U.S.C. § 1961 to mandate the application of post-judgment interest in this case. (*See* Liquidation Plan, at 2). Accordingly, in setting forth the Extrapolated Calculation Method in the Liquidation Plan, the Receiver made clear reference to post-judgment interest applying to portions of this Court's judgment after December 2018 and July 2021. (*See* Liquidation Plan, at 14). The Receiver does not interpret any portion of this Court's Liquidation Order as instructing him not to include post-judgment interest in his proposals or the Total Judgment amount. Indeed, the application of post-judgment interest in this case is consistent with well-settled law. *Lewis v. Whelan*, 99 F.3d 542, 545 (2d Cir. 1996) ("The award of post-judgment interest is mandatory on awards in civil cases as of the date judgment is entered"); *see also SEC v. Forest Resources Management Corp.*, 2010 U.S. Dist. LEXIS 50203, at *6 n.2 (S.D.N.Y. May 18, 2010) (applying post-judgment interest to disgorgement and pre-judgment interest amounts). Therefore, and consistent with section 1961, the Receiver set forth his calculations of the Post-Judgment Interest Award given the facts and circumstances of this case in his Report. (Report, at 18-21). Thus, the Receiver submits that his proposals regarding the Post-Judgment Interest Award are consistent with section 1961, the Liquidation Plan, and the Liquidation Order. The Ahmeds' latest challenge to the application of post-judgment interest does not undermine the Receiver's conclusion that Unique Assets need to be liquidated. (Ms. A. Resp., at 50-53; Def. Resp., at 31-32).

### VI.    The Liquidation of Additional Assets is Necessary to Secure the Judgment

In the Report, the Receiver provided his proposed calculations regarding the amount of the Total Judgment, including its various constituent parts, for this Court's consideration. (*See* Report, at 12-21). In so doing, the Receiver provided the basis for his conclusion that the Total Judgment

is tens of millions of dollars more than the $97 million that the Receivership Estate holds in cash, without factoring in tax payments that this Court may authorize and direct the Receiver to make.

To further secure the Total Judgment with cash, the Receiver is presently seeking this Court's authority to liquidate the assets set forth in **Exhibit D**.[14] As set forth in Exhibit D, based on the Receiver's own research and the Relief Defendants' estimates, the Receiver expects that the liquidation of these assets will generate approximately $16.6 million. (*See also* Report, at 26; *see also* Motion to Approve, at 3). Thus, even after liquidating these assets, the Receiver expects to only have approximately $114.1 million in cash (representing $16.6 million plus $97 million of existing cash and $550,000 from the sale of the bitcoins held by Circle[15]). (*See* Report, at 5).

While the Receiver expects that additional Unique Assets, beyond those assets listed in Exhibit D, will need to be liquidated to fully secure the Total Judgment, he is not seeking this Court's authority to engage in such liquidations at this time. Instead, as described in the Report, the Receiver is evaluating various aspects of the remaining Unique Assets and expects that he will, as appropriate, file separate motions during Phase 2 seeking this Court's approval of the liquidation of these remaining Unique Assets. (*See* Report, at 42-48).

---

[14] The Receiver has selected these particular assets because the liquidation process is relatively simple – surrendering an insurance policy, selling real estate, and auctioning items of personal property – as compared to the more difficult to liquidate Unique Assets, such as privately-held business interests and insurance policies that cannot be surrendered for cash. (*See* Report, at 27; *see also* Ms. A. Resp., at 2 (challenging the selection of these particular assets)). This Court already addressed the Ahmeds' arguments concerning the alleged "irreparable harm" of selling these assets. (*See* Ms. A. Resp., at 15-16; Def. Resp., at 8; Liquidation Order, at 19-21). Furthermore, this Court should reject Ms. Ahmed's vague assertion that the Receiver is "harming the estate by liquidating" the Receivership Estate's interest in Ribbit Capital, LP, Ribbit Capital II, LP, Qoo10 Pte. Ltd, Crypto Currency Partners LP, and iMENA Holdings Ltd. This Court has held that these assets are Unique Assets eligible for liquidation in Phase 2, *see* Liquidation Order, at 14, and the Receiver has not yet moved for authority to liquidate these particular assets.

