## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Civil Action No. 3:15-cv-675-JBA |
| IFTIKAR AHMED | ) ) | |
| Defendant, and | ) | |
| and | ) ) | |
| IFTIKAR ALI AHMED SOLE PROP; I-CUBED DOMAINS, LLC; SHALINI AHMED; SHALINI AHMED 2014 GRANTOR RETAINED ANNUITY TRUST; DIYA HOLDINGS LLC; DIYA REAL HOLDINGS, LLC; I.I. 1, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; I.I. 2, a minor child, by and through his next friends, IFTIKAR and SHALINI AHMED, his parents; I.I. 3, a minor child, by and through his next friends, IFTIKAR and SHALINI AHMED, his parents | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Relief Defendants. | ) ) | November 16, 2022 |

## FIFTEENTH INTERIM APPLICATION FOR PROFESSIONAL FEES AND EXPENSES INCURRED BY THE RECEIVER AND HIS PROFESSIONALS

Stephen M. Kindseth, Esq., in his capacity as Court-appointed receiver of the Receivership

Estate[1] (the "Receiver"),[2] by and through his undersigned counsel Zeisler & Zeisler, P.C. ("Z&Z"),

respectfully submits this fifteenth interim application (the "15th Application") for professional

---

[1] Unless expressly defined otherwise, the Receiver incorporates by reference the definitions of terms set forth in the Order Appointing Receiver [Doc. No. 1070] (the "Appointment Order").

[2] This Court substituted Stephen M. Kindseth as Receiver on November 8, 2021. (*See* Order Granting Motion for Order Substituting Stephen M. Kindseth, Esq. as Receiver [Doc. No. 2100]). References to the "Receiver" for any time before November 8, 2021, refer to Jed Horwitt, Esq. acting in such capacity.

fees and expenses incurred by the Receiver, Z&Z, and Verdolino & Lowey, P.C. ("V&L") on behalf of the Receivership Estate during the period commencing on July 1, 2022, through and including September 30, 2022 (the "Compensation Period"). In advance of its filing, and pursuant to paragraph 35 of the Appointment Order, on October 17, 2022, the Receiver served upon counsel for the Securities and Exchange Commission (the "Commission"), the Defendant, and counsel for the Relief Defendants a copy of the 15th Application. The Commission does not object to the relief requested herein. The Defendant and the Relief Defendants (sometimes, jointly, the "Defendants") have not advised as to their position. In support of this 15th Application, the Receiver and Z&Z respectfully represent as follows:

## I.    SUMMARY OF PROFESSIONAL FEES AND EXPENSES REQUESTED

1.    This 15th Application is prepared in accordance with the Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission (the "SEC Guidelines") and the Appointment Order.

2.    Pursuant to the SEC Guidelines, the undersigned attaches the following exhibits to this 15th Application:

a.    The completed Standardized Fund Accounting Report ("SFAR"), in the form prescribed by the SEC Guidelines, and certified by Receiver, as **Exhibit A**;[3]

b.    A Certification of Compliance with the Receivership Guidelines as **Exhibit B**;

c.    A summary of total expenses for which reimbursement is sought as **Exhibit C**;

d.    Time records summarizing the work performed by legal professionals and paraprofessionals at Z&Z, for each of the applicable Activity Categories (as hereinafter defined), as **Exhibit D-1**, **D-2**, **D-3**, **D-4**, **D-5**; and,

---

[3] The amounts stated in **Exhibit A** represent the total income and expenses in the Receivership Accounts, which may include income and expenses attributable to Young Bae Ku by way of his interest in the The Essell Group, LLC and The Essell Farms, LLC.

e.      Time records summarizing the work performed by the professionals at V&L as **Exhibit D-6**.

3.      The Receiver, his professionals, and paraprofessionals have expended a total of 532.5 hours working on this matter during the Compensation Period, not including time spent preparing the Fourteenth Interim Application for Professional Fees and Expenses Incurred by the Receiver and his Professionals [Doc. No. 2306] (the "14th Application").[4] The Receiver and Z&Z seek an allowance of $101,852.11 in compensation for services rendered during the Compensation Period on behalf of the Receivership Estate and reimbursement of actual and necessary expenses in the amount of $893.62. Additionally, the Receiver seeks this Court's authority to pay V&L $34,864.13 for services rendered to the Receivership Estate during the Compensation Period.

4.      The Receiver and his professionals acknowledge that their fee compensation is subject to a twenty percent (20%) holdback, pursuant to the SEC Guidelines and the Appointment Order.

5.      The fees assessed reflect the hours worked by the Receiver and staff at Z&Z and V&L at the hourly rates applicable at the time that they rendered their services, as modified by the significant discounts provided by the Receiver, Z&Z, and V&L (described below).

6.      These amounts also take into account all relevant circumstances and factors as set forth in the Connecticut Rules of Professional Conduct and the SEC Guidelines, including the nature of the services performed, the amount of time spent, the experience and ability of the professionals and paraprofessionals working on this engagement, the novelty and complexity of

---

[4] In this Court's Ruling Granting Receiver's Motions for Fees [Doc. No. 1714] (the "Second Fee Ruling"), this Court made clear that the Receiver can seek compensation for "time spent defending his fee motions" as "the SEC Guidelines prohibit billing only time spent preparing fee applications, not time spent defending such applications, and courts in similar SEC enforcement actions have permitted receivers to recover fees on fees." (Second Fee Ruling, at 10).

the specific issues involved, the time limitations imposed by the circumstances, and the responsibilities undertaken by the Receiver, Z&Z, and V&L pursuant to this Court's orders.

7.      A narrative description of the particular services provided is included in the attached time records (Ex. D-1 through D-6) and a summary of the Receiver's administration of the Receivership Estate during the Compensation Period is set forth in Section IV below.

8.      The expense reimbursements requested principally consist of: (i) charges for accessing electronic documents; (ii) online research; and (iii) other routine expenses. (*See* Ex. C.).

9.      The Receiver, Z&Z, and V&L have not sought reimbursement for secretarial, word processing, proofreading or document preparation expenses (other than by professionals or paraprofessionals), data processing and other staff services (exclusive of paraprofessional services), or clerical overtime.

10.     The Receiver and Z&Z have complied with the SEC Guidelines' internal photocopying rates as follows: $0.15 per page for black/white and $1.00 per page for color copies.

A.      **Public Service Discounts**

11.     As proposed by the Receiver as part of his application for selection as receiver submitted to the Commission, and as provided in the Appointment Order, the Receiver and Z&Z have consented to and implemented substantial public service discounts with respect to their billing rates for services provided in this proceeding. V&L agreed to an identical discount.

