UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　*Plaintiff*,<br><br>　　　*v.*<br><br>IFTIKAR AHMED,<br><br>　　　*Defendant*, and<br><br>IFTIKAR ALI AHMED SOLE PROP; I-CUBED DOMAINS, LLC; SHALINI AHMED; SHALINI AHMED 2014 GRANTOR RETAINED ANNUITY TRUST; DIYA HOLDINGS LLC; DIYA REAL HOLDINGS, LLC; I.I. 1, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; I.I. 2, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; and I.I. 3, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents,<br><br>　　　*Relief Defendants*. | Civil No. 3:15-cv-675 (JBA)<br><br><br><br>December 2, 2022 |

**ORDER APPROVING WITH MODIFICATION RECEIVER'S PHASE 1 REPORT, DENYING MS. AHMED'S MOTIONS FOR A STAY AND TO FILE A SUR-REPLY, AND GRANTING RELIEF DEFENDANTS' JOINDER MOTION**

Following the Court's approval [Doc. # 2147] of the Receiver's Liquidation Plan, and pursuant to that plan, the Receiver has submitted his Phase 1 Report [Doc. # 2272] on the liquidation and moves [Doc. # 2280] for its approval and other relief necessary to commence Phase 2 of the liquidation. Plaintiff SEC supports [Doc. # 2310], with some minor modifications, the Receiver's motion. Defendant, Ms. Ahmed, and Relief Defendants all oppose [Doc. ## 2346, 2345, 2365] the Receiver's motion. Ms. Ahmed, joined by Relief

Defendants, has moved for a stay should the Court grant the Receiver's motion [Doc. ## 2368, 2370], so that she can appeal. Ms. Ahmed has also moved [Doc. # 2363] for leave to file a sur-reply to the Receiver's response.

For the following reasons, the Receiver's motion to approve the Phase I report is GRANTED with modification.[1]

## I.    Background

This enforcement action seeks to remedy ill-gotten gains Defendant acquired by defrauding Oak Investment Partners ("Oak"), Oak investment funds, and Oak investors. For a decade Mr. Ahmed worked as a partner at Oak, where he recommended and coordinated Oak Funds' investments in various companies. During that time, Mr. Ahmed also conducted his fraudulent scheme in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder, Section 17(a) of the Securities Act of 1933 ("Securities Act"), and Section 206 of the Investment Advisers Act ("Advisers Act"). *See SEC v. Ahmed*, 308 F. Supp. 3d 628, 636-37 (D. Conn. 2018) ("*Ahmed I*"). The underlying facts of this case are discussed in more detail in the Court's decision granting summary judgment on Defendant's liability [Doc. # 835].

The relevant procedural history is as follows. In May 2015, the SEC filed its complaint [Doc. # 1] against Defendant. At the SEC's request, the Court issued a temporary restraining order on May 7, 2015 [Doc. # 9] freezing assets allegedly derived from the fraud scheme. The SEC then filed an amended complaint and motion for a preliminary injunction to freeze additional assets [Doc. ## 27, 29], naming the Relief Defendants in addition to Defendant.

---

[1] Ms. Ahmed's motion [Doc. # 2363] to file a sur-reply to the Receiver's reply is DENIED. The Court previously stated [Doc. # 2320] that no sur-replies in response to the Phase 1 Report would be considered.

For the reasons given below, Ms. Ahmed's motion for a stay is DENIED, and Relief Defendants' joinder motion is GRANTED.

The court granted the preliminary injunction [Doc. # 113], freezing Defendant and Relief Defendants' assets believed to consist of or have been purchased with using illegally-obtained funds.

Thereafter, the Court granted summary judgment in favor of the SEC finding Defendant liable for violations of sections 206(1)-(4) of the Advisers Act, section 10(b) of the Exchange Act, and section 17(a)(1) of the Securities Act. *See Ahmed I*, 308 F. Supp. 3d at 673. The Court then awarded the Plaintiff SEC $62,920,639.00, which included disgorgement and a civil penalty but not pre-judgment interest or gains on the frozen assets. *SEC v. Ahmed*, 343 F. Supp. 3d 16, 39 (D. Conn. 2018) ("*Ahmed II*"). On December 14, 2018, the Court amended this judgment [Doc. # 1054] to include pre-judgment interest on the judgment until the commencement of the asset freeze and interest and gains on the frozen assets after the commencement of the freeze. Defendant appealed the Court's amended judgment. On March 11, 2021, pursuant to a request from the SEC, the Second Circuit remanded the case for determination of Mr. Ahmed's disgorgement obligation "consistent with § 6501 of the National Defense Authorization Act, and, if appropriate, entry of an amended judgment."[2] Motion Order, *Ahmed III*, No. 18-2903, ECF # 533. The Court accordingly reconsidered Mr. Ahmed's disgorgement obligation and on July 6, 2021, increased [Doc. # 2011] the disgorgement obligation by $22,251,007.04. Defendant and Relief Defendants have appealed this ruling, which remains pending. *See* Notice of Appeal, *SEC v. Ahmed*, No. 21-1686, ("*Ahmed IV*"), ECF # 1.6.

Concurrent with this litigation and appeals, the Court has taken steps to secure the assets and satisfy the judgment. In December 2018, the Court appointed a Receiver to value, maintain, and liquidate the frozen assets (hereinafter "Receivership Assets") to satisfy the judgment against Defendant. (Order Appointing Receiver ("Appointment Order") [Doc. #

---

[2] This provision of the NDAA expanded the statute of limitations for disgorgement in securities actions from five years to ten years and applied to any proceeding pending on or commenced on or after January 1, 2021.

1070].) In January 2022, the Court approved the Receiver's Liquidation Plan. (Liquidation Order [Doc. # 2147].) The Liquidation Plan was split into two phases, liquidating non-unique assets in Phase 1 and unique assets in Phase 2, to minimize the potential for irreparably disposing of unique assets that cannot be easily replaced. (*Id.*) At the same time that it approved the Liquidation Plan, the Court directed the Receiver to commence Phase 1 of liquidation. (*Id.* at 27.)

At the conclusion of Phase 1, the Receiver submitted his Phase 1 Report [Doc. # 2272]. According to the report, the estimated value of the judgment against Defendant is in excess of $125 million. (Phase 1 Report [Doc. # 2272] at 10.) Following completion of the Phase 1 liquidation, the Receivership Estate holds $97 million in cash and an estimated $21 million in other assets whose value the Receiver can readily ascertain, for a total of $118 million. (*Id.* at 9.)

## II.    Phase 1 Report

In evaluating the Phase 1 Report and parties' arguments, the Court again looks to the principles that guided it in approving the liquidation plan.

> First, the Court maintains broad authority to fashion remedies for violations of federal securities law. *See Official Comm. of Unsecured Creditors of WorldCom*, *Inc. v. SEC*, 467 F.3d 73, 81 (2d Cir. 2006). Second, the primary purpose of disgorgement is to ensure that those guilty of securities fraud are not unjustly enriched. *See SEC v. Wang*, 944 F.2d 80, 88 (2d Cir. 1991). Third, "[w]hen funds are limited, hard choices must be made" *Official Comm. of Unsecured Creditors*, 467 F.3d at 84 (internal citation and quotations omitted), and thus, "an equity plan is not necessarily one that everyone will like." *SEC v. Credit Bancorp, Ltd.*, No. 99 CIV. 11395 RWS, 2000 WL 1752979, at *29 (S.D.N.Y. Nov. 29, 2000).

(Liquidation Order at 7.)

