UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

-------------------------------------------------------------- x
UNITED STATES SECURITIES AND EXCHANGE     :
COMMISSION,     :
     :
                              Plaintiff,     :     **ORDER GRANTING IN**
     :     **PART AND DENYING IN**
     -against-     :     **PART MOTION FOR**
     :     **POST-REMAND RELIEF**
IFTIKAR AHMED,     :
     :     3:15-CV-675 (VDO)
                              Defendant,     :
     :
     *and*     :
     :
IFTIKAR ALI AHMED SOLE PROP; I-CUBED     :
DOMAINS, LLC; SHALINI AHMED; SHALINI     :
AHMED 2014 GRANTOR RETAINED ANNUITY     :
TRUST; DIYA HOLDINGS LLC; DIYA REAL     :
HOLDINGS, LLC; I.I. 1, a minor child, by and through     :
his next friends IFTIKAR and SHALINI AHMED, his     :
parents; I.I. 2, a minor child, by and through his next     :
friends IFTIKAR and SHALINI AHMED, his parents;     :
and I.I. 3, a minor child, by and through his next friends     :
IFTIKAR and SHALINI AHMED, his parents,     :
     :
                              Relief Defendants.     :
     :
-------------------------------------------------------------- x

**VERNON D. OLIVER**, United States District Judge:

    In this action, the United States Securities and Exchange Commission[1] obtained a

judgment of nearly $105 million against Defendant Iftikhar Ahmed. That judgment resulted

----

[1] The Court will use the term "SEC" to refer to the Comission both in the opinion and in case
citations.

from Mr. Ahmed's[2] decade-long systematic defrauding of his employer and its investors. During this period, Mr. Ahmed was also transferring huge sums of money into the names of his family members. Sometimes, Mr. Ahmed would directly deposit large sums into trusts or other accounts to benefit his family members directly; other times, he would buy valuable property, such as eight-figure Park Avenue apartments or gold bars, and gift or otherwise designate that property to his family members.

This order resolves two post-judgment issues: (1) whether the SEC can recover supplemental enrichment for gains on frozen assets during the duration of the asset freeze and (2) whether frozen assets placed in the names of family members are available to satisfy the judgment against Mr. Ahmed. For the reasons explained in the discussion that follows, the Court grants the Commission's motion on both issues except as to a handful of miscellaneous assets.

## I.    <u>BACKGROUND</u>

This civil action has spanned nearly a decade and almost three thousand docket entries, rendering a complete yet concise explanation of its factual background and procedural history entirely impossible. Accordingly, this order recounts only those facts relevant to each issue addressed in the order.

### A.    **Mr. Ahmed's frauds**

In 2004, Mr. Ahmed joined Oak Management Corporation ("Oak"), a venture capital firm. *SEC v. Ahmed*, 72 F.4th 379, 390 (2d Cir. 2023). At Oak, Mr. Ahmed's job was to

---

[2] This order repeatedly refers to both Iftikar Ahmed, the defendant in this action, and his wife Shalini Ahmed, a relief defendant in this action. For ease of readability, the Court will refer to Iftikar Ahmed as "Mr. Ahmed" and Shalini Ahmed as "Ms. Ahmed."

"identify and recommend 'portfolio companies' in which Oak might invest and to negotiate the terms of those investments." *Id.* at 390 (cleaned up).[3] Quickly, Mr. Ahmed began to induce Oak and its investors to enter into fraudulent transfers that, unbeknownst to Oak and investors, allowed him to personally profit. *Id.*; *SEC v. Ahmed*, 308 F. Supp. 3d 628, 637 (D. Conn. 2018).

Mr. Ahmed utilized "the same basic scheme in each fraudulent transaction." *Ahmed*, 72 F.4th at 390. He executed variations of a two-step process: First, he opened bank accounts in the name of Oak and its portfolio companies. *Id.* In actuality, however, Oak and the portfolio companies were completely unaware of these accounts; instead, Mr. Ahmed controlled these accounts. *Ahmed*, 308 F. Supp. 3d at 637–38. At step two, Mr. Ahmed would steer money intended for Oak or its portfolio companies funds into these accounts and would divert a portion of these funds into personal bank accounts that he and his wife controlled. *Id.*

"To cover his tracks, Ahmed submitted fraudulent invoices and contracts to Oak, misrepresenting things like the size of investments, the currency exchange rates applicable to transactions, and the need to make payments to tax authorities or to reimburse legal and other fees." *Ahmed*, 72 F.4th at 390. "As one example of Ahmed's fraud, in 2013, he negotiated an Oak entity's investment in a company that was conditioned on the company redeeming shares of an entity that, unbeknownst to Oak, was owned by Ahmed. Ahmed pocketed more than $8 million from this particular scheme." *Id.* In total, Mr. Ahmed stole some $67 million over ten years. *Id.* at 391.

---

[3] Unless otherwise indicated, in quoting cases, all internal quotation marks, footnotes and citations are omitted, and all alterations are adopted.

### B.    Procedural history

On April 2, 2015, Mr. Ahmed was indicted in the District of Massachusetts on insider trading charges, and he was arrested that same day by the Federal Bureau of Investigation. *United States v. Kanodia*, No. 15-CR-10131 (D. Mass. Apr. 21, 2015), ECF No. 19. Also on April 2, the United States Securities and Exchange Commission ("SEC") filed a civil complaint regarding the same insider trading allegations. *SEC v. Kanodia, et al.*, No. 1:15-CV-13042 (D. Mass. 2015), ECF No. 1. These developments prompted Oak to conduct an internal investigation, which uncovered the fraud at issue here. *Ahmed*, 72 F.4th at 390-91.

About a month after Mr. Ahmed's arrest, the SEC filed this action, alleging that these fraudulent schemes had violated various federal securities laws.[4] The SEC contemporaneously filed for an *ex parte* emergency restraining order freezing many of Mr. Ahmed's assets,[5] and the district court (Arterton, J.) entered a then-sealed order freezing up to about $55 million of Mr. Ahmed's assets.[6] The SEC then amended the complaint to name the following parties as relief defendants: Ms. Ahmed, the Ahmed's three minor children, and several companies held in the Ahmeds' names or for their benefit: Iftikar Ali Ahmed Sole Proprietorship; I-Cubed Domains, LLC; Shalini Ahmed 2014 Grantor Retained Annuity Trust; DIYA Holdings, LLC; and DIYA Real Holdings, LLC.[7]

Thereafter, the SEC sought and received a preliminary injunction, which froze up to $118,246,186 of assets owned by Mr. Ahmed and the Relief Defendants (made up of $65

---

[4] Comp., ECF No. 1.

[5] ECF No. 2.

[6] Temp. Restr. Ord., ECF No. 9.

[7] Amend. Compl., ECF No. 33.

million for disgorgement, $9.3 million for potential prejudgment interest, and $44 million for potential civil penalties).[8] *SEC v. Ahmed*, 123 F. Supp. 3d 301, 306, 314–15 (D. Conn. 2015), *aff'd. SEC v. I-Cubed Domains, LLC*, 664 F. App'x 53, 55–56 (2d Cir. 2016) (summary order). As the district court explained, the asset freeze was "to ensure that, in the event the SEC obtains a judgment, money will be available to satisfy that judgment." *Id.* at 308. After the SEC moved for a preliminary injunction, Mr. Ahmed fled the country. *Ahmed*, 72 F.4th at 391. To this day, he remains a fugitive from justice. *Id.*

The district court then bifurcated the liability and remedies stages of this action. *Id.* At the liability stage, the Court granted summary judgment against Mr. Ahmed, concluding that the facts—viewed in the light most favorable to Mr. Ahmed—conclusively established that he had violated federal securities laws. *See Ahmed*, 308 F. Supp. 3d at 628. At the remedies stage, the Court awarded the SEC a permanent injunction and entered a substantial financial award against Mr. Ahmed in the form of a disgorgement obligation, civil penalties, and supplemental enrichment. *SEC v. Ahmed*, 343 F. Supp. 3d 16, 39 (2018). The Court then appointed a Receiver to "control the operation of the Receivership Estate" which "includes all assets subject to the Court's asset freeze order."[9] Prior to this order, the total judgment in this case—

---

[8] It is notable that, at this stage, Ms. Ahmed responded to interrogatories asking what assets she owned by claiming only an ownership interest over DIYA Holdings LLC, DIYA Real Holdings LLC, and the Shalini Ahmed 2014 Grantor Retained Annuity Trust. ECF No. 891-7 at 3. Those claims stand in stark contrast to her position at this stage in the litigation, as she claims an ownership interest in scores of frozen assets.

[9] ECF No. 1070 at 6 ¶¶ 1–2.

which included the disgorgement obligation, a civil penalty, and various forms of pre- and post-judgment interest—stood at approximately $105 million.[10]

The district court then evaluated whether the frozen assets were available to satisfy the judgment against Mr. Ahmed. The Court held that all assets subject to the asset freeze were available to satisfy the judgment because they were either Mr. Ahmed's assets outright or they were equitably owned by Mr. Ahmed. *Ahmed,* 343 F. Supp. 3d at 31–39. In reaching this conclusion, the Court applied the "nominee" theory of relief through a six-part test and determined that all of the frozen assets in the Relief Defendants' names were, in fact, equitably owned by Mr. Ahmed. *Id.* The Court made no findings as to the other doctrines under which the SEC argued that assets in the Relief Defendants' names were equitably owned by Mr. Ahmed.

Mr. Ahmed appealed, and the case was held pending the resolution of *Liu v. SEC*, 591 U.S. 71 (2020). *Ahmed*, 72 F.4th at 392. After *Liu*, the case was granted a limited remand to allow the district court to redetermine Mr. Ahmed's disgorgement obligation as a result of the passage of retroactive amendments to the securities laws that Mr. Ahmed violated. *Id.* at 392–93. Those amendments extended the statutes of limitations governing those statutes from five years to ten years. *Id.* As a result, the SEC sought to increase the disgorgement award against

---

[10] *See* ECF No. 2899 at 8–9. In accordance with an order of this Court, the Receiver calculated an updated judgment to account for distributions from a life insurance policy. *SEC v. Ahmed*, 2024 WL 5182669, at *6, *9 (D. Conn. 2024). A portion of the judgment has now been satisfied as a result of this Court's first tranche of distributions to Ahmed's victims. *See* ECF Nos. 2911, 2913.

Mr. Ahmed to include assets fraudulently obtained over the entire ten-year period. The district court agreed and increased the total disgorgement obligation by more than $22 million.[11]

After the limited remand, the Second Circuit affirmed the disgorgement calculation and the civil penalty that the district court entered. *Ahmed*, 72 F.4th at 396–402. The Circuit also affirmed the Court's application of the nominee doctrine to certain assets held in the name of the Relief Defendants, as well as its conclusion that those assets were available to satisfy the judgment against Mr. Ahmed. *Id.* at 407–09. But the Circuit held that the Court should have applied the nominee doctrine on an asset-by-asset basis and therefore vacated the district court's application of the nominee doctrine to the bulk of the frozen assets. *Id.* at 407–10.

The Circuit further vacated the district court's award of "actual gains" on the disgorged assets for the period between the beginning of the asset freeze through the entrance of the judgment. *Id.* at 404–06. The district court, the Court of Appeals held, failed to consider equitable limitations on the award of actual gains: Specifically, the district court did not consider whether these gains were "unduly remote" from Mr. Ahmed's fraud. *Id.* at 405–06.

On remand, the Receiver organized the Estate's assets into four categories: (1) assets titled to Mr. Ahmed, (2) assets for which the Second Circuit affirmed the Court's application of the nominee doctrine, (3) assets jointly titled to Mr. Ahmed and one or more of the Relief Defendants, and (4) assets titled solely to the Relief Defendants. *Ahmed*, 2024 WL 5182669 at *3. Assets in the first two categories have been disbursed to Mr. Ahmed's victims pursuant to

---

[11] ECF No. 1997.

orders from the district court,[12] so only the latter two categories of assets remain subject to the asset freeze.

Also on remand, the SEC moved for "post-remand relief," seeking to resolve the two issues on which the Court of Appeals vacated the district court's orders: whether the SEC should be awarded supplemental enrichment for the period between the beginning of the asset freeze and the entrance of judgment, and whether the remaining two categories of assets are available to satisfy the judgment against Mr. Ahmed.[13] The Ahmeds have opposed that motion,[14] and the motion is now ripe for resolution.[15]

---

[12] ECF No. 2913. The Court previously held that assets solely in Mr. Ahmed's name were available to satisfy the judgment in this case against Mr. Ahmed. Amend. Final Judgment, ECF No. 1054, at 5–9 (¶ 7). On appeal, Ahmed did not challenge that determination.

[13] Mot. for Post-Remand Relief, ECF No. 2760.

[14] Br. in Opp., ECF No. 2806. Throughout their briefing, the Ahmeds seek to raise settled arguments. This Court is precluded from reconsidering those findings by both the law of the case doctrine and the mandate rule, which this opinion references in passing to explain its rejection of attempts to reraise these arguments.

"[T]he mandate rule . . . rigidly binds the district court, barring it from considering issues explicitly or implicitly decided on appeal." *Stegemann v. United States*, No. 23-7712, 2025 WL 865222, at *2 (2d Cir. Mar. 20, 2025). And the "law of the case doctrine requires that when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case unless cogent and compelling reasons militate otherwise." *Reynolds v. HNS Mgmt. Co*., No. 23-484-CV, 2025 WL 783733, at *2 (2d Cir. Mar. 12, 2025).

[15] The Parties dispute whether prior findings of the district court can be considered as evidence at this stage in the litigation. *Compare* Br. in Opp. at 28 and Reply Br., ECF No. 2830 at 10. The Court need not resolve this conflict, however, because the evidentiary record at this stage independently supports its conclusions. But the Court agrees with the SEC as to the straightforward position that the Second Circuit's limited vacatur and remand does not wipe away, or otherwise exclude, all of the *evidence* that has accumulated in the case to this point.