[15] The Receiver has moved this Court to grant him authority to enter into an agreement requested by Circle in connection with liquidating approximately $550,000 worth of bitcoins held by Circle. (Doc. No. 2300 (the "Circle Motion")). Though they purport to oppose the Circle Motion, neither the Defendant nor Ms. Ahmed filed an objection thereto. (*See* Ms. A. Resp., at 14; Def. Resp., at 18). As the difference between the Receivership Estate's cash position and the estimated Total Judgment greatly exceeds $550,000, there is no reason to delay the liquidation of the other Unique Assets. (Report, at 26).

Subject to further order of this Court, the Receiver will continue to investigate ways in which the remaining Unique Assets can be liquidated and file motions seeking the relief necessary to enable to the Receiver to liquidate such assets until such time as either (i) the Total Judgment is fully secured or (ii) there are no Unique Assets remaining in the Receivership Estate that can be liquidated. This is a reasonable and equitable process, consistent with the Liquidation Plan as approved by the Liquidation Order.[16] Indeed, this Court has directed the Receiver to liquidate "unique assets last and only if necessary to satisfy the judgment." (Disgorgement Order, at 13). The Receiver's liquidation approach is entirely consistent with that directive.

The Receiver's perfectly reasonable and appropriate projection of the dollar amount of the Total Judgment indicates that it will greatly exceed the cash currently held in the Receivership Estate. Thus, this Court should grant the Motion to Approve and authorize the Receiver to liquidate the foregoing Unique Assets through the processes detailed in the Report.[17]

## VII.    The Liquidation Processes Proposed by the Receiver

### a.    The MetLife Policy

This Court "directed [the Receiver] to reclassify the MetLife Insurance policy as a unique asset." (Liquidation Order, at 14). The Receiver has done so, and now seeks to liquidate that asset in Phase 2. (Report, at 28). As additional assets must be liquidated to fully secure the Total

---

[16] The Ahmeds' assertion that a "final judgment amount" must be ascertained before any Unique Assets can be liquidated is inconsistent with the Liquidation Plan. (Ms. A. Resp., at 2; *see also* Def. Resp., at 3). The Phase 2 Report will include the Receiver's "final calculation" of the Total Judgment "for this Court's consideration and approval." (Liquidation Plan, at 23-24; *see also* Liquidation Order, at 7 (noting that, under the Liquidation Plan, certain "modifications or redeterminations of the total judgment" may occur in Phase 2).

[17] The Ahmeds assert that the Receiver "has not exhausted liquidating 'Non-Unique' assets," and make reference to assets held by Oak HC/FT, listed on the Form K-1s issued by OMC, and possible claims regarding Essell Farms. (Ms. A.'s Resp., at 14-15). The Liquidation Plan did not provide for the liquidation of the Oak HC/FT-held assets or the investigation (if any) of Essell Farms-related claims before the liquidation of any Unique Assets. Likewise, the Non-Unique assets held by OMC (the cash distributions) are already incorporated into the Receivership Estate's cash position. The remaining assets at OMC are Unique Assets, to be addressed in Phase 2. Therefore, the Receiver submits that beginning to liquidate Unique Assets is appropriate at this time.

Judgment, the Receiver submits that liquidating the MetLife policy is necessary and appropriate.[18] (*See also* Amended Final Judgment, at 5-6 (noting that the MetLife Policy is "available to satisfy" the judgment)). Furthermore, "there are two other life insurance policies in the Receivership Estate that list the Defendant as the named insured. Both are term policies with no cash value that each carry a face amount of $15 million." (Doc. No. 2071, at 13, n. 12). Therefore, the Defendant's life is still insured for tens of millions of dollars.

The Defendant and Ms. Ahmed seek to re-litigate whether the MetLife Policy should be liquidated at all. (Ms. A. Resp., at 27; Def. Resp., at 11-13). The Receiver respectfully submits that this Court should reject such repeated and untimely arguments. (*See* Doc. No. 2293, at 3).

### b. The Apartments

The Defendant and Ms. Ahmed also try to re-litigate whether the Apartments should be liquidated. (Ms. A. Resp., at 30; Def. Resp., at 13-14). Again, this Court has held that these properties are available to satisfy the Total Judgment and are appropriately classified as Unique Assets to be liquidated in Phase 2. (*See* Amended Final Judgment, at 5, 7; Liquidation Order, at 14). This Court should reject these attempts at untimely re-argument.