12.     More specifically, and as shown in the fee schedules set forth below, Z&Z and V&L have consented to and applied a 25% public service discount to their regularly applicable hourly rates for all legal professionals and paraprofessionals. As the standard hourly rates for some Z&Z professionals and paraprofessionals changed effective January 1, 2022, the amount sought in this 15th Application reflects a 25% public service discount from the revised January 1, 2022, rates.

13.     The Receiver has further discounted his generally applicable hourly rate for all services provided to $250 per hour, reflecting a nearly 50% discount.

**B.    Fee Schedules**

14.     The fee schedule for the Receiver, showing: his name; the hourly rate applied to his services in this proceeding and his customary hourly rate; the discount reflected in the applied hourly rate; the number of hours of services performed in the Compensation Period; the amount billed for such services in the Compensation Period; and the amount of the discount to his services during the Compensation Period; is as follows:

| Receiver | Rate (Cust. Rate) | Rate Disc. | Hours | Amt. Billed | Amt. Disc. |
|---|---|---|---|---|---|
| Kindseth, Stephen | $250 ($495) | $245 | 39.6 | $9,900.00 | $9,702.00 |

15.     The fee schedule for all Z&Z legal professionals who provided services during the Compensation Period, showing for each: their name; the hourly rate applied to his or her services in this proceeding and his or her customary hourly rate; the discount reflected in the applied hourly rate; the number of hours of services performed in the Compensation Period; the amount billed for such services in the Compensation Period; and the amount of the discount to his or her services during the Compensation Period is as follows:

| Legal Professional | Rate (Cust. Rate) | Rate Disc. | Hours | Amt. Billed | Amt. Disc. |
|---|---|---|---|---|---|
| Blau, Christopher | $262.50 ($350) | $87.50 | 292.2 | $74,130.00 | $24,990.00 |
| Byrd, Daniel | $206.25 ($275) | $67.75 | 53.30 | $10,745.86 | $ 3,719.14 |
| Moriarty, James | $337.50 ($450) | $112.50 | 1.5 | $506.25 | $    168.75 |

16.     The fee schedule for the legal paraprofessionals who provided services during the Compensation Period, showing: their name; the hourly rate applied to their services in this proceeding and their customary hourly rate; the discount reflected in the applied hourly rate; the number of hours of services performed in the Compensation Period; the amount billed for such

services in the Compensation Period; and the amount of the discount to their services during the Compensation Period is as follows:

| Paraprofessional | Rate (Cust. Rate) | Rate Disc. | Hours | Amt. Billed | Amt. Disc. |
|---|---|---|---|---|---|
| Accurso, Deborah | $150 ($200) | $50 | 36.6 | $5,490.00 | $1,830.00 |
| Jervey, Carla | $150 ($200) | $50 | 7.2 | $1,080.00 | $ 360.00 |

17.     Additionally, the fee schedule for professionals at V&L who provided services during the Compensation Period showing: their name, the hourly rate applied to their services in this proceeding and their customary hourly rate; the discount reflected in the applied hourly rate; the number of hours of services performed in the Compensation Period; the amount billed for such services in the Compensation Period; and the amount of the discount to their services during the Compensation Period is as follows:

| Professional | Rate (Cust. Rate) | Rate Disc. | Hours | Amt. Billed | Amt. Disc. |
|---|---|---|---|---|---|
| Hurley, William | $386.25 ($515) | $128.75 | 54.4 | $21,012.00 | $7,004.00 |
| Lafave, Laurie | $295.00(221.25) | $73.75 | .3 | $ 66.38 | $ 22.12 |
| Lowey, Keith | $386.25 ($515) | $128.75 | 19.8 | $ 7,647.75 | $2,549.25 |
| Whitehouse, Matthew | $247.50 ($330) | $82.50 | 19.9 | $ 4,925.25 | $1,641.75 |
| Yumet, Luis | $210.00 (157.50) | $52.50 | 7.7 | $ 1,212.75 | $ 404.25 |

**C.     Activity Categories**

18.     Pursuant to the SEC Guidelines, the Receiver and Z&Z utilized the following activity categories (the "Activity Categories") under which the following fees were incurred during the Compensation Period:

a.     Case Administration, 335.2 hours, $82,815.23 (*see* Ex. D-1);

b.     Asset Analysis & Recovery, 44.30 hours, $9,457.50 (*see* Ex. D-2);

c.     Asset Disposition, 16.30 hours, $4,095.00 (*see* Ex. D-3);

d.     Business Operations, 19.70 hours, $4,411.88 (*see* Ex. D-4);

e.     Claims Administration & Objections, 5.2 hours, $1,072.50 (*see* Ex. D-5); and,

f.     Tax Issues (V&L), 102.1 hours, $34,864.13 (*See* Ex. D-6).

## II.    NATURE OF THE PROCEEDINGS

### A.    Underlying Procedural History

19.    On May 6, 2015, the Commission commenced this civil action by filing its Complaint [Doc. No. 1] against the Defendant. Subsequently, on June 16, 2015, the Commission filed an Amended Complaint [Doc. No. 33] naming the Relief Defendants in addition to the Defendant and, on April 1, 2016, the Commission filed a Second Amended Complaint [Doc. No. 208] in which it amended its claims against the Defendant and Relief Defendants.

20.    The Commission claimed that the Defendant "violated Section 10(b) of the Securities Exchange Act of 1934… and Rule 10b-5 (Count One), Section 17(a) of the Securities Act of 1933 …, and Section 206 of the Investment Advisers Act…." *SEC* v. *Ahmed*, 308 F. Sup. 3d 628, 636 (D. Conn. 2018). The Commission alleged that these violations arose out of the Defendant's use of "fraudulent and deceptive means to divert" millions of dollars "from funds he advised while employed by venture capital firm Oak Investment Partners ('Oak') into his personal bank accounts, before funneling much of his ill-gotten gains into assets and accounts in the name of his wife [("Ms. Ahmed")] in order to conceal his fraud and protect the assets from confiscation." *Id*.

21.    "In response" to the Commission's allegations, "neither Defendant nor Relief Defendants argue that Defendant did not commit the alleged frauds, [but] instead contend[] primarily that Defendant should not be held liable because (1) certain fraudulent acts are time-barred by the statute of limitations, (2) the fraud was not sufficiently connected to securities transactions, and (3) the underlying securities transactions are not sufficiently domestic to be within the reach of the United States securities laws." *Id*. at 637.