Defendant, Ms. Ahmed, and Relief Defendants (collectively, "Defendants")[3] oppose both the Phase 1 Report, taking issue with the findings, decisions, and suggestions of the Receiver, and the liquidation process as a whole. (Def.'s Opp'n [Doc. # 2346] at 1-2; Ms. Ahmed Opp'n [Doc. # 2345] at 1-4; Relief Defs.' Opp'n [Doc. # 2365] at 1.) The SEC urges the Court to approve the Phase 1 Report, with some minor modifications (SEC Reply [Doc. 2310] at 4.) Most of Defendants' briefing revisits issues the Court has previously addressed. Defendants' new issues and or concerns specific to the Phase 1 Report are addressed below.

A.      **Impact of Marriage Dissolution Agreement**

Defendant and Ms. Ahmed maintain that their pending state court divorce proceeding, filed March 8, 2022, should halt the liquidation plan because the dissolution agreement will affect the ownership of assets.[4] (Def.'s Opp'n at 4-6; Ms. Ahmed's Opp'n at 4-6.) However, as the Court has previously explained, the receivership and liquidation plan do not purport to adjudicate the Ahmeds' divorce or any other related family law matters. (Order on Thirteenth and Fourteenth Fee Requests at 6.) Additionally, the Supreme Court has explained that the court "first assuming jurisdiction over property may exercise jurisdiction to the exclusion of other courts." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 818 (1976). This is particularly true "where property has been actually seized under judicial process before a second suit is instituted." *Princess Lida v. Thompson*, 305 U.S. 456, 466 (1939).[5]   Here, the divorce proceeding was begun three years after the Court appointed the Receiver. Finally, the Court has previously held that all Receivership

---

[3] Where the Defendants' positions are not consistent or where they have not all raised an objection, the Court refers to them individually by name.

[4] The SEC has moved for an order to show cause [Doc. # 2379] why Defendant and Ms. Ahmed should not be held in contempt for their efforts to use the dissolution agreement to assign and convey frozen assets.

[5] Unless otherwise indicated, this opinion omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.

Assets, regardless of alleged ownership, are available for liquidation.[6] (Liquidation Order at 14-15.)

## B.    Estimated Appreciation Award

For the period between the entry of the asset freeze and the entry of final judgment, the Receiver used the extrapolation method to estimate the asset appreciation award. (Phase 1 Report at 17-18.) The Receiver first determined the value of the Receivership Estate at the time of the asset freeze to be $73,407,248.67, then determined the subsequent percentage change in the value of the Estate from the freeze to when judgment was entered. (*Id.* at 14) The disgorgement award was then multiplied by that percentage, yielding the appreciation award. (*Id.*) For this calculation, the Receiver split the disgorgement award into two time periods and amounts, reflecting the court's two different judgment: the December 14, 2018 Amended Final Judgment [Doc. # 1054] and the July 6, 2021 Redetermined Final Judgment [Doc. # 2011], which was entered following remand from the Second Circuit. (Phase 1 Report at 18.) The Amended Final Judgment ordered Defendant to disgorge $41,920,639, pre-asset freeze pre-judgment interest, and appreciation from the pendency of the freeze to entry of judgment and imposed a $21,000,000 civil penalty. (Am. Final J. at 2.) The Redetermined Final Judgment imposed an additional $22,251,007.14 in disgorgement and additional pre-judgment interest and post-freeze appreciation on the new disgorgement amount. (Redetermined Final J. at 1.) The Receiver calculated the appreciation award for each judgment separately, using the individual entry date for each. (Phase 1 Report 14.)

---

[6] The Court previously gave Relief Defendants the opportunity to prove that they owned and controlled any particular assets in the Estate, which they declined to do. *Ahmed II*, 343 F. Supp. 3d at 32-36.

|  | Date Judgment Was Entered | Increase in the Value of the Receivership Estate From Freeze to Judgment | Appreciation Award |
|---|---|---|---|
| **Disgorgement Award** ($41,920,639.00) | 12/14/2018 | 21.46% | $8,996,044.21 |
| **Disgorgement Award** ($22,251,007.14) | 7/6/2021 | 63.85% | $14,208,035.44 |
| **Total** | | | $23,204,079.65 |
| **Total following adjustments in Receiver's Reply** | | | $20,412,242.80 |

The Phase 1 Report notes that this figure is an estimate because certain assets will require appraisals to accurately ascertain their value on the relevant dates. (Phase 1 Report at 14-16.) Additionally, in his reply, the Receiver further adjusts the appreciation award, agreeing with Defendants that certain assets were erroneously excluded from the initial valuation of the Estate or improperly quantified. The revised appreciation award figure is $20,412,242.80, which the Receiver will further refine in his Phase 2 report. (Receiver's Reply [Doc. # 2357] at 13-14.) The Phase 2 Report will also reflect any necessary offsets to the appreciation award. (Phase 1 Report at 8 n.7.)

Defendants disagree with the Receiver's proposed method of appraising assets, dispute the use of the extrapolation method to calculate the appreciation award, and argue that the Receiver incorrectly valued some of the assets in the Receivership Estate. (Def.'s Opp'n at 10, 19, 27-29; Ms. Ahmed Opp'n at 8-9, 17, 45-48; Relief Defs.' Opp'n at 9-12.) The SEC agrees with the use of the extrapolation method but suggests that some assets do not require appraisal to be valued. (SEC Reply at 5-6.)

### 1.    Appraisal of Assets

To arrive at a final valuation of the Receivership Estate, for the purpose of calculating the Appreciation Award, the Receiver proposes appraisals of assets that do not have a readily ascertainable historical value. (Phase 1 Report at 15.) The SEC believes that most of the jewelry and art has likely held its value during the freeze, and so should not require additional appraisals. (SEC Reply at 6.) Defendants appear to agree that these items have held their value. (Def.'s Opp'n at 10; Ms. Ahmed Opp'n at 17; Relief Defs.' Opp'n at 9.) However, absent stipulations by the parties that the assets have held their value, the Receiver believes appraisals should be performed. (Receiver Reply at 8 n.6.) The Receiver also states that he is in the process of identifying appraisers and submits that under the terms of the Appointment Order he does not need Court approval to retain them. (*Id.* at 16 n.20.) Ms. Ahmed disagrees, arguing that he should seek the Court's approval before hiring appraisers, and she should be allowed to approve any appraisers. (Ms. Ahmed Opp'n at 25.)

Absent formal stipulation from the parties that the jewelry and art assets have not changed in value during the freeze, appraisal is necessary. Further, the Receiver need not seek Court approval before retaining appraisers, as an appraisal is an expense in the ordinary course of the administration of the Receivership. (Appointment Order at 15.) Additionally, Ms. Ahmed will not be permitted to pre-approve the Receiver's choice of appraisers. The process outlined by Ms. Ahmed would unnecessarily slow the pace of liquidation and in the Receiver's view, would potentially result in a process that costs more than the appraisal itself. (Receiver's Reply at 8 n.6.)

### III.    Choice of Extrapolation Method

Defendants oppose the use of the extrapolation method, which they argue is contrary to the Court's prior orders and outside of the Court's jurisdiction because of Defendants' pending appeals. (Def.'s Opp'n at 19; Ms. Ahmed's Opp'n at 8-9; Relief Defs.' Opp'n at 9.) The SEC accepts the extrapolation method. (SEC Reply at 5-6.)

In the Liquidation Order, the Court determined that the appreciation award during the period of the asset freeze should be determined by the extrapolation method and explained that it has jurisdiction because the choice of method to ascertain the appreciation award is a clarification rather than a substantive change to the Court's order now on appeal. (Liquidation Order at 24-26.) *See United States v. Nichols*, 56 F.3d 403, 411 (2d Cir. 1995) (explaining that a court may "clarif[y]" its findings while an appeal is pending but may not substantively alter its judgment). Defendants have presented no reason to reconsider this ruling.