II.    **DISCUSSION**

A.    **Supplemental Enrichment**

"Once the district court has found federal securities law violations, it has broad equitable power to fashion appropriate remedies." *SEC v. Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013).[16] District courts have the discretion to assess as remedies any appropriate form of "equitable relief." 15 U.S.C. § 78u(d)(5). The Supreme Court has explained that when evaluating "statutes like § 78u(d)(5) that provide for 'equitable relief,'" whether a given remedy is appropriate under the statute requires a determination of whether that remedy "falls into 'those categories of relief that were typically available in equity.'" *Liu*, 591 U.S. at 78–79 (quoting *Mertens v. Hewitt Associates*, 508 U.S. 248, 256 (1993).

But equitable remedies contain limitations that might, at first glance, appear unusual. The situation in *Liu*, for example, is instructive. *Liu* required the High Court to determine whether disgorgement was contemplated by the "equitable relief" clause of Section 78u(d)(5). The Court concluded that because "[e]quity courts have routinely deprived wrongdoers of their net profits from unlawful activity," sufficient analogs to what we now refer to as "disgorgement" existed at equity to confirm that the remedy was properly included by the

---

[16] As a preliminary matter, the Ahmeds contend that the procedures associated with summary judgment are the appropriate procedure vessel to resolve this matter. Br. in Opp. at 33. And, as a result, the Ahmeds have also filed a "statement of material facts." ECF No. 2807. That same argument was made during the first round of post-summary judgment briefing on remedies and rejected then. *Ahmed*, 343 F. Supp. 3d at 24 n.3. Nor was that conclusion disturbed on appeal—in fact, the Second Circuit's opinion, if anything, stated that on remand, the district court should reemploy the same procedures, only moreso. *Ahmed*, 72 F.4th at 410. The Court again rejects that argument, both as barred by the law of the case doctrine and for the substantive reasons explained by the district court in rejecting it in the first instance. Here, as there, the Court will consider all filings relating to the instant motion but described as regarding "summary judgment" as part of the Ahmeds' opposition to the SEC's motion.

statute's allowance for "equitable relief." *Id.* at 79. The common thread between disgorgement and the analogous remedies at equity was that these remedies were "profit-based" and "reflected a foundational principle: 'It would be inequitable that [a wrongdoer] should make a profit out of his own wrong.'" *Id.* at 79–80 (quoting *Root v. Railway Co.*, 105 U.S. 189, 207 (1882)). Therefore, disgorgement was permissible as a remedy "that simply restores the status quo." *Id.* at 80.

But because Section 78u(d)(5) incorporated remedies that existed at equity, the Supreme Court explained, it also incorporated the equitable principles behind those remedies, including the limitations on those remedies that existed in equity. *Id.* at 85. Chiefly, equity courts "circumscribed the award [of disgorgement] in multiple ways to avoid transforming it into a penalty outside their equitable powers." *Id.* at 82. The Supreme Court held that in referencing "equitable relief," Congress had "incorporate[ed] these longstanding equitable principles into § 78u(d)(5)." *Id.* at 84. These limitations generally result from the principle underlying all equity jurisprudence, that "equity never 'lends its aid to enforce a . . . penalty.'" *Id.* at 77 (quoting *Marshall v. Vicksburg*, 15 Wall. 146, 149 (1873)). As relevant in *Liu*, because disgorgement's purpose is merely to prevent wrongdoers from holding onto the profits of their wrongdoing, the Supreme Court has explained that an award of disgorgement must "not exceed a wrongdoer's net profits." *Id.* at 75. That is, a wrongdoer cannot be asked to disgorge more than they actually gained as a result of their frauds.

All of these limitations may seem strange—after all, why should punishment for a wrongful act be so circumscribed?—but they make far more sense when we recognize that equitable remedies are not the only remedies available for violations of securities laws. For example, in this action, the Court has also ordered Mr. Ahmed to pay $21 million in civil

penalties. *Ahmed,* 72 F.4th at 391, 398. Properly understood, then, disgorgement and other equitable remedies are but one part of the remedial scheme for violations of securities laws.

But disgorgement, even alongside civil penalties, could fail to deprive wrongdoers of the entirety of their profits. A disgorgement award that seeks only to return the value of fraudulently obtained assets at the time those assets were stolen would fail to account for the profits that a wrongdoer could make through the control and use of those profits over the intervening period and would therefore allow a violator to retain a portion of the "fruits of their illegal conduct." *Ahmed*, 72 F.4th at 395. For example, at this point in the case, some of Ahmed's victims have been deprived of the use of their funds for nearly two decades. *See Ahmed*, 2024 WL 5182669, at *4 ("This case stretches back to frauds beginning in 2005, meaning that at least some of Mr. Ahmed's victims have been deprived of their assets for nearly twenty years."). Disgorgement of the initial value of the illicitly obtained assets alone would fail to account for the gains on those assets over the many years that Mr. Ahmed controlled those assets.

To that end, the district court has already awarded various forms of interest and restitution for gains on the fraudulently obtained assets to account for the period in which Mr. Ahmed illicitly controlled those assets. These awards include pre-judgment interest, which covers the period between each of the frauds and the beginning of the asset freeze, *Ahmed*, 343 F. Supp. 3d at 28; post-judgment interest, which covers the period between the judgment and the transfer of the assets into an interest-bearing Court account; *Ahmed*, 2024 WL 5182669 at *6; and, when funds were later transferred into court investment accounts, the district court ensured that these funds were deposited into an interest-bearing account; *id.* at *3, *6.

But because these awards stem from the invocation of the Section 78u(d)(5)'s provision for equitable remedies, awards of this sort must constitute a form of equitable relief. In this action, the Second Circuit has already addressed whether these sorts of awards are permissible as equitable relief. The Circuit concluded that these awards were "incident to disgorgement," and therefore evaluated whether such awards "'fall into those categories of relief that were *typically* available at equity.'" *Ahmed*, 72 F.4th at 403 (quoting *Liu*, 591 U.S. at 79).

The Circuit concluded that these awards were most analogous to awards for supplemental enrichment. *Id.* Supplemental enrichment aims to account for "the opportunity cost or time value of money lost by victims, including 'interest, rent, and other measures of use value, proceeds, and consequential gains' on ill-gotten assets." *Id.* at 403 (quoting 2 Restatement (Third) of Restitution and Unjust Enrichment § 53(1) & cmt. a (Am. L. Inst. 2011)). Put otherwise, when a party holds ill-gotten assets for a period of time, the rightful owner is likely to be further harmed by the inability to use those assets while the wrongdoer is likely to reap the benefit of the use of those assets. *See* 1 Dan B. Dobbs, Law of Remedies: Damages–Equity–Restitution § 3.6(2), at 342–43 (2d ed. 1993) ("When the defendant is under a duty to pay the plaintiff as damages or otherwise, and during the period of nonpayment the defendant has a legally recognized benefit from use of the money retained, he is under an obligation to make restitution of that benefit to the plaintiff, whether the benefit is measured in profits or interest or some other form of use value."). Because supplemental enrichment is a long-recognized form of relief available at equity, the Court of Appeals held that it was a form of the "equitable relief" contemplated by Section 78u(d)(5)'s and therefore upheld the availability of supplemental enrichment under that Section. *Ahmed*, 72 F.4th at 403.

But, like disgorgement, supplemental enrichment is subject to traditional equitable limitations. As to the award of interest for the period before the asset freeze, the Circuit affirmed the district court's award of supplemental enrichment as consistent with those limitations. *Id.* at 403–04. The Circuit held that the assessing interest at the Internal Revenue Service's underpayment rate would not "overcompensate Ahmed's victims" and thus was not impermissibly "punitive," and, therefore, was within the bounds of traditional equitable limitations. *Id.* at 403–04. "That rate reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from its fraud." *Id*. at 404.

However, the Court of Appeals vacated the district court's award for gains on the assets for the period between the beginning of the asset freeze and the entrance of judgment, concluding that the district court had failed to account for one traditional equitable limitation. Rather than interest, for this period, the district court awarded "actual returns on the frozen assets."[17] *Ahmed*, 343 F. Supp. 3d at 29. The Second Circuit held that the district court had failed to consider an equitable limitation against awarding actual gains where those gains were "unduly remote from the fraud." *Ahmed*, 72 F.4th at 405. The Circuit explained that actual gains could be awarded only so long as they were "attributable" to the underlying wrong, and it held that the district court had erred in failing to consider whether the gains were too remote to be considered attributable to the underlying wrong. *Id.* at 406.

---

[17] It is not clear whether the Second Circuit believed that the district court's award of "actual gains" was an exercise of the remedy of disgorgement or of supplemental enrichment, or the third remedy of "consequential gains." *See Ahmed*, 72 F.4th at 403–05. For the reasons explained below, however, this distinction is not relevant to whether the Court can award supplemental enrichment at the level contemplated in this action.

Therefore, the Court of Appeals remanded the action to the district court to reassess supplemental enrichment for the period between the beginning of the asset freeze and the entrance of judgment. *Id.* at 407. In so doing, though, it emphasized that "[o]n remand, the district court retains discretion over the appropriate measure of supplemental enrichment." *Id.* The Circuit explicitly noted that, in addressing the vacatur of supplemental enrichment for the period between the beginning of the asset freeze and the entrance of the judgment, this Court could "reimpose an actual-gains award on disgorged assets" after a determination that the "consequential gains on the frozen assets are not 'unduly remote,'" or it could "elect a different measure of supplemental enrichment . . . such as a fixed-interest rate for the period of the asset freeze." *Id.* at 407.

On remand, the SEC accepts that invitation and does not seek the reimposition of an award for actual gains. Instead, the SEC seeks an award only of supplemental enrichment at the IRS underpayment rate: "to avoid further prolonging this lengthy litigation and continuing to penalize the victims of the Defendant's fraud by depriving them of the time-value and use of their money, the SEC respectfully requests that the Court use a fixed-interest rate, even though it may undercompensate Defendant's victims and does not fully disgorge Defendant's gains attributable to his fraud."[18] The SEC calculates that such an award would total $12,539,632.53, and the Ahmeds do not dispute the calculations used to arrive at this amount.[19]

---

[18] Mot. for Post-Remand Relief at 30.

[19] The Ahmeds once again challenge the IRS underpayment rate itself as impermissibly punitive, but this argument has been foreclosed time and again by the Second Circuit, and this Court is therefore bound to reject the argument. *See, e.g.*, *Ahmed*, 72 F.4th at 404. The Ahmeds also challenge the compounding nature of the rate. That challenge was rejected in the proceedings regarding pre-freeze interest, *SEC v. Ahmed*, 2021 WL 2471526, at *6 (D. Conn. June 16, 2021),

But the Ahmeds do raise a more fundamental challenge: whether the Court can award supplemental enrichment for any period in which assets are frozen. Their argument relies on *SEC v. Razmilovic*, 738 F.3d 14 (2d Cir. 2013). In that case, the SEC froze $17.4 million in Swiss bank accounts, and the district court awarded prejudgment interest at the IRS underpayment rate on those funds for the period in which they were frozen. *Id.* at 36 (citing *SEC v. Razmilovic*, 822 F.Supp. 2d 234, 278 (S.D.N.Y 2011)).

The Second Circuit vacated that award, explaining:

> The primary purpose of disgorgement as a remedy for violation of the securities laws is to deprive violators of their ill-gotten gains, thereby effectuating the deterrence objectives of those laws, it is within the discretion of a court to award prejudgment interest on the disgorgement amount for the period during which a defendant had the use of his illegal profits.

*Id.* But an effective asset freeze deprives the wrongdoer of the use of those assets. Therefore, when assets are frozen "at the behest of the government in connection with [an SEC civil] enforcement action, an award of prejudgment interest relating to those funds would be inappropriate" with respect to the period covered by the freeze order, because the defendant has already, for that period, "been denied the use of those assets." *Id.* Or, put otherwise, "where a defendant's funds are frozen, if the freeze is not violated, the defendant derives no such possessory benefit for the duration of the freeze." *SEC v. Tavella*, 77 F. Supp. 3d 353, 361 (S.D.N.Y. 2015).

---

and a compounding rate was affirmed by the Second Circuit, *Ahmed*, 72 F. 4th at 404. As a result of the mandate rule and the law of the case doctrine, the Court is bound to follow these conclusions, but further adopts the same reasoning contained in the district court's prior explicit rejection of this argument.

*Razmilovic* also recognizes that it would run afoul to the purposes of securities laws to allow a wrongdoer to benefit from the asset freeze by pocketing accumulated returns on the frozen principal. That rule, if adopted, would incentivize defendants in SEC enforcement actions to delay at any cost while profits on frozen assets—to which they might well be entitled—continue to accumulate. Thus, *Razmilovic* recognizes that frozen funds "turned over to the government in complete or partial satisfaction of the disgorgement order" should be turned over "along with any interest that has accrued on them during the freeze period." 738 F.3d at 36. But "to require the defendant to pay prejudgment interest on the entire disgorgement amount including the earlier frozen amount would, for the freeze period, deprive him twice of interest on the portion of the disgorgement award that is satisfied by the frozen assets." *Id.* at 37.

At first glance, this seems in tension with the Circuit's opinion in *Ahmed*, 72 F.4th at 407, which held that this Court could, on remand, "elect . . . a fixed-interest rate for the period of the asset freeze." But *Ahmed* explains that *Razmilovic*'s holding is more limited than it might appear: While *Razmilovic* "limited the availability of prejudgment interest during the period of an asset freeze when the defendant has been denied the use of those assets," in some circumstances, it might nonetheless "be appropriate for a district court to award an alternative measure of supplemental enrichment, such as a fixed interest rate that approximates fair compensation to the person wronged within the equitable limits set forth in *Liu*." *Id.* at 405 n.14.