With regards to the Apartment Sale Procedure described in the Report, the Receiver emphasizes that this procedure tracks (as closely as possible) the sale procedure an ordinary individual would utilize in obtaining the highest and best sale price for the real estate while also complying with the mandatory provisions of section 2001. Thus, the Receiver submits that the Apartment Sale Procedure respects "the interests of the Defendant and Relief Defendants,"

---

[18] After filing the Report, MetLife requested any order authorizing the liquidation of the MetLife Policy should "reflect that Metropolitan Life Insurance Company Policy # 210 381 236 PR, insuring Iftikar Ahmed and owned by the Iftikar A Ahmed Family Trust, is part of the Receivership Estate established in SEC v. Ahmed and that the Receiver has the power to surrender the policy, take possession of its cash value, and pay any applicable taxes. It should also direct Metropolitan Life Insurance Company to terminate Policy # 210 381 236 PR and pay all current policy values, less any mandatory federal and state tax withholdings, to a specific person or entity." (8/3/22 Email, attached hereto as **Exhibit E**).

particularly in the context of a liquidation process designed to secure the Total Judgment. (Ms. A. Resp., at 33, *quoting* Appointment Order, at ¶ 28). This Court should reject Ms. Ahmed's three challenges to the Apartment Sale Procedure for the following reasons. (*See* Report, at 30-31).

First, to comply with section 2001(b), the Apartment Sale Procedure provides, *inter alia*, that the Receiver shall not enter into a PSA with the Stalking Horse if the offered price is "less than two-thirds of the appraised value of the property." (Report, at 31; *see also* 28 U.S.C. § 2001(b)). The Receiver will seek to "maximiz[e] the realizable value" of the Apartments by seeking the highest and best price possible under the circumstances. (Appointment Order, at ¶ 5). The prohibition of entering into a PSA for less than two-thirds of the property's appraised value is simply to ensure that the property is not sold below the minimum level set by section 2001. Furthermore, the Defendant and Ms. Ahmed have an opportunity to object to the sale price in response to the Sale Motion that the Receiver files. (Report, at 32). Neither the Defendant nor Ms. Ahmed suffer any prejudice from the Apartment Sale Procedure insofar as it prohibits the Receiver from accepting an offer (subject to approval by this Court) that is less than two-thirds of the property's appraised value. Ms. Ahmed's challenge to the procedure in this regard is therefore meritless. (Ms. A. Resp., at 35-36; *see also* Def. Resp., at 13).

Second, Ms. Ahmed's assertion that utilizing this Court's CM/ECF system to provide Notice of the Apartment Hearing "does not reach people outside of this litigation" is true. (Ms. A. Resp., at 37). However, section 2001(b) requires that notice of the Apartment Hearing be provided "to all interested parties." Ms. Ahmed does not identify what "interested parties" may exist beyond the parties to this action, who would receive notice via the CM/ECF system, or provide an alternative noticing procedure. The public at large will have ample notice of the actual listing and potential sale of the Apartments. (*See* Report, at 34-35). The Receiver respectfully submits that providing notice of the initial Apartment Hearing to CM/ECF recipients is sufficient and complies

with section 2001(b). (*See* Report, at 32-33).

Third, the three appraisals of the Apartments that the Receiver proposes to obtain will reflect, *inter alia*, the appraisers' opinions of the fair market value of the property. (*See* Report, at 15, n. 14 ("The Receiver's reference to 'appraisals' in this Report also includes such other valuation procedures as may be appropriate depending on the asset in question")). The Receiver submits that obtaining such appraisals complies with the plain language of section 2001(b) and, therefore, this Court should not credit Ms. Ahmed's objection to the Apartment Sale Procedure on this basis. (Ms. A. Resp., at 35).

### c. The Auction of Personal Property

#### i. The Personal Property Sale Procedure

The Personal Property Sale Procedure respects "the interests of the Defendant and Relief Defendants," Ms. A. Resp., at 20, because it uses a competitive and publicly accessible auction process that will efficiently liquidate the Personal Property at each item's then-current value as driven by public demand for each item. (Report, at 39). Indeed, the Personal Property Sale Procedure is largely consistent with the public sale process contemplated in section 2001(a), except it utilizes Nest Egg's technological and professional expertise to increase awareness of the auction and permit individuals from all over the world to participate.