22.     On December 14, 2018, this Court entered an Amended Final Judgment [Doc. No. 1054] (the "Amended Final Judgment") against the Defendant and Relief Defendants and in favor of the Commission. The Amended Final Judgment, *inter alia*, ordered the Defendant to disgorge $41,920,639 "together with prejudgment interest thereon in the amount of $1,491,064.01 and any interest or gains accrued on disgorged frozen assets from the date of this Court's freeze order [described below]" and imposed a civil penalty in the amount of $21,000,000. (*Id*. at 2, 4).

23.     Thereafter, the Defendant filed a Motion to Alter or Amend the Amended Final Judgment Pursuant to Fed. R. Civ. P. 59(e) [Doc. No. 1086] on January 11, 2019 (the "January 2019 Motion to Alter or Amend"), which this Court denied in its Ruling Denying Defendant's Motion to Alter Final Judgment [Doc. No. 1263] on September 4, 2019. The Defendant filed a Motion to Reduce Disgorgement in this Case for the Default Judgment Entered Against Him in the NMR e-Tailing New York State Proceeding [Doc. No. 1325], which this Court denied as premature, without prejudice to renew. (*See* Doc. No. 1680). The Defendant filed a Rule 60(b) Motion for Relief from Amended Final Judgment and Order [Doc. No. 1567] on June 9, 2020, which this Court denied in its Order Denying Defendant's Rule 60(B) Motion for Relief from Amended Final Judgment [Doc. No. 2041].

24.     "On March 11, 2021, the Second Circuit granted the motion for limited remand, remanding the appeals to this Court for determination of Appellant's disgorgement obligation consistent with 6501 of the National Defense Authorization Act." (Order [Doc. No. 1801]). Following briefing by the Commission, the Defendant, and the Relief Defendants, the Court scheduled argument on the Defendant's disgorgement obligation for May 18, 2021. (Order [Doc. No. 1893]). On June 16, 2021, this Court issued its Redetermination of Defendant's Disgorgement Obligation [Doc. No. 1997] (the "Disgorgement Order"), which increased the Defendant's

disgorgement obligation to $64,171,646.14 and his prejudgment interest obligation to $9,755,798.34. (*See also* Redetermined Final Amended Judgment [Doc. No. 2011]).

25.     On July 26, 2021, the Defendant filed his Motion to Reduce Disgorgement in this Case by the Amount of Judgment in the New York State Proceeding [Doc. No. 2033], which this Court denied on August 26, 2021. (*See* Endorsement Order [Doc. No. 2069]).

26.     As a result of the Disgorgement Order and the subsequent Redetermined Final Amended Judgment, the judgment against the Defendant now includes $64,171,646.14 in disgorgement, "any interest or gains accrued on disgorged frozen assets from the date of the Court's freeze order" pursuant to the Redetermined Final Amended Judgment, $9,755,798.34 in prejudgment interest, a $21,000,000 penalty, and post-judgment interest pursuant to 28 U.S.C. § 1961 (collectively, the "Judgment").

### B.     <u>The Asset Freeze</u>

27.     On May 6, 2015, the same day that it filed its initial Complaint against the Defendant, the Commission filed an Emergency Motion for an *Ex Parte* Temporary Restraining Order Freezing Assets and Providing Other Ancillary Relief and for a Preliminary Injunction [Doc. No. 2] (the "TRO Motion").

28.     On May 7, 2015, this Court granted the TRO Motion and, *inter alia*, froze certain assets held by or under the direct or indirect control of the Defendant and Relief Defendant I-Cubed Domains, LLC ("I-Cubed"). (Doc. No. 9.)

29.     After this Court's August 12, 2015, Ruling and Order Granting Preliminary Injunction [Doc. No. 113], and after the asset freeze entered by the same was modified from time to time, this Court issued its Order on Defendant's Motions for Modification of the Asset Freeze Order to Release Funds for His Legal Defense and for a Stay in Light of *Kokesh* [Doc. No. 829]

(the "Operative Freeze Order") in which this Court froze "[t]he assets, funds, or other property held by or under the direct or indirect control of Defendant and Relief Defendants, whether held in any of their names or for their direct or indirect beneficial interest, wherever located, up to the amount of $89,000,000." (*Id*. at 5.) The Amended Final Judgment, at paragraph 7, provides a schedule of assets included in the freeze that "are available to satisfy" the Judgment and further states that "[t]he asset freeze will continue and will effectively serve as Defendant's supersedes bond to secure the judgment while" distribution of assets in effectuation of the judgment is stayed.[5] (Amended Final Judgment, at 9).

30.     This Court subsequently modified the Operative Freeze Order from time to time to release funds from the asset freeze to pay for various routine and other expenses incurred by assets of the Receivership Estate and the parties to the action.

### C.     <u>Appointment of the Receiver</u>

31.     On May 29, 2018, the Commission filed its Motion for Remedies and Judgment [Doc. No. 886] seeking, *inter alia*, the appointment of a receiver.

32.     Following a telephonic conference on November 9, 2018, and a hearing held on November 28, 2018, this Court issued the Appointment Order on December 20, 2018, and thereby appointed Attorney Horwitt as Receiver and Z&Z as his counsel.

33.     The Appointment Order provides that the Receiver shall control the operation of the Receivership Estate, which "includes all assets subject to this Court's asset freeze order… as modified throughout this litigation." (Appointment Order, at 6.) Among other powers and duties, the Appointment Order directed the Receiver to:

---

[5] This Court's Redetermined Final Amended Judgment [Doc. No. 2011] does not modify the Amended Final Judgment's identification of assets available to satisfy this Court's Judgment.

> [M]anage, in consultation with qualified business advisors, and taking into consideration the wishes of Defendant and Relief Defendants, and with the dual objects of maximizing the realizable value of the assets of the Receivership Estate and minimizing the expense charged thereto, the assets of the Receivership Estate, pending further order of the Court or until such time that the Receivership Estate can be liquidated or modified, including but not limited to management of investments and rental and maintenance of real property[.]

(Appointment Order, at 7.)

34.     The Appointment Order provides that the goal of the receivership, in part, is to "value the frozen assets[,] avoid over-freezing, [] secure the judgment for the [Commission], [and] manage and maximize the value of the frozen assets…." (Appointment Order, at 5.)