## IV.    Value of Receivership Estate

In addition to the adjustments to the Phase 1 estimate noted above, Defendants argue that the Receiver's calculation of the value of the Receivership Estate when the asset freeze went into effect has two other errors. First, Defendants argue that the Receiver erred in excluding the value of Defendant's forfeited Oak holdings from the value of the Estate. (Def.'s Opp'n at 27-28; Ms. Ahmed's Opp'n at 47-48; Relief Defs.' Opp'n at 11-12.) Second, Defendants dispute the Receiver's valuation of the Clues Network holdings, arguing that the Receiver erroneously valued these holdings as shares in Clues Network Inc. rather than shares in ShopClues. (Def.'s Opp'n at 29; Ms. Ahmed's Opp'n at 45-46; Relief Defs.' Opp'n at 9-10.) .

Defendants contend that because the Oak assets were not forfeited until after the freeze went into effect, they should be counted as part of the Estate as of the date of the freeze, and their forfeit should be recorded as a loss to the Estate, which would substantially reduce the appreciation award. Def.'s Opp'n at 27-28; Ms. Ahmed's Opp'n at 47-48; Relief Defs.' Opp'n at 11-12.) However, because Defendant does not own the forfeited Oak assets, *Ahmed II*, 343 F. Supp. 3d at 36-38, they are not part of the asset freeze (Order on Defendant's Motions for Modification of the Asset Freeze [Doc. # 829] at 5), and therefore not part of the Receivership Estate. (Appointment Order at 6.) Thus, because they are not part of the

9

Receivership Estate, they are properly excluded from the extrapolation calculation. (Liquidation Order at 24.)

Regarding the Clues Network assets, the Receiver asserts that the extrapolation calculation should use the value of Clues Network, Inc. to determine the value of Defendant's Clues Network, Inc. holding. (Receiver's Reply at 10-11). Defendants, however, argue that the value of ShopClues, which was significantly higher than that of Clues Network Inc. at the time the assets were frozen, should be used to value those assets because ShopClues is owned by Clues Network Pvt. Ltd., which is a wholly-owned subsidiary of Clues Network Inc. (Def.'s Opp'n at 29; Ms. Ahmed's Opp'n at 45-46; Relief Defs.' Opp'n at 9-10.) In making this argument, they describe the investment as an investment in ShopClues. (*Id.*) However, the Receivership Estate does not hold stock in ShopClues; it holds stock in Clues Network, Inc. Thus, the value of Clues Network, Inc. is the relevant one for the purposes of the extrapolation calculation.

### A.    Estimated Post-Judgment Interest

The Receiver has estimated the post-judgment interest as follows, using the above appreciation award calculation. (Phase 1 Report at 20). The interest rate was determined in accordance with the post-judgment interest statute, 28 U.S.C. § 1961(a), which states that post-judgment interest "shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment."

|  | Date Post-Judgment Interest Begins to Run | Post-Judgment Interest Rate | Amount of Post-Judgment Interest Through 6/30/22 |
|---|---|---|---|
| **Disgorgement Award** ($41,920,639.00) | 12/14/2018 | 2.70% | $4,256,668.26 |

| | | | |
|---|---|---|---|
| **Disgorgement Award** ($22,251,007.14) | 7/6/2021 | .08% | $19,047.40 |
| **Penalty** ($21,000,000) | 12/14/2018 | 2.70% | $2,132,363.33 |
| **Prejudgment Interest** ($1,491,064.01) | 12/14/2018 | 2.70% | $151,404.30 |
| **Prejudgment Interest** ($8,264,734.33) | 7/6/2021 | .08% | $7,074.81 |
| **Appreciation Award** ($8,996,044.21) | 12/14/2018 | 2.70% | $913,468.32 |
| **Appreciation Award** ($14,208,035.44) | 7/6/2021 | .08% | $12,162.42 |
| | | **Total** | $7,492,188.84 |

Defendants first argue that no post-judgment interest can accrue because the judgment has not yet been meaningfully ascertained and that the Receiver's use of a fixed interest rate to determine post-judgment interest violates the Second Circuit and this Court's prior orders. (Def.'s Opp'n at 20; Ms. Ahmed's Opp'n at 53-54; Relief Defs.' Opp'n at 12.) Defendants also argue that no interest should accrue during the period when the Court was considering the remand requested by the SEC and the Receiver erroneously included frozen assets when calculating post-judgment interest. (Def.'s Opp'n at 22-24, 30-35; Ms. Ahmed's Opp'n at 53-55; Relief Defs.' Opp'n at 12.) For the reasons that follow, the Court approves the Receiver's method of calculating post-judgment interest, recognizing that the figure is at this stage still an estimate.

### 1. Meaningful Ascertainment of Judgment

As with the appreciation award calculation, the Receiver's calculation of post-judgment interest splits the total judgment into two separate judgment awards: the December 14, 2018 Amended Final Judgment and the July 6, 2021 Redetermined Final Judgment (Phase 1 Report at 18.) The Receiver believes that post-judgment interest on the initial award should run from the date of the Amended Final Judgment, because "where the

original judgment is basically sound but is modified on remand, post-judgment interest accrues from the date of the first judgment." *Whelan*, 99 F.3d at 545 (quoting *Cordero v. De Jesus-Mendez*, 922 F.2d 11, 16 (1st Cir. 1990)). Because the additional judgment amount was not "ascertained in a meaningful way" until the Redetermined Final Judgment, the Receiver argues that interest on the additional judgment amounts should begin to run on the date the redetermination was issued. *Westinghouse Credit Corp. v. D'Urso*, 371 F.3d 96, 104 (2d Cir. 2004). The SEC agrees with the Receiver's approach. (SEC Reply at 7.)

Defendants argue that the judgment has not been meaningfully ascertained as to the appreciation award amounts because the Receiver's interest/gains calculations are estimates, and so no post-judgment interest should accrue. (Def.'s Opp'n at 23-24; Ms. Ahmed's Opp'n at 53-54; Relief Defs.' Opp'n at 12.) However, meaningful ascertainment of the judgment occurs not when the numeric figure of the judgment is ascertained but when the judgment is entered. *See Hubbard v. Total Commc'ns, Inc.*, 623 F. Supp. 2d 270 (D. Conn. 2009) (describing the majority rule within this district and across Circuits that post-judgment interest begins to accrue from the date that the plaintiff is entitled to the judgment rather than the date the judgment is quantified). Furthermore, neither of the Court's judgments has been vacated or otherwise found to be legally insufficient. *See D'urso*, 371 F.3d at 104 ("Where the judgment on damages finds no support in the evidence, it may not be said that damages have been ascertained in a meaningful way. Where a judgment is vacated because it lacks a legal basis or requires further factual development, the vacated award should be treated as a nullity and post-judgment interest therefore accrues from the entry of judgment on remand.")

Defendants further argue that the Receiver's use of two separate judgment dates is erroneous, and the entire judgment was meaningfully ascertained on the date of the Amended Final Judgment, with the Redetermined Final Judgment merely amending that judgment. (Def.'s Opp'n at 23-24; Ms. Ahmed's Opp'n at 53-54; Relief Defs.' Opp'n at 12.) The

12

Amended Final Judgment meaningfully ascertained only the disgorgement award contained in that judgment. The Redetermined Final Judgment put in place a separate award stemming from a separate period of violations by Defendant. (*See* Redetermination of Def.'s Disgorgement Obligation at 4-5 [Doc. # 1997] (explaining that the judgment was redetermined to add additional damages in light of changes to the statute of limitations for disgorgement).) The Receiver's division of the post-judgment interest periods appropriately reflects the separate nature of these two judgments.