And, as the Second Circuit has recently explained elsewhere, "the principle underlying [*Razmilovic* and like] cases is that forcing a defendant to pay disgorgement twice amounts to a penalty." *SEC v. Govil*, 86 F.4th 89, 107 (2d Cir. 2023) (collecting cases). In *Govil*, the

Circuit pointed to recognition of that proposition in *Liu*: "a wrongdoer 'should not profit by his own wrong' but also 'should not be punished by paying *more* than a fair compensation to the person wronged.'" *Id.* (citing *Liu*, 591 U.S. at 80). The SEC does not so much as address *Razmilovic*, relying only on the language in *Ahmed* upholding a pre-freeze award of supplemental enrichment. But *Liu's* rule sets forth a general principle applicable to all equitable relief—that "equity never lends its aid to enforce . . . a penalty." 591 U.S. at 77. Therefore, awarding supplemental enrichment both in the amount of actual gains and in the amount of a fixed interest rate could well violate *Liu's* prohibition on overpayment, and the Circuit's opinion in *Ahmed* does not hold otherwise.

Taken as a whole, though, this line of caselaw confirms the availability of interest as a form of supplemental enrichment on frozen assets, so long as that interest is not joined in the judgment by another award for supplemental enrichment for the same period. *Govil* and *Liu* preclude double-awards—or any other form of award that would lead to overpayment—against a wrongdoer as beyond "fair compensation." For the same reasons, *Razmilovic* holds that where an asset freeze deprives a wrongdoer of the use of the fraudulent assets, courts cannot award both interest and actual gains on those assets for the period of an asset freeze. And *Ahmed* clarifies that *Razmilovic* does not prohibit awards of interest on frozen assets outright, but merely prohibits awards that have the effect of twice depriving a wrongdoer of the profits of their frauds. At bottom, *Liu's* prohibition on overpayment, as *Ahmed* notes, operates as the ultimate gravamen of the inquiry.

The Court's task, then, is to determine whether awarding the SEC supplemental enrichment calculated by a set interest rate for the period of the asset freeze would result in an impermissible double award. That inquiry is straightforward, because the question is merely

whether some portion of the judgment already seeks to deprive Mr. Ahmed of the profits for the period of the asset freeze. And there is plainly no portion of the judgment that results from profits for that period. In the absence of any award covering profits from that period, the SEC had (at least) two choices here: it could (1) seek to calculate actual gains on ill-gotten assets and ask the Court to add that amount to the judgment or (2) seek to add only supplemental enrichment to the judgment calculated by a set interest rate and, in so doing, forego any right to add the actual amount that the defendant profited to its judgment.

Here, the SEC has chosen to calculate the number it adds to the judgment through a set interest rate, which serves as an approximation,[20] rather than seeking to calculate the actual gains on Mr. Ahmed's fraudulently obtained assets. That is permissible under *Liu's* framework because the addition of supplemental enrichment as the sole recovery for the profits on frozen assets is contemplated as part of depriving wrongdoers of the fruits of their frauds. The SEC might violate *Liu's* prohibition on overpayment if it then also sought an increase in the judgment in the amount of the actual gains on the assets for the same period. But merely choosing to calculate supplemental enrichment through interest is not inherently duplicative standing alone.

*Razmilovic* recognizes that, as a practical matter, the SEC is often able to hold onto the actual gains from the duration of the freeze. That is because the SEC often obtains a judgment that is larger than the amount of frozen assets, and the SEC is then able to *execute* its judgment

---

[20] An approximate amount is permissible because "the amount of disgorgement ordered need only be a reasonable approximation of profits causally connected to the violation," and "any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." *Razmilovic*, 783 F.3d at 31.

to recover value for all of the frozen assets in the defendant's name, gains included. But that speaks to the *collection* of the judgment—that is, how the judgment is recovered—not the total amount of the judgment awarded, which is the entire amount that the SEC is entitled to collect. *Liu's* limitation prohibits awarding more than the total amount of a defendant's profits, but it says nothing about how the SEC may collect its judgment. And it is not a duplicative award to allow the SEC to include an award for supplemental enrichment in the judgment itself and also collect that judgment against the gains the asset experienced.

Therefore, the Court concludes that the SEC has shown that an award of supplemental enrichment at the IRS underpayment rate is warranted to deprive Mr. Ahmed of the profits of his fraud for the period from the entrance of the asset freeze until the entrance of the judgment. The Court, therefore, grants the SEC's request for an award of supplemental enrichment in the amount of $12,539,632.53.[21]

### B. Equitable ownership of the frozen assets

The remaining task is to determine equitable ownership of the frozen assets. The SEC asks the Court to hold that all of the still-frozen assets are available to satisfy the judgment.[22] Many of these assets were frozen while they were in the name of at least one of the Relief Defendants. "A relief defendant is a person who holds the subject matter of the litigation in a

---

[21] The Ahmeds raise several other foreclosed arguments against the imposition of supplemental enrichment. For example, they argue that supplemental enrichment should be denied because Oak will ultimately recover supplemental enrichment and that Oak has unclean hands. That argument was raised previously by the Ahmeds and rejected by the entrance of judgment. *See* ECF No. 884 at 35. The Ahmeds appealed from that order, but the district court's conclusions were not disturbed on appeal, and the Ahmeds cannot now seek to relitigate a settled issue.

[22] Mot. for Post-Remand Relief at 31.

subordinate or possessory capacity as to which there is no dispute." *Commodity Futures Trading Comm'n v. Walsh*, 618 F.3d 218, 225 (2d Cir. 2010). Here, the SEC contends that the assets in the names of the Relief Defendants are, in fact, equitably owned by Mr. Ahmed and therefore available to satisfy the judgment entered against him. *See Ahmed*, 72 F.4th at 409 ("If a relief defendant is deemed a mere nominal owner of an asset that is equitably owned by the primary defendant, the equitable rules governing primary-defendant disgorgement apply." ("nominee liability")). Initially, because the district court concluded that Mr. Ahmed was likely the equitable owner of these assets, the district court included these assets in the freeze order, and the Second Circuit affirmed that decision. *I-Cubed Domains*, 664 F. App'x 53.

Now that Mr. Ahmed's ultimate liability has been established, the SEC puts forth three theories that, it argues, render every remaining asset available to satisfy the judgment: each asset is either (1) nominally owned by the Relief Defendants but equitably owned by Mr. Ahmed, (2) jointly owned by Mr. Ahmed and at least one Relief Defendant, and/or is (3) nonetheless collectible as an ill-gotten gain.[23] Each of these three presents a path through a different area of law for a determination that an asset is available to satisfy a judgment. Nominee theory allows courts to redetermine the ownership of an asset; joint-ownership theory presents satisfaction-of-judgment questions resolved with reference to the rules of civil procedure; and ill-gotten gains recovery allows for a determination that a relief defendant lacks a legitimate interest in the asset.

---

[23] *Id.* at 31–32.

The SEC has provided a schedule of the frozen assets as well as a corresponding list of the theories of availability it asserts as to each (the "Asset Schedule").[24] The Schedule lists 101 separate assets. A substantial number of these, the SEC contends, the Court should find available as a result of the mandate rule without further analysis, and some separate number assets originally titled to the Relief Defendants were explicitly affirmed as available to satisfy the judgment against Mr. Ahmed. *Ahmed*, 72 F.4th at 408–09. Those funds affirmed as available or titled solely to Mr. Ahmed have been disbursed to his victims.[25]

### 1.    The Second Circuit's vacatur and remand

The district court examined whether certain assets were available to satisfy the judgment against Mr. Ahmed in the first instance. It relied on the so-called nominee theory to hold that each asset titled in part or whole to the Relief Defendants was available to satisfy the judgment. 343 F. Supp. 3d. at 31–32. First, applying the nominee doctrine through a six-factor test, the court held that Mr. Ahmed was the equitable owner of all frozen assets in the Relief Defendants' names. *Id.* at 33–39. Second, the district court stated that "jointly controlled assets can nevertheless be used to satisfy Defendant's judgment." *Id.* at 36.[26]

---

[24] Asset Schedule, ECF No. 2760-1.

[25] ECF No. 2913.

[26] The district court also cited *SEC v. Smith*, 646 F. App'x 42, 43 (2d Cir. 2016) (summary order) for the proposition that the Second Circuit "reject[ed] the relief defendant's argument that the district court erred in applying all assets in a jointly controlled account—held only in the name of relief defendant—to satisfy final judgment against defendant." 343 F. Supp. 3d at 36. And the district court quoted *Sarasota CCM, Inc. v. Golf Mktg., LLC*, 891 A.2d 72, 74 (Conn. App. 2006) for the proposition that "Connecticut's 'legislature's intent [is] to allow a judgment creditor to execute against all forms of a judgment debtor's assets' and therefore a creditor is 'entitled to reach any property in which the judgment debtor had a cognizable interest' including the full amount of funds held in a joint account." 343 F. Supp. 3d at 36.

The Second Circuit held "the district court's analysis in support of its conclusion that the Relief Defendants are merely nominal owners of all the frozen assets held in their names was inadequate" and vacated those findings. *Ahmed*, 72 F.4th at 407. First, the court explained that equitable limits on disgorgement differed between assets held by the wrongdoer themselves and third parties holding contested assets. "As to primary defendants, the amount of disgorgement ordered need only be a reasonable approximation of profits causally connected to the violation." *Id.* The district court was "not required to 'trace' ill-gotten gains to specific assets in Ahmed's possession—any of his own assets may be liquidated to satisfy his disgorgement obligation." *Id.*

As to assets held by third parties—put otherwise, assets held by relief defendants— "equity imposes different rules." *Id.* at 408. The Second Circuit affirmed the validity of the nominee theory as one way to find that assets held by relief defendants are available to satisfy a judgment against the defendant. *Id.* "A 'nominee' holds bare legal title to an asset but is not its true equitable owner," and therefore "[s]uch an asset may be disgorged to satisfy a judgment against a third party deemed to be the asset's true equitable owner." *Id.* The nominee doctrine, the Circuit explained, "reflects the principle that equity looks to the intent, rather than to the form, and is thus able to treat that as done which in good conscience ought to be done." *Id.*

But, the Circuit explained, "the nominee doctrine is necessarily an asset-specific inquiry," which "turns on a third party's behavior toward a *particular* asset, such as whether the third party controlled, benefitted from, and/or transferred a particular asset held in a nominee's name." *Id.* at 409. It was here that the district court went wrong, the Circuit held: "The district court's application of the nominee doctrine was inadequate as to most of the assets in question because it failed to determine whether the SEC proved that these particular

assets (or groups of similar assets) were held by the Relief Defendants as mere nominees of Ahmed." *Id.* More specifically, the Court of Appeals explained: "The district court invoked a six-factor nominee test but did not apply it on an *asset-by-asset basis*. Instead, it deemed the Relief Defendants nominal owners of a large swathe of assets without finding that Ahmed is in fact the equitable owner." *Id.* (emphasis added).

The Court of Appeals upheld the district court's analysis regarding three specific assets "because the district court weighed the SEC's evidence and considered the Relief Defendants' counter-evidence as to each asset and made findings on the record." *Id.* As to other assets, the Circuit held that the district court erred in relying solely on the Circuit's affirmance of the district court's preliminary injunction. *Id.* The Circuit explained that a preliminary injunction finding was just that—preliminary—and that the burden "remained with the SEC to prove that [Mr.] Ahmed was the true owner of each asset (or group of similar assets), and the district court should have made specific findings accordingly." *Id.* at 410.

The Circuit also affirmed that "courts in civil cases can draw adverse inferences against relief defendants should they invoke their Fifth Amendment privilege not to testify." *Id.* at 409 n.19. But, in order for that inference to be consistent with the burden on the SEC, the district court must "state on the record what, if any, adverse inferences it draws from the Relief Defendants' failure to testify." *Id.* at 410.

At bottom, the district court's failure to apply an asset-by-asset approach was error because it "erroneously shifted the burden to the Relief Defendants to show that Ahmed is *not* the equitable owner of assets to which the Relief Defendants hold legal title." *Id.* at 409. As to the jointly owned assets, the Second Circuit held that this Court could consider on remand whether "an alternative theory of relief-defendant liability" rendered a given asset

available to satisfy the judgment and described "joint-ownership theory" as one such avenue. *Ahmed*, 72 F.4th at 410. The Circuit explained that "[t]he parties dispute whether the district court's joint-ownership analysis was *dicta* or an alternative holding," and declined to resolve that dispute, instead holding "[t]he record is unclear, and the district court is best positioned to clarify on remand." *Id.* at 410 n.21.

### 2.    Nominee doctrine standard

On remand, this Court benefits from the Circuit's detailed instructions. First and foremost, it is clear that the SEC bears the burden of showing that Mr. Ahmed was the "true owner of each asset." *Ahmed*, 72 F.4th at 410. And the Court must determine whether the SEC has met that burden on an asset-by-asset basis. That the SEC bears the burden as to each individual asset, however, does not preclude consideration of evidence—like the Ahmed's failure to testify— that might apply to all or many of the disputed assets. *Id.* Nor does it preclude "group[ing] of similar assets." *Id.* at 409–10. The Court will group assets only, however, where the assets are so alike that substantially the same application of law to facts governs the outcome of that determination.