Furthermore, the Personal Property Sale Procedure already contemplates Nest Egg engaging in "additional advertising efforts" including "press releases to generate interest in the auction," the cost of which would all be included in Nest Egg's fee. (Report, at 42-43). Should this Court so order, the Receiver has no objection to publicizing the auction more broadly. However, such efforts will increase the expense associated with liquidating the Personal Property and, the Receiver submits, are unnecessary under the circumstances given the existing marketing plans.

Additionally, the Receiver has conferred with Nest Egg concerning Ms. Ahmed's request

for post-auction briefing and Court approval of the sale of each item of Personal Property. (Ms. A. Resp., at 23).[19] In Nest Egg's professional opinion, with which the Receiver agrees, such a procedure would greatly decrease the demand (and thus realized sale prices) for the Personal Property because bidders would not want their purchases subject to briefing and delay. Not even in a public sale under section 2001(a), which the Personal Property Sale Procedure largely tracks, is such post-auction briefing and Court approval required. Ms. Ahmed does not explain these additional steps benefit the Receivership Estate, and the Receiver submits that they do not.

### ii. Betteridge and Nest Egg

If the Receiver was proposing to use Betteridge to appraise the Personal Property *and also buy* the Personal Property *at the Betteridge-appraised price*, Ms. Ahmed's objection to the Receiver using Betteridge to ascertain the fair market value of certain items of Personal Property might be logical. (Ms. A. Resp., at 23). However, that is not what the Receiver is proposing to do.

Instead, the Receiver proposes to rely on Betteridge to provide an assessment of the fair market value of certain items of Personal Property (namely, the jewelry) and use that assessment to "establish the appropriate starting prices, pre-sale estimates, opening bids, and reserve prices (if any) for each item…." (Report, at 40). The Receiver has no objection to instructing Betteridge not to bid at the auction organized by Nest Egg to eliminate any chance that its appraisals are somehow driven by a desire to artificially depress the sale price of the Personal Property. Consequently, the Receiver submits that this Court should reject Ms. Ahmed's objection to the Receiver utilizing Betteridge to obtain an opinion on the fair market value of the Personal Property.

---

[19] The Receiver notes that Ms. Ahmed's reliance on *Pennant Mgmt. v. First Farmers Fin.*, LLC, No. 14-cv-7581, 2015 U.S. Dist. LEXIS 118222 (N.D. Ill. Sep. 4, 2015) is misplaced. In *Pennant*, the Court was adjudicating the sale "of five hotel properties" that were sold at auction for an aggregate price of over $86 million. *Id.*, at *3, *15. Considering the value of the properties, and the fact that the receiver in that case was selling real estate, it was appropriate for the Court to accept briefing and hold a hearing to consider the sales. Here, the aggregate value of the Personal Property is a small fraction of $86 million.

This Court should also reject Ms. Ahmed's objection to Nest Egg. (Ms. A. Resp., at 24-25). Nest Egg has extensive experience successfully selling items of significant value. In asserting that Nest Egg is unqualified, Ms. A. Resp., at 24, Ms. Ahmed is looking at only one auction, which the Receiver submits is not representative of Nest Egg's nearly 20 years of experience. (Report, at 41). Furthermore, Nest Egg's fee structure is lower than other auction houses, *see* Report, at 42-43, which inures to the benefit of the Receivership Estate. Finally, contrary to Ms. Ahmed's assertions at page 24 of her response, the Receiver has re-confirmed with Nest Egg that online, in person, telephonic, and absentee bidding is possible in its auctions. (*See, e.g., Auction registration for absentee & phone bids*, NestEggAuctions.com, https://nesteggauctions.com/bidder-registration/). Moreover, bidding is open *at least* 21 days prior to the auction, allowing ample time for interested buyers to place a bid.

On balance, therefore, the Receiver submits that utilizing the services of Betteridge and Nest Egg in connection with the liquidation of the Personal Property is reasonable and appropriate under the circumstances of this case.