35.     Consistent with these principles, the Receiver was directed to:

> [F]ile and serve a report reflecting… (i) the existence, value, and location of assets of the Receivership Funds and all other assets of the Receivership Estate which are liquid or could be liquidated with relative ease, including but not limited to publicly traded securities and brokerage accounts; (ii) the Receiver's proposal for securing the judgment using additional assets of the Receivership Estate, including the Receiver's recommendations as to which additional assets should be valued for possible liquidation and placement into a Court Registry Investment System ("CRIS") account and the order in which the Receiver proposes to liquidate such assets; and (iii) the Receiver's estimate regarding the dollar amount which should ultimately be placed into such account to fully secure the judgment, taking into consideration the amount of the judgment in this case, the costs of the receivership and administration of the Receivership Estate, and any other relevant factors.

(Appointment Order, at 14-15.)

36.     The Receiver filed the Report on April 3, 2019. As directed by the Appointment Order, the Receiver identified those particular assets "which are liquid or could be liquidated with relative ease" and such additional assets proposed to be liquidated as necessary to secure the Judgment. The Receiver also provided in his Report his estimate regarding "the amount of the

judgment in this case, the costs of the receivership and administration of the Receivership Estate, and any other relevant factors."

37.     Subsequently, in compliance with the Disgorgement Order, the Receiver filed a revised liquidation plan on July 15, 2021. (Receiver's Liquidation Plan [Doc. No. 2022] (the "2021 Liquidation Plan"). On January 11, 2022, this Court issued its Order Granting with Modification the Receiver's Motion to Approve his Proposed Plan of Liquidation [Doc. No. 2147] (the "Liquidation Order"), which, *inter alia*, authorized and directed the Receiver to begin the liquidation process.

38.     Following the Receiver's Motion for Order Substituting Stephen M. Kindseth, Esq. as Receiver [Doc. No. 2007], this Court substituted Attorney Kindseth as Receiver on November 8, 2021. (*See* Order Granting Motion for Order Substituting Stephen M. Kindseth, Esq. as Receiver [Doc. No. 2100]).

39.     The Receiver further describes his and his counsel's activities during the Compensation Period, detailed in the attached exhibits, in Section IV.

**D.     Prior Fee Applications**

40.     This Court has granted, in some instances with modification, the Receiver's fee applications for the period from December 2018 through and including June 2022. (*See* Doc. Nos. 1415, 1714, 1982, 2123, 2245, 2369).

## III.     SUMMARY OF CASH ON HAND

41.     Pursuant to paragraphs 25 and 26 of the Appointment Order, the Receiver has opened certain accounts (collectively, the "Receivership Accounts") to "hold… cash and cash-equivalent property of the Receivership Estate." (Appointment Order, at 14).

42.     As of the end of the Compensation Period, the Receivership Accounts held funds marshaled by the Receiver and constitute a Receivership Asset, with the exception of Young Bae Ku's interest in $149.88 held therein that the Receiver utilizes to pay certain expenses incurred by Essell Group and Essell Farms.

43.     In addition to the cash held in bank accounts subject to the Operative Freeze Order that fall within the Receivership Estate as more fully detailed below in Section V, as of the end of the Compensation Period the remainder of the cash in the Receivership Estate was held in the Receivership Accounts. As of September 30, 2022, the total balance of the Receivership Accounts, which includes the Morgan Account as defined below, was $42,638,932.35.

## IV.     SUMMARY OF RECEIVER'S ADMINISTRATION OF THE ESTATE AND SERVICES PROVIDED BY Z&Z AND V&L

44.     During the Compensation Period, the Receiver has continued to fulfill his duties required of him under the Appointment Order, the Liquidation Order, and other orders of this Court. Although the detailed time entries contained in the invoices appended hereto as **Exhibits D-1** through **D-6** set forth with particularity the services provided by the Receiver, Z&Z, and V&L, a summary of the most significant services is provided below.

### A.     Continued Preparing the Report, Reviewed Parties' Responses to the Report, and Drafted an Omnibus Reply Thereto

45.     During the first portion of the Compensation Period, the Receiver dedicated significant resources to drafting and finalizing the Phase 1 Report [Doc. No. 2272] (the "Report") and associated exhibits. As evidenced by the length and detail of the Report, this effort was extensive. V&L's assistance continued to be critical in enabling the Receiver to compile a fulsome and accurate Report addressing the wide array of issues necessary to successfully continue the liquidation of assets to further secure the Total Judgment.

46.    The topics that the Receiver and his professionals (at Z&Z and V&L) analyzed and addressed as part of this process are listed in the Receiver's 14th Application at pages 15-17, which the Receiver incorporates herein by reference, and reflected in the billing entries attached hereto.

47.    Relatedly, the Receiver prepared a separate motion to approve the Report. (Doc. No. 2279). Additionally, the Receiver drafted motions to seal both the Report and said motion to approve the Report consistent with this Court's protective order and to preserve the confidentiality of the Ahmeds' tax information. (Doc. Nos. 2271, 2278).

48.    In connection with preparing the Report and otherwise preparing to complete liquidation-related tasks in Phase 2 of the Liquidation Plan if so authorized by this Court, the Receiver also continued to investigate methods by which additional Unique Assets might be sold. This investigation included discussions with parties who may be interested in purchasing certain assets if authorized and approved by this Court, such as Young Bae Ku (with regards to the Essell Group) and Edward Glassmeyer's counsel (with regards to Desert Wind Technologies, LLC, in which Mr. Glassmeyer holds an 85% interest). The Receiver also investigated certain liquidation options with respect to other illiquid assets, such as the Defendant's interest in Crypto Currency Partners, LP. Similarly, the Receiver began the process of identifying an appraiser to assess the value the 194-acre property held by Essell Farms, which will be necessary in connection with any liquidation of said property and/or the Defendant's interest in the Essell Farms entity itself.

49.    Additionally, the Receiver continued engaging in discussions with the relevant taxing authorities, including the IRS and Connecticut Department of Revenue Services ("DRS"). During such discussions, the Receiver and his professionals did not disclose information that is protected from disclosure by this Court's protective order. Participating in these discussions was

and will be vital to the successful management of the Receivership Estate and liquidation process, particularly given the multiple unique tax issues that require input from the relevant authorities.

50.     The Receiver respectfully submits that, in connection with fulfilling his obligations under the Liquidation Order, it was necessary and appropriate for his counsel and tax professionals to spend substantial time during the Compensation Period on preparing the multifaceted Report.