### a.  Post-Judgment Interest Rate

Defendants contest the Receiver's use of fixed interest rates to calculate post-judgment interest. (Def.'s Opp'n at 32, Ms. Ahmed Opp'n at 9, Relief Defs.' Opp'n at 12.) Defendants rely on *Razmilovic*, 738 F.3d at 36-37, where the Second Circuit held that when frozen assets are turned over to satisfy disgorgement award, a securities law violator is also liable for the actual interest accrued on the frozen assets during the period between the beginning of the freeze and entry of the judgment. This Court then applied *Razmilovic* to conclude that Defendant is liable for the actual pre-judgment appreciation award on the frozen assets used to satisfy the disgorgement award. (Supp. Ruling on Remedies [Doc. # 1051] at 5; Am. Final J. [Doc. # 1054] at 4.) However, neither *Razmilovic* nor the Court's prior rulings are relevant to post-judgment interest, which is mandatory and set at a fixed rate by statute.[7] *See Lewis v. Whelan*, 99 F.3d 542, 545 (2d Cir. 1996); 28 U.S.C. § 1961(a) ("Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment.").

---

[7] For the same reason, Defendants' arguments that *Razmilovic* should be read to prohibit post-judgment interest on the appreciation award are unavailing. (Def.'s Opp'n at 35; Ms. Ahmed's Opp'n at 54; Relief Defs.' Opp'n at 12.)

**b.**     **Inclusion of Remand Period When Calculating Post-Judgment Interest**

Defendants argue that because the SEC requested the remand from the Second Circuit, no post-judgment interest should accrue during the period the case was remanded to this Court. (Def.'s Opp'n at 30; Ms. Ahmed's Opp'n at 51; Relief Defs.' Opp'n at 12.) They argue that accrual of interest for that period would unfairly penalize them for a delay caused by the SEC. (*Id.*)

The Court views including the remand period as proper. As the Tenth Circuit explained in *Wheeler v. John Deere Co.*, 986 F.2d 413, 415 (10th Cir. 1993), § 1961 "is both mandatory and broad." It held that post-judgment interest was applicable even when the plaintiff appealed the case, explaining that in addition to the language of the statute, denying post-judgment interest would "penalize [the plaintiff] for pursuing his right to appeal." *Id.* at 416. The same is true here. In addition to the mandatory language of § 1961, removing the remand period would penalize the SEC for exercising their appeal right.

**2.**     **Inclusion of Frozen Assets and Receivership Estate Assets in Post-Judgment Interest Calculation**

Defendants argue that no post-judgment interest should accrue on frozen assets. (Def.'s Opp'n at 32-34; Ms. Ahmed's Opp'n at 50; Relief Defs.' Opp'n at 12.) In support of this argument, Defendants argue that the interest specified by § 1961 should only accrue on assets that Defendants have use of. However, as discussed above, post-judgment interest is mandatory without exceptions. Additionally, the purpose of post-judgment interest is not to ensure that Defendants do not receive a windfall from their use of their ill-gotten gains, but to "compensate the successful plaintiff for being deprived of compensation for the loss from the time between the ascertainment of the damage and the payment by the defendant." *Kaiser Aluminum $ Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835-836 (1990). Courts have accordingly applied post-judgment interest to assets that are frozen. *See Spin Master Ltd. v.*

*Alan Yuan's Store*, 325 F. Supp. 3d 413, 425 (SDNY 2018) (granting post-judgment interest where defendant's assets were frozen before judgment and remained frozen after judgment).

Defendant also argues that no post-judgment interest should accrue after the establishment of the Receivership, because the Receivership is akin to placing the assets in a CRIS account, which halts post-judgment interest. (Def.' Opp'n at 33-34.) Defendant's argument misunderstands the nature of the Receivership and liquidation process. The Receiver's role is to guard the assets of the Receivership Estate and liquidate assets, placing the proceeds of liquidation in a CRIS account for the purpose of satisfying the judgment. (Appointment Order at 5; Liquidation Order at 6-7.) The Receiver will not himself make payments in satisfaction of the judgment to Plaintiff. However, the purpose of a CRIS account is to make such payments, "reliev[ing] a party who holds a contested fund from responsibility for disbursement of that fund among those claiming some entitlement thereto." *Alstom Caribe, Inc. v. Geo. P. Reintjes Co.*, 484 F.3d 106, 113 (1st Cir. 2007).

### B.     Taxation Issues

Included in the Phase 1 report is Verdolino & Lowey's ("V&L") tax report, which comprehensively addresses current tax issues related to the Receivership Estate. Specific issues raised by Defendants related to taxation are discussed below.

### 1.        Establishment of a Qualified Settlement Fund

V&L concluded that the Court's issuance of the liquidation order gave rise to a Qualified Settlement Fund (QSF), a tax designation which is defined below, and the assets included in the liquidation order were subject to a "deemed sale" for tax purposes.[8] (Ex. A

---

[8] Pursuant to 26 C.F.R. § 1.468B-3(a)(1):

> [a] transferor must treat a transfer of property to a qualified settlement fund as a sale or exchange of that property for purposes of section 1001(a). In computing the gain or loss, the

([Doc. # 2272-1] at 4-10.) Defendants disagree with V&L's conclusion that the Court's liquidation order [Doc. # 2147] gave rise to a QSF and urge the Court to reject V&L's report. (Def.'s Opp'n at 35-38; Ms. Ahmed Opp'n at 11-12; Ms. Ahmed Ex. 1 at 15-19; Relief Defs.' Opp'n at 7-9.) Defendants argue that the creation of the Receivership and the Liquidation order do not meet the requirements of the QSF regulations because Defendants did not assent to the creation of a QSF, a QSF was not explicitly and affirmatively created, there are ongoing appeals in this case, and Defendants remain the legal owners of all assets in the Receivership Estate. (*Id.*) The SEC does not object to V&L's analysis.

A QSF is established when a fund, account, or trust meets the following criteria:

> (1) It is established pursuant to an order of, or is approved by, the United States . . . or any agency or instrumentality (including a court of law) of any of the foregoing and is subject to the continuing jurisdiction of that governmental authority;
>
> (2) It is established to resolve or satisfy one or more contested or uncontested claims that have resulted or may result from an event (or related series of events) that has occurred and that has given rise to at least one claim asserting liability . . . [a]rising out of . . . violation of law . . . ; and
>
> (3) The fund['s] . . . assets are . . . segregated from other assets of the transferor (and related persons).

26 C.F.R. § 1.468B-1(c).

The requirements of the QSF regulation are fulfilled by the Court's appointment and liquidation orders. The governmental order or approval requirement is satisfied "when the authority issues its initial or preliminary order to establish, or grants its initial or preliminary approval of, the fund, account, or trust." 26 C.F.R. § 1.468B-1(e)(1). The Court's order appointing the Receiver with authority to  and creating the Receivership Estate constituted

---

amount realized by the transferor is the fair market value of the property on the date the transfer is made (or is treated as made under § 1.468B-1(g)) to the qualified settlement fund.

the creation of a trust. *See Rob Evans & Assocs., LLC v. United States*, 9 F. Supp. 3d 165, 166-167 (D. Mass. 2014) (finding that the court's appointment of a Receiver with the power to manage, control, and liquidate defendants' property created a constructive trust for the purposes of the order or approval requirement). The Appointment Order and Liquidation Order fulfill the "resolve or satisfy requirement" as well. 26 C.F.R. § 1.468B-1(f)(1). The Appointment Order contemplates the liquidation of assets in the Receivership Estate for placement in a CRIS account in satisfaction of the judgment against Defendant for his violations of the law. (Appointment Order at 15.) The Liquidation Order then approved liquidation "to satisfy a disgorgement award and civil penalty which this Court ordered." (Liquidation Order at 10.) This function is not altered by the pendency of appeals in this case, since the QSF regulations contain no requirement prohibiting appeals from being taken following the creation of a QSF. *See* 26 C.F.R. § 1.468B-1(e)(1) (stating that the governmental order or approval requirement is met "even if that order or approval may be subject to review or revision"). Finally, the segregation requirement is met by the fact that none of the assets in the Receivership Estate are held in accounts that contain non-Estate funds, and the Liquidation order states that "Defendant and Relief Defendants shall have no authority with respect to the Receivership Estate's assets." (Liquidation Order at 6.) *See* 26 C.F.R. § 1.468B-1(h)(1) ("[A] fund, account, or trust satisfies the requirements of paragraph (c)(3) of this section if its assets are physically segregated from other assets of the transferor.") There is no requirement that actual ownership of the assets change hands.