The Circuit did not endorse any particular test for determining if a relief defendant was a mere nominee. It repeatedly referenced the six-factor test the district court employed, but it neither pointed toward shortcomings with that test nor adopted it. But the Circuit did explain that equitable doctrines like the nominee doctrine looked to "intent, rather than to [] form." *Id.* at 408. Here, the gravamen of the nominee inquiry is the legitimacy of the transfer to the third party: that is, whether the asset was transferred to the nominee "for the mere purpose of avoiding [] liability" by the wrongdoer. *Id.* at 408–09. The question is whether the asset "is, in reality, [] an asset of [the] defendant." *SEC v. Heden*, 51 F. Supp. 2d 296, 299 (S.D.N.Y. 1999),

24

*aff'd sub nom. Smith*, 646 F. App'x 42. The nominee doctrine is but one way of determining whether an asset was in fact owned by a relief defendant or whether, though placed in a relief defendant's name, the asset remained truly owned by the wrongdoer. *See Smith*, 646 F. App'x at 43 ("Equitable ownership is established when 'an individual exercises considerable authority over the assets[,] acting as though the assets are his alone to manage and distribute.'" (quoting *In re Vebeliunas*, 332 F.3d 85, 92 (2d Cir. 2003)) (summary order); *see also United States v. Evseroff*, No. 00-CV-06029, 2012 WL 1514860, at *9 (E.D.N.Y. 2012) (The question is "whether a [defendant] has engaged in a sort of legal fiction . . . by placing legal title to property in the hands of another while, in actuality, retaining all or some of the benefits of being the true owner.").

To that end, the Circuit explained that whether a relief defendant was a nominee "turn[ed] on [the] third party's behavior toward a *particular* asset." *Ahmed*, 72 F.4th at 409. In determining an asset's true ownership, the Circuit held, courts should examine the behavior of the third party towards that asset, "such as whether the third party controlled, benefitted from, and/or transferred a particular asset held in a nominee's name." *Id.* at 409.

The six-factor test that the district court previously applied included consideration of (1) the degree of the defendant's control over the asset, (2) the length of time the asset had been held by the defendant or the relief defendant, (3) whether the defendant held an interest in or benefitted from the asset, (4) whether the defendant had transferred assets from his name into the disputed asset, (5) whether the defendant initially acquired the asset or contributed to its acquisition, and (6) whether the defendant withdrew funds from the asset or otherwise utilized the asset for financial gain. *Ahmed*, 123 F. Supp. 3d at 308 (citing *SEC v. McGinn, Smith & Co.*, 752 F. Supp. 2d 194, 207–08 (N.D.N.Y. 2010)).

*McGinn* developed that six-part test from the factors considered in *Heden*, 51 F. Supp. 2d at 299–303, and *Heden* itself did not purport to apply any established test. Instead, *Heden* merely discussed these six considerations because the facts of that case made these six factors relevant in determining the true owner of the contested assets. *Id.* And *Heden* did not cite binding authority as requiring consideration of these factors (exclusively or otherwise), nor does any such authority appear to exist.[27]

The absence of binding authority adopting a particular nominee test is consistent with the Court of Appeals' guidance that this inquiry should be one of intent rather than form. The core inquiry—who owns the asset—controls and, at equity, that inquiry was flexible. Therefore, the Court declines to rigidly adopt any specific multi-factor test. The *McGinn* test identifies factors that are highly probative in determining an asset's true ownership, but formulaic application of any given multifactor test is inconsistent with the equitable origins of the nominee doctrine. Instead, the Court will rely on the *McGinn* test as a starting point for its inquiry but may introduce other considerations when a particular asset's background gives rise

---

[27] In this Circuit, the nominee doctrine also appears in enforcement actions for tax code violations, where it takes the form of a second six-factor test. That test asks: "(1) whether inadequate or no consideration was paid by the nominee; (2) whether the property was placed in the nominee's name in anticipation of a lawsuit or other liability while the transferor remains in control of the property; (3) whether there is a close relationship between the nominee and the transferor; (4) whether they failed to record the conveyance; (5) whether the transferor retains possession; and (6) whether the transferor continues to enjoy the benefits of the transferred property." *Nassar Fam. Irrevocable Tr. v. United States*, No. 13-CV-5680, 2016 WL 5793737, at *7 (S.D.N.Y. Sept. 30, 2016), *aff'd in part, appeal dismissed in part sub nom. United States v. Nassar*, 699 F. App'x 46 (2d Cir. 2017) (quoting *Giardino v. United States,* No. 96-CV-6348, 1997 WL 1038197, at *2 (W.D.N.Y. Oct. 29, 1997)); *see also First Corp. Sedans, Inc. v. United States*, No. 94-CV-7642, 1996 WL 145958, at *4 (S.D.N.Y. Apr. 1, 1996) (Chin, J.); *Everoff,* 2012 WL 1514860, at *10. This test addresses essentially the same considerations.

to other probative factors. Likewise, if a factor from this test does not provide meaningful guidance as to the ownership of a given asset, the Court may decline to apply that factor to that asset.

Lastly, though it is clear that the SEC bears the burden of establishing that Mr. Ahmed is the actual owner of each asset, there is no authority holding—and the Ahmeds do not argue—that the SEC must do so by a higher standard than "[t]he usual standard of proof in civil litigation[, the] preponderance of the evidence." *E.M.D. Sales, Inc. v. Carrera*, 604 U.S. 45, 47 (2025). *Carrera* explained that "[a] more demanding standard. . . applies only when a statute or the Constitution requires a heightened standard or in certain other rare cases, such as when the government seeks to take unusual coercive action. . . more dramatic than entering an award of money damages or other conventional relief." *Id.*

Disgorgement is not that sort of unusually coercive action because it seeks essentially conventional relief in the form of the return of illicitly obtained gains. *Cf. Hoffer v. Tellone*, 128 F.4th 433, 439 (2d Cir. 2025) ("The Supreme Court has listed as examples of such 'important individual interests or rights': proceedings to terminate parental rights, involuntary commitment proceedings, and deportation, while noting that other 'severe civil sanctions' can be proved by a preponderance of the evidence." (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 389–90 (1983))). And in determining nominee status, circuits evaluating the issue have concluded that the preponderance standard ought apply. *See In re Dordevic*, 67 F.4th 372, 382 (7th Cir. 2023).[28] Therefore, the Court will apply the preponderance standard

---

[28] *Dordevic* arose in the bankruptcy context, but there is no particular reason to conclude that the standard should be heightened in a securities action.

and require the SEC to show that it is "more likely than not" that Mr. Ahmed is the true owner of the asset.[29] *Villiers v. Decker*, 31 F.4th 825, 834 (2d Cir. 2022). That means, however, that if the evidence is in equipoise, the Court will conclude that the SEC has not met its burden; or, put otherwise, the presumption is that the SEC has not met its burden.

### 3. *Cavanagh* doctrine

The *Cavanagh* doctrine stems from the history of courts of equity that would "'wrest property fraudulently acquired, not only from the perpetrator of the fraud, but . . . from his children and his children's children, or, as elsewhere said, from any persons amongst whom he may have parceled out the fruits of his fraud.'" *Ahmed*, 72 F.4th at 408 (quoting 3 John Norton Pomeroy, Equity Jurisprudence § 918, at 601 (5th ed. 1994)). *Cavanagh* provides a more straightforward standard, holding that a third-party relief defendant may be liable in a securities-enforcement action where "(1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds."[30] 155 F.3d at 136. As with the nominee doctrine, "'[t]he burden rests with the Commission to show that the funds in the possession of [the relief defendant] are ill-gotten.'" *McGinn,* 752 F. Supp. 2d at 205 (quoting *Fed. Trade Comm'n v. Bronson Partners, LLC*, 674 F. Supp. 2d 373, 392 (D. Conn. 2009)).

A gift, for example, is not considered a "legitimate claim" under *Cavanagh*. *See Walsh*, 618 F.3d at 226. But *Cavanagh* recognizes that "third parties, like the Relief Defendants, have

---

[29] The vast majority of these determinations, however, are not close calls. As a result, unless the Court clarifies that a particular determination was particularly difficult or close, the Court finds that the successful party would also meet the higher 'clear and convincing evidence' standard.

[30] "Although *Cavanagh* [] was decided in the asset-freeze context, it is based on the same background principles of equity, including the bona fide purchase rule," and therefore "relief-defendant liability under *Cavanagh* [] applies to disgorgement." *Ahmed*, 72 F. 4th at 408.

a bona fide purchase defense," an "inherently asset[-]specific" defense which requires courts "to determine whether a third party (1) gave value in exchange for an asset in particular and (2) lacked notice as to that asset's true provenance." *Ahmed*, 72 F.4th at 408. The bona-fide purchaser defense, then, may be applied to defeat availability under *Cavanagh*.

Because the *Cavanagh* doctrine is born of equitable principles, it, like nominee liability, requires a flexible inquiry. Nonetheless, the Court concludes that the two factors established in *Cavanagh*—whether a relief defendant "(1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds"—effectively determine whether assets titled to a relief defendant are ill-gotten goods available to satisfy a judgment and will apply those factors. 155 F.3d at 136. And, for the same reasons articulated in its discussion of the evidentiary standard for nominee doctrine determinations, the Court will apply the preponderance of the evidence standard to *Cavanagh* determinations.

### 4.    Jointly held assets

The Second Circuit concluded that the "record [wa]s unclear" as to "whether the district court's joint-ownership analysis was dicta or an alternative holding," and held that the district court was best positioned to clarify on remand. *Ahmed*, 72 F.4th at 410 n.21. The SEC asks this Court to hold that the initial ruling was clear and that these items were not remanded for reconsideration.[31] The Court disagrees and concludes that in light of the Second Circuit's ruling that the district court's previous joint-ownership discussion was ambiguous, the Court must now examine the issue anew.

---

[31] Mot. for Post-Remand Relief at 34–35.

The SEC contends first that "the Court of Appeals explicitly held that 'joint-ownership' is an 'example' of an 'alternative theory' that would permit 'disgorgement of [an] asset.'"[32] That is literally true, but the framing is misleading. The quotes that the SEC points to, in context, are part of a discussion about whether the SEC has preserved its right to pursue alternative theories in addition to the nominee doctrine, and joint-ownership was one such theory put forward by the SEC. But the Circuit said nothing about the viability of such a theory of recovery. Instead, the entirety of the Second Circuit's analysis of joint-ownership liability is as follows: "If the district court finds that an asset is not nominally owned by one of the Relief Defendants, then the district court may consider whether an alternative theory of relief-defendant liability permits disgorgement of the asset. For example, the district court may apply *Cavanagh* [] liability *or a joint-ownership theory*." *Ahmed*, 72 F.4th at 410 (emphasis added).

The Court concludes that this statement does nothing more than clarify that the SEC has preserved its ability to seek theories of relief beyond the nominee doctrine. Compare the Second Circuit's explicit endorsement of the *Cavanagh* and nominee doctrines to its mere statement that "the district court may consider whether an alternative theory . . . permits disgorgement of the asset." Unlike the Circuit's discussion of the nominee and *Cavanagh* doctrines, its discussion of joint ownership does not establish principles of adjudication. For that reason, the Court concludes that it must first determine whether mere joint ownership of an asset by the defendant renders that asset available to satisfy a judgment against the defendant.

---

[32] *Id.* at 34 (citing *Ahmed*, 72 F.4th at 410).

Properly understood, however, this issue presents only a straightforward question about the satisfaction of a judgment, not a question about equitable ownership, securities law, or disgorgement. The SEC has secured a judgment against Mr. Ahmed. It now seeks, as a judgment creditor, to execute that judgment against assets owned in part by Mr. Ahmed and in part by the Relief Defendants.

The process by which a judgment creditor may seek to effectuate that judgment against a judgment-debtor's assets is well-known in federal practice. "Under Federal Rule of Civil Procedure 69(a), '[p]rocess to enforce a judgment for the payment of money shall be a writ of execution,' and '[t]he procedure on execution, in proceedings supplementary to and in aid of a judgment, and in proceedings on and in aid of execution shall be in accordance with the practice and procedure of the state in which the district court is held.'" *All. Bond Fund, Inc. v. Grupo Mexicano De Desarrollo, S.A.*, 190 F.3d 16, 20 (2d Cir. 1999).

This Court is located in Connecticut, so it looks to Connecticut law. And "our case law is clear that joint accounts can be executed upon in their entirety even when only one co-owner is the judgment debtor." *Clark v. Quantitative Strategies Grp., LLC*, 311 A.3d 732, 739 n.11 (Conn. App. Ct. 2024) (quoting *Fleet Bank Conn., N.A. v. Carillo*, 240 Conn. 343, 352 (1997) for the proposition that, in the context of bank accounts, "each coholder of a joint account . . . has a sufficient property interest [in the account] to permit a *judgment* creditor to exercise a bank execution[] pursuant to [state law] against the entire account").

And Connecticut courts have been clear that this principle is not limited to "accounts." *See Sarasota CCM, Inc. v. Golf Mktg., LLC*, 891 A.2d 72, 74 (Conn. App. Ct. 2006) (recognizing that Connecticut's "legislature's intent [is] to allow a judgment creditor to execute against all forms of a judgment debtor's assets" and therefore a creditor is "entitled to

reach any property in which the judgment debtor had a cognizable interest"). Nothing in Connecticut law requires apportioning jointly owned assets among their owners and allowing a recovery to be executed only against the judgment-debtor's portion. Instead, joint owners have "sufficient ownership interests . . . so that [a] creditor of any one [joint owner] may exercise setoff rights against [the asset] in its entirety." *Clark*, 311 A.3d at 739 n.11 (describing the holding of *Masotti v. Bristol Sav. Bank*, 232 Conn. 172, 173–75 (1995)).