## VIII.   The Transfer to the CRIS Account

The Liquidation Plan, as approved by the Liquidation Order, the Receiver proposed to transfer funds to the CRIS Account "to minimize to the extent reasonable the Post-Judgment Interest Award" because "the Commission is not seeking post-judgment interest on any portion of the Total Judgment after the date upon which said portion of the Total Judgment is secured by deposits into the CRIS Account." (Liquidation Plan, at 19). Even though fees might be payable on funds deposited into the CRIS Account, *see* Ms. A. Resp., at 60-61, such fees are significantly lower than the applicable post-judgment interest rates in this case, the weighted average of which the Receiver calculates to be 1.70%. Though the *current* interest rates for Treasury bills may exceed the applicable post-judgment interest rate, the Receiver submits the prudent course is to

not assume that such rates will continue and instead take such steps as necessary to stop post-judgment interest from running.[20]

Accordingly, the Receiver submits that transferring the funds proposed in the Report to the CRIS Account is consistent with the Liquidation Plan, minimizes the Post-Judgment Interest Award, and should thus be authorized by this Court. Therefore, the Receiver submits that this Court should reject the Ahmeds' challenge to the proposed transfers to the CRIS Account. (Ms. A. Resp., at 60; Def. Resp., at 36).

### IX.    The Reserves Proposed by Receiver

#### a.    Commission's request to eliminate the reserve for Non-Estate Expenses

Consistent with the Liquidation Order, in the Report, the Receiver set forth his calculations for various reserves to be held outside the CRIS Account while the liquidation process is completed. (*See* Report, at 21-25). Among other sums, the Receiver proposed to reserve "at least $2,863,945.03" to pay for Non-Estate Expenses, including remaining disbursements that this Court provisionally approved and funds sufficient to continue making monthly payments in the amount of $9,521.88 to the Relief Defendants for 48 months.[21] (Report, at 24-25). The Receiver proposed this reserve so as much as possible could be transferred to the CRIS Account (and thereby minimize, to the extent reasonable, the Post-Judgment Interest Award) while still reserving funds sufficient to enable the Receiver to comply with potential future orders issued by this Court directing the Receiver to satisfy Non-Estate Expenses. (*See* Report, at 21-22).

The Commission correctly points out that with respect to amounts potentially paid from the Receivership Estate for HSW's fees (a Non-Estate Expense), such payment was conditioned

---

[20] If this Court approves the Receiver's proposal to transfer funds to the CRIS Account, he will submit a discrete proposed order consistent with D. Conn. L. R. 67 to effectuate that transfer.

[21] As this Court authorized the release of $101,816.87 to Jenner & Block, LLP after the Receiver filed the Report, *see* Doc. No. 2285, the Receiver submits that decreasing the reserve for Non-Estate Expense by $101,816.87 to $2,762,128.16 is appropriate.

upon there remaining excess funds after the Total Judgment was fully secure. (Com. Resp., at 9-11; Doc. No. 2002). In such a circumstance, excess funds would be available to pay HSW's fees and, therefore, a separate reserve may not be necessary. Likewise, the Commission correctly notes that other provisionally approved releases for other attorneys' fees "shall terminate should the Court determine that the value of the assets of the Receivership Estate has changed such that the continued release of funds would place undue risk upon the security of the judgment." (Com. Resp., at 9-11; Doc. No. 1405, at 6; Doc. No. 1750, at 5). While the Receiver understands and appreciates the Commission's points, considering the identified potential obligation of the Receivership Estate to pay Non-Estate Expenses, the Receiver would prefer to establish a reserve for them until further order of this Court specifically addressing the issue presented.

The Receiver further notes the Commission's assertion that this "Court should not reserve four years' worth of funds for the Relief Defendants' monthly living expenses," and that ceasing such payments would increase the security of the Total Judgment. (Com. Resp., at 11). It is within this Court's discretion to modify the amount of monthly living expenses released from the Receivership Estate, and the Receiver will proceed as directed by this Court with respect to the establishment of a reserve for this potential obligation. (Appointment Order, at 7 (authorizing the Receiver "to approve the payment of the Relief Defendants' reasonable living expenses consistent with the Orders issued by this Court")).

### b.  The Ahmeds' arguments about reserves

#### i.  Using funds in the QSF Account to pay receivership expenses

V&L has advised the Receiver that, from a tax perspective, using funds in the QSF Account to pay Receivership Expenses is an appropriate use of those funds. Now that liquidation has commenced, and particularly as there is no stay pending appeal, the Receiver perceives there to be no reason to seek to maintain the *status quo* by only using certain assets to pay for certain expenses.