51.     On September 17, 2022, the Commission filed its response to the Report. (Doc. No. 2310, the "Commission's Response"). Thereafter, on September 21, 2022, the Defendant and Ms. Ahmed filed their responses to the Report. (Doc. Nos. 2345, 2346, jointly the "Ahmeds' Responses").

52.     The Receiver and his professionals reviewed the Commission's Response and the Ahmeds' Responses. In aggregate, the Ahmeds' Responses consist of 220 pages of briefing and exhibits on a vast array of issues and thus took a considerable amount of time for the Receiver and his professionals to evaluate. Without duplication of effort, the tax professionals at V&L focused on the tax-related issues raised in the Ahmeds' Responses while counsel at Z&Z focused on the Commission's Response and the Ahmeds' Responses broadly, incorporating V&L's input on tax matters where appropriate.

53.     The Receiver and his counsel at Z&Z then spent a significant amount of time drafting and revising the Receiver's omnibus reply to the Commission's Response and the Ahmeds' Responses and conducting related research. As reflected in the final product, Doc. No. 2357, the Receiver's omnibus reply addressed, *inter alia*, the Ahmeds' dissolution proceeding, further liquidation sequencing, assets held by OMC and Oak HC/FT, the Receiver's calculations of the Total Judgment and its constituent parts, various asset valuations, the liquidation procedures for the Apartments and Personal Property, transfers to the CRIS account and funds that may be

reserved from such transfers, and multiple tax matters (including issues related to a qualified settlement fund).

54.    The Receiver respectfully submits that the efforts by the Receiver and the professionals at Z&Z and V&L in finalizing the Report and replying to the Commission's and the Ahmeds' Responses thereto were necessary, appropriate, and benefited the Receivership Estate.

### B.    Activities Undertaken Concerning Dissolution Proceeding

55.    During the Compensation Period, the Receiver continued to address the Defendants' Dissolution of Marriage Agreement (the "Agreement") in the marriage dissolution proceeding that Ms. Ahmed commenced in Connecticut Superior Court. *Ahmed v. Ahmed*, Case No. FST-FA22-5026169-S (the "Dissolution Proceeding"). (*See* Notice Regarding Defendants' Apparent Failure to Comply with the Appointment Order [Doc. No. 2248] (the "Dissolution Notice"); Supplemental Notice Regarding Defendants' Apparent Failure to Comply With the Appointment Order [Doc. No. 2266] (the "Supplemental Dissolution Notice" and, with the Dissolution Notice, the "Dissolution Notices")).

56.    Among other steps taken during the Compensation Period, the Receiver responded to Ms. Ahmed's Caseflow Request, filed on July 7, 2022, asserting that she and the Defendant "are in agreement on all issues and have submitted a final dissolution of marriage agreement" and "request entry of the agreement as judgment." (Dissolution Proceeding, Entry No. 129.00). The Receiver promptly objected to that Caseflow Request as the Agreement at that point appeared to concern (and the Receiver has subsequently confirmed that the Agreement does concern) frozen assets within the Receivership Estate.

57.     The Receiver also drafted and filed his reply to Ms. Ahmed's opposition to the Receiver's motion to intervene (attached hereto as **Exhibit F**) in the Dissolution Proceeding during the Compensation Period.

58.     On August 22, 2022, the Receiver's counsel appeared for argument before the Superior Court concerning the Receiver's motion to intervene in the Dissolution Proceeding and Oak Management Corporation's similar motion. The Superior Court heard argument but did not issue a decision.

59.     Subsequently, on September 30, 2022, the Receiver filed his Notice of Supplemental Facts Relevant to Receiver's Motion to Intervene (attached hereto as **Exhibit G**) to alert the Superior Court to the Ahmeds' attempts to disrupt the instant proceeding by arguing that the Agreement prevents, *inter alia*, the further liquidation and transfer of assets pursuant to the Liquidation Plan. Oak Management Corporation filed a motion (attached hereto as **Exhibit H**) seeking an order from the Superior Court allowing for additional argument and evidence to be taken concerning the statements made in the Ahmeds' Responses to the Report as such statements relate to the pending motions to intervene in the Dissolution Proceeding. The Superior Court granted Oak Management Corporation's motion and scheduled a hearing for December 20, 2022.

60.     The Superior Court has also scheduled a hearing for January 23, 2023, concerning Ms. Ahmed's previously filed motion to disqualify Oak Management Corporation's counsel.

**C.     Apartment 12A and Apartment 12F Repairs**

57.     Both Apartment 12A and Apartment 12F have suffered water damage from different sources. The Receiver has coordinated the repairs to both units with the assistance of Classic Realty LLC, the management company for the 530 Park Avenue building where the units are located. During the Compensation Period, the repairs to both Apartment 12A and Apartment

12F were completed. The Receiver sent a representative to both Apartment 12A and Apartment 12F who performed a visual inspection and confirmed that the repairs were performed in a satisfactory manner.

58.     The Receiver continues to work with the relevant insurance carriers to obtain reimbursement for these necessary repairs. The insurance carriers have been exceedingly slow to respond to the Receiver's inquiries, but progress has recently been made and the Receiver is hopeful this issue will be fully resolved soon.

   **D.     Addressed Various Motions Filed During the Compensation Period**

59.     As during prior quarters, the Receiver continued to evaluate and respond, where necessary and appropriate, to the various filings submitted to this Court by other parties and entities during the Compensation Period. Specifically, during the Compensation Period such efforts included evaluating and/or responding to OMC's Motion to Lift the Litigation Stay [Doc. No. 2260]; the Defendant's Motion to Compel Production of Settlement Agreement between NMRE and Oak [Doc. No. 2262] and related filings (*see* Doc. Nos. 2275, 2276, 2277, and 2298); and the Defendant's Emergency Motion to Compel Details on Receiver's Establishment of a QSF without Court Order [Doc. No. 2311]. In instances where a certain filing would have an impact on the Receivership Estate, the Receiver and his counsel determined whether to articulate an objection and/or anything the Receiver felt this Court and other parties-in-interest should be apprised of so that any material impact upon the Receivership Estate (in the Receiver's view) was highlighted for this Court and all parties-in-interest and any adverse impacts could be avoided.

   **E.     Took the Steps Necessary to Purchase Treasury Bills in the Morgan Account**

60.     After the liquidation of various Non-Unique Assets, the Receivership Estate held tens of millions of dollars in cash. To maximize the value of the Receivership Estate, the Receiver

worked with the advisors at Morgan Stanley to determine how such funds could be held securely but still generate a measurable return. Consistent with the guidance from the advisors at Morgan Stanley, the Receiver determined that purchasing (and holding to maturity) 1-month Treasury bills ("T-Bills") to be in the best interests of the Receivership Estate.