Transferor assent is not required to create a QSF. *See U.S. v. Brown*, 348 F.3d 1200, 1208-09 (10th Cir. 2003) (finding that a QSF need not be created by stipulation or settlement of all parties). The QSF regulations explicitly contemplate the transfer to a QSF being made by someone other than the transferor, and the only approval required by the regulation is the approval of a governmental authority. 26 C.F.R. §§ 1.468B-1(c)(1), 1.468B-1(d)(1), 1.468B-3(a)(1). Likewise, the regulation does not require that any action be taken to

affirmatively declare the creation of a QSF, instead turning solely on whether a fund meets the requirements set forth in the regulation. 26 C.F.R. §§ 1.468B-1(l) (giving examples illustrating the rules of QSFs, none of which mention explicit declarations that a QSF is being established).

V&L further opines that the establishment of the QSF on the date of the liquidation order created a "deemed sale" for tax purposes.[9] 26 C.F.R. § 1.468B-3(a)(1). Defendants argue that no deemed sale occurred because such a sale would be tax-inefficient and transfer assets in violation of the asset freeze. (Def.'s Opp'n at 50-51; Ms. Ahmed Ex. 1 at 21-22; Relief Defs.' Opp'n at 7.) While the deemed sale may result in unfavorable tax liabilities for Defendants, there is no requirement that QSFs be tax-efficient. *See Kelly Capital, LLC v. S & M Brands, Inc.*, 532 Fed. App'x 442, 424 (4th Cir. 2014) (noting that the QSF designation of escrowed funds in which the transferor retains an interest in investment income and reversionary interest results in double-taxation, which is consistent with the regulations). Furthermore, a "deemed sale" does not affect the actual ownership of assets, and thus does not violate the asset freeze.[10] *Brown*, 348 F.3d at 1215 (explaining that whether or not someone is considered the owner of assets for tax purposes is unrelated to true ownership).

### 2. Receiver's Liability for Defendants' Taxes

Defendants continue to argue that the Receiver is responsible for payment of all of Defendant and Ms. Ahmed's personal income taxes from 2015 on. (Def.'s Opp'n at 44-46; Ms. Ahmed Ex. 1 at 24-25; Relief Defs.' Opp'n at 7.) The Receiver believes that this issue need not be resolved at this stage of the liquidation proceedings. (Receiver's Reply at 29-30.) The Court agrees with the Receiver that this issue can be appropriately addressed in Phase 2 of

---

[9] The regulations state that "[a] transferor must treat a transfer of property to a qualified settlement fund as a sale or exchange of that property" for the purpose of income taxes, which is known as a "deemed sale." 26 C.F.R. § 1.468B-3(a)(1).

[10] The same reasoning applies to Defendants' objection to post-judgment interest running after the deemed sale. (Def.'s Opp'n at 37; Ms. Ahmed's Opp'n at 54; Relief Defs.' Opp'n at 12.)

the liquidation because due to the projected shortfall between the liquidation proceeds and the estimated judgment, Phase 2 of the liquidation plan is necessary regardless of whether the Receiver is responsible for Defendants' taxes.

### 3.  Notification Regarding Tax Refunds

The Receiver requests that the Court require Defendants to promptly alert him if they receive any tax refund and hold such refunds securely pending instruction from the Receiver or the Court. (Phase 1 Report at 49.) The Receiver also requests that the Court require Defendants to promptly alert the Receiver to any potential tax refunds should they file tax returns or amended returns that would entitle them to a refund. (*Id.*) The SEC further requests that the Court direct the Receiver to determine whether the IRS can notify the Receiver directly about any requests for tax refunds. (SEC Reply at 5.) Because these requests will facilitate the execution of the Receiver's responsibilities, the Court will require such notification from Defendants and directs the Receiver to make inquiries to the IRS, which will ensure that issues related to the refunds can be properly addressed if they arise.

### C.  Liquidation of Unique Assets in Phase 2

Consistent with the Receiver's conclusion that the value of the non-unique assets will not be sufficient to satisfy the final judgment amount, in the Phase 1 report the Receiver proposes to liquidate unique assets in Phase 2, beginning with the following assets. (Phase 1 Report at 26.)

| Asset | SEC. No. |
|---|---|
| MetLife Whole Life Insurance Policy | 25 |
| Apartment 12A at 530 Park Ave., New York, NY | 63 |
| Apartment 12F at 530 Park Ave., New York, NY | 66 |
| Painting – M.F. Husain, "Ashoka's Pillar" | 51 |
| Harry Winston Diamond Ring | 52 |
| Non-Standard Coins in Safe Deposit Boxes | 53 |
| Other Jewelry | 54, 55, 56 |
| Remaining Items in Safe Deposit Boxes | 60 |

| | |
|---|---|
| Paintings (2) | 82 |
| Sculpture of Hand | 83 |
| Harry Winston Earrings | 84 |
| Hermès Purse | 85 |

(*Id.*) Other assets cannot be as easily liquidated, and the Receiver proposes to separately seek the Court's approval of plans to liquidate those assets. (*Id.* at 26-27.)

| Asset | SEC. No. |
|---|---|
| Genworth Life and Annuity Insurance Policy | 26 |
| American General Life Insurance Policy | 27 |
| Interest in The Essell Farm, LLC | 18 |
| Ribbit Capital, LP Interest | 19 |
| Ribbit Capital II, LP Interest | 20 |
| Qoo10 Pte. Ltd. Interest | 21 |
| Crypto Currency Partners, LP Interest | 23 |
| iMENA/Desert Wind Technologies, LLC Interest | 24 |
| Playsino, Inc. Interest | (none) |
| Non-Forfeited Interests in OMC-affiliated entities | (none) |

## 1.    Availability of Unique Assets for Liquidation

Defendants oppose the liquidation of the unique assets as well as the Receiver's proposed order of liquidation, arguing that liquidation is not appropriate until the final judgment is determined, that the unique assets are not clearly owned by Defendant and that Ms. Ahmed and Relief Defendants will be prejudiced by the liquidation of the unique assets, which cannot be returned to them if the Second Circuit alters aspects of the judgment. (Def.'s Opp'n at 3-18; Ms. Ahmed's Opp'n at 14-18; Relief Defs.' Opp'n at 3-4.) They maintain that the Receiver should investigate the status of other assets before liquidating the unique assets. (*Id.*) The SEC urges approval of the liquidation of unique assets and castigates Defendants' attempts to prolong litigation and relitigate already decided issues. (SEC Reply at 12, 14-15.)

The availability of unique assets for liquidation has been addressed by the Court, which has repeatedly stated that all Receivership Assets are available for liquidation. (*Ahmed II*, 343 F. Supp. 3d at 39; Liquidation Order at 15.) Significantly, the Court previously gave Relief Defendants the opportunity to prove that they owned and controlled any particular assets in the Estate so they could be removed, which they declined to do. (*Ahmed II*, 343 F. Supp. 3d at 32-36; *Id.* at 15-16.)