In a non-precedential summary order, the Second Circuit directly addressed whether joint equitable ownership meant that the entirety of an account was available to satisfy a judgment. *Smith*, 646 F. App'x at 42. In *Smith*, the Circuit first concluded that the defendant was a joint equitable owner of an account that was in the name of a relief defendant, and then relied on the law of the forum state to hold that the entire account was available to satisfy the judgment. *Id.* at 43 ("'The opening of a joint bank account creates a rebuttable presumption that each named tenant is possessed of the whole of the account so as to make the account vulnerable to levy of a money judgment by the judgment creditor of one of the joint tenants.'" (quoting *JRP Old Riverhead, Ltd. v. Hudson Sav. Bank*, 965 N.Y.S.2d 176, 177 (N.Y. App. Div. 2013)). *Smith* does not explicitly refer to Rule 69, but its discussion of New York state law can only be understood to apply Rule 69's invocation of forum state execution-of-judgment law. *Smith* thus confirms that whether a jointly owned asset is available to satisfy a judgment is a question not of the asset's equitable ownership, but of routine post-judgment procedure.[33]

---

[33] The Court would reach the same conclusion, however, exercising only its equitable powers. The equitable remedy of disgorgement is well-established, *see* Liu, 591 U.S. 71, but it would be

Here, the SEC does not explicitly seek a writ of execution pursuant to Rule 69, but the relief it presumes nonetheless sounds in the execution of a judgment. Presumably because the assets are frozen and under court control and the ultimate distribution of those assets will likely be to Mr. Ahmed's victims, the SEC seeks only an order from this Court holding that the jointly owned assets are available to satisfy the judgment against Mr. Ahmed.[34] Under Rule 69, this Court looks to the law of the state in which the Court is located; and, in turn, Connecticut law entitles the SEC to that determination. Therefore, the SEC may execute its judgment against any asset owned—whether in whole or in part—by Mr. Ahmed. The Court will note in its asset-by-asset discussion whether a given asset is recoverable under Rule 69, but the Court agrees with the SEC's conclusion that the Parties do not dispute that eleven assets are jointly owned.[35] The Court, therefore, holds that those assets are available to satisfy the judgment against Mr. Ahmed due to his ownership share in those assets.[36]

---

rendered meaningless if a wrongdoer could escape its reach merely by placing an asset also in the name of their spouse. As to each of the joint ownership determinations that follow throughout, therefore, the Court notes that it would reach the same conclusion under its equitable powers.

[34] Rule 69(a) refers to "money judgments," and the SEC's judgment in this case requires Mr. Ahmed to turn over a certain amount of ill-gotten funds pursuant to the equitable remedy of disgorgement. The equitable nature of the remedy notwithstanding, courts routinely grant Rule 69 motions seeking execution of disgorgement judgments. *See, e.g.*, *SEC v. Colonial Inv. Mgmt. LLC*, No. 07-CV-8849, 2010 WL 4159276, at *1, *4 (S.D.N.Y. Oct. 6, 2010); *SEC v. Seagal*, No. 21-MC-1797, 2022 WL 17851620, at *1 (E.D.N.Y. Sept. 19, 2022); *SEC v. Gold Standard Mining Corp.*, No. CV 12-5662, 2017 WL 6043988, at *4 (C.D. Cal. Oct. 26, 2017), *report and recommendation adopted*, No. CV 12-5662, 2017 WL 6061609 (C.D. Cal. Dec. 6, 2017).

[35] Mot. for Post-Remand Relief at 35.

[36] The Ahmeds argue that the SEC overstates the amount of disgorgement required as to "joint" account x9566, asset number 40 on the SEC's asset schedule. *See* Br. in Opp. at 81–82 & n.34 & 35. But this Court holds that the account as a whole is available to satisfy the judgment because it is jointly owned, so the amount of illicitly obtained funds that entered the account is irrelevant.

### 5. Broadly applicable evidence of ownership

The Second Circuit's opinion in *Ahmed* contemplates the consideration of some forms of evidence that are broadly applicable to a number of assets. *See Ahmed*, 72 F.4th at 410 (discussing permissible adverse inferences). In this section of the opinion, the Court makes findings as to these broadly applicable pieces of evidence. In subsequent portions of the opinion, the Court references these findings as part of its determinations as to individual assets.

### a. The Ahmeds' incoming assets

The evidence clearly establishes that the vast majority—more than 97%—of the Ahmeds' incoming assets between 2004 and 2015 are attributable to Mr. Ahmed. Therefore, the Court finds it unlikely that funds earned by the Relief Defendants were used to purchase the assets placed in the names of the Relief Defendants.[37] This is even more true for those assets valued in the many millions, far above the amount of income brought in by Ms. Ahmed.

A highly qualified[38] SEC expert witness submitted a report showing that of the $64,697,094.26 in non-suspect pretax income that the Ahmeds brought in during that period, only $1,938,133.00 was attributable to Ms. Ahmed.[39] Ms. Ahmed's share of this income works out to less than three percent, a number that is diluted much further when the $67 million that Mr. Ahmed brought in fraudulently is included in the household's incoming assets. The Court will evaluate how each asset was purchased based on the record as it relates to that individual

---

[37] This determination is relevant both to the factor of the *Cavanagh* test regarding whether a relief defendant "has a legitimate claim" to an asset as well as to the following factors of the nominee analysis: (4) whether the defendant transferred assets from his name into the asset and (5) whether the defendant contributed to the initial acquisition of the asset.

[38] *See* ECF No. 888-15 at 1–3 § 1.A, 14–18.

[39] *Id.* at 9 (Table 1).

asset, but this background reveals that the overwhelming majority of the Ahmeds' assets were likely purchased using funds brought in by Mr. Ahmed.

### b.    Ms. Ahmed's inconsistent testimony

Ms. Ahmed has given fundamentally contradictory testimony regarding her ownership of the frozen assets. Specifically, when deposed just a few months after this action was filed, Ms. Ahmed did not claim that a single frozen asset belonged to her.[40] And when specifically questioned about more than $24 million in checks that were written to her from Mr. Ahmed over the previous eighteen months, Ms. Ahmed repeatedly disclaimed any knowledge about the reason for these checks.[41] Nor could Ms. Ahmed identify the vast majority of the assets in her name.[42] Even though several highly valuable real estate assets in her name were generating rental income, Ms. Ahmed could not identify any taxable income she had (other than from her prior employment at Goldman Sachs).[43] And, in interrogatory responses, Ms. Ahmed similarly claimed to own only very few assets. *Ahmed*, 343 F. Supp. 3d at 33.

---

[40] ECF No. 891-2 at 15–16.

[41] *Id.* at 15–17, 19 (Just a few of these answers: "Q. Okay. Why did Iftikar Ahmed write you a check for $500,000 on January 7th, 2013? A. I don't remember. . . Q. And why did your husband write you a $2 million check on August 15, 2014? A. I don't remember. . . Q. Why did your husband write you a $500,000 check on September 23rd, 2014? A. I don't remember. . .  Q. Why did Ahmed write you a $1.2 million check on November 6th, 2014? A. I don't remember. . . Q. Why did Iftikar Ahmed write you a $1.5 million check on November 17th, 2014? A. I don't remember.").

[42] *Id.* at 16 ("Q. How many bank accounts do you hold solely in your name? A. I don't know. Q. How many brokerage accounts do you hold solely in your name? A. I don't know. Q. How many assets do you hold solely in your name? A. I don't know.").

[43] *Id.* at 7.

Now, however, as she seeks to establish that she is the true owner of these assets, Ms. Ahmed insists that because she "is a highly qualified financial investor with years of professional experience and degrees from Princeton and Harvard, [] it is absurd to suggest that she is merely a nominee."[44] Ms. Ahmed argues that, as an "experienced investment professional, [] *she* controlled the accounts."[45] And, as the availability of these assets to satisfy the judgment is disputed, Ms. Ahmed now asserts an ownership interest in the vast majority of frozen assets.

The Court concludes that this dramatic shift is not supported by an adequate explanation. Instead, the Court finds that this shift likely represents a strategic litigation decision. The Court finds Ms. Ahmed, generally speaking, not to be a reliable witness. And, of these two major irreconcilable positions, the Court finds that the evidence supports the conclusion that Ms. Ahmed's initial position—taken without the benefit of a clear view of the SEC's position and without the opportunity to learn more about the assets at issue—is by and large the more truthful position. Therefore, the Court will generally credit Ms. Ahmed's initial testimony regarding her knowledge and management of the assets.

At this stage, Ms. Ahmed argues that she was not the nominal owner of any asset because she received the asset in exchange for services she performed and exercised complete control over the assets in her position as the family's chief investment officer. In her own words, she "spent substantial time and energy in controlling, managing, and investing these

---

[44] Br. in Opp. at 1.

[45] *Id.* at 73 (emphasis in original).

assets."[46] To begin, the Court notes that even if this were the case, it would not disturb any of its nominee or *Cavanagh* doctrine determinations except—perhaps—those few determinations for which the Court notes that its finding was a close call.

More importantly, though, the Court finds this claim unconvincing for two reasons: (1) it was made for the first time only years into a decade-long case, and only at a time where it might be advantageous to her interests and (2) it simply is not supported by the record, which is littered with Mr. Ahmed's deep involvement with even minor logistical decisions in every corner of his financial network. And the evidence Ms. Ahmed adduces to support her claim is largely her own say-so, developed years into this litigation.

Ms. Ahmed claims that she "met with various advisors, selected asset managers and equity investment strategies, and conducted substantial due diligence on funds for placement of the joint assets, and reviewed and rejected a variety of management teams."[47] Even if the Court agreed with this statement in full, it would not be sufficient to outweigh the overwhelming evidence—discussed throughout—that Mr. Ahmed nearly entirely funded all of the family's assets and predominately managed these assets.

### c.    Adverse inferences

Throughout this action, the Ahmeds have categorically refused to answer a number of important questions about their assets. "Parties are free to invoke the Fifth Amendment in civil cases, but the court is equally free to draw adverse inferences from their failure of proof." *SEC*

---

[46] Br. in Opp. at 23.

[47] *Id.*

*v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998).[48] "A court may draw an adverse inference against a party who asserts his Fifth Amendment privilege in a civil matter, because the invocation of the privilege results in a disadvantage to opposing parties by keeping them from obtaining information they could otherwise get." *SEC v. Collector's Coffee, Inc.*, 697 F. Supp. 3d 138, 154 (S.D.N.Y. 2023).

"The determination whether to draw an adverse inference from a Fifth Amendment claim and the scope of the inference are within the discretion of the court." *Donoghue v. Retrophin, Inc.*, No. 14-CV-7640, 2015 WL 13882435, at *2 (S.D.N.Y. July 20, 2015). "The decision . . . will turn at least in major part on whether invocation of the privilege has prevented the other side from obtaining relevant information." *Id.* (citing *United States v. Certain Real Prop. & Premises Known as 4003-4005 Fifth Ave.*, 55 F.3d 78, 84 (2d Cir. 1995)). "An adverse inference is designed to balance the equities when a party is deprived of evidence[] and must 'be only one of a number of factors the factfinder will consider and be given no more weight than the facts of the case warrant.'" *Collector's Coffee*, 697 F. Supp. 3d at 154 (quoting *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 97–98 (2d Cir. 2012)). At times, so long as the other facts in a case do not indicate otherwise, "[a]n adverse inference may be given significant weight because silence when one would be expected to speak is a powerful persuader." *LiButti v. United States*, 178 F.3d 114, 120 (2d Cir. 1999) (citing *United States ex rel. Bilokumsky v. Tod*, 263 U.S. 149, 153–54 (1923)).

---

[48] The Second Circuit affirmed the availability of an adverse inference in this case. *See Ahmed*, 72 F.4th at 409 n.19 ("[C]ourts in civil cases can draw adverse inferences against relief defendants should they invoke their Fifth Amendment privilege not to testify.").

Both of the Ahmeds have repeatedly refused to answer questions regarding the assets placed into the names of the Relief Defendants. These refusals largely, if not entirely, took place after the SEC began arguing that the Relief Defendants were only nominal owners of assets in their names.[49] Mr. Ahmed consistently has invoked his Fifth Amendment right against self-incrimination and has refused to answer any questions about assets transferred to or obtained in the names of the Relief Defendants.[50]

The Second Circuit was clear that, on remand, this Court "should state on the record what, if any, adverse inferences it draws from the Relief Defendants' failure to testify." 72 F.4th at 410. At a high level, the adverse inference drawn following a refusal to testify is generally that the answer to a refused question would have been "adverse to the witness' interest." *Mirlis v. Greer*, 952 F.3d 36, 44 (2d Cir. 2020); *see also* Leonard B. Sand et al., 4 *Modern Federal Jury Instructions: Civil*, Instruction 75-5 (2019) ("[I]n civil cases, you are permitted, but not required, to draw the inference that withheld information would have been unfavorable to the defendant.").

Here, the Ahmeds both refused to answer questions about the transfer of assets into the names of the Relief Defendants. Specifically, Mr. Ahmed refused to answer questions about the purpose behind these transfers, and Ms. Ahmed likewise refused to answer questions about, for example, how she came to be named as the owner of various assets.[51] The Court therefore

---

[49] *See, e.g.*, Supp. Mem. in Support of Prelim. Inj., ECF No. 98, at 16–21.

[50] *See* ECF No. 888-17 at 21:3–16; 25:13–26:7; 28:18–29:10; 32:3-20; 36:11–37:3; 40:7–25; 43:24–44:19; 47:21–48:14; 52:6–23; 57:1–8; 58:12–59:8; 61:13–62:8; 65:22–66:20; 69:5–70:2; 72:9–73:6; 77:25–78:18; 82:22–83:15; 89:5–90:9; 96:18–98:1; 102:3–23; 108:22–110:4.

[51] *See, e.g.*, ECF No. 891-2 at 94:5–97:8; ECF No. 891-4 at 389:3–18; 395:16–397:7; 476:13–16.

draws an adverse inference that the answers to these questions would have tended to prove that the Relief Defendants were nominal owners of the assets.