(*See* [Doc. No. 1701 (describing the Receiver's efforts to maintain the *status quo* before liquidation)). Accordingly, in the Report the Receiver proposed to use funds from the QSF Account to pay Receivership Expenses. In opposing using "a general pool" of funds to pay for Receivership Expenses, the Defendant fails to identify any prejudice that might befall him or the Relief Defendants. (Def. Resp., at 38). Especially in the absence of prejudice, the Receiver opposes expending the resources to select (and likely litigate with the Defendant and Relief Defendants regarding such selection in each instance) certain funds (other than those in the QSF Account) for a certain purpose at this stage of the proceeding.[22]

### ii. The Non-Estate Expense reserve should not be increased

By all indications the Total Judgment is likely not secured. Given the Receiver's obligation to, *inter alia*, "secure the judgment for the SEC," the Receiver must object to increasing the Non-Estate Expense Reserve as doing so further erodes the already likely insufficient funds designated to secure the Total Judgment. (Appointment Order, at 5). Furthermore, the Defendant and Ms. Ahmed fail to offer any legitimate justification for such increase. The Receiver does not reasonably anticipate that the Receivership Estate will be compelled to pay any greater Non-Estate Expenses. This Court should reject the requests by the Defendant and Ms. Ahmed to increase the reserve for Non-Estate Expenses. (Ms. A. Resp., at 58-59; Def. Resp., at 41).

### X.    V&L Concluded that a QSF Came into Existence on January 11, 2022

Pursuant to the Liquidation Order, the Receiver submitted his and his tax professionals' analysis of tax issues, including the formation of a QSF, in his Report and associated Tax Report

---

[22] The only exception to this principle are expenses incurred by Essell Group and Essell Farms. Because these entities are partially owned by Young Bae Ku, who is not a defendant or relief defendant in this action, the Receiver submits that making payments for those entities' expenses using funds held by those entities continues to be reasonable and appropriate. To do otherwise would be an inequitable windfall in Young Bae Ku's favor, whereby funds tilted to the Defendant and/or Relief Defendants would be used to pay Young Bae Ku's share of expenses incurred by Essell Group and/or Essell Farms.

prepared by V&L. (Liquidation Plan, at 4, 19; Liquidation Order, at 27).

In the Tax Report, V&L presented its analysis concerning a myriad of issues, including the formation of a QSF based on what has already transpired in this case.[23] (*See* Tax Report, at 4-6). Based on this analysis, V&L reached the legal conclusion that "all of the requirements for the establishment of a QSF have been met as of January 11, 2022" when this Court issued the Liquidation Order. (Tax Report, at 6). The Receiver agrees with V&L's interpretation of, and conclusions concerning, the relevant statutes and this Court's orders.

This Court previously stated that the "decision [to establish a QSF] will be left to the discretion of the Receiver and his retained professionals within the parameters set forth in the Court's previous Orders." (Doc. No. 2193, at 4; *see also* Order [Doc. No. 2187] ("the Court already has authorized the Receiver to engage in all tax analysis appropriate to facilitate the Liquidation Plan", *citing* Liquidation Order)).

Based on V&L's conclusions and this Court's orders, the Receiver took certain preliminary steps consistent with the conclusion that a QSF came into existence on January 11, 2022. Such steps included opening an account at Morgan Stanley to hold liquidation proceeds using an EIN assigned to the QSF,[24] transferring funds to that account, and seeking this Court's authority (and the consent of the Commission, the Defendant, and the Relief Defendants) to purchase Treasury bills in said account. (*See* Appointment Order, at 5 (granting the Receiver the power "[t]o take any

---

[23] The Receiver notes that, in V&L's view, the vast majority of the Ahmeds' assertions regarding the operation and consequences of a QSF are mistaken. For example, an "agreement between the defendant and plaintiff on settlement issues and final resolution of the case" is not a prerequisite for the establishment of a QSF. (Ms. A. Resp. to V&L's Tax Report, at 16; *see also* Def. Resp., at 51). It is the Internal Revenue Code, not the Defendant's agreement, that controls when a QSF comes into existence. The Receiver invites the Defendant and Ms. Ahmed to engage with them during Phase 2 so that these misunderstandings can be resolved, and hopes that the Defendant will agree to discuss such matters with V&L.