61.     To minimize expenses by avoiding unnecessary motion practice, the Receiver conferred with the Defendant, the Relief Defendants, and the Commission regarding the purchase of such T-Bills. After some negotiation with the Defendant and Relief Defendants, the Receiver filed his Motion on Consent for Order Authorizing the Receiver to Purchase Short-Maturity United States Government Debt [Doc. No. 2301] seeking this Court's authority to purchase the T-Bills.

62.     This Court granted the Receiver's motion (Doc. No. 2304) and, to date, the T-Bills purchased by the Receiver in the Morgan Account have generated tens of thousands of dollars in income to the Receivership Estate as detailed below.

63.     The Receiver also investigated potentially purchasing T-Bills using frozen funds held in accounts at other financial institutions titled to one or more of the Defendants. However, because such purchases would require relaxing account restrictions on the accounts (and thereby decrease the security of the frozen funds) and/or present an administrative burden that the financial institutions were thus far unwilling to shoulder, the Receiver has not yet identified a method by which funds outside the Morgan Account could be used to purchase T-Bills.

F.     **Efforts Related to Cryptocurrency in the Receivership Estate**

64.     During the Compensation Period, the Receiver continued to negotiate with Circle Internet Financial, LLC ("Circle") regarding the conditions under which Circle would liquidate approximately 29 bitcoins on behalf of the Receiver consistent with the Liquidation Plan as authorized and approved by this Court in the Liquidation Order. Following such negotiations, the

Receiver drafted and filed his Motion for Order Approving and Authorizing the Receiver to Enter Into Agreement Concerning the Liquidation of Certain Bitcoin [Doc. No. 2300] to seek this Court's authorization to enter into the requisite agreement. This Court granted the Receiver's motion (*see* Order [Doc. No. 2359]), and the bitcoins held at Circle have been liquidated.

65.     Additionally, after conferring with Young Bae Ku the Receiver facilitated the liquidation of additional bitcoins and ether cryptocurrencies totaling $172,665.92, that Ribbit Capital had distributed to the Essell Group, pursuant to this Court's authority granted to the Receiver in the Liquidation Order. The Receiver is in the process of distributing these and other funds from the Essell Group to Young Bae Ku and the Receiver (as appropriate).[6]

### G.     Review of Essell Farms' and Essell Group's Tax Returns

66.     As in prior years, including those before this Court appointed the Receiver, Andrew Reardon, CPA prepared the 2021 federal and state tax returns for Essell Farms and Essell Group. This year, the Receiver asked the tax professionals at V&L to review the returns prepared by Mr. Reardon and V&L incurred modest fees in doing so.

67.     The Receiver determined that such a review by the tax professionals at V&L was appropriate because there is a possibility that the Receivership Estate may be ultimately responsible for the Defendants' personal tax obligations for the period of 2015 through the present, including the Defendant's tax obligations arising from his interest in Essell Farms and Essell Group. Though the Receiver continues to believe that the Receivership Estate is not responsible for such taxes for the reasons set forth in V&L's Tax Report, the Receiver concluded that a review of the Essell Farms and Essell Group's tax returns by V&L was prudent under the circumstances.

---

[6] The completion of this distribution has been slowed because of questions from Northern Trust regarding said distribution and related transfer of funds between Northern Trust accounts. The funds remain secure, and the Receiver hopes to finish these distributions soon.

(*See generally* Doc. No. 2193, at 2 (this Court recognizing the Receiver's desire to retain V&L because, *inter alia*, "it is necessary for him to seek advice from tax professions about his potential personal liability for unpaid claims by the Government against the Receivership Estate")).

68.     Therefore, the Receiver submits that V&L's efforts in reviewing Essell Farms' and the Essell Group's 2021 tax returns were necessary and appropriate, and therefore compensable.

**H.     Monitoring of Other Ancillary Proceedings**

69.     In addition to the Dissolution Proceeding, the Receiver also continued to monitor other Ancillary Proceedings, as that term is defined by the Appointment Order, to ensure that those actions did not pose new or different threats to the Receivership Estate during the Compensation Period.

70.     Specifically, the Receiver monitored the two actions commenced by the Defendant in Connecticut Superior Court during the Compensation Period: *Iftikar A. Ahmed v. Oak Management Corporation, et al.* (Case No. FST-CV20-5023148-S, "*Ahmed v. OMC I*"), which names Oak Management Corporation ("OMC"), Oak HC/FT, and various affiliated entities and persons, and *Iftikar A. Ahmed v. Oak Management Corporation* (Case No. FST-CV20-5023509-S, "*Ahmed v. OMC II*").

71.     The Superior Court has stayed the entire *Ahmed v. OMC I* proceeding pending further order in light of this Court's litigation stay. The superior Court continued the stay in the *Ahmed v. OMC I* matter pending a further status conference on January 11, 2023.

72.     On September 21, 2021, the Superior Court in *Ahmed v. OMC II* affirmed the arbitration award obtained by OMC against the Defendant. The Defendant appealed the Superior Court's decision on October 8, 2021, to the Connecticut Appellate Court. (*Iftikar Ahmed v. Oak Management Corporation*, Case No. AC 45027). Subsequently, on February 8, 2022, pursuant to

Connecticut General Statutes Section 51-199 and Connecticut Practice Book Section 65-1, the appeal was transferred to the Supreme Court of Connecticut. (*Iftikar Ahmed v. Oak Management Corporation*, Case No. SC 20677). Briefing in the Supreme Court of Connecticut has concluded, and oral argument took place on November 15, 2022.

73.    Similarly, the Receiver continued to monitor *Klestadt v. Ahmed, et al*. (Case No. 1:18-AP-1794) and *Brown Rudnick LLP v. Iftikar Ahmed* (Case No. FST-CV21-6053349-S) during the Compensation Period. No developments relevant to this Receivership occurred in *Klestadt v. Ahmed, et al*. In *Brown Rudnick LLP v. Iftikar Ahmed*, the Receiver understands that the "[p]arties have agreed on a settlement amount and are drafting papers." (Caseflow Request, Doc. No. 129.00, *Brown Rudnick LLP v. Iftikar Ahmed* (Case No. FST-CV21-6053349-S)).