The Court has also already addressed Defendants' argument that the Receiver should liquidate other unique assets before the jewelry, art, real estate, and insurance assets that the Receiver seeks to liquidate first. (*See*, *e.g.*, Def.'s Opp'n at 7, 14-15.) In the liquidation order, the Court split the liquidation into two phases "to balance the primary consideration of satisfying the judgment against secondary considerations such as harm to Relief Defendants." (Liquidation order at 21.) Nothing in the order requires additional sequencing, nor has any significant benefit been shown that would outweigh the efficiency and logic of this plan. The Phase 1 report concludes that the value of all remaining assets is likely to be less than the final judgment amount, This means that any further sequencing of the liquidation process as Defendants request would not avoid any unnecessary liquidation. (Phase 1 Report at 10.)

### 2.    Procedures for Liquidation of Unique Assets

#### a.    Jewelry and Art

The Receiver requests that the Court approve his plan to liquidate the Estate's jewelry, accessory, and art assets in accordance with 28 U.S.C. § 2004, which states that "[a]ny personalty sold under any order or decree of any court of the United States shall be sold in accordance with section 2001 of this title, unless the court orders otherwise." (Phase 1 Report at 37, 50.) Under § 2004, "courts have discretion regarding the procedures used to consummate a court-ordered sale of personal property." *SEC v. Amerindo Investment Advisors*, No. 05-cv-5231, 2016 WL 10826483, at *4 (S.D.N.Y. Apr. 26, 2016). The Receiver

argues that the procedures of § 2001, which requires a courthouse sale are "archaic," *Pennant Mgmt. v. First Farmers Fin., LLC*, Docket No. 14-cv-7581, 2015 WL 5180678, at *25 (N.D. Ill. Sep. 4, 2015), and unlikely to appeal to the majority of prospective buyers who are not accustomed to purchasing items through such a process, thereby limiting the audience of possible buyers. (Phase 1 Report 38.) Additionally, § 2001 would require marketing, finding a stalking horse, and publishing notice for each item of property, a process that he submits is inefficient. (*Id.*) He instead proposes to appraise each item and put the items up for auction with Nest Egg, a local private auction house, that will then market the items. (Phase 1 Report at 38-39.) The auction house can accept competitive live, telephone, and in-person bids, maximizing the pool of possible buyers. (*Id.* at 39.) For appraisal, the Receiver plans to use Betteridge, a local jewelry store, and Katherine Yellen Antique and Fine Art Appraisals, seeking one appraisal for each item. (*Id.* at 40.) The SEC has no objections to the Receiver's plan. (SEC Reply at 13.)

Ms. Ahmed objects to this proposal to the extent it differs from the procedures of § 2001. She argues that the Receiver's auction plan will not maximize the value of the assets because there is no clear market value for the items, the marketing plan is not sufficiently extensive, and Nest Egg is not equipped to handle high-value sales (Ms. Ahmed Opp'n at 21-22, 24-25.) She also argues the Court should have briefing from the parties and final approval over each sale before it is completed. (*Id.* at 24.)

The Court sees no reason why the Receiver's outlined process would not maximize the value of these assets. The Court agrees that the procedures of § 2001 are outdated and ill-suited to the sale of many smaller items rather than large, singular items such as property. Requiring parties' briefing before the close of sales could likewise reduce the pool of interested buyers. As to the appraisal process, additional appraisals beyond those from the designated appraiser would constitute an unnecessary expense for the Receivership Estate, since the appraisals will not determine the actual sale price of any of the items. For the same

reason, Ms. Ahmed's objection to the use of Betteridge is misplaced.  However, the Receiver

will prohibit Betteridge from bidding on any of the items. (Receiver Reply at 21.) As to the

use of Nest Egg, while it is not a nationally known auction house, its fees are substantially

lower than the fees of such auction houses, thereby maximizing the gains of the auction.

(Phase 1 Report 42-43.)

### b.     Apartments

The Phase 1 report also proposes a procedure to sell the two New York City

apartments. (Phase 1 Report at 30.) The Receiver suggests that the private sale procedure

outlined in 28 U.S.C. § 2001(b) be followed: if deemed in the best interest of the Receivership

Estate after the court hearing, the Receiver shall proceed with the sale with the assistance of

a real estate broker. (*Id.* at 30-31.)

> The Receiver shall promptly move to retain a real estate broker to assist in the marketing and sale of the Apartments and such motion shall include a copy of the proposed listing agreement with the proposed real estate broker.

> Upon this Court's authorization and approval of the sale of the Apartments at the Apartment Hearing, the Receiver shall proceed to act in accordance herewith.

> The Receiver shall obtain appraisals of Apartment 12A and Apartment 12F from three disinterested persons. Promptly upon his receipt of such appraisals, the Receiver shall file notice of them with a copy of each of them with this Court.

> Utilizing the appraisals in conjunction with guidance from the Receiver's approved real estate broker, the Receiver shall determine the initial listing price for the Apartments.

> With the assistance of the real estate broker, the Receiver shall then market the Apartments as customary for similar properties in New York City.

> Upon the receipt of an offer to purchase one of the Apartments that (i) the Receiver determines to represent the highest and best offer under the circumstances and (ii) is no less than two-thirds of the appraised value of the property, the Receiver shall

enter into a Purchase and Sale Agreement (the "PSA") with the buyer (the "Stalking Horse") explicitly conditioned upon the approval of this Court and subject to higher and better offers but otherwise on terms and conditions determined by the Receiver in the exercise of his business judgment as in the best interest of the Receivership Estate and consistent with this Court's orders.

Promptly upon entering into the PSA, the Receiver shall (i) file the PSA with this Court and (ii) cause the terms of the accepted offer to be published as a notice (the "Notice") in a newspaper of general circulation.

If an entity (a "Notice Buyer") comes forward following the publication of the Notice and offers at least 10% more than the price offered by the Stalking Horse, the Receiver shall promptly engage in good faith negotiations with the Stalking Horse and Notice Buyer(s) to obtain the highest and best offer as determined by the Receiver in the exercise of his business judgment as in the best interest of the Receivership Estate, subject to this Court's approval.

Promptly after either (i) the tenth calendar day following publication of the Notice (if no Notice Buyer comes forward) or (ii) the Receiver concludes his negotiations with the Stalking Horse and Notice Buyer(s) and such successful buyer and the Receiver have entered into a corresponding PSA, the Receiver shall file a motion (the "Sale Motion") with a copy of the operative PSA asking this Court to authorize and confirm the sale on such terms and conditions to either the Stalking Horse or the Notice Buyer and seeking other, related relief.

If this Court grants the Sale Motion and authorizes and approves the sale proposed in the Sale Motion, the Receiver shall take such steps as necessary and appropriate to conclude the transaction with the Stalking Horse or Notice Buyer.

(*Id.* at 30-32 (internal numbering omitted).) Defendants argue that selling the apartments would not be in the best interest of the Receivership Estate, when they could instead be retained and rented, and the sale would create significant tax liabilities for Defendants. (Def.'s Opp'n at 13-14; Ms. Ahmed Opp'n at 34-35; Relief Defs.' Opp'n at 7.) They also oppose

the Receiver's proposed process.[11] (*Id.* at 35-37.) The SEC agrees with the Receiver's plan and urges the Court to schedule a hearing on whether a private sale is in the best interest of the Estate as soon as practicable. (SEC Reply at 12.)