More specifically, from Mr. Ahmed's refusal to answer questions about why he placed assets in the names of the Relief Defendants, the Court draws the inference that the answer to those questions would likely have indicated that Mr. Ahmed transferred the assets to protect them against a possible future recovery and that he intended to continue to exercise control over the assets. And, with respect to Ms. Ahmed's refusal to answer questions about how she came to own the assets, the Court draws the inference that her answer to these questions would likely indicate that she did not give consideration for these assets and, instead, was aware of Mr. Ahmed's efforts to protect assets against reclamation.[52]

### 6.    Asset-by-asset determinations

The Court proceeds to evaluate the availability of each asset to satisfy the judgment on an asset-by-asset basis. The Court notes that it will not respond directly to every argument made in the many hundreds of pages of briefing on this motion, but that it has nonetheless carefully considered each.

### i.    Assets titled solely to Mr. Ahmed

In entering final judgment against Mr. Ahmed, the district court held that assets owned by Mr. Ahmed were available to satisfy the judgment against him.[53] That judgment was

---

[52] Once again, however, the overwhelming majority of these determinations are clear. Therefore, unless the Court specifically notes otherwise, the Court would have reached the same conclusion as to each finding with or without these inferences.

[53] Amend. Final Judgment at 5–8.

appealed,[54] but those determinations were not disturbed on appeal.[55] Instead, only assets whose availability to satisfy the judgment was reliant on the district court's application of the nominee doctrine require a redetermination of their ownership. Accordingly, the availability of the following assets titled only to Mr. Ahmed is not at issue here: Asset numbers 1–15, 18–21, 23–24, 28, and 36. Further, the following unnumbered assets are not at issue for the same reason: the Ribbit Capital Bitcoin Distribution, Playsino, OMC Class B Shares, the Oak Non-Forfeited Interests, and the Fidelity x1744 account.

### ii.  Assets not at issue before the Second Circuit and thus not amenable to dispute on remand

There are also some number of assets whose availability the Ahmeds explicitly did not contest before the Second Circuit. The Relief Defendants' extensive, careful, and counseled brief before the Circuit provided a list of "assets at issue in this appeal."[56] That list did not include a number of assets that are part of the Receivership Estate.[57] The Court now concludes that these assets are not at issue on remand. The Ahmeds designated the entirety of the district court's previous adjudications as subject to appeal,[58] but on appeal, the Relief Defendants explicitly disclaimed any desire to dispute findings related to the availability of those assets. The Relief Defendants cannot now reconsider that decision and argue that the assets are, in fact, available. Doing so would prejudice the SEC, the appellee in those proceedings, who

---

[54] ECF No. 1100.

[55] ECF No. 2913.

[56] *SEC v. Ahmed*, No. 21-1656 (2d Cir. 2023), ECF No. 79 at 16-17.

[57] Asset Schedule at lns. 40–48, 76.

[58] ECF No. 1105 at 1.

could have argued for affirmance at the Court of Appeals regarding those assets (whether on the grounds that the district court reached or on any other basis supported by the record). The Court, therefore, concludes that these assets are available to satisfy the judgment against Mr. Ahmed.[59]

### iii.    Assets affirmed as available under the nominee doctrine by the Second Circuit

The Second Circuit affirmed the District Court's application of the nominee doctrine to three assets, which no longer require a determination of their availability: Asset numbers 25, 71–72 (both owned by the Iftikar A. Ahmed Family Trust, which the Second Circuit affirmed was available to satisfy the judgment, *Ahmed*, 72 F.4th at 409), and 75.

### iv.    Forfeited assets

Mr. Ahmed forfeited a number of interests in Oak funds as a result of his termination for cause by Oak. *See Ahmed*, 72 F.4th at 398. Those assets, therefore, are indisputably not available to satisfy the judgment: Asset numbers 16–17, 22, 29–35, and the Oak HC/FT Cash Distributions.

### v.    Previously returned assets

Three assets were previously returned to the Relief Defendants, and the SEC does not seek a determination that they are now available to satisfy the judgment. These three assets are thus not at issue: Asset numbers 37–39.[60]

---

[59] The Court may, at times, make alternate findings relating to these assets. For example, many of these assets are covered by the Court's holding that the joint ownership of some assets is not disputed. *See supra* Sec. II.B.4.

[60] Mot. for Post-Remand Relief at 6–7 n.2.

### vi.    DIYA Holdings LLC and DIYA Real Holdings LLC

Two Relief Defendants—DIYA Holdings LLC and DIYA Real Holdings LLC—have substantially similar backgrounds and, therefore, are amenable to joint resolution of the availability of the frozen assets they hold. These two Relief Defendants own five assets on the Asset Schedule, including four bank accounts and two apartments at 530 Park Avenue in New York City.[61] As to each of these assets, the SEC asserts availability to satisfy the judgment because Mr. Ahmed has an ownership interest, Ms. Ahmed's ownership is merely nominal, and, in the alternative, through the *Cavanagh* doctrine.[62]

The Court begins with the nominee analysis. First, these two limited liability corporations are solely held by Ms. Ahmed.[63] But it was essentially Mr. Ahmed alone who established these entities. The attorney who was responsible for consulting on the strategic decisions behind setting up these entities to purchase real estate, and who later filed the paperwork to do so, testified that it was Mr. Ahmed who first approached him about setting up these LLCs and that it was Mr. Ahmed who worked with him to do so.[64] Consistent with the attorney's testimony that each DIYA entity was meant to hold real estate assets,[65] each purchased one condominium worth many millions. *Ahmed*, 123 F. Supp. 3d at 310.

---

[61] Asset Schedule at lns. 61–66.

[62] Asset Schedule at 5–6.

[63] ECF No. 888-20 at 6–7; ECF No. 888-21 at 4. At first, Mr. Ahmed owned one percent of DIYA Real Holdings, but that ownership interest was later transferred to an entity owned by Ms. Ahmed. ECF No. 888-21 at 4, 7.

[64] ECF No. 888-20 at 5, 8–9; ECF No. 888-21 at 4–5, 7.

[65] ECF No. 888-20 at 5; ECF No. 888-21 at 4.

The record demonstrates that Mr. Ahmed was intimately involved in the purchase of these real estate assets including, among other things, writing checks into the DIYA accounts for the purchase of the assets.[66] Mr. Ahmed attended the closing on the DIYA Holdings apartment and handwrote information on the purchase documents.[67] Ms. Ahmed, meanwhile, was usually unable to provide basic information about those purchases, such as the price.[68] Nor could Ms. Ahmed provide elementary information about the rental of the DIYA Holdings apartment.[69]

Mr. Ahmed was also predominately responsible for the management of the assets. For example, he alone negotiated the lease for the DIYA Holdings apartment.[70] In that instructive email chain, Ms. Ahmed is the recipient of the emails, but forwarded these emails directly to Mr. Ahmed, who provided decisive instruction.[71] That sort of relationship is a paradigmatic example of a nominee-real owner relationship, wherein the nominee defers entirely to the decision-making of the equitable owner.

Further, both apartments were purchased entirely with fraudulently obtained assets. The district court has already concluded that Mr. Ahmed orchestrated a fraud netting approximately

---

[66] ECF No. 68-21 at 13 (check written by Mr. Ahmed from account funded by frauds to DIYA accounts); ECF No. 835 at 8–11 (concluding that Mr. Ahmed's frauds funded the purchase of the apartments).

[67] ECF No. 891-11 at 7, 10.

[68] *See, e.g.*, ECF No. 891-2 at 31.

[69] *Id.* at 7, 35 (testifying that she could not provide the renters' names, the dates of the lease, the terms of the lease, and the total earned from renting the apartment).

[70] ECF No. 888-39.

[71] *Id.* at 2.

$11 million in proceeds. 308 F. Supp. 3d at 640–41. As carefully explained in the declaration of an experienced attorney who investigated the Ahmeds' movement of assets, that fraud directly funded DIYA Holdings apartment purchase.[72] A nearly identical series of events occurred with respect to the DIYA Real Holdings apartment. Mr. Ahmed netted $18 million from a fraud he perpetrated on an Oak fund. *Ahmed*, 308 F. Supp. 3d at 639–40. That money was then transferred through Mr. Ahmed's individual accounts and the Ahmeds' joint accounts before being used to purchase the apartment owned by DIYA Real Holdings.[73] And the Ahmeds consistently refused to explain why these entities were placed in Ms. Ahmed's name,[74] from which the Court draws the adverse inference that the answers would likely have indicated that Ms. Ahmed was only a nominal owner.

The Court concludes that Mr. Ahmed entirely funded the DIYA entities by transferring assets from his name into those entities and that Mr. Ahmed exerted control over and predominately managed these entities. With or without the widely applicable evidence regarding ownership, the SEC has clearly established that Mr. Ahmed was the equitable owner of the DIYA entities. That includes the non-real estate DIYA assets, which were part and parcel of Mr. Ahmed's ownership of the DIYA entities and management of their real estate holdings.

---

[72] ECF No. 68 at 16–17.

[73] *Id.* at 17–18.

[74] *See, e.g.*, ECF No. 888-17 at 29–30; ECF No. 891-11 at 12–13. The Ahmeds also refused to let their attorney testify as to the reason for these transfers. ECF No. 888-20 at 6–7.

Even if the Court did not conclude that Mr. Ahmed was the sole equitable owner of the two DIYA entities, the record makes perfectly clear that he is at least a partial equitable owner. Under Rule 69 and Connecticut state law, then, the asset is available for collection.[75]

In the alternative, if Ms. Ahmed were the equitable owner, the assets would be subject to disgorgement under *Cavanagh*. Ms. Ahmed has produced no evidence that her ownership in these entities was anything but a gift from Mr. Ahmed of assets purchased with ill-gotten funds. Even if Ms. Ahmed were the owner of these assets, she would have no legitimate claim to those assets, and they would be subject to disgorgement.

The Court concludes that Asset numbers 61–66 are available to satisfy the judgment under all three theories.

### vii.    I-Cubed Domains, LLC and the Shalini A. Ahmed 2014 Grantor Retained Annuity Trust ("GRAT")

Assets owned by these two entities are amenable to group analysis because the GRAT was created for the purpose of holding a 99% interest in I-Cubed (and a 99% interest in I-Cubed was transferred to the GRAT shortly after its creation). *Ahmed*, 308 F. Supp. 3d at 642.[76] I-Cubed is the owner of five frozen assets, including one bank account and investments in four companies.[77] The GRAT is the owner of one asset, a bank account.[78] The SEC asserts that assets owned by I-Cubed are available to satisfy the judgment under all three theories of recovery.

---

[75] The same would be true under New York law. *See Smith*, 646 F. App'x at 43.

[76] *See also* ECF No. 888-19 at 6.

[77] Asset Schedule at lns. 67–70, as well as the unnumbered but "likely valueless investment" in Lola Travel Company.

[78] *Id.* at lns. No. 74.

The district court has already held that Ms. Ahmed was merely a nominal owner of I-Cubed. *See Ahmed*, 308 F. Supp. 3d at 641 n.8 (explaining that "[a]lthough Defendant moved I–Cubed into the name of his wife, she merely served as a nominee [and] Ms. Ahmed testified that despite being the 'owner' of I–Cubed, she played no role in the sale negotiations"). The Court concludes that it is not bound by that determination for purposes of I-Cubed's equitable ownership and weighs the factors relevant to the nominee analysis *de novo*.

I-Cubed was formed by Mr. Ahmed in 2012. *Ahmed*, 308 F. Supp. 3d at 641.[79] Two years later, after transferring his own interest in I-Cubed to Ms. Ahmed, Mr. Ahmed used I-Cubed to defraud an Oak fund out of $7.5 million, which he then transferred from I-Cubed into the GRAT. *Id.* at 641–42. Mr. Ahmed's total control of I-Cubed is clear in the frauds he used it to perpetuate: for example, it was Mr. Ahmed who negotiated the sale from I-Cubed to an Oak fund of shares in a third company without disclosing his interest in the other side of the transaction to Oak. *Id.* And, as described above, the GRAT was formed solely to serve as an ownership vessel for a stake in I-Cubed.

Ms. Ahmed admitted that I-Cubed was placed in her name only as a contingency related to her husband's health: "Q: So just to be clear, I-Cubed belonged to your husband, but it was transferred into your name in case your husband was no longer around? A: It was transferred in my name so that there would be assets in my name in case anything happened to him."[80] And in a follow-up, Ms. Ahmed disclaimed knowledge of I-Cubed's assets and dealings other

---

[79] For ease of reference, the Court will cite the summary judgment opinion's discussion of I-Cubed, which in turn provides citations to the evidence in the record.

[80] ECF No. 888-8 at 76–77.

than very vague, high-level knowledge: "Q: So to your knowledge, did [I-Cubed's transfer to your name] have anything to do with Oak purchasing stock in a company . . . ? A: My husband and I never spoke about what he did in his business dealings . . . We never spoke business to each other."[81] Throughout, her knowledge of I-Cubed was extremely limited: "Q: Do you know why the I-Cubed LLC was created? A: I do not know. Q: Do you know when the I-Cubed LLC was created? A: I don't know when it was created. Q: Do you have an understanding at all to the creation of I-Cubed? A: I do not. Q: Do you know what assets I-Cubed held in 2014? A: I did not know what assets were in there. I knew there was a company, but I didn't know the extent of whatever was in there."[82]

While Ms. Ahmed described the transfer of I-Cubed into her name as a contingency, Mr. Ahmed, for his part, refused to answer questions regarding the reason for the transfer entirely.[83] From this, the Court draws the inference that the answer to these questions would be adverse to Mr. Ahmed's interests, namely that the answers would indicate that I-Cubed was transferred to Ms. Ahmed with the intention that she would be merely a nominal owner.