[24] The Receiver described this account in the Report as the QSF Account simply for ease of reference. As set forth in the Tax Report, in V&L's opinion all the assets subject to liquidation pursuant to the Liquidation Order were transferred (via the "deemed sale") to the QSF on January 11, 2022.

action (whether or not in the ordinary course of business) which, prior to the asset freeze in this case, could have been taken by the Defendant or Relief Defendants with regard to the assets of the Receivership Estate"), 14 (permitting the Receiver to "establish one or more custodial accounts at a federally insured bank to receive and hold all cash and cash-equivalent property of the Receivership Estate"); Doc. No. 2304 (authorizing Treasury bill purchases).

Now, in the Motion to Approve, the Receiver seeks this Court's approval of, *inter alia*, V&L's tax analysis, including its conclusion that a QSF formed on January 11, 2022, upon the issuance of the Liquidation Order. (*See* Motion to Approve, at 3).

On this record, the Receiver respectfully submits that nothing he did with regards to the QSF was "extrajudicial" or otherwise inappropriate. (*See* Ms. A. Resp., at 12; Def. Resp., at 53). Indeed, this Court left the establishment of a QSF "to the discretion of the Receiver and his retained professionals," V&L concluded that a QSF came into existence as of a certain date (and provided the analysis supporting such conclusion in the Tax Report), the Receiver took certain preliminary steps consistent with that conclusion, and the Receiver sought this Court's approval of V&L's conclusion. It should be noted that the Defendant even filed an emergency motion wherein he essentially argued in favor of the establishment of a QSF. (Doc. No. 2150).[25] The Ahmeds fail to offer any substantive reason why V&L's conclusion as to when a QSF formed is incorrect.

Moreover, should the Defendants provide some legitimate justification for this Court to reject V&L's analysis and conclude that a QSF was not established on January 11, 2022, and/or was or will be established on some other date in 2022, none of the steps the Receiver has taken to date are irreversible. In such a circumstance, the Receiver would then proceed to mange the Receivership Estate in accordance with this Court's determination. But, again, the Receiver

---

[25] The Receiver notes that, as explained in V&L's Tax Report, the Defendant's assertions in Doc. No. 2150 that a QSF would "negate the need to pay any taxes at all due to liquidation" are inaccurate.

submits that V&L's analysis is correct and a QSF formed in this proceeding on January 11, 2022.

## XI.    Other Tax Issues

### a.  No other tax minimization strategies are possible.

Contrary to the Ahmeds' assertions, the tax professionals at V&L have fully evaluated the tax situation presented by this receivership proceeding and, in their professional opinion, there is no additional tax planning or other strategies that could have been performed to minimize the taxes payable by either the Defendant, the Relief Defendants, or the Receivership Estate. (Doc. No. 2345-1, at 6; Def. Resp. at 48, 53). There is no magic bullet to eliminate the tax liabilities inherent in the liquidation of tens of millions of dollars in assets, many of which have appreciated significantly over the years resulting in large capital gains upon their sale.

The lone concrete strategy that the Defendant has articulated – liquidating assets that lost value in the same tax year as liquidating assets that gained value – is accomplished precisely by the deemed sale of assets to the QSF. (Def. Resp., at 55, *citing* Doc. No. 2065). Indeed, "[t]he actual sale by the Receiver of the assets contributed to the QSF has no effect on the Defendant's or Relief Defendants' tax liability from the deemed sale (*e.g.*, no tax planning to match gains and losses from the sale of assets by the Receiver is necessary)." (Tax Report, at 8).

Therefore, the Receiver submits that nothing further can be done to limit the taxes arising out of the liquidation of Receivership Assets pursuant to the Liquidation Order.[26]

### b.  Tax Liens

V&L has confirmed that the tax liens issued by the IRS are not an impediment to the continued liquidation of Receivership Assets pursuant to the Liquidation Order. (*See* Ms. A. Resp.,

---

[26] The Receiver notes that the Defendant's purports to assign his tax loss carryforwards to Ms. Ahmed in the Dissolution Agreement. (*See* Doc. No. 2248-1, at 6). If not assigned, these tax loss carryforwards would reduce the Defendant's tax liability for the deemed sale of assets to the QSF. The Receiver is evaluating how the purported assignment of these tax loss carryforwards to Ms. Ahmed impacts the amount of tax the Receivership Estate must pay and will provide his analysis to this Court.