## I.    Continued Collection of Information Concerning Receivership Assets

74.    To fulfill the Receiver's responsibility to manage and protect Receivership Assets, during the Compensation Period the Receiver continued to collect and evaluate information concerning the Receivership Assets. Though the liquidation of Non-Unique Assets is largely complete, the Receiver continued to collect account statements to confirm that no unauthorized activity (such as trades or transfers) occurred.

75.    These information collection efforts also included successfully re-establishing contact with Playsino, Inc. ("Playsino"), an entity in which the Essell Group has an interest, after prior emails to Playsino's counsel bounced back. Based on representations from Playsino's counsel, the Receiver expects to receive a letter from Playsino to its shareholders regarding updates to the company in the near term.

## J.    Other Management of Receivership Assets

76.    During the Compensation Period, the Receiver used funds in the Receivership Accounts to pay for various expenses incurred in connection with the Receivership Assets ("Routine Receivership Expenses") and other disbursements approved by this Court.

77.    As of September 30, 2022, the Receivership Accounts held $42,638,932.35. During the Compensation Period, the Receivership Accounts earned $120,378.66 in interest.

78.    During the Compensation Period, the Receiver paid the following Routine Receivership Expenses and other Court-approved disbursements from the Receivership Accounts as authorized and directed by this Court in paragraph 32 of the Appointment Order:

| Date | Expense | Amount |
|---|---|---|
| 7/6/2022 | Morgan Manhattan (Storage) | $105.00 |
| 7/21/2022 | Classic Realty LLC (12A alteration fee, leak repairs) | $350.00 |
| 7/21/2022 | 530 Park Avenue Condominium (12A alteration, security deposit) | $1,000.00 |
| 7/22/2022 | CSC – DIYA Holdings LLC | $164.40 |
| 7/22/2022 | CSC – I-Cubed Domains LLC | $164.40 |
| 7/26/2022 | Classic Realty LLC (common charges and electric) | $8,366.18 |
| 8/10/2022 | Morgan Manhattan (storage) | $105.00 |
| 8/10/2022 | Delaware Secretary of State – Diya Capital Ltd Partnership | $530.00 |
| 8/25/2022 | Classic Realty LLC (common charges and electric) | $8,361.81 |
| 9/19/2022 | Bank of America (safe deposit box fee) | $139.00 |
| 9/19/2022 | Morgan Manhattan (Storage) | $105.00 |
| 9/23/2022 | Classic Realty LLC (common charges and electric) | $7,255.01 |
|  | **TOTAL:** | $26,645.80 |

79.    Additionally, the Receiver effectuated this Court's orders with respect to releasing funds to Jenner & Block, LLP (in the amount of $101,816.87) and Murtha Cullina LLP (in the amount of $51,271).[7] (Doc. Nos. 2285, 2347).

---

[7] Consistent with his prior practice, the Receiver initially made these payments from an account that the Receiver opened pursuant to paragraph 25 of the Appointment Order so the payments could be effectuated promptly. Thereafter, the Receiver caused money from other frozen accounts, which the Receiver identified as the ultimate source for these payments, to be transferred to the Receiver's account as reimbursement. (*See, e.g.*, Notice Regarding Payment of Fees to Jenner & Block, LLP [Doc. No. 2295]). The reimbursement for the payment to Jenner & Block, LLP was completed

80.    The Receiver also made a payment to UNICEF in the amount of $717.00 on behalf of the Iftikar Foundation to avoid certain taxes and penalties that the foundation would be subject to for not making minimum charitable distributions.

81.    Further, pursuant to this Court's June 22, 2021, Order [Doc. No. 2002], and paragraph 5(c) of the Appointment Order, the Receiver has approved three payments of $9,521.88 (the sum total of the Relief Defendants' living expense and health insurance disbursements) from Fidelity x7540 during the Compensation Period.

82.    Pursuant to guidance from V&L, during the Compensation Period the Receiver continued to transfer funds to the account he opened at Morgan Stanley (the "Morgan Account") which holds the proceeds of the liquidation process, and which will ultimately be transferred (subject to further order of this Court) to the CRIS Account. The current value of the Morgan Account is $40,466,824.04.

83.    As authorized by this Court's Order [Doc. No. 2304], the Receiver purchased Treasury bills with funds in the Morgan Account. As of September 30, 2022, the Receiver held $29,968,796.90 worth of Treasury bills in the Morgan Account, with the balance held in savings, which as of September 30, 2022, paid interest at a rate of 3.00%. During the Compensation Period, the Treasury bills generated $74,020.10 in the form of interest payments and Morgan Stanley paid interest on the savings account in the amount of $46,303.60. Additionally, as of September 30, 2022, there were $31,566.50 in unrealized short-term gains on the Treasury bills.

K.    **Anticipated Closure**

---

during the Compensation Period. Accordingly, the Receiver omitted that transaction from the SFAR attached hereto as Exhibit A. However, because the reimbursement for the payment to Murtha Cullina LLP did not occur during the Compensation Period, the Receiver included that payment under line 10e on the SFAR so the SFAR would balance.

84.   At this time, it is premature for the Receiver to speculate as to when this receivership proceeding will be ready to close.

85.   In the Receiver's view, in accordance with the Appointment Order, the Receivership can be appropriately closed after (i) all appeals have been fully adjudicated, (ii) if and to the extent the Judgment is affirmed on appeal, distributions are made to satisfy the Judgment, and (iii) all costs of the administration of the Receivership are paid.

## V.   DESCRIPTION OF ASSETS OF THE RECEIVERSHIP ESTATE

86.   A description of the assets of the Receivership Estate, including approximate or actual valuations as of the end of the Compensation Period based on the information in the Receiver's possession, is attached hereto as **Exhibit E**. The anticipated disposition of these assets is reflected in the 2021 Liquidation Plan, as modified by this Court's Liquidation Order.

87.   At this time, the Receiver believes it is prudent to maintain this Court's asset freeze over the Receivership Assets to secure the Judgment to the greatest extent possible unless and until a liquidation process has been completed.

## VI.   SUMMARY OF RECEIVERSHIP ESTATE CLAIMS

88.   The Receiver is not aware of any existing or likely claims against the Receivership Estate other than (i) the Total Judgment; (ii) the Receiver and his professionals' fees and expenses; (iii) future claims for fees and expenses of professionals retained pursuant to the Appointment Order; (iv) the ordinary expenses incurred on account of the Receivership Assets (such as real estate taxes, property repairs, and other such routine expenditures); (v) potential tax obligations as may be determined by V&L and/or as may be ordered by this Court; and, (vi) such other disbursements from the Receivership Estate pursuant to the orders of this Court.