The Court agrees with the Receiver's plan for liquidating the apartments. The 28 U.S.C. § 2001(b) procedure outlined by the Receiver is appropriately calibrated to maximize the sale price. As discussed above, the alternative, a public sale at the courthouse under 28 U.S.C. § 2001(a), is likely to deter buyers due to the unusual nature of the sale and mandatory four-week notice period. (Phase 1 Report at 29.) The stalking horse method and the floor set by the appraisals, however, appear likely to maximize the value of the apartments. The Court will accordingly schedule a hearing on the merits of a private sale. To the extent Ms. Ahmed continues to oppose such a sale, she can share her objections then.

### c.    MetLife Insurance Policy

The MetLife policy is a life insurance policy with a cash surrender value of $1.3 million. (Phase 1 Report at 28.) The Receiver proposes to surrender the policy for its cash value. (*Id.*) The SEC supports this plan. (SEC Reply at 14.) Defendants oppose this plan, arguing that the policy is irreplaceable, the policy is for the benefit of Defendant's minor children, and Second Circuit precedent and Connecticut law give precedence to the beneficiaries of life insurance policies over creditors. (Def.'s Opp'n at 11-13; Ms. Ahmed Opp'n at 26-29; Relief Defs.' Opp'n at 5-6.)

Defendants are correct that "[t]he beneficiary of any life insurance policy, being a person other than the insured, whether named as beneficiary in the original policy or subsequently named as beneficiary in accordance with the terms of the policy, shall be

---

[11] Specifically, they argue that notification of the hearing on the use of the private sale procedure via CM/ECF is insufficient, the Receiver should be required to get market value assessments as well as appraisals, two-thirds of the appraised value is too low, and objects to the Receiver's suggested broker, arguing that her broker should be used instead. (Def.'s Opp'n at 13-14; Ms. Ahmed Opp'n at 35-37; Relief Defs.' Opp'n at 7.)

entitled to the proceeds of the policy as against the representatives or creditors of the insured," Conn. Gen. Stat. § § 38a-453. However, the children are not the beneficiaries of the policy; the Family Trust is the beneficiary (Defendant's Resp. to Proposed Liquidation Plan [Doc. # 2065] at 17), and the Court has determined that the Family Trust is held by Defendant with the Relief Defendants as nominee owners. (Liquidation Order at 21.) Thus, Defendant is both the insured and the beneficiary of the policy, and the policy is available to satisfy the judgment. *See Ahmed II*, 343 F. Supp. 3d at 25 n.21 (finding that the Family Trust can be used to satisfy a judgment against Defendant). The Receiver is accordingly authorized to surrender the policy.

### D.      CRIS Transfer and Reserves

In an effort to limit post-judgment interest, the Receiver proposes to transfer the maximum amount possible of the Receivership Estate's current cash assets, less the reserves outlined below, to the CRIS account. (Phase 1 Report at 21-22.) This transfer will halt the accrual of post-judgment interest.

| | |
|---|---|
| Current cash Receivership Estate assets | $97,018,506.71 |
| Reserve for Receivership expenses | -$1,840,000 |
| Tax Reserves | -$43,000,000 |
| Reserve for other distributions ordered by the Court | -$2,863,945.03 |
| Proposed CRIS transfer amount | $49,314,561.68 |

In opposition, Defendants argue that Relief Defendants are the owners of the funds that would be transferred, that the transfer to a CRIS account would not be reversible, that no post-judgment interest should accrue beyond the date of the deemed sale, and that it would be more financially advantageous to keep the funds in an investment account because of the lower fees charged. (Def.'s Opp'n at 36-38; Ms. Ahmed Opp'n at 60-63; Relief Defs.' Opp'n at

12.) The SEC does not oppose the transfer to a CRIS account, although they disagree with some of the Receiver's proposed reserves, detailed further below. (SEC Reply at 7.)

The Court has already addressed all of Defendants' objections to the CRIS account transfer, except their objection that it is more financially beneficial to keep funds out of the CRIS account. This argument is premised on Defendants' misplaced assertion that no post-judgment interest is accruing. The fees charged on funds deposited in the CRIS account are lower than the post-judgment interest rates, so it is prudent to make the transfer to a CRIS account and halt the accrual of post-judgment interest. (Phase 1 Report at 22-23.) The Court therefore directs the Receiver to transfer $49,416,378.55 to the CRIS account, as detailed below.

| | |
|---|---|
| Current cash Receivership Estate assets | $97,018,506.71 |
| Reserve for Receivership expenses | -$1,840,000 |
| Tax Reserves | -$43,000,000 |
| Reserve for other distributions ordered by the Court | -$2,762,128.16 |
| Proposed CRIS transfer amount | $49,416,378.55 |

### a.    Reserves

The Receiver proposes a reserve of $1,840,000 for Receivership expenses, premised on the fact that the Estate has had approximately $460,000 in annual expenses since the Court appointed the Receiver. (Phase 1 Report at 22.) Neither the SEC nor Defendants oppose this reserve. The Court accordingly approves a reserve of $1,840,000 for Receivership expenses, and directs the Receiver to file motions reducing this amount should the sale of unique assets reduce the Receivership's expenses.

The Receiver also proposes a reserve of $43,000,000 for taxes. (Phase 1 Report at 23-24.) This reserve is intended to cover taxes from the deemed sale of QSF assets, which V&L

has advised is the responsibility of Defendants, not the Receivership Estate, and the potential personal tax liability of the Receiver due to Defendants' amended tax returns, both state and federal. (*Id.*) Defendants dispute the Receiver's argument that the taxes are their responsibility, arguing that the Receiver is responsible for the payment of taxes on all income since the asset freeze. (Def.'s Opp'n at 44-48.) The SEC does not object to this reserve. (SEC Reply at 8.) As the Receiver points out, the entity responsible for paying Defendants' tax liability does not need to be identified for liquidation to proceed. (SEC Reply at 30.) The Court therefore approves this reserve and directs the Receiver to continue to engage with tax authorities about this issue. Additionally, should it become clear that any taxes owed are less than this reserve, the Receiver is directed to seek the Court's authorization to transfer excess funds to the CRIS account.

Finally, the Receiver has proposed a reserve of $2,863,945.03 for other distributions that have been and may be ordered by the Court, including attorneys' fees provisionally approved by the Court, attorneys' fees the Court directed the Receiver to pay, and Relief Defendants' living expenses. (Phase 1 Report at 24.) Defendant and Ms. Ahmed argue that this reserve should be larger, to include fees for other attorneys for whom the Court has not approved compensation, an additional $1,118,000 for the upkeep of the home, and further reserves for any additional distributions the Court may order in the future. (Def.'s Opp'n at 40-41; Ms. Ahmed Opp'n at 56-60.) Relief Defendants argue that there should be a specific reserve for Murtha Cullina's fees. (Relief Defs.' Opp'n at 2-3.) The SEC opposes any reserve for non-Receivership Estate expenses. (SEC Reply at 9.) The SEC argues that two of the attorneys' fees payments specified by the Receiver, $1,021,000 for Harris St. Laurent & Wechsler LLP and the $135,894.79 remaining from Jenner & Block's fee cap, were expressly conditioned on there being excess funds after liquidation, and it now seems that the judgment is significantly under-secured. (*Id.* at 9-11.) The SEC further notes that the Court's authorization for the release of funds for Defendant's appellate and arbitration counsel

specified authorization could be terminated if the release of such funds would risk the security of the judgment. (*Id.* at 9-10.) The SEC also opposes any reserve for living expenses, arguing that the Court should stop releasing funds for living expenses at the end of this year because Ms. Ahmed has some source of external funds and still has not obtained gainful employment despite the direction of the Court. (*Id.* at 11.)