The Court concludes that the SEC has demonstrated by overwhelming evidence that Ms. Ahmed was merely a nominal owner of I-Cubed (and, therefore, the assets in the GRAT). The Court finds that both were created and funded by Mr. Ahmed with fraudulently obtained assets. The Court further finds that Mr. Ahmed entirely controlled and managed both and, after weighing the evidence, the Court concludes that Mr. Ahmed was the equitable owner of both.

---

[81] *Id.* at 77.

[82] ECF No. 891-2 at 53.

[83] ECF No. 888-17 at 29–30.

Therefore, the Court finds that all of the assets owned by either entity are available to satisfy the judgment as equitably owned by Mr. Ahmed.[84]

Even if the Court did not conclude that Mr. Ahmed was the sole equitable owner of I-Cubed and the assets I-Cubed owns, the record makes perfectly clear that he is at least a partial equitable owner. Under Rule 69 and Connecticut state law, then, the asset is available for collection.[85]

Further, Ms. Ahmed explicitly disclaimed that she provided any consideration for the transfer of I-Cubed into her name.[86] Therefore, in the alternative, if Ms. Ahmed were the equitable owner of I-Cubed, its assets would be subject to disgorgement under *Cavanagh*. The Court concludes that, at best, these assets were a tainted gift, and Ms. Ahmed has no legitimate claim to these assets.

### viii.    Contents of Safety Deposit Boxes 1325, 1332, and 2465

The Ahmeds had three safe deposit boxes. When opened, those boxes contained gold bars, jewelry, coins, and other quantities of gold, and those items are listed as Asset numbers 52-60 and 84. These assets were stored together and the same testimony and evidence generally applies to these assets as a class, so the Court concludes that they are amenable to joint treatment. Notably, unlike many other assets at issue, these items do not have a formal title designating one of the Ahmeds as the owner. As a result, the Court determines ownership of

---

[84] Perhaps an asset owned by an entity could itself be owned by a different owner than the entity. Here, however, there is no evidence that is the case, and all of the frozen assets owned by these entities are part-and-parcel with the ownership of the entity.

[85] The same would be true under New York law. *See Smith*, 646 F. App'x at 43.

[86] *Id.* at 77.

these assets without reference to a verifiable titled owner and, in accordance with the SEC's request, does not make nominal ownership determinations.

Each of the three boxes was jointly leased to both Mr. and Mrs. Ahmed.[87] As this Court previously explained, "Ms. Ahmed did not even know of their contents until after the boxes were inventoried." *Ahmed*, 343 F. Supp. 3d at 34 n.18 (citing, as one example, the following colloquy from a preliminary hearing: "THE COURT: Is it still accurate that nobody knows what is in these safe deposit boxes?" [Counsel for Ms. Ahmed]: "That's correct, your Honor.")[88] . An initial deposition from Ms. Ahmed stated much the same in her own words: "I am also aware that there are safety deposit boxes at Bank of America that hold jewelry and other valuables. I do not recall the exact details of what is in the boxes[,] and I cannot access them due to the asset freeze, and thus I am unable to reliably estimate the value of these assets."[89] If Ms. Ahmed owned these assets, it is unlikely that she would not remember these assets nor be able to provide a description of them.

And the Court further notes its earlier conclusion that the vast majority of the Ahmeds' assets—especially those that, like the assets contained in the deposit boxes, commanded high purchase prices—were likely acquired by Mr. Ahmed. This conclusion is furthered by compelling direct evidence: Many of the items purchased appear on Mr. Ahmed's credit card statements. For example, the gold bars appeared on Mr. Ahmed's American Express statements, as did a number of significant charges for jewelry and art.[90]

---

[87] ECF Nos. 2806-44, 2806-45, 2806-46.

[88] ECF No. 465-2 at 4.

[89] ECF No. 149 at 11 (¶ 22).

[90] *See, e.g.* ECF No. 891-8 at 61, 75, 91, 98, 109, 121, 135-36, 140, 159, 179, 207, 223.

The Court agrees with the SEC that Ms. Ahmed's statements disclaiming knowledge of the boxes' contents are particularly credible because of the posture of the litigation at the time they were made. At that stage, Ms. Ahmed was arguing for the release of frozen assets on the grounds that the SEC was undervaluing those assets and that the frozen assets amply covered the SEC's (then-potential) judgment.[91] As a result, Ms. Ahmed's claims that she did not know the contents of the boxes were counter to her interest and are, therefore, particularly credible.

Instead, the (admittedly minimal) evidence in the record regarding control of the assets indicates that Mr. Ahmed was managing these assets. For example, it was Mr. Ahmed that withdrew these assets from the Ahmeds' insurance policy.[92] Mr. Ahmed, therefore, demonstrated a level of awareness of these assets that Ms. Ahmed did not demonstrate until after the deposit boxes were opened and inventoried.

Only after the assets were inventoried did Ms. Ahmed make a claim to them. Ms. Ahmed relies chiefly on the assertion that she controlled the items in these boxes, but she does not provide evidence to that effect. Her evidence is chiefly in the form of Record of Entry cards that show that she primarily (and in one case, solely) signed those cards demonstrating access to the safety deposit box.[93] But that does not mean Ms. Ahmed *solely* accessed those boxes: As the SEC points out, even when the Ahmeds jointly opened these boxes, only Ms.

---

[91] *See, e.g.*, ECF No. 152 at 3.

[92] ECF No. 888-23 at 2.

[93] ECF Nos. 2806-44, 2806-45, & 2806-46.

Ahmed's signature appeared on the record of entry.[94] At best, this shows that Mr. Ahmed did not access these boxes alone, but that fact is insufficient to outweigh all of the other evidence discussed throughout.

Ms. Ahmed asserts that she is the owner of all of the jewelry, even though it was purchased by Mr. Ahmed, because she "provided goods and services [] as a wife for whatever jewelry was given to me."[95] Ms. Ahmed declined to answer questions about what these "goods and services" were.[96] From this, the Court draws the adverse inference that she likely provided no particular good or service in exchange for these assets. Obviously, any marriage involves work from both parties, but that does not mean that any gift from one spouse to the other is instead compensation. For these reasons, the Court finds incredible Ms. Ahmed's claim that she provided consideration for these assets and now owns them.

And, at this stage, presented with pictures of the pieces of jewelry, Ms. Ahmed was able to somewhat more specifically identify the jewelry. However, her answers continued to be, on the whole, nonspecific and evasive.[97] The Court therefore declines to find that this represents noteworthy evidence of Ms. Ahmed's ownership of the assets.

---

[94] ECF No. 2806-45 (entry for Apr. 22, 2011). The same is true for another box. ECF No. 2806-44 (entry for Oct. 12, 2007). And, when Mr. Ahmed was added to the third box, he nonetheless did not sign the record of entry. ECF No. 2806-46 (entry for May 17, 2012).

[95] ECF No. 891-4 at 23.

[96] See id. at 22–23.

[97] See id. at 23–26. Even at this stage, Ms. Ahmed could not provide any information at all, even in nonspecific terms, about many of the pieces of jewelry. See id. at 19–23 (387:5–388:24 (Tiffany diamond bangle bracelet); 390:3–391:19 (diamond bracelet); 391:20-393:18 (Tiffany diamond necklace); 395:4–397:25 (Tiffany diamond bracelet); 400:15–404:22 (Tiffany diamond earrings, Cartier diamond earrings, and Tiffany Diamond ring)).

The Court concludes that Mr. Ahmed likely purchased these assets, controlled, and cared for these assets. Therefore, the Court believes Mr. Ahmed to be the owner of all of the deposit box assets. In the event, however, that these assets were jointly owned, Mr. Ahmed's joint ownership is enough to render the assets available to satisfy the judgment under Rule 69.[98]

And, lastly, if Ms. Ahmed alone owned these assets, the Court concludes that they would be available under *Cavanagh*. But, although there is evidence that jewelry and art was generally purchased by Mr. Ahmed, there is a lack of evidence about when each individual asset was purchased and how. For that reason, it is difficult to determine whether—if Ms. Ahmed did own these assets—she would have received "ill-gotten gains." The Court notes that the *Cavanagh* determination as to these assets is perhaps the only close question in any of these scores of evidentiary determinations.

Still, the Court concludes that any assets that would be owned by Ms. Ahmed are available to satisfy the judgment under *Cavanagh*. It is clear that Mr. Ahmed purchased these assets using accounts tainted with a mix of legitimate and illegitimate assets.[99] In such cases, because "the ill-gotten gains . . . were commingled . . . [t]he SEC is not required to trace specific funds to their ultimate recipient." *SEC v. Rosenthal*, 426 F. App'x. 1, 3 (2d Cir. 2011) (summary order). "Imposing such a tracing requirement would allow [a] defendant to escape disgorgement by . . . commingling and transferring such profits. . . . Denying disgorgement in

---

[98] Some of these assets are inarguably owned by both Ahmeds. Wedding presents, for example, fit into this category. *See* Asset Schedule at lns. 54.

[99] ECF Nos. 2706-6, 2706-7, 2706-8.

such a situation because of the SEC's inability to trace the funds would be inconsistent with disgorgements purpose to prevent unjust enrichment." *Id.* Because Mr. Ahmed used commingled legitimate and illegitimate funds and used them to purchase these assets, the Court concludes that these funds are available to satisfy the judgment pursuant to *Cavanagh*.

Independently, the Court concludes that, on the basis of Mr. Ahmed's course of behavior over the period in which he was committing frauds, it is more likely than not that Mr. Ahmed utilized ill-gotten gains to purchase these assets as a way to conceal the proceeds of his frauds. The Court's conclusion is based, in part, on the nature of the objects as small, valuable, easy to liquidate, and likely to hold their value or appreciate with time. For that reason, separate from the issue of commingling, these assets would be available under *Cavanagh*.

Lastly, the Harry Winston earrings,[100] which were recovered separately from the Harry Winston Ring,[101] are available to satisfy the judgment for much the same reasons as the other items in the deposit boxes. Chiefly, Ms. Ahmed testified that the earrings were purchased alongside the ring by Mr. Ahmed.[102] That is sufficient to render them available under the nominee doctrine as properly belonging to Mr. Ahmed, or, at minimum, as jointly owned by Mr. Ahmed and available under Rule 69 and Connecticut law.

---

[100] Asset Schedule at ln. 84.

[101] *Id.* at ln. 52.

[102] ECF No. 891-4 at 18.

### ix.    Painting "Ashoka's Pillar"

One remaining asset is a painting described as "Ashoka's Pillar." The Ahmeds conceded in a previous asset schedule that they jointly owned the painting, listed as Asset number 51.[103] And, as Ms. Ahmed concedes, both she and Mr. Ahmed were "involved in the purchase of the painting."[104] Ms. Ahmed does not claim that she alone purchased the painting. For that reason, the painting is undoubtedly jointly owned, and thus available to satisfy the judgment under Rule 69 and Connecticut law.

Because the record has no specifics about how the asset was purchased, and because the painting, unlike jewelry, is not necessarily easily transported and liquidated, the Court has no basis to determine whether it was purchased with ill-gotten assets. As a result, the Court declines to find the asset is, in the alternative, available under *Cavanagh*.

### x.    Assets in the names of the three Ahmed children

Nine accounts established pursuant to the Uniform Transfers to Minors Act (UTMA) to benefit the Ahmed children are disputed.[105] Ms. Ahmed is the custodian for three of these accounts, a family attorney was the custodian for three other accounts, and Mr. Ahmed was listed as the custodian for the remaining three.[106] Here, Mr. Ahmed is the equitable owner of these accounts as a matter of the exercise of this Court's equitable powers, but the accounts are unavailable for collection of a judgment against Mr. Ahmed as a matter of state law.

---

[103] ECF No. 862-1 at 2 ln. 43.

[104] Br. in Opp. at 84.

[105] The accounts are listed at Asset Schedule lns. 86–94.

[106] ECF No. 2760-1 at 7–8 lns. 86–94; ECF No. 888-24 at 1, 3, 5.

Mr. Ahmed refused to answer any questions regarding these accounts, particularly regarding the sources of the funds in these accounts.[107] From this refusal, the Court draws the adverse inference that the answers to these questions would have been against Mr. Ahmed's interests, namely that these answers would indicate that he was the owner of these accounts and that he funded the accounts with the proceeds of his frauds.

Further, the direct evidence in the record makes plain that Mr. Ahmed controlled all nine of these accounts. Mr. Ahmed directed wealth managers to transfer some of the children's accounts to a different bank, controlled which wealth managers supervised the accounts, and referred to the accounts as "my accounts."[108] *C.f. Commodity Futures Trading Comm'n v. EJS Cap. Mgmt., LLC*, No. 14-CV-3107, 2015 WL 5679688, at *9 (S.D.N.Y. Sept. 24, 2015) (concluding that a parent who "controlled [ ] UTMA accounts" had an "'equitable interest' in them and, as such, they are properly considered to be [parent's] assets" ).

The only sources of funds to these accounts that the Court can discern from the record come in the form of checks from family members and friends, but these are nothing more than a mere pass-through. The Ahmeds wrote checks to family members, who then turned around and wrote the same checks back to the children's accounts.[109] These family members then refused to testify regarding their contributions to the accounts entirely. Specifically, the family

---

[107] ECF No. 888-17 at 30.

[108] ECF No. 888-28 at 2, 3. Ms. Ahmed notes that she is copied on these emails and—with nothing more to support the claim than her say-so—claims that she directed Mr. Ahmed to send these emails. Br. in Opp. at 125. The Court finds this unlikely, given the language in Mr. Ahmed's email and his intimate involvement in the scheme to have family members deposit funds in these accounts and the creation of the accounts.