at 36). The proceeds from such liquidation activities *may* be subject to the liens and V&L has "recommend[ed] further analysis" of this issue, "including discussion with the Internal Revenue Service and Connecticut Department of Revenue Services." (Tax Report, at 15). The Receiver and V&L have already commenced such discussions with the IRS. The resolution of this issue is complicated and delayed, in fact, because Ms. Ahmed amended her tax returns disclaiming liability for the very same taxes that gave rise to the tax liens. (*See* Doc. No. 2158, at 3; Doc. No. 1919, at 2). If the Receiver confirms that the liquidation proceeds are subject to the tax liens, such payments as may be appropriate can be made at a later stage of the liquidation process. (*See* Tax Report, at 14-15). There is no reason to delay the commencement of Phase 2 to complete this analysis.

### c. The Defendant's and Ms. Ahmed's 2015 to 2020 Taxes

"Because the Receiver is not a receiver for the Defendant and/or Relief Defendants, the Receiver has no obligation or responsibility to prepare tax returns and pay tax obligations for the Defendant and/or Relief Defendants other than the liability created from the deemed sale at the creation of the QSF…." (Tax Report, at 13-14). The Ahmeds' arguments with regards to their tax liabilities for the years 2015 through 2020 are fundamentally flawed for the reasons stated in the Tax Report. (Doc. No. 2345-1, at 7-8; Def. Resp., at 44).[27] Nonetheless, the Receiver will further evaluate this issue in Phase 2.[28] (Tax Report, at 14). As part of this evaluation, the Receiver will continue engaging with the IRS and other relevant taxing authorities to the extent permitted by applicable statute and this Court's orders. (*See* Doc. No. 2340, at 6-10). Such discussions with the

---

[27] The Receiver notes that the Defendant's current position that the Receiver is responsible for the Defendant's tax liabilities for 2015 through 2020 is in direct contrast to the Defendant's prior position. (*See* Iftikar Ahmed 10/11/19 Email, attached hereto as **Exhibit F** (the Defendant states that the Receiver "is not responsible for my personal taxes…")).

[28] The Receiver also acknowledges Ms. Ahmed's assertion regarding tax refunds. (Doc. No. 2345-1, at 27). The Receiver is further evaluating this issue and reserves all rights to seek relief from this Court as may be appropriate.

IRS will include identifying a mechanism by which the IRS can alert the Receiver to any tax refunds requested by the Defendants, as requested by the Commission.[29] (Com. Resp., at 5).

The Receiver notes, however, that the entity responsible for paying the Ahmeds' 2015-2020 taxes does not need to be identified before the Receiver commences liquidating Unique Assets. The two issues are entirely distinct. If the Receivership Estate is in fact responsible for such tax obligations now that the Defendant and Ms. Ahmed amended their tax returns, more funds will need to be made available, which means more assets will need to be liquidated.

## XII.    Conclusion

For the reasons set forth above, the Receiver respectfully submits that this Court should grant the specific relief requested by the Motion to Approve and grant such other and further relief as this Court deems just and proper.

Respectfully submitted,
STEPHEN M. KINDSETH, ESQ.,
RECEIVER

 /s/ Christopher H. Blau
Christopher H. Blau (ct30120)
Zeisler & Zeisler, P.C.
10 Middle Street, 15th Floor
Bridgeport, CT  06604
Telephone: 203-368-4234
Facsimile: 203-549-0903
Email: cblau@zeislaw.com
*Counsel to the Receiver*

---

[29] Following such further discussions with the IRS, the Receiver may need to seek certain relief from this Court to allow the IRS to disclose otherwise confidential information under section 6103. If necessary, the Receiver will file an appropriate motion seeking such relief.

## CERTIFICATE OF SERVICE

I hereby certify that on October 5, 2022, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System. Furthermore, a copy of the foregoing was sent via email to the Defendant Iftikar A. Ahmed at iftyahmed@icloud.com and i3siam@protonmail.com. Finally, a copy of the foregoing was sent via email to the Relief Defendant Shalini Ahmed at shalini.ahmed@me.com.


 */s/ Christopher H. Blau*
Christopher H. Blau (ct30120)