## VII.   SUMMARY OF THE RECEIVERSHIP ESTATE'S CAUSES OF ACTION

89.   Considering the limited scope of the Receiver's primary duties and given the historic value of the existing Receivership Assets, the Receiver has not to date undertaken to identify causes of action held by the Receivership Estate. Likewise, while the Judgement may be under-secured by the Receivership Estate, the Receiver does not intend to expend the limited resources of the Receivership Estate to identify potential causes of action unless and until such expenditures are necessary and/or as ordered by this Court.

## VIII.   THE GOVERNING LEGAL STANDARD

90.   "A receiver appointed by a court who reasonably and diligently discharges his duties is entitled to be fairly compensated for services rendered and expenses incurred." *SEC* v. *Byers*, 2014 U.S. Dist. LEXIS 177180, at *13 (S.D.N.Y. Dec. 23, 2014); *see also Donovan v. Robbins*, 588 F. Supp. 1268, 1272 (N.D. Ill. 1984) ("[T]he receiver diligently and successfully discharged the responsibilities placed upon him by this Court and is entitled to reasonable compensation for his efforts."); *Securities & Exchange Comm'n v. Elliott*, 953 F.2d 1560 (11th Cir. 1992) (receiver is entitled to compensation for faithful performance of his duties.).

91.   "The [D]istrict [C]ourt's award of a receiver's compensation is… firmly within its discretion." *Gaskill* v. *Gordon*, 27 F.3d 248, 253 (7th Cir. 1994), *citing Crites, Inc. v. Prudential Ins. Co.*, 322 U.S. 408, 418, 88 L. Ed. 1356, 64 S. Ct. 1075 (1944). This Court "may consider all of the factors involved in a particular receivership in determining the appropriate fee."  *Id*.

92.   The case law and other authority may provide "convenient guidelines," but ultimately "the unique fact situation renders direct reliance on precedent impossible." *Securities & Exchange Comm'n v. W.L. Moody & Co.*, 374 F. Supp. 465, 480 (S.D. Tex. 1974), *aff'd*, 519 F. 2d 1087 (5th Cir. 1975).

93.   In awarding counsel fees in Securities Act receiverships, courts consider "the complexity of problems faced, the benefits to the receivership estate, the quality of the work performed, and the time records presented." *SEC v. Illarramendi*, Docket No. 3:11CV78 (JBA), 2013 U.S. Dist. LEXIS 171950, at *8-9 (D. Conn. Dec. 5, 2013), *quoting Securities & Exchange Comm'n v. Fifth Ave. Coach Lines, Inc.*, 364 F. Supp. 1220, 1222 (S.D.N.Y. 1973); *see also United States v. Code Prods.*, 362 F.2d 669, 673 (3rd Cir. 1966) (court should consider the time, labor and skill required but not necessarily expended, the fair value of such time, labor and skill, the degree of activity, the dispatch with which the work is conducted and the result obtained).

94.   While "results are always relevant," a good result may take a form other than a "bare increase in monetary value."  *Elliott*, 953 F.2d at 1577 ("Even though a receiver may not have increased, or prevented a decrease in, the value of the collateral, if a receiver reasonably and diligently discharges his duties, he is entitled to compensation").  Overall results can be determined only at the conclusion of the Receivership Proceeding.

95.   Another "basic consideration is the nature and complexity of the legal problems confronted and the skill necessary to resolve them." *Moody*, 374 F. Supp. at 485.  Moreover, "[t]ime spent cannot be ignored." *Id.* at 483.

## IX.   THIS COURT SHOULD AWARD THE REQUESTED FEES AND EXPENSES

96.   Based on the foregoing, the Receiver, Z&Z, and V&L respectfully submit that the services for which they seek compensation in this 15th Application were reasonable and necessary for, and beneficial to, the orderly administration of the Receivership Estate.

97.   With the exception of agreeing to abide by the SEC Guidelines, the Receiver has not entered into any agreement, written or oral, express or implied, with any person or entity

concerning the amount of compensation paid or to be paid from the Receivership Estate, or any sharing thereof.

98.   As more fully set forth throughout this 15th Application and as detailed in the exhibits submitted herewith, the issues addressed by the Receiver and his counsel have been and continue to be numerous and in certain instances complex. The Receiver and his counsel respectfully submit that compensation for the foregoing services as requested is commensurate with the complexity, importance and nature of the problems, issues or tasks involved.  The Receiver and his counsel performed such professional services expediently and efficiently.

99.   Accordingly, the Receiver submits that the compensation requested herein is fair, reasonable and warranted in light of the nature, extent and value of such service to the Receivership Estate and all parties in interest.

## X.     SOURCE AND MANNER OF PAYMENT

100.  The Receivership Estate includes cash held in the Morgan Account sufficient to pay the fees and expenses sought in this 15th Application. The Receiver and Z&Z request that this Court enter an order directing the approved fees and reimbursed expenses to be paid from the Morgan Account, less the 20% holdback which shall be held in the Morgan Account pending this Court's further order as to the disposition of such funds.

**WHEREFORE**, Stephen M. Kindseth, Esq., Receiver, Z&Z, and V&L, respectfully request that this 15th Application be granted and that the Receiver and Z&Z be awarded an allowance of $101,852.11 in professional and paraprofessional fees and reimbursement of actual and necessary expenses in the amount of $893.62, subject to a 20% holdback applicable to fees for services, and V&L be awarded an allowance of $34,864.13 in professional fees; and grant such other and further relief as this Court deems just and proper.

Dated: November 16, 2022, at Bridgeport, Connecticut.

Respectfully submitted,

STEPHEN M. KINDSETH, ESQ.,
RECEIVER


 */s/ Stephen M. Kindseth*
Stephen M. Kindseth., Receiver (ct14640)


 */s/ Christopher H. Blau*
Christopher H. Blau (ct30120)
Zeisler & Zeisler, P.C.
10 Middle Street, 15th Floor
Bridgeport, CT  06604
Telephone: 203-368-4234
Facsimile: 203-549-0903
Email: cblau@zeislaw.com
His attorneys

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 16, 2022, a copy of the foregoing 15th Application was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System. Furthermore, a copy of the foregoing was sent via email to the Defendant, Iftikar A. Ahmed, at iftyahmed@icloud.com and i3siam@protonmail.com.  Finally, a copy of the foregoing was sent via email to the Relief Defendant Shalini Ahmed at shalini.ahmed@me.com.


 _/s/ Christopher H. Blau_
Christopher H. Blau (ct30120)