While there is likely to be a significant shortfall between the Receivership's Estate and the final judgment, the Court approves a reserve for attorney's fees.  As the SEC notes, the Court's approval of attorneys' fees was conditioned on the existence of excess funds after the payment of the judgment.[12]  However, as neither the final judgment nor the final value of the receivership assets has been obtained, it would be premature to remove this reserve. However, the Court does agree with SEC that in light of the Court's recent approval of a distribution to Jenner & Block [Doc. # 2285], only $34,077.92 remains of their fee cap and needs to be reserved.

The Court approves the reserve for living expenses, which it has previously approved (Emergency Motion on Consent for Authority to Change Source of Funds for Health Insurance Premiums [Doc. # 2001]; Order [Doc. # 2002]), but notes that parties may move to revisit the necessity of these distributions. The Court rejects, however, Defendants' request for an additional reserve for home-related expenses, which would be duplicative of

---

[12] The Court's order directing the Receiver to pay Harris St. Laurent & Wechsler's stated that payment should occur "after liquidation but before the end of the Receivership to the extent Relief Defendants' funds remain available." (Order Granting in Part Harris St. Laurent & Wechsler's Mot. for Alt. Relief [Doc. # 2131] at 3.) The most recent distribution to Jenner & Block likewise stated that "[s]ince further disbursements may also exceed the Receivership Estate resources, further payments must await finalization of the Receiver's liquidation process. (Order Granting Relief Defs.' Mot. for Funds [Doc. # 2285] at 3.) Finally, the Court's orders authorizing Defendant to seek the release of funds for counsel stated that "authorization [ ] shall terminate should the Court determine that the value of the assets of the Receivership Estate has changed such that the continued release of funds would place undue risk upon the security of the judgment." (Ruling Granting Def.'s Mot. for App. Att'y Fees [Doc. # 1405] at 5; Order Granting with Modification Release of Funds for Def.'s Arb. Def. Counsel [Doc. # 1750 at 5.)

the money approved for living expenses and irresponsible given that liquidation is unable to fully satisfy the judgment. The Receiver is therefore, as part of the reserve for other distributions ordered by the court, directed to maintain a reserve of $457,050.24 for Relief Defendants' estimated living expenses for the next four years. Should future orders from the Court alter the amount distributed for living expenses, the Receiver is directed to seek the Court's authorization to transfer excess funds to the CRIS account.

## V.    Ms. Ahmed's Request for a Stay

Ms. Ahmed has separately moved [Doc. # 2368] to stay the liquidation of unique assets pending the resolution of the pending Second Circuit appeal. In the alternative, she requests an administrative stay to allow her to file for a stay in the Second Circuit. (*Id.* at 1-2.) Relief Defendants have moved [Doc. # 2370] to join this motion.

The Court has already addressed, and denied, several requests from Defendant and Relief Defendants to stay liquidation. After entering the amended final judgment, the Court denied [Doc. # 1052] Defendant's motion to stay enforcement of the judgment, staying only the distribution of the judgment and permitting liquidation to proceed. Defendant then filed a motion in the Second Circuit seeking to stay enforcement of the judgment, arguing that he and Relief Defendants would be irreversibly harmed by liquidation. Def's Mot. to Stay, *SEC v. Ahmed*, No. 18-2903 (2d Cir. Jan. 13, 2021), ECF No. 59-1. The Second Circuit denied this motion, finding that Defendant had not shown a likelihood of success on the merits of irreparable injury absent a stay. Order Denying Mot. to Stay at 1, SEC v. Ahmed, No. 18-2903 (2d Cir. Jan. 13, 2021), ECF No. 154. Relief Defendants then sought to stay liquidation for the duration of the pending appeals [Doc. # 1602]. The Court denied [Doc. # 1868] this request. Defendants then, in briefing the Court on the effects of the NDAA on disgorgement again requested that liquidation be stayed [Doc. ## 1901, 1906]. The Court denied [Doc. # 1997] this request, making it clear that liquidation would proceed. Undeterred, following the Receiver's submission of the Liquidation Plan, Relief Defendants moved [Doc. # 2104] to stay

liquidation. The Court approved the liquidation plan and denied the motion to stay, explaining that the Court had already denied a stay and that the sequencing of the liquidation would mitigate the risk of irreversible harm to Relief Defendants. (Liquidation Order at 11-13.) Relief Defendants have appealed [Doc. # 2152] the Liquidation Order.

Ms. Ahmed and Relief Defendants acknowledge that the Court has consistently and repeatedly denied requests to stay liquidation, but argue that circumstances have changed since the Court last denied a stay since 1) liquidation of unique assets is about to commence and 2) the Receiver has submitted the Phase 1 report. (Ms. Ahmed Mot. to Stay at 2; Relief Defs.' Joinder Mot. at 2.) They also argue that they must seek a stay in this court before filing for a stay in the Second Circuit. The Receiver and the SEC argue that Ms. Ahmed's motion is procedurally unnecessary and substantively deficient (SEC Opp'n [Doc. # 2380] at 6; Receiver's Opp'n [Doc. # 2375] at 1-2), and a stay "would serve no purpose other than to delay litigation" (SEC Opp'n at 6).

The law of the case doctrine precludes the Court from issuing a stay. Under the doctrine, a trial court must "follow an appellate court's previous ruling on an issue in the same case." *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002). The Second Circuit has already ruled that liquidation would not cause irreparable harm to Defendant or Relief Defendants, and the Court may not depart from that ruling. Order Denying Mot. to Stay at 1, *SEC v. Ahmed*, No. 18-2903 (2d Cir. Jan. 13, 2021). Additionally, a temporary administrative stay is not warranted because this Court has already, in the Liquidation Order, declined to stay the liquidation process. (Liquidation Order, at 11-13).

## VI.    Conclusion

For the foregoing reasons, the Court orders the following:

    a.  The Motion for Approval of Phase 1 Report and Ancillary Relief Necessary to Accomplish Phase 2 of the Liquidation Plan [Doc. # 2280], except as modified by

this order, is GRANTED and the Receiver is hereby authorized to commence Phase 2 of liquidation.

b.  The Court approves V&L's Tax Report [Doc. # 2272-1]. Defendants are ordered to promptly alert the Receiver to any tax refunds issued by the Internal Revenue Service or other taxing authority and hold such funds securely subject to further instruction from the Receiver or order from this Court and promptly alert the Receiver of any other potential tax refunds upon their assertion of entitlement to such refunds by submission of initial or amended returns or otherwise. The Receiver shall determine whether the IRS can notify the Receiver directly about any requests for tax refunds.

c.  Except for the modifications made in this order, the Court approves and authorizes the Receiver's proposed reserves for Receivership Expenses, taxes, and Non-Estate Expenses.

d.  The Court Direct the Receiver to take such steps as reasonably necessary to transfer $49,416,378.55 to the CRIS Account.

e.  The Receiver is authorized to surrender the MetLife Policy and thereby realize its liquidation value.

f.  The sale of the Apartments is approved. A hearing will be scheduled at 10:00 AM on December 19, 2022, pursuant to 28 U.S.C. § 2001(b), to consider whether the private sale of the apartments is in the Estate's best interest.  The Receiver and parties shall forthwith submit their proposed schedule for this hearing, including the estimated amount of time required.

g.  The sale of personal property pursuant to 28 U.S.C. § 2004 is approved, and the Receiver is directed to proceed in accordance therewith.

h.  Ms. Ahmed's motion for leave to file a sur-reply to the Phase 1 Report [Doc. # 2363] is DENIED.

i.  Ms. Ahmed's motion to stay liquidation [Doc. # 2368] is DENIED.

j.  Relief Defendants joinder motion [Doc. # 2370] is GRANTED.

IT IS SO ORDERED.



Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 2nd day of December, 2022