[109] *See* ECF No. 891-10 (collecting checks to family members and to the childrens' accounts).

members refused questions regarding whose money was used to fund contributions to the children's accounts and whether there was a direct agreement for the Ahmeds to give money to family and friends so that they would, in turn, contribute those funds to the children's accounts.[110] From this refusal, the Court draws the adverse inference that the answers to these questions would be against the family members' interests, namely that such an agreement existed, and that all of the funds contributed to these accounts by friends and family in fact originated with Mr. Ahmed. And Ms. Ahmed's own testimony essentially conceded as much: At the preliminary injunction hearing in this action, she stated that "I would gift — I wrote a check to my parents and to my sisters. It was a gift. They, in turn, gifted it to my children."[111]

Ms. Ahmed argues that under state law these accounts, in fact, belong to the children. But though state law has a role in the determination of Rule 69 enforcement of judgment proceedings, it does not determine this Court's application of the nominee doctrine (though it may, of course, have persuasive effect). *See Ahmed*, 72 F.4th at 408 n.18. Ms. Ahmed is right, however, that an "UTMA account cannot be executed upon by a judgment creditor in order to satisfy a debt owed by a judgment debtor if the judgment debtor is simply a custodian of the UTMA account." *Watts v. Chittenden*, No. NNHCV054014425S, 2012 WL 12128451, at *4 (Conn. Super. Ct. Mar. 24, 2012). State law seeks to protect the property interest of the child: "A transfer made pursuant to [the Connecticut UTMA] is irrevocable, and the custodial property is indefeasibly vested in the minor." Conn. Gen. Stat. § 45a–558h(b).

---

[110] ECF No. 628-10 (collecting deposition testimony).

[111] ECF No. 888-8 at 87.

The Court therefore concludes that these assets cannot be used to satisfy the judgment under Rule 69's reliance on state law. But while the children's status as sole possible beneficiaries of these accounts is relevant to one of the six nominee doctrine factors, it is far from dispositive. Other factors weigh in favor of concluding that Mr. Ahmed is the equitable owner of the accounts. Specifically, Mr. Ahmed exercised total control over the accounts and did so for the entirety of their existence prior to the asset freeze, and all were funded by Mr. Ahmed entirely.

The Court finds that, weighed against each other, these factors establish that Mr. Ahmed is the equitable owner of these accounts, and thus that these assets should be available to satisfy the judgment held by the SEC (and, likely, ultimately to Mr. Ahmed's victims). Mr. Ahmed's funding and control of all nine accounts outweigh the fact that the children are the sole beneficiaries and indicate that the accounts can more properly be described as belonging to Mr. Ahmed. Therefore, the Court concludes that he is the equitable owner of the accounts and thus that all nine accounts are available to satisfy the judgment under the nominee doctrine. The Court determines, however, that under Rule 69, Connecticut law forbids the SEC from reaching these assets to satisfy the judgment against Mr. Ahmed. The Court further notes that the nominee determination as to these assets is a close question.

### xi. Pershing LLC/Bank of New York Mellon Account x0166

Also at issue is an account ending in 0166 at Bank of New York Mellon. This account, listed at Asset number 78, is in Ms. Ahmed's name.[112] There is little evidence in the record to

---

[112] Asset Schedule at ln. 78.

show who exercised control over this account, but the evidence that is before the Court shows that Ms. Ahmed used the account to wire funds to her attorneys.[113] This evidence, however, is outweighed by evidence regarding the account's formation and funding. The account was funded by one of the Ahmeds' joint accounts (Fidelity account ending in 7540), which was itself funded, at least in part, by the proceeds of one of Mr. Ahmed's frauds.[114] Ms. Ahmed argues that the Fidelity account contained more than just ill-gotten assets.[115] But the district court's previous conclusion that Ms. Ahmed was a mere nominee for the Fidelity account was affirmed by the Second Circuit. *Ahmed*, 72 F. 4th at 409. The account was therefore funded by Mr. Ahmed's assets, and the limited evidence regarding the control of the account is therefore outweighed by the substantial evidence that Mr. Ahmed funded the account. Therefore, the Court finds that Mr. Ahmed was the equitable owner of the account.

At minimum, because he funded the Bank of New York Mellon account, Mr. Ahmed held an ownership interest in the account sufficient to establish its availability to satisfy the judgment under Rule 69 and Connecticut law.

### xii.    Iftikar A. Ahmed 2010 Irrevocable Insurance Trust ("Insurance Trust")

The Insurance Trust, which holds two life insurance policies, is at issue here.[116] Mr. Ahmed has stated that he "obtained and started [the] life insurance policies,"[117] and he paid

---

[113] Mot. for Post-Remand Relief at 9.

[114] *See generally* ECF No. 2760-8.

[115] Br. in Opp. at 128.

[116] Asset Schedule at lns. 26, 27.

[117] ECF No. 341 at 2 ¶ 2.

the premiums from personal accounts rather than creating a specific account for the Trust.[118] Ms. Ahmed points out that she, and not Mr. Ahmed, is the trustee of the Insurance Trust.[119] However, Ms. Ahmed's role as trustee does not outweigh the evidence that the account was funded and established by Mr. Ahmed. As a result, the Court concludes that Mr. Ahmed is the equitable owner of the Insurance Trust. At a minimum, Mr. Ahmed is a joint owner, sufficient to render the assets available under Rule 69 and Connecticut law.

### xiii.    Two paintings and one sculpture of a hand

There are three pieces of artwork (including two paintings and a sculpture) that are also disputed by the Parties.[120] The record reflects that it was likely Mr. Ahmed who purchased all three items from Spanierman Gallery, LLC, as he wrote checks to the gallery.[121] There is no evidence in the record relevant to control or to any other factor in the nominee analysis. Therefore, the Court concludes that Mr. Ahmed is the equitable owner of these assets and that they are available to satisfy the judgment against him.

Moreover, Ms. Ahmed herself admitted that the paintings, at least, were "purchased jointly."[122] That is sufficient to ensure that Mr. Ahmed is at least a joint owner and, therefore,

---

[118] *See* ECF No. 921-2.

[119] *See* ECF No. 2806-77 at 2.

[120] Asset Schedule at lns. 82–83.

[121] ECF No. 888-25 at 7, 8. There was also a wire transfer to Spanierman. *Id.* at 10. Ms. Ahmed contends that the paintings, at least, were purchased elsewhere. Br. in Opp. at 127. She cites only her own deposition to support this claim. During that deposition, she makes only a nondescript claim that "I remember going to a museum that held very beautiful artwork, and I—I believe that the paintings were purchased from there." ECF No. 2806-16 at 21. This nondescript answer is insufficient to overcome the evidence of Mr. Ahmed's practice of purchasing art himself.

[122] *Id.* at 21.

to render the paintings available under Rule 69 and Connecticut law. As to the sculpture, Ms. Ahmed repeatedly testified that the Ahmeds bought these sorts of items together (as they did the paintings).[123] The Court therefore concludes, in addition to the Court's earlier finding that the vast majority of the Ahmeds' purchased assets were funded by Mr. Ahmed. This is sufficient to ensure that the SEC has met its burden to show that the sculpture is, at least, jointly owned, and available for that reason.

Further, the Court concludes that the assets are available under the *Cavanagh* doctrine. Mr. Ahmed purchased the paintings using funds from personal accounts where he comingled legitimate and illegitimate assets.[124] Therefore, because "the ill-gotten gains . . . were commingled . . . [t]he SEC is not required to trace specific funds to their ultimate recipient." *Rosenthal*, 426 F. App'x. at 3. Because Mr. Ahmed comingled the assets in this case—and in the absence of some other evidence that he made these purchases only with legitimate assets— the Court concludes that the assets are available under *Cavanagh*.

### xiv.    Remaining miscellaneous items

There are several remaining assets for which the SEC makes no specific arguments regarding their availability to satisfy the judgment. These assets include: Northern Trust brokerage accounts in the names of both of the Ahmeds[125] and Chase Bank accounts in the names of both Ahmeds.[126]

---

[123] *Id.*

[124] ECF No. 888-25 at 7-8, 10; ECF No. 2760-7 (demonstrating Mr. Ahmed's movement of proceeds from "Company G" fraud into the account used to pay for Spanierman purchases).

[125] Asset Schedule at 45-48.

[126] *Id.* at 43-44.

There are also a number of individual assets that are disputed: Ms. Ahmed's handbag;[127] (2) the Diya Capital Management bank account,[128] (3) Blade Networks,[129] (4) Aldrich Capital Investment,[130] (5) an investment originally held at Fort Warren Capital Management,[131] (6) Reserve Media,[132] (7) the Iftikar Foundation bank check,[133] (8) Ms. Ahmed's Fidelity x5070 IRA,[134] (9) Ms. Ahmed's Fidelity x5760 IRA account,[135] (10) Ms. Ahmed's TD Bank checking account x2774,[136] (11) an investment in Lola Travel Company, and (12) the Relief Defendants' interest in Rakitfi.[137]

As a preliminary matter, Ms. Ahmed asserts that the SEC has waived any claim to these assets in failing to make specific arguments about their availability.[138] Not so. The SEC specifically requests time and again that the Court "adjudge that each disputed asset[] listed in

---

[127] *Id.* at 85.

[128] *Id.* at 61.

[129] *Id.* at 68.

[130] *Id.* at 69.

[131] *Id.* at 46.

[132] *Id.* at 70.

[133] *Id.* at 73.

[134] *Id.* at 76.

[135] *Id.* at 77

[136] *Id.* at 79.

[137] *Id.* at 72.

[138] Br. in Opp. at 119. Ms. Ahmed also argues that the SEC has waived any claim to the unnumbered investment in Lola travel Company. That investment is owned by I-Cubed, and the Court has adjudged that all I-Cubed assets are available for satisfaction of the judgment. *See supra* Sec. II.B.6.V.

[the Asset Schedule] is available to satisfy the judgment."[139] The SEC then makes a number of broadly-applicable arguments in favor of finding *all* assets available to satisfy the judgment. Requests regarding the availability of these assets, then, are plainly not waived by the SEC. First, many of these assets are controlled by the Court's determination that assets whose availability was not reliant on the nominee doctrine are not at issue on remand. That is true of the following assets: the Northern Trust accounts, the Chase Bank accounts, the Fidelity 5070 account, and the Rakitfi Holdings interest.

Next, Blade Networks, Aldrich Capital, Reserve Media, and Lola Travel are all owned by I-Cubed and have already been addressed in the Court's discussion of I-Cubed. Third, the SEC does raise specific arguments regarding Ashoka's Pillar, which has also already been adjudicated available herein.

That leaves only a few remaining items: the handbag, the DIYA Capital Management bank account, the Iftikar Foundation bank check, the Fidelity x5760 account, and the TD Bank x2774 account. The SEC, for its part, offers that these items are "of a small dollar value."[140] These items are difficult to adjudicate because neither party makes specific arguments with respect to the ownership of these assets. Ms. Ahmed merely presents her waiver argument, and the SEC provides only that it "has addressed these (and others) with its comprehensive arguments" and refers only to its broadly-applicable arguments—for example, that Mr. Ahmed "made almost all of the money in the Ahmed household" and that Ms. Ahmed "has admitted

---

[139] Mot. for Post-Remand Relief at 6.

[140] Reply Br. at 29.

that the Ahmeds shared their assets."[141] But the SEC carries the burden here, and though the Court generally agrees with the SEC as to these principles, such broad conclusions standing alone are insufficient to support a finding that an individual item is available for disgorgement or to satisfy the judgment. Therefore, the Court denies the SEC's request and concludes that these assets are not available to satisfy the judgment.

There are also two cash assets, both held by law firms,[142] for which the SEC offers tracing showing that these assets were transferred from accounts containing tainted funds.[143] Ms. Ahmed again rejoins that not all of the funds in the account were tainted,[144] but this misstates the burden she faces when the SEC has shown that funds in an account were tainted. After such a showing, the SEC is not required to trace which funds were used in a particular transaction; that burden—the bona-fide purchaser defense—falls to Ms. Ahmed. As a result, without specific evidence that these assets were not tainted, the Court concludes that these assets are available under *Cavanagh*. In addition, because these funds originated in joint accounts, Mr. Ahmed has at least a joint ownership of these funds sufficient to render them available under Rule 69 and Connecticut law.

Lastly, the Court notes that the SEC does not request determinations as to two other previously listed assets: Nos. 49 (an account determined to have no value) and 50 (a home in Greenwich that is the subject of bond forfeiture proceedings in Mr. Ahmed's aforementioned District of Massachusetts criminal case).

---

[141] *Id.*

[142] Asset Schedule at lns. 80-81.

[143] ECF No. 2760-6, 2760-7, & 2760-8.

[144] ECF No. 2806 at 132, ECF No. 2806-81 at 2.

III.    **CONCLUSION**

For the reasons stated above, the SEC's Motion for Post-Remand Relief is **granted in part and denied in part**. The Court awards supplemental enrichment for the period from the commencement of the asset freeze until the entrance of judgment in the amount of $12,539,632.53. The Court further adjudges that each of the assets disputed in the Asset Schedule is available to satisfy the judgment against Mr. Ahmed according to the theories specified herein with the exception of the five miscellaneous assets described above. If any party seeks clarification of any portion of this ruling, they may file a motion seeking such relief **on or before April 14, 2025.**

As to the few assets that the Court has found unavailable to satisfy the judgment, the Court will allow these assets to remain frozen until **April 28, 2025,** to allow the SEC or any other party to seek reconsideration or another form of relief with respect to these assets.

The Court **directs** the Receiver and the SEC to communicate regarding the distribution of the assets that are available to satisfy the judgment and are ready to be distributed, and to file that plan **on or before April 28, 2025.**

**SO ORDERED.**

Hartford, Connecticut
March 31, 2025

/s/Vernon D. Oliver
VERNON D. OLIVER
United States District